# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MILTON LINHARES, Individually and On Behalf of All Others Similarly Situated, | No. 1:23-CV-02246-KMW-SAK |
| | Hon. Karen M. Williams, U.S.D.J. |
| Plaintiff, | Hon. Sharon A. King, Mag. |
| v. | MOTION DATE: June 5, 2023 |
| CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, THOMAS GOTTSTEIN, ULRICH KORNER, DAVID R. MATHERS, and DIXIT JOSHI | |
| Defendants. | |
| BRADEN TURNER, Individually and On Behalf of All Others Similarly Situated, | No. 1:23-cv-01476-KMW-SAK |
| | Hon. Karen M. Williams, U.S.D.J. |
| Plaintiff, | Hon. Sharon A. King, Mag. |
| v. | MOTION DATE: June 5, 2023 |
| CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KORNER, DIXIT JOSHI, THOMAS GOTTSTEIN, and DAVID R. MATHERS | |
| Defendants. | |

*(Additional Case Caption Continued on Following Page)*

| | |
|---|---|
| PATRICK CALHOUN, Individually and On Behalf of All Others Similarly Situated, | No. 1:23-cv-01297-KMW-SAK |
| | Hon. Karen M. Williams, U.S.D.J. |
| Plaintiff, | Hon. Sharon A. King, Mag. |
| v. | MOTION DATE: June 5, 2023 |
| CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KORNER, and DIXIT JOSHI | |
| Defendants. | |

## OMNIBUS MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF ALI DIABAT FOR CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF HIS SELECTION OF COUNSEL AND IN OPPOSITION TO THE <u>COMPETING MOTIONS FOR APPOINTMENT</u>

**KAHN SWICK & FOTI, LLC**

Kim E. Miller (*PHV* forthcoming)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Email: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Email: lewis.kahn@ksfcounsel.com

*Counsel for Lead Plaintiff Movant Ali Diabat and Proposed Lead Counsel for the Class*

**DECOTIIS, FITZPATRICK, COLE & GIBLIN, LLP**

Vincent M. Giblin
Richard F.X. Regan
61 South Paramus Road, Suite 250
Paramus, NJ 07652
Telephone: (201) 347-2136
Telephone: (201) 907-5276
Email: vgiblin@decotiislaw.com
Email: rregan@decotiislaw.com

*Local Counsel for Lead Plaintiff Movant Ali Diabat and Proposed Liaison Counsel for the Class*

# **TABLE OF CONTENTS**

**Page:**

I.   INTRODUCTION ........................................................................................1

II.  ARGUMENT...............................................................................................7

   A. All Three Related Actions Should Be Consolidated Under the Control of One Lead Plaintiff...................................................................................7

     1. The Rule 42(a) Factors Are Met................................................................7

     2. The Court Should Not Appoint a Separate, Co-Lead Plaintiff for the Bond Claims ..............................................................................................9

   B. Core Capital Should Not Be Appointed Lead Plaintiff of the Consolidated Action.....................................................................................................12

     1. Core Capital is Subject to Unique Defenses ..........................................12

       a. Core Capital Must Prove Its Bond Purchases Constitute "Domestic Transactions"........................................................................................13

       b. Core Capital Has Not Established That it Purchased the Bonds for its Own Account or That it Has Authority to Move As Lead Plaintiff on its Clients' Behalf................................................................................17

   C. Mr. Resit As Should Not be Appointed Lead Plaintiff of the Consolidated Action.....................................................................................................21

     1. Mr. Resit As Is Subject to Unique Defenses Based on the Timing of His Purchases ..............................................................................................21

     2. Tick-by-Tick Data Presented by Professor Diabat Calls Into Question the Veracity of Mr. Resit As' Trades ..........................................................26

     3. By Advocating for a Shorter Class Period, Mr. Resit As Is Not Acting in the Best Interests of the Class...............................................................29

     4. Mr. Resit As Failed to Provide Sufficient Information to Establish His Adequacy ..............................................................................................31

     5. Mr. Resit As' Certification Demonstrates That His Motion is Lawyer-Driven ...................................................................................................35

     6. Results of an Independent Investigation Contradict Representations Made By Mr. Resit As' Counsel and Raise Doubts About His Adequacy and Typicality..............................................................................................36

III. CONCLUSION..........................................................................................40

ii

# TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Absolute Activist Value Master Fund Ltd v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ..................................................................................13

*Beck v. Maximus, Inc.*,
  457 F.3d 291 (3d Cir. 2006) ...............................................................................17

*Berger v. Compaq Computer Corp.*,
  279 F.3d 313 (5th Cir. 2002) ..............................................................................31

*Borenstein v. Finova Grp.*,
  No. 00-cv-0619, 2000 U.S. Dist. LEXIS 14732 (D. Ariz. Aug. 28, 2000) ...........8

*Clair v. DeLuca*,
  232 F.R.D. 219 (W.D. Pa. 2005) ....................................................... 31, 32, 33, 34

*De Vito v. Liquid Holdings Grp., Inc.*,
  No. 15-cv-6969, 2018 U.S. Dist. LEXIS 217963 (D.N.J. Dec. 31, 2018) ...........29

*Deering v. Galena Biopharma, Inc.*,
  No. 14-cv-00367, 2014 U.S. Dist. LEXIS 140766 (D. Or. Oct. 3, 2014) ............30

*Eichenholtz v. Verifone Holdings, Inc.*,
  No. 07-cv-06140, 2008 U.S. Dist. LEXIS 64633 (N.D. Cal. Aug 22, 2008).......30

*Erickson v. Snap, Inc.*,
  No. 17-cv-03679, 2017 U.S. Dist. LEXIS 221050 (C.D. Cal. Sep. 18, 2017).....24

*Ezra Charitable Trust v. Rent-Way Inc.*,
  136 F. Supp. 2d 435 (W.D. Pa. 2001)..................................................................19

*Faris v. Longtop Fin. Techs. Ltd.*,
  No. 11-cv-3658, 2011 U.S. Dist. LEXIS 112970 (S.D.N.Y. Oct. 4, 2011) .........23

*Freudenberg v. E\*Trade Fin. Corp.*,
  No. 07-cv-8538, 2008 U.S. Dist. LEXIS 62767 (S.D.N.Y. July 16, 2008) .........11

*Gonzalez v. Cano Health, Inc.*,
  No. 22-cv-20827, 2022 U.S. Dist. LEXIS 238706 (S.D. Fla. Dec. 22, 2022) .....39

*Hevesi v. Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004) ..................................................................................11

iii

*Hom v. Vale, S.A.*,
  No. 15-cv-9539, 2016 U.S. Dist. LEXIS 28863 (S.D.N.Y. Mar. 7, 2016) ..........29

*In Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineracao S.A.*,
  No. 16-cv-8800, 2019 U.S. Dist. LEXIS 101561 (S.D.N.Y. June 18, 2019) 14, 16

*In re Aphria, Inc. Sec. Litig.*,
  342 F.R.D. 199 (S.D.N.Y. 2022) ....................................................................17

*In re Bank One Shareholders Class Actions*,
  96 F. Supp. 2d 780 (N.D. Ill. 2000) ...............................................................20

*In re Cardinal Health, Inc. Sec. Litig.*,
  226 F.R.D. 298 (S.D. Ohio 2005) ...................................................................22

*In re Cendant Corp. Litig.*,
  182 F.R.D. 476 (D.N.J. 1998)........................................................ 3, 10, 11, 35

*In re CenturyLink Sales Practices & Sec. Litig.*,
  MDL No. 17-2795, 2018 U.S. Dist. LEXIS 66926 (D. Minn. Apr 20, 2018) .8, 11

*In re Critical Path*,
  156 F. Supp. 2d 1102 (N.D. Cal. 2001)...........................................................28

*In re CTI BioPharma Corp. Sec. Litig.*,
  No. 16-cv-0216, 2016 U.S. Dist. LEXIS 119301
  (W.D. Wash. Sept. 2, 2016) ...........................................................................11

*In re DVI Inc. Sec. Litig.*,
  249 F.R.D. 196 (E.D. Pa. 2008)......................................................................24

*In re Enron Corp., Sec. Litig.*,
  206 F.R.D. 427 (S.D. Tex. 2002)............................................................. 10, 11

*In re Gemstar-TV Guide Int'l Sec. Litig.*,
  209 F.R.D. 447 (C.D. Cal. 2002).....................................................................34

*In re Harcourt Brace Jovanovich Sec. Litig.*,
  838 F. Supp. 109 (S.D.N.Y. 1993) ..................................................................22

*In re Hebron Tech. Co. Sec. Litig.*,
  No. 20-cv-4420, 2020 U.S. Dist. LEXIS 169480 (S.D.N.Y. Sep. 16, 2020).......12

*In re Herley Indus. Secs. Litig.*,
  No. 06-cv-2596, 2009 U.S. Dist. LEXIS 91600 (E.D. Pa. Sept. 30, 2009) .........18

*In re HEXO Corp. Sec. Litig.*,
No. 19-cv-10965, 2020 U.S. Dist. LEXIS 166312 (S.D.N.Y. Sep. 11, 2020).....32

*In re Lucent Techs., Inc. Sec. Litig.*,
194 F.R.D. 137 (D.N.J. 2000)..................................................................................9

*In re Oxford Health Plans, Inc. Sec. Litig.*,
182 F.R.D. 42 (S.D.N.Y. 1998) ............................................................................38

*In re Petrobras Sec. Litig.*,
104 F. Supp. 3d 618 (S.D.N.Y. 2015) ...........................................................4, 23

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016) ..........................................................................10

*In re Tarragon Corp. Sec. Litig.*,
No. 07-cv-7972, 2007 U.S. Dist. LEXIS 91418 (S.D.N.Y. Dec. 6, 2007)...........35

*In re Te Holdcorp LLC*,
No. 20-cv-11442, 2022 U.S. Dist. LEXIS 58293 (D. Del. Mar 30, 2022)...........35

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
209 F.R.D. 35 (S.D.N.Y. 2002) ............................................................................20

*In re Tyco Intern., Ltd.*,
236 F.R.D. 62 (D.N.H. 2006) ...............................................................................20

*In re Valeant Pharms. Int'l, Inc. Secs. Litig.*,
No. 15-cv-7658, 2018 U.S. Dist. LEXIS 191439 (D.N.J. Nov 7, 2018)................7

*In re Valence Tech. Sec. Litig.*,
No. 95-cv-20459, 1996 U.S. Dist. LEXIS 21774 (N.D. Cal. Mar. 14, 1996)......24

*Irving Firemen's Relief & Ret. Fund v. Tesco PLC*,
No. 14-cv-08495, 2015 U.S. Dist. LEXIS 38635 (S.D.N.Y. Mar. 19, 2015) ......28

*Jersey Cent. Power Light Co. v. Lacey Tp.*,
772 F.2d 1103 (3d Cir. 1985) ...............................................................................35

*Kabak v. Becton, Dickinson & Co.*,
No. 20-cv-2155, 2020 U.S. Dist. LEXIS 100941 (D.N.J. June 9, 2020) .............11

*Kanefsky v. Honeywell Int'l Inc.*,
No. 18-cv-15536, 2020 U.S. Dist. LEXIS 87108 (D.N.J. May 18, 2020) ...........23

*Karp v. Diebold Nixdorf, Inc.*,
No. 19-cv-6180, 2019 U.S. Dist. LEXIS 188670 (S.D.N.Y. Oct. 30, 2019) .......33

*Khunt v. Alibaba Grp. Holding Ltd.*,
  102 F. Supp. 3d 523 (S.D.N.Y. 2015) ...............................................................35

*Lang v. Tower Grp. Int'l, Ltd.*,
  No. 13-cv-5852, 2014 U.S. Dist. LEXIS 86496 (S.D.N.Y. June 17, 2014).........28

*Lawless v. Aurora Cannabis Inc.*,
  No. 20-cv-13819, 2021 U.S. Dist. LEXIS 127153 (D.N.J. July 7, 2021)............35

*Lundy v. Ideanomics, Inc.*,
  No. 20-cv-4944, 2020 U.S. Dist. LEXIS 236652 (S.D.N.Y. Dec. 16, 2020).......23

*Marcus v. J.C. Penney Co.*,
  No. 13-cv-0736, 2014 U.S. Dist. LEXIS 197529 (E.D. Tex. Feb. 28, 2014) ......30

*Morrison v. Australia Bank*,
  561 U.S. 247 (2010)................................................................................. 13, 16

*Nakamura v. BRF S.A.*,
  No. 18-cv-2213, 2018 U.S. Dist. LEXIS 110187 (S.D.N.Y. July 2, 2018) .........34

*Parkcentral Glob. HUB Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) ...............................................................................16

*Pelletier v. Endo Int'l PLC*,
  No. 17-cv-5114, 2021 U.S. Dist. LEXIS 21207 (E.D. Pa. Feb. 4, 2021).............25

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*,
  229 F.R.D. 395 (S.D.N.Y. 2004).........................................................................39

*Piven v. Sykes Enters.*,
  137 F.Supp. 2d 1295 (M.D. Fla. 2000).................................................................34

*Rodriguez v. Draftkings Inc.*,
  No. 21-cv-5739, 2021 U.S. Dist. LEXIS 219489 (S.D.N.Y. Nov. 12, 2021) ......28

*Sgalambo v. McKenzie*,
  268 F.R.D. 170 (S.D.N.Y. 2010) .........................................................................31

*Silverberg v. Dryships Inc.*,
  No. 17-cv-4547, 2018 U.S. Dist. LEXIS 225563 (E.D.N.Y. Aug. 21, 2018) ......39

*Smith v. Suprema Specialties*,
  206 F. Supp. 2d 627 (D.N.J. 2002).......................................................................19

*Sprint Communs. Co. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008)................................................................................. 17, 18

*Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*,
No. 11-cv-247, 2012 U.S. Dist. LEXIS 118693 (D.N.J. Aug. 22, 2012)..............17

*Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*,
No. 11-cv-6247, 2012 U.S. Dist. LEXIS 118692 (D.N.J. June 30, 2012) ...........17

*United States v. Georgiou*,
777 F.3d 125 (3d Cir. 2015) ...............................................................................13

*Versarge v. Twp. Of Clinton NJ.*,
984 F.2d 1359 (3d Cir. 1993) .............................................................................35

*Weisz v. Calpine Corp.*,
No. 02-cv-1200, 2002 U.S. Dist. LEXIS 27831 (N.D. Cal. Aug. 15, 2002)2, 7, 19

**Statutes**

15 U.S.C. § 78c(a)(10) ........................................................................................9

## I.    INTRODUCTION

Professor Ali Diabat respectfully submits this omnibus memorandum in opposition to the competing motions and in further support of his motion for consolidation of all cases and appointment as Lead Plaintiff and approval of selection of Counsel. On May 8, 2023, eight timely motions seeking appointment as lead plaintiff were filed in this Action by: (1) Core Capital Partners, Ltd. ("Core Capital") (ECF No. 19); (2) Mehmet Resit As (ECF No. 18);[1] (3) Professor Ali Diabat (ECF No. 16); (4) Xiyi Wang (ECF No. 17) (5) Paul Yang (ECF No. 14); (6) Michael J. Ross and Cleveland Capital Co. Ltd. (ECF No. 11); (7) Chung Lai Ken Ng (ECF No. 12); and (8) Jun Wang (ECF No. 15). Mr. Ross and Cleveland Capital and Mr. Jun Wang have withdrawn their motions, and Mr. Ng, Mr. Xiyi Wang, and Mr. Pau Yang have all filed notices of non-opposition with respect to the pending motions, conceding that they did not have the largest financial interest in the matter. *See* ECF Nos. 20 (Mr. Ross and Cleveland Capital); 21 (Mr. Jun Wang); 22 (Mr. Ng); 23 (Mr. Paul Yang); and 24 (Mr. Xiyi Wang).

Recognizing that consolidation is appropriate here, all but one of the competing movants sought consolidation of all three Related Actions.[2] Movant Resit

---

[1] For the sake of brevity, and to distinguish him from Mr. Halil As, throughout the brief Movant Mehmet Resit As will be referred to as "Mr. Resit As."

[2] *Calhoun, et al. v. Credit Suisse Group AG, et al.*, No. 1:23-cv-01297 (the "*Calhoun* Action"); *Turner, et al. v. Credit Suisse Group AG, et al.*, No. 1:23-cv-01476 (the

As, however, stands alone in arguing that the *Linhares* Action should not be consolidated with the *Calhoun* and *Turner* Actions on the sole basis that it "seeks to include Credit Suisse bondholders." ECF No. 18-2 (Resit As Brief) at 2. But bonds, which constitute "securities" under the Securities Exchange Act of 1934 (the "Exchange Act"), were already included within the class definition of the first-filed *Calhoun* Action, which alleged Exchange Act claims on behalf of purchasers of all "Credit Suisse securities…." *Calhoun* Compl. at ¶ 1.[3] Mr. Resit As' argument that the *Linhares* Action should therefore only be "coordinated" with the *Calhoun* and *Turner* Actions should be rejected, as it is based on a distinction that does not exist. In fact, courts regularly consolidate securities class actions that contain both stocks and bonds where, as here, the Rule 42(a) factors are met. *See*, *e.g.*, *Weisz v. Calpine Corp.*, No. 02-cv-1200, 2002 U.S. Dist. LEXIS 27831, at *9 (N.D. Cal. Aug. 15, 2002). Promoting another unique position not advanced by any of the seven other competing movants, Mr. Resit As also argues that separate lead plaintiffs and lead counsel should be appointed for stockholders and bondholders. This argument also

---

"*Turner* Action"); and *Linhares, et al. v. Credit Suisse Group AG, et al.*, No. 1:23-cv-02246 (the "*Linhares* Action") (collectively, the "Related Actions").

[3] The *Calhoun* Action was brought on behalf of purchasers of "Credit Suisse securities" (*Calhoun* Compl. at ¶ 1); the *Turner* Action was brought on behalf of purchasers of "Credit Suisse American Depository Shares ("ADSs")" (*Turner* Compl. at ¶ 1); and the *Linhares* Action was brought on behalf of purchasers of "Credit Suisse Securities, *including* the Company's AT1 Bonds" (*Linhares* Compl. at ¶ 1) (emphasis added).

should be rejected. It is well-established that purchasers of one type of security can adequately represent purchasers of other types of securities in the same action, and creating a sub-class would "would injure the purpose of the PSLRA by fragmenting the plaintiff class and decreasing client control." *In re Cendant Corp. Litig.*, 182 F.R.D. 476, 479-80 (D.N.J. 1998).

Turning to the motions for lead plaintiff appointment, Professor Diabat is the most adequate plaintiff. *See In re Cendant Corp. Litig.,* 264 F.3d 201, 267 (3d Cir. 2001) (instructing that if a movant with the largest financial interest does not satisfy the typicality and adequacy requirements, the court must look to other movants).

While Core Capital claims to have the largest financial loss, just hours before the filing deadline of this brief, counsel for Core Capital contacted counsel for Professor Diabat and conceded that Core Capital would not seek lead plaintiff for the "whole class" or of the "ADSs." *See* Supplemental Declaration of Vincent M. Giblin ("Supp. Giblin Decl."), submitted contemporaneously herewith, at Exhibit A (Supplemental Declaration of Kim E. Miller), at ¶ 4. However, Core Capital still intends to seek "lead" for the bonds. *Id*. In addition to conceding it is not a proper lead plaintiff for the class, any presumption in Core Capital's favor is rebutted due to its apparent lack of standing. Core Capital is subject to a unique and two-pronged standing defense that would jeopardize all Class members if it were to be appointed lead plaintiff and would jeopardize non-AT1 bond purchasers if it were appointed to

3

represent all bondholders. First, while Core Capital attests to having purchased AT1 Bonds in "domestic transactions," as required under controlling Supreme Court precedent, that representation is contrary to the December 2, 2020, Information Memorandum for Credit Suisse's AT1 Bonds (the "AT1 Prospectus"), which demonstrates Core Capital purchased AT1 Bonds issued pursuant to Regulation S of the Securities Act of 1933 (the "Securities Act") outside the United States. Second, despite the fact that Core Capital's own website and Bahamian regulatory filings suggest it operates as a broker-nominee, Core Capital has failed to submit evidence that it made any purchases on behalf of its own account, or, conversely, that it possesses the requisite authority to move on behalf of those clients for whom it purchased AT1 Bonds. For these reasons, Core Capital is not an adequate or typical lead plaintiff of the Class as a whole nor an adequate or typical lead plaintiff of all bondholders. Indeed, no niche plaintiffs are necessary or appropriate here.

Next, any presumption in favor of Mr. Resit As – the movant with the next largest asserted loss – is rebutted because Mr. Resit As is inadequate and atypical under Rule 23. First, all of Mr. Resit As' transactions in Credit Suisse securities occurred *after* the first (and most impactful) alleged partial corrective disclosure, which "raises serious questions regarding [his] reliance on the alleged misrepresentations and omissions." *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015). Second, Professor Diabat submits herewith 'Tick-by-Tick'

4

data which does not match the trading information provided in Mr. Resit As' certification, calling into question the veracity of his alleged trades. Third, as Mr. Resit As concedes in his brief, "a more inclusive class period is favored at the lead plaintiff stage." ECF No. 18-2 at 1 n.1. Yet – against the best interests of the Class – Mr. Resit As attempts to drastically *shorten* the class period by arguing that the more comprehensive *Linhares* Action should not be consolidated with the *Calhoun* and *Turner* Actions. This decision appears to be lawyer-driven, as Mr. Resit As' certification was signed before the *Linhares* Action was even filed. Fourth, Mr. Resit As' bare-bones PSLRA certification is insufficient to establish his adequacy to serve as lead plaintiff, and those defects cannot be cured by arguments made by his attorneys in their brief. And finally, an independent investigation conducted by Professor Diabat, with the assistance of Turkish counsel, has uncovered that Mr. Resit As does not "own" a grain company, as the brief filed by his counsel attests without a supporting declaration. Rather, it appears he co-founded a grain company – Rus Agro Trade -- with Mr. Halil As. Mr. Halil As now owns 100% of the company. The Turkish equivalent to the SEC recently suspended him from trading on the Turkish stock exchange and multiple criminal complaints were initiated against him for related incidences of securities fraud, insider trading, and misconduct. Five days after Mr. Halil As' suspension, Mr. Resit As purchased millions of dollars of Credit Suisse ADSs. Mr. Diabat has rebutted any presumption

5

in favor of Mr. Resit As.

Professor Diabat is the movant with the next largest financial loss, having lost **$2,916,082.08** on his purchases of Credit Suisse ADSs. As detailed in his opening motion, Professor Diabat has made a *prima facie* showing that he satisfies the typicality and adequacy requirements of Rule 23. Further, the interests of Professor Diabat, who purchased Credit Suisse ADSs and was damaged thereby, are clearly aligned with the members of the Class, and there is no evidence of any antagonism between Professor Diabat's interests and those of the other members of the Class. Moreover, Professor Diabat has retained competent and experienced counsel to prosecute these claims and is well-suited for the role as Lead Plaintiff in this matter, having demonstrated a commitment to this litigation by filing a timely motion for appointment as Lead Plaintiff with supporting documentation. No competing movant has rebutted or can rebut the presumption in favor of appointment of Professor Diabat.

Based on the foregoing, and for the reasons discussed in Movant's opening brief and below, this Court should consolidate the three Related Actions, appoint Professor Diabat as Lead Plaintiff, and approve Professor Diabat's choice of Kahn Swick & Foti, LLC ("KSF") as Lead Counsel and DeCotiis FitzPatrick Cole & Giblin, LLC as Liaison Counsel for the Class.

## II.    ARGUMENT

### A.    All Three Related Actions Should Be Consolidated Under the Control of One Lead Plaintiff

#### 1.    The Rule 42(a) Factors Are Met

The Related Cases all assert claims against Credit Suisse and various related defendants under the Securities Exchange Act, on behalf of purchasers and acquirors of Credit Suisse securities and/or ADSs, arising out of misrepresentations regarding Credit Suisse's business and financial condition in public filings. Nevertheless, Mr. Resit As alone argues that the *Linhares* Action should not be consolidated with the *Calhoun* and *Turner* Actions because it "seeks to include Credit Suisse bondholders" and, instead, it should be "coordinated" with those two cases, with a separate lead plaintiff and lead counsel. ECF No. 18-2 at 6-9.

But courts regularly consolidate securities fraud class actions involving different equity and debt securities where, as here, they are premised upon the same factual and legal issues, finding that any unique or divergent issues among them can be addressed at the class certification stage. For example, in *Weisz*, the court examined whether 14 securities fraud class actions – 13 asserting shareholder claims and 1 asserting bondholder claims – should be consolidated. 2002 U.S. Dist. LEXIS 27831, at *9. The court found in the affirmative, concluding that "the differences inherent in bondholder versus shareholder claims are outweighed by the fact that the claims alleged in [the bondholder action] and the remaining actions are based on the same alleged course of conduct." *Id.* The court also found that "any need to create a

7

subclass for the bondholders may be addressed at the time of class certification." *Id.* at \*34 n.4. *See also In re Valeant Pharms. Int'l, Inc. Secs. Litig.*, No. 15-cv-7658, 2018 U.S. Dist. LEXIS 191439, at \*15-26 (D.N.J. Nov 7, 2018) (consolidating case alleging class of purchasers of call options on Valeant common stock with purchasers of Valeant equity securities and senior notes and concluding that "much of the prejudice [plaintiff] alleges are future ills that may be resolved as this litigation progresses"); *In re CenturyLink Sales Practices & Sec. Litig.*, MDL No. 17-2795, 2018 U.S. Dist. LEXIS 66926, at \*10-12 (D. Minn. Apr 20, 2018) (consolidating case asserting claims on behalf of CenturyLink noteholders with cases asserting claims on behalf of "Centurylink securities");[4] *Miller v. Ventro Corp.*, No. 01-cv-01287, 2001 U.S. Dist. LEXIS 26027, at \*13-14 (N.D. Cal. Nov. 28, 2011) (consolidating stockholder and bondholder actions "based on the same factual allegations"); *Borenstein v. Finova Grp.*, No. 00-cv-0619, 2000 U.S. Dist. LEXIS 14732, at \*10-11 (D. Ariz. Aug. 28, 2000) (consolidating cases involving common stock and noteholder claims because "[t]he differences between the claims of the common stock and the note purchasers do not eliminate the benefits of consolidation at this time," but noting that court would address additional issues at class

---

[4] The court noted that "the PSLRA's definition of 'security' is broad enough to encompass notes" and, therefore, "the noteholders' claims were already encompassed within the consolidated actions." 2018 U.S. Dist. LEXIS 66926, at \*10-11.

8

certification stage).[5]

Because the Related Cases involve common questions of law and fact, and because Mr. Resit As "has not sufficiently established that the prejudice, if any, that would result from consolidation is not outweighed by the efficiencies and cost savings of consolidation," *Valeant*, 2018 U.S. Dist. LEXIS 191439, at *15-16, the Related Cases should be consolidated.

### 2. The Court Should Not Appoint a Separate, Co-Lead Plaintiff for the Bond Claims

Professor Diabat does not dispute that *domestic* purchasers of Credit Suisse's AT1 Bonds (which constitute "securities" as defined under the Exchange Act, 15 U.S.C. § 78c(a)(10)) may be included in the definition of the Class.[6] Nevertheless,

---

[5] *See also Mullen v. Wells Fargo & Co.*, No. 20-cv-07674, 2021 U.S. Dist. LEXIS 48402, at *7 (N.D. Cal. Mar. 15, 2021) (consolidating case alleging class of "securities purchasers" with case alleging class of "common stock purchasers"); *In re Carnival Corp. Secs. Litig.,* No. 20-cv-22202, 2020 U.S. Dist. LEXIS 205773, at *10 (S.D. Fla. Oct. 30, 2020) (consolidating case brought on behalf of sellers of put contracts and purchasers of call options with action on behalf of common stock and securities purchasers); *Simmons v. Spencer*, No. 13-cv-8216, 2014 U.S. Dist. LEXIS 58743, at *6-7 (S.D.N.Y. Apr. 24, 2014) (consolidating cases with classes of purchasers of "Fab publicly traded securities" and purchasers of "common stock, call options, or sold put options of Fab").

[6] AT1 bonds are also known as "contingent convertible" bonds or notes ("CoCos"), or "enhanced capital notes" ("ECNs") and are primarily issued by European financial institutions. CoCos are high-yield, high-risk products that are convertible to equity or stock upon a specific strike price or triggering event. One of the primary drivers of CoCos' popularity is their ability to act as additional Tier 1 capital so that European banks can meet Basel III capital requirements. *See* https://www.investopedia.com/terms/c/contingentconvertible.asp (last accessed May 22, 2023).

there is no reason why he -- as a purchaser of Credit Suisse ADSs -- cannot adequately represent a unified Class consisting of both ADS purchasers and domestic bond purchasers (among other Credit Suisse securities). *See, e.g.*, *In re Lucent Techs., Inc. Sec. Litig.*, 194 F.R.D. 137, 150 (D.N.J. 2000) ("Rule 23(a)(3) does not require the claims of the Proposed Lead Plaintiffs to be identical to those of the class. Rather the typicality requirement is satisfied when the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other members and is based on the same legal theory."); *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 361 (S.D.N.Y. 2016) ("Because the same alleged misconduct drives plaintiffs' claims, regardless of whether they arise from purchases of Notes, common ADS, or preferred ADS, the interests of all members of the Exchange Act Class are aligned."); *In re Enron Corp., Sec. Litig.*, 206 F.R.D. 427, 445 (S.D. Tex. 2002) ("[C]ourts have repeatedly concluded that stock purchasers can represent purchasers of debt instruments and vice versa in the same action.") (collecting cases).

Further, as the court in *Cendant* recognized, "[m]ore likely than not, the putative class in any large shareholder action will be composed of plaintiffs whose portfolios differ in composition from one another. This, however, does not justify the appointment of potentially innumerable co-lead plaintiffs to ensure that each individual interest is represented." 182 F.R.D. at 148. Thus, while courts consistently hold that purchasers of one type of security can adequately represent purchasers of

10

other types of securities in the same action, they have also rejected subclassing for different types of securities or "niche" claims:

> [A]ny requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff—namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole.

*Kabak v. Becton, Dickinson & Co.*, No. 20-cv-2155, 2020 U.S. Dist. LEXIS 100941, at *9 (D.N.J. June 9, 2020) (citing *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004)); *see also CenturyLink*, 2018 U.S. Dist. LEXIS 66926, at *13 ("Appointing different lead plaintiffs for stock versus debt holders is not called for, because 'splintering the action or appointing multiple Lead Plaintiffs to represent specialized interests, especially in light of the common facts and legal issues here, would undermine the purpose of the PSLRA.'"); *In re CTI BioPharma Corp. Sec. Litig.*, No. 16-cv-0216, 2016 U.S. Dist. LEXIS 119301, at *12 (W.D. Wash. Sept. 2, 2016) (declining to appoint co-lead plaintiffs for preferred and common stock); *Freudenberg v. E\*Trade Fin. Corp.*, No. 07-cv-8538, 2008 U.S. Dist. LEXIS 62767, at *15-17 (S.D.N.Y. July 16, 2008) ("In light of the Securities Exchange Act's broad definition of 'security,' courts have appointed as lead plaintiffs purchasers of a wide variety of financial instruments. Further, they often appoint purchasers of one type of securities to represent purchasers of other types of securities of the same issuer where the interests of those purchasers are aligned."); *Enron*, 206 F.R.D. at 451

11

(refusing to fragment class into separate subclasses for different securities or appoint multiple co-lead plaintiffs, as "splintering the action or appointing multiple Lead Plaintiffs to represent specialized interests, especially in light of the common facts and legal issues here, would undermine the purpose of the PSLRA"); *Cendant*, 182 F.R.D. at 479-80 (reasoning that creating a subclass "would injure the purpose of the PSLRA by fragmenting the plaintiff class and decreasing client control").

Finally, Professor Diabat notes that the *Calhoun* and *Linhares* Actions encompass affected purchasers of *all* Credit Suisse "securities," including ADSs, AT1 Bonds, and other securities (including options). Importantly, the AT1 Bonds are not even the only Credit Suisse debt securities encompassed by the Related Actions.

**B.    Core Capital Should Not Be Appointed Lead Plaintiff of the Consolidated Action**

1.    Core Capital is Subject to Unique Defenses

"Before disqualifying a potential lead plaintiff on [the basis that he is subject to a unique defense], the Court need not conclude that the defense is likely to or will succeed." *In re Hebron Tech. Co. Sec. Litig.*, No. 20-cv-4420, 2020 U.S. Dist. LEXIS 169480, at *17 (S.D.N.Y. Sep. 16, 2020) (citation omitted). "Rather, it must only find 'at least a potential that the presumptively most adequate lead plaintiff will be subject to unique defenses.' *Id.* (citation omitted). "This approach protects members of the putative class, because even ultimately unsuccessful unique defenses

may 'divert attention from the substance of the basic claim,' and class members are 'entitled to be represented by someone unhindered by' such distractions." *Id.* (citation omitted).

Here, Core Capital is subject to several unique defenses that render it inadequate to serve as lead plaintiff.

> a.     *Core Capital Must Prove Its Bond Purchases Constitute "Domestic Transactions"*

In *Morrison v. Australia Bank*, the Supreme Court limited the application of Section 10(b) of the Exchange Act to two different contexts: (1) transactions involving "the purchase or sale of a security listed on an American stock exchange," and (2) transaction involving "the purchase or sale of any other security in the United States." 561 U.S. 247, 273 (2010). While the ADSs Professor Diabat purchased were listed on the New York Stock Exchange and therefore fall neatly within prong one of *Morrison*, the bonds that Core Capital purchased were not listed on a U.S. exchange, and therefore must be a "domestic transaction" within prong two in order for Section 10(b) to apply.

The Third Circuit follows the Second Circuit's position in *Absolute Activist* that "a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015) (quoting *Absolute Activist Value Master Fund Ltd v. Ficeto*, 677 F.3d 60, 69 (2d Cir.

13

2012)). Facts that demonstrate the situs of irrevocable liability include the location for the formation of contracts, placement of purchase orders, passing of title or exchange of money. *Id.* Such a showing is often difficult with bond transactions, and at least one court has dismissed an action with prejudice after affording plaintiffs several different attempts to make the required showing. *See In Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineracao S.A.*, No. 16-cv-8800, 2019 U.S. Dist. LEXIS 101561, at *17-18 (S.D.N.Y. June 18, 2019).

While Core Capital's submissions assert, without any substantiation, that it purchased Credit Suisse bonds "in domestic transactions in the U.S.," (ECF No. 19-2 at 3, 12; *see also* Declaration of Christian Quege (the "Quege Declaration"; ECF No. 19-3) at 15 ¶¶ 2, 3), Core Capital is a Bahamian entity with principal executive offices located in Nassau, Bahamas. *See* Supp. Giblin Decl. at Exhibit B (SCB Registrant Excerpt). By his own admission, moreover, Core Capital's director -- who purportedly purchased the Credit Suisse bonds at issue -- lives in Nassau, Bahamas. *See* ECF No. 19-3 at ¶ 2. Indeed, Core Capital's website touts the "alluring regulatory administration" of the Bahamas as one of the reasons it "is an ideal jurisdiction for business development," such that "CORE utilizes the strengths that the jurisdiction offers to benefit our clients' diverse needs and requirements." *See* Supp. Giblin Decl. at Exhibit C (Excerpts from Core Capital Website, last accessed May 22, 2023). Thus, it is unclear how Core Capital, a foreign entity operating in a

14

foreign country, purchased the bonds of a foreign issuer (which are not listed on a U.S.-based exchange), in domestic transactions in the United States. *See Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 293 (2d Cir. 2021) ("A conclusory assertion that securities transactions 'took place in the United States' by itself will not satisfy the domestic transaction requirement.").

The Quege Certification attaches a schedule listing Core Capital's purported "domestic transactions" in Credit Suisse AT1 Bonds. *See* Quege Cert (ECF No. 19-3) at 13. Under a column titled "Security Type," the CUSIP[7] for each of those transactions is listed as "H3698DDD3." *Id.* The AT1 Prospectus, however, unequivocally reveals that this CUSIP corresponds to AT1 Bonds sold *outside* the U.S. to non-U.S. persons pursuant to Regulation S of the Securities Act. *See* Supp. Giblin Decl. at Exhibit D (excerpts from AT1 Prospectus) at iii, 9. As the AT1 Prospectus explains, Credit Suisse's AT1 Bonds, "are being offered and sold ***outside the United States to non-U.S. persons in reliance on Regulation S*** and within the United States to persons reasonably believed to be QIBs [Qualified Institutional Buyers] in reliance on Rule 144a." *Id.* at iii (emphasis added). The AT1 Prospectus then sets forth discrete CUSIP codes for the "Rule 144a Notes" and the "Regulation

---

[7] CUSIP is an acronym for the Committee on Uniform Security Identification Procedures. A CUSIP code is a unique identifier attached to the equity, debt, and other securities issued by a company.

S Notes," with the former being assigned "225401AS7," and the latter being assigned "H3698DDD3." *Id.* at 9.

Put simply, Core Capital itself certified, through Quege, that the Credit Suisse AT1 Bonds it purchased were those offered pursuant to Regulation S, *not* Rule 144a. Therefore, Core Capital's purchases appear to be foreign, *not* domestic. *See Banco Safra*, 849 Fed. Appx. at 295 (affirming dismissal of complaint alleging Exchange Act violations predicated on foreign plaintiff's purchases of foreign defendant's bonds issued under Regulation S because "the SAC does not plausibly allege a domestic securities transaction that satisfies the requirements of *Morrison* and *Absolute Activist*"). It is unclear how Core Capital can reconcile Quege's assertion that he "purchased the Company's AT1 Bonds[] in a domestic transaction in the U.S." with the fact that those purchases were of bonds specifically designated for sale *outside* the U.S. under Regulation S. Quege Decl. at ¶ 3, 5. Moreover, "while a domestic transaction or listing is *necessary* to state a claim under § 10(b), a finding that these transactions were domestic would not *suffice* to compel the conclusion that the plaintiffs' invocation of § 10(b) was appropriately domestic." *Parkcentral Glob. HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (emphasis in original). In other words, even if Core Capital's transactions were deemed domestic, that would not necessarily end the inquiry, especially because neither Core Capital nor Credit Suisse is a U.S. entity and the AT1 Prospectus

16

specifically states that the AT1 Bonds "are being offered and sold outside the United States to non-U.S. persons…."

Even if such a reconciliation were possible, Core Capital is nevertheless subject to (significant) unique defenses regarding its standing vis-à-vis the purported domesticity of its transactions in Credit Suisse securities. *See, e.g.*, *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006) ("A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation."); *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 209 (S.D.N.Y. 2022) ("Proposed Lead Plaintiff Alexander has not shown how she engaged in a domestic transaction under the Exchange Act and therefore cannot serve as a class representative.").

> b.  *Core Capital Has Not Established That it Purchased the Bonds for its Own Account or That it Has Authority to Move As Lead Plaintiff on its Clients' Behalf.*

Even assuming its purchases of Regulation S AT1 Bonds somehow constitute domestic transactions, Core Capital's standing is still in doubt. In order to possess Article III standing, a plaintiff must adequately establish, *inter alia*, that "he has suffered an injury in fact." *Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*, No. 11-cv-6247, 2012 U.S. Dist. LEXIS 118692, at *9 (D.N.J. June 30, 2012) (Williams, J.), *Report & Recommendation adopted*, 2012 U.S. Dist. LEXIS 118693, at *27-28 (D.N.J. Aug. 22, 2012) (citing *Sprint Communs. Co. v.*

17

*APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008)). In order to bring suit, "plaintiffs must have legal title to, or some type of proprietary interest in, the claim they are litigating in order to satisfy the minimum requirement for injury-in-fact." *Id.* at *22 (citing *In re Herley Indus. Secs. Litig.*, No. 06-cv-2596, 2009 U.S. Dist. LEXIS 91600, at *18 (E.D. Pa. Sept. 30, 2009)).[8] The Quege Declaration states that Core Capital "is a brokerage firm that provides investment and wealth management advice, under my control." ECF No. 19-3 at ¶ 3.[9] Here, Core Capital cannot establish Article III standing, as absent from the Quege Declaration and Core Capital's submissions is an unambiguous assertion that Quege and/or Core Capital purchased Credit Suisse's AT1 Bonds *for its own account* or, conversely, that it purchased those bonds on behalf of its clients and possesses the requisite authority to move as

---

[8] The *Herley* court relied on the Second Circuit's decision in *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 103 (2d Cir. 2008), which held that pursuant to the Supreme Court's decision in *Sprint*, an investment advisor with "a mere power of attorney" lacked standing to sue; "[b]y contrast, an assignment of claims transfers legal title or ownership of those claims and thus fulfills the constitutional requirement of an injury-in-fact." *Cent. European Distrib. Corp.*, 2012 U.S. Dist. LEXIS 118693, at *29.

[9] The Securities Commission of the Bahamas ("SCB") lists Core as a Securities Commission Licensee and Registrant under the Securities Industry Act of 2011. *See* Supp. Giblin Decl. at Ex. B (SCB Registrant Excerpt). Notably, under the "Categories" column of the SCB list of registrants, Core's roles are enumerated as: "1. Dealing in Securities as Agent / 2. Arranging Deals / 3. Managing Securities / 4. Advising on Securities." *Id.*

lead plaintiff on their behalf.[10]

Courts within this Circuit and others have denied appointment to investment entities where those entities failed to produce sufficient evidence of their authority to move on behalf of their clients. *See Smith v. Suprema Specialties*, 206 F. Supp. 2d 627, 634 (D.N.J. 2002) ("This Court finds that StoneRidge Investment may not bring the action on behalf of its clients because it did not function as a 'single investor' and it has not submitted any evidence that it received permission to move on its clients' behalf."). In *Suprema Specialties*, the court further held that "where a court appoints an asset manager as lead plaintiff, the plaintiff should provide evidence that it 'acts as attorney-in-fact for its clients and is authorized to bring suit to recover for, among other things, investment losses.'" *Id.* at 634 (quoting *Ezra Charitable Trust v. Rent-Way Inc.*, 136 F. Supp. 2d 435, 441 (W.D. Pa. 2001)); *see also Gross v. AT&T Inc.*, No. 19-cv-2892, 2019 U.S. Dist. LEXIS 128615, at *8-10 (S.D.N.Y. July 31, 2019) (finding fund management company subject to potential risk that it lacked property interest in the asserted claims, which was sufficient to rebut fund management company's presumptive lead-plaintiff status); *Weisz*, 2002 U.S. Dist. LEXIS 27831, at *22-23 ("An asset manager seeking appointment as lead

---

[10] While the Quege Declaration states that, "[a]s director of Core Capital, I have authority to pursue recovery of my losses incurred through Core Capital's investments in Credit Suisse," ECF No. 19-3 at ¶ 3, Quege's assertion is not sufficient *evidence* of such authority vis-à-vis Core Capital's clients, as discussed *supra* and *infra*.

19

plaintiff is generally required to provide evidence that it acts as an attorney-in-fact for its clients and is authorized to seek recovery for investment losses….In the absence of such evidentiary support, the Court finds that Northern Oak has not demonstrated itself to be an adequate plaintiff within the meaning of the PSLRA.") (internal citations omitted). Here, Core Capital has submitted no such evidence.[11]

If Core Capital merely acted as a broker-nominee, purchasing Credit Suisse bonds solely on behalf of its clients, it faces significant, unique defenses regarding authority and standing. In *Cent. European Distrib. Corp.*, this Court held that a group of investment advisors could not serve as lead plaintiff because it lacked standing and "[t]he Court cannot prejudice the class members by subjecting them to the time and expense of litigating these unique defenses." 2012 U.S. Dist. LEXIS 118693, at *24; *see also In re Tyco Intern., Ltd.*, 236 F.R.D. 62, 73 (D.N.H. 2006) (declining to appoint an investment advisor that purchased stock on behalf of its clients as a class representative because it could not allege it was directly injured by the defendants' conduct and therefore could not establish Article III standing); *In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780, 784 (N.D. Ill. 2000) (refusing to appoint investment manager lead plaintiff because, *inter alia*, it was "not a buyer for

---

[11] Moreover, Core Capital cannot cure this deficiency by, for example, submitting post-filing assignments, as "a post-filing assignment of legal rights will not cure a prospective plaintiff's defective Article III standing." *Cent. European Distrib. Corp.*, 2012 U.S. Dist. LEXIS 118692, at *20 n.5.

its own account, standing instead in the place of whatever number of investors are participants in the managed fund"); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 358 (S.D.N.Y. 2002) (refusing to confirm investment advisor as a class representative for lack of standing where it purchased stock for its clients and did not purchase stock for its own account).[12]

### C. Mr. Resit As Should Not be Appointed Lead Plaintiff of the Consolidated Action

#### 1. Mr. Resit As Is Subject to Unique Defenses Based on the Timing of His Purchases

Mr. Resit As did not purchase *any* Credit Suisse securities until February 9, 2023, *after* the first (and most impactful) alleged partial corrective disclosure. *See* Turner Am. Compl. at ¶ 24 ("On February 9, 2023, **before market hours**, the Company filed with the SEC its quarterly report on Form 6-K for the period ended December 31, 2022 (the "4Q22 Report").") (emphasis added). For the Court's convenience, Professor Diabat includes a chart illustrating the timing of Mr. Resit As' purchases below (a full-sized version is Appendix A to this Memorandum):

---

[12] Based on contractual language in the purchasing documents, AT1 Bond purchasers may also face an additional attack at the motion to dismiss stage arguing they are prohibited from seeking relief against Credit Suisse. *See* Supp. Giblin Decl. at Ex. D, at 7. Importantly, this defense would be unique to AT1 Bonds, as other Credit Suisse equity and bond purchasers did not contractually agree to similar waiver provisions. Thus, while Professor Diabat is adequate and typical to represent all Class Members, including purchasers of non-AT1 bonds, Core Capital is not, and if it were to have a leadership role solely for the bonds and then lose any one of these standing arguments, non-AT1 bond purchasers may be harmed.



*Linhares* Class Period: 2/18/2021 - 03/20/2023

Because the fraud-on-the-market theory of reliance is essential to class certification in securities fraud actions, and the timing of Mr. Resit As' purchases subjects him to unique defenses on the element of reliance, he is not adequate or typical under Rule 23. *See, e.g.*, *In re Harcourt Brace Jovanovich Sec. Litig.*, 838 F. Supp. 109, 113 (S.D.N.Y. 1993) (a named class plaintiff "who is subject to an *arguable* defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3)") (emphasis added); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 310 (S.D. Ohio 2005) (finding the "timing of New Jersey's purchases" after a partial corrective disclosure

22

in which the defendant "Cardinal Health began to disclose publicly the ongoing investigations," "will make it susceptible to claims that New Jersey did not rely on the Defendants' alleged misrepresentations").

Numerous courts have found lead plaintiff movants subject to unique defenses regarding their trading patterns where those movants only purchase securities *after* partial disclosures. *See, e.g.*, *Petrobras*, 104 F. Supp. 3d at 623 (the fact that lead plaintiff movant did not purchase *any* securities until after partial disclosures "raise serious questions regarding [their] reliance on the alleged misrepresentations and omissions"); *Kanefsky v. Honeywell Int'l Inc.*, No. 18-cv-15536, 2020 U.S. Dist. LEXIS 87108, at *7 n.4 (D.N.J. May 18, 2020) ("Plaintiff…purchased shares on September 11, 2018, *after* the first corrective disclosure. Thus, the Court foresees problems arising at the class certification stage.") (emphasis in original) (internal citations omitted); *Lundy v. Ideanomics, Inc.*, No. 20-cv-4944, 2020 U.S. Dist. LEXIS 236652, at *7 (S.D.N.Y. Dec. 16, 2020) ("While post-disclosure purchases are not a *per se* bar to an appointment as lead plaintiff, Sons may be subject to a unique defense because he purchased *all* his class period shares after the June 25, 2020 partial corrective disclosures but before the June 26, 2020 final corrective disclosure.") (emphasis in original); *Faris v. Longtop Fin. Techs. Ltd.*, No. 11-cv-3658, 2011 U.S. Dist. LEXIS 112970, at *26-28 (S.D.N.Y. Oct. 4, 2011) (fact that three members of a lead plaintiff movant group did not purchase *any* of their shares

23

before the first partial corrective disclosure "suggest[s] that these three members invested in Longtop securities notwithstanding notice of defendant's misstatements and omissions," such that "[t]hese unusual trading patterns may well undermine the ability of these three members to assert the fraud-on-the-market presumption of reliance, thereby rendering them inadequate class representatives").

Several courts have even found that mere 'disproportionate' purchases after a partial corrective disclosure subject putative lead plaintiffs to a unique defense on the element of reliance. *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 n.13 (E.D. Pa. 2008) (recognizing fraud-on-the-market presumption of reliance is defeated "when a disproportionately large percentage of the investor's purchases are made *after* a curative disclosure") (emphasis in original); *Erickson v. Snap, Inc.*, No. 17-cv-03679, 2017 U.S. Dist. LEXIS 221050, at *9 (C.D. Cal. Sep. 18, 2017) (denying appointment of lead plaintiff movant who purchased more than 60% of his total class period purchases "after the initial corrective disclosure" as "[t]here is no reason to subject the class to these unique defenses [on the element of reliance] when a non-conflicted candidate for Lead Plaintiff is also before the Court"); *In re Valence Tech. Sec. Litig.*, No. 95-cv-20459, 1996 U.S. Dist. LEXIS 21774, at *15 (N.D. Cal. Mar. 14, 1996) (finding plaintiff who tripled his shares after initial partial disclosure was atypical). Here, of course, Mr. Resit As purchased *all* of his Credit Suisse ADSs after the initial partial disclosure, making his atypicality even starker than that of

plaintiffs rejected in the cases cited above (who made purchases of the securities at issue prior to the first partial disclosure).

Finally, the February 9, 2023, disclosure was highly material, as it both first "revealed large customer outflows through year-end 2022" and resulted in Credit Suisse's ADS price falling "$0.56 per ADS, or *15.64%*...." *Linhares* Compl. ¶¶ 52, 53 (emphasis added). In fact, the February 9, 2023, disclosure represents the single largest alleged partial corrective disclosure, both in terms of raw dollars and percentage. *See id.* at ¶ 55 (February 21, 2023 disclosure impacts ADS price by $0.10, or 3.31%); ¶ 57 (March 9, 2023, disclosure impacts ADS price by $0.13, or 4.48%); ¶ 59 (March 14, 2023, disclosure impacts ADS price by $0.03, or 1.18%); and ¶ 61 (March 15, 2023, impacts ADS price by $0.35, or 13.94%). Only the final drop is larger.

To that end, in addition to subjecting him to unique defenses on the element of reliance, the timing of Mr. Resit As' purchases also raises the specter of significant intra-Class conflict. In *Pelletier v. Endo Int'l PLC*, No. 17-cv-5114, 2021 U.S. Dist. LEXIS 21207, at *30-31 (E.D. Pa. Feb. 4, 2021), the court found that "[w]here a lead plaintiff made its initial acquisition after a corrective disclosure, it may have a change in incentives, including to minimize the price impact of pre-purchase disclosures and maximize recovery on its own later-bought shares." There, the appointed lead plaintiff, Park, purchased shares within its proposed class period,

but "acquired those shares only <u>after</u> the first corrective disclosure on November 3, 2016, and it continued to acquire more shares throughout the class period." *Id.* at *24 (emphasis in original). In consideration of this fact, the court determined that "Park, a post-disclosure stockholder, may not be an adequate representative for all of the pre-disclosure stockholders, many of whom would have been injured by misrepresentations made over a year before Park acquired any Endo shares." *Id.* at *31. Ultimately, the court concluded "[t]he specter of inadequacy…from perverse incentives to downplay the effects of the <u>Bloomberg</u> article…concerns the Court and justifies Park's replacement."

Here, the Court should be similarly concerned that Mr. Resit As' trading patterns will create intra-Class conflict as he would not personally benefit from damages attributable to the February 9, 2023, disclosure.

### 2.    Tick-by-Tick Data Presented by Professor Diabat Calls Into Question the Veracity of Mr. Resit As' Trades

Notwithstanding the fact that Mr. Resit As purportedly purchased some 1,533,900 ADRs on February 9, 2023, *after* the first partial corrective disclosure, Professor Diabat's analysis of those purchases (which amount to over **53%** of Mr. Resit As' purchases) reveals a separate, serious concern regarding the veracity of his trades. Specifically, of the twelve separate February 9, 2023, purchases listed on Mr. Resit As' certification (ECF No. 18-5), Professor Diabat was only able to identify *five* that correspond to the 'Tick-by-Tick' price and volume trading data for February

9, 2023, he obtained from Refinitiv (formerly Thomson Eikon).[13] *See* Supp. Giblin Decl. at Exhibit E (2/9/23 Tick-by-Tick Data) p. 1,039 (purchase of 4,800 shares at $3.10/share); p. 1,005 (purchase of 380,000 shares at $3.1196/share); p. 1,494 (purchase of 5,000 shares at $3.03/share); p. 1,112 (purchase of 1,100 shares at $3.11/share); p. 1,532 (purchase of 850 shares at $3.02/share).

Those five corroborated purchases represent just 391,750 of the 1,533,900 ADSs Mr. Resit As purportedly purchased on February 9, 2023. In light of this Tick-By-Tick evidence submitted by Professor Diabat, which calls into doubt the majority of Mr. Resit As' purchases, Mr. Resit As' trade confirmations are necessary to show the trades listed on his certification are valid. Without such confirmations, which have not been submitted to date, the Tick-by-Tick data is sufficient evidence to rebut the bona fides of his losses because, in the absence of such evidence, there are two plausible explanations for the apparent discrepancy between the publicly available Tick-by-Tick data and the trading data Mr. Resit As submitted, either of which impute his adequacy and typicality under Rule 23.

First, it is possible Mr. Resit As did not provide accurate trading data in his

---

[13] Refinitiv is an LSEG (London Stock Exchange Group) business and one of the world's largest providers of financial markets data and infrastructure. Refinitiv Tick History is a historical market data service that provides global intraday time and sales, quotes and market depth content for both over the counter (OTC) and exchange-traded instruments from over 500 exchanges and third-party data contributors. *See* https://www.refinitiv.com/en/market-data/data-feeds/tick-history.

sworn certification. Such inaccuracies cast doubt not only on the veracity of Mr. Resit As' claimed loss and his certification, but also on his adequacy. *See Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, No. 14-cv-08495, 2015 U.S. Dist. LEXIS 38635, at *10 (S.D.N.Y. Mar. 19, 2015) (refusing to appoint lead plaintiff movant with the largest claimed losses because transactions stated on certification could not be reconciled with "publicly available historical trading data"); *Rodriguez v. Draftkings Inc.*, No. 21-cv-5739, 2021 U.S. Dist. LEXIS 219489, at *25 (S.D.N.Y. Nov. 12, 2021) ("As have other courts in this District presented with similar sloppiness, this Court finds that Kaintz's careless errors [in his certification] weigh heavily against his appointment as lead plaintiff.").

Second, it is plausible that Mr. Resit As purchased the ADSs in private, off-market transactions, which would be disqualifying in a case such as this. As one court previously reasoned in denying the appointment of an investor who acquired its shares off-market, "[a]ppointing as lead plaintiff one who acquired its shares in a private transaction invites lengthy litigation both at the class certification stage and thereafter of whether that plaintiff is subject to unique defenses. Certainly, the Court should not appoint as lead plaintiff one whose appointment will invite scrutiny of the details of a private transaction." *In re Critical Path*, 156 F. Supp. 2d 1102, 1110-11 (N.D. Cal. 2001); *see also Lang v. Tower Grp. Int'l, Ltd.*, No. 13-cv-5852, 2014 U.S. Dist. LEXIS 86496, at *11-12 (S.D.N.Y. June 17, 2014) (fact that lead plaintiff

28

movant acquired shares through a private transaction was "sufficient to undermine the [movant's] presumption as the most adequate plaintiff due to the atypicality of the acquisition," as "[t]he manner in which a potential lead plaintiff acquired shares may affect that plaintiff's ability to represent the class"); *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-cv-6969, 2018 U.S. Dist. LEXIS 217963, at \*103-04 (D.N.J. Dec. 31, 2018) ("In the Third Circuit, the loss causation analysis differs as between typical and non-typical Section 10(b) claims. A typical Section 10(b) claim is that the defendant made material public misrepresentations or omissions in order to affect the price of a publicly traded stock….A non-typical case, in contrast, involves…a particular party [] enter[ing] into a private transaction.") (internal citations omitted).

In contrast to Mr. Resit As' transactions, Professor Diabat's transactions are unquestionably bona fide. For the avoidance of any doubt, Professor Diabat submits to the Court copies of his trade confirmations corroborating the transactions listed on his Certification. *See* Supp. Giblin Decl. at Exhibit F (Diabat Trade Confirmations).

      3.     <u>By Advocating for a Shorter Class Period, Mr. Resit As<br>Is Not Acting in the Best Interests of the Class.</u>

Because a "longer class period encompasses more potential class members and damages," courts overwhelmingly favor utilizing the longest, most inclusive class period. *Hom v. Vale, S.A.*, No. 15-cv-9539, 2016 U.S. Dist. LEXIS 28863, at \*12-13 (S.D.N.Y. Mar. 7, 2016) (collecting cases). Indeed, at the lead plaintiff stage,

courts are "wary of arguments advocating a shorter class period instead of the longest potential class period," as they are "inimical to the interests of the class members those plaintiffs purportedly represent." *Eichenholtz v. Verifone Holdings, Inc.*, No. 07-cv-06140, 2008 U.S. Dist. LEXIS 64633, at *6 (N.D. Cal. Aug 22, 2008). Yet Mr. Resit As argues that the *Linhares* Action – which alleges the most expansive class period (February 18, 2021 through March 20, 2023, inclusive) – should not be consolidated with the other two Related Actions, resulting in a substantially truncated class period of March 10, 2022 through March 20, 2023, inclusive.[14]

As the court noted in *Eichenholtz*, "it is unclear why a plaintiff would argue for a shorter class period at th[e] [lead plaintiff] stage…unless it was in the best interest of that particular plaintiff only." 2008 U.S. Dist. LEXIS 64633, at *13-14 (N.D. Cal. Aug 22, 2008); *see also Marcus v. J.C. Penney Co.*, No. 13-cv-0736, 2014 U.S. Dist. LEXIS 197529, at *22 (E.D. Tex. Feb. 28, 2014) (noting that "[t]his self-serving behavior is precisely the type of rebuttable evidence provided in the PSLRA that would prohibit this Court from appointing [movant] lead plaintiff"); *Deering v. Galena Biopharma, Inc.*, No. 14-cv-00367, 2014 U.S. Dist. LEXIS 140766, at *33-34 (D. Or. Oct. 3, 2014) (movant's decision to use shorter class period "is directly at odds with the interests of the majority of the proposed class

---

[14] The *Turner* Class Period is March 10, 2022, through March 20, 2023, inclusive, while the *Calhoun* Plass Period is December 1, 2022, through February 17, 2023, inclusive.

based on a longer period and raised questions whether [movant] will act as effective advocates for all class members under a longer class period") ("A proposed lead plaintiff is an adequate representative of the class only when it 'does not have interests that are antagonistic to the class that [it] seeks to represent.'") (citing *Sgalambo v. McKenzie*, 268 F.R.D. 170, 174 (S.D.N.Y. 2010)).

Further, Mr. Resit As executed his certification on April 12, 2023, *prior* to the filing of the *Linhares* Action on April 21, 2023. Because the certification was executed before the *Linhares* Action was filed (which extended the Class Period significantly), it is entirely unclear whether Mr. Reset As was even aware of the *Linhares* Action or his counsel's strategic decision to oppose consolidation of the *Linhares* Action with the other two Related Actions.[15]

4.    <u>Mr. Resit As Failed to Provide Sufficient Information to Establish His Adequacy</u>

"In enacting the lead plaintiff provisions of the Reform Act, Congress intended that courts would appoint 'the most sophisticated investor available and willing to serve in a putative securities class action,' that is, 'an investor capable of understanding and controlling the litigation.'" *Clair v. DeLuca*, 232 F.R.D. 219, 226 (W.D. Pa. 2005) (citing *Berger v. Compaq Computer Corp.*, 279 F.3d 313, 313 (5th Cir. 2002)). Thus, "a preliminary showing of adequacy requires a threshold amount

---

[15] In contrast, Professor Diabat executed his certification on May 4, 2023, after having reviewed the *Linhares* Complaint. *See* ECF No. 16-4.

of information regarding an individual movant's background and sophistication." *In re HEXO Corp. Sec. Litig.*, No. 19-cv-10965, 2020 U.S. Dist. LEXIS 166312, at *4 (S.D.N.Y. Sep. 11, 2020). Yet, in marked contrast to Professor Diabat[16] (and, in fact, most of the other movants),[17] Mr. Resit As did not provide any information to the Court about himself beyond the bare-bones certification required under the PSLRA. *See* ECF No. 18-5. As a result, the Court is without sufficient information that would enable it to evaluate Mr. Resit As' adequacy and, therefore, he should not be appointed lead plaintiff.

The court addressed a similar situation in *Clair*. There, like here, movants "provided absolutely no information about themselves beyond the [PSLRA]

---

[16] Professor Diabat submitted a declaration in which, *inter alia*, he provided detailed information on his educational background and current employment and research interests. *See* ECF No. 16-9. As set forth therein, Professor Diabat has a Ph.D. in Industrial Engineering from Purdue University, is a Professor of Civil and Urban Engineering at New York University Abu Dhabi, edits and writes for several journals, and conducts research on logistics and supply chain management, healthcare logistics optimization, and production planning. *Id.* at ¶ 2. Professor Diabat also averred that, as a result of the "substantial loss" he suffered, he is "committed to maximining the recovery on behalf of the Class"; he "understand[s] the responsibilities and duties of being a Lead Plaintiff, including [his] fiduciary duties to the Class"; he "understand[s] and appreciate[s] a lead plaintiff's obligation under the PSLRA to select lead counsel and to monitor the actions of counsel to ensure the action is prosecuted efficiently"; and he "will continue to supervise Lead Counsel and actively oversee the prosecution of this action for the benefit of the Class." *Id.* at ¶¶ 3-5.

[17] *See* ECF Nos. 12-6, 14-7, 15-7, 16-9, 19-3.

certifications which are required by law." 232 F.R.D. at 226.[18] Because "there [wa]s no evidence that [movants] [were] the type of sophisticated investor[s] who can control a multi-million dollar class action," the court found that it could not conclude that they were the most adequate plaintiff.[19] The same result should be reached here. Because "[w]e know nothing about [Mr. Resit As'] understanding of [his] role and responsibilities as lead plaintiff, [his] commitment to pursue vigorously litigation that is liable to extend for years, or [his] experience directing counsel" (*Clair*, 232 F.R.D. at 227,), this Court should reject Mr. Resit As' application for appointment as lead plaintiff. *See Karp v. Diebold Nixdorf, Inc.*, No. 19-cv-6180, 2019 U.S. Dist. LEXIS 188670, at *16 (S.D.N.Y. Oct. 30, 2019) (holding lead plaintiff applicant failed to make prima facie showing of adequacy where they "provided the Court with little to go on with respect to their alleged capacity to manage th[e] litigation"); *Nakamura v. BRF S.A.*, No. 18-cv-2213, 2018 U.S. Dist. LEXIS 110187, at *9-10

---

[18] The certification in *Clair*, like Mr. Resit As' here, stated simply that movants were "willing to testify at deposition and trial if necessary, have not served as a class representative in a securities litigation action during the preceding three years, and will not accept supplemental payment except as approved by the court for reasonable costs and expenses directly related to lead plaintiff status." *Clair*, 232 F.R.D. at 226; *compare* to ECF No. 18-5.

[19] Because the movants in *Clair* were the only ones who had sought appointment as lead plaintiff, if the court rejected them "the putative class members [would have been] left without any viable plaintiff." 232 F.R.D. at 228. Thus, the court allowed them another opportunity to establish their credentials. *Id.* Thereafter, movants filed a renewed motion for lead plaintiff, which the court granted in part and denied in part. *Clair v. DeLuca*, 232 F.R.D. 523 (W.D. Pa. 2006).

(S.D.N.Y. July 2, 2018) (finding declaration of proposed lead plaintiff "has not made a satisfactory showing as to the sophistication of the group's proposed members [because] [i]t does not explain the declarants' business expertise, educational background, management experience or history of monitoring or participating in litigation"); *In re Gemstar-TV Guide Int'l Sec. Litig.*, 209 F.R.D. 447, 452 (C.D. Cal. 2002) (rejecting movants who "proffer[ed] no declarations concerning their ability to act as lead plaintiffs," as there was "no evidence that [they] [we]re competent to serve as lead plaintiffs…or to supervise the host of attorneys representing them[,]…that [they] ha[d] the resources to supervise and participate fully in this litigation[,] that [they] appreciated the nature of the role which they [sought] to perform in this litigation"); *Piven v. Sykes Enters.*, 137 F.Supp. 2d 1295, 1305 (M.D. Fla. 2000) (declining to appoint as lead plaintiff movant for whom "there was a "dearth of information," including "regarding its identity, resources, and experience," in the record).

While Mr. Resit As' *attorneys* state in their brief that Mr. Resit As has a "strong desire…to prosecute this action on behalf of the [C]lass" and is "willing and committed" (ECF No. 18-2 at 13), there is nothing in the record to substantiate those assertions.[20] *See Clair,* 232 F.R.D. at 227 ("Since there is no declaration to support

---

[20] Nor are there any sworn averments from Mr. Resit As to support these statements by his attorneys in their brief: "Movant lives in Turkey, where he owns a grain trading business. Movant has a Masters degree and has been investing for several

this alleged 'strong desire' and no evidence of their ability to 'take an active role' and 'control the litigation,' we view these assertions [in movants' brief] somewhat skeptically"); *see also In re Te Holdcorp LLC*, No. 20-cv-11442, 2022 U.S. Dist. LEXIS 58293, at *26 (D. Del. Mar 30, 2022) ("arguments of counsel do not constitute evidence") (citing *Versarge v. Twp. Of Clinton NJ.*, 984 F.2d 1359, 1370 (3d Cir. 1993); *Jersey Cent. Power Light Co. v. Lacey Tp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985)).

### 5. Mr. Resit As' Certification Demonstrates That His Motion is Lawyer-Driven

Mr. Resit As has also failed to provide the Court with sufficient information to determine whether he chose his attorneys, or whether – impermissibly – it was the other way around. "One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation." *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 532 (S.D.N.Y. 2015) (citing *In re Tarragon Corp. Sec. Litig.*, No. 07-cv-7972, 2007 U.S. Dist. LEXIS 91418, at *4 (S.D.N.Y. Dec. 6, 2007)).

To that end, a crucial additional factor in this Circuit regarding adequacy is "whether the movant has demonstrated a willingness and ability to select competent class counsel…." *Lawless v. Aurora Cannabis Inc.*, No. 20-cv-13819, 2021 U.S. Dist. LEXIS 127153, at *9 (D.N.J. July 7, 2021) (citing *Cendant*, 264 F.3d at 265).

---

years. Movant is willing to sit for deposition and testify at trial in New Jersey or elsewhere in the U.S." ECF No. 18-2 at 13.

While the brief conclusorily avers that "Movant has selected Rosen Law as Lead Counsel" (ECF No. 18-2 at 14), Mr. Resit As' actual statement under oath in his certification does not indicate that he retained the Rosen Law Firm or, even assuming he did, why he chose it; it merely states that he "authorize[d] The Rosen Law firm to file a lead plaintiff motion on my behalf." ECF No. 18-5 at ¶ 1.[21] Further, as noted *supra*, Mr. Resit As executed his certification more than a week *prior* to the filing of the *Linhares* Action. Thus, it appears that Mr. Resit As was unaware of the *Linhares* Action when he executed his certification in support of his motion for lead plaintiff, further indicating his bid for appointment may be lawyer-driven.

6.    Results of an Independent Investigation Contradict Representations Made By Mr. Resit As' Counsel and Raise Doubts About His Adequacy and Typicality

While Mr. Resit As did not submit a declaration setting forth identifying information about himself to the Court, the brief in support of his motion states that he "lives in Turkey, where he owns a grain trading business." ECF No. 18-2 at 13. With the assistance of Turkish counsel, Professor Diabat conducted an investigation of Mr. Resit As and his "grain trading business," Rus Agro Trade. *See* Supp. Giblin Decl. at Exhibit G (Declaration of Cihan Topcu ("Topcu Decl.")). Professor Diabat's

---

[21] By contrast, Professor Diabat stated in his certification that he "retain[ed the firm of Kahn Swick and Foti, LLC" (ECF No. 16-4 at ¶ 1), and explained in his declaration that he "select[ed] and retain[ed] Lead Counsel with a proven history of handling this type of complex litigation," and chose KSF after conducting due diligence, including "assess[ing] the firm's qualifications and communicat[ing] with KSF Managing Partner." ECF No. 16-9 at ¶ 4.

investigation revealed that Mr. Resit As founded Rus Agro Trade jointly with Mr. Halil As on or about September 13, 2019, and that Mr. Halil As assumed full ownership of the company on or about June 27, 2022. *See* Topcu Decl. at ¶¶ 5-7, 10 & Exhibits 1-4. Thus, the unverified assertion by Mr. Resit As' attorneys in their opening brief that Mr. Resit As presently owns a "grain trading business" is directly contradicted by the evidence submitted herewith by Professor Diabat's investigator, Mr. Topcu. A records search by Mr. Diabat's counsel reveals no other grain trading companies associated with Mr. Resit As. Finally, Mr. Resit As' LinkedIn page, located by Professor Diabat's counsel, refers to Rus Agro Trade and no other grain trading companies. *See* Supp. Giblin Decl. at Exhibit H (Resit As LinkedIn page). Rus Agro Trade purportedly "[o]ffers fully supply services for international trading of all crude, refined edible oils, oilseeds, grains and feedstuffs," with primary focus on "commodity origination in the Black Sea (Russia, Ukraine, Moldova, Romania, Bulgaria, Hungary), and destination business into Turkey, the Mediterranean Sea and Persian Gulf." *See id.* at Exhibit I (Rus Agro Trade Website, 'About Us').

Professor Diabat's investigation also uncovered very recent evidence of relevant serious misconduct, including multiple criminal complaints and associated securities sanctions imposed by the Capital Markets Board of Turkey (the Turkish analogue of the SEC) for fraud, market manipulation, insider trading, and/or market abuse, by the co-founder (with Mr. Resit As) and now full owner of Rus Agro Trade,

Mr. Halil As. Specifically, on or about December 22, 2022, a criminal complaint was filed against Mr. Halil As "for his involvement in transactions in the stock market of Izmir Demir Çelik Sanayi Anonim Şirketi (IZMDC) between August 11, 2022, and August 16, 2022." Topcu Decl. at ¶ 12 & Exhibit 6. IZMDC is a Turkey-based steel producer whose shares trade on the Borsa İstanbul (formerly the İstanbul Stock Exchange, Market Identifier Code ("MIC") "XIST"), the sole Turkish stock exchange. As result, Mr. Halil As "was suspended from trading on the Stock Exchange and other organized markets" for a period of two years. *Id.* at ¶ 14 & Exhibit 6.  Prior to this suspension, Mr. Halil As was provisionally suspended from trading for six months for his involvement in these transactions.  *See id.* at ¶ 11 & Exhibit 5.

Then, on or about February 2, 2023 -- ***just five business days before Mr. Resit As purportedly began purchasing millions of dollars in Credit Suisse ADSs*** -- another criminal complaint was filed against Mr. Halil As "for his involvement in transactions in the stock market of İhlas Gazetecilik AŞ (IHGZT) between July 28, 2022, and August 16, 2022." *Id.* at ¶¶ 15-16 & Exhibit 7. IHGZT is a Turkey-based publisher whose shares trade on the Borsa İstanbul. As a result, Mr. Halil As became "subject to a 2-year trading ban in Borsa Istanbul and other organized markets…." *Id.* at ¶ 17 & Exhibit 7.

"A class representative, once designated by the Court, is a fiduciary for the absent class members." *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 46 (S.D.N.Y. 1998). Therefore, "honesty and trustworthiness are relevant factors in assessing a candidate's ability to serve as an adequate fiduciary for a class." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 416 (S.D.N.Y. 2004) (citations omitted). In turn, "courts have found that an individual is an inadequate lead plaintiff due to unrelated misconduct which implicates that individual's ability to serve as a fiduciary…." *Silverberg v. Dryships Inc.*, No. 17-cv-4547, 2018 U.S. Dist. LEXIS 225563, at *32 (E.D.N.Y. Aug. 21, 2018) (citations omitted). "Courts look to the nature of the charges and how much time has elapsed since the conviction to determine whether to disqualify a proposed lead plaintiff." *Gonzalez v. Cano Health, Inc.*, No. 22-cv-20827, 2022 U.S. Dist. LEXIS 238706, at *10-11 (S.D. Fla. Dec. 22, 2022). Disqualifying unrelated misconduct is more typical with respect to "serious financial crimes or crimes involving dishonesty." *Id.* at *11.

In *Villare v. Abiomed, Inc.*, No. 19 Civ. 7319, 2020 U.S. Dist. LEXIS 114684, at *18-19 (S.D.N.Y. June 29, 2020), for example, the court found a lead plaintiff movant's "criminal fraud conviction ten years ago [] extremely concerning for an individual seeking to serve as a fiduciary for absent class members asserting they are the victims of a fraudulent scheme." The court ultimately denied the movant's

39

motion for appointment on this basis. *Id.* at \*19. *See also Newman v. Eagle Building Tech.*, 209 F.R.D. 499, 504 (S.D. Fla. 2002) (proposed lead plaintiff inadequate where SEC and NASD previously found he violated securities rules).

Here, Mr. Resit As' lack of candor regarding his "ownership" of Rus Agro Trade, his close association with Mr. Halil As (who was very recently suspended from trading by the Turkish analogue of the SEC), and the timing of Mr. Resit As' purchases immediately after Mr. Halil As' indictment and suspension, renders Mr. Resit As inadequate and atypical to represent the Class.

## III.    CONCLUSION

For the foregoing reasons, as well as those set forth in Professor Diabat's opening motion, Professor Diabat respectfully submits that the Court should consolidate the three Related Actions, deny the competing motions for appointment, appoint Professor Diabat as lead plaintiff, and approve Professor Diabat's choice of KSF as Lead Counsel and DeCotiis FitzPatrick as Liaison Counsel for the Class.

DATED: May 22, 2023                    Respectfully submitted,

                                       **DeCotiis, FitzPatrick, Cole &
                                       Giblin, LLP**

                                       */s/ Vincent M. Giblin*
                                       Vincent M. Giblin
                                       Richard F.X. Regan
                                       61 South Paramus Road, Suite 250
                                       Paramus, NJ 07652
                                       Telephone: (201) 347-2136
                                       Telephone: (201) 907-5276
                                       Fax: (201) 928-0588
                                       Email: vgiblin@decotiislaw.com
                                       Email: rregan@decotiislaw.com

                                       *Local Counsel for Lead Plaintiff Movant
                                       Ali Diabat and Proposed Liaison Counsel
                                       for the Class*

                                       **Kahn Swick & Foti, LLC**

                                       Kim E. Miller (*PHV* forthcoming)
                                       250 Park Avenue, 7th Floor
                                       New York, NY 10177
                                       Telephone: (212) 696-3732
                                       Fax: (504) 455-1498
                                       Email: kim.miller@ksfcounsel.com

                                        -and-

                                       Lewis S. Kahn
                                       1100 Poydras Street, Suite 960
                                       New Orleans, LA 70163
                                       Telephone: (504) 455-1400
                                       Fax: (504) 455-1498
                                       Email: lewis.kahn@ksfcounsel.com

                                       *Counsel for Lead Plaintiff Movant
                                       Ali Diabat and Proposed Lead Counsel
                                       for the Class*

41

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on May 22, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to the e-mail addresses on the Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to non-CM/ECF participants.

*/s/ Vincent M. Giblin*
Vincent M. Giblin

42