N97HCreC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
IN RE:  CREDIT SUISSE GROUP AG,
*et al.*,                                        23 Civ. 4458 (CM)
                                                23 Civ. 5874 (CM)
                                                23 Civ. 4813 (CM)
                                                23 Civ. 6023 (CM)
                                                23 Civ. 7297 (CM)
                                                23 Civ. 6039 (CM)

                                                Conference

------------------------------x

                                                New York, N.Y.
                                                September 7, 2023
                                                2:00 p.m.

Before:

                    HON. COLLEEN McMAHON,

                                        District Judge

                        APPEARANCES

JOHNSON BOTTINI, LLP
        Attorneys for Plaintiff Stevenson
BY:  ALBERT YONG CHANG
        -and-
GEORGIOU ENTERPRISES
BY:  BYRON S. GEORGIOU

DICELLO LEVITT, LLP
        Attorneys for Plaintiffs Star Colbert and the Credit
Suisse AT1 bondholders
BY:  GREG G. GUTZLER
        JAMES D. BASKIN

KAHN SWICK & FOTI LLC
        Attorneys for Plaintiff Diabat
BY:  KIM ELAINE MILLER
        MATTHEW P. WOODARD

THE ROSEN LAW FIRM P.A.
        Attorneys for Plaintiff Resit As
BY:  PHILLIP C. KIM
        LAURENCE M. ROSEN

N97HCreC

APPEARANCES (Cont'd)

POMERANTZ LLP
     Attorneys for Plaintiff Core Capital Partners LP
BY:  JOSEPH ALEXANDER HOOD II

KAPLAN FOX & KILSHEIMER LLP
     Attorneys for Plaintiff Yang
BY:  JEFFREY PHILIP CAMPISI

CAHILL GORDON & REINDEL LLP
     Attorneys for Defendant Credit Suisse Group AG
BY:  EDWARD NATHANIEL MOSS
     TAMMY L. ROY

LATHAM & WATKINS LLP
     Attorneys for Defendants KPMG, Knopp, and Newinski
BY:  COREY CALABRESE

BROWN RUDNICK LLP
     Attorneys for Defendant Wada
BY:  JESSICA N. MEYERS
     STEPHEN COOK (telephonic)

BALLARD SPAHR LLP
     Attorneys for Defendants Marcello, Whittle, Middendorf,
Sweet, and Holder
BY:  LAUREN ENGELMYER

N97HCreC

(Case called)

MR. CHANG:  Good afternoon, your Honor.  I'm Albert Chang on behalf of the RICO plaintiffs.  With me is one of my colleagues, Byron Georgiou.

THE COURT:  OK.  We're not going to have much to say about you.  Have a seat.

MR. GUTZLER:  Good afternoon, your Honor.  Greg Gutzler with DiCello Levitt, LLP, on behalf of Star Colbert and the Credit Suisse AT1 bondholders.  I'm with my colleague and partner James Baskin.

THE COURT:  OK.

MS. MILLER:  Good afternoon, your Honor.  Kim Miller, Kahn Swick & Foti, on behalf of lead plaintiff movant Professor Ali Diabat.  My client, Professor Diabat, is in the courtroom today in the red shirt back by the chairs and my colleague Matt Woodard.

MR. DIABAT:  Good afternoon, your Honor.

MR. KIM:  Good afternoon, your Honor.  Phillip Kim, Rosen Law Firm, for lead plaintiff movant Mehmet Resit As, along with my partner Laurence Rosen.

THE COURT:  Good afternoon.

MR. HOOD:  Good afternoon, your Honor.  Alex Hood of Pomerantz LLP, representing lead plaintiff movant Core Capital Partners LP.

MR. CAMPISI:  Jeff Campisi, Kaplan Fox, for lead

N97HCreC

plaintiff movant Paul Yang.

THE COURT:  Really?  I only got three —— I thought there were only three lead plaintiffs motions still extant?

MR. CAMPISI:  Mr. Yang filed a document with the Court, recognizing the other movants have large losses. However, if the Court doesn't appoint any of the pending movants, he's willing and able to step forward if your Honor would like.

THE COURT:  Great.  Thank you.

MR. DIABAT:  Good afternoon, your Honor.  My name is ——

THE COURT:  It's Professor Diabat, a client.  That's OK.  Don't speak.  The court reporter needs to hear from the lawyers.

Anybody else from a plaintiff from any lawsuit?

Now defendants.

MR. MOSS:  Good afternoon, your Honor.  Edward Moss from Cahill for Credit Suisse in the various cases, and with me is my partner Tammy Roy.

MS. CALABRESE:  Good afternoon, your Honor.  Corey Calabrese, from Latham & Watkins for KPMG and two of the KPMG defendants, Paul Knopp and Laura Newinski.

MS. MEYERS:  Good morning, your Honor.  Jessica Meyers from Brown Rudnick on behalf defendant Jeffrey Wada, and I believe my colleagues Steven Cook is attending telephonically.

N97HCreC

MS. ENGELMYER:  Good afternoon, your Honor.  Lauren Engelmyer from Ballard Spahr on behalf of the KPMG defendants Scott Marcello, Thomas Whittle, David Middendorf, Brian Sweet, and Cynthia Holder.

THE COURT:  Have a seat.

All right.  So first things first, we can get the RICO case out of the way.  I have a letter asking for permission to file opening briefs not exceeding 75 pages total for all defendants.  Granted, on the promise that you're not going to duplicate.  OK?

I understand the principal arguments are if it's not a RICO case, it's a securities case; and to the extent it's not a securities case, it's a derivative case; and to the extent it's neither of those things, it's a Swiss case.  OK.  Did I get it right?

MR. MOSS:  Yes, your Honor.

THE COURT:  So since I understand what the principal issues are, let's focus on the principal issues.  Thank you very much.

MR. CHANG:  Your Honor.

THE COURT:  Wait a minute.

MR. CHANG:  I'm sorry.

THE COURT:  Not yet.  OK.

So I'm giving them 75 pages.  Now, the question is how much — how many pages to give you.

N97HCreC

MR. CHANG:  Your Honor, again, it's Albert Chang on behalf of the RICO plaintiffs.

Defendants are essentially asking for a 105-page submission.  We'll ask leave to submit the same amount of page numbers if necessary.

THE COURT:  I don't understand.  They didn't say —— they said not exceeding 75 pages in total.

MR. CHANG:  Oh, defendants are asking for 75 pages for their brief and 30-page limit for an expert declaration.  So in total ——

THE COURT:  No, no, no, no, no.  You can have a 75-page brief.  If you're going to submit a counter expert designation, I don't care how many pages it is.  That's testimony.  OK?  So you can have 75 pages in your responsive brief.  You cannot have 76.  You can have 75.

MR. CHANG:  We'll try to do less.

THE COURT:  I hope you will, but if they have a 30-page expert declaration, well, that's testimony.  And if you're going to have a counter-designation —— I don't know if you're going to or not, not saying whether you should or you shouldn't —— but if you're going to offer testimony, it will be as long as the testimony is.  That's not the same thing as a page limit on a brief.

MR. CHANG:  Understood, your Honor.

THE COURT:  Thank you, Mr. Chang.

N97HCreC

All right.  Do we have any other business with respect to the RICO case?

MR. CHANG:  Your Honor, last time we took your Honor's note to heart.  Our complaint was long.

THE COURT:  Very.  I read it.

MR. CHANG:  We have now prepared a chart.  If I may hand it to your law clerk, to you, this is a chart that we have prepared that's almost our whole case.

THE COURT:  You want to add to your complaint a chart outlining your complaint?

MR. CHANG:  This is ——

THE COURT:  Because I've read the complaint.

MR. CHANG:  This is actually a chart that's on page 10 of our complaint, but it's improved with all the things in it.

THE COURT:  A new, improved chart.

Do you all have any objection to the new, improved chart?

MR. MOSS:  Yeah.  We haven't seen it yet.  Is it different from the chart in the complaint?

MR. CHANG:  This has more items, all the things that have been alleged in the complaint.

THE COURT:  So you're seeking leave to amend your complaint to change your chart?

MR. CHANG:  Your Honor, we're not seeking leave to amend.  We took to heart what you said last time.  The

N97HCreC

complaint that's on docket, 33-1, is our complaint.

THE COURT:  OK.  33-1, that's your complaint.

MR. CHANG:  If you allow us to file a clean copy, we will.

THE COURT:  I don't understand what you're doing.  Is this chart different than the chart that's in your complaint?

MR. CHANG:  Yes, with more items in it, that's all.

THE COURT:  Is there a reference in this chart to exactly where in your complaint at 33-1 each of these items is?

MR. CHANG:  Yes.

THE COURT:  OK.  Where does it say, for example, July 8, 2018, Chinese Princelings scandal, Eastern District criminal plea?  What paragraphs of your complaint does that refer to?  That's what's missing here, the cross-references to your complaint.

MR. CHANG:  The Princelings allegations were in paragraph ——

THE COURT:  OK.  You need to redo this chart.  If indeed this chart is not an amendment, then I need, for each entry in this chart, a reference to where in your complaint that item is pleaded, otherwise I'm not going to look at your chart because I'm not going to go through your very long complaint and do that job myself.  I've other work to do.

MR. CHANG:  We'll do that, your Honor.

THE COURT:  Thank you.

N97HCreC

MR. MOSS:  Your Honor, may I raise one housekeeping issue on the RICO case?

THE COURT:  Sure.

MR. MOSS:  So the plaintiffs have filed their currently operative complaint is a redline, and there is no clean version of that complaint, and we were wondering if it would be easier for the Court and the parties ——

THE COURT:  I expect a clean version.  I don't want any redline version.

MR. MOSS:  I don't believe that a clean version has been filed.

MR. CHANG:  We will.

THE COURT:  Good.

MR. CHANG:  We will file a clean copy if we may, your Honor.

THE COURT:  Thank you.

MR. MOSS:  Thank you.

THE COURT:  Next, first order of business is to appoint lead plaintiff and lead counsel.  There are three remaining applicants.  Two purchased Credit Suisse ADSs and one purchased Credit Suisse AT1 bonds.

Under the PSLRA, the presumptive lead plaintiff, in the wisdom of Congress, is the plaintiff that suffered the largest financial loss.  The largest loss was suffered by Core Capital which purchased the bonds.  Core seeks primarily to

N97HCreC

represent a class consisting only of Credit Suisse bondholders. However, if the Court is inclined to appoint on one lead plaintiff to represent purchasers of both equity and debt securities, Core Capital believes that it should be that lead plaintiff for a single class of all securities holders.

This Court is inclined to appoint just one lead plaintiff. Nothing in anyone's papers suggests that there are unique allegations of securities fraud that pertain to any individual class of securities, and it is well settled that the holder of one class of an issuer's securities can represent the holders of multiple classes of securities if all suffered the same type of loss due to the same misconduct such that their interests are aligned. *Freudenberg v. E\*Trade Financial Corporation*. That's at, I think, 2008 U.S. Dist. LEXIS, but I have a typo in my notes, 62767, at *16-17. Mindful of Federal Rule 1 which requires courts to manage civil actions in a just, speedy, and inexpensive manner, I dislike appointing more than one firm as class counsel because a substantial amount of duplicative work is inevitable no matter what is represented up front. Core Capital's counsel has particular reason to be aware of my views on that subject.

So the question before the Court is whether anyone has rebutted the presumption that Core Capital should be allowed to represent a class of all security holders. Core Capital cannot be appointed lead plaintiff, I believe. I believe that the

N97HCreC

presumption has been rebutted.

Now, Professor Diabat asserts primarily that Core is subject to unique defenses because the CS AT1 bonds were not purchased in a domestic transaction as required by *Morrison v. National Australia Ltd.*, 561 U.S. 247, and *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60. As evidence, he indicates that Core is a Bahamian brokerage firm whose principal lives in Nassau. He observed that the AT1 bonds were initially issued under Reg S which provides an exemption from registration under Section 5 of the '33 Act for securities offered and sold outside the United States, and the CUSIP number assigned to the bonds in a prospectus indicates that the bonds will be offered for sale outside the United States.

Now, of course, the mere fact that Core is a Bahamian enterprise is not determinative of whether the bond purchases were U.S.-based transactions. A transaction is domestic within the meaning of *Morrison* if irrevocable liability was incurred or title was transferred within the United States. Facts showing that a contract was formed, a purchase order was placed, title was passed, or money was exchanged in the United States need to be pleaded, and in the case of the appointment of a class representative, proved if they are contested, in order to obviate standing and inadequate representation issues that may arise at a later stage in the litigation.

Core argues that while the initial offering of Reg S bond issue can only be purchased outside the United States, there is a robust domestic secondary market and that Core's purchases were made on that secondary market.

Moreover, Mr. —— is Quege the gentleman's name?

MR. HOOD:  It's pronounced Quege, your Honor.

THE COURT:  Quege, thank you.

—— Mr. Quege, the principal of Core, swears that the purchases were made while he was physically present at one of his two homes in the United States from which he caused Core Capital's bond transactions to be executed by calling Core's Miami-based broker-dealer and that the broker-dealer accessed price quotes via a U.S. trading platform and that Mr. Quege emailed the broker-dealer from one of his U.S. residences to confirm that Core Capital wanted to purchase the bonds at the quoted prices and that the transaction between Core and the broker, which of course initially purchased the bonds in the secondary market, was effect entirely in the United States and in U.S. dollars that were deposited into U.S. bank accounts. This, Core asserts, constitutes evidence that the transaction qualified as domestic.

If Mr. Quege's statement is true —— and I have no reason to doubt that it is —— then the bond transaction was indeed domestic within the meaning of *Morrison* and *Absolute Activist* in that Core placed its purchase order in the United

States, title was passed in the United States, and money was exchanged in the United States.

However, there is a far more persuasive reason to reject Core Capital as lead plaintiff or even lead plaintiff for a bond class.  It seems that as part of the CS bailout earlier this year, all of Credit Suisse's AT1 bonds, the bonds owned by Core Capital, were fully written down by directive of the Swiss Financial Market Supervisory Authority.  This occurred pursuant to the terms of the bonds themselves, which provided that the bonds had to be completely written down if extraordinary government support was ever granted to Credit Suisse, Credit Suisse, the so-called viability event.  As we all know, Credit Suisse was granted extraordinary liquidity assistance loans secured by a Swiss government default guarantee on March 19 of this year.  Per the terms of the bond indentures, this meant that the AT1 bonds had to be written down; meaning they effectively became worthless as of that day, which was the day before the final corrective disclosure occurred on March 20, 2023.

This superseding event gives rise to the very real prospect that the bonds were effectively worthless at the end of the class period, making it impossible for the AT1 bondholders to recover much of anything.  They certainly occupy a unique position insofar as damages are concerned, one that will likely render Core Capital an atypical plaintiff.  Indeed,

N97HCreC

the bondholders are not similarly situated to holders of other CS bonds which were not required or ordered to be written down. The inevitability of litigation over whether there can be any recovery on the AT1 bonds and over whether any such litigation must take place in Switzerland now that the bonds have been written down and CS is in some kind of insolvency proceeding in Switzerland makes Core Capital a singularly poor lead plaintiff for any U.S.-based securities class action.

The fact that this was not revealed as part of Core's filings with the court —— I learned about it from Professor Diabat's May 30 reply papers —— additionally cements my belief that any presumption that Core should be the lead plaintiff has been rebutted.

Now, the next largest purported shareholder of CS securities is Resit As.  The presumption now attaches to him. Professor Diabat asserts that Mr. As is subject to unique reliance defenses since he did not make his first purchase of CS American deposit shares until after the initial curative disclosure, the one that caused the price of the stock to decline by 15 percent, which is the largest single-day decline until the final disclosure was made on March 20 when the stock lost over 50 percent of its remaining value.

Obviously, Mr. As stands in a somewhat different position than the ADS holders, including Professor Diabat, who purchased the shares prior to any corrective disclosure,

N97HCreC

Professor Diabat having purchased some shares prior and some shares after. Now, the fact that Mr. As bought his shares after the partial corrective disclosure does not automatically bar him from being the lead plaintiff. However, he may not be able to assert reliance under a fraud-on-the-market theory given the timing of his initial purchases and that arguable possibility is, in the opinion of this Court, highly problematic because it would defeat typicality.

The case that I find most persuasive is the *Lundy* case, *Lundy v. Ideanomics*, in which my colleague Judge Daniels, while acknowledging that the purchase of shares after a partial corrective disclosure was not an automatic disqualifier, declined to appoint a putative lead plaintiff to that position because that person, like Mr. As, purchased all of his shares after the partial corrective disclosure, raising the very real possibility of non-reliance on the market.

I will speak briefly to Professor Diabat's other points. I did not find them dispositive. Professor Diabat points out that Mr. As cofounded a grain company called Rus Agro Trade with his cousin Halil, who is presently the subject of at least two criminal proceedings in Turkey alleging violations of Turkish securities laws. In a supplemental affidavit, Mr. As asserts that cousin Halil has been the sole owner of that company since June 2022 when the two men parted business ways. Professor Diabat obviously believes that Mr. As

is a front for his cousin, who is barred from trading on Turkish exchanges.  He argues that Mr. As made his first purchases only five days after his cousin was subject to an order barring him from trading.

But sheer speculation is no substitute for proof, and we do not engage in guilt by association in this court.  There is no evidence that Mr. As participated in any illicit security dealings in Turkey with his cousin or that there has been any effort to sanction him, as his cousin has been twice sanctioned.  Nor is there any evidence that he bought shares for anyone else.

I believe the presumption to have been rebutted because of the timing of his purchases, but I wanted to make it very clear that I did not find the other argument, which is something of an aspersion on Mr. As, to have any merit.

So this leaves Professor Diabat, who does not appear to have any similar deficiencies.  He is a resident of Jordan, a lawful permanent resident of the United States, although I do believe he lives abroad since he is on the faculty of New York University in Abu Dhabi.  There does not appear to be any indication in the record before me that his transactions in Credit Suisse ADSs are not domestic transactions.  The only argument I can find in the papers that is raised against him is that he defaulted in a state court matter in Indiana some years ago, a case in which he claims never to have been served.  He

is appointed lead counsel, and the Kahn Swick & Foti firm as class counsel.

So we've taken care of that.  So let me turn to ——  who's going to speak for Kahn Swick.

MS. MILLER:  Your Honor, Kim Miller.

THE COURT:  I assume you're going to file a consolidated amended class action complaint?

MS. MILLER:  Yes, of course, your Honor.

THE COURT:  You have ten days.

MS. MILLER:  I thought I'd get 14.

THE COURT:  OK.  You have 14 days.

MS. MILLER:  Thank you, your Honor.

THE COURT:  All right.  Now, so I've got a consolidated class action.  I've got the RICO case.  That's over here.  I've got a consolidated class action, and then there are some —— there's another case, another AT1 bond case, is that correct?

MR. GUTZLER:  That's correct, your Honor.  Greg Gutzler on behalf of the AT1 bondholders.

It is a case against the directors, officers, senior management of Credit Suisse under the Swiss Code of Obligations.  We seek to hold those individuals liable for the AT1 bondholder losses of $17 billion.

THE COURT:  I assume that whoever is representing those defendants is going to want to suggest to me that that is

N97HCreC

the case, that it is a uniquely Swiss case that should be brought in Switzerland?

MR. MOSS:  That's correct, your Honor.

THE COURT:  I'm shocked.

MR. MOSS:  Among other things.

THE COURT:  Shocked.  I'm shocked, shocked.

You all submitted a briefing schedule to me?

MR. GUTZLER:  Yes, your Honor.

THE COURT:  Fine.

MR. GUTZLER:  Thank you.

THE COURT:  So now they're going to file a consolidated amended complaint in 14 days.  You're, obviously, going to move to dismiss it or for forum non conveniens, or whatever the heck you're going to do.  Let's get a briefing schedule for the class actions, securities fraud class actions.

When do you want to make that motion?  I mean, there's a lot of overlap in these motions.  It's not like you're starting from scratch.

MR. MOSS:  Would 30 days after the filing of the CSC be acceptable, your Honor?

THE COURT:  It would be acceptable.

And how long would you like to respond?

MS. MILLER:  The same, your Honor.

THE COURT:  Thirty days.

And then ten days —— 14 days for reply; 14 days, 14

N97HCreC

days —— 14, 14, 30, 30.

MR. MOSS:  That's fine, your Honor.  I would just ask —— I haven't done the math in my head —— but if it overlaps with Thanksgiving ——

THE COURT:  Well, let's do the math.

MR. MOSS:  —— for a little extra.

THE COURT:  Let's do the math.  First I have to tear August off the calendar.

MS. MILLER:  Your Honor, at the risk of complicating things, could I have, instead of 30 days on my opposition, five more on the amended complaint on the front end?

THE COURT:  And then 25?

MS. MILLER:  Yes.

THE COURT:  OK.  I'm not going to —— let's start with —— OK.  So what's 19 days from today.  What's today?  It's the 7th.  So that means the amended consolidated complaint is going to be filed on the 26th of September, which means —— and I'll give you until the 27th, which happens to be a Friday.  It will make for a nice weekend for everyone.  The 27th of October to file your motion to dismiss.

Then you've got 25 days, so we have one, two, three, four, and 21.  So you have to file by Tuesday, the 21st of November, good job, which is two days before Thanksgiving, your response.  And then you'll have a nice holiday, and we'll give 14 days to the defendants to do a reply, which will be December

N97HCreC

the 5th.  And, actually, because I'm feeling benevolent, let's make it December the 7th.  That way you guys can have a little Thanksgiving too.

All right.  That means that by the morning of December 8, everything will be briefed in the securities case.

What's my deadline date in the RICO case?

MR. MOSS:  Go ahead.

MR. CHANG:  The opposition is due October 27 and the reply is 30 days.

MR. MOSS:  I have it right here, your Honor.  That case will be —— it's September 22 opening brief, October 27 opposition, November 10 it will be fully submitted.

THE COURT:  November 10 for the RICO case.

And then you gave me —— I have to find the letter.

MR. MOSS:  I have those dates as well.

THE COURT:  The dates for the ——

MR. MOSS:  Yes.

THE COURT:  —— the new A1?

MR. MOSS:  Yeah, that's the Star Colbert case.

THE COURT:  Star, thank you.

MR. MOSS:  And that's fully submitted by December 4.

THE COURT:  Great.  That puts everybody on more or less the same timetable.  It also puts me on one timetable, which is a good thing.

I look forward to reading your motion papers and to

N97HCreC

deciding these various interesting issues.

Can you guys enlighten me?  What's going on in Switzerland?  What happens when a Swiss bank goes under, besides the fact that the other Swiss bank has a gun put to its head?  But other than that, what goes on?  Is there some kind of an insolvency proceeding like we would have in the United States?  I'm just curious.

MR. MOSS:  I'm not aware of that, your Honor.  I know that the entities have merged, CS and UBS.

THE COURT:  Yes.

MR. MOSS:  And that's the answer.

THE COURT:  OK.

MR. MOSS:  I believe that's the extent of it.

THE COURT:  And that's the extent of it.  Fine. Useful piece of information.

All right.  Well, I always love cases where I get interesting affidavits from people who tell me about European law.  So I'm sure I'm going to see quite a few of those. Looking forward to that.  And I'm ready to rumble.

Great.  Glad to have you all here.  Thank you very much.

(Adjourned)