**KAHN SWICK & FOTI, LLC**
Kim E. Miller (KM-6996)
J Ryan Lopatka
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: j.lopatka@ksfcounsel.com

-and-

Lewis S. Kahn
Craig Geraci
Melissa H. Harris (MH-3583)
Matthew P. Woodard (admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Diabat*
*and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALI DIABAT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KÖRNER, DIXIT JOSHI, THOMAS GOTTSTEIN, DAVID R. MATHERS, ANTÓNIO HORTA-OSÓRIO, and PRICEWATERHOUSECOOPERS AG<br><br>Defendants. | No. 1:23-cv-5874-CM-SLC<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page:**


**OVERVIEW** ..... 1

I. Background ..... 1

II. PwC's Participation in the Fraud ..... 8

**JURISDICTION AND VENUE** ..... 10

**PARTIES** ..... 11

I. Plaintiff ..... 11

II. Defendants ..... 11

**CONFIDENTIAL WITNESSES** ..... 12

**CREDIT SUISSE DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS** ..... 14

I. April 6, 2021: Media Releases and Compensation Report Update ..... 14

II. April 6, 2021: Defendant Gottstein Interview with *Neue Zürcher Zeitung* ..... 18

III. April 22, 2021: First Quarter 2021 Media Release and Investor Presentation ..... 19

IV. April 22, 2021: First Quarter 2021 Earnings Release ..... 21

V. April 22, 2021: Defendant Gottstein's Statements to Reporters ..... 24

VI. April 22, 2021: First Quarter 2021 Earnings Conference ..... 25

VII. April 22, 2021: First Quarter 2021 Press Conference ..... 30

VIII. April 30, 2021: Annual General Meeting of Shareholders ..... 33

IX. May 6, 2021: First Quarter 2021 Report ..... 36

X. July 1, 2021: Defendant Horta-Osório Interview with *Neue Zürcher Zeitung* ..... 38

XI. July 27, 2021: David Wildermuth Appointment Media Release ..... 39

XII. July 29, 2021: Archegos Media Release and Report ..... 40

XIII. July 29, 2021: Second Quarter 2021 Earnings Release ..... 41

XIV. July 29, 2021: Second Quarter 2021 Report ..... 43

XV. July 29, 2021: Second Quarter 2021 Earnings Conference ..... 44

XVI. July 29, 2021: Second Quarter 2021 Press Conference ..... 52

XVII. August 13, 2021: Axel Lehman and Juan Colombas Nominations Media Release ..... 53

XVIII. September 26, 2021: Defendant Horta-Osório and Gottstein Interview with *SonntagsBlick* ..... 54

XIX. November 4, 2021: Investor Day 2021 Media Release and Investor Presentation ........ 55

XX. November 4, 2021: Investor Day ........ 57

XXI. November 4, 2021: Third Quarter 2021 Media Release and Investor Presentation ........ 60

XXII. November 4, 2021: Third Quarter 2021 Report ........ 61

XXIII. November 4, 2021: Defendants Horta-Osório and Gottstein Interview with *Bloomberg TV* ........ 63

XXIV. November 6, 2021: Third Quarter 2021 Earnings Conference ........ 64

XXV. November 7, 2021: Defendants Horta-Osório and Gottstein Interview with *Neue Zürcher Zeitung* ........ 65

XXVI. January 17, 2022: Defendant Horta-Osório "Resignation" and Defendant Lehmann Appointment Media Release ........ 65

XXVII. January 25, 2022: Preliminary Fourth Quarter and Fiscal Year 2021 Earnings Media Release ........ 67

XXVIII. February 10, 2022: Fourth Quarter and Fiscal Year 2021 Media Release and Investor Presentation ........ 68

XXIX. February 10, 2022: Fourth Quarter and Fiscal Year 2021 Earnings Release ........ 68

XXX. February 10, 2022: Fourth Quarter and Fiscal Year 2021 Earnings Conference ........ 70

XXXI. February 18, 2022: Defendant Gottstein Interview with *Finanz und Wirtschaft* ........ 74

XXXII. February 20, 2022: Suisse Secrets Press Release ........ 75

XXXIII. March 10, 2022: 2021 Annual Report ........ 76

XXXIV. March 15, 2022: Morgan Stanley European Financials Conference ........ 79

XXXV. April 4, 2022: Credit Suisse Answers to Ethos Foundation Information Request Regarding Greensill Funds and Suisse Secrets ........ 81

XXXVI. April 20, 2022: Preliminary First Quarter 2022 Earnings Media Release ........ 83

XXXVII. April 27, 2022: First Quarter 2022 Media Release and Investor Presentation ........ 84

XXXVIII. April 27, 2022: First Quarter 2022 Earnings Release ........ 86

XXXIX. April 27, 2022: First Quarter 2022 Earnings Conference ........ 87

XL. April 27, 2022: First Quarter 2022 Press Conference ........ 89

XLI. April 29, 2022: Annual General Meeting of Shareholders ........ 92

XLII. May 5, 2022: First Quarter 2022 Report ... 94
XLIII. May 23, 2022: Defendant Lehmann Interview with *CNBC* ... 95
XLIV. May 31, 2022: Denial of *Reuters* Report On Capital Raise ... 96
XLV. June 8, 2022: Preliminary Second Quarter 2022 Earnings Media Release ... 97
XLVI. June 28, 2022: Investor Deep Dive 2022 Presentation ... 98
XLVII. July 27, 2022: Defendant Gottstein "Resignation" and Defendant Körner Appointment Media Release ... 100
XLVIII. July 27, 2022: Second Quarter 2022 Media Release and Investor Presentation ... 101
XLIX. July 27, 2022: Second Quarter 2022 Earnings Release ... 103
L. July 27, 2022: Second Quarter 2022 Earnings Conference ... 104
LI. July 27, 2022: Defendant Lehmann Interview with *Bloomberg TV* ... 107
LII. July 29, 2022: Second Quarter 2022 Report ... 108
LIII. August 22, 2022: Defendant Mathers "Resignation" and Defendant Joshi Appointment Media Release ... 110
LIV. October 14, 2022: Defendant Lehmann Speech at the Institute of International Finance ... 111
LV. October 27, 2022: 2022 Strategic Review Media Release ... 112
LVI. October 27, 2022: 2022 Strategy Update Presentation ... 114
LVII. October 27, 2022: Rights Offering Media Release ... 116
LVIII. October 27, 2022: Third Quarter 2022 Media Release and Investor Presentation ... 117
LIX. October 27, 2022: Third Quarter 2022 Earnings Release ... 119
LX. October 27, 2022: Third Quarter 2022 Earnings Conference ... 122
LXI. October 27, 2022: Defendant Körner Interview with *CNBC* ... 123
LXII. October 31, 2022: Defendant Körner Interview with *Bloomberg TV* ... 124
LXIII. November 2, 2022: Third Quarter 2022 Report ... 124
LXIV. November 15, 2022: SPG/Apollo Media Release ... 127
LXV. November 23, 2022: Preliminary Fourth Quarter 2022 Earnings Media Release ... 129
LXVI. November 23, 2022: Rights Offering Media Release ... 131
LXVII. December 1, 2022: Defendant Lehmann *Financial Times* Interview ... 131
LXVIII. December 2, 2022: Defendant Lehmann *Bloomberg* Interviews ... 132
LXIX. December 5, 2022: Defendant Lehmann Interview with *SFR* ... 134

LXX. December 8, 2022: Rights Offering Media Release ... 135

LXXI. January 17, 2023: Defendant Lehmann Interview with *Bloomberg TV* ... 136

LXXII. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Media Release and Investor Presentation ... 136

LXXIII. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Earnings Release ... 138

LXXIV. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Earnings Conference ... 140

LXXV. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Press Conference ... 145

LXXVI. February 9, 2023: Defendant Körner Interview with *Bloomberg TV* ... 146

LXXVII. March 13, 2023: Defendant Lehmann Speech at Financial Sector Conference ... 147

LXXVIII. March 14, 2023: 2022 Annual Report ... 147

LXXIX. March 14, 2023: Defendant Körner Speech at European Financials Conference ... 150

LXXX. March 14, 2023: Defendant Körner Interview with *Bloomberg* ... 151

LXXXI. March 15, 2023: Defendant Körner Interview with *CNA* ... 151

**CREDIT SUISSE'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP** ... 152

I. Interim Financial Statements ... 153

II. Audited Financial Statements ... 154

III. SOX Certifications ... 155

**PwC's MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS** ... 157

I. May 6, 2021: First Quarter 2021 Interim Audit ... 158

II. July 29, 2021: Second Quarter 2021 Interim Audit ... 159

III. November 4, 2021: Third Quarter 2021 Interim Audit ... 160

IV. March 10, 2022: 2021 Annual Report Audit ... 161

V. May 5, 2022: First Quarter 2022 Interim Audit ... 163

VI. July 29, 2022: Second Quarter 2022 Interim Audit ... 164

VII. November 2, 2022: Third Quarter 2022 Interim Audit ... 165

VIII. March 14, 2023: 2022 Annual Report Audit ... 166

**THE TRUTH IS REVEALED CAUSING LOSSES AND ECONOMIC DAMAGES** ... 168

**POST CLASS PERIOD EVENTS** ... 180

**DEFENDANTS ACTED WITH SCIENTER** .......... 183

I. Scienter for the Individual Defendants .......... 185

A. The Individual Defendants Knew or Recklessly Disregarded That Their Statements Were Materially False and Misleading .......... 185

1. The SEC Inquiry Into Credit Suisse's Financial Reporting Supports a Strong Inference of Scienter .......... 185

2. Confidential Witnesses Support a Strong Inference of Scienter .......... 186

3. FINMA's Investigation of Credit Suisse's Top Banker Lescaudron Prior to the Class Period Supports Scienter .......... 187

4. The Individual Defendants' Attempt to Destroy Documents and Hide Client Accounts Relating to its Russia Dealings Supports Scienter .......... 188

5. Class Period Admissions and Events Support a Strong Inference of Scienter .......... 189

6. Post Class Period Admissions and Events Support a Strong Inference of Scienter .......... 190

7. Numerous Red Flags Support a Strong Inference of Scienter .......... 192

a. Credit Suisse's Risk Staffing, Systems, Technology, and Structure Were Deficient .......... 192

b. Credit Suisse's Recent History of Massive Fines, Government Investigations, and a Guilty Plea .......... 194

c. Public Report of Swiss Banks' Actual Russia Exposure Put Individual Defendants on Notice .......... 195

8. The Departures of Key Executives and Defendants Horta-Osório, Gottstein, and Mathers Support a Strong Inference of Scienter .......... 195

9. Individual Defendants' High-Level Positions and Access to Contrary Information Support a Strong Inference of Scienter .......... 197

10. The Core Operations Doctrine Further Supports a Strong Inference of Scienter .......... 198

B. The Individual Defendants Had Significant Financial Motives to Commit Fraud .......... 198

C. Corporate Scienter is Established .......... 201

II. Scienter for PwC .......... 201

A. PwC Either Knew or Recklessly Disregarded That Its Statements Were False .......... 201

B. PwC Had Significant Financial Motive to Commit Fraud .......... 203

**PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY** ..... 204

**THE 2021 AND 2022 ANNUAL REPORTS OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN UNDER ITEM 5 OF FORM 20-F** ..... 204

**THE PRESUMPTION OF RELIANCE** ..... 206

**CONTROL PERSON ALLEGATIONS** ..... 207

**CLASS ACTION ALLEGATIONS** ..... 208

**COUNT I** ..... 210

**COUNT II** ..... 212

**PRAYER FOR RELIEF** ..... 213

**JURY TRIAL DEMANDED** ..... 214

Lead Plaintiff Ali Diabat ("Plaintiff"), individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters based upon the investigation conducted by Lead Counsel. This investigation included review and analysis of: (i) court records; (ii) public filings of Credit Suisse Group AG ("Credit Suisse" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) Credit Suisse's press releases and other investor materials; (v) analyst reports and independent media reports regarding Credit Suisse, its securities price movement, pricing, and volume data; (vi) news articles; and also included (vii) interviews of persons with knowledge of the allegations contained herein, including former employees of Credit Suisse. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

## OVERVIEW

### I. Background

1. On March 19, 2023, Credit Suisse announced it would no longer operate as an independent entity and would merge into its former rival, UBS Group AG ("UBS"). "The deal, hastily brokered over the course of a few days by the Swiss government, signifie[d] the stunning fall of a 166-year-old institution that was once an emblem of Swiss pride." Michael J. de la Meced, Maureen Farrell & Andrew Ross Sorkin, "UBS Agrees to Buy Rival Credit Suisse." *The New York Times*, Mar. 19, 2023. UBS' takeover of Credit Suisse marks the first time two global, systemically important financial institutions have been brought together since the financial collapse of 2008 and 2009. Put simply, the consequences of Defendants' fraud are historic.

2. Plaintiff brings this securities class action on behalf of persons or entities who purchased or otherwise acquired Credit Suisse securities in domestic transactions from April 6, 2021 through and including March 20, 2023, (the "Class Period"), against defendants Credit Suisse; former Chairman of the Board of Directors Axel P. Lehmann ("Lehmann"); former Chief Executive Officer Ulrich Körner ("Körner"); former Chief Financial Officer Dixit Joshi ("Joshi"); former Chairman of the Board of Directors António Horta-Osório ("Horta-Osório"); former Chief Executive Officer Thomas Gottstein ("Gottstein"); and former Chief Financial Officer David R. Mathers ("Mathers"); and auditor PricewaterhouseCoopers AG ("PwC") (collectively, "Defendants"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

3. From its founding in 1856 until its merger with UBS in June of 2023, Credit Suisse was a global financial services company based in Zurich, Switzerland. It had branch offices in the United States and around the globe. Throughout the Class Period, its American Depository Shares ("ADSs") were listed and traded on the New York Stock Exchange ("NYSE") under the ticker symbol "CS," and its bonds traded worldwide, including domestically.

4. Prior to the beginning of the Class Period on April 6, 2021, Credit Suisse had been rocked by a variety of high profile scandals.[1] Most recently, the failure of Credit Suisse's funds structured in collaboration with UK-based financier Lex Greensill ("Greensill Funds") and the collapse of Archegos Capital Management ("Archegos"), a hedge fund for which Credit Suisse had significant, undisclosed exposure, forced Credit Suisse to incur substantial losses and reveal critical risk management and control governance failures in March 2021.

[1] For example, in 2017 Credit Suisse agreed to pay USD $5.28 billion to resolve a probe by the U.S. Department of Justice relating to its conduct in the packaging, securitization, issuance, marketing, and sale of residential mortgage-backed securities ("RMBS") between 2005 and 2007.

5. On March 1, 2021, Credit Suisse's Asset Management division ("CSAM") issued a press release announcing that it had suspended redemptions and subscriptions of its Greensill Funds, previously valued at approximately USD $10 billion, over concerns that they were "subject to considerable uncertainties with respect to their accurate valuation." The Greensill Funds were backed by short-term loans Greensill made to enable companies to spread out the time they had to pay bills -- a practice known as supply chain finance. Approximately a week after Credit Suisse's announcement, Greensill filed for bankruptcy in London. Ultimately, Credit Suisse was unable to recover approximately ***USD $3 billion*** of its customers' money from the Greensill Funds.

6. Shortly thereafter, during the week of March 22, 2021, the market value of Archegos' portfolio with Credit Suisse and other prime brokerage banks dropped precipitously, largely driven by declines in certain technology stocks. This steep decline triggered a chain reaction that led to Archegos' default on its prime brokers' margin calls. On March 29, 2021, before the market opened, Credit Suisse issued a press release disclosing that a "significant US-based hedge fund defaulted on margin calls made last week by Credit Suisse and certain other banks" and that while it was "premature to quantify the exact size of the loss resulting from this exit, it could be highly significant and material to our first quarter results…." According to the investigation and report conducted by the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") (which was retained by a Special Committee of the Credit Suisse Board of Directors appointed to review the bank's relationship with Archegos), Credit Suisse ultimately "incurred approximately [USD] ***$5.5 billion*** in losses following the March 2021 default of Archegos…."

7. Thus, it is within the context of not one but *two* major risk management and control governance scandals immediately preceding the Class Period that Defendants repeatedly reassured

investors throughout the Class Period that Credit Suisse had "taken significant steps to address" the underlying causes of those scandals, the Company's "risk and control governance is being strengthened and will be further enhanced," and the Company maintained "sufficient liquidity to sustain operations" in the event of "unexpected outflows."

8. Furthermore, despite the fact that Credit Suisse's outside auditor PwC identified significant accounting issues with respect to Credit Suisse's balance sheet and cash flow positions for audit years 2020 and 2019 during the Class Period, Defendants nevertheless falsely characterized those issues as "not material individually or in the aggregate to the prior period financial statements…." In so doing, Defendants avoided disclosing *present* material weaknesses in internal controls over financial reporting (which would have necessitated restatements of prior financials). PwC characterized these accounting issues as immaterial while being compensated in excess of ***CHF***[2] ***$209.6 million*** (approximately USD $231.3 million), for its work on Credit Suisse's 2020, 2021, and 2022 audits. Only after the SEC continued to press the matter would Defendants belatedly identify material weaknesses in internal controls over financial reporting relating to these very same issues.

9. On February 20, 2022, the *Süddeutsche Zeitung* (the "*SZ*"), one of the largest daily newspapers in Germany, reported it had received data from a whistleblower on more than 30,000 Credit Suisse customers and 18,000 accounts, holding in excess of USD $100 billion, approximately one year earlier. That data was evaluated by a consortium of 48 media companies, among them the Organized Crime and Corruption Reporting Project (the "OCCRP"), *The Guardian*, *The New York Times*, and *Le Monde*. The data and subsequent investigation by the media consortium became widely known as the "Suisse Secrets" or "Swiss Leaks" scandal.

[2] "CHF" is the abbreviation for the Swiss franc.

According to reporting published that same day, the leaked data "reveal[ed] how Credit Suisse repeatedly either opened or maintained bank accounts for a panoramic array of high-risk clients across the world." David Pegg, Kalyeena Makortoff, Martin Chulov, Paul Lewis & Luke Harding, "Revealed: Credit Suisse leak unmasks criminals, fraudsters and corrupt politicians," *The Guardian*, Feb. 20, 2022. "Among the biggest revelations is that Credit Suisse continued to do business with customers even after bank officials flagged suspicious activity involving their finances." Jesse Drucker & Ben Hubbard, "Vast Leak Exposes How Credit Suisse Served Strongmen and Spies," *The New York Times*, Feb. 20, 2022. Subsequent reporting on the Suisse Secrets data revealed that Credit Suisse held at least 27 secret accounts (with deposits in excess of CHF $1.9 billion, or over USD $2 billion), for the sanctioned Russian oligarch Alisher Usmanov, through his sister, Saodat Narzieva. Kalyeena Makortoff & Simon Goodley, "Oligarch linked to billions in 27 Swiss bank accounts in sister's name," *The Guardian*, Mar. 22, 2022.

10. In late February 2022, as Defendants continued to tout Credit Suisse's risk management and control governance reforms in the wake of recent scandals, Russia launched a military attack on Ukraine. In response to Russia's invasion of Ukraine, the US, EU, UK, Switzerland and other countries imposed severe sanctions against Russia's financial system and on Russian government officials and Russian business leaders. While Defendants would tout their adherence to the sanctions to downplay the Company's related exposure throughout the Class Period, Credit Suisse's exposure was, in reality, immense. To that end, on March 1, 2022, *Financial Times* reported that Credit Suisse sent a letter to investors asking them "to destroy documents relating to its richest clients' yachts and private jets, in an attempt to stop information leaking about a unit of the bank that has made loans to oligarchs who were later sanctioned." Subsequently, on March 28, 2022, the U.S. House Oversight Committee sent Credit Suisse a letter

requesting that it turn over information relating to its financing of yachts and aircraft owned by potentially sanctioned individuals.[3]

11. At the same time, Credit Suisse's high-net-worth and ultra-high-net worth customers were leaving the beleaguered bank *en masse*. While the Company eventually revealed customers had withdrawn tens of billions of dollars in October 2022, on December 2, 2022, Defendant Lehmann told *Bloomberg* that, as of November 11, 2022, customer outflows had "basically stopped." In the same interview, Defendant Lehmann characterized the outflows as a mere "two-to-three-week event." But this was simply not the case. In fact, Credit Suisse experienced significant customer outflows both prior to October 2022 and through the end of the Class Period.

12. On February 10, 2022, while Defendants were continuing to issue materially false and misleading statements, the truth began to be revealed when the Company issued its FY21 Earnings Release. The FY21 Earnings Release revealed a fourth quarter "net loss attributable to shareholders of ***CHF 2.0 bn***," or approximately USD $2.2 billion. On February 22, 2022, the market digested the Suisse Secrets scandal, with analysts at RBC Capital Markets publishing a research note titled "CS – 'Swiss Secrets' leak is the bank's latest headache." The note stated that the allegations "raise[] questions about [Credit Suisse's] business practices in wealth management and should tie up management having to spend time fighting fires instead of moving forward."

13. On May 31, 2022, *Reuters* published a report that the Company was "in the early stages of weighing options to bolster its capital after a string of losses has eroded its financial buffers…." Thereafter, on September 23, 2022, *Reuters* published another report that "Credit

[3] More recently, on March 23, 2023, *Bloomberg* reported that the U.S. Department of Justice had issued subpoenas to Credit Suisse (and UBS) in connection with a probe into whether the Company helped Russian oligarchs evade sanctions.

Suisse is sounding out investors for fresh cash…as it attempts a radical overhaul of its investment bank."

14. On October 27, 2022, the Company released a blitzkrieg of information, including: (1) that it intended to approve "two separate share capital increases" consisting of a new share issuances for the Saudi National Bank and existing shareholders, for a combined total of ***CHF $4 billion*** (approximately USD $4.4 billion); (2) that it would spin-off its Investment Bank business and sell its Securitized Products Group; and (3) that it "recorded a net loss attributable to shareholders of ***CHF 4,034 million***" (approximately USD $4,450 million) in 3Q22.

15. On November 23, 2022, the Company issued both its Preliminary 4Q22 Media Release announcing customers had withdrawn approximately ***10%*** of all assets under management as of the end of 3Q22 and that it expected to incur a substantial loss of approximately ***CHF $1.5 billion*** (approximately USD $1.65 billion) in 4Q22, as well as a media release announcing shareholder approval of the proposed capital increases announced on October 27, 2022. Shortly thereafter, on November 25, 2022, Credit Suisse issued another release announcing the Company's execution of the capital increases.

16. On February 9, 2023, the Company disclosed in its earnings release for the fourth quarter and fiscal year of 2022 that customers had withdrawn approximately ***CHF $110.5 billion*** (approximately USD $124 billion) in the final three months of 2022, a figure that surprised analysts.

17. On March 14, 2023, the Company filed its 2022 Annual Report admitting it had identified material weaknesses in its internal controls over financial reporting. The following day, *Reuters* reported that Credit Suisse's biggest investor – the Saudi National Bank – refused to buy any more of the Company's shares on regulatory grounds.

18. On March 20, 2023, the last day of the Class Period, the Company issued a press release announcing its merger with its competitor, UBS Group AG ("UBS"), at the behest of the Swiss government. It was later revealed that Swiss authorities had forced the merger in lieu of Credit Suisse's imminent collapse, which officials feared would trigger a global financial meltdown.

## II. PwC's Participation in the Fraud

19. After an evaluation and selection process beginning in 2018, Credit Suisse shareholders at the Annual General Meeting of Shareholders ("AGM") on April 30, 2020 voted to approve the Board of Directors' proposal that PwC should succeed the Company's prior auditor, KPMG AG ("KPMG"), and PwC's appointment became effective for the fiscal year ended December 31, 2020.

20. The Sarbanes-Oxley Act of 2002 ("SOX") requires publicly traded companies, like Credit Suisse, to file audited financial statements. Independent auditors like PwC audit public companies to determine whether the companies' financial statements were prepared in accordance with GAAP. Although some auditor's reports are referred to as "opinions," these reports are not subjective opinions in the ordinary sense of the word, but rather a specific type of attestation about whether financial statements do or do not comply with GAAP. If it is determined that financial statements do not comply with GAAP, the company may be required to restate its financial statements.

21. While independent auditors are paid for their services, their obligation is not to their client(s). Rather, independent auditors serve the important function of "public watchdog," with a "public responsibility transcending any employment relationship with the client."[4] "The

[4] *United States v. Marino*, 654 F.3d 310, 323 (2d Cir. 2011) (citing *United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984)).

independent auditor's obligation to serve the public interest assures that the integrity of the securities markets will be preserved." *Id.* The Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation created by SOX to oversee the audits of public companies, is responsible for establishing generally accepted auditing standards ("GAAS"), professional standards to which auditors are required to adhere.

22. The PCAOB also inspects a number of registered accounting firms each year in order to assess, drive improvement in, and communicate audit quality. The lists of which firms/areas/audits will be inspected are not public information, as this would allow firms to take additional measures to shore-up their audits for that year, and potentially minimize work in other, non-inspection years.

23. In 2018, the year Credit Suisse initially made the decision to switch auditors, the SEC charged six public accountants with leaking confidential PCAOB data to KPMG from 2015-2017. The Co-Director of the SEC's Enforcement Decision Division likened this misconduct to "stealing the exam…in an effort to interfere with the PCAOB's ability to detect audit deficiencies at KPMG." The U.S. Attorney's Office for the Southern District of New York also brought criminal charges against the six accountants. Court filings in that case revealed that Credit Suisse was on the list of KPMG clients to be inspected in 2016.[5] Though it was eventually dropped from the inspection roster, court filings showed KPMG was concerned that issues found in previous investigations of Credit Suisse, specifically related to cash flows, still existed, and performed a series of "stealth reviews" of the bank's 2016 audit to ensure that, if these issues came up, the audit would be clean. *Id.* These statements indicated that such care was not taken during those years for

[5] Francine McKenna, "Anatomy of a failure: Credit Suisse, PwC, and KPMG, too," *The Dig*, May 28, 2023, available at https://thedig.substack.com/p/anatomy-of-a-failure-credit-suisse

which KPMG did not expect a PCAOB inspection. As such, when PwC took on the mantle of Credit Suisse's auditor, it inherited several known issues, signaling the need to take special care.

24. Nevertheless, PwC stated, in letters attached to each of Credit Suisse's Interim Reports on Form 6-K during the Class Period, that it was "not aware of any material modifications that should be made" to bring the interim report in conformity with GAAP; that the information included from the previous year's balance sheet "is fairly stated, in all material respects"; and that it had conducted its review in accordance with PCAOB standards. PwC also stated, in a letter attached to Credit Suisse's 2021 Annual Report filed on Form 20-F with the SEC on March 10, 2022, that the financial statement "present[ed] fairly, in all material respects, the financial position the Group as of December 31, 2021 and 2020" and that Credit Suisse had maintained "effective internal control over financial reporting as of December 31, 2021."

25. In this same Form 20-F, however, Credit Suisse stated that it had "identified accounting issues" that required it to revise (not restate) its financial statements for the years ending December 31, 2020, and December 31, 2019, but that these issues were "not material individually or in aggregate," a determination Credit Suisse later represented was blessed by PwC. Specifically, the Company stated that the issues were with the "netting treatment relating to the presentation of a limited population of certain securities lending and borrowing activities" resulting in the "balance sheet and cash flow positions for both assets and liabilities relating to these activities were understated." Separately, the Company identified issues with "consolidated statements of cash flows share-based compensation expenses, net"; "expanded the elimination of non-cash exchange rate movements related to certain operating, investing and financing activities"; and "the presentation of certain cash flow hedges were reclassified."

**JURISDICTION AND VENUE**

26. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

28. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Credit Suisse's ADSs traded on the New NYSE throughout the Class Period. Accordingly, there are investors in Credit Suisse's securities located within the U.S., some of whom reside in this Judicial District.

29. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### I. Plaintiff

30. Plaintiff Ali Diabat, as set forth in the certification attached hereto, purchased Credit Suisse securities in domestic transactions during the Class Period and was damaged when the truth was revealed and the artificial inflation was removed from the price of the securities.

### II. Defendants

31. Until its merger with UBS on or about June 12, 2023, Defendant Credit Suisse was a financial services company. During the Class Period it operated through the following four divisions: Wealth Management, Investment Bank, Swiss Bank, and Asset Management.

32. Credit Suisse was organized under the laws of Switzerland with its principal executive office located at Paradeplatz 8, 8001, Zurich, Switzerland. Prior to its merger into UBS

and subsequent delisting, Credit Suisse's ADSs traded on the New York Stock Exchange ("NYSE") under the ticker symbol "CS."

33. Defendant Axel P. Lehmann ("Lehmann") served as Chairman of the Board of Directors from January 2022 until June 2023.

34. Defendant Ulrich Körner ("Körner") served as the Company's Chief Executive Officer ("CEO") from August 2022 until June 2023.

35. Defendant Dixit Joshi ("Joshi") served as the Company's Chief Financial Officer ("CFO") from October 2022 until June 2023.

36. Defendant António Horta-Osório ("Horta-Osório") served as the Company's Chairman of the Board of Directors from April 2021 until his "resignation" in January 2022.

37. Defendant Thomas Gottstein ("Gottstein") served as the Company's CEO from February 2020 until his "resignation" in July 2022.

38. Defendant David R. Mathers ("Mathers") served as the Company's CFO from October 2010 until his "resignation" in August 2022.

39. Defendants Lehmann, Körner, Joshi, Horta-Osório, Gottstein, and Mathers are collectively referred to herein as the "Individual Defendants." The Individual Defendants and Credit Suisse are collectively referred to herein as the "Credit Suisse Defendants."

40. Defendant PricewaterhouseCoopers AG ("PwC") is an international accounting and consulting firm. PwC was engaged by Credit Suisse to provide "independent" auditing, accounting, and management consulting services, tax services, examination and review of filings with the SEC, audits and/or reviews of financial statements which were included in Credit Suisse's SEC filings, including audited and unaudited information, and annual reports, since 2020.

## CONFIDENTIAL WITNESSES

41. Confidential Witness 1 ("CW1") worked at Credit Suisse as a Financial Analyst

from March 2019 to April 2022.

42. CW1's responsibilities included monitoring risk targets at Credit Suisse's branches throughout the world and his/her work was presented to a Managing Director in Risk Management at Credit Suisse's headquarters in Zurich, Switzerland.

43. CW1 stated that each Credit Suisse branch had a risk target and that the Company monitored the risk status of each branch to ensure it was staying within that target. Larger branches, such as New York City and Hong Kong, had a higher risk threshold than smaller branches, such as South Africa. CW1 also stated that branches were divided into tiers which determined how much risk that branch would hold. CW1's job was to monitor that. CW1 stated that he/she presented reports about the status of risk levels at each branch to the Managing Director in Risk Management in Switzerland.

44. CW1 stated that the Company monitored inflow and outflow of customer assets. CW1 also stated that Credit Suisse's customers were the "mega rich" and that the Wealth Management department served some of the world's wealthiest people. Consequently, when a customer exited the bank, that exit represented a loss of tens of millions, if not hundreds of millions, of dollars.

45. Confidential Witness 2 ("CW2") worked at Credit Suisse as an Executive Assistant from June 2015 to August 2021. CW2 supported five Managing Directors in the Mergers & Acquisitions ("M&A") division in New York City, working under the Global head of M&A.

46. CW2 designed and managed the day-to-day workload for five M&A Managing Directors, including managing those directors' schedules, meetings, emails, and calls.

47. CW2 stated that Credit Suisse was already losing customers and deposits in 2021 prior to his/her departure. CW2 states that as of the time of his/her departure there were already

concerns about Credit Suisse's health.

48. Confidential Witness 3 ("CW3") was a Managing Director at Credit Suisse from September 2015 to May 2023. CW3 reported to the Managing Director & Global Head of Equity Capital Markets, David Hermer.

49. CW3 attended leadership meetings with C-suite leaders, including Defendants Lehmann and Gottstein, throughout the Class Period. Specifically, CW3 attended an off-site leadership meeting in New York in late-February to early-March 2023 and another off-site leadership meeting in Zurich in mid-March 2023.

50. CW3 stated that "the executives knew" about customer and asset outflows throughout the Class Period.

## CREDIT SUISSE DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### I. April 6, 2021: Media Releases and Compensation Report Update

51. On April 6, 2021, the Company issued an update to the 2020 compensation report ("2020 Compensation Update") and two media releases regarding Board of Directors announcements (the "Board of Directors Media Release") and a preliminary first quarter 2021 earnings media release (the "Preliminary 1Q21 Earnings Media Release") which it filed with the SEC as exhibits to a Form 6-K the same day.

52. The Preliminary 1Q21 Earnings Media Release stated, in relevant part, as follows:

> While our financial results are still subject to detailed finalization and review, ***we would expect to report a pre-tax loss for 1Q 2021 of approximately CHF 900 million. This includes a charge of CHF 4.4 billion in respect of the failure by a US-based hedge fund to meet its margin commitments as we announced on March 29, 2021.***
>
> * * *
>
> With regard to the four supply chain finance funds, where we continue to see cash inflows, we will distribute a separate update on further repayments within the next few days.

***We acknowledge that both the US hedge fund and the supply chain finance fund matters require substantial further review and scrutiny. The Board of Directors has launched investigations into both of these matters which will not only focus on the direct issues arising from each of them, but also reflect on the broader consequences and lessons learned. We have also undertaken senior management changes within the Investment Bank division and within the Risk and Compliance organization as separately announced today.***

Thomas Gottstein, CEO of Credit Suisse Group said: "***The significant loss in our Prime Services business relating to the failure of a US-based hedge fund is unacceptable. In combination with the recent issues around the supply chain finance funds, I recognize that these cases have caused significant concern amongst all our stakeholders. Together with the Board of Directors, we are fully committed to addressing these situations. Serious lessons will be learned. Credit Suisse remains a formidable institution with a rich history.***"

(Emphasis added)

53. The Board of Directors Media Release stated, in relevant part, as follows:

***Following the significant US-based hedge fund matter, Brian Chin, CEO of the Investment Bank is stepping down from his role on the Executive Board, effective April 30, 2021. Lara Warner, Chief Risk and Compliance Officer, is stepping down from her role on the Executive Board, effective April 6. Both of them will leave the bank.***

* * *

In March 2021, the tactical crisis committee of the Board of Directors consisting of the Chairman, the Chairs of the Audit Committee and Risk Committee and the Chair of the Conduct and Financial Crime Control Committee was activated to exercise close oversight and ensure timely decision making with respect to the resolution of the issues in connection with the Credit Suisse Asset Management managed supply chain finance funds. The mandate of this committee has in the meanwhile been expanded to include the significant US-based hedge fund matter. ***The tactical crisis committee works closely with the CEO and the rest of the management team.***

***The Board of Directors has launched two investigations, to be carried out by external parties, into the supply chain finance funds matter and into the significant US-based hedge fund matter. These investigations will be supervised by a special committee of the Board of Directors and will not only focus on the direct issues arising from those matters, but also reflect on the broader consequences and lessons learned.***

(Emphasis added).

54. The 2020 Compensation Update stated, in relevant part, as follows:

> **Recent developments**
> Since the publication of the Compensation Report on March 18, 2021, the Board of Directors (Board) has assessed the recent significant developments in connection with the US-based hedge fund.
>
> **Withdrawal of the previously proposed Executive Board variable compensation amounts and other actions**
> Under the current circumstances, the Board has resolved to withdraw its proposals regarding the variable compensation for the Executive Board, comprising the 2020 short-term incentive compensation (STI), which was determined based on 2020 performance, and the 2021 long-term incentive opportunities (LTI), for which payout would have been determined based on prospective performance over the three-year period 2021– 2023.
>
> Overall, the previously proposed Executive Board compensation will be reduced by the entire previously proposed variable compensation amount of CHF 40.8 million. Of this reduction, CHF 15.7 million will relate to the withdrawn 2020 STI and CHF 25.1 million to the withdrawn 2021 LTI.
>
> * * *
>
> ***The Compensation Committee will continue to monitor developments closely and will determine, based on the results of any investigation, any appropriate actions to be applied, including the application of the Group's existing malus and clawback provisions on variable compensation awards to any applicable employees.***

(Emphasis added).

55. The statements contained in ¶¶ 52-54 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. First, no 'lessons would be learned' from the investigations into the failure of the Greensill Funds and Archegos losses, strongly suggesting that the investigations were largely a smokescreen to appease uneasy clients and investors. As later events (such as the near collapse of the bank, which would have had severe global ramifications) revealed, Defendants failed to

implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking throughout and prior to the Class Period. Likewise, the departures of Chin and Warner from their roles on the Executive Board had no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies, as the underlying issues reached far deeper than these two individuals. According to Sergio Ermotti, who took over as CEO of UBS after it absorbed Credit Suisse, after the merger, a "deep restructuring" was "necessary at Credit Suisse because our analysis has proven that the business model was not viable any longer."[6] Specifically, Ermotti cited "cultural" issues with Credit Suisse's "risk discipline," noting "some people were not really probably behaving in the best interest of clients and the bank."

56. Further, at the time these statements were made, there existed material weaknesses in the Company's internal controls over financial reporting. These weaknesses were symptomatic of Credit Suisse's flawed and unsustainable business model; contrary to the implications in the two April 6, 2021, media releases they ran far deeper than the two executives mentioned in the Board of Directors Release, and even deeper than the losses stemming from Greensill and Archegos. These material weaknesses also undermined the "very strong performance" touted by Credit Suisse in the Preliminary 1Q21 Earnings Media Release.

57. Analysts viewed the news regarding the internal investigations as a positive step for the Company. In a report "published on the same day titled "Credit Suisse: Some relief, and first steps taken," an analyst from Deutsche Bank noted, "first steps to regain confidence in Credit Suisse's risk management and businesses have been announced…***We see these as an opportunity***

[6] *CNBC International TV*, "UBS CEO Sergio Ermotti discusses first earnings report since Credit Suisse acquisition," August 31, 2023, available at https://www.youtube.com/watch?v=q3-N-U7_qhE.

to improve the group business mix and valuation in the mid-term." (Emphasis added). Other analysts applauded Credit Suisse's strong performance in the quarter, with an analyst from Morgan Stanley noting, in a report titled, "Credit Suisse Group AG: Losses quantified, strong underlying performance, management changes. Line in the sand?," that, had it not been for the Archegos losses, "[t]he underlying pretax profit run-rate would have been the strongest quarterly performance, at 80% run rate of 2020 pre-tax profit."

## II. April 6, 2021: Defendant Gottstein Interview with *Neue Zürcher Zeitung*

58. On April 6, 2021, Defendant Gottstein was interviewed by Swiss German-language newspaper *Neue Zürcher Zeitung*. *Reuters* summarized the interview in an article published that day titled "Credit Suisse's investment banking to be scrutinized by new chairman: CEO."

59. The article stated, in relevant part:

> The structure of Credit Suisse's investment bank will be scrutinised closely by incoming chairman Antonio Horta-Osorio, CEO Thomas Gottstein told a newspaper, as the bank aims to boost risk management after billions in losses on U.S. fund Archegos.
>
> "That is with certainty one of the core strategic themes that the board under the new chairman, together with the bank's executive leadership, will be focusing on," Gottstein told Neue Zuercher Zeitung on Tuesday.
>
> * * *
>
> "There are no sacred cows," Gottstein added in the interview. "What we can already say is, ***we will be taking risks out of certain parts of investment banking. That certainly includes the Prime Services business" that serves hedge funds like Archegos.***
>
> * * *
>
> In the NZZ interview, ***Gottstein blamed Credit Suisse's failings to adequately manage risks at least partly on the lack of face-to-face meetings with clients during the COVID-19 pandemic.***
>
> "It's a challenge to manage a global bank during a pandemic over Zoom," Gottstein told the newspaper. "I'm convinced that in the era of COVID-19 the scrutiny of risk business, whether for banks or insurers, has grown more difficult."

(Emphasis added).

60. The statements contained in ¶ 59 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. As described above, Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, and as such would not "be taking risks out of certain parts of investment banking." The same risk management issues which led to the Archegos loss persisted throughout the Class Period, in fact, incoming UBS CEO Ermotti stated that "risk discipline" was a cultural issue at Credit Suisse that UBS needed to address after the merger. As such, Defendants' failure to adequately manage risk was not due to "the lack of face-to-face meetings with clients during the COVID-19 pandemic," but because its risk parameters were materially deficient at all times. In fact, other banks conducted business via zoom throughout the pandemic without reporting severe issues with risk management stemming from conducting deals via zoom rather than face-to-face. These "face-to-face meeting" statements also implied that Credit Suisse's risk management issues were in the rear-view mirror, when, in fact, the issues pervaded Credit Suisse's business model and culture throughout the Class Period, resulting in a near collapse of the bank.

**III. April 22, 2021: First Quarter 2021 Media Release and Investor Presentation**

61. On April 22, 2021, the Company issued a media release announcing financial results for the first quarter of 2021 (the "1Q21 Media Release") for the period ended March 31, 2021, which it filed with the SEC, along with slides accompanying its presentation to investors, on a Form 6-K the same day. The 1Q21 Media Release quoted Defendant Gottstein in relevant part, as follows:

**Our results for the first quarter of 2021 have been significantly impacted by a CHF 4.4 bn charge related to a US-based hedge fund. The loss we report this quarter, because of this matter, is unacceptable. Together with the Board of Directors, we have taken significant steps to address this situation** as well as the supply chain finance funds matter. ***Among other decisive actions, we have made changes in our senior business and control functions; we have enhanced our risk review across the bank;*** **we have launched independent investigations into these matters by external advisors, supervised by a special committee of the Board; and we have taken several capital-related actions.**

* * *

**DECISIVE ACTIONS TAKEN FOLLOWING RECENT EVENTS**

As previously announced in trading updates in March and April, the Credit Suisse Board of Directors and the Executive Board have taken action to address the supply chain finance funds and US-based hedge fund matters directly. FINMA and other regulators were kept informed. These include:

Senior management changes:

- ***Replacing Brian Chin, CEO Investment Bank, and Lara Warner, Chief Risk and Compliance Officer***
- Christian Meissner appointed CEO of the Investment Bank and member of the Executive Board, effective May 1, 2021
- Joachim Oechslin appointed Chief Risk Officer and member of the Executive Board, in each case on an ad-interim basis, effective April 6, 2021
- Thomas Grotzer appointed interim Global Head of Compliance, reporting to the Group CEO, effective April 6, 2021
- Ulrich Körner appointed CEO of Asset Management and member of the Executive Board, effective April 1, 2021
- And a number of other executive changes in the Investment Bank and the CRCO function

***Enhanced review of risk across the bank:***

- ***Extensive review across our Prime Services business focused on underlying risk positions, as well as related counterparties***
- ***Enhanced due diligence across Asset Management following supply chain finance funds matter***
- ***Group-wide review of risk positions and of business and risk processes in close cooperation with Board of Directors and external advisors***
- ***Applying lessons learned from recent matters across the bank***

***Launched independent investigations into supply chain finance funds matter and US-based hedge fund matter***

- ***The Board of Directors has launched two independent investigations, carried out by external advisors, into the supply chain finance funds matter and the significant US-based hedge fund matter***

- ***These investigations are being supervised by a special committee of the Board of Directors and will not only focus on the direct issues arising from those matters, but also reflect on the broader consequences and lessons learned***

Capital related actions:
- Suspension of share buyback program
- Reduction of ordinary total dividend proposal to CHF 0.10 gross per registered share
- Successful placement of two series of MCNs
- ***Close engagement with FINMA and all relevant regulators; FINMA has initiated two enforcement proceedings (with regards to the US-based hedge fund and supply chain finance funds matters)***

(Emphasis added).

62. The statements contained in ¶ 61 were materially false and/or misleading because they misrepresented and failed to disclose the adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. As discussed above, contrary to Defendants' statements that the Company had "taken significant steps" to resolve the issues which led to the Archegos losses, Credit Suisse implemented no meaningful changes to the Company's severely lacking risk management and/or control governance procedures at this time or any other time during the Class Period. These issues were deeply ingrained in the Company's business model and culture and would not be solved by surface-level band-aids like management changes, "[e]nhanced due diligence," or "[a]pplying lessons learned from recent matters across the bank." The lack of meaningful changes also indicates that the much-touted investigations launched by the Board of Directors were largely window dressing to appease clients and shareholders. Additionally, at the time these statements were made, there existed material weaknesses in the Company's internal controls over financial reporting, undermining the announced quarterly results.

## IV. April 22, 2021: First Quarter 2021 Earnings Release

63. On April 22, 2021, the Company also issued its earnings release announcing

financial results for the first quarter of 2021 (the "1Q21 Earnings Release") for the period ended March 31, 2021, which it filed with the SEC as an exhibit to a Form 6-K the same day. The 1Q21 Earnings Release stated, in relevant part, as follows:

> **US-based hedge fund matter**
> As reported on April 6, 2021, we have incurred a provision for credit losses of CHF 4,430 million in 1Q21 in respect of the failure by a US-based hedge fund to meet its margin commitments…. Following the failure of the fund, we initiated the process of exiting the fund positions. To date, we estimate that we have exited 97% of the related positions. We have also incurred additional losses in 2Q21 of approximately CHF 0.6 billion as a result of market movements during the process of closing out these positions. ***The Board of Directors has also initiated an externally-led investigation of this matter, which will be supervised by a special committee of the Board of Directors.***
>
> Following the US-based hedge fund matter, we have reviewed exposures across the prime services business. ***The related risk and control governance is being strengthened and will be further enhanced after rigorous first and second line risk management assessments.*** We expect that our prime brokerage and prime financing businesses will be resized with a primary focus on continuing to serve our most important franchise clients. By the end of 2021, we also expect to reduce leverage exposure in the Investment Bank by at least USD 35 billion and to align risk-weighted assets in the Investment Bank to no more than end-2020 levels.
>
> **Supply chain finance funds matter**
> As previously reported, on March 1, 2021, the boards of four supply chain finance funds managed by certain Group subsidiaries (collectively, the SCFFs) decided to suspend redemptions and subscriptions of those funds to protect the interests of the funds' investors. On March 4, 2021, the boards decided to terminate the SCFFs and to proceed to their liquidation.
>
> * * *
>
> ***The last published net asset value of the SCFFs in late February was approximately USD 10 billion in the aggregate. To date, total cash collected in the supply chain finance funds, including the cash position in the funds at the time of suspension, amounts to USD 5.4 billion, and redemption payments totaling USD 4.8 billion have been made to their investors in two cash distributions.*** The portfolio manager continues to work to liquidate the remaining assets of the SCFFs, including by engaging directly with potentially delinquent obligors and other creditors as appropriate. However, there remains considerable uncertainty regarding the valuation of a significant part of the remaining assets, including the fact that certain of the notes underlying the funds were not paid when they fell due and the portfolio manager has been informed that further notes will

> not be paid when they fall due in the future. It therefore can be assumed that the investors of the SCFFs will suffer a loss. CSAM will take all necessary steps to collect outstanding amounts from debtors and insurers, but can give no assurance as to the final amount that may be recovered for the SCFFs under such notes. ***The amount of loss of the investors therefore is currently unknown. Based on currently available information, losses for the investors can be expected to occur predominantly in positions that, prior to March 31, 2021, had a net asset value of approximately USD 2.3 billion in the aggregate.*** These positions relate primarily to three groups of companies: "GFG Alliance," Katerra and Bluestone.
>
> * * *
>
> ***We continue to analyze these matters, including with the assistance of external counsel and other experts. The Board of Directors has also initiated an externally-led investigation of these matters, which will be supervised by a special committee of the Board of Directors.***
>
> * * *
>
> ***On April 6, 2021, the Board announced that following the significant US-based hedge fund matter, Brian Chin, CEO of the Investment Bank, will be stepping down from his role on the Executive Board, effective April 30, 2021. Lara Warner, former Chief Risk and Compliance Officer, stepped down from her role on the Executive Board on April 6, 2021. Both of them will leave Credit Suisse.***
>
> * * *
>
> A number of regulatory and other investigations and actions have been initiated or are being considered…including enforcement actions by FINMA. **FINMA has also imposed certain measures, including those previously reported, as well as certain risk-reducing measures and capital surcharges** discussed elsewhere in this report.
>
> (Emphasis added).

64. The statements contained in ¶ 63 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. The eventual near collapse of the bank and post-Class Period events, such as comments by Ermotti revealing that a "deep restructuring" of Credit Suisse was necessary after the merger because "the business model was no longer viable" and there was a cultural issue with "risk discipline,"

demonstrate that Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies. This suggests that the investigations initiated by the Board of Directors were a smokescreen, and that "related risk and control governance" was not "being strengthened" and would not "be further enhanced after rigorous first and second line risk management assessments." Additionally, the departures of Chin and Warner would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies. Furthermore, at the time these statements were made, there existed material weaknesses in the Company's internal controls over financial reporting, undermining the announced quarterly results.

## V. April 22, 2021: Defendant Gottstein's Statements to Reporters

65. On April 22, 2021, *The New York Times* published an article entitled "Credit Suisse reports a loss as regulators open an investigation," reporting that the Company's losses attributable to the collapse of Archegos had "prompted Switzerland's financial regulator to investigate whether the bank was doing a poor job monitoring the riskiness of its investments." The article stated in relevant part:

> ***Mr. Gottstein promised Thursday that Credit Suisse would overhaul its systems for tracking risk to avoid future disasters.*** Several top executives have already left the bank as part of a management shake-up, including Lara Warner, the chief risk and compliance officer.
>
> Credit Suisse also plans to pare back the size of a unit that serves hedge fund clients and was involved in the Archegos losses. **Mr. Gottstein declined to say whether the debacle would lead to major changes at Credit Suisse's investment bank, which has a large presence in New York.**
>
> ***But he suggested that Credit Suisse would not retreat from investment banking. "The underlying results show that the strategy is working," he told reporters. "I wouldn't say that because we had two disappointing incidents we should throw the whole strategy overboard."***
>
> (Emphasis added).

66. The statements contained in ¶ 65 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Defendants would *not* "overhaul its systems for tracking risk to avoid future disasters" or implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies during the Class Period. Credit Suisse's "strategy" was not "working" but was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices. Defendant Gottstein also minimized the disastrous loss of many tens of billions of dollars, dominos in a chain that would lead to the near collapse of the bank, as merely "two disappointing incidents," indicating that these events were one-offs, when, in fact, they were the product of Credit Suisse's deeply flawed business model and poor risk management culture. Additionally, these statements omit that, at the time and throughout the Class Period, there existed material weaknesses in the Company's internal controls over financial reporting.

## VI. April 22, 2021: First Quarter 2021 Earnings Conference

67. On April 22, 2021, Credit Suisse held a conference call with analysts and investors to discuss the Company's first quarter 2021 earnings (the "1Q21 Earnings Conference"). During the 1Q21 Earnings Conference, Defendant Gottstein began by addressing the recent scandals:

> Let me begin with some comments about the recent events. The significant loss in our prime services business relating to the failure of a US-based hedge fund is unacceptable. In combination with the recent issues around the supply chain finance funds, I recognize that these cases have caused significant concern among all our stakeholders. ***Accountability is one of the core pillars of our corporate values. Together with the Board of Directors, we are addressing these situations through a series of decisive actions in the business and through two independent and thorough investigations, which are already under way. The investigations will not only focus on the direct issues, but also broader consequences and lessons learned across the bank. We will work to ensure Credit Suisse emerges stronger.***

* * *

> ***[W]e have reviewed exposures across the entire prime services business. Related risk and control governance is already being strengthened and will be further enhanced following first and second line risk management assessments. Our prime brokerage and prime financing businesses will be resized and derisked with the primary focus on our most important franchise clients.*** By the end of 2021, we plan to reduce the Investment Bank leverage exposure by at least $35 billion and to align the IB risk weighted assets to no more than the end of 2020 levels.

* * *

> ***The management team is fully focused on strengthening prime services and asset management risk controls, including forensic analysis of the two incidents and lessons learned. We are conducting an overall review of risk systems, processes and culture across the bank in close collaboration with the Board of Directors and external advisors.*** The Board of Directors has launched two investigations carried out by external parties. These investigations will be supervised by a special committee of the Board of Directors and will not only focus on the direct issues arising from those matters, but also reflect on the broader consequences and lessons learned. ***In each instance, we will work closely with the relevant regulators including FINMA, which has opened enforcement proceedings in both cases.***

(Emphasis added).

68. When questioned by an analyst "from your perspective, how we've arrived at this point" of "having a debate where the Group is looking to cut back on risk within the prime business and there are questions about the future of the Asset Management business," and "secondly, on a go-forward basis, how do you think about the roadmap in terms of rebuilding investor and other stakeholder confidence and trust in the Group," Defendant Gottstein responded:

> Look, generally, the prime services business in the past didn't have any losses. ***Clearly, this loss came as a big surprise to us and we are taking measures that this will not reoccur. We are reducing our exposure in that business and we are doing the investigation how it exactly happened and make sure it will not happen again.*** Asset Management, we had, again, the situation around Greensill, but the overall Asset Management business, as we saw also today, is actually doing very well from an operational perspective. The same is true for the Investment Bank. So, clearly, the two incidents are unacceptable, but at the same time, we have to move forward. We have to look forward. And the fact is that we can build on the very strong operational performance in Q1.

(Emphasis added).

69. When questioned by an analyst about the projected direct and indirect "revenue attrition attached to" the "CH35 billion leverage exposure reduction" in Credit Suisse's prime services business, Defendant Mathers responded:

> ***Just to give you some idea, that CHF35 billion leverage reduction is about a third of the total leverage we have deployed in prime. And I would expect clearly our prime revenues to fall as a consequence of that. But I think in terms of the actual revenue impact, quite clearly, we will be focusing our prime business around clients that have multiple connectivity to Credit Suisse, i.e., are important across our businesses. And obviously, de-focusing on clients that have much less connection across the bank.*** So, one would clearly expect we'll be, at that point, reducing the lowest ROA businesses, but it does move prime to being more of a utility to actually support the overall bank as opposed to a stand-alone business model, which I think is the right way to go. But yes, we will see some revenue reduction. It's going to be difficult to estimate it, given those two constraining factors, and that will obviously come through as a reduction in our equity sales and trading revenues going forward.

(Emphasis added).

70. When questioned by an analyst about "the mechanics of how that [Archegos] loss came about in terms of…[h]ow much margin you had and the sequence of events in terms of, were you slow to sell down or how do you assess what happened," Defendant Mathers responded:

> ***Firstly, I think I would just refute the suggestion that we were slow to sell down. We reduced our position in a lawful and an orderly manner, I think, with respect to the challenge we actually faced. And I think as far as I can tell, in terms of looking at the prices we achieved compared to the other prime brokers, the exit prices were broadly similar over the period of time. That's the point I'd make first.***
>
> I think the second point I'd make is, ***it is an exceptional event.*** I think the last time the industry has seen anything like this was LTCM in terms of its size and consequence. It is an industrywide issue. ***But that said, I think as Thomas has summarized, we've obviously conducted an immediate read-across to anything similar, any other immediate lessons learned to ensure that that is not the case within the rest of our prime portfolio. And we're obviously very focused on the investigation review that the Board of Directors is leading in terms of the longer-term lessons to be learned around this particular position.*** But as Thomas said, clearly, this is likely to be a broader industry issue as well, given the number of

> other prime brokers involved and some of the disclosure requirements relating to these types of funds.
>
> (Emphasis added).

71. When questioned by another analyst if "the underlying implication of" Defendant Mathers' response that Credit Suisse achieved comparable prices to other prime brokers in liquidating its Archegos position(s) was "that the entirety of the CH5 billion loss is due to poor collateral or poor margin management" relative to its peers, Defendant Mathers responded:

> ***[Y]ou can't make that direct link. Although, clearly, the level of margining and collateral will be very much in scope for the review that the Board is conducting into the US hedge fund matter and it's clearly a risk factor in terms of this. But it's not a direct deduction from what you said.***
>
> (Emphasis added).

72. When questioned by an analyst about the Archegos matter and "kind of when you look back, and that's particularly at the risk framework, the decision-making, the communications between the executives, are there any kind of early learnings or any kind of additional color that you can share with us kind of to make the understanding of the situation kind of more helpful not only for yourself, but of course, as you said, on an industry level as well," Defendant Gottstein responded:

> So, on Archegos early learnings, clearly, one of the early learnings is that the disclosure has to be improved around ***especially family offices*** in that business. Secondly, I think we have to look at absolute limits much more carefully, about margin limits, about how we look at Delta One and correlation between short and long positions and we have to look at concentration risk management. ***So, these are all elements that we are extremely focused and on which basis we have done the first analysis of the entire book. But there will certainly be more learnings to come through as we go through the next few weeks in terms of the review that we're doing internally, but also that will be done as part of our external review with our regulators.***
>
> ***This is an isolated case. Look, I definitely hope it is, and I think it is. But we are obviously reviewing the entire bank now, just to make sure that our risk processes and systems are where they should be. Clearly, historically, the prime business***

> ***has not been subject to major losses and that is now our prime focus. But we are, together with Christian Meissner, the first line of defense, but also the second line of defense, our new chief risk officer and the head of risk for the Investment Bank, are doing a special effort now to review the entire division.***

(Emphasis added).

73. When questioned by an analyst if the Company was "doing a [risk] review of all division, all exposures or is it specific to the areas where we have had issues," Defendant Gottstein responded "***Yeah, we are doing a comprehensive review. Obviously, that's something that we owe to ourselves and to our stakeholders that we – after such a shock loss that we had, we have to review that in detail.***" (Emphasis added).

74. The statements contained in ¶¶ 67-73 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. As later events revealed, the investigations into the failure of the Greensill Funds and Archegos losses were largely smokescreens: Defendants were not conducting a "comprehensive review" of risk, "reviewing the entire bank" to make sure their "risk processes and systems are where they should be," addressing "immediate lessons learned" and "broader consequences and lessons learned across the bank," or "addressing these situations through a series of decisive actions in the business." Certainly, at the time, Credit Suisse's business was not "already being strengthened," nor would it "be further enhanced following first and second line risk management assessments." In fact, Defendants did not make any meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time throughout the Class Period.

75. Further, the departures of Chin and Lara would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies, as their

departures could not address the underlying issues which led to the Greensill Funds and Archegos losses. Such events were not "isolated," but rather could be reasonably expected in light of Credit Suisse's severe risk management issues. Further, a "direct link" between the Company's risk management issues and the Archegos losses could be made, as later events demonstrated. Similarly, the characterization of Archegos as a "family office" was misleading because it minimized the role Defendants' risk management and control deficiencies played. The statements also omitted that there existed material weaknesses in the Company's internal controls over financial reporting.

## VII. April 22, 2021: First Quarter 2021 Press Conference

76. On April 22, 2021, Credit Suisse held a press conference to discuss the Company's first quarter 2021 earnings (the "1Q21 Press Conference"). During the 1Q21 Press Conference Defendant Gottstein repeated, in large part, the prepared remarks he made during the 1Q21 Earnings Conference.

77. When asked during the question-and-answer session ("Q&A") to explain what caused the Archegos scandal, Defendant Gottstein responded, in relevant part:

> Look, we are still analyzing the exact details of the loss. But what we can certainly say as we are looking at the absolute exposures, we are looking at the relative margin exposure, we are looking at the Delta 1 correlation between the long and the shorts. We are looking at the underlying concentration of the individual positions, both on the long and the short side. And we cannot comment on the others what was different, both at the time when we served our margin call nor a few days earlier nor a few weeks earlier.
>
> ***What is very clear, this was an idiosyncratic situation with an underlying exposure that had explosive growth over the few months that led up to this incident***, and we are now reviewing this, together with our Board, to clearly take the right lessons from that. But we cannot really comment on others. But it's clearly unacceptable that we even got into this position, and that's why we also took our consequences from it in terms of personnel changes. ***And we are going now through the entire portfolio, which we have done already and will continue to do in all detail***.

> ***We will reduce our risk exposures***, as we mentioned, by roughly $35 billion by the end of the year, which is roughly 1/3 of our Prime Services business. ***And we'll take then the right lessons learned from it. We are working very closely with risk and control staff, both in the first line and second line of defense.***

(Emphasis added).

78. As a follow up, Defendant Gottstein was asked: "But I guess what I really want to know is you said that the underlying exposure wasn't acceptable. But like how did that happen then? I mean it was unacceptable that you even got into the position is what you said, so where did it break down? Was it -- how did that -- how did risk limits get blown through or how did this happen?" Defendant Gottstein responded: "***It's clear that a family office like that did not disclose the positions like a normal hedge fund would do***." (Emphasis added).

79. When questioned about whether the source of the Archegos loss was due to the fact that Credit Suisse "had higher leverage than [its] competitors?", Defendant Mathers responded: "Clearly, we'll look at margining, we'll look at collateral, but we also have to look at concentration risk around these positions, too. ***But there's a number of factors that actually drives this result, including the balance of long-term shorts***." (Emphasis added).

80. When asked for more detail on inflows, Defendant Gottstein responded:

> We show the NNA numbers on, I think, it was Page 11, if we can go back to that, where you see the client business volumes. ***And there you see the net new assets in Switzerland, CHF 2.2 billion; IWM, CHF 7.2 billion; APAC, CHF 5.4 billion. So that's roughly half of the CHF 28 billion. The other half is in institutional asset management. From divisional perspective and from a timing perspective***, ***they came through in a pretty steady way through all 3 months in the first quarter***. The 4 -- April is not even concluded, and it's too early to say. ***But we have not seen any significant flows in either direction***. ***So there has been a very strong client engagement, continues to be very strong client engagement and very positive flows both in terms of divisional perspective as well as from a regional perspective***.
>
> In terms of variable compensation, as you probably know, the largest division in terms of our variable compensation pool is the investment bank, followed by IWM and APAC and then Switzerland. But the corporate functions and the reductions

> were broad-based. Clearly it -- particularly hard hit was the Investment Bank due to the loss. But this is just 1 quarter out of 4 quarters, and ***we obviously have to take the right hard look at variable compensation given the loss we had***. But at the same time, we also have to pay for performance. A lot of businesses have performed extremely well, as you saw from the numbers, and we need to find the right balance.

(Emphasis added).

81. Finally, in response to a question of whether he supported a strategy of risk reduction in the Investment Bank, Defendant Gottstein stated:

> And as I said, there are no sacred cows. But at the same time, the fact is that the first quarter actually demonstrated that the strategy per se – ***the underlying results show that the strategy per se was working***. So I would not say that there is a need now because we have two very disappointing incidents to throw the whole strategy overboard. And I definitely don't think that that's the right conclusion to take…. But this is not the moment now to discuss this. ***We have a new Chairman who starts on the 1st of May, and then we will sit down together and have these discussions.***

(Emphasis added).

82. The statements contained in ¶¶ 77-81 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was not going to "reduce [its] risk exposure" and "the right lessons" would not be "learned" from the Greensill Funds or Archegos scandals, as Defendants did not implement any meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time not at any time during the Class Period; (ii) the risk limits with respect to Archegos were not exceeded because "a family office like that did not disclose the positions like a normal hedge fund would do" but, rather, the Company's liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; (iii) the classification of the recent losses as merely an "idiosyncratic situation" and "two disappointing incidents" likewise ignores Credit Suisse's underlying risk management issues;

(iv) the Company's "strategy" was not "working" and was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices, and stemmed from a culture of poor risk discipline; (v) the Company was not experiencing "very positive flows," but instead was experiencing significant and unusual customer and/or asset outflows; and (vi) there existed material weaknesses in the Company's internal controls over financial reporting.

83. Analyst reactions to Defendants' April 22, 2021, statements were generally mixed. For example, in a report titled, "A lot of moving parts," on April 23, 2021, analysts at RBC Capital Markets wrote, "CS made progress addressing concerns but more visibility on potential additional capital headwinds and more decisive action on strategy are likely to be needed." Similarly, analysts at Kepler Cheuvreux, in a report titled, "Still a lot to do," published on the same day, stated, "Now more than ever, a new strategic roadmap is needed at CS and all eyes are turned towards the incoming chairman and the company's expected strategic review."

## VIII. April 30, 2021: Annual General Meeting of Shareholders

84. On April 30, 2021, Credit Suisse held its AGM in Zurich, Switzerland. During the AGM, Defendant Gottstein stated, in relevant part, as follows:

> I recognize that Credit Suisse is currently surrounded by negative events, news and commentary. These events have caused great anxiety among employees, clients and shareholders alike, and they substantially weakened our share price. Let me address this directly. **The significant loss in our prime services business relating to the failure of a U.S. prime brokerage client is unacceptable.** We deeply regret that these cases, in combination with the supply finance funds matter, have caused significant and understandable concerns among our stakeholders, including you, our valued shareholders.
>
> ***We have taken decisive actions, which include the following: first, significant personnel and organizational changes at the Executive Board level and the echelons directly below them***; second, the withdrawal of proposals for the Executive Board variable compensation comprising both their short-term incentive awards based on 2020 performance and their 2021 long-term incentive awards. At the same time, variable compensation from previous years that has not yet been

paid out will be retained for relevant employees. This measure will ensure that we are able to reevaluate variable compensation for 2020 and apply malus or clawbacks where appropriate.

***Third, the strengthening of risk controls, including forensic analysis of the 2 incidents. In addition, we are conducting an overall review of risk systems, processes and culture across the bank and are significantly reducing our risk positions in the prime services business.*** Fourth, we have further strengthened our balance sheet by means of a capital increase, as recently announced, in which we raised a total of CHF 1.7 billion. ***Fifth, the Board of Directors has launched 2 independent investigations carried out by external parties. These will also reflect on the broader consequences and lessons learned.*** We will work closely with the relevant regulators, including our domestic supervisor, FINMA, which has opened enforcement proceedings in both cases.

These events represent real setbacks. ***I'm confident that we will draw the right conclusions with the aim of making sure that events of this kind never happen again. We are dedicated to ensuring that Credit Suisse will emerge stronger from the situation. However, I would like to reassure you that even as we diligently address these issues, we remain well positioned to support our clients globally.***

* * *

Ladies and gentlemen, Credit Suisse remains a formidable institution. We have thrived for 165 years through external crises and our own challenges. I've been at Credit Suisse for 22 years now through many ups and downs, and I am self-critical with regard to the recent developments which have left their mark on me as well. ***I see my role now, together with the new Chairman and the rest of the Board of Directors and my colleagues of the Executive Board, is to steer Credit Suisse back into calmer waters. I'm proud to lead this bank, and I am confident about the future.*** At the heart of this confidence are the close relationships that we have with our clients, our earnings power and the dedication of our employees around the world. I ***therefore assure you that my management team and I, together with our employees, will do everything we can to bring back the best of the bank to you, our valued shareholders, ladies and gentlemen.***

(Emphasis added).

85. Defendant Horta-Osório then stated, in relevant part:

Any company that has been around as long as this company will have experienced its fair share of ups and downs. Indeed, over 3.5 decades, I have personally worked at and led several banks in different countries and have lived through many crises. **What has happened with Credit Suisse over the last 8 weeks with the U.S.-based hedge funds and the supply chain finance funds matters certainly goes beyond that.** ***Important lessons have to be learned and decisions taken***

> ***accordingly in a transparent, thoughtful and decisive way.* In the months to come, my focus will be on 3 areas.**
>
> ***First, risk management. The current and potential risk of Credit Suisse need to be a matter of immediate and close scrutiny. I firmly believe that any banker should be, at heart, a risk manager. Together with the Board and management, I will have a thorough look at how risks are being assessed, managed and controlled.*** Second, strategy. Credit Suisse has an outstanding franchise and client base and has outstanding people. I see it as my duty as Chairman to ensure that Credit Suisse continues to excel where it has its strengths and competitive advantages. ***We will take the time required for an in-depth assessment of the bank's strategic options. This will be done with a long-term perspective not losing sight of the short-term needs. Then we will decide on a course of action and closely oversee the execution.*** Third, culture. Credit Suisse's rich heritage has been built by women and men over many decades. The bank is associated with excellency, creativity and an entrepreneurial spirit as well as long-standing commitment to its customers, the economy and society at large. However, a series of setbacks has been holding us back, and we need to reflect on what led us to the issues we face today.
>
> It is my firm ambition and determination to listen into the organization and to engage in dialogue with all relevant stakeholders in order to get a deep understanding of our strengths and weaknesses. ***We need to foster a culture that reinforces the importance of risk management, ensures that we have the right incentives in place including on remuneration and focuses on personal responsibility and accountability, a culture where every single employee can be proud of what we stand for and how we act. The Board and I will do this together with the management team led by Thomas Gottstein.*** Thomas has the Board's confidence, and I'm looking forward to working with him and the Executive Team.
>
> (Emphasis added).

86. The statements contained in ¶¶ 84-85 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) Despite Defendant Gottstein's personal guarantee that he would "steer Credit Suisse back into calmer waters," as later events revealed, Defendants did not implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies at this time or throughout the Class Period, demonstrating that the investigations

into the failure of the Greensill Funds and Archegos losses were shams: Defendants were not conducting "an overall review of risk systems, processes and culture across the bank," there would be no "important lessons…learned," nor would they "draw the right conclusions" or "reflect on the broader consequences and lessons learned"; (ii) Defendants never changed the Company's policies or incentives relating to remuneration; (iii) like the other personnel changes, the "resignation" of Chairman of the Board of Directors Urs Rohner and appointment of Defendant Horta-Osório as Chairman of the Board of Directors would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies; and (iv) there existed material weaknesses in the Company's internal controls over financial reporting.

## IX. May 6, 2021: First Quarter 2021 Report

87. On May 6, 2021, the Company filed with the SEC its financial report for the first quarter of 2021 (the "1Q21 Quarterly Report"), on Form 6-K for the period ended March 31, 2021. The 1Q21 Quarterly Report stated, in relevant part, as follows:

> Following the US-based hedge fund matter, we have reviewed exposures across the prime services business. ***The related risk and control governance is being strengthened and will be further enhanced after rigorous first and second line risk management assessments.*** We expect that our prime brokerage and prime financing businesses will be resized with a primary focus on continuing to serve our most important franchise clients. By the end of 2021, we also expect to reduce leverage exposure in the Investment Bank by at least USD 35 billion and to align risk-weighted assets in the Investment Bank to no more than end-2020 levels.

* * *

> Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. We achieve this through a conservative asset/liability management strategy aimed at maintaining long-term funding, including stable deposits, in excess of illiquid assets. ***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to***

> ***sustain operations for a period of time in excess of our minimum limit.***
>
> * * *
>
> The Board has initiated an externally-led investigation into each of these matters, both of which will be supervised by a special committee of the Board. We have also undertaken senior management changes within the Investment Bank division and within the Risk and Compliance organization in response to these matters. In addition, effective April 1, 2021, we have established Asset Management as a separate division, and the Board appointed a new CEO of Asset Management. ***We are carrying out a Group-wide review of risk appetite, risk positions and business and risk processes in close cooperation with the Board and external advisors. With respect to the US-based hedge fund matter, we have performed an extensive review of our prime services business, focused on underlying risk positions as well as related counterparties. The related risk and control governance is being strengthened and will be further enhanced after rigorous first and second line risk management assessments. This includes enhancing our due diligence across Asset Management following the supply chain finance funds matter. In connection with these reviews, we also intend to apply lessons learned from recent matters across the bank.***

88. The statements contained in ¶ 87 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) as evidenced by the fact that Defendants did not implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies at this time, or throughout the Class Period, Defendants did not, in fact "perform[] an extensive review of our prime services business"; (ii) the Company had not "strengthened" and would not "further enhance[]" its risk and control governance; (iii) the changes in management would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies; (iv) the company did not maintain a "sufficient" liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not "conservative" and were materially deficient at all times; and (v) there existed material weaknesses in the Company's internal controls over financial reporting.

## X. July 1, 2021: Defendant Horta-Osório Interview with *Neue Zürcher Zeitung*

89. On July 1, 2021, Horta-Osório was interviewed by Swiss, German-language newspaper *Neue Zürcher Zeitung*. *Reuters* summarized the interview in an article published that day titled, "Credit Suisse to realign strategy this year, chairman says."

90. The article stated, in relevant part:

> Credit Suisse (CSGN.S) expects to decide on a new strategy by the end of the year, Chairman Antonio Horta-Osorio said in his first interview since assuming the role at the troubled lender.
>
> * * *
>
> Describing his first seven weeks in the job -- during which he met with employees, as well as Swiss politicians and Swiss, U.S. and British regulators -- as "intensive," Horta-Osorio said the bank ***needed a realignment that would clear up short-term crises but also position it for the long term***.
>
> "I have a clear picture of the direction the bank must take," he said in the interview with Swiss newspaper Neue Zuercher Zeitung published on Thursday. "For me the question isn't, 'what do we need to do to ensure it works this time?' The question is much more, 'why isn't the bank making progress, despite having a fantastic group of wealth management clients in Switzerland, Europe and high-growth Asia?'" he said, adding the bank's major strength lay in serving entrepreneurs and wealthy families.
>
> "We need to agree on how we can best serve these customers and on where we are most competitive - on what that means for the bank as a whole," he said. ***To ensure success, the bank would need not only the right strategic direction, but also "the right people in the right place," he added***.
>
> Describing the recent failings at Switzerland's second-largest bank as unacceptable, Horta-Osorio compared the 165-year-old lender to a racecar driving on a highway with its wheels on wrong and promised no quick fixes, saying cultural shifts take time.
>
> * * *
>
> Asked about the future of the investment bank, Horta-Osorio said it was too soon to anticipate the outcome of the board's discussions. "We're in the beginning phase of a new strategic positioning," he said.
>
> (Emphasis added).

91. The statements contained in ¶ 90 were materially false and/or misleading because

they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Credit Suisse's new "strategy" was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices.

**XI. July 27, 2021: David Wildermuth Appointment Media Release**

92. On July 27, 2021, the Company issued a media release announcing the appointment of David Wildermuth ("Wildermuth") as Chief Risk Officer and a member of the Executive Board as of February 1, 2022 (the "Wildermuth Appointment Release"), which it filed with the SEC on a Form 6-K the same day. The Wildermuth Appointment Release stated, in relevant part, as follows:

> António Horta-Osório, Chairman of Credit Suisse, said: "I am delighted to welcome David to Credit Suisse, ***where he will help shape the Group's enhanced risk management framework, an essential part of the bank's strategic realignment currently underway.*** David will contribute a wealth of experience and deep professional insights, having served more than three decades in various senior roles in the financial services industry."
>
> Thomas Gottstein, Group CEO, said: "David joins with an impressive track record, underlining our firm commitment to further enhance our risk management across the bank. ***He is the right person to lead and further strengthen our risk organization.*** I look forward to closely working with David in his new role and as a member of the Executive Board. At the same time, I would like to thank Joachim for accepting to perform the role as ad interim Chief Risk Officer in early April when the bank needed his experience and technical knowhow. ***Joachim was instrumental in leading the various risk-mitigation initiatives over the past few challenging months and we are fortunate to be able to continue to count on his leadership during the coming months until David joins us and thereafter***."
>
> (Emphasis added).

93. The statements contained in ¶ 92 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.

Specifically, (i) just like the other personnel changes, Wildermuth's appointment as Chief Risk Officer would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; and (ii) the Company was not formulating an "enhanced risk management framework," nor had it engaged in "various risk-mitigation initiatives," as Defendants never implemented meaningful changes to Credit Suisse's deficient risk management and/or control governance procedures and/or policies in the wake of the Greensill Funds or Archegos scandals, or at any time throughout the Class Period.

## XII. July 29, 2021: Archegos Media Release and Report

94. On July 29, 2021, the Company issued a media release announcing the publishing of a report into the independent external investigation into Archegos (the "Archegos Release" and "Archegos Report"), which it filed with the SEC as exhibits to a Form 6-K the same day. The Archegos Report was commissioned by a Special Committee of the Company's Board of Directors and conducted by Paul, Weiss and its expert advisors. The Archegos Release summarized the conclusions of the Archegos Report, in relevant part, as follows:

> Among some of the key conclusions, the investigation found a failure to effectively manage risk in the Investment Bank's Prime Services business by both the first and second lines of defense as well as a lack of risk escalation. In the same business, it also found a failure to control limit excesses across both lines of defense as a result of an insufficient discharge of supervisory responsibilities in the Investment Bank and in Risk, as well as a lack of prioritization of risk mitigation and enhancement measures (such as dynamic margining).
>
> ***However, the investigation also found that this was not a situation where the business and risk personnel engaged in fraudulent or illegal conduct or acted with ill intent. Nor was it one where the architecture of risk controls and processes was lacking, or the existing risk systems failed to operate sufficiently to identify critical risks and related concerns.***
>
> António Horta-Osório, Chairman of Credit Suisse, said: "While ***the bank has already taken a series of decisive actions to strengthen the risk framework***, we are determined to learn all the right lessons and further enhance our control

> functions to ensure that we emerge stronger. ***We are committed to developing a culture of personal responsibility and accountability, where employees are, at heart, risk managers; know exactly what they must do; escalate any concerns; and are responsible for their actions***. Such a culture is of critical importance and, by working relentlessly on this goal, we can create lasting change and value for both clients and shareholders."
>
> (Emphasis added).

95. The statements contained in ¶ 94 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's "risk controls and processes" *were* "lacking," both at this time and as of the time of Archegos' failure; and (ii) the Company had not taken "decisive actions to strengthen the risk framework," as Defendants did not implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies at this time or throughout the Class Period.

**XIII. July 29, 2021: Second Quarter 2021 Earnings Release**

96. On July 29, 2021, the Company also issued its earnings release announcing financial results for the second quarter of 2021 (the "2Q21 Earnings Release") for the period ended June 30, 2021, which it filed with the SEC as an exhibit to a Form 6-K the same day. The 2Q21 Earnings Release stated, in relevant part, as follows:

> Credit Suisse delivered resilient underlying second quarter results and strong capital ratios as we are benefitting [sic] from having taken decisive actions to address the challenges raised by the Archegos and Supply Chain Finance Funds matters. We take these two events very seriously and we are determined to learn all the right lessons. ***We have significantly reduced our RWA* [risk-weighted assets] *and leverage exposure and improved the risk profile of our Prime Services business in the Investment Bank, as well as strengthened the overall risk capabilities across the bank***. Our underlying business performance remains solid with a record level of assets under management in our Wealth Management and Asset Management businesses, supporting strong growth in recurring commissions and fees. Together with our more conservative approach to risk and a less favorable trading environment compared to the second quarter of 2020, we delivered a

resilient underlying performance in the Investment Bank. We continue to invest in people and technology across Wealth Management, notably in APAC, as well as Asset Management and the Investment Bank. Over the coming months, we will continue to develop our long-term vision for the bank that will serve as our compass for the years ahead. Our objectives are clear: whilst ***we aim to further strengthen our risk culture***, we remain committed to serving all our private, corporate and institutional clients with best-in-class service and advice and to creating value for our shareholders.

* * *

Overall, we continue to expect more normal levels of market volumes in the coming quarters of 2021 compared to the elevated levels seen in 2020. ***Furthermore, for the course of the ongoing review of the Group's business strategy, we expect to continue to adopt a more conservative approach to risk.***

* * *

Today we announced the outcome of the independent investigation into the Archegos matter and published the full externally-led report commissioned by the Board of Directors' special committee….

Select key findings from the independent investigation into Archegos include failure to:

- Effectively manage risk in our Prime Services business by both first and second lines of defense
- Escalate risks and to control limit excesses across first and second lines of defense
- Discharge supervisory responsibilities across first and second lines of defense
- Prioritize risk mitigation and enhancement measures (including dynamic margining)

***However, the investigation also found that, this was not a situation where the business and risk personnel engaged in fraudulent or illegal conduct or acted with ill intent. Nor was it one where the architecture of risk controls and processes was lacking, or the existing risk systems failed to operate sufficiently to identify critical risks and related concerns.***

(Emphasis added).

97. The statements contained in ¶ 96 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business,

operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not "taken decisive actions to address the challenges raised by the Archegos and Supply Chain Finance Funds matters" and did not intend to "adopt a more conservative approach to risk," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies at this time, or at any time during the Class Period; (ii) the situation was "one where the architecture of risk controls and processes was lacking, or the existing risk systems failed to operate sufficiently"; (iii) at the time, the Company was experiencing significant and unusual customer and/or asset outflows; and (iv) there existed material weaknesses in the Company's internal controls over financial reporting.

**XIV. July 29, 2021: Second Quarter 2021 Report**

98. On July 29, 2021, the Company filed with the SEC its financial report for the second quarter of 2021 (the "2Q21 Quarterly Report"), on Form 6-K for the period ended June 30, 2021. The 2Q21 Quarterly Report stated, in relevant part, as follows:

> In 2Q21, we reported net revenues of CHF 5,103 million, which decreased 18% compared to 2Q20, primarily reflecting lower net revenues in the Investment Bank. The decrease in the Investment Bank reflected a loss of CHF 493 million related to Archegos and lower results across most businesses compared to a strong prior year period, which benefited from robust volumes and higher volatility, and, ***in light of the Archegos matter, we de-risked and resized the Investment Bank, notably in our prime services business***.
>
> * * *
>
> ***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit***.
>
> * * *

> ***With respect to the Archegos matter, we continued to strengthen control governance across first and second line risk management with new limits and a restriction implemented for the onboarding of new clients with static margin arrangements.*** Additionally, we completed a reduction of arrangements with static margining for a majority of counterparties as well as a majority of Credit Suisse exposures to such counterparties. Furthermore, following the supply chain finance funds matter, ***we have enhanced our due diligence by strengthening governance as well as reinforcing the product approval process across Asset Management.***

(Emphasis added).

99. The statements contained in ¶ 98 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows; (ii) the Company did not maintain a "sufficient" liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not "conservative" and were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting.

## XV. July 29, 2021: Second Quarter 2021 Earnings Conference

100. On July 29, 2021, Credit Suisse held a conference call with analysts and investors to discuss the Company's second quarter 2021 earnings (the "2Q21 Earnings Conference"). During the 2Q21 Earnings Conference, Defendant Gottstein began by again addressing the recent Greensill Funds and Archegos scandals, stating:

> Firstly, this has been an incredibly challenging first half of the year for our bank and for all our stakeholders, overshadowed by the Archegos and supply chain finance fund matters. ***We are taking these events very seriously and are determined to learn all the right lessons. We firmly believe we can and will emerge stronger from these events. Secondly, we have taken action. We have taken action to address many of the issues, and we will continue to do so.*** Regarding Archegos, we have exited all the remaining positions in early June and today have released the independent investigation report. ***We have proactively derisked our Prime Services business and overachieved the goals we set ourselves***

***in the first quarter to reduce RWA and leverage exposure in the Investment Bank. We made key hires. We have reviewed our risk appetite across the bank, and we are proactively strengthening the overall risk culture across the group.***

* * *

[W]e have clear priorities for the coming months, including maximizing the cash distributions to our supply chain finance fund investors and ***continuing to strengthen our first and second line of defense risk approach and governance***.

* * *

Regarding Archegos, I will be clear. The total loss of approximately CHF5 billion is unacceptable, and the independent report pointed to a number of failures. ***We have learned serious lessons and have taken multiple thorough steps to address these issues across the bank. Appropriate HR-related actions have been taken.*** You see here the selected key findings of the independent 160-page report, which we have made available in full on our website. The findings in the report included the failure to effectively manage risk in Prime Services by both lines of defense; a lack of escalation and of controlling limit excesses; a failure to discharge supervisory responsibilities in the Investment Bank and in risk; as well as insufficient prioritization of risk mitigation measures, including moving clients from static to dynamic margining. However, the investigation also found that this was not a situation where the business and risk personnel engaged in fraudulent or illegal conduct or acted with ill intent, ***nor was it one where the architecture of risk controls and processes was lacking or the existing systems failed to operate sufficiently to identify critical risks and related concerns***.

* * *

***We are recalibrating our risk appetite at both the group and divisional levels, are strengthening our key risk management processes and risk and control infrastructure.*** In terms of governance, we have announced two important executive appointments related to technology and risk: Joanne Hannaford as Chief Technology and Operations Officer; and David Wildermuth as Chief Risk Officer, both starting in early 2022. I'm proud to have been able to recruit two such high-caliber talents for our executive team. We are more focused than ever to provide best-in-class service and advice to our private, corporate and institutional clients globally. And finally, we initiated a joint group strategy review by the Board of Directors and the Executive Board with the goal to clearly define and articulate a long-term vision and a midterm plan expected to be finalized by the end of the year.

(Emphasis added).

101. Defendant Mathers then stated, in relevant part:

> ***Our priority this quarter has been to ensure that we deal with and mitigate the challenges posed by the default of Archegos and by the supply chain finance matter. A core part of this has been to do whatever we can to ensure that there's no repetition of these events. We've taken a number of steps in this regard, and there will be more to come this year as we work our way through the strategic review. Fundamentally, we prioritized a more conservative approach to risk in both the first and the second lines of defense. This has been most apparent in the Investment Bank, where as you can see, we've substantially reduced the size of our Prime Service business and ensure that client accounts in this business have been fully migrated to dynamic margining, and that was completed by the end of the second quarter. And it's clearly one of the key lessons learned from the Archegos matter. That said, while we've been very focused on ensuring that we have a resized Prime Services and we have conducted a thorough and full risk review across the whole bank*****….**
>
> * * *
>
> ***Whilst we have seen net asset outflows of CHF7.3billion across these businesses during the second quarter, $4.2 billion of this was due to certain derisking actions that we have taken in APAC. And I think that the progress in AUM*** **[assets under management]** ***and in client business volume demonstrates the momentum in the Wealth Management franchise.***
>
> * * *
>
> ***A second factor in our performance was the resizing of the Prime Service business and the more conservative approach to risk that we have been taking across the bank.*** We said in the first quarter that we would reduce leverage exposure in the Investment Bank by at least $35 billion, and we have, in fact, reduced it by $41 billion or 11% quarter-on-quarter, notwithstanding higher HQLA. We have also reduced RWAs in the Investment Bank by $20 billion quarter-on-quarter.
>
> (Emphasis added).

102. When questioned by an analyst "when you talk about this reduction in risk appetite currently, what does it actually mean? What sort of constraints are you operating on from a risk perspective," Defendant Mathers responded:

> ***I mean, I don't think there's anything specific I'd like to highlight. I mean, I think one point I did bring out was the fact that we did review very carefully the businesses across the entire bank. There's been a very thorough risk review,***

> ***which is being conducted by the tactical crisis committee of the Board of Directors. And that has included the Wealth Management operations as well as the Investment Bank. And we did basically result -- that did result in $4.2 billion of net new asset outflows within APAC, relating to certain clients where we did decide to significantly restrict our activities. But there was nothing broad in terms of that.*** I think it was fair and appropriate that I think following both the Greensill episodes and the Archegos issues, that we did do a thorough review of our risk appetite, which was led by our interim Chief Risk Officer, Jo Oechslin, and in conjunction with the tactical crisis committee of the Board, and we then continued a thorough risk review across the bank. And I think that taking that more conservative approaches has been the right thing to do in the second quarter. ***But clearly, the bulk of the reductions have clearly been borne by prime and by the Investment Bank.***

(Emphasis added).

103. When questioned by the same analyst if "we [are] likely to see more of those kind of reviews of clients into the third and fourth quarter, similar thing that you've described happened in APAC in the second quarter? Or would you think that, that process is largely complete," Defendant Mathers responded:

> ***That process is largely complete. I think you can understand that given the events of February and March, and this was done on an accelerated basis immediately after that. And as I said, the tactical crisis committee has been going through our business portfolio one by one, and obviously, Zeth [Phonetic] is an executive member of that committee, and I think it has been a good and thorough process, but the bulk of that has now been completed.***

(Emphasis added).

104. When questioned by an analyst about "the $4.2 billion derisking in APAC" and "generally [what], you, as a management team, didn't like about these positions," Defendant Gottstein responded:

> ***On the $4.2 billion NNA*** **[net new assets]** ***outflows in APAC, these were linked to situations where we wanted to exit clients either for risk or for other reasons. And this is a small number of clients, but we feel very good about that, having exited those positions.*** But there are various considerations where I would not like to go into the details. ***But this was a one-off move that we had to do and wanted to do***, and I do not really want to comment more on individual clients.

(Emphasis added).

105. When questioned by an analyst about "the customer flows that you're seeing in the three different segments," Defendant Gottstein responded:

> ***So we did see positive inflows in the third month of the quarter, so in June. So April, May was really -- were two months where we had outflows and where we also proactively addressed some of the client situations that I was alluding to also in APAC. But actually, June was positive inflows in all three divisions. And so the momentum into the end of the quarter was very positive.*** So look, this is something we had to do. We wanted to work through. We clearly also had some side effects from our more cautious approach to lending volumes. We had clear targets for each of the divisions, including Asia, including SUB and including IWM in terms of RWA and leverage for the end of the second quarter because we were determined to achieve our targets that we have set ourselves. And that is obviously one of the side effects that some of the NNA or AUMs that were linked to lending volumes also came down. ***But as I said, the momentum into the end of the quarter was positive.*** And if you look at the first half as a whole, we are at around CHF7 billion now for Wealth Management and CHF24 billion if you include the institutional Asset Management business. So absolutely decent NNA flow for year-to-date.

(Emphasis added).

106. Responding to the same question, Defendant Mathers stated:

> ***After the Archegos incident, Credit Suisse, we moved, we focused extremely hard on, a, the resizing of the prime portfolio; and b, shifting any clients who are on static margining to dynamic margining.*** And those two things were the priority for the business during the quarter, and we moved as fast as possible in terms of that. So I think you've seen the revenue impact in the second quarter. ***We're obviously not going to be resizing the prime business upwards going forward. So I think we've moved it to a new lower steady state basically.*** But I mean, this wasn't a steady process during the quarter. We executed on this. ***It was fairly obvious what needed to be done, and we executed on that resizing as fast and as quickly as possible in terms of that. I think beyond that, as I said, I think in terms of the capital reduction reallocation process, we did complete that during the quarter. And as I said, I would expect to operate a broadly unchanged levels during the third quarter. And I think you'll see more normal levels of activity beyond that.*** But I think certainly, second quarter, the priority was dealing with Archegos. It was dealing with the Greensill-related supply chain funds. That's unfortunate, but I think it was the right thing to do on behalf of the shareholders, on behalf of the bank overall.

(Emphasis added).

107. When questioned by an analyst about "the RWA reduction being bigger than expected" and "what sort of decisions that involved in terms of going further than targeted," Defendant Mathers responded:

> As I said, look, I think the Greensill matter closely followed by the Archegos matter, I think, necessitated a conservative approach to risk, necessitated a resizing of the risk appetite by our interim Chief Risk Officer and by the tactical crisis committee at the beginning of the second quarter. And I think that clearly has resulted in reductions in RWA beyond the prime financing business. ***But that said though, I just would say it before I said really now, that in terms of the third quarter level, I think I don't expect to see radical increases or decreases in terms of overall RWA and leverage for either the Investment Bank or for the group as a whole in the third quarter.***

(Emphasis added).

108. When questioned by an analyst how Defendant Gottstein could reconcile his statements "that this is not a situation where the business and risk personnel engaged in fraudulent or illegal conduct, nor is one where the architecture of risk controls and processes was lacking, or the existing risk systems failed to operate sufficiently to identify critical risks" with the fact that "Credit Suisse immediately changed, for example, the way you margin in your prime brokerage, went from static to dynamic, and yet the report seems to suggest that systems are fine," Defendant Gottstein responded:

> ***[S]o just to give you the example on dynamic and static margining. This was already discussed by the teams in September, October.*** They had agreed that they would move some of the clients, including Archegos, from static to dynamic. It was rediscussed in early March. And if you read the report, they were in the process of actually doing that and reaching out to the client. ***But it was just not prioritized the way it should have been. So this is, to a large extent, really a series of human errors and failures by the teams. They didn't effectively manage this situation, and whether it was lack of escalation or also limit -- control of limits, which had numerous occasions being breached, but they did not act on it even though they discussed it and were supposed to do it. So this was clearly a series of failures, which is regrettable and which we have now addressed with a new team both on the first line of defense in Prime Services, Prime Services risk and on the risk management side.*** So that's really how I would answer this question.

(Emphasis added).

109. Responding to the same question, Defendant Mathers stated:

> [J]ust to second what Thomas is saying. ***It is clear and the report makes clear that the appropriate escalation protocols were in place in both the business and in the second line and in the CPOC committee, which you'll see described there, but they were not operated by the individuals. So the protocols were there, but they were not followed. It's clear that while we obviously can improve in our data systems, we can prove in the timeliness of those data systems. Nonetheless, the first and second line data systems did demonstrate the risks to Credit Suisse of Archegos. And again, those were not basically followed up as part of it.*** So I think that is the basis -- or part of the basis for the distinction that the independent counsel to the Board has made in their report.

(Emphasis added).

110. When asked by the same analyst if Defendant Gottstein "agree[d] with this conclusion here, that the architecture of risk controls and processes is fine," he responded:

> ***Yes.*** Well, this is the independent investigators' view, and ***it was discussed also within Credit Suisse, within also the Executive Board and the Board of Directors, and we collectively absolutely agree with that, yes.***

(Emphasis added).

111. Responding to the same question, Defendant Mathers stated:

> Clearly, this report was not written by Credit Suisse. This was written by an external council, Paul, Weiss. It's an extremely thorough process they actually prepared. They prepared it under the aegis of the Board and specifically the Chair of the Audit and Risk Committee. And it was written by them. It's independent -- so the firm is independent of the Board. ***And I think they've conducted a thorough view. And I think we do agree with their conclusions, but it is their report***.

(Emphasis added).

112. When questioned by an analyst if "you expect these instances or these issues you had to continue to impact your ability to generate positive net new money going forward," Defendant Gottstein stated:

> ***[G]ross NNA flows are actually very similar to previous years. So clients are fully***

> ***involved and active in the rare situations or in some of the situations of ultra-high-net worth clients who have asked for, for example, incremental lending, where we have been maybe more cautious. They fully understand that. They don't see that as an issue.*** You would also see that our assets under custody have increased. So in certain situations where we had a reduction of lending, the underlying collateral, it stayed with us. ***So we have very positive feedback about the way we have addressed some of these issues with respect to the risk-weighted asset reductions***, the fact that we raised the capital immediately at the end of April and the read across from the lessons learned. So investors take a lot of -- sorry, clients take a lot of comfort from the fact also that we are increasing our capital ratio. ***So the client reaction is very constructive.***

(Emphasis added).

113. When questioned by an analyst about if the Company was "continu[ing] to see inflows in July," Defendant Gottstein responded:

> ***Look, we are not starting to give intra-months NNA numbers***….We did, in this specific situation, provide some color because the question was asked how in the second quarter the monthly NNA development was, but we are not going now to answer questions on intra-months or weekly NNA developments. By the way, ***for me, it's absolutely irrelevant now how the last two or three weeks were in terms of NNA. It's for me much more the longer-term trends, and the longer-term trend is very positive.***

(Emphasis added)

114. In conclusion, Defendant Gottstein stated:

> ***Since the occurrence of the Archegos and supply chain finance fund matters, which we are taking very seriously, as I said, we have taken decisive actions around capital and risk management. We have learned and will continue to learn the lessons from these events, and we will ensure that we emerge stronger by improving our capital ratios and strengthening risk, compliance and control foundations.***

(Emphasis added).

115. The statements contained in ¶¶ 100-114 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. While Defendants stated, "[w]e are taking these events very seriously" and that they had

"taken action to address many of the issues," "proactively derisked our Prime Services business," had "proactively strengthening the overall risk culture across the group" and would "continuing to strengthen our first and second line of defense risk approach and governance," in fact, the Company had not taken any meaningful actions to address Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or throughout the Class Period. Defendants were vague about what specific actions had been taken. In fact, when Defendant Mathers was asked what was meant by a "reduction in risk appetite," he stated "I don't think there's anything specific I'd like to highlight." Despite Defendants' assertions that the investigation was "largely complete" and had been "a good and thorough process," and that Defendants had "learned serious lessons," in fact, the investigation could not have been sufficiently thorough, as it found the Archegos scandal was merely the result of "a series of human errors," that "the protocols were there, but they were not followed," and "[i]t was fairly obvious what needed to be done." As later events made clear, the issues went much deeper, requiring a full restructuring of Credit Suisse after its acquisition by UBS. Additionally, at the time, the Company was experiencing significant and unusual customer and/or asset outflows, which were not merely a "one-off move" "due to certain derisking actions that we have taken in APAC." As in the previous quarter, at the time these statements were made, there existed material weaknesses in the Company's internal controls over financial reporting.

**XVI. July 29, 2021: Second Quarter 2021 Press Conference**

116. On July 29, 2021, Credit Suisse also held a press conference to discuss the Company's second quarter 2021 results (the "2Q21 Press Conference"). Defendant Gottstein repeated, in large part, the prepared remarks he had made at the 2Q21 Earnings Conference.

117. When questioned about what had been done to ensure staff followed procedures regarding the escalation of "concerns up the chain," Defendant Gottstein responded:

> ***Well, we obviously had very clear instructions to all the respective, not only Prime Service-related first line of defense and related second line of defense employees, but globally, the importance of escalation. We reiterate this constantly also in our town halls, in our recent internal memos. It's very important that people escalate when there are issues, whether it's limit breaches, whether it relates to, for example, in this case, the fact that we discussed and actually advised to move certain clients like Archegos from static dynamic margining, but it was just not followed through. And these are the type of things that need to be escalated and this is something that each and everyone here on the Executive Board are telling our management committees, how important that is***.
>
> (Emphasis added).

118. The statements contained in ¶ 117 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company did not have "very clear instructions" to "escalate when there are" "limit breaches" or related risk management issues; rather, Credit Suisse's risk management and/or control governance procedures and/or policies were severely lacking, both throughout and prior to the Class Period.

## XVII. August 13, 2021: Axel Lehman and Juan Colombas Nominations Media Release

119. On August 13, 2021, the Company issued a media release announcing the nominations and proposed appointments of Defendant Axel Lehman and Juan Colombas ("Colombas") to Credit Suisse's Board of Directors, which it filed with the SEC on a Form 6-K (the "Lehman and Colombas Nominations Media Release"). The Lehman and Colombas Nominations Media Release stated, in relevant part, as follows:

> António Horta-Osório, Chairman of Credit Suisse, said: "I am extremely pleased that Axel Lehmann and Juan Colombas have been nominated to join our Board. With their deep experience in risk management and business leadership, and both with careers spanning approximately three decades in financial services, ***they will make an invaluable contribution as we shape the bank's strategic realignment and enhance our culture of risk management and personal responsibility and accountability.*** I look forward to working closely with them in their new respective

roles as members of the Board."

(Emphasis added).

120. The statements contained in ¶ 119 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the nominations and ultimate appointments of Defendant Lehman and Colombas would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both throughout and prior to the Class Period; and (ii) the Company was not "enhanc[ing] our culture of risk management and personal responsibility and accountability," as Defendants did not implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies at this time or at any time during the Class Period.

## XVIII. September 26, 2021: Defendant Horta-Osório and Gottstein Interview with *SonntagsBlick*

121. On September 26, 2021, Defendants Horta-Osório and Gottstein were jointly interviewed by Swiss newspaper *SonntagsBlick*. *Reuters* summarized the interview in an article it published that day titled, "Credit Suisse board backs CEO, chairman tells SonntagsBlick."

122. The article stated, in relevant part:

> Credit Suisse's (CSGN.S) board of directors is convinced Chief Executive Thomas Gottstein is the right person to ***strategically realign the bank by curbing risk appetite***, the Swiss bank's chairman said in a newspaper interview published on Sunday.
>
> Asked whether he was planning to replace Gottstein as CEO or take over the operational lead of the bank himself, Antonio Horta-Osorio was quoted as replying "no" in the interview with Swiss Sunday newspaper SonntagsBlick.
>
> "I can only say with certainty that Thomas Gottstein has the full confidence of the board of directors," he said. "In the difficult phase the bank went through recently, he impressively demonstrated his leadership skills. He is the right man for the

strategic realignment of the bank."

Horta-Osorio, who took over as chairman in April, said ***the bank had to curb risk appetite and set the right incentives***, while also hiring and supporting staff sharing its values.

* * *

Gottstein said the bank had thoroughly analysed its balance sheet. "We did not find any cases comparable to Greensill or Archegos."

(Emphasis added).

123. The statements contained in ¶ 122 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was not going to "curb[ ] risk appetite," as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both throughout and prior to the Class Period; and (ii) at this time, there existed material weaknesses in the Company's internal controls over financial reporting.

## XIX. November 4, 2021: Investor Day 2021 Media Release and Investor Presentation

124. On November 4, 2021, the Company issued a media release regarding its presentation to investors in connection with "Investor Day 2021" held the same day, which it filed with SEC, along with slides accompanying its presentation to investors, on a Form 6-K (the "Investor Day 2021 Release" and "Investor Day 2021 Presentation"). The Investor Day 2021 Release stated, in relevant part, as follows:

Following a comprehensive assessment of its strategy, the Credit Suisse Group Board of Directors (BoD) has unanimously agreed on a long-term strategic direction for the Group. ***The strategy is based on a long-term vision and reemphasizes the integrated model, with a well-defined three-year plan, investing in sustainable growth across Credit Suisse's businesses, while placing risk***

> ***management and a culture that reinforces the importance of accountability and responsibility at its core****….*
>
> ***Work in this direction has already begun as we strengthened our risk management and capitalization, and de-risked the bank while increasing the investment in our core businesses.***
>
> * * *
>
> **PRIORITIZING RISK MANAGEMENT**
> As part of the outcomes of the strategic review, the bank will continue to focus on risk culture, putting risk management at the heart of all its actions, with investments in data, infrastructure, reporting capabilities, as well as in compliance.
>
> The following initiatives have already been completed or are underway:
>
> - **Fundamental risk review**, examining how risks are being assessed, managed and controlled across the Group.
> - Clear **definition of roles, responsibilities and accountabilities** across all divisions, as Credit Suisse continues to implement remediation efforts that were initiated earlier in the year.
> - Development of **tools and processes** to improve business accountability and ownership as the first line of defense for risk and controls.
> - Revision of **compensation process** and structure, ***incorporating risk-sensitive performance and non-financial objectives into the enhanced performance scorecards.***
> - Fostering a culture that reinforces the importance of **personal accountability and responsibility**.
>
> (Bold and italicized emphasis added)

125. The statements contained in ¶ 124 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's new "strategy" was a sham and Defendants had not "strengthened [Credit Suisse's] risk management" – to the contrary, Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies,

which were severely lacking, both throughout and prior to the Class Period; (ii) the Company never revised its compensation structure to "incorporat[e] risk-sensitive performance and non-financial objections," and; (iii) at the time, there existed material weaknesses in the Company's internal controls over financial reporting.

**XX. November 4, 2021: Investor Day**

126. On November 4, 2021, Credit Suisse held its 2021 Investor Day (the "2021 Investor Day") in London, England. During the 2021 Investor Day, Defendant Horta-Osório stated, in relevant part, as follows:

> As I have said when I was elected Chairman, there is no doubt that this is a very challenging time for Credit Suisse. The issues we have seen in the past year, including the settlements of 2 legacy investigations in mid-October, clearly highlights the need for us to focus on rebuilding a culture of risk management. ***Together with the Board of Directors, Thomas and the Executive Board, we have been working hard to understand the root causes of these issues. The Archegos report provides evidence that we do not shy away from learning serious lessons. You have my personal commitment that we will work to solve our issues one by one with the required diligence, thoroughness and humility.***
>
> ***Since I joined the bank as Chairman in May, my focus has been on 3 key areas: risk management, strategy and culture. Over the past 6 months, we have made significant progress,*** while I recognize that there is still a lot more to do. Let me elaborate on where we stand. ***First, risk management. We have largely completed our fundamental review of risks, examining the risk profile of each business, tightening limits, reducing concentrations and strengthening our risk governance. This includes adjusting our risk appetite at the group and divisional levels accordingly. We have appointed a new Group Chief Risk Officer and a new Group Chief Compliance Officer. We have enhanced our oversight at the Board of Directors with the election of Axel Lehmann as new Chair of the Risk Committee and of Juan Columbus as a member of the Compensation, Risk and Audit Committees. In addition, we have further reemphasized that every employee plays a pivotal role in being a risk manager at heart. Risk will be an area of key and continuous focus going forward.***
>
> * * *
>
> ***[W]e will seek to place risk management at the core of the bank and in everything we do, and operate under the right risk appetite as approved by the Board***….
>
> (Emphasis added).

127. Defendant Gottstein then stated, in relevant part, as follows:

> Let me say a few words about 2021. This has been a challenging year for Credit Suisse and our employees with Archegos and supply chain finance fund matter. Credit Suisse captured negative headlines because of these events, and rightly so, because they were simply unacceptable. In addition, the Board of Directors and the Executive Board have been dealing with other legacies in the last few months stemming back, in some cases, 10 years or more, including in the fourth quarter last year. ***We are committed to addressing these issues and legacies. We have learned serious lessons from all of these matters, and we have already implemented significant changes to our organization and risk management policies where needed.***
>
> * * *
>
> ***We have thoroughly looked at every aspect of the bank, and I want to stress that we have implemented significant changes already. These include strengthening our capital position as evidenced by our 14.4% CET1*** **[Common Equity Tier One]** ***ratio at the end of the third quarter. This is the highest level we have ever seen, and up from 12.2% at the end of the first quarter, as we have significantly reduced risk-weighted assets and leverage exposure since then.***
>
> * * *
>
> Let me turn to our risk management foundation. ***Underpinning our growth strategy is sound risk management. We have reinvigorated our risk culture around the principle that everyone is a risk manager and strength and accountability as the first line of defense. We have strengthened our leadership with the appointments of Chief Risk Officer, David Wildermuth; and Chief Compliance Officer, Rafael Lopez Lorenzo, who is also here with us in the room. We have invested in risk and compliance and are working to recalibrate risk appetite to the strategic direction of the bank.*** We are aligning the compensation process to reinforce a shift towards more risk and control objectives and collaboration.

(Emphasis added).

128. When questioned by an analyst about the "surpris[ing]" focus on "growth and the growth opportunities for the business and how you're going to try and drive growth" when "what's got us here was several issues in terms of risk management and obviously the issues during the year," Defendant Horta-Osório responded:

> ***The main priority and the first point when I was elected Chairman of the AGM,***

> ***the first part of my speech is risk management. At heart, every banker should be a risk manager.*** So when you heard a lot in these presentations, which are coherently, holistically and thoroughly discussed together and unanimously endorsed by all of us, you heard about the growth areas. But ***what you have to see is that mostly we are reallocating capital to the highest-returning businesses and with a lower risk profile, and we are lowering the risk profile of the bank overall by going to segments with lower risk and also by other measures that we are doing.***
>
> In terms of risk management, as a whole, it is a series of levers. ***And it starts with example at the top, secondly, with hiring the right people that share the values about risk management, and I told you in my speech, about the hiring that we have done, about the internal promotions that we have done. So very, very important in terms of the new CRO, Chief Compliance Officer, Axel is Chairman of the Risk Committee; Juan Colombas, the internal promotions, Rafales, Chief Compliance Officer, Christine.*** So this is the second point. You need a team that's sharing the same values, absolutely diffuses the culture throughout the organization and represent the role models that people inside the bank should aspire to be.
>
> * * *
>
> ***[T]he risk appetite, as approved by the Board, will follow the strategy review. And…the incentives that we'll set up that also follow the strategy review will also incorporate risk in the incentives all along the organization***, and that's where also the economic profit comes along. So don't have any misunderstanding on that. ***This is a strategy, holistic and coherent, fully endorsed by the team, should deliver the proper returns for shareholders, but with a much lower risk profile, much lower volatility of earnings going forward.***
>
> (Emphasis added).

129. The statements contained in ¶¶ 126-128 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's new "strategy" was a sham, as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, both throughout and prior to the Class Period; (ii) Defendants never "align[ed] the compensation process to reinforce a shift towards more risk and control objectives and collaboration"; and (iii) at the time, there existed material weaknesses in the

Company's internal controls over financial reporting.

## XXI. November 4, 2021: Third Quarter 2021 Media Release and Investor Presentation

130. On November 4, 2021, the Company also issued a media release announcing financial results for the third quarter of 2021 (the "3Q21 Media Release") for the period ended September 30, 2021, which it filed with the SEC, along with slides for its presentation to investors, on a Form 6-K the same day. The 3Q21 Media Release quoted Defendant Gottstein, in relevant part, as follows:

> ["]***We have also taken decisive actions to strengthen our overall risk & controls foundation***, continued our remediation efforts on the Supply Chain Finance Funds matter, with our priority to return cash to investors, and made significant progress in resolving legacy issues. ***Our objectives are clear: we want to become a stronger, more customer-centric bank that puts risk management at the very core of its DNA to deliver sustainable growth for investors, clients and colleagues.***["]
>
> * * *
>
> ***We saw NNA of CHF 5.6 bn in 3Q21, compared to NNA of CHF 18.0 bn in 3Q20 and net asset outflows of CHF 4.7 bn in 2Q21.***

(Emphasis added).

131. The statements contained in ¶ 130 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not "taken decisive actions to strengthen our overall risk & controls foundation," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, which were severely lacking, both throughout and prior to the Class Period; (ii) the Company was experiencing significant and unusual customer and/or asset outflows; and (iii) at the time there existed material weaknesses in the Company's internal controls over financial reporting.

## XXII. November 4, 2021: Third Quarter 2021 Report

132. On November 4, 2021, the Company filed with the SEC its financial report for the third quarter of 2021 (the "3Q21 Quarterly Report"), on Form 6-K for the period ended September 30, 2021. The 3Q21 Quarterly Report stated, in relevant part, as follows:

> As previously reported, the Board of Directors (Board) had initiated an externally led investigation of the Archegos matter, which was supervised by a special committee of the Board. On July 29, 2021, Credit Suisse published on its website the report based on this independent external investigation, as well as a summary of management's responses to this report to date. Since then, we have continued to further implement a Group-wide remediation program to facilitate the execution of key activities including:
>
> - ***strengthening the risk management environment through the streamlining of governance and oversight structures***, including the alignment of incentives with roles and accountability, and through the reinforcement of a Group-wide risk mindset and speak-up culture;
> - holistically reviewing client relationships to identify and manage similar risk concentrations; and
> - ***reinforcing and extending risk capabilities and frameworks, especially in the areas of credit risk, counterparty risk, and stress testing including the related models employed.***
>
> ***In addition, we continue to review and implement efforts to improve the overall risk appetite and limit framework and breach escalation processes. We have largely completed our fundamental review of risks, examining the risk profile of each business division, tightening limits, reducing concentrations and strengthening our risk governance. We are also committed to supporting further risk management improvements by enhancing related tools, reporting, data quality and types of data available in a strategic manner.***
>
> The Archegos review contains a broader aspect of leveraging remediation efforts in specific functions and business lines to identify areas across the Group where similar risks may exist and to identify and implement sustainable solutions in response to lessons learned, ***including key controls and requisite risk metrics. While many of the key actions have already been completed or are in the process of being completed in 2021, we expect certain aspects of our remediation activities, particularly to the extent they require infrastructure changes, to continue into 2022 as we seek to strengthen specific risk management capabilities, expertise and culture.***

* * *

> ***Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We have adapted our liquidity and funding profile to reflect lessons learned from the financial crisis, the subsequent changes in our business strategy and regulatory developments.***
>
> * * *
>
> Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. We achieve this through a conservative asset/liability management strategy aimed at maintaining long-term funding, including stable deposits, in excess of illiquid assets. ***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***
>
> (Emphasis added).

133. The statements contained in ¶ 132 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not "strengthen[ed] the risk management environment through the streamlining of governance and oversight structures" and was not "committed to supporting further risk management improvements," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) the Company was experiencing significant and unusual customer and/or asset outflows; (iii) the Company did not maintain a "sufficient" liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not "conservative" and were materially deficient at all times; and (iv) at this time, there existed material weaknesses in the Company's internal controls over financial reporting.

## XXIII. November 4, 2021: Defendants Horta-Osório and Gottstein Interview with *Bloomberg TV*

134. On November 4, 2021, Defendants Horta-Osório and Gottstein were jointly interviewed on *Bloomberg TV*. In the interview, Defendant Gottstein characterized the Company's most recent results as "***very solid***" and stated that net new assets were "***very solid***."

135. With respect to the Company's purported strategic changes, Defendant Horta-Osório stated that the outcome would be "***a bank which has a much lower risk profile" and "[a] bank that has risk management at its heart…We want to elevate the risk management and the clear culture of accountabilities and responsibilities."***

136. Defendant Horta-Osório also stated, in reference to Archegos and the Greensill Funds: ***"[W]e have made a very significant effort of addressing those issues. We will learn what happened…We are much better than we were six months ago…[A]nd the lower risk bank that we are creating should absolutely avoid these types of issues happening again."***

137. The statements contained in ¶¶ 134-136 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the investigations into the failure of the Greensill Funds and Archegos losses were shams and no 'lessons would be learned,' nor would the bank have "a much lower risk profile" or have "risk management at its heart," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) net new assets were not "very solid," as the Company was experiencing significant and unusual customer and/or asset outflows that it failed to disclose; and (iii) at the time, there existed material weaknesses in the Company's internal controls over financial reporting.

138. Analysts reacted favorably to both the quarterly results and the new strategy announced by management. An analyst from Barclays, in a report titled, "Credit Suisse AG: Q321 Results and Strategy Update" published on November 4, 2021, called the quarterly results "better than expected" and remarked that the "strategy plan looks sensible to us." Deutsche Bank, in a report on the same day titled "Credit Suisse: New strategy - in the right direction," rated the stock "Buy," stating, "overall we think the strategy goes in the right direction and should help to unlock Credit Suisse's potential better over time.

**XXIV. November 6, 2021: Third Quarter 2021 Earnings Conference**

139. On November 6, 2021, Credit Suisse held a conference call with analysts and investors to discuss the Company's third quarter 2021 earnings (the "3Q21 Earnings Conference"). During the 3Q21 Earnings Conference, Defendant Gottstein began by stating, in relevant part:

> Our strong third quarter results reflect four important factors that put us in excellent position to further our growth strategy: robust underlying performance, good net new asset inflows, strong capital and progress in addressing legacy issues. ***They reflect progress in achieving our clear objectives to become an even stronger, more client-centric bank that puts risk management at our core and to deliver sustainable growth for investors, clients and colleagues.***
>
> * * *
>
> We were very pleased to see, after the outflows of the second quarter, positive net inflows across each of our three Wealth Management businesses totaling CHF6.2 billion, representing a 3% annualized growth rate. ***And we achieved this despite further outflows related to the supply chain finance fund matter as well as deleveraging and market-related client outflows in APAC as other competitors have also seen it.***
>
> * * *
>
> Now in terms of net new assets, ***although we did see approximately CHF400 million of net outflows in our Corporate & Institutional Clients business, this was more than offset by CHF1.9 billion of net inflows in our Private Clients business reversing the outflows that we saw in the second quarter….However, IWM [International Wealth Management] did see a reversal of the net outflows of the second quarter with positive net new assets totaling CHF1.4 billion, notwithstanding CHF1.5 billion relating to the supply chain finance funds matter***

***this quarter.***

(Emphasis added).

140. The statements contained in ¶ 139 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows, which were not due to "deleveraging" and "market-related" factors; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting.

## XXV. November 7, 2021: Defendants Horta-Osório and Gottstein Interview with *Neue Zürcher Zeitung*

141. On November 7, 2021, Defendants Horta-Osório and Gottstein were jointly interviewed by Swiss, German-language newspaper *Neue Zürcher Zeitung.*

142. As reported by *Bloomberg* in an article published that day titled "Credit Suisse Executives Make Show of Unity Over Strategy," during the interview Defendants Horta-Osório and Gottstein said they were "***restructuring executive pay in the wake of the Archegos and Greensill scandals***." Specifically, Defendant Horta-Osório said "***We will restructure the variable remuneration in such a way that there is no longer any incentive to take excessive risk***."

143. The statements contained in ¶ 142 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants never "restructure[d] the variable remuneration in such a way that there is no longer any incentive to take excessive risk."

## XXVI. January 17, 2022: Defendant Horta-Osório "Resignation" and Defendant Lehmann Appointment Media Release

144. On January 17, 2022, the Company issued a media release announcing the

resignation of Defendant Horta-Osório as Chairman of the Board of Directors and appointment of Defendant Lehmann as the new Chairman (the "Lehmann Appointment Media Release"), which it filed with the SEC on a Form 6-K the same day. The Lehmann Appointment Release stated, in relevant part, as follows:

> Credit Suisse Group today announced that the Board of Directors (Board) has appointed Axel P. Lehmann as the bank's new Chairman effective immediately. He succeeds António Horta-Osório, who resigned following an investigation commissioned by the Board. Under the leadership of Axel Lehmann, the Board and the Executive Board will continue to execute Credit Suisse's strategy, driving forward the transformation of the bank.
>
> * * *
>
> Axel Lehmann, Chairman of Credit Suisse, said: "I would like to thank the Board for the trust it has placed in me and look forward to working even more closely with the Board and the Executive Board. ***We have set the right course with the new strategy and will continue to embed a stronger risk culture across the firm. By executing our strategic plan in a timely and disciplined manner, without distraction, I am convinced that Credit Suisse will demonstrate the renewed strength and business focus needed to generate sustainable value for all of our stakeholders.***"
>
> (Emphasis added).

145. The statements contained in ¶ 144 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) Defendant Horta-Osório's "resignation" and Lehmann's appointment as Chairman of the Board of Directors would have no meaningful effect on Credit Suisse's "new strategy" or "stronger risk culture" and/or control governance procedures and/or policies; and (ii) the Company was not dedicated to a "new strategy" that promoted a "stronger risk culture" and no 'lessons would be learned' from the Archegos and Greensill Funds scandals, as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control

governance procedures and/or policies, either at this time or at any time throughout the Class Period.

## XXVII. January 25, 2022: Preliminary Fourth Quarter and Fiscal Year 2021 Earnings Media Release

146. On January 25, 2022, the Company issued a media release announcing preliminary financial results for the fourth quarter and fiscal year of 2021 (the "Preliminary FY21 Media Release") for the period and year ended December 31, 2022, which it filed with the SEC on a Form 6-K the same day. The Preliminary FY21 Media Release stated, in relevant part, as follows:

> ***With regard to our underlying business results, as we indicated in our announcement of November 4, 2021, we have seen a reduction in transaction-based revenues in the Investment Bank and our wealth management businesses. This reflects the usual seasonal slowdown but, in addition, business activity reflects the reversion to more normal trading conditions after the exceptional environment that prevailed for most of 2020 and 2021. Combined with the reduction in our overall risk appetite, including our decision to substantially exit our prime services business, this has resulted in a loss for the fourth quarter 2021 in the Investment Bank division (before the goodwill impairment). In our wealth management businesses, there has been a significant slowdown in transaction activity in the International Wealth Management and Asia Pacific divisions, with the latter also reflecting client de-leveraging mainly due to the adverse market conditions in Asia. As a consequence, fourth-quarter 2021 net new assets for our wealth management businesses will be modestly negative, albeit more than offset by inflows in our Asset Management business.***

(Emphasis added).

147. The statements contained in ¶ 146 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's reduced revenues were not attributable to a "usual season slowdown," "the reversion to more normal trading conditions," or "adverse market conditions in Asia," but instead the Company was experiencing significant and unusual customer and/or asset outflows, which the Company failed to disclose; and (ii) there existed material weaknesses in the

Company's internal controls over financial reporting.

## XXVIII. February 10, 2022: Fourth Quarter and Fiscal Year 2021 Media Release and Investor Presentation

148. On February 10, 2022, the Company issued a media release announcing financial results for the fourth quarter and fiscal year of 2021 (the "FY21 Media Release") for the period and year ended December 31, 2021, which it filed with the SEC, along with slides accompanying its presentation to investors, on a Form 6-K the same day. The FY21 Media Release quoted Defendant Gottstein, in relevant part, as follows:

> ["]***During the last three quarters of the year, we ran the bank with a constrained risk appetite across all divisions as we took decisive actions to strengthen our overall risk and controls foundation and continued our remediation efforts***, including on the Supply Chain Finance Funds matter, where our priority is to return cash to investors.
>
> …***I am confident that we are well-positioned to build a stronger and customer-centric bank that puts risk management at the very core of its DNA in order to deliver sustainable growth and value for investors, clients and colleagues.***"
>
> (Emphasis added).

149. The statements contained in ¶ 148 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not "taken decisive actions to strengthen our overall risk and controls foundation," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) the Company was experiencing significant and unusual customer and/or asset outflows; and (iii) at the time, there existed material weaknesses in the Company's internal controls over financial reporting.

## XXIX. February 10, 2022: Fourth Quarter and Fiscal Year 2021 Earnings Release

150. On February 10, 2022, the Company issued its earnings release announcing

financial results for the fourth quarter and fiscal year of 2021 (the "FY21 Earnings Release") for the period and year ended December 31, 2021, which it filed with the SEC on a Form 6-K the same day. The FY21 Earnings Release stated, in relevant part, as follows:

> **4Q21 results**
> As of the end of 4Q21, assets under management of CHF 1,614.0 billion decreased CHF 9.0 billion compared to the end of 3Q21. The decrease was driven by unfavorable foreign exchange-related movements, partially offset by favorable market movements and net new assets of CHF 1.6 billion.
>
> Net new assets of CHF 1.6 billion in 4Q21 mainly reflected inflows across the following businesses. Net new assets of CHF 4.7 billion in Asset Management were mainly driven by inflows from investments and partnerships, primarily related to an emerging markets joint venture, as well as traditional investments, primarily related to index solutions. Net new assets of CHF 2.7 billion in International Wealth Management reflected inflows in emerging markets and Western Europe. ***These inflows were partially offset by net asset outflows of CHF 2.9 billion in Asia Pacific, which mainly reflected outflows from Greater China and included client deleveraging as well as de-risking measures we have taken, and net asset outflows of CHF 1.8 billion in the Private Clients business of Swiss Universal Bank, which mainly reflected outflows in the UHNW and HNW client segment as well as the usual seasonal slowdown in the fourth quarter.***
>
> **2021 results**
> As of the end of 2021, assets under management of CHF 1,614.0 billion increased CHF 102.1 billion compared to the end of 2020. The increase was driven by favorable market movements, net new assets of CHF 30.9 billion and favorable foreign exchange-related movements, partially offset by structural effects….***Structural effects also reflected the strategic decision to exit substantially all of our prime services businesses.***
>
> Net new assets of CHF 30.9 billion in 2021 mainly reflected inflows across the following businesses. Net new assets of CHF 14.6 billion in Asset Management were mainly driven by inflows from investments and partnerships, primarily related to an emerging markets joint venture, traditional investments, primarily related to index solutions. Net new assets of CHF 11.0 billion in International Wealth Management mainly reflected inflows in emerging markets and Western Europe. Net new assets of CHF 5.1 billion in the Corporate & Institutional Clients business of Swiss Universal Bank reflected inflows from the pension and external asset managers businesses. Net new assets of CHF 1.4 billion in the Private Clients business of Swiss Universal Bank reflected inflows across all client segments. ***These inflows were partially offset by net asset outflows of CHF 1.1 billion in Asia Pacific, which mainly reflected outflows from Japan and China, and included client deleveraging as well as de-risking measures taken during the***

***year***, partially offset by inflows from Australia.

(Emphasis added).

151. The statements contained in ¶ 150 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's outflows were not chiefly attributable to a "usual season slowdown" or "client deleveraging as well as de-risking measures," but instead the Company was experiencing significant and unusual customer and/or asset outflows, which Defendants failed to disclose; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting.

**XXX. February 10, 2022: Fourth Quarter and Fiscal Year 2021 Earnings Conference**

152. On February 10, 2022, Credit Suisse held a conference call with analysts and investors to discuss the Company's fourth quarter and fiscal year 2021 earnings (the "FY21 Earnings Conference") for the period ended December 31, 2022. During the FY21 Earnings Conference, Defendant Gottstein stated, in relevant part:

> ***Our results were significantly affected by goodwill impairment and litigation provisions. In addition, they were impacted by lower transaction-based revenues and reflected more normal trading conditions, client deleveraging and a significant reduction of our overall risk appetite in 2021.*** More generally, we were a bank which just embarked on a new organizational structure and have become very inward focused, especially in December. This all negatively impacted our franchise momentum. At the same time, ***we took a number of decisive steps last year to position ourselves for sustainable growth***.
>
> And let me please highlight the following. ***Firstly, we strengthened our capital position and substantially reduced our risk positions. Secondly, we strengthened risk and compliance teams, systems and processes and underwent a comprehensive risk review across the entire group, which was completed in the fourth quarter. And thirdly, we strengthened our leadership in the investment bank, in asset management, in risk, in compliance, in technology and operations, in wealth management, as well as most recently in human resources. This will***

***not be a quick fix, and we expect 2022 will be a transition year. But we have made clear progress in creating the conditions for a much more stable and predictable bank.***

* * *

Let me now turn to the decisive steps we have taken to align risk with our strategy, please. Slide 8. ***Management and the board of directors spent a great deal of time and energy in 2021 strengthening our risk and compliance efforts, including in our first line of defense***. We are committed to continuing this process under the guidance of our new chief risk officer, David Wildermuth, and our chief compliance officer, Rafael Lopez, as well as under the new leadership in asset management, the investment bank and wealth management. ***We are confident that the changes we are making across our risk and compliance functions will support our growth ambitions in the strategic plan. You can see the steps we have taken at the top of the slide as regards our leadership and governance, our risk appetite and our risk culture. Next slide, please. Here, you see the substantial risk reduction we achieved since the first quarter of 2021 at the group level as well as in investment bank and across our wealth management businesses.***

(Emphasis added).

153. Defendant Mathers then stated, in relevant part:

[C]lient deleveraging and challenging markets in some of the regions in which we operate, particularly in Asia, together with reductions in our own risk appetite resulted in a mixed performance for our wealth management businesses in the fourth quarter. However, ***we've continued to make progress in growing assets under management and increasing our mandate volumes***.

* * *

***Now, as we've seen before in the fourth quarter, and this is -- this often happens, there were outflows in our Private Client business totaling 1.8 billion Swiss francs.*** But I'd remind you for the year, we saw total net new assets in private clients of 1.4 billion positive Swiss francs.

(Emphasis added).

154. When questioned by an analyst about the Company's "slightly contradictory" stated goals of "accelerating the revenue momentum and strengthening the risk culture" and "how you can achieve both at the same time," Defendant Gottstein responded:

***[N]o, I don't think there is any contradiction to that at all.*** And I would like to

come from two angles. ***First of all, what we've seen really in Q4 was the result of a series of steps we've taken during the year in terms of strengthening our leadership and governance in risk management in terms of recalibrating our risk appetite and reducing our risk positions starting, obviously, within the investment bank and prime services.*** But across frankly, the board also exiting certain other businesses like GTS, emerging markets, reduced oil and gas exposures and overall RWA and leverage reduction since the end of the first quarter, as we showed between 10% and 12%. And as a consequence of that, we really saw in Q4, a very low activity in new business, and that has been very much also influenced by slower markets and -- but also somewhat inward focus, I would say, of the organization as we immediately implemented the new structure -- organizational structure, which followed the strategic review that we presented on the 4th of November. And then obviously, as a consequence of that, ***we are strengthening the risk culture with a much more disciplined approach around risk in both the first line and second line of defense, significant investments across risk and compliance, etc. And this all leads to -- or led to a real slowdown in Q4 and has now been really, I would say, embedded and has now laid the foundation for a very disciplined slow growth coming forward now in Q1 and beyond.***

And maybe more conceptually, ***I mean, banking is about risk management. It's not about avoiding risk. It's about proper risk management, and that's really what the executive board and including myself, are telling all our troops. We want to have disciplined approach to risk, but we want to do new business. So that's very clear. And in that sense, we see absolutely no contradiction when we say on one side, we want to further strengthen the risk culture. But at the same time, regaining some revenue momentum.***

(Emphasis added).

155. Following up on Defendant Gottstein's response, the same analyst asked if "there is a deep understanding across the franchise about exactly what risk tolerance levels are acceptable," to which Defendant Gottstein responded:

***Absolutely. I think that has become very clear. We have recalibrated our risk appetite division by division and region by region.*** That broken down to country limits, to limits for each of the business areas and product areas. And we have a very clear framework on limits, and this is now very clear in the organization and fully signed up by all ExB members, both the old ExB members, but also the new ExB members. And I'm really very excited about Francesco on the wealth management side and Christian's collaboration together with David Wildermuth and the risk teams and compliance teams. ***So this has really been now starting to work very well.***

(Emphasis added).

156. When questioned by an analyst about the "group risk review" vis-à-vis "the Greensill report and the conclusions out of that report," Defendant Gottstein responded:

> So the risk review is separate from the supply chain funds and also from Archegos. So as part of the work we went through over the nine months, I would say, since April to the end of the year under the leadership of the tactical crisis committee, initially, that was with the former chief risk officer -- sorry, the former chair of the risk committee on the board and then subsequently under the leadership of our former chairman, ***we really had three themes that this tactical crisis committee looked at. One was Archegos agreed across, one was supply chain funds and agreed across and the third one was the risk review. And the risk review was really a very systematic review of all balance sheet items and off-balance sheet items. It was really a very detailed analysis so to speak, vertically through the balance sheet and -- but then also looking at each of the divisions and regions, looking at special themes, special businesses, whether it was in investment banking, whether it was in corporate banking, whether it was Level 3 assets, etc***. So this -- these three themes really were part of our work that we went through with the tactical crisis committee week-by-week in the first phase and then every second week thereafter.
>
> So the risk review was really separate from the supply chain fund. ***And all three have essentially been completed.*** As we said already earlier, the Archegos -- with the Archegos report coming out, the Paul, Weiss report at the time, then the risk review was completed in the fourth quarter, and we have now also completed the review by the board with respect to the report on the supply chain finance fund, which was commissioned to Deloitte and a Swiss law firm. ***So all three themes have really been completed.***
>
> ***And from that perspective, also the tactical crisis committee is now essentially being phased out.***
>
> (Emphasis added).

157. The statements contained in ¶¶ 152-156 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not "strengthened" its "risk positions," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the

Class Period; (ii) the Company was experiencing significant and unusual customer and/or asset outflows, which were not due to "client deleveraging" or "challenging markets"; and (iii) at the time, there existed material weaknesses in the Company's internal controls over financial reporting.

**XXXI. February 18, 2022: Defendant Gottstein Interview with *Finanz und Wirtschaft***

158. On February 18, 2022, Defendant Gottstein was interviewed by Swiss newspaper *Finanz und Wirtschaft*. *Reuters* summarized the interview in an article published that day titled "Credit Suisse aims for 2022 profit, wants to go it alone – CEO tells paper."

159. The article stated, in relevant part:

> Credit Suisse (CSGN.S) aims to make a profit this year, Chief Executive Thomas Gottstein told Swiss newspaper Finanz und Wirtschaft in an interview published on Friday.
>
> "We expect a profit in 2022. But uncertainty factors such as Russia, China, inflation and the interest rate environment are difficult to assess," he said.
>
> * * *
>
> Gottstein said he was convinced the bank's strategy of focusing even more on wealth management would pay off in the long run.
>
> Asked about his relations with new Chairman Axel Lehmann, Gottstein said they were good. "We agree 100% on strategic issues and are ***concentrating on implementing the new strategy***," he said.
>
> Addressing speculation that a plunge in the bank's stock price had left Credit Suisse exposed to a takeover, Gottstein said he believed the group was substantially undervalued.
>
> "That this can trigger takeover fantasies is neither new nor surprising. If the bank is so undervalued, you should have had an offer on the table long ago," he said.
>
> "Firstly, taking over a systemically important bank is not easy. Secondly, and more importantly, Credit Suisse, with its 165-year history, has many strengths that arouse interest among rivals. But we want to play to our strengths ourselves, both nationally and internationally," he added.

(Emphasis added).

160. The statements contained in ¶ 159 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company's new "strategy" was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices.

## XXXII. February 20, 2022: Suisse Secrets Press Release

161. On February 20, 2022, shortly after the release of several articles detailing the Suisse Secrets scandal were published, the Company issued a responsive press release (the "Suisse Secrets Press Release"). The Suisse Secrets Press Release stated, in relevant part, as follows:

> ***Credit Suisse strongly rejects the allegations and insinuations about the bank's purported business practices.*** The matters presented are predominantly historical, in some cases dating back as far as the 1940s, and the accounts of these matters are based on partial, inaccurate, or selective information taken out of context, resulting in tendentious interpretations of the bank's business conduct. While as a matter of law Credit Suisse cannot comment on potential client relationships, ***we can confirm that actions have been taken in line with applicable policies and regulatory requirements at the relevant times, and that related issues have already been addressed.***
>
> Following numerous inquiries by the consortium over the last three weeks, ***Credit Suisse has reviewed a large volume of accounts potentially associated with the matters raised***. Approximately 90% of the reviewed accounts are today closed or were in the process of closure prior to receipt of the press inquiries, of which over 60% were closed before 2015. Of the remaining active accounts, ***we are comfortable that appropriate due diligence, reviews and other control related steps were taken in line with our current framework. We will continue to analyze the matters and take additional steps if necessary.***
>
> Credit Suisse notes that the consortium is referring to a large number of external sources including those previously known as well as an alleged leak in their reporting. ***We take this latter allegation very seriously and will continue with our investigations with an internal task force including specialist external experts.*** We have robust data protection and data leakage prevention controls in place to protect our clients.

> ***As a leading global financial institution, Credit Suisse is deeply aware of its responsibility to clients and the financial system as a whole to ensure that the highest standards of conduct are upheld.*** These media allegations appear to be a concerted effort to discredit not only the bank but the Swiss financial market-place as a whole, which has undergone significant changes over the last several years. In line with financial market reforms across the sector and in Switzerland, ***Credit Suisse has taken a series of significant additional measures over the last decade, including considerable further investments in combating financial crime. Across the bank, Credit Suisse continues to strengthen its compliance and control framework, and as we have made clear, our strategy puts risk management at the very core of our business.***
>
> (Emphasis added).

162. The statements contained in ¶ 161 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not conducted "appropriate due diligence, reviews and other control related steps" vis-à-vis the Suisse Secrets customers and/or accounts; (ii) the Company had not "strengthen[ed] its compliance and control framework" and "risk management" was not "at the very core of [its] business"; (iii) Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; and (iv) there existed material weaknesses in the Company's internal controls over financial reporting.

## XXXIII. March 10, 2022: 2021 Annual Report

163. On March 10, 2022, the Company filed with the SEC its 2021 annual report (the "2021 Annual Report") on Form 20-F for the year ended December 31, 2021. The 2021 Annual Report was signed by Defendants Gottstein and Mathers, attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting. The 2021 Annual Report failed to identify any material weaknesses with the

Company's internal controls over financial reporting, which stated the following, in relevant part:

> **Evaluation of disclosure controls and procedures**
>
> The CEO and CFO concluded that, as of December 31, 2021, the design and operation of the Group's ***disclosure controls and procedures were effective, in all material respects, to ensure that information required to be disclosed in reports filed and submitted under the Exchange Act is recorded, processed, summarized and reported as and when required.***
>
> * * *
>
> Based upon its review and evaluation, management, including the Group CEO and CFO, ***has concluded that the Group's internal control over financial reporting is effective as of December 31, 2021.***
>
> The Group's independent registered public accounting firm, PricewaterhouseCoopers AG, has issued an unqualified opinion on the effectiveness of the Group's internal control over financial reporting as of December 31, 2021, as stated in their report.
>
> **Changes in internal control over financial reporting**
>
> ***There were no changes in the Group's internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Group's internal control over financial reporting.***

(Emphasis added.)

164. The statements contained in ¶ 163 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company's "internal control over financial reporting" was *not* "effective"; in fact, there existed material weaknesses in the Company's internal controls over financial reporting.

165. The 2021 Annual Report further stated, in relevant part:

> The year 2021 was very disappointing and challenging for Credit Suisse. Our reported financial results were negatively impacted by the Archegos and Supply Chain Finance Funds (SCFF) matters, a goodwill impairment and litigation provisions as we worked to proactively resolve legacy issues. We deeply regret that

the Archegos and SCFF matters have caused significant concerns for our stakeholders, and we would like to thank them for their support during these times. We recognize that there are no quick fixes, and 2022 is expected to be a transition year. ***Still, we have achieved a great deal, in difficult circumstances, to turn the page and set the path for the future with our new Strengthen, Simplify and Invest for Growth strategy. We have made a number of enhancements throughout the year, and thanks to the dedication of our employees around the world, we are rebuilding a bank we can all be proud of, with the clear aim of delivering sustainable growth and value for our shareholders.*** At the same time, the world around us is changing in at times alarming ways, with the ongoing effects of COVID-19 and, more recently, the tragic consequences of Russia's invasion of Ukraine. As a global financial institution, we have a crucial role to play for our clients, investors, employees, communities, societies and economies that are confronting immense challenges. ***We understand we have to work hard to retain the trust of all our stakeholders. We are up to the task.***

* * *

***We have reviewed our positions and believe that the bank's exposure in relation to Russia is well-managed and that we have appropriate systems in place to address associated risks.***

* * *

***Our market risk exposure to Russia as of March 9, 2022 is not significant. Credit Suisse is monitoring settlement risks related to certain open transactions with Russian banks and nonbank counterparties or Russian underlyings as market closures, the imposition of exchange controls, sanctions or other factors may limit our ability to settle existing transactions or realize collateral which may result in changes in our exposure.***

* * *

***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***

(Emphasis added).

166. The statements contained in ¶ 165 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business,

operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not established a strategy for "sustainable growth and value," as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; (ii) the Company did not maintain a "sufficient" liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not "conservative" and were materially deficient at all times; (iii) the Company's exposure to Russia was *not* "not significant" or "well-managed"; to the contrary, the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; and (iv) there existed material weaknesses in the Company's internal controls over financial reporting.

## XXXIV. March 15, 2022: Morgan Stanley European Financials Conference

167. On March 15, 2022, Defendant Gottstein participated in the Morgan Stanley European Financials Conference during which he was interviewed by a Morgan Stanley analyst ("Morgan Stanley Conference Interview"). When questioned during Morgan Stanley Conference Interview about Credit Suisse's exposures relating to the Russia-Ukraine situation, Defendant Gottstein responded:

> ***So in terms of net credit exposure, CHF 850 million at the end of '21. And we also announced that we reduced this. So we reduced this materially actually at the end of -- at the second month of February….We have roughly 4% of our assets under management, and Wealth Management is with Russian clients, be they Russia domiciled or Russian nationals, who live in the West.*** So -- and obviously, we used to have a meaningful equity and trading business and Investment Banking business. ***So obviously, like everybody else, we are now reviewing the situation.*** It's a very serious situation, and we will have to see now over the next few months, what this all means for our operation in Russia. I have not taken any decisions on that. So that's kind of a primary effect perspective.
>
> (Emphasis added).

168. When questioned about the Company's posture with respect to potential sanctions relating to Russia-Ukraine, Defendant Gottstein responded:

> ***[Y]ou have to follow the sanctions.*** And for us, the fact that Switzerland also joined EU sanctions was actually almost irrelevant because we were anyway -- for us, the U.S., U.K. and EU sanctions were already binding. So the Swiss following these sanctions was -- I mean it was important for the country, and I think it was the right step. ***But for us, it's very important that the teams are implementing these sanctions and following these sanctions and there is zero tolerance, obviously, that we have to implement them.*** And we also have experience from previous situations in the past when we had these sanctions.

(Emphasis added)

169. When questioned about the Company's progress with respect to the 2021 risk and strategy reviews, Defendant Gottstein responded:

> '21 was a challenging year, but ***we also achieved a lot in terms of strengthening our risk management, also strengthening our Executive Board***…. You mentioned ***the risk review, which we completed in December, which was a very thorough and analytical process through the entire group***, whether it was in terms of Investment Banking, Wealth Management or the other divisions and region by region. ***So we feel actually very good about this. We have, obviously, with David Wildermuth, the new Chief Risk Officer. We have with Rafael Lopez, the new Chief Compliance Officer; and Joanne Hannaford, who joined us also on the 1st of January as the Chief Technology and Operations Officer. And they have really been tremendous in their start.***

(Emphasis added).

170. The statements contained in ¶¶ 167-169 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not established "achieved a lot in terms of strengthening" its "risk management," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) the Company did not

have "zero tolerance" for non-compliance with Russia sanctions, but instead had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; and (iii) at the time, there existed material weaknesses in the Company's internal controls over financial reporting.

## XXXV. April 4, 2022: Credit Suisse Answers to Ethos Foundation Information Request Regarding Greensill Funds and Suisse Secrets

171. On April 4, 2022, Credit Suisse issued a media release announcing its answers to an information request by the Ethos Foundation, a large group of Swiss pension funds and public utility foundations, and other shareholders regarding, i*nter alia*, the Greensill Funds failure and the widely publicized Suisse Secrets investigation, publicly available on its website (the "Ethos Foundation Answers").

172. First, regarding the failure of the Greensill Funds, the Ethos Foundation Answers revealed a number of damning details including that, "[a]s early as mid-2020, CS Group informed FINMA about the results of the investigation" conducted by the law firm Cahill Gordon & Reindel LLP ("Cahill") at the behest of Credit Suisse regarding the discovery that Credit Suisse Asset Management ("CSAM") entered into a "side letter" agreement whereby SoftBank, which "held a large stake in Greensill and wanted to promote its business," "agreed to invest USD 1.5 billion in the [Greensill Funds]" in exchange for CSAM's "commit[tment] to purchase notes for the [Greensill Funds] only through Greensill in the future." According to Cahill, this side letter agreement "failed to consider the conflicts of interest and violations of the requirement to treat investors equally."

173. In response to the Ethos Foundation question asking for an explanation of how the Company's remedial measures have led "to a reduction of the risks" of such a failure reoccurring, the Ethos Foundation Answers stated:

> The transition to a separate business unit led by a member of the Executive Board results in direct linkage of Asset Management to the Executive Board and increased transparency vis-à-vis the Executive Board. ***The fact that CSAM is now led by a member of the Executive Board also indicates a much stronger commitment from senior management and a correspondingly stronger direct oversight of this business unit.*** The same effect is of course achieved by direct reporting to the Executive Board.
>
> (Emphasis added)

174. The Ethos Foundations Answers further stated:

> ***We continue to invest in our Risk and Compliance organisations alongside strengthening of our controls and culture, which remains a key priority building on our new purpose and cultural values***, as referenced within our 2021 Annual Report
>
> (Emphasis added).

175. The statements contained in ¶¶ 172-174 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period.

176. Second, regarding the Suisse Secrets investigation, the Ethos Foundation Answers stated:

> ***We are comfortable that based on the results of our preliminary investigation to date there are no new concerns which have been identified and actions taken were in line with applicable processes and requirements at the relevant time and in accordance with our legal and regulatory obligations.***
>
> As we investigate each particular case we also take note of any potential lessons learned that may support the ***many other enhancements…we have made over recent years to our overriding control framework***, which applies globally and where minimum standards apply. We may also re-assess based on current standards and our legal and regulatory obligations to ensure we take appropriate actions up until and including filing of Suspicious Activity Reports. We do this reassessment

to ensure that we fully investigate all facts and to eliminate any potential gaps alongside applying current standards where warranted.

* * *

***At Credit Suisse, we are deeply aware of our responsibility to clients and the financial system as a whole to ensure that the highest standards of conduct are upheld. Whilst such allegations being raised are distracting, we wish to assure you and reiterate that our focus and strategy at Credit Suisse places risk management at the very core of our business.***

(Emphasis added).

177. The statements contained in ¶ 176 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's actions vis-à-vis the Suisse Secrets customers and/or accounts were *not* "in line with applicable processes and requirements…in accordance with [] legal and regulatory obligations"; (ii) the Company had not made "many [] enhancements" to its "overriding control framework" in "recent years" and "risk management" was *not* "at the very core of [its] business"; (iii) Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; and (iv) at the time, there existed material weaknesses in the Company's internal controls over financial reporting.

## XXXVI. April 20, 2022: Preliminary First Quarter 2022 Earnings Media Release

178. On April 20, 2022, the Company issued media release announcing preliminary financial results for the first quarter of 2022 (the "Preliminary 1Q22 Media Release"), which it filed with the SEC on a Form 6-K the same day. The Preliminary 1Q22 Media Release stated, in relevant part, as follows:

Credit Suisse Group AG (Group) announces today that its reported earnings for the

> first quarter of 2022 will be negatively impacted by a decision to increase litigation provisions relating to developments in a number of previously disclosed legal matters, all of which originated more than a decade ago, by approximately CHF 600 million, resulting in total litigation provisions for the quarter of approximately CHF 700 million.
>
> The Group will announce its earnings for the first quarter of 2022 on Wednesday, April 27th, and would expect to report a loss as a consequence of this increase in reserves. ***With regard to our exposure to the impact of Russia's invasion of Ukraine both on our counterparties and on our credit risks, our results will be adversely affected by an aggregate of approximately CHF 200 million of negative revenues and provisions for credit losses.***
>
> (Emphasis added).

179. The statements contained in ¶ 178 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine.

## XXXVII. April 27, 2022: First Quarter 2022 Media Release and Investor Presentation

180. On April 27, 2022, the Company issued a media release announcing financial results for the first quarter and of 2022 (the "1Q22 Media Release"), which it filed with the SEC, along with slides accompanying its presentation to investors, on a Form 6-K the same day. The 1Q22 Media Release quoted Defendant Gottstein, in relevant part, as follows:

> The first quarter of 2022 has been marked by volatile market conditions and client risk aversion. These conditions, together with the impact from our reduction in risk appetite in 2021 as ***we took decisive actions to strengthen our overall risk and controls foundation***, had an adverse impact on our net revenues….***2022 is a transition year, and our clear focus remains on the disciplined execution of our new Group strategy as announced in November 2021: strengthening our core, simplifying our organization and investing for growth.*** We went live with our new structure in January; have reduced the allocated capital in the IB by USD 2.5 bn, 82% of our ambition of more than USD 3.0 bn; and have made significant progress on various other strategic priorities. ***I am confident that we are well positioned to build a stronger and client-centric bank that puts risk management at the core to***

> ***deliver sustainable growth and value for investors, clients and colleagues.***

(Emphasis added).

181. The 1Q22 Media Release further stated:

> ***The combination of the current geopolitical situation following Russia's invasion of Ukraine and the significant monetary tightening initiated by several of the major central banks in response to inflation concerns have resulted in heightened volatility and client risk aversion so far this year.*** While the Swiss Bank delivered a resilient performance and Equity Derivatives, M&A and Securitized Products had solid performances in 1Q22, ***overall, this market environment, in combination with the cumulative effect of our newly defined risk appetite as executed during 2021, has led to an adverse impact on client activity in our Wealth Management division as well as a reduction in the level of capital markets issuances within our Investment Bank.*** Furthermore, the Investment Bank has relatively limited exposure to business areas, such as interest rate trading, which have benefited from these developments.
>
> * * *
>
> As previously highlighted at our Investor Day on November 4, 2021, the year 2022 will be one of transition for Credit Suisse. The benefits from the strategic capital reallocation towards our core businesses and the structural cost savings from the reorganization measures that we are currently implementing should largely materialize from 2023 onwards. In this respect, ***we are focused on disciplined execution of our strategy with a clear focus on strengthening and simplifying our integrated model and investing in sustainable growth, while placing risk management at the very core of the bank.***
>
> * * *
>
> ***We actively managed our exposure to Russia's invasion of Ukraine across our businesses.*** We have substantially reduced our Russia net credit exposure to CHF 373 mn, a 56% reduction since the end of 2021. Our net credit exposure to Russian financial institutions is down 67% since the end of 2021 and we are continuing to reduce our exposures. ***Our corporate and individual clients are highly collateralized with non-Russian collateral and limited losses.***

(Emphasis added).

182. The statements contained in ¶¶ 180-181 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded

by them. Specifically, (i) Defendants "decisive actions to strengthen" Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; and (ii) the Company had not "actively managed [its] exposure to Russia's invasion of Ukraine across [its] businesses," but in fact had significant, unmanaged risk and exposure as a result of the sanctions imposed on Russia and its nationals.

## XXXVIII. April 27, 2022: First Quarter 2022 Earnings Release

183. On April 27, 2022, the Company also issued its earnings release announcing financial results for the first quarter of 2022 (the "1Q22 Earnings Release") for the period ended March 31, 2022, which it filed with the SEC as an exhibit to a Form 6-K the same day. The 1Q22 Earnings Release stated, in relevant part, as follows:

> **Russia's invasion of Ukraine**
> In late February 2022, the Russian government launched a military attack on Ukraine. In response to Russia's military attack, the US, EU, UK, Switzerland and other countries across the world imposed severe sanctions against Russia's financial system and on Russian government officials and Russian business leaders….***With regard to our exposure to the impact of Russia's invasion of Ukraine, our 1Q22 results were adversely affected by an aggregate amount of CHF 206 million of negative revenues, provisions for credit losses and trading losses. The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of March 31, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 373 million, primarily to financial institutions.*** In addition, Russian subsidiaries had a net asset value of approximately CHF 0.2 billion as of March 31, 2022. ***As of March 31, 2022, we had minimal total credit exposures towards specifically sanctioned individuals managed by our Wealth Management division.*** The Group is currently monitoring settlement risk on certain open transactions with Russian counterparties; market closures, the imposition of exchange controls, sanctions or other factors may limit the Group's ability to settle existing transactions or realize on collateral, which could result in unexpected increases in exposures. The Group notes that these recent developments may continue to affect its financial performance, including credit loss estimates and potential asset impairments.
>
> * * *
>
> As of the end of 1Q22, assets under management of CHF 1,554.9 billion decreased

> CHF 59.1 billion compared to the end of 4Q21. ***The decrease was driven by unfavorable market movements and structural effects, partially offset by foreign exchange-related movements and net new assets of CHF 7.9 billion. Structural effects included certain de-risking measures and outflows of CHF 10.4 billion related to the sanctions imposed in connection with the Russian invasion of Ukraine.***

(Emphasis added).

184. The statements contained in ¶ 183 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; and (ii) the Company was experiencing significant and unusual customer and/or asset outflows.

**XXXIX. April 27, 2022: First Quarter 2022 Earnings Conference**

185. On April 27, 2022, Credit Suisse held a conference call with analysts and investors to discuss the Company's first quarter 2022 earnings (the "1Q22 Earnings Conference") for the period ended March 31, 2022. During the 1Q22 Earnings Conference, Defendant Gottstein began stated:

> As I've have said previously, in the context of our long-term strategic plan, the year 2022 is one of transition for us at Credit Suisse. ***We are determined to continue with the implementation of our strategy as announced in November last year and remain focused on refining and reinvigorating our franchise consistent with our approved risk appetite****….* ***Our results were also negatively impacted by Russia related losses of CHF206 million.***
>
> * * *
>
> Overall, we saw net revenues decline year-on-year, mainly due to a particularly strong comparable in the first quarter of 2021, especially in the Investment Bank and Wealth Management. ***We also experienced significant industry wide headwinds in the form of more challenging market conditions due to higher inflation and interest rates as well as Russia's invasion of Ukraine impacting a number of our businesses.***

> ***In the first quarter, we reduced our Russia related net credit exposure by 56% and we continue to make further progress in exposure reductions….Regarding risk, the strengthening of both our first and second lines of defense are on track. We are confident that our strengthened risk culture should help us build a stronger and customer-centric bank that puts risk management at the core to deliver sustainable growth and value for investors, clients and colleagues.***
>
> * * *
>
> ***We made a number of decisive actions throughout 2021 to strengthen risk and compliance teams, systems and processes. As you know, we underwent a comprehensive risk review across the entire group, which was completed in the fourth quarter. Our derisking measures have improved our risk profile, but also have negatively impacted our topline in the short term.*** For example, the derisking measures in Wealth Management that you see on the left of the slide led to a reduction of roughly CHF25 million in net revenues during the first quarter.

(Emphasis added).

186. Defendant Mathers then stated, in relevant part:

> I'd just note that as we continue to execute on the strategic plan with the investment spending, internal reorganization and the capital reallocation associated with this, ***our risk appetite and our risk management remain key focuses***. Now this combines clearly with a period of reduced risk appetite and lower activity from our clients. The overall impact to which has been a decline in revenues across our major business lines.
>
> * * *
>
> [L]et me give you some more details on the impact of Russia's invasion of Ukraine and what has had on our first quarter performance…. Now if we consider the impact these events on our P&L in the first quarter, there are three broad themes. First, we ***were generally successful in reducing our exposure before the invasion***, but we did see some defaults on amounts owed to us by Russian counterparties, partly due to the imposition of the sanctions and certain other developments. Second, we took a limits demand of specific credit provisions across the bank. And third, a scenario review of the provision for credit losses led us to increase our non-specific provisions that is related to CECL accounting by CHF44 million. Overall, we saw a negative impact of CHF206 million on pretax income with respect to Russia's invasion of Ukraine in the first quarter, comprising CHF58 million in the provisions for credit losses and CHF148 million of trading and fair value losses. Just to be clear that was split across the divisions as follows: CHF99 million in Wealth Management; $101 in the Investment bank and CHF14 million in the Swiss Bank. ***Now more broadly, in terms of the Wealth Management's divisions, exposure to Russia, I think you will recall that at the Morgan Stanley Financials' Conference***

> ***last month, Thomas confirmed that about 4% of our assets under management was linked to Russian clients globally. And just to say that number has not changed significantly since then.*** In terms of our general position, with respect to Russia. Clearly, ***we've stopped pursuing any new client business in Russia, we continue to reduce our exposure to Russia as the figures that I've just given demonstrate. We're helping our clients to unwind their own exposure and we have moved roles out of Russia. I would make it clear that we're making no new investments in our Russian subsidiaries. And have not done so since the invasion on February 24th. And I'd reiterate that as a matter of principle and policy Credit Suisse applies international sanctions worldwide in particular, those issued by Switzerland, the European Union, the UK and United States.***

(Emphasis added).

187. When questioned by an analyst if the "derisking [and] deleveraging that we had kind of seen in wealth, over the last 12 months" was "broadly done," Defendant Gottstein responded "That is fair. ***Yes. Absolutely***." (Emphasis added).

188. The statements contained in ¶¶ 185-187 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) Defendants did not "ma[k]e a number of decisive actions throughout 2021 to strengthen risk and compliance teams, systems and processes" – in fact, Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; and (iii) the Company was experiencing significant and unusual customer and/or asset outflows.

## XL. April 27, 2022: First Quarter 2022 Press Conference

189. On April 27, 2022, Credit Suisse held a press conference to discuss the Company's first quarter 2022 results (the "1Q22 Press Conference"). Defendant Gottstein repeated, in large part, the prepared remarks he had made at the1Q22 Earnings Conference.

190. When questioned during the Q&A about why revenues were down so much, Defendant Gottstein responded:

> So clearly, the comparison with last year is only partially relevant because ***you have to also look at some of the extraordinary factors that impacted revenues both last year and this year***.
>
> Secondly, you have to really also look at the quarter-on-quarter improvement. And thirdly, you have to look at some of the different business mixes. If you compare ourselves with certain competitors, so for example, in Wealth Management, ***we do not have a U.S. business, which was largely protected from some of the impacts we've seen in the rest of the world in particular, also Asia, which was very weak, not only for us but also others and also a different business mix in the Investment Bank***.
>
> * * *
>
> ***But clearly, in March, we had 2 effects. We had the effects of the Russia invasion in Ukraine, and we had the effects of the legal provisions, which impacted our pretax income by CHF 700 million. And thirdly, the net profit, we continue to forecast the net profit for the full year 2022, despite the loss in the first quarter. So that's clearly still our expectation, yes***.

(Emphasis added).

191. Responding to the same question, Defendant Mathers then stated:

> If you look back at the interest rates at that point, it was a very favorable trading environment. What we're seeing now is a very sharp increase at the short end 2, 3, 4, 5 level and then a flattening of the curve. That actually is fine if you have a large rates business, which some of our competitors do, but we obviously exited from rates back in 2015, which was the right decision. It wasn't making as much money and for 7 years, there hasn't been much of an issue.
>
> But clearly, if you have a different business mix, you'll have different results in response to that. ***And I think it is particularly a particular change between the first quarter of last year and the first quarter of this year due to those -- due to what -- you've seen such a radical change in the monetary environment***. I think it's clear that central banks may say it was perhaps a little tardy in terms of reacting to the inflation signals last year, but quite clearly at this point, they've really moved very fast to actually respond to them.

(Emphasis added).

192. When questioned about Credit Suisse's ongoing business and presence in Russia,

Defendant Mathers responded:

> [I]n terms of Russia, think we were very clear in terms of this basically. ***We have not made any new investments in our Russian subsidiary since the invasion back on February 24. We clearly are looking to help our clients wind down their positions in Russia.*** We clearly support our staff in Russia, but clearly, a number of roles have actually been moved out of Russia. ***And Credit Suisse is committed to enforcing the sanctions that have been imposed both by the Swiss governments, the European governments, the U.S. government and the U.K. government.***
>
> (Emphasis added).

193. Responding to the same question, Defendant Gottstein stated:

> If I can add to that. I mean, most of these employees are not working in the office right now. They are basically on a paid leave. And we are obviously want to not yet take any decision on releasing employees, but this is something that ***we are clearly winding down the operations there like winding down the propositions as David explained.*** But at this stage, we still have -- like everybody else, by the way, our legal entity there. We still have our license there, but we have not at all invested in the business. And quite the contrary, ***we are basically winding down our positions in Russia. And when we talk about our Russia business, for example, in the context of Wealth Management, like the 4% we mentioned in March and that we reiterated today have now gone down a little bit to more towards the 3%. This is for all Russian clients globally.***
>
> (Emphasis added).

194. The statements contained in ¶¶ 190-193 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's reduced revenues were not attributable to general market factors, adverse market conditions in Asia, or a "radical change in the monetary environment," but instead the Company was experiencing significant and unusual customer and/or asset outflows; (ii) the Company was not "winding down" its business in Russia or with Russian nationals, nor was it "committed to enforcing the sanctions" imposed on Russia and Russian nations, but instead had significant, unmanaged risk and exposure as a result of the sanctions imposed on Russia and

its nationals; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting.

## XLI. April 29, 2022: Annual General Meeting of Shareholders

195. On April 29, 2022, Credit Suisse held its AGM in Zurich, Switzerland. During the AGM, Defendant Lehmann stated, in relevant part, as follows:

> As a result of addressing setbacks, ***it has become clear that the challenges of the past were not solely attributable to isolated poor decisions or to individual decision-makers. Within the organization as a whole, we have failed too often to anticipate material risks in good time in order to counter them proactively and to prevent them.*** We're therefore obliged to making profound and lasting changes to the way we work together and to our processes and risk culture…. Recent analysis has exposed areas of improvement, and ***as an immediate response, we've carried out and completed a comprehensive risk review, redefined and adjusted the bank's risk appetite, reduced critical exposures and concentrations, realigned our risk and control system and placed it on a stronger foundation, and ensured that corrective actions are embedded within the organization***. At the same time, we have made lasting changes to our Executive Board and leadership team and strengthened them in a targeted manner. Change has to start at the top.
>
> * * *
>
> ***Among the areas where we need to take action, I believe our risk culture is the epicenter.*** This is where we have to roll up our sleeves, get to work and prove ourselves once again. Every successful entrepreneur is also a successful risk manager. Entrepreneurial thinking and responsibility are not contradictions in terms, they go hand in hand. For us, as an entrepreneurial bank, this is a key concept. It is not a question of avoiding risk. Instead, it is a case of dealing with risk in an appropriate, controlled way. Risks need to be taken consciously. It has to be possible to identify and monitor those risks. It is not worth putting the reputation of the entire company at stake for any business, no matter how appealing it may be. ***We are, therefore, implementing even more rigorous, more visible risk management and risk monitoring.*** Everyone in our bank must know and feel that when it comes to risks, there are limits. When we talk about risk culture, this is not primarily about repressing and prohibiting risk taking, but it is about clarity, motivation and conviction. ***This is also the goal of our internal culture program that has been replicated around the world.***
>
> * * *
>
> At this point, I would like to state that Credit Suisse formally condemns Russia's terrible war against Ukraine and the serious violations of international law in any form. ***Credit Suisse has ceased entering into new client business in Russia and is,***

> ***as a matter of principle, applying all sanctions in full, especially those imposed by the European Union, the United States, the U.K. and Switzerland***.

(Emphasis added).

196. Defendant Gottstein then stated, in relevant part, as follows:

> We made a number of enhancements throughout 2021 with a clear aim of delivering sustainable growth and value for you, our shareholders. ***We strengthened our capital position and substantially reduced the risk profile of the bank. We strengthened our risk and compliance teams, systems and processes, and undertook a comprehensive risk review across the entire group which was completed in the fourth quarter.***
>
> * * *
>
> ***[W]e will continue to improve risk and compliance with an emphasis on risk culture***, whilst not losing our client focus and the entrepreneurial spirit that has been the hallmark of Credit Suisse since its founding more than [166] years ago.
>
> * * *
>
> ***We actively managed our exposure in relation to Russia's invasion of Ukraine across our businesses. We have substantially reduced our net credit exposure to Russia by 56% since the end of 2021, so in just 4 months. And we also significantly reduced our credit exposure to Russian financial institutions.*** Our results for the first quarter of 2022 were impacted by losses of CHF 206 million related to Russia's invasion of Ukraine.

(Emphasis added).

197. The statements contained in ¶¶ 195-196 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had not implemented more "rigorous" "risk management and risk monitoring," or "substantially reduce[] the risk profile of the bank"; to the contrary, Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; and (ii) the Company had not "actively managed [its] exposure in relation

to Russia's invasion of Ukraine across [its] businesses," but had significant, unmanaged risk and exposure as a result of the sanctions imposed on Russia and its nationals.

## XLII. May 5, 2022: First Quarter 2022 Report

198. On May 5, 2022, the Company filed with the SEC its financial report for the first quarter of 2022 (the "1Q22 Quarterly Report"), on Form 6-K for the period ended March 31, 2022. The 1Q22 Quarterly Report stated, in relevant part, as follows:

> In 1Q22, we reported net revenues of CHF 4,412 million, which decreased 42% compared to 1Q21, primarily reflecting lower net revenues in the Investment Bank, Wealth Management and the Corporate Center. ***The decrease in the Investment Bank was driven by lower sales and trading revenues, which included the impact of resizing its prime services franchise and also included Russia-related trading and fair value losses in its Global Trading Solutions (GTS) franchise, and reduced capital markets revenues.*** The decrease in Wealth Management reflected lower revenues across all revenue categories, including a loss on the equity investment in Allfunds Group of CHF 353 million.
>
> * * *
>
> ***With regard to our exposure to the impact of Russia's invasion of Ukraine, our 1Q22 results were adversely affected by an aggregate amount of CHF 206 million of negative revenues, provisions for credit losses and trading losses. The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of March 31, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 373 million, primarily to financial institutions.*** In addition, Russian subsidiaries had a net asset value of approximately CHF 0.2 billion as of March 31, 2022. ***As of March 31, 2022, we had minimal total credit exposures towards specifically sanctioned individuals managed by our Wealth Management division.***
>
> * * *
>
> As of the end of 1Q22, assets under management of CHF 1,554.9 billion decreased CHF 59.1 billion compared to the end of 4Q21. ***The decrease was driven by unfavorable market movements and structural effects, partially offset by foreign exchange-related movements and net new assets of CHF 7.9 billion. Structural effects included certain de-risking measures and outflows of CHF 10.4 billion related to the sanctions imposed in connection with the Russian invasion of Ukraine.***
>
> * * *

> ***Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We have adapted our liquidity and funding profile to reflect lessons learned from the financial crisis, the subsequent changes in our business strategy and regulatory developments.***
>
> * * *
>
> ***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***

(Emphasis added).

199. The statements contained in ¶ 198 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; (ii) the Company's risk management and/or control governance policies and/or procedures were severely lacking, both at this time and prior to the Class Period; (iii), the Company was experiencing significant and unusual customer and/or asset outflows; (iv) the Company did not maintain a "sufficient" liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not "conservative" and materially deficient at all times; and (v) there existed material weaknesses in the Company's internal controls over financial reporting.

## XLIII. May 23, 2022: Defendant Lehmann Interview with *CNBC*

200. On May 23, 2022, Defendant Lehmann was interviewed on *CNBC* while attending the World Economic Forum in Davos, Switzerland. *CNBC* published an article that day

summarizing the interview titled, “Credit Suisse chairman denies reports of talks to replace CEO Gottstein.”

201. In the interview, Defendant Lehmann stated: “It is a very challenging situation for the company, but ***we have a clear plan, we are executing on that plan, so we are rebuilding, basically, the company***.”

202. The statements contained in ¶ 201 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company’s business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company’s “plan” and new strategy were fundamentally flawed, as they were predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices; and (ii) in mid-May 2002, the UK’s financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls.

**XLIV. May 31, 2022: Denial of *Reuters* Report On Capital Raise**

203. On May 31, 2022, *Reuters* published an article, titled “EXCLUSIVE Credit Suisse weighs options to strengthen capital – sources,” in which it reported that the Company was “in the early stages of weighing options to bolster its capital after a string of losses has eroded its financial buffers, two people with knowledge of the matter told Reuters.” In the same article, Reuters published Credit Suisse’s response to its request for comment, which read: “‘***Credit Suisse is currently not considering raising additional equity capital***,’ the bank said in a statement.” (Emphasis added).

204. The statements contained in ¶ 203 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company’s business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.

Specifically, *Reuters*' reporting was accurate and the Company *was* "considering raising additional equity capital," as it would eventually admit on October 27, 2022.

### XLV. June 8, 2022: Preliminary Second Quarter 2022 Earnings Media Release

205. On June 8, 2022, the Company issued media release announcing preliminary financial results for the second quarter of 2022 (the "Preliminary 2Q22 Media Release"), which it filed with the SEC on a Form 6-K the same day. The Preliminary 2Q22 Media Release stated, in relevant part, as follows:

> Market conditions so far in the second quarter of 2022 have remained challenging, consistent with our published outlook statement of April 27, 2022. ***The combination of the current geopolitical situation following Russia's invasion of Ukraine, significant monetary tightening by major central banks in response to the substantial increase in inflation and the unwind of COVID-related stimulus measures have resulted in continued heightened market volatility, weak customer flows and ongoing client deleveraging, notably in the APAC region***. Within the Investment Bank, while our advisory revenues have been resilient and GTS revenues, compared to last year, have benefited from the higher volatility, albeit with an uneven performance, the impact of these conditions, together with continued low levels of capital markets issuance and the widening in credit spreads, have depressed the financial performance of this division in April and May and are likely to lead to a loss for this division as well as a loss for the Group in the second quarter of 2022. We would note that our reported earnings will also be affected by continued volatility in the market value of our 8.6% investment in Allfunds Group.
>
> As we look forward to the second half, the year 2022 will remain one of transition for Credit Suisse. Given the economic and market environment, we are accelerating our cost initiatives across the Group with the aim of maximizing savings from 2023 onwards. We will provide further details at our upcoming Investor Deep Dive on June 28, 2022. ***We remain focused on the disciplined execution of our strategy, delivering on our regulatory remediation programs and placing risk management at the core of the bank.*** In doing so, we are focused on delivering best-in-class service and support to our clients, especially in this challenging market environment.
>
> (Emphasis added).

206. The statements contained in ¶ 205 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.

Specifically, (i) Defendants did not "place[] risk management at the core of the bank," but instead never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls; (iii) the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; (iv) the Company was experiencing significant and unusual customer and/or asset outflows; and (v) there existed material weaknesses in the Company's internal controls over financial reporting.

**XLVI. June 28, 2022: Investor Deep Dive 2022 Presentation**

207. On June 28, 2022, Credit Suisse held an Investor Deep Dive 2022 presentation with investors (the "Investor Deep Dive 2022 Presentation"). During the Presentation, Defendant Gottstein stated, in relevant part, as follows:

> ***[W]e have [] strengthened our risk and compliance leadership at all levels of the bank. This includes the first and second lines of defense. It includes the bank-wide risk framework and processes, encompassing risk assessment, risk review and risk escalation. Moreover, together with the Board oversight, we have clearly defined accountability as well as roles and responsibilities across the organization. And we have adopted a group-wide initiative, which is based on individual accountability namely, everyone is a risk manager. This cultural change and this cultural change program includes risk training programs as well as adding risk metrics to scorecards and compensation.*** David will talk more about this in his presentation. We are confident that these and many other initiatives we are undertaking will restore the confidence of our stakeholders in the bank.
>
> (Emphasis added).

208. When directly questioned by an analyst if, in light of the particularly "difficult period for Credit Suisse," "retaining advisers and clients has been difficult," Defendant Gottstein responded:

> [C]learly some of the reputational issues we've had, has had an impact on our Wealth Management franchise as well. But I would like to point out as an example how this long-term loyalty between clients and us plays when, ***in April 2021, we did the mandatory convertible to raise $2 billion of capital***, which basically David made this when I had to do between 2 Chairman. And ***out of the 10 largest orders we had in the book, 5 were from ultra high net worth clients, and 2 of those have actually supply chain firm in their portfolio. And they were not necessarily happy about that, but they put in the money and they said, "Look, you have been there for us. Now we're going to be here for you." And this is the type of client relationships we have that we're very proud of.***

(Emphasis added).

209. When questioned by an analyst regarding the impact of "derisking efforts" on revenues, Defendant Gottstein responded:

> It's clear that, in November, we were indeed focusing on Prime Services, but we also said already in November that we are reviewing all the risk. And as a matter of fact, for example, in leverage finance we had reduced our risk appetite already in the third quarter and fourth quarter 2021 significantly. ***We then went through an exercise together with David and the Board of our risk appetite across businesses, including leverage finance. And in many of these businesses actually went back to pre-Archegos risk appetite numbers. And clearly, some of the reductions we also mentioned today in David's presentation in LevFin was also a reaction to the current market environment, and where we have, like many of our peers take a more conservative approach with the higher rates, the higher spreads.***

(Emphasis added).

210. The statements contained in ¶¶ 207-209 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls; (iii) the

Company never changed its compensation policy by "adding risk metrics"; and (iv) the Company was experiencing significant and unusual customer and/or asset outflows.

## XLVII. July 27, 2022: Defendant Gottstein "Resignation" and Defendant Körner Appointment Media Release

211. On July 27, 2022, the Company issued a media release announcing the resignation of Defendant Gottstein as CEO and appointment of Defendant Körner as the new CEO (the "Körner Appointment Media Release"), which it filed with the SEC on a Form 6-K the same day. The Körner Appointment Release stated, in relevant part, as follows:

> Credit Suisse Group AG (Credit Suisse) today announced the appointment of Ulrich Körner as Group Chief Executive Officer from August 1, 2022, replacing Thomas Gottstein, who is resigning. ***At the same time, the bank has announced that it is conducting a comprehensive strategic review***….
>
> * * *
>
> Axel P. Lehmann, Chairman of Credit Suisse, said: "I am delighted to welcome Ueli as our new Group CEO, to oversee this comprehensive strategic review at a pivotal moment for Credit Suisse. With his profound industry knowledge and impressive track record, ***Ueli will drive our strategic and operational transformation, building on existing strengths and accelerating growth in key business areas.*** Since becoming Chairman and reviewing the bank's portfolio with our newly refreshed Board of Directors, I have come to appreciate the world-class quality of our businesses. But we need to be more flexible to ensure they have the necessary resources to compete. Our goal must be to become a stronger, simpler and more efficient Group with more sustainable returns. I would like to thank Thomas for his commitment to Credit Suisse over more than two decades and in particular as Group CEO. He has made an enormous contribution to Credit Suisse and always served our clients in Switzerland and beyond with integrity and entrepreneurial spirit. I wish him all the best in his future endeavors."
>
> Thomas Gottstein, outgoing CEO of Credit Suisse, said: "It has been an absolute privilege and honor to serve Credit Suisse over these past 23 years. Credit Suisse has formidable client franchises in all four divisions globally and an immense talent pool across more than 50,000 colleagues worldwide. ***Despite the challenges of the past two years, I am immensely proud of our achievements since joining the Executive Board seven years ago and more recently in strengthening the bank, recruiting a top-caliber Executive Board, reducing risk and fundamentally improving our risk culture.*** In recent weeks, for personal and health-related considerations, and after discussions with Axel and my family, I concluded that now would be the right time to step aside and clear the way for new leadership to

> fully embrace the important initiatives announced this morning, which I wholeheartedly support."
>
> * * *
>
> Credit Suisse's Board of Directors and Executive Board have initiated a program to reduce the Group's absolute cost base to below CHF 15.5 bn in the medium term given the more challenging economic and market environment. ***This builds on commitments made at the June Investor Deep Dive to deliver significant savings in the Technology and Operations function to improve scalability and ensure the long-term sustainability of these efficiencies, while continuing the digital transformation and improving the Group's sound risk culture.***

(Emphasis added).

212. The statements contained in ¶ 211 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendant Gottstein's "resignation" and Defendant Körner's appointment as CEO would have no meaningful effect on the Company's strategy for "sustainable growth and value" and the Company did not "reduc[e] risk and fundamentally improve [its] risk culture," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; and (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls.

## XLVIII. July 27, 2022: Second Quarter 2022 Media Release and Investor Presentation

213. On July 27, 2022, the Company issued a media release announcing financial results for the second quarter and of 2022 (the "2Q22 Media Release"), which it filed with the SEC, along with slides accompanying its presentation to investors, on a Form 6-K the same day. The 2Q22

Media Release quoted Defendant Gottstein, in relevant part, as follows:

> Our results for the second quarter of 2022 are disappointing, especially in the Investment Bank, and were also impacted by higher litigation provisions and other adjusting items. ***The bank's performance was significantly affected by a number of external factors, including geopolitical, macroeconomic and market headwinds. These challenging circumstances led to results which overshadow the strength of our leading client franchises in all four divisions of the bank. The urgency for decisive action is clear and a comprehensive review to strengthen our pivot to the Wealth Management, Swiss Bank and Asset Management businesses, supported by a fundamental transformation of our Investment Bank, is underway.*** Further, we have now launched a broader cost efficiency and digital transformation program to reduce our absolute cost base to less than CHF 15.5 bn in the medium term. Today marks a leadership change for Credit Suisse. It has been an absolute privilege and honor to serve Credit Suisse over these past 23 years. It has been my passion since day one to deliver best-in-class service to our clients. As a leader, since joining the Executive Board in 2015, I was focused on delivering results and embracing our values, including partnership, accountability and integrity.
>
> (Emphasis added).

214. The 2Q22 Media Release further stated, in relevant part:

> As stated in our Trading Update on June 8, 2022, the second quarter was marked by challenging economic and market conditions. The combination of the current geopolitical situation following Russia's invasion of Ukraine and significant monetary tightening by major central banks in response to the substantial increase in inflation have resulted in continued heightened market volatility, weak customer flows and ongoing client deleveraging.
>
> * * *
>
> ***We had Group net asset outflows of CHF 7.7 bn in 2Q22, compared to net asset outflows of CHF 4.7 bn in 2Q21. Our global wealth management, which includes our WM division and Private Banking Switzerland, had moderate net asset outflows for 2Q22 of CHF 1.8 bn; this was driven primarily by net asset outflows in EMEA and Switzerland*** partially offset by net inflows across Asia Pacific and Americas. Group AuM for 2Q22, stood at CHF 1.5 trn, down from CHF 1.6 trn at the end of 1Q22.
>
> * * *
>
> ***As stated at our Investor Deep Dive in June, we remain firmly focused on the execution of our strategic plan throughout 2022 and on reinforcing our risk culture – crucially, while staying close to our clients.***

(Emphasis added).

215. The statements contained in ¶¶ 213-214 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) a "fundamental transformation of" the Investment Bank was not underway and the Company was not focused on "reinforcing [its] risk culture," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls; (iii) the Company's performance was not affected by mere "external factors," but instead by its significant, unmanaged self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; and (iv) the Company was experiencing significant and unusual customer and/or asset outflows.

**XLIX. July 27, 2022: Second Quarter 2022 Earnings Release**

216. On July 27, 2022, the Company also issued its earnings release announcing financial results for the second quarter of 2022 (the "2Q22 Earnings Release") for the period ended, June 30, 2022, which it filed with the SEC as an exhibit to a Form 6-K the same day. The 2Q22 Earnings Release stated, in relevant part, as follows:

> **Russia's invasion of Ukraine**
> ….The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. ***As of June 30, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 244 million, primarily related to corporates, individuals and the sovereign. In addition,***

> ***Russian subsidiaries had a net asset value of approximately CHF 0.3 billion as of June 30, 2022. In 2Q22, CHF 7.2 billion of assets under management were reclassified due to the imposed sanctions, and less than 3% of assets under management in our wealth management-related businesses are linked to Russian clients. The Group has further reduced Russia related exposures in 2Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.***
>
> * * *
>
> As of the end of 2Q22, assets under management of CHF 1,453.9 billion decreased CHF 101.0 billion compared to the end of 1Q22. ***The decrease was driven by unfavorable market movements, structural effects and net asset outflows of CHF 7.7 billion, partially offset by foreign exchange-related movements. Structural effects included certain de-risking measures, outflows and reclassifications of CHF 7.2 billion related to the sanctions imposed in connection with the Russian invasion of Ukraine.***

(Emphasis added).

217. The statements contained in ¶ 216 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; (ii) the Company's risk management and/or control governance policies and/or procedures were severely lacking, both at this time and prior to the Class Period; (iii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls; (iv) the Company was experiencing significant and unusual customer and/or asset outflows; and (v) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

## L. July 27, 2022: Second Quarter 2022 Earnings Conference

218. On July 27, 2022, Credit Suisse held a conference call with analysts and investors

to discuss the Company's second quarter 2022 earnings (the "2Q22 Earnings Conference") for the period ended June 30, 2022. During the 2Q22 Earnings Conference, Defendant Lehmann began by stating, in relevant part:

> Credit Suisse is undoubtedly facing a challenging situation, both structurally and via the markets in which we operate. ***The need for change was clear before the second quarter results. But the disappointing performance has added a sense of urgency, as well, conviction for our actions. That is why the board of directors has decided to take decisive actions to reposition our bank and to strengthen the performance, the reputation, and credibility of the bank. With conviction, we are now embarking on measures to speed up our transformational course with a clear direction for the bank and a new leadership. Our goal is to become a stronger, simpler, and more efficient bank with sustainable returns.*** As announced earlier today, the board of directors accepted the resignation of Thomas Gottstein. Thomas has led the bank through some of its most challenging corporate period, and he has done it with a lot of courage, energy and commitment, as well as huge personal integrity. His absolute dedication and commitment to the bank over the past two decades are beyond commendable. The board of directors is grateful to Thomas for the leadership he has provided during the global COVID-19 pandemic, as well as in the aftermath of the two incidents in 2021. Thank you, Thomas. And yet, as the bank embarks on a new course, both Thomas and the board of directors agreed that this should be under a new leadership free to steer a new course. ***Ulrich Koerner will oversee the detailed work required as part of the comprehensive strategic review with the full trust and support of the board of directors.***
>
> * * *
>
> ***In closing, we remain focused on improving risk management, as well as the risk culture across the group. We remain focused to speed up our transformation and disciplined execution. And I'm absolutely convinced that under the leadership of our new CEO, Ulrich Koerner, and the rest of our strong executive board, we have the right leadership team in place to transform and to deliver.***

(Emphasis added).

219. Defendant Gottstein then stated, in relevant part:

> ***Strengthening risk management and risk culture, as well as addressing legacy issues, remain an absolute priority.***
>
> * * *
>
> While we attracted inflows in APAC and the Americas in the second quarter, reflecting our franchise strength, ***we reported moderate net outflows overall,***

> ***mainly due to outflows from Switzerland and the EMEA region.*** In addition, in the first half, we attracted positive net new assets of 3.4 billion Swiss francs, which included ***Russia-related outflows of 1.9 billion Swiss francs….Our asset management division was impacted by the challenging market environment with net asset outflows of 6.1 billion Swiss francs, driven by outflows across both traditional and alternative investments***, only partially offset by inflows from investments and partnerships.
>
> * * *
>
> Despite the challenges of the global COVID-19 pandemic in 2020, the two major incidents which Credit Suisse had to face in 2021, and then the Ukraine invasion and market downturn this year, ***we made significant progress in strengthening our bank, recruiting an excellent leadership team, starting the transformation of our investment bank, reducing risk overall, and fundamentally improve our risk culture.***
>
> (Emphasis added).

220. When questioned by an analyst "on the outflows, Middle East, Russian-sanctioned individuals as well," "[d]o you think that has now run its course," Defendant Mathers responded:

> I think just quickly on the Russian-rated outflows, look, I think we've had outflows in both in respect of sanctioned clients, which we obviously do treat as a structural change because the money is locked. And then in terms of non-sanctioned clients, we had about a 1.4 billion outflow. ***You know, I'm not going to comment. I think clearly it's an evolving situation or obviously very changeable geopolitical situation, very uncomfortable, and very difficult. I just note that we saw that in terms of those numbers. I mean, yes, I think in terms of the third quarter. And looked, brutally, we're only three weeks into the third quarter. I'm not going to comment on new asset outflows three weeks into the quarter. We'll see how this quarter develops. Just do note, we've had positive inflows for the first half of the year in, I think, you know, clearly in what is a very challenging environment.***
>
> (Emphasis added).

221. The statements contained in ¶¶ 218-220 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at

this time or at any time throughout the Class Period; (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls; (iii) the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; and (iv) the Company was experiencing significant and unusual customer and/or asset outflows.

## LI. July 27, 2022: Defendant Lehmann Interview with *Bloomberg TV*

222. On July 27, 2022, Defendant Lehmann was interviewed by *Bloomberg TV*. In the interview, Defendant Lehmann stated "We are speeding up ***our strategy, our transformation***."

223. Defendant Lehmann further stated that despite the Company's massive losses, "***we still have a strong balance sheet***" and that it was a "great franchise," but "we need to reposition." Finally, Defendant Lehmann stated that the Company would ***"continue to improve" on risk management***.

224. The statements contained in ¶¶ 222-223 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) Defendants had not improved, nor would they "continue to improve," on risk management, as they never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking both at this time and prior to the Class Period; (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls; (iii) Credit Suisse's "strategy" and "transformation" were fundamentally flawed, as they were predicated on unsustainable investment approaches that contravened risk management and/or control

governance best practices; and (iv) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

## LII. July 29, 2022: Second Quarter 2022 Report

225. On July 29, 2022, the Company filed with the SEC its financial report for the second quarter of 2022 (the "2Q22 Quarterly Report"), on Form 6-K for the period ended June 30, 2022. The 2Q22 Quarterly Report stated, in relevant part, as follows:

> In 2Q22, we reported net revenues of CHF 3,645 million, which decreased 29% compared to 2Q21, primarily reflecting lower net revenues in the Investment Bank, Wealth Management and Asset Management. ***The decrease in the Investment Bank was driven by significantly reduced capital markets revenues, including mark-to-market losses in leveraged finance, and lower fixed income sales and trading revenues, partially offset by increased equity sales and trading revenues as 2Q21 included a loss of CHF 493 million related to Archegos Capital Management (Archegos) in prime services.*** The decrease in Wealth Management reflected lower other revenues, including a loss on the equity investment in Allfunds Group of CHF 168 million, lower recurring commissions and fees and lower transaction- and performance-based revenues, partially offset by higher net interest income. The decrease in Asset Management reflected lower performance, transaction and placement revenues and reduced management fees.
>
> * * *
>
> In response to Russia's invasion of Ukraine, many countries across the world imposed severe sanctions against Russia's financial system and on Russian government officials and business leaders, and these sanctions have been expanded several times. ***The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of June 30, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 244 million, primarily related to corporates, individuals and the sovereign. In addition, Russian subsidiaries had a net asset value of approximately CHF 0.3 billion as of June 30, 2022. In 2Q22, CHF 7.2 billion of assets under management were reclassified due to the imposed sanctions, we had net asset outflows relating to non-sanctioned Russia-related clients of CHF 1.4 billion, and less than 3% of assets under management in our wealth management-related businesses are linked to Russian clients. The Group has further reduced Russia related exposures in 2Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.*** The Group notes that these developments may

continue to affect its financial performance, including credit loss estimates and potential asset impairments. The Executive Board is notified of any material developments and escalations in relation to the Russia crisis response.

* * *

As of the end of 2Q22, assets under management of CHF 1,453.9 billion decreased CHF 101.0 billion compared to the end of 1Q22. ***The decrease was driven by unfavorable market movements, structural effects and net asset outflows of CHF 7.7 billion, partially offset by foreign exchange-related movements. Structural effects included certain de-risking measures, outflows and reclassifications of CHF 7.2 billion related to the sanctions imposed in connection with the Russian invasion of Ukraine.***

* * *

***Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We have adapted our liquidity and funding profile to reflect lessons learned from the financial crisis, the subsequent changes in our business strategy and regulatory developments.***

* * *

***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***

(Emphasis added).

226. The statements contained in ¶ 225 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; (ii) the Company's risk management and/or control governance policies and/or procedures were severely lacking, both

at this time and prior to the Class Period; (iii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls; (iv) the Company was experiencing significant and unusual customer and/or asset outflows; (v) the Company did not maintain a "sufficient" liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not "conservative" and were materially deficient at all times; and (vi) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

### LIII. August 22, 2022: Defendant Mathers "Resignation" and Defendant Joshi Appointment Media Release

227. On August 22, 2022, the Company issued a media release announcing the resignation of Defendant Mathers as CFO and appointment of Defendant Joshi as the new CFO (the "Joshi Appointment Media Release"), which it filed with the SEC on a Form 6-K the same day. The Joshi Appointment Release stated, in relevant part, as follows:

> ***Credit Suisse Group today announces the appointments of Dixit Joshi as Chief Financial Officer***….
>
> ***Dixit Joshi rejoins Credit Suisse, taking up the role of CFO on October 1, 2022. He will replace David Mathers who decided to step down after more than 11 years in his role as previously communicated***. For the past five years, Dixit Joshi served as Group Treasurer at Deutsche Bank, where he played a key part in the bank's restructuring while overhauling the firm's balance sheet.
>
> * * *
>
> Axel P. Lehmann, Chairman of the Board of Directors, said: "I am delighted to welcome Dixit, Francesca, Michael and Michael to their new roles. Dixit and Francesca are joining Credit Suisse with impressive track records, adding a wealth of experience at this important juncture. ***All four are expected to drive our strategic and operational transformation into the future, with the clear objective to position Credit Suisse for a successful future and realize its full potential."***
>
> Ulrich Körner, Group CEO, said: "I would like to welcome Dixit and Francesca to Credit Suisse, while congratulating Michael and Michael on taking their respective

> new roles. They all join with extensive professional experience and a profound knowledge of the financial services industry, ***as we accelerate our efforts to make Credit Suisse a stronger, simpler and more efficient Group with more sustainable returns.*** Dixit has an impressive turnaround track-record, with a broad experience across a range of investment-banking businesses, which will be invaluable on ***our journey in transforming the Investment Bank into a highly competitive Banking and more sustainable Markets business that complements Wealth Management and the Swiss Bank.*** I would like to thank Francesco for taking on the role of CEO of the EMEA region on top of his responsibilities as CEO of the Wealth Management division. At the same time, I would like to thank David for his many years of service and his continued commitment to Credit Suisse, helping ensure a smooth transition period."
>
> (Emphasis added).

228. The statements contained in ¶ 227 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendant Mathers' "resignation" and Defendant Joshi's appointment as CFO would have no meaningful effect on the Company's "strategic and operational transformation," or lead to "more sustainable returns," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; and (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls.

## LIV. October 14, 2022: Defendant Lehmann Speech at the Institute of International Finance

229. On October 14, 2022, Defendant Lehmann gave a speech at the Institute of International Finance's annual conference. His speech was reported in an article published by *The Wall Street Journal* that day titled, "Credit Suisse 'Will Change,' Chairman Axel Lehmann Says."

230. The article stated, in relevant part:

> Credit Suisse Chairman Axel Lehmann said the bank's strong capital position will help it weather its worst crisis and become smaller and leaner.
>
> Mr. Lehmann, speaking in Washington, D.C., at the annual conference of the Institute of International Finance, said the bank's strategy will narrow and ***its risk controls will keep tightening*** after losing $5 billion last year from the collapse of two clients. Credit Suisse has said it will give details Oct. 27 on its latest strategic pivot.
>
> Mr. Lehmann, who took the job in January, said the financial losses in 2021 from Archegos Capital Management and Greensill Capital were the worst in Credit Suisse's 166-year history, and that its challenges are no secret.
>
> ***"We are fully aware that we need to change and we will change," he said.***
>
> Mr. Lehmann said it was astonishing that Credit Suisse's main capital ratio has remained high through the turmoil, even though the bank hasn't been making profits. The bank is committed to keeping that ratio between 13% and 14% through the second half, he said.
>
> (Emphasis added).

231. The statements contained in ¶ 230 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the bank's "risk controls" had not been "tighten[ed]," and would not "keep tightening," as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period, and its risk parameters were materially deficient at all times; and (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls.

## LV. October 27, 2022: 2022 Strategic Review Media Release

232. On October 27, 2022, the Company issued a media release titled "Credit Suisse unveils new strategy and transformation plan" (the "2022 Strategic Review Media Release") which

it filed with the SEC on a Form 6-K the same day. The 2022 Strategic Review Media Release stated, in relevant part, as follows:

> Credit Suisse Group AG (Credit Suisse) today announces a series of decisive actions to create a simpler, more focused and more stable bank built around client needs. ***The announcement follows a strategic review conducted by the Board of Directors and Executive Board, resulting in a radical restructuring of the Investment Bank, an accelerated cost transformation, and strengthened and reallocated capital, all of which are designed to create a new Credit Suisse.***
>
> * * *
>
> Axel P. Lehmann, Chairman of the Board of Directors of Credit Suisse, said: "Over 166 years, ***Credit Suisse has built a powerful and respected franchise but we recognize that in recent years we have become unfocused.*** For a number of months, the Board of Directors along with the Executive Board has been assessing our future direction and, in doing so, we believe we have left no stone unturned. ***Today we are announcing*** the result of that process – ***a radical strategy and a clear execution plan to create a stronger, more resilient and more efficient bank with a firm foundation, focused on our clients and their needs. At the same time, we will remain absolutely focused on driving our cultural transformation, while working on further improving our risk management and control processes across the entire bank.*** I am convinced that this is the blueprint for success, helping rebuild trust and pride in the new Credit Suisse while realizing value and creating sustainable returns for our shareholders."
>
> Ulrich Körner, Chief Executive Officer of Credit Suisse, said: "This is a historic moment for Credit Suisse. ***We are radically restructuring the Investment Bank to help create a new bank that is simpler, more stable and with a more focused business model built around client needs.*** Our new integrated model, with our Wealth Management franchise, strong Swiss Bank and capabilities in Asset Management at its core, is designed to allow us to deliver a unique and compelling proposition for clients and colleagues while targeting organic growth and capital generation for shareholders. ***The new Executive Board is focused on restoring trust through the relentless and accountable delivery of our new strategy, where risk management remains at the very core of everything we do.***"
>
> * * *
>
> Credit Suisse intends to take decisive steps to restructure the Investment Bank and focus on areas more closely connected to its core businesses where it has a competitive advantage. ***This will involve transforming the risk profile of the Investment Bank and targeting a reduction in RWAs of ~40% by 2025 through strategic actions***…

(Emphasis added).

233. The statements contained in ¶ 232 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's new "strategy" was a sham, as was its purported focus on "improving our risk management and control processes," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) restructuring of the Investment Bank was not designed to make the Company "simpler" and "more stable" but was instead necessitated by the Company's wholly inadequate capital position as a result of, among other things, significant and undisclosed customer and/or asset outflows throughout the Class Period; and (iii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls.

## LVI. October 27, 2022: 2022 Strategy Update Presentation

234. On October 27, 2022, the Company also held its 2022 Strategy Update Presentation with investors (the "2022 Strategy Update Presentation"). During the 2022 Strategy Update Presentation, Defendant Lehmann stated, in relevant part:

> ***[We] intend to significantly derisk and reduce our Investment Bank, focusing on core parts of sustainable value. This means we plan to transfer certain investment banking and capital market capabilities into a separate entity, revitalization, the CS First Boston brand. Credit Suisse intends to remain a long-term investor, creating equity ownership and a partner-like culture to tap the right talent and attract external capital. Going forward, this business will be advisory-led and have a reduced risk profile.*** We expect to access external credit facilities for the leveraged finance business. I will be delighted when Michael Klein is appointed CEO-designate of Credit Suisse First Boston. He will lead this transformation towards Credit Suisse First Boston's more independent future.

* * *

And finally, we have entered into a framework agreement and exclusivity agreement to transfer a significant portion of our Securitized Products business to an investor group led by Apollo Global Management. ***This proposed transaction will support our transformation. It will derisk and reposition Securitized Products to release capital.***

* * *

***Since my appointment as Chairman and also before as the Chair of the Risk Committee after my election to the Board just a year ago, my clear focus has been on strengthening our governance, improving our risk management control processes, and establishing the right risk culture. We have achieved significant progress and clear results in these areas, and we will continue with our efforts.***

(Emphasis added).

235. Defendant Körner then stated, in relevant part, as follows:

We are creating a new Credit Suisse with a simpler, more stable, more focused business model built around our leading franchises in Wealth Management and in our Swiss home market, complemented by our strong capabilities in Asset Management and Markets. ***We will radically restructure our Investment Bank and reduce risk by around 40%.*** We will create a resized connected Markets business as an integral part of new Credit Suisse.

* * *

We currently have USD 90 billion of risk-weighted assets in the Investment Bank, down from historic levels but still accounting for about 1/3 of the group. And they are not generating sufficient value in the current setup. ***With the actions announced today, we will reduce our risk exposure by around 40%, both in terms of risk-weighted assets and leverage exposure.***

* * *

Securitized Products is an attractive market-leading business, but it is a business that is not central to our strategy and requires more capital than we are willing to allocate. ***We have, therefore, decided to reduce exposure and will partner with Apollo Global Management and PIMCO.***

* * *

***These actions combined will release a total of $57 billion in risk-weighted assets, and USD 217 billion in leverage exposure.*** This will allow us to allocate more

capital to higher-return businesses in which we are more competitive.

(Emphasis added).

236. The statements contained in ¶¶ 234-235 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the proposed transactions would not meaningfully reduce Credit Suisse's "risk exposure" and the Company had not "achieved significant progress and clear results" in "improving [] risk management and control processes," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls; (iii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were materially deficient at all times; and (iv) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

**LVII. October 27, 2022: Rights Offering Media Release**

237. On October 27, 2022, the Company also issued a media release announcing two capital increases, including the issuances of new shares to qualified investors, including the Saudi National Bank, and a rights offering for existing shareholders (the "October 2022 Rights Offering Media Release"), which it filed with the SEC on a Form 6-K the same day. The October 2022 Rights Offering Media Release stated, in relevant part, as follows:

The Board of Directors of Credit Suisse Group AG will propose to an Extraordinary

> General Meeting to be held on November 23, 2022, to approve two separate share capital increases: a first capital increase through the issuing of new shares to a number of qualified investors, including Saudi National Bank (SNB), and a second capital increase through a rights offering for existing shareholders. SNB has committed to invest up to CHF 1.5 billion in Credit Suisse to achieve a shareholding of up to 9.9%. ***Through the proposed share capital increases, Credit Suisse Group AG intends to raise CHF 4.0 billion to further strengthen the Group's capital base and support its strategic transformation.***

(Emphasis added).

238. The statements contained in ¶ 237 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) as opposed to "support[ing] its strategic transformation," the proposed Rights Offering was merely a last-ditch effort to shore-up liquidity necessitated by significant and unusual customer and/or asset outflows that were not disclosed by Defendants; and (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

## LVIII. October 27, 2022: Third Quarter 2022 Media Release and Investor Presentation

239. On October 27, 2022, the Company also issued a media release announcing financial results for the third quarter and of 2022 (the "3Q22 Media Release"), which it filed with the SEC, along with slides accompanying its presentation to investors, on a Form 6-K the same day. The 3Q22 Media Release quoted Defendant Körner, in relevant part, as follows:

> "***The third quarter, and more broadly 2022 so far, have been significantly impacted by the continued challenging market and macroeconomic conditions, leading to a weaker performance for our Investment Bank in particular.*** Our recent Group level performance has been disappointing for our stakeholders. From today, we are taking a series of decisive actions to re-focus Credit Suisse around the needs of our clients and stakeholders. ***Our new, integrated model will be focused on Wealth Management, the Swiss Bank, as well as Asset Management, and we will radically restructure the Investment Bank, strengthen capital, and accelerate our cost transformation. We believe these actions will lead Credit***

***Suisse to a more stable performance and generate lasting value for our shareholders.***"

(Emphasis added).

240. The 3Q22 Media Release further stated, in relevant part:

Credit Suisse's performance in the third quarter of 2022 continued to be challenged by the current economic and market environment. ***The combination of the geopolitical situation as well as the significant monetary tightening by major central banks worldwide in response to the continued and significant increase in inflation have resulted in continued heightened market volatility, weak customer flows and ongoing client deleveraging.***

* * *

We reported a net loss attributable to shareholders of CHF 4.0 bn, compared to net income attributable to shareholders of CHF 434 mn in 3Q21. Our reported net loss attributable to shareholders included an impairment of deferred tax assets related to our strategic review of CHF 3.7 bn. ***The challenging market conditions in 3Q22 were the main driver of the decline in Group AuM which stood at CHF 1.4 trn, down CHF 53 bn from CHF 1.45 trn at the end of 2Q22. This included Group net asset outflows of CHF 12.9 bn in 3Q22, compared to NNA of CHF 5.6 bn in 3Q21.***

* * *

***Our financial results for 9M22 have been significantly affected by the challenging economic and market environment, the combination of monetary tightening by major central banks and the ongoing geopolitical situation following Russia's invasion of Ukraine, resulting in heightened volatility and client risk aversion.*** The Swiss Bank continues to deliver a resilient performance, notwithstanding the impact from the SNB's decision to increase rates, and Wealth Management benefited from higher rates. However, the current market environment has had an adverse impact on client activity across our divisions. In particular, the Investment Bank has been notably impacted by the substantial industry-wide slowdown in capital markets and the challenging market backdrop.

We would expect these market conditions to continue in the coming months. In the Investment Bank, although our pipeline remains robust, market conditions may delay deal completions. ***Client activity remains subdued in our Sales & Trading businesses, exacerbating normal seasonal declines.*** We would expect this division to report a loss in the fourth quarter. Likewise, client activity remains subdued in Wealth Management and recurring revenues are expected to continue to reflect lower assets under management. ***Moreover, during the first two weeks of October 2022, following negative press and social media coverage based on incorrect***

> ***rumors, Credit Suisse experienced a significant level of deposit and assets under management outflows. While these outflows have stabilized since this period, they have not yet reversed. We have plans to address these matters through, among other things, accessing capital markets after October 27 and executing the strategic initiatives we announce today.*** We would note that the execution of these measures is also expected to generate liquidity and reduce the funding requirements of the Group.

(Emphasis added).

241. The statements contained in ¶¶ 239-240 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's new "strategy" was not focused on providing "more stable performance," as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period; (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls; (iii) the Company's performance was not affected by mere "macroeconomic" and "geopolitical" conditions, but instead by its significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; (iv) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized"; and (v) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022..

## LIX. October 27, 2022: Third Quarter 2022 Earnings Release

242. On October 27, 2022, the Company also issued its earnings release announcing financial results for the third quarter of 2022 (the "3Q22 Earnings Release") for the period ended,

September 30, 2022, which it filed with the SEC as an exhibit to a Form 6-K the same day. The 3Q22 Earnings Release stated, in relevant part, as follows:

> **Liquidity issues in October 2022**
> ***During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced significantly higher withdrawals of cash deposits as well as non-renewal of maturing time deposits. These outflows have since stabilized to much lower levels but have not yet reversed.*** As is normal practice, we also limited our access to the capital markets in the period immediately preceding our upcoming strategy announcements. ***While these outflows have partially utilized liquidity buffers at the Group and legal entity level, and we have fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times.*** The Group's average daily LCR for the month of October through October 25 was 154%, with lower spot rates over this period that remained below this average through that date. ***Remediation plans have been prepared to reverse these outflows, including accessing the public and private markets following our announcements on October 27 together with certain asset disposals and other measures. We would note that the execution of the strategic measures that we have announced is also expected to generate liquidity and reduce the funding requirements of the Group. We also continue to have access to central bank funding sources if required***.
>
> These circumstances have exacerbated the risks we described under "Liquidity Risk" in our Risk Factors contained in our 2021 Annual Report.
>
> **Outflows in assets under management in October 2022**
> ***During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced client asset outflows at levels that substantially exceeded the rates incurred in 3Q22.*** These asset outflows primarily impacted our Wealth Management and Swiss Bank divisions. ***These outflows have reduced significantly since mid-October but have not yet reversed.*** It is premature to estimate the impact on net new asset flows for 4Q22 but, coupled with reductions in asset values due to adverse market movements in client portfolios in 3Q22, this reduction in assets under management may lead to decreased fee revenues for the Group, thereby leading to reduced profitability.
>
> * * *
>
> **Russia's invasion of Ukraine**
> ….***The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of September 30, 2022, the Group had a net credit exposure to Russia, after specific***

> ***allowances and provisions for credit losses and valuation adjustments, of CHF 229 million, primarily related to corporates, individuals and the sovereign. In addition, Russian subsidiaries had a net asset value of approximately CHF 250 million as of September 30, 2022. The Group has further reduced Russia related exposures in 3Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.***
>
> * * *
>
> As of the end of 3Q22, assets under management of CHF 1,400.6 billion decreased CHF 53.3 billion compared to the end of 2Q22. ***The decrease was mainly driven by unfavorable market movements and net asset outflows of CHF 12.9 billion. Net asset outflows of CHF 12.9 billion in 3Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF 6.4 billion in Wealth Management reflected mainly outflows across the Middle East, Asia Pacific and Swiss ultra-high-net-worth businesses***, partially offset by inflows in the European businesses. ***Net asset outflows of CHF 4.2 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in index solutions, equities and fixed income, and alternative investments, primarily related to outflows in credit, partially offset by inflows from investments and partnerships, primarily related to an emerging markets joint venture. Net asset outflows of CHF 1.5 billion in Swiss Bank reflected outflows in the private clients business***, partially offset by inflows in institutional clients business.
>
> (Emphasis added).

243. The statements contained in ¶ 242 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; (ii) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized" or "reduced significantly since mid-October"; (iii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iv) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on

notice by SEC Comment Letters dated July 15, 2022.

## LX. October 27, 2022: Third Quarter 2022 Earnings Conference

244. On October 27, 2022, Credit Suisse also held a conference call with analysts and investors to discuss the Company's third quarter 2022 earnings (the "3Q22 Earnings Conference") for the period ended September 30, 2022. During the 2Q22 Earnings Conference, Defendant Joshi began by stating, in relevant part:

> As you all know, challenging conditions continue during the third quarter with heightened market volatility, weak customer flows, and ongoing client deleveraging. And our financial performance reflects these challenges….I would like to provide some additional context and commentary on asset flows at the start of the fourth quarter. ***We did see a significant level of deposit in AUM outflows during the first two weeks of October. Whilst these outflows have stabilized since this period, they have not yet reversed. We have plans to address these matters after 27th of October through, among other things, accessing capital markets and executing the strategic initiatives we have announced today. We would note that the execution of these measures is also expected to generate liquidity and reduce the funding requirements of the group.***

(Emphasis added).

245. When questioned by an analyst about "what drove" the customer outflows, Defendant Joshi responded:

> You know, as you know, ***the negative social media news around our name at the beginning of October, you know, did lead to outflows, you know, across our franchise. You know, it's something that we're looking to address today through the strategic announcements that we're making, including the 4 billion capital raise and ensuring that, you know, we're well capitalized through this transformation period, while we make the transformational announcements and restructuring across our investment bank and other business areas.***

(Emphasis added)

246. When questioned by another analyst about "what actually happened during the quarter" regarding the outflows in order "for us to be able to assess…how to look at them going forward," Defendant Körner responded:

> So, if we look at the wealth management situation, you've seen the outflows of 6.4

> billion for the quarter. And you rightly put it, which you then see reflected in the transaction-based income line as well, our wealth management business is very strong, as you know, in APAC and emerging markets. That has impacted that clearly, as we said***. If you look at the 6.4 billion, it's a combination in the third quarter of, you know, deleveraging and derisking, if you want to. So, about 3 billion comes from deleveraging and other like 2 billion is proactive, call it derisking, and then some additional deposit outflows. I think that's the right way to think about that one.***

(Emphasis added).

247. When questioned by another analyst if Defendants "could give us a sense of scale of a similar run rate to" the outflows seen in 3Q22, Defendant Körner responded:

> What we have seen -- and thanks for the question, what ***we have seen, particularly at the beginning of October, certainly, a heightened level of outflows, which was very much based on what you have seen in the media and the press rumors. And let me say here very clearly, to the largest extent possible, factually incorrect rumors. But, obviously, that, you know, the overall situation that has come in and down very significantly in the last couple of weeks, actually***.

(Emphasis added).

248. The statements contained in ¶¶ 244-247 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized" and were not chiefly the result of "deleveraging" and "derisking"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

## LXI. October 27, 2022: Defendant Körner Interview with *CNBC*

249. On October 27, 2022, Defendant Körner was interviewed on CNBC. During the interview, Defendant Körner spoke about Credit Suisse's "transformation into the ***new Credit***

***Suisse***," which he characterized as "***much more stable***" and "much simpler in terms of how it is setup." He explained that the restructuring entailed three pieces: (1) a "radical restructuring of the Investment Bank", (2) a "significant reduction in costs"; and (3) "further strengthening of our capital base." Körner stated that "with that, we have all the ingredients to go where we want to go."

250. The statements contained in ¶ 249 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the "new Credit Suisse" was not "much more stable," and Credit Suisse's new strategy was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices.

### LXII. October 31, 2022: Defendant Körner Interview with *Bloomberg TV*

251. On October 31, 2022, Defendant Körner was interviewed on *Bloomberg TV*. During the interview, when asked if he was expecting outflows to "reverse," Körner responded that ***outflows had "clearly stabilized***" and in fact they were seeing "***some inflows coming and I would anticipate that we would have further inflows in the weeks and months to come***," as "[w]e have a lot of clients that told us that they would come back."

252. The statements contained in ¶ 251 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company was experiencing significant and unusual customer and/or asset outflows that had not "clearly stabilized."

### LXIII. November 2, 2022: Third Quarter 2022 Report

253. On November 2, 2022, the Company filed with the SEC its financial report for the

third quarter of 2022 (the "3Q22 Quarterly Report"), on Form 6-K for the period ended September 30, 2022. The 3Q22 Quarterly Report stated, in relevant part, as follows:

> In 3Q22, we reported net revenues of CHF 3,804 million, which decreased 30% compared to 3Q21, primarily reflecting lower net revenues in the Investment Bank and Wealth Management. ***The decrease in the Investment Bank was driven by significantly reduced capital markets revenues and lower equity and fixed income sales and trading revenues, reflecting challenging operating conditions and the Group's relative underperformance.*** The decrease in Wealth Management mainly reflected lower transaction- and performance-based revenues, lower recurring commissions and fees and lower other revenues, partially offset by higher net interest income.
>
> * * *
>
> During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced significantly higher withdrawals of cash deposits as well as non-renewal of maturing time deposits. ***These outflows have since stabilized to much lower levels but have not yet reversed.*** As is normal practice, we also limited our access to the capital markets in the period immediately preceding our strategy announcements. ***While these outflows have partially utilized liquidity buffers at the Group and legal entity level, and we have fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times….Remediation plans have been prepared to reverse these outflows, including accessing the public and private markets following our announcements on October 27 together with certain asset disposals, including the transfer of a significant portion of SPG*** **[Securitized Products Group]** ***to an investor group led by Apollo, and other measures. We would note that the execution of the strategic measures that we have announced is also expected to generate liquidity and reduce the funding requirements of the Group. We also continue to have access to central bank funding sources if required.***
>
> * * *
>
> **Outflows in assets under management in October 2022**
> During the month of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced client asset outflows at levels that substantially exceeded the rates incurred in 3Q22. These asset outflows primarily impacted our Wealth Management and Swiss Bank divisions. ***These outflows have reduced since mid-October but have not yet reversed.*** It is premature to estimate the impact on net new asset flows for 4Q22 but, coupled with reductions in asset values due to adverse market movements in client portfolios in 3Q22, this reduction in assets under management may lead to decreased fee revenues for the Group, thereby leading to reduced profitability.

* * *

***The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of September 30, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 229 million, primarily related to corporates, individuals and the sovereign. In addition, Russian subsidiaries had a net asset value of approximately CHF 250 million as of September 30, 2022. The Group has further reduced Russia related exposures in 3Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.***

* * *

As of the end of 3Q22, assets under management of CHF 1,400.6 billion decreased CHF 53.3 billion compared to the end of 2Q22. ***The decrease was mainly driven by unfavorable market movements and net asset outflows of CHF 12.9 billion.***

Net asset outflows of CHF 12.9 billion in 3Q22 mainly reflected outflows across the following businesses. ***Net asset outflows of CHF 6.4 billion in Wealth Management reflected mainly outflows across the Middle East, Asia Pacific and Swiss ultra-high-net-worth businesses***, partially offset by inflows in the European businesses. ***Net asset outflows of CHF 4.2 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in index solutions, equities and fixed income, and alternative investments, primarily related to outflows in credit***, partially offset by inflows from investments and partnerships, primarily related to an emerging markets joint venture. ***Net asset outflows of CHF 1.5 billion in Swiss Bank reflected outflows in the private clients business***, partially offset by inflows in institutional clients business.

* * *

***Our liquidity and funding profile is driven by business activity levels and the overall operating environment. We have been an active participant in regulatory and industry forums to promote best practice standards on quantitative and qualitative liquidity management.***

* * *

Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. We achieve this through a conservative asset/liability management strategy aimed at maintaining long-term funding, including stable deposits, in excess of illiquid assets. ***To address short-term liquidity stress, we***

> ***maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***

(Emphasis added).

254. The statements contained in ¶ 253 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; (ii) the Company's risk management and/or control governance policies and/or procedures were severely lacking, both at this time and prior to the Class Period; (iii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls; (iv) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized"; (v) the Company did not maintain a "sufficient" liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not "conservative" and were materially deficient at all times; and (vi) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

### LXIV. November 15, 2022: SPG/Apollo Media Release

255. On November 15, 2022, the Company issued a media release announcing the restructuring of its Investment Bank via the sale of its Securitized Products Group ("SPG") to Apollo Global Management ("Apollo") (the "SPG/Apollo Media Release"), which it filed with the

SEC on a Form 6-K the same day. The SPG/Apollo Media Release stated, in relevant part, as follows:

> Credit Suisse accelerates the radical restructuring of its Investment Bank with the announcement that it has entered into definitive transaction agreements to sell a significant part of its Securitized Products Group (SPG) and other related financing businesses to Apollo Global Management (Apollo). ***The execution of these agreements represents an important step towards a managed exit from the Securitized Products business, which is expected to significantly de-risk the Investment Bank and release capital to invest in Credit Suisse's core businesses.***
>
> * * *
>
> ***Completion of these transactions is expected to achieve a release of Risk Weighted Assets (RWAs) of up to approximately USD 10 billion, depending on the scope of assets ultimately transferred***….
>
> * * *
>
> ***Under the terms of the transactions contemplated with Apollo, Credit Suisse's CET1 capital ratio is expected to be strengthened by the release of RWAs*** and the recognition, upon closing, of the premium paid by Apollo, whereby the final amount will depend on discount rates and other transaction-related factors.
>
> (Emphasis added).

256. The statements contained in ¶ 255 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's sales of its SPG to Apollo would not "significantly de-risk" the Investment Bank or meaningfully reduced its RWAs, as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies; and (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls.

## LXV. November 23, 2022: Preliminary Fourth Quarter 2022 Earnings Media Release

257. On November 23, 2022, the Company issued a media release announcing preliminary financial results for the fourth quarter of 2022 (the "Preliminary 4Q22 Media Release"), which it filed with the SEC on a Form 6-K the same day. The Preliminary 4Q22 Media Release stated, in relevant part, as follows:

> In its Outlook statement on October 27, 2022, the bank highlighted that the challenging economic and market environment has had an adverse impact on client activity across its divisions. ***In particular, the Investment Bank has been impacted by the substantial industry-wide slowdown in capital markets and reduced activity in the Sales & Trading businesses, exacerbating normal seasonal declines, and the Group's relative underperformance. In addition, client activity remains subdued in the Wealth Management and Swiss Bank divisions***, and the bank expects these market conditions to continue in the coming months.
>
> As previously disclosed, ***Credit Suisse began experiencing deposit and net asset outflows in the first two weeks of October 2022 at levels that substantially exceeded the rates incurred in the third quarter of 2022. At the Group level, as of November 11, 2022, net asset outflows were approximately 6% of assets under management at the end of the third quarter of 2022. In Wealth Management, these outflows have reduced substantially from the elevated levels of the first two weeks of October 2022 although have not yet reversed and were approximately 10% of assets under management at the end of the third quarter of 2022. In the Swiss Bank, these client balances have stabilized and were approximately 1% of assets under management at the end of the third quarter of 2022.***
>
> ***As announced on October 27, 2022, these outflows have led the bank to partially utilize liquidity buffers at the Group and legal entity level, and while the bank has fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times.***
>
> ***Credit Suisse is executing on its strategic commitments to strengthen its balance sheet and reduce risk, engaging clients proactively and accessing the public and private markets***, including the recent issuance of approximately USD 5 billion through two bond sales, which saw strong investor demand. Key steps taken include the recently announced sale of a significant part of Credit Suisse's Securitized Products Group (SPG) and other related financing businesses to Apollo Global Management.…***These actions and other deleveraging measures including, but not limited to, in the non-core businesses, are expected to strengthen liquidity ratios and reduce the funding requirements of the Group.***

* * *

***Strategic actions taken to significantly reduce the Group's risk profile are expected to be reflected in near-term financial results….Lower deposits and assets under management are expected to lead to reduced net interest income and recurring commissions and fees; this is likely to lead to a loss for Wealth Management in the fourth quarter of 2022. Together with the adverse revenue impact from the previously disclosed exit from the non-core businesses and exposures, and as previously announced on October 27, 2022, Credit Suisse would expect the Investment Bank and the Group to report a substantial loss before taxes in the fourth quarter 2022, of up to CHF ~1.5 billion for the Group****….*

***The Group continues to execute on the decisive strategic actions detailed on October 27, 2022, to create a simpler, more focused and more stable bank – a new Credit Suisse.***

(Emphasis added).

258. The statements contained in ¶ 257 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's new "strategic actions" would not "significantly reduce the Group's risk profile," as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; (ii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls; (iii) the Company's reduced client activity was not attributable to an "industry-wide slowdown," "normal seasonal declines," or other "market conditions," but instead the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized"; (iv) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially

deficient at all times; and (v) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

**LXVI. November 23, 2022: Rights Offering Media Release**

259. On November 23, 2022, the Company issued a media release announcing shareholder approval of the two proposed capital increases (the "November 2022 Rights Offering Media Release"), which it filed with the SEC on a Form 6-K the same day. The November 2022 Rights Offering Media Release stated, in relevant part, as follows:

> Axel P. Lehmann, Chairman of the Board of Directors of Credit Suisse, said: "Today's vote by shareholders marks a further important step in our journey to build the new Credit Suisse. On behalf of the Board of Directors, ***I want to thank our shareholders for their approvals today, which reinforce our collective will to deliver and to execute our strategic plan. This vote confirms confidence in the strategy, as we presented it in October, and we are fully focused on delivering our strategic priorities to lay the foundation for future profitable growth.***"
>
> (Emphasis added).

260. The statements contained in ¶ 259 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) as opposed to supporting the Company's "strategic plan," the Rights Offering was merely a last-ditch effort to shore-up liquidity necessitated by significant and unusual customer and/or asset outflows that were not disclosed by Defendants, and would not "lay the foundation for future profitable growth"; and (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

**LXVII. December 1, 2022: Defendant Lehmann *Financial Times* Interview**

261. On December 1, 2022, the *Financial Times* published an article entitled "Credit

Suisse chair says outflows have reversed since 'social media storm'" citing Defendant Lehmann and stating that Credit Suisse clients had returned to the bank after pulling out tens of billions of dollars of assets at the start of October. The article stated in relevant part:

> Axel Lehmann said ***withdrawals had flattened across the group and had started to reverse in the Swiss domestic business***, but the scale of the outflows had caught the Swiss lender off-guard.
>
> "It ***was*** a real storm," said Lehmann at the Financial Times' Global Banking Summit on Thursday. "It ***was*** a storm in the retail and partially in the wealth management segment, in particular in Asia, ***where we had really massive outflows for two to three weeks***."
>
> "The good part of the sad story is we had very few clients leaving. They are still with us, they still continue to do business with us."
>
> He said clients had been taking up to a third of the assets they held with the bank and transferring them to rivals. "I have anecdotes from clients and I know that the money will certainly come back over time."
>
> (Emphasis added.)

262. The statements contained in ¶ 261 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "flattened"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

## LXVIII. December 2, 2022: Defendant Lehmann *Bloomberg* Interviews

263. On December 2, 2022, before market hours, in a *Bloomberg TV* interview, Lehmann stated that outflows "basically have stopped" after it had disclosed on November 23,

2023 the loss of 84 billion francs or $90.8 billion of client assets. In the same interview, Lehmann characterized the October increase in customer outflows as simply a "two-to-three-week event."

264. Also on December 2, 2022, *Bloomberg* published an article entitled "Credit Suisse Gains Most Since 2020 After Asset Outflows Halted" quoting Lehmann's assurances regarding the Company's financial stability. The article stated in relevant part:

> Credit Suisse Group AG Chairman Axel Lehmann said the ***main indicators of the bank's financial stability were strong*** and that its level of liquidity is improving after declines in recent weeks.
>
> * * *
>
> ***In October, outflows of assets and the subsequent use of liquidity buffers had caused the bank to fall below certain regulatory levels at some of its entities.***
>
> ***Credit Suisse saw 84 billion francs ($89.7 billion) of client asset withdrawals in the first few weeks of the fourth quarter amid persistent rumors about the bank's stability.*** Credit spreads and the cost to insure the bank's debt against default have surged to above 400 basis points, far above peers. ***The outflows have "basically stopped," Lehmann said.***
>
> * * *
>
> Credit Suisse shares slumped to record lows in recent days and approached the price of the rights offer that's part of the bank's $4 billion capital increase, signaling investor skepticism.
>
> ***Yet the stock rebounded after Lehmann's comments on Friday, helping to arrest the losing streak.*** It traded up as much as 6.73% to 2.86 Swiss francs in Zurich.
>
> (Emphasis added)

265. Following Defendant Lehmann's statements, Credit Suisse's ADS price climbed $0.29 per ADS, or 9.36%, to close at $3.38 per ADS on December 2, 2022.

266. The statements contained in ¶¶ 263-264 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded

by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "basically stopped"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all time; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

**LXIX. December 5, 2022: Defendant Lehmann Interview with *SFR***

267. On December 5, 2022, Defendant Lehmann was interviewed on Swiss broadcaster *SRF*. *Reuters* reported on the interview in an article published that day titled, "Credit Suisse business is stable, chairman tells broadcaster SRF."

268. The article stated, in relevant part:

> Credit Suisse (CSGN.S) is "***definitely stable,"*** Chairman Axel Lehmann told Swiss broadcaster SRF on Monday, adding that ***the embattled bank had seen a stabilisation in the outflows of client funds***.
>
> * * *
>
> "When you have a capital raising, which has a big dilution effect, that creates a lot of uncertainty and that leads to high volatility," Lehmann said in the interview.
>
> "***But I believe the situation has calmed***. ***The business is definitely stable***," he said. Still, he expected 2023 and 2024 to be years of transformation for the bank as it seeks to stabilise after years of mishaps.
>
> "It's true, the whole group will not be profitable next year," Lehmann said. "What is important is the progress we make.
>
> "What is the earnings power of the Swiss business, wealth management, asset management and the part of the investment bank we retain, and then from 2024 produce positive numbers."
>
> (Emphasis added).

269. The statements contained in ¶ 268 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business,

operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "stabilized"; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

**LXX. December 8, 2022: Rights Offering Media Release**

270. On December 8, 2022, the Company issued a media release announcing the completion of the Rights Offering (the "December 2022 Rights Offering Media Release"), which it filed with the SEC on a Form 6-K on December 9, 2022. The December 2022 Rights Offering Media Release stated, in relevant part, as follows:

> ***Since October 27, 2022, Credit Suisse has continued to progress on its strategic actions.*** In addition to the successful completion of its capital raise, which is expected to strengthen Credit Suisse Group AG's CET1 ratio by approximately 140 basis points, the bank continues to make progress in relation to the definitive transaction agreements to sell a significant part of the Securitized Products Group and other related financing businesses to entities and funds managed by affiliates of Apollo Capital Management. ***The deal is expected to close in the first half of 2023 and is expected to further bolster Credit Suisse Group AG's CET1 capital ratio.***
>
> As announced on December 5, 2022, Credit Suisse Group AG has also completed HoldCo and AT1 issuances for 2022 including approximately USD equivalent of 5 billion of HoldCo debt issued since the Strategy Update on October 27, 2022. ***Together with the capital raise, progress on our Securitized Products transaction and other measures have further strengthened Credit Suisse Group AG's spot liquidity coverage ratio (LCR), with the average daily LCR for the fourth quarter-to-date, as of December 7, 2022, above 140%.***
>
> (Emphasis added).

271. The statements contained in ¶ 270 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) as opposed to supporting the Company's "strategic actions," the Rights Offering

was merely a last-ditch effort to shore-up liquidity necessitated by significant and unusual customer and/or asset outflows that were not disclosed by Defendants, and would not "further bolster" Credit Suisse's capital ratio; and (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

### LXXI. January 17, 2023: Defendant Lehmann Interview with *Bloomberg TV*

272. On January 17, 2023, Defendant Lehmann was interviewed on *Bloomberg TV*. During the interview, he warned that "it will not look great" for bonuses at the bank, explaining: "***When you suffered huge losses, it is clear that the budget gets cut also on bonuses***." (Emphasis added).

273. The statements contained in ¶ 272 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants never cut executives' bonuses.

### LXXII. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Media Release and Investor Presentation

274. On February 9, 2023, the Company issued a media release announcing financial results for the fourth quarter and fiscal year of 2022 (the "FY22 Media Release") for the period and year ended December 31, 2022, which it filed with the SEC, along with slides accompanying its presentation to investors, on a Form 6-K the same day. The FY22 Media Release quoted Defendant Körner, in relevant part, as follows:

> 2022 was a crucial year for Credit Suisse. ***We announced our strategic plan to create a simpler, more focused bank, built around client needs and since October we have been executing at pace. We successfully raised CHF ~4 billion in equity capital, accelerated the delivery of our ambitious cost targets, and are making strong progress on the radical restructuring of our Investment Bank.*** Today's announcement of our acquisition of the M. Klein & Company investment banking business marks another milestone in the carveout of CS First Boston as a leading

independent capital markets and advisory business. The transaction should further strengthen CS First Boston's advisory and capital markets capabilities.

***We have a clear plan to create a new Credit Suisse and intend to continue to deliver on our three-year strategic transformation by re-shaping our portfolio, reallocating capital, right-sizing our cost base, and building on our leading franchises.***

(Emphasis added).

275. The FY22 Media Release further stated, in relevant part:

***Our performance in 2022 underscores the importance of our forward focus on radically transforming the bank, efficiently reducing risk, lowering our cost base, strengthening our capital position and playing to our strengths and core franchises***. The Group continues to execute on the decisive strategic actions detailed on October 27, 2022, to create a simpler, more focused, stable bank built around the needs of our clients – a new Credit Suisse.

(Emphasis added).

276. The statements contained in ¶¶ 274-275 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company's new "strategic plan" was a sham, as was its stated goal of "efficiently reducing risk," as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; (ii) restructuring of the Investment Bank was not designed to make the Company "simpler" and "more focused," but was instead necessitated by the Company's wholly inadequate capital position as a result of, among other things, significant and undisclosed customer and/or asset outflows throughout the Class Period; and (iii) in mid-May 2002, the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls.

## LXXIII. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Earnings Release

277. On February 9, 2023, the Company issued its earnings release announcing financial results for the fourth quarter and fiscal year of 2022 (the "FY22 Earnings Release") for the period and year ended December 31, 2022, which it filed with the SEC on a Form 6-K the same day. The FY22 Earnings Release stated, in relevant part, as follows:

> **Liquidity issues in 4Q22**
> As previously disclosed, during early 4Q22, Credit Suisse began experiencing significantly higher withdrawals of cash deposits as well as nonrenewal of maturing time deposits. However, ***as the quarter progressed, these outflows stabilized to much lower levels but had not yet reversed by year end, and customer deposits declined by CHF 138 billion in 4Q22.*** As is normal practice, we also limited our access to the capital markets in the period immediately preceding the strategy announcements we made on October 27, 2022. ***While these outflows led us to partially utilize liquidity buffers at the Group and legal entity level, and we fell below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level were maintained at all times.*** The Group's three-month average daily LCR was 144% as of the end of 4Q22, improved from lower levels earlier in the quarter.
>
> Remediation plans were prepared, initiated and implemented to mitigate these outflows, including accessing the public and private markets. We issued over USD 5 billion through three bond sales in November and December 2022, which saw strong investor demand, and an additional CHF 4 billion through our capital increases. Other steps also include certain asset disposals, including the announced sale of a significant portion of SPG and other related financing businesses. ***We would note that the execution of these actions and other deleveraging measures, including, but not limited to, in the non-core businesses, is also expected to strengthen liquidity ratios and, over time, reduce the funding requirements of the Group.*** As is common for banks, we also continue to have access to central bank funding sources if required.
>
> * * *
>
> **Outflows in assets under management in 4Q22**
> As previously disclosed, Credit Suisse began experiencing deposit and net asset outflows in early 4Q22 at levels that substantially exceeded the rates incurred in 3Q22. At the Group level, net asset outflows in 4Q22 were approximately 8% of assets under management as of the end of 3Q22, with approximately two-thirds of these net asset outflows in the quarter concentrated in October 2022. In ***Wealth Management, these outflows in 4Q22 had reduced substantially in the rest of the***

***quarter from the elevated levels of early 4Q22***, but had not reversed, and represented approximately 15% of assets under management reported as of the end of 3Q22. ***In the Swiss Bank, these outflows in 4Q22 broadly stabilized after the elevated levels of early 4Q22***, and represented approximately 2% of assets under management reported as of the end of 3Q22. In Asset Management, these outflows in 4Q22 represented 3% of assets under management reported as of the end of 3Q22.

* * *

**Russia's invasion of Ukraine**

In response to Russia's invasion of Ukraine, many countries across the world imposed severe sanctions against Russia's financial system and on Russian government officials and business leaders, and these sanctions have been expanded several times. ***The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of December 31, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 249 million, primarily related to corporates, individuals and the sovereign. In addition, Russian subsidiaries had a net asset value of approximately CHF 214 million as of December 31, 2022. The Group has further reduced Russia related exposures in 4Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.*** The Group notes that these developments may continue to affect its financial performance, including credit loss estimates and potential asset impairments.

* * *

As of the end of 4Q22, assets under management of CHF 1,293.6 billion decreased CHF 107.0 billion compared to the end of 3Q22. ***The decrease was mainly driven by net asset outflows of CHF 110.5 billion and foreign exchange-related movements, partially offset by favorable market movements of CHF 27.6 billion***.

Net asset outflows of CHF 110.5 billion in 4Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF 92.7 billion in Wealth Management were driven by outflows across all regions. ***Approximately two-thirds of the outflows were concentrated in October 2022. The outflows in 4Q22 had reduced substantially in the rest of the quarter from the elevated levels of early 4Q22 but had not reversed.*** Net asset outflows of CHF 11.7 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in multi-asset solutions, index solutions and fixed income, from investments and partnerships, primarily related to an emerging markets joint venture, and from alternative investments, primarily related to outflows in credit. Net asset outflows of CHF 8.3 billion in Swiss Bank mainly reflected outflows in the private clients business.

(Emphasis added).

278. The statements contained in ¶ 277 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company had significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; (ii) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized" or "reduced substantially in the rest of the quarter from the elevated levels of early 4Q22"; (iii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iv) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

### LXXIV. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Earnings Conference

279. On February 9, 2023, Credit Suisse held a conference call with analysts and investors to discuss the Company's fourth quarter and fiscal year 2022 earnings (the "FY21 Earnings Conference") for the period ended December 31, 2023. During the FY22 Earnings Conference, Defendant Körner stated, in relevant part:

> 2022 was an extremely challenging year for Credit Suisse with the group posting a net loss of CHF 7.3 billion. ***Nonetheless, it was also a year which marked the beginning of the important and necessary transformation for our organization. On October 27, we presented a targeted plan to create the new Credit Suisse, a simpler, more focused bank built around client needs. And today, we reaffirm all of the targets we announced in October.***
>
> * * *
>
> ***We have a robust balance sheet, and we are executing on our transformation from a position of strength.*** We reported a year-end CET1 ratio of 14.1% and a

Tier 1 leverage ratio of 7.7%. ***Our liquidity position also improved following the impact of the events of October.*** The average liquidity coverage ratio was at 144% at the end of the fourth quarter with further improvements this year.

* * *

Now let me be clear, our teams continue to work relentlessly on serving our clients. Since October, we have proactively engaged with more than 10,000 wealth management clients and over 50,000 clients in the Swiss bank. ***As previously mentioned, we are seeing the first positive signs, comprehensive global initiatives to regain deposits, as well as assets under management. In January, we saw deposit inflows at group level in Wealth Management and the APAC, as well as net new assets in APAC and to Swiss Bank. Importantly, clients remain overwhelmingly supportive, and we remain very thankful for that.*** To remind you of the strength of our Wealth Management business, we are the No. 2 wealth manager outside the U.S. with a deep client franchise balance between ultra and high net risk clients.

* * *

***We are building a unified culture from the top of the organization with a strong focus on risk management, collaboration, and accountability. We remain disciplined on strategic execution, strengthening and reallocating capital delivering our cost ambitions, and most importantly, supporting our clients globally. As I mentioned, we have acted decisively to address the impact of the outflows experienced in the fourth quarter, and we have seen deposit inflows at the group level, in wealth management and APAC, as well as net new assets in APAC and the Swiss Bank. We are also, making progress with the carve-out of CS First Boston and are creating a more focused markets business that will deliver innovative solutions and products for our Wealth Management and our institutional clients. In short, we are determined to make this transformation a success, restore trust with all stakeholders and ultimately create sustainable value for our shareholders.***

(Emphasis added).

280. Defendant Joshi then stated, in relevant part:

***The group took clear strides forward despite the challenging fourth quarter. We delivered the strategy update alongside our third quarter earnings and started immediately on implementation.*** We made good progress reducing noncore-related exposures on cost reduction measures and on balance sheet reductions relating to the Capital Release Unit. ***We proactively managed our liquidity position following the outflows in the fourth quarter. We executed a successful series of capital and funding measures, including raising around CHF 4 billion in equity and completing around CHF 6 billion of debt issuance in the fourth quarter. We***

***strengthened our CET1 ratio to 14.1%, and we remain resolutely focused on execution and on supporting our clients. As you can see from this morning's announcement regarding the acquisition of the Investment Banking business of M. Klein & Company and the completion of the first closing of our securitized products transaction with Apollo, we are executing rapidly on the strategy and were ahead of plan.***

* * *

I'll touch on the impact of the client asset outflows during the fourth quarter on Slide 15. Our assets under management were impacted by significant net asset outflows early in the quarter which affected both our revenues and our liquidity position for the fourth quarter. ***Approximately two-thirds of the net asset outflows in the fourth quarter occurred in October, and they reduced considerably in November and December….Since the start of the fourth quarter, we strengthened our balance sheet, including through the capital raises to set the group on a stronger trajectory.***

***We're now three months into our transformation journey and we saw the first signs of the benefits of these and other proactive initiatives in January with positive deposit inflows at the group level and specifically in wealth management. Net asset flows in the Swiss Bank were positive and the net asset outflows in wealth management in January were at a reduced level compared to December with net asset in flows in Asia Pacific.***

* * *

Moving on to our liquidity coverage ratio. ***Although the group's liquidity position was impacted by deposit outflows in the fourth quarter, our average liquidity coverage ratio at the end of December stood at 144%, well above the group's minimum regulatory requirements and comparing favorably with our peer group. This represents an improvement from the lower levels in the quarter and was a result of a series of proactive measures, including the capital raises, debt issuances, and deleveraging. We have continued to see the improvement in the ratio since the start of the year and were main focused on maintaining our LCR at a prudent level. The disciplined execution of our strategy, including our simplification program should lead to further liquidity improvements and more efficient liquidity management across the group.***

* * *

***To summarize, our financial performance for the fourth quarter reflects the decisive actions we have taken against a difficult market backdrop. Looking forward, we expect that the strategic actions taken to reduce the group's risk profile and the challenging market conditions will continue to be reflected in our financial results.***

(Emphasis added).

281. When questioned by an analyst about the "commentary around being proactive on flaws and winning back some of the client money" and "how [] you [are] going about winning back that business," Defendant Körner responded:

> So, as we are alluding to, and I'd like to reiterate that because it's really, I think, important for where we are now, where we are going throughout the year. ***So, this client outreach program, which I was talking about is really unprecedented. That is at least what the colleagues here in the firm tell me being here longer than 30 years. And I think it has shown, has developed very good momentum and hence, the figures I gave for January****….* So, what is the fact, and I think that is something which all my colleagues in the bank and myself felt in the many, many clients in the actions which we had nearly on a daily basis, ***I would say that the client support which we get from them is really overwhelming. And I mean this I'm saying, which is absolutely for me and my colleagues is absolutely fantastic. So, the clients, in other words, the clients want us to be successful, and that is something which we can feel and therefore, we are so, focused on delivery****.*

(Emphasis added).

282. When questioned by an analyst about how the Company saw "flows, deposits, custody assets, [and] loans" "developing…over the next 12 months," Defendant Körner responded:

> So, I would say with respect to your Wealth Management question, what is important, that's why we gave these indications from January. ***The group overall, as I said, is positive on deposits, Wealth Management, globally, positive on deposits, Asia Pac, positive on deposits. And I'm reiterating that because as you are fully aware of, the deposits are these kind of assets.*** So, to say, which leave first and have the fungibility to reenter first. And I think that is important to bear in mind. As you immediately understand [], we do not give your business plan figures, but ***you can assume that in the best mention is a fair chunk of rewinning lost volumes lost business with our clients. And important to note here is as well that we hardly lost any client. I think that is also important that shows you something about what I said before in terms of the relationship which we may have with our clients.***

(Emphasis added).

283. When questioned by an analyst about outflows and the "split between November

and December," as well as what management meant by a "reduced level" of outflows in January, Defendant Körner responded:

> [W]e said like two-thirds in October. ***If you look into October and November together, it's more than 85% and of the outflows stemming from these two months***, and that was exactly the reason…. ***With respect to your second question, net new assets, in particular, we said we are positive, which is very good because that's a very proactive region, growth region, we are positive in APAC with a good number for January also, in comparison to other years. We are positive in Switzerland, also, with a good number overall here. We are positive in a couple of smaller other geographies, but we are also, still having some outflows in other regions, and that's why we gave this guidance…. That's how you should read it. But again, as I said, in my eyes, the situation has completely changed from last year.***
>
> (Emphasis added).

284. When questioned by an analyst about what amount of the "over 90 billion of outflows in Wealth Management…you see as a realistic number to come back" and "what clients are open to returning based upon what they see in terms of progression around your restructuring plan," Defendant Körner responded:

> So, as we said or as I said earlier, ***we feel that the declines are overwhelmingly supportive.*** What we have observed, I would say, since October, in particular, and then early November on all these clients' meetings, at least where I was participating and doing, as I said, typically several a day. ***I would say there are three groups of clients.*** The one which we started to come back very quickly already last year. So, after a successful capital raise, they came back, they brought money back and so, on. ***A second group, which I tend to believe is a very large group. At the end of the day, which was a bit more careful, So, I look -- let's look at that, look at how you are doing, how you are executing and so, on, which will come back over time, I'm not saying in a run, but over time.*** And there's a third group I would think relatively smaller group, which says, look, we stick with you with what we have now. After reductions, we like you, but we want to observe you a little bit longer than just let's say, the next, whatever, a few months. So, I think that's what I felt at least from client meetings.
>
> ***So, to your concrete question, how much is coming back, I would like to know that as well, as you can imagine. As I said, the wealth management colleagues are pretty hopeful that we bring a fair part of the outflows back already in 2023. And the rest will come later. And as I said also, earlier, obviously, our target is to bring all and everything back and then go beyond that.***

(Emphasis added).

285. The statements contained in ¶¶ 279-284 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was not "seeing positive signs" with respect to "regain[ing] deposits, as well as assets under management," and "the situation" had *not* "completely changed from last year, as Credit Suisse was experiencing significant and unusual customer and/or asset outflows; (ii) the Company did not experience "liquidity improvements" but instead did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022.

## LXXV. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Press Conference

286. On February 9, 2022, Credit Suisse held a press conference to discuss the Company's fourth quarter and fiscal year 2022 results (the "FY22 Press Conference"). Defendant Körner repeated, in large part, the prepared remarks he had made at the FY22 Earnings Conference.

287. When questioned during the Q&A session about the "numbers of clients who have actually closed their accounts," Defendant Körner responded:

> ***98% of our clients remain with us. And I think…that's, I would say, a very, very strong message if you think it's you because you have normal – you have a very normal attrition. And what we are seeing here is, I don't know, either very normal attrition or even below normal attrition. So that's a very, very strong signal to the organization and to Credit Suisse. And this is very, very supportive for all of us and for Credit Suisse, I think.***

(Emphasis added).

288. The statements contained in ¶ 287 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, 98% of the Company's clients had *not* "remained with" Credit Suisse and the Company was not experiencing "normal…or even below normal attrition," but was rather experiencing significant and unusual customer and/or asset outflows.

**LXXVI. February 9, 2023: Defendant Körner Interview with *Bloomberg TV***

289. On February 9, 2023, Defendant Körner was interviewed on *Bloomberg TV*. During the interview, Defendant Körner stated that Credit Suisse was "making really good progress" toward "creating a new Credit Suisse," it had a "clear plan," and was in "full execution" of it.

290. With respect to outflows, Körner said they ***"have reduced very significantly and we are seeing new money coming back in different parts of the firm." He said that "we have launched a very well organized client reachout…[that] has generated*** very positive momentum...[which] will travel with us in 2023." (Emphasis added).

291. When asked if it was "still the plan…to be profitable for 2024 onwards," Körner responded: "That's absolutely the plan. The plan is unchanged."

292. The statements contained in ¶¶ 289-291 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "reduced very significantly"; and (ii) the "new Credit Suisse" was a sham, as its "plan" was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices.

**LXXVII. March 13, 2023: Defendant Lehmann Speech at Financial Sector Conference**

293. On March 13, 2023, Defendant Lehmann spoke at the Financial Sector Conference in Saudi Arabia. The speech was reported in an article published that day by *Bloomberg* titled "Credit Suisse Chair Says State Assistance 'Not a Topic' for Bank."

294. The article stated, in relevant part:

> Credit Suisse Group AG Chairman Axel Lehmann said government assistance "isn't a topic" for the lender as the Swiss bank seeks to shore up confidence among clients, investors and regulators after a series of missteps.
>
> Speaking at the Financial Sector Conference in Saudi Arabia on Wednesday, Lehmann said ***it wouldn't be accurate to compare Credit Suisse's current problems with the recent collapse of Silicon Valley Bank, particularly because the banks are regulated differently***.
>
> ***"We have strong capital ratios, a strong balance sheet," Lehmann said. "We already took the medicine," he said, referring to the extensive restructuring program announced in October.***
>
> (Emphasis added).

295. The statements contained in ¶ 294 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company did not "have strong capital ratios," as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (ii) the "restructuring" of Credit Suisse was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices.

**LXXVIII. March 14, 2023: 2022 Annual Report**

296. On March 14, 2023, the Company filed with the SEC its 2022 annual report (the "2022 Annual Report") on Form 20-F for the year ended December 31, 2022. The 2022 Annual

Report was signed by Defendants Körner and Joshi, attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting. Notably, and as discussed *infra*, the 2022 Annual Report identified material weaknesses in the Company's internal controls over financial reporting, but also stated the following, in relevant part:

> Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. ***Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date.***

(Emphasis added).

297. The 2022 Annual Report further stated:

> For Credit Suisse, ***2022 was an important year that marked a decisive break from the past and the beginning of our journey to become a simpler, more focused bank built around the needs of our clients***. In October, we announced a clear strategy that builds on our core strengths and addresses current challenges, and we have since been executing it at pace. ***Our strategic, cultural and operational transformation aims to re-establish Credit Suisse as a solid, reliable and trusted partner with a strong value proposition for all our stakeholders***.
>
> * * *
>
> Culturally, we want to build on our core values of entrepreneurship, inclusion, meritocracy, partnership, accountability, client focus and trust – values that have shaped the bank since 1856 when it was founded by entrepreneur Alfred Escher. ***As part of our cultural transformation, we want to ensure that our people act as prudent and professional risk managers at all times, are part of a diverse and inclusive environment and always feel confident to speak up. As one of the milestones in this respect, all our people, including ourselves, completed a dedicated risk culture training during 2022.***
>
> * * *
>
> Regarding legacy issues, we have also taken decisive action, as demonstrated by

the settlements we have reached relating to our residential mortgage-backed securities, foreign exchange and French legacy cases. ***Our regulatory remediation program is advancing, and we have rolled out a comprehensive plan to strengthen and improve risk management across the Group, including putting additional measures and safeguards in place.***

* * *

**Russia's invasion of Ukraine**
In response to Russia's invasion of Ukraine, many countries across the world imposed severe sanctions against Russia's financial system and on Russian government officials and business leaders, and these sanctions have been expanded several times. ***The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of December 31, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 249 million, primarily related to corporates, individuals and the sovereign. The net credit exposure decreased from CHF 848 million as of December 31, 2021. In addition, Russian subsidiaries had a net asset value of approximately CHF 214 million as of December 31, 2022. The Group has further reduced Russia related exposures in the fourth quarter of 2022 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.***

* * *

***Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We continuously adapt our liquidity and funding profile to reflect changes in our business strategy and regulatory developments.***

* * *

***Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***

(Emphasis added).

298. The statements contained in ¶¶ 296-297 were materially false and/or misleading

because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was *not* "developing a remediation plan to address the material weaknesses" it belatedly identified after engaging in a lengthy comment letter process with the SEC, but was instead presently engaged in discussions with Swiss authorities regarding the sale or liquidation of Credit Suisse; (ii) the Company was *not* undergoing a "strategic, cultural and operational transformation" and did not have a "comprehensive plan to strengthen and improve risk management" whereby its employees would act as "prudent and professional risk managers at all times, as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period; (iii) the Company had significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; and (iv) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

## LXXIX. March 14, 2023: Defendant Körner Speech at European Financials Conference

299. On March 14, 2023, Defendant Körner spoke at the Morgan Stanley European Financials Conference in London. During the conference, Defendant Körner stated that ***Credit Suisse did not have "material risk"*** in the wake of SVB's recent collapse because Credit Suisse had "***materially different standards" in capital strength, funding and liquidity***. (Emphasis added).

300. The statements contained in ¶ 299 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business,

operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company *did*, in fact, have "material risk" and did *not* have "materially different standards" in capital strength, funding, and liquidity, as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

### LXXX. March 14, 2023: Defendant Körner Interview with *Bloomberg*

301. On March 14, 2023, Defendant Körner was interviewed by *Bloomberg*.

302. When asked about inflows, Koerner said that things at the bank were "calm" and, in fact, there had been "***material good inflows***" ***the previous day***, which was a "***positive sign***." Koerner also said that ***outflows had "significantly moderated."*** (Emphasis added).

303. With respect to the recent collapse of SVB, Koerner said that "was a very different situation" than Credit Suisse, because Credit Suisse was "following ***materially different and higher standards when it comes to capital funding, liquidity, and so on***." (Emphasis added).

304. The statements contained in ¶¶ 302-303 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company did *not* "follow[] materially different and higher standards when it comes to capital funding, [and] liquidity," as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (ii) the Company was experiencing significant and unusual customer and/or asset outflows which had not "significantly moderated."

### LXXXI. March 15, 2023: Defendant Körner Interview with *CNA*

305. On March 15, 2023, Defendant Körner was interviewed by *CNA*, a Singapore news channel. The interview was reported by *Reuters* in an article published that day titled "Credit Suisse CEO said bank's liquidity basis is "'very very strong.'"

306. The article stated, in relevant part:

> Credit Suisse (CSGN.S) Chief Executive Ulrich Koerner spoke of the strength of the Swiss lender's liquidity basis in an interview with CNA on Wednesday, after its share price dropped more than 30% following comments by the company's lead investor.
>
> ***"Our capital, our liquidity basis is very very strong***," Koerner said. "***We fulfill and overshoot basically all regulatory requirements***."

(Emphasis added).

307. The statements contained in ¶ 306 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Credit Suisse's liquidity was not "very very strong," and Credit Suisse did not "fulfill and overshoot basically all regulatory requirements," as its liquidity and funding profile, policy, and/or risk parameters were materially deficient at all times.

**CREDIT SUISSE'S FINANCIAL STATEMENTS**
**<u>FAILED TO COMPLY WITH GAAP</u>**

308. During the Class Period, in the Company's SEC filings and elsewhere, Defendants represented that Credit Suisse's financial statements were prepared in conformity with generally accepted accounting principles ("GAAP"), a common set of accounting rules, standards, and procedures issued by the Financial Accounting Standards Board ("FASB").[7]

309. As set forth in FASB Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information

[7] As used herein, the term GAAP will refer to U.S. GAAP, even though the Company's Form 20-Fs occasionally referenced International Financial Reporting Standards ("IFRS") and Swiss GAAP.

concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

310. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

311. SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform to GAAP. As stated in the professional standards adopted by the AICPA:

> [F]inancial statements are management's responsibility….[M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management….Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

## I. Interim Financial Statements

312. Credit Suisse disclosed in each of its 2021 interim financial statements (the 1Q21 Quarter Report, the 2Q21 Quarterly Report, and the 3Q2 Quarterly Report), that:

> The accompanying unaudited condensed consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). These condensed consolidated financial statements should be read in

> conjunction with the consolidated financial statements and notes thereto for the year ended December 31, 2020 included in the Credit Suisse Annual Report 2020.

313. Credit Suisse disclosed in each of its 2022 interim financial statements (the 1Q22 Quarterly Report, the 2Q22 Quarterly Report, and the 3Q22 Quarterly Report), that:

> The accompanying unaudited condensed consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and notes thereto for the year ended December 31, 2021 included in the Credit Suisse Annual Report 2021.

314. The statements contained in ¶¶ 312-313 were materially false or misleading, or omitted information necessary to make them not misleading, because Credit Suisse's interim financial statements did not comply with GAAP but rather resulted from a series of decisions by Defendants designed to conceal the truth regarding Credit Suisse's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. As a result, Defendants materially misstated the Company's financial results throughout the Class Period.

## II. Audited Financial Statements

315. Credit Suisse disclosed in its 2021 Annual Report filed on Form 20-F with the SEC on March 10, 2022, that:

> The accompanying consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). The financial year for the Group ends on December 31. Certain reclassifications have been made to the prior year's consolidated financial statements to conform to the current presentation which had no impact on net income/(loss) or total shareholders' equity.

316. Credit Suisse disclosed in its 2022 Annual Report filed on Form 20-F with the SEC on March 14, 2023, that:

> The accompanying consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). The financial year for the Group ends on December 31. Certain reclassifications have been made to the prior year's consolidated financial statements to conform to the current presentation which had no impact on net income/(loss) or total shareholders' equity.

317. The statements contained in ¶¶ 315-316 were materially false or misleading, or omitted information necessary to make them not misleading, because Credit Suisse's 2021 and 2022 Annual Reports did not comply with GAAP but rather resulted from a series of decisions by Defendants designed to conceal the truth regarding Credit Suisse's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. As a result, Defendants materially misstated the Company's financial results throughout the Class Period.

## III. SOX Certifications

318. In connection with the filing of the Company's 2021 and 2022 Annual Reports on Forms 20-F with the SEC, Defendants Gottstein, Mathers, Körner, and Joshi all executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that attested to the purported accuracy and completeness of the Company's financial and operational reports as well as statements concerning Credit Suisse's internal controls and procedures, as follows:

> 1. I have reviewed this annual report on Form 20-F of Credit Suisse Group AG and Credit Suisse AG;
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report;
> 4. The registrants' other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

> Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrants and we have:
> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,
> to ensure that material information relating to the registrants, including their consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> c) evaluated the effectiveness of the registrants' disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> d) disclosed in this report any change in the registrants' internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is likely to materially affect, the registrants' internal control over financial reporting; and
>
> 5. The registrants' other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrants' auditors and the audit committee of each of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrants' ability to record, process, summarize and report financial information; and
> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting.

319. Defendants Gottstein, Mathers, Körner, and Joshi's SOX Certifications were materially false and misleading because the 2021 and 2022 Annual Reports filed on Forms 20-F with the SEC did not comply with GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. Furthermore, contrary to the statements in Defendants' SOX Certifications, as Defendants themselves would later admit, Credit Suisse's internal controls

over financial reporting suffered from material weaknesses, and, as a result, the Company's financial reports were inaccurate, unreliable, and/or subject to manipulation.

**PwC's MATERIALLY FALSE**
**AND MISLEADING STATEMENTS AND OMISSIONS**

320. In July 2022, the SEC initiated comment letter correspondence with Defendant Mathers requesting more information about the Company's "revision" of its financial statements for the years ending December 31, 2020, and December 31, 2019, as reflected in the 2021 Annual Report. This exchange ultimately led to a "late night request" by the SEC on March 8, 2023, which Credit Suisse announced on March 9, 2023, precipitated the delay of its filing the Form 20-F for the period ending December 31, 2022. When the Form 20-F was eventually filed on March 14, 2023, it revealed that Credit Suisse had "identified certain material weaknesses in internal control over financial reporting as of December 31, 2021 and, consequently, December 31, 2022." Just days later, Credit Suisse was acquired by UBS.

321. Up until that point -- the entire time Credit Suisse was engaged in the comment process with the SEC -- PwC continued to represent in each of Credit Suisse's interim Quarterly Reports that the information included in the Company's balance sheet for the period ending December 31, 2021, was "fairly stated, in all material respects," and that PwC had conducted its review in accordance with PCAOB standards.

322. But PCAOB Audit Standard ("AS") No. 5, "An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements," required PwC to "obtain appropriate evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment."[8]

---

[8] https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-standards-interpretations/details/Auditing_Standard_5

323. Among other requirements, AS No. 5 required that PwC:

- Properly plan the audit of internal control over financial reporting and properly supervise the engagement team members;
- Test entity-level controls that are important to the auditor's conclusion about whether the company has effective internal control over financial reporting, for example, controls related to the control environment, the company's risk assessment process, and controls to monitor results of operations;
- Evaluate the control environment at the company, such as whether management's philosophy and operating style promote effective internal control over financial reporting, whether sound integrity and ethical values, particularly of top management, are developed and understood, and whether the Board or audit committee understands and exercises oversight responsibility over financial reporting and internal control;
- Understand the likely sources of potential misstatements;
- Perform walkthroughs, where the auditor follows a transaction from origination through the company's processes, including information systems, until it is reflected in the company's financial records, using the same documents and information technology that company personnel use; and
- Test the operating effectiveness of a control by determining whether the control is operating as designed and whether the person performing the control possesses the necessary authority and competence to perform the control effectively.

324. The fact that the existence of accounting issues in Credit Suisse's 2020 financial statements was not revealed until March 2022, and the existence of a material weakness in internal controls over financial reporting related to these issues was not revealed until March 2023, indicates that PwC neither obtained reasonable assurance about whether material weaknesses existed during its 2020 audit nor in its 2021 interim Quarterly Reports.

**I. May 6, 2021: First Quarter 2021 Interim Audit**

325. On May 6, 2021, Credit Suisse filed its 1Q21 Quarterly Report on a Form 6-K with the SEC, signed by Defendants Gottstein and Mathers. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and

shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of March 31, 2021…***Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***
>
> We have previously audited, **in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB)**, the consolidated balance sheet of the Group as of December 31, 2020…In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2020, ***is fairly stated, in all material respects***, in relation to the consolidated balance sheet from which it has been derived.
>
> * * *
>
> ***We conducted our review in accordance with the standards of the PCAOB***.
>
> (Emphasis added).

326. The statements contained in ¶ 325 were materially false or misleading, or omitted information necessary to make them not misleading, because, as Credit Suisse later admitted, at the time each of the statements were made, accounting issues existed that required a revision of Credit Suisse's consolidated financial statements for the year ending December 31, 2020, and as such, it was not "fairly stated, in all material respects." Additionally, at the time each of the statements were made, Credit Suisse had a material weakness in internal controls over financial reporting, and as such, its interim financial statements were not "in conformity" with GAAP.

## II. July 29, 2021: Second Quarter 2021 Interim Audit

327. On July 29, 2021, Credit Suisse filed its 2Q21 Quarterly Report on a Form 6-K with the SEC, signed by Defendants Gottstein and Mathers. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of June 30, 2021…***Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America***
>
> .
>
> ***We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB)***, the consolidated balance sheet of the Group as of December 31, 2020…In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2020, ***is fairly stated, in all material respects***, in relation to the consolidated balance sheet from which it has been derived.
>
> * * *
>
> ***We conducted our review in accordance with the standards of the PCAOB***.

(Emphasis added).

328. The statements contained in ¶ 327 were materially false or misleading, or omitted information necessary to make them not misleading, because, as Credit Suisse later admitted, at the time each of the statements were made, accounting issues existed that required a revision of Credit Suisse's consolidated financial statements for the year ending December 31, 2020, and as such, it was not "fairly stated, in all material respects." Additionally, at the time each of the statements were made, Credit Suisse had a material weakness in internal controls over financial reporting, and as such, its interim financial statements were not "in conformity" with GAAP.

## III. November 4, 2021: Third Quarter 2021 Interim Audit

329. On November 4, 2021, Credit Suisse filed the 3Q21 Quarterly Report on a Form 6-K with the SEC, signed by Defendants Gottstein and Mathers. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of September 30, 2021…***Based on***

> ***our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***
>
> We have previously audited, **in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB)**, the consolidated balance sheet of the Group as of December 31, 2020…In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2020, ***is fairly stated, in all material respects***, in relation to the consolidated balance sheet from which it has been derived.
>
> * * *
>
> ***We conducted our review in accordance with the standards of the PCAOB***.
>
> (Emphasis added)

330. The statements contained in ¶ 329 were materially false or misleading, or omitted information necessary to make them not misleading, because, as Credit Suisse later admitted, at the time each of the statements were made, accounting issues existed that required a revision of Credit Suisse's consolidated financial statements for the year ending December 31, 2020, and as such, it was not "fairly stated, in all material respects." Additionally, at the time each of the statements were made, Credit Suisse had a material weakness in internal controls over financial reporting, and as such, its interim financial statements were not "in conformity" with GAAP.

## IV. March 10, 2022: 2021 Annual Report Audit

331. On March 10, 2022, Credit Suisse filed its 2021 Annual Report on Form 20-F with the SEC for the year ending December 31, 2021, signed by Defendants Gottstein and Mathers. Attached to the Form 20-F was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated:

> We have audited the accompanying consolidated balance sheets of Credit Suisse Group AG and its subsidiaries (the "Group") as of December 31, 2021 and 2020 … We also have audited the Group's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control - Integrated

Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above **present fairly, in all material respects**, the financial position the Group as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America***. Also in our opinion, the Group maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the COSO.***

* * *

The Group's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's report on internal control over financial reporting. **Our responsibility is to express opinions on the Group's consolidated financial statements and on the Group's internal control over financial reporting based on our audits**.

***We conducted our audits in accordance with the standards of the PCAOB***. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. ***We believe that our audits provide a reasonable basis for our opinions.***

(Emphasis added).

332. The statements contained in ¶ 331 were materially false or misleading, or omitted

information necessary to make them not misleading. In its 2022 Annual Report filed on Form 20-F with the SEC on March 14, 2023, Credit Suisse revealed that it had "identified certain material weaknesses in internal control over financial reporting as of December 31, 2021." If PwC had properly adhered to AS No. 5, discussed above, it would not have concluded that Credit Suisse "maintained, in all material respects, effective internal control over financial reporting." As such, both this statement and the statement that PwC conducted its audit "in accordance" with PCAOB standards were materially false or misleading.

333. The letter also listed several "Critical Audit Matters," defined as matters which "(i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments." These Critical Audit Matters included "Fair value of Certain Level 3 Financial Instruments"; "Allowance for Credit Losses - Collectively Evaluated Corporate and Institutional Loans – Investment Bank"; "Litigation provisions"; and "Income Taxes – Realization of the tax benefit of the loss related to Archegos." The identified cash flow issue, which required a "revision" of the prior years' statements, however, was not listed as a "Critical Audit Matter." AS No. 5 explains, "A direct relationship exists between the degree of risk that a material weakness could exist in a particular area of the company's internal control over financial reporting and the amount of audit attention that should be devoted to that area." As such, failure to give particular attention to the cash flow issues further indicated that PwC's audit was not "in accordance" with PCAOB standards.

## V. May 5, 2022: First Quarter 2022 Interim Audit

334. On May 5, 2022, Credit Suisse filed its 1Q22 Quarterly Report on Form 6-K with the SEC, signed by Defendants Gottstein and Mathers. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter

stated:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of March 31, 2022 . . . **Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.**
>
> We have previously audited, **in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB)**, the consolidated balance sheet of the Group as of December 31, 2020 . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2021, **is fairly stated, in all material respects**, in relation to the consolidated balance sheet from which it has been derived.
>
> * * *
>
> **We conducted our review in accordance with the standards of the PCAOB**.

(Emphasis added)

335. The statements contained in ¶ 334 were materially false or misleading, or omitted information necessary to make them not misleading, because, as Credit Suisse later admitted, at the time each of the statements were made, material weaknesses in internal control over financial reporting existed, and as such, the December 31, 2021 consolidated balance sheet was not "fairly stated, in all material respects." Due to a failure to disclose this material weakness, Credit Suisse's interim financial statements were not "in conformity" with GAAP. Additionally, as discussed above, PwC's failure to detect and disclose this material weakness strongly indicated that it had not conducted its audit or reviews "in accordance" with PCAOB Standards.

### VI. July 29, 2022: Second Quarter 2022 Interim Audit

336. On July 29, 2022, Credit Suisse filed its 2Q22 Quarterly Report on Form 6-K with the SEC, signed by Defendants Gottstein and Mathers. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter

stated:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of June 30, 2022 . . . ***Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***
> *We have previously audited, **in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB)**,* the consolidated balance sheet of the Group as of December 31, 2020 . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2021, ***is fairly stated, in all material respects***, in relation to the consolidated balance sheet from which it has been derived.
>
> * * *
>
> ***We conducted our review in accordance with the standards of the PCAOB***.
>
> (Emphasis added).

337. The statements contained in ¶ 336 were materially false or misleading, or omitted information necessary to make them not misleading, because, as Credit Suisse later admitted, at the time each of the statements were made, material weaknesses in internal control over financial reporting existed, and as such, the December 31, 2021 consolidated balance sheet was not "fairly stated, in all material respects." Due to a failure to disclose this material weakness, Credit Suisse's interim financial statements were not "in conformity" with GAAP. Additionally, as discussed above, PwC's failure to detect and disclose this material weakness strongly indicated that it had not conducted its audit or reviews "in accordance" with PCAOB Standards.

## VII. November 2, 2022: Third Quarter 2022 Interim Audit

338. On November 2, 2022, Credit Suisse filed its 3Q22 Quarterly Report on Form 6-K with the SEC, signed by Defendants Körner and Joshi. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of September 30, 2022 . . . ***Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***
>
> We have previously audited, **in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB)**, the consolidated balance sheet of the Group as of December 31, 2020 . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2021, ***is fairly stated, in all material respects***, in relation to the consolidated balance sheet from which it has been derived.
>
> * * *
>
> ***We conducted our review in accordance with the standards of the PCAOB***.

(Emphasis added).

339. The statements contained in ¶ 338 were materially false or misleading, or omitted information necessary to make them not misleading, because, as Credit Suisse later admitted, at the time each of the statements were made, material weakness in internal control over financial reporting existed, and as such, the December 31, 2021 consolidated balance sheet was not "fairly stated, in all material respects." Due to a failure to disclose this material weakness, Credit Suisse's interim financial statements were not "in conformity" with GAAP. Additionally, as discussed above, PwC's failure to detect and disclose this material weakness strongly indicated that it had not conducted its audit or reviews "in accordance" with PCAOB Standards.

## VIII. March 14, 2023: 2022 Annual Report Audit

340. On March 14, 2023, Credit Suisse filed its 2022 Annual Report on Form 20-F with the SEC for the year ending December 31, 2022, signed by Defendants Körner and Joshi. The Form 20-F stated:

> The Bank identified certain material weaknesses in internal control over financial reporting as of December 31, 2021 and, consequently, December 31, 2022, which are described below. ***As a result of these material weaknesses, the Bank CEO and***

> ***CFO have concluded that, as of December 31, 2022, the Bank's disclosure controls and procedures were not effective.***
>
> Notwithstanding the existence of these material weaknesses in internal control over financial reporting, the Bank confirms that its consolidated financial statements in this Annual Report **fairly present, in all material respects**, the Bank's consolidated financial condition as of December 31, 2022 and 2021, and its consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP, **as reflected in PricewaterhouseCoopers AG's (PwC) report on those financial statements**.
>
> (Emphasis added).

341. Attached to the Form 20-F was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated:

> We have audited the accompanying consolidated balance sheets of Credit Suisse AG and its subsidiaries (the "Bank") as of December 31, 2022 and 2021, and the related consolidated statements of operations, comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2022, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Bank's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> In our opinion, the consolidated financial statements referred to above **present fairly, in all material respects**, the financial position of the Bank as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, ***the Bank did <u>not</u> maintain, in all material respects, effective internal control over financial reporting as of December 31, 2022**,* based on criteria established in Internal Control – Integrated Framework (2013) issued by the COSO because material weaknesses in internal control over financial reporting existed as of that date related to (i) the effectiveness of the risk assessment process to identify and analyze the risk of material misstatements in the Bank's financial statements, (ii) the effectiveness of monitoring activities relating to providing sufficient management oversight over the internal control evaluation process to support the Bank's internal control objectives, involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives and assessing and communicating tile severity of deficiencies in a timely manner to those parties responsible for taking corrective action and (iii) the effectiveness

> of controls over the completeness and the classification and presentation of non-cash items in the consolidated statements of cash flows.
>
> The Bank's management and we ***previously concluded that the Bank maintained effective internal control over financial reporting as of December 31, 2021***. However, the Bank's management and we have subsequently determined that **material weaknesses in internal control over financial reporting existed** and accordingly concluded that **internal control over financial reporting was not effective as of such date**.
>
> (Emphasis added).

342. As in the letter attached to 2021 Form 20-F, PwC also represented, "We conducted our audits in accordance with the standards of the PCAOB" and "We believe that our audits provide a reasonable basis for our opinions."

343. The letter also listed several "Critical Audit Matters," including "Fair value of Certain Level 3 Financial Instruments"; "Allowance for Credit Losses – Collectively Evaluated Corporate and Institutional Loans – Investment Bank"; "Litigation provisions"; and "Goodwill Impairment Assessment of the Asset Management and Wealth Management Reporting Units." Neither the cash flow issues identified in the 2021 Annual Report nor the material weaknesses in internal control identified in the 2022 Annual Report were listed as "Critical Audit Matters." Since AS No. 5 requires auditors to pay particular attention to areas of the company where there is a higher risk of material weakness in internal controls, PwC's failure to give particular attention to the cash flow issues further indicated that PwC's audit was not "in accordance" with PCAOB standards.

## THE TRUTH IS REVEALED CAUSING LOSSES AND ECONOMIC DAMAGES

344. As alleged herein, during the Class Period, Defendants made numerous material misstatements and omissions regarding the sufficiency of Credit Suisse's risk management and control governance, the strength of its internal controls over financial reporting, the significance

and impact of customer and asset outflows, and its exposure to Russia, that were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiff and other members of the Class purchased or acquired Credit Suisse securities, relying upon the integrity of the market price for Credit Suisse securities and market information relating to Credit Suisse, and they have been damaged thereby.

345. Beginning on February 10, 2022, the truth began to be revealed to the public through a series of corrective disclosures, while at the same time Defendants continued to mislead the market with further materially false and misleading disclosures. As the truth was revealed to investors, shares of Credit Suisse securities declined immediately and precipitously because the artificial inflation was removed from the market price of Credit Suisse's securities, causing substantial damage to Plaintiff and the Class.

346. First, on February 10, 2022, Credit Suisse issued its FY21 Earnings Release revealing a fourth quarter "net loss attributable to shareholders of ***CHF 2.0 bn***," or approximately USD $2.2 billion. Analysts were concerned. For example, analysts at Barclays, in a research report titled "Q421 – Negative Operating Leverage," stated "[w]e have cut our estimates significantly after results." BofA Global Research analysts, in a report titled "Credit Suisse Group / Work to do," stated that the "4Q 21 pretax loss of CHF1.6bn is CHF0.4bn worse than we expected," while RBC Capital Markets analysts, in a report titled "Credit Suisse Group AG / Recovery further delays," stated that "[r]evenues were weaker than we expected across most divisions." Following the revelations on February 10, 2022, the price of Credit Suisse ADSs fell 9.29%, from a closing price of $10.01 on February 9, 2022, to close at $9.08 per ADS on February 10, 2022. The stock price continued to fall in the coming days as investors digested the news.

347. On February 22, 2022, the market digested the Suisse Secrets scandal (which was

published on February 20, 2022, a Sunday). Analysts at RBC Capital Markets, in a research note titled "CS – 'Swiss Secrets' leak is the bank's latest headache," Feb. 21, 2022, stated that the allegations "raise[] questions about [Credit Suisse's] business practices in wealth management and should tie up management having to spend time fighting fires instead of moving forward." In response to the Suisse Secrets news the price of Credit Suisse ADSs fell 3.92% to close at $8.58 per ADS on Monday February 22, 2022, down from $8.93 per ADS on Friday February 18, 2022.

348. On May 31, 2022, *Reuters* published a report that the Company was "in the early stages of weighing options to bolster its capital after a string of losses has eroded its financial buffers…." Despite the fact that Credit Suisse gave a materially false statement to *Reuters* denying its correct reporting, the market took note. In response to the *Reuters* news the price of Credit Suisse ADSs fell 4.08% to close at $7.05 per ADS on May 31, 2022, down from $7.35 per ADS on May 30, 2022.

349. On September 23, 2022, *Reuters* published another exclusive report that "Credit Suisse is sounding out investors for fresh cash…as it attempts a radical overhaul of its investment bank." In response to the *Reuters* news the price of Credit Suisse ADSs fell 12.10% to close at $4.14 per ADS on September 23, 2022, down from $4.71 per ADS on September 22, 2022.

350. On October 27, 2022, the Company released a blitzkrieg of information on the market, including, *inter alia*: (1) that it intended to approve "two separate share capital increases" consisting of a new share issuances for the Saudi National Bank and existing shareholders, for a combined total of CHF 4.0 billion; (2) that it would spin-off its Investment Bank business and sell its Securitized Products Group; and (3) that it "recorded a net loss attributable to shareholders of CHF 4,034 million" in 3Q22.

351. While Defendants made numerous materially false and misleading statements in

their October 27, 2022, disclosures, on balance, analysts nevertheless interpreted the news as having a negative impact on the share price. Analysts at J.P. Morgan stated, for example, "[w]e believe the main driver of negative share price reaction was the announcement of a CHF 4bn capital raise to 'clear the deck' and such a material dilution should have been avoided in our view." Analysts at Kepler Cheuvreux, in a report titled "Credit Suisse / Change at a hefty price," stated that "[t]he decisions taken are, in our view radical enough. However, the cost is immense and the new 3-year restructuring period will have high execution risk….We expect the shares to underperform today." In response to the news, the price of Credit Suisse ADSs fell 20.04% to close at $3.83 per ADS on October 27, 2022, down from $4.79 per ADS on October 26, 2022.

352. On November 23, 2022, the Company issued both its Preliminary 4Q22 Media Release announcing customers had withdrawn approximately 10% of all assets under management as of the end of 3Q22 and that it expected to incur a substantial loss of approximately CHF 1.5 billion in 4Q22, as well as a media release announcing shareholder approval of the proposed capital increases announced on October 27, 2022. In response, *Reuters* published an article titled, "Credit Suisse flags hefty loss as rich clients pull out," in which it reported that "shareholders and analysts were disturbed by the bank's sobering assessment of the scale of its problems, as well as the pace at which rich clients pulled out savings and investments." In response to the news, the price of Credit Suisse ADSs fell 6.36% to close at $3.83 per ADS on November 23, 2022, down from $4.09 per ADS on November 22, 2022.

353. Then, on November 25, 2022, the Company issued another media release announcing the Company's execution of the capital increases. In an article published that day titled, "Credit Suisse's Foundation is Cracking as Rich Clients Flee," *The Washington Post* reported that the company's "core wealth business…is suffering a crisis of credibility among

clients at a time when an elite private bank ought to be reveling in its role as a trusted shepherd in treacherous markets." As the market digested this news and continued to digest the November 23, 2022 news (as the market was closed on November 24, 2022 for the Thanksgiving holiday), the price of Credit Suisse ADS fell another 6.27% to close at $3.59 per ADS on November 25, 2022, down from $3.83 per ADS on November 23, 2022.

354. On February 9, 2023, before market hours, the Company issued its FY22 Earnings Release in which it disclosed a $1.5 billion loss, customer outflows of 110.5 billion Swiss francs in the final three months of 2022, and a dramatic decrease in assets under management.

355. "[A]nalysts were alarmed by the scale of losses and outflows," reported *Reuters* in a February 9 article titled "Credit Suisse warns of more losses, drawing regulatory attention." For example, analysts at Barclay's released a research report that day titled "Credit Suisse AG: Q422 First Look: Much weaker than we anticipated," stating that the announced results were "worse than our expectations, with far larger outflows in wealth management." Deutsche Bank analysts, in a research report titled "Credit Suisse: 4Q22 – Capital & liquidity issues checked; material impact on businesses," observed that "operational momentum in Wealth Management and Investment Bank came in significantly worse than expected," and that "the impact on the businesses has been worse than expected." And Kepler Cheuvreux analysts, in a research report titled "Credit Suisse: Q4 2022 first reaction: Very significant outflows in Wealth Management," stated: There is little positive to be found in CS Q4results and the outlook for 2023 is grim."[9]

---

[9] *See also* Morgan Stanley, "Credit Suisse Group AG 4Q22: Tough finish to the year," Feb. 9, 2023 ("Outflows were significantly higher than street, which raises questions on flow recovery going forward, and underlying revenue capacity in Wealth in particular."); RBC Capital Markets, "Credit Suisse Group AG, Headline loss as expected but WM trends worse," Feb. 9, 2023 ("Substantially higher net outflows in the WM business as well as the impact of higher funding costs are headwinds to earnings estimates while CS is moving forward executing on its transformation and addressing costs").

356. Following the revelations of these previously undisclosed facts by Credit Suisse on February 9, the price of Credit Suisse ADSs fell 15.6%, from a closing price of $3.58 on February 8, 2023 to close at $3.02 per ADS on February 9, 2023. The stock price continued to fall in the coming days as investors digested the news.

357. However, while part of the truth was revealed to the market, Defendants continued to make materially false and misleading statements. In its FY22 Earnings Release, Defendants stated that the "[t]he outflows in Q422 had reduced substantially in the rest of the quarter from the elevated levels of early 4Q22," and assured the public that it had "taken comprehensive measures to further increase our client engagement and regain deposits as well as Assets under Management."

358. Then, on March 14, 2023, the Company filed its 2022 Annual Report, which was signed by Defendants Körner and Joshi. The 2022 Annual Report identified material weaknesses in the Company's internal controls, which stated the following, in relevant part:

> **We have identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021**
>
> Management has identified certain material weaknesses in our internal control over financial reporting as a result of which management has concluded that, as of December 31, 2022, ***the Group's internal control over financial reporting was not effective, and for the same reasons, management has reassessed and has reached the same conclusion regarding December 31, 2021, as more fully described in this Annual Report. Management has also accordingly concluded that our disclosure controls and procedures were not effective.***
>
> ***The material weaknesses that have been identified relate to the failure to design and maintain an effective risk assessment process to identify and analyze the risk of material misstatements in its financial statements and the failure to design and maintain effective monitoring activities relating to (i) providing sufficient management oversight over the internal control evaluation process to support the Group's internal control objectives; (ii) involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives; and (iii) assessing and communicating the severity of deficiencies in a timely manner to those parties responsible for taking corrective action. These material***

> ***weaknesses contributed to an additional material weakness, as management did not design and maintain effective controls over the classification and presentation of the consolidated statement of cash flows. This material weakness resulted in the revisions contained in our previously issued consolidated financial statements for the three years ended December 31, 2021 as disclosed in the 2021 Annual Report.***
>
> Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date. ***While we are taking steps to address these material weaknesses, which could require us to expend significant resources to correct the material weaknesses or deficiencies, any gaps or deficiencies in our internal control over financing reporting may result in us being unable to provide required financial information in a timely and reliable manner and/or incorrectly reporting financial information, which could reduce confidence in our published information, impact access to capital markets, impact the trading price of our securities or subject us to potential regulatory investigations and sanctions. In addition, there can be no assurance that these measures will remediate the material weaknesses in our internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Any of the foregoing could materially and adversely affect our business, results of operations and financial condition.***
>
> (Emphasis added.)

359. The media reported on this dramatic announcement and quoted extensively from the Annual Report. *See, e.g.*, Margot Patrick, "Credit Suisse Finds Material Weaknesses in Financial Reporting," *The Wall Street Journal*, Mar. 14, 2023; Julia Kollewe & Graeme Wearden, "Credit Suisse warns of 'material weaknesses' in financial reporting," *The Guardian*, Mar. 14, 2023. Ultimately, the media attributed Credit Suisse's downfall, in part, to the announcement of the material weaknesses. *See, e.g.*, Michael J. de la Merced, Maureen Farrell & Andrew Ross Sorkin, "UBS Agrees to Buy Rival Credit Suisse," *The New York Times*, Mar. 19, 2023. On this

news, the price of Credit Suisse ADSs fell 1.18% to close at $2.51 per ADS on March 14.

360. But the truth was not yet fully revealed because Defendants continued to make materially false and misleading statements. Specifically, in the 2022 Annual Report, the Company represented that, despite the weaknesses, its financial statements "fairly present, in all material respects, the Group's consolidated financial condition." Further, that day Defendant Körner spoke at Morgan Stanley's European Financials Conference, reassuring the public with respect to Credit Suisse's liquidity, outflows, and costs, and representing that the restructuring was progressing rapidly. Analysts at BofA Global Research, in a report titled "Credit Suisse Group: CEO comments supportive," noted Körner's comments favorably and maintained its "buy" rating. Similarly, Kepler Cheuvreux released an analyst report that day titled "Credit Suisse: CEO gives relatively reassuring message," noting that Körner's "message was reassuring on liquidity, outflows, and costs" that the improvements in liquidity and outflow "can help stem the very negative newsflow around CS and stop the negative spiraling," and that Credit Suisse was "forcefully tackling the issue related to the material weakness in the financial reporting process."

361. Thus, while the price of Credit Suisse ADSs fell as much as 5% in intra-day trading, it was able to recover some ground to close at $2.51 per ADS on March 14, 2023, down from $2.54 per ADS on March 13, 2023 – a new all-time low.

362. The next day, on March 15, 2023, it was widely reported in the press that Credit Suisse's largest shareholder, the Saudi National Bank, would not buy any more of the Company's shares for "regulatory" reasons. *See, e.g.*, Rachna Uppal, "Credit Suisse's biggest backer says can't put up more cash; share down by a fifth," *Reuters*, Mar. 15, 2023.

363. On this news, the price of Credit Suisse ADSs fell 13.94%, from $2.51 per ADS on March 14 to close at $2.16 per ADS on March 15, reaching an intra-day low of $1.75 per ADS.

According to the *The New York Times*, "[t]he immediate catalyst for [this] perilous drop in the bank' stock" was the comments by the Saudi National Bank. Michael J. de la Merced & Maureen Farrell, "Credit Suisse to Borrow Up to $54 Billion From Central Bank," *The New York Times*, Mar. 15, 2023; *see also* "Focus: On the precipice: How Credit Suisse's day of drama unfolded," *Reuters*, Mar. 16, 2023 ("[W]hen Saudi National Bank Chairman Anmar Al Khudairy said his bank, the largest investor in Credit Suisse, could not give it more money, investors ran for the exits."); Margot Patrick, Stephen Kalin & Patricia Kowsmann, "Credit Suisse Stock Price Drops as Much as 30%," *The Wall Street Journal*, Mar. 15, 2023 ("Credit Suisse shares (CSGN) in Switzerland fell as much as 30% and hit a fresh all-time low, reflecting increasing concerns about the bank's struggles to stabilize its operations.").

364. Credit Suisse's stock avoided complete collapse, however, because late on March 15, FINMA and the Swiss National Bank (SNB) announced that Credit Suisse met capital and liquidity requirements, and that SNB would provide liquidity to Credit Suisse if necessary. Credit Suisse then announced later that night that it would be borrowing up to CHF 50 billion from the SNB and also buying back various debt instruments for approximately CHF 3 billion.

365. This news was reassuring to analysts and investors. Analysts at J.P. Morgan issued a report the next day, on March 16, 2023, titled "Credit Suisse Group: Short-term relief from SNB facility access but long-term questions remain on franchise erosion," stating that the announcement by Credit Suisse to borrow from the SNB "allows CSG to further strengthen its liquidity position and the bond repurchase helps with optimizing interest expense and overall liability composition which is helpful in the short-term, allowing CSG to clam [sic] down markets." And analysts at Kepler Cheuvreux, in a report titled "Credit Suisse: Staying alive?," stated: "We believe that the combination of these two measures should provide some measure of calm to a market perception

that has been strongly eroded since the start of the week."[10]

366. Thus, Credit Suisse ADSs held steady, closing again at $2.16 per ADS on March 16. As reported by *Reuters* in an article that day titled "Credit Suisse share rebound loses steam in delicate truce with doubters," "Credit Suisse shares rebounded on Thursday after getting a lifeline from the Swiss central bank to shore up investor confidence." But the stock "resum[e]d its plunge on Friday. That set off a weekend race to seal a deal before the markets opened Monday." Joe Wallace & Eliot Brown, "Credit Suisse, the Risk-Taking Swiss Banking Giant, Succumbs to Crisis," *The Wall Street Journal*, Mar. 19, 2023. Analysts at Kepler Cheuvreux, in a report issued March 20, 2023 titled "Credit Suisse: CHF3bn for Switzerland's second-largest bank," noted: "Discussions about Credit Suisse's future and involving UBS, the Swiss government, as well as FINMA and the SNB have been going on all weekend….Indeed, CS has lost market trust and despite the emergency liquidity backup of CHF50bn, outflows are said to have topped up to CHF10bn a day, making the situation unstainable for CS."

367. On Monday, March 20, 2023, Credit Suisse announced that it had entered into a merger agreement with UBS at the behest of the Swiss government, in order to prevent Credit Suisse's imminent collapse. Under the terms of the agreement, Credit Suisse would be bought by UBS in a fire-sale for approximately $3.2 billion – less than half of its last traded market value on March 17, 2023. The announcement stated, in relevant part:

> Credit Suisse and UBS have entered into a merger agreement on Sunday following the intervention of the Swiss Federal Department of Finance, the Swiss National

[10] *See also* "Credit Suisse Group: The authorities are clear. Reiterate Buy," BofA Global Research, Mar. 15, 2023 ("The statement from the authorities is to us clear that Credit Suisse in its current form will continue. In effect, regulatory support has been provided through this statement, but without any change in the structure or going concern nature of Credit Suisse. We think this materially de-risks the group from an investor perspective. At 0.17x tangible book, we reiterate our Buy rating."); "Credit Suisse announces actions to strengthen liquidity," RBC Capital Markets, Mar. 16, 2023 ("A stronger liquidity position and a backstop provided by the Swiss National Bank with the support from Finma are positive.").

> Bank and the Swiss Financial Market Supervisory Authority FINMA ("FINMA"). UBS will be the surviving entity upon closing of the merger transaction. Under the terms of the merger agreement all shareholders of Credit Suisse will receive 1 share in UBS for 22.48 shares in Credit Suisse. Until consummation of the merger, Credit Suisse will continue to conduct its business in the ordinary course and implement its restructuring measures in collaboration with UBS.
>
> * * *
>
> Axel P. Lehmann said: "Given recent extraordinary and unprecedented circumstances, the announced merger represents the best available outcome. This has been an extremely challenging time for Credit Suisse and while the team has worked tirelessly to address many significant legacy issues and execute on its new strategy, we are forced to reach a solution today that provides a durable outcome."

368. As noted by *The Wall Street Journal* in an article titled "Markets Digest UBS, Credit Suisse Deal," before U.S. markets opened that day, "[i]nvestors [we]re assessing the risk of contagion….The deal has been welcomed by regulators, but it may not be enough to assuage investors with stock markets in Asia and Europe down today." Analysts at Deutsche Bank, in a report issued March 20, 2023, titled "After Credit Suisse and SVB," observed that while "[t]he acquisition of Credit Suisse by UBS removed a major tail risk for the sector [] uncertainty remains elevated."

369. Indeed, after the news of the merger was revealed to the market, the price of Credit Suisse securities fell precipitously, as the artificial inflation caused by Defendants' material omissions and false and misleading statements made during the Class Period was finally removed from the price of Credit Suisse securities, thereby causing substantial damage to Plaintiff and other members of the Class. Indeed, on the news of the merger, the price of Credit Suisse ADSs fell ***52.99%*** to close at $0.9450 per ADS on March 20, 2023 (down from $2.01 per ADS on March 17, 2023, the previous business day), and fell overall from $10.97 per ADS at the close of trading on April 6, 2021, the first day of the Class Period, to $0.9450 per ADS on March 20, 2023, an

astonishing ***91.4%*** overall decline in value. The media noted the stunning price decline. *See, e.g.*, Keith Collins, "Credit Suisse Agrees to be Bought by Swiss Rival UBS," *The Wall Street Journal*, Mar. 20, 2023 ("Shares of Credit Suisse fell sharply following an emergency deal for rival Swiss bank UBS to buy the troubled lender for more than 3 billion dollars.").

370. The March 20, 2023, disclosure fully and finally revealed, *inter alia*, that:

- the Company's risk management and/or control governance policies and/or procedures were severely lacking throughout the Class Period;
- Defendants failed to implement meaningful changes to Credit Suisse's risk management and/or control governance procedures during the Class Period;
- the Company did not maintain an adequate or sufficient liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not conservative and were materially deficient throughout the Class Period;
- the Company was experiencing significant and unusual customer and/or asset outflows that never stabilized after October 2022 and Defendants did not disclose this;
- the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine; and
- there existed material weaknesses in the Company's internal controls over financial reporting

371. The declines in the price of Credit Suisse securities after the truth came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Credit Suisse's securities price rise and decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changes in market conditions, macroeconomic or industry factors, or other facts unrelated to Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and other members of the Class was a direct result of Defendants' misrepresentations and omissions and the subsequent decline in the value of Credit Suisse's securities when Defendants' prior misrepresentations and

other fraudulent conduct were revealed.

372. The economic loss (*i.e.*, damages) suffered by Plaintiff and other members of the Class, was a direct result of the truth about Defendants' misrepresentations and omissions being revealed to investors, and the subsequent, significant decline in the value of Credit Suisse securities was also the direct result of the truth about Defendants' misrepresentations and omissions being revealed to the market.

**POST CLASS PERIOD EVENTS**

373. Following the Company's announcement of its merger with UBS, on April 4, 2023, Credit Suisse held its final AGM at the Hallenstadion in Zurich, Switzerland. In his prepared remarks Defendant Lehmann stated, in relevant part:

> We stand here today in a situation that no one could have anticipated. It is a sad day. For all of you, and for us. The bitterness, anger, and shock of all those who are disappointed, overwhelmed, and affected by the developments of the past few weeks is palpable.
>
> * * *
>
> ***We needed a comprehensive strategic and cultural transformation. The business model had to be fundamentally overhauled and changed. It was also clear that there were unhealthy developments, errant behaviors, and wrong incentive systems. That there were transactions that should not have been allowed to play out. That we needed to work in many areas not only on structures, but also on mentalities and culture.*** That is what we wanted to rectify. That was the goal of our strategy.
>
> * * *
>
> ***The period from October to March was not long enough. One legacy issue after another had already seen trust eroded – and with it, patience dwindled. At that, we failed. It was too late.*** The bitter reality is that there wasn't enough time for our strategy to bear fruit.
>
> * * *
>
> ***The massive outflows of client funds last October were a major setback. Working with the regulators, we withstood this trend thanks to the tremendous efforts of***

> ***our employees. Yet the downward spiral of events leading to this fateful week intensified later in that week, swallowing everything up.*** The bank could not be saved.
>
> * * *
>
> ***We failed to stem the impact of legacy scandals***, and counter negative headlines with positive facts in order to rebuild the lost confidence.

(Emphasis added).

374. Thereafter, Defendant Körner gave his prepared marks, stating, in relevant part:

> ***The bank had been significantly weakened by the strong outflows in October 2022*** as a result of unfounded rumours and speculation. At the same time, for legal reasons, our hands were tied for almost four weeks until the new strategy was communicated on October 27, 2022. Only then were we able to address these incorrect statements.
>
> * * *
>
> ***The sudden collapse of Silicon Valley Bank and Signature Bank in the US caused shockwaves around the world and triggered a dramatic loss of confidence in the global financial industry. We were particularly vulnerable at the time.*** While were able to turn the situation around at the end of 2022, we were unable to repeat this achievement. This is a matter of deep personal regret to me.
>
> But the bank's survival was at stake – and ***we were forced to act quickly and decisively***. We no longer had a choice. The collapse of Credit Suisse would have been catastrophic not just for Switzerland but for the global economy.
>
> Together with the Swiss Federal Council, the Swiss National Bank and FINMA, we worked hard to find possible solutions within a limited timeframe. In the end, the merger with UBS was the only feasible option.

(Emphasis).

375. On April 24, 2023, Credit Suisse issued its final earnings release, announcing financial results for the first quarter of 2023 (the "1Q23 Earnings Release") for the period ended March 31, 2023, which it filed with the SEC as an exhibit to a Form 6-K the same day. The 1Q23 Earnings Release stated, in relevant part, that:

> ***In the second half of March 2023, Credit Suisse experienced significant***

> ***withdrawals of cash deposits as well as non-renewal of maturing time deposits. Customer deposits declined by CHF 67 billion in 1Q23.*** These outflows, which were most acute in the days immediately preceding and following the announcement of the merger, stabilized to much lower levels, but had not yet reversed as of the date of this report.
>
> * * *
>
> As of the end of 1Q23, assets under management of CHF 1,252.6 billion decreased CHF 41.0 billion compared to the end of 4Q22. ***The decrease was mainly driven by net asset outflows of CHF 61.2 billion***, partially offset by favorable market movements of CHF 28.4 billion.
>
> (Emphasis added).

376. In the days and weeks that followed more analysts and reporters shed new light on Credit Suisse's spectacular collapse (and Defendants' historic fraud).

377. On June 8, 2023, Switzerland's parliament voted to empower a special parliamentary commission of inquiry into the downfall of Credit Suisse and the rescue deal engineered by the Swiss authorities, the SNB, and FINMA. This marks only the fifth occasion such a committee has been created in the 175-year history of the Swiss constitution. In keeping with the central Swiss tenant of secrecy, however, the results of that committee's inquiry will not be made public for 50 years. John Revill, "Credit Suisse inquiry will keep files secret for 50 years," *Reuters*, July 16, 2023.

378. On July 24, 2023, UBS announced that it had been ordered to pay USD $269 million to the U.S. Federal Reserve and roughly USD $119 million to the Bank of England in fines from U.S. and UK regulators relating to Credit Suisse's deadlines with Archegos. FINMA had and has no authority to levy fines.

379. On July 29, 2023, the Swiss German-language newspaper of record *NZZ am Sonntag* reported that up to 75% of Credit Suisse's Russian clients would have to leave UBS. UBS declined to comment but referred NZZ "to its fundamentally more conservative risk profile and

lower risk appetite compared to CS." Jürg Meier & Zoé Baches, "UBS kicks out Credit Suisse customers," *NZZ am Sonntag*, July 29, 223.

380. On August 31, 2023, UBS issued its earnings release announcing financial results for the second quarter of 2023 (the "UBS 2Q23 Earnings Release") for the period ended June 30, 2023, which it filed with the SEC as an exhibit to a Form 6-K the same day. In the UBS 2Q23 Earnings Release, UBS revealed that "Credit Suisse has received requests for documents and information from regulatory and governmental agencies in connection with inquiries, investigations and/or actions relating to" this Action "as well as for other statements regarding Credit Suisse's financial condition, including from the SEC, the DOJ and FINMA."

381. On September 1, 2023, the Bank Stability Expert Group submitted a 98-page report commissioned by the Swiss Federal Department of Finance, concluding that the Swiss government should urgently explore changes to laws to equip FINMA with greater powers, including the authority to levy fines. The report stated that Credit Suisse's management was "recalcitrant" in the face of regulatory scrutiny.

382. On September 6, 2023, FINMA CEO Urban Angehrn ("Angehrn") announced his resignation. Angehrn stated that "the high and permanent stress level had health consequences" precipitated his departure. As reported by *Reuters* that same day, "[t]he regulator [FINMA] has come under fire for failing to act sooner, or more effectively, to halt the string of scandals at Credit Suisse in recent years" and that "Swiss media has accused FINMA of being too cautious around Switzerland's large banks, which they reported did not take the regulator seriously."

**DEFENDANTS ACTED WITH SCIENTER**

383. Throughout the Class Period, the Individual Defendants touted the sufficiency of Credit Suisse's risk management and control governance and the strength of its internal controls over financial reporting, and downplayed the significance and extent of customer and/or asset

outflows. They also downplayed the Company's exposure to sanctions against Russia and the sweeping impact such sanctions would have on the Company. Credit Suisse's auditor, Defendant PwC blessed the Company's financials, stating they were "fairly stated, in all material respects." Throughout the Class Period, Defendants knew or recklessly disregarded that those statements were materially false or misleading when made.

384. Indeed, the Individual Defendants made (and repeated) materially false and misleading statements concerning each of these issues and problems despite the fact that the Company admitted, on March 12, 2023, that it had a material weakness in its internal control over financial reporting which had "***remained un-remediated for several years***" – in other words, *before the Class Period even began*. Individual Defendants also tried to have documents relating to its Russia dealings destroyed right after Western sanctions were imposed on Russia and tried to hide client accounts subject to sanctions. And the statements were made in the face of overwhelming red flags, including the bank's own history of criminal and civil investigations and suits, which led to substantial financial penalties, and a guilty plea arising out of risk management and control governance failures.

385. The Individual Defendants also had significant financial motives to commit fraud, reaping millions of dollars in compensation throughout the Class Period. Together with Credit Suisse's many thousands of bankers and other employees, they collectively received approximately ***CHF $ 18.935 billion*** (approximately USD $20.685 billion) in 2021 and 2022. In 2021 and 2022 the Executive Board (including all Individual Defendants) was compensated at least ***CHF $70.79 million*** (approximately ***USD $77.32 million***), while all Material Risk Takers and Controllers ("MRTCs") (roughly 1,500 employees whose number *excludes* the Executive Board) were compensated over ***CHF $3 billion*** (approximately ***USD $3.28 billion***). And PwC

wanted to maintain its highly lucrative engagement as Credit Suisse's auditor. Indeed, for its work on Credit Suisse's 2021, 2021, and 2022 audits, it was compensated in excess of CHF 209.6 million, or approximately ***USD $231.3 million***.

## I. Scienter for the Individual Defendants

### A. The Individual Defendants Knew or Recklessly Disregarded That Their Statements Were Materially False and Misleading

#### 1. The SEC Inquiry Into Credit Suisse's Financial Reporting Supports a Strong Inference of Scienter

386. On March 12, 2023, Credit Suisse responded to a nine-month long inquiry from the SEC into the sufficiency of its financial reporting, stating that it "note[d] the Staff's concerns, and have now reassessed our position" and would report a material weakness in its internal control over financial reporting. Significantly, the Company stated: "***We acknowledge that the control deficiencies remained un-remediated for several years.***"

387. The SEC's inquiry began in July 2022, although the Company did not disclose it until March 9, 2023, and, even then, falsely characterized it as a "last minute request" that it had received the evening before, in order to justify the delay in publication of its 2022 Annual Report. The inquiry stemmed from Credit Suisse's disclosure in its 20-F for FY 2021 that "[i]n connection with ongoing internal control processes, the Group identified accounting issues," but that because they were not considered "material," it would not need to restate its financial statements.[11]

[11] Just the previous day the SEC's Office of Chief Accountant had issued a public statement observing that "some materiality analyses appear to be biased toward supporting an outcome that an error is not material to previously issued financial statements, resulting in 'little r revision restatements.'" The SEC reminded companies that an:

> actual error is only the starting point for determining the potential impact and severity of a deficiency.... Management's assessment of the effectiveness of ICFR should therefore be focused on a holistic, objective analysis of what could happen in the context of current and evolving financial reporting risks.

SEC, "Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors, Mar. 9, 2022, available at https://www.sec.gov/news/statement/munter-statement-assessing-

388. The SEC's July 15, 2022 Comment Letters asked whether the "accounting issues" resulted from "control deficiencies," and "[i]n light of your accounting issues and resulting revisions, as well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management, ***please provide us with your analysis supporting your conclusion that there were no material changes to ICFR***." (Emphasis added).

389. What followed was a lengthy exchange of correspondence back and forth between the Company and the SEC, during which the Company tried to justify its position that the identified errors were not material, and the SEC pushed back. This process culminated in the Company's March 12, 2023, admission and disclosure of a material weakness in its internal controls.

### 2. Confidential Witnesses Support a Strong Inference of Scienter

390. While the Individual Defendants denied serious lapses in risk management and internal controls concerning customer/asset outflows and exposure to Russia sanctions, the Confidential Witnesses provide compelling support that the Credit Suisse Defendants knew about these problems during the Class Period.

391. Specifically, CW1, a Financial Analyst at Credit Suisse from March 2019 to April 2022, whose responsibilities included monitoring risk targets at Credit Suisse's branches throughout the world, stated that the Company regularly monitored inflow and outflow of customer assets. CW1 also stated that Credit Suisse's customers were the "mega rich" and that the Wealth Management department served some of the world's wealthiest people – meaning that when a customer left the bank, that departure represented a loss of tens of millions, if not hundreds of millions, of dollars in business.

materiality-030922.

392. Similarly, CW2, an Executive Assistant at Credit Suisse from June 2015 to August 2021, who supported five Managing Directors in the M&A division in New York City, working under the Global head of M&A, stated that Credit Suisse was already losing customers and deposits in 2021 prior to her departure. CW2 also stated that as of the time of his/her departure, there were already concerns internally about Credit Suisse's health.

393. Finally, CW3, a Managing Director at Credit Suisse from September 2015 to May 2023 who reported to the Managing Director & Global Head of Equity Capital Markets and who attended leadership meetings with C-suite leaders, including Defendants Lehman and Gottstein throughout the Class Period, stated that "*the executives knew*" about customer and asset outflows.

### 3. FINMA's Investigation of Credit Suisse's Top Banker Lescaudron Prior to the Class Period Supports Scienter

394. Credit Suisse was long recognized as the premier banker to Russian oligarchs. As reported in *Bloomberg*, Babak Dastmaltschi ("Dastmaltschi"), a Managing Director at Credit Suisse (now Executive Vice Chair of UBS's newly created Global Wealth Management Strategic Clients unit), was the premier banker to sanctioned Russian oligarchs such as Alisher Usmanov, Roman Abramaovich, Viktor Vekselberg, Oleg Deripaska, Andrey Melnichenko, and Mikhail Fridman. *See* Hugo Miller & Marion Halftermeyer, "One man helped Credit Suisse make billions from Russia tycoons," *Bloomberg*, May 24, 2022.

395. Dastmaltschi's predecessor Patrice Lescaudron ("Lescaudron"), was Credit Suisse's go-to banker for Russian clients prior to his 2018 conviction for fraud and forgery (and subsequent suicide). In February of 2021, the previously-sealed report of FINMA's investigation of Credit Suisse's involvement in Lescaudron's fraud in 2018 was inadvertently released. The report revealed that Credit Suisse ignored repeated warning signs and "[t]here were even attempts to gloss over [Lescaudron's] violations…." Sam Jones, "Credit Suisse turned blind eye as top

banker stole from billionaire clients," *Financial Times*, Feb. 5, 2021; *see also* Margot Patrick, "Credit Suisse Was Alerted to Private Banker's Misconduct Years Before Criminal Charges," *The Wall Street Journal*, Feb. 4, 2021.

#### 4. The Individual Defendants' Attempt to Destroy Documents and Hide Client Accounts Relating to its Russia Dealings Supports Scienter

396. On February 7, 2022, the *Financial Times* reported that Credit Suisse had "quietly sold on a slice of the risk related to $2 billion (CHF1.85 billion) of its' 'ultra-high-net-worth' client loans at the end of 2021." According to the article, "the securitisation of the portfolio of loans to tycoons and oligarchs backed by their 'jets, yachts, real estate and/or financial assets' was made by a unit of the bank that has previously been plagued with sanctions-related issues." Robert Smith & Owen Walker, "Credit Suisse securities yacht loans to oligarchs and tycoons," *Financial Times*, Feb. 7, 2022.

397. On February 20, 2022, the Suisse Secrets data was leaked, revealing that Credit Suisse had repeatedly either opened or maintained bank accounts for a panoramic array of high-risk clients across the world," and how it "continued to do business with customers even after bank officials flagged suspicious activity involving their finances." Subsequent reporting revealed that Credit Suisse held at least 27 secret accounts (with deposits in excess of CHF $1.9 billion, or over USD $2 billion), for the sanctioned Russian oligarch Usmanov, through his sister, Saodat Narzieva.

398. Barely one week after Western governments initiated a new wave of sanctions on Russia in retaliation for its invasion of Ukraine, in early March 2022, the *Financial Times* reported that Credit Suisse had requested hedge funds and other investors to destroy documents regarding its richest clients' yachts and private jets, in an attempt to stop information leaking about the unit of the bank that had securitized the loans.

399. On March 28, 2022, the U.S. House of Representatives Committee on Oversight and Reform sent a letter to Credit Suisse asking the bank to turn over information and documents from January 1, 2017 to the present about a portfolio of loans backed by yachts and private jets owned by clients, potentially including sanctioned Russian individuals. The Committee noted that the "timing of [Credit Suisse's] request and its subject matter … raises significant concerns about Credit Suisse's compliance with the severe sanctions imposed by United States and its allies and partners on the architects and enablers of Russia's brutal and unprovoked invasion of Ukraine, including Russian President Vladimir Putin and oligarchs in his inner circle," and it "may be concealing information about whether participants in the securitization deal…may be evading sanctions…."" Indeed, the only reasonable inference to be drawn from Credit Suisse's document destruction request is that it had something to hide.

#### 5. Class Period Admissions and Events Support a Strong Inference of Scienter

400. On April 29, 2022, at the Company's AGM, Defendant Lehmann conceded the Company's risk management failures:

> As a result of addressing setbacks, it has become clear that the challenges of the past were not solely attributable to isolated poor decisions or to individual decision-makers. Within the organization as a whole, ***we have failed too often to anticipate material risks*** in good time in order to counter them proactively and to prevent them.
>
> (Emphasis added).

401. Indeed, the next month, the UK's financial regulator, the Financial Conduct Authority, placed Credit Suisse on a "watchlist of institutions requiring tougher supervision," based on concerns that it had "not done enough to improve its culture, governance and risk controls." "UK regulator puts Credit Suisse on watchlist after scandals," *Financial Times*, June 12, 2022. The article reported that the British regulator ""urged the bank to address 'persistent' cultural

issues, including a lack of internal challenges to risky transactions and said they had not yet seen 'sufficient evidence of effective remediation."

### 6. Post Class Period Admissions and Events Support a Strong Inference of Scienter

402. On March 23, 2023, *Bloomberg* reported that the U.S. Department of Justice had issued subpoenas to Credit Suisse (and UBS) in connection with a probe into whether the Company helped Russian oligarchs evade sanctions.

403. On April 2, 2023, Switzerland's Attorney General announced it was opening a criminal investigation into collapse of Credit Suisse and its takeover by UBS.

404. Two days later, on April 4, 2023, at the Company's final AGM, Defendant Lehmann admitted that the Company's risk management, governance, and controls were deficient, and it had failed to rectify the problems. Specifically, Defendant Lehmann conceded:

> We needed a comprehensive strategic and cultural transformation. The business model had to be fundamentally overhauled and changed. It was also clear that there were unhealthy developments, errant behaviors, and wrong incentive systems. That there were transactions that should not have been allowed to play out. That we needed to work in many areas not only on structures, but also on mentalities and culture. That is what we wanted to rectify.
>
> * * *
>
> ***The period from October to March was not long enough. One legacy issue after another had already seen trust eroded – and with it, patience dwindled. At that, we failed. It was too late.***
>
> * * *
>
> We failed to stem the impact of legacy scandals, and counter negative headlines with positive facts in order to rebuild the lost confidence.
>
> (Emphasis added).

405. Thereafter, Defendant Körner gave his remarks, conceding that "the bank had been ***significantly weakened by the strong outflows in October 2022***," and that it had been "**particularly vulnerable at the time**" when Silicon Valley Bank and Signature Banks collapsed

[March 10 and March 12, 2023, respectively]. (Emphasis added).

406. On April 24, 2023, Credit Suisse revealed in its final, 1Q23 Earnings Release: "In the second half of March 2023, Credit Suisse experienced significant withdrawals of cash deposits as well as non-renewal of maturing time deposits. Customer deposits declined by CHF 67 billion in 1Q23."

407. In May 2023, the Swiss Parliament announced that it was convening a special commission to investigate the collapse of Credit Suisse. This is only the fifth time in the country's modern history that its parliament has undertaken such an investigation.

408. On July 24, 2023, UBS announced that it had been ordered to pay USD $269 million to the U.S. Federal Reserve and roughly USD $119 million to the Bank of England in fines from U.S. and UK regulators relating to Credit Suisse's dealings with Archegos.

409. On July 29, 2023, the Swiss German-language newspaper of record *NZZ am Sonntag* reported that up to 75% of Credit Suisse's Russian clients would have to leave UBS. UBS declined to comment but referred NZZ "to its fundamentally more conservative risk profile and lower risk appetite compared to CS." Jürg Meier & Zoé Baches, "UBS kicks out Credit Suisse customers," *NZZ am Sonntag*, July 29, 223.

410. U.S. regulators are now looking into the collapse of Credit Suisse as well. On August 31, 2023, UBS announced in its financial report for 2Q 2023 that it had "received requests for documents and information" from the SEC, DOJ, and FINMA relating to customer outflows and Credit Suisse's financial condition and financial controls.

411. Recent statements by UBS regarding its post-merger review of Credit Suisse further support a strong inference of scienter. On August 31, 2023, in a UBS earnings call, Sergio Ermotti, the CEO of UBS, made remarks regarding "our assessment of Credit Suisse as of March 19." He

explained that UBS had done an "in-depth analysis" and an "extremely thorough review, and had concluded, in relevant part:

> It was not just a matter of liquidity drying up. ***Credit Suisse's business model and business mix was deeply flawed and its reputation severely damaged. With its structural lack of underlying profitability, unsustainable capital allocation, and negative revenue and costs prospects, the bank was no longer in a position to continue on its own.*** This is clearly visible from the year-to-date losses Credit Suisse reported today, a culmination of the bank's two loss-making years.

412. That same day, in an interview on *CNBC International TV*, Ermotti stated that "our analysis has proven that the business model was not viable any longer…the business model was not sustainable any longer and needs to be restructured." Ermotti also stated, with respect to elements of Credit Suisse's "culture" that needed to be addressed in connection with the integration, "[t]he most important one is risk discipline, risk/reward discipline…some people [at Credit Suisse] were not really probably behaving in the best interest of clients and the bank."

### 7. Numerous Red Flags Support a Strong Inference of Scienter

413. Individual Defendants were aware of or on notice of the following "red flags," such that they had a duty to investigate and should have known that their statements were materially false and misleading:

#### *a. Credit Suisse's Risk Staffing, Systems, Technology, and Structure Were Deficient*

414. Prior to, and throughout the Class Period, the staffing of Credit Suisse's Risk and related departments was woefully inadequate to effectively manage or control risk, as confirmed in the Archegos Report. These inadequacies were detailed remained largely un-remediated throughout the Class Period.

415. Prime Services and Credit Risk Management ("CRM") in general were chronically understaffed. Further, from 2019 through Archegos's default, PSR, the Prime Services in-business risk function, lost a number of senior, experienced personnel who were replaced over time with

less experienced individuals. Risk, too, had numerous departures of senior Risk officers, which the Archegos Report referred to critically as "a 'juniorization' of the Risk function." As Defendant Gottstein would later acknowledge during an earnings press conference on July 29, 2021: "We did see some reduction of senior people in the Risk organization…. And I do think this was one contributing factor…." At the time the Archegos Report was issued, only "some" "capable, competent, and experienced risk managers" had been hired by Credit Suisse.

416. During her tenure as Chief Risk Officer, Warner also "reshaped the risk function so that it would be 'more commercial' and 'aligned' with front office traders and relationship managers," and changed reporting lines in 2020 to move some market risk functions, which had previously sat within an independent central risk team, to report to head of front office technology, thereby losing their independence. *See* Stephen Morris & Owen Walker, "Credit Suisse resorts to rehiring risk staff on elevated salaries after scandals," *Financial Times*, July 30, 2021.

417. Credit Suisse failed to invest in technology that would have assisted in more effectively managing risk – for example, by bringing "dynamic margining" capability to swaps held by all clients. Risk, too, used ineffective technology. For example, the new PE ("Potential Exposure") models for swaps that were implemented in 2020 were considered unreliable and generated extremely volatile PE numbers that were substantially higher than the ones generated by the prior technology. As a result, when either of these models generated a large PE amount for a client, the standard response was to investigate the validity of the number, a lengthy process that caused considerable delay in remediating breaches. In addition, the CRM systems only showed a counterparty's aggregate portfolio (*i.e.*, not individual position data), interfering with CRM's ability to see the details of the particular risks posed by a client. In addition, CRM only received monthly verified data with respect to scenario limit breaches and was unable on its own to run ad

hoc scenarios with respect to a client's portfolio—instead, it was required to ask the business to run them.

418. Moreover, the various Risk Committees only had access to data that were four to six weeks old, preventing them from being aware of the magnitude and pace of growth in positions and attendant risks.

419. And the interim chief risk officer announced by Defendant Gottstein on April 22, 2021 to replace Warner – Joachim Oechslin – was the same person who had held the post from 2014 to 2019, during many of the scandals listed above.

### *b. Credit Suisse's Recent History of Massive Fines, Government Investigations, and a Guilty Plea*

420. In addition to the Archegos and Greensill Funds failures, which immediately preceded the Class Period, Credit Suisse was embroiled in numerous high-profile criminal and civil proceedings and governmental investigations, both before and during the Class Period, stemming from risk management and control governance failures. Their very nature and extent – which revealed a longstanding culture of extreme risk-taking and lax compliance and risk management and internal controls – put the Individual Defendants on notice that its compliance, risk management, and governance systems and processes were deficient.

- In February 2022, the Suisse Secrets Project revealed that Credit Suisse had clients involved in money laundering, corruption, and other serious crimes, and that it had continued to do business with high-risk clients even after bank officials flagged suspicious activity involving their finances;
- In July 2018, Credit Suisse was fined nearly $100 million in the Eastern District of New York resulting from violations of the Foreign Corrupt Practices Act;
- In 2017, Credit Suisse paid $5.28 billion to resolve a probe by the U.S. Department of Justice relating to the mis-selling of mortgage securities;
- In November 2017, Credit Suisse paid a fine of $135 million as part of a consent order with the New York Department of Financial Services for failure to implement effective controls over its foreign exchange business;

- In February 2016, Credit Suisse agreed to pay $154.3 million to the State of New York and the SEC to settle investigations into false statements and omissions made in connection with marketing dark pools and other high-speed electronic equities trading services; and
- In February 2014, Credit Suisse pled guilty and was fined in excess of $2.6 billion for helping U.S. clients evade taxes.

421. To this end, at a May 5, 2022, briefing entitled "Russia's Swiss Enablers" hosted by the U.S. Helsinki Commission's Commission on Security & Cooperation In Europe, Miranda Patrucic, now Editor in Chief of the OCCRP, stated with respect to Credit Suisse:

> We have also learned that the bank basically has a very toxic corporate culture, which is designed to basically maximize the profit and bonuses, which means that the employees are tied to that new money, which basically incentivizes them to look the other way. And basically, the whole system is based on plausible deniability. So if you don't find something or if you don't look and don't find something, that's good. We have also discovered that the – basically, no head of the Swiss bank has ever been jailed. And any punishment, any kind of fines that are imposed on these banks are basically treated as a cost of doing business. And, for example, if you think about the $1.3 billion penalty that was imposed on Credit Suisse, that was even tax deductible, which is completely counterintuitive in terms of a fine. (Laughs.)

*c. Public Report of Swiss Banks' Actual Russia Exposure Put Individual Defendants on Notice*

422. On March 17, 2022, the Swiss Bankers Association, the country's financial industry association, publicly issued an estimate that Swiss Banks held between 150 billion and 200 billion Swiss francs (up to approximately $213 billion USD) of Russian client money in offshore accounts – far more extensive than the "limited" exposure reported by Credit Suisse. Thus, the Individual Defendants were on notice that the bank's Russian exposure likely exceeded what it was publicly reporting and should have warranted further investigation.

**8. The Departures of Key Executives and Defendants Horta-Osório, Gottstein, and Mathers Support a Strong Inference of Scienter**

423. Throughout the Class Period Credit Suisse's C-suite and Board of Directors were revolving doors. At the outset of the Class Period, the Greensill Funds and Archegos failures

precipitated the Company's announcement that Brian Chin, then-CEO of the Investment Bank, and Lara Warner, then-Chief Risk and Compliance Officer, would be "stepping down" from their "role[s] on the Executive Board" and that "[b]oth of them will leave the bank."

424. Thereafter, in the 1Q21 Earnings Release filed with the SEC on April 22, 2201, the Company announced that Board of Directors Chairman Urs Rohner "would not stand for re-election at the AGM" and the Board was proposing Defendant Horta-Osório as his replacement. Defendant Horta-Osório formally assumed the role of Chairman after his election at the AGM on April 30, 2021.

425. But Defendant Horta-Osório would only last approximately eight months as Chairman before he was forced to resign. On January 17, 2022, Defendant Horta-Osório announced he was resigning due to "a number of my personal actions [that] have led to difficulties for the bank and compromised my ability to represent the bank internally and externally." Defendant Lehmann was appointed as his immediate successor. While Defendant Horta-Osório was reportedly ousted due to his breaches of coronavirus quarantine protocols and his use of Credit Suisse's private jets, *Reuters* also reported that "the chairman had been at "war" with key members of the executive board" and that "unlike his predecessor Urs Rohner, [Defendant Horta-Osório] had questioned executives closely when they gathered every guard to review the bank's performance." Oliver Hirt, Sumeet Chatterjee & John O'Donnell, "Horta Osorio's broken promise the final straw at embittered Credit Suisse," Jan. 18, 2022. *Reuters'* source said "There were quite a few red faces" and "many senior employees were unhappy with Horta-Osorio's attempts to make the board of directors more powerful at the expense of executives."

426. Approximately six months later, Defendant Gottstein was forced to resign as CEO. On July 27, 2022, Defendant Gottstein announced he was resigning for "personal and health-

related considerations…." Defendant Körner was appointed as his successor. As reported by *Reuters* and other media outlets, however, "[p]ressure had been mounting on…Gottstein for months over major scandals and losses racked up during his two-year tenure that have hammered shares and angered investors." Oliver Hirt, "Credit Suisse expected to announce Koerner as CEO, latest change at helm – sources," July 26, 2022.

427. Not even a month later, on August 22, 2022, Defendant Mathers resigned as CFO. Defendant Joshi was announced as his immediate successor. Earlier, on April 27, 2022, the Company announced that Defendant Mathers had "indicated his wish to seek alternative opportunities outside of Credit Suisse."

### 9. Individual Defendants' High-Level Positions and Access to Contrary Information Support a Strong Inference of Scienter

428. As the Individual Defendants conceded both before, during, and after the Class Period, Credit Suisse's risk management and internal controls were severely lacking, and massive customer and asset outflows eventually prompted the Swiss government to intervene and pressure the Company's merger with UBS. That the alleged misrepresentations and omissions go to the core of Credit Suisse's ability to operate as a going concern bolster the inference of scienter.

429. Further, the Individual Defendants were intimately involved in Credit Suisse's business and operations and had access to extensive information regarding the same — information that directly contradicted their claims.

430. Finally, the Individual Defendants were all high-level corporate insiders, each of whom — by virtue of his high-level position — directly participated in the management of the Company, were directly involved in the day-to-day operations of Credit Suisse at the highest levels, were directly or indirectly involved in the oversight or implementation of the Company's risk management procedures/policies and internal controls over financial reporting, and were privy

to confidential information concerning the Company and its business, operations, practices, financial statements, and financial condition, including the misstatements alleged herein. Because of the Individual Defendants' positions, they possessed the power and authority to, and did, control and monitor the contents of Credit Suisse's SEC filings, press releases, presentations, and other public statements during the Class Period made and disseminated to investors, securities analysts, money and portfolio managers and institutional investors (*i.e.*, the market), and/or approved or ratified these statements. Defendants Gottstein and Mathers signed and/or certified the Company's 2021 Annual Report filed on Form 20-F with the SEC, while Defendants Körner and Joshi signed and/or certified the Company's 2022 Annual Report filed on Form 20-F with the SEC, and the Individual Defendants regularly issued releases and spoke about the Company's business and operations. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the SEC filings, press releases, and other public statements detailed herein, and is primarily liable for the false and misleading statements and omissions and wrongful conduct pleaded herein.

#### 10. The Core Operations Doctrine Further Supports a Strong Inference of Scienter

431. Credit Suisse's Form 20-F for FY 2020 revealed that of its overall net revenues of CHF 22.4 billion for 2020, CHF 13.6 billion, or nearly ***61%***, were derived from its Wealth Management-related businesses.

432. That the alleged misrepresentations and omissions go to the core of Credit Suisse's business and viability bolster the inference of scienter attributable to the Individual Defendants.

### B. The Individual Defendants Had Significant Financial Motives to Commit Fraud

433. Throughout the Class Period Defendants were motivated by their desire for concrete, personal financial gain. Notably, despite the fact that Credit Suisse and the Individual Defendants touted the "withdraw[al] [of] its proposals regarding the variable compensation for the

Executive Board" in the 2020 Compensation Update on April 6, 2021, the Company did not implement any meaningful changes to its compensation structure in order to align with risk management and/or control governance best practices.

434. As set forth in the 2020 Compensation Report filed with the 2020 Annual Report on March 18, 2021, even after deduction of certain variable compensation for the Executive Board, total compensation awarded to Credit Suisse employees and board members in 2020 amounted to approximately ***CHF $9.84 billion*** (approximately USD $10.79 billion). Notably, while the Company eliminated the Short-Term Incentive ("STI") compensation for the Executive Board in 2020, the total aggregate Executive Board compensation (including both fixed compensation and Long-Term Incentive ("LTI") compensation), still totaled approximately ***CHF $52.7 million*** (approximately USD $57.8 million). Defendant Gottstein's compensation was approximately ***CHF $6.53 million*** (approximately USD $7.1 million). Total compensation awarded to the Board of Directors was approximately ***CHF $11.1 million*** (approximately USD $12.2 million).

435. After shepherding Credit Suisse through another year of unprecedented failure, the 2021 Compensation Report filed with the 2021 Annual Report on March 10, 2022, revealed that total compensation awarded to Credit Suisse employees and board members in 2021 amounted to a staggering ***CHF $9.551 billion*** (approximately USD $10.473 billion). Total aggregate Executive Board compensation in 2021 totaled approximately ***CHF $38.57 million*** (approximately USD $42.29 million), while Defendant Gottstein's compensation was approximately ***CHF $3.9 million*** (approximately USD $4.28 million), and Defendant Mathers' compensation was approximately ***CHF $4.6 million*** (approximately USD $5.04 million). Total compensation awarded to Managing Directors and MRTCs, who in 2021 numbered just 1,480 Credit Suisse employees, amounted to approximately ***CHF $1.487 billion*** (approximately ***USD $1.624 billion***). ***The Board of Directors***

***got a 5% raise in 2021*** – with awarded compensation totaling approximately ***CHF $11.7 million*** (approximately USD $12.83 million).

436. Finally, the 2022 Compensation Report filed with the 2022 Annual report on March 14, 2023, revealed that total compensation awarded to Credit Suisse employees and board members in 2022 amounted to approximately ***CHF $9.384 billion*** (approximately USD $10.29 billion), a mere ***1.8%*** haircut from Credit Suisse's 2020 compensation. Total aggregate Executive Board compensation in 2022 totaled approximately ***CHF $32.22 million*** (approximately USD $35.33 million), while Defendant Körner's compensation was approximately ***CHF $2.3 million*** (approximately USD $2.52 million), Defendant Mathers' compensation was approximately ***CHF $4.3 million*** (approximately USD $4.72 million), and total compensation awarded to the Board of Directors was approximately ***CHF $10.4 million*** (approximately USD $11.4 million). Total compensation awarded to MRTCs, who in 2022 totaled 1,577 Credit Suisse employees, amounted to approximately ***CHF $1.514 billion*** (approximately ***USD $1.653 billion***).,1

437. Credit Suisse's generous compensation structure provided a strong motivation for Individual Defendants and for the Company itself (through the actions of the Individual Defendants as well as the Company's many bankers who were consistently rewarded) to ignore red flags and continue the fraud throughout the Class Period. Despite overseeing one of the most historic failures of a systemically important financial institution in the history of modern banking, the Individual Defendants – and all Credit Suisse bankers and employees – were rewarded handsomely, to the tune of approximately ***CHF $ 18.935 billion*** (approximately USD $20.685 billion) in 2021 and 2022. In 2021 and 2022 the Executive Board alone was compensated at least ***CHF $70.79 million*** (approximately ***USD $77.32 million***), while all MRTCs (whose number *excludes* the Executive Board) were compensated over ***CHF $3 billion*** (approximately ***USD $3.28***

***billion***).

### C. Corporate Scienter is Established

438. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

439. The scienter of the Individual Defendants and other employees and agents of the Company, including individual Credit Suisse bankers who profited handsomely during the Class Period, is similarly imputed to the Company under respondeat superior and agency principles.

## II. Scienter for PwC

### A. PwC Either Knew or Recklessly Disregarded That Its Statements Were False

440. During the nine months-long correspondence between the SEC and Credit Suisse regarding the "accounting issues" identified in the company's FY 2021 20-F, PwC represented, in *every single one of Credit Suisse's interim quarterly report*s, that the information included in the Company's balance sheet for the period ending December 31, 2021 was "fairly stated, in all material respects," and that PwC had conducted its review in accordance with PCAOB standards. Credit Suisse ultimately admitted that it had a material weakness in its internal control over financial reporting "that remained un-remediated for several years. In other words, the blessings that PwC gave to Credit Suisse's financials were false at the times they were made.

441. AS No. 5 requires that auditors "use the same suitable, recognized control framework to perform his or her audit of internal control over financial reporting as management uses for its annual evaluation of the effectiveness of the company's internal control over financial reporting." As such, if Credit Suisse was able to detect a material weakness in internal controls, if PwC used the same control framework, it would have also detected the weakness. PwC's failure to properly investigate and identify the material weaknesses in Credit Suisse's internal controls

indicated that the auditor's review was not conducted "in accordance" with PCAOB standards.

442. Moreover, PwC ignored glaring red flags arising out of Credit Suisse's prior audit engagement of KPMG as its auditor. PwC was hired by Credit Suisse to replace its former auditor, KPMG, in the wake of a scandal involving KPMG's receipt of stolen, confidential information about inspections of Credit Suisse that would be conducted by PCAOB. Court filings in that matter reveal that KPMG was concerned that issues it had found in previous investigations of Credit Suisse – specifically related to cash flows – still existed; therefore, it performed a series of "stealth reviews" of the bank's 2016 audit to ensure that, if these issues came up, the audit would be clean. This indicates that such care was not taken during those years for which KPMG did not expect a PCAOB inspection. Accordingly, when PwC assumed the mantle of Credit Suisse's auditor in 2018, it inherited several known issues, signaling the need to take special care. This need only became more acute in the wake of the Archegos and Greensill Funds failures, and further when the SEC began its inquiry into the company's financial controls in July 2022.

443. KPMG has also come under fire in its role as the auditor of three U.S. banks that failed between March and May of 2023. In fact, KPMG signed off on the audit report for Silicon Valley Bank's parent company, SVB Financial Group, just two weeks before regulators seized the bank after a surge of withdrawals threatened to leave it short of cash. *See, e.g.*, Preeti Mondal, "KPMG under scrutiny: Why the Auditor is being criticized in relation to Three Failed Banks in the US," *The Finance Story*, June 12, 2023.

444. Finally, Credit Suisse's history of criminal and civil proceedings and fines and penalties arising out of its risk management and control governance failures should have put PWC on notice that it needed to exercise particular caution and carefully scrutinize Credit Suisse's financial statements and representations, which it utterly failed to do.

### B. PwC Had Significant Financial Motive to Commit Fraud

445. The process by which public companies are audited involves a fundamental conflict of interest. While the accounting firms are supposed to be "independent," they are, in fact, highly dependent, as they "are chosen and paid by the companies they audit." If the company does not like the results of an audit, it has the power to replace the auditor. "Losing a client means cutting off a revenue stream that could otherwise stretch into an open-ended future." Thus, this system "incentivizes auditors to please their clients instead of protecting the public." David S. Hilzenrath, "Accounting's Big Lie and How to Fix it," *Project on Government Oversight*, Oct. 6, 2022; *see also* J. Edward Ketz, "The Myth of Auditor Independence: Waking Up to Unconscious Bias," The CPA Journal, February 2020 (describing the public auditing system as "a patronage system that rewards cozy relationships between auditors and clients and discourages strict adherence" to accounting rules).

446. Indeed, in 2018, a senior manager at PwC in Silicon Valley became an SEC whistleblower, revealing deeply concerning problems with the culture of auditing at PwC. Specifically, he revealed that that "to keep corporate managers happy and to avoid losing their business, PwC was pulling its punches—trying not to flag too many problems with companies' internal controls." As a result, "he was concerned about 'the risk of collusion between auditors and management in this valley…with management paying us the fees and auditors picking and choosing what to call an audit issue." David S. Hilzenrath, "PwC Whistleblower Alleges Fraud in Audits of Silicon Valley Companies," *Project on Government Oversight*, May 10, 2018.

447. And on March 15, 2022, the SEC announced that it had launched a probe into conflict-of-interest concerns among accounting firms, including KPMG and PwC.

448. PwC had significant financial motive to bless Credit Suisse's financial reports and representations about its financial controls: PwC was compensated in excess of ***CHF $209.6***

***million***, or approximately USD $2321.3 million, for its work on Credit Suisse's 2020, 2021, and 2022 audits. All the while, PwC represented that, despite errors identified by Credit Suisse requiring it to revise its 2019 and 2020 financial statements, accounting issues were immaterial (thereby not requiring a Restatement), Credit Suisse's financial statements "present[ed] fairly, in all material respects, the financial position of the Group," and Credit Suisse had maintained "effective internal control over financial reporting."

## PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

449. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the scheme or any of the allegedly materially false and misleading statements pleaded herein. Many of the statements were regarding present or past events or were mixed statements of past/present and future conditions — and thus were not forward-looking. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

450. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

## THE 2021 AND 2022 ANNUAL REPORTS OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN UNDER ITEM 5 OF FORM 20-F

451. Part I, Item 5(d) of Form 20-F requires registrants to:

> [I]dentify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also must discuss, for at least the current financial year, any known trends,

> uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

452. "The disclosure requirements for Item 5 of Form 20-F (Operating and Financial Review and Prospects) are substantively comparable to the MD&A requirements under Item 303 of Regulation S-K." SEC Final Rule Release No. 33-10890, *Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information*, November 19, 2020, at 91; *see also Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021).

453. In a 1989 Interpretive Release, the SEC describe the purposes of the MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.
>
> *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 SEC LEXIS 1011.

454. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on

> the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.
>
> 1989 SEC LEXIS 1011, *19; *see also Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 U.S. App. LEXIS 35103, at *6 (2d Cir. Dec. 20, 2022).

455. Accordingly, Credit Suisse had an affirmative obligation to disclose facts in the 2021 Annual Report and 2022 Annual Report filed on Forms 20-F required by Item 5 of Form 20-F and Item 303 of Regulation S-K, including information regarding known trends, uncertainties, or events, including, but not limited to, the fact that the Company was experiencing significant and unusual customer and/or asset outflows throughout the Class Period.

## THE PRESUMPTION OF RELIANCE

456. Plaintiff and other members of the Class are entitled to a presumption of reliance on Defendants' material misrepresentations, deceptive devices, and fraudulent scheme pursuant to the fraud-on-the-market doctrine because, among other things, during the Class Period:

457. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(a) The misrepresentations and omissions were material;

(b) Credit Suisse's securities were actively traded in efficient markets and its ADSs were traded on the NYSE;

(c) Credit Suisse's securities were liquid and traded with moderate to high weekly volumes;

(d) As a regulated issuer, Credit Suisse filed periodic public reports with the SEC;

(e) Credit Suisse regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(f) The market reacted promptly to public information disseminated by Credit Suisse;

(g) Credit Suisse was covered by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. These reports were publicly available and entered the public marketplace;

(h) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Credit Suisse securities; and

(i) Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiff and other members of the Class purchased or acquired Credit Suisse securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

458. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

459. Alternatively, Defendants corrupted the market for Credit Suisse securities through a course of conduct that misled the market as to the value of Credit Suisse securities. To the extent that these Defendants disrupted the integrity of the market for Credit Suisse securities, Plaintiff and members of the Class are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153 (1972).

**CONTROL PERSON ALLEGATIONS**

460. The Individual Defendants, by virtue of their high-level and controlling positions at Credit Suisse, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the actions, individually and in

concert, of these individuals.

461. Defendants Lehmann and Horta-Osório, in their role(s) as Chairman of the Board of Directors, Defendants Gottstein and Körner, in their role(s) as CEO, and Defendants Mathers and Joshi, in their role(s) as CFO, were participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased or otherwise acquired Credit Suisse securities during the Class Period. The scheme/course of conduct deceived the investing public regarding Credit Suisse's business, operations, financial condition, and the intrinsic value of Credit Suisse's securities, and caused Plaintiff and other members of the Class to purchase or otherwise acquire Credit Suisse securities at artificially inflated prices.

462. The Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, and financial condition, so that the market prices of Credit Suisse's securities would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period. Defendants were also under a continuing duty to update and/or correct any false or misleading statements alleged herein.

463. The Individual Defendants, because of their positions of control and authority, were able to and did control the content of the Company's SEC filings, press releases, and other public statements issued by or on behalf of Credit Suisse during the Class Period. Each would have been provided with copies of at least some of the statements made in the SEC filings other public statements at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements alleged herein.

## CLASS ACTION ALLEGATIONS

464. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Credit Suisse securities in domestic transactions during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

465. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded and the Company's ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

466. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

467. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

468. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and

financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

469. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

470. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

471. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

472. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

473. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

474. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of, such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

475. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

476. As a result of the foregoing, the market price of the Company's securities was

artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

477. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

478. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

479. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities in domestic transactions during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

480. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

481. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of outflows.

482. As officers and/or directors of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

483. Because of the position of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

484. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the Class reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

(d) awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: September 26, 2023

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
J Ryan Lopatka
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: j.lopatka@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
Melissa H. Harris (MH-3583)
Matthew P. Woodard (admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Diabat*
*and Lead Counsel for the Class*