UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALI DIABAT, Individually and On Behalf of All Others
Similarly Situated,

                                        Plaintiff,

                    - *against* -

CREDIT SUISSE GROUP AG, AXEL P. LEHMANN,
ULRICH KÖRNER, DIXIT JOSHI, THOMAS
GOTTSTEIN, DAVID R. MATHERS, ANTÓNIO
HORTA-OSÓRIO, and
PRICEWATERHOUSECOOPERS AG,

                                        Defendants.

Case No. 1:23-cv-5874-CM

[rel. 1:23-cv-04458-CM]

## MEMORANDUM OF LAW IN SUPPORT OF THE
## CREDIT SUISSE DEFENDANTS' MOTION TO DISMISS

**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
Jason M. Hall
Edward N. Moss
Tammy L. Roy
Nicholas N. Matuschak
Lauren Riddell
32 Old Slip
New York, New York 10005
(212) 701-3000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

PRELIMINARY STATEMENT ........................................................................................... 1

THE COMPLAINT'S ALLEGATIONS ............................................................................... 4

ARGUMENT ........................................................................................................................ 5

I.     THE COMPLAINT FAILS TO ADEQUATELY ALLEGE AN ACTIONABLE
MISSTATEMENT................................................................................................... 6

     A.    The Complaint Is a "Puzzle Pleading" That Fails to Satisfy Rule 9(b)................ 6

     B.    The Risk Management Statements Are Not Actionable ........................................ 8

     C.    The Customer Outflow Statements Are Not Actionable ..................................... 14

     D.    The ICFR Statements Are Not Actionable .......................................................... 19

II.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE A STRONG
INFERENCE OF SCIENTER ................................................................................ 23

     A.    The Complaint Fails to Allege Facts Showing that the CS Defendants Had
Motive to Commit Fraud ..................................................................................... 24

     B.    The Complaint Fails to Allege Facts that Constitute Strong Circumstantial
Evidence of Conscious Misbehavior or Recklessness......................................... 25

          i.    The Complaint Does Not Allege Scienter for the Risk Management
Statements ................................................................................................. 25

          ii.   The Complaint Does Not Allege Scienter for the Customer Outflow
Statements ................................................................................................. 28

          iii.  The Complaint Does Not Allege Scienter for the ICFR Statements ............ 30

     C.    The Complaint's Additional Scienter Allegations Do Not Save Its
Deficient Section 10(b) Claim .............................................................................. 32

     D.    The Complaint Fails to Establish Scienter for Each Individual Defendant
or Corporate Scienter ............................................................................................ 33

III.   THE COMPLAINT FAILS TO ADEQUTELY ALLEGE LOSS CAUSATION ........... 36

IV.     PLAINTIFF HAS NOT PLED A SECTION 20(a) CLAIM AGAINST THE
        INDIVIDUAL DEFENDANTS....................................................................................... 39

CONCLUSION...................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Allergan PLC Securities Litigation,*
　2022 WL 17584155 (S.D.N.Y. Dec. 12, 2022) .........................................................................10

*Altimeo Asset Management* v. *Qihoo 360 Technology Co. Ltd.,*
　2023 WL 2585942 (S.D.N.Y. Mar. 21, 2023) ..........................................................................39

*Anwar* v. *Fairfield Greenwich Ltd.,*
　728 F. Supp. 2d 372 (S.D.N.Y. 2010)......................................................................................40

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.,*
　493 F.3d 87 (2d Cir. 2007)........................................................................................................6

*Barrett* v. *PJT Partners Inc.,*
　2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)...........................................................................31

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash,*
　506 F. App'x 32 (2d Cir. 2012) .................................................................................................7

*Boluka Garment Co., Ltd.* v. *Canaan Inc.,*
　547 F. Supp. 3d 439 (S.D.N.Y. 2021)......................................................................................37

*Born* v. *Quad/Graphics, Inc.,*
　521 F. Supp. 3d 469 (S.D.N.Y. 2021)................................................................................... 7-8

*In re Citigroup Securities Litigation,*
　2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ............................... 10, 13-14, 23, 24, 27, 32, 33

*City of Pontiac Policemen's and Firemen's Retirement System* v. *UBS AG,*
　752 F.3d 173 (2d Cir. 2014).....................................................................................................13

*Das* v. *Rio Tinto PLC,*
　332 F. Supp. 3d 786 (S.D.N.Y. 2018)........................................................................... 12-13, 32

*Davidoff* v. *Farina,*
　2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005).........................................................................20

*Dura Pharmaceuticals, Inc.* v. *Broudo,*
　544 U.S. 336 (2005)..................................................................................................................36

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.,*
　553 F.3d 187 (2d Cir. 2009)................................................................................................24, 25

*In re Flag Telecom Holdings, Ltd. Securities Litigation,*
　574 F.3d 29 (2d Cir. 2009).......................................................................................................36

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................26, 29

*Gray* v. *Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)........................................................... 18-19

*Greco* v. *Qudian Inc.*,
    2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022)..........................................................34

*Gross* v. *GFI Group, Inc.*,
    784 F. App'x 27 (2d Cir. 2019) ...............................................................................21

*In re Hain Celestial Group Inc. Securities Litigation*,
    2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022)..........................................................31

*Harris* v. *AmTrust Financial Services, Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015).....................................................................20

*Hawaii Structural Ironworkers Pension Trust Fund* v. *AMC Entertainment Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)........................................................... 24-25

*Holbrook* v. *Trivago N.V.*,
    2019 WL 948809 (S.D.N.Y. Feb. 26, 2019)............................................................15

*IKB International S.A.* v. *Bank of America Corp.*,
    584 F. App'x 26 (2d Cir. 2014) ...............................................................................33

*Janbay* v. *Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ............................................. 9-10, 37

*Janus Capital Group, Inc.* v. *First Derivative Traders*,
    564 U.S. 135 (2011).....................................................................................................8

*Kleinman* v. *Elan Corp., plc*,
    706 F.3d 145 (2d Cir. 2013)........................................................................... 20-21

*Lachman* v. *Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) .....................................................................23

*Lattanzio* v. *Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)......................................................................................38

*Lehmann* v. *Ohr Pharmaceutical Inc.*,
    2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019)........................................................25

*Lentell* v. *Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................36, 37, 39

iv

*Lipow* v. *Net1 UEPS Technologies, Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)....................................................................................36

*Miao* v. *Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)................................................................29, 30, 33, 35

*In re Lululemon Securities Litigation*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)....................................................................................10

*In re Magnum Hunter Resources Corp. Securities Litigation*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014)..........................................................10-11, 23-24, 25, 28

*Matrixx Initiatives, Inc.* v. *Siracusano*,
    563 U.S. 27 (2011)..................................................................................................20, 21

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008)..................................................................................39

*In re MGT Capital Investments, Inc. Securities Litigation*,
    2018 WL 1224945 (S.D.N.Y. Feb. 27, 2018).....................................................................12, 15

*New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*,
    80 F.4th 158 (2d Cir. 2023) ..........................................................................22-23, 31

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................................. 6, 17-18

*In re Philip Services Corp. Securities Litigation*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)..................................................................................40

*In re Plug Power, Inc. Securities Litigation*,
    2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023)........................................................................33

*Plymouth County Retirement Association* v. *Array Technologies, Inc.*
    2023 WL 3569068 (S.D.N.Y. May 19, 2023) ..........................................................................8

*In re PXRE Group, Ltd. Securities Litigation*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009)..................................................................................24

*S.E.C.* v. *First Jersey Securities, Inc.*,
    101 F.3d 1450 (2d Cir. 1996)............................................................................... 39-40

*In re Sanofi Securities Litigation*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)....................................................................................18

*Steamfitters Local 449 Pension Plan* v. *Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019)..................................................................................19

*Stratte-McClure* v. *Morgan Stanley*,
    784 F. Supp. 2d 373 (S.D.N.Y. 2011)........................................................................8

*Stratte-McClure* v. *Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015).....................................................................................5

*Tabak* v. *Canadian Solar Inc.*,
    549 F. App'x 24 (2d Cir. 2013) ...........................................................................25

*In re Take-Two Interactive Securities Litigation*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................37

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008).........................................................................24, 36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................23

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016).................................................................................12

*In re UBS AG Securities Litigation*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)....................................................32

*In re Weight Watchers International Inc. Securities Litigation*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020).................................................................11

*Woodley* v. *Wood*,
    2022 WL 103563 (S.D.N.Y. Jan. 11, 2022) .......................................................39

*Woolgar* v. *Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020).................................................................32

**Statutes**

15 U.S.C. § 78u-4 .........................................................................................................6, 23

15 U.S.C. § 78u-5 ............................................................................................................11

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................................................6, 8, 10

Defendants Credit Suisse Group AG ("CS"), Axel P. Lehmann, Ulrich Körner, Dixit Joshi, Thomas Gottstein, and David R. Mathers (collectively, the "Individual Defendants," and, with CS, the "CS Defendants")[1] submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint ("Complaint" or "CAC"; ECF No. 65) filed by Lead Plaintiff Ali Diabat ("Plaintiff").[2]

## PRELIMINARY STATEMENT

In this latest attempt to capitalize on the collapse of CS, Plaintiff claims that unspecified portions of virtually every quarterly filing, and numerous other public statements, the CS Defendants made during a two-year period violated the federal securities laws. But that sweeping assertion has no basis in any pleaded facts showing that any of the statements were false (let alone knowingly false) when made. Instead, Plaintiff assumes that they must have been false because CS ultimately was forced to merge with UBS in March 2023. Indeed, the only failure the Complaint pleads is a failure to predict these unprecedented events. The Complaint consists of nothing more than a textbook example of alleged fraud by hindsight, and it falls far short of the heightened pleading requirements for securities fraud claims. The Court should dismiss the Complaint in its entirety for multiple independent reasons.

*First*, the Complaint fails to plead an actionable misstatement. *See* Section I. Plaintiff's "puzzle pleading" approach—reprinting large block quotes from myriad statements and summarily asserting fraud based on a list of supposedly undisclosed (and often unconnected) facts—warrants

---

[1] Defendant António Horta-Osório has not been served with the Complaint and thus has not joined this motion.

[2] Unless otherwise specified, all (i) emphasis is added, (ii) internal citations, quotations, and emendations are omitted, and (iii) capitalized terms have the meanings assigned in the CAC.

1

dismissal on its own.  Neither Defendants nor the Court should be forced to try to make sense of the Complaint's nearly 500 paragraphs to divine a theory of fraud.  *See* Section I(A).  But even if one were to wade through Plaintiff's pleading to attempt to identify the allegedly false statements, none of the three categories of statements on which Plaintiff appears to focus can support a claim for securities fraud.  These categories—(i) the "Risk Management Statements"; (ii) the "Customer Outflow Statements"; and (iii) the "Internal Reporting Financial Controls ("ICFR") Statements"— are not actionable for a host of reasons.

Plaintiff's theory of fraud based on the Risk Management Statements asserts a conclusion: that CS's statements concerning its efforts to strengthen its risk management functions during the putative class period must have been false because CS later suffered losses and outflows and merged with UBS.  This is classic—and impermissible—fraud by hindsight.  Moreover, Plaintiff ignores that CS expressly disclosed that its risk management procedures might fail, and those statements that Plaintiff does include in the Complaint are objectively true, corporate puffery, and/or forward-looking statements, none of which are actionable.  *See* Section I(B).

Plaintiff next takes issue with CS's statements regarding the extent and pace of customer deposits and asset inflows and outflows throughout the putative class period.  Plaintiff asks this Court to infer that these statements were false because CS later experienced a run on the bank in March 2023, following the sudden collapse of two regional banks in the United States that led to "shockwaves around the world and triggered a dramatic loss of confidence in the global financial industry."  CAC ¶ 374.  But CS accurately reported these financial figures, and Plaintiff fails to plead facts showing that any of the CS Defendants' statements about the extent and pace of customer and asset outflows were actually false when made.  *See* Section I(C).

Plaintiff's claim based on the ICFR Statements also fails, as it rests on the notion that events

in March 2023—namely CS's announcement of certain material weaknesses in its ICFR—rendered materially false and misleading many of CS's public statements leading up to that announcement. But the issues announced in March 2023 did not cause any material misstatement of CS's financial statements, had no impact on CS's reported financial results, and were unrelated to the causes of the UBS/CS merger. Moreover, courts repeatedly have dismissed claims, just like Plaintiff's here, based on Sarbanes-Oxley certifications. *See* Section I(D).

*Second*, Plaintiff fails to plead the requisite strong inference of scienter. *See* Section II. Plaintiff cannot adequately plead motive, only generically referencing an incentive to make a profit. But courts in this Circuit repeatedly have found such generic allegations of motives, which any company or executive could hold, insufficient to allege a strong inference of scienter.

Nor can Plaintiff adequately allege conscious misbehavior or recklessness. Having failed to plead falsity as to any alleged misstatement, Plaintiff cannot allege facts showing that the statements were knowingly false. He relies on three Confidential Witnesses ("CWs"), but those relatively junior employees (some of whom were only at the bank for a very short portion of the putative class period) say nothing of substance. Regarding the Risk Management Statements, the CWs say only that the CS Defendants monitored risk and had risk targets. On the Customer Outflow Statements, they simply say that senior management tracked the outflows. And they say nothing at all with respect to the ICFR Statements. As CS fully and repeatedly disclosed all of the "facts" the CWs provide, the CWs add *nothing* to the analysis, and none of Plaintiff's other scienter allegations are any more cogent or compelling.

*Third*, Plaintiff fails to properly plead the required element of loss causation. *See* Section III. The Complaint alleges several supposedly "corrective" statements, but none of those statements "corrects" or even suggests the falsity of any prior statement. Thus, Plaintiff has not

3

pleaded loss causation under a corrective disclosure theory.  And Plaintiff's failure to connect any allegedly concealed risk with the cause of the UBS/CS merger—the extraordinary and unexpected run on the bank—precludes a pleading of loss causation under a materialization-of-risk theory.

***Finally***, because Plaintiff has not adequately alleged a primary violation under Section 10(b) and because, as noted above, he fails to adequately plead scienter as to any Individual Defendant, his Section 20(a) claim should also be dismissed.  *See* Section IV.

## THE COMPLAINT'S ALLEGATIONS

To avoid duplication, most of the Complaint's allegations are discussed in the Argument section below, where they are applied to the law.  This section provides a high-level overview.

The 214-page, 484-paragraph Complaint copies and pastes large swaths of text from many different public filings or statements the CS Defendants made over a nearly two-year span (April 2021 to March 2023) and alleges that they are all false and misleading.  *See* CAC ¶¶ 51-307.  To the extent it is possible to successfully unravel Plaintiff's intertwined allegations at all, those allegations appear to fall into three categories:

- ***Risk Management Statements.***  Plaintiff alleges that statements concerning CS's risk management and controls (the "Risk Management Statements") were false or misleading principally because CS allegedly "did not implement any meaningful changes" to its "risk management and/or control governance procedures and/or policies . . . at any time during the Class Period." CAC ¶¶ 62, 66, 74, 82, 86, 88, 93, 95, 97, 120, 123, 125, 129, 131, 133, 137, 145, 149, 157, 162, 166, 170, 175, 177, 188, 197, 206, 210, 212, 215, 221, 224, 228, 231, 233, 236, 241, 256, 258, 276, 298.

- ***Customer Outflow Statements.***  Plaintiff alleges that statements concerning CS's customer, asset, and/or deposit outflows and inflows, and concerning CS's liquidity (collectively, the "Customer Outflow Statements"), were false or misleading because CS "was experiencing significant and unusual customer and/or asset outflows" and did not disclose that fact or because CS "did not maintain a 'sufficient' liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not 'conservative.'" *Id.* ¶¶ 82, 88, 97, 99, 115, 131, 133, 137, 140, 147, 149, 151, 157, 166, 184, 188, 194, 199, 206, 210, 215, 217, 221, 226, 236, 238, 241, 243, 248, 252, 254, 258, 260, 262, 266, 269, 271, 278, 285, 288, 292, 295, 298, 300, 304, 307.

4

- ***ICFR Statements.*** Plaintiff alleges that numerous of CS's statements were false or misleading because "there existed material weaknesses in the Company's [ICFR]" (the "ICFR Statements"). *Id.* ¶¶ 56, 62, 64, 66, 75, 82, 86, 88, 97, 99, 115, 123, 125, 129, 131, 133, 137, 140, 147, 149, 151, 157, 162, 164, 166, 170, 177, 194, 199, 206, 217, 224, 226, 236, 241, 243, 248, 254, 258, 262, 266, 269, 278, 285.

The Complaint pleads no facts showing that any CS Defendant knew any of these statements were allegedly false when made (because they were not false at all). Instead, Plaintiff relies on speculation and innuendo, including generalized motive allegations, fraud by hindsight (*e.g.*, suggesting that Defendants must have known their statements were false because CS later suffered losses), and the generic allegation that the Individual Defendants were high-level CS executives and directors and were compensated in connection with those roles. *See id.* ¶¶ 386-437. Although Plaintiff includes statements from three CWs, they only say unremarkable things: CS set and monitored risk targets, and senior members of CS were informed about customer and asset outflows. CS itself routinely disclosed these "facts," and the CWs' alleged statements add nothing to the mix of publicly available information. *See id.* ¶¶ 41-50, 391-93.

Finally, Plaintiff alleges that the supposed misstatements were partially or wholly corrected by 11 disclosures beginning on February 10, 2022 and ending on March 20, 2023. But the so-called "corrective" disclosures did not actually correct anything at all. *See id.* ¶¶ 345-72.

## ARGUMENT

Plaintiff asserts a claim under Section 10(b) of the Exchange Act against all Defendants, and a claim under Section 20(a) of the Exchange Act against the Individual Defendants. *See* CAC ¶¶ 470-84. "To state a claim for securities fraud under [Section 10(b)] a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015). Because Section 10(b) claims sound in fraud, Plaintiff must

satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and of the Private Securities Litigation Reform Act ("PSLRA").

The elements of a Section 20(a) claim are "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

The Complaint falls well short of these requirements and thus fails to state any claim.

## I.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE AN ACTIONABLE MISSTATEMENT

### A.  The Complaint Is a "Puzzle Pleading" That Fails to Satisfy Rule 9(b).

The Complaint is a textbook example of the type of "puzzle pleading" that courts consistently reject. To satisfy Rule 9(b), a securities fraud "complaint . . . must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak* v. *Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *see also* 15 U.S.C. § 78u-4(b)(1). The Complaint fails to satisfy the first and fourth requirements (and, in many instances, the second as well).

The Complaint follows the same playbook for each alleged misstatement. First, Plaintiff excerpts a large block of text—sometimes, multiple blocks of text pulled from different sources— that, in many cases, addresses numerous distinct issues. Plaintiff often bolds and italicizes certain language in each block quote, but the reader is left to guess why. Second, Plaintiff claims that "statements" in the large block of quoted text "were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them." Finally, Plaintiff lists various, unconnected "facts" that the statements allegedly failed to disclose,

6

which supposedly rendered the statements false or misleading.

Courts routinely dismiss securities fraud claims that follow this kind of "puzzle pleading" approach because it makes it virtually impossible for anyone to determine *which* specific statements are allegedly fraudulent, or *why*. *See, e.g.*, *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012) (affirming dismissal of complaint that consisted "in large part of large block quotations with italicized text" followed by a "bullet-point list" of alleged undisclosed facts, "basically leaving the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter").

Judge Caproni's holding in *Born* v. *Quad/Graphics, Inc.*, 521 F. Supp. 3d 469 (S.D.N.Y. 2021), is on all fours.  In that case, plaintiffs' "puzzle pleading" consisted of:

> [A] 100-page, 268-paragraph Complaint, of which 69 paragraphs spanning over 30 pages [were] dedicated to reciting Defendants' statements during the Class Period. Broken down by fiscal quarter, Plaintiffs excerpt[ed] statements from nearly every public disclosure document and related investor call [the company] conducted during the Class Period, relying primarily on bolded text in half-page block quotations to identify the allegedly misleading statements.  After each subsection of the Complaint pertaining to a particular fiscal quarter, Plaintiffs include[d] a substantially similar paragraph containing some variation of the same five or so generalized, conclusory statements. . . .   While in a couple of these paragraphs Plaintiffs point[ed] to a specific type of statement . . . the explanation for *why* the statement [was] allegedly false or misleading can be reduced to the same conclusory assertions articulated above. . . .  Plaintiffs' selective bolding does little to assist the Court in identifying the falsity of Defendants' statements because, in many instances, Plaintiffs bold almost the entirety of a multi-paragraph block quotation.

*Id*. at 478 (emphasis in original).

This is *exactly* the same approach Plaintiff takes here.  As Judge Caproni held in dismissing that complaint in its entirety, "[t]his type of pleading is insufficient to support Plaintiffs' allegations that over 18 months' worth of statements, only marginally winnowed down for

7

purposes of the Complaint, are all false or misleading" and fails to "meet the heightened pleading standards of Rule 9(b) and the PSLRA." *Id.* at 478-79; *see also Plymouth Cnty. Ret. Ass'n* v. *Array Techs., Inc.*, 2023 WL 3569068, at *9 (S.D.N.Y. May 19, 2023) (plaintiffs' use of "the same formulaic response as to why the statements [were] false," even though the statements themselves were "not only varied but [were] broad and multifaceted and, at times, complex," warranted dismissal under Rule 9(b) and the PSLRA).

Moreover, Plaintiff appears to assume that all alleged misstatements can be attributed to every Individual Defendant (or perhaps is content with ambiguity on this issue). This too is insufficient. "Obviously . . . statements made after [Individual Defendants] left the Company"— or before they joined—"can not be attributed to them" for Section 10(b) purposes. *Stratte-McClure* v. *Morgan Stanley*, 784 F. Supp. 2d 373, 384 n.8 (S.D.N.Y. 2011); *see also* CAC ¶¶ 33-38 (no Individual Defendant worked at CS for the entire class period). And even if an Individual Defendant was at CS when a statement was made, that does not necessarily mean that Defendant "made" every alleged misstatement during that time period. *See Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). Plaintiff's lack of specificity makes it impossible for Defendants or the Court to attempt to trace every potential combination of speakers and alleged misstatements. The Complaint thus does not meet the requirements of Rule 9(b) or the PSLRA.

### B. The Risk Management Statements Are Not Actionable.

Plaintiff bases his theory of fraud as to the Risk Management Statements on the following:

- Before the putative class period, CS disclosed that it had suffered significant losses as a result of what the Complaint calls "two major risk management and control governance scandals" (*i.e.*, losses resulting from the failure of CS counterparties Greensill and Archegos). CAC ¶¶ 5-7. The Archegos and Greensill issues were the subject of separate securities litigation, since resolved, and are not at issue in this case.

8

- Then, during the putative class period, CS stated that it had "taken significant steps" to try to address and improve its risk management processes, and that CS's "risk and control governance is being strengthened and will be further enhanced[.]" *Id.* ¶ 7.

- From this, Plaintiff concludes that the CS Defendants' statements about risk management must have been false because risks continued to exist (*e.g.*, exposure to Russian clients that attracted scrutiny as governments imposed sanctions related to the Ukraine war). *See, e.g., id.* ¶ 10.

In cobbling together this speculative theory, however, Plaintiff selectively omits a key detail—CS expressly warned in its Annual Report that its risk management efforts might fail:

**Our risk management procedures and policies may not always be effective**

We have risk management procedures and policies designed to manage our risk. These techniques and policies, however, may not always be effective, particularly in highly volatile markets. We continue to adapt our risk management techniques, in particular value-at-risk and economic capital, which rely on historical data, to reflect changes in the financial and credit markets. No risk management procedures can anticipate every market development or event, and our risk management procedures and hedging strategies, and the judgments behind them, may not fully mitigate our risk exposure in all markets or against all types of risk.

2020 Annual Report (October 27, 2023 Declaration of Nicholas N. Matuschak ("Matuschak Decl."), Ex. 1) at 53 (emphasis in original). Plaintiff's allegations must be viewed in the context of this explicit warning.

Moreover, Plaintiff's entire theory based on these statements suffers from two fatal flaws— each of which requires dismissal.

***First***, the Complaint's allegations are so vague that it is unclear what "risk management" policies and procedures Plaintiff is even addressing. Some statements refer to risk controls for specific portions of the bank—such as risk controls for the "prime services business" (*see, e.g.,* CAC ¶ 63)—while others refer broadly to "risk processes and systems" across "the entire bank" (*see, e.g., id.* ¶ 72). Plaintiff's failure to identify with particularity which risk management processes, policies, or initiatives are actually at issue requires dismissal. *See Janbay* v. *Canadian*

9

*Solar, Inc.*, 2012 WL 1080306, at \*4, \*9 (S.D.N.Y. Mar. 30, 2012) (falsity not pled where plaintiffs "failed to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why" and holding "[u]nder Rule 9(b), [a plaintiff] must plead specific facts explaining why each alleged misstatement was false at the time it was made").

**Second**, the Complaint does not plead any facts showing that the statements were false when made. Instead, Plaintiff simply asks the Court to infer that the statements about taking steps to improve risk management must have been false because the bank later suffered additional losses. This is classic—and impermissible—fraud by hindsight. *See In re Citigroup Sec. Litig.*, 2023 WL 2632258, at \*16 (S.D.N.Y. Mar. 24, 2023) ("[P]laintiffs may not plead fraud by hindsight."); *In re Allergan PLC Sec. Litig.*, 2022 WL 17584155, at \*7 (S.D.N.Y. Dec. 12, 2022) (McMahon, J.) ("A statement believed to be true when made, but later shown to be false, is insufficient, because it lacks contemporaneous falsity.").

Despite Plaintiff's speculation, the far more plausible inference is that CS **did** try to strengthen its risk management processes, and **did** believe its plans would succeed, but that it ran out of time before it could fully accomplish those goals. Indeed, Plaintiff does not and cannot allege that incidents similar to the Greensill and Archegos matters ever arose again, so one might reasonably conclude that, consistent with CS's statements, CS did in fact address certain aspects of its risk management approach. Courts in this Circuit routinely dismiss speculative and hindsight-based securities fraud claims just like Plaintiff's claims here. *See, e.g.*, *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 584 (S.D.N.Y. 2014) (suggestion that "the company thought it could improve its quality controls faster and more comprehensively than it did . . . speak[s] to areas of corporate mismanagement, not securities fraud"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) ("The fact that defendants recognized problems,

10

announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made.").

In addition to these overarching problems, the Risk Management Statements are inactionable because they consist of:

***Forward-Looking Statements***.  Many of the Risk Management Statements are inactionable because they are forward-looking.  *See, e.g.*, CAC ¶ 63 ("risk and control governance . . . ***will be further enhanced***"); *id.* ¶ 92 (new Chief Risk Officer "***will help shape*** the Group's enhanced risk management framework"); *id.* ¶ 96 ("*[W]e aim* to further strengthen our risk culture[.]"); *id.* ¶ 275 (discussing "our ***forward focus*** on . . . efficiently reducing risk"); *id.* ¶ 297 ("As part of our cultural transformation, ***we want to ensure*** that our people act as prudent and professional risk managers at all times[.]").

Such statements fall under the PSLRA's safe harbor for forward-looking statements that are "accompanied by meaningful cautionary" language.  15 U.S.C. § 78u-5(c)(1)(A)(i).  And as discussed above, CS expressly warned investors of the risk that its risk management processes could prove ineffective.  *See* Matuschak Decl., Ex. 1 at 53.

It is difficult to imagine more direct cautionary language.  *See, e.g.*, *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 255 (S.D.N.Y. 2020) (applying safe harbor where cautionary language "disclose[d] the <u>exact</u> risk of which Plaintiffs complain") (emphasis in original).  CS's express warnings put investors on notice about the risks of relying on its forward-looking, aspirational statements about its efforts to try to improve risk management.

***Objectively Truthful Statements***.  Plaintiff points to several statements describing steps CS took to try to improve its risk management—for example, that it (i) was conducting an investigation into events related to the collapse of Archegos and Greensill; (ii) had implemented

11

personnel changes; and (iii) had taken measures to reduce risk exposure, including the "[s]uspension of [CS's] share buyback program[,] [r]eduction of ordinary total dividend proposal to CHF 0.10 gross per registered share [and] [s]uccessful placement of two series of MCNs [mandatory convertible notes.]"  CAC ¶ 61; *see also, e.g.*, *id.* ¶¶ 52-54, 63, 65, 67, 72-73, 77.

The Complaint does not and could not allege that any of these statements were false. Instead, Plaintiff asserts that the remedial steps CS took were not sufficiently "meaningful."  *See, e.g.*, *id.* ¶ 55.  But Plaintiff's hindsight disparagement of CS's remedial measures does not transform true facts into misstatements.  *See In re MGT Cap. Invs., Inc. Sec. Litig.*, 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) ("Once a company discloses material objective factual matters, it need not characterize or editorialize on those facts in any particular way.").  Indeed, even if the CS Defendants had opined that the measures were "meaningful," that would ***still*** be insufficient to state a claim.  *See Tongue* v. *Sanofi*, 816 F.3d 199, 210, 213-14 (2d Cir. 2016) (dismissing for failure to plead falsity claim based on drug-manufacturer-defendant's optimistic statement about accurately disclosed trial data even though FDA later criticized that same data).

***Corporate Puffery****.*  Nor can Plaintiff state a claim based on generalized statements of corporate optimism or other broad, non-specific statements.  For example, Plaintiff complains about statements that (i) "[t]he related risk and control governance is being strengthened" (CAC ¶ 63); (ii) "[w]e have taken action to address many of the issues . . . [and] proactively derisked our Prime Services business" (*id.* ¶ 100); (iii) "[w]e have set the right course with the new strategy" (*id.* ¶ 144); (iv) "our strategy puts risk management at the very core of our business," (*id.* ¶ 161); (v) "we also achieved a lot in terms of strengthening our risk management" (*id.* ¶ 169); and (vi) "we remain focused on improving risk management" (*id.* ¶ 218).  But courts in this Circuit routinely hold such statements to be non-actionable puffery.  *See Das* v. *Rio Tinto PLC*, 332 F.

Supp. 3d 786, 806 (S.D.N.Y. 2018) ("aspirational statements" that defendant was "committed, in principle and practice, to transparency consistent with good governance" were puffery); *City of Pontiac Policemen's and Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("explicitly aspirational" statements "with qualifiers such as 'aims to,' 'wants to,' and 'should'" were not actionable).

For many of these same reasons, Judge Preska recently dismissed strikingly similar allegations involving another large global bank, Citigroup. *See generally Citigroup*, 2023 WL 2632258. The plaintiffs there alleged that Citigroup and several individuals were liable for securities fraud because they publicly touted the bank's risk management efforts despite knowing that (i) regulators believed the efforts were inadequate, and (ii) Citigroup was not adequately investing in risk management. *Id.* at *3. And those plaintiffs based their claim, in part, on statements—much like those here—that, for example, "Citigroup made 'sustainable,' 'necessary,' 'essential,' and 'significant' investments in risk, control, and compliance" and "Citigroup would remain 'committed' to making the necessary investments in these areas." *Id.* at *13.

In dismissing plaintiffs' claim, the court explained that Citigroup's statements regarding "investments and commitments" to compliance, its descriptions of its "policies and procedures," and its "general statements about how Citigroup 'manages its risks'" were "simple and generic" assertions on which no investor would reasonably rely. *Id.* at *14. Judge Preska continued: "[T]hese are exactly the types of routine representations of risk-management practices that almost every bank . . . makes and which are inactionable" as "puffery." *Id.* CS's statements about "strengthening" its risk management and putting risk "at the very core of [its] business" (*see, e.g.*, CAC ¶¶ 161, 169) are no different. Judge Preska also explained that her conclusion was "buttressed by the repeated and specific cautions that Citigroup provided in its Annual Reports"

13

about the supposed risk that materialized—there, the possibility of adverse regulatory findings. *Id.* at \*15. Again, the same is true here.

Judge Preska held that the plaintiffs had failed to plead falsity because they never "allege[d] facts showing that Citigroup did not, in fact, make the described investments in risk, control, and compliance as of the time the . . . statements were made," but instead "conclud[ed]" as much "by reasoning backward" from later-disclosed regulatory orders and actions. *Id.* at \*16. Again, that reasoning applies here as well. The Complaint offers no facts to demonstrate that CS did *not* strengthen or focus on its risk management policies. Rather, just like the plaintiffs in Citigroup, Plaintiff merely concludes, with the benefit of hindsight, that the CS Defendants must have failed to strengthen CS's risk management processes and controls because some risks continued to exist. Such allegations fail to plead falsity.

### C. The Customer Outflow Statements Are Not Actionable.

The Customer Outflow Statements also are not actionable because Plaintiff has not sufficiently alleged that any of them were actually false when made. The Court should dismiss Plaintiff's claims based on these statements for four reasons.

*First*, in each quarter of the putative class period, CS disclosed various measures of its performance including, as relevant here, total assets under management, net new assets (or net asset outflows), and total customer deposits. *See, e.g.*, Matuschak Decl., Ex. 2 at 35, 44; *id.*, Ex. 4 at 44, 72; *id.*, Ex. 5 at 45, 74; *id.*, Ex. 6 at 41, 52; *id.*, Ex. 8 at 28, 38; *id.*, Ex. 11 at 30, 41; *id.*, Ex. 15 at 32, 43; *id.*, Ex. 19 at 35, 46. Plaintiff does not allege that *any* of these reported amounts were false or later corrected. Rather, he alleges that Defendants misrepresented the alleged "*significance* and *impact* of customer and asset outflows" throughout the almost two-year putative class period. CAC ¶ 344.

In rote fashion, Plaintiff quotes excerpts of public statements and then asserts in boilerplate

14

allegations that such statements were "materially false and/or misleading" because, *inter alia*, CS "was experiencing ***significant*** and ***unusual*** customer and/or asset outflows." *See, e.g.*, *id.* ¶ 82. But, as discussed above, the federal securities laws do not require companies to "characterize or editorialize" accurately-reported numbers. *MGT*, 2018 WL 1224945, at *11; *see also Holbrook* v. *Trivago N.V.*, 2019 WL 948809, at *18 (S.D.N.Y. Feb. 26, 2019) (holding similarly).

Moreover, Plaintiff does not point to anything to suggest that CS's inflows and outflows ***before*** October 2022 were "significant" or "unusual." For each quarter of 2021 and the first three quarters of 2022, CS reported net asset inflows and outflows ranging from inflows of approximately CHF 28.4 billion to outflows of approximately CHF 12.9 billion. *See* Matuschak Decl., Ex. 2 at 35; *id.*, Ex. 4 at 44; *id.*, Ex. 5 at 45; *id.*, Ex. 6 at 41; *id.*, Ex. 8 at 28; *id.*, Ex. 11 at 30; *id.*, Ex. 15 at 32. Plaintiff does not and cannot explain why anyone at CS would have or should have viewed these amounts as particularly significant or unusual.

Indeed, the only "outflows" on which Plaintiff actually appears to base his claim are those that CS experienced ***during the fourth quarter of 2022***. *See, e.g.*, CAC ¶ 352 (alleging that the putative class was damaged when Credit Suisse announced that it experienced net asset outflows of approximately CHF 84 billion ***for the period of October 1, 2022 through November 11, 2022***); *id.* ¶¶ 354, 357 (alleging that the "truth" was revealed about net asset "outflows of 110.5 billion Swiss francs ***in the final three months of 2022***"). Neither of these purported "corrective disclosures" corrected—or said anything at all—about customer and/or asset outflows prior to October 2022 (nor did they correct any statements about outflows after October 2022 either, as discussed further herein and in Section III, below).[3]

---

[3] The Complaint also includes conclusory assertions that CS should have disclosed "additional information regarding known trends, uncertainties, or events" in its 2021 and 2022 Annual Reports, "including, but not limited to, the fact that the Company was experiencing significant and

***Second***, with respect to Customer Outflow Statements after October 1, 2022, Plaintiff does not dispute that CS actively updated the market about significant outflows that occurred during the fourth quarter of 2022. The Complaint cites to numerous of CS's public statements from October through December 2022 discussing the extent and apparent pace of these outflows, including statements on October 27, 2022 flagging a "***significant*** level of deposit and assets under management outflows" experienced "during the first two weeks of October 2022." *Id.* ¶ 240. Similarly, on November 23, 2022, CS reported that outflow volumes in October had "substantially exceeded the rates incurred in the third quarter of 2022" and quantified the net asset outflows for the fourth quarter through November 11, 2022 as "approximately 6% of assets under management at the end of the third quarter of 2022" (*id.* ¶ 257)—which equated to ***CHF 84 billion*** (*see, e.g.*, *id.* ¶ 264). *See also id.* ¶¶ 242, 244-47, 253, 261.

Again, Plaintiff does not allege that ***any*** of these reported numbers were inaccurate. Rather, he alleges that statements by the CS Defendants that the pace of outflows had "stabilized," "reduced," "flattened," or "basically stopped"—each made at particular points in time in late October, November, and December 2022—were false and misleading. *See, e.g.*, *id.* ¶¶ 241, 243, 248, 252, 254, 258, 262, 266, 269. But Plaintiff offers no factual allegations to support any claim that outflows had not in fact "stabilized," "reduced," "flattened," or "basically stopped" at the times each of those statements were made (when things, of course, were fluid). Nor does Plaintiff point to any "corrective" disclosure that would support Plaintiff's bald assertion that those statements were inaccurate when made. Instead, the quarterly numbers CS reported in early 2023

---

unusual customer and/or asset outflows through the Class Period." *See* CAC ¶¶ 451-55. As discussed above, there are no factual allegations in the Complaint that would support any claim of "significant and unusual" outflows in 2021, and in its 2022 Annual Report, CS ***did*** discuss at some length the outflows experienced in the fourth quarter of 2022. *See, e.g.*, 2022 Annual Report (Matuschak Decl., Ex. 23) at 40, 46, 55, 61, 67.

are entirely consistent with the CS Defendants' statements in the fourth quarter of 2022 that outflows slowed after spiking in October.

Specifically, on February 9, 2023, CS reported net asset outflows for the full fourth quarter of CHF 110.5 billion "with approximately two-thirds of these net asset outflows," *i.e.*, approximately CHF 73 billion, "concentrated in October 2022." *Id.* ¶ 277. Defendant Körner further explained during CS's February 9, 2023 Earnings Conference that "October and November together" accounted for "more than 85%" of net asset outflows, *i.e.*, approximately CHF 94 billion. *Id.* ¶ 283. There is no reason why the fact of additional outflows in December 2022—in an amount far lower than that experienced in October 2022 (and October-November collectively)—would render false statements that the rate of outflows had decreased as the fourth quarter progressed.

The Complaint cites a report from March 20, 2023 indicating that outflows at CS "topped up to CHF10bn a day, making the situation unstainable [sic] for CS." *Id.* ¶ 366. The Complaint also cites CS's own disclosures that, "[i]n the second half of March 2023, Credit Suisse experienced significant withdrawals of cash deposits . . . which were most acute in the days immediately preceding . . . the announcement of the merger [with UBS; *i.e.*, around March 20, 2023]," due at least in part to "[t]he sudden collapse of Silicon Valley Bank and Signature Bank" earlier in the month. *Id.* ¶¶ 374-75. But this significant (and disclosed) increase in the pace of outflows in the second half of March 2023 does not make any of CS's earlier statements false.

***Third***, Plaintiff's real grievance about CS's Customer Outflow Statements appears to be that CS and its senior management did not predict that outflows would increase in the way that they did, and to the extent they did, in March 2023. But "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain

17

disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309.

Indeed, even if CS's failure to predict this increase were actionable (and it is not), Plaintiff cannot explain why CS should have predicted, months earlier, the unprecedented events of March 2023. This is particularly true where, as pled in the Complaint, (i) CS stated explicitly to the market in October 2022 that "[i]t [was] premature to estimate the impact" of the October outflows "on net new asset flows for 4Q22" (CAC ¶ 242); (ii) CS specifically warned that CS "*may continue to suffer . . . outflows of assets* and a slowdown in net new asset generation across our divisions" (3Q22 Quarterly Report (Matuschak Decl., Ex. 16), at 10); and (iii) CS at times experienced "positive deposit *inflows*" in certain areas of the bank in the first quarter of 2023 (CAC ¶ 280).

*Finally*, Plaintiff takes issue with language in CS's periodic disclosures that used the following (or materially identical) language:

> To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that *we believe* are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, *we expect* to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.

*Id.* ¶¶ 87, 98, 132, 165, 198, 225, 253, 297.

But there are no allegations (nor could there be) that CS did not, in fact, "maintain a liquidity pool" based on parameters that management "believe[d]" to be conservative. *Id.* And CS's statements as to the expected sufficiency of its liquidity pool are quintessential statements of opinion, which "are actionable only if the defendant's opinions were both false and not honestly believed when they were made." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015); *see also id.* (statements about what a company "expects" are "statements of opinion—they express [the company's] expectations for the future rather than presently existing, objective facts"); *Gray*

18

v. *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 400 (S.D.N.Y. 2020) (statements referring to what a speaker "believed" were "classic statements of opinion").  Here, there are no allegations to plausibly suggest the CS Defendants did not honestly hold these opinions.  That CS found itself in financial distress in March 2023 says nothing about whether its liquidity risk parameters were conservative or whether management believed its liquidity pool would be sufficient.

The PSLRA's safe harbor provision also renders these forward-looking statements inactionable.  "The use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement."  *Steamfitters Local 449 Pension Plan* v. *Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 361 (S.D.N.Y. 2019).  Here, the language at issue uses just such "linguistic cues," and CS repeatedly issued explicit cautionary language as to liquidity.  *See* Matuschak Decl., Ex. 3 at 147; *id.*, Ex. 4 at 157; *id.*, Ex. 5 at 159; *id.*, Ex. 7 at A-12; *id.*, Ex. 9 at 143; *id.*, Ex. 12 at 147; *id.*, Ex. 16 at 151; *id.*, Ex. 23 at A-12.

### D.  The ICFR Statements Are Not Actionable.

In March 2023, after a protracted exchange with the SEC Staff regarding nuanced and technical questions about the application of certain accounting rules, CS concluded that it had "identified certain material weaknesses in [its ICFR] as of December 31, 2022 and 2021," such that those controls were deemed "not effective."  CAC ¶ 358.  This conclusion did not mean or suggest that any prior financial results were materially misstated.  Instead, this conclusion constituted an acknowledgement by CS that certain controls were insufficient to comprehensively prevent the ***possibility*** that such mistakes ***could*** occur in the future.

As the Complaint acknowledges (*see id.* ¶¶ 8, 25), the ICFR deficiencies in question had resulted in CS failing to identify certain minor accounting errors that, when discovered in 2021,

19

required revisions to the financial results for 2019 and 2020 that were "not material individually or in aggregate." 2021 Annual Report (Matuschak Decl., Ex. 7) at 292.  These issues related to (i) "the netting treatment relating to the presentation of a limited population of certain securities lending and borrowing activities" and (ii) the classification of "share-based compensation expenses" and "non-cash exchange rate movements related to certain operating, investing and financing activities." *Id.*  Plaintiff suggests that CS's determination that these revisions were not material was "false[]" and that the issues were "significant" (CAC ¶ 8), but cites nothing to support that conclusory statement.  Plaintiff attempts to suggest that CS violated GAAP (*see id.* ¶¶ 308-19), but Plaintiff identifies no specific, actionable GAAP violation.  *See Harris* v. *AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 n.28 (S.D.N.Y. 2015) (allegations that company violated "a Statement of Financial Accounting Concepts" does not allege a GAAP violation); *Davidoff* v. *Farina*, 2005 WL 2030501, at *17 (S.D.N.Y. Aug. 22, 2005) ("[A]llegations of GAAP violations or accounting irregularities alone are insufficient to state a securities fraud claim without evidence of corresponding fraudulent intent.").

Unable to point to any materially incorrect financial reporting, Plaintiff lards the Complaint with boilerplate allegations that an assortment of statements on various subjects failed to disclose that "there existed material weaknesses in the Company's internal controls over financial reporting." *See, e.g.*, CAC ¶ 56.  This "puzzle pleading" approach is ineffective here, where the ICFR deficiencies at issue largely had nothing at all to do with most of the challenged statements.

Section 10(b) does "not create an affirmative duty to disclose any and all material information;" disclosure is required "only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011); *Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 152-53 (2d Cir.

20

2013) (same).  Because the CS Defendants' statements concerning CS's financials were not rendered misleading without a discussion of CS's ICFR (since, as noted, there were no material errors in CS's financial statements), the CS Defendants had no duty to address that topic in connection with those statements.  *See generally Gross* v. *GFI Grp., Inc.*, 784 F. App'x 27, 31 (2d Cir. 2019) ("[D]isclosure is required only when a defendant chooses to speak about material issues and the defendant's affirmative statements would be misleading without the disclosure."); *Matrixx Initiatives*, 563 U.S. at 45 ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under [Section 10(b)] by controlling what they say to the market.").

Plaintiff's central allegation with respect to CS's ICFR appears to be that the language contained in SOX Certifications signed by Defendants Gottstein, Mathers, Körner, and Joshi (the "SOX Defendants") as part of the 2021 and 2022 CS Annual Reports, or similar language contained elsewhere in those Reports, was false or misleading.  *See* CAC ¶¶ 163, 318-19.  The SOX Certifications stated, *inter alia*, that:

- "Based on [each SOX Defendant's] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report;"

- The SOX Defendants had "designed" or "caused . . . to be designed" what they believed to be effective ICFR processes within CS "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;" and

- The SOX Defendants "ha[d] disclosed, based on [their] most recent evaluation of internal control over financial reporting, to [CS's] auditors and the audit committee of [CS's] board of directors . . . all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [CS's] ability to record, process, summarize and report financial information[.]"

*Id.* ¶ 318; *see also id.* ¶¶ 163-64 (alleging that similar language elsewhere in the 2021 Annual

21

Report was false and misleading).

Here again, it is not clear which portion(s) of the lengthy SOX Certifications Plaintiff alleges were false. The Complaint generically asserts that the Certifications were false, apparently in their entirety, because "as Defendants themselves would later admit, Credit Suisse's internal controls over financial reporting suffered from material weaknesses, and, as a result, the Company's financial reports were inaccurate, unreliable, and/or subject to manipulation." *Id.* ¶ 319. Of course, this makes no sense with respect to the SOX Certifications attached to the 2022 Annual Report, given that ***CS disclosed the material weakness in its ICFR in that very same Report.*** More broadly, Plaintiff's theory of falsity is fundamentally mismatched with the statements themselves, which describe ***opinions*** as to the accuracy of the information reported, management's efforts to design and implement effective controls, and a process to escalate deficiencies in such controls.

The Second Circuit and courts in this district have repeatedly held SOX Certifications such as these inactionable as a matter of law. Indeed, just two months ago, the Second Circuit rejected virtually identical allegations. *See New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*, 80 F.4th 158, 176 (2d Cir. 2023). This Court should reject Plaintiff's allegations based on the SOX Certifications in this case for the same reasons.

***First***, as in *DeCarlo*, Plaintiff fails to allege that the SOX Certifications were materially false when made because the Certifications constitute "non-actionable statements of opinion." *Id.* As in *DeCarlo*, each of the SOX Certifications here states explicitly that it is made "[b]ased on [each signatory's] knowledge." CAC ¶ 318; *see also DeCarlo*, 80 F.4th at 176 ("[Defendants'] certifications about the accuracy of AmTrust's financial reporting, including that financial statements were prepared in conformity with GAAP, signal that they are opinions by stating that

22

they are 'based on [the] knowledge' of the officer."). In the absence of allegations that these opinions were not honestly held at the time they were made or that they were not based on reasonable inquiry (and such allegations are lacking here), they are not actionable as a matter of law. *Id.*; *see also Citigroup*, 2023 WL 2632258, at *20 (same).

**Second**, also as in *DeCarlo*, the fact that CS subsequently identified flaws in its ICFR processes says nothing about whether the SOX Certifications were false when made. *See DeCarlo*, 80 F.4th at 176 ("AmTrust's change of opinion [regarding the sufficiency of its controls], standing alone, does not mean that the original certified opinions were disingenuous."); *Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111, 134 (E.D.N.Y. 2020) ("Plaintiffs fail to allege that [defendant's] SOX certifications were materially false or misleading simply because a weakness in [the company's ICFR] was later discovered."); *Citigroup*, 2023 WL 2632258, at *20 ("Post-Class Period identification of control deficiencies . . . without more" does not establish that defendants "knew . . . of any . . . deficiencies in the Company's internal controls").

## II. THE COMPLAINT FAILS TO ADEQUATELY ALLEGE A STRONG INFERENCE OF SCIENTER

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2)(A). The PSLRA's use of the word "strong" means that "the inference of scienter must be more than merely reasonable or permissible[.]" *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

"The requisite strong inference of [scienter] may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Magnum*

*Hunter*, 26 F. Supp. 3d at 292.  The Complaint here fails to satisfy either prong.

### A. The Complaint Fails to Allege Facts Showing that the CS Defendants Had Motive to Commit Fraud.

As discussed above, Plaintiff does not and cannot allege any facts showing that any CS Defendant had any knowledge that any statement in the Complaint was false when made.  So Plaintiff lobs in a weak attempt to plead scienter based on generalized and conclusory motive allegations, which courts in this Circuit routinely reject.

Plaintiff's only explicit attempt to plead motive is to ask the Court to assume that CS's compensation structure incentivized Individual Defendants "to ignore red flags and continue the fraud throughout the Class Period."  CAC ¶ 437.  But courts have consistently rejected general motive allegations like these.  *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of [the scienter] inquiry."); *Citigroup*, 2023 WL 2632258, at *12 (same).  "[T]he Second Circuit has held that motives that are generally possessed by most corporate directors and officers do not suffice to plead securities fraud."  *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 530 (S.D.N.Y. 2009).  If the rule were otherwise, "virtually every company . . . that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 197 (2d Cir. 2008).  Plaintiff's generalized motive allegations are no different and are, thus, likewise insufficient.

For similar reasons, any implicit suggestion that the CS Defendants were incentivized to maintain CS as a going concern and avoid a bank run or insolvency also fails.  As courts in this Circuit have frequently held, "any corporation would be motivated to avoid bankruptcy."  *Haw.*

24

*Structural Ironworkers Pension Tr. Fund* v. *AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 849 (S.D.N.Y. 2019); *see also Tabak* v. *Canadian Solar Inc.*, 549 F. App'x 24, 28 (2d Cir. 2013) (even where plaintiffs alleged company "had no available means to pay down . . . loans other than by issuing more stock . . . a desire to raise capital to repay loans is insufficient to establish motive because it is a goal possessed by virtually all corporate insiders"); *Lehmann* v. *Ohr Pharm. Inc.*, 2019 WL 4572765, at *6 (S.D.N.Y. Sept. 20, 2019) (even where auditor had questioned whether the company could continue as a going concern, "point[ing] to the Company's desire to avoid bankruptcy as Defendants' motive . . . [could not] form the basis for finding the requisite scienter"). Thus, Plaintiff's attempt to allege a strong inference of scienter through motive fails.

**B. The Complaint Fails to Allege Facts that Constitute Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.**

Where, as here, a complaint fails to allege motive, scienter must be shown "by identifying circumstances indicating conscious [mis]behavior or recklessness by the defendant, though [in cases where motive has not been pled,] the strength of the circumstantial allegations must be correspondingly greater." *Magnum Hunter*, 26 F. Supp. 3d at 292; *see also JP Morgan*, 553 F.3d at 198-99 (same). To allege scienter based on conscious misbehavior or recklessness, a plaintiff must allege facts demonstrating that either the defendants ***knew*** their statements were false when made, or made statements based upon "an extreme departure from the standards of ordinary care to the extent that the danger [of falsity] was either known to the defendant or so obvious that the defendant must have been aware of it." *Magnum Hunter*, 26 F. Supp. 3d at 292; *see also JP Morgan*, 553 F.3d at 198. None of Plaintiff's allegations come close to meeting this high bar.

**i. The Complaint Does Not Allege Scienter for the Risk Management Statements.**

As discussed in Section I(B) above, Plaintiff fails to allege facts showing that the CS Defendants' generic and forward-looking statements about "strengthening" CS's risk management

25

practices in the wake of Greensill and Archegos were false when made.  It follows, therefore, that Plaintiff cannot possibly allege that any CS Defendant knew, or recklessly disregarded, that those statements were false when made.

The Complaint bears this out.  There is not a single fact alleged to demonstrate that anybody knew or believed CS was not, in fact, taking steps to try to improve its risk management (because it was).  There is no discussion of a document, a meeting, a conversation, or anything else demonstrating any such knowledge or belief.  And the only aspect of CS's risk management framework that any CW has commented on is CW1's non-controversial statement that "each Credit Suisse branch had a risk target and that the Company monitored the risk status of each branch to ensure it was staying within that target."  CAC ¶ 43.  This unremarkable statement, which could apply to any bank in the world, says nothing about whether CS was or was not trying to improve its risk management framework, or who knew about those efforts.  Accordingly, Plaintiff comes nowhere close to pleading a strong inference of scienter for the Risk Management Statements.  *See Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (to establish circumstantial evidence of scienter, a plaintiff must allege "both (1) *specific* contradictory information that was available to the defendants (2) *at the same time* they made their [allegedly] misleading statements") (emphasis in original).

Unable to meet this standard, Plaintiff tries to allege a strong inference of scienter with a hodgepodge of pleading gimmicks and fraud by hindsight—all of which this Court should reject.

***First***, Plaintiff relies on a host of alleged events that pre-date the putative class period (which began on April 6, 2021).  For example, the Complaint alleges that the public disclosure in February 2021 of FINMA's investigation into a banker's 2018 fraud somehow shows that CS was not trying to strengthen its risk management policies during the putative class period.  CAC ¶¶

394-96.  Similarly, Plaintiff relies on fines and guilty pleas that took place between 2014 and 2018 (*see id.* ¶ 420), alleged deficiencies in risk management "from 2019 through Archegos's default" (which pre-dates the class period) (*id.* ¶ 415), as well as changes in the "risk function" and allegedly insufficient investment in risk management technology—both in 2020 (*id.* ¶¶ 416-17).  But the Complaint fails entirely to explain how alleged risk management issues ***before*** the putative class period cast doubt on the CS Defendants' statements that they were trying to improve the risk management function ***during*** the putative class period.

***Second***, Plaintiff points to a handful of disconnected regulatory events: (i) the U.K. Financial Conduct Authority's May 2022 decision to put CS on "a watchlist of institutions requiring tougher supervision based on concerns that it had not done enough to improve its culture, governance and risk controls" (*id.* ¶ 401); (ii) a U.S. Department of Justice investigation into whether CS "helped Russian oligarchs evade sanctions" (*id.* ¶ 402); and (iii) various after-the-fact investigations "into [the] collapse of Credit Suisse and its takeover by UBS" (*id.* ¶ 403; *see also id.* ¶¶ 407, 410).  But none of these events suggests that any CS Defendant knew that CS had not strengthened, and was not trying to further strengthen, its risk management procedures during the putative class period.  Once again, *Citigroup* is instructive.  There, Judge Preska rejected similar fraud-by-hindsight allegations.  *See Citigroup*, 2023 WL 2632258, at *18 (allegations "that regulators . . . identified unspecified deficiencies" did not render statements that company "had made progress and had made investments in controls meant to improve processes across risk, compliance and audit" false because defendant "could well have been making progress and rebuilding . . . and still be subject to regulatory action [later]").

***Third***, Plaintiff points to public reports that "Credit Suisse had repeatedly either opened or maintained bank accounts for . . . high-risk clients across the world," including in Russia (CAC ¶

27

397; *see also id.* ¶ 420) and that "Swiss Banks [collectively] held between 150 billion and 200 billion Swiss francs . . . of Russian client money" as of March 2022 (*see id.* ¶ 422). This is more fraud by hindsight. The fact that CS was still exposed to risk during the putative class period says nothing about the truth or falsity of the CS Defendants' statements during that period that CS was working to improve its risk profile. Indeed, Plaintiff does not allege that CS suffered any subsequent events similar to the Greensill and Archegos incidents, suggesting that improvements *had* been made.

*Finally*, Plaintiff cites three public statements that CS struggled to overcome "legacy issue[s]" and "negative headlines[.]" *Id.* ¶ 404 (quoting statement from Defendant Lehmann in April 2023); *see also id.* ¶ 400 (in April 2022, Defendant Lehmann remarked that, in the past, CS had "failed too often to anticipate material risks"); *id.* ¶¶ 411-12 (in August 2023, UBS's CEO opined that CS's "business model" had been "deeply flawed" and that CS's "risk discipline" had to "be addressed in connection with the integration" into UBS). But none of these statements are specific as to timeframe (and may well relate to events that pre-date the putative class period). Nor do they suggest that CS was not trying to improve its risk management during the putative class period. *See Magnum Hunter*, 26 F. Supp. 3d at 297 ("[I]t is equally plausible that defendants were in a constant game of 'Catch up'—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more.").

### ii. The Complaint Does Not Allege Scienter for the Customer Outflow Statements.

The Complaint is also bereft of any allegations that would support the claim that the CS Defendants made any of the Customer Outflow Statements with the requisite fraudulent intent.

The only scienter allegations relevant to these Statements are the vague accounts of the three CWs, which, at most, plead the unremarkable fact that CS monitored and was aware of the

28

inflow and outflow of customer assets (which CS disclosed publicly). *See, e.g.*, CAC ¶ 391 (alleging that CW1 "stated that the Company regularly monitored inflow and outflow of customer assets"); *id.* ¶ 393 (alleging that CW3 "stated that 'the executives knew' about customer and asset outflows"). CW2 also allegedly stated that, at some point in time prior to his or her departure in August 2021, CS had lost some unidentified amount of customers and deposits. *Id.* ¶ 392. Yet, as discussed in Section I(C), above, the Complaint does not allege that any of CS's "regularly monitored"—and regularly disclosed—inflow and outflow numbers were false at any point in time. Thus, the CWs' purported knowledge on this point adds nothing to the scienter analysis.

In addition, Plaintiff does not allege the first two CWs had any contact whatsoever with any Individual Defendant. *See id.* ¶¶ 41-42, 391 (CW1 was a "Financial Analyst" at CS until April 2022); *id.* ¶¶ 45-46, 392 (CW2 was an "Executive Assistant" at CS until August 2021—only four months into the class period—who "supported five Managing Directors in the M&A division" that themselves worked "under the Global head of M&A"). The lack of any connection with the Individual Defendants renders the statements of these witnesses irrelevant for scienter purposes. *See Glaser*, 772 F. Supp. 2d at 590 (CW statements are "insufficient [to plead scienter] absent some allegation that the witness communicated with the individual defendants . . . or else that the witness was privy to the individual defendants' knowledge"); *Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 n.19 (S.D.N.Y. 2020) ("[W]here a complaint relies on information from a CW to establish scienter, the complaint must describe the nature of the CW's contact with the individual defendants that would be probative of defendants' mental state.").

Plaintiff alleges CW3 attended two meetings that included Defendants Lehmann and Gottstein. CW3's statements thus have no bearing on scienter with respect to any other Individual Defendant. But, even for Defendants Lehmann and Gottstein, CW3's alleged statement—that they

"knew about customer and asset outflows" (CAC ¶¶ 50, 393)—is far too general to give rise to any inference of scienter, much less a strong one.  *See Miao*, 442 F. Supp. 3d at 800 ("[A]llegations by CWs that are insufficiently particular are apt to be discounted or disregarded.").

### iii.    The Complaint Does Not Allege Scienter for the ICFR Statements.

The Complaint's only scienter allegations directed to the ICFR issues relate to correspondence between CS and the SEC Staff that touched on CS's ICFR and several other topics, most of which CS addressed to the Staff's satisfaction without the need for any financial reporting revisions.  CAC ¶¶ 386-89; *see also* Matuschak Decl., Exs. 10, 13-14, 17-18, 20-22.  As Plaintiff acknowledges (*see* CAC ¶ 389), that correspondence shows that CS initially determined the ICFR issues to be "not material."  Matuschak Decl., Ex. 17 at 4.  Then, in March 2023, CS "reassessed [its] position and performed additional procedures" that led it to conclude that the ICFR issue was, in fact, material.  *Id.*, Ex. 22 at 2.  Even if any of the CS Defendants' statements relating to ICFR were actionable, which they are not (*see* Section I(D), above), nothing in the Complaint comes close to suggesting that those statements were made with the requisite intent to deceive.

CS's correspondence with the SEC concerned highly technical aspects of CS's accounting and reporting processes, such as controls "designed to designate the non-cash elements of a limited number of equity statement movements . . . for presentation and disclosure within the operating section of the consolidated statement of cash flows" and issues relating to "the exclusion of certain instruments from the computation and reporting of the cash flow effects of gains and losses on remeasurements (transactional currency to functional currency) within the consolidated statement of cash flows."  Matuschak Decl., Ex. 20 at 2, 4.  It is thus hardly surprising that CS's finance and accounting personnel engaged in extended and detailed consideration with the SEC Staff before determining that those issues represented a material problem with CS's ICFR processes.

Plaintiff seeks to leverage the fact that CS acknowledged in March 2023 that "the control

30

deficiencies remained un-remediated for several years." CAC ¶ 386. But this says nothing about when any CS Defendant *knew* (or should have known) that the ICFR issues CS was discussing with the SEC were material. *See DeCarlo*, 80 F.4th at 178 ("In determining whether the AmTrust Defendants acted with scienter, it is not enough that it took a period of years for AmTrust to acknowledge its significant accounting errors.").

Nothing in the SEC correspondence suggests that any CS Defendant ever intentionally or recklessly misrepresented ICFR issues as immaterial. Here, as in *Barrett* v. *PJT Partners Inc.*, 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017), the Complaint "does not allege . . . that [Defendants] failed to evaluate the effectiveness of [CS's] controls; that there were any undisclosed changes in [CS's ICFR]; [or] that [the SOX Defendants] were aware of a deficiency or material weakness in [CS's ICFR] that was not reported to [CS's] auditors and board[.]" *See also In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *23 (E.D.N.Y. Nov. 4, 2022) (SOX certifications not actionable where allegations did not "indicate that Defendants knew or reasonably should have known of different material facts about the Company's internal controls contemporaneously with the SOX Statements"). The far more cogent inference based on the facts alleged in the Complaint is that CS's management held a good faith belief about the adequacy of its ICFR processes, and the lack of materiality about the few issues being discussed with the SEC Staff relating to those processes, but that CS eventually changed its view after a protracted and detailed discussion with the SEC.

Finally, the Complaint acknowledges that PwC separately and independently concluded, prior to March 2023, that CS "maintained effective internal control over financial reporting as of December 31, 2021." CAC ¶ 341; *see also id.* ¶¶ 320-39 (PwC reviewed CS's financial statements for each quarter during the class period but did not identify any material issues). This further

31

establishes the CS Defendants' lack of scienter.  *See Woolgar* v. *Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 238 (S.D.N.Y. 2020) ("[T]he fact that [a company's] independent auditor and independent actuary were unable to identify any material inaccuracies or weaknesses undermines a finding of recklessness on Defendants' part"); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) ("[T]he fact that UBS's outside independent auditor . . . did not require a restatement of UBS's financials significantly undercuts Plaintiffs' allegations of recklessness as to compliance with [accounting standards].").

### C. The Complaint's Additional Scienter Allegations Do Not Save Its Deficient Section 10(b) Claim.

Failing to plead that any of the CS Defendants possessed the requisite intent to deceive, and unable to muster sufficient motive obligations, the Complaint resorts to a grab bag of miscellaneous intent allegations—all of which fail.

*First*, Plaintiff alleges that certain Individual Defendants' departures from CS during the putative class period somehow suggest wrongdoing.  "[A] resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind.  Standing alone, however, an employee's resignation does not raise a strong inference of scienter." *Citigroup*, 2023 WL 2632258, at *22; *see also Das*, 332 F. Supp. 3d at 815 ("[T]here are any number of reasons that an executive may resign, most of which are not related to fraud.").  Here, as demonstrated above, Plaintiff has not pleaded that any of the departing employees held a culpable state of mind.  Moreover, the only specific allegation relating to any departure is that Defendant Horta-Osório's resignation was supposedly tied to alleged "breaches of coronavirus protocols and . . . use of Credit Suisse's private jets."  CAC ¶ 425.  Those issues could not be further afield from the securities fraud claim pleaded here.

*Second*, Plaintiff alleges that the Individual Defendants were "high-level corporate

32

insiders" who "directly participated in the management of the Company[.]" *Id.* ¶ 430.  Obviously, such allegations standing alone cannot support scienter; if they could, plaintiffs could automatically establish scienter for any officer or director of any company accused of securities fraud.  For this reason, courts in this district routinely reject such allegations.  *See, e.g.*, *Miao*, 442 F. Supp. 3d at 806 ("[I]t is practically hornbook law that accusations . . . founded on nothing more than a defendant's corporate position . . . are entitled to no weight.").

*Third*, Plaintiff makes passing reference to the "core operations doctrine," alleging that "nearly 61%" of CS's revenues in 2020 "were derived from its Wealth Management-related business."  CAC ¶ 431.  Even if this doctrine "remains applicable to proving scienter after the enactment of the PSLRA," it "can only provide *additional* support for an inference of scienter but could not establish scienter on its own."  *In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at *21 (S.D.N.Y. Aug. 29, 2023) (emphasis in original).  Here, there are no other plausible allegations of scienter, so the Complaint's vague suggestion that some or all of the alleged misstatements concerned "nearly all" of CS's business are insufficient.  *Id.* at *22.

*Finally*, because "zero plus zero cannot equal one" (*Citigroup*, 2023 WL 2632258, at *22), taking Plaintiff's insufficient allegations together holistically does not render them any more sufficient than they are individually.

### D. The Complaint Fails to Establish Scienter for Each Individual Defendant or Corporate Scienter.

Plaintiff's Section 10(b) claim also fails for the independent reason that he has not pled "circumstances providing a factual basis for scienter for *each* defendant; guilt by association is not permissible."  *IKB Int'l S.A.* v. *Bank of Am. Corp.*, 584 F. App'x 26, 29 (2d Cir. 2014).

Indeed, almost all of Plaintiff's scienter allegations generically refer to "Credit Suisse" or the "Company" (*see, e.g.*, CAC ¶¶ 386-89, 394-99, 401-03, 406-12, 414-17, 420-22, 431-32), to

the "Credit Suisse Defendants" (*see, e.g., id.* ¶ 390), or to the "Individual Defendants" collectively (*see, e.g., id.* ¶¶ 390, 413, 428-30). This group-pleading approach is not permitted. *See Greco* v. *Qudian Inc.*, 2022 WL 4226022, at \*25 (S.D.N.Y. Sept. 13, 2022) ("Group pleading of scienter runs afoul of the PSLRA's requirement that a plaintiff state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.").

Plaintiff's few allegations that actually mention specific Individual Defendants are insufficient to establish that any of these Defendants acted with scienter:[4]

The only specific scienter allegations against Defendant **Lehmann** are that (i) CW3 attended two meetings in early 2023 that Lehmann also attended and that CW3 believed that "the executives knew about customer and asset outflows" (*id.* ¶¶ 50, 393); (ii) Lehmann commented on April 29, 2022 that CS had "failed too often to anticipate material risks in good time to counter them proactively and to prevent them" (*id.* ¶ 400); and (iii) Lehmann commented on April 4, 2023 that CS had "failed to stem the impact of legacy scandals, and counter negative headlines with positive facts in order to rebuild the lost confidence" (*id.* ¶ 404). The first allegation says nothing about the basis for CW3's belief regarding Lehmann's alleged knowledge, *what* Lehmann allegedly knew about outflows and when, or how any such knowledge might have been inconsistent with any public statement. Thus, it does not give rise to a strong inference of scienter for the reasons discussed in Section II(B)(ii), above. The latter two allegations also fail, for the reasons discussed in Section II(B)(i), above.

With respect to Defendant **Körner**, the Complaint pleads only that (i) he stated on April 4, 2023 that "the bank had been significantly weakened by the strong outflows in October 2022" (*id.*

---

[4] For completeness, the CS Defendants address herein the deficient scienter allegations against Defendant Horta-Osório, even though he has not been served and has not joined this motion.

34

¶ 405); (ii) that he signed CS's 2022 Annual Report, including the SOX Certification for that Report (*see id.* ¶¶ 318, 430); and (iii) he was paid approximately $2.52 million in 2022 (*see id.* ¶ 436). Körner's comments about outflows do not give rise to scienter because, as discussed in Section I(C), above, the market was already well aware that CS had seen significant outflows in October 2022. Körner's mere signing of the 2022 Annual Report and related SOX Certification does not give rise to scienter because "a plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements" (*Miao*, 442 F. Supp. 3d at 807)—which the Complaint does not do, as it barely mentions Körner's individual knowledge at all. *See also* Section II(B)(iii), above. And allegations regarding Körner's compensation add nothing, as discussed in Section II(C), above.

The ***only*** scienter-related allegation against Defendant **Joshi** is that he signed the 2022 Annual Report and SOX Certification. *See* CAC ¶¶ 318, 430. These allegations are as deficient as to Joshi as they are to Körner.

With respect to Defendant **Horta-Osório,** Plaintiff cites only Horta-Osório's departure from CS in early 2022. *See id.* ¶ 425. But, as discussed in Section II(C), above, resignations standing alone are not evidence of scienter, and, in any event, the Complaint concedes that Horta-Osório left for reasons unrelated to this case.

With respect to Defendants **Gottstein** and **Mathers,** the Complaint alleges (i) they resigned in mid-2022 (*see id.* ¶¶ 426-27); (ii) they signed CS's 2021 Annual Report and SOX Certification (*see id.* ¶¶ 318, 430); and (iii) they were paid annual amounts ranging between $4.28 million and $7.1 million between 2020 and 2022 (*see id.* ¶¶ 434-36). These allegations are insufficient to establish scienter for the reasons discussed in Sections II(B)(iii) and II(C), above. The Complaint

35

also alleges that Defendant Gottstein attended two meetings with CW3 discussed above, which do not give rise to scienter on the part of Gottstein any more than they do for Defendant Lehmann.

That leaves CS itself.  Because Plaintiff has failed to plead scienter as to any Individual Defendant, Plaintiff can establish so-called "corporate scienter" only by "establishing scienter on behalf of an employee who acted within the scope of his employment" or by alleging that "a corporate statement is so important and dramatic that it would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 160 (S.D.N.Y. 2015).  The Complaint does not satisfy the first approach because it fails to plead scienter as to *any* specific CS officer or director, regardless of whether they are defendants here.  The Complaint also fails to satisfy the second approach—as discussed above, Plaintiff fails to allege any statements were false at all, much less that they were "dramatically" so.  *Compare Dynex*, 531 F.3d at 195-96 (using, as an example of such a misstatement, a hypothetical where "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero").

## III.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE LOSS CAUSATION

"To plead loss causation, the complaint[] must allege facts that support an inference that [the alleged] misstatements and omissions concealed the circumstances that bear upon the loss[.]" *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005).  A securities fraud claim is not a "partial downside insurance policy." *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 348 (2005).  So a plaintiff cannot establish a securities fraud claim without disaggregating losses "caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events[.]" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).

Courts in this Circuit have accepted two types of loss causation pleading in securities fraud

36

cases: (i) a plausible "allegation that the market reacted negatively to a corrective disclosure regarding the falsity" of the alleged misstatements at issue (*Lentell*, 396 F.3d at 175), or (ii) allegations that "a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss." *Boluka Garment Co., Ltd.* v. *Canaan Inc.*, 547 F. Supp. 3d 439, 445 (S.D.N.Y. 2021). The Complaint fails to plead either, and more fundamentally fails to plead any facts sufficient to exclude obvious non-fraud explanations for the decline in CS's stock price.

The Complaint points to a number of statements near and after the end of the alleged class period, but none of those statements admits or even suggests the falsity of any prior statement. *See* CAC ¶¶ 344-72. For example, Plaintiff cites a few instances where CS announced net losses (*see id.* ¶¶ 346, 350), and also cites reports or disclosures concerning efforts by CS to raise additional capital and/or restructure some of its divisions (*see id.* ¶¶ 348-50, 362). But Plaintiff does not allege those reports and disclosures revealed anything about CS's risk management practices or any category of alleged misstatements. Plaintiff cites disclosures reporting customer and asset outflows (*see id.* ¶¶ 352, 354), but these disclosures neither corrected previously disclosed outflow figures nor suggested that any prior disclosures were false in any other way. And Plaintiff cites CS's March 14, 2023 disclosure regarding its ICFR (*see id.* ¶ 358), but, as discussed above, Plaintiff fails to identify any alleged misstatement that this disclosure was supposedly correcting. Collectively, these statements are not "corrective" because they did not "reveal the falsity" of any prior statement and as a matter of law are insufficient to plead loss causation. *Janbay*, 2012 WL 1080306, at *14; *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) (an alleged corrective disclosure "must possess a sufficient nexus to a prior misstatement such that it reveals at least part of the [alleged] falsity of that misstatement").

The plausibility of the inference Plaintiff asks the Court to accept—that a hodgepodge of

disconnected statements addressing a variety of subjects were all materially false and when corrected (by statements that did not purport to correct them) resulted in a decline in CS's stock price—must be evaluated in the context of the far more likely explanation. The market was reacting in early 2023 to bad news: CS experienced customer outflows as a result of a bank panic, which occurred contemporaneously with other bank panics that brought down Silicon Valley Bank and others. The Complaint goes so far as to plead this obvious non-fraud explanation for the decline in CS's stock price. *See, e.g.*, CAC ¶ 374 (Defendant Körner stated on April 4, 2023 that "[t]he sudden collapse of Silicon Valley Bank and Signature Bank in the US caused shockwaves around the world and triggered a dramatic loss of confidence in the global financial industry. We [CS] were particularly vulnerable at that time."). It is incumbent on Plaintiff to plead facts sufficient, taken as true, "to ascribe some rough proportion of the whole loss" to Defendants' alleged fraud. *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). But Plaintiff alleges nothing of the sort and thus fails to plead any corrective disclosures.

Nor does Plaintiff adequately plead a materialization-of-risk theory. As a threshold matter, the Complaint does not identify what risk the allegedly false statements supposedly concealed. It certainly could not be the risk that CS's "risk management procedures and policies may not be fully effective in mitigating [its] risk exposures," or the risk that customer outflows could be higher than anticipated, or the risk that financial reporting controls could prove inadequate, because all of those risks were expressly disclosed even ***before*** the class period began. *See, e.g.*, 2020 Annual Report (Matuschak Decl., Ex. 1) at 53 (disclosing that CS's "risk management procedures and policies may not always be effective"); *id.* at 426 (disclosing the risk that CS's ICFR "may become inadequate" and that "[t]here are inherent limitations to the effectiveness of any system of controls and procedures"); *id.* at 45 (disclosing that, if "short-term funding sources" like deposits and

38

similar instruments ceased to become "a stable source of funding . . . [CS's] liquidity position could be adversely affected").

The alleged materialization of ***disclosed*** rather than concealed risks is not sufficient to plead loss causation. *See Lentell*, 396 F.3d at 177 (complaint failed to plead materialization-of-risk theory where "the risk that [allegedly] materialized [was] unambiguously apparent on the face of the disclosures alleged to conceal the very same risk").

In any event, here again the Complaint does not come close to plausibly pleading that unspecified issues with CS's risk management procedures—as opposed to other intervening causes such as macroeconomic factors that, as CS executives discussed and the Complaint acknowledges (*see, e.g.*, CAC ¶¶ 374, 405), affected CS disproportionately given its historical challenges— caused any loss. *See In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008) (loss causation not pled where complaint did not "plead that [plaintiff's] losses resulted solely or even partially from the purported materialization of the risk that the defendants allegedly concealed, rather than from intervening causes"); *Altimeo Asset Mgmt.* v. *Qihoo 360 Tech. Co. Ltd.*, 2023 WL 2585942, at *22 (S.D.N.Y. Mar. 21, 2023) (citing numerous cases where connection between alleged risk and alleged losses was "conjectural").

## IV.    PLAINTIFF HAS NOT PLED A SECTION 20(a) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS

Plaintiff's Section 20(a) claims against the Individual Defendants should also be dismissed.

***First***, for the reasons discussed in Section I, above, Plaintiff has not alleged a primary violation of Section 10(b). Accordingly, Plaintiff's Section 20(a) claims fail as a matter of law. *See Woodley* v. *Wood*, 2022 WL 103563, at *10 (S.D.N.Y. Jan. 11, 2022) ("Because Plaintiffs have inadequately pled a § 10(b) violation, they cannot make a successful Section 20(a) claim.").

***Second***, Plaintiff has not pleaded, as he must, that each of the Individual Defendants was

"in some meaningful sense a culpable participant" in the primary violation.  *S.E.C.* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).  "In order to plead culpable participation . . . Plaintiff[] must plead with particularity facts giving rise to a strong inference that the defendant acted with . . . scienter."  *Anwar* v. *Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 427 (S.D.N.Y. 2010).  As discussed above (*see* Sections I(A) & II(D)), the Complaint fails to do so with respect to the Individual Defendants.

*Finally*, Plaintiff does not even bother to limit his control-person claims to the periods in which each Individual Defendant actually held his or her respective positions, instead seeking to hold *all* of the Individual Defendants liable under Section 20(a) for *all* of the alleged misstatements.  None of the Individual Defendants, however, were at CS for the entire class period.  *See* CAC ¶¶ 33-38.  Of course, none can be held liable for statements made when they had no affiliation with CS.  *See generally In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 487 (S.D.N.Y. 2004) ("Control person liability attaches only to a person who was in control at the time that the liability of the controlled person accrued.").

## CONCLUSION

The Complaint should be dismissed with prejudice as to the CS Defendants.

40

Dated:   October 27, 2023

Respectfully submitted,

/s/ Herbert S. Washer
Herbert S. Washer
Jason M. Hall
Edward N. Moss
Tammy L. Roy
Nicholas N. Matuschak
Lauren Riddell
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, New York 10005
(212) 701-3000
hwasher@cahill.com
jhall@cahill.com
emoss@cahill.com
troy@cahill.com
nmatuschak@cahill.com
lriddell@cahill.com

*Attorneys for Defendants Credit Suisse Group AG,*
*Axel P. Lehmann, Ulrich Körner, Dixit Joshi,*
*Thomas Gottstein, and David R. Mathers*

41