**KAHN SWICK & FOTI, LLC**
Kim E. Miller (KM-6996)
J. Ryan Lopatka (admitted *pro hac vice*)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: j.lopatka@ksfcounsel.com

-and-

Craig J. Geraci, Jr. (admitted *pro hac vice*)
Melissa H. Harris (MH-3583)
Matthew P. Woodard (admitted *pro hac vice*)
Jyoti Kehl
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: craig.geraci@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com
Email: jyoti.kehl@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Adiabat
and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALI DIABAT, Individually and On Behalf of All Others Similarly Situated, <br><br>     Plaintiff, <br><br> v. <br><br> CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KÖRNER, DIXIT JOSHI, THOMAS GOTTSTEIN, DAVID R. MATHERS, ANTÓNIO HORTA-OSÓRIO, and PRICEWATERHOUSECOOPERS AG <br><br>     Defendants. | No. 1:23-cv-5874-CM-SLC <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO CREDIT SUISSE DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..............................................................................................ii

PRELIMINARY STATEMENT .........................................................................................1

FACTUAL BACKGROUND ..............................................................................................2

I. THE COMPLAINT ADEQUATELY ALLEGES MATERIAL MISSTATEMENTS AND OMISSIONS ...................................................................................................................6

    A.   The Complaint's Allegations Are Sufficiently Particular.....................................6

    B.   Defendants' Materially False or Misleading Statements ......................................7

        1.   "Risk Management Statements" Are Actionable.........................................7

        2.   "Customer Outflow Statements" and Liquidity Statements Are Actionable.............13

        3.   "ICFR Statements" Are Actionable ..........................................................18

        4.   The PSLRA Safe Harbor Does Not Apply .................................................21

    C.   The Complaint Adequately Pleads Scienter .........................................................22

        1.   Defendants Knew or Recklessly Disregarded That Their Statements Were Materially False and Misleading .............................................................23

           (a)  Plaintiff's Confidential Witnesses .......................................................23

           (b)  Governmental Investigations and Findings .........................................24

           (c)  The July 2022 SEC Inquiry and Defendants' Admitted Material Weaknesses....26

           (d)  Red Flags ..............................................................................................27

           (e)  The Magnitude of the Fraud .................................................................28

           (f)  Whistleblower Report Regarding High-Risk Customers and Defendants' Instruction to Destroy Documents ..................29

           (g)  Admissions by Defendants and Current UBS CEO.............................30

           (h)  Defendants' High-Level Involvement in and Focus on Risk Management and Outflows, and Their SOX Certifications .................31

           (i)  Suspiciously Timed Executive Departures ..........................................34

        2.   Individual Defendants Had Motive and Opportunity .................................34

        3.   Defendants' Remaining Scienter Arguments Fail ......................................35

        4.   The Inference of Scienter Is at Least as Compelling as Any Competing Nonculpable Inferences ..............................................................................36

II.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ...............................36

III.  THE COMPLAINT ESTABLISHES CONTROL PERSON LIABILITY ..........................40

IV.  LEAVE TO AMEND .....................................................................................................40

CONCLUSION..................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ................................................................................ 17, 20, 37, 39

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) ................................................................................................... 6

*Barrett v. PJT Partners, Inc.*,
No. 16-cv-2841, 2017 U.S. Dist. LEXIS 145781 (S.D.N.Y. Sept. 8, 2017) ......................... 33

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ............................................. 27

*Camofi Master LDC v. Riptide Worldwide, Inc.*,
No. 10-cv-4020, 2011 U.S. Dist. LEXIS 31237 (S.D.N.Y. Mar. 23, 2011) ......................... 33

*Carpenters Pension Trust Fund v. Barclays*, *PLC*, 750 F.3d 227 (2d Cir. 2014) ....................... 38

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp.*,
No. 17 Civ. 10014, 2019 U.S. Dist. LEXIS 26962 (S.D.N.Y. Feb. 19, 2019) ...................... 38

*City of Providence v. Aeropostale, Inc.*,
No. 11-cv-7132, 2013 U.S. Dist. LEXIS 44948 (S.D.N.Y. Mar. 25, 2013) ......................... 21

*Constr. Laborers Pension Tr. v. CBS Corp.*, 433 F. Supp. 3d 515 (S.D.N.Y. 2020) .................... 7

*Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629 (S.D.N.Y. 2010) ...................................... 25

*Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012) .......................... 20, 30, 32, 33

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................................................... 36

*Freedman v. Value Health, Inc.*, 958 F. Supp. 745 (D. Conn. 1997) .......................................... 30

*Hall v. Children's Place Retail Stores, Inc.,* 580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................... 25

*Halperin v. eBanker*, 295 F.3d 352 (2d Cir. 2007) ..................................................................... 22

*Hawaii Str. Iron Pen. Tr. Fund v. AMC Ent. Hold., Inc.*,
422 F.Supp. 3d 821 (S.D.N.Y. 2019) ................................................................................... 32

*In re Allianz Glob. Inv'rs U.S. LLC Alpha Series Litig.*,
No. 20-cv-5615, 2021 U.S. Dist. LEXIS 188650 (S.D.N.Y. Sep. 30, 2021) ......................... 30

*In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424 (S.D.N.Y. 2000) .................. 40

*In re Appharvest Sec. Litig.*, No. 21-cv-7985,
2023 U.S. Dist. LEXIS 132320 (S.D.N.Y. July 31, 2023) ...................................................... 6

*In re Avon Secs. Litig.*,
No. 19 Civ. 1420, 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019) ....... 11, 16, 23, 24

*In re Bear Stearns Cos. Sec., Deriv., & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................... 10, 19, 28, 39

*In re Citigroup Sec. Litig.*,
No. 20-cv-9132, 2023 U.S. Dist. LEXIS 50726 (S.D.N.Y. Mar. 24, 2023) ............... 13, 21, 25

*In re Complete Mgmt. Sec. Litig.*, 153 F.Supp. 2d 314 (S.D.N.Y. 2001) ..................................... 28

*In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320 (S.D.N.Y. 2014).................................... 40

*In re EVCI Colleges Holding Corp. Secs. Litig.*, 469 F.Supp. 2d 88 (S.D.N.Y. 2006)................ 23

*In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197 (S.D.N.Y. 2016) ........................................ 37

*In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013)........... 16

*In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458 (S.D.N.Y. 2012) .................................. 10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009)................................. 38

*In re Hain Celestrial Grp.*, No. 16-cv-4581,
2022 U.S. Dist. LEXIS 202774 (E.D.N.Y. Nov. 4, 2022) ......................................................... 33

*In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011) .................. 27, 33

*In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194 (S.D.N.Y. 1999)............................................. 29

*In re Microstrategy*, *Inc. Sec. Litig.*,115 F.Supp. 2d 620 (E.D. Va. 2000).................................. 29

*In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008)......................................................... 31

*In re New Oriental Educ. & Tech. Grp. Secs. Litig.*, 988 F. Supp. 2d 406 (S.D.N.Y. 2013) ....... 35

*In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp. 2d 290 (S.D.N.Y. 1999) ........................ 26

*In re Pareteum Sec. Litig.*, No. 19 Civ. 9767, 2021 U.S. Dist. LEXIS 151106
(S.D.N.Y. Aug. 11, 2021) .......................................................................................................... 27

*In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571 (S.D.N.Y. 2020) ................................... 10

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................ 23

*In re Resideo Techs., Inc., Sec. Litig.*, No. 19-cv-2863,
2021 U.S. Dist. LEXIS 60883 (D. Minn. Mar. 30, 2021)......................................................... 31

*In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) ..................................................... 17

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63(2d Cir. 2001) ..................................................... 23

*In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................... 38

*In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221 (S.D.N.Y. 2019) .............. 9, 12, 31, 32

*In re SLM Corp., Sec. Litig.*, 740 F. Supp. 2d 542 (S.D.N.Y. 2010)............................................ 22

*In re Sunedison Secs. Litig.*, 300 F.Supp. 3d 444 (S.D.N.Y. 2018).............................................. 19

*In re Vale S.A. Sec. Litig.,* No. 19-CV-526, 2020 U.S. Dist. LEXIS 91150
(E.D.N.Y. May 20, 2020)........................................................................................................... 21

*In re Veeco Instruments, Inc., Sec. Litig.,* 235 F.R.D. 220 (S.D.N.Y. 2006)..................... 26, 32, 36

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ......................... 11

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ........................................................... 6

*In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004)...................................... 27

*Johnson v. Costco Wholesale Corp.*, No. 18-cv-1611,

2019 U.S. Dist. LEXIS 205433 (W.D. Wa. Nov. 26, 2019) .................................................. 19

*Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp. 3d 381 (S.D.N.Y. 2022) ................... 28

*Kleinman v. Elan Corp., PLC*, 706 F.3d 145 (2d Cir. 2013) ......................................................... 10

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 787 F.3d 160 (2d Cir. 2015)............ 39

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
    No. 21-2524, 2022 U.S. App. LEXIS 35103 (2d Cir. Dec. 20, 2022) ...................................... 16

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 09-cv-01740,
    2013 U.S. Dist. LEXIS 40788 (D. Conn. Mar. 23, 2013) .......................................................... 22

*Nespresso USA, Inc. v. Peet's Coffee, Inc.*,
    No. 22-cv-2209, 2023 U.S. Dist. LEXIS 12228 (S.D.N.Y. Jan. 24, 2023).............................. 40

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
    80 F.4th 158 (2d Cir. 2023) ....................................................................................................... 21

*Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472 (S.D.N.Y. 2018) ............................... 35

*Novak v. Kosaks*, 216 F.3d 300 (2d Cir. 2000) ............................................................................. 13

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F.Supp. 3d 1328 (C.D. Cal. 2014)................. 35

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019) ......................................................................................... 35

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
    575 U.S. 175 (2015) ............................................................................................................. 17, 20

*Pearlstein v. BlackBerry Ltd.*,
    No. 13-cv-7060, 2021 U.S. Dist. LEXIS 14888 (S.D.N.Y. Jan. 26, 2021).............................. 38

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    No. 15-CV-7199, 2016 U.S. Dist. LEXIS 138439 (S.D.N.Y. Oct. 5, 2016) ........................... 32

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F.Supp. 3d 602 (S.D.N.Y. 2015) .......................................................................... 24, 26, 28, 34

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................................... 6

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)........................................................................... 28

*SEC v. DCI Telecomms.*, 122 F. Supp. 2d 495 (S.D.N.Y. 2000).................................................. 35

*Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021)................................. 22, 25

*Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204 (2d Cir. 2020 ......................................... 23

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*,
    No. 09-cv-2083, 2018 U.S. Dist. LEXIS 55359 (D. Conn. Mar. 31, 2018)............................. 38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)........................................ 23, 36

*Varghese v. Chian Shenghuo Pharm. Holdings*, 672 F. Supp. 2d 596 (S.D.N.Y. 2009) ............. 34

*Yi v. GTV Media Grp. Inc.*, No. 21-cv-2669, 2021 U.S. Dist. LEXIS 147995
    (S.D.N.Y. Aug. 6, 2021) ........................................................................................................... 12

**Statutes**

15 U.S.C. § 78u-4(b) ....................................................................................................................... 6

15 U.S.C. § 78u-5(c) ..................................................................................................................... 21

**Rules**

FED. R. CIV. P. 15(a) .................................................................................................................... 45

Fed. R. Civ. P. 8 ......................................................................................................................... 1, 7

Fed. R. Civ. P. 9(b) .................................................................................................................... 1, 7

**PRELIMINARY STATEMENT**

Defendants' motion to dismiss tiptoes around the spectacular downfall of Credit Suisse, a once renowned banking institution, which announced an emergency stock buyout by rival UBS, on March 19, 2023.[1] The buyout—hastily engineered by the Swiss government to avert a global financial crash—revealed the full truth regarding Defendants' false and misleading statements, gutting Class Members' investments as the stock plummeted nearly 53% in a single trading day.

Rather than address Plaintiff's allegations head-on, Defendants instead paint a picture of a run-of-the-mill securities fraud case, relying on conventional dismissal arguments that fall well short when set against the unconventional backdrop of a historic alleged fraud. Defendants argue, for example, that: (1) the Complaint constitutes impermissible "puzzle pleading," despite setting forth the who, what, when, where, and why of each statement in compliance with Rule 9(b) and the PSLRA and putting Defendants on notice of the claims as Rule 8 requires;; (2) the misstatements are shielded by the PSLRA's safe harbor, though they are neither forward-looking nor provide meaningful warnings; (3) the misstatements are "objectively truthful," when this claim is sharply contradicted by the well-pleaded allegations; and (4) the misstatements are immaterial "puffery," despite Defendants' acknowledgements that earlier scandals caused "significant concern amongst all our stakeholders." ¶¶67, 128.

With respect to both falsity and scienter, Defendants' repeated mantra of "fraud by hindsight" is wholly misplaced, as Plaintiff plausibly alleges Defendants knew, or were reckless in not knowing, from the outset of the Class Period, that Credit Suisse was particularly prone to customer outflows, had not adequately addressed its risk management issues despite pre-Class

---

[1] While defending Defendant Horta-Osório in this motion, counsel for Defendants has not agreed to accept service for him. Plaintiff is undertaking service, but there is little doubt Horta-Osório has actual notice of this suit. *See* Declaration of Kim E. Miller at Ex. 1, p.1 (Oct.13, 2023, email stating defense counsel had "raised this with Mr. Horta-Osório (via his European counsel)").

1

Period red flags, and suffered from material weaknesses in its ICFR. Indeed, around the beginning of the Class Period, a whistleblower had already shared data with a German daily newspaper about a high-risk client problem affecting more than 30,000 customers and 18,000 accounts. ¶9. Plaintiffs' falsity and scienter allegations are also bolstered by multiple corroborative Confidential Witnesses, including a former Credit Suisse Managing Director (employed throughout the Class Period) who attended meetings with C-suite leaders, including Defendants Lehmann and Gottstein, and stated that "the executives knew" about customer and asset outflows. ¶¶48-50. Defendants' own admissions also strongly support Plaintiff's claims. On April 29, 2022, Lehmann admitted that Credit Suisse had "failed too often to anticipate material risks in good time to counter them proactively and to prevent them." ¶400.

Defendants also argue that, because Defendant PwC blessed its financial statements, Plaintiff does not adequately plead scienter. But whether Defendants can abdicate responsibility for alleged misstatements by hiding behind the Company's auditor is a premature argument that does not support dismissal, but, rather, presents an issue for the finder of fact.

As to causation, when Credit Suisse made its final disclosure, Defendant Lehmann noted that "recent extraordinary and unprecedented circumstances" and "many significant legacy issues" "forced [Credit Suisse] to reach a solution today that provides a durable outcome." ¶367. Thus, Lehmann himself linked the merger announcement and the 52.99% drop in Credit Suisse's ADS price to the same "circumstances" and "issues" about which Defendants had issued materially false and misleading statements for nearly two years.

Defendants' motion to dismiss should be denied in full, and Plaintiff should be permitted to move forward promptly with discovery in this historically important case.

## FACTUAL BACKGROUND

From 1856 until its forced merger with UBS, Defendant Credit Suisse was a financial

2

services company based in Switzerland. ¶3. As a direct result of Credit Suisse's poor risk management and control governance failures, just prior to the Class Period (April 6, 2021 through March 20, 2023), two major scandals came to light: the failure of its funds structured in collaboration with financier Lex Greensill ("Greensill"), and the collapse of hedge fund Archegos Capital Management ("Archegos"), to which Credit Suisse had significant, undisclosed exposure. ¶¶4-6. As a result, Credit Suisse customers incurred billions of dollars in unrecoverable losses. *Id.*

In the wake of these scandals, beginning at the outset of the Class Period, Defendants repeatedly assured investors and the public that adequate steps had been, and would continue to be, taken in order to evaluate and improve the Company's deficient risk management and control governance procedures. *E.g.*, ¶¶67, 85, 102, 124, 195, 235. In fact, however, they were not. Rather, the actions taken by Defendants were superficial at best—such as firing two scapegoats, the CEO of the Investment Bank and the Chief Risk and Compliance Officer—and did not meaningfully address the risk management issues. ¶¶53, 61, 63. Just before the Class Period, in February 2021, a report by the Swiss Financial Market Supervisory Authority ("FINMA") regarding its investigation into the Company's former go-to banker for Russian clients, Patrice Lescaudron (who had been convicted of fraud and forgery), concluded the Company had ignored repeated warning signs and had "even attempt[ed] to gloss over [Lescaudron's] violations." ¶395. Then, on July 29, 2021, the Company released a report commissioned by a Special Committee of the Board (the "Archegos Report"), concluding that Credit Suisse's risk staffing, systems, technology, and structure were deficient. ¶¶414-19. And in mid-May 2022, the U.K.'s financial regulator placed the Company on a "watchlist of institutions requiring tougher supervisions," because it had "not done enough to improve its culture, governance and risk controls," after the regulator had "urged the bank to address 'persistent' cultural issues, including a lack of internal challenges to risky

3

transactions and said they had not yet seen 'sufficient evidence of effective remediation.'" ¶401.

Throughout the Class Period, Defendants repeatedly claimed the Greensill and Archegos scandals were "isolated" and "idiosyncratic" incidents caused by an inadequate review of family-run offices and the inability to meet face-to-face during the pandemic. ¶¶59, 70, 72, 77-78. These excuses downplayed the true extent of the Company's risk management issues and made it appear as if they were in the rear-view mirror when, in fact, its risk management failures were endemic—attributable to a deeply-rooted culture that rewarded risky behavior and serving risky clients. *See*, *e.g.*, ¶62.

On February 20, 2022, the German newspaper *Süddeutsche Zeitung* reported it had received data from a whistleblower approximately one year earlier—around the beginning of the Class Period—on more than 30,000 Credit Suisse customers, holding in excess of $100 billion (the "Suisse Secrets Leak"). ¶9. This data revealed Credit Suisse had "opened or maintained bank accounts for a panoramic array of high-risk clients across the world," including "criminals, fraudsters and corrupt politicians" and a sanctioned Russian oligarch. *Id.* A few weeks later, on March 1, 2022, the *Financial Times* reported the Company had requested that various wealthy clients "destroy documents…in an attempt to prevent information from leaking about a unit of the bank that has made loans to oligarchs who were later sanctioned." ¶¶10, 396. On March 28, 2022, the House of Representatives Committee on Oversight and Reform sent a letter to Credit Suisse requesting it to turn over information and documents from January 1, 2017, to the present about a portfolio of loans backed by yachts and private jets owned by clients. ¶399. As the letter noted, the "timing of Credit Suisse's request and its subject matter…raises significant concerns about Credit Suisse's compliance with [Russia] sanctions," and it "may be concealing information about whether participants in the securitization deal…may be evading sanctions…." *Id.* Thus, while

4

Defendants assured investors the Company was taking actions to improve its risk management, Plaintiff alleges it knowingly catered to some of the world's riskiest clients.

On October 27, 2022, Credit Suisse announced a massive increase in its already unusually high outflows. ¶239. Körner and Joshi attributed the outflows to "negative press," "rumors," and "social media coverage," but indicated they had "stabilized," and Credit Suisse had plans to address the problem. ¶¶239, 240, 242, 244, 245, 247, 253. A few days later, when asked in an interview on *Bloomberg* TV if he was expecting outflows to "reverse," Körner said the situation had "clearly stabilized." ¶251. On December 2, 2022, Lehmann said outflows "basically have stopped" and that "the situation has calmed." ¶¶263, 268. In the first quarter of 2023, Defendants continued to state that outflows had "stabilized," "significantly moderated," and "reduced significantly" after October 2022, that they had "acted decisively to address the impact of the outflows," and that things at the Company were "calm." ¶¶27, 279, 280, 290, 302. But outflows had not stabilized and things were *not* calm. Just a few days after this last statement on March 14, 2023, Credit Suisse nearly collapsed due to the very issues it downplayed and denied. ¶367.

On March 14, 2023, Defendants admitted in Credit Suisse's 2022 Annual Report that there were "material weaknesses" in its ICFR throughout the Class Period. ¶358. Although the admission stemmed from a nine-month inquiry by the SEC into the sufficiency of Credit Suisse's financial reporting, to justify the delay in publication of its 2022 Annual Report, on March 9, 2023, Defendants mischaracterized the inquiry, as a last-minute request received "late" the evening before. ¶¶320, 387. Further, while Defendants reassured investors they were "developing a remediation plan to address the material weaknesses" (¶358), they were instead discussing the Company's sale or liquidation with Swiss authorities. ¶¶366-67. Indeed, just five days later, on March 19, 2023, the Company announced its merger with UBS. ¶367. Upon the revelation of this

news to the market, Credit Suisse's ADS price dropped *52.99%* on March 20, 2023, resulting in massive losses to Class Members. ¶369. Thereafter, on April 4, 2023, at Credit Suisse's final Annual General Meeting, Lehmann admitted the Company's business had been plagued by "unhealthy developments, errant behaviors, and wrong incentive systems," such that it engaged in "transactions that should not have been allowed to play out." ¶373. The merger closed on June 12, 2023, and, with that, a 166-year-old global financial institution had come to an abrupt end.

## ARGUMENT

### I.    The Complaint Adequately Alleges Material Misstatements and Omissions

A plaintiff meets the PSLRA's particularity requirement by "specify[ing] each statement alleged to have been misleading and the reason or reasons why the statement is misleading." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citing 15 U.S.C. § 78u-4(b)). "Although pleading standards are heightened for securities fraud claims, '[courts] must be careful not to mistake heightened pleading standards for impossible ones.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (citation omitted). "The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (citation omitted).

#### A.    The Complaint's Allegations Are Sufficiently Particular

Defendants claim the Complaint constitutes a "puzzle pleading" because it "reprint[s] large block quotes from myriad statements…" Def. Br. at 1. Courts in this Circuit hold complaints satisfy Fed. R. Civ. P. 9(b) and the PSLRA where they "allege[] each misstatement, who made it, and where, when, and why it is false or misleading…." *In re Appharvest Sec. Litig.*, No. 21-cv-7985, 2023 U.S. Dist. LEXIS 132320, at \*56 n.5 (S.D.N.Y. July 31, 2023). The Complaint does

so here. ¶¶51-307. The Complaint also complies with Rule 8 by putting Defendants on notice of each particular statement over the two-year Class Period. *See*, *e.g.*, *Constr. Laborers Pension Tr. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). That Defendants make a variety of arguments seeking dismissal of alleged misstatements, organizing them into categories (Def. Br. at 4-5), undermines their argument that they are somehow puzzled by the allegations.

    **B.**    **Defendants' Materially False or Misleading Statements**

        1.    <u>"Risk Management Statements" Are Actionable</u>

In the aftermath of the Greensill and Archegos scandals, throughout the Class Period, Defendants assured investors again and again that steps were being taken to evaluate and improve the Company's risk management procedures to prevent future scandals. *See*, *e.g.*, ¶67 (Gottstein: "[W]e have reviewed exposures across the entire prime services business. Related risk and control governance is already being strengthened and will be further enhanced…."); ¶85 (Horta-Osório: "The current and potential risk of Credit Suisse need to be a matter of immediate and close scrutiny….Together with the Board and management, I will have a thorough look at how risks are being assessed, managed and controlled.").[2] Instead, Defendants took merely perfunctory actions, like firing two scapegoats. ¶¶53, 61, 63. After Defendants concluded perfunctory investigations into the Archegos and Greenhill Funds matters, Gottstein and Mathers represented they were isolated incidents largely caused by an inadequate review of family-run offices and the inability to meet face-to-face during the pandemic. ¶¶59, 70, 72, 77-78. These statements downplayed the true extent of the Company's risk management issues. ¶60.

---

[2] *See also* ¶102 (Mathers: "There's been a very thorough risk review"); ¶124 (Credit Suisse: "[New strategy] plac[es] risk management and a culture that reinforces the importance of accountability and responsibility at its core….Work in this direction has already begun as we strengthened our risk management and capitalization, and de-risked the bank…."); ¶195 (Lehmann: "Among the areas where we need to take action, I believe our risk culture is the epicenter….We are, therefore, implementing even more rigorous, more visible risk management and risk monitoring."); ¶235 (Körner: "We will…reduce risk by around 40%.").

On February 20, 2022, the Suisse Secrets Leak publicly revealed that Credit Suisse had "opened or maintained bank accounts for a panoramic array of high-risk clients across the world," including "criminals, fraudsters and corrupt politicians" and a sanctioned Russian oligarch. ¶9. On March 1, 2022, shortly after various western countries imposed sanctions on Russia in response to its invasion of Ukraine, Credit Suisse sent a letter to investors asking them to destroy documents relating to its richest clients' yachts and private jets, in an attempt to stop information leaking about a unit of the bank that had made loans to oligarchs who were later sanctioned. ¶10. The reasonable inference to be drawn from this is that the Company felt it had something to hide. ¶399. Indeed, on March 28, 2022, the U.S. House Oversight Committee requested information from Credit Suisse relating to its financing of yachts and aircraft owned by potentially sanctioned individuals, because it was "concern[ed] about Credit Suisse's compliance with [Russia] sanctions." ¶¶10, 399. On March 23, 2023, *Bloomberg* reported the DOJ had issued subpoenas to Credit Suisse in connection with a probe of whether it helped Russian oligarchs evade sanctions. ¶402. Credit Suisse eventually announced outflows of CHF 10.4 billion (approximately $10.8 billion) related to the Russia sanctions in 1Q22 and a further CHF 7.2 billion (approximately $7.5 billion) in 2Q22. ¶¶183, 216.

In mid-May 2022, UK regulators placed Credit Suisse on a "watchlist of institutions requiring tougher supervision," because it had "not done enough to improve its culture, governance and risk controls."[3] ¶401. Additionally, as the July 29, 2021, the Archegos Report revealed, the staffing of Credit Suisse's Risk and related departments was woefully inadequate to effectively manage or control risk. ¶¶414-15. By March 2023, the Company was on the brink of collapse, and the Swiss government rushed to broker its merger with UBS. ¶¶1, 367. On August 31, 2023, the

---

[3] The Complaint erroneously pleads this occurred in 2002, rather than 2022.

post-merger CEO of UBS stated, with respect to elements of Credit Suisse's "culture" that needed to be addressed in connection with the integration, "[t]he most important one is risk discipline, risk/reward discipline…some people [at Credit Suisse] were not really probably behaving in the best interest of clients and the bank." ¶412. Then, on April 4, 2023, at Credit Suisse's final Annual General Meeting, Lehmann admitted:

> *We needed a comprehensive strategic and cultural transformation. The business model had to be fundamentally overhauled and changed. It was also clear that there were unhealthy developments, errant behaviors, and wrong incentive systems. That there were transactions that should not have been allowed to play out.* That we needed to work in many areas not only on structures, but also on mentalities and culture …. The period from October to March was not long enough. *One legacy issue after another had already seen trust eroded—and with it, patience dwindled. At that, we failed. It was too late.*

¶404 (emphasis added). These statements establish that the risk management issues were deeply ingrained in its culture and were not "isolated" incidents or resulted from doing business with family offices or conducting Zoom meetings during the pandemic. their rapid "discovery" after the merger, moreover, further supports an inference that risk management issues were pervasive.

Defendants argue several statements regarding Credit Suisse's purported efforts to improve risk management are not actionable because they are "objectively truthful." *See* Def. Br. at 11-12. The well-pleaded allegations of the Complaint show otherwise. For example, statements that Archegos was "an isolated case," "an idiosyncratic situation" (¶¶72, 77), and that the first lesson to be learned was that "disclosure has to be improved around especially family offices" (¶77), were materially false or misleading because: the risk management issues were culturally systemic (¶412); employees were "incentivize[d] to look the other way" (¶421); and "Credit Suisse's business model and business mix was deeply flawed." ¶411. Importantly, whether a statement is misleading is "evaluated not only by 'literal truth,' but by context and manner of presentation." *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (McMahon, J).

"'Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation.'" *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 580 (S.D.N.Y. 2020) (quoting *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013)).

Here, statements such as "we are obviously reviewing the entire bank now, just to make sure that our risk processes and systems are where they should be" (¶72), and "risk and control governance is already being strengthened and will be further enhanced following first and second line risk management assessments" (¶67), conveyed to investors that the Company had taken, and was continuing to take, meaningful actions to improve risk management and corporate governance, and that the actions announced were specifically tailored to address those admitted issues. But this was not the case. As demonstrated by later events, such as the February 2021 release of a FINMA report concluding Credit Suisse ignored repeated warning signs regarding its banker's fraud, the placement of Credit Suisse by a UK regulator on a "watchlist of institutions requiring tougher supervision" in mid-May 2022, and the near collapse of the Company in 2023, the purportedly remedial actions touted by Defendants were superficial at best and not designed to meaningfully address the risk management issues.

Defendants also argue Plaintiff's allegations amount to "fraud by hindsight." Def. Br. at 10. But "[t]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 476 (S.D.N.Y. 2012) (citing *In re Bear Stearns Cos. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011); *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) ("[M]isstatements of existing fact are not mere fraud by hindsight."). The Complaint alleges Defendants made a number of misstatements and

10

omissions assuring shareholders that: (1) Credit Suisse was conducting a comprehensive review of the Company's risk management and corporate governance controls and procedures; (2) actions were being taken to remediate the risk management issues; and (3) the problems that led to the Archegos and Greensill scandals were merely the lack of face-to-face meetings during COVID-19 and doing business with family-run offices. *See, e.g.*, ¶¶59, 73, 130, 132. The Complaint alleges these statements were materially false or misleading when made because Credit Suisse's risk management failures were attributable to a deeply rooted culture that rewarded risky behavior and serving risky clients. *See, e.g.*, ¶¶60, 62, 401, 420. That this unsustainable culture eventually led to the Company's near collapse merely supports that the statements were materially false or misleading, or omitted material facts, when they were made. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) (post-class period articles established awareness of falsity of class period statements; opposite result would "reward [defendants] for their successful concealment"). Around the beginning of the Class Period, moreover, the Suisse Secrets whistleblower had already shared data with a German daily newspaper about a high-risk client problem affecting some 30,000 Credit Suisse clients. ¶9. It can plausibly be inferred that Defendants knew about such enormous and widespread problems throughout the Class Period.

Defendants proffer an alternative interpretation—that the Company "*did* try to strengthen its risk management processes, and *did* believe its plans would succeed, but that it ran out of time before it could fully accomplish those goals," which they claim is supported by the fact "that incidents similar to the Greensill and Archegos matters [n]ever arose again." Def. Br. at 10 (emphasis added). But this is contrary to the well-pleaded allegations of the Complaint that must be taken as true at this stage. *See In re Avon Secs. Litig.*, No. 19 Civ. 1420, 2019 U.S. Dist. LEXIS 200816, at *35; (S.D.N.Y. Nov. 18, 2019) (McMahon, J.); *see also Yi v. GTV Media Grp. Inc.*,

11

No. 21-cv-2669, 2021 U.S. Dist. LEXIS 147995, at *9 (S.D.N.Y. Aug. 6, 2021) (when opposing inferences can be gleaned from the facts at the motion-to-dismiss stage, "the Court must draw all reasonable inferences in Plaintiffs' favor"). Further, Defendants' interpretation is severely undercut by the near collapse of Credit Suisse and its forced merger with UBS.

Defendants' argument that its Risk Management Statements constitute mere puffery (Def. Br. at 12-13) is contrary to Defendant Gottstein's own words regarding the Archegos and Greensill investigations: "I recognize that these cases have caused significant concern amongst all our stakeholders." (¶52); "Yeah, we are doing a comprehensive review. Obviously, that's something that we owe to ourselves and to our stakeholders that we – after such a shock loss that we had, we have to review that in detail." ¶73. Additionally, Horta-Osório stated, "The main priority and the first point when I was elected Chairman…is risk management. At heart, every banker should be a risk manager." ¶128. Analysts confirmed the importance of these investigations. For example, on April 6, 2021, a Deutsche Bank analyst noted, "[F]irst steps to regain confidence in Credit Suisse's risk management and businesses have been announced…We see these as an opportunity to improve the group business mix and valuation in the mid-term." ¶57.

Moreover, "[m]ateriality depends upon a number of context-specific factors, including specificity, emphasis, and whether certain statements are designed to distinguish the company in some fashion that is meaningful to the investing public." *Signet*, 389 F. Supp. 3d at 230. In this case, the context of Defendants' statements is paramount. At the start of the Class Period, Credit Suisse had just faced two major scandals indicating failures of its risk management, which it purported to be actively investigating and remediating. *See, e.g.*, ¶¶4, 7. In early 2022, after numerous countries imposed sanctions on Russia, Defendants repeatedly assured shareholders and analysts that it was appropriately managing its Russia exposure. *See, e.g.*, ¶¶165, 181. And even

12

as Credit Suisse began to suffer significant outflows, days before its near collapse, it continued to make statements such as "we have rolled out a comprehensive plan to strengthen and improve risk management across the Group." ¶297 (2022 Annual Report). These circumstances differentiate this case from the one upon which Defendants heavily rely, *In re Citigroup Sec. Litig.*, where plaintiff alleged "routine, generic, and vague statements" about investments into risk management compliance over a four-year period, and the court found that two consent orders Citibank and its regulators had entered just days before the class period ended, upon which plaintiff largely relied, failed to support the falsity of Citibank's earlier risk management statements. No. 20-cv-9132, 2023 U.S. Dist. LEXIS 50726, at *8 (S.D.N.Y. Mar. 24, 2023). Here, unlike in *Citigroup*, Plaintiff alleges numerous facts both before and during the Class Period (including myriad red flags), which support the falsity of Defendants' Risk Management statements. Nor did *Citigroup* involve a bank that was subsumed into its largest rival pursuant to a government-mandated, emergency buyout to avert a global financial meltdown. This case is more analogous to *Freudenberg*, where defendants concealed the "high risk nature" of its sub-prime mortgage portfolio, ultimately leading to "an $18 billion 'run on the bank' by bread-and butter brokerage customers." 712 F. Supp. 2d at 177-78. There, the late Judge Sweet found "misstatements regarding risk management, discipline, monitoring and credit quality [we]re not 'puffery' where . . . they were 'misrepresentations of existing facts.'" *Id*. at 189 (citing *Novak v. Kosaks*, 216 F.3d 300, 315 (2d Cir. 2000)).

        2.      <u>"Customer Outflow Statements" and Liquidity Statements Are Actionable</u>

According to CW2, Credit Suisse was already losing customers and deposits in 2021, and there were concerns about the Company's health at the time of his/her departure in August 2021. ¶47. These allegations rebut the argument that "Plaintiff does not point to anything to suggest that Credit Suisse's inflows and outflows before October 2022 were 'significant' or 'unusual.'" Def. Br. at 15. Plaintiff alleges outflows continued to increase in 2022, especially after the February

2022 Suisse Secrets Leak. ¶12. On July 27, 2022, during the 2Q22 Earnings Call, an analyst asked: "[O]n the outflows…[d]o you think that has now run its course?" Mathers responded, "We'll see how this quarter develops. Just do note, we've had positive inflows for the first half of the year in, I think, you know, clearly in what is a very challenging environment." ¶220. Lehmann and Gottstein also blamed the outflows on "unfavorable market movements" (¶218), taking no responsibility for Credit Suisse's role in the situation and ignoring and downplaying the true reasons for the outflows, which continued to accelerate throughout the Class Period.

On October 27, 2022, Credit Suisse announced a massive increase in its already unusually high outflows, which Körner attributed in a media release to "negative press and social media coverage based on incorrect rumors," once again taking no responsibility for Credit Suisse's role. ¶240. While the release acknowledged outflows had not yet reversed, it also said they had "stabilized," and Credit Suisse had "plans to address these matters," statements which were repeated in the 3Q22 Earnings Release and Quarterly Report, and by Joshi during the Earnings Call on the same day. ¶¶240, 242, 244, 253. When asked about the cause of the outflows, Joshi reiterated it was "the negative social media news around our name at the beginning of October." ¶245. Körner also said the cause was "press rumors. And let me say here very clearly, to the largest extent possible, factually incorrect rumors" and that the outflows were "down very significantly in the last couple of weeks." ¶247. On October 31, 2022, when asked in an interview on *Bloomberg* TV if he was expecting outflows to "reverse," Körner said the situation had "clearly stabilized," and in fact, Credit Suisse was seeing "some inflows coming and I would anticipate that we would have further inflows in the weeks and months to come," as "[w]e have a lot of clients that told us that they would come back." ¶251. On December 2, 2022, Lehmann stated on *Bloomberg* TV that outflows "basically have stopped," and characterized the October increase in outflows as simply a

14

"two-to-three-week event." ¶263. A *Bloomberg* article published that day noted Credit Suisse's stock rebounded after these comments. ¶264. On December 5, 2022, in an interview with *SFR*, Lehmann stated, "I believe the situation has calmed. The business is definitely stable." ¶268.

In the first quarter of 2023, Defendants continued to state that outflows had "stabilized," "reduced significantly," and "significantly moderated" after October 2022, that they had "acted decisively to address the impact of the outflows," and that, in fact, they had seen "material good inflows," which was a "positive sign." ¶277 (Credit Suisse); ¶¶279, 290, 302 (Körner); ¶280 (Joshi). But outflows had not stabilized. Just a few days after this last statement, Credit Suisse nearly collapsed due in part to liquidity issues from outflows. ¶367. Given this event, Defendants' argument that there was no "corrective disclosure" regarding the Customer Outflow Statements (Def. Br. at 15, 16) is hard to comprehend. *See also infra* §II. Defendants also argue "Plaintiff does not dispute that CS actively updated the market about significant outflows that occurred during the fourth quarter of 2022." Def. Br. at 16. But Plaintiff alleges these "updates" were themselves materially false or misleading. *See*, *e.g.*, ¶¶258, 262, 266, 278.

Defendants erroneously state that Plaintiff's "real grievance" is that "CS and its senior management did not predict that outflows would increase in the way that they did, and to the extent they did, in March 2023." Def. Br. at 17. This is merely another erroneous incantation of fraud-by-hindsight. Indeed, Plaintiff plausibly alleges Defendants knew, or were reckless in not knowing, that Credit Suisse was particularly prone to risks that could lead to customer outflows, including: (1) a history of conducting business with especially risky clients, including Russian oligarchs (¶¶394-99); (2) a number of past scandals and regulatory investigations, including two major scandals resulting in significant losses of customer assets that occurred shortly before the Class Period began (¶420); (3) frequently changing leadership (¶¶423-27); (4) material weaknesses

15

in internal controls (¶¶386-89); and (5) a concentration of business in very wealthy clients, such that one client's departure meant tens or hundreds of millions of dollars in outflows. ¶44. These facts indicate the Customer Outflow Statements were materially false or misleading, or omitted material facts, *at the time they were made. See Avon*, 2019 U.S. Dist. LEXIS 200816, at *54-55 (when defendants "repeatedly referenced" a topic "in public statements," "their disclosures on that topic were required to be complete and accurate….That the Defendants suddenly claim ignorance of the details does not negate the inference that their statements were false when made"); *In re Facebook, Inc., IPO & Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 468 (S.D.N.Y. 2013) (statements actionable when defendants "ignored obvious signs of fraud").

Defendants also argue the Customer Outflow Statements were not materially false or misleading because Credit Suisse disclosed "various measures of its performance," including "total assets under management," "net new assets," and "total customer deposits," which they had no duty to "characterize or editorialize." Def. Br. at 14, 15. Not only is this ancillary to Plaintiff's allegations, but Defendants ***did*** characterize/editorialize when they represented outflows had "stabilized" and "basically stopped" during 4Q22 and 1Q23—which is precisely what Plaintiff alleges is materially false or misleading. Even if Defendants did not have an affirmative duty to characterize the figures, once they chose to speak on the issue, they had a "duty to speak accurately, giving all material facts in addressing those issues to permit investors to evaluate the potential risks." *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 U.S. App. LEXIS 35103, at *8 (2d Cir. Dec. 20, 2022).

Defendants also ask the Court to infer the outflows were unforeseeable because they were due to "[t]he sudden collapse of Silicon Valley Bank [SVB] and Signature Bank" and "the unprecedented events of March 2023." Def. Br. at 17, 18. But these competing inferences relating

16

to falsity are "entitled to little weight at this stage of the litigation," where the Court must draw all reasonable inferences in Plaintiff's favor. *See IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021). Indeed, the question is simply whether the statement "plausibly would have conveyed this supposed fact to a reasonable investor." *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020). Further, this argument is belied by the fact that Lehmann and Körner repeatedly differentiated Credit Suisse from SVB. ¶294 ("Lehmann said it wouldn't be accurate to compare Credit Suisse's current problems with the recent collapse of [SVB], particularly because the banks are regulated differently."); *see also* ¶¶299, 303. Throughout the Class Period, Credit Suisse stated repeatedly on liquidity:

> To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.

¶¶87, 98, 132, 165, 198, 225, 253, 297. Because this statement contains one sentence with the words "we believe," Defendants argue the entire statement is opinion and, as such, is "actionable only if the defendant's opinions were both false and not honestly believed when they were made." Def. Br. at 18 (citing *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015)). This argument mischaracterizes *Omnicare*, which "reduced the significance of district courts' classification of statements as those of fact or opinion," and "established two principal ways of challenging statements of opinion that do not require plaintiffs to show that the speaker subjectively disbelieved the statement." *NewLink*, 965 F.3d at 175-76 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175 (2015)). First, "plaintiffs can allege that a statement of opinion contained one or more embedded factual statements that can be proven false." *Id*. Second, "plaintiffs can allege that a statement of opinion, without providing

17

critical context, implied facts that can be proven false." *Id*. Here, the liquidity pool statements contain the embedded fact(s) that Credit Suisse maintained a liquidity pool sufficient to protect it in the event of an increase in outflows—even "in the event of severe market and idiosyncratic stress." *See*, *e.g.*, ¶87. As the near collapse of the Company in March 2023 proved, this was false. Additionally, as discussed above, Defendants were aware of numerous undisclosed facts indicating the unusually high levels of outflows the Company was experiencing before the Class Period began was likely to continue and accelerate. Thus, even if the words "I believe" were enough to render the entire statement opinion, it would remain actionable.

Defendants also claim the statement is protected by the safe harbor. Def. Br. at 19. The statement, however, is one of present condition ("we *maintain* a liquidity pool"), so the safe harbor does not apply. *See infra* §I.B.4.

### 3.    "ICFR Statements" Are Actionable

Throughout the Class Period, Defendants made numerous statements regarding Credit Suisse's financial and operational performance, but failed to disclose there were material weaknesses in its ICFR (*see*, *e.g.*, ¶¶63-82, 86-88, 96-99, 100-15, 122-37) and on March 10, 2022, the Company represented in its 2021 Annual Report its "internal control over financial reporting is effective as of December 31, 2021." ¶163. But in its 2022 Annual Report, Credit Suisse admitted there had been "material weaknesses" in its ICFR throughout the Class Period, and, as a result, "the Bank's disclosure controls and procedures were not effective." ¶¶296, 340, 386. The attached Audit Report explained that the material weaknesses related to "the effectiveness of the risk management process to identify and analyze the risk of material misstatements in the Company's financial statements," the "effectiveness of monitoring activities relating to providing sufficient management oversight over the internal control evaluation process to support the Company's internal control objectives," and "the effectiveness of controls over the completeness and the

18

classification and presentation of non-cash items in the consolidated statement of cash flows." ¶358. These admissions demonstrate Defendants' earlier statements were false.

Defendants' attempt to characterize the ICFR weaknesses as immaterial falls flat. They argue it "did not mean or suggest that any prior financial results were materially misstated," but was simply "an acknowledgement by CS that certain controls were insufficient to comprehensively prevent the *possibility* that such mistakes *could* occur in the future." Def. Br. at 19. Relatedly, they argue they had "no duty" to discuss ICFR weaknesses because there "were no material errors in CS's financial statements." *Id.* at 21. These are red herrings. As the late Judge Sweet noted, "'Management's assessment of internal control over financial reporting' [i]s a critical metric for investors because it provide[s] assurance that the Company's financial statements [a]re reliable and in accordance with applicable laws." *In re Sunedison Secs. Litig.*, 300 F.Supp. 3d 444, 469 (S.D.N.Y. 2018) (citing *Bear Stearns*, 763 F. Supp. 2d at 471). Thus, "when a company misrepresents the effectiveness of its internal controls, investors may be left with a false impression of the company's risks and holdings." *Id.* Further, as the court noted in rejecting a similar argument in *Johnson v. Costco Wholesale Corp.*, "Plaintiffs must only show that there was a material weakness in internal controls when Defendants stated there was no such weakness. The SEC does not require a particular level of severity to state a material weakness." No. 18-cv-1611, 2019 U.S. Dist. LEXIS 205433, at *44 n.11 (W.D. Wa. Nov. 26, 2019).

Defendants also claim the material weaknesses "were unrelated to the causes" of the merger and "largely had nothing at all to do with most of the challenged statements." Def. Br. at 3, 20. This conclusory claim is contrary to Plaintiff's well-pleaded allegations. *See* ¶359 ("Ultimately, the media attributed Credit Suisse's downfall, in part, to the announcement of the material weaknesses."). It is also "entirely beside the point": the "allegations permit the conclusion

19

that [defendant] knew about but failed to resolve meaningful control deficiencies at times when [it] was certifying that the internal controls were effective. While discovery ultimately may undermine the probative value of the supposed deficiencies…the complaint is sufficient in this respect to survive a motion to dismiss." *Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012).

Moreover, when Defendants did (belatedly) disclose the material weaknesses, they claimed they were "developing a remediation plan to address" them. ¶296. Instead, however, Credit Suisse was discussing its sale or liquidation with Swiss authorities—which was announced only five days later. ¶¶366-67. Defendants' failure to reveal the true extent and severity of the problems Credit Suisse was facing rendered the statements they made contemporaneously with, and after, their admission of ICFR weaknesses (¶¶296-97, 299, 302-03, 306) materially false and misleading.

In addition, contrary to Defendants' claim, Plaintiff alleges GAAP violations. *See* ¶¶308-19 (alleging GAAP violations based on "inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities").

Finally, Defendants also argue the SOX certifications are statements of opinion that are inactionable "[i]n the absence of allegations that these opinions were not honestly held at the time they were made or that they were not based on reasonable inquiry." Def. Br. at 23. Not only do Defendants again misstate the standard for opinion liability (*see NewLink*, 965 F.3d at 175-76 (opinion statements actionable where they contain false embedded factual statements or implied facts that can be proven false) (citing *Omnicare*, 575 U.S. 175)), but the cases upon which they rely are distinguishable in a crucial respect: there, the only allegation to support that defendants did not believe the certifications when they were made was a later admission of deficiencies. *See New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 176

20

(2d Cir. 2023); *Citigroup*, 2023 U.S. Dist. LEXIS 50726, at *59. Here, by contrast, the Complaint contains detailed allegations supporting a strong inference of Defendants' scienter, corroborated by the CW statements, Defendants' own admissions, and statements by UBS after the merger.

Defendants claim Plaintiff's falsity allegations "make [] no sense with respect to the SOX Certifications attached to the 2022 Annual Report, given that *Credit Suisse disclosed the material weakness in its ICFR in that very same Report*." Def Br. at 22 (emphasis in original). But the statements disclosing the material weaknesses are alleged to be false and misleading because they downplayed their scope and falsely represented Credit Suisse was remediating them. ¶298.

### 4.    The PSLRA Safe Harbor Does Not Apply

Most of the statements cited by Defendants are actually mixed statements of future and past/present tense, which they try to obscure through the artful use of ellipses. *See, e.g.*, ¶63 ("The related risk and control governance *is being strengthened* and will be further enhanced."); ¶96 ("whilst we aim to further strengthen our risk culture, *we remain committed* to serving all our…clients with best-in-class service and advice and to creating value for our shareholders."); ¶275 ("Our *performance in 2022* underscores the importance of our forward focus…") (emphasis added). The Safe Harbor only protects statements that are "forward-looking," not "statements of current or historical fact." *City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132, 2013 U.S. Dist. LEXIS 44948, at *32 (S.D.N.Y. Mar. 25, 2013) (McMahon, J.); *see also* 15 U.S.C. § 78u-5(c)(1).

Further, the only example of cautionary language Defendants cite (from the 2020 Annual Report), was not meaningful. To invoke the Safe Harbor, "cautionary language must be substantive, specific, and accompany the forward-looking statement." *In re Vale S.A. Sec. Litig.*, No. 19-CV-526, 2020 U.S. Dist. LEXIS 91150, at *42-43 (E.D.N.Y. May 20, 2020). Cautionary language is meaningful when "it cannot be said that any reasonable investor could consider [the statement] important in light of the adequate cautionary language." *Halperin v. eBanker*, 295 F.3d

21

352, 357 (2d Cir. 2007). The boilerplate statement that risk management "may not always be effective" and "may not fully mitigate our risk exposure in all markets or against all types of risk" was not substantive or specific, as it could have been said about *any* institution with risk management policies at any time. The warning was also not meaningful, as the Company was already experiencing, and would continue to experience, serious risk management issues. *See, e.g.*, *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 n. 92 (2d Cir. 2021) (a "warning that identifies a potential risk, but implies that no such problems were on the horizon even if a precipice was in sight, would not qualify as a 'meaningful cautionary statement'").

In addition, oral statements "must be accompanied by a cautionary statement (1) identifying the particular oral statement as forward-looking, (2) stating that the 'actual results might differ materially from those projected in the forward-looking statement,' and (3) identifying a readily available written document or portion thereof that identifies factors that 'could cause actual results to materially differ from those in the forward-looking statement.'" *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 09-cv-01740, 2013 U.S. Dist. LEXIS 40788, at *48 (D. Conn. Mar. 23, 2013). Defendants do not argue their oral statements contained such language, nor could they, as many of them did not. *See, e.g.*, ¶¶135-36; 201; 222-23; 299.

Finally, to the extent the Court finds any of Defendants' statements were forward-looking, Plaintiff alleges they were made with "actual knowledge" they were false or misleading (15 U.S.C. §78u-5(c)(5); *see infra* § I.C.1) and, therefore, the safe harbor does not apply. *See In re SLM Corp., Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010).

## C.    The Complaint Adequately Pleads Scienter

In this Circuit, plaintiffs can satisfy the scienter requirement by either "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud *or* (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v.*

*Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (citation omitted) (emphasis added). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," but need only be "at least as compelling" as any opposing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see also In re EVCI Colleges Holding Corp. Secs. Litig.*, 469 F.Supp. 2d 88, 99 (S.D.N.Y. 2006) (McMahon, J.) ("[A]t the pleading stage, the plaintiff is not required to prove his case; only to raise a reasonable and strong inference of scienter."). Contrary to Defendants' approach, "the court's job is not to scrutinize each allegation in isolation" but to assess whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 313, 322-23 (emphasis in original). Taken collectively, Plaintiff's allegations—showing both strong circumstantial evidence of conscious misbehavior or recklessness (¶¶386-427) and motive and opportunity (¶¶433-37)—are more than sufficient to adequately allege a strong inference that Defendants knowingly, or at minimum, recklessly, misled investors.

### 1. Defendants Knew or Recklessly Disregarded That Their Statements Were Materially False and Misleading

"Plaintiffs can establish recklessness by adequately alleging that 'defendants knew facts or had access to non-public information contradicting their public statements' and therefore 'knew or should have known they were misrepresenting material facts.'" *Avon*, 2019 U.S. Dist. LEXIS at *58 (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). Likewise, "scienter may be found where there are 'specific allegations of various reasonably available facts, or "red flags," that should have put the officers on notice' that the public statements were false." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).

### (a) Plaintiff's Confidential Witnesses

The three CWs' allegations are corroborative of each other, providing strong support for an inference of scienter, especially with respect to the Customer Outflow Statements. CW3, a

23

Credit Suisse Managing Director through May 2023, attended leadership meetings with C-suite leaders, including Lehmann and Gottstein, throughout the Class Period, and stated "the executives knew" about customer and asset outflows. ¶393. CW1, a Financial Analyst at Credit Suisse through April 2022, who monitored risk targets at the Company's branches worldwide, stated "the Company regularly monitored" inflow and outflow of customer assets. ¶391. And CW2, an Executive Assistant who supported five Managing Directors in the M&A division in New York, stated Credit Suisse was already losing customers and deposits in 2021, and at the time of his/her departure in August 2021, there were "concerns internally" about the Company's health. ¶392.

Defendants' argument that a CW must have contact with individual defendants to be credited (Def. Br. at 29) has been expressly rejected by this Court as "not the standard in this Circuit: rather, the CW simply must be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Avon*, 2019 U.S. Dist. LEXIS 200816, at \*63-64; *see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F.Supp. 3d 602, 615 (S.D.N.Y. 2015) ("[T]here is no baseline requirement of [] contact…."). Here, Plaintiff described in detail each CW's position and responsibilities, indicating a substantial likelihood that they actually knew the facts alleged. ¶¶391-93. These facts support a strong inference of scienter.

(b)    *Governmental Investigations and Findings*

Credit Suisse is currently being investigated by the SEC, DOJ, and FINMA relating to customer outflows and its financial condition and financial controls. ¶410. In May 2023, the Swiss Parliament announced that it was convening a special commission to investigate the collapse of Credit Suisse (¶407), and on July 24, 2023, UBS announced that it had been ordered to pay $388 million to U.S. and U.K. regulators relating to Credit Suisse's Archegos scandal. ¶408. On March 23, 2023, it was reported that the U.S. Department of Justice had issued subpoenas to Credit Suisse

in connection with a probe into whether the Company helped Russian oligarchs evade sanctions. ¶402. In February 2021, a FINMA report regarding its 2018 investigation into Credit Suisse's former go-to banker for Russian clients, concluded the Company had ignored repeated warning signs and had "even attempt[ed] to gloss over [the banker's] violations." ¶395. These investigations provide strong indicia of scienter. *See, e.g.*, *Credit Suisse Grp.*, 996 F.3d at 79-81 (reversing dismissal of complaint for failure to plead scienter and holding that SEC investigation of Credit Suisse "strengthen[ed]" scienter inference); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (SEC investigation "probative of scienter"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view"); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (problems in pre-class period reports "pertinent to the Defendants' public statements during the Class Period") (citation omitted).

Defendants argue governmental investigations amount to nothing more than "fraud-by-hindsight," citing a holding on the element of falsity (not scienter). Def. Br. at 27 (citing *Citigroup*, 2023 U.S. Dist. LEXIS 50726). This tired refrain is unpersuasive. In *Citigroup*, the court held "news reports that regulators, at unidentified times, identified unspecified deficiencies" in regulatory compliance did not render Citigroup's statements that it "ha[d] been rebuilding [its] relationship with regulators" false or misleading. *Id.* at *53-54. In sharp contrast, here, the governmental investigations are specific in time and tied to Credit Suisse's risk management deficiencies and customer outflow problems. *See supra* §I.C.1(b). And unlike *Citigroup*, Plaintiff alleges myriad other indicia of scienter, including statements from CWs, red flags throughout the Class Period, admissions by Defendants, and the SEC inquiry into Credit Suisse's ICFR.

25

(c)    *The July 2022 SEC Inquiry and Defendants' Admitted Material Weaknesses*

After a nine-month SEC inquiry into the sufficiency of Credit Suisse's financial reporting, Credit Suisse abruptly conceded on March 12, 2023, that it had material weaknesses in ICFR as of December 31, 2022, and 2021. ¶¶386, 389; Def. Ex. 22 at 2-3. During the SEC inquiry, which began in July 2022, at least eight letters were exchanged between the SEC and Credit Suisse. *See* Def. Exs. 10, 13, 14, 17, 18, 20-22. The SEC repeatedly asked Credit Suisse for additional information and explanations as to why it had concluded the accounting issues identified in its 2021 Annual Report that required "revision" of its financial statements for FY 2019 and 2020 were not material. ¶¶386-88; Def. Exs. 10, 14, 18, 21. In response after response, each signed by Joshi and copied to the Audit Committee, Credit Suisse pushed back, attempting to justify its position. Def. Exs. 13, 17, 20. Ultimately, the Company conceded to the SEC: "***We acknowledge that the control deficiencies remained un-remediated for several years***" (¶386; Def. Ex. 22 at 2)—in other words, for the entire Class Period. Two days later, on March 14, 2023, Credit Suisse disclosed in its 2022 Annual Report that ICFR were not effective and material weaknesses existed regarding risk assessment for FY 2021 and 2022. ¶358.

"[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter." *In re Veeco Instruments, Inc., Sec. Litig.,* 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (McMahon, J.) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp. 2d 290, 294 (S.D.N.Y. 1999)); *Orthofix*, 89 F. Supp. 3d at 619 (internal control weakness combined with other allegations gave rise to strong scienter inference). Moreover, only a month before conceding the material weaknesses in ICFR, in a February 13, 2023, letter to the SEC, Credit Suisse stated it had "effective ICFR as of December 31, 2021." Def. Ex. 20 at 16. That Credit Suisse admitted material weaknesses only **one month** after it represented the opposite to the SEC further supports an

26

inference of scienter. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008) ("[T]he 'temporal proximity' of the misleading statement and the subsequent disclosures 'bolster[s]' the inference [of scienter]"); *In re Pareteum Sec. Litig.*, No. 19 Civ. 9767, 2021 U.S. Dist. LEXIS 151106, at *49 (S.D.N.Y. Aug. 11, 2021) (temporal proximity "support[ed] an inference of scienter" where restatement occurred seven months after defendants affirmed effectiveness of internal controls) (citations omitted).

### (d)    Red Flags

To plead the existence of "red flags" that lead to an inference of scienter, plaintiff must allege facts "that would place a reasonable party in defendant's position on notice that the [company] was engaged in wrongdoing to the detriment of its investors." *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 672 (S.D.N.Y. 2004) (citation omitted). Red flags are especially significant for high-ranking officers, such as Körner, Joshi, Horta-Osório, Gottstein, and Mathers. *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 294 (S.D.N.Y. 2011).

On March 17, 2022, the Swiss Bankers Association issued an estimate that Swiss banks held up to approximately $213 billion of Russian client money in offshore accounts—far more than the "limited" exposure reported by Credit Suisse. ¶422. This public report put Defendants on notice that the Company's Russian exposure likely exceeded what it was publicly reporting and warranted further investigation. A few months later, in mid-May 2022, the U.K.'s financial regulator, the Financial Conduct Authority, put Credit Suisse on a "watchlist of institutions requiring tougher supervisions," because it had "not done enough to improve its culture, governance and risk controls." ¶401. The British regulator "urged the bank to address 'persistent' cultural issues, including a lack of internal challenges to risky transactions and said they had not yet seen 'sufficient evidence of effective remediation.'" *Id.* "Relevant warnings from and settlements with regulators are widely recognized to be evidence of scienter." *Karimi v. Deutsche*

27

*Bank Aktiengesellschaft*, 607 F.Supp. 3d 381, 397 (S.D.N.Y. 2022) (citing *Bear Stearns*, 763 F.Supp. 2d at 423 ("warnings from the SEC and other indicators" were indicia of scienter)). Further, as detailed in the July 29, 2021, Archegos Report, Credit Suisse's risk staffing, systems, technology, and structure were deficient (¶¶414-19), and those deficiencies remained largely unremediated throughout the Class Period. ¶414. Finally, Credit Suisse's involvement in recent high-profile criminal and civil proceedings and government investigations stemming from risk management and control governance failures put Defendants on notice that its compliance, risk management, and governance systems and processes were deficient. ¶420. *See Karimi*, 607 F. Supp. 3d at 397 ("The complaint identifies several reports of government investigations and settlements with regulators that provided red flags of the Bank's deficient…practices….").

### (e)     *The Magnitude of the Fraud*

"[T]he size of the purported fraud may also contribute to an inference of scienter." *Orthofix*, 89 F.Supp. 3d at 619 (citation omitted). Credit Suisse's forced merger with UBS, engineered by the Swiss government to prevent a global economic catastrophe, was the first time two global, systemically important financial institutions were brought together since the financial collapse of 2008. ¶1. UBS purchased Credit Suisse in an all-stock transaction for approximately $3.2 billion— less than half its last traded market value. ¶367. In Credit Suisse's final earnings release, issued on April 24, 2023, it reported a decrease in assets under management of CHF 41 billion (approximately $46 billion) and losses of CHF 67 billion (approximately $76 billion) in customer deposits. ¶375. As such, this was a historic fraud, in both proportion and consequence, "'render[ing] less credible' the proposition that defendants there were somehow surprised by their sudden reversal of fortune." *In re Complete Mgmt. Sec. Litig.*, 153 F.Supp. 2d 314, 327 (S.D.N.Y. 2001) (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)); *see also Bear Stearns*, 763 F. Supp. 2d at 517 (despite lack of restatement, magnitude of "alleged accounting violations"

28

precipitated Bear Stearns' "collapse [and] establish the failure to consider the red flags and constitute an adequate allegation of reckless disregard sufficient to establish scienter"); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999) (considering magnitude of fraud in scienter analysis where defendants' "manipulations were allegedly significant enough to cause the bankruptcy of the Company").

(f)    *Whistleblower Report Regarding High-Risk Customers and Defendants' Instruction to Destroy Documents*

In early March 2022, only a few weeks after the Suisse Secrets Leak publicly revealed Credit Suisse had opened or maintained bank accounts for numerous high-risk clients around the world, including a sanctioned Russian oligarch, and shortly after various countries imposed severe sanctions against Russia in response to its invasion of Ukraine, the *Financial Times* reported Credit Suisse had requested various wealthy clients to destroy documents relating to their yachts and private jets, in an attempt to prevent information from leaking about a unit of the bank that had made loans to oligarchs who were later sanctioned. ¶¶9-10. Defendants' alleged attempt to destroy evidence is powerful indicia of scienter and falsity. *See In re Microstrategy*, *Inc. Sec. Litig.*,115 F.Supp. 2d 620, 641 (E.D. Va. 2000) (holding that "attempts at covering-up the truth are probative of a culpable state of mind"). Indeed, as the House Committee on Oversight and Reform noted in a March 28, 2022, letter to Credit Suisse asking it to turn over information and documents from January 1, 2017, to the present regarding its financing of yachts and aircrafts owned by potentially sanctioned individuals, the "timing of [Credit Suisse's] request and its subject matter…raises significant concerns about Credit Suisse's compliance with [Russia] sanctions," and it "may be concealing information about whether participants in the securitization deal…may be evading sanctions." ¶399. Thus, at the same time Defendants assured investors Credit Suisse was taking actions to improve its risk management, the Complaint alleges it was instead catering to some of

29

the world's riskiest clients and concealing this fact from the U.S. government. It speaks volumes that Defendants do not address this allegation.

### (g)    Admissions by Defendants and Current UBS CEO

On April 29, 2022, Lehmann said Credit Suisse had "failed too often to anticipate material risks in good time to counter them proactively and to prevent them" (¶400), and on April 4, 2023, Lehmann admitted its risk management, governance, and controls had been deficient. ¶404. Contradicting his own statements made only a few weeks earlier that Credit Suisse was not at risk of collapse because it had "materially different standards" than SVB (¶299), Körner stated on April 4, 2023, that "the bank had been significantly weakened by the strong outflows in October 2022," and it was "particularly vulnerable at the time" when SVB and Signature Banks collapsed. ¶405. More recently, the new UBS CEO, Sergio Ermotti, stated on August 31, 2023, that UBS' "in-depth analysis" and "extremely thorough review" revealed "Credit Suisse's business model and business mix was deeply flawed…and was no longer in a position to continue on its own." ¶411. Ermotti elaborated "the business model was not sustainable any longer and needs to be restructured," and, with respect to risk, "some people [at Credit Suisse] were not really probably behaving in the best interest of clients and the bank." ¶412.

Courts routinely sustain allegations of scienter where, as here, later admissions (including by a new CEO) contradict alleged misstatements. *See, e.g.*, *In re Allianz Glob. Inv'rs U.S. LLC Alpha Series Litig.*, No. 20-cv-5615, 2021 U.S. Dist. LEXIS 188650, at *95 (S.D.N.Y. Sep. 30, 2021) (admission demonstrating "key employees involved in the Fund's management had access to information about the Fund's true strategy, all the while making misleading representations to the public," "adds to the inference of scienter"); *Dobina*, 909 F. Supp. 2d at 246 (scienter found where "discrepancies between the admissions…and the repeated certifications…are stark"); *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 757 (D. Conn. 1997) (executive's admissions

of "shortcomings" in due diligence and that company "blew it" gave rise to "strong inference" of scienter with respect to company's earlier statements that its due diligence consisted of a "full review"). Moreover, admissions—such as Lehmann, Körner, and Ermotti's here—are supportive of an inference of scienter when they are predicated on rapid 'discoveries' of fraud. *See, e.g.*, *In re Resideo Techs., Inc., Sec. Litig.*, No. 19-cv-2863, 2021 U.S. Dist. LEXIS 60883, at *19 (D. Minn. Mar. 30, 2021) (finding "the rapid discovery of undisclosed problems by the new chief financial officer" was a "compelling reason[] to conclude that Plaintiffs have plausibly alleged scienter"); *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) (finding "the fact that the new [CEO]…discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly"). Accordingly, these admission allegations contribute to a strong inference of scienter.

> (h)   *Defendants' High-Level Involvement in and Focus on Risk Management and Outflows, and Their SOX Certifications*

Defendants touted their focus on, intimate knowledge of, and involvement in the areas of risk and control governance in numerous Class Period statements. For example, Horta-Osório represented: "Since I joined the bank as Chairman in May, my focus has been on…risk management," then described the "fundamental review of risks" that had taken place and stated: "Risk will be an area of key and continuous focus going forward." ¶126. Similarly, Lehmann stated: "Since my appointment as Chairman and also before as the Chair of the Risk Committee…my clear focus has been on strengthening our governance, improving our risk management control processes, and establishing the right risk culture." ¶234. The other Defendants made similar statements. *See* ¶235 (Körner); ¶67 (Gottstein); ¶101 (Mathers); ¶124 (Credit Suisse). Defendants' focus on risk management and its critical importance to Credit Suisse further support a strong inference of scienter. *See Signet*, 268 F.Supp. 3d at *47 (scienter inference "especially"

31

strong "when one accounts for Defendants' various public representations touting the strategic importance of credit to Signet's business"); *Veeco*, 235 F.R.D. at 233 ("Where [] accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the [ ] improprieties may be imputed to the company's officers and directors who are involved in the day-to-day operations of the company.") (citation omitted).

Defendants also spoke knowledgeably about customer outflows, liquidity, and the Company's Russia exposure. *See, e.g.*, ¶¶80, 101, 134, 244, 246, 261 (Gottstein, Mathers, Horta-Osório, Joshi, Körner, and Lehmann discussing customer outflows); ¶¶244, 279 (Joshi and Körner discussing liquidity); ¶¶167-68, 186, 195 (Gottstein, Mathers, and Lehmann discussing Russia sanctions and Russia exposure). "Where, as here, 'a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of scienter.'" *Dobina*, 909 F. Supp. 2d at 246. Thus, this Court found scienter in *Signet* where "Plaintiffs allege[d] that Defendants were intimately familiar with Signet's portfolio and underwriting," which was "supported by Defendants' various representations," including "we fully understand the credit risk," "we watch it closely," we have every confidence in the way we manage our credit portfolio," and "management monitors credit exposure." 2018 U.S. Dist. LEXIS 199809, at *47; *see also Hawaii Str. Iron Pen. Tr. Fund v. AMC Ent. Hold., Inc.*, 422 F.Supp. 3d 821, 850 (S.D.N.Y. 2019) (finding scienter based on defendant's statements because "in order to speak so knowledgeably….[he] 'must have educated himself regarding' the [issue]…presumably by reviewing data given to [him] and by performing his own due diligence") (citation omitted); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199, 2016 U.S. Dist. LEXIS 138439, at *27-28 (S.D.N.Y. Oct. 5, 2016) (scienter when "Defendants 'frequently' discussed 'regulatory compliance in press releases, earnings calls and SEC filings'").

32

Further, Defendants' high-level positions, involvement on pertinent committees, and access to information, contribute to a strong inference of scienter.[4] As this Court stated in finding scienter in *Camofi Master LDC v. Riptide Worldwide, Inc.*: "[Defendants] were President and Senior Vice President of Riptide [ ]. The most plausible inference to be drawn from their positions is that they had access to the company's financial records …. Any other inference, frankly, would mean that [defendants] were derelict in their duties." No. 10-cv-4020, 2011 U.S. Dist. LEXIS 31237, at *24-25 (S.D.N.Y. Mar. 23, 2011) (McMahon, J.); *see also Lehman Bros.*, 799 F. Supp. 2d at 295-97 (scienter found where each defendant "was Lehman's [CFO] at one point during the class period and therefore had primary responsibility for overseeing Lehman's finances").

Finally, Gottstein, Mathers, Körner, and Joshi signed SOX certifications attesting to the purported accuracy of the Company's financial and operational reports, as well as the effectiveness of its ICFR. ¶318. These certifications contribute to a strong inference of scienter. *See Dobina*, 909 F. Supp. 2d at 246 (stating, with respect to identically worded SOX certifications, that "the personal participation of [defendants who signed SOX certifications] in designing and evaluating the internal controls is relevant to the [scienter] inquiry."). The cases cited by Defendants (Def. Br. at 31) are inapposite. The language quoted from *Barrett v. PJT Partners, Inc.*, No. 16-cv-2841, 2017 U.S. Dist. LEXIS 145781, at *17-19 (S.D.N.Y. Sept. 8, 2017) addresses falsity, not scienter. And in *In re Hain Celestial Grp.*, the only allegation defendant knew its statements were false was its subsequent admission. No. 16-cv-4581, 2022 U.S. Dist. LEXIS 202774, at *68 (E.D.N.Y. Nov. 4, 2022). Here, by contrast, the Complaint contains detailed allegations of scienter.

---

[4] Lehmann was Chairman of the Board followed by Horta-Osório; Gottstein was CEO followed by Körner; and Mathers was CFO followed by Joshi. ¶¶33-38. Gottstein, Mathers, Körner, and Joshi signed quarterly and/or annual reports (¶¶325, 327, 329, 331, 334, 336, 338, 340, 358). Lehmann was Chair of the Risk Committee (¶126), Horta-Osório was on the "tactical crisis committee" formed in the aftermath of the Archegos and Greensill disasters, and Joshi responded to the SEC's inquiries regarding ICFR deficiencies. ¶¶36, 53, 102; Def. Exs. 13, 17, 20, 22.

*(i)*    *Suspiciously Timed Executive Departures*

There were numerous suspiciously timed high-level departures at Credit Suisse. On April 6, 2021, the Board admitted key departures were related to Archegos, announcing "[f]ollowing the significant US-based hedge fund matter," Brian Chin, then-CEO of the Investment Bank, and Lara Warner, then-Chief Risk and Compliance Officer, would "step[] down" from the Board and "leave the bank." ¶423. Then, on April 22, 2021, when 1Q21 earnings were announced, Credit Suisse announced Horta-Osório would replace Urs Rohner as Chairman. ¶424. On January 17, 2022 (a week before preliminary 4Q and FY22 financial results were to be announced, Horta-Osório announced his resignation and that Lehmann would replace him. ¶425. Then, on July 27, 2022, the day 2Q22 financial results were issued, Gottstein's resignation as CEO and replacement by Körner were announced. ¶211. The media reported "[p]ressure had been mounting on…Gottstein for months over major scandals and losses racked up during his two-year tenure that have hammered shares and angered investors." ¶426. Less than a month later, on August 22, 2022, Mathers "decided to step down" as CFO and was replaced by Joshi. ¶¶227, 427. While a defendant's resignation, *standing alone*, does not give rise to scienter, "the timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter." *Orthofix*, 89 F. Supp. 3d at 619 (CEO and CFO resignations one month apart and just before restatement, "lend further weight to an inference of scienter") (citation omitted); *Varghese v. Chian Shenghuo Pharm. Holdings*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) ("Qiong's removal as CEO also contributes to a strong inference of scienter.") (citation omitted).

2.    Individual Defendants Had Motive and Opportunity

Individual Defendants do not dispute they had the opportunity to commit fraud; their positions as "high-level corporate insiders" "gives rise to the presumption of an opportunity to commit fraud." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16,

34

36 (S.D.N.Y. 2019). Further, Plaintiff alleges that despite overseeing one of the largest failures of a systemically important financial institution in the history of modern banking, Individual Defendants—and other Credit Suisse employees—were rewarded handsomely. ¶¶434-37 (in 2021 and 2022, Executive Board compensated at least $77.32 million; Material Risk Takers and Controllers compensated over $3.28 billion). *See*, *e.g.*, *Nguyen v. NewLink Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) (scienter allegations cannot "rest[] solely on the fact that individual defendants stood to benefit by way of employment incentives" but "allegations regarding [their] specific motives to obtain outsized bonuses may certainly be considered as part of the calculus in assessing whether there is a strong inference of scienter") (citation omitted).

### 3.    Defendants' Remaining Scienter Arguments Fail

Defendants argue PwC's blessing of its financial statements "establishes [their] lack of scienter." Def. Br. at 31-32. But "the willingness of an accountant to give an unqualified opinion…does not negate the existence of the requisite intent." *SEC v. DCI Telecomms.*, 122 F. Supp. 2d 495, 500 n.2 (S.D.N.Y. 2000); *see also Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F.Supp. 3d 1328, 1365 n.183 (C.D. Cal. 2014) ("PwC's audit opinion cannot negate scienter for purposes of a motion to dismiss."). This is because "[a]t this stage of the litigation, there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements." *In re New Oriental Educ. & Tech. Grp. Secs. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) (rejecting defendants' argument that no scienter inference was warranted because independent auditors certified their financial statements) (citation omitted).

Defendants also claim Plaintiff engages in impermissible "group pleading." Def. Br. at 34. But this Court has expressly rejected the argument that the group pleading "doctrine is no longer good law in light of the PSLRA," stating: "[P]laintiffs are permitted to 'rely on a presumption that statements…in annual reports, press releases, or other group-published information, are the

35

collective work of those individuals with direct involvement in the everyday business of the company." *Veeco*, 235 F.R.D. at 232 (citations omitted). At any rate, the Complaint makes specific allegations with respect to each Individual Defendant's scienter. *See supra* §I.C.1.

4.    The Inference of Scienter Is at Least as Compelling as Any Competing Nonculpable Inferences

Importantly, Defendants do not offer *any* alternative, competing inference with respect to the Customer Outflow Statements, thereby conceding there is none. With respect to the Risk Management Statements, Defendants' alternative inference—that "CS ***did*** try to strengthen its risk management processes, and ***did*** believe its plans would succeed, but that it ran out of time before it could fully accomplish those goals" (Def. Br. at 10 (emphasis added))—is decidedly *less* plausible than Plaintiff's culpable inference. Defendants' alternative inference with respect to the ICFR Statements is also uncompelling. Defendants argue "CS's management held a good faith belief about the adequacy of its ICFR processes, and the lack of materiality about the few issues being discussed with the SEC Staff…but that CS eventually changed its view after a protracted and detailed discussion with the SEC." Def. Br. at 31. But this does not explain why Defendants falsely claimed the inquiry was a request only received from the SEC "late" the prior evening to justify the delay in its 2022 Annual Report. ¶387. Even if Defendants' alternative explanations were plausible, they are certainly not *more* plausible than Plaintiff's allegations. Rather, "a reasonable person [would] deem the inference of scienter as least as strong as"—if not stronger than—Defendants' unconvincing alternative explanations. *Tellabs*, 551 U.S. at 326. And Defendants' failure to provide any alternative explanation for customer outflows speaks for itself.

## II.    **The Complaint Adequately Pleads Loss Causation**

Plaintiffs adequately plead loss causation when they "give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). The loss causation pleading standard is 'not meant to impose a great

burden upon a plaintiff.'" *In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016) (quoting *Dura*, 544 U.S. at 346). Defendants' argument that Plaintiff's allegations must rigidly adhere to either a strict corrective disclosure or materialization of the risk theory has been rejected by the Second Circuit:

> [O]ur past holdings do not suggest that 'corrective disclosure' and 'materialization of risk' create fundamentally different pathways for proving loss causation, such that a specific corrective disclosure is the only method by which a plaintiff may prove losses resulting from the revelation of the truth . . . [T]o establish loss causation, plaintiffs must show that a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus.

*Vivendi*, 838 F.3d at 261-62. The Second Circuit later expanded on this point in *NewLink*, explaining that materialization of the risk is not the only theory by which a plaintiff can plead that a fraud was constructively revealed, but that loss causation can be demonstrated "'through events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed." 965 F.3d at 179 (citation omitted). Consistent with that framework, Plaintiff adequately pleads that the relevant truth about the sufficiency of Credit Suisse's risk management and control governance, the significance and impact of customer outflows, and the strength of its ICFR (*compare* Def. Br. at 36-39 *with* ¶¶344-72) was revealed through a series of disclosures and events.

When Credit Suisse announced its merger with UBS on or about March 19, 2023, Lehmann stated "recent extraordinary and unprecedented circumstances" and "many significant legacy issues" "forced [Credit Suisse] to reach a solution today that provides a durable outcome" (¶367), thus explicitly linking the merger announcement and attendant 52.99% drop in Credit Suisse's ADS price to the same "circumstances" and "issues" about which Defendants had issued materially false and misleading statements for nearly two years. Nevertheless, Defendants argue none of

37

Plaintiff's alleged corrective disclosures "admits or even suggests the falsity of any prior statement." Def. Br. at 37. But no "court addressing the loss causation pleading standard require[s] a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 712 F. Supp. 2d at 202; *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060, 2021 U.S. Dist. LEXIS 14888, at *47-48 (S.D.N.Y. Jan. 26, 2021) (McMahon, J) (same); *see also Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, No. 09-cv-2083, 2018 U.S. Dist. LEXIS 55359, at *30 (D. Conn. Mar. 31, 2018) ("Defendants' theory of loss causation would have the effect of insulating from liability defendants who . . . inflate a company's sales data, correct the data over time, and never admit that earlier data was inflated."). Further, it is unclear how Defendants can reconcile the SOX Certifications attesting to the sufficiency of ICFR (¶318-19) with the March 14, 2023, corrective disclosure that ICFR "was not effective." ¶358. This reflects a "causal relationship between concealment of the failings of the Company's internal controls and the loss suffered by plaintiffs." *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 396 (S.D.N.Y. 2007).

Finally, Defendants claim Plaintiff does not adequately plead loss causation because he failed to "dissagregat[e] losses" attributable "to other intervening causes such as macroeconomic factors…." Def. Br. at 36, 39. But "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters Pension Trust Fund v. Barclays, PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (emphasis in original); *see*, *e.g.*, *City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp.*, No. 17 Civ. 10014, 2019 U.S. Dist. LEXIS 26962, at *27 (S.D.N.Y. Feb. 19, 2019) ("[A] complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes."). To that end, Defendants' citation to *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009), is inapposite, as that holding was on appeal of the class certification order.

Nevertheless, Defendants speculate, without evidence, that the price of Credit Suisse's ADSs declined because the market was reacting to a "bank panic" in "early 2023." Def. Br. at 38. Given that the collapse of SVB had occurred nearly a week before March 19, 2023, giving the market ample time to digest that news, it makes no sense that *any* of the staggering 52.99% drop in the price of Credit Suisse's ADSs on March 20, 2023, was in reaction to that rather than the constructive revelation of the fraud through the announcement of the merger and near collapse of Credit Suisse. Further, Defendants cannot simply substitute their preferred reason for Plaintiff's well-founded allegations. *See Textron*, 14 F.4th at 146; *cf. Bear Stearns*, 763 F. Supp. 2d at 504-05 (rejecting "competing inference of unpredictable market-wide collapse" as "Defendants' alleged misconduct was integral to the decline of Bear Stearns, and the financial markets with it"). To the extent any portion of the raw declines in the value of Credit Suisse's securities are not attributable to Defendants' alleged fraud, that is a factual matter to be addressed by the Parties' respective experts at class certification (and, ultimately, by the jury).

Furthermore, the merger itself—following Credit Suisse's near collapse in March 2023—constructively revealed the full truth about Defendants' materially false or misleading statements and omissions. *See NewLink*, 965 F.3d at 179. In *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 787 F.3d 160, 187-88 (2d Cir. 2015), the Second Circuit explained with a hypothetical that "it is enough at the pleading stage for the plaintiff to allege the particular misrepresentation [well-built house] and the destruction of the house in an earthquake," regardless of whether "shoddy and well-built houses alike were destroyed in the earthquake." Here, where the earthquake was entirely of Defendants' own making, there can be no argument that Plaintiff has failed to meet his burden. And, to the extent Defendants argue the merger precludes loss causation because CS' collapse did not occur, that argument was effectively rejected by the Second Circuit in *Vivendi*,

where the court found loss causation based on statements and omissions concealing the risk of bankruptcy even though the company did not, in fact, go bankrupt. *Vivendi,* 838 F.3d at 262-63.

### III.    The Complaint Establishes Control Person Liability

Because Plaintiff adequately pleads §10(b) and control person violations (¶¶460-63), his §20(a) survive. *See In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014). Further, "[b]y pleading that the Individual Defendants engaged in specific conduct while serving as [Chairmen, CEOs, and CFOs []] of [Credit Suisse] throughout the Class Period, the Plaintiffs have alleged particularized facts that give rise to a strong inference not only of the power to direct and control the culpable acts of [Credit Suisse], but also participation in those acts." *In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 449 (S.D.N.Y. 2000) (McMahon, J.).

### IV.    Leave to Amend

If the Court grants Defendants' Motion, Plaintiff respectfully requests leave to amend pursuant to FED. R. CIV. P. 15(a)(2). "[T]he court should freely give leave [to amend] when justice so requires." *Nespresso USA, Inc. v. Peet's Coffee, Inc.*, No. 22-cv-2209, 2023 U.S. Dist. LEXIS 12228, at *44 (S.D.N.Y. Jan. 24, 2023) (McMahon, J.) (quoting FED. R. CIV. P. 15(a)).

### CONCLUSION

Plaintiff respectfully requests the Court deny Credit Suisse Defendants' motion to dismiss.

DATED: November 21, 2023

Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

 */s/ Kim E. Miller*
Kim E. Miller (KM-6996)
J. Ryan Lopatka (admitted *pro hac vice*)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
E-Mail: kim.miller@ksfcounsel.com
E-Mail: j.lopatka@ksfcounsel.com

-and-

Craig Geraci (admitted *pro hac vice*)
Melissa H. Harris (MH-3583)
Matthew P. Woodard (admitted *pro hac vice*)
Jyoti Kehl
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: craig.geraci@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com
Email: jyoti.kehl@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Diabat and
Lead Counsel for the Class*

41