**KAHN SWICK & FOTI, LLC**
Kim E. Miller (KM-6996)
J. Ryan Lopatka (admitted *pro hac vice*)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: j.lopatka@ksfcounsel.com

-and-

Craig J. Geraci, Jr. (admitted *pro hac vice*)
Melissa H. Harris (MH-3583)
Matthew P. Woodard (admitted *pro hac vice*)
Jyoti Kehl
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: craig.geraci@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com
Email: jyoti.kehl@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Adiabat*
*and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALI DIABAT, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KÖRNER, DIXIT JOSHI, THOMAS GOTTSTEIN, DAVID R. MATHERS, ANTÓNIO HORTA-OSÓRIO, and PRICEWATERHOUSECOOPERS AG<br><br>      Defendants. | No. 1:23-cv-5874-CM-SLC<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO PRICEWATERHOUSECOOPERS AG'S MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 3

III.  ARGUMENT ...................................................................................................... 7

  A.   Plaintiff Adequately Pleads Facts Supporting a Strong Inference of PwC's Scienter ........ 7

    1. Legal Standard for Auditor Scienter ............................................................... 7

    2. Plaintiff Alleges Numerous (Not Just One) Red Flags Supporting a Strong
      Inference of Scienter ..................................................................................... 11

      i.    The Archegos and Greensill Scandals ...................................................... 12

      ii.   Credit Suisse's History of Past Scandals .................................................. 13

      iii.  The Archegos Report Revealed Issues Related to Risk Management ....... 13

      iv.   The Suisse Secrets Leak Reveals Credit Suisse's Risky Clientele ........... 15

      v.    The SEC Comment Letters Pointed to ICFR Issues ................................. 16

      vi.   The Revolving Door of Upper Management Signaled Potential ICFR Issues ........... 17

      vii.  The Large Increase in Customer Outflows in October 2022 were a Red Flag ....... 18

      viii. The Alleged Violations of GAAP and GAAS are Red Flags ................... 18

      ix.   Public Records Confirm Prior Cash Flow Issues in Credit Suisse Audits ............. 19

  B.   Plaintiff's Allegations are Not Merely Fraud by Hindsight ............................................. 20

  C.   Leave to Amend .............................................................................................................. 22

IV.   CONCLUSION ................................................................................................. 23

## **TABLE OF AUTHORITIES**

**Cases**

*Advanced Battery Techs., Inc. v. Bagell,*
  781 F.3d 638 (2d Cir. 2015) ........................................................................................ 9

*Athale v. SinoTech Energy Ltd.,*
  No. 11 Civ. 0531, 2014 U.S. Dist. LEXIS 22996 (S.D.N.Y. Feb. 21, 2014) ............................ 8

*Carlson v. Xerox Corp.,*
  392 F. Supp. 2d 267 (D. Conn. 2005) .......................................................................... 15

*Cent. Laborers' Pension Fund v. Sirva, Inc.,*
  No. 04-cv-7644, 2006 U.S. Dist. LEXIS 73375 (N.D. Ill. Sep. 22, 2006) .............................. 15

*Cosby v. KPMG, LLP,*
  No. 16-cv-121, 2018 U.S. Dist. LEXIS 130244 (E.D. Tenn. Aug. 2, 2018)..................... 15, 17

*Dodona I, LLC v. Goldman, Sachs & Co.,*
  847 F. Supp. 2d 624 (S.D.N.Y. 2012) ........................................................................ 21

*Freudenberg v. E*Trade Fin. Corp.,*
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................................ 20

*Gould v. Winstar Commc'ns, Inc.,*
  692 F.3d 148 (2d Cir. 2012) ...................................................................................... 9

*In Longwei Petroleum Inv. Holding Ltd. Sec. Litig.,*
  No. 13-cv-214, 2014 U.S. Dist. LEXIS 9689 (S.D.N.Y. Jan. 27, 2014).................................. 10

*In re Advanced Battery Techs., Inc. Sec. Lititg.,*
  No. 11-cv-2279, 2012 U.S. Dist. LEXIS 123757 (S.D.N.Y.  Aug. 29, 2012)......................... 10

*In re Advanced Battery Techs., Inc.,*
  No. 11-cv-2279, 2013 U.S. Dist. LEXIS 102325 (S.D.N.Y. July 18, 2013)...................... 2, 11

*In re Aegean Marine Petroleum Network, Inc.,*
  529 F. Supp. 3d 111 (S.D.N.Y. 2021)................................................... 8, 10, 11, 13

*In re Am. Bus. Fin. Servs. Noteholders Litig.,*
  No. 05-0232, 2008 U.S. Dist. LEXIS 61450 (E.D. Pa. Aug. 11, 2008)................................... 17

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ........................................................................ 20

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,*
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................... 8, 17

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ...................................................................... 22

*In re Complete Mgmt. Inc. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) ............................................... 10, 19

*In re DNTW Chtd. Accountant Sec. Litig.*,
   666 Fed. Appx. 78 (2d Cir. 2016) ................................................................ 9

*In re Health Mgmt. Inc. Sec. Litig.*,
   970 F. Supp. 192 (E.D.N.Y. 1997) ........................................................... 10

*In re J.P. Jeanneret Assocs.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011) ...................................................... 21

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   51 F. Supp. 2d 290 (S.D.N.Y. 1999) ................................................... 8, 10

*In re Pareteum Sec. Litig.*,
   No. 19-cv-9767, 2021 U.S. Dist. LEXIS 151106 (S.D.N.Y. Aug. 11, 2021) ........................... 22

*In re Parmalat Sec. Litig.*,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005) ......................................................... 1

*In re Philip Servs. Corp., Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) ...................................................... 10

*In re Salix Pharms., Ltd.*,
   No. 14-cv-8925, 2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016) ............................ 20

*In re Sunbeam Sec. Litig.*,
   89 F. Supp. 2d 1326 (S.D. Fla. 1999) ...................................................... 16

*In re the Leslie Fay Cos., Inc., Sec. Litig.*,
   871 F. Supp. 686 (S.D.N.Y. 1995) ............................................................. 8

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ...................................................... 21

*Iowa Pub. Empls. Ret. Sys. v. Deloitte & Touche Llp*,
   919 F. Supp. 2d 321 (S.D.N.Y. 2013) ...................................................... 21

*Lachman v. Revlon, Inc.*,
   487 F. Supp. 3d 111 (E.D.N.Y. 2020) ......................................................... 8

*Masel v. Villarreal*,
   924 F.3d 734 (5th Cir. 2019) .................................................................... 20

*McCurdy v. SEC*,
    396 F.3d 1258, 1261, 364 U.S. App. D.C. 522 (D.C. Cir. 2005) .................................................. 8

*Nespresso USA, Inc. v. Peet's Coffee, Inc.*,
    No. 22-cv-02209, 2023 U.S. Dist. LEXIS 12228 (S.D.N.Y. Jan. 24, 2023) ........................... 23

*Peifa Xu v. Gridsum Holding Inc.*,
    No. 18-cv-3655, 2020 U.S. Dist. LEXIS 55452 (S.D.N.Y. Mar. 30, 2020) ........................... 22

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
    968 F.3d 204 (2d Cir. 2020) ..................................................................................................... 7

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014) ........................................................................................ 22

*United States v. Arthur Young & Co.*,
    465 U.S. 805 (1984) ................................................................................................................... 1

*Venkataraman v. Kandi Techs. Grp., Inc.*,
    No. 20-cv-8082, 2021 U.S. Dist. LEXIS 205517 (S.D.N.Y. Oct. 25, 2021) ........................... 22

*Whalen v. Hibernia Foods PLC*,
    No. 04-cv-3182, 2005 U.S. Dist. LEXIS 15489 (S.D.N.Y. Aug. 1, 2005) ........................... 2, 8

*Woodley v. Wood*,
    No. 20-cv-2357, 2022 U.S. Dist. LEXIS 5397 (S.D.N.Y. Jan. 11, 2022) ............................... 22

*Yannes v. Scworx Corp.*,
    No. 20-cv-03349, 2021 U.S. Dist. LEXIS 116330 (S.D.N.Y. June 21, 2021) ........................ 20

**Rules**

Fed. R. Civ. P. 15(a) .................................................................................................................. 23

**Other Authorities**

Auditing Standards of the Public Company Accounting Oversight Board

AS 1105 .............................................................................................................................. 16

AS 2110 .................................................................................................................. 14, 16, 19

AS 2201 .......................................................................................................................... 15, 19

AS 2401 .............................................................................................................................. 18

## I.    INTRODUCTION[1]

*Independent auditors serve a crucial role in the functioning of world capital markets because they are reputational intermediaries. In certifying a company's financial statements, their reputations for independence and probity signal the accuracy of the information disclosed by the company.*

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 289 (S.D.N.Y. 2005). Defendant PricewaterhouseCoopers AG ("PwC")'s failure in playing this "crucial role," characterized by the Supreme Court as a "public watchdog," cannot be overstated here. *United States v. Arthur Young & Co.*, 465 U.S. 805, 819 (1984).  After PwC had issued clean audit opinions for over two years, representing that Credit Suisse's financial reports were "fairly stated, in all material respects," the Bank revealed that it, in fact, had material weaknesses in its internal controls over financial reporting ("ICFR") "that had remained un-remediated for several years." ¶¶ 384, 440. This revelation not only cratered Credit Suisse's stock price, but it also threatened the stability of the entire global financial system. ¶ 18. So, when PwC downplays its error, repeatedly emphasizing that this was a mere "revision" (what the accounting world sometimes refers to as a "little r" restatement), PwC Br. at 5, 13-15, make no mistake; there was nothing "little" about this revision.

PwC has little choice but to downplay its cataclysmic failure, because PwC concedes, as it must, that its statements were false. Though PwC half-heartedly argues that "Plaintiff makes no effort to tether PwC CH's alleged misstatements" to Credit Suisse's overarching fraud, PwC makes no loss causation argument, nor could it. Plaintiff plainly pleads that the revelation of ICFR material weaknesses resulted in a price decline of Credit Suisse's securities, and even the media attributed Credit Suisse's downfall, in part, to the announcement of the material weaknesses. ¶¶ 358-359.

---

[1] All "¶ --" references are to the Consolidated Amended Class Action Complaint (ECF No. 65) and all references to "PwC. Br." are to PwC's memorandum of law in support of its motion to dismiss (ECF No. 91).

The only argument PwC makes in its motion is that Plaintiff fails to plead that PwC's admittedly false statements were made with scienter. Recognizing, as it must, that the Second Circuit permits plaintiffs to plead auditor scienter through the auditor's disregard of red flags, PwC Br. at 17, PwC wrongly argues that Plaintiff must plead that PwC was "actually aware" of the red flags and must identify all "pertinent documents concerning the audits or reviews" and the dates and times of all relevant "meetings or interactions between PwC CH and Credit Suisse (or among PwC CH)." PwC Br. at 15, 17. As even PwC's own cited cases make clear, the law requires no such thing. *See, e.g., In re Advanced Battery Techs., Inc.*, No. 11-cv-2279, 2013 U.S. Dist. LEXIS 102325, at *23-26 (S.D.N.Y. July 18, 2013) (McMahon, J) (acknowledging that if the red flags would "necessarily" be encountered during audit, the Court "could easily infer" knowledge of the red flags). In fact, PwC previously attempted to heighten the pleading standard in this manner in this district, and that attempt was shot down. *See Whalen v. Hibernia Foods PLC*, No. 04-cv-3182, 2005 U.S. Dist. LEXIS 15489, at *7 (S.D.N.Y. Aug. 1, 2005) ("To plead with particularity does not require at this stage that Plaintiff spell out the very moment PwC should have known about the alleged fraud or that PwC had actual knowledge of the scope or particulars of the scheme.").

Contrary to PwC's mischaracterization that the Complaint pleads only a "single red flag," PwC Br. at 16, Plaintiff pleads an abundance of red flags that PwC necessarily would have encountered had it performed its duties as an auditor. As discussed more thoroughly below, Plaintiff alleges that PwC ignored flashing warning signs in the form of scandals, reports of risk management issues, SEC comment letters, and risky accounts, among other things, that undermined its audit opinions. When considered in the aggregate, these red flags support a strong inference of scienter more than sufficient to move forward at this stage. And because these red flags existed and were ignored at the time PwC made its materially false and misleading

statements, PwC's argument that Plaintiff pleads "fraud by hindsight," is wholly inapplicable. PwC Br. at 13-16.

For these reasons and those discussed herein, Defendant PwC's motion should be denied.

## II.    FACTUAL BACKGROUND

Throughout the Class Period (April 6, 2021–March 20, 2023), Credit Suisse admittedly had material weaknesses in its internal controls over financial reporting ("ICFR") related to:

> (i) the effectiveness of the risk assessment process to identify and analyze the risk of material misstatements in the Bank's financial statements, (ii) the effectiveness of monitoring activities relating to providing sufficient management oversight over the internal control evaluation process to support the Bank's internal control objectives, involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives and assessing and communicating tile severity of deficiencies in a timely manner to those parties responsible for taking corrective action and (iii) the effectiveness of controls over the completeness and the classification and presentation of non-cash items in the consolidated statements of cash flows.

¶ 341. Just days after it revealed this material weakness, on March 19, 2023, Credit Suisse announced, after 166 years in business, it would no longer operate as an independent entity, and would merge into its former rival, UBS Group AG ("UBS"). ¶ 1. It was later revealed that Swiss authorities had forced the merger in lieu of Credit Suisse's imminent collapse, which officials feared would trigger a global financial meltdown. ¶ 18. The media attributed Credit Suisse's downfall, in part, to the announcement of the material weaknesses. ¶ 359. At the time of this near-collapse, Defendant PwC was Credit Suisse's auditor.

PwC became Credit Suisse's statutory auditor for the fiscal year ending 2020, replacing KPMG AG ("KPMG"), which had acted as Credit Suisse's auditor since 1989. ¶ 19. In 2018, the year Credit Suisse initially made the decision to switch auditors, the SEC charged six accountants with leaking confidential information about upcoming PCAOB audit inspections to KPMG. ¶ 23. Documents made public in a related criminal case revealed that Credit Suisse was initially on the

list to be audited in 2016, that KPMG was concerned that issues found in previous investigations of Credit Suisse, specifically related to cash flows, still existed, and that KPMG performed a series of "stealth reviews" of the Bank's 2016 audit to ensure that, if these issues came up, the audit would be clean. ¶¶ 23, 442. As such, it is public record that Credit Suisse's past audits evidenced issues related to cash flows.

Additionally, shortly before the Class Period, Credit Suisse was involved in two major scandals, Archegos and Greensill. ¶ 4. Both of these scandals revealed significant risk-management issues at the Bank, which would also signal to auditors the need to take extra care in the 2021 and 2022 audits. ¶ 4. The investigation into the Archegos matter found that several Credit Suisse departments directly related to risk management were chronically understaffed, that the Bank had recently experienced numerous departures of senior Risk officers (which the Archegos Report referred to critically as "a 'juniorization' of the Risk function"), and that Credit Suisse had failed to invest in technology that would have assisted in more effectively managing risk. ¶ 415. Additionally, in February 2022, in another scandal termed the "Suisse Secrets Leak," data from a whistleblower revealed that Credit Suisse repeatedly opened or maintained bank accounts for an array of high-risk clients across the world, including sanctioned Russian oligarchs. ¶ 9. Subsequently, on March 23, 2023, Bloomberg reported that the U.S. DOJ had issued subpoenas to Credit Suisse in connection with a probe into whether the Company helped Russian oligarchs evade sanctions. ¶ 402. These scandals were only the latest in a long line of civil proceedings and governmental investigations against Credit Suisse stemming from risk management and control governance failures. ¶ 420. And PwC itself was not immune to scandals: on March 15, 2022, the SEC announced that it had launched a probe into conflict-of-interest concerns among accounting

firms, including both KPMG and PwC. ¶ 447. In fact, PwC was compensated in excess of CHF 209.6 million (or over $213 million) for its work on Credit Suisse's 2021 and 2022 audits. ¶ 385.

Despite knowledge of these issues, PwC stated, in letters attached to each of Credit Suisse's Interim Reports on Form 6-K during the Class Period, that it was "not aware of any material modifications that should be made" to bring the interim report in conformity with GAAP, that the information included from the previous year's balance sheet "is fairly stated, in all material respects," and that PwC conducted its review in accordance with PCAOB standards. ¶ 24. PwC also stated, in a letter attached to Credit Suisse's Form 20-F filed on March 10, 2022, that the financial statement "present[ed] fairly, in all material respects, the financial position the Group as of December 31, 2021 and 2020," and that Credit Suisse had maintained "effective internal control over financial reporting as of December 31, 2021." ¶ 24.

In this same 2022 Form 20-F, Credit Suisse stated that it had "identified accounting issues" that required it to revise (not restate) its financial statements for the years ending December 31, 2020, and December 31, 2019, but that these issues were "not material individually or in aggregate," a determination Credit Suisse later represented was blessed by PwC. ¶ 25. Specifically, the Company stated that the issues were with the "netting treatment relating to the presentation of a limited population of certain securities lending and borrowing activities" resulting in the "balance sheet and cash flow positions for both assets and liabilities relating to these activities were understated." ¶ 25. Separately, the Company identified issues with "consolidated statements of cash flows share-based compensation expenses, net"; "expanded the elimination of non-cash exchange rate movements related to certain operating, investing and financing activities"; and "the presentation of certain cash flow hedges were reclassified." ¶ 25.

In July 2022, the SEC began a comment letter correspondence string with Credit Suisse CFO Mathers (and later CFO Joshi) requesting more information about this "revision." ¶ 320. The July 15, 2022 letter asked: "In light of your accounting issues and resulting revisions, as well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management, please provide us with your analysis supporting your conclusion that there were no material changes to ICFR." Declaration of Nicholas N. Matuschak ("Matuschak Decl.") at Exhibit 10 (ECF No. 85). In this sentence, the SEC was literally pointing to a number of red flags indicating a potential for a material weakness in Credit Suisse's ICFR and was suggesting a lack of evidence that Credit Suisse and its auditors took these factors into consideration. After months of corresponding back and forth, including several conferences between the staff of the SEC's Division of Corporation Finance and Credit Suisse's counsel, Credit Suisse had still not given the SEC a concrete answer to its questions. And the whole time Credit Suisse was corresponding with the SEC, PwC continued representing in each of Credit Suisse's Interim Reports on Form 6-K that the information included from the Company's balance sheet for the period ending December 31, 2021, was "fairly stated, in all material respects," and that PwC conducted its review in accordance with PCAOB standards. ¶ 321.

The SEC ultimately issued a late night request on March 8, 2023, which resulted in Credit Suisse announcing on March 9, 2023, that it was delaying the filing of its Form 20-F for the period ending December 31, 2022. ¶ 320. The next day, March 10, 2023, the SEC sent another letter to Defendant Joshi, stating:

> We note in the root cause analysis you provided, you concluded the two cash flow control deficiencies resulted from missing controls designed to address the risks of presentation and disclosure to the financial statements. While you concluded that one control deficiency was remediated as of December 31, 2021, it does not appear that either control deficiency was linked to risk assessment. In light of the fact that there were indications of missing controls responsive to risks of material

misstatements, explain how you believe there was not a failure in the risk assessment entity-level control component as of December 31, 2022 and 2021.

Matuschak Decl. at Ex. 21. In response to this statement, Credit Suisse stated: "We note the Staff's concern, and have now reassessed our position and performed additional procedures. We will report that *we have, and have had, a material weakness in internal control over financial reporting* as it relates to COSO Principle 7." Matuschak Decl. at Ex. 22. In this same letter, Credit Suisse acknowledged that "the control deficiencies *remained un-remediated for several years*." *Id.*, *see also* ¶¶ 386, 440. And yet, throughout the Class Period, despite ample red flags pointing to Credit Suisse's risk management issues, despite management's admission to un-remediated control deficiencies, PwC continually represented that no such issues existed.

## III.    ARGUMENT

### A.    Plaintiff Adequately Pleads Facts Supporting a Strong Inference of PwC's Scienter

To plead scienter, Plaintiff must allege "facts (1) showing that the defendants had both motive and opportunity to commit the fraud *or* (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (emphasis added).

While Plaintiff pleads facts supporting PwC's motive, which include very large fees (over $200m in just a few years) and the motivation to avoid a restatement that impacted global financial markets, ¶¶445-448, Plaintiff predominantly pleads scienter through the second avenue, circumstantial evidence of conscious misbehavior or recklessness.

### 1.    <u>Legal Standard for Auditor Scienter</u>

Courts in this Circuit have long held that "auditor scienter can be established by allegations that the auditor was aware of 'red flags' of fraud and yet recklessly disregarded them." *In re Aegean Marine Petroleum Network, Inc.,* 529 F. Supp. 3d 111, 149 (S.D.N.Y. 2021) (quoting *Athale v.*

*SinoTech Energy Ltd.*, No. 11 Civ. 0531, 2014 U.S. Dist. LEXIS 22996, at *7 (S.D.N.Y. Feb. 21, 2014)). Red flags are "particular factors that arouse suspicion and call for focused investigation." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 512 (S.D.N.Y. 2011) (citing *McCurdy v. SEC*, 396 F.3d 1258, 1261, 364 U.S. App. D.C. 522 (D.C. Cir. 2005)). Put another way, red flags "illustrate at the very least behavior that could not conceivably escape a rational auditor's critical eye, if his eyes were open." *Whalen*, 2005 U.S. Dist. LEXIS 15489, at *11. The rationale for this approach to scienter is that the accountant is "immersed in [the company's] operations while performing its audit, and because the 'red flags' would clearly be evident to any auditor performing its duties, one could reasonably conclude that [the accountant] must have noticed the 'red flags,' but deliberately chose to disregard them to avoid antagonizing [the company] and incidentally frustrating its fraudulent scheme." *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (citing *In re the Leslie Fay Cos., Inc., Sec. Litig.*, 871 F. Supp. 686 (S.D.N.Y. 1995)).

Underpinning this framework for scienter are the responsibilities and functions of an auditor. Thus, cases cited by Defendant PwC such as *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111 (E.D.N.Y. 2020) (which does not involve claims against an auditor), have little value in the analysis. There, the court rejected plaintiffs' claims that "defendants exhibited scienter because it was their job to monitor [the company's] internal controls," and held that plaintiffs failed to allege 'specific facts to suggest that . . . defendants were actually aware of any weakness in [the company's] internal controls at the time of the challenged statements." *Id*. at 138. But, it *is* an auditor's job—that's part of the reason they are hired—to assess the company's ICFR, especially

when the auditor, like here, blessed the ICFR as not having deficiencies despite myriad red flags.[2] *See, e.g.,* ¶ 331 ("in our opinion, the Group maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021.").

Despite PwC's arguments, the pleading standard does not elevate to "actual knowledge" for claims against auditor defendants. PwC Br. at 18; *see also* PwC Br. at 17 ("Plaintiff must allege that *PwC CH* was actually aware of the alleged 'red flag.'"). Indeed, as Defendants' own cited authority makes clear, plaintiffs adequately plead scienter "when a defendant conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that the defendant ***must have been aware of them***." *Advanced Battery Techs., Inc. v. Bagell*, 781 F.3d 638, 644 (2d Cir. 2015) (citing *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 160-61 (2d Cir. 2012)) (emphasis added).

To this end, Plaintiff need not meet PwC's demands to identify all "pertinent documents concerning the audits or reviews" and the "meetings or interactions between PwC CH and Credit Suisse (or among PwC CH)" when these red flags were discussed. PwC Br. at 15. On this point, the law is clear (and directly on the nose): "To plead with particularity does not require at this stage that Plaintiff spell out the very moment PwC should have known about the alleged fraud or that PwC had actual knowledge of the scope or particulars of the scheme." *Whalen*, 2005 U.S. Dist. LEXIS 15489, at *7 (finding scienter where "PwC knew about and ignored a wide variety of 'red

---

[2] Compare this with *In re DNTW Chtd. Accountant Sec. Litig.,* 666 Fed. Appx. 78 (2d Cir. 2016), another case cited by PwC throughout its brief. PwC Br. at 9, 10, 14, 16, 17. In that case, unlike here, the auditor "expressly disclaimed providing any opinion regarding [the company's] internal controls and sometimes sought confirmation of [the company's] finances from outside sources." *Id*. at 80. Accordingly, in *DNTW*, the Second Circuit found that "[t]he more compelling inference to be drawn from these allegations is that [the auditor] tried, albeit inadequately, to compensate for [the company's] deficient internal controls and did not intent to aid in [the company's] fraud." *Id*. Here, not only was there no disclaimer, but PwC also openly endorsed Credit Suisse's ICFR, supporting the inference of scienter. ¶ 331.

flag' incidents or events, that should have put PwC on notice that fraud was afoot").[3] As the *Whalen* court recognized, to require plaintiffs to plead evidence at this stage of the litigation, when discovery has yet to be conducted, would create a near-impossible burden.

Defendants manufacture this "actual knowledge" requirement from language cited in Southern District of New York cases, including in the *Advanced Battery* decision by this Court, that "an unseen red flag cannot be heeded." *See* PwC Br. at 17 (citing *In re Advanced Battery Techs., Inc. Sec. Lititg.*, 2012 U.S. Dist. LEXIS 123757, at *46 (S.D.N.Y. Aug. 29, 2012)). But the court in *In Longwei Petroleum Inv. Holding Ltd. Sec. Litig.* rejected defendants' very same "conten[tion] that they were unaware of the claimed red flags, and 'an unseen red flag cannot be heeded.'" No. 13-cv-214, 2014 U.S. Dist. LEXIS 9689, at *17 (S.D.N.Y. Jan. 27, 2014). There, the court explained that plaintiffs need not demonstrate the auditor actually saw the red flags; rather, "where 'the "red flags" would be clearly evident to any auditor performing its duties,' it is reasonable to infer that the auditor 'must have noticed the "red flags," but deliberately chose to disregard them.'" *Id.* at *17-18 (quoting *In re Philip Servs. Corp., Sec. Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004)). This approach has been consistently applied in this Circuit.[4]

Indeed, this Court applied the same approach in *Advanced Battery*. There, the Court distinguished allegations of red flags that an auditor "should have" considered, which require detailed facts demonstrating knowledge, and red flags that an auditor "must have" considered in

---

[3] *See also Complete Mgmt.*, 153 F. Supp. 2d at 334-35 (rejecting defendant auditor's argument that the complaint failed to allege how the auditor would have been aware of an alleged fraud of its client's largest account, stating that "such specificity is more than Rule 9(b) and the PSLRA demand at this stage in the litigation"); *In re Health Mgmt. Inc. Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997) (rejecting argument that complaint was deficient because it failed to allege that defendant had actual knowledge of the alleged fraud).

[4] *See, e.g., Aegean,* 529 F. Supp. 3d at 149 (denying motion to dismiss against auditor defendant, explaining that the "red flags must be so obvious that knowledge of them by the auditor can be presumed.") (citation omitted); *Oxford*, 51 F. Supp. 2d at 295.

order to perform its audit, the latter of which can be inferred by the Court. *Advanced Battery*, 2013 U.S. Dist. LEXIS 102325, at *23-26. In fact, the Court "illustrated circumstances from which I could infer that [the auditor] must have reviewed the documents upon which ABAT's AIC filings were based," and that constituted the red flag. *Id*. at *25. Specifically, the Court explained that "if [the auditor] had prepared ABAT's AIC filings or advised ABAT with respect to its overseas subsidiary's accounting, I could easily infer that [the auditor] must have reviewed the relevant documents," because "[b]oth of these examples are scenarios in which [the auditor] *necessarily* would have reviewed the documents that would have revealed the discrepancy between ABAT's AIC and SEC filings." *Id*. (emphasis in original). But neither circumstance applied in *Advanced Battery*, and even plaintiffs' own expert opined that, at most, the US-based auditor defendant "should have" reviewed the AIC filings for revenue discrepancies to the company's SEC filings, but did not have to. *Id.* at *24. Unlike in *Advanced Battery*, here there are no allegations that PwC should have reviewed audit papers subject to a different regulator in a different jurisdiction; rather, Plaintiff alleges numerous red flags relating to Credit Suisse's representations in SEC filings that necessarily "must have been" considered, but disregarded, by PwC in conducting its audit.

## 2. <u>Plaintiff Alleges Numerous (Not Just One) Red Flags Supporting a Strong Inference of Scienter</u>

"Because it is elementary that, on a motion to dismiss, the Complaint must be read as a whole, the red flags must be viewed in the aggregate; defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder." *Aegean*, 529 F. Supp. 3d at 149. While Defendants try to distill Plaintiff's allegations down to a "single 'red flag,'" PwC Br. at 2, in reality, the Complaint contains a wide assortment of factors that PwC ignored when conducting Credit Suisse's audit, especially regarding the sufficiency of ICFRs related to risk assessment and management oversight (two of the areas in which Credit

Suisse later admitted to having weaknesses which "remained un-remediated for several years.") ¶¶ 341, 440. When viewed collectively, these red flags support a strong inference that PwC made its alleged misstatements—that PwC concedes were materially false and misleading when made—with the requisite scienter.

i.    The Archegos and Greensill Scandals

Just prior to the start of the Class Period, Credit Suisse was rocked by _two_ high-profile scandals, each of which separately pointed to significant issues with the Bank's risk management procedures. First, on March 1, 2021, Credit Suisse issued a press release announcing that it had suspended redemptions and subscriptions of its Greensill Funds, previously valued at approximately USD $10 billion, over concerns that they were "subject to considerable uncertainties with respect to their accurate valuation." ¶ 5. Approximately a week after Credit Suisse's announcement, Greensill filed for bankruptcy in London, leaving Credit Suisse unable to recover approximately USD $3 billion of its customers' money from the Greensill Funds. ¶ 5. Then, during the week of March 22, 2021, the market value of Archegos' portfolio with Credit Suisse and other prime brokerage banks dropped precipitously, largely driven by declines in certain technology stocks, triggering a chain reaction that led to Archegos' default on its prime brokers' margin calls. ¶ 6. On March 29, 2021, Credit Suisse issued a press release disclosing that a "significant US-based hedge fund defaulted on margin calls made last week by Credit Suisse and certain other banks" and that while it was "premature to quantify the exact size of the loss resulting from this exit, it could be highly significant and material to our first quarter results." ¶ 6. Credit Suisse ultimately incurred approximately [USD] $5.5 billion in losses related to the Archegos matter. ¶ 6. In the wake of these scandals, and throughout the Class Period, the Credit Suisse Defendants assured investors that the Bank's "risk and control governance is being strengthened and will be further enhanced," and the Bank maintained "sufficient liquidity to sustain operations"

in the event of "unexpected outflows." ¶ 7. Both the Archegos and Greensill matters were widely

publicized and discussed in Credit Suisse's SEC filings, making it impossible PwC would not have

been aware of the incidents.

Either the Archegos or Greensill scandals on their own could be considered a red flag to

an auditor, but in combination, they should have been more like a flashing red warning sign that

there were serious issues with Credit Suisse's risk management and corporate governance, and that

special care needed to be taken in these areas when conducting the audit. Both the Greensill and

Archegos incidents and the later recognition of losses related to these scandals occurred while PwC

was Credit Suisse's auditor, during quarters where PwC represented that it reviewed Credit

Suisse's balance sheet, that this review was conducted "in accordance with the standards of the

PCAOB," and that it was "not aware of any material modifications that should be made to the

accompanying interim financial statements for them to be in conformity with accounting principles

generally accepted in the United States of America." ¶¶ 325, 327.

### ii.   Credit Suisse's History of Past Scandals

The Archegos and Greensill matters are *especially* significant red flags in light of the fact

that Credit Suisse had a history in recent years of similar scandals, government investigations, civil

proceedings, and even a guilty plea. ¶ 420. This history should have been another red flag alerting

PwC to the need to take extra care when conducting Credit Suisse's audit. *See, e.g., Aegean*, 529

F. Supp. 3d at 153 (information about a CEO's "reputation and history" was a red flag that called

for "heightened scrutiny" on the part of the auditors).

### iii.   The Archegos Report Revealed Issues Related to Risk Management

On July 29, 2021, Credit Suisse issued a media release announcing the publication of a

report regarding the external investigation into Archegos (the "Archegos Report"), which it filed

with the SEC as exhibits to a Form 6-K the same day. The Archegos Report found that both Credit Suisse's Prime Services and Credit Risk Management departments were chronically understaffed, that Prime Services lost a number of senior, experienced personnel who were replaced with less experienced individuals, and that generally Credit Suisse had numerous departures of senior Risk officers, which the Archegos Report referred to critically as "a 'juniorization' of the Risk function." ¶ 415. The Archegos Report also found that Credit Suisse failed to invest in technology that would have assisted in more effectively managing risk. ¶ 417. Moreover, the various Risk Committees only had access to data that were four to six weeks old, preventing them from being aware of the magnitude and pace of growth in positions and attendant risks. ¶ 418.

Each of these factors is a red flag indicating a risk of a material weakness in the Company's ICFR, particularly in regards to "appropriate and sufficient management resources to support the risk assessment and monitoring objectives," one of the areas where Credit Suisse later admitted to having a material weakness. ¶ 341. Not only would PwC have been aware of the Archegos Report based on the fact that it was widely publicized and publicly filed with the SEC, but GAAS also requires auditors to "identify business risks that could reasonably be expected to result in material misstatement of the financial statements." AS 2110.14. Business Risks are defined as "Risks that result from significant conditions, events, circumstances, actions, or inactions that could adversely affect a company's ability to achieve its objectives and execute its strategies." AS 2110.A2. GAAS also specifically states: 1) "The auditor should obtain an understanding of specific risks to a company's internal control over financial reporting resulting from [information technology]," including "[f]ailure to make necessary changes to systems or programs" (AS 2110.B4); and 2) "[f]actors that affect the risk associated with a control include… [t]he competence of the personnel who perform the control or monitor its performance and whether there have been changes in key

personnel." (AS 2201.47; *see also Cent. Laborers' Pension Fund v. Sirva, Inc.*, No. 04-cv-7644, 2006 U.S. Dist. LEXIS 73375, at *76 (N.D. Ill. Sep. 22, 2006) (red flags included a "lack of properly trained personnel responsible for ensuring accurate financial reporting")). If PwC had adequately reviewed Credit Suisse's business risks, the auditors would have discovered the same issues that were found by the consultants who issued the Archegos Report.

iv.    The Suisse Secrets Leak Reveals Credit Suisse's Risky Clientele

On Sunday, February 20, 2022, the *Süddeutsche Zeitung*, one of the largest daily newspapers in Germany, reported it had received data from a whistleblower on more than 30,000 Credit Suisse customers and 18,000 accounts, holding in excess of USD $100 billion, approximately one year earlier (around the start of the Class Period). ¶ 9. The leaked data, which revealed that Credit Suisse repeatedly either opened or maintained bank accounts for a panoramic array of high-risk clients across the world, including at least one sanctioned Russian oligarch, was widely reported on, including in publications such as the *Guardian* and the *New York Times*. ¶ 9. On February 22, 2022, the market digested the Suisse Secrets scandal, with analysts at RBC Capital Markets publishing a research note titled "CS – 'Swiss Secrets' leak is the bank's latest headache," which stated that the allegations "raise[] questions about [Credit Suisse's] business practices in wealth management." ¶ 12. Courts in the past have found media articles disclosing fraud at a company can be "red flags" when evaluating auditor scienter. *See, e.g., Cosby v. KPMG, LLP*, No. 16-cv-121, 2018 U.S. Dist. LEXIS 130244, at *13 (E.D. Tenn. Aug. 2, 2018) (Red flag when "[e]ven after a report from *TheStreetSweepers* questioned the valuation of Miller Energy's assets, defendant represented to shareholders that the valuation was accurate"); *Carlson v. Xerox Corp.,* 392 F. Supp. 2d 267, 290 (D. Conn. 2005) (red flag when there was "a good deal of discussion by analysts and in the financial press . . . and concerns had been expressed about lapses of control"); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999) (finding auditor "knew of

15

or was severely reckless not to know of an article in *Barron's*" which "accused Sunbeam of manipulating its 1996 and interim 1997 financial statements"). Additionally, when conducting an investigation, AS 1105.15 requires auditors to examine both internal and external documents.

Regardless, even if PwC were to argue that it was not aware of this massive, globally reported news story, the whistleblower obtained the data from Credit Suisse. When assessing the risk of a material misstatement, GAAS requires auditors to "[o]btain[] an understanding of the nature of the company" including "[t]he sources of the company's earnings" and "[k]ey supplier and customer relationships." AS 2110.10. Since it is a confirmed fact that Credit Suisse had records indicating it was catering to some of the world's most high-risk clientele, the only conclusion to be drawn is that PwC did not properly conduct this inquiry. And common sense dictates that, if PwC had conducted a thorough review of the balance sheets on which Credit Suisse's financial statements were based (which PwC represented every quarter during the Class Period were in conformance with GAAP (*see, e.g.*, ¶¶ 325, 327, 329)), PwC would have known where Credit Suisse's money was coming from.

### v.    The SEC Comment Letters Pointed to ICFR Issues

In July 2022, the SEC initiated comment letter correspondence with Credit Suisse CFO Mathers (and later his replacement, CFO Joshi) requesting more information about the Company's "revision" of its financial statements for the years ending December 31, 2020, and December 31, 2019, as reflected in the 2021 Annual Report. ¶ 320. This exchange ultimately led to a late night request by the SEC on March 8, 2023, causing Credit Suisse to the delay the filing of its Form 20-F for the period ending December 31, 2022 (previously scheduled for March 9, 2023). ¶ 320. After another comment letter from the SEC, Credit Suisse finally admitted, "[We] have now reassessed our position and performed additional procedures. We will report that we have, and have had, a material weakness in internal control over financial reporting." Matuschak Decl. at Ex.

22. When the Form 20-F was eventually filed on March 14, 2023, it revealed that Credit Suisse had "identified certain material weaknesses in internal control over financial reporting as of December 31, 2021 and, consequently, December 31, 2022." ¶ 320. Just days later, it was announced that Credit Suisse would be acquired by UBS after its near collapse. ¶ 18.

Courts in this district and others have found SEC comment letters to be red flags. *See Bear Stearns*, 763 F. Supp. 2d at 513 (red flag when the SEC "sent a comment letter to [defendant] requesting that the Company provide the SEC with material information not included in its 2006 Form 10-K filing" even when "despite its comments, the SEC took no action."); *Cosby*, 2018 U.S. Dist. LEXIS 130244, at *15 (Red flags, including "inquiries by the SEC . . . should have put defendant on notice of possible violations."); *In re Am. Bus. Fin. Servs. Noteholders Litig.*, No. 05-0232, 2008 U.S. Dist. LEXIS 61450, at *10 (E.D. Pa. Aug. 11, 2008) (red flags included "comment letters from the SEC").

Furthermore, the comment letters themselves pointed to certain red flags. For example, the July 15, 2022 letter stated: "In light of your accounting issues and resulting revisions, as well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management . . ."  This one sentence points to three potential red flags: 1) the acknowledged recent accounting issues; 2) recent changes in business structure; and 3) recent changes in senior management.

                vi.    <u>The Revolving Door of Upper Management Signaled Potential ICFR Issues</u>

In its "Report of Independent Registered Public Accounting Firm" attached to Credit Suisse's 2021 Form 20-F, PwC stated: "The Group's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting,

included in the accompanying Management's report on internal control over financial reporting." ¶ 331. As such, it should have been a red flag to PwC that management, including high level positions such as the CEO, CFO, Chairman of the Board, and Chief Risk and Compliance Officer, changed multiple times throughout the Class Period. ¶¶ 423-427. Logically, learning the complexity of a large company's ICFR and the areas of potential weakness would not happen overnight, and as such, the frequent new management was a red flag to alert PwC, as Credit Suisse's auditor, of the need to take extra care when evaluating the Bank's ICFR.

vii.    The Large Increase in Customer Outflows in October 2022 were a Red Flag

GAAS lists "Significant declines in customer demand and increasing business failures in either the industry or overall economy" as an example of "risk factors relating to misstatements arising from fraudulent financial reporting." AS 2401.A.2(a). While the Complaint alleged Credit Suisse was experiencing unusually high customer outflows throughout the Class Period (*see, e.g.*, CW allegations in ¶ 47), outflows significantly increased in October 2022, and remained heightened throughout the remainder of the Class Period, leading to the near collapse of the Bank. ¶¶ 11, 239. The existence of these outflows called for PwC to exercise increased caution when reviewing Credit Suisse's ICFR, particularly related to risk and the sufficiency of Credit Suisse's liquidity pool, which Credit Suisse represented, in each of its financial statements throughout the Class Period, was "sufficient [] to sustain operations" in the event of "unexpected outflows." ¶ 7.

viii.    The Alleged Violations of GAAP and GAAS are Red Flags

Although "allegations of a violation of GAAP and GAAS are, without more, insufficient to survive a motion to dismiss. . . . such allegations may be one of several "red flags" that support an inference of scienter." *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001). The Complaint alleges that, throughout the Class Period, Credit Suisse's financial

18

statements failed to comply with GAAP. ¶¶ 308-319. Additionally, in its 2021 Form 20-F, which PwC audited, Credit Suisse stated that it had "identified accounting issues" but had determined the issues were "not material individually or in aggregate" (though it later concluded the opposite). ¶¶ 25, 341.

The Complaint also alleges PwC violated AS No. 5, which required that auditors "use the same suitable, recognized control framework to perform his or her audit of internal control over financial reporting as management uses for its annual evaluation of the effectiveness of the company's internal control over financial reporting." ¶ 441. While PwC is correct that this standard is no longer referred to as AS No. 5, it is patently wrong that the standard no longer applies (*see* PwC Br. at 22 n. 7), as the exact same wording appears in the current standards as AS 2201.05. As one of the "Big Four" accounting firms, PwC should know it is beholden to this standard.

ix.    Public Records Confirm Prior Cash Flow Issues in Credit Suisse Audits

Documents made public in a criminal case related to PCAOB auditors illegally giving inspection rosters to KPMG auditors revealed that KPMG (Credit Suisse's previous auditor) knew of issues regarding the reporting of cash flows in previous Credit Suisse audits and believed those issues still existed as of the 2016 audit. ¶¶ 23, 442. AS 2110.42 states:

> ***Past Audits.*** In subsequent years, the auditor should incorporate knowledge obtained during past audits into the auditor's process for identifying risks of material misstatement, including when identifying significant ongoing matters that affect the risks of material misstatement or determining how changes in the company or its environment affect the risks of material misstatement.

If it had adequately reviewed Credit Suisse's past audits, PwC would necessarily have come across the same cash flow issues that KPMG identified. These past cash flow reporting issues required PwC to exercise caution when reviewing the cash flow reporting issues Credit Suisse revealed in its 2021 Form 20-F, which, at the time, it stated were immaterial. ¶ 341.

**B.    Plaintiff's Allegations are Not Merely Fraud by Hindsight**

PwC claims that Plaintiff's allegations amount to no more than "scienter-by-hindsight." PwC Br. at 13-16. Fraud by hindsight "refers to allegations that assert no more than that because something eventually went wrong, defendants must have known about the problem earlier." *Bear Stearns,* 763 F. Supp. 2d at 518 (citation omitted). This argument makes no sense in this case in light of Credit Suisse's admission that "we have, ***and have had***, a material weakness in internal control over financial reporting" and that the material weakness "***remained*** un-remediated for several years." Matuschak Decl. at Ex. 22; ¶ 440 (emphasis added). As this admission makes clear, this material weakness in ICFR existed ***at the time*** PwC made each alleged misstatement in the Complaint. Moreover, the majority of the red flags described above existed at the time PwC made each alleged misstatement; PwC's hindsight argument would only make sense if the red flags appeared after the truth was revealed. *See In re Salix Pharms., Ltd.*, No. 14-cv-8925, 2016 U.S. Dist. LEXIS 54202, at *53 (S.D.N.Y. Apr. 22, 2016) ("Courts often reject an incantation of fraud-by-hindsight when plaintiffs allege that 'the company failed to take into account information that was available to it' at the time the company issued the incorrect statements or omissions.'") (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494-95 (S.D.N.Y. 2004)); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191-92 (S.D.N.Y. 2010) (rejecting fraud by hindsight arguments, noting that "misstatements of existing fact are not mere fraud by hindsight.").

Nevertheless, contrary to PwC's arguments, "evidence of later events can provide useful circumstantial evidence that a given representation was false when made." *Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019); *see also Yannes v. Scworx Corp.*, No. 20-cv-03349, 2021 U.S. Dist. LEXIS 116330, at *21 (S.D.N.Y. June 21, 2021) ("[The] Second Circuit has explicitly recognized that plaintiffs may rely on post-class period data to confirm what a defendant should have known

during the class period."); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 644 (S.D.N.Y. 2012) (rejecting fraud by hindsight arguments when there was "a 'vast gap' between the picture that Defendants presented to investors—of an admittedly risky investment, but one that was not in any way extraordinarily risky—and the actions that Goldman took"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003) (post-class period articles used to establish awareness of falsity of class period statements; opposite result would "reward [defendants] for their successful concealment").

The cases cited by PwC are easily distinguishable. Both *Iowa Pub. Empls. Ret. Sys. v. Deloitte & Touche Llp*, 919 F. Supp. 2d 321 (S.D.N.Y. 2013) and *In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) involved feeder funds in ponzi schemes and conclusory allegations by plaintiffs that the auditors should have discovered the schemes before they came to light. As this Court explained in *J.P. Jeanneret*, scienter could not be properly alleged from "the very same 'red flags' that the SEC and the entire investment community managed to overlook for over a decade." 769 F. Supp. 2d at 377. Here, Plaintiff claims that PwC turned a blind eye to numerous well-publicized red flags and a series of SEC comment letters pointing to the very same material weaknesses Credit Suisse later admitted existed throughout the Class Period (*see* Section III.A.2 above). And in *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, the Board disclosed that CEO of the company had taken actions such as "thwarting the 2011 audit of the Company's financial statements," "remov[ing] or destr[oying] a substantial portion of the [company's] financial documents," and "transferr[ing] at least $35 million of the $44 million in proceeds from the Company's 2009 public common stock offering to entities outside the

Company's group structure." 33 F. Supp. 3d 401, 416-17 (S.D.N.Y. 2014).[5] Obviously, these extreme factors are not alleged in this case.

While a "restatement alone does not support an inference of scienter . . ." (*see Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20-cv-8082, 2021 U.S. Dist. LEXIS 205517, at *12 (S.D.N.Y. Oct. 25, 2021)), "[t]he magnitude of [accounting] errors can constitute 'some evidence of scienter.'" *Woodley v. Wood*, No. 20-cv-2357, 2022 U.S. Dist. LEXIS 5397, at *25 (S.D.N.Y. Jan. 11, 2022); *see also In re Pareteum Sec. Litig.*, No. 19-cv-9767, 2021 U.S. Dist. LEXIS 151106, at *50 (S.D.N.Y. Aug. 11, 2021) (finding the restatement of a financial statement to be one factor contributing to scienter); *Peifa Xu v. Gridsum Holding Inc.*, No. 18-cv-3655, 2020 U.S. Dist. LEXIS 55452, at *33 (S.D.N.Y. Mar. 30, 2020) ("the size and nature of the restatement" can contribute to "a properly plead allegation of scienter."). Here, just days after the material weakness in Credit Suisse's ICFR was revealed, the Bank nearly collapsed, which Swiss authorities feared could trigger a global financial meltdown. ¶ 18. The media attributed Credit Suisse's downfall, in part, to the announcement of the material weaknesses: the announcement was essentially the last straw for customers whose trust was shaken by several years of scandal after scandal and an already unusually high rate of customer outflows. ¶ 359. As such, the magnitude of the material weakness—while it did not trigger a restatement—was qualitatively enormous in terms of importance to shareholders.

## C.    Leave to Amend

If this Court grants Defendants' Motion, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a)(2). *See Nespresso USA, Inc. v. Peet's Coffee, Inc.*, No. 22-cv-

---

[5] In a related case against the CEO, the court found that the auditor had "identified 'serious internal control weaknesses' with respect to [the company's] financial oversight" *before* the CEO "looted the company's coffers," so this subsequent event could not have related to the auditor's scienter. *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 473 (9th Cir. 2015).

02209, 2023 U.S. Dist. LEXIS 12228, at *44 (S.D.N.Y. Jan. 24, 2023) (McMahon, J.) ("[T]he court should freely give leave [to amend] when justice so requires.") (quoting Fed. R. Civ. P. 15(a)).

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant PricewaterhouseCoopers AG's motion to dismiss in full.

DATED: November 21, 2023                    **KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
J Ryan Lopatka
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: j.lopatka@ksfcounsel.com

-and-

Craig J. Geraci, Jr. (admitted *pro hac vice*)
Melissa H. Harris (MH-3583)
Matthew P. Woodard (admitted *pro hac vice*)
Jyoti Kehl
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: craig.geraci@ksfcounsel.com
Email: melissa.harris@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com
Email: jyoti.kehl@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Diabat*
*and Lead Counsel for the Class*