**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALI DIABAT, Individually and On Behalf of All Others
Similarly Situated,

Plaintiff,

- *against* -

CREDIT SUISSE GROUP AG, AXEL P. LEHMANN,
ULRICH KÖRNER, DIXIT JOSHI, THOMAS
GOTTSTEIN, DAVID R. MATHERS, ANTÓNIO
HORTA-OSÓRIO, and
PRICEWATERHOUSECOOPERS AG,

Defendants.

Case No. 1:23-cv-5874-CM

[rel. 1:23-cv-04458-CM]

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE**
**CREDIT SUISSE DEFENDANTS' MOTION TO DISMISS**

**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
Jason M. Hall
Edward N. Moss
Tammy L. Roy
Nicholas N. Matuschak
Lauren Riddell
32 Old Slip
New York, New York 10005
(212) 701-3000

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................. 1

I.      PLAINTIFF'S COMPLAINT FAILS UNDER RULE 9(b) AND THE PSLRA .............. 1

II.     THE RISK MANAGEMENT STATEMENTS ARE NOT ACTIONABLE .................... 2

III.    THE CUSTOMER OUTFLOW STATEMENTS ARE NOT ACTIONABLE ................. 6

IV.     THE ICFR STATEMENTS ARE NOT ACTIONABLE .................................................. 9

V.      THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER ....................... 11

        A.      The Complaint Does Not Plead Motive to Commit Fraud ................................. 11

        B.      The Complaint Fails to Allege Facts That Constitute Strong Circumstantial
                Evidence of Conscious Misbehavior or Recklessness ......................................... 12

                i.      Allegations Concerning the Risk Management Statements Remain
                        Deficient ................................................................................................... 12

                ii.     Allegations Concerning the Customer Outflow Statements Remain
                        Deficient ................................................................................................... 14

                iii.    Allegations Concerning the ICFR Statements Remain Deficient ................ 16

                iv.     Plaintiff's Remaining Scienter Arguments Are Insufficient ........................ 17

        C.      The Complaint Fails to Establish Scienter for Each Defendant ........................... 18

VI.     THE COMPLAINT FAILS TO ADEQUTELY ALLEGE LOSS CAUSATION ........... 18

VII.    PLAINTIFF HAS NOT PLED A SECTION 20(a) CLAIM ........................................... 20

VIII.   LEAVE TO REPLEAD IS NOT WARRANTED ........................................................... 20

CONCLUSION ......................................................................................................................... 20

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Altimeo Asset Management* v. *Qihoo 360 Technology Co. Ltd.*,
   2023 WL 2585942 (S.D.N.Y. Mar. 21, 2023) ................................................................. 19-20

*In re AppHarvest Securities Litigation*,
   2023 WL 4866233 (S.D.N.Y. July 31, 2023) ...................................................................... 1-2

*Bettis* v. *Aixtron SE*,
   2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ..............................................................3, 15, 17

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ...........................................................................................10

*Born* v. *Quad/Graphics, Inc.*,
   521 F. Supp. 3d 469 (S.D.N.Y. 2021).....................................................................................2

*Cheng* v. *Canada Goose Holdings Inc.*,
   2021 WL 3077469 (S.D.N.Y. July 19, 2021) ..........................................................................7

*In re Citigroup Securities Litigation*,
   2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ......................................................4, 5, 10, 11, 13

*City of Brockton Retirement System* v. *Shaw Group Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008).........................................................................11, 16, 20

*In re DDAVP Direct Purchaser Antitrust Litigation*,
   585 F. 3d 677 (2d Cir. 2009).................................................................................................18

*Felske* v. *Hirschmann*,
   2012 WL 716632 (S.D.N.Y. Mar. 1, 2012) ...................................................................3, 18 n.6

*Freudenberg* v. *E*Trade Financial Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................................. 5-6

*Halperin* v. *eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)...................................................................................................6

*Hassan* v. *Boston Beer Co., Inc.*,
   2023 WL 8110940 (2d Cir. Nov. 22, 2023)............................................................................4

*IKB International S.A.* v. *Bank of America Corp.*,
   584 F. App'x 26 (2d Cir. 2014) ............................................................................................18

*Jacquemyns* v. *Spartan Mullen Et Cie, S.A.*,
   2011 WL 348452 (S.D.N.Y. Feb. 1, 2011)............................................................................18

*Kassel* v. *Universal Fidelity LP*,
   2014 WL 824335 (E.D.N.Y. Mar. 3, 2014)..............................................................................20

*Lee* v. *Mikimoto (America) Co. Ltd.*,
   2023 WL 2711825 (S.D.N.Y. Mar. 30, 2023) ...........................................................................9

*Lipow* v. *Net1 UEPS Technologies, Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015)......................................................................................13

*Lorely Financing (Jersey) No. 3 Ltd.* v. *Wells Fargo Securities, LLC*,
   797 F.3d 160 (2d Cir. 2015).....................................................................................................19

*Lucente* v. *International Business Machines Corp.*,
   310 F.3d 243 (2d Cir. 2002)......................................................................................................20

*Malin* v. *XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007).......................................................................................18

*Miao* v. *Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020).........................................................................................8

*New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) ..................................................................................10, 14, 16, 17

*In re New Oriental Education & Technology Group Securities Litigation*,
   988 F. Supp. 2d 406 (S.D.N.Y. 2013)..................................................................................17 n.5

*Nguyen* v. *New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018)........................................................................................12

*In re Oxford Health Plans, Inc. Securities Litigation*,
   51 F. Supp. 2d 290 (S.D.N.Y. 1999).........................................................................................16

*In re Pareteum Securities Litigation*,
   2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)...........................................................................16

*In re Plug Power, Inc. Securities Litigation*,
   2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023)...........................................................................17

*Plymouth County Retirement Association* v. *Array Technologies, Inc.*
   2023 WL 3569068 (S.D.N.Y. May 19, 2023) .............................................................................2

*San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996).........................................................................................................7

*Schaffer* v. *Horizon Pharma PLC*,
   2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...............................................................................6

iii

*Set Capital LLC* v. *Credit Suisse Group AG*,
    996 F.3d 64 (2d Cir. 2021)..................................................................................13

*In re SunEdison, Inc. Securities Litigation*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018)..................................................................11

*In re Telefonaktiebolaget LM Ericsson Securities Litigation*,
    2023 WL 3628244 (E.D.N.Y. May 24, 2023) .........................................................12

*In re Top Tankers, Inc. Securities Litigation*,
    528 F. Supp. 2d 408 (S.D.N.Y. 2007)..................................................................16

*In re Veeco Instruments, Inc. Securities Litigation*,
    235 F.R.D. 220 (S.D.N.Y. 2006) .....................................................................16, 18

**Rules**

Fed. R. Civ. P. 8..................................................................................................2

Fed. R. Civ. P. 9(b) ...........................................................................................1, 2

**PRELIMINARY STATEMENT**[1]

In his Opposition ("Opp."; ECF No. 93), Plaintiff suggests that the "unconventional" events of March 2023, including the merger of CS and UBS, somehow exempt his Complaint from "conventional dismissal arguments." Opp. at 1. They do not. The supposedly "spectacular downfall of Credit Suisse" (*id.*) does not entitle Plaintiff to a presumption of fraud. Plaintiff—like any other securities-fraud plaintiff—was required to meet the stringent pleading standards of Rule 9(b) and the PSLRA. He has not. Plaintiff fails to adequately allege an actionable misstatement, scienter, or loss causation. Instead, Plaintiff asks this Court to conclude that the events of March 2023 ***must have been*** the result of a fraud. The Court should reject these classic fraud-by-hindsight contentions and dismiss the Complaint with prejudice.

**ARGUMENT**

## I.    PLAINTIFF'S COMPLAINT FAILS UNDER RULE 9(b) AND THE PSLRA

The Complaint is a "puzzle pleading" of ***exactly*** the kind that courts in this District have dismissed under Fed. R. Civ. P. 9(b). *See* MTD at 6-8. Plaintiff cannot dispute this, so he essentially ignores the problem, failing to address ***any*** of the cases cited by Defendants in which courts dismissed similar complaints under Rule 9(b) and the PSLRA. *See* MTD at 7-8. The few sentences that Plaintiff does devote to this topic are unavailing.

***First***, Plaintiff cites a case where a securities-fraud complaint satisfied Rule 9(b) and the PSLRA because it "allege[d] each . . . misstatement, who made it, and where, when, and why it is false or misleading" in an "organized fashion" that described "what portion of each quotation constitute[d] a false representation[.]" *In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *19 n.5

---

[1] Unless otherwise specified, all (i) emphasis is added, (ii) internal citations, quotations, and emendations are omitted, and (iii) capitalized terms have the meanings assigned in the CS Defendants' memorandum of law in support of their motion to dismiss ("MTD"; ECF No. 84).

1

(S.D.N.Y. July 31, 2023) (cited in Opp. at 6).  But that is far from the case here.  *See* MTD at 6-7.

*Second*, Plaintiff argues that "[t]he Complaint . . . complies with Rule 8[.]"  Opp. at 7.  That argument is wrong, but also academic because Rule 9(b)—and the PSLRA—apply here, and they impose a higher pleading standard.

*Third*, Plaintiff argues that since the CS Defendants "make a variety of arguments seeking dismissal of alleged misstatements, organizing them into categories," the Complaint must satisfy Rule 9(b).  *Id.*  But the fact that the CS Defendants have tried to make sense of the Complaint has nothing to do with whether the Complaint itself pleads fraud with particularity.  Indeed, courts in this District have been forced to do precisely the same thing when faced with a puzzle pleading like the one presented here.  *See, e.g.*, *Born* v. *Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478-80 (S.D.N.Y. 2021) ("bucket[ing] [the alleged misstatements] into three general categories" and finding the Complaint failed to satisfy Rule 9(b)); *Plymouth Cnty. Ret. Ass'n* v. *Array Techs., Inc.*, 2023 WL 3569068, at *9-10 (S.D.N.Y. May 19, 2023) (dismissing complaint for "lack of specificity under Rule 9(b)" while "categoriz[ing] the statements in an effort to streamline" the court's analysis).

## II.   THE RISK MANAGEMENT STATEMENTS ARE NOT ACTIONABLE

The crux of Plaintiff's argument as to the Risk Management Statements is that the CS Defendants knew they "had not adequately addressed [CS's] risk management issues despite pre-Class Period red flags."  Opp. at 1-2.  But Plaintiff never explains what he believes CS would have needed to do to "adequately address[] its risk management issues" (*id.*) and, in any event, the CS Defendants ***never said*** they had "adequately" addressed all such issues.  Rather, they said that CS would investigate the issues that led to the Greensill and Archegos incidents, would take (and had taken) action to try to prevent similar issues in the future, and would take steps to improve CS's risk management procedures.  Plaintiff does not point to anything to show these statements were

false when made; he simply wants the Court to infer as much because CS's stock price later dropped. Despite Plaintiff's protests (*see* Opp. at 10-11), that is precisely what "fraud by hindsight" means. *See Bettis* v. *Aixtron SE*, 2016 WL 7468194, at \*15 (S.D.N.Y. Dec. 20, 2016) (dismissing claims that "earlier optimistic statements . . . must have been fraudulent" because the defendant "ultimately went south") (McMahon, J.). Plaintiff's other arguments all lack merit.

*First*, Plaintiff does not even address the CS Defendants' showing that the Risk Management Statements are not actionable because the Complaint is so vague that it does not identify which risk management policies and procedures are at issue. *See* MTD at 9-10. Thus, Plaintiff has waived this point. *See generally Felske* v. *Hirschmann*, 2012 WL 716632, at \*3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments [in a motion to dismiss] by his failure to respond to them.").

*Second*, the Opposition does not demonstrate that the Risk Management Statements were false when made. Plaintiff argues the Risk Management Statements must have been false because CS continued to be exposed to risk. *See* Opp. at 8-11. But the CS Defendants never promised that CS would never be exposed to risk again. Rather, they told the market *before* the putative class period that they could not guarantee that CS's "risk management procedures and policies [would] always be effective[.]" MTD at 9; *see also* ECF. No. 85-1 at 53. *During* the putative class period, the CS Defendants provided additional warnings—for example, that the earlier Archegos and Greensill matters might continue to result in "negative effects on our business," such as a "loss of revenues and assets under management," and that future "inadequacies or lapses in [CS's] risk management procedures," such as those that led to the Archegos matter, were possible. December 7, 2023 Supplemental Declaration of Nicholas Matuschak ("Supp. Matuschak Decl."), Ex. 1 at 39, 47 (excerpts from CS's 2021 Annual Report); *see also id*., Ex. 2 at 41, 50 (CS's 2022 Annual

3

Report contained similar language).  The CS Defendants did say they would endeavor to improve risk controls, but a bank can both "be[] making progress" on improving its risk controls and "still be subject to regulatory action" and risk.  *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *18 (S.D.N.Y. Mar. 24, 2023); *see also* MTD at 27; *Hassan* v. *Boston Beer Co., Inc.*, 2023 WL 8110940, at *3 (2d Cir. Nov. 22, 2023) (statement that company was "making a lot of progress" not rendered false by subsequent "disappointing performance").

Moreover, many of the alleged risks to which Plaintiff points are irrelevant to whether the Risk Management Statements were false when made because they relate to conduct that pre-dates the putative class period (which begins in April 2021).  For example, Plaintiff cites "a FINMA report [in February 2021] concluding Credit Suisse ignored repeated warning signs regarding its banker's fraud," and a report into the Archegos matter (which occurred before the putative class period) that Plaintiff suggests "revealed [that] the staffing of Credit Suisse's Risk and related departments was woefully inadequate[.]" Opp. at 8, 10.  Plaintiff's reliance on these earlier events highlights the insufficiency of the Complaint's allegations of "false" statements.

Other statements on which Plaintiff relies also suffer from a timing problem.  For example, Plaintiff points to statements after the putative class period that CS's merger with UBS was in part due to CS's struggles to overcome "legacy issues." Opp. at 9.  But putting aside that the CS Defendants never said "issues" would not arise during the putative class period, the statements do not say ***when*** the "legacy issues" occurred.  In context, it is far more plausible that they refer to events (including Greensill and Archegos) that pre-date the putative class period.  MTD at 28.

Finally, Plaintiff attempts to establish falsity by arguing that the CS Defendants "downplayed the true extent of the Company's risk management issues" by suggesting the Archegos and Greensill matters "were isolated incidents[.]" Opp. at 7; *see also id.* at 9, 11.  Not

4

so.  In reality, the CS Defendants repeatedly referred to the matters as "unacceptable" and a cause for "significant concern."  *See* CAC ¶¶ 52, 61, 67-68, 77, 84, 90, 100, 127, 165; *see also* Supp. Matuschak Decl., Ex. 1 at 39, 47; *id*., Ex. 2 at 41, 50.  Moreover, Plaintiff does not refute the fact that nothing like those two incidents ever occurred again—suggesting they were, in fact, isolated.

*Third*, the Opposition does not refute the CS Defendants' showing that many of the alleged misstatements are mere puffery.  *See* Opp. at 12-13, 21-22.  Plaintiff argues principally that Judge Preska's decision in *Citigroup* is somehow inapposite because the "context" of the statements was different.  Opp. at 12-13.  But *Citigroup* is on all fours.  There, as here, the bank was dealing with pre-class period "control lapses" that required it to "rebuild[] . . . a culture that's based on ethics and execution."  *Citigroup*, 2023 WL 2632258, at *5-6.  And there, as here, regulators raised issues with aspects of Citigroup's risk controls, and the bank responded by stating it was "committed to taking all necessary and appropriate steps to remedy the concerns" identified by the regulators, including "substantial investments[.]"  *Id.* at *6-7.  Judge Preska found that these and similar statements were inactionable puffery because they did not suggest that investments in risk controls "would forestall regulatory action in perpetuity" and because "[n]o bank would declare that it was not investing in and would not continue to invest in regulatory compliance or risk management."  *Id.* at *14.  The same is true here.

Nor does *Freudenberg* v. *E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) (cited in Opp. at 13), support Plaintiff's position.  In that case, which arose from the 2007-8 credit crisis, E\*TRADE allegedly had a portfolio of risky mortgage and mortgage-backed securities, yet it denied publicly that its "real estate loan portfolio had become more risky" and touted that it had "significant organic growth in cash, assets and credit."  *Id.* at 190.  Then, when the credit crisis hit, E\*TRADE suffered large losses in its real estate loan portfolio.  *See id.* at 178.  Here, by contrast,

5

CS never denied that it was exposed to risk, and, as discussed above, it is not even clear what specific risks Plaintiff believes caused which alleged losses.  Indeed, in *Freudenberg*, Judge Sweet acknowledged that where (as here) a complaint purports to take issue with a company's "statements touting risk management" but does not include "detailed factual [allegations]" describing why those statements are false, such statements are inactionable.  *Id.* at 190.

**Fourth**, Plaintiff also argues that not ***all*** of the risk management statements were forward-looking—which the CS Defendants never suggested.  *See* Opp. at 21.  As to statements that ***were*** unquestionably forward-looking, Plaintiff argues that the cautionary language in the 2020 Annual Report (and in subsequent Annual Reports; *see* Supp. Matuschak Decl., Ex. 1 at 39, 47; *id.*, Ex. 2 at 41, 50) was not specific enough.  *See* Opp. at 21-22.  Plaintiff fails to explain, however, what more the CS Defendants could or should have said.  "To qualify as meaningful, cautionary language must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement."  *Schaffer* v. *Horizon Pharma PLC*, 2018 WL 481883, at *3 (S.D.N.Y. Jan. 18, 2018).  The cautionary language regarding risk management did just that.  *See* MTD at 9, 11.  Moreover, even if a forward-looking statement does not technically fall within the PSLRA safe harbor, it is still inactionable if, in light of cautionary language, "a reasonable investor could [not] have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist."  *Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).  As discussed above, a reasonable investor would not have interpreted any of these statements as a promise that CS would never again suffer losses due to risk-management issues.

## III.    THE CUSTOMER OUTFLOW STATEMENTS ARE NOT ACTIONABLE

Plaintiff does not dispute that throughout the two-year putative class period, CS reported ***accurate*** quarterly numbers concerning its assets under management, net new assets (or net asset

outflows), and customer deposits. *See* MTD at 14; Opp. at 16. Plaintiff also does not dispute that in October 2022, CS publicly disclosed that it had recently experienced significant outflows, particularly during the first two weeks of October. *See* MTD at 16; Opp. at 14. Finally, Plaintiff does not dispute that from October 2022 to March 2023, CS publicly discussed various fluctuations in net assets and customer deposits. *See* MTD at 16-17; Opp. at 14-15.

Nonetheless, Plaintiff continues to argue that CS's characterization of outflows both before and after the reported spike in October 2022—including statements that, at various points in time, outflows had "reduced," "moderated," or "calmed"—were false and misleading because, in mid-March 2023, "Credit Suisse nearly collapsed due in part to liquidity issues from outflows." Opp. at 14-15. But Plaintiff never explains or alleges why it cannot be true both that (i) outflows and inflows fluctuated during the putative class period; and (ii) Credit Suisse experienced liquidity issues in mid-March 2023. *See generally Cheng* v. *Canada Goose Holdings Inc.*, 2021 WL 3077469, at *8 (S.D.N.Y. July 19, 2021) (finding falsity not pled where at-issue "statements on their face [were] not mutually exclusive" and "there is no reason why both statements could not have been accurate when made"); *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos., Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) (finding falsity not pled where plaintiffs "made no showing that defendants' descriptions of [the company's] performance were not based on the facts available to the company at the time the statements were made").

The far more plausible scenario based on the facts pled in the Complaint is that:

- CS experienced (and reported) both inflows and outflows over the years (*see* MTD at 15 (citing quarterly disclosures of, among other things, new asset inflows or outflows between 1Q21 and 3Q22));

- CS experienced (and reported) significant outflows in early October 2022 (*see, e.g.*, CAC ¶¶ 240, 242, 244-47, 253, 257, 277);

- These significant outflows lessened as the fourth quarter of 2022 progressed, even stopping or reversing at certain points in time or in certain areas, as CS actively took steps

7

to address these issues (*see, e.g.*, CAC ¶¶ 240, 242, 244, 247, 251, 253, 257, 261, 263-64, 268, 277, 283; Opp. at 14 (quoting CS 3Q22 public statements that CS had "plans to address" the issue of outflows));

- CS continued to see "positive sign[s]" with respect to outflows in early 2023 (CAC ¶ 302; *see also id.* ¶¶ 280, 283);[2]

- But that ultimately outflows unexpectedly spiked again in mid-March 2023 (*see, e.g.,* CAC ¶ 366 (quoting articles reporting that as discussions "about Credit Suisse's future" progressed in mid-March 2023 "outflows are said to have topped up to CHF10bn a day, making the situation unstainable for CS")).

By contrast, there are no pleaded facts that plausibly allege Plaintiff's theory of the case—*i.e.*, that CS was consistently experiencing (but somehow withstanding) "unusually high levels of outflows" for over ***two years*** and even before the putative class period began (Opp. at 18) such that all of CS's statements about outflows and liquidity must have been false.

In addition, the CS Defendants have established that they had no obligation to characterize pre-October 2022 outflows as "significant" or "unusual." MTD at 15. Plaintiff argues that he has "rebut[ted]" that argument because CW2 reported that (i) CS lost some customers and deposits in 2021; and (ii) CW2 had heard "concerns about the Company's health . . . in August 2021." Opp. at 13. But neither allegation suggests that the outflow and inflow numbers CS reported prior to October 2022 were particularly "significant" or "unusual" or that Credit Suisse had a duty to describe them as such. *See* MTD at 14-15. Moreover, Plaintiff offers no information at all as to the nature of CW2's purported "health" concerns, much less that they had anything to do with outflows. *See Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 (S.D.N.Y. 2020) ("[A]llegations by CWs that are insufficiently particular are apt to be discounted or disregarded.").

---

[2] Plaintiff suggests that it is impossible that CS could have seen "material good inflows" on March 13, 2023 and then a sudden increase in outflows a few days later (Opp. at 15), but gives no reason why this is so, particularly given that the Complaint itself quotes articles suggesting that the "immediate catalyst" for the mid-March bank run was comments the Saudi National Bank made ***after*** March 13, 2023 that it would not invest any more money into CS. CAC ¶ 363.

Recognizing these failings, Plaintiff argues that Defendants' public statements were misleading because Defendants allegedly omitted any statement "taking . . . responsibility for Credit Suisse's role" in the increase in outflows and/or disclosing that CS "was particularly prone to risks that could lead to customer outflows." Opp. at 14, 15. But the Complaint never alleges that the CS Defendants had a duty to disclose these alleged facts, and Plaintiff "cannot amend [his] complaint by asserting new facts or theories for the first time" in the Opposition. *Lee* v. *Mikimoto (Am.) Co. Ltd.*, 2023 WL 2711825, at *7 (S.D.N.Y. Mar. 30, 2023). In any event, CS disclosed outflows or inflows each quarter, and the alleged underlying facts that Plaintiff claims made CS "prone" to outflows (*e.g.,* publicly-disclosed "scandals and regulatory investigations"; Opp. at 15) were also public. There was thus nothing further CS needed to say. *See* MTD at 14-15.

Finally, Plaintiff argues that the statements concerning the sufficiency of CS's liquidity pool CS were false because CS experienced a liquidity crisis in March 2023. Opp. at 18. Again, this is fraud by hindsight based on speculation—not pleaded facts. Moreover, CS contextualized these statements by stating it "***expect[ed]***" to have sufficient liquidity even in times of crisis, making clear that these statements are ones of opinion and protected by the PSLRA safe harbor. *See* MTD at 18-19.

## IV.    THE ICFR STATEMENTS ARE NOT ACTIONABLE

As to the ICFR Statements, Plaintiff's Opposition fails to engage with Defendants' central argument for dismissal: Plaintiff cannot link any later-identified weaknesses in CS's ICFR to an actionable prior statement. *See* MTD at 19-23. Instead, the Opposition refers vaguely to "numerous statements regarding Credit Suisse's financial and operational performance," and suggests that all such statements were false. Opp. at 18. This is wrong for multiple reasons.

***First***, Plaintiff does not allege or argue that any of CS's reported financial results during the putative class period were materially inaccurate. Accurate statements of past financial results

9

are inactionable under the securities laws and do not give rise to a generalized duty to disclose. *See*, *e.g.*, *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings.").[3]

**Second**, Plaintiff suggests that more than 50 alleged misstatements relate to "Credit Suisse's financial and operational performance." Opp. at 18. But these statements have no connection to CS's ICFR. Rather, they addressed topics such as changes to the investment banking business (*see* CAC ¶¶ 65, 68, 81, 98, 101); the Archegos and Greensill losses, and management's response thereto (*see id.* ¶¶ 63, 67, 70-73, 77-79, 84-85, 87, 96, 100-101, 106-11, 114); reductions in leverage or plans to do so (*see id.* ¶¶ 69, 96, 107); asset inflows and outflows (*see id.* ¶¶ 80, 101-105, 112-13, 130); and CS's commitment to risk management (*see id.* ¶¶ 122, 124, 126-28, 130, 132, 135-36). Because these statements did not implicate CS's ICFR, they did not give rise to any obligation for the CS Defendants to speak on that topic. *See* MTD at 20-21.

**Third,** even the few statements that did mention CS's ICFR—the SOX Certifications—are inactionable under the Second Circuit's decision earlier this year in *New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*, 80 F.4th 158 (2d Cir. 2023). *See* MTD at 21-23. That decision is consistent with other recent decisions in this Circuit. *See In re Citigroup*, 2023 WL 2632258, at *20 (holding that "SOX certifications are statements of opinion" and citing other recent cases holding the same); MTD at 22-23.

Plaintiff argues that "opinion statements [are] actionable where they contain false embedded factual statements or implied facts that can be proven false[.]" Opp. at 20. But Plaintiff

---

[3] Plaintiff alludes to purported unspecified GAAP violations, but fails to allege any actionable violations. *See* MTD at 20; *cf.* Opp. at 20 (simply citing back to Complaint's deficient allegations).

does not identify any such supposed factual statements or explain how any such statements are alleged to be false.  Plaintiff also argues that, in *DeCarlo* and *Citigroup*, "the only allegation to support that defendants did not believe the certifications when they were made was a later admission of deficiencies."  *Id.*  But that is the case here, too: although Plaintiff asserts that "the CW statements, Defendants' own admissions, and statements by UBS after the merger" have some bearing on the ICFR Statements (*id.* at 21), the text of those statements makes clear that is wrong.  Rather, just as in *Citigroup*, "Plaintiff offers nothing beyond conjecture to suggest that the [SOX Defendants] knew—at the time they signed their certifications—of any . . . [undisclosed, material] deficiencies in the Company's internal controls."  *Citigroup*, 2023 WL 2632258, at *20.  Plaintiff's cases only confirm this deficiency.  *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 469 (S.D.N.Y. 2018) (cited in Opp. at 19) ("To be actionable, a [SOX Certification] must have been ***knowingly*** false at the time that it was made.").

**Fourth**, Plaintiff argues that CS's 2022 Annual Report, issued days before the end of the class period, was misleading because it did not "reveal the true extent and severity" of Credit Suisse's issues with its financial reporting controls.  Opp. at 20, 21.  But Plaintiff does not allege any specific facts about CS's ICFR that should have been, but were not, disclosed at that time.

## V.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER

Plaintiff advances several weak scienter arguments in the hopes that, taken collectively, they will somehow become strong.  Opp. at 23-36.  But when it comes to pleading the requisite strong inference of scienter, a securities-fraud plaintiff cannot argue that "zero plus zero plus zero plus zero plus zero adds up to something."  *City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (McMahon, J.); *see also Citigroup*, 2023 WL 2632258, at *22.

### A.  The Complaint Does Not Plead Motive to Commit Fraud.

Plaintiff's generalized allegations that the Individual Defendants were well-compensated

11

have no bearing on whether they had motive to commit fraud. *See* MTD at 24-25. The one case Plaintiff cites in opposition actually establishes this point: in that case, the court found that defendants had a specific motive to lie about patient enrollment numbers because their bonuses were tied to those numbers. *See Nguyen* v. *New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) (cited in Opp. at 35). There are no such specific allegations here.

**B. The Complaint Fails to Allege Facts That Constitute Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.**

Since the Complaint fails to plead motive, it must plead facts demonstrating that the CS Defendants "knew or should have known they were misrepresenting material facts." Opp. at 23; *see also* MTD at 25. The Opposition confirms that the Complaint does not do so.

**i. Allegations Concerning the Risk Management Statements Remain Deficient.**

Plaintiff's scienter arguments concerning the Risk Management Statements focus almost exclusively on the mere existence of various governmental investigations, largely before and after the putative class period. *See* Opp. at 24-25, 28. Evidence of ***pre*-**class period risk management deficiencies is not relevant here given that there is no dispute the Individual Defendants were aware of such deficiencies at the beginning of the putative class period. The relevant question, rather, is whether the CS Defendants believed statements that CS was working to ***remedy*** those deficiencies, a question into which pre-class period findings cannot provide insight. ***Post*-**class period investigations or findings are similarly irrelevant because they say nothing about whether there was any "specific contradictory information available to [the Individual Defendants] at the time of [the] challenged statements," which is the linchpin of any scienter determination. *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 2023 WL 3628244, at *17 (E.D.N.Y. May 24, 2023).

The only investigation potentially covering conduct ***during*** the putative class period is the May 2022 U.K. regulatory finding that CS "had not done enough to improve its culture,

governance and risk controls." Opp. at 27. Despite Plaintiff's efforts to mischaracterize it yet again (*see* Opp. at 25), *Citigroup* remains instructive. There, Judge Preska held that a regulatory investigation and monetary penalty was irrelevant to scienter because the penalty was not directed to any of the individual defendants, and because it suggested only a "pattern of misconduct" without specifying what that meant. *Citigroup*, 2023 WL 2632258, at *21. The U.K. regulatory findings here are similarly vague. *See* CAC ¶ 401. In addition, government investigations do not themselves "raise[] a compelling inference of [fraudulent] intent," but rather can be merely "support[ive] [of] culpable inferences drawn from stronger allegations[.]" *Set Cap. LLC* v. *Credit Suisse Grp. AG*, 996 F.3d 64, 80 (2d Cir. 2021) (cited in Opp. at 25). The Complaint lacks any such stronger allegations, and "government investigations cannot bolster allegations of scienter that do not exist[.]" *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015).

Plaintiff attempts to shore up his insufficient scienter allegations by mischaracterizing post-class period statements as "admissions" [that] contradict alleged misstatements." Opp. at 30. But the statements, if anything, suggest that CS **did** try to improve its risk procedures. *See, e.g.*, Supp. Matuschak Decl., Ex. 3 at 1, 2 (Defendant Lehmann stated on April 4, 2023 that "[p]rogress was made at many levels" and that "[w]e fought hard to ensure a successful turnaround"); *see also* MTD at 28. As such, Plaintiff's cases holding that "the rapid discovery of undisclosed problems" supports an inference of scienter (Opp. at 31) are irrelevant here; there were no undisclosed "problems" that were discovered after the putative class period.

Plaintiff's other arguments also lack merit. For example, Plaintiff cites a report that "Swiss banks [collectively] held up to approximately $213 billion of Russian client money" as of March 2022. Opp. at 27. But this, again, says nothing about what the Individual Defendants knew about CS's efforts to improve risk management (*see* MTD at 28), and there are no non-conclusory

13

allegations in the Complaint that CS's "Russian exposure . . . exceeded what it was publicly reporting" or, even if it did, how that caused any loss.  Opp. at 27.

Plaintiff also argues that "at the same time Defendants assured investors Credit Suisse was taking actions to improve its risk management, the Complaint alleges it was instead catering to some of the world's riskiest clients and concealing this fact from the U.S. government."  Opp. at 29-30.[4]  These arguments, however, go to falsity, not scienter—and are meritless in any event.  *See* Section II, above.  Plaintiff also cites a *Financial Times* report that "Credit Suisse had requested various wealthy clients to destroy documents relating to their yachts and private jets[.]"  Opp. at 29.  But the article (*see* Supp. Matuschak Decl., Ex. 5) does not suggest any of the Individual Defendants, or any other senior CS executive, was involved in that request or provide insight into what any Individual Defendant knew or should have known about CS's efforts to improve its risk management procedures.  *See generally DeCarlo*, 80 F.4th at 178 n.15 (no inference of scienter where press reports did not address the specific facts alleged to have been misrepresented).

Finally, Plaintiff suggests that "Defendants' focus on risk management . . . support[s] a strong inference of scienter."  Opp. at 31.  But Plaintiff cannot have his cake and eat it too:  either the Individual Defendants *were* focused on improving risk management (meaning their statements to that effect were not false), or they were not (meaning that such a focus cannot be the basis for an inference of scienter).  Either way, Plaintiff's scienter allegations with respect to the Risk Management Statements fail.

### ii.    Allegations Concerning the Customer Outflow Statements Remain Deficient.

The *only* outflow-related scienter allegations Plaintiff offers are the statements of three CWs that, at most, suggest that CS executives monitored asset and customer outflow information.

---

[4] Plaintiff says that "[i]t speaks volumes that Defendants do not address this allegation"—but the CS Defendants did address it.  *See* MTD at 27-28.

*See* MTD at 28-29.  The Opposition simply repeats these insufficient allegations (*see* Opp. at 23-24), which do not even suggest any of the Customer Outflow Statements were false, much less that any Individual Defendant knew or recklessly ignored that they were.  *See* Section III, above; MTD at 28-29; *see also Bettis*, 2016 WL 7468194, at *16 (rejecting scienter allegations based on a CW's "conclusory and unsupported . . . statements" that a company's management was vaguely "aware of . . . problems" on a relevant topic).

Moreover, Plaintiff offers no explanation for how any of the CWs would have information regarding the state of mind of any of the Individual Defendants.  *See* MTD at 29.  It is not the CS Defendants' position "that a CW ***must*** have contact with individual defendants to be credited" (Opp. at 24), but a complete lack of contact is relevant to determining whether "a person in the position occupied by the source would possess the information alleged."  *Id*.  Here, in addition to the lack of contact, there is no reason alleged as to why CW1, a "Financial Analyst at Credit Suisse" who "monitored risk targets," or CW2, an executive assistant "in the M&A division," would have any insight into asset and customer outflows.  Opp. at 24.

Plaintiff next argues that Defendant Körner's remarks on April 4, 2023 somehow suggest that the CS Defendants knew or should have known that the Customer Outflow Statements were false.  Opp. at 30.  But those statements are consistent with the CS Defendants' statements during the putative class period: that although the bank was "weakened by . . . strong outflows in October 2022," it was "able to turn the situation around at the end of 2022" and, by the beginning of 2023, "[t]he situation [had] stabilized somewhat[.]"  Supp. Matuschak Decl., Ex. 4 at 2.

Finally, Plaintiff suggests that the CS Defendants "do not offer any alternative, competing inference with respect to the Customer Outflow Statements[.]"  Opp. at 36.  This is untrue.  As discussed in the MTD and in Section III, above, Defendants have argued that the more compelling

15

(and indeed, only plausible) version of events consistent with the allegations in the Complaint is that the CS Defendants were truthfully and accurately reporting on a fluid and evolving issue but did not predict the extent and pace of outflows that CS ultimately would experience in March 2023.

### iii.    Allegations Concerning the ICFR Statements Remain Deficient.

Plaintiff's scienter arguments concerning the ICFR Statements mirror those the Second Circuit rejected in *DeCarlo*:  *i.e.*, that because CS "acknowledged a failure of internal controls," the SOX Certifications must not have been "believed when made."  80 F.4th at 176; *compare* Opp. at 26.  But a company's "change of opinion, standing alone, does not mean that the original certified opinions were disingenuous."  *DeCarlo*, 80 F.4th at 176.

This Court's decisions in other cases (*see* Opp. at 26) are not to the contrary.  Those cases involved more specific allegations suggesting the defendants must have known their certifications were false, such as reductions in a company's accounting staff (*see In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006)) or a "complete lack of internal controls" (*In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999)).  This Court has repeatedly rejected the idea that the mere fact that a defendant signed a SOX Certification, standing alone, is evidence of scienter.  *See City of Brockton Ret. Sys.*, 540 F. Supp. 2d at 474; *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 415 (S.D.N.Y. 2007) (McMahon, J.).

Nor does the fact that CS acknowledged that the ICFR weaknesses were material in March 2023, despite having believed in February 2023 that such weaknesses were immaterial (*see* Opp. at 26), support an inference of scienter.  Such timing might have been relevant if, as in *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021) (cited in Opp. at 27), CS had made "firm and rosy representations" despite having been informed by its auditor that its ICFR was "inadequate and ineffective."  But here, CS affirmatively disclosed in March 2022 that certain cash-flow results for 2019 and 2020 would be revised.  *See* ECF No. 85-7 (excerpt from

16

CS 2021 Annual Report) at 292.  CS then provided the SEC significant additional information about the issues, including what led CS to believe that any ICFR deficiencies were immaterial. *See* ECF Nos. 85-13, 85-17, & 85-20.  CS's auditor agreed with CS's opinion.  *See* MTD at 31-32.[5]  In this context, the far more cogent and compelling inference is that CS initially did not think any ICFR weaknesses were material, but later, after further discussion with the SEC and PwC, changed its mind.  *See Bettis*, 2016 WL 7468194, at *16 ("[P]roximity alone, without corroborative evidence, is insufficient to give rise to a strong inference of scienter."); *see also* MTD at 31.

### iv.    Plaintiff's Remaining Scienter Arguments Are Insufficient.

Plaintiff also makes two even more tenuous, generic scienter arguments.  First, Plaintiff argues that the "magnitude" of fraud "in both proportion and consequence" is probative of scienter. *See* Opp. at 28-29.  But in *DeCarlo*, the Second Circuit held that the "magnitude" of a financial restatement did not "satisfy the[] requirements" to establish scienter.  80 F.4th at 178.  At most, such allegations are relevant only when there are ***other*** indicia of scienter—but here, there are none.  *See In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at *21 (S.D.N.Y. Aug. 29, 2023) ("[M]agnitude alone does not create an inference of scienter.").  Furthermore, none of the cases Plaintiff cites stand for the proposition that the purportedly "historic" nature of the merger (Opp. at 28) is relevant to scienter.

Plaintiff's allegations concerning executive departures from CS are also unavailing.  *See* Opp. at 34 (admitting "a defendant's resignation, standing alone, does not give rise to scienter"); *see also* MTD at 32.  Plaintiff argues the timing of certain departures was "suspicious[]" (Opp. at 34), but the timeline does not bear that out.  On the contrary, the fact that no departures occurred

---

[5] While "good faith reliance on [an] accountant is not a ***complete*** defense to scienter" (*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) (cited in Opp. at 35)), such reliance sheds light on the evaluation of inferences here, where the context establishes that reasonable minds could differ about the severity of CS's ICFR issues.  *See* MTD at 31-32.

17

immediately before or after key events like the October 2022 increase in outflows or CS's disclosure that it had determined its ICFR issues were material is, if anything, indicative of a ***lack*** of scienter. *Compare Malin* v. *XL Cap. Ltd.*, 499 F. Supp. 2d 117, 162-63 (D. Conn. 2007) (executive departures probative of scienter only where they occurred around the same time as other "strong evidence of fraudulent behavior, such as the restatement of prior financial statements").[6]

### C. The Complaint Fails to Establish Scienter for Each Defendant.

"[I]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for ***each*** defendant[.]" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *see also IKB Int'l, S.A.* v. *Bank of Am. Corp.*, 584 F. App'x 26, 28-29 (2d Cir. 2014) (same holding). In an attempt to suggest otherwise, Plaintiff points to this Court's 2006 decision in *Veeco*, 235 F.R.D. at 232 (cited in Opp. at 35-36), but this Court has since expressly recognized that "scienter must be pleaded as to each defendant individually." *Jacquemyns* v. *Spartan Mullen Et Cie, S.A.*, 2011 WL 348452, at *6 (S.D.N.Y. Feb. 1, 2011) (McMahon, J.). Most of Plaintiff's scienter allegations should be discounted on this basis, and any remaining allegations are insufficient. *See* MTD at 33-35. And because Plaintiff has not pled the scienter of any individual CS executive, he has not pled scienter as to CS either. *See id.* at 36.

### VI.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE LOSS CAUSATION

Plaintiff argues the Complaint pleads loss causation in two ways: through specific corrective disclosures and through events that "constructively revealed" that the CS Defendants' statements were false. Opp. at 36-40. Both arguments lack merit.

***First***, other than for the March 14, 2023 disclosure of material weaknesses in CS's ICFR, Plaintiff does not even attempt to explain how any alleged corrective disclosure revealed the falsity

---

[6] The Opposition does not discuss the core operations doctrine (*see* MTD at 33), so Plaintiff has conceded that argument. *See generally Felske*, 2012 WL 716632, at *3.

of any alleged misstatement. *See* Opp. at 38. A review of the alleged misstatements and the alleged corrective disclosures reveals a complete mismatch: the alleged corrective disclosures have virtually nothing to do with the alleged misstatements. *See* MTD at 37. Even as to the March 14, 2023 disclosure, which stated that CS's ICFR had material weaknesses, Plaintiff fails to plead that it "corrected" the SOX Certifications which, as discussed in Section IV, above, stated only inactionable, honestly-held opinions that the March 14, 2023 disclosure did not contradict.

**Second**, Plaintiff's argument that the merger with UBS constructively revealed that all manner of prior statements were false (Opp. at 39)—essentially a materialization-of-risk argument (*see, e.g.*, MTD at 38-39)—also fails. As an initial matter, Plaintiff does not contest (because he cannot) that the very risks he now alleges were concealed had been disclosed years before. *See* MTD at 38-39; *see also* Supp. Matuschak Decl., Exs. 1-2 (additional, detailed risk disclosures made during the putative class period).

Moreover, Plaintiff was required to plausibly plead that the putative class "would have been spared all or an ascertainable portion of [the alleged] loss [resulting from the UBS merger] absent the fraud." *Lorely Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015) (cited in Opp. at 39). The Complaint makes no such allegations. On the contrary, statements quoted in the Complaint that Plaintiff does not allege were false make clear that ***other*** factors led to CS's near-collapse and merger, such as "unfounded rumors and speculation" in October 2022 (CAC ¶ 374), "[t]he sudden collapse of Silicon Valley Bank and Signature Bank in the US" (*id.*), and larger issues unrelated to CS's risk management such as CS's overall "business model and business mix" and "negative revenue and costs prospects" (*id.* ¶ 411). Plaintiff is thus merely speculating that the alleged fraud—and not these other factors—caused the alleged losses. More is required. *See Altimeo Asset Mgmt.* v. *Qihoo 360 Tech. Co. Ltd.*, 2023 WL 2585942, at

19

*22-23 (S.D.N.Y. Mar. 21, 2023) ("speculation and conjecture" is insufficient to allege loss causation, particularly where, as here, the alleged losses "could instead be the result of other intervening causes, such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events"); *see also* MTD at 39.

Finally, although the Complaint purports to bring claims on behalf of purchasers of all "Credit Suisse securities" (CAC ¶ 2), Plaintiff does not even attempt to argue that the CS Defendants caused a decline in anything other than CS's "ADS price." Opp. at 37; *see also id.* at 39.

## VII.   PLAINTIFF HAS NOT PLED A SECTION 20(a) CLAIM

As discussed above and in the MTD, the Complaint does not plausibly allege a primary violation of Section 10(b), and has not pled with particularity that any Individual Defendant is a culpable participant in the alleged fraud. Plaintiff's Section 20(a) claims against the Individual Defendants should thus also be dismissed. *See* MTD at 39-40.

## VIII.   LEAVE TO REPLEAD IS NOT WARRANTED

The Court should deny Plaintiff's formulaic request for leave to amend. Because the Complaint fails to adequately allege an actionable misstatement or scienter, any amendment "could not withstand a motion to dismiss" and would thus be futile. *Lucente* v. *Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *see also Kassel* v. *Universal Fid. LP*, 2014 WL 824335, at *4 (E.D.N.Y. Mar. 3, 2014) (denying leave to replead as futile where "the alleged deceptive statements are not materially false or misleading"); *City of Brockton Ret. Sys.*, 540 F. Supp. 2d at 476 (dismissal with prejudice where complaint did "not raise a strong inference of scienter").

## CONCLUSION

The Complaint should be dismissed with prejudice as to the CS Defendants.

Dated:   December 7, 2023                  Respectfully submitted,


                                            /s/ Herbert S. Washer
                                           Herbert S. Washer
                                           Jason M. Hall
                                           Edward N. Moss
                                           Tammy L. Roy
                                           Nicholas N. Matuschak
                                           Lauren Riddell
                                           **CAHILL GORDON & REINDEL LLP**
                                           32 Old Slip
                                           New York, New York 10005
                                           (212) 701-3000
                                           hwasher@cahill.com
                                           jhall@cahill.com
                                           emoss@cahill.com
                                           troy@cahill.com
                                           nmatuschak@cahill.com
                                           lriddell@cahill.com


                                           *Attorneys for Defendants Credit Suisse Group AG,*
                                           *Axel P. Lehmann, Ulrich Körner, Dixit Joshi,*
                                           *Thomas Gottstein, and David R. Mathers*

21