UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

––––––––––––––––––––––––––––––––––––––– x

ALI DIABAT,
individually and on behalf of all others
similarly situated,

     Plaintiff,

vs.

             23 Civ. 5874 (CM)
             23 Civ. 6023 (CM)
             23 Civ. 6039 (CM)

CREDIT SUISSE GROUP AG, et al.,
     Defendants.

––––––––––––––––––––––––––––––––––––––– x

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**
**DATE FILED: 9/19/24**

## DECISION AND ORDER DISPOSING OF PENDING MOTIONS TO DISMISS

McMahon, J.:

  In the wake of Credit Suisse's March 2023 collapse, Lead Plaintiff Ali Diabat ("Plaintiff"), has brought this lawsuit on behalf of himself and a class of similarly situated persons or entities – other than the defendants – who purchased or otherwise acquired Credit Suisse Group AG ("Credit Suisse" or the "Bank" or the "Company") securities in domestic transactions from April 6, 2021 through March 20, 2023, inclusive (the "Class Period"). By way of a 214-page, 484-paragraph Consolidated Amended Class Action Complaint (the "Complaint"), Plaintiff alleges that the following individuals and entities violated federal securities laws by making false and/or misleading statements about Credit Suisse's operations: Credit Suisse's auditor PricewaterhouseCoopers AG ("PwC AG"); Credit Suisse itself; and Credit Suisse Officers and/or Directors Axel P. Lehmann, Ulrich Körner, Dixit Joshi, António Horta-Osório, Thomas Gottstein, and David R. Mathers (the "Individual Defendants," together with Credit Suisse, the "Credit Suisse

Defendants," and collectively, the "Defendants"). Dkt. No. 65. Specifically, Plaintiff asserts a claim against all of the Defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and a claim against the Individual Defendants under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

All Defendants have moved to dismiss the Complaint on numerous grounds. For the reasons set forth below, PwC AG's motion is granted, as are the motions by Individual Defendants Gottstein, Horta-Osório, and Mathers. The motions by Credit Suisse and Individual Defendants Joshi, Körner, and Lehmann are granted in part and denied in part. Leave to amend, for reasons that will become apparent, is denied as futile.

## BACKGROUND

The facts below are taken from the Complaint and assumed to be true for purposes of this motion. The Court also considers statements or documents incorporated into the Complaint by reference and legally required public disclosure documents filed with the Securities and Exchange Commission. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

### I.  The Parties

#### a.  Plaintiff

Lead Plaintiff Professor Ali Diabat, a resident of Jordan and a lawful permanent resident of the United States, brings this securities class action on behalf of persons or entities who purchased or otherwise acquired Credit Suisse securities in domestic transactions during the Class

Period – from April 6, 2021 through and including March 20, 2023.[1] Compl. ¶¶ 2, 30, 369; Exs. 1–2 to Dkt. No. 65.

Plaintiff states that, when purchasing or otherwise acquiring Credit Suisse securities, he and the other members of the proposed Class relied on: (1) the false and misleading public statements made by Defendants during the Class Period; (2) the integrity of the market price of the Company's securities during the Class Period; and (3) market information related to Credit Suisse. Compl. ¶¶ 344, 476. Plaintiff claims that the proposed Class was damaged "when the truth was revealed and the artificial inflation was removed from the price of the securities," resulting in the cratering of Credit Suisse's ADS price – from $10.97 per ADS at the close of trading on April 6, 2021 to $0.9450 per ADS on March 20, 2023. *Id.* ¶¶ 30, 369. Plaintiff considers the steep decline in price to be "a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market," *id.* ¶ 371; therefore, he seeks to recover compensable damages caused by Defendants' alleged violations of the federal securities laws under the Exchange Act. *Id.* ¶ 30.

### b. Defendants

#### i. Credit Suisse

Credit Suisse was, until June 12, 2023, a global financial services company based in Zurich, Switzerland and organized under the laws of Switzerland. *Id.* ¶¶ 3, 31–32. On that date, at the behest of the Swiss Federal Department of Finance, the Swiss National Bank ("SNB"), and the Swiss Financial Market Supervisory Authority ("FINMA"), Credit Suisse merged with and

---

[1]    Excluded from the Class are Defendants, the officers and directors of the Company, members of the Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Compl. ¶ 464.

into UBS Group AG ("UBS"), a different Swiss bank, and ceased to exist. *Id.* ¶¶ 1, 4, 18, 31, 367, 373.

Prior to Credit Suisse's dissolution, Credit Suisse was one of Switzerland's two largest and best-known banking corporations. During the Class Period, the Company operated through four divisions: Asset Management, Investment Bank, Swiss Bank, and Wealth Management. *Id.* ¶ 31. Credit Suisse's American Depository Shares ("ADSs") were listed and traded on the New York Stock Exchange ("NYSE") under the ticker symbol "CS," and its bonds traded worldwide. *Id.* ¶¶ 3, 32.

### ii.  Credit Suisse Individual Defendants

Plaintiff names six former Credit Suisse Directors and/or Officers as Individual Defendants in the Complaint: Axel P. Lehmann, Chairman of the Credit Suisse Board of Directors (the "Board") from January 2022 until June 2023; Ulrich Körner, Credit Suisse's Chief Executive Officer from August 2022 until June 2023; Dixit Joshi, Credit Suisse's Chief Financial Officer from October 2022 until June 2023; António Horta-Osório, Chairman of the Board from April 2021 until January 2022; Thomas Gottstein, Credit Suisse's Chief Executive Officer from February 2020 until July 2022; and David R. Mathers, Credit Suisse's Chief Financial Officer from October 2010 until August 2022. *Id.* ¶¶ 33–38.

Plaintiff claims that the Individual Defendants, by virtue of their high-level and controlling positions at Credit Suisse, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition. *Id.* ¶ 460. Plaintiff asserts

that the material misstatements conveyed to the public were the result of the actions, individually and in concert, of the Individual Defendants, as they were responsible for the accuracy of and content within Credit Suisse's SEC filings, press releases, presentations, and other public statements during the Class Period. *Id.* ¶¶ 430, 460, 463.

### iii.   PwC AG

PwC AG, an international accounting and consulting firm, was Credit Suisse's independent auditor throughout the Class Period. *Id.* ¶ 40. Public companies retain audit firms like PwC AG as independent auditors to determine whether the company's financial statements were prepared in accordance with the Generally Accepted Accounting Principles ("GAAP"), a common set of accounting rules, standards, and procedures issued by the Financial Accounting Standards Board ("FASB"). *Id.* ¶¶ 20, 308. If a public company's financial statements do not comply with GAAP, it may be required to restate its financial statements. *Id.* ¶ 20. Audits of public companies are overseen by the Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation created by the Sarbanes-Oxley Act of 2002 ("SOX"). *Id.* ¶¶ 20–21. The PCAOB is responsible for establishing the generally accepted auditing standards ("GAAS"), which are professional standards to which auditors are required to adhere. *Id.* ¶ 21.

On April 30, 2020, during Credit Suisse's Annual General Meeting of Shareholders ("AGM"), Credit Suisse shareholders voted to approve the Credit Suisse's Board of Directors' proposal that PwC AG succeed the Company's then-auditor, KPMG AG ("KPMG"). *Id.* ¶ 19. PwC AG's appointment as Credit Suisse's auditor became effective for the fiscal year ending on December 31, 2020. *Id.* Credit Suisse engaged PwC AG to perform the following services: to provide independent auditing, accounting, management consulting, and tax services; to examine

and review filings with the SEC; and to provide audits and/or reviews of financial statements included in Credit Suisse's SEC filings and annual reports. *Id.* ¶ 40. Credit Suisse paid PwC AG approximately $231.3 million for its work on Credit Suisse's 2020, 2021, and 2022 audits. *Id.* ¶¶ 8, 385.

## II.    Pre-Class Period Events

According to the Complaint, "Prior to the beginning of the Class Period on April 6, 2021, Credit Suisse had been rocked by a variety of high profile scandals." *Id.* ¶ 4. Plaintiff repeatedly references two of those "high profile scandals" throughout the Complaint: (1) "the failure of Credit Suisse's funds structured in collaboration with UK-based financier Lex Greensill" (the "Greensill Funds") in the first few months of 2021; and (2) the collapse of Archegos Capital Management ("Archegos"), "a hedge fund for which Credit Suisse had significant, undisclosed exposure," which "forced Credit Suisse to incur substantial losses and reveal critical risk management and control governance failures in March 2021. *Id.*

On March 1, 2021, Credit Suisse's Asset Management division announced in a press release that it had "suspended redemptions and subscriptions of its Greensill Funds, previously valued at approximately USD $10 billion, over concerns that they were 'subject to considerable uncertainties with respect to their accurate valuation.'" *Id.* ¶ 5. About one week after the press release, Greensill filed for bankruptcy. *Id.* It was later revealed that Credit Suisse was unable to recover approximately USD $3 billion of its customers' money from the Greensill Funds. *Id.*

Towards the end of March 2021, Credit Suisse issued a press release disclosing that Archegos had "defaulted on margin calls made last week by Credit Suisse and certain other banks" and that while it was "premature to quantify the exact size of the loss resulting from this

exit, it could be highly significant and material to [Credit Suisse's] first quarter results…." *Id.* ¶ 6. After Archegos's collapse, a Special Committee of the Credit Suisse Board of Directors retained the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") to investigate Credit Suisse's relationship with Archegos. *Id.* The resulting report, delivered to the Board on July 29, 2021, revealed that Credit Suisse ultimately "incurred approximately [USD] $5.5 billion in losses following the March 2021 default of Archegos…." *Id.*

### III.    Alleged Misstatements and/or Omissions by the Credit Suisse Defendants

Plaintiff identifies eighty-one different instances during the Class Period – which runs from April 6, 2021, or shortly after the Archegos press release, until March 20, 2023 – in which he alleges the Credit Suisse Defendants made "material misstatements and omissions regarding the sufficiency of Credit Suisse's risk management and control governance, the strength of its internal controls over financial reporting, the significance and impact of customer and asset outflows, and its exposure to Russia, that were widely disseminated to the securities market, investment analysts, and the investing public." *Id.* ¶¶ 51–314, 344.

Plaintiff also alleges that certain Credit Suisse interim financial statements, audited financial statements, and Sarbanes-Oxley (SOX) Certifications failed to comply with GAAP. *Id.* ¶¶ 315–19. According to Plaintiff, "[t]he economic loss (i.e., damages) suffered by Plaintiff and other members of the Class" and the "subsequent, significant decline in the value of Credit Suisse securities" were direct results "of the truth about Defendants' misrepresentations and omissions being revealed to investors" and the market. *Id.* ¶ 372.

In their motion to dismiss, the Credit Suisse Defendants accuse the Plaintiff of "puzzle pleading" and urge the Court to throw out the cases on that ground. I certainly could do that,[2] but I choose instead to piece together the "puzzle" by analyzing separately, and in chronological order, each misstatement and/or omission that is alleged in the Amended Complaint. That way, statements that are not actionable – whether because they are true (or not alleged to be false), or because what was allegedly not disclosed was already in the total mix of publicly available information, or because the statements qualify as puffery, or because they are forward looking statements that fall within the "safe harbor" of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4(b), or because they qualify as nothing more than "fraud by hindsight," or because the allegedly misleading aspect of the statement constitutes a non-actionable pure omission – can be eliminated from the case. As will be seen, many of the 81 allegedly false or misleading statements, in addition to the SOX Certifications and excerpts from the challenged financial statements, falls into one or more of these buckets, which means that allegations of securities fraud predicated thereon must be dismissed with prejudice.

## IV.    PwC AG's Statements/Omissions

Plaintiff takes issue with PwC AG's auditing practices in connection with Credit Suisse, and claims that PwC AG made materially false and/or misleading statements and omissions in audit reports filed with Credit Suisse's quarterly and annual reports in 2021, 2022, and 2023. Compl. ¶¶ 325–43.

---

[2]    *See Kempen Int'l Funds v. Syneos Health, Inc.*, No. 23-cv-8848, 2024 WL 1805011, at *1 (S.D.N.Y. April 25, 2024); *In re FuboTV Inc. Sec. Litig.*, No. 21-cv-01412, 2023 WL 2711826, at *11–13 (S.D.N.Y. Mar. 30, 2023); *Born v. Quad/Graphics, Inc.*, 521 F.Supp.3d 469, 477–79 (S.D.N.Y. 2021); *In re Pareteum Sec. Litig.*, Nos. 19 Civ. 9767, 19 Civ. 10460, 20 Civ. 3738, 20 Civ. 359, 20 Civ. 740, 2020 WL 3448526, at *2 (S.D.N.Y. June 23, 2020); *In re Athenex, Inc. Sec. Litig.*, No. 21-cv-337, 2024 WL 2725609, at *12 n.13 (W.D.N.Y. May 28, 2024); *Lanigan Grp., Inc. v. Li-Cycle Holdings Corp.*, No. 22-cv-02222, 2023 WL 6541884, at *4 (E.D.N.Y. Oct. 6, 2023).

Plaintiff alleges that PwC AG's auditing practices deviated from a purportedly applicable PCAOB Audit Standard ("AS"), AS No. 5, "An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements." *Id.* ¶ 322. According to Plaintiff, AS No. 5 required PwC AG to, among other obligations, "obtain appropriate evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment." *Id.* ¶¶ 322–23. He asserts, "The fact that the existence of accounting issues in Credit Suisse's 2020 financial statements was not revealed until March 2022, and the existence of a material weakness in internal controls over financial reporting related to these issues was not revealed until March 2023, indicates that PwC neither obtained reasonable assurance about whether material weaknesses existed during its 2020 audit nor in its 2021 interim Quarterly Reports."  *Id.* ¶ 324.

Plaintiff specifically challenges representations made by PwC AG in letters attached to the following Credit Suisse audit reports: Credit Suisse's May, July, and November 2021 interim quarterly audit reports filed on 6-K forms with the SEC; Credit Suisse's 2021 Annual Report for the year ending December 31, 2021 filed on Form 20-F with the SEC on March 10, 2022; Credit Suisse's May, July, and November 2022 interim quarterly audit reports filed on 6-K forms with the SEC; and Credit Suisse's 2022 Annual Report filed Form 20-F with the SEC on March 14, 2023. *Id.* ¶¶ 325, 327, 329, 331, 334, 336, 338, 340.

## V.    The "Truth" Is Revealed

According to Plaintiff, the "truth began to be revealed to the public through a series of corrective disclosures" beginning with an earnings release issued by Credit Suisse on February 10, 2022. *Id.* ¶¶ 345–46. Allegedly, "[a]s the truth was revealed to investors, shares of Credit Suisse

securities declined immediately and precipitously because the artificial inflation was removed from the market price of Credit Suisse's securities, causing substantial damage to Plaintiff and the Class." *Id.* ¶ 345.

Of the many "corrective" disclosures discussed in the Complaint, *id.* ¶¶ 345–370, one of the more critical ones appears to be the Company's March 19, 2023 announcement that it had, in accordance with a Swiss government directive, entered into a merger agreement with UBS.[3] *Id.* ¶ 367. According to Plaintiff, Credit Suisse's March 19, 2023 announcement – its last disclosure during the Class Period – "fully and finally revealed" what Plaintiff has deemed the "truth:" (1) that "the Company's risk management and/or control governance policies and/or procedures were severely lacking throughout the Class Period;" (2) that the "Defendants failed to implement meaningful changes to Credit Suisse's risk management and/or control governance procedures during the Class Period;" (3) that "the Company did not maintain an adequate or sufficient liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not conservative and were materially deficient throughout the Class Period;" (4) that "the Company was experiencing significant and unusual customer and/or asset outflows that never stabilized after October 2022 and Defendants did not disclose this;" (5) that "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" and (6) that "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 370.

## VI.     Post-Class Period Events

---

[3]     Press Release, Credit Suisse, Credit Suisse and UBS to Merge (Mar. 19, 2023), https://www.credit-suisse.com/about-us-news/en/articles/media-releases/credit-suisse-and-ubs-to-merge-202303.html [https://perma.cc/Z4GD-9GBY].

Credit Suisse's final Annual General Meeting took place on April 4, 2023, several weeks after the Company's announcement of its merger with UBS. *Id.* ¶ 373. Defendants Lehmann and Körner delivered prepared remarks that acknowledged many of the Company's problems, including strategic issues, legacy scandals, client fund outflows, and an overall loss of confidence in the global financial industry. *Id.* ¶¶ 373–74.

On April 24, 2023, Credit Suisse issued its final earnings release, which announced the financial results for the first quarter of 2023 ("1Q23"). *Id.* ¶ 375. The earnings release referenced the "significant withdrawals of cash deposits as well as non-renewal of maturing time deposits" – "[c]ustomer deposits declined by CHF 67 billion in 1Q23" – and "net asset outflows of CHF 61.2 billion, partially offset by favorable market movements of CHF 28.4 billion." *Id.*

Analysts and reporters covered developments in the months that followed the "spectacular collapse" of Credit Suisse, and Plaintiff included excerpts from this coverage in his Complaint. *Id.* ¶¶ 376–82. On June 8, 2023, Switzerland's parliament voted to empower a special commission of inquiry into the downfall of Credit Suisse and the rescue deal engineered by Swiss authorities, the SNB, and FINMA. *Id.* ¶ 377. UBS announced on July 24, 2023, that it had been ordered by U.S. and UK regulators to pay USD $269 million to the U.S. Federal Reserve and roughly USD $119 million to the Bank of England to cover fines relating to Credit Suisse's dealings with Archegos. *Id.* ¶ 408. Several days later, on July 29, 2023, it was reported that up to 75% of Credit Suisse's Russian clients would have to leave UBS. *Id.* ¶ 379. In UBS's August 31, 2023 earnings release announcing the financial results for the second quarter of 2023, UBS disclosed that "Credit Suisse has received requests for documents and information from regulatory and governmental agencies in connection with inquiries, investigations and/or actions relating to" this action "as well as for other statements regarding Credit Suisse's financial

condition, including from the SEC, the DOJ and FINMA." *Id.* ¶ 380. The Complaint also

references a September 1, 2023 Bank Stability Expert Group report commissioned by the Swiss

Federal Department of Finance, which stated that "Credit Suisse's management was

'recalcitrant' in the face of regulatory scrutiny." *Id.* ¶ 381. On September 6, 2023, following the

announcement of the resignation of FINMA's CEO, *Reuters* reported that "[t]he regulator

[FINMA] has come under fire for failing to act sooner, or more effectively, to halt the string of

scandals at Credit Suisse in recent years" and that "Swiss media has accused FINMA of being

too cautious around Switzerland's large banks, which they reported did not take the regulator

seriously." *Id.* ¶ 382.


### VII.    Procedural History

In March and April 2023, various members of the proposed Class filed three federal

securities class action complaints against Credit Suisse and several of the Individual Defendants

in the United States District Court for the District of New Jersey. Dkt. No. 1; *see Turner v.

Credit Suisse Grp. AG*, 1:23-cv-05874-CM; *Calhoun v. Credit Suisse Grp. AG*, 1:23-cv-06023-

CM; *Linhares v. Credit Suisse Grp. AG*, 1:23-cv-06039-CM. On July 10, 2023, those cases were

transferred from the District of New Jersey to the Southern District of New York. Dkt. No. 38.

On September 7, 2023, I designated Professor Diabat as putative Lead Plaintiff for this

consolidated class action. Dkt. No. 58.

On October 5, 2023, Plaintiff filed his consolidated amended class action complaint

containing allegations that Credit Suisse, the Individual Defendants, and PwC AG violated

federal securities laws. Dkt. No. 65. Count I is alleged against all Defendants for violations of

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Count II is alleged

against the Individual Defendants for violations of Section 20(a) of the Exchange Act. *Id.*

The Credit Suisse Defendants and PwC AG have moved to dismiss.  Dkt. Nos. 83, 90.


## LEGAL STANDARDS

### I.    Standard of Review

"In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally

construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable

inferences in favor of the plaintiff." *In re Avon Sec. Litig.*, No. 19 Civ. 01420, 2019 WL

6115349, at *12 (S.D.N.Y. Nov. 18, 2019) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d

41, 44 (2d Cir. 2003); *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at

1949 (citing *Twombly*, 550 U.S. at 556). Though the complaint "does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted).

Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from

conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal*, 129 S.

Ct. at 1950–51.

In deciding the present motion, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the Securities Exchange Commission ('SEC'), and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## II.    Pleading Requirements Specific to Securities Fraud Claims

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI*, 493 F.3d at 99; *see Tellabs*, 551 U.S. at 321–23. The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (the "PSLRA"). Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u–4(b).

Rule 9(b) requires plaintiffs, when alleging fraud or mistake, to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). The plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

Under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state

14

of mind" – scienter, or intent "to deceive, manipulate, or defraud" – with respect to each statement or omission. *Id.*; *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration in original).

### III.    Liability Under Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements the statute, prohibits making "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To adequately allege a violation of Section 10(b), and the accompanying regulation Rule 10b-5, a private securities plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 65 (S.D.N.Y. 2015) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

### IV.    Liability Under Section 20(a) of the Exchange Act

Section 20(a) holds liable any persons who "control" those found primarily liable under the Exchange Act. 15 U.S.C. § 78t(a). Control person liability exists "to the same extent as" the controlled entity that committed the violation, *id.*, which means that in this case, Plaintiff "must demonstrate primary liability under Section 10(b) and Rule 10b-5 before it can make out a claim for control-person liability." *Avon*, 2019 WL 6115349, at *13.

To state a claim of control person liability under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise.' " *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017) (quoting *In re Lehman Bros. Mortg.–Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011)).

## DISCUSSION

Plaintiff asserts two securities fraud claims: Count I alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, and Count II alleges a Section 20(a) violation against the Individual Defendants as control persons.

The Credit Suisse Defendants challenge the Complaint under the PSLRA and Federal Rules of Civil Procedure 9(b) and 12(b)(6); they assert that Plaintiff has failed to plausibly allege an actionable misstatement or omission, scienter, and loss causation. The Credit Suisse Defendants further argue that, as a result of the deficiencies in Plaintiff's Section 10(b)/Rule 10b-5 claim,

Plaintiff has not pleaded a viable Section 20(a) claim against the Individual Defendants. PwC AG has also moved for dismissal, arguing that the Complaint does not plead a strong inference of scienter.

### A. The Credit Suisse Defendants' Allegedly False and/or Misleading Statements/Omissions

"At the pleading stage, a plaintiff satisfies the materiality requirement by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions," *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 182 (2d Cir. 2023) (ellipsis and citation omitted), meaning that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). This inquiry is "fact-specific" and "depends on all relevant circumstances." *ECA*, 553 F.3d at 197.

"Certain categories of statements are immaterial as a matter of law, such as 'puffery,' opinions, and forward-looking statements accompanied by adequate cautionary language." *Barilli v. Sky Solar Holdings, Ltd.*, 389 F.Supp.3d 232, 250 (S.D.N.Y. 2019); *In re Duane Reade Inc. Sec. Litig.*, No. 02-cv-6478 (NRB), 2003 WL 22801416, at *4–5 (S.D.N.Y. Nov. 25, 2003). "Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (cleaned up), such "as a company's statements of hope, opinion, or belief about its future performance," *Sheiman v. Rsch. In Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 12585779, at *23 (S.D.N.Y. Mar. 29, 2013); *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 557 (S.D.N.Y. 2004). "[A] sincere statement of pure opinion is not an untrue statement of material fact, regardless [of] whether an

investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborer's Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (quotation marks omitted). However, statements of opinion may be actionable if (1) "the speaker did not hold the belief she professed," (2) "if the supporting fact[s] she supplied were untrue," *id.*, or (3) if the stated opinion, "though sincerely held and otherwise true as a matter of fact, ... omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor," *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016); *accord In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840, 2018 WL 2081859, at *9 (S.D.N.Y. Mar. 30, 2018).

Forward-looking statements are "statements whose truth cannot be ascertained until some time after they are made." *In re Vale S.A. Sec. Litig.*, No. 15-cv-9539-GHW, 2017 WL 1102666, at *24 (S.D.N.Y. Mar. 23, 2017) (citation and quotation marks omitted). The PSLRA identifies several types of forward-looking statements, including: "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;" "a statement of the plans and objectives of management for future operations . . .;" "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;" "any statement of the assumptions underlying or relating to any statement described in" the preceding definitions; "any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer;" and "a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission." 15 U.S.C. § 78u–5(i)(1). Under the PSLRA's statutory safe-harbor for forward-looking statements, "a defendant is not liable if the forward-

looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (citation omitted). To fall within the "meaningful cautionary language" prong of the safe harbor, "the cautionary language 'must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement.'" *In re Adient plc Sec. Litig.*, No. 18-cv-9116, 2020 WL 1644018, at *18 (S.D.N.Y. Apr. 2, 2020) (quoting *Slayton*, 604 F.3d at 771). In other words, "defendants must demonstrate that their cautionary language was not boilerplate . . . ." *Slayton*, 604 F.3d at 772.

"An alleged statement or omission must also be false or misleading" *Constr. Laborer's Pension Tr. for S. California v. CBS Corp.*, 433 F.Supp.3d 515, 531 (S.D.N.Y. 2020), at the time it was made, *In re Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 571 (S.D.N.Y. 2014). "Falsity is a failure to be truthful—it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made." *Id.* (cleaned up). "The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false," *id.* at 572, "they must demonstrate with specificity why that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). "A statement believed to be true when made, but later shown to be false, is insufficient," *id.*; so "without *contemporaneous* falsity, there can be no fraud," *id.* (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812–13 (2d Cir. 1996); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)) (emphasis in original).

"The test for whether a statement is materially misleading . . . is not whether the statement is misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Vivendi*, 838 F.3d at 250

(quotation marks omitted). Thus, whether a statement is "misleading," is "evaluated not only by literal truth, but by context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2015) (cleaned up).

Regarding omissions, Rule 10b-5 does not "create an affirmative duty to disclose any and all material information . . . ." *In re Citigroup Sec. Litig.*, No. 20 Civ. 9132, 2023 WL 2632258, at *12 (S.D.N.Y. Mar. 24, 2023) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)) (internal quotation marks omitted). Rule 10b-5 "does not proscribe pure omissions," which "occur[] when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). Rather, Rule 10b-5 covers half-truths, or "representations that state the truth only so far as it goes, while omitting critical qualifying information," *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016), by "requir[ing] disclosure of information necessary to ensure that statements already made are clear and complete. . . ." *Macquarie*, 601 U.S. at 264. "[T]o prevail on [an omission] theory, plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission to demonstrate that" there is "a duty to disclose the omitted information ... in order to prevent the statement from being materially misleading." *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272–73 (S.D.N.Y. 2021). "In other words, the subject matter of the alleged statement must relate closely enough to the allegedly omitted information such that a reasonable investor might have drawn inferences about the omitted information because of the statement." *Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, No. 22 Civ. 9174, 2024 WL 1330047, at *11 (S.D.N.Y. Mar. 28, 2024) (citations omitted).

According to Plaintiff, "During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements . . . which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Compl. ¶ 472. I have broken down the statements into two categories – statements/omissions predating late October 2022, and statements issued during the last six months of the Class Period. I will address the alleged misstatements/omissions in the order in which they appear in the Complaint.

*Allegedly Materially Misleading Statements Prior to October 2022*

### I.     April 6, 2021: Media Releases and Compensation Report Update

Plaintiff first challenges language from the Company's update to its 2020 compensation report, a media release announcing Company personnel changes, and a media release announcing the Company's preliminary earnings for the first quarter of 2021, *id.* ¶ 51:

*Earnings Release*:

- While our financial results are still subject to detailed finalization and review, **we would expect to report a pre-tax loss for 1Q 2021 of approximately CHF 900 million. This includes a charge of CHF 4.4 billion in respect of the failure by a US-based hedge fund to meet its margin commitments as we announced on March 29, 2021.**

*        *        *

With regard to the four supply chain finance funds, where we continue to see cash inflows, we will distribute a separate update on further repayments within the next few days.

**We acknowledge that both the US hedge fund and the supply chain finance fund matters require substantial further review and scrutiny. The Board of Directors has launched investigations into both of these matters which will not only focus on the direct issues arising from each of them, but also reflect on the broader consequences and lessons learned. We have also undertaken senior management changes within the Investment**

*Bank division and within the Risk and Compliance organization as separately announced today.*

- _Defendant Gottstein_: "***The significant loss in our Prime Services business relating to the failure of a US-based hedge fund is unacceptable. In combination with the recent issues around the supply chain finance funds, I recognize that these cases have caused significant concern amongst all our stakeholders. Together with the Board of Directors, we are fully committed to addressing these situations. Serious lessons will be learned. Credit Suisse remains a formidable institution with a rich history.***" *Id.* ¶ 52.

_Board of Directors Release_:

***Following the significant US-based hedge fund matter, Brian Chin, CEO of the Investment Bank is stepping down from his role on the Executive Board, effective April 30, 2021. Lara Warner, Chief Risk and Compliance Officer, is stepping down from her role on the Executive Board, effective April 6. Both of them will leave the bank.***

\*     \*     \*

In March 2021, the tactical crisis committee of the Board of Directors consisting of the Chairman, the Chairs of the Audit Committee and Risk Committee and the Chair of the Conduct and Financial Crime Control Committee was activated to exercise close oversight and ensure timely decision making with respect to the resolution of the issues in connection with the Credit Suisse Asset Management managed supply chain finance funds. The mandate of this committee has in the meanwhile been expanded to include the significant US-based hedge fund matter. ***The tactical crisis committee works closely with the CEO and the rest of the management team.***

***The Board of Directors has launched two investigations, to be carried out by external parties, into the supply chain finance funds matter and into the significant US-based hedge fund matter. These investigations will be supervised by a special committee of the Board of Directors and will not only focus on the direct issues arising from those matters, but also reflect on the broader consequences and lessons learned.*** *Id.* ¶ 53.

_Compensation Update_:

**Recent developments**

Since the publication of the Compensation Report on March 18, 2021, the Board of Directors (Board) has assessed the recent significant developments in connection with the US-based hedge fund.

**Withdrawal of the previously proposed Executive Board variable compensation amounts and other actions**

Under the current circumstances, the Board has resolved to withdraw its proposals regarding the variable compensation for the Executive Board, comprising the 2020 short-term incentive compensation (STI), which was determined based on 2020 performance,

and the 2021 long-term incentive opportunities (LTI), for which payout would have been determined based on prospective performance over the three-year period 2021– 2023.

Overall, the previously proposed Executive Board compensation will be reduced by the entire previously proposed variable compensation amount of CHF 40.8 million. Of this reduction, CHF 15.7 million will relate to the withdrawn 2020 STI and CHF 25.1 million to the withdrawn 2021 LTI.

* * *

> ***The Compensation Committee will continue to monitor developments closely and will determine, based on the results of any investigation, any appropriate actions to be applied, including the application of the Group's existing malus and clawback provisions on variable compensation awards to any applicable employees***. *Id.* ¶ 54.

Plaintiff asserts that the above statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts which were known to or recklessly disregarded by the Defendants: (1) "no 'lessons would be learned' from the investigations into the failure of the Greensill Funds and Archegos losses, strongly suggesting that the investigations were largely a smokescreen to appease uneasy clients and investors;" (2) "[a]s later events (such as the near collapse of the bank, which would have had severe global ramifications) revealed, Defendants failed to implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking throughout and prior to the Class Period;" (3) "the departures of Chin and Warner from their roles on the Executive Board had no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies, as the underlying issues reached far deeper than these two individuals, *id.* ¶ 55;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting," *id.* ¶ 56.

Plaintiff's allegations are deficient for a variety of reasons, but principally because an allegation that the Company failed to disclose what was (or was not) going to happen in the future does not render a representation materially false or misleading at the time the statement was made.

23

"Without contemporaneous falsity there simply is no fraud." *C.D.T.S. v. UBS AG*, No. 12 Civ. 4924, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013) (citations omitted).

The Company's statements about the investigations were objectively true. For example, Credit Suisse retained Paul, Weiss to investigate the Archegos matter. Compl. ¶ 6. "Once a company discloses material objective factual matters, it need not characterize or editorialize on those facts in any particular way." *In re MGT Cap. Invs., Inc. Sec. Litig.*, No. 16 Civ. 7415, 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) (citation and internal quotation marks omitted). And it is not at all clear – because Plaintiff has failed to provide any factual support for his allegations – how, at the time these representations were made (which was prior to the conclusion of any investigation, *see* Compl. ¶¶ 94, 100), the Company could have known that "no lessons would be learned" from the investigations – which is the basis for referring to them as a "smokescreen." The very fact that Plaintiff asserts that something would not happen *in the future* to justify his contention that these disclosures were false and misleading demonstrates that the allegation is pure fraud by hindsight – which cannot support a 10(b) claim. *See In re Shanda Games Ltd. Sec. Litig.*, No. 1:18-cv-02463, 2019 WL 11027710, at *5 (S.D.N.Y. Sept. 30, 2019).

As to Plaintiff's conclusion that the Defendants did not implement meaningful changes to Credit Suisse's "severely lacking" risk management and/or control governance procedures and/or policies: nowhere in the Complaint does he allege facts showing that Credit Suisse did not, in fact, intend to make the investments in risk, control, and compliance (personnel changes, strategic reviews) that were disclosed in the April 7 Media Release at the time those statements were made. *See Citigroup*, 2023 WL 2632258, at *16 (citing *In re Banco Bradesco S.A. Sec. Litig.*, 277 F.Supp.3d 600, 648 (S.D.N.Y. 2017)). Moreover, those changes were to be made in the future, after the Board reviewed the results of the investigations. "Corporate officials need not be

clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309 (citations omitted). Credit Suisse was not required to predict accurately what would happen following an investigation that had yet to conclude. Future developments cannot, as a purely logical matter, render statements misleading when made, and "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309.

Defendants' disclosure that Chin and Warner left the Company was objective true. There was nothing misleading about disclosing that development, and by disclosing those undeniable facts, the Company fulfilled its disclosure obligations. *See MGT*, 2018 WL 1224945, at *11. Plaintiff's argument that the personnel changes would have no meaningful effect on the Bank's operations in the future depends on events that had yet to happen – and thus, is just another attempt to plead fraud by hindsight. *See In re Aceto Corp. Sec. Litig.*, No. 2:18-cv-2425, 2019 WL 3606745, at *7 (E.D.N.Y. Aug. 6, 2019).

Finally, the representations made in the Compensation Report and media releases have *nothing* to do with the Company's internal control over financial reporting ("ICFR") – and pure omissions are not actionable under Rule 10b-5. *Macquarie*, 601 U.S. at 262, 264–65. Even if they were, Plaintiff has not alleged any non-conclusory facts supporting the notion that anyone at the Company was aware of material weaknesses in its ICFR at the time these statements were made. *Lachman v. Revlon, Inc.*, 487 F.Supp.3d 111, 135 (E.D.N.Y. 2020); *see Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012). According to the Complaint, "the existence of accounting issues in Credit Suisse's 2020 financial statements was not revealed until March 2022," Compl. ¶¶ 24–25, 324, or almost a full year after the challenged

statement was released, and it was not until March 14, 2023, when the Company filed its 2022 Annual Report with the SEC, that the Company publicly admitted and disclosed material weaknesses in its ICFR, *id.* ¶ 358.

## II.    April 6, 2021: Defendant Gottstein Interview with *Neue Zürcher Zeitung*

Plaintiff next challenges the following portions of a *Reuters* article about an interview of Defendant Gottstein by Swiss German-language newspaper *Neue Zürcher Zeitung, id.* ¶ 58:

> The structure of Credit Suisse's investment bank will be scrutinised closely by incoming chairman Antonio Horta-Osorio, CEO Thomas Gottstein told a newspaper, as the bank aims to boost risk management after billions in losses on U.S. fund Archegos. "That is with certainty one of the core strategic themes that the board under the new chairman, together with the bank's executive leadership, will be focusing on," Gottstein told Neue Zuercher Zeitung on Tuesday.

> *       *       *

> "There are no sacred cows," Gottstein added in the interview. "What we can already say is, ***we will be taking risks out of certain parts of investment banking. That certainly includes the Prime Services business' that serves hedge funds like Archegos.***

> *       *       *

> In the NZZ interview, ***Gottstein blamed Credit Suisse's failings to adequately manage risks at least partly on the lack of face-to-face meetings with clients during the COVID-19 pandemic.*** "It's a challenge to manage a global bank during a pandemic over Zoom," Gottstein told the newspaper. "I'm convinced that in the era of COVID-19 the scrutiny of risk business, whether for banks or insurers, has grown more difficult."

*Id.* ¶ 59. Plaintiff claims that the above representations were materially false and/or misleading because they misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, and as such would not 'be taking risks out of certain parts of investment banking;'" and (2) "Defendants' failure to adequately manage risk was not due to 'the lack of face-to-face meetings with clients

during the COVID-19 pandemic,' but because its risk parameters were materially deficient at all times." *Id.* ¶ 60.

Gottstein's statement that "[Credit Suisse] will be taking risks out of certain parts of investment banking" is non-actionable as a matter of law: it is corporate puffery. In the excerpt, Gottstein does not say, for example, what those risks were or provide any sort of timeline as to when the unspecified risks would be removed. His statement is not "sufficiently specific that a reasonable investor could rely on [it] as a guarantee of some concrete fact or outcome," *Greco v. Quidian Inc.*, No. 1:20-cv-577, 2022 WL 4226022, at *10 (S.D.N.Y. Sept. 13, 2022) (citation and internal quotation marks omitted), and thus could not have misled a reasonable investor, *Vivendi*, 838 F.3d at 245; *Barilli*, 389 F.Supp.3d at 250. Moreover, that the Company *will* be taking risks out of certain parts of investment banking is a plan that depends on things that have yet to happen, so the statement also qualifies as forward-looking, as its "truth cannot be ascertained until some time after the time [the statement was] made." *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 763 F.Supp.2d 423, 493 (S.D.N.Y. 2011); *see* 15 U.S.C. § 78u–5(i)(1)(B). For such a statement to be actionable, "the plaintiff must show that the statement was made with actual knowledge of its falsity by the speaker." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 253 (S.D.N.Y. 2020) (citations and quotation marks omitted). Plaintiff has not pleaded any facts tending to show that Credit Suisse executives did not really intend to lessen the risk profile in certain parts of its Investment Banking Division, so what is pleaded is essentially fraud by hindsight, which is not actionable as a matter of law. *Gissin v. Endres*, 739 F.Supp.2d 488, 502 (S.D.N.Y. 2010).

As to Plaintiff's assertion that Defendants never implemented meaningful risk management and/or control governance changes, Plaintiff was required to "plead with particularity sufficient

facts to support [his] belief[]] that the statements were false," *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700, 2012 WL 3957916, at *13 (S.D.N.Y. Sept. 10, 2012), at the time they were made, *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950, 2015 WL 4931357, at *22 (S.D.N.Y. Aug. 19, 2015) (citation omitted). This assertion is not supported by *any* facts. Instead, Plaintiff has attempted to argue in hindsight that the Defendants ultimately did not "tak[e] risks out of certain parts of investment banking" or "implement[] meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies" – but, again, fraud by hindsight is not actionable. *See Novak*, 216 F.3d at 309.

Finally, Plaintiff asserts that the statements in the interview were false and/or misleading because Defendants misrepresented or failed to disclose that their "failure to adequately manage risk was not due to 'the lack of face-to-face meetings with clients during the COVID-19 pandemic,' but because [the Company's] risk parameters were materially deficient at all times." Compl. ¶ 60. However, this does not mean that it was false and/or misleading for Gottstein to "blame[] Credit Suisse's failings to adequately manage risks at least partly on the lack of face-to-face meetings with clients during the COVID-19 pandemic." *Id.* ¶ 59. Plaintiff has not alleged *any specific facts* to establish that the reason provided by Gottstein was false or misleading, or to support his claim that the Company's risk parameters were materially deficient at all times and were known by management to be materially deficient. *See Kraft v. Third Coast Mistream*, No. 19-cv-9398, 2021 WL 860987, at *13 (S.D.N.Y. Mar. 8, 2021). Gottstein is also quoted as saying that it was "a challenge to manage a global bank during a pandemic over Zoom," and that he was "convinced that in the era of COVID-19 the scrutiny of risk business, whether for banks or insurers, has grown more difficult." Compl. ¶ 59. This subjective statement of opinion or belief would have only been actionable if Plaintiff had alleged with particularity provable facts to demonstrate that the

statement of opinion was both objectively and subjectively false on the date of the interview –
April 6, 2021. *Fairway*, 2015 WL 4931357, at *10; *see In re Sanofi Sec. Litig.*, 87 F.Supp.3d 510,
528 (S.D.N.Y. 2015). Plaintiff has not even attempted to do so – which is hardly surprising, since
it inarguably was a challenge to manage any business during a pandemic, over Zoom or otherwise.

### III.      April 22, 2021: First Quarter 2021 Media Release and Investor Presentation

Plaintiff highlights the following representations made by Gottstein in the Company's First
Quarter 2021 Media Release and Investor Presentation:

> **Our results for the first quarter of 2021 have been significantly impacted by a CHF
> 4.4 bn charge related to a US-based hedge fund. The loss we report this quarter,
> because of this matter, is unacceptable. Together with the Board of Directors, we have
> taken significant steps to address this situation** as well as the supply chain finance funds
> matter. ***Among other decisive actions, we have made changes in our senior business and
> control functions; we have enhanced our risk review across the bank;* we have launched
> independent investigations into these matters by external advisors, supervised by a
> special committee of the Board; and we have taken several capital-related actions.**

> **DECISIVE ACTIONS TAKEN FOLLOWING RECENT EVENTS**
> As previously announced in trading updates in March and April, the Credit Suisse Board
> of Directors and the Executive Board have taken action to address the supply chain finance
> funds and US-based hedge fund matters directly. FINMA and other regulators were kept
> informed. These include:

> Senior management changes:

> - ***Replacing Brian Chin, CEO Investment Bank, and Lara Warner, Chief Risk and
> Compliance Officer***

> - Christian Meissner appointed CEO of the Investment Bank and member of the Executive
> Board, effective May 1, 2021

> - Joachim Oechslin appointed Chief Risk Officer and member of the Executive Board, in
> each case on an ad-interim basis, effective April 6, 2021

> - Thomas Grotzer appointed interim Global Head of Compliance, reporting to the Group
> CEO, effective April 6, 2021

- Ulrich Körner appointed CEO of Asset Management and member of the Executive Board, effective April 1, 2021

- And a number of other executive changes in the Investment Bank and the CRCO function

***Enhanced review of risk across the bank:***

***- Extensive review across our Prime Services business focused on underlying risk positions, as well as related counterparties***
***- Enhanced due diligence across Asset Management following supply chain finance funds matter***
***- Group-wide review of risk positions and of business and risk processes in close cooperation with Board of Directors and external advisors***
***- Applying lessons learned from recent matters across the bank***

***Launched independent investigations into supply chain finance funds matter and US-based hedge fund matter***

***- The Board of Directors has launched two independent investigations, carried out by external advisors, into the supply chain finance funds matter and the significant US-based hedge fund matter***
***- These investigations are being supervised by a special committee of the Board of Directors and will not only focus on the direct issues arising from those matters, but also reflect on the broader consequences and lessons learned***

Capital related actions:

- Suspension of share buyback program
- Reduction of ordinary total dividend proposal to CHF 0.10 gross per registered share
- Successful placement of two series of MCNs
***- Close engagement with FINMA and all relevant regulators; FINMA has initiated two enforcement proceedings (with regards to the US-based hedge fund and supply chain finance funds matters)***

Compl. ¶ 61. According to Plaintiff, the above statements are materially false and misleading because they misrepresented and/or failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "contrary to Defendants' statements that the Company had 'taken significant steps' to resolve the issues which led to the Archegos losses, Credit Suisse implemented no meaningful changes to the Company's severely lacking risk management and/or control governance procedures at this time or any other time during the Class Period;" (2) "[t]he

lack of meaningful changes also indicates that the much-touted investigations launched by the Board of Directors were largely window dressing to appease clients and shareholders;" and (3) "at the time these statements were made, there existed material weaknesses in the Company's internal controls over financial reporting, undermining the announced quarterly results." *Id.* ¶ 62.

Plaintiff's conclusory allegations are insufficient to survive a motion to dismiss. *See Smith v. Loc. 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002). Basically, Plaintiff is once again alleging that the program Credit Suisse announced it was going to undertake would prove inadequate to "resolve the issues which led to the Archegos losses." But Plaintiff does not identify a single statement about what Credit Suisse did that is untrue as a matter of fact – Credit Suisse did replace those officers, it did authorize those investigations, it did take various capital-related actions. Whether the steps that were announced on April 22, 2021, would prove adequate to solve the problems presented by the Archegos loss was a hope – perhaps even an expectation – but the results of these factually accurate changes could not be predicted on the date the changes were disclosed. Thus, these factually correct disclosures could not have misled investors by failing to predict that the announced measures would prove unsuccessful. Allegations that would have required the Credit Suisse Defendants to be "clairvoyant" and "anticipate[] future events" "do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309; *see In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-cv-4953, 2021 WL 4482151, at *6 (S.D.N.Y. Sept. 30, 2021). Again, this type of pleading – fraud by hindsight – is not actionable as a matter of law. *Strougo v. Barclays PLC*, 105 F.Supp.3d 330, 342 (S.D.N.Y. 2015).

Plaintiff's attempt to plead falsity by alleging that there existed material weaknesses in the Company's ICFR, Compl. ¶ 62, is also insufficient. Again, it is a "pure omission" unrelated to the challenged statements – *i.e.*, the speaker has said nothing about the Company's ICFR in the

excerpt, in circumstances that do not give any particular meaning to that silence – and thus is not actionable under Rule 10b-5. *Macquarie*, 601 U.S. at 263, 266. Moreover, "the Complaint does not allege any facts explaining why or how [Credit Suisse's] internal controls were materially deficient at the time [Credit Suisse] made many of the challenged statements. Instead, Plaintiff[] rel[ies] . . . on [his] general assertion[] regarding the existence" of a material weakness in the Company's ICFR, "which fall[s] far short of satisfying the exacting pleading requirements of Rule 9(b) and the PSLRA." *Janbay*, 2012 WL 1080306, at *9.

### IV.    April 22, 2021: First Quarter 2021 Earnings Release

Plaintiff challenges language from the Company's 1Q21 Earnings Release:

**US-based hedge fund matter**

As reported on April 6, 2021, we have incurred a provision for credit losses of CHF 4,430 million in 1Q21 in respect of the failure by a US-based hedge fund to meet its margin commitments…. Following the failure of the fund, we initiated the process of exiting the fund positions. To date, we estimate that we have exited 97% of the related positions. We have also incurred additional losses in 2Q21 of approximately CHF 0.6 billion as a result of market movements during the process of closing out these positions. ***The Board of Directors has also initiated an externally-led investigation of this matter, which will be supervised by a special committee of the Board of Directors.***

Following the US-based hedge fund matter, we have reviewed exposures across the prime services business. ***The related risk and control governance is being strengthened and will be further enhanced after rigorous first and second line risk management assessments.*** We expect that our prime brokerage and prime financing businesses will be resized with a primary focus on continuing to serve our most important franchise clients. By the end of 2021, we also expect to reduce leverage exposure in the Investment Bank by at least USD 35 billion and to align risk-weighted assets in the Investment Bank to no more than end-2020 levels.

**Supply chain finance funds matter**

As previously reported, on March 1, 2021, the boards of four supply chain finance funds managed by certain Group subsidiaries (collectively, the SCFFs) decided to suspend redemptions and subscriptions of those funds to protect the interests of the funds' investors.

On March 4, 2021, the boards decided to terminate the SCFFs and to proceed to their liquidation.

\* \* \*

*The last published net asset value of the SCFFs in late February was approximately USD 10 billion in the aggregate. To date, total cash collected in the supply chain finance funds, including the cash position in the funds at the time of suspension, amounts to USD 5.4 billion, and redemption payments totaling USD 4.8 billion have been made to their investors in two cash distributions.* The portfolio manager continues to work to liquidate the remaining assets of the SCFFs, including by engaging directly with potentially delinquent obligors and other creditors as appropriate. However, there remains considerable uncertainty regarding the valuation of a significant part of the remaining assets, including the fact that certain of the notes underlying the funds were not paid when they fell due and the portfolio manager has been informed that further notes will not be paid when they fall due in the future. It therefore can be assumed that the investors of the SCFFs will suffer a loss. CSAM will take all necessary steps to collect outstanding amounts from debtors and insurers, but can give no assurance as to the final amount that may be recovered for the SCFFs under such notes. *The amount of loss of the investors therefore is currently unknown. Based on currently available information, losses for the investors can be expected to occur predominantly in positions that, prior to March 31, 2021, had a net asset value of approximately USD 2.3 billion in the aggregate.* These positions relate primarily to three groups of companies: "GFG Alliance," Katerra and Bluestone.

\* \* \*

*We continue to analyze these matters, including with the assistance of external counsel and other experts. The Board of Directors has also initiated an externally-led investigation of these matters, which will be supervised by a special committee of the Board of Directors.*

\* \* \*

*On April 6, 2021, the Board announced that following the significant US-based hedge fund matter, Brian Chin, CEO of the Investment Bank, will be stepping down from his role on the Executive Board, effective April 30, 2021. Lara Warner, former Chief Risk and Compliance Officer, stepped down from her role on the Executive Board on April 6, 2021. Both of them will leave Credit Suisse.*

\* \* \*

A number of regulatory and other investigations and actions have been initiated or are being considered…including enforcement actions by FINMA. **FINMA has also imposed certain measures, including those previously reported, as well as certain risk-reducing measures and capital surcharges** discussed elsewhere in this report.

Compl. ¶ 63. Plaintiff asserts that these statements were materially false and/or misleading because they misrepresent and failed to disclose certain adverse facts that were known to or recklessly disregarded by the Defendants: (1) as evidenced by the "eventual near collapse of the bank and post-Class Period events," "Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies;" (2) which Plaintiff claims "suggests that the investigations initiated by the Board of Directors were a smokescreen, and that 'related risk and control governance' was not 'being strengthened' and would not 'be further enhanced after rigorous first and second line risk management assessments;'" (3) "the departures of Chin and Warner would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies;" and (4) "at the time these statements were made, there existed material weaknesses in the Company's internal controls over financial reporting, undermining the announced quarterly results." *Id.* ¶ 64.

Once again, Plaintiff alleges that a failure to predict accurately the results of various steps taken by Credit Suisse renders statements disclosing that those steps would be taken false or misleading. Plaintiff's allegations are not actionable because he fails to "explain why the statements are false and allege specific facts that support his claim that the complained of statements were false *when made*." *Barrett v. PJT Partners*, No. 16-cv-2841, 2017 WL 3995606, at *4 (S.D.N.Y. Sept. 8, 2017) (emphasis added) (citation and internal quotation marks omitted). While greater clairvoyance at the time of the First Quarter 2021 Earnings Release might have led to the Defendants' realizations that the Company would eventually collapse and be negatively affected by other post-Class Period events, and that the departure of certain executives would, in the end, "have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies," and that changes were not being made to related risk and control

governance procedures and policies, it is settled law that the "failure to make such perceptions does not constitute fraud." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995). None of Plaintiff's allegations suggests that the steps that the Bank took to stanch the bleeding from Archegos were nothing but "a smokescreen."

Plaintiff's assertion that the Company was not enhancing and strengthening its risk and control governance does not plausibly support falsity for an additional reason: "The fact that defendants recognized problems" through their assessments, investigations, and reviews, "announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F.Supp.3d 278, 295 (S.D.N.Y. 2014). And as to Plaintiff's claim that at the time the statements were made, there existed material weaknesses in the Company's ICFR, the Complaint does not state with particularity sufficient – or any – facts that would support any claim that management was aware of this in April 2021. *See Novak*, 216 F.3d at 313. As a result, Plaintiff has failed to meet the pleading requirements of Rule 9(b) and the PSLRA.

## V.    April 22, 2021: Defendant Gottstein's Statements to Reporters

Plaintiff challenges several of Defendant Gottstein's representations that the *New York Times* reported on in an article entitled "Credit Suisse reports a loss as regulators open an investigation." Compl. ¶ 65. The article stated in relevant part:

> ***Mr. Gottstein promised Thursday that Credit Suisse would overhaul its systems for tracking risk to avoid future disasters.*** Several top executives have already left the bank as part of a management shake-up, including Lara Warner, the chief risk and compliance officer. Credit Suisse also plans to pare back the size of a unit that serves hedge fund clients and was involved in the Archegos losses**. Mr. Gottstein declined to say whether the debacle would lead to major changes at Credit Suisse's investment bank, which has a large presence in New York. *But he suggested that Credit Suisse would not retreat from***

> *investment banking.* **"The underlying results show that the strategy is working,"** *he told* **reporters. "I wouldn't say that because we had two disappointing incidents we should throw the whole strategy overboard**.*"*

*Id.* Plaintiff states that the above statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "Defendants would not 'overhaul its systems for tracking risk to avoid future disasters' or implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies during the Class Period;" (2) "Credit Suisse's 'strategy' was not 'working' but was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices;" (3) Gottstein "minimized the disastrous loss of many tens of billions of dollars . . . as merely 'two disappointing incidents' . . . when, in fact, they were the product of Credit Suisse's deeply flawed business model and poor risk management culture;" and (4) "these statements omit that, at the time and throughout the Class Period, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 66.

Certainly the first allegation is deficient as a matter of law in that, like so many other allegedly "false and/or misleading" statements made by Credit Suisse, Plaintiff does not plead that the Defendants were lying when they said they intended to take steps to avoid future disasters, but rather accuses them of failing to predict that the steps Defendants announced that they were taking would not prove sufficient to allow the Company to avoid future disasters. *See Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999); *Novak*, 216 F.3d at 309. Plaintiff's "retrospective critique" does not make out a claim of securities fraud. *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.* ("*Bank of Am. – ERISA*"), Nos. 09 MD 2058, 09 Civ. 5411, 2012 WL 1353523, at *6 (S.D.N.Y. April 12, 2012); *Novak*, 216 F.3d at 309.

As to the "adverse facts" about Credit Suisse's investment banking strategy, Compl. ¶ 66, Plaintiff has "offer[ed] nothing more than conclusory allegations that," *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F.Supp.2d 576, 585 (S.D.N.Y. 2006), the strategy was "fundamentally flawed" in that it "was predicated on unsustainable investment approaches that contravene risk management and/or control governance best practices." Compl. ¶ 66. Plaintiff does not particularize the "unsustainable investment approaches" that rendered Gottstein's assessment erroneous, nor does he explain which specific "risk management and/or control governance best practices" were violated by the Bank's decision to take those approaches. In sum, he does not offer any facts to substantiate his conclusory allegations.

Plaintiff also criticizes Gottstein's characterization of the events preceding this interview as "two disappointing incidents." "Disappointing" they certainly were, however; and while there may be stronger words to describe them, "the law is clear that companies need not depict facts in a negative or pejorative light or draw negative inferences to have made adequate disclosures." *Singh v. Schikan*, 106 F.Supp.3d 439, 448 (S.D.N.Y. 2015) (citations omitted). Moreover, Plaintiff's assertion, offered without any semblance of factual support, that the Archegos and Greensill losses "were the product of Credit Suisse's deeply flawed business model and poor risk management culture" is both general and conclusory. "Such statements obviously do not comply with Rule 9(b)." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir. 1982) (citing *Denny*, 576 F.2d at 469–70). To the extent that Plaintiff relies on the ultimate outcome – the failure of the Company – to support his assertion that the statements were false and misleading, he is engaged in classic "fraud by hindsight" pleading. *See In re Molycorp, Inc. Sec. Litig.*, No. 13 Civ. 5697, 2015 WL 1097355, at *11 (S.D.N.Y. Mar. 12, 2015).

Plaintiff's final argument that the statements – which do not address the Company's ICFR – omit that there existed material weaknesses in the Company's ICFR also fails. But again, "Rule 10b–5(b) does not proscribe pure omissions;" there can be no "liability for failure to speak on a subject at all." *Macquarie*, 601 U.S. at 262, 264–65.

## VI.    April 22, 2021: First Quarter 2021 Earnings Conference

Plaintiff has included in the Complaint excerpts from the Company's First Quarter 2021 Earnings Conference Call that go on for several pages. Compl. ¶¶ 67–73. This lengthy quotation contains multiple "statements." The Court understands that, by putting certain of the quoted statements in bold-faced type, Plaintiff is asserting that the bold-faced language contains the misstatements that form the basis of his cause of action, with the surrounding providing context; as a result, what is reprinted below is what appears in bold in the Amended Complaint.

Plaintiff has bold-faced the following representations made during the Conference Call:

*Defendant Gottstein*:

- "Accountability is one of the core pillars of our corporate values. Together with the Board of Directors, we are addressing these situations through a series of decisive actions in the business and through two independent and thorough investigations, which are already under way. The investigations will not only focus on the direct issues, but also broader consequences and lessons learned across the bank. We will work to ensure Credit Suisse emerges stronger."

- "[W]e have reviewed exposures across the entire prime services business. Related risk and control governance is already being strengthened and will be further enhanced following first and second line risk management assessments. Our prime brokerage and prime financing businesses will be resized and derisked with the primary focus on our most important franchise clients."

- "The management team is fully focused on strengthening prime services and asset management risk controls, including forensic analysis of the two incidents and lessons learned. We are conducting an overall review of risk systems, processes and culture across the bank in close collaboration with the Board of Directors and external advisors."

- "In each instance, we will work closely with the relevant regulators including FINMA, which has opened enforcement proceedings in both cases." *Id.* ¶ 67.

- "Clearly, this loss came as a big surprise to us and we are taking measures that this will not reoccur. We are reducing our exposure in that business and we are doing the investigation how it exactly happened and make sure it will not happen again." *Id.* ¶ 68.

*Defendant Mathers*:

- "Just to give you some idea, that CHF35 billion leverage reduction is about a third of the total leverage we have deployed in prime. And I would expect clearly our prime revenues to fall as a consequence of that. But I think in terms of the actual revenue impact, quite clearly, we will be focusing our prime business around clients that have multiple connectivity to Credit Suisse, i.e., are important across our businesses. And obviously, de-focusing on clients that have much less connection across the bank." *Id.* ¶ 69.

- "Firstly, I think I would just refute the suggestion that we were slow to sell down. We reduced our position in a lawful and an orderly manner, I think, with respect to the challenge we actually faced. And I think as far as I can tell, in terms of looking at the prices we achieved compared to the other prime brokers, the exit prices were broadly similar over the period of time. That's the point I'd make first."

- ". . . it is an exceptional event. . . But that said, I think as Thomas has summarized, we've obviously conducted an immediate read-across to anything similar, any other immediate lessons learned to ensure that that is not the case within the rest of our prime portfolio. And we're obviously very focused on the investigation review that the Board of Directors is leading in terms of the longer-term lessons to be learned around this particular position." *Id.* ¶ 70.

- An analyst asked "if 'the underlying implication of' Defendant Mathers' response that Credit Suisse achieved comparable prices to other prime brokers in liquidating its Archegos position(s) was 'that the entirety of the CH5 billion loss is due to poor collateral or poor margin management' relative to its peers." Mathers replied, "[Y]ou can't make that direct link. Although, clearly, the level of margining and collateral will be very much in scope for the review that the Board is conducting into the US hedge fund matter and it's clearly a risk factor in terms of this. But it's not a direct deduction from what you said." *Id.* ¶ 71.

- "[O]n Archegos early learnings, clearly, one of the early learnings is that the disclosure has to be improved around especially family offices in that business . . . . So, these are all elements that we are extremely focused and on which basis we have done the first analysis of the entire book. But there will certainly be more learnings to come through as we go through the next few weeks in terms of the review that we're doing internally, but also that will be done as part of our external review with our regulators. This is an isolated case. Look, I definitely hope it is, and I think it is. But we are obviously reviewing the entire bank now, just to make sure that our risk processes and systems are where they should be.

Clearly, historically, the prime business has not been subject to major losses and that is now our prime focus. But we are, together with Christian Meissner, the first line of defense, but also the second line of defense, our new chief risk officer and the head of risk for the Investment Bank, are doing a special effort now to review the entire division." *Id.* ¶ 72.

- "Yeah, we are doing a comprehensive review. Obviously, that's something that we owe to ourselves and to our stakeholders that we – after such a shock loss that we had, we have to review that in detail." *Id.* ¶ 73.

Plaintiff asserts that the above statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) that "the investigations into the failure of the Greensill Funds and Archegos losses were largely smokescreens: Defendants were not conducting a 'comprehensive review' of risk, 'reviewing the entire bank' to make sure their 'risk processes and systems are where they should be,' addressing 'immediate lessons learned' and 'broader consequences and lessons learned across the bank,' or 'addressing these situations through a series of decisive actions in the business;'" (2) "[a]t the time, Credit Suisse's business was not 'already being strengthened,' nor would it 'be further enhanced following first and second line risk management assessments;'" (3) "Defendants did not make any meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time throughout the Class Period;" (4) "the departures of Chin and Lara would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies, as their departures could not address the underlying issues which led to the Greensill Funds and Archegos losses;" (5) "a 'direct link' between the Company's risk management issues and the Archegos losses could be made, as later events demonstrated;" (6) "the characterization of Archegos as a 'family office' was misleading because it minimized the role Defendants' risk management and control deficiencies played;" and (7) "[t]he statements also

omitted that there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶¶ 74–75.

Plaintiff's allegations fail because the statements themselves are immaterial, or because he has not satisfied the pleading standards of Rule 9(b) and of the PSLRA – he has not stated with the required particularity the reason or reasons these statements were false and/or misleading at the time they were made, rather than with the benefit of hindsight. First, in connection with Plaintiff's claim that the investigations into the failure of the Greensill Funds and Archegos losses were "largely smokescreens," he has not alleged *any facts* contradicting the veracity of the Defendants' representations about the investigations, or indicating that Defendants' representations about the investigations were false or misleading. *See In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F.Supp.2d 572, 578 (S.D.N.Y. 2012). Not a single fact is alleged tending to show that Defendants were not conducting a "comprehensive review" of the Bank's risk; that they were not "reviewing the entire bank" to make sure their "risk processes and systems are where they should be;" that they were not addressing "immediate lessons learned" and "broader consequences and lessons learned across the bank;" or that they were not "addressing these situations" through what management reasonably believed were "a series of decisive actions in the business." Ultimately, of course, the steps taken by management during the Class Period would not be able to reverse years of pre-Class Period mismanagement. But that would only become clear many months later.

Next, Gottstein's comments on strengthening and enhancing related risk and control governance are not actionable, as they "are no more than 'puffery' which does not give rise to securities violations." *ECA*, 553 F.3d at 206. "[T]hese statements did not, and could not, amount to a guarantee that [the Company's] choices would prevent failures in its risk management

41

practices," and they are prime examples of statements that are far "too general to cause a reasonable investor to rely on them." *Id.*

Additionally, Plaintiff takes issue with Mathers' characterization of Archegos as a family office – rather than, presumably, a hedge fund. Plaintiff has not alleged any facts allegations suggesting such a characterization was inaccurate, and "Defendants cannot be held liable for statements that were true when made." *In re Symbol Tech. Class Action Litig.*, 950 F.Supp. 1237, 1242 (E.D.N.Y. 1997). And even if this characterization about the nature of Archegos was erroneous, that error would not rise to the level of a material misstatement about Credit Suisse and the value of its securities. What is material – Credit Suisse's extensive losses from its investment in Archegos – occurred prior to the beginning of the Class Period and was a matter of public record at the commencement of the Class Period. *See* Compl. ¶ 4. A reasonable investor could easily have located information about Archegos in the public record; like virtually every other such enterprise, it had an internet presence.

Plaintiff has claimed that Defendants did not make any *meaningful* changes to Credit Suisse's risk management and/or control governance procedures and/or policies. For this he relies on the eventual collapse of the Company. But what Plaintiff fails to allege is that the Bank's officers and directors knew that the steps they were taking would prove inadequate at the time they set out on their corrective course. Absent such allegations – which are entirely absent from the Amended Complaint – Plaintiff fails to plead specific facts in support of this allegation. Plaintiff's claim that the executive departures would have no *meaningful* effect on the Company's risk management and/or control governance procedures and/or policies is deficient due to his failure to plead with specificity that Defendants knew, at the time of the statements/omissions, that the executive departures would not have a meaningful effect on the unspecified procedures and/or

policies. *City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. RyanAir Holdings PLC*, No. 18-CV-10330, 2020 WL 2834857, at *7 (S.D.N.Y. June 1, 2020).

Additionally, whether the changes that Credit Suisse announced would work could only be evaluated in the future – they relate to events that had yet to unfold. Expressions of hope, or even confidence, that the changes Credit Suisse was making would have a positive impact on the Bank's financial posture are not actionable. *See Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F.Supp.3d 353, 363 (S.D.N.Y. 2019), *aff'd*, 826 F. App'x 111 (2d Cir. 2020). Plaintiff's contention that there was "a 'direct link' between the Company's risk management issues and the Archegos losses" does not render any of these predictive statements either false when made or material. Again, he has not pleaded any supporting facts tending to show that, at the time of the Bank's disclosures, management knew that the steps they were taking to address outstanding issues would prove inadequate. Overall, Plaintiff's allegations are conclusory, based on hindsight, *see Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, 902 F.Supp.2d 329, 342 (S.D.N.Y. 2012), and insufficient to plead fraud. *Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F.Supp.2d 673, 690 (S.D.N.Y. 2012) (collecting cases).

Further, many of the challenged statements from the Earnings Conference include "quintessentially forward-looking language," *In re Phillip Morris Int'l Inc., Sec. Litig.*, 89 F.4th 408, 428 (2d Cir. 2023) (emphasis omitted), and the truth of such statements could not be ascertained until some time after the statements were made, *Bear Stearns*, 763 F.Supp.2d at 493 (citations omitted). Gottstein spoke about what *will* be the focus of the Company's investigations, how the Company *will* work to ensure Credit Suisse emerges stronger, and how the Company *will* work closely with the relevant regulators including FINMA. Compl. ¶ 67. Mathers talked about how the Company *will* be focusing on its prime business around clients that have "multiple

connectivity" to Credit Suisse, how the Company *will* be de-focusing on clients that have much less connection across the bank, *id.* ¶ 69, and how there *will* certainly be more learnings to come through as the Company continues with its internal and external reviews, *id.* ¶ 72. None of these statements is actionable, as Plaintiff has not offered any allegations that indicate that Gottstein and Mathers made such statements with actual knowledge that they were false or misleading. *See* 15 U.S.C. § 78u–5(c).

Finally, not only is Plaintiff's assertion that the Defendants omitted that there existed material weaknesses in the Company's ICFR not actionable under Rule 10b-5(b) as a pure omission, *Macquarie*, 601 U.S. at 266, but also his assertion is not sufficiently particularized to survive a motion to dismiss. *Salim v. Mobile Telesystems PJSC*, No. 19-cv-1589, 2021 WL 796088, at *11 (E.D.N.Y. Mar. 1, 2021). Throughout the Complaint, Plaintiff seizes onto the general refrain that "there existed material weaknesses in the Company's [ICFR]" – and in fact, it would be revealed in March 2023 that there were such weaknesses during both 2021 and 2022, Compl. ¶ 341 – but Plaintiff fails to plead any facts tending to show that the Defendants were aware of those weaknesses at the time the challenged statements were made. This "fall[s] short of satisfying the exacting (specificity) pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the [PSLRA]," *Emps.' Ret. Sys. of City of Providence v. Embraer S.A.*, No. 16 Civ. 6277, 2018 WL 1725574, at *10 (S.D.N.Y. Mar. 30, 2018) (citation omitted), and does not establish that the Company's statements were false or misleading.

## VII.    April 22, 2021: First Quarter 2021 Press Conference

As above, excerpts from the Company's First Quarter 2021 Press Conference extend for several pages in the Complaint. Compl. ¶¶ 77–81. They contain multiple "statements" that take up page after page of the pleading. I again assume that, by putting certain representations in bold-

faced type, Plaintiff is asserting that the bolded language contains the misstatements that form the

basis of his cause of action, with the rest of the quoted statement in the pleading providing context.

All of the following appears in bold-faced type in the Complaint:

<u>Defendant Gottstein</u>:

- "What is very clear, this was an idiosyncratic situation with an underlying exposure that had explosive growth over the few months that led up to this incident . . . . And we are going now through the entire portfolio, which we have done already and will continue to do in all detail. We will reduce our risk exposures . . . . And we'll take then the right lessons learned from it. We are working very closely with risk and control staff, both in the first line and second line of defense." *Id.* ¶ 77.

- "It's clear that a family office like that did not disclose the positions like a normal hedge fund would do." *Id.* ¶ 78.

- "And there you see the net new assets in Switzerland, CHF 2.2 billion; IWM, CHF 7.2 billion; APAC, CHF 5.4 billion. So that's roughly half of the CHF 28 billion. The other half is in institutional asset management. From divisional perspective and from a timing perspective, they came through in a pretty steady way through all 3 months in the first quarter. . . . But we have not seen any significant flows in either direction. So there has been a very strong client engagement, continues to be very strong client engagement and very positive flows both in terms of divisional perspective as well as from a regional perspective. . . . [W]e obviously have to take the right hard look at variable compensation given the loss we had." *Id.* ¶ 80.

- "[T]he underlying results show that the strategy per se was working. . . . We have a new Chairman who starts on the 1st of May, and then we will sit down together and have these discussions." *Id.* ¶ 81.

<u>Defendant Mathers</u>:

- When questioned about whether the source of the Archegos loss was due to the fact that Credit Suisse "had higher leverage than [its] competitors?", Defendant Mathers responded: "Clearly, we'll look at margining, we'll look at collateral, but we also have to look at concentration risk around these positions, too. But there's a number of factors that actually drives this result, including the balance of long-term shorts." *Id.* ¶ 79.

Plaintiff asserts that the above statements were materially false and/or misleading because they

misrepresented and failed to disclose the following adverse facts known to or recklessly

disregarded by the Defendants: (1) "the Company was not going to 'reduce [its] risk exposure' and

'the right lessons' would not be 'learned' from the Greensill Funds or Archegos scandals, as Defendants did not implement any meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time not at any time during the Class Period;" (2) "the risk limits with respect to Archegos were not exceeded because 'a family office like that did not disclose the positions like a normal hedge fund would do' but, rather, the Company's liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times;" (3) "the classification of the recent losses as merely an 'idiosyncratic situation' and 'two disappointing incidents' likewise ignores Credit Suisse's underlying risk management issues;" (4) "the Company's 'strategy' was not 'working' and was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices, and stemmed from a culture of poor risk discipline;" (5) "the Company was not experiencing 'very positive flows,' but instead was experiencing significant and unusual customer and/or asset outflows;" and (6) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 82.

Plaintiff's "speculative, conclusory allegations . . . provide no particularized basis for relief under the securities laws. . . ." *Pollio v. MF Glob., Ltd.*, 608 F.Supp.2d 564, 575 (S.D.N.Y. 2009). Plaintiff first targets statements where Gottstein states, "We will reduce our risk exposures," and "we'll take then the right lessons learned from it." Compl. ¶ 77. Once again, these are "forward-looking statements squarely protected by the 'safe harbor' provision of the PSLRA." *Hutchinson v. Perez*, No. 12 Civ. 1073, 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012) (citing 15 U.S.C. § 78u–5(i)1(A),(B)). "The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was

false or misleading." *Slayton*, 604 F.3d at 766 (emphasis in original) (citation omitted). Since Plaintiff fails to plead any facts indicating that Gottstein's statements were actually known to be false or misleading, "the fate of such statements is clear." *Hutchinson*, 2012 WL 5451258, at *8.

Additionally, Plaintiff's argument proceeds from the premise that because the Company ultimately failed in 2023, the changes Defendants made to the Company's risk management and/or control governance procedures and/or policies in the First Quarter of 2021 were not "meaningful," and so the disclosures were false. But Plaintiff pleads no fact tending to show that management knew it was undertaking what would ultimately prove fruitless. Instead, we have here pure fraud by hindsight pleading, which is not actionable under Section 10(b) and Rule 10b-5. *See Bank of Am. – ERISA*, 2012 WL 1353523, at *4. It could not be known in 2021 that the changes being made by Credit Suisse's management would ultimately not be what was needed to save the Bank from collapse.

Next, Plaintiff's conclusory allegation that the Archegos risk limits were exceeded because of Credit Suisse's liquidity deficiencies is not supported by any facts; thus, it is insufficient. *See ATSI*, 493 F.3d at 99. Similarly, Plaintiff has done nothing more than assert in a conclusory fashion that some of the Company's representations "ignore[] Credit Suisse's underlying risk management issues," and that the Company's strategy was "fundamentally flawed" for a variety of reasons – none of which is supported by any specific facts. *See Lasker v. N.Y. State Elec. & Gas Corp.*, No. 94-cv-3781, 1995 WL 867881, at *10 (E.D.N.Y. Aug. 22, 1995).

Plaintiff also criticizes Gottstein's "classification of the recent losses as merely an 'idiosyncratic situation' and 'two disappointing incidents.'" But Gottstein's disclosures are not deficient because of his failure to characterize the recent losses in a certain way. *See Singh*, 106 F.Supp.3d at 448. "[S]o long as material facts are disclosed . . . it is not deceptive to fail to

'characterize' those facts with 'pejorative nouns and adjectives,' or to fail to verbalize all adverse inferences expressly." *Klamberg v. Roth*, 473 F.Supp. 544, 551 (S.D.N.Y. 1979) (quoting *Goldberg v. Meridor*, 567 F.2d 209, 218 n.8 (2d Cir. 1977)) (collecting cases). The full amount of the losses in Greensill ($3 billion), Compl. ¶ 5, and Archegos ($5.5 billion), *id.* ¶ 6; *see also id.* ¶ 100, was disclosed when known. Nothing more was required.

Regarding the alleged significant and unusual customer and/or asset outflows, "plaintiff[] fail[s] to adequately describe the facts upon which [he] base[s] [his] beliefs. . . . Plaintiff[] cite[s] no reports or data supporting the existence of . . . these alleged trends, and therefore fail[s] to state facts on which [his] belief of fraud could reasonably be based." *Garber v. Legg Mason, Inc.*, 537 F.Supp.2d 597, 616 (S.D.N.Y. 2008). Gottstein disclosed that there were outflows in specific amounts; he also disclosed that there were inflows ("in both directions"). No fact is pleaded tending to show that this statement was false.

And again, Plaintiff has not alleged any facts explaining his claim that there existed material weaknesses in Credit Suisse's ICFR at the time the Defendants made the challenged statements. *Janbay*, 2013 WL 1287326, at *9. Nor has he alleged any facts that would so relate any failure to disclose that fact (were it adequately supported, which it is not) to the April 22, 2021 statements made by Gottstein and Mathers. *See Macquarie*, 601 U.S. at 264.

## VIII.  April 30, 2021: Annual General Meeting of Shareholders

Excerpts from the Company's Annual General Meeting of Shareholders extend for several pages in the Complaint. Compl. ¶¶ 84–85. They contain multiple "statements." The statements quoted below are those that the Plaintiff has placed in bold-faced type, which the Court assumes are the alleged misstatements, with the unbolded language in the pleading providing context.

*Defendant Gottstein*:

- "The significant loss in our prime services business relating to the failure of a U.S. prime brokerage client is unacceptable."

- "We have taken decisive actions, which include the following: first, significant personnel and organizational changes at the Executive Board level and the echelons directly below them."

- "Third, the strengthening of risk controls, including forensic analysis of the 2 incidents. In addition, we are conducting an overall review of risk systems, processes and culture across the bank and are significantly reducing our risk positions in the prime services business."

- "Fifth, the Board of Directors has launched 2 independent investigations carried out by external parties. These will also reflect on the broader consequences and lessons learned."

- "I'm confident that we will draw the right conclusions with the aim of making sure that events of this kind never happen again. We are dedicated to ensuring that Credit Suisse will emerge stronger from the situation. However, I would like to reassure you that even as we diligently address these issues, we remain well positioned to support our clients globally."

- "I see my role now, together with the new Chairman and the rest of the Board of Directors and my colleagues of the Executive Board, is to steer Credit Suisse back into calmer waters. I'm proud to lead this bank, and I am confident about the future."

- I therefore assure you that my management team and I, together with our employees, will do everything we can to bring back the best of the bank to you, our valued shareholders, ladies and gentlemen." *Id.* ¶ 84.

*Defendant Horta-Osório*:

- "What has happened with Credit Suisse over the last 8 weeks with the U.S.- based hedge funds and the supply chain finance funds matters certainly goes beyond that. Important lessons have to be learned and decisions taken accordingly in a transparent, thoughtful and decisive way. In the months to come, my focus will be on 3 areas."

- "First, risk management. The current and potential risk of Credit Suisse need to be a matter of immediate and close scrutiny. I firmly believe that any banker should be, at heart, a risk manager. Together with the Board and management, I will have a thorough look at how risks are being assessed, managed and controlled."

- "We will take the time required for an in-depth assessment of the bank's strategic options. This will be done with a long-term perspective not losing sight of the short-term needs. Then we will decide on a course of action and closely oversee the execution."

- "We need to foster a culture that reinforces the importance of risk management, ensures that we have the right incentives in place including on remuneration and focuses on personal responsibility and accountability, a culture where every single employee can be proud of what we stand for and how we act. The Board and I will do this together with the management team led by Thomas Gottstein." *Id.* ¶ 85.

Plaintiff asserts that Gottstein and Horta-Osório's statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "[d]espite Defendant Gottstein's personal guarantee that he would 'steer Credit Suisse back into calmer waters,' as later events revealed, Defendants did not implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies at this time or throughout the Class Period, demonstrating that the investigations into the failure of the Greensill Funds and Archegos losses were shams: Defendants were not conducting 'an overall review of risk systems, processes and culture across the bank,' there would be no 'important lessons…learned,' nor would they 'draw the right conclusions' or 'reflect on the broader consequences and lessons learned;'" (2) "Defendants never changed the Company's policies or incentives relating to remuneration;" (3) "like the other personnel changes, the 'resignation' of Chairman of the Board of Directors Urs Rohner and appointment of Defendant Horta-Osório as Chairman of the Board of Directors would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 86.

I hate to sound like a broken record, but here we are again in fraud by hindsight land. Plaintiff relies on "later events" in an effort to establish why certain of Gottstein's statements/omissions were allegedly false or misleading at the time they were made, without alleging a single fact tending to show that Gottstein did not believe that the way Credit Suisse was

dealing with an adverse situation would not work. Corporate officials "are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 308 (citation omitted). Information that was revealed by later events does not fall into that category.

Plaintiff's contention that Defendants somehow misrepresented or failed to disclose that "investigations into the failure of the Greensill Funds and the Archegos losses were shams," that the Defendants did not change the Company's remuneration policies, and that the executive departures and appointments would have no meaningful effect on unspecified risk management and/or control governance procedures and/or policies similarly fail because Plaintiff has not pled contemporaneous falsity, *see City of Birmingham*, 2020 WL 2834857, at *7, and because his allegations are "entirely vague and conclusory." *In re NBTY, Inc. Sec. Litig.*, 224 F.Supp.2d 482, 493 (E.D.N.Y. 2002). As to Plaintiff's repeated claim that there existed material weaknesses in the Company's ICFR – again, nothing is pleaded that would so relate that information to these statements so as to render the challenged statements false and/or misleading. *See Macquarie*, 601 U.S. at 264.

Additionally, though Plaintiff characterizes a portion of Gottstein's comments as a "personal guarantee" to "steer Credit Suisse back into calmer waters," that portion "conveys no meaningful, objective data that an investor would rely upon." Rather, it qualifies as the type of hopeful "assertion that courts have found immaterial." *Billhofer v. Flamel Tech., S.A.*, No. 07 Civ. 9920, 2012 WL 3079186, at *9 (S.D.N.Y. July 30, 2012) (citations omitted). It is also an opinion-based statement: Gottstein says, "I see my role now . . . is to steer Credit Suisse back into calmer waters." Compl. ¶ 84; *see Bank of Am. – ERISA*, 2012 WL 1353523, at *6. "[T]o allege actionable fraud for an opinion-based statement, a plaintiff must allege that the defendant did not actually believe the stated opinion." *Bank of Am. – ERISA*, 2012 WL 1353523, at *6 (citation and internal

quotation marks omitted). Plaintiff makes no plausible or particularized allegation indicating that Gottstein did not truly believe it was his mission to steer Credit Suisse back into calmer waters. Absent that, there is nothing actionable here.

### IX.    May 6, 2021: First Quarter 2021 Report

Plaintiff challenges language in the following excerpt from the Company's 1Q21 Quarterly Report:

> Following the US-based hedge fund matter, we have reviewed exposures across the prime services business. ***The related risk and control governance is being strengthened and will be further enhanced after rigorous first and second line risk management assessments.*** We expect that our prime brokerage and prime financing businesses will be resized with a primary focus on continuing to serve our most important franchise clients. By the end of 2021, we also expect to reduce leverage exposure in the Investment Bank by at least USD 35 billion and to align risk-weighted assets in the Investment Bank to no more than end-2020 levels.

> \*    \*    \*

> Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. We achieve this through a conservative asset/liability management strategy aimed at maintaining long-term funding, including stable deposits, in excess of illiquid assets. ***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to 37 sustain operations for a period of time in excess of our minimum limit.***

> \*    \*    \*

> The Board has initiated an externally-led investigation into each of these matters, both of which will be supervised by a special committee of the Board. We have also undertaken senior management changes within the Investment Bank division and within the Risk and Compliance organization in response to these matters. In addition, effective April 1, 2021, we have established Asset Management as a separate division, and the Board appointed a new CEO of Asset Management. ***We are carrying out a Group-wide review of risk appetite, risk positions and business and risk processes in close cooperation with the Board and external advisors. With respect to the US-based hedge fund matter, we have***

> *performed an extensive review of our prime services business, focused on underlying*
> *risk positions as well as related counterparties. The related risk and control governance*
> *is being strengthened and will be further enhanced after rigorous first and second line*
> *risk management assessments. This includes enhancing our due diligence across Asset*
> *Management following the supply chain finance funds matter. In connection with these*
> *reviews, we also intend to apply lessons learned from recent matters across the bank*."

Compl. ¶ 87. According to Plaintiff, the above language is materially false and/or misleading because it misrepresents and fails to disclose the following adverse facts that were known to or recklessly disregarded by the Defendants: (1) "as evidenced by the fact that Defendants did not implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies at this time, or throughout the Class Period, Defendants did not, in fact 'perform[] an extensive review of our prime services business;'" (2) "the Company had not 'strengthened' and would not 'further enhance[]' its risk and control governance;" (3) "the changes in management would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies;" (4) "the company did not maintain a 'sufficient' liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not 'conservative' and were materially deficient at all times; and (5) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 88.

These statements are not actionable under Section 10(b). Since the Complaint does not allege any particularized facts tending to suggest that the Defendants did not implement changes to Company procedures and/or policies or that they did not perform an extensive review of the Company's prime services business – or, for that matter, that they had no intention of doing so on May 6, 2021, when these statements were made – these conclusory allegations do not allege contemporaneous falsity. *See In re Gentiva Sec. Litig.*, 932 F.Supp.2d 352, 370 (E.D.N.Y. 2013). It is a complete non sequitur to assert that the ultimate failure to make meaningful changes means that the Company did not perform an extensive review. Moreover, whether any changes resulting

from the review would prove "meaningful" was something that could only be ascertained after those changes were implemented.

Additionally, not only has Plaintiff failed to allege how the statements about the Company's liquidity were false when made, *see In re Nokia Corp. Sec. Litig.*, No. 96 CIV. 3752, 1998 WL 150963, at *9 (S.D.N.Y. Apr. 1, 1998), but those statements – which touch on Company's beliefs and expectations about its "conservative" "liquidity stress assumptions" and "liquidity pool" – are "classic examples of puffery." *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F.Supp.2d 569, 597 (S.D.N.Y. 2010) (citation omitted). They "are the types of general statements that investors are unlikely to rely on." *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. FXCM Inc.*, 333 F.Supp.3d 338, 349 (S.D.N.Y. 2018) (collecting cases). For example, in *FXCM*, the Court found that FXCM's statements that it had a "fairly conservative margin policy," "maintained a substantial pool of liquidity," and "maintained excess regulatory capital" not actionable on that exact basis. *Id.* Similarly, the challenged statements about the Company strengthening and enhancing its risk and control governance are non-actionable general expressions of puffery and corporate optimism. *Meyer v. Organogenesis Holdings Inc.*, No. 21-cv-06845, 2024 WL 1346432, at *15 (E.D.N.Y. Mar. 29, 2024).

Additionally, "Plaintiff has not said anything specific about the nature of the alleged deficiencies in [Credit Suisse's] control environment. [He] asks the Court instead to infer that [Credit Suisse's] statements 'must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures.'" *Arora v. HDFC Bank*, 671 F.Supp.3d 305, 315 (E.D.N.Y. 2023) (quoting *Banco Bradesco*, 277 F. Supp. 3d at 648) (emphasis removed). But nothing in the Complaint suggests that management was aware of any control deficiencies on the day this statement was released. Moreover, nothing in the excerpt from the Company's First

54

Quarter 2021 Report relates to the issue of the Company's ICFR, thus rendering the "adverse fact" of the alleged existence of material weaknesses in the Company's ICFR a pure omission. *See Macquarie*, 601 U.S. at 264.

Plaintiff also challenges the Company's First Quarter 2021 Report based on the following disclosure:

> The accompanying unaudited condensed consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and notes thereto for the year ended December 31, 2020 included in the Credit Suisse Annual Report 2020.

Compl. ¶ 312. He claims that this disclosure was materially false or misleading, or omitted information necessary to make them not misleading, because the First Quarter 2021 Report did not comply with GAAP, but rather "resulted from a series of decisions by Defendants designed to conceal the truth regarding Credit Suisse's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. As a result, Defendants materially misstated the Company's financial results . . . ." *Id.* ¶ 314.

"Financial statements ... which are not prepared in accordance with GAAP are presumptively ... misleading or inaccurate." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (omissions in original) (internal brackets omitted) (quoting 17 C.F.R. § 210.4-01(a)(1)), *cert. granted sub nom. Leidos, Inc. v. Ind. Pub. Ret. Sys.*, —— U.S. ——, 137 S.Ct. 1395, 197 L.Ed.2d 553 (2017), and *cert. dismissed sub nom. Leidos, Inc. v. Ind. Pub. Ret. Sys.*, —— U.S. ——, 138 S.Ct. 2670 (2018). Nevertheless, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Id.* (quoting

*Novak*, 216 F.3d at 309). "Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.* (quoting *Novak*, 216 F.3d at 309).

Under Fed. R. Civ. P. 9(b) and the PSLRA, "[w]here improper accounting under GAAP is alleged," *Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *12 (S.D.N.Y. Aug. 22, 2005), a plaintiff "must provide at the very least some level of detail about the improper accounting alleged to underlie misleading statements, and their materiality, in order to survive the motion to dismiss phase," *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291, 2004 WL 2210269, *13 (S.D.N.Y. Sept. 30, 2004) (citation omitted). Plaintiff does not identify any specific provision of GAAP that the Credit Suisse Defendants allegedly violated. Merely stating – and repeating in his opposition papers, CS Opp. Memo, at 20 – that there were inaccuracies within the financial statements is vague and insufficient. And though Plaintiff cites to several rules and regulations in the Complaint (Federal Accounting Standards Advisory Board ("FASB") Statement of Concepts No. 1, SEC Regulation S-X, SEC Rule 4-01(a) of SEC Regulation S-X, Compl. ¶¶ 309–11), none of these rules and regulations establishes a GAAP violation. According to the FASB, a statement of Financial Accounting Concepts does not establish generally accepted accounting standards. *Harris v. AmTrust Fin. Servs., Inc.*, 135 F.Supp.3d 155, 171 n.28 (S.D.N.Y. 2015) (citation omitted). Nor is SEC Regulation S-X – which sets out what must be included in financial statements and delegates the authority to promulgate GAAP to the FASB – the same thing as GAAP. *Id.* In sum, the Court finds that the Plaintiff has failed to allege with the required particularity any facts that support his claim that First Quarter 2021 Report was materially false and misleading because it did not comply with GAAP and SEC Rules. *Id.* at 172; Compl. ¶¶ 314, 317.

X.    **July 1, 2021: Defendant Horta-Osório Interview with *Neue Zürcher Zeitung***

Plaintiff challenges portions of a *Reuters* summary of Defendant Horta-Osório's Interview

with *Neue Zürcher Zeitung*, Compl. ¶ 89:

> Credit Suisse (CSGN.S) expects to decide on a new strategy by the end of the year,
> Chairman Antonio Horta-Osorio said in his first interview since assuming the role at the
> troubled lender.
>
> *        *        *
>
> Describing his first seven weeks in the job -- during which he met with employees, as well
> as Swiss politicians and Swiss, U.S. and British regulators -- as "intensive," Horta-Osorio
> said the bank ***needed a realignment that would clear up short-term crises but also position
> it for the long term.***
>
> "I have a clear picture of the direction the bank must take," he said in the interview with
> Swiss newspaper Neue Zuercher Zeitung published on Thursday. "For me the question
> isn't, 'what do we need to do to ensure it works this time?' The question is much more,
> 'why isn't the bank making progress, despite having a fantastic group of wealth
> management clients in Switzerland, Europe and high-growth Asia?'" he said, adding the
> bank's major strength lay in serving entrepreneurs and wealthy families.
>
> "We need to agree on how we can best serve these customers and on where we are most
> competitive - on what that means for the bank as a whole," he said. ***To ensure success, the
> bank would need not only the right strategic direction, but also 'the right people in the
> right place," he added.***
>
> Describing the recent failings at Switzerland's second-largest bank as unacceptable, Horta-
> Osorio compared the 165-year-old lender to a racecar driving on a highway with its wheels
> on wrong and promised no quick fixes, saying cultural shifts take time.
>
> *        *        *
>
> Asked about the future of the investment bank, Horta-Osorio said it was too soon to
> anticipate the outcome of the board's discussions. 'We're in the beginning phase of a new
> strategic positioning,' he said." *Id.* ¶ 90.

Plaintiff finds the above statements materially false and/or misleading because they misrepresent

and fail to disclose an adverse fact known to or recklessly disregarded by the Defendants – that

"Credit Suisse's new 'strategy' was fundamentally flawed, as it was predicated on unsustainable

investment approaches that contravened risk management and/or control governance best practices. *Id.* ¶ 91.

The challenged language amounts to typical corporate puffery. *See ITT*, 859 F.Supp.2d at 580. Horta-Osório's comments are so broad and generic that no reasonable purchaser or acquirer of Credit Suisse securities in domestic transactions during the Class Period would view Horta-Osório's comments as meaningfully altering the mix of available information about the Company, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 Fed.Appx. 32, 37 (2d Cir. 2012), and thus, would not rely on them. *See In re Nokia Corp. Sec. Litig.*, No. 19-cv-3982, 2021 WL 1199030, at *17 (S.D.N.Y. Mar. 29, 2021) (citations omitted).

Not only has Plaintiff challenged language routinely deemed immaterial as a matter of law, *see, e.g.*, *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F.Supp.2d 364, 397 (S.D.N.Y. 2006), but he also has failed to plead falsity. Plaintiff's claim that Credit Suisse's strategy was "predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices" is unsupported by any sort of particularized allegation that even suggests that management believed this to be the case. *See Rombach*, 355 F.3d at 172. There is certainly no allegation that the changes Credit Suisse announced were not in fact made – only that they would later prove to be ineffectual, which is classic fraud by hindsight pleading. *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F.Supp.3d 196, 217 (S.D.N.Y. 2018).

## XI.    July 27, 2021: David Wildermuth Appointment Media Release

Plaintiff challenges language from the Company's media release announcing the appointment of David Wildermuth as the Company's Chief Risk Officer and as a member of its Executive Board as of February 1, 2022:

> António Horta-Osório, Chairman of Credit Suisse, said: "I am delighted to welcome David to Credit Suisse, *where he will help shape the Group's enhanced risk management framework, an essential part of the bank's strategic realignment currently underway.* David will contribute a wealth of experience and deep professional insights, having served more than three decades in various senior roles in the financial services industry."

> Thomas Gottstein, Group CEO, said: "David joins with an impressive track record, underlining our firm commitment to further enhance our risk management across the bank. *He is the right person to lead and further strengthen our risk organization.* I look forward to closely working with David in his new role and as a member of the Executive Board. At the same time, I would like to thank Joachim for accepting to perform the role as ad interim Chief Risk Officer in early April when the bank needed his experience and technical knowhow. *Joachim was instrumental in leading the various risk-mitigation initiatives over the past few challenging months and we are fortunate to be able to continue to count on his leadership during the coming months until David joins us and thereafter.*"

Compl. ¶ 92. This, according to Plaintiff, is materially false and/or misleading because it misrepresents and fails to disclose certain adverse facts known to or recklessly disregarded by Defendants: (1) "just like the other personnel changes, Wildermuth's appointment as Chief Risk Officer would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period;" and (2) "the Company was not formulating an 'enhanced risk management framework,' nor had it engaged in 'various risk-mitigation initiatives,' as Defendants never implemented meaningful changes to Credit Suisse's deficient risk management and/or control governance procedures and/or policies in the wake of the Greensill Funds or Archegos scandals, or at any time throughout the Class Period." *Id.* ¶ 93.

The challenged statements singing Wildermuth's praises and thanking Joachim for his tenure as the Company's Chief Risk Officer "are textbook cases of corporate puffery or optimism,"

*Schaffer v. Horizon Pharma PLC*, No. 16-cv-1763, 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018), and are "too general to cause a reasonable investor to rely upon them." *City of Westland Police & Fire Ret. Sys.*, 129 F. Supp. 3d at 77. Thus, they are not actionable under the securities laws. *Schaffer*, 2018 WL 481883, at *9.

"Moreover, even if the complained-of statement were material statements of fact, the Amended Complaint does not allege that they were false or misleading." *CBS*, 433 F.Supp.3d at 535. Plaintiff has failed to allege any particularized facts supporting the conclusion that at the time the above statements were made, Defendants knew or recklessly disregarded that the personnel changes would in the end have no meaningful effect on Company risk management and/or control governance procedures and policies, or that the Company was not engaging in the actions described in the Media Release. Rather, Plaintiff's reasoning "constitute[s] classic fraud by hindsight." *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, No. 21 Civ. 4390, 2023 WL 3569068, at *11 (S.D.N.Y. May 19, 2023). Plaintiff can only reach the conclusions that there was "no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies," and that the Defendants "never implemented meaningful changes to Credit Suisse's deficient risk management and/or control governance procedures and/or policies," Compl. ¶ 93, because "the future did not unfold exactly how [the Company] had hoped." *Plymouth*, 2023 WL 3569068, at *11. "With nothing else, Plaintiff['s] argument collapses to merely a quarrel with [Credit Suisse's] inability to accurately predict the future. Such arguments do not pass muster as sufficient to sustain claims of fraud." *Id.*

## XII.    July 29, 2021: Archegos Media Release and Report

Plaintiff takes issue with the following language summarizing the conclusions of Paul, Weiss's independent external investigation into the Company's dealings with Archegos:

Among some of the key conclusions, the investigation found a failure to effectively manage risk in the Investment Bank's Prime Services business by both the first and second lines of defense as well as a lack of risk escalation. In the same business, it also found a failure to control limit excesses across both lines of defense as a result of an insufficient discharge of supervisory responsibilities in the Investment Bank and in Risk, as well as a lack of prioritization of risk mitigation and enhancement measures (such as dynamic margining).

**However, the investigation also found that this was not a situation where the business and risk personnel engaged in fraudulent or illegal conduct or acted with ill intent. Nor was it one where the architecture of risk controls and processes was lacking, or the existing risk systems failed to operate sufficiently to identify critical risks and related concerns.**"

António Horta-Osório, Chairman of Credit Suisse, said: "While **the bank has already taken a series of decisive actions to strengthen the risk framework**, we are determined to learn all the right lessons and further enhance our control functions to ensure that we emerge stronge**r. We are committed to developing a culture of personal responsibility and accountability, where employees are, at heart, risk managers; know exactly what they must do; escalate any concerns; and are responsible for their actions.** Such a culture is of critical importance and, by working relentlessly on this goal, we can create lasting change and value for both clients and shareholders."

Compl. ¶ 94. Plaintiff states that the above representations were materially false and/or misleading because they misrepresent and failed to disclose the following facts known to or recklessly disregarded by the Defendants: (1) "the Company's 'risk controls and processes were 'lacking,' both at this time and as of the time of Archegos' failure;" and (2) "the Company had not taken 'decisive actions to strengthen the risk framework,' as Defendants did not implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies at this time or throughout the Class Period." *Id.* ¶ 95.

These particular disclosures purport to summarize the findings of the Paul, Weiss investigation. Plaintiff does not allege that these were not the findings of the Paul, Weiss investigation. He does not point to anything in the Paul, Weiss report that contradicts any of the statements made in this disclosure, or that indicates that the disclosures had been found by the investigators to be incorrect. Instead, he effectively argues that the conclusions of the report were

wrong. Even were that so, it would not make statements that accurately describe the results of the investigation either false or misleading. *See Plymouth*, 2023 WL 3569068, at *9.

Similarly, Plaintiff does not allege any *facts* to support his allegation that Horta-Osório's claim that the Company had taken decisive actions to strengthen its risk framework was false and/or misleading when made. *See Nokia*, 1998 WL 150963, at *9. This is especially true since Horta-Osorio's statement is plainly directed to what the Company hoped to do in the future: "learn all the right lessons and further enhance our control functions to ensure that we emerge stronger," and "develop[] a culture of personal responsibility and accountability." Such statements by their nature cannot possibly be either false or misleading.[4]

### XIII.   July 29, 2021: Second Quarter 2021 Earnings Release

Plaintiff includes the following excerpt from the Company's Second Quarter 2021 Earnings Release in the Complaint:

> "Credit Suisse delivered resilient underlying second quarter results and strong capital ratios as we are benefitting [sic] from having taken decisive actions to address the challenges raised by the Archegos and Supply Chain Finance Funds matters. We take these two events very seriously and we are determined to learn all the right lessons. ***We have significantly reduced our RWA [risk-weighted assets] and leverage exposure and improved the risk profile of our Prime Services business in the Investment Bank, as well as strengthened the overall risk capabilities across the bank.*** Our underlying business performance remains solid with a record level of assets under management in our Wealth Management and Asset Management businesses, supporting strong growth in recurring commissions and fees. Together with our more conservative approach to risk and a less favorable trading environment compared to the second quarter of 2020, we delivered a resilient underlying performance in the Investment Bank. We continue to invest in people and technology across Wealth Management, notably in APAC, as well as Asset Management and the Investment Bank. Over the coming months, we will continue to develop our long-term vision for the bank that will serve as our compass for the years ahead. Our objectives are clear: whilst ***we aim to further strengthen our risk culture***, we remain committed to serving all our private, corporate and institutional clients with best-in-class service and advice and to creating value for our shareholders.

---

[4]    It is hardly insignificant that Plaintiff failed to highlight portions of these statements which give context to the entire disclosure.

\*      \*      \*

Overall, we continue to expect more normal levels of market volumes in the coming quarters of 2021 compared to the elevated levels seen in 2020. ***Furthermore, for the course of the ongoing review of the Group's business strategy, we expect to continue to adopt a more conservative approach to risk.***

\*      \*      \*

Today we announced the outcome of the independent investigation into the Archegos matter and published the full externally-led report commissioned by the Board of Directors' special committee….

Select key findings from the independent investigation into Archegos include failure to:
- Effectively manage risk in our Prime Services business by both first and second lines of defense
- Escalate risks and to control limit excesses across first and second lines of defense
- Discharge supervisory responsibilities across first and second lines of defense
- Prioritize risk mitigation and enhancement measures (including dynamic margining)

***However, the investigation also found that, this was not a situation where the business and risk personnel engaged in fraudulent or illegal conduct or acted with ill intent. Nor was it one where the architecture of risk controls and processes was lacking, or the existing risk systems failed to operate sufficiently to identify critical risks and related concerns.***"

Compl. ¶ 96. Plaintiff states that the above representations were materially false and/or misleading because they misrepresent and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had not 'taken decisive actions to address the challenges raised by the Archegos and Supply Chain Finance Funds matters' and did not intend to 'adopt a more conservative approach to risk,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies at this time, or at any time during the Class Period;" (2) the situation was 'one where the architecture of risk controls and processes was lacking, or the existing risk systems failed to operate sufficiently;'" (3) "at the time, the Company was experiencing significant

and unusual customer and/or asset outflows;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 97.

But once again, Plaintiff fails to allege that the disclosure did not accurately summarize the investigation's findings – which is what would be necessary to make the highlighted language false and/or misleading. *See Plymouth*, 2023 WL 3569068, at *9. And Plaintiff has alleged no *facts* to support his conclusions that, notwithstanding these statements, the Company had actually not taken what management believed to be decisive actions, or that the Company had not reduced its exposure to leverage or risk-weighted assets, or that it was experiencing significant and unusual customer and/or asset outflows, or that there existed material weaknesses in the Company's ICFR. *Fant v. Perelman*, No. 97 CIV. 8435, 97 CIV. 8436, 1999 WL 199078, at *7 (S.D.N.Y. Apr. 9, 1999). Additionally, the challenged statements are wholly unrelated to Plaintiff's claim that there existed material weaknesses in the Company's ICFR. *See Macquarie*, 601 U.S. at 264. Consequently, Plaintiff has failed to satisfy the Rule 9(b) and the PSLRA's pleading requirements. *Janbay*, 2012 WL 1080306, at *9.

The purely conclusory allegation that Credit Suisse did not intend to adopt a more conservative approach to risk is not supported by any fact pleaded in the Complaint. Further, regarding statements like "we expect to continue to adopt a more conservative approach to risk," Compl. ¶ 96, "the law is very clear that statements such as these, expressed in relative terms and describing subjective attitudes like intent and motivation, are generally insufficient to support a claim for securities fraud." *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691, 2018 WL 1725553, at *9 (S.D.N.Y. Mar. 30, 2018).

## XIV.   July 29, 2021: Second Quarter 2021 Report

Plaintiff challenges the following language from the Company's 2Q21 Quarterly Report:

In 2Q21, we reported net revenues of CHF 5,103 million, which decreased 18% compared to 2Q20, primarily reflecting lower net revenues in the Investment Bank. The decrease in the Investment Bank reflected a loss of CHF 493 million related to Archegos and lower results across most businesses compared to a strong prior year period, which benefited from robust volumes and higher volatility, and, *in light of the Archegos matter, we de-risked and resized the Investment Bank, notably in our prime services business.*

\* \* \*

*To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.*

\* \* \*

*With respect to the Archegos matter, we continued to strengthen control governance across first and second line risk management with new limits and a restriction implemented for the onboarding of new clients with static margin arrangements.* Additionally, we completed a reduction of arrangements with static margining for a majority of counterparties as well as a majority of Credit Suisse exposures to such counterparties. Furthermore, following the supply chain finance funds matter, *we have enhanced our due diligence by strengthening governance as well as reinforcing the product approval process across Asset Management*.

Compl. ¶ 98. Plaintiff asserts that those representations were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company was experiencing significant and unusual customer and/or asset outflows;" (2) "the Company did not maintain a 'sufficient' liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not "conservative" and were materially deficient at all times;" and (3) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 99.

For the most part, Plaintiff alleges only in conclusory fashion, and with far from the required particularity, that the statements were false or misleading. *Okla. Firefighters Pension &*

*Ret. Sys. v. Xerox Corp.*, 300 F.Supp.3d 551, 568 (S.D.N.Y. 2018). Not only does Plaintiff fail to allege with any detail why the Company's statements about its liquidity pool, liquidity funding and profile, policy, and/or risk parameters were false, but he also fails to appreciate that "[t]hese types of statements are not actionable, because they are the types of general statements that investors are unlikely to rely on." *FXCM*, 333 F.Supp.3d at 349 (collecting cases); *supra* p. 54.

As to Plaintiff's assertion that the Company failed to disclose that it was experiencing significant and unusual customer and/or asset outflows as of July 29, 2021, "where allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information." *In re KeySpan Corp. Sec. Litig.*, 383 F.Supp.2d 358, 377 (E.D.N.Y. 2003). The extent of the Company's outflows – net asset outflows of CHF 7.3 billion during the second quarter, including CHF 4.2 billion net new assets outflows in APAC, Compl. ¶ 101–02, 104 – was disclosed during Credit Suisse's Second Quarter 2021 Earnings Conference, which took place on the same day the Company released its Second Quarter 2021 Report. That the above-quoted portion of this particular disclosure does not in and of itself include the information about the outflows does not change the fact that the Company contemporaneously admitted it was experiencing large outflows. And the fact that the outflows were discussed at an earnings conference the day the challenged statements were made means that the information was in the marketplace – and thus, not undisclosed.

Additionally, Plaintiff's allegation that there existed material weaknesses in Credit Suisse's ICFR cannot survive the motion to dismiss. *Salim*, 2021 WL 796088, at *11. Not only is it a "pure omission," *Macquarie*, 601 U.S. at 264, but also, "The Complaint does not allege any facts explaining why or how [the Company]'s internal controls were materially deficient at the time [the Company] made any of the challenged statements." *Janbay*, 2012 WL 1080306, at *9. Nor does it

allege any facts from which a trier of fact could conclude that management was aware of material weaknesses in ICFR at the time of this disclosure.

Finally, Plaintiff challenges the Company's Second Quarter 2021 Report in a manner that is identical to his challenge to the Company's First Quarter 2021 Report: he calls attention to language in the report that states that it was "prepared in accordance with accounting principles generally accepted in the US (US GAAP)" and claims that the financial statement was materially false and misleading because it did not comply with GAAP and SEC Rules. Compl. ¶¶ 312, 314. This argument is deficient for the reasons articulated above. *Supra* pp. 55–56.

### XV.    July 29, 2021: Second Quarter 2021 Earnings Conference

Excerpts from the 2Q21 earnings conference call extend for several pages in the Complaint and contain multiple "statements." Compl. ¶¶ 100–114. The challenged (bold-faced) language is as follows:

*Defendant Gottstein*:

- "We are taking these events very seriously and are determined to learn all the right lessons. We firmly believe we can and will emerge stronger from these events. Secondly, we have taken action. We have taken action to address many of the issues, and we will continue to do so."

- "We have proactively derisked our Prime Services business and overachieved the goals we set ourselves in the first quarter to reduce RWA and leverage exposure in the Investment Bank. We made key hires. We have reviewed our risk appetite across the bank, and we are proactively strengthening the overall risk culture across the group."

- ". . . continuing to strengthen our first and second line of defense risk approach and governance."

- "We have learned serious lessons and have taken multiple thorough steps to address these issues across the bank. Appropriate HR-related actions have been taken."

- ". . . nor was it one where the architecture of risk controls and processes was lacking or the existing systems failed to operate sufficiently to identify critical risks and related concerns."

- "We are recalibrating our risk appetite at both the group and divisional levels, are strengthening our key risk management processes and risk and control infrastructure." *Id.* ¶ 100.

- "On the $4.2 billion NNA [net new assets] outflows in APAC, these were linked to situations where we wanted to exit clients either for risk or for other reasons. And this is a small number of clients, but we feel very good about that, having exited those positions."

- "But this was a one-off move that we had to do and wanted to do . . . ." *Id.* ¶ 104.

- "So we did see positive inflows in the third month of the quarter, so in June. So April, May was really -- were two months where we had outflows and where we also proactively addressed some of the client situations that I was alluding to also in APAC. But actually, June was positive inflows in all three divisions. And so the momentum into the end of the quarter was very positive."

- "But as I said, the momentum into the end of the quarter was positive." *Id.* ¶ 105.

- "[S]o just to give you the example on dynamic and static margining. This was already discussed by the teams in September, October."

- "But it was just not prioritized the way it should have been. So this is, to a large extent, really a series of human errors and failures by the teams. They didn't effectively manage this situation, and whether it was lack of escalation or also limit -- control of limits, which had numerous occasions being breached, but they did not act on it even though they discussed it and were supposed to do it. So this was clearly a series of failures, which is regrettable and which we have now addressed with a new team both on the first line of defense in Prime Services, Prime Services risk and on the risk management side." *Id.* ¶ 108.

- When asked if he agreed with Paul, Weiss's conclusion that the Company's architecture of risk and controls and processes is fine, Gottstein replied, "Yes. . . . it was discussed also within Credit Suisse, within also the Executive Board and the Board of Directors, and we collectively absolutely agree with that, yes." *Id.* ¶ 110.

- "[G]ross NNA flows are actually very similar to previous years. So clients are fully involved and active in the rare situations or in some of the situations of ultra-high-net worth clients who have asked for, for example, incremental lending, where we have been maybe more cautious. They fully understand that. They don't see that as an issue."

- "So we have very positive feedback about the way we have addressed some of these issues with respect to the risk-weighted asset reductions . . . . So the client reaction is very constructive." *Id.* ¶ 112.

- When questioned by an analyst about if the Company was "continu[ing] to see inflows in July," Gottstein responded: "Look, we are not starting to give intra-months NNA numbers….for me, it's absolutely irrelevant now how the last two or three weeks were in terms of NNA. It's for me much more the longer-term trends, and the longer-term trend is very positive." *Id.* ¶ 113.

- "Since the occurrence of the Archegos and supply chain finance fund matters, which we are taking very seriously, as I said, we have taken decisive actions around capital and risk management. We have learned and will continue to learn the lessons from these events, and we will ensure that we emerge stronger by improving our capital ratios and strengthening risk, compliance and control foundations." *Id.* ¶ 114.

*Defendant Mathers*:

- "Our priority this quarter has been to ensure that we deal with and mitigate the challenges posed by the default of Archegos and by the supply chain finance matter. A core part of this has been to do whatever we can to ensure that there's no repetition of these events. We've taken a number of steps in this regard, and there will be more to come this year as we work our way through the strategic review. Fundamentally, we prioritized a more conservative approach to risk in both the first and the second lines of defense. This has been most apparent in the Investment Bank, where as you can see, we've substantially reduced the size of our Prime Service business and ensure that client accounts in this business have been fully migrated to dynamic margining, and that was completed by the end of the second quarter. And it's clearly one of the key lessons learned from the Archegos matter. That said, while we've been very focused on ensuring that we have a resized Prime Services and we have conducted a thorough and full risk review across the whole bank…."

- "Whilst we have seen net asset outflows of CHF 7.3 billion across these businesses during the second quarter, $4.2 billion of this was due to certain derisking actions that we have taken in APAC. And I think that the progress in AUM [assets under management] and in client business volume demonstrates the momentum in the Wealth Management franchise."

- "A second factor in our performance was the resizing of the Prime Service business and the more conservative approach to risk that we have been taking across the bank." *Id.* ¶ 101.

- "I mean, I don't think there's anything specific I'd like to highlight. I mean, I think one point I did bring out was the fact that we did review very carefully the businesses across the entire bank. There's been a very thorough risk review, which is being conducted by the tactical crisis committee of the Board of Directors. And that has included the Wealth Management operations as well as the Investment Bank. And we did basically result -- that did result in $4.2 billion of net new asset outflows within APAC, relating to certain clients where we did decide to significantly restrict our activities. But there was nothing broad in terms of that."

- "But clearly, the bulk of the reductions have clearly been borne by prime and by the Investment Bank." *Id.* ¶ 102.

- "That process is largely complete. I think you can understand that given the events of February and March, and this was done on an accelerated basis immediately after that. And as I said, the tactical crisis committee has been going through our business portfolio one by one, and obviously, Zeth [Phonetic] is an executive member of that committee, and I think it has been a good and thorough process, but the bulk of that has now been completed." *Id.* ¶ 103.

- "After the Archegos incident, Credit Suisse, we moved, we focused extremely hard on, a, the resizing of the prime portfolio; and b, shifting any clients who are on static margining to dynamic margining."

- "We're obviously not going to be resizing the prime business upwards going forward. So I think we've moved it to a new lower steady state basically."

- "It was fairly obvious what needed to be done, and we executed on that resizing as fast and as quickly as possible in terms of that. I think beyond that, as I said, I think in terms of the capital resource reallocation process, we did complete that during the quarter. And as I said, I would expect to operate a broadly unchanged levels during the third quarter. And I think you'll see more normal levels of activity beyond that." *Id.* ¶ 106.

- "But that said though, I just would say it before I said really now, that in terms of the third quarter level, I think I don't expect to see radical increases or decreases in terms of overall RWA and leverage for either the Investment Bank or for the group as a whole in the third quarter." *Id.* ¶ 107.

- "It is clear and the report makes clear that the appropriate escalation protocols were in place in both the business and in the second line and in the CPOC committee, which you'll see described there, but they were not operated by the individuals. So the protocols were there, but they were not followed. It's clear that while we obviously can improve in our data systems, we can prove in the timeliness of those data systems. Nonetheless, the first and second line data systems did demonstrate the risks to Credit Suisse of Archegos. And again, those were not basically followed up as part of it." *Id.* ¶ 109.

- When asked if he agreed with the Paul, Weiss's conclusion that the Company's architecture of risk and controls and processes is fine, Mathers responded, "And I think [Paul, Weiss] conducted a thorough view. And I think we do agree with their conclusions, but it is their report." *Id.* ¶ 111.

According to Plaintiff, those statements were materially false and/or misleading because they misrepresented and failed to disclose adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had not taken any meaningful actions to address Credit Suisse's

severely lacking risk management and/or control governance procedures and/or policies, either at this time or throughout the Class Period;" (2) "Defendants were vague about what specific actions had been taken;" (3) "the investigation could not have been sufficiently thorough, as it found the Archegos scandal was merely the result of "a series of human errors," that 'the protocols were there, but they were not followed,' and '[i]t was fairly obvious what needed to be done;'" (4) "[a]s later events made clear, the issues [at the Company] went much deeper, requiring a full restructuring of Credit Suisse after its acquisition by UBS;" (5) "at the time, the Company was experiencing significant and unusual customer and/or asset outflows, which were not merely a 'one-off move' 'due to certain derisking actions that we have taken in APAC;'" and (6) "[a]s in the previous quarter, at the time these statements were made, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 115.

The Court concludes that the alleged misstatements from the Second Quarter 2021 Earnings Conference are not actionable for several reasons. Plaintiff first asserts that at the time the statements were made, the Defendants knew or recklessly disregarded that the Company had not taken any meaningful actions. This assertion fails because: (1) the term "meaningful" is not definable; (2) it "mimics the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain," *Duane Reade*, 2003 WL 22801416, at *10, in that whether something turns out to be meaningful cannot be known until time has passed; and (3) Plaintiff has failed to allege any contemporaneous facts to support a claim that the actions announced by the Company were not, in fact, taken.

As to Plaintiff's allegation that Defendants were "vague" about which actions had been taken, the Defendants cannot be held liable for failing to disclose publicly available information. *In re Merrill Lynch & Co., Rsch. Reports Sec. Litig.*, 272 F.Supp.2d 243, 249–50 (S.D.N.Y. 2003).

The actions the Company was taking were disclosed in various earlier disclosures. *See e.g.*, *supra* pp. 48–49, 52.

Next, Plaintiff claims that "the investigation could not have been sufficiently thorough" and criticizes its conclusions. But saying that the investigation "could not have been thorough" because it reached certain conclusions (that human error and failure to follow established protocols led to the loss) does not make Defendants' statements about the investigation's findings false or misleading. Those were in fact the findings of the investigation. No fact is pleaded tending to show that human error and the failure to follow protocols were not in fact the reasons why Credit Suisse exposed itself to the loss it suffered with Archegos. Plaintiffs do not identify a single factual reason leading to the Archegos loss that a more "thorough" investigation would have uncovered.

In another attempt to frame Gottstein and Mathers' statements as false or misleading, Plaintiff writes, "*[a]s later events made clear*, the issues [at the Company] went much deeper . . . ." Compl. ¶ 115 (emphasis added). But because Plaintiff explicitly relies on things that happened at a subsequent time, he has failed to plausibly allege that Defendants' statements were "false at the time they were made, and not with the benefit of 20/20 hindsight." *Zecher v. Vince Holding Corp.*, Nos. CV-18-5072 CV-19-5629, 2020 WL 6370264, at *7 (E.D.N.Y. April 14, 2020). "[S]uch *post hoc*, *ergo propter hoc* pleading has been repeatedly rejected by the courts." *Susie Ong v. Chipotle Mexican Grill, Inc.*, No. 16 Civ. 141, 2017 WL 933108, at *11 (S.D.N.Y. Mar. 8, 2017).

Plaintiff's allegation about the existence of material weaknesses in the Company's ICFR is not supported by any facts tending to show that management was aware of any such deficiencies at the time these statements were made. *See Janbay*, 2012 WL 1080306, at *5. It is, therefore, "[s]peculative and conclusory pleading," which  is "legally insufficient." *Id.* (citing *Decker*, 681

F.2d at 114; *Rombach*, 355 F.3d at 176). Critically, the challenged statements from the earnings conference do not address the topic of the Company's ICFR, and Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are clear and complete" – or, in other words, applies to half-truths and not pure omissions. *Macquarie*, 601 U.S. at 264.

Finally, Plaintiff argues that the statements misrepresent or fail to disclose that the Company was experiencing significant and unusual customer and/or asset outflows. But a plaintiff cannot state a claim of misrepresentation based on facts that were admittedly disclosed. *Sable v. Southmark/Envicon Cap. Corp.*, 819 F.Supp. 324, 333 (S.D.N.Y. 1993). Both Gottstein and Mathers discuss the amount of outflows in their remarks – net asset outflows of CHF 7.3 billion during the second quarter, including CHF4.2 billion net new assets outflows in APAC, Compl. ¶¶ 101–02, 104. Characterizing these as "significant" or "unusual" (even assuming that was true) was not required by the securities laws. *See MGT*, 2018 WL 1224945, at *11. Investors were free to go to financial statements released in earlier years, compare the outflows experienced in the Second Quarter of 2021 to those experienced in prior periods, and draw their own conclusions about how to characterize those outflows.

## XVI.    July 29, 2021: Second Quarter 2021 Press Conference

Plaintiff takes issue with Gottstein's response during the Company's Second Quarter 2021 Press Conference to a question about "what had been done to ensure staff followed procedures regarding the escalation of 'concerns up the chain,'" Compl. ¶¶ 116–17:

> ***"Well, we obviously had very clear instructions to all the respective, not only Prime Service-related first line of defense and related second line of defense employees, but globally, the importance of escalation. We reiterate this constantly also in our town halls, in our recent internal memos. It's very important that people escalate when there are issues, whether it's limit breaches, whether it relates to, for example, in this case, the fact that we discussed and actually advised to move certain clients like Archegos from static***

*dynamic margining, but it was just not followed through. And these are the type of things that need to be escalated and this is something that each and everyone here on the Executive Board are telling our management committees, how important that is."*

*Id.* ¶ 117. Plaintiff states that Gottstein's statement was materially false and/or misleading because it misrepresented and failed to disclose the following adverse fact known to or recklessly disregarded by the Defendants: that "the Company did not have 'very clear instructions' to 'escalate when there are' 'limit breaches' or related risk management issues; rather, Credit Suisse's risk management and/or control governance procedures and/or policies were severely lacking, both throughout and prior to the Class Period." *Id.* ¶ 118.

Plaintiff's attempt to show the falsity of Gottstein's statement falls flat. *In re Garrett Motion Inc. Sec. Litig.*, No. 1:20-cv-07992, 2023 WL 2744029, at *17 (S.D.N.Y. Mar. 31, 2023). "[F]alsity requires more than plaintiff's say-so," *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, No. 20 Civ. 5635, 2022 WL 784017, at *12 (S.D.N.Y. Mar. 15, 2022) (citing *Francisco v. Abnegoa, S.A.*, 481 F.Supp.3d 179, 207 (S.D.N.Y. 2020)), and the Plaintiff has failed to allege any facts demonstrating that the Company did not, as he claims, "have 'very clear instructions' to 'escalate when there are' 'limit breaches' or related risk management issues . . . ." Compl. ¶ 118. Nor does he allege that the Company did not "reiterate…constantly in its town halls" that employees were to be sensitive to escalating perceived problem issues to a higher level. Because Plaintiff's challenge is an insufficient conclusory allegation without any factual support, it is dismissed. *See La Pietra v. RREEF Am., L.L.C.*, 738 F.Supp.2d 432, 443 (S.D.N.Y. 2010).

### XVII.  August 13, 2021: Axel Lehmann and Juan Colombas Nominations Media Release

Plaintiff challenges as false or misleading a portion of the Company's media release announcing the nominations and proposed appointments of Juan Colombas and Defendant Lehmann to Credit Suisse's Board of Directors:

> António Horta-Osório, Chairman of Credit Suisse, said: "I am extremely pleased that Axel Lehmann and Juan Colombas have been nominated to join our Board. With their deep experience in risk management and business leadership, and both with careers spanning approximately three decades in financial services, **they will make an invaluable contribution as we shape the bank's strategic realignment and enhance our culture of risk management and personal responsibility and accountability.** I look forward to working closely with them in their new respective roles as members of the Board."

Compl. ¶ 119. Allegedly, Horta-Osório's statements were materially false and/or misleading because they misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the nominations and ultimate appointments of Defendant Lehman [sic] and Colombas would have no meaningful effect on Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both throughout and prior to the Class Period;" and (2) "the Company was not 'enhanc[ing] our culture of risk management and personal responsibility and accountability,' as Defendants did not implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies at this time or at any time during the Class Period." *Id.* ¶ 120.

This borders on the absurd. Plaintiff, again, has chosen to challenge generic, indefinite statements that are considered puffery in this Circuit. *See Bahash*, 506 Fed.Appx. at 37. No reasonable purchaser or acquirer of Credit Suisse securities in domestic transactions during the Class Period would view such nonspecific statements about the "invaluable contributions" that were expected from incoming personnel as meaningfully altering the mix of available information about the Company, *id.*, and such statements are not actionable under the securities laws, *Pollio*, 608 F.Supp.2d at 571. That Colombas and Lehmann were to join Credit Suisse's Board is a true

statement. No facts are alleged tending to show that, when Colombas and Lehmann were nominated, it was not with the expectation that they would be good directors who would make a valuable contribution to corporate governance. *See San Leandro*, 75 F.3d at 812.

Further, this portion of the media release is, in essence, a prediction that the hiring of Colombas and Lehmann would have a positive impact on Credit Suisse's future performance. Plaintiff has not alleged facts tending to that the Defendants lacked a reasonable basis for this prediction. *Id.* at 813. Whether bringing these two men on board would have any impact, let alone a positive impact, on Credit Suisse's future performance could not have been known at the time this statement was made – and, as discussed, "Plaintiffs are not permitted . . . to proceed with allegations of 'fraud by hindsight,' in which statements are proven false on the basis of subsequent information." *In re Ferroglobe PLC Sec. Litig.*, No. 1:19-cv-00629, 2020 WL 6585715, at *6 (S.D.N.Y. Nov. 10, 2020).

## XVIII. September 26, 2021: Defendant Horta-Osório and Gottstein Interview

Plaintiff takes issue with representations made by Defendants Horta-Osório and Gottstein in their joint interview with Swiss newspaper *SonntagsBlick*, which was summarized by *Reuters*. Compl. ¶ 121. Plaintiff includes in the Complaint the following portion of the interview summary:

> Credit Suisse's (CSGN.S) board of directors is convinced Chief Executive Thomas Gottstein is the right person to ***strategically realign the bank by curbing risk appetite***, the Swiss bank's chairman said in a newspaper interview published on Sunday.
>
> Asked whether he was planning to replace Gottstein as CEO or take over the operational lead of the bank himself, Antonio Horta-Osorio was quoted as replying "no" in the interview with Swiss Sunday newspaper SonntagsBlick.
>
> "I can only say with certainty that Thomas Gottstein has the full confidence of the board of directors," he said. "In the difficult phase the bank went through recently, he impressively demonstrated his leadership skills. He is the right man for the strategic realignment of the bank."

> Horta-Osorio, who took over as chairman in April, said **the bank had to curb risk appetite and set the right incentives**, while also hiring and supporting staff sharing its values.
>
> *       *       *
>
> Gottstein said the bank had thoroughly analysed its balance sheet. "We did not find any cases comparable to Greensill or Archegos."

*Id.* ¶ 122. Plaintiff finds the above language materially false and/or misleading because it represents and fails to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company was not going to 'curb[ ] risk appetite,' as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both throughout and prior to the Class Period;" and (2) "at this time, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 123.

The majority of the excerpt consists of puffery. For the most part, this segment extols the virtues of CEO Gottstein as the "right person" to "strategically realign the Bank by curbing risk." These statements are not "sufficiently specific that a reasonable investor could rely on them as a guarantee of some concrete fact or outcome." *Sask. Healthcare Emps.' Pension Plan v. KE Holdings Inc.*, No. 1:21-cv-11196, 2024 WL 775195, at *20 (S.D.N.Y. Feb. 26, 2024).

Gottstein's statement that the Company found no cases comparable to Greensill or Archegos in its balance sheet is a statement of fact, which is capable of being false. But Plaintiff pleads no facts tending to show that this statement was not true. Instead, as above, he has offered mere conclusory allegations – that the Company was not going to curb risk appetite, and that there existed material weaknesses in the Company's ICFR – which are insufficient to plead the falsity of Gottstein's assertion about what was found on the balance sheet. *See Janbay*, 2012 WL

1080306, at *8. Plaintiff's allegations as they related to the Company's ICFR fail for the reasons discussed above. *See, e.g.*, *supra* pp. 25, 31–32, 44.

In addition, Plaintiff's conclusory allegations are deficient because they rely on fraud by hindsight. *See In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, No. 20-cv-3135, 2022 WL 4539119, at *17 (S.D.N.Y. Sept. 28, 2022). His claims that the Company was not going to curb risk appetite, and that the Defendants never did implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, are based on the Company's eventual failure. This "cannot support a finding that earlier statements were false," and Plaintiff has "not pled any factual matter sufficient to show that defendants knew their claims . . . were false when they made them." *Id.*

## XIX. November 4, 2021: Investor Day 2021 Media Release and Investor Presentation

Plaintiff challenges certain portions of the Company's 2021 Investor Day Media Release:

Following a comprehensive assessment of its strategy, the Credit Suisse Group Board of Directors (BoD) has unanimously agreed on a long-term strategic direction for the Group. ***The strategy is based on a long-term vision and reemphasizes the integrated model, with a well-defined three-year plan, investing in sustainable growth across Credit Suisse's businesses, while placing risk management and a culture that reinforces the importance of accountability and responsibility at its core…. Work in this direction has already begun as we strengthened our risk management and capitalization, and de-risked the bank while increasing the investment in our core businesses.***

\*        \*        \*

**PRIORITIZING RISK MANAGEMENT**
As part of the outcomes of the strategic review, the bank will continue to focus on risk culture, putting risk management at the heart of all its actions, with investments in data, infrastructure, reporting capabilities, as well as in compliance.

The following initiatives have already been completed or are underway:

- **Fundamental risk review**, examining how risks are being assessed, managed and controlled across the Group.

- Clear **definition of roles, responsibilities and accountabilities** across all divisions, as Credit Suisse continues to implement remediation efforts that were initiated earlier in the year.
- Development of **tools and processes** to improve business accountability and ownership as the first line of defense for risk and controls.
- Revision of **compensation process** and structure, ***incorporating risk-sensitive performance and non-financial objectives into the enhanced performance scorecards***.
- Fostering a culture that reinforces the importance of **personal accountability and responsibility.**

Compl. ¶ 124. Plaintiff alleges that the above representations are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's new 'strategy' was a sham and Defendants had not 'strengthened [Credit Suisse's] risk management' – to the contrary, Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies which were severely lacking, both throughout and prior to the Class Period;" (2) "the Company never revised its compensation structure to 'incorporat[e] risk-sensitive performance and non-financial objections;'" and (3) "at the time, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 125.

Again, Plaintiff's allegations fail for several reasons. First, the excerpt from the Company's media release consists of statements that were mere puffery – they were "too general to give rise to liability." *Buhrke*, 2024 WL 130047, at *12. "Vague positive statements regarding a corporate entity's risk management strategy . . . and business practices are too general to cause a reasonable investor to rely upon them," *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021), and thus, are non-actionable. The language Plaintiff has highlighted includes phrases like "long-term vision" and "the bank will continue to focus on risk culture" – qualifiers which render statements even more in the nature of puffery. *See Vale*, 2017 WL 1102666, at *22.

Next, "[w]hile courts have held that fraud is adequately alleged 'where statements touting risk management [are] ... juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent . . . risk procedures,'" *Strougo*, 105 F.Supp.3d at 345 (quoting *Freudenberg v. E\*Trade Fin. Corp.*, 712 F.Supp.2d 171, 190 (S.D.N.Y. 2010), Plaintiff's Complaint fails to include any such "detailed factual description." Indeed, Plaintiff has not pleaded any facts tending to show that any of the steps listed was not planned to be implemented or that they were not actually implemented, which is what would be necessary to establish that the Company's new strategy was a "sham" rather than a good faith effort that might or might not bear fruit. Nor has Plaintiff pleaded any facts tending to show that Defendants had not strengthened the Company's risk management. The fact that the Company eventually failed does not establish that these statements were false when made, and is simple fraud by hindsight pleading. *See Kirkland Lake Gold*, 2021 WL 4482151, at \*5.

Finally, once again, Plaintiff fails to plead any facts tending to show that Company knew, at the time of the statements, that there existed material weaknesses in the Company's ICFR. Nor has Plaintiff pleaded any facts tending to show how disclosure of material weaknesses in ICFR related to the statements made in the Media Release, such that the failure to disclose them (if they were known to exist) would have rendered the statements made misleading. As a result, he has failed to "demonstrate with specificity why and how" the statements in the Media Release were false or misleading when made. *Rombach*, 355 F.3d at 174.

## XX.    November 4, 2021: Investor Day

Excerpts from remarks made during Credit Suisse's Investor Day take up several pages of the Complaint and contain multiple "statements." Compl. ¶¶ 126–28. I again assume that, by

putting certain representations in bold-faced type, Plaintiff is asserting that the bold-faced language

contains the misstatements that form the basis of their cause of action.

The bold-faced language is as follows:

*Defendant Horta-Osório*:

- "Together with the Board of Directors, Thomas and the Executive Board, we have been working hard to understand the root causes of these issues. The Archegos report provides evidence that we do not shy away from learning serious lessons. You have my personal commitment that we will work to solve our issues one by one with the required diligence, thoroughness and humility. Since I joined the bank as Chairman in May, my focus has been on 3 key areas: risk management, strategy and culture. Over the past 6 months, we have made significant progress . . . . First, risk management. We have largely completed our fundamental review of risks, examining the risk profile of each business, tightening limits, reducing concentrations and strengthening our risk governance. This includes adjusting our risk appetite at the group and divisional levels accordingly. We have appointed a new Group Chief Risk Officer and a new Group Chief Compliance Officer. We have enhanced our oversight at the Board of Directors with the election of Axel Lehmann as new Chair of the Risk Committee and of Juan Columbus as a member of the Compensation, Risk and Audit Committees. In addition, we have further reemphasized that every employee plays a pivotal role in being a risk manager at heart. Risk will be an area of key and continuous focus going forward."

- "[W]e will seek to place risk management at the core of the bank and in everything we do, and operate under the right risk appetite as approved by the Board…." *Id.* ¶ 126.

- "The main priority and the first point when I was elected Chairman of the AGM, the first part of my speech is risk management. At heart, every banker should be a risk manager."

- "[W]hat you have to see is that mostly we are reallocating capital to the highest-returning businesses and with a lower risk profile, and we are lowering the risk profile of the bank overall by going to segments with lower risk and also by other measures that we are doing."

- "And it starts with example at the top, secondly, with hiring the right people that share the values about risk management, and I told you in my speech, about the hiring that we have done, about the internal promotions that we have done. So very, very important in terms of the new CRO, Chief Compliance Officer, Axel is Chairman of the Risk Committee; Juan Colombas, the internal promotions, Rafales, Chief Compliance Officer, Christine."

- "[T]he risk appetite, as approved by the Board, will follow the strategy review. And…the incentives that we'll set up that also follow the strategy review will also incorporate risk in the incentives all along the organization . . . . This is a strategy, holistic and coherent, fully endorsed by the team, should deliver the proper returns for shareholders, but with a much lower risk profile, much lower volatility of earnings going forward." *Id.* ¶ 128.

_Defendant Gottstein_:

- "We are committed to addressing these issues and legacies. We have learned serious lessons from all of these matters, and we have already implemented significant changes to our organization and risk management policies where needed."

- "We have thoroughly looked at every aspect of the bank, and I want to stress that we have implemented significant changes already. These include strengthening our capital position as evidenced by our 14.4% CET1 [Common Equity Tier One] ratio at the end of the third quarter. This is the highest level we have ever seen, and up from 12.2% at the end of the first quarter, as we have significantly reduced risk-weighted assets and leverage exposure since then."

- "Underpinning our growth strategy is sound risk management. We have reinvigorated our risk culture around the principle that everyone is a risk manager and strength and accountability as the first line of defense. We have strengthened our leadership with the appointments of Chief Risk Officer, David Wildermuth; and Chief Compliance Officer, Rafael Lopez Lorenzo, who is also here with us in the room. We have invested in risk and compliance and are working to recalibrate risk appetite to the strategic direction of the bank." _Id._ ¶ 127.

Plaintiff asserts that Horta-Osório and Gottstein's representations were materially false and/or misleading because they misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's new 'strategy' was a sham, as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, both throughout and prior to the Class Period;" (2) "Defendants never 'align[ed] the compensation process to reinforce a shift towards more risk and control objectives and collaboration;'" and (3) "at the time, there existed material weaknesses in the Company's internal controls over financial reporting." _Id._ ¶ 129.

But Plaintiff was required to convey through _factual allegations_ that the Defendants made materially false or misleading statements. _See In re JP Morgan Chase Sec. Litig._, 363 F.Supp.2d 595, 618 (S.D.N.Y. 2005). His allegations, as discussed in the context of other challenged disclosures, fail to meet this requirement. Whether it is that the Company's new strategy was a

"sham" (even though Plaintiff never alleges any facts tending to show that Credit Suisse did not take the steps mentioned in the Investor Day remarks, let alone that it never intended to do so), or that the Defendants never changed the compensation structure, or that there existed material weaknesses in the Company's ICFR – all of these allegations are wholly conclusory. *See ECA*, 553 F.3d at 205. His allegations as they relate to the Company's ICFR independently fail for reasons discussed above. *See, e.g.*, *supra* pp. 25, 31–32, 44.

Plaintiff's conclusory allegations also fail because he again has attempted to plead fraud by hindsight. *See Kasilingam v. Tilray, Inc.*, No. 20-cv-03459, 2021 WL 4429788, at *11 (S.D.N.Y. Sept. 27, 2021). He alleges that the Defendants knew or recklessly disregarded that what they were doing did not meaningfully change the Company's risk management and/or control governance procedures and/or policies, and that they never aligned the compensation process; but these allegations are clearly based on developments that would occur in the future and on information that would have been impossible to know (or recklessly disregard) at the time the statements were made. *See Ferroglobe*, 2020 WL 6585715, at *6.

## XXI.    November 4, 2021: Third Quarter 2021 Media Release and Investor Presentation

Plaintiff challenges Gottstein's quotes that appear in the Company's 3Q21 Media Release:

["]***We have also taken decisive actions to strengthen our overall risk & controls foundation***, continued our remediation efforts on the Supply Chain Finance Funds matter, with our priority to return cash to investors, and made significant progress in resolving legacy issues. ***Our objectives are clear: we want to become a stronger, more customer-centric bank that puts risk management at the very core of its DNA to deliver sustainable growth for investors, clients and colleagues.***["]

\*       \*       \*

"***We saw NNA of CHF 5.6 bn in 3Q21, compared to NNA of CHF 18.0 bn in 3Q20 and net asset outflows of CHF 4.7 bn in 2Q21.***"

Compl. ¶ 130. Plaintiff alleges that this language is materially false and/or misleading because it misrepresents and fails to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had not 'taken decisive actions to strengthen our overall risk & controls foundation,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, which were severely lacking, both throughout and prior to the Class Period;" (2) "the Company was experiencing significant and unusual customer and/or asset outflows;" and (3) "at the time there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 131.

Plaintiff's unsupported general claims that (1) the Company had not taken decisive actions to strengthen its risk & controls foundation, (2) the Company was experiencing significant and unusual customer and/or asset outflows, and (3) there existed material weaknesses in the Company's ICFR are insufficient to survive a motion to dismiss. In particular, the quoted statement discloses the fact of asset outflows in the third quarter of 2021, second quarter of 2021, and third quarter of 2020. There is no allegation that these disclosures were false as a matter of fact. The alleged failure to characterize those outflows as "significant" or "unusual" does not violate the securities laws; "[o]nce a company discloses material objective factual matters, it need not characterize or editorialize on those facts in any particular way." *MGT*, 2018 WL 1224945, at *11 (citation and internal quotation marks omitted). As I have already observed, investors could compare the numbers and draw their own conclusions.

Plaintiff's allegations about the Company's lack of decisive actions and failure to implement "meaningful changes" to its "severely lacking risk management and/or control governance procedures and/or policies" are classic examples of fraud by hindsight. *See Aceto*,

2019 WL 3606745, at *4. "Plaintiff[] can argue . . . with the benefit of hindsight that" decisive actions and meaningful changes did not occur, "but this chain of causation was hardly known . . . the time [Gottstein's] statement[s] [were] made." *In re Barrick Gold Corp. Sec. Litig.*, 341 F.Supp.3d 358, 372 (S.D.N.Y. 2018). And while it would eventually transpire (in March 2023, Compl. ¶ 341) that Credit Suisse did have material weaknesses in its ICFR at the time these statements were made, Plaintiff neither pleads facts tending to show that management was aware of this on November 4, 2021, or that disclosing this fact was necessary to render any statements that were made not misleading.

Finally, the majority of the bolded portions in the excerpt are, in essence, "'vague descriptions [that] offer only generally optimistic opinions'" which "are not actionable under section 10(b) and Rule 10b-5." *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F.Supp.3d 56, 89 (S.D.N.Y. Feb. 28, 2022) (quoting *Synchrony*, 988 F.3d at 170).

## XXII.  November 4, 2021: Third Quarter 2021 Report

Plaintiff challenges language in the Company's 3Q21 Quarterly Report:

As previously reported, the Board of Directors (Board) had initiated an externally led investigation of the Archegos matter, which was supervised by a special committee of the Board. On July 29, 2021, Credit Suisse published on its website the report based on this independent external investigation, as well as a summary of management's responses to this report to date. Since then, we have continued to further implement a Group-wide remediation program to facilitate the execution of key activities including:

- *strengthening the risk management environment through the streamlining of governance and oversight structures*, including the alignment of incentives with roles and accountability, and through the reinforcement of a Group-wide risk mindset and speak-up culture;
- holistically reviewing client relationships to identify and manage similar risk concentrations; and
- *reinforcing and extending risk capabilities and frameworks, especially in the areas of credit risk, counterparty risk, and stress testing including the related models employed.*

*In addition, we continue to review and implement efforts to improve the overall risk appetite and limit framework and breach escalation processes. We have largely completed our fundamental review of risks, examining the risk profile of each business division, tightening limits, reducing concentrations and strengthening our risk governance. We are also committed to supporting further risk management improvements by enhancing related tools, reporting, data quality and types of data available in a strategic manner.*

The Archegos review contains a broader aspect of leveraging remediation efforts in specific functions and business lines to identify areas across the Group where similar risks may exist and to identify and implement sustainable solutions in response to lessons learned*, including key controls and requisite risk metrics. While many of the key actions have already been completed or are in the process of being completed in 2021, we expect certain aspects of our remediation activities, particularly to the extent they require infrastructure changes, to continue into 2022 as we seek to strengthen specific risk management capabilities, expertise and culture.*

\*     \*     \*

*Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We have adapted our liquidity and funding profile to reflect lessons learned from the financial crisis, the subsequent changes in our business strategy and regulatory developments.*

\*     \*     \*

Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. We achieve this through a conservative asset/liability management strategy aimed at maintaining long-term funding, including stable deposits, in excess of illiquid assets. ***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***

Compl. ¶ 132. Plaintiff asserts that the above statements are materially false and/or misleading

because they misrepresent and fail to disclose that: (1) "the Company had not 'strengthen[ed] the

risk management environment through the streamlining of governance and oversight structures'

and was not 'committed to supporting further risk management improvements,' as Defendants did

not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "the Company was experiencing significant and unusual customer and/or asset outflows;" (3) "the Company did not maintain a 'sufficient' liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not 'conservative' and were materially deficient at all times;" and (4) "at this time, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 133.

Again, Plaintiff has not alleged circumstances indicating that any of the statements made in the Third Quarter Report were false or misleading. Plaintiff's conclusory allegations about the Company's risk management environment, outflows, liquidity, and ICFR are inadequate, as they are devoid of specific facts that support the conclusion that these statements were false or misleading. *See In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973, at *7 (S.D.N.Y. June 23, 2004). No facts are alleged tending to show that the measures outlined were not in fact implemented at Credit Suisse. To the extent that subsequent events demonstrated that those measures were "too little, too late," we are in the realm of fraud by hindsight, which fails to state a claim. *See Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14 CV 3876, 2016 WL 1261135, at *9 (S.D.N.Y. Mar. 30, 2016).

Additionally, the Company's statement that it was "committed to supporting further risk management improvements," Compl. ¶ 132, as well as the Company's statements related to its liquidity, is corporate puffery. Those statements are "merely generalizations regarding [Credit Suisse's] business practices" and are thus "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable.'" *ECA*, 553 F.3d at 206.

As for the existence of material weaknesses in the Company's ICFR, that issue is discussed above time and time again. *See, e.g.*, *supra* pp. 25, 31–32, 44. I need not repeat that discussion here.

Finally, Plaintiff challenges the Company's Third Quarter 2021 Report in a manner that is identical to his challenges to the Company's First and Second Quarter 2021 Reports: he calls attention to language in the report that states that it was "prepared in accordance with accounting principles generally accepted in the US (US GAAP)" and claims that the financial statement was materially false and misleading because it did not comply with GAAP and SEC Rules. Compl. ¶¶ 312, 314. This argument is deficient for the reasons articulated above. *Supra* pp. 55–56.

## XXIII. November 4, 2021: Defendants Horta-Osório and Gottstein Interview

Plaintiff challenges statements made by Defendants Horta-Osório and Gottstein in a joint interview on *Bloomberg TV*:

- Gottstein characterized the Company's most recent results as "***very solid***" and stated that net new assets were "***very solid***." Compl. ¶ 134.

- With respect to the Company's purported strategic changes, Horta-Osório stated that the outcome would be "***a bank which has a much lower risk profile***" and "***[a] bank that has risk management at its heart…We want to elevate the risk management and the clear culture of accountabilities and responsibilities***." *Id.* ¶ 135.

- Horta-Osório stated, in reference to Archegos and the Greensill Funds: "***[W]e have made a very significant effort of addressing those issues. We will learn what happened…We are much better than we were six months ago…[A]nd the lower risk bank that we are creating should absolutely avoid these types of issues happening again.***" *Id.* ¶ 136.

Allegedly, their statements are materially false and/or misleading because they misrepresent and fail to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the investigations into the failure of the Greensill Funds and Archegos losses were shams and no 'lessons would be learned,' nor would the bank have 'a much lower risk profile' or have 'risk

management at its heart,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "net new assets were not 'very solid,' as the Company was experiencing significant and unusual customer and/or asset outflows that it failed to disclose;" and (3) "at the time, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 137.

"The law is concerned with *fraud*, not the inaccuracy of statements such as" Gottstein's characterization of the Company's assets. *Goplen v. 51job, Inc.*, 453 F.Supp.2d 759, 770 (S.D.N.Y. 2006) (emphasis in original). The factual support – or lack thereof – provided by the Plaintiff for each of his allegations of *fraud* fails to satisfy the particularity and sufficiency requirements of Rule 9(b) and the PSLRA. *Id.*

And again, we are in the realm of fraud by hindsight. Basically, all Plaintiff alleges is that the Company eventually went under, so these essentially predictive statements about Credit Suisse being a better bank in the future (which turned out not to be true) were fraudulent because things did not work out as the speakers had hoped. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).

As to Plaintiff's allegation that there existed material weaknesses in the Company's ICFR – he fails to allege any facts tending to show that Defendants Horta-Osório and Gottstein were aware of this at the time these statements were made, nor does Plaintiff put this allegation into relationship with the allegedly false or misleading statements.

Additionally, in this Circuit, Gottstein's references to the Company's "very solid" results and net new assets are considered "expressions of puffery and optimism," *In re Express Scripts*

*Holdings Co. Sec. Litig.*, 773 Fed.Appx. 9, 13 (2d Cir. 2019), which "do not give rise to securities

violations." *Rombach*, 355 F.3d at 174.

## XXIV. November 6, 2021: Third Quarter 2021 Earnings Conference

Plaintiff takes issue with statements made by Gottstein during Credit Suisse's 3Q21

Earnings Conference:

> Our strong third quarter results reflect four important factors that put us in excellent
> position to further our growth strategy: robust underlying performance, good net new asset
> inflows, strong capital and progress in addressing legacy issues. ***They reflect progress in
> achieving our clear objectives to become an even stronger, more client-centric bank that
> puts risk management at our core and to deliver sustainable growth for investors, clients
> and colleagues.***
>
> *    *    *
>
> We were very pleased to see, after the outflows of the second quarter, positive net inflows
> across each of our three Wealth Management businesses totaling CHF6.2 billion,
> representing a 3% annualized growth rate. ***And we achieved this despite further outflows
> related to the supply chain finance fund matter as well as deleveraging and market-
> related client outflows in APAC as other competitors have also seen it.***
>
> *    *    *
>
> Now in terms of net new assets***, although we did see approximately CHF400 million of
> net outflows in our Corporate & Institutional Clients business, this was more than offset
> by CHF1.9 billion of net inflows in our Private Clients business reversing the outflows
> that we saw in the second quarter….However, IWM [International Wealth
> Management] did see a reversal of the net outflows of the second quarter with positive
> net new assets totaling CHF1.4 billion, notwithstanding CHF1.5 billion relating to the
> supply chain finance funds matter this quarter.***

Compl. ¶ 139. According to Plaintiff, those statements were materially false and/or misleading

because they misrepresented and failed to disclose the following adverse fact known to or

recklessly disregarded by Defendants: (1) "the Company was experiencing significant and unusual

customer and/or asset outflows, which were not due to 'deleveraging' and 'market-related'

90

factors;" and (2) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 140.

I repeat: the actual amount of the inflows and outflows was disclosed within the challenged statements. Having given the market that factual information, the Company had no need to characterize the numbers in the manner suggested by Plaintiff. "[S]o long as material facts are disclosed . . . it is not deceptive to fail to 'characterize' those facts with 'pejorative nouns and adjectives,' or to fail to verbalize all adverse inferences expressly." *Klamberg*, 473 F.Supp. at 551 (quoting *Goldberg*, 567 F.2d at 218) (collecting cases).

As for Plaintiff's claim that there existed material weaknesses in the Company's ICFR, "the complaint never alleges when and how, if at all, before [November 6, 2021], the defendants in fact learned of [said weaknesses] – without which allegations there remains no sufficient basis for the claim their statements, or omissions, were false when made." *Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068, 1999 WL 756466, at *3 (S.D.N.Y. Sept. 24, 1999). Moreover, Plaintiff does not allege how – if at all – failure to disclose this "fact" renders a statement wholly unrelated to it false and/or misleading. *See Macquarie*, 601 U.S. at 264.

## XXV.  November 7, 2021: Defendants Horta-Osório and Gottstein Interview

Plaintiff challenges as misleading statements made by Horta-Osório and Gottstein in a joint interview with German-language newspaper *Neue Zürcher Zeitung*, Compl. ¶ 141:

- As reported by Bloomberg in an article published that day titled "Credit Suisse Executives Make Show of Unity Over Strategy," during the interview Defendants Horta-Osório and Gottstein said they were "***restructuring executive pay in the wake of the Archegos and Greensill scandals***."

- Horta-Osório said "***We will restructure the variable remuneration in such a way that there is no longer any incentive to take excessive risk***." *Id.* ¶ 142.

Plaintiff states that the above representations are materially false and/or misleading because they misrepresent and fail to disclose the fact – known to and recklessly disregarded by Defendants – that the Defendants never did "restructure the variable remuneration in such a way that there is no longer any incentive to take excessive risk." *Id.* ¶ 143.

"While the PSLRA does not require plaintiffs to plead 'every single fact upon which their beliefs concerning false or misleading statements are based,' it does require the facts alleged to be 'sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Coronel v. Quanta Cap. Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656, at *24 (S.D.N.Y. Jan. 26, 2009) (quoting *Novak*, 26 F.3d at 313–14 fn. 1). There is no allegation of fact tending to support an inference that the Company did not in fact intend to restructure compensation at the time this statement was made. Nor is there any allegation that executive compensation was not in fact restructured. The Plaintiff's complaint seems to be that any restructuring of executive compensation was not accomplished in a manner that eliminated the incentive to take excessive risk.

I will assume (although the Complaint contains no such allegation) that, in the end, whatever changes were made to the Company's compensation structure failed to eliminate the well-known human tendency toward risk-taking. But that does not render Horta-Osório and Gottstein's statements false *at the time they were made*. It is simply another instance where "what we tried didn't work out" adds up to fraud by hindsight. *See Denny*, 576 F.2d at 470. Like so many of Plaintiff's preceding allegations, this allegation fails to plead that the statements were known to be false when they were made, which is what is required to allege a violation of the federal securities laws.

## XXVI. January 17, 2022: Defendant Horta-Osório's "Resignation" and Defendant Lehmann's Appointment Media Release

Plaintiff challenges language from an excerpt of the media release announcing Horta-Osório's resignation from and Lehmann's appointment to the position of Chairman of the Company's Board of Directors:

> Credit Suisse Group today announced that the Board of Directors (Board) has appointed Axel P. Lehmann as the bank's new Chairman effective immediately. He succeeds António Horta-Osório, who resigned following an investigation commissioned by the Board. Under the leadership of Axel Lehmann, the Board and the Executive Board will continue to execute Credit Suisse's strategy, driving forward the transformation of the bank.
>
>          *     *     *
>
> Axel Lehmann, Chairman of Credit Suisse, said: "I would like to thank the Board for the trust it has placed in me and look forward to working even more closely with the Board and the Executive Board. ***We have set the right course with the new strategy and will continue to embed a stronger risk culture across the firm. By executing our strategic plan in a timely and disciplined manner, without distraction, I am convinced that Credit Suisse will demonstrate the renewed strength and business focus needed to generate sustainable value for all of our stakeholders.***"

Compl. ¶ 144. This language is supposedly materially false and/or misleading because it misrepresents and fails to disclose certain facts known to or recklessly disregarded by the Defendants: (1) "Defendant Horta-Osório's 'resignation' and Lehmann's appointment as Chairman of the Board of Directors would have no meaningful effect on Credit Suisse's 'new strategy' or 'stronger risk culture' and/or control governance procedures and/or policies;" and (2) "the Company was not dedicated to a 'new strategy' that promoted a 'stronger risk culture' and no 'lessons would be learned' from the Archegos and Greensill Funds scandals, as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period." *Id.* ¶ 145.

This is yet another circumstance in which Plaintiff challenges language that is considered non-actionable. Vague statements about Company strategy and generating sustainable value are "just the sort of predictive statements of opinion and belief that courts have found immaterial," *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996) (citation and quotation marks omitted), and are far "too general to cause a reasonable investor to rely on them," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (citations and quotation marks omitted).

Additionally, Plaintiff does not allege any factual basis for any assertion that Credit Suisse management knew that these management changes "would have no meaningful effect" on the Company's new strategy and risk culture, or his conclusory and speculative assertion that "no lessons would be learned from the Greensill and Archegos scandals." *See NBTY*, 224 F.Supp.2d at 493. These allegations "hardly suffice[s] to support [his] claim." *In re Donna Karan Int'l Sec. Litig.*, No. 97-cv-2011, 1998 WL 637547, at *15 (E.D.N.Y. Aug. 14, 1998). In essence, Plaintiff has alleged that because it all ended badly ("had no meaningful effect"), Credit Suisse never intended to make any changes that might have had meaningful effects. I am starting to sound like a broken record, but this is classic "it didn't turn out well, so obviously it was never intended to turn out well" – fraud by hindsight. *See In re QTL Inc. Sec. Litig.*, 312 F.Supp.2d 526, 534–35 (S.D.N.Y. 2004).

## XXVII.    January 25, 2022: Preliminary Fourth Quarter and Fiscal Year 2021 Earnings Media Release

Plaintiff challenges representations made in the Company's Preliminary FY21 Media Release:

> *With regard to our underlying business results, as we indicated in our announcement of November 4, 2021, we have seen a reduction in transaction-based revenues in the Investment Bank and our wealth management businesses. This reflects the usual seasonal slowdown but, in addition, business activity reflects the reversion to more normal trading conditions after the exceptional environment that prevailed for most of 2020 and 2021. Combined with the reduction in our overall risk appetite, including our decision to substantially exit our prime services business, this has resulted in a loss for the fourth quarter 2021 in the Investment Bank division (before the goodwill impairment). In our wealth management businesses, there has been a significant slowdown in transaction activity in the International Wealth Management and Asia Pacific divisions, with the latter also reflecting client de-leveraging mainly due to the adverse market conditions in Asia. As a consequence, fourth-quarter 2021 net new assets for our wealth management businesses will be modestly negative, albeit more than offset by inflows in our Asset Management business.*

Compl. ¶ 146. Plaintiff claims that this portion of this media release is materially false and/or misleading because it misrepresents and fails to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's reduced revenues were not attributable to a 'usual season slowdown,' 'the reversion to more normal trading conditions,' or 'adverse market conditions in Asia,' but instead the Company was experiencing significant and unusual customer and/or asset outflows, which the Company failed to disclose;" and (2) there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 147.

Plaintiff's allegations are again defeated by his "fail[ure] to allege any facts upon which an inference of wrongdoing may be gleaned or is reasonably warranted from [the] defendant[s] statements." *Schwartz v. Novo Industri A/S*, 658 F.Supp. 795, 798 (S.D.N.Y. 1987). Plaintiff simply asserts that various statements about the reasons for the Company's decline in revenue were untrue, and that there existed unspecified material weaknesses in the Company's ICFR. However, he does not plead any facts to back those assertions up – other, of course, than the Company's eventual failure or, in the case of the ICFR, the fact that, in March 2023, the Company would reveal in its 2022 Annual Report that it had identified material weaknesses in its ICFR going back

to 2021. *See* Compl. ¶ 332. This, again, is fraud by hindsight. *See San Leandro*, 75 F.3d at 812.

Additionally, Plaintiff fails to relate his claim about the Company's ICFR to the challenged

statement. *See Macquarie*, 601 U.S. at 264. Thus, there is nothing in the pleading showing that

these statements were untrue or that Defendants had any reason to believe that these statements

were fraudulent at the time they were made. *Schwartz*, 658 F.Supp. at 798.

Plaintiff has also not alleged any facts tending to show that the Company *was* experiencing

unusual and undisclosed customer outflows at the time the Company issued its Preliminary FY21

Media Release (please note the disclosure of customer outflows just two months earlier, as

discussed at *supra* p. 83). And as noted repeatedly above, Credit Suisse was not required to

characterize, in a negative manner or otherwise, the facts it did disclose, *see MGT*, 2018 WL

1224945, at *11 – which were that the Bank experienced Q4 losses in the Investment Banking

Division and Wealth Management, which losses were offset by increases in inflows in Asset

Management. There is no allegation that these disclosures were false, only that the Bank failed to

characterize them with sufficient negativity, which is not a violation of the securities laws.

*Klamberg*, 473 F.Supp. at 551 (quoting *Goldberg*, 567 F.2d at 218 n.8) (collecting cases).

### XXVIII.    February 10, 2022: Fourth Quarter and Fiscal Year 2021 Media Release and Investor Presentation

Plaintiff challenges representations made by Gottstein in the Company's FY21 Media

Release:

> ["]*During the last three quarters of the year, we ran the bank with a constrained risk appetite across all divisions as we took decisive actions to strengthen our overall risk and controls foundation and continued our remediation efforts*, including on the Supply Chain Finance Funds matter, where our priority is to return cash to investors.

> *…I am confident that we are well-positioned to build a stronger and customer-centric bank that puts risk management at the very core of its DNA in order to deliver sustainable growth and value for investors, clients and colleagues.*

Compl. ¶ 148. Plaintiff asserts that Gottstein's quotes were materially false and misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had not 'taken decisive actions to strengthen our overall risk and controls foundation,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "the Company was experiencing significant and unusual customer and/or asset outflows;" and (3) "at the time, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 149.

Gottstein's statements about his confidence in the Company's positioning "were, without more, simply expressions of confidence in the viability of [the Company's] future business which do not give rise to a securities violation." *Steinberg v. Ericsson LM Tel. Co.*, No. 07 Cv. 9615, 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008). No facts are alleged tending to show that the Company failed to take action to strengthen overall risk and controls during the last three quarters of FY21, or that the Company failed to continue remediation efforts. Instead, all Plaintiff has offered are conclusory allegations about the Company's alleged lack of decisive actions, significant and unusual customer and/or asset outflows, and material weaknesses in its ICFR – the latter two of which the proffered statements do not even address, and the former of which is "grounded more in hindsight than in fact." *Pfeiffer v. Goldman, Sachs & Co.*, No. 02 Civ. 6912, 2003 WL 21505876, at *5 (S.D.N.Y. June 30, 2003) (citation omitted). Additionally, he does not connect the "pure omission" that there existed material weaknesses in the Company's ICFR to the

challenged statements. *See Macquarie*, 601 U.S. at 264. "These allegations do not satisfy the heightened pleading requirements applicable in this case. . . ." *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.Supp.2d 365, 375 (S.D.N.Y. 2007).

### XXIX. February 10, 2022: Fourth Quarter and Fiscal Year 2021 Earnings Release

Plaintiff includes in the Complaint the following language from the Company's FY21 Earnings Release:

**4Q21 results**

As of the end of 4Q21, assets under management of CHF 1,614.0 billion decreased CHF 9.0 billion compared to the end of 3Q21. The decrease was driven by unfavorable foreign exchange-related movements, partially offset by favorable market movements and net new assets of CHF 1.6 billion.

Net new assets of CHF 1.6 billion in 4Q21 mainly reflected inflows across the following businesses. Net new assets of CHF 4.7 billion in Asset Management were mainly driven by inflows from investments and partnerships, primarily related to an emerging markets joint venture, as well as traditional investments, primarily related to index solutions. Net new assets of CHF 2.7 billion in International Wealth Management reflected inflows in emerging markets and Western Europe. ***These inflows were partially offset by net asset outflows of CHF 2.9 billion in Asia Pacific, which mainly reflected outflows from Greater China and included client deleveraging as well as de-risking measures we have taken, and net asset outflows of CHF 1.8 billion in the Private Clients business of Swiss Universal Bank, which mainly reflected outflows in the UHNW and HNW client segment as well as the usual seasonal slowdown in the fourth quarter.***

**2021 results**

As of the end of 2021, assets under management of CHF 1,614.0 billion increased CHF 102.1 billion compared to the end of 2020. The increase was driven by favorable market movements, net new assets of CHF 30.9 billion and favorable foreign exchange-related movements, partially offset by structural effects….***Structural effects also reflected the strategic decision to exit substantially all of our prime services businesses.***

Net new assets of CHF 30.9 billion in 2021 mainly reflected inflows across the following businesses. Net new assets of CHF 14.6 billion in Asset Management were mainly driven by inflows from investments and partnerships, primarily related to an emerging markets joint venture, traditional investments, primarily related to index solutions. Net new assets of CHF 11.0 billion in International Wealth Management mainly reflected inflows in

emerging markets and Western Europe. Net new assets of CHF 5.1 billion in the Corporate & Institutional Clients business of Swiss Universal Bank reflected inflows from the pension and external asset managers businesses. Net new assets of CHF 1.4 billion in the Private Clients business of Swiss Universal Bank reflected inflows across all client segments. ***These inflows were partially offset by net asset outflows of CHF 1.1 billion in Asia Pacific, which mainly reflected outflows from Japan and China, and included client deleveraging as well as de-risking measures taken during the year***, partially offset by inflows from Australia."

Compl. ¶ 150. Plaintiff asserts that the above excerpt is materially false and/or misleading because it misrepresents and fails to disclose adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's outflows were not chiefly attributable to a 'usual season slowdown' or 'client deleveraging as well as de-risking measures,' but instead the Company was experiencing significant and unusual customer and/or asset outflows, which Defendants failed to disclose;" and (2) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 151.

Though Plaintiff asserts that the Company inaccurately attributed outflow trends to a seasonal slowdown or client deleveraging, he alleges not a single fact tending to demonstrate that this was not accurate. Plaintiff, in making purely conclusory allegations, fails to plead adequately that the statements about those matters were false and/or misleading when made. *See City of Birmingham*, 2020 WL 2834857, at *6. Once again, Plaintiff is simply complaining about the Company's failure to characterize certain disclosed facts in a negative manner (*i.e.*, as "significant and unusual"). As to the repeated allegation regarding material weaknesses in the Company's ICFR, no facts are pleaded tending to show that management was aware of material weaknesses in the Company's ICFR at the time these statements were made. Moreover, Plaintiff does not so relate the alleged material weaknesses in the Company's ICFR to the challenged statements or explain why that allegation (which would eventually be proven true) rendered this particular statement either false or misleading. *See Macquarie*, 601 U.S. at 264.

**XXX.    February 10, 2022: Fourth Quarter and Fiscal Year 2021 Earnings Conference**

Excerpts from the Company's Fourth Quarter 2021 Earnings conference call extend for several pages and contain multiple "statements." Compl. ¶¶ 152–56. Plaintiff challenges the following representations made by various Defendants during the conference call (as indicated by his use of bold-faced type):

_Defendant Gottstein_:

- "Our results were significantly affected by goodwill impairment and litigation provisions. In addition, they were impacted by lower transaction-based revenues and reflected more normal trading conditions, client deleveraging and a significant reduction of our overall risk appetite in 2021. . . . we took a number of decisive steps last year to position ourselves for sustainable growth."

- "Firstly, we strengthened our capital position and substantially reduced our risk positions. Secondly, we strengthened risk and compliance teams, systems and processes and underwent a comprehensive risk review across the entire group, which was completed in the fourth quarter. And thirdly, we strengthened our leadership in the investment bank, in asset management, in risk, in compliance, in technology and operations, in wealth management, as well as most recently in human resources. This will not be a quick fix, and we expect 2022 will be a transition year. But we have made clear progress in creating the conditions for a much more stable and predictable bank."

- "Management and the board of directors spent a great deal of time and energy in 2021 strengthening our risk and compliance efforts, including in our first line of defense. . . . We are confident that the changes we are making across our risk and compliance functions will support our growth ambitions in the strategic plan. You can see the steps we have taken at the top of the slide as regards our leadership and governance, our risk appetite and our risk culture. Next slide, please. Here, you see the substantial risk reduction we achieved since the first quarter of 2021 at the group level as well as in investment bank and across our wealth management businesses." _Id._ ¶ 152.

- "[N]o, I don't think there is any contradiction to that at all. . . . First of all, what we've seen really in Q4 was the result of a series of steps we've taken during the year in terms of strengthening our leadership and governance in risk management in terms of recalibrating our risk appetite and reducing our risk positions starting, obviously, within the investment bank and prime services."

- "[W]e are strengthening the risk culture with a much more disciplined approach around risk in both the first line and second line of defense, significant investments across risk and

compliance, etc. And this all leads to -- or led to a real slowdown in Q4 and has now been really, I would say, embedded and has now laid the foundation for a very disciplined slow growth coming forward now in Q1 and beyond."

- "I mean, banking is about risk management. It's not about avoiding risk. It's about proper risk management, and that's really what the executive board and including myself, are telling all our troops. We want to have disciplined approach to risk, but we want to do new business. So that's very clear. And in that sense, we see absolutely no contradiction when we say on one side, we want to further strengthen the risk culture. But at the same time, regaining some revenue momentum." *Id.* ¶ 154.

- An analyst asked if "there is a deep understanding across the franchise about exactly what risk tolerance levels are acceptable," to which Gottstein responded: "Absolutely. I think that has become very clear. We have recalibrated our risk appetite division by division and region by region. . . . So this has really been now starting to work very well." *Id.* ¶ 155.

- When questioned by an analyst about the "group risk review" vis-à-vis "the Greensill report and the conclusions out of that report," Gottstein responded, in part: "we really had three themes that this tactical crisis committee looked at. One was Archegos agreed across, one was supply chain funds and agreed across and the third one was the risk review. And the risk review was really a very systematic review of all balance sheet items and off-balance sheet items. It was really a very detailed analysis so to speak, vertically through the balance sheet and -- but then also looking at each of the divisions and regions, looking at special themes, special businesses, whether it was in investment banking, whether it was in corporate banking, whether it was Level 3 assets, etc. . . . . And all three have essentially been completed. . . . So all three themes have really been completed. And from that perspective, also the tactical crisis committee is now essentially being phased out." *Id.* ¶ 156.

### *Defendant Mathers*:

- "[W]e've continued to make progress in growing assets under management and increasing our mandate volumes."

- "Now, as we've seen before in the fourth quarter, and this is -- this often happens, there were outflows in our Private Client business totaling 1.8 billion Swiss francs." *Id.* ¶ 153.

Plaintiff states that Gottstein and Mathers' statements are materially false and/or misleading because they misrepresent and fail to disclose certain facts known to or recklessly disregarded by the Defendants: (1) "the Company had not 'strengthened' its 'risk positions,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or

control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "the Company was experiencing significant and unusual customer and/or asset outflows, which were not due to 'client deleveraging' or 'challenging markets;'" and (3) "at the time, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 157.

Plaintiff has not identified any facts which support his allegation that the statements made at the Fourth Quarter and Fiscal Year 2021 Earnings Conference were false. *See Schwartz*, 635 F.Supp. 1465. Instead, he relies solely on conclusory allegations about the Company's purported failure to take steps that would improve its risk positions, outflows, and ICFR. He fails to acknowledge that Gottstein, after outlining steps taken by the Company – steps that Plaintiff fails to allege are false with any supporting facts – notes that, while Credit Suisse has made progress in creating conditions for a most stable bank, "this will not be a quick fix" – a disclosure that is both undoubtedly true and that contextualizes the various statements about the steps the Company is taking during what it expects will be a "transition year" (*i.e.*, 2022). Compl. ¶ 152. And again, the repeated allegation about the existence of material weaknesses in the Company's ICFR is not related to anything in these alleged misstatements, and Plaintiff does not explain why this allegation renders anything said during the Company's Fourth Quarter and Fiscal Year 2021 Earnings Conference either false or misleading. *See Macquarie*, 601 U.S. at 264.

## XXXI. February 18, 2022: Defendant Gottstein Interview with *Finanz und Wirtschaft*

Plaintiff challenges as misleading Gottstein's remarks in an interview with Swiss newspaper *Finanz und Wirtschaft*, which were then summarized in a *Reuters* article. *Id.* ¶ 158. Plaintiff highlights the following portion of the *Reuters* article:

Credit Suisse (CSGN.S) aims to make a profit this year, Chief Executive Thomas Gottstein told Swiss newspaper *Finanz und Wirtschaft* in an interview published on Friday.

"We expect a profit in 2022. But uncertainty factors such as Russia, China, inflation and the interest rate environment are difficult to assess," he said.

\*    \*    \*

Gottstein said he was convinced the bank's strategy of focusing even more on wealth management would pay off in the long run.

Asked about his relations with new Chairman Axel Lehmann, Gottstein said they were good. "We agree 100% on strategic issues and are ***concentrating on implementing the new strategy***," he said.

Addressing speculation that a plunge in the bank's stock price had left Credit Suisse exposed to a takeover, Gottstein said he believed the group was substantially undervalued.

"That this can trigger takeover fantasies is neither new nor surprising. If the bank is so undervalued, you should have had an offer on the table long ago," he said.

"Firstly, taking over a systemically important bank is not easy. Secondly, and more importantly, Credit Suisse, with its 165-year history, has many strengths that arouse interest among rivals. But we want to play to our strengths ourselves, both nationally and internationally," he added.

*Id.* ¶ 159. Plaintiff claims that the representations Gottstein made were materially false and/or misleading because they misrepresented and failed to disclose the fact, which was known to or recklessly disregarded by the Defendants, that "the Company's new 'strategy' was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices." *Id.* ¶ 160.

Gottstein's remarks about the Company's expectations and new strategy are not actionable, as remarks of this sort "do not give a reasonable investor meaningful information on which to rely." *Xerox*, 300 F.Supp.3d at 569 (collecting cases). In addition, Plaintiff's challenge to the veracity of Gottstein's remarks is utterly devoid of factual support – there is not a single allegation that Gottstein knew that Credit Suisse's proposed strategy was flawed and doomed to fail.

Moreover, it is not possible for Gottstein's remarks to be false insofar as the strategy that was in the process of being implemented could not have been known to be "fundamentally flawed" until it played itself out. "Such predictions about the future are not rendered fraudulent just because in hindsight they turn out to have been wrong." *Nemo Tile Co. v. Shawmut Nat. Corp.*, No. 95 cv 0757, 1995 WL 1682315, at *2 (E.D.N.Y. Nov. 1, 1995). Plaintiff's challenge is just another instance of fraud by hindsight – a defect that plagues the Complaint in this case. *See Novak*, 216 F.3d at 309.

## XXXII.    February 20, 2022: Suisse Secrets Press Release

On or about February 20, 2022, press reports appeared about a data leak at Credit Suisse involving some 18,000 accounts that were linked to criminals and sanctioned persons.[5] Compl. ¶¶ 12, 161, 347, 397, 420. Plaintiff alleges that  some of the Company's disclosures in a press release addressing these "Suisse Secrets" articles were false and misleading:

> ***Credit Suisse strongly rejects the allegations and insinuations about the bank's purported business practices.*** The matters presented are predominantly historical, in some cases dating back as far as the 1940s, and the accounts of these matters are based on partial, inaccurate, or selective information taken out of context, resulting in tendentious interpretations of the bank's business conduct. While as a matter of law Credit Suisse cannot comment on potential client relationships, ***we can confirm that actions have been taken in line with applicable policies and regulatory requirements at the relevant times, and that related issues have already been addressed.***

> Following numerous inquiries by the consortium over the last three weeks, ***Credit Suisse has reviewed a large volume of accounts potentially associated with the matters raised.*** Approximately 90% of the reviewed accounts are today closed or were in the process of closure prior to receipt of the press inquiries, of which over 60% were closed before 2015. Of the remaining active accounts, ***we are comfortable that appropriate due diligence, reviews and other control related steps were taken in line with our current framework. We will continue to analyze the matters and take additional steps if necessary.***

---

[5]    *See. e.g.*, PYMNTS, *Report: Extensive Credit Suisse4 Leak Shows Alleged Criminal Ties*, PYMNTS, (Feb. 21, 2022),    https://www.pymnts.com/bank-regulation/2022/report-extensive-credit-suisse-leak-shows-alleged-criminal-ties [https://perma.cc/Z6MG-KCRB]. The Court may take judicial notice of newspaper articles without converting a motion to dismiss into a motion for summary judgment. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); Fed. R. Evid. 201(c)(2).

Credit Suisse notes that the consortium is referring to a large number of external sources including those previously known as well as an alleged leak in their reporting. ***We take this latter allegation very seriously and will continue with our investigations with an internal task force including specialist external experts.*** We have robust data protection and data leakage prevention controls in place to protect our clients.

***As a leading global financial institution, Credit Suisse is deeply aware of its responsibility to clients and the financial system as a whole to ensure that the highest standards of conduct are upheld.*** These media allegations appear to be a concerted effort to discredit not only the bank but the Swiss financial market-place as a whole, which has undergone significant changes over the last several years. In line with financial market reforms across the sector and in Switzerland, ***Credit Suisse has taken a series of significant additional measures over the last decade, including considerable further investments in combating financial crime. Across the bank, Credit Suisse continues to strengthen its compliance and control framework, and as we have made clear, our strategy puts risk management at the very core of our business.***"

Compl. ¶ 161. Allegedly, the above excerpt from the Company's Suisse Secrets press release is materially false and/or misleading because it misrepresents and fails to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had not conducted 'appropriate due diligence, reviews and other control related steps' vis-à-vis the Suisse Secrets customers and/or accounts;" (2) "the Company had not 'strengthen[ed] its compliance and control framework' and 'risk management' was not 'at the very core of [its] business;'" (3) "Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 162.

Plaintiff's assertions that the Company never implemented meaningful changes to its risk management and/or control governance procedures and/or policies, and that there existed material weaknesses in the Company's ICFR, are defeated here, as elsewhere, by their lack of particularity. *See In re Sanofi Sec. Litig.*, 155 F.Supp.3d 386, 402 (S.D.N.Y. 2016). All of those assertions are

conclusory, and the last does not relate in any way to the challenged disclosure, *see Macquarie*, 601 U.S. at 264 – which is about a data leak – such that it might render that disclosure either false or misleading. Additionally, Plaintiff simply states that the Company's representations about conducting appropriate due diligence, reviews, and other control-related steps were false, but no facts are alleged tending to show that the Company did not conduct such reviews or that Defendants knew these statements were false or misleading when made. *See Adient*, 2020 WL 1644018, at *13. And finally, the Company's statement that it "continues to strengthen its compliance and control framework . . ." is "precisely the type of 'puffery' that [the Second] and other circuits have consistently held to be inactionable." *Lasker*, 85 F.3d at 59. It is "so broad and nebulous as to not provide any specific or concrete guarantee on which a reasonable investor could have relied." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F.Supp.3d 12, 28 (S.D.N.Y. 2016).

## XXXIII.    March 10, 2022: 2021 Annual Report

Plaintiff challenges as false and misleading certain language from the Company's Annual Report for the year ending on December 31, 2021:

### Evaluation of disclosure controls and procedures

The CEO and CFO concluded that, as of December 31, 2021, the design and operation of the Group's **disclosure controls and procedures were effective, in all material respects, to ensure that information required to be disclosed in reports filed and submitted under the Exchange Act is recorded, processed, summarized and reported as and when required.**

\*        \*        \*

Based upon its review and evaluation, management, including the Group CEO and CFO, **has concluded that the Group's internal control over financial reporting is effective as of December 31, 2021.**

The Group's independent registered public accounting firm, PricewaterhouseCoopers AG, has issued an unqualified opinion on the effectiveness of the Group's internal control over financial reporting as of December 31, 2021, as stated in their report.

**Changes in internal control over financial reporting**

***There were no changes in the Group's internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Group's internal control over financial reporting.***

Compl. ¶ 163. Plaintiff asserts that the excerpt from the Company's 2021 Annual Report is materially false and/or misleading because it misrepresents and fails to disclose the facts, known to or recklessly disregarded by the Defendants, that the Company's ICFR was not "effective" and there existed material weaknesses in the Company's ICFR. *Id.* ¶ 164.

Again, we are in the province of factually unsupported conclusions trying to cover for what is actually fraud by hindsight. Attached to the Company's 2021 Annual Report filed with the SEC was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." *Id.* ¶ 331. PwC AG opined in its 2021 Annual Report Audit that "the Group maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the COSO." *Id.* It is true that, a year later, PwC AG would revise its view and determine that there were material weaknesses in the Company's ICFR as of December 31, 2021. *Id.* ¶ 341. But there is no allegation of fact tending to show that these material weaknesses were known to Company management when Credit Suisse filed its 2021 Annual Report. "Because the securities laws do not allow fraud by hindsight claims, after-the-fact allegations that statements in one report" – *e.g.*, the Company's material weaknesses in its ICFR disclosed in its 2022 Annual Report, filed on March 14, 2023 – "should have been made in earlier reports do not make out a claim of securities fraud."

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F.Supp.2d 287, 301 (S.D.N.Y. 2010) (citing *Acito*, 47 F.3d at 53) (internal quotation marks omitted); Compl. ¶ 340. And "[i]n the absence of any particularized facts in support of [his] allegations," Plaintiff "ha[s] failed to adequately allege that the defendants violated Rule 10b-5 by making materially false and misleading statements." *Ferber v. Travelers Corp.*, 802 F.Supp. 698, 712 (D. Conn. 1992).

Plaintiff also challenges language from other portions of the Company's 2021 Annual Report, reproduced below:

> The year 2021 was very disappointing and challenging for Credit Suisse. Our reported financial results were negatively impacted by the Archegos and Supply Chain Finance Funds (SCFF) matters, a goodwill impairment and litigation provisions as we worked to proactively resolve legacy issues. We deeply regret that the Archegos and SCFF matters have caused significant concerns for our stakeholders, and we would like to thank them for their support during these times. We recognize that there are no quick fixes, and 2022 is expected to be a transition year**. Still, we have achieved a great deal, in difficult circumstances, to turn the page and set the path for the future with our new Strengthen, Simplify and Invest for Growth strategy. We have made a number of enhancements throughout the year, and thanks to the dedication of our employees around the world, we are rebuilding a bank we can all be proud of, with the clear aim of delivering sustainable growth and value for our shareholders.** At the same time, the world around us is changing in at times alarming ways, with the ongoing effects of COVID-19 and, more recently, the tragic consequences of Russia's invasion of Ukraine. As a global financial institution, we have a crucial role to play for our clients, investors, employees, communities, societies and economies that are confronting immense challenges. *We understand we have to work hard to retain the trust of all our stakeholders. We are up to the task.*
>
>    *   *   *
>
> *We have reviewed our positions and believe that the bank's exposure in relation to Russia is well-managed and that we have appropriate systems in place to address associated risks.*
>
>    *   *   *
>
> *Our market risk exposure to Russia as of March 9, 2022 is not significant. Credit Suisse is monitoring settlement risks related to certain open transactions with Russian banks and nonbank counterparties or Russian underlyings as market closures, the imposition*

*of exchange controls, sanctions or other factors may limit our ability to settle existing transactions or realize collateral which may result in changes in our exposure.*

*     *     *

*To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.*

Compl. ¶ 165. Plaintiff claims that this portion of the Company's 2021 Annual Report is materially false and/or misleading because it misrepresents and fails to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had not established a strategy for 'sustainable growth and value,' as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period;" (2) "the Company did not maintain a 'sufficient' liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not 'conservative' and were materially deficient at all times;" (3) "the Company's exposure to Russia was not 'not significant' or 'well-managed;' to the contrary, the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 166.

Plaintiff's argument that the Defendants "never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies" is, once again, simply fraud by hindsight pleading. His assertion that the Company had not established a strategy for sustainable growth and value is entirely conclusory. As to Plaintiff's allegations about the Company's liquidity pool and liquidity and funding profile, policy, and or/risk parameters, "the

Complaint . . . fails to allege with any specificity the reason or reasons why [these] statements were false or misleading." *Pollio*, 608 F.Supp.2d at 570.

In order to evaluate the language concerning the Russia/Ukraine situation, it is necessary to take judicial notice of the undeniable fact that Russia invaded Ukraine in February 2022, and the EU imposed multiple escalating sanctions starting as early as February 23, 2022.[6]  In light of that information, which was known to the market, alleging in general terms that the Company "had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine," Compl. ¶ 166, does not demonstrate with specificity that the Company was not, as it claimed, monitoring risks associated with its dealings with Russia in light of the rapidly unfolding situation, *id.* ¶ 165; *see In re Supercom Inc. Sec. Litig.*, No. 15 Civ. 9650, 2018 WL 4926442, at *25 (S.D.N.Y. Oct. 10, 2018). The same can be said about Plaintiff's allegations regarding the Company's ICFR – but not only are his allegations conclusory and reliant on hindsight pleading, they also are not related to the disclosures within this portion of the 2021 Annual Report. *See Macquarie*, 601 U.S. at 264.

Finally, Plaintiff challenges the Company's 2021 Annual Report based on the following disclosure:

> The accompanying consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). The financial year for the Group ends on December 31. Certain reclassifications have been made to the prior year's consolidated financial statements to conform to the current presentation which had no impact on net income/(loss) or total shareholders' equity.

Compl. ¶ 315. He asserts that the above language was materially false or misleading, or omitted information necessary to make them not misleading, because Credit Suisse's 2021 Annual Report

---

6    *See, e.g.*, *Timeline – EU sanctions against Russia*, European Council Council of the European Union, https://www.consilium.europa.eu/en/policies/sanctions-against-russia/timeline-sanctions-against-russia (last visited Aug. 7, 2024).

did not comply with GAAP, "but rather resulted from a series of decisions by Defendants designed to conceal the truth regarding Credit Suisse's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. As a result, Defendants materially misstated the Company's financial results . . . ." *Id.* ¶ 317.

This is effectively the same as Plaintiff's challenges to disclosures addressing GAAP in the Company's First, Second, and Third Quarter 2021 Reports, where Plaintiff called attention to language in the report that states that it was "prepared in accordance with accounting principles generally accepted in the US (US GAAP)" and claimed that the financial statement was materially false and misleading because it did not comply with GAAP and SEC Rules. *Id.* ¶¶ 312, 314.

As applied to the Company's 2021 Annual Report, the argument is deficient for the reasons articulated above. *See, e.g.*, *supra* pp. 55–56.

## XXXIV.    March 10, 2022: 2021 Annual Report SOX Certifications

In connection with the filing of the Company's 2021 Annual Report on Form 20-F with the SEC, Defendants Gottstein and Mathers executed SOX Certifications that attested to the purported accuracy and completeness of the Company's financial and operational reports, as well as statements concerning Credit Suisse's internal controls and procedures. Compl. ¶ 318. Plaintiff calls attention to the following language from the SOX Certifications:

1. I have reviewed this annual report on Form 20-F of Credit Suisse Group AG and Credit Suisse AG;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report;

4.    The registrants' other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrants and we have:

a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrants, including their consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    evaluated the effectiveness of the registrants' disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    disclosed in this report any change in the registrants' internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is likely to materially affect, the registrants' internal control over financial reporting; and

5.    The registrants' other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrants' auditors and the audit committee of each of the registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrants' ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting.

*Id.* Plaintiff asserts that the SOX Certifications were materially false and misleading because the 2021 Annual Report "did not comply with GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. Furthermore, contrary to the statements in Defendants' SOX Certifications, as Defendants themselves would later admit, Credit Suisse's internal controls over financial reporting suffered from material weaknesses, and, as a result, the Company's financial reports were inaccurate, unreliable, and/or subject to manipulation." *Id.* ¶ 319.

Plaintiff fails to state a claim for several reasons. First, he fails to identify any specific GAAP provision or SEC rule that the Credit Suisse Defendants violated, which is a fatal defect at the motion to dismiss stage.[7] *See Harris*, 135 F.Supp.3d at 171 n.28. Second, he fails to appreciate that each of the challenged statements in the SOX Certifications is a statement of opinion. *In re Lottery.com, Inc. Sec. Litig.*, No. 1:22-cv-07111, 2024 WL 454298, at *27 (S.D.N.Y. Feb. 6, 2024). Gottstein and Mathers both certified that the Company's financial and operational reports were accurate and complete, but their certifications contained an important qualification: that the certifying officer's statements were true "based on [his] knowledge." Compl. ¶¶ 318–19; *see Lottery.com,* 2024 WL 454298, at *27; *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F.Supp.3d 500, 517 (S.D.N.Y. 2017); *Lachman*, 487 F.Supp.3d at 134 (citations omitted). A genuinely held opinion that turned out to be wrong is not necessarily actionable. *DeCarlo*, 80 F.4th at 176 (citing *Omnicare*, 575 U.S. at 186). Plaintiff fails to allege a single fact

---

[7]    *Krasner v. Rahfco Funds LP*, No. 11 cv 4092, 2012 WL 4069300, at *6 (S.D.N.Y. Aug. 9, 2012); *Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *12 (S.D.N.Y. Aug. 22, 2005); *see also Stratte-McClure v. Morgan Stanley*, 784 F.Supp.2d 373, 386 (S.D.N.Y. 2011); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F.Supp.2d 452, 477 (S.D.N.Y. 2006).

tending to show that either Gottstein or Mathers had actual knowledge, at the time he certified, that the 2021 Annual Report did not comply with GAAP and/or SEC Rules, or that Gottstein or Mathers knew about any material weaknesses within the Company's ICFR at the time they filed their SOX Certifications on March 10, 2022. The SOX Certifications occurred months prior to the two incidents that (as will be seen below) are alleged to have alerted Credit Suisse executives to this issue: the Company's placement on the UK's financial regulator's watchlist, Compl. ¶ 401; *see infra* pp. 137–38, and the commencement of the Company's correspondence with the SEC about portions of the Company's 2021 Annual Report, *see infra* pp. 150–51; Compl. ¶¶ 387–88; *see also* Ex. 10 to Matuschak Decl.

    In his brief opposing the Credit Suisse Defendants' motion to dismiss, Plaintiff tries to distinguish this case from *DeCarlo*, 80 F.4th at 176, and *Citigroup*, 2023 WL 2632258, at *20. But his effort fails. In both of those cases, complaints were dismissed because all that the plaintiffs alleged was that the defendants must not have believed the SOX certifications when they were made because the company subsequently admitted deficiencies. CS Opp. Memo, at 20–21. But that is *exactly* what Plaintiff pleads here. In connection with the Company's 2021 Annual Report, "Plaintiff offers nothing beyond conjecture to suggest that the Individual Defendants knew—at the time they signed their certifications—of any misrepresentations in [Credit Suisse's] financial statements or deficiencies in the Company's internal controls." *Citigroup*, 2023 WL 2632258, at *20. Issues with the Company's ICFR were disclosed in its *2022* Annual Report – Plaintiff states in his pleading that in Credit Suisse's 2022 Annual Report, the Company admitted it had identified material weaknesses in its internal control over financial reporting. Compl. ¶ 17. But that report was not filed until March 2023. That Credit Suisse, after the filing of its 2021 Annual Report, subsequently identified issues with its ICFR does not mean

that the SOX Certifications for 2021 were false *when made*. This "change in opinion, standing alone, does not mean that the original certified opinions were disingenuous." *DeCarlo*, 80 F.4th at 176.

And while Plaintiff is correct that opinion statements containing false embedded factual statements, or implied facts that can be proven false, are actionable, CS Opp. Memo, at 20, "Plaintiff does not identify any such supposed factual statements or explain how any such statements are alleged to be false." CS Reply, at 10–11.

"Since the statements are predicated on the certifying officer's belief, and Plaintiff[] do[es] not sufficiently allege that [the certifying officers] believed the statements were false or misleading," *In re Veon Ltd. Sec. Litig.*, No. 15-cv-08672, 2018 WL 4168958, at *14 (S.D.N.Y. Aug. 30, 2018), the Court concludes that Gottstein and Mathers' SOX Certifications were non-actionable statements of opinion, *see Lottery.com*, 2024 WL 454298, at *28.

## XXXV.       March 15, 2022: Morgan Stanley European Financials Conference

Following the invasion of Ukraine, Credit Suisse was faced with a whole new set of challenges relating to its Russian accounts/relationships and the sanctions imposed by the EU. These challenges, and how Credit Suisse was dealing with them, were discussed in many of the Company's public statements for the rest of the year.

Plaintiff challenges as false and misleading comments made by Defendant Gottstein during an interview with a Morgan Stanley analyst at Morgan Stanley's European Financials Conference:

- When questioned about Credit Suisse's exposures in relation to the Russia-Ukraine situation, Gottstein replied: ***So in terms of net credit exposure, CHF 850 million at the end of '21. And we also announced that we reduced this. So we reduced this materially actually at the end of -- at the second month of February….We have roughly 4% of our assets under management, and Wealth Management is with Russian clients, be they Russia domiciled or Russian nationals, who live in the West.*** So -- and obviously, we used

to have a meaningful equity and trading business and Investment Banking business. ***So obviously, like everybody else, we are now reviewing the situation.*** It's a very serious situation, and we will have to see now over the next few months, what this all means for our operation in Russia. I have not taken any decisions on that. So that's kind of a primary effect perspective. Compl. ¶ 167.

- When asked about the Company's posture regarding potential sanctions relating to Russia-Ukraine, Gottstein responded: ***[Y]ou have to follow the sanctions.*** And for us, the fact that Switzerland also joined EU sanctions was actually almost irrelevant because we were anyway -- for us, the U.S., U.K. and EU sanctions were already binding. So the Swiss following these sanctions was -- I mean it was important for the country, and I think it was the right step. ***But for us, it's very important that the teams are implementing these sanctions and following these sanctions and there is zero tolerance, obviously, that we have to implement them.*** And we also have experience from previous situations in the past when we had these sanctions. *Id.* ¶ 168.

- When questioned about the Company's progress on the 2021 risk and strategy reviews, Gottstein responded: '21 was a challenging year, but ***we also achieved a lot in terms of strengthening our risk management, also strengthening our Executive Board….*** You mentioned ***the risk review, which we completed in December, which was a very thorough and analytical process through the entire group***, whether it was in terms of Investment Banking, Wealth Management or the other divisions and region by region. ***So we feel actually very good about this. We have, obviously, with David Wildermuth, the new Chief Risk Officer. We have with Rafael Lopez, the new Chief Compliance Officer; and Joanne Hannaford, who joined us also on the 1st of January as the Chief Technology and Operations Officer. And they have really been tremendous in their start.*** *Id.* ¶ 169.

Plaintiff claims that Gottstein's responses were materially false and/or misleading because they misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had not established [sic] 'achieved a lot in terms of strengthening' its 'risk management,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "the Company did not have 'zero tolerance' for non-compliance with Russia sanctions, but instead had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating

to Russia's invasion of Ukraine;" and (3) "at the time, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 170.

Again, Plaintiff has failed to allege falsity and plead fraud with particularity. He has alleged no factual circumstances to support his allegation that the Company had not "achieved a lot" in terms of strengthening its risk management during 2021. *See San Leandro*, 75 F.3d at 812. While Credit Suisse's eventual failure (in 2023) might tend to show that the Company had not managed to achieve "enough" in terms of everything that was needful for adequate risk management, Gottstein's claim that the Company was on the path of strengthening a weakness is not demonstrably false in light of any factual allegation in the Complaint. *Id.* Similarly, Plaintiff's challenges to Gottstein's statements about the Company's approach to sanctions fail because Plaintiff has not alleged any factual basis in support of his claim that such statements were false or misleading. *See NBTY*, 224 F.Supp.2d at 495. Gottstein disclosed that Credit Suisse had Russian clients and that, "like everybody else, we are now reviewing the situation." Compl. ¶ 167. He insisted that "you have to follow the sanctions." *Id.* ¶ 168. Plaintiff has made no showing that Gottstein's characterization of the Company's response to Russia sanctions was not based on the facts available to the Company at the time his statements were made. *See San Leandro*, 75 F.3d at 813.

The same flaw repeats itself with respect to Plaintiff's claim that at the time Gottstein responded to the Morgan Stanley analyst's questions, there existed material weaknesses in the Company's ICFR. That is, of course, the Plaintiff's contention with respect to what seems like nearly every statement that was made by Credit Suisse and its executives throughout the course of a two year period. But the contention that Gottstein knew, at the time he made his statements, that material weaknesses in the Company's ICFR undermined the accuracy of the Company's financial

statements is wholly lacking in factual support. Furthermore, Plaintiff does not allege how this fact relates in any way to the statements made during Gottstein's interview with the Morgan Stanley analyst, or renders them either false or misleading. *See Macquarie*, 601 U.S. at 264.

## XXXVI.    April 4, 2022: Credit Suisse Answers to Ethos Foundation Information Request Regarding Greensill Funds and Suisse Secrets

On March 11, 2022,[8] Credit Suisse received an information request from the Ethos Foundation, "a large group of Swiss pension funds and public utility foundations, and other shareholders," regarding the Greensill Funds failure and the "widely publicized" Suisse Secrets investigation. Compl. ¶ 171. Plaintiff challenges language from the Company's April 4, 2022 Media Release announcing its responses to the Ethos Foundation's questions:

- On the subject of the Greensill funds, Credit Suisse stated the following: "[a]s early as mid-2020, CS Group informed FINMA about the results of the investigation" conducted by the law firm Cahill Gordon & Reindel LLP ("Cahill") at the behest of Credit Suisse regarding the discovery that Credit Suisse Asset Management ("CSAM") entered into a "side letter" agreement whereby SoftBank, which "held a large stake in Greensill and wanted to promote its business," "agreed to invest USD 1.5 billion in the [Greensill Funds]" in exchange for CSAM's "commit[tment] to purchase notes for the [Greensill Funds] only through Greensill in the future." According to Cahill, this side letter agreement "failed to consider the conflicts of interest and violations of the requirement to treat investors equally." *Id.* ¶ 172.

- In response to the Ethos Foundation question asking for an explanation of how the Company's remedial measures have led "to a reduction of the risks" of such a failure reoccurring, the Company stated: "The transition to a separate business unit led by a member of the Executive Board results in direct linkage of Asset Management to the Executive Board and increased transparency vis-à-vis the Executive Board. ***The fact that CSAM is now led by a member of the Executive Board also indicates a much stronger commitment from senior management and a correspondingly stronger direct oversight***

---

[8]    *See Credit Suisse: Ethos requests a special audit*, ETHOS, (Mar. 30, 2022), https://www.ethosfund.ch/en/credit-suisse-ethos-requests-a-special-audit [https://perma.cc/UCF4-D7ZT]; *see also Kramer*, 937 F.2d at 774; Fed. R. Evid. 201(c)(2). "Matters of which judicial notice can be taken include press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d 564, 570 (S.D.N.Y. 2013) (citing *Staehr v. Hartford Fin. Serv. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

*of this business unit.* The same effect is of course achieved by direct reporting to the Executive Board." *Id.* ¶ 173.

- The Company also stated: "***We continue to invest in our Risk and Compliance organizations alongside strengthening of our controls and culture, which remains a key priority building on our new purpose and cultural values***, as referenced within our 2021 Annual Report." *Id.* ¶ 174.

According to Plaintiff, the above responses are materially false and/or misleading because they misrepresent and fail to disclose an adverse fact known to or recklessly disregarded by the Defendants – specifically, that the Defendants did not "implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period." *Id.* ¶ 175. However, Plaintiff's assertion is too conclusory to credit, as it is unsupported by any evidence or relevant facts actually pleaded in the Complaint. *See In re Dynagas LNG Partners LP Sec. Litig.*, 504 F.Supp.3d 289, 318 (S.D.N.Y. 2020). Plaintiff does not allege facts from which it could be inferred that no steps were taken to reduce risk; it is pure fraud by hindsight to assert that one could know in advance that the Company's actions would prove inadequate. *See Plymouth*, 2023 WL 3569068, at *11.

Plaintiff also challenges the Company's following responses:

- "***We are comfortable that based on the results of our preliminary investigation to date there are no new concerns which have been identified and actions taken were in line with applicable processes and requirements at the relevant time and in accordance with our legal and regulatory obligations.*** As we investigate each particular case we also take note of any potential lessons learned that may support the ***many other enhancements…we have made over recent years to our overriding control framework***, which applies globally and where minimum standards apply. We may also re-assess based on current standards and our legal and regulatory obligations to ensure we take appropriate actions up until and including filing of Suspicious Activity Reports. We do this reassessment to ensure that we fully investigate all facts and to eliminate any potential gaps alongside applying current standards where warranted."

- "***At Credit Suisse, we are deeply aware of our responsibility to clients and the financial system as a whole to ensure that the highest standards of conduct are upheld. Whilst such allegations being raised are distracting, we wish to assure you and reiterate that***

*our focus and strategy at Credit Suisse places risk management at the very core of our business*." Compl. ¶ 176.

Plaintiff claims that those responses are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's actions vis-à-vis the Suisse Secrets customers and/or accounts were not 'in line with applicable processes and requirements…in accordance with [] legal and regulatory obligations;'" (2) "the Company had not made 'many [] enhancements' to its 'overriding control framework' in 'recent years' and 'risk management' was not 'at the very core of [its] business;'" (3) "Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" and (4) "at the time, there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 177.

"The particularity requirement demands . . . that plaintiffs sufficiently plead why the statements were fraudulent." *In re NTL, Inc. Sec. Litig.*, 347 F.Supp.2d 15, 22 (S.D.N.Y. 2004). Plaintiff has failed to do so. Plaintiff's justifications for his allegations of falsity are wholly conclusory – nowhere does he allege any facts in support of any of his claims. The Suisse Secrets Leak related to accounts that had at one time been protected by Swiss bank secrecy laws, and it was hardly unknown to the market that Credit Suisse and other Swiss banks had long offered a safe haven for the nefariously derived assets of some very bad people. Nor was it a secret that all Swiss banks, including Credit Suisse, had taken steps to deal with what was left of that long-followed-but-now-discredited national policy. Insofar as Plaintiff alleges that these steps were not sufficiently meaningful, or that the Company failed to make enhancements to its overriding control framework or "meaningful" changes to its risk management and/or control governance procedures and/or policies, or that there existed material weaknesses in the Company's ICFR, his "'allegations

fall pitifully short of the pleading requirements here applicable,' and are insufficient to support an actionable claim of misrepresentation." *Hammerstone NV, Inc. v. Hoffman*, No. 09 CV 2685, 2010 WL 882887, at *8 (S.D.N.Y. Mar. 10, 2020) (quoting *Pollio*, 608 F.Supp.2d at 570). And as to Plaintiff's allegations regarding the Company's ICFR – the challenged statements do not even come close to addressing that topic. *See Macquarie*, 601 U.S. at 264.

### XXXVII.    April 20, 2022: Preliminary First Quarter 2022 Earnings Media Release

Plaintiff challenges language from the Company's media release announcing preliminary financial results for the first quarter of 2022:

> Credit Suisse Group AG (Group) announces today that its reported earnings for the first quarter of 2022 will be negatively impacted by a decision to increase litigation provisions relating to developments in a number of previously disclosed legal matters, all of which originated more than a decade ago, by approximately CHF 600 million, resulting in total litigation provisions for the quarter of approximately CHF 700 million.

> The Group will announce its earnings for the first quarter of 2022 on Wednesday, April 27th, and would expect to report a loss as a consequence of this increase in reserves. ***With regard to our exposure to the impact of Russia's invasion of Ukraine both on our counterparties and on our credit risks, our results will be adversely affected by an aggregate of approximately CHF 200 million of negative revenues and provisions for credit losses.***

Compl. ¶ 178. Plaintiff asserts that this language was materially false and/or misleading because it misrepresented and failed to disclose an adverse fact known to or recklessly disregarded by the Defendants – that "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine." *Id.* ¶ 179.

But Plaintiff has only asserted conclusory allegations about the extent of the Company's sanctions-related risk and exposure. *See JP Morgan*, 363 F.Supp.2d at 634. The situation involving Russia, Ukraine, and sanctions was new – this statement was issued just two months after Russia's invasion – and unfolding, with the EU imposing multiple rounds of sanctions. Yet Credit Suisse

was already advising investors that its results would be adversely impacted by the war. This was hardly the action of an enterprise that was hiding either the fact of risk or its likely impact on the bottom line. No reasonable investor could have required Credit Suisse to be able at this point to predict exactly how, or how much, its bottom line would be impacted by the Russian invasion of Ukraine.

**XXXVIII.    April 27, 2022: First Quarter 2022 Media Release and Investor Presentation**

Plaintiff takes issue with Defendant Gottstein's remarks that were quoted in the Company's media release announcing financial results for the first quarter of 2022:

- The first quarter of 2022 has been marked by volatile market conditions and client risk aversion. These conditions, together with the impact from our reduction in risk appetite in 2021 as *we took decisive actions to strengthen our overall risk and controls foundation*, had an adverse impact on our net revenues….*2022 is a transition year, and our clear focus remains on the disciplined execution of our new Group strategy as announced in November 2021: strengthening our core, simplifying our organization and investing for growth.* We went live with our new structure in January; have reduced the allocated capital in the IB by USD 2.5 bn, 82% of our ambition of more than USD 3.0 bn; and have made significant progress on various other strategic priorities. *I am confident that we are well positioned to build a stronger and client-centric bank that puts risk management at the core to deliver sustainable growth and value for investors, clients and colleagues.* Compl. ¶ 180.

The media release also includes the following disclosures:

- *The combination of the current geopolitical situation following Russia's invasion of Ukraine and the significant monetary tightening initiated by several of the major central banks in response to inflation concerns have resulted in heightened volatility and client risk aversion so far this year.* While the Swiss Bank delivered a resilient performance and Equity Derivatives, M&A and Securitized Products had solid performances in 1Q22, *overall, this market environment, in combination with the cumulative effect of our newly defined risk appetite as executed during 2021, has led to an adverse impact on client activity in our Wealth Management division as well as a reduction in the level of capital markets issuances within our Investment Bank.* Furthermore, the Investment Bank has relatively limited exposure to business areas, such as interest rate trading, which have benefited from these developments.

*      *      *

122

As previously highlighted at our Investor Day on November 4, 2021, the year 2022 will be one of transition for Credit Suisse. The benefits from the strategic capital reallocation towards our core businesses and the structural cost savings from the reorganization measures that we are currently implementing should largely materialize from 2023 onwards. In this respect, *we are focused on disciplined execution of our strategy with a clear focus on strengthening and simplifying our integrated model and investing in sustainable growth, while placing risk management at the very core of the bank.*

\*    \*    \*

*We actively managed our exposure to Russia's invasion of Ukraine across our businesses.* We have substantially reduced our Russia net credit exposure to CHF 373 mn, a 56% reduction since the end of 2021. Our net credit exposure to Russian financial institutions is down 67% since the end of 2021 and we are continuing to reduce our exposures. *Our corporate and individual clients are highly collateralized with non-Russian collateral and limited losses.*

*Id.* ¶ 181. Plaintiff claims that the above language was materially false and/or misleading because it misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "Defendants 'decisive actions to strengthen' Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period" [sic]; and (2) "the Company had not 'actively managed [its] exposure to Russia's invasion of Ukraine across [its] businesses,' but in fact had significant, unmanaged risk and exposure as a result of the sanctions imposed on Russia and its nationals." *Id.* ¶ 182.

At the risk of being repetitive, Plaintiff fails to allege with factual specificity why the highlighted statements were false. *See Stratte-McClure v. Morgan Stanley*, No. 09 Civ. 2017, 2013 WL 297954, at \*4 (S.D.N.Y. Jan. 18, 2013). Plaintiff's allegations relating to Russian sanctions are deficient for reasons discussed above. *Supra* pp. 121–22. Plaintiff cannot rely on conclusory, fraud-by-hindsight generalizations. *See Hutchinson*, 2012 WL 5451258, at \*4. "Rule 9(b) will have failed in its purpose if conclusory generalizations such as these will permit a plaintiff to set

off a log and expensive discovery process in the hope of uncovering some sort of wrongdoing or of obtaining a substantial settlement." *Decker*, 681 F.2d at 116.

XXXIX.        **April 27, 2022: First Quarter 2022 Earnings Release**

Plaintiff challenges the following excerpt from the Company's 1Q22 Earnings Release:

**Russia's invasion of Ukraine**
In late February 2022, the Russian government launched a military attack on Ukraine. In response to Russia's military attack, the US, EU, UK, Switzerland and other countries across the world imposed severe sanctions against Russia's financial system and on Russian government officials and Russian business leaders….*With regard to our exposure to the impact of Russia's invasion of Ukraine, our 1Q22 results were adversely affected by an aggregate amount of CHF 206 million of negative revenues, provisions for credit losses and trading losses. The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of March 31, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 373 million, primarily to financial institutions.* In addition, Russian subsidiaries had a net asset value of approximately CHF 0.2 billion as of March 31, 2022. *As of March 31, 2022, we had minimal total credit exposures towards specifically sanctioned individuals managed by our Wealth Management division.* The Group is currently monitoring settlement risk on certain open transactions with Russian counterparties; market closures, the imposition of exchange controls, sanctions or other factors may limit the Group's ability to settle existing transactions or realize on collateral, which could result in unexpected increases in exposures. The Group notes that these recent developments may continue to affect its financial performance, including credit loss estimates and potential asset impairments.

*        *        *

As of the end of 1Q22, assets under management of CHF 1,554.9 billion decreased CHF 59.1 billion compared to the end of 4Q21. *The decrease was driven by unfavorable market movements and structural effects, partially offset by foreign exchange-related movements and net new assets of CHF 7.9 billion. Structural effects included certain de-risking measures and outflows of CHF 10.4 billion related to the sanctions imposed in connection with the Russian invasion of Ukraine.*

Compl. ¶ 183. Plaintiff says the above statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had significant, unmanaged risk and exposure

as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" and (2) "the Company was experiencing significant and unusual customer and/or asset outflows." *Id.* ¶ 184.

The precise amount of the decrease of assets under management was fully disclosed, as was the fact that certain outflows related to the sanctions imposed as a result of the Russian invasion of Ukraine. No fact is alleged tending to show that any of this was false. The repeated incantation that Credit Suisse's Russian-related risk was "significant" is a conclusion a reasonable investor could readily draw from the facts disclosed. And again, "so long as material facts are disclosed . . . it is not deceptive to fail to 'characterize' those facts with 'pejorative nouns and adjectives,' or to fail to verbalize all adverse inferences expressly." *Klamberg*, 473 F.Supp. at 551 (quoting *Goldberg*, 567 F.2d at 218 n.8) (collecting cases). Finally, the assertion that the risk was "unmanaged" is not supported by a single contemporaneous fact tending to show that the Bank was not trying to manage an unanticipated geopolitical risk, the scope of which was simply unknowable. In sum, Plaintiff's allegations are insufficient as a matter of law.

## XL.    April 27, 2022: First Quarter 2022 Earnings Conference

Plaintiff challenges representations made by Defendants Gottstein and Mathers during the Company's first quarter 2022 earnings conference call:

<u>*Defendant Gottstein*</u>:

- As I've have said previously, in the context of our long-term strategic plan, the year 2022 is one of transition for us at Credit Suisse. ***We are determined to continue with the implementation of our strategy as announced in November last year and remain focused on refining and reinvigorating our franchise consistent with our approved risk appetite…. Our results were also negatively impacted by Russia related losses of CHF206 million.***

- Overall, we saw net revenues decline year-on-year, mainly due to a particularly strong comparable in the first quarter of 2021, especially in the Investment Bank and Wealth Management. ***We also experienced significant industry wide headwinds in the form of more challenging market conditions due to higher inflation and interest rates as well as Russia's invasion of Ukraine impacting a number of our businesses.***

- ***In the first quarter, we reduced our Russia related net credit exposure by 56% and we continue to make further progress in exposure reductions….Regarding risk, the strengthening of both our first and second lines of defense are on track. We are confident that our strengthened risk culture should help us build a stronger and customer-centric bank that puts risk management at the core to deliver sustainable growth and value for investors, clients and colleagues.***

- ***We made a number of decisive actions throughout 2021 to strengthen risk and compliance teams, systems and processes. As you know, we underwent a comprehensive risk review across the entire group, which was completed in the fourth quarter. Our derisking measures have improved our risk profile, but also have negatively impacted our topline in the short term***. For example, the derisking measures in Wealth Management that you see on the left of the slide led to a reduction of roughly CHF25 million in net revenues during the first quarter. Compl. ¶ 185.

- When asked by an analyst if the "derisking [and] deleveraging that we had kind of seen in wealth, over the last 12 months" was "broadly done," Defendant Gottstein responded "That is fair. ***Yes. Absolutely.***" *Id.* ¶ 187.


*Defendant Mathers*:

- I'd just note that as we continue to execute on the strategic plan with the investment spending, internal reorganization and the capital reallocation associated with this, ***our risk appetite and our risk management remain key focuses***. Now this combines clearly with a period of reduced risk appetite and lower activity from our clients. The overall impact to which has been a decline in revenues across our major business lines.

- [L]et me give you some more details on the impact of Russia's invasion of Ukraine and what has had on our first quarter performance…. Now if we consider the impact these events on our P&L in the first quarter, there are three broad themes. First, we ***were generally successful in reducing our exposure before the invasion***, but we did see some defaults on amounts owed to us by Russian counterparties, partly due to the imposition of the sanctions and certain other developments. Second, we took a limits demand of specific credit provisions across the bank. And third, a scenario review of the provision for credit losses led us to increase our non-specific provisions that is related to CECL accounting by CHF44 million. Overall, we saw a negative impact of CHF206 million on pretax income with respect to Russia's invasion of Ukraine in the first quarter, comprising CHF58 million in the provisions for credit losses and CHF148 million of trading and fair value losses. Just to be clear that was split across the divisions as follows: CHF99 million in Wealth

Management; $101 in the Investment bank and CHF14 million in the Swiss Bank. ***Now more broadly, in terms of the Wealth Management's divisions, exposure to Russia, I think you will recall that at the Morgan Stanley Financials' Conference last month, Thomas confirmed that about 4% of our assets under management was linked to Russian clients globally. And just to say that number has not changed significantly since then.*** In terms of our general position, with respect to Russia. Clearly, ***we've stopped pursuing any new client business in Russia, we continue to reduce our exposure to Russia as the figures that I've just given demonstrate. We're helping our clients to unwind their own exposure and we have moved roles out of Russia. I would make it clear that we're making no new investments in our Russian subsidiaries. And have not done so since the invasion on February 24th. And I'd reiterate that as a matter of principle and policy Credit Suisse applies international sanctions worldwide in particular, those issued by Switzerland, the European Union, the UK and United States****. Id.* ¶ 186.

Plaintiff asserts that Gottstein and Mathers' statements are materially false and/or misleading because the statements misrepresent and fail to disclose certain facts known to or recklessly disregarded by the Defendants: (1) "Defendants did not 'ma[k]e a number of decisive actions throughout 2021 to strengthen risk and compliance teams, systems and processes' – in fact, Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" and (3) "the Company was experiencing significant and unusual customer and/or asset outflows." *Id.* ¶ 188.

Plaintiff's assertion that Defendants misrepresented and/or failed to disclose that they had not taken decisive actions to control risk is, in essence, an attempt to "argue that statements were misleading by asserting, without support, that the opposite of the statement was true." *NTL*, 347 F.Supp.2d at 27. Unfortunately for Plaintiff, there is no factual support for his assertion in the Complaint, and "[a] conclusory allegation that the opposite of a statement . . . is true, without further factual elaboration, is insufficient." *Id.* (citation and internal quotation marks omitted).

Certainly no inference of knowing falsity at the time the statement was made can be inferred from the fact that, ultimately, things went south at the Company. *See Hutchinson*, 2012 WL 5451258, at *7.

Both the Company's sanctions-related risk and exposure and the Company's outflows were discussed at length, as seen in the excerpt from the First Quarter 2022 Earnings Conference. Plaintiff has again failed to supply a factual basis for his allegations about the extent of the Company's sanctions-related risk and exposure and customer and/or asset outflows. Even after the Court draws all inferences in favor of the Plaintiff, his claims are too conclusory to credit. *See Dynagas*, 504 F.Supp.3d at 318.

### XLI.    April 27, 2022: First Quarter 2022 Press Conference

Plaintiff calls attention to the following remarks made by Defendants Gottstein and Mathers at the Company's press conference about its first quarter results, Compl. ¶ 189:

*Defendant Gottstein*:

- When questioned during the Q&A about why revenues were down so much, Defendant Gottstein responded: So clearly, the comparison with last year is only partially relevant because ***you have to also look at some of the extraordinary factors that impacted revenues both last year and this year.*** Secondly, you have to really also look at the quarter-on-quarter improvement. And thirdly, you have to look at some of the different business mixes. If you compare ourselves with certain competitors, so for example, in Wealth Management, ***we do not have a U.S. business, which was largely protected from some of the impacts we've seen in the rest of the world in particular, also Asia, which was very weak, not only for us but also others and also a different business mix in the Investment Bank***.

- But clearly, in March, we had 2 effects. We had the effects of the Russia invasion in Ukraine, and we had the effects of the legal provisions, which impacted our pretax income by CHF 700 million. And thirdly, the net profit, we continue to forecast the net profit for the full year 2022, despite the loss in the first quarter. So that's clearly still our expectation, yes. *Id.* ¶ 190.

- When questioned about Credit Suisse's ongoing business and presence in Russia, Gottstein replied: If I can add to that. I mean, most of these employees are not working in the office right now. They are basically on a paid leave. And we are obviously want to not yet take

any decision on releasing employees, but this is something that ***we are clearly winding down the operations there like winding down the propositions as David explained***. But at this stage, we still have -- like everybody else, by the way, our legal entity there. We still have our license there, but we have not at all invested in the business. And quite the contrary, ***we are basically winding down our positions in Russia. And when we talk about our Russia business, for example, in the context of Wealth Management, like the 4% we mentioned in March and that we reiterated today have now gone down a little bit to more towards the 3%. This is for all Russian clients globally.*** *Id.* ¶ 193.

<u>Defendant Mathers</u>:

- When questioned during the Q&A about why revenues were down so much, Defendant Mathers responded: If you look back at the interest rates at that point, it was a very favorable trading environment. What we're seeing now is a very sharp increase at the short end 2, 3, 4, 5 level and then a flattening of the curve. That actually is fine if you have a large rates business, which some of our competitors do, but we obviously exited from rates back in 2015, which was the right decision. It wasn't making as much money and for 7 years, there hasn't been much of an issue. But clearly, if you have a different business mix, you'll have different results in response to that. ***And I think it is particularly a particular change between the first quarter of last year and the first quarter of this year due to those -- due to what -- you've seen such a radical change in the monetary environment.*** I think it's clear that central banks may say it was perhaps a little tardy in terms of reacting to the inflation signals last year, but quite clearly at this point, they've really moved very fast to actually respond to them. *Id.* ¶ 191.

- When questioned about Credit Suisse's ongoing business and presence in Russia, Mathers responded: [I]n terms of Russia, think we were very clear in terms of this basically. ***We have not made any new investments in our Russian subsidiary since the invasion back on February 24. We clearly are looking to help our clients wind down their positions in Russia.*** We clearly support our staff in Russia, but clearly, a number of roles have actually been moved out of Russia. ***And Credit Suisse is committed to enforcing the sanctions that have been imposed both by the Swiss governments, the European governments, the U.S. government and the U.K. government.*** *Id.* ¶ 192.

According to Plaintiff, these statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's reduced revenues were not attributable to general market factors, adverse market conditions in Asia, or a 'radical change in the monetary environment,' but instead the Company was experiencing significant and unusual customer and/or asset outflows;" (2) "the Company was not 'winding down' its business in Russia or with Russian nationals, nor

was it 'committed to enforcing the sanctions' imposed on Russia and Russian nations, but instead had significant, unmanaged risk and exposure as a result of the sanctions imposed on Russia and its nationals;" and (3) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 194.

Plaintiff's allegations again fail to satisfy the pleading standards of Rule 9(b) and of the PSLRA due to Plaintiff's failure to state with the required particularity the reason or reasons these statements were false or misleading when made. *ITT*, 859 F.Supp.2d at 577. That Defendants' explanations about the Company's decline in revenue differ from the Plaintiff's conclusions about the same topic does not make Defendants' explanations false. Plaintiff does not point to any facts tending to support his opposing conclusions. With respect to allegations about the Company's ongoing business in Russia, again, Plaintiff has failed to offer any factual support for his assertion that the Company was not reducing its presence or complying with the very recently imposed sanctions that, by Credit Suisse's admission, were having a negative impact on its business – an impact that could not be offset by income from non-existent Wealth Management operations in the United States. The market was made fully aware that unwinding from Russia was at that point an ongoing proposition, and was one that had both cost Credit Suisse money (poor results in March, the first month following the invasion) and was likely to impact earnings in the future. No reasonable investor could possibly have expected more by way of disclosure.

As to Plaintiff's argument regarding the alleged material weaknesses in the Company's ICFR, Plaintiff has not explained why disclosure of this fact, had it been known to management, would have rendered any of these challenged statements false or misleading.

**XLII.  April 29, 2022: Annual General Meeting of Shareholders**

Plaintiff calls attention to remarks by Defendants Gottstein and Lehmann at the Company's

AGM, Compl. ¶ 195:

*Defendant Gottstein*:

- We made a number of enhancements throughout 2021 with a clear aim of delivering sustainable growth and value for you, our shareholders. ***We strengthened our capital position and substantially reduced the risk profile of the bank. We strengthened our risk and compliance teams, systems and processes, and undertook a comprehensive risk review across the entire group which was completed in the fourth quarter.***

- [***W***]***e will continue to improve risk and compliance with an emphasis on risk culture***, whilst not losing our client focus and the entrepreneurial spirit that has been the hallmark of Credit Suisse since its founding more than [166] years ago.

- ***We actively managed our exposure in relation to Russia's invasion of Ukraine across our businesses. We have substantially reduced our net credit exposure to Russia by 56% since the end of 2021, so in just 4 months. And we also significantly reduced our credit exposure to Russian financial institutions.*** Our results for the first quarter of 2022 were impacted by losses of CHF 206 million related to Russia's invasion of Ukraine. *Id.* ¶ 196.

*Defendant Lehmann*:

- As a result of addressing setbacks***, it has become clear that the challenges of the past were not solely attributable to isolated poor decisions or to individual decision-makers. Within the organization as a whole, we have failed too often to anticipate material risks in good time in order to counter them proactively and to prevent them.*** We're therefore obliged to making profound and lasting changes to the way we work together and to our processes and risk culture…. Recent analysis has exposed areas of improvement, and ***as an immediate response, we've carried out and completed a comprehensive risk review, redefined and adjusted the bank's risk appetite, reduced critical exposures and concentrations, realigned our risk and control system and placed it on a stronger foundation, and ensured that corrective actions are embedded within the organization.*** At the same time, we have made lasting changes to our Executive Board and leadership team and strengthened them in a targeted manner. Change has to start at the top.

- ***Among the areas where we need to take action, I believe our risk culture is the epicenter.*** This is where we have to roll up our sleeves, get to work and prove ourselves once again. Every successful entrepreneur is also a successful risk manager. Entrepreneurial thinking and responsibility are not contradictions in terms, they go hand in hand. For us, as an entrepreneurial bank, this is a key concept. It is not a question of avoiding risk. Instead, it is a case of dealing with risk in an appropriate, controlled way. Risks need to be taken consciously. It has to be possible to identify and monitor those risks. It is not worth putting the reputation of the entire company at stake for any business, no matter how appealing it

may be. ***We are, therefore, implementing even more rigorous, more visible risk management and risk monitoring.*** Everyone in our bank must know and feel that when it comes to risks, there are limits. When we talk about risk culture, this is not primarily about repressing and prohibiting risk taking, but it is about clarity, motivation and conviction. ***This is also the goal of our internal culture program that has been replicated around the world.***

- At this point, I would like to state that Credit Suisse formally condemns Russia's terrible war against Ukraine and the serious violations of international law in any form. ***Credit Suisse has ceased entering into new client business in Russia and is, as a matter of principle, applying all sanctions in full, especially those imposed by the European Union, the United States, the U.K. and Switzerland.*** *Id.* ¶ 195.

Plaintiff states that the above statements are materially false and/or misleading because they misrepresent and fail to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had not implemented more 'rigorous' 'risk management and risk monitoring,' or 'substantially reduce[] the risk profile of the bank;' to the contrary, Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period;" and (2) "the Company had not 'actively managed [its] exposure in relation to Russia's invasion of Ukraine across [its] businesses,' but had significant, unmanaged risk and exposure as a result of the sanctions imposed on Russia and its nationals." *Id.* ¶ 197.

It gets tiresome to repeat that, "at the pleading stage, plaintiffs in securities fraud actions must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so." *Garrett Motion*, 2023 WL 2744029, at *16 (cleaned up). Credit Suisse made a number of very specific statements during the annual shareholder meeting: that it had made changes to top management, that it had undertaken a comprehensive risk management review and strengthened risk and compliance teams, that it had strengthened its capital position, and that it was actively managing the unforeseen change in business relations with Russia and Russians as a result of the invasion of Ukraine – a situation that

the Company admitted had led to significant first quarter losses – by reducing its exposure (by 56% in just 4 months, Compl. ¶ 196), by refusing to engage in new business dealings with Russia, and by complying with international sanctions. Finally, and most significantly, Credit Suisse advised its shareholders that the Company needed to take further action in order to address outstanding issues with the Company's "risk culture" – it was not yet done implementing changes in that regard.

Plaintiff pleads not a single fact tending to show that any of those things was untrue. To take but one example, he does not plead a single fact tending to show that Credit Suisse had not actually reduced its exposure to Russia by 56% in 4 months. Instead, he simply asserts "that statements were [false or] misleading by asserting, without support, that the opposite of the statement[s]" were in fact the truth – that the Company had not implemented more rigorous risk management and monitoring, had not substantially reduced its risk profile, and had not actively managed its exposure in relation to Russia's invasion of Ukraine. *NTL*, 347 F.Supp.2d at 27. He has not offered any actual support for his conclusory assertions, and without factual support, his assertions are insufficient. *Id.*

### XLIII. May 5, 2022: First Quarter 2022 Report

Plaintiff challenges an excerpt from the Company's 1Q22 Quarterly Report:

In 1Q22, we reported net revenues of CHF 4,412 million, which decreased 42% compared to 1Q21, primarily reflecting lower net revenues in the Investment Bank, Wealth Management and the Corporate Center. ***The decrease in the Investment Bank was driven by lower sales and trading revenues, which included the impact of resizing its prime services franchise and also included Russia-related trading and fair value losses in its Global Trading Solutions (GTS) franchise, and reduced capital markets revenues.*** The decrease in Wealth Management reflected lower revenues across all revenue categories, including a loss on the equity investment in Allfunds Group of CHF 353 million.

\*      \*      \*

*With regard to our exposure to the impact of Russia's invasion of Ukraine, our 1Q22 results were adversely affected by an aggregate amount of CHF 206 million of negative revenues, provisions for credit losses and trading losses. The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of March 31, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 373 million, primarily to financial institutions.* In addition, Russian subsidiaries had a net asset value of approximately CHF 0.2 billion as of March 31, 2022. *As of March 31, 2022, we had minimal total credit exposures towards specifically sanctioned individuals managed by our Wealth Management division.*

\*     \*     \*

As of the end of 1Q22, assets under management of CHF 1,554.9 billion decreased CHF 59.1 billion compared to the end of 4Q21. *The decrease was driven by unfavorable market movements and structural effects, partially offset by foreign exchange-related movements and net new assets of CHF 7.9 billion. Structural effects included certain de-risking measures and outflows of CHF 10.4 billion related to the sanctions imposed in connection with the Russian invasion of Ukraine.*

\*     \*     \*

*Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We have adapted our liquidity and funding profile to reflect lessons learned from the financial crisis, the subsequent changes in our business strategy and regulatory developments.*

\*     \*     \*

*To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.*

Compl. ¶ 198. Plaintiff alleges that the above statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" (2) "the Company's risk management and/or control governance policies and/or

134

procedures were severely lacking, both at this time and prior to the Class Period;" (3) "the Company was experiencing significant and unusual customer and/or asset outflows;" (4) "the Company did not maintain a 'sufficient' liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were not 'conservative' and materially deficient at all times;" and (5) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 199.

In other words, Plaintiff simply pleads again what he has previously pleaded over and over again – adverse conclusions that are not backed up with any facts that would suggest why various statements and omissions were materially false and/or misleading. He does not allege a single fact tending to show that the Company's assessment of its losses – losses that are reported on its financial statement and announced to shareholders – was false. He alleges no fact tending to show that the wholly unanticipated and extremely fluid (especially in terms of sanctions) situation resulting from Russia's invasion of Ukraine was not adequately accounted for by Credit Suisse in its financial reporting during the earliest months of the unexpected geopolitical crisis, or that Credit Suisse was not taking steps to minimize its future risk.

Plaintiff's general allegations about unspecified deficiencies in the Company's risk management and/or control governance policies and/or procedures, as well as the extent of the Company's customer and/or asset outflows suffer from the same problem: they are conclusory, and are insufficient to plead fraud with the particularity required. *See NBTY*, 224 F.Supp.2d at 493. As to the alleged insufficiency of the Company's liquidity pool and related deficiencies in the Company's liquidity and funding profile, policy, and/or risk parameters: "[t]o satisfy Rule 9(b) and the PSLRA, the Plaintiff[] must plead particular facts supporting [his] theory that the Defendants' [liquidity issues] [were] due to something nefarious, rather than simply imperfect

economic forecasting. The complaint lacks the requisite particularity." *Aegon*, 2004 WL 1415973, at *8 (citations omitted). Finally, Plaintiff's argument related to alleged material weaknesses in the Company's ICFR similarly fail because there are no facts pleaded to support an inference that the Company knew, at the time of this disclosure, that its ICFR was in any way flawed, *Waterford*, 2016 WL 1261135, at *11, and because the challenged portion of the statement does not address the issue of the Company's ICFR, *see Macquarie*, 601 U.S. at 264.

Plaintiff also challenges the Company's First Quarter 2022 Report based on the following disclosure:

> The accompanying unaudited condensed consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and notes thereto for the year ended December 31, 2021 included in the Credit Suisse Annual Report 2021.

Compl. ¶ 313. He claims that this disclosure was materially false or misleading, or omitted information necessary to make them not misleading, because the First Quarter 2021 Report did not comply with GAAP, but rather "resulted from a series of decisions by Defendants designed to conceal the truth regarding Credit Suisse's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. As a result, Defendants materially misstated the Company's financial results . . . ." *Id.* ¶ 314.

This challenge to the Company's First Quarter 2022 Report is almost identical – apart from the slight variations in language in the disclosure – to Plaintiff's challenges to the Company's First, Second, and Third Quarter 2021 Reports: he calls attention to language in the report that states that it was "prepared in accordance with accounting principles generally accepted in the US (US

GAAP)" and claims that the financial statement was materially false and misleading because it did not comply with GAAP and SEC Rules, without identifying a single rule that was not complied with. *Id.* ¶¶ 312–314. This argument, again, is deficient for the reasons articulated above. *Supra* pp. 55–56.

## XLIV. May 23, 2022: Defendant Lehmann Interview with *CNBC*

Plaintiff challenges a comment by Lehmann in an interview with *CNBC* at the World Economic Forum in Davos, Switzerland. Compl. ¶ 200. Lehmann stated, "It is a very challenging situation for the company, but ***we have a clear plan, we are executing on that plan, so we are rebuilding, basically, the company***." *Id.* ¶ 201. Plaintiff states that this was materially false and/or misleading because it misrepresents and fails to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's 'plan' and new strategy were fundamentally flawed, as they were predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices;" and (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls." *Id.* ¶ 202.

Lehmann's comment is puffery: it is too general to cause a reasonable investor to rely upon it and thus, not actionable. *Vivendi*, 838 F.3d at 245.

As to the Company's presence on the UK financial regulator's watchlist: Plaintiff alleges that this action took place in May, based on a *Financial Times* story that was published on June 12, 2022. Compl. ¶ 401. However, Plaintiff does not allege that the UK financial regulator opened any official compliance investigation – the only allegation is that the regulator was concerned

enough to begin monitoring the Bank more closely, and that it urged the bank to address 'persistent' cultural issues. *Id.* "The law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement." *Ciresi v. Citicorp*, 782 F.Supp. 819, 823 (S.D.N.Y. 1991). Additionally, "Rule 10b–5(b) does not proscribe pure omissions" – *i.e.*, "when a speaker says nothing, in circumstances that do not give any special significance to that silence" – and there can be no "liability for failure to speak on a subject at all." *Macquarie*, 601 U.S. at 262, 264–65. Lehmann said nothing about the UK financial regulator's announcement during his interview with *CNBC*, and the Plaintiff does not indicate how this omission rendered any of the challenged statements either false or misleading.

### XLV.  May 31, 2022: Denial of *Reuters* Report On Raising New Capital

Plaintiff takes issue with a representation made by Credit Suisse in a *Reuters* report that stated that the Company was "in the early stages of weighing options to bolster its capital after a string of losses has eroded its financial buffers, two people with knowledge of the matter told Reuters." Compl. ¶ 203. When asked for comment, Credit Suisse replied: "***Credit Suisse is currently not considering raising additional equity capital.***" *Id.* Plaintiff says that this was materially false and/or misleading because it misrepresents and fails to disclose the following adverse fact known to or recklessly disregarded by the Defendants: that "*Reuters*' reporting was accurate and that the Company *was* 'considering raising additional equity capital,' as it would eventually admit on October 27, 2022." *Id.* ¶ 204 (emphasis in original).

But "material misrepresentations must be untrue at the time that they were made . . . ." *In re Liberty Tax, Inc. Sec. Litig.*, 435 F.Supp.3d 457, 467 (E.D.N.Y. 2020). On October 27, 2022, the Company announced two capital increases. Compl. ¶ 237. However, Plaintiff pleads no fact

tending to show that Credit Suisse was, in fact, considering the possibility of raising additional

capital as early as May 2022, which is what would be required for the challenged statement to have

been false when it was made. *See Union Cent. Life Ins. v. Credit Suisse Secs. (USA), LLC*, No. 11

Civ. 2327, 2013 WL 1342529, at \*9 (S.D.N.Y. Mar. 29, 2013).


## XLVI. June 8, 2022: Preliminary Second Quarter 2022 Earnings Media Release

Plaintiff challenges language in the Company's media release announcing preliminary

financial results for the second quarter of 2022:

> Market conditions so far in the second quarter of 2022 have remained challenging, consistent with our published outlook statement of April 27, 2022. ***The combination of the current geopolitical situation following Russia's invasion of Ukraine, significant monetary tightening by major central banks in response to the substantial increase in inflation and the unwind of COVID-related stimulus measures have resulted in continued heightened market volatility, weak customer flows and ongoing client deleveraging, notably in the APAC region.*** Within the Investment Bank, while our advisory revenues have been resilient and GTS revenues, compared to last year, have benefited from the higher volatility, albeit with an uneven performance, the impact of these conditions, together with continued low levels of capital markets issuance and the widening in credit spreads, have depressed the financial performance of this division in April and May and are likely to lead to a loss for this division as well as a loss for the Group in the second quarter of 2022. We would note that our reported earnings will also be affected by continued volatility in the market value of our 8.6% investment in Allfunds Group.

> As we look forward to the second half, the year 2022 will remain one of transition for Credit Suisse. Given the economic and market environment, we are accelerating our cost initiatives across the Group with the aim of maximizing savings from 2023 onwards. We will provide further details at our upcoming Investor Deep Dive on June 28, 2022. ***We remain focused on the disciplined execution of our strategy, delivering on our regulatory remediation programs and placing risk management at the core of the bank.*** In doing so, we are focused on delivering best-in-class service and support to our clients, especially in this challenging market environment.

Compl. ¶ 205. Plaintiff finds this language materially false and/or misleading because it

misrepresents and fails to disclose that: (1) "Defendants did not 'place[] risk management at the

core of the bank,' but instead never implemented meaningful changes to Credit Suisse's risk

management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period;" (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls;" (3) "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" (4) "the Company was experiencing significant and unusual customer and/or asset outflows;" and (5) "there existed material weaknesses in the Company's internal controls over financial reporting." *Id.* ¶ 206.

"The Court finds that these allegations are conclusory and insufficiently supported by facts." *NBTY*, 224 F.Supp.2d at 493. First, Plaintiff's conclusory allegation that the Defendants did not place risk management at the core of the bank is yet another instance where he has attempted to "argue that statements were misleading by asserting, without support, that the opposite of the statement was true." *NTL*, 347 F.Supp.2d at 27. It is also yet another attempt by Plaintiff to argue fraud by hindsight – he has alleged no facts demonstrating that at the time these statements were made, the Company was doing anything but pursuing its strategy of "placing risk management at the core of the bank," Compl. ¶ 205. Rather, the Company's statements at the time reflect that strategy. *See San Leandro*, 75 F.3d at 812.

Second, Plaintiff's reference to the Company's failure to mention its presence on a UK financial regulator's watchlist does not support a securities fraud claim as of June 8, 2022 for the same reason it did not give rise to a securities fraud claim two weeks earlier – Credit Suisse had no obligation to disclose that the UK's financial regulator had indicated that it would be watching the Bank closely, and saying nothing at all does not violate Rule 10b-5. *See supra* pp. 137–38.

Third, Plaintiff has failed to allege a factual basis for his conclusions that the Company had significant, unmanaged risk and exposure resulting from Russian sanctions and that the Company was experiencing significant customer and/or asset outflows. Significantly, the Company acknowledged that it had considerable risk resulting from the situation in Ukraine and that it was experiencing outflows; the language disclosing those facts is highlighted. Compl. ¶ 205. That Credit Suisse did not use the words Plaintiff would put in its mouth does not mean that the material facts were not disclosed.

Finally, the challenged statements do not touch on the topic of the Company's ICFR. *See Macquarie*, 601 U.S. at 264.

## XLVII.    June 28, 2022: Investor Deep Dive 2022 Presentation

Plaintiff challenges Gottstein's comments during the Company's Investor Deep Dive 2022 presentation with investors:

- "*[W]e have [] strengthened our risk and compliance leadership at all levels of the bank. This includes the first and second lines of defense. It includes the bank-wide risk framework and processes, encompassing risk assessment, risk review and risk escalation. Moreover, together with the Board oversight, we have clearly defined accountability as well as roles and responsibilities across the organization. And we have adopted a group-wide initiative, which is based on individual accountability namely, everyone is a risk manager. This cultural change and this cultural change program includes risk training programs as well as adding risk metrics to scorecards and compensation.* David will talk more about this in his presentation. We are confident that these and many other initiatives we are undertaking will restore the confidence of our stakeholders in the bank." Compl. ¶ 207.

- When directly questioned by an analyst if, in light of the particularly "difficult period for Credit Suisse," "retaining advisers and clients has been difficult," Gottstein responded: "[C]learly some of the reputational issues we've had, has had an impact on our Wealth Management franchise as well. But I would like to point out as an example how this long-term loyalty between clients and us plays when, *in April 2021, we did the mandatory convertible to raise $2 billion of capital*, which basically David made this when I had to do between 2 Chairman. And *out of the 10 largest orders we had in the book, 5 were from ultra high net worth clients, and 2 of those have actually supply chain firm in their*

*portfolio. And they were not necessarily happy about that, but they put in the money and they said, 'Look, you have been there for us. Now we're going to be here for you.' And this is the type of client relationships we have that we're very proud of.*" *Id.* ¶ 208.

- When an analyst asked Gottstein about the impact of "derisking efforts" on revenues, Gottstein replied: "It's clear that, in November, we were indeed focusing on Prime Services, but we also said already in November that we are reviewing all the risk. And as a matter of fact, for example, in leverage finance we had reduced our risk appetite already in the third quarter and fourth quarter 2021 significantly. *We then went through an exercise together with David and the Board of our risk appetite across businesses, including leverage finance. And in many of these businesses actually went back to pre-Archegos risk appetite numbers. And clearly, some of the reductions we also mentioned today in David's presentation in LevFin was also a reaction to the current market environment, and where we have, like many of our peers take a more conservative approach with the higher rates, the higher spreads. Id.* ¶ 209.

Plaintiff asserts that Gottstein's statements were material false and/or misleading because they

misrepresent and fail to disclose certain adverse facts known to or recklessly disregarded by the

Defendants: (1) "Defendants did not implement meaningful changes to Credit Suisse's severely

lacking risk management and/or control governance procedures and/or policies, either at this time

or at any time throughout the Class Period;" (2) "in mid-May 2002 [sic], the UK's financial

regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision

because of concerns it had not done enough to improve its governance and risk controls;" (3) "the

Company never changed its compensation policy by 'adding risk metrics;'" and (4) "the Company

was experiencing significant and unusual customer and/or asset outflows." *Id.* ¶ 210.

The reasons why these conclusory allegations fail to allege actionable securities fraud with

the requisite particularity, whether under Rule 9(b) or the PSLRA, are fully discussed above. The

Complaint does not specify they ways in which the Company's "risk management and/or control

governance procedures and/or policies" were "severely lacking;" or establish a factual basis for

the claim that the Company's compensation policy never changed; or particularize the extent of

the "significant and unusual customer and/or asset outflows" that were in fact disclosed in the

highlighted statement – let alone deal with the fact that the Company, having disclosed the raw data, was not required to characterize in the Plaintiff's manner of choice. *See MGT*, 2018 WL 1124945, at *11; *see supra* p. 125. Plaintiff's lone attempt to be more specific – his reference to the Company's misrepresentation of/failure to disclose that it was on the UK financial regulator's watchlist – fails not only for the reasons discussed above, *supra* pp. 137–38, but also because Plaintiff does not allege that the market was unaware of this fact (indeed it was, because, as acknowledged by the Plaintiff in his Complaint, at least one news outlet – the *Financial Times* – wrote about it on June 12, 2022, several weeks prior to the making of the challenged statements, Compl. ¶ 401). The Defendants cannot be held liable for failing to disclose publicly available information. *Merrill Lynch*, 272 F.Supp.2d at 249–50.

## XLVIII. July 27, 2022: Defendant Gottstein "Resignation" and Defendant Körner Appointment Media Release

Plaintiff takes issue with portions of the media release announcing Defendant Gottstein's resignation and Defendant Körner's appointment as Company CEO:

> Credit Suisse Group AG (Credit Suisse) today announced the appointment of Ulrich Körner as Group Chief Executive Officer from August 1, 2022, replacing Thomas Gottstein, who is resigning. ***At the same time, the bank has announced that it is conducting a comprehensive strategic review….***
>
> \*     \*     \*
>
> Axel P. Lehmann, Chairman of Credit Suisse, said: "I am delighted to welcome Ueli as our new Group CEO, to oversee this comprehensive strategic review at a pivotal moment for Credit Suisse. With his profound industry knowledge and impressive track record, ***Ueli will drive our strategic and operational transformation, building on existing strengths and accelerating growth in key business areas.*** Since becoming Chairman and reviewing the bank's portfolio with our newly refreshed Board of Directors, I have come to appreciate the world-class quality of our businesses. But we need to be more flexible to ensure they have the necessary resources to compete. Our goal must be to become a stronger, simpler and more efficient Group with more sustainable returns. I would like to thank Thomas for his commitment to Credit Suisse over more than two decades and in particular as Group

CEO. He has made an enormous contribution to Credit Suisse and always served our clients in Switzerland and beyond with integrity and entrepreneurial spirit. I wish him all the best in his future endeavors."

Thomas Gottstein, outgoing CEO of Credit Suisse, said: "It has been an absolute privilege and honor to serve Credit Suisse over these past 23 years. Credit Suisse has formidable client franchises in all four divisions globally and an immense talent pool across more than 50,000 colleagues worldwide. ***Despite the challenges of the past two years, I am immensely proud of our achievements since joining the Executive Board seven years ago and more recently in strengthening the bank, recruiting a top-caliber Executive Board, reducing risk and fundamentally improving our risk culture.*** In recent weeks, for personal and health-related considerations, and after discussions with Axel and my family, I concluded that now would be the right time to step aside and clear the way for new leadership to fully embrace the important initiatives announced this morning, which I wholeheartedly support."

*     *     *

Credit Suisse's Board of Directors and Executive Board have initiated a program to reduce the Group's absolute cost base to below CHF 15.5 bn in the medium term given the more challenging economic and market environment. ***This builds on commitments made at the June Investor Deep Dive to deliver significant savings in the Technology and Operations function to improve scalability and ensure the long-term sustainability of these efficiencies, while continuing the digital transformation and improving the Group's sound risk culture.***

Compl. ¶ 211. Plaintiff alleges that the above statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "Defendant Gottstein's 'resignation' and Defendant Körner's appointment as CEO would have no meaningful effect on the Company's strategy for 'sustainable growth and value' and the Company did not 'reduc[e] risk and fundamentally improve [its] risk culture,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" and (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision

because of concerns it had not done enough to improve its governance and risk controls." *Id.* ¶ 212.

None of the statements attributed to Gottstein and Lehmann is actionable, as they "are couched in general terms and make no concrete representations" about any specific acts, practices, or policies (aside from the replacement of the Company's CEO). *Sanofi*, 87 F.Supp.3d at 537. General references in the Media Release to reducing risk and fundamentally improving risk culture are "broad statements of corporate optimism." *Adient*, 2020 WL 1644018, at *22. "These statements . . . did not reference specific improvements in [the Company] that were actually false at the time or could have misled a reasonable investor, and Plaintiff[] ha[s] failed to show that such statements were concrete, specific statements of fact." *Id.* Plaintiff therefore cannot rely on any of them to support a claim under the Exchange Act. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Tech. Corp.*, 450 F.Supp.3d 379, 400 (S.D.N.Y. 2020). And as to Plaintiff's references to the Company's presence on a UK financial regulator's watchlist – again, by the time of the Company issued this Media Release, this information was public, and "there is no duty to disclose information to one who reasonably should be aware of it." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (internal citations and quotation marks omitted).

## XLIX. July 27, 2022: Second Quarter 2022 Media Release and Investor Presentation

Plaintiff challenges portions of the Company's 2Q22 Media Release, Compl. ¶ 213:

- As stated in our Trading Update on June 8, 2022, the second quarter was marked by challenging economic and market conditions. The combination of the current geopolitical situation following Russia's invasion of Ukraine and significant monetary tightening by major central banks in response to the substantial increase in inflation have resulted in continued heightened market volatility, weak customer flows and ongoing client deleveraging.

\* \* \*

*We had Group net asset outflows of CHF 7.7 bn in 2Q22, compared to net asset outflows of CHF 4.7 bn in 2Q21. Our global wealth management, which includes our WM division and Private Banking Switzerland, had moderate net asset outflows for 2Q22 of CHF 1.8 bn; this was driven primarily by net asset outflows in EMEA and Switzerland* partially offset by net inflows across Asia Pacific and Americas. Group AuM for 2Q22, stood at CHF 1.5 trn, down from CHF 1.6 trn at the end of 1Q22.

*    *    *

*As stated at our Investor Deep Dive in June, we remain firmly focused on the execution of our strategic plan throughout 2022 and on reinforcing our risk culture – crucially, while staying close to our clients. Id.* ¶ 214.

- *Defendant Gottstein*: Our results for the second quarter of 2022 are disappointing, especially in the Investment Bank, and were also impacted by higher litigation provisions and other adjusting items. *The bank's performance was significantly affected by a number of external factors, including geopolitical, macroeconomic and market headwinds. These challenging circumstances led to results which overshadow the strength of our leading client franchises in all four divisions of the bank. The urgency for decisive action is clear and a comprehensive review to strengthen our pivot to the Wealth Management, Swiss Bank and Asset Management businesses, supported by a fundamental transformation of our Investment Bank, is underway.* Further, we have now launched a broader cost efficiency and digital transformation program to reduce our absolute cost base to less than CHF 15.5 bn in the medium term. Today marks a leadership change for Credit Suisse. It has been an absolute privilege and honor to serve Credit Suisse over these past 23 years. It has been my passion since day one to deliver best-in-class service to our clients. As a leader, since joining the Executive Board in 2015, I was focused on delivering results and embracing our values, including partnership, accountability and integrity. *Id.* ¶ 213.

From Plaintiff's perspective, these statements are materially false and/or misleading because they misrepresent and fail to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "a 'fundamental transformation of' the Investment Bank was not underway and the Company was not focused on 'reinforcing [its] risk culture,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done

enough to improve its governance and risk controls;" (3) "the Company's performance was not affected by mere 'external factors,' but instead by its significant, unmanaged self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" and (4) "the Company was experiencing significant and unusual customer and/or asset outflows." *Id.* ¶ 215.

We can dispense quickly with the Plaintiff's UK financial regulator watchlist argument because the Complaint affirmatively alleges that by the date these statements were made – July 27, 2022 – this fact was known to the market and widely discussed in the press. *See e.g.*, *id.* ¶ 401. Where, as here, "allegedly undisclosed material information is in fact readily accessible in the public domain . . . a defendant may not be held liable for failing to disclose this information." *KeySpan*, 383 F.Supp.2d at 377; *Merrill Lynch*, 272 F.Supp.2d at 249–250.

Plaintiff does not allege that Credit Suisse did not accurately report the losses and/or outflows for the second quarter of 2022, or that its assessment that these losses were disappointing was inaccurate; or that its belief that macroeconomic and geopolitical conditions contributed significantly to the losses was untrue; or that the Company was not undergoing both management changes and business reviews at the time these statements were made. For the most part, Plaintiff quarrels with the predictive value of these statements: Credit Suisse failed to predict that what it was doing would prove insufficient to stem the catastrophe lurking around the corner. Inaccurate predictions, without more, do not constitute securities fraud, *see Decker*, 681 F.2d at 117–18; neither are they evidence that statements (quite specific statements, I might add) were false when made.

But also – some of what Plaintiff identifies as inaccurate consists of broad, general statements that are insufficient to state a claim for securities fraud. *In re Marsh & McLennan Cos.,*

*Inc. Sec. Litig.*, Nos. MDL 1744, 04 CIV. 8144, 2006 WL 2789860, at *1 (S.D.N.Y. Sept. 27, 2006). For example, the statement relaying that the Company "remain[ed] firmly focused on the execution of [its] strategic plan throughout 2022 and on reinforcing [its] risk culture," Compl. ¶ 214, is non-actionable puffery. Merely conveying the Company's general business focus does not give a reasonable investor meaningful information on which to rely. *Xerox*, 300 F.Supp.3d at 569.

Additionally, Plaintiff is free to disagree with the Company about the efforts it was undertaking, but "the conclusory allegation that the opposite of a statement in a press release is true, without further factual elaboration, is insufficient." *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865, 1998 WL 283286, at *5 (S.D.N.Y. June 1, 1998) (citation omitted). Plaintiff's claims that the Company's performance was not affected merely by the various external factors it identified and that the Company was experiencing significant and unusual outflows are "vague and conclusory" – especially as, in this particular statement, the exact amount of the "outflows" was disclosed – and are "certainly not enough to allege that the Company's statements were false when made." *In re Francesca's Holdings Corp. Sec. Litig.*, Nos. 13-cv-6882, 13-cv-7804, 2015 WL 1600464, at *13 (S.D.N.Y. Mar. 31, 2015). Again, Credit Suisse had no obligation to characterize disclosed amounts in any manner, let alone with the language preferred by Plaintiff. *See supra* p. 125.

## L.    July 27, 2022: Second Quarter 2022 Earnings Release

Plaintiff challenges the accuracy of the following portion of the Company's 2Q22 Earnings Release:

> **Russia's invasion of Ukraine**
> ….The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. ***As of June 30, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 244 million, primarily related to***

*corporates, individuals and the sovereign. In addition, 104 Russian subsidiaries had a net asset value of approximately CHF 0.3 billion as of June 30, 2022. In 2Q22, CHF 7.2 billion of assets under management were reclassified due to the imposed sanctions, and less than 3% of assets under management in our wealth management-related businesses are linked to Russian clients. The Group has further reduced Russia related exposures in 2Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.*

*    *    *

As of the end of 2Q22, assets under management of CHF 1,453.9 billion decreased CHF 101.0 billion compared to the end of 1Q22. *The decrease was driven by unfavorable market movements, structural effects and net asset outflows of CHF 7.7 billion, partially offset by foreign exchange-related movements. Structural effects included certain de-risking measures, outflows and reclassifications of CHF 7.2 billion related to the sanctions imposed in connection with the Russian invasion of Ukraine.*

Compl. ¶ 216. Plaintiff says that this part of the Company's 2Q22 Earnings Release was materially false and/or misleading because it misrepresented and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" (2) "the Company's risk management and/or control governance policies and/or procedures were severely lacking, both at this time and prior to the Class Period;" (3) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls;" (4) "the Company was experiencing significant and unusual customer and/or asset outflows;" and (5) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 217.

Plaintiff does not seem able to read what the Company's statement says. The Company disclosed both its significant exposure to the situation in Russia and continuing outflows – the two factual things that Plaintiff contends were not disclosed. The Company DISCLOSED that it had

149

significant risks as a result of sanctions – it even tried to quantify that risk. The Company also DISCLOSED that it had experienced a decrease in net assets under management due, among other things, to net asset outflows. Plaintiff's allegation is simply that Credit Suisse did not sufficiently flagellate itself about the impact of these DISCLOSED facts. But there is no requirement that it do so. *See Singh*, 106 F.Supp.3d at 448.

As for Plaintiff's purely conclusory assertions about the Company's risk management and/or control governance policies and/or procedures, they are not actionable because they are unsupported by specific facts, and because Plaintiff fails to explain why not disclosing anything about such matters renders the statements that were made either false or misleading. *See San Leandro*, 75 F.3d at 812. As to the omission of the fact that the Company was on a UK financial regulator's watchlist, this demanded disclosure could not have altered the total mix of information available to the public, since the information was already public. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d 564, 577–78 (S.D.N.Y. 2013); Compl. ¶ 401.

Finally, we turn to Plaintiff's assertion that the Company was required to disclose that there existed material weaknesses in its internal control over financial reporting, of which it had been put on notice by SEC Comment Letters dated July 15, 2022. This assertion is not only deficient for the reasons discussed above, *see, e.g.*, *supra* pp. 31–32, but also because the text of the Amended Complaint completely undercuts this allegation. In his pleading, Plaintiff alleges that in July 2022, "the SEC initiated comment letter correspondence with Defendant Mathers requesting more information about the Company's 'revision' of its financial statements for the years ending December 31, 2020, and December 31, 2019." Compl. ¶ 320. Specifically, the SEC asked whether the "accounting issues" disclosed in the Company's Form 20-F for FY 2021 resulted from "control deficiencies," *id.* ¶¶ 387–88, and, "In light of your accounting issues and resulting revisions, as

well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management, please provide us with your analysis supporting your conclusion that there were no material changes to ICFR." *Id.* ¶ 388. The fact that the SEC was making initial inquiries is not the equivalent of the SEC notifying the Company that the SEC had concluded that there existed material weaknesses in the Company's ICFR. Moreover, "To the extent that the SEC letter is a criticism of accounting practice, '[a]llegations of accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient.'" *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 939 F.Supp.2d 445, 453 (S.D.N.Y. 2013) (quoting *In re JP Morgan Chase Sec. Litig.*, No. 02 Civ. 1282(SHS), 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2007) (internal alterations omitted)).

## LI.    July 27, 2022: Second Quarter 2022 Earnings Conference

Plaintiff challenges statements by Defendants Gottstein, Lehmann, and Mathers during the Company's conference call about its second quarter 2022 earnings, Compl. ¶ 218:

*Defendant Gottstein*:

- ***Strengthening risk management and risk culture, as well as addressing legacy issues, remain an absolute priority.***

- While we attracted inflows in APAC and the Americas in the second quarter, reflecting our franchise strength, ***we reported moderate net outflows overall,*** mainly due to outflows from Switzerland and the EMEA region. In addition, in the first half, we attracted positive net new assets of 3.4 billion Swiss francs, which included ***Russia-related outflows of 1.9 billion Swiss francs....Our asset management division was impacted by the challenging market environment with net asset outflows of 6.1 billion Swiss francs, driven by outflows across both traditional and alternative investments***, only partially offset by inflows from investments and partnerships.

- Despite the challenges of the global COVID-19 pandemic in 2020, the two major incidents which Credit Suisse had to face in 2021, and then the Ukraine invasion and market

downturn this year, *we made significant progress in strengthening our bank, recruiting an excellent leadership team, starting the transformation of our investment bank, reducing risk overall, and fundamentally improve our risk culture. Id.* ¶ 219.

*Defendant Lehmann*:

- Credit Suisse is undoubtedly facing a challenging situation, both structurally and via the markets in which we operate. *The need for change was clear before the second quarter results. But the disappointing performance has added a sense of urgency, as well, conviction for our actions. That is why the board of directors has decided to take decisive actions to reposition our bank and to strengthen the performance, the reputation, and credibility of the bank. With conviction, we are now embarking on measures to speed up our transformational course with a clear direction for the bank and a new leadership. Our goal is to become a stronger, simpler, and more efficient bank with sustainable returns*. As announced earlier today, the board of directors accepted the resignation of Thomas Gottstein. Thomas has led the bank through some of its most challenging corporate period, and he has done it with a lot of courage, energy and commitment, as well as huge personal integrity. His absolute dedication and commitment to the bank over the past two decades are beyond commendable. The board of directors is grateful to Thomas for the leadership he has provided during the global COVID-19 pandemic, as well as in the aftermath of the two incidents in 2021. Thank you, Thomas. And yet, as the bank embarks on a new course, both Thomas and the board of directors agreed that this should be under a new leadership free to steer a new course. *Ulrich Koerner will oversee the detailed work required as part of the comprehensive strategic review with the full trust and support of the board of directors.*

- *In closing, we remain focused on improving risk management, as well as the risk culture across the group. We remain focused to speed up our transformation and disciplined execution. And I'm absolutely convinced that under the leadership of our new CEO, Ulrich Koerner, and the rest of our strong executive board, we have the right leadership team in place to transform and to deliver. Id.* ¶ 218.

*Defendant Mathers*:

- When questioned by an analyst "on the outflows, Middle East, Russian-sanctioned individuals as well," "[d]o you think that has now run its course," Mathers replied: I think just quickly on the Russian-rated outflows, look, I think we've had outflows in both in respect of sanctioned clients, which we obviously do treat as a structural change because the money is locked. And then in terms of non-sanctioned clients, we had about a 1.4 billion outflow. *You know, I'm not going to comment. I think clearly it's an evolving situation or obviously very changeable geopolitical situation, very uncomfortable, and very difficult. I just note that we saw that in terms of those numbers. I mean, yes, I think in terms of the third quarter. And looked, brutally, we're only three weeks into the third quarter. I'm not going to comment on new asset outflows three weeks into the quarter.*

> *We'll see how this quarter develops. Just do note, we've had positive inflows for the first half of the year in, I think, you know, clearly in what is a very challenging environment. Id. ¶ 220.*

Plaintiff asserts that Gottstein, Lehmann, and Mathers' remarks are materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at his time or at any time throughout the Class Period;" (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring heightened supervision because of concerns it had not done enough to improve its governance and risk controls;" (3) "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" and (4) "the Company was experiencing significant and unusual customer and/or asset outflows." *Id.* ¶ 221.

The discussion above explains why none of these statements is actionable as securities fraud for any of the redundant reasons cited by Plaintiff. There is simply no allegation that the statements were false when made. The UK financial regulator's watchlist became public no later than June 12, 2022, Compl. ¶ 401, so the Company's failure to discuss it at the end of July 2022 could have had no impact on the market – the Company had no obligation to disclose it in the first place, but the information was out there and the market could take it into account. *See Bank of Am. AIG*, 980 F.Supp.2d at 576. Plaintiff has offered no facts in support of his allegations that the statements and/or omissions are false and/or misleading because the Company had significant, unmanaged risk and exposure as a result of the Russian sanctions and because the Company was experiencing outflows that Plaintiff insists should have been characterized as "significant" and

"unusual." The Company disclosed both the fact of highly significant risk and exposure as a result of the unfolding situation in Russia – a country in which it had may pre-sanctions business interests – and the amount of its net asset outflows. *See* Compl. ¶¶ 219–20. Credit Suisse had no obligation to characterize the outflows in the manner suggested by Plaintiff; "so long as material facts are disclosed . . . it is not deceptive to fail to 'characterize' those facts with 'pejorative nouns and adjectives,' or to fail to verbalize all adverse inferences expressly." *Klamberg*, 473 F.Supp. at 551 (quoting *Goldberg*, 567 F.2d at 218 n.8).

Finally, the Company's alleged failure to disclose that whatever changes the Company was making to its management or corporate plan were not "meaningful" is both predictive (and hence not actionable) and far too general to support a claim in fraud. *See Citigroup*, 2023 WL 2632258, at *16; *Sabratek Corp. v. Keyser*, 2000 WL 423529, at *4 (S.D.N.Y. Apr. 19, 2000).  In short, Plaintiff has not sufficiently pled that the statements/omissions made during the Second Quarter 2022 Earnings Conference were actually false or misleading when made. *See Citigroup*, 2023 WL 2632258, at *16.

## LII.    July 27, 2022: Defendant Lehmann Interview with *Bloomberg TV*

Plaintiff challenges Defendant Lehmann's comments from an interview with *Bloomberg TV*, where Lehmann stated that: "We are speeding up ***our strategy, our transformation***;" "***we still have a strong balance sheet***;" it was a "great franchise," but "we need to reposition;" and the Company would "***continue to improve*** on risk management." Compl. ¶¶ 222–23. Plaintiff says that Lehmann's statements were materially false and/or misleading because they misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "Defendants had not improved, nor would they 'continue to improve,' on risk management, as

they never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking both at this time and prior to the Class Period;" (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls;" (3) "Credit Suisse's 'strategy' and 'transformation' were fundamentally flawed, as they were predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 224.

There is no need to reiterate what has been said about the first two points made by Plaintiff; they have already been shown to be legally insufficient. Lehmann's statements about the Company's "strategy" and "transformation" are "mere puffery, and hence non-actionable." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F.Supp.3d 737, 757 (S.D.N.Y. 2018). This is yet another instance where Plaintiff has selected vague statements – this time about the Company's focus on improvement – that "are couched in general terms and make no concrete representations about any specific acts, practices, or policies." *Holbrook v. Trivago N.V.*, No. 17 Civ. 8348, 2019 WL 948809, at *18 (S.D.N.Y. Feb. 26, 2019) (citation and internal quotation marks omitted). "Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" *Rombach*, 355 F.3d at 174 (quoting *Shields*, 25 F.3d at 1129–30).

Arguably, the only actionable portion of Lehmann's remarks is where he says that the Company "still [has] a strong balance sheet." Compl. ¶ 223. Similar statements referencing a company's "strong financial position" and "strong balance sheet" were deemed "more than mere puffery" in *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F.Supp.3d 111, 173 (S.D.N.Y. 2021). The court found that those statements were "retrospective" since they "focus[ed] on how events of the previous quarter affected [the company's] financial health," and "plausibly designed to mislead investors into believing that [the company's] present (as well as its future was rosier than reality . . . ." *Id.* (citation and internal quotation marks omitted). Conversely, in *Gissin*, 739 F.Supp.2d at 511–12, the court found that the defendant's statement that the company "continues to maintain a strong balance sheet" was mere puffery because it did not "offer any of the long-term guarantees or specifics which would convert an opinion or projection into a factual misrepresentation." *See also In re DRGOLD Ltd. Sec. Litig.*, 472 F.Supp.2d 562, 568–69 (S.D.N.Y. 2007).

But even if we were to assume that Lehmann's statement about the balance sheet could be actionable, Plaintiff's challenges are once more defeated by his failure to plead contemporaneous falsity. Instead of alleging specific facts that demonstrate that the Company did not have a strong balance sheet at the time these statements were made, Plaintiff, again, largely relies on general, conclusory allegations that the Company's strategy for improving its risk management profile was fundamentally flawed and there existed material weaknesses in the Company's ICFR. These allegations are insufficient in light of Rule 9(b) and the PSLRA's heightened pleading requirements. *See Sabratek*, 2000 WL 423529, at *3–4. Plaintiff attempts to be more specific by referencing the Company's presence on the UK financial regulator watchlist and the SEC Comment Letter. However, as discussed above, the former was publicly available information that

the Company had no duty to disclose in the first place, *see Merrill Lynch*, 272 F.Supp.2d at 249–50; *supra* pp. 137–38; and Plaintiff mischaracterizes the nature of the SEC Comment (really, inquiry) Letter as alleged in his own pleading, of which he was the master, *see supra* pp. 150–51.

### LIII.    July 29, 2022: Second Quarter 2022 Report

Plaintiff challenges language from the Company's 2Q22 Quarterly Report:

In 2Q22, we reported net revenues of CHF 3,645 million, which decreased 29% compared to 2Q21, primarily reflecting lower net revenues in the Investment Bank, Wealth Management and Asset Management. ***The decrease in the Investment Bank was driven by significantly reduced capital markets revenues, including mark-to-market losses in leveraged finance, and lower fixed income sales and trading revenues, partially offset by increased equity sales and trading revenues as 2Q21 included a loss of CHF 493 million related to Archegos Capital Management (Archegos) in prime services.*** The decrease in Wealth Management reflected lower other revenues, including a loss on the equity investment in Allfunds Group of CHF 168 million, lower recurring commissions and fees and lower transaction- and performance-based revenues, partially offset by higher net interest income. The decrease in Asset Management reflected lower performance, transaction and placement revenues and reduced management fees.

\*      \*      \*

In response to Russia's invasion of Ukraine, many countries across the world imposed severe sanctions against Russia's financial system and on Russian government officials and business leaders, and these sanctions have been expanded several times. ***The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of June 30, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 244 million, primarily related to corporates, individuals and the sovereign. In addition, Russian subsidiaries had a net asset value of approximately CHF 0.3 billion as of June 30, 2022. In 2Q22, CHF 7.2 billion of assets under management were reclassified due to the imposed sanctions, we had net asset outflows relating to non-sanctioned Russia-related clients of CHF 1.4 billion, and less than 3% of assets under management in our wealth management-related businesses are linked to Russian clients. The Group has further reduced Russia related exposures in 2Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.*** The Group notes that these developments may continue to affect its financial performance, including credit loss estimates and potential asset impairments. The Executive Board is notified of any material developments and escalations in relation to the Russia crisis response.

      \*  \*  \*

As of the end of 2Q22, assets under management of CHF 1,453.9 billion decreased CHF 101.0 billion compared to the end of 1Q22. ***The decrease was driven by unfavorable market movements, structural effects and net asset outflows of CHF 7.7 billion, partially offset by foreign exchange-related movements. Structural effects included certain de-risking measures, outflows and reclassifications of CHF 7.2 billion related to the sanctions imposed in connection with the Russian invasion of Ukraine.***

      \*  \*  \*

***Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We have adapted our liquidity and funding profile to reflect lessons learned from the financial crisis, the subsequent changes in our business strategy and regulatory developments.***

      \*  \*  \*

***To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***

Compl. ¶ 225. Plaintiff alleges that the above statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" (2) "the Company's risk management and/or control governance policies and/or procedures were severely lacking, both at this time and prior to the Class Period;" (3) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls;" (4) "the Company was experiencing significant and unusual customer and/or asset outflows;" (5) "the Company did not maintain a 'sufficient' liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not 'conservative' and

were materially deficient at all times;" and (6) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 226.

By now it should be obvious that Plaintiff is simply piling up allegation upon allegation in the hope of satisfying its burden to plead fraud with particularity. But no matter how numerous, Plaintiff's allegations "fall[] woefully short of satisfying the PSLRA's requirement that plaintiff identify the reasons why each allegedly actionable statement is misleading." *Pollio*, 608 F.Supp.2d at 570 (citation omitted). "[C]laims of fraud must not be based on 'speculation and conclusory allegations.'" *Donna Karan*, 1998 WL 637547, at *17 (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).

The Russian sanctions risks and exposures were disclosed and quantified. Plaintiff's only complaint is that the Company failed to use the disparaging adjectives he applies to those fully disclosed risks. Credit Suisse was not required to characterize the risks in a particular manner; it was only required to disclose them. *See Solow v. Citigroup, Inc.*, No. 10 Civ. 2927, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012). It did so. Plaintiff offers not a single factual allegation tending to show that the amount of the risk disclosed by the Company was in any way erroneous.

The rest of the alleged non-disclosures consist of unspecified deficiencies in the Company's risk management and/or control governance procedures and/or policies, unsubstantiated claims about the extent of the Company's customer and/or asset outflows (the amount of which had previously been disclosed), unspecified material weaknesses in the Company's ICFR, and alleged issues with the Company's liquidity (an allegation that is buttressed with not a single fact). Once again, I am constrained to note that by this time, the information that the Company appeared on a UK financial regulator's watchlist was publicly available and had

been available for months, and that the Plaintiff's characterization of the SEC Comment Letter is contradicted by the allegations of his own pleading. *See supra* pp. 150–51. And Plaintiff continues to make no effort at all to explain why any of these alleged non-disclosures would, if disclosed, render the challenged statements either false or misleading. As to his claim regarding the Company's ICFR, Plaintiff again fails to connect it to the topic of the challenged misstatement. *See Macquarie*, 601 U.S. at 264.

Finally, Plaintiff also challenges the Company's Second Quarter 2022 Report in a manner that is almost identical to Plaintiff's challenges to the Company's First, Second, and Third Quarter 2021 Reports, and the Company's First Quarter 2022 Report. Once again, he calls attention to language in the report that states that it was "prepared in accordance with accounting principles generally accepted in the US (US GAAP)" and claims, without any specificity, that the financial statement was materially false and misleading because it did not comply with GAAP and SEC Rules. Compl. ¶¶ 312–314. This argument is deficient for the reasons articulated above. *Supra* pp. 55–56.

## LIV.   August 22, 2022: Defendant Mathers' "Resignation" and Defendant Joshi Appointment Media Release

Plaintiff challenges statements within the Company's media release announcing Defendant Mathers' resignation and Defendant Joshi's appointment as the Company's CFO:

> ***Credit Suisse Group today announces the appointments of Dixit Joshi as Chief Financial Officer….***
>
> ***Dixit Joshi rejoins Credit Suisse, taking up the role of CFO on October 1, 2022. He will replace David Mathers who decided to step down after more than 11 years in his role as previously communicated.*** For the past five years, Dixit Joshi served as Group Treasurer at Deutsche Bank, where he played a key part in the bank's restructuring while overhauling the firm's balance sheet.

*    *    *

Axel P. Lehmann, Chairman of the Board of Directors, said: "I am delighted to welcome Dixit, Francesca, Michael and Michael to their new roles. Dixit and Francesca are joining Credit Suisse with impressive track records, adding a wealth of experience at this important juncture. ***All four are expected to drive our strategic and operational transformation into the future, with the clear objective to position Credit Suisse for a successful future and realize its full potential.***"

Ulrich Körner, Group CEO, said: "I would like to welcome Dixit and Francesca to Credit Suisse, while congratulating Michael and Michael on taking their respective new roles. They all join with extensive professional experience and a profound knowledge of the financial services industry, ***as we accelerate our efforts to make Credit Suisse a stronger, simpler and more efficient Group with more sustainable returns.*** Dixit has an impressive turnaround track-record, with a broad experience across a range of investment-banking businesses, which will be invaluable on ***our journey in transforming the Investment Bank into a highly competitive Banking and more sustainable Markets business that complements Wealth Management and the Swiss Bank.*** I would like to thank Francesco for taking on the role of CEO of the EMEA region on top of his responsibilities as CEO of the Wealth Management division. At the same time, I would like to thank David for his many years of service and his continued commitment to Credit Suisse, helping ensure a smooth transition period."

Compl. ¶ 227. Plaintiff asserts that the above statements are materially false and/or misleading because they misrepresent and fail to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "Defendant Mathers' 'resignation' and Defendant Joshi's appointment as CFO would have no meaningful effect on the Company's 'strategic and operational transformation,' or lead to 'more sustainable returns,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" and (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls." *Id.* ¶ 228.

The statements about the newly-hired officers contained in the Media Release "are mere puffery, and hence non-actionable," *Gregory v. ProNAi Therapeutics Inc.*, 297 F.Supp.3d 372,

398–99 (S.D.N.Y. 2018), since they are "too general to cause a reasonable investor to rely upon them," *ECA*, 553 F.3d at 206. A significant portion of the excerpt focuses on the Company's new hires' professional experiences and qualifications – experiences and qualifications that Plaintiff does not contend are in any way erroneous. *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07 Civ. 3994, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009). Instead, Plaintiff claims that Mathers' resignation and Joshi's appointment would have no meaningful effect on the Company's strategic and operational transformation or lead to more sustainable returns – some of which were matters of concern to the UK financial regulators (whose interest in the Company was public information). But the mere fact that Lehmann's hoped-for results did not, as alleged by Plaintiff, materialize does not indicate that the statements were untrue or were not believed at the time they were made. *See Marbury Mgmt., Inc. v. Kohn*, 470 F.Supp. 509, 512–13 (S.D.N.Y. 1979), *aff'd in part, rev'd in part on other grounds*, 629 F.2d 705 (2d Cir. 1980), *cert. denied*, 449 U.S. 1011 (1980).

\* \* \* \* \* \* \* \* \*

Because adverse developments at Credit Suisse cascaded beginning in October 2022, I choose to stop at this point and summarize the decisions already made and their implications.

I have taken the time and trouble to analyze every single statement through August 22, 2022, that is alleged by Plaintiff to be false or misleading in his prolix yet woefully undetailed pleading. For the reasons discussed in the pages above, none of these allegedly false or misleading statements is actionable as fraudulent under Section 10(b) and Rule 10(b)-5 or the PSLRA. I have gone to great lengths to explain why this is so, on a statement by statement basis, so as to be able to dispose of claims predicated on these alleged misstatements fully and finally.

Plaintiff has moved for leave to replead his entire Amended Complaint in the event of its dismissal, but the pleading deficiencies identified by the Court with respect to the statements discussed above cannot be cured by amendment. The statements discussed in the preceding pages are either: (1) demonstrably true and/or not alleged to be false and/or misleading; (2) forward-looking with appropriate qualification, which means they fall within the safe harbor provision of the PSLRA; (3) puffery; (4) alleged to be false and/or misleading due to non-disclosure of information that was already publicly available; (5) fraud by hindsight pleading; or (6) "pure omissions," which cannot support a securities fraud claim. It is not necessary to address either scienter or loss causation in order to dismiss allegations of securities fraud based on these statements; and in light of the reasons why those claims have been dismissed, amendment would be futile. It is, therefore, not allowed.

Because all claims of securities fraud based on the above statements, whether against Credit Suisse or against the Individual Defendants, and whether pleaded under Section 10 or Section 20 of the Exchange Act, are dismissed with prejudice and without leave to replead, the following Individual Defendants are dismissed from this action: António Horta-Osório, who ceased to be Chairman of the Company's Board of Directors in January 2022 and who was no longer affiliated with the Company in October 2022 (when the next set of challenged statements were made); Thomas Gottstein, who left the Company in July 2022; and David Mathers, who left the Company in August 2022. Compl. ¶¶ 36–38. None of these individuals is alleged to have made or participated in making false and/or misleading statements after their respective departures from Credit Suisse, which means they are not implicated in the events of the Bank's last six months of independent existence.

*Allegedly Materially Misleading Statements During and After October 2022*

The first two weeks of October 2022 saw a deluge of bad press and social media postings about Credit Suisse's stability – which, the pleading alleges, Credit Suisse said were "based on *incorrect rumors*," *id.* ¶¶ 240, 242, 244–47, 264 (emphasis added). Allegedly as a result of this bad press (whatever the reason for it), "Credit Suisse experienced a significant level of deposit and assets under management outflows," *id.* ¶¶ 240, 242, 244–47 – essentially, a "run on the bank." Plaintiff argues in his opposition papers that by attributing the "massive increase in [the Company's] already unusually high outflows" "to 'negative press and social media coverage based on incorrect rumors,'" Defendants "once again [are] taking no responsibility for Credit Suisse's role." CS Opp. Memo, at 14 (quoting Compl. ¶ 240).

Various disclosures made by the Company starting on October 27, 2022 – including specifically the 3Q22 financials – revealed that Credit Suisse had experienced 12.5 billion CHF in net asset outflows during the third quarter, followed by unusually high levels of asset outflows in the first two weeks of October (the amount of which was not specified). The Company further disclosed on October 27, 2022, that: "While these outflows have stabilized since this period, they have not yet reversed." Compl. ¶ 240. This "run on the bank" had, among other things, required to Company to partially utilize liquidity buffers at the Company and legal entity level, because the Company had fallen below "certain" legal entity-level regulatory requirements (although the Company also stated that "the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level ha[d] been maintained at all times"). *Id.* ¶ 242.

Simultaneously with the release of the Q3 financials, the Company released statements disclosing the events of early October 2022, outlining a remediation plan designed to reverse the situation, and stating that "the execution of the strategic measures that [the Company had] announced [was] also expected to generate liquidity and reduce the funding requirements of the Group." *Id.* Indeed, the Company issued a "blitzkrieg of information" to the market on October 27, 2022, stating: "(1) that it intended to approve 'two separate share capital increases' consisting of a new share issuances for the Saudi National Bank and existing shareholders, for a combined total of CHF 4.0 billion; (2) that it would spin-off its Investment Bank business and sell its Securitized Products Group; and (3) that it 'recorded a net loss attributable to shareholders of CHF 4,034 million' in 3Q22." *Id.* ¶ 350. Plaintiff states that analysts "interpreted the news as having a negative impact on the share price," which "fell 20.04% to close at $3.83 per ADS on October 27, 2022, down from $4.79 per ADS on October 26, 2022." *Id.* ¶ 351.

All this was going on against the context of regulatory inquiries and concerns. One such expression of concern has already been discussed at length – the placement of Credit Suisse on a "watchlist of institutions requiring tougher supervision" by the U.K's Financial Conduct Authority (FCA) because of the regulator's concerns that the Company had "not done enough to improve its culture, governance and risk controls." *Id.* ¶ 401. The FCA's action became public very soon after the FCA placed the Bank on the watchlist (which occurred in May 2022), *id.*, so the market was able to take this information into account during the pre-October 27, 2022 period. Moreover, beyond placing Bank on its watchlist and reportedly "urg[ing] the bank to address 'persistent' cultural issues," the FCA is not alleged to have taken any further action or made any adverse findings about Credit Suisse (particularly, though not exclusively, its risk controls) throughout the remainder of the Class Period. *Id.* As a result, Plaintiff has not and cannot state a claim for a

violation of Section 10(b) and Rule 10b-5 on the ground that Credit Suisse did not itself discuss the FCA's action publicly. The market knew what Plaintiff insists was not disclosed, which is that the FCA was concerned. *See Merrill Lynch*, 272 F.Supp.2d at 249–50. Plaintiff was not required to comment on it.

But the FCA was not the only regulator that took an interest in Credit Suisse during 2022. On July 15, 2022, the SEC's Division of Corporation Finance initiated comment letter correspondence (the "SEC Correspondence") with the Company about its Form 20-F filed on March 10, 2022, for the Fiscal Year that ended on December 31, 2021. Compl. ¶ 320; *see* Ex. 10 to Matuschak Decl. In the initial letter sent by the Commission, the SEC commented on the Company's critical accounting estimates, controls and procedures, and notes to consolidated financial statements. Ex. 10 to Matuschak Decl. The SEC acknowledged the Company's identification in its 2021 Annual Report of "accounting issues" pertaining to netting treatment in the presentation of certain securities lending and borrowing activities and also pertaining to the reclassification and other changes to the consolidated statements of cash flows in the fiscal years ending December 31, 2020 and December 31, 2019.[9] *Id.* at 2. The Commission asked for a full and detailed description of these errors (including, but not limited to, who identified them, when and how, and whether they were the result of control deficiencies). *Id.* Additionally, in connection with its comment on the Company's controls and procedures, the Commission asked "In light of [Credit Suisse's] accounting issues and resulting revisions as well as the various changes that ha[d]

---

[9]    Per the Company's 2021 Annual Report: "[T]he presentation of certain cash flow hedges were reclassified. In aggregate for these matters for the year ended December 31, 2020, 'Net cash provided by/(used in) operating activities' were revised by a debit of CHF 483 million, 'Net cash provided by/(used in) investing activities' were revised by a credit of CHF 2,294 million and 'Net cash provided by/(used in) financing activities were revised by a debit of CHF 1,811 million. In aggregate for these matters for the year ended December 31, 2019, 'Net cash provided by/(used in) operating activities' were revised by a debit of CHF 1,086 million, 'Net cash provided by/(used in) investing activities' were revised by a credit of CHF 1,033 million and 'Net cash provided by/(used in) financing activities were revised by a credit of CHF 53 million." Credit Suisse Group AG, 2021 Annual Report, at 292 (2022); *see* Ex. 10 to Matuschak Decl., at 2.

taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management," that Credit Suisse "provide [the SEC's Division of Corporation Finance] with [the Company's] analysis supporting [its] conclusion that there were no material changes to ICFR." *Id.*

There followed nine months of correspondence – seven more letters – between the Company and the SEC. *See* Compl. ¶¶ 389, 440; Exs. 10, 13–14, 17–18, 20–22 to Matuschak Decl. In the SEC Correspondence, Credit Suisse "tried to justify its position" that the errors identified in the 2021 Annual Report were not material, but repeatedly "the SEC pushed back." Compl. ¶ 389. Finally, in Credit Suisse's last letter to the SEC, dated March 12, 2023 – just a week prior to the Bank's collapse – the Company advised the Commission, in relevant part, that: (1) there indeed was a material weakness in internal control over financial reporting insofar as it related to certain criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"); and (2) those control deficiencies had remained unremediated for several years. Ex. 22 to Matuschak Decl.; *see* Compl. ¶¶ 8, 341, 389, 440. In the Company's subsequent 20-F for the period ending December 31, 2022, which was filed on March 14, 2023, Credit Suisse revealed publicly for the first time that it had "identified certain material weaknesses in internal control over financial reporting as of December 31, 2021, and consequently, December 31, 2022." Compl. ¶¶ 17, 320. PwC AG, Credit Suisse's auditor, acknowledged in the Company's 2022 Annual Report Audit that, while "The Bank's management and [PwC] previously concluded that the Bank maintained effective internal control over financial reporting as of December 31, 2021......the Bank's management and [PwC] have subsequently determined that material weaknesses in internal control over financial reporting existed and accordingly concluded that internal control over

financial reporting was not effective as of such date." *Id.* ¶ 341. The price of Credit Suisse ADSs closed at $2.51 per ADS on March 14, 2023, down from $2.54 per ADS the day before. *Id.* ¶ 361.

The Complaint alleges no facts tending to show when, exactly, Credit Suisse senior executives knew or had reason to know that the Company's ICFR was inadequate – whether as of December 31, 2021 or any other specific date prior to this disclosure. Certainly, prior to the SEC's initial Comment Letter in the summer of 2022, no facts are alleged tending to show what the Individual Defendants knew or should have known about this problem, or when they should have known it. Furthermore, as Plaintiff himself alleges, "the entire time Credit Suisse was engaged in the comment process with the SEC – PwC AG continued to represent in each of Credit Suisse's interim Quarterly Reports that the information included in the Company's balance sheet for the period ending December 31, 2021, was 'fairly stated, in all material respects.'" *Id.* ¶¶ 321, 383, 440. There were no public qualifiers about the Company's ICFR until the Form 20-F was filed on March 14, 2023, *id.* ¶ 340, with PwC AG's "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" attached, *id.* ¶ 341.

But what Plaintiff *does* allege is that the SEC indicated that it had concerns about aspects of Credit Suisse's financial statements and related disclosures, including specifically ICFR – and that Credit Suisse said nothing about this issue as correspondence with the Commission continued over many months, until the Company ultimately admitted and disclosed on March 12, 2023, that the Commission had been correct in suspecting that something was wrong with the Bank's ICFR. Compl. ¶¶ 388–89; *see* Exs. 10, 22 to Matuschak Decl. The issue is whether enough facts are pleaded to indicate that the SEC's comments, concerns, and requests for additional information

and clarification – which as far as the Court can tell are not a matter of public record while the comment letter process is ongoing[10] – needed to be disclosed, or whether Credit Suisse's pure omission to mention the pendency of the comment letter process publicly was not actionable. That will be discussed below.

It is against this background that I return to the statement by statement analysis of the public statements alleged by Plaintiff to be false or misleading.

## LV.    October 14, 2022: Defendant Lehmann Speech at the Institute of International Finance

Plaintiff takes issue with certain representations made by Defendant Lehmann during a speech at the Institute of International Finance's annual conference that were reported in a *Wall Street Journal* article, Compl. ¶ 229:

> Credit Suisse Chairman Axel Lehmann said the bank's strong capital position will help it weather its worst crisis and become smaller and leaner.
>
> Mr. Lehmann, speaking in Washington, D.C., at the annual conference of the Institute of International Finance, said the bank's strategy will narrow and ***its risk controls will keep tightening*** after losing $5 billion last year from the collapse of two clients. Credit Suisse has said it will give details Oct. 27 on its latest strategic pivot.
>
> Mr. Lehmann, who took the job in January, said the financial losses in 2021 from Archegos Capital Management and Greensill Capital were the worst in Credit Suisse's 166-year history, and that its challenges are no secret.
>
> "***We are fully aware that we need to change and we will change,***" he said.
>
> Mr. Lehmann said it was astonishing that Credit Suisse's main capital ratio has remained high through the turmoil, even though the bank hasn't been making profits. The bank is committed to keeping that ratio between 13% and 14% through the second half, he said.

---

[10]    *See Filing Review Process*, U.S. SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/about/divisions-offices/division-corporation-finance/filing-review-process-corp-fin#:~:text=To%20increase%20the%20transparency%20of,declared%20a%20registration%20statement%20effective (last visited Aug. 9, 2024).  The Complaint does not plead any facts in this regard.

*Id.* ¶ 230. Allegedly, these statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the bank's 'risk controls' had not been 'tighten[ed],' and would not 'keep tightening,' as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period, and its risk parameters were materially deficient at all times;" and (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls." *Id.* ¶ 231.

Plaintiff fails to explain why any of Lehmann's statements were fraudulent. *See Vogel v. Sands Bros & Co.*, 126 F.Supp.2d 730, 738 (S.D.N.Y. 2001); *Health Mgmt. Sys.*, 1998 W 283286, at *4. Plaintiff's allegation regarding the UK financial regulator's watchlist fails for the reasons discussed above – that information was publicly available. *See, e.g.*, *supra* pp. 137–38. To the extent that Plaintiff might argue that he is alleging that the Defendants never implemented "meaningful" changes to the Company's risk management and/or control governance procedures and/or policies, that is exactly the type of conclusory allegation that fails to satisfy the PSLRA's and Rule 9(b)'s requirement of particularized pleading, *see Vogel*, 126 F.Supp.2d at 739, and amounts to nothing more than an attempt to plead fraud by hindsight, *see In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F.Supp.3d 164, 230 (S.D.N.Y. 2022).

### LVI.    October 27, 2022: Third Quarter 2022 Media Release and Investor Presentation

Plaintiff takes issue with language from the Company's media release announcing financial results for the third quarter and of 2022, Compl. ¶ 239:

Credit Suisse's performance in the third quarter of 2022 continued to be challenged by the current economic and market environment. ***The combination of the geopolitical situation as well as the significant monetary tightening by major central banks worldwide in response to the continued and significant increase in inflation have resulted in continued heightened market volatility, weak customer flows and ongoing client deleveraging.***

*     *     *

We reported a net loss attributable to shareholders of CHF 4.0 bn, compared to net income attributable to shareholders of CHF 434 mn in 3Q21. Our reported net loss attributable to shareholders included an impairment of deferred tax assets related to our strategic review of CHF 3.7 bn. ***The challenging market conditions in 3Q22 were the main driver of the decline in Group AuM which stood at CHF 1.4 trn, down CHF 53 bn from CHF 1.45 trn at the end of 2Q22. This included Group net asset outflows of CHF 12.9 bn in 3Q22, compared to NNA of CHF 5.6 bn in 3Q21.***

*     *     *

***Our financial results for 9M22 have been significantly affected by the challenging economic and market environment, the combination of monetary tightening by major central banks and the ongoing geopolitical situation following Russia's invasion of Ukraine, resulting in heightened volatility and client risk aversion.*** The Swiss Bank continues to deliver a resilient performance, notwithstanding the impact from the SNB's decision to increase rates, and Wealth Management benefited from higher rates. However, the current market environment has had an adverse impact on client activity across our divisions. In particular, the Investment Bank has been notably impacted by the substantial industry-wide slowdown in capital markets and the challenging market backdrop. We would expect these market conditions to continue in the coming months. In the Investment Bank, although our pipeline remains robust, market conditions may delay deal completions. ***Client activity remains subdued in our Sales & Trading businesses, exacerbating normal seasonal declines.*** We would expect this division to report a loss in the fourth quarter. Likewise, client activity remains subdued in Wealth Management and recurring revenues are expected to continue to reflect lower assets under management. ***Moreover, during the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced a significant level of deposit and assets under management outflows. While these outflows have stabilized since this period, they have not yet reversed. We have plans to address these matters through, among other things, accessing capital markets after October 27 and executing the strategic initiatives we announce today.*** We would note that the execution of these measures is also expected to generate liquidity and reduce the funding requirements of the Group. *Id.* ¶ 240.

- <u>*Defendant Körner*</u>: "***The third quarter, and more broadly 2022 so far, have been significantly impacted by the continued challenging market and macroeconomic conditions, leading to a weaker performance for our Investment Bank in particular.*** Our recent Group level performance has been disappointing for our stakeholders. From today,

171

we are taking a series of decisive actions to re-focus Credit Suisse around the needs of our clients and stakeholders. ***Our new, integrated model will be focused on Wealth Management, the Swiss Bank, as well as Asset Management, and we will radically restructure the Investment Bank, strengthen capital, and accelerate our cost transformation. We believe these actions will lead Credit Suisse to a more stable performance and generate lasting value for our shareholders.***" *Id.* ¶ 239.

Plaintiff claims that the above statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's new 'strategy' was not focused on providing 'more stable performance,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls;" (3) "the Company's performance was not affected by mere 'macroeconomic' and 'geopolitical' conditions, but instead by its significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" (4) "the Company was experiencing significant and unusual customer and/or asset outflows that had not 'stabilized;'" and (5) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 241.

Most of the reasons assigned by Plaintiff for why these statements were false and misleading border on the absurd. The numbers disclosed by the Company are devastating enough in and of themselves: Group Assets under Management down 53 billion Swiss francs from the preceding quarter (2Q22), Group net asset outflows of 12.9 billion Swiss francs in 3Q22, with further large outflows in the first weeks of 4Q. But there is no allegation that these disclosed

numbers are wrong, or that central banks did not in fact tighten credit during the third quarter of

2022, or that inflation had not increased, or that the markets had not been particularly volatile

during that period. Instead, Plaintiff contends that the announcement of these terrible and ongoing

results was rendered misleading principally by Credit Suisse's failure to disclose information that

had been in the public domain for months (placement on the UK financial regulator's watchlist

back in May, which became public on or about June 12) and by Credit Suisse's failure to blame

its own mismanagement for the losses.

Insofar as these contentions are concerned, Plaintiff has "failed to plead with particularity

the fourth prong of the Rule 9(b) requirements, namely, 'how the statements were false or

misleading.'" *Caiafa v. Sea Containers Ltd.*, 525 F.Supp.2d 398, 409 (S.D.N.Y. 2007) (citation

omitted). Instead, the Complaint contains conclusory allegations that the Company's strategy for

dealing with a disclosed crisis would not be effective. But "[a] plaintiff cannot base securities fraud

claims on speculation and conclusory allegations." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.

2001).

As for Plaintiff's assertion that the statements in the Third Quarter 2022 Media Release

and Investor Presentation were false and/or misleading because they misrepresented and failed to

disclose that the Company's performance was affected by its significant, unmanaged, self-inflicted

risk and exposure as a result of the Russian sanctions: Plaintiff fails to appreciate the allegations

in its own pleading, which alleges that the Company expressly disclosed that its financial results

for 9M22 "ha[d] been significantly affected by the challenging economic and market

environment," which included "the ongoing geopolitical situation following Russia's invasion of

Ukraine, resulting in heightened volatility and client risk aversion." Compl. ¶ 240. Numerous

previous disclosures (discussed above) revealed that Credit Suisse began trying to reduce its

Russian exposure in light of the sanctions as soon as they were imposed. Business decisions made years prior to the invasion of Ukraine in 2022 – an unanticipated geopolitical event – ended up having disastrous results for Credit Suisse. But nothing in the Complaint supports an allegation that the Company misled the market about either the fact or the extent of its exposure. All Plaintiff alleges is that Credit Suisse failed to self-flagellate for being so dramatically exposed when Russia unexpectedly invaded Ukraine. That is not the stuff of a securities fraud complaint; Credit Suisse was not under any duty "to direct conclusory accusations at itself" in its public disclosures. *Ballan v. Wilfred Am. Educ. Corp.*, 720 F.Supp. 241, 249 (E.D.N.Y. 1989); *see Harrison v. Rubenstein*, No. 02 Civ. 9356, 2007 WL 582955, at *13 (S.D.N.Y. Feb. 26, 2007).

In addition, Körner's statements about Company strategy are puffery, and thus, non-actionable. *See Vale*, 2017 WL 1102666, at *22.

I have already indicated why the Company's failure to mention publicly available information about the UK financial regulator's placement of Credit Suisse on a watchlist is not actionable (the information was publicly available and so did not need to be disclosed by Credit Suisse). However, Plaintiff has also alleged that this statement is false and misleading for failing to disclose a fact that was not publicly known: that the Company had received the initial Comment Letter from the SEC dated July 15, 2022, which raised questions related to the Company's ICFR. Compl. ¶ 241. This statement was made after the Company's response in August 2022 to the July 15, 2022 letter, and the SEC's subsequent response, dated October 20, 2022, seeking additional information and clarification. Exs. 13–14 to Matuschak Decl.

A regulatory inquiry does not constitute notice to the corporation that there exists a deficiency; a question is just that – a question, not a finding. Additionally, Plaintiff fails to allege how the failure either to confess to material weaknesses in the Company's ICFR or to disclose the

pendency of an SEC inquiry into that subject rendered any specific statement that Credit Suisse made either false or misleading. The Company said nothing whatever in these statements about ICFR, which ordinarily would place us in the realm of pure omission – and pure omission is not actionable unless the issuer is under a duty to speak in order to render some statement that was actually made not misleading. *Macquarie*, 601 U.S. at 264, 266.

Significantly, the parties do not discuss in their briefs whether the pendency of the SEC inquiry was a matter that needed to be disclosed, independent of its impact on the validity of any other statement that was made by the Company. "There are many circumstances where the omission to disclose even a strongly worded comment will not give rise to either a misstatement or scienter—when, for example, a defendant has not made a statement giving rise to a duty to disclose or when the comment on its face or from context indicates that it is interim and subject to revision and there are no facts pled that would indicate the defendant would fail to address the regulator's comments or would be unable to do so without significant cost." *Rosi v. Aclaris Therapeutics, Inc.*, No. 19-cv-7118, 2021 WL 1177505, at *24 (S.D.N.Y. Mar. 29, 2021). For example, in *Espinoza v. Whiting*, 8 F.Supp.3d 1142, 1152 (E.D. Mo. 2014), *aff'd Podraza v. Whiting*, 790 F.3d 828, 838 n.4, 839–40 (8th Cir. 2015) – a case that will be discussed in greater detail in the context of scienter – the defendant company ultimately was not liable for making false and misleading statements concerning its court-ordered environmental remediation obligations – remediation obligations which were the subject of an SEC inquiry. The court in *Espinoza* held that "The mere existence of the SEC inquiries – in the absence of SEC findings of misconduct – [did] not imply misconduct or fraud occurred." 8 F.Supp.3d at 1151 (citing *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248–49 (8th Cir. 2008)). However, the court also acknowledged that the defendant company in that case (unlike Credit Suisse) had disclosed the

SEC's inquiry and that it was in discussions with the Commission about the issue. That information was public.

The situation as of October 27, 2022 vis-à-vis the SEC was this: in July 2022, Credit Suisse had received a comment letter, which included requests for supplemental information, from the SEC's Division of Corporation Finance, a non-enforcement branch of the Commission. Ex. 10 to Matuschak Decl. The Company had responded to that letter. Ex. 13 to Matuschak Decl. Had the matter ended there, pure omission would have shielded Credit Suisse from disclosing this inquiry to the market; in fact, "the Division makes its comment letters and company responses to those comment letters public on the SEC's EDGAR system no sooner than 20 business days after it has completed its review of a periodic or current report or declared a registration statement effective,"[11] which might fairly imply no duty to disclose an open inquiry.

However, Credit Suisse's initial response to the SEC's questions about ICFR was inadequate to close the matter – a fact of which the Company became aware on or shortly after October 20. Ex. 14 to Matuschak Decl. At that point, I cannot say as a matter of law that the Company did not have a duty to alert the market to the pendency of this regulatory inquiry and that it could no longer hide behind the "pure omission" doctrine.

I will discuss the impact of this conclusion in a subsequent section of this decision devoted to this specific issue (*see infra* pp. 234–43).

## LVII.  October 27, 2022: Third Quarter 2022 Earnings Release

Plaintiff calls attention to language from the Company's 3Q22 earnings release:

**Liquidity issues in October 2022**
***During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced significantly higher***

---

[11]    *Id.*

*withdrawals of cash deposits as well as non-renewal of maturing time deposits. These outflows have since stabilized to much lower levels but have not yet reversed.* As is normal practice, we also limited our access to the capital markets in the period immediately preceding our upcoming strategy announcements. *While these outflows have partially utilized liquidity buffers at the Group and legal entity level, and we have fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times.* The Group's average daily LCR for the month of October through October 25 was 154%, with lower spot rates over this period that remained below this average through that date. *Remediation plans have been prepared to reverse these outflows, including accessing the public and private markets following our announcements on October 27 together with certain asset disposals and other measures. We would note that the execution of the strategic measures that we have announced is also expected to generate liquidity and reduce the funding requirements of the Group. We also continue to have access to central bank funding sources if required.*

These circumstances have exacerbated the risks we described under "Liquidity Risk" in our Risk Factors contained in our 2021 Annual Report.

**Outflows in assets under management in October 2022**
*During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced client asset outflows at levels that substantially exceeded the rates incurred in 3Q22.* These asset outflows primarily impacted our Wealth Management and Swiss Bank divisions. *These outflows have reduced significantly since mid-October but have not yet reversed.* It is premature to estimate the impact on net new asset flows for 4Q22 but, coupled with reductions in asset values due to adverse market movements in client portfolios in 3Q22, this reduction in assets under management may lead to decreased fee revenues for the Group, thereby leading to reduced profitability.

\*       \*       \*

**Russia's invasion of Ukraine**
*….The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of September 30, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 229 million, primarily related to corporates, individuals and the sovereign. In addition, Russian subsidiaries had a net asset value of approximately CHF 250 million as of September 30, 2022. The Group has further reduced Russia related exposures in 3Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.*

\*       \*       \*

As of the end of 3Q22, assets under management of CHF 1,400.6 billion decreased CHF 53.3 billion compared to the end of 2Q22. ***The decrease was mainly driven by unfavorable market movements and net asset outflows of CHF 12.9 billion. Net asset outflows of CHF 12.9 billion in 3Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF 6.4 billion in Wealth Management reflected mainly outflows across the Middle East, Asia Pacific and Swiss ultra-high-net-worth businesses***, partially offset by inflows in the European businesses. ***Net asset outflows of CHF 4.2 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in index solutions, equities and fixed income, and alternative investments, primarily related to outflows in credit, partially offset by inflows from investments and partnerships, primarily related to an emerging markets joint venture. Net asset outflows of CHF 1.5 billion in Swiss Bank reflected outflows in the private clients business, partially offset by inflows in institutional clients business.*** *Id.*

Compl. ¶ 242. Plaintiff asserts that the above statements are materially false and/or misleading because they misrepresent and fail to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" (2) "the Company was experiencing significant and unusual customer and/or asset outflows that had not 'stabilized' or 'reduced significantly since mid-October;'" (3) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 243.

The majority of the Plaintiff's allegations "lack the requisite specificity." *Clark v. Nevis Cap. Mgmt., LLC*, No. 04 Civ. 2702, 2005 WL 488641, at *12 (S.D.N.Y. Mar. 2, 2005). The Company disclosed that it had experienced massive and unanticipated outflows and documented the amount of those outflows during the third quarter, both absolutely and over the same quarter in the preceding year. The challenged statement describes the Company's liquidity issues. While

the Plaintiff asserts in conclusory fashion that those outflows had not "stabilized" or "significantly reduced since mid-October," he pleads not a single fact tending to support these conclusions.

There is also extensive discussion about Credit Suisse's continuing exposure as a result of its extensive pre-Ukraine invasion dealings in Russia and the sanctions imposed following Russia's invasion into Ukraine. The facts are disclosed; Plaintiff does not point to a single disclosed fact that is false. Instead, Plaintiff complains in conclusory fashion that the Company failed to characterize these disclosed facts in a sufficiently negative light – which is insufficient to state a claim under Section 10(b) and Rule 10b-5 of the Exchange Act. *See Singh*, 106 F.Supp.3d at 448.

But as will be explained below, Plaintiff's allegation concerning material weaknesses in the Company's ICFR renders this particular statement actionable. *See infra* pp. 234–43.

### LVIII. October 27, 2022: 2022 Strategic Review Media Release

Plaintiff takes issue with portions of the Company's media release unveiling its new strategy and transformation plan:

> Credit Suisse Group AG (Credit Suisse) today announces a series of decisive actions to create a simpler, more focused and more stable bank built around client needs. ***The announcement follows a strategic review conducted by the Board of Directors and Executive Board, resulting in a radical restructuring of the Investment Bank, an accelerated cost transformation, and strengthened and reallocated capital, all of which are designed to create a new Credit Suisse.***
>
> \*       \*       \*
>
> Axel P. Lehmann, Chairman of the Board of Directors of Credit Suisse, said: "Over 166 years, ***Credit Suisse has built a powerful and respected franchise but we recognize that in recent years we have become unfocused.*** For a number of months, the Board of Directors along with the Executive Board has been assessing our future direction and, in doing so, we believe we have left no stone unturned. ***Today we are announcing*** the result of that process – ***a radical strategy and a clear execution plan to create a stronger, more resilient and more efficient bank with a firm foundation, focused on our clients and their***

*needs. At the same time, we will remain absolutely focused on driving our cultural transformation, while working on further improving our risk management and control processes across the entire bank.* I am convinced that this is the blueprint for success, helping rebuild trust and pride in the new Credit Suisse while realizing value and creating sustainable returns for our shareholders."

Ulrich Körner, Chief Executive Officer of Credit Suisse, said: "This is a historic moment for Credit Suisse. *We are radically restructuring the Investment Bank to help create a new bank that is simpler, more stable and with a more focused business model built around client needs.* Our new integrated model, with our Wealth Management franchise, strong Swiss Bank and capabilities in Asset Management at its core, is designed to allow us to deliver a unique and compelling proposition for clients and colleagues while targeting organic growth and capital generation for shareholders. *The new Executive Board is focused on restoring trust through the relentless and accountable delivery of our new strategy, where risk management remains at the very core of everything we do.*"

\*    \*    \*

Credit Suisse intends to take decisive steps to restructure the Investment Bank and focus on areas more closely connected to its core businesses where it has a competitive advantage. *This will involve transforming the risk profile of the Investment Bank and targeting a reduction in RWAs of ~40% by 2025 through strategic actions…*

Compl. ¶ 232. These statements are allegedly materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's new 'strategy' was a sham, as was its purported focus on 'improving our risk management and control processes,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "restructuring of the Investment Bank was not designed to make the Company 'simpler' and 'more stable' but was instead necessitated by the Company's wholly inadequate capital position as a result of, among other things, significant and undisclosed customer and/or asset outflows throughout the Class Period;" and (3) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision

because of concerns that it had not done enough to improve its governance and risk controls." *Id.* ¶ 233.

Plaintiff fails to identify a single reason why any of these statements are materially false and/or misleading. "[T]he Court has little trouble concluding that the challenged statements" regarding the Company's focus and strategy "are a set of aspirational generalizations," *Vale*, 2017 WL 1102666, at *22, which are "precisely the type of 'puffery'" that the Second Circuit has "consistently held to be inactionable." *ECA*, 553 F.3d at 206 (citation and internal quotation marks omitted); *see Holbrook*, 2019 WL 948809, at *18. Plaintiff throws around the word "sham" throughout his pleading. But to quote the immortal Inigo Montoya, "You keep using that word. I do not think it means what you think it means."[12] "Sham" means "bogus" or "false" or "fake" – something that is not what it purports to be. But Plaintiff does not allege that Credit Suisse did not really hope that it could stanch the bleeding by implementing these new strategies – which is to say, he does not plead facts tending to indicate that the new strategies were a "sham." Rather, he uses "sham" to indicate that the strategies adopted by the Company did not work in the end. That is not what the word means. And the fact that strategies adopted in good faith ultimately fail is not actionable. This announcement reflects a hope – and perhaps a prediction – but not any sort of guarantee that the steps to be taken would succeed. If Plaintiff meant to allege that Defendants did not believe the new strategy would work when they announced it, he fails because he has not plausibly alleged that anyone at Credit Suisse lacked faith in the strategy the Company was implementing. Corporate optimism is not actionable. *See Bank of Am. – ERISA*, 2012 WL 1353523, at *10.

---

[12]    From THE PRINCESS BRIDE (motion picture), based on the novel *The Princess Bride* by William Goldman, released October 9, 1987, 20th Century Studios, Metro-Goldwyn-Mayer, Lionsgate and Vestron, Distributors.

Plaintiff's allegation that the Investment Bank's restructuring was not designed to make the Company more simple and more stable is not only implausible, it is illogical. Plaintiff asserts that this was not the purpose of the restructuring, but pleads no fact in support of that conclusion. Instead, he pleads that the restructuring was "necessitated" by the capital outflows that had compromised the Company's capital position. But Credit Suisse never said that the restructuring was not "necessitated" by the need to do something to counter and, hopefully, reverse what was fast turning into a run on the bank. Quite the contrary; the overall tenor of its statements about implementing a restructuring of Credit Suisse was that this move – which would involve transforming the risk profile of the Investment Bank and targeting a reduction in RWAs of ~40% by 2025 through strategic actions, Compl. ¶ 232 – was necessary in light of the Company's precarious financial position. Saying that the purpose of a restructuring is to stabilize the Company does not contradict the fact that what necessitated the restructuring was the fully disclosed capital/liquidity issue facing the Bank. *Of course* the purpose of the restructuring was to stabilize the situation; there was no other reason for the Bank do have tried anything like the radical restructuring it proposed to implement.

In short, Plaintiff does not identify a single fact that was not known to the market on the date of these disclosures that would render them in any way false or misleading. *See In re Bausch & Lomb, Inc. Sec. Litig.*, No. 01-cv-6190, 2003 WL 23101782, at *22 (W.D.N.Y. Mar. 28, 2003). And significantly, Plaintiff does not allege that this statement is inaccurate because it fails to discuss ICFR deficiencies. Therefore, this statement is not actionable.

## LIX.    October 27, 2022: 2022 Strategy Update Presentation

Plaintiff challenges statements made by Defendants Körner and Lehmann during the Company's 2022 Strategy Update Presentation with investors, Compl. ¶ 234:

_Defendant Körner_:

- We are creating a new Credit Suisse with a simpler, more stable, more focused business model built around our leading franchises in Wealth Management and in our Swiss home market, complemented by our strong capabilities in Asset Management and Markets*. **We will radically restructure our Investment Bank and reduce risk by around 40%.** We will create a resized connected Markets business as an integral part of new Credit Suisse.

- We currently have USD 90 billion of risk-weighted assets in the Investment Bank, down from historic levels but still accounting for about 1/3 of the group. And they are not generating sufficient value in the current setup. **With the actions announced today, we will reduce our risk exposure by around 40%, both in terms of risk-weighted assets and leverage exposure.**

- Securitized Products is an attractive market-leading business, but it is a business that is not central to our strategy and requires more capital than we are willing to allocate. **We have, therefore, decided to reduce exposure and will partner with Apollo Global Management and PIMCO.**

- **These actions combined will release a total of $57 billion in risk-weighted assets, and USD 217 billion in leverage exposure.** This will allow us to allocate more capital to higher-return businesses in which we are more competitive. _Id._ ¶ 235.

_Defendant Lehmann_:

- **[We] intend to significantly derisk and reduce our Investment Bank, focusing on core parts of sustainable value. This means we plan to transfer certain investment banking and capital market capabilities into a separate entity, revitalization, the CS First Boston brand. Credit Suisse intends to remain a long-term investor, creating equity ownership and a partner-like culture to tap the right talent and attract external capital. Going forward, this business will be advisory-led and have a reduced risk profile.** We expect to access external credit facilities for the leveraged finance business. I will be delighted when Michael Klein is appointed CEO-designate of Credit Suisse First Boston. He will lead this transformation towards Credit Suisse First Boston's more independent future.

- And finally, we have entered into a framework agreement and exclusivity agreement to transfer a significant portion of our Securitized Products business to an investor group led by Apollo Global Management. **This proposed transaction will support our transformation. It will derisk and reposition Securitized Products to release capital.**

- ***Since my appointment as Chairman and also before as the Chair of the Risk Committee after my election to the Board just a year ago, my clear focus has been on strengthening our governance, improving our risk management control processes, and establishing the right risk culture. We have achieved significant progress and clear results in these areas, and we will continue with our efforts. Id. ¶ 234.***

These statements amplify the ones just discussed.

Plaintiff alleges that Körner and Lehmann's statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the proposed transactions would not meaningfully reduce Credit Suisse's 'risk exposure' and the Company had not 'achieved significant progress and clear results' in 'improving [] risk management and control processes,' as Defendants did not implement meaningful changes to Credit Suisse's severely lacking risk management and/or control governance procedures and/or policies, either at this time or at any time throughout the Class Period;" (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls;" (3) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were materially deficient at all times;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 236.

For the most part, Plaintiff again has failed to allege, in any specific sense, why the representations made in the 2022 Strategy Update Presentation were fraudulent. *See AIG Glob. Sec. Lending Corp. v. Bank of Am. Sec. LLC*, 254 F.Supp.2d 373, 382 (S.D.N.Y. 2003). We will skip over reasons 2 and 3, as they have been discussed above in connection with other alleged misrepresentations and are as unpersuasive in connection with this disclosure as they were with

those. *See supra* pp. 54, 137–38. Insofar as Plaintiff alleges that the proposed transactions with Apollo Global Management and PIMCO "would not meaningfully reduce Credit Suisse's 'risk exposure,'" the statement that the transactions would have such an effect is predictive and not actionable in the absence of facts tending to show that the Company knew its strategy would fail – facts that are entirely absent from the Complaint.

Additionally, Lehmann's assertion about the Company's "significant progress" and "clear results" in strengthening governance and improving CS's risk management practices is non-actionable puffery, and "do[es] no more than place a 'positive spin on developments in the" Company's efforts at improving its risk management process. *Aratana*, 315 F.Supp.3d at 757–58 (quoting *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069 (LGS), 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015)).

However, Plaintiff does allege that this statement is inaccurate because of the lack of allegations concerning material weaknesses in the Company's ICFR. That issue will be discussed below. *See infra* pp. 234–43.

## LX.    October 27, 2022: Rights Offering Media Release

Plaintiff challenges language from another media release issued on October 27, 2022:

> The Board of Directors of Credit Suisse Group AG will propose to an Extraordinary General Meeting to be held on November 23, 2022, to approve two separate share capital increases: a first capital increase through the issuing of new shares to a number of qualified investors, including Saudi National Bank (SNB), and a second capital increase through a rights offering for existing shareholders. SNB has committed to invest up to CHF 1.5 billion in Credit Suisse to achieve a shareholding of up to 9.9%. ***Through the proposed share capital increases, Credit Suisse Group AG intends to raise CHF 4.0 billion to further strengthen the Group's capital base and support its strategic transformation.***

Compl. ¶ 237. This language was allegedly materially false and/or misleading because it misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by

the Defendants: (1) "as opposed to 'support[ing] its strategic transformation,' the proposed Rights Offering was merely a last-ditch effort to shore-up liquidity necessitated by significant and unusual customer and/or asset outflows that were not disclosed by Defendants;" and (2) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times." *Id.* ¶ 238.

Plaintiff's allegations are entirely insufficient – especially Plaintiff's assertion that this announcement was deficient for failing to disclose that the Rights Offering was merely a last-ditch effort to shore-up liquidity, as opposed to being undertaken to support the Company's strategic transformation. Credit Suisse "was not obligated to characterize its performance or future outlook in negative terms, speculate on future negative results or paint themselves in the most unflattering light possible." *Solow*, 2012 WL 1813277, at *4. The media release discloses that through the proposed share capital increases, the Company intended to raise CHF 4.0 billion both to "support its strategic transformation" AND "further strengthen the Group's capital base" – which is another way of saying that the Company was trying to "shore-up liquidity." "[S]o long as material facts are disclosed . . . it is not deceptive . . . to fail to verbalize all adverse inferences expressly." *Klamberg*, 473 F.Supp. at 551 (citing *Goldberg*, 567 F.2d at 218 n.8).

The statement is not misleading because it did not say that the Company did not maintain an adequate liquidity pool at the time the statement was made. A reasonable investor could reach this conclusion on his or her own based on the Company's disclosure that it needed to raise CHF 4.0 billion in order to "shore up liquidity." Plaintiff's additional claim that the Company's liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times is wholly conclusory, and "Conclusory statements or statements unsupported by factual assertions are

inadequate to state a claim of fraud." *In re Tarragon Corp. Sec. Litig.*, 2009 WL 10732259, at *5 (S.D.N.Y. Mar. 27, 2009).

Plaintiff does not rely on the lack of information about the Company's ICFR to challenge the accuracy of these statements.

So, not actionable.

### LXI.    October 27, 2022: Third Quarter 2022 Earnings Conference

Plaintiff calls attention to comments by Defendants Joshi and Körner during the Company's conference call with investors to discuss the Company's third quarter 2022 earnings:

*Defendant Joshi*:

- "As you all know, challenging conditions continue during the third quarter with heightened market volatility, weak customer flows, and ongoing client deleveraging. And our financial performance reflects these challenges….I would like to provide some additional context and commentary on asset flows at the start of the fourth quarter. ***We did see a significant level of deposit in AUM outflows during the first two weeks of October. Whilst these outflows have stabilized since this period, they have not yet reversed. We have plans to address these matters after 27th of October through, among other things, accessing capital markets and executing the strategic initiatives we have announced today. We would note that the execution of these measures is also expected to generate liquidity and reduce the funding requirements of the group.***" Compl. ¶ 244.

- When questioned by an analyst about "what drove" the customer outflows, Joshi responded: You know, as you know, ***the negative social media news around our name at the beginning of October, you know, did lead to outflows, you know, across our franchise. You know, it's something that we're looking to address today through the strategic announcements that we're making, including the 4 billion capital raise and ensuring that, you know, we're well capitalized through this transformation period, while we make the transformational announcements and restructuring across our investment bank and other business areas.*** *Id.* ¶ 245.

*Defendant Körner*:

- So, if we look at the wealth management situation, you've seen the outflows of 6.4 billion for the quarter. And you rightly put it, which you then see reflected in the transaction-based income line as well, our wealth management business is very strong, as you know, in

APAC and emerging markets. That has impacted that clearly, as we said. ***If you look at the 6.4 billion, it's a combination in the third quarter of, you know, deleveraging and derisking, if you want to. So, about 3 billion comes from deleveraging and other like 2 billion is proactive, call it derisking, and then some additional deposit outflows. I think that's the right way to think about that one.*** *Id.* ¶ 246.

- When questioned by another analyst if Defendants "could give us a sense of scale of a similar run rate to" the outflows seen in 3Q22, Körner responded: What we have seen -- and thanks for the question, what ***we have seen, particularly at the beginning of October, certainly, a heightened level of outflows, which was very much based on what you have seen in the media and the press rumors. And let me say here very clearly, to the largest extent possible, factually incorrect rumors. But, obviously, that, you know, the overall situation that has come in and down very significantly in the last couple of weeks, actually.*** *Id.* ¶ 247.

Allegedly, Joshi and Körner's statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company was experiencing significant and unusual customer and/or asset outflows that had not 'stabilized' and were not chiefly the result of 'deleveraging' and 'derisking;'" (2) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times;" and (3) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 248.

Plaintiff has bolded and italicized portions of Joshi and Körner's favorable statements about the status of customer and/or asset outflows and alleged the contrary of those statements. *Decker*, 681 F.2d at 115. But, as in *Decker*, 681 F.2d at 116 (citing *Todd v. Oppenheimer & Co.*, 78 F.R.D. 415, 422-23 (S.D.N.Y.1978)), "Generalized allegations such as these are completely inadequate." "There must be allegations of facts amounting to deception in one form or another." *Id.* (citing *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir. 1972)). Plaintiff has not offered evidence of deception. The Company disclosed that there were significant and unusually large customer outflows at the beginning of October 2022; Plaintiff does not allege a single fact tending to

disprove the Company's assertion that the situation had "stabilized." He simply alleges, in conclusory fashion, that it had not stabilized, which affords no basis to infer that Joshi's statement to that effect was false when made.

As to Plaintiff's claim that the Company misrepresented and failed to disclose information about its liquidity pool and related "materially deficient" funding profile, policies, and risk parameters "at all times," no particulars are pleaded either. In fact, Joshi discloses in the challenged statements that the Company had plans to execute certain strategic initiatives, such as raising 4 billion in new capital, that were "expected" to generate liquidity and to ensure that the Company was well capitalized. Compl. ¶¶ 244–45.

This portion of the challenged statement is, under the PSLRA, a "statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B); *see Turquoise*, 625 F.Supp.3d at 210. Given Plaintiff's failure to allege any particulars, he has not sufficiently alleged that Joshi's statement was made with actual knowledge that it was false or misleading – so Joshi's statement is protected by the PSLRA's safe harbor for forward-looking statements. *See Turquoise*, 625 F.Supp.3d at 217. And while Plaintiff asserts that Credit Suisse's liquidity pool was materially deficient "at all times," he offers no support whatever for that allegation. For example, Plaintiff does not particularize his claim with factual specifics tied to actual dates, *Decker*, 681 F.2d at 116, or allege that the facts that are disclosed about the Company's liquidity posture in October 2022 are in any way untrue.

So to that extent this alleged misstatement is not actionable. However, as for the omission to disclose material weaknesses in the Company's ICFR*, see infra* pp. 234–43.

**LXII.  October 27, 2022: Defendant Körner Interview with *CNBC***

In an interview on *CNBC*, Körner spoke about Credit Suisse's "transformation into the ***new Credit Suisse***," which he characterized as "***much more stable***" and "much simpler in terms of how it is setup." He explained that the restructuring entailed three pieces: (1) a "radical restructuring of the Investment Bank;" (2) a "significant reduction in costs;" and (3) "further strengthening of our capital base." Compl. ¶ 249. He stated that "with that, we have all the ingredients to go where we want to go." *Id.* This, according to Plaintiff, was materially false and/or misleading because it misrepresented and failed to disclose that "the 'new Credit Suisse' was not 'much more stable,' and that Credit Suisse's new strategy was fundamentally flawed and predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices." *Id.* ¶ 250.

 "Up to a point, companies must be permitted to operate with a hopeful outlook," *Rombach*, 355 F.3d at 174, and "statements containing . . . expressions of optimism, and other puffery are insufficient." *Novak*, 216 F.3d at 315. But  "whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015) (citations omitted). Körner's characterization of the "new Credit Suisse" as "much more stable" came on the same day the Company released "a blitzkrieg of information," including its share capital increases of CHF 4.0 billion, the spin-off of the Company's Investment Bank business, the sale of the Securitized Products Group, and the recorded net loss attributable to shareholders of CHF 4,034 million in 3Q22. Compl. ¶¶ 249, 350. When viewed in the context of this "blitzkrieg of information," all of which the market was able to take into account, perhaps Körner's statement that the new Credit Suisse would turn out to be much more stable was overly optimistic. But "[t]he corporate puffery rule applies to loose optimism about both a company's

current state of affairs and its future prospects." *Nokia Oyj*, 423 F.Supp.2d at 397 (citation and quotation marks omitted). "Statements that, in retrospect, were inaccurate or were too high optimistic" – as is the case here – "do not typically constitute material misstatements." *Id.* (citation omitted).

Plaintiff's claim that the Company's new strategy was fundamentally flawed is no different from the same allegation made repeatedly above. Körner's description of the proposed restructuring is not alleged to be factually inaccurate. Nor is there a single allegation in the Complaint tending to show that anyone knew, on October 27, 2022, that the newly devised and announced strategy was destined to fail. Saying that Körner's statement was inaccurate because the strategy did not work – which is what Plaintiff does here – is fraud by hindsight pleading. *Africa v. Jianpu Tech. Inc.*, No. 21-cv-1419, 2022 WL 4537973, at *9 (S.D.N.Y. Sept. 28, 2022).

Not actionable.


## LXIII. October 31, 2022: Defendant Körner Interview with *Bloomberg TV*

Plaintiff challenges a portion of Körner's remarks during an interview on *Bloomberg TV*. Compl. ¶ 251. Specifically, when asked if he was expecting outflows to "reverse," Körner states *that outflows had "clearly stabilized"* and in fact they were seeing "*some inflows coming and I would anticipate that we would have further inflows in the weeks and months to come*," as "[w]e have a lot of clients that told us that they would come back." *Id.* Plaintiff says this was materially false and/or misleading because it misrepresented and failed to disclose the following adverse fact known to or recklessly disregarded by the Defendants: "the Company was experiencing significant and unusual customer and/or asset outflows that had not 'clearly stabilized.'" *Id.* ¶ 252.

Most of Körner's assessment of outflows is not alleged to be false in light of the information available to him at the time. *See Rombach*, 355 F.3d at 174. Körner did not state that the Company had not experienced significant outflows; he did not deny the truth. There is not a scintilla of an allegation in the Complaint that there were in fact no inflows, or that no customers had told Credit Suisse they would return. Plaintiff does not allege facts tending to show that Körner did not honestly believe his statements, or that the statements "omit[ted] to mention facts that conflict with what a reasonable investor would take away from the statements themselves." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589 (S.D.N.Y. 2016) (citation omitted).

The problem with this statement is its use of the phrase "clearly stabilized." Saying that a situation has "stabilized" strongly suggests that it is not getting any worse. Saying that is has "clearly stabilized" suggests that there is no doubt on that score. However, only five days after this interview, in its Third Quarter Report, Credit Suisse would reveal that "stabilized" did not mean "is not getting any worse;" rather, it meant "the adverse developments are continuing but have slowed down" – as in "outflows have stabilized *to much lower levels*." (emphasis added); *see infra* p. 193. Outflows had not stopped, it seems; the Bank was still experiencing a decrease in assets under management, just less of one than it had earlier in the month. That renders the statement "outflows have clearly stabilized" potentially misleading. Had Körner said that the situation was "stabilizing," rather than it was "clearly stabilized," there would be no issue, since asserting that the catastrophe that took place earlier in the month was in the process of getting better would qualify as a prediction – not a statement that could be proved to be untrue at the time it was made. But that is not what he said. He said they had "clearly stabilized." And a reasonable investor could have concluded, based on Körner's reassurance, that the run on the Bank had ended, when it had not. It had merely slowed down.

The market impact from this is, of course, *de minimis*, since only two days later, the Company would make its unusual definition of the word "stabilized" public and reveal that the Bank was still experiencing outflows. However, for the next two days, it is arguable that the market was being misled about conditions at the Bank.

Actionable.

## LXIV. November 2, 2022: Third Quarter 2022 Report

Excerpts from the Company's Third Quarter 2022 Report extend for several pages and contain multiple "statements." I assume that, by putting certain representations in bold-faced type, Plaintiff is asserting that the language quoted below contains the misstatements that form the basis of their cause of action. I will analyze accordingly.

- The decrease in the Investment Bank was driven by significantly reduced capital markets revenues and lower equity and fixed income sales and trading revenues, reflecting challenging operating conditions and the Group's relative underperformance.

- *These outflows have since stabilized to much lower levels but have not yet reversed.* (Emphasis added)

- While these outflows have partially utilized liquidity buffers at the Group and legal entity level, and we have fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times….Remediation plans have been prepared to reverse these outflows, including accessing the public and private markets following our announcements on October 27 together with certain asset disposals, including the transfer of a significant portion of SPG [Securitized Products Group] to an investor group led by Apollo, and other measures. We would note that the execution of the strategic measures that we have announced is also expected to generate liquidity and reduce the funding requirements of the Group. We also continue to have access to central bank funding sources if required.

- *These outflows have reduced since mid-October but have not yet reversed.* (emphasis added).

- The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of September 30, 2022, the

Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 229 million, primarily related to corporates, individuals and the sovereign. In addition, Russian subsidiaries had a net asset value of approximately CHF 250 million as of September 30, 2022. The Group has further reduced Russia related exposures in 3Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.

- The decrease was mainly driven by unfavorable market movements and net asset outflows of CHF 12.9 billion.

- Net asset outflows of CHF 6.4 billion in Wealth Management reflected mainly outflows across the Middle East, Asia Pacific and Swiss ultra-high-net-worth businesses, partially offset by inflows in the European businesses. Net asset outflows of CHF 4.2 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in index solutions, equities and fixed income, and alternative investments, primarily related to outflows in credit . . . .

- Net asset outflows of CHF 1.5 billion in Swiss Bank reflected outflows in the private clients business . . . .

- Our liquidity and funding profile is driven by business activity levels and the overall operating environment. We have been an active participant in regulatory and industry forums to promote best practice standards on quantitative and qualitative liquidity management.

- To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions that we believe are conservative. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.

Compl. ¶ 253. The majority of the above statements from the Third Quarter Report were also included in the Third Quarter 2022 Earnings Release, which were released a few days later and are discussed in detail above. *Supra* pp. 176–79. And the Third Quarter Report, coming just one week after Credit Suisse executives first began to use the word "stabilized" to describe the slowdown in outflows, clarifies what the Bank meant by "stabilized" – namely, that the word did not mean "ended," but instead meant "slowed."

Nonetheless, Plaintiff says that these statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company had significant, unmanaged risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" (2) "the Company's risk management and/or control governance policies and/or procedures were severely lacking, both at this time and prior to the Class Period;" (3) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls;" (4) "the Company was experiencing significant and unusual customer and/or asset outflows that had not 'stabilized;'" (5) "the Company did not maintain a 'sufficient' liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not 'conservative' and were materially deficient at all times;" and (6) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 254.

As the reader will appreciate, these are the same tired reasons on which Plaintiff relied when alleging that disclosures were inadequate as long ago as two years earlier. Except for the last one (the existence of material weaknesses in the Company's ICFR), they appear to bear little to no relationship to what was going on at Credit Suisse by the third quarter of 2022, just months before the Company's demise. The arguments Plaintiff makes about these statements duplicate his arguments in connection with the Third Quarter 2022 Earnings Release and the rest of the "blitzkrieg of information" that hit the market just a few days earlier. There is no need to rehash in detail why the pleading is inadequate. *See supra* pp. 170–91. The Company was by this time hemorrhaging billions of dollars in a single quarter; and business sectors that had been its pillars

for decades were beginning to crumble under the weight of the crisis. Credit Suisse was experiencing what it hoped was a "short term liquidity stress." And it was disclosing all these facts. The only things missing from the challenged language in the Third Quarter Report are the adjectives that Plaintiff uses to characterize the disclosed facts (which require no adjectives, they are awful enough in their own right). *See Singh*, 106 F.Supp.3d at 448. But a reasonable (*i.e.*, not stupid) investor could look at the disclosed facts and reach his own conclusion about how things were going at the Bank. The reasonable investor did not need the Bank's bad news to be characterized for him.

Over the course of the next few months, there would be "a dramatic decrease in assets under management," Compl. ¶ 354, the Company would continue to face capital and liquidity issues, *id.* ¶ 355, outflows would increase, *id.* ¶¶ 355, 366, and ultimately, the measures Credit Suisse's executives put in place would prove insufficient to stave off the Bank's collapse, *id.* ¶¶ 357, 367. But Plaintiff cannot establish falsity with the benefit of hindsight, *Lighthouse*, 902 F.Supp.2d at 345 – especially not when the justifications for doing so are the very same boilerplate reasons that Plaintiff relies on to allege that nearly every statement made by Credit Suisse over a two year period was false and/or misleading – including during the many months when there was no immediate crisis. Not only is there no specificity about what statements are in fact false, there is no specificity about why anything is false.

The failure of a publicly traded bank does not necessarily imply that the bank has committed securities fraud. Only the failure to advise the market about adverse developments as they transpire qualifies as securities fraud. Plaintiff fails to explain why the facts disclosed in the Company's Third Quarter 2022 Report, issued on November 2, 2022, did not advise the market of exactly what investors needed to know in order to make informed investment decisions.

The only reason for falsity assigned by Plaintiff that bears further mention is the allegation concerning material weaknesses in the Company's ICFR, which will be discussed *infra* pp. 234–43. That issue impacts whether the Plaintiff's challenge to the Company's Third Quarter 2022 Report – specifically, to the language in the report certifying that it was "prepared in accordance with accounting principles generally accepted in the US (US GAAP)"— is actionable. Compl. ¶¶ 312–314. But the rest of the statement is not.

## LXV.  November 15, 2022: SPG/Apollo Media Release

Plaintiff challenges language from the Company's media release announcing the restructuring of its Investment Bank:

> Credit Suisse accelerates the radical restructuring of its Investment Bank with the announcement that it has entered into definitive transaction agreements to sell a significant part of its Securitized Products Group (SPG) and other related financing businesses to Apollo Global Management (Apollo). ***The execution of these agreements represents an important step towards a managed exit from the Securitized Products business, which is expected to significantly de-risk the Investment Bank and release capital to invest in Credit Suisse's core businesses.***
>
> *         *         *
>
> ***Completion of these transactions is expected to achieve a release of Risk Weighted Assets (RWAs) of up to approximately USD 10 billion, depending on the scope of assets ultimately transferred….***
>
> *         *         *
>
> ***Under the terms of the transactions contemplated with Apollo, Credit Suisse's CET1 capital ratio is expected to be strengthened by the release of RWAs*** and the recognition, upon closing, of the premium paid by Apollo, whereby the final amount will depend on discount rates and other transaction-related factors.

Compl. ¶ 255. According to Plaintiff, these statements were materially false and/or misleading because they misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's sales of its SPG to Apollo would not

'significantly de-risk' the Investment Bank or meaningfully reduced its RWAs, as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies;" and (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls." *Id.* ¶ 256.

Plaintiff fails to allege that anything disclosed in the Media Release was either false or misleading. The statements themselves are true. Credit Suisse did spin off assets to Apollo in November 2022, on an "accelerated" basis, in an effort – a failed effort, but an effort nonetheless – to preserve its core banking business. Plaintiff's allegation that prior changes to Credit Suisse's risk management and/or control and governance procedures and/or policies were not "meaningful" does not make the challenged statements false; neither does the already-in-the-market information that the UK financial regulator had put Credit Suisse on a watchlist six months earlier.

Read most generously, Plaintiff alleges that this excerpt from the Media Release is false and/or misleading because this last-ditch effort failed to stave off Credit Suisse's collapse. In other words, his argument is based on the fact that "events unfold[ed] differently from the stated expectation," *Robbins v. Moore Medic. Corp.*, 788 F.Supp. 179, 184 (S.D.N.Y. 1992), that the spin-off would "significantly de-risk" the Investment Bank and "meaningfully reduce" the RWAs. Compl. ¶ 256. But "[s]tatements of . . . expectation as to future events, which are not strictly factual and therefore cannot be evaluated for truth or falsehood, are deemed fraudulent under § 10(b) only where 'the defendant disseminated the forecasts knowing they were false or that the method of preparation was so egregious as to render their dissemination reckless,' and are not actionable merely because events unfold differently from the stated expectation." *Robbins*, 788 F.Supp. at

184 (quoting *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 137 (S.D.N.Y. 1989)). As Plaintiff has not alleged a single fact tending to show that Defendants either knew their strategy would not work or recklessly disregarded that possibility, the contents of the Media Release cannot be deemed fraudulent.

Not actionable.

### LXVI. November 23, 2022: Preliminary Fourth Quarter 2022 Earnings Media Release

Plaintiff takes issue with a portion of the Company's media release announcing preliminary financial results for the fourth quarter of 2022:

> In its Outlook statement on October 27, 2022, the bank highlighted that the challenging economic and market environment has had an adverse impact on client activity across its divisions. ***In particular, the Investment Bank has been impacted by the substantial industry-wide slowdown in capital markets and reduced activity in the Sales & Trading businesses, exacerbating normal seasonal declines, and the Group's relative underperformance. In addition, client activity remains subdued in the Wealth Management and Swiss Bank divisions***, and the bank expects these market conditions to continue in the coming months.

> As previously disclosed, ***Credit Suisse began experiencing deposit and net asset outflows in the first two weeks of October 2022 at levels that substantially exceeded the rates incurred in the third quarter of 2022. At the Group level, as of November 11, 2022, net asset outflows were approximately 6% of assets under management at the end of the third quarter of 2022. In Wealth Management, these outflows have reduced substantially from the elevated levels of the first two weeks of October 2022 although have not yet reversed and were approximately 10% of assets under management at the end of the third quarter of 2022. In the Swiss Bank, these client balances have stabilized and were approximately 1% of assets under management at the end of the third quarter of 2022.***

> ***As announced on October 27, 2022, these outflows have led the bank to partially utilize liquidity buffers at the Group and legal entity level, and while the bank has fallen below certain legal entity-***level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times.

> ***Credit Suisse is executing on its strategic commitments to strengthen its balance sheet and reduce risk, engaging clients proactively and accessing the public and private***

***markets***, including the recent issuance of approximately USD 5 billion through two bond sales, which saw strong investor demand. Key steps taken include the recently announced sale of a significant part of Credit Suisse's Securitized Products Group (SPG) and other related financing businesses to Apollo Global Management….***These actions and other deleveraging measures including, but not limited to, in the non-core businesses, are expected to strengthen liquidity ratios and reduce the funding requirements of the Group.***

\*    \*    \*

***Strategic actions taken to significantly reduce the Group's risk profile are expected to be reflected in near-term financial results….Lower deposits and assets under management are expected to lead to reduced net interest income and recurring commissions and fees; this is likely to lead to a loss for Wealth Management in the fourth quarter of 2022. Together with the adverse revenue impact from the previously disclosed exit from the non-core businesses and exposures, and as previously announced on October 27, 2022, Credit Suisse would expect the Investment Bank and the Group to report a substantial loss before taxes in the fourth quarter 2022, of up to CHF ~1.5 billion for the Group….***

***The Group continues to execute on the decisive strategic actions detailed on October 27, 2022, to create a simpler, more focused and more stable bank – a new Credit Suisse.***

Compl. ¶ 257. Plaintiff asserts that the above statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's new 'strategic actions' would not 'significantly reduce the Group's risk profile,' as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period;" (2) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls;" (3) "the Company's reduced client activity was not attributable to an 'industry-wide slowdown,' 'normal seasonal declines,' or other 'market conditions,' but instead the Company was experiencing significant and unusual customer and/or asset outflows that had not 'stabilized;'" (4) "the Company did not maintain an adequate liquidity pool and its liquidity

and funding profile, policy, and/or risk parameters, were materially deficient at all times;" and (5) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 258.

The statements in the November 23, 2022 Preliminary Fourth Quarter Earnings Assessment lay out in stark detail what has occurred at Credit Suisse over the preceding seven weeks and outline the negative impact these developments were expected to have on Credit Suisse's fourth quarter earnings. One is literally reduced to observing that all the Plaintiff has done in the Complaint is take what seems to be nearly every single public statement made by Credit Suisse during the putative Class Period and insist, without any specificity, that the statement was untrue, or must have been untrue, because Credit Suisse eventually collapsed. That is not the way to plead a claim in securities fraud.

Additionally, a plaintiff "cannot plead fraud simply by 'quoting pertinent favorable . . . statements . . . and then alleging the contrary of each statement.'" *Ferber v. Travelers Corp.*, 785 F.Supp. 1101, 1109 (D. Conn. 1991) (quoting *Decker*, 681 F.2d at 115). But that is exactly what Plaintiff tries to do here by alleging that the Company's new strategic actions would not significantly reduce the Group's risk profile. Compl. ¶ 258.

Plaintiff has also indicated that the Company inaccurately attributed its reduced client activity to various market conditions. However, he has pleaded no facts that demonstrate with specificity that the Company's statements in this regard were false. *See City of Birmingham*, 2020 WL 2834857, at *6. Similarly, he has not offered any factual support for his allegations related to the Company's liquidity, which the Company revealed was parlous and out of regulatory

201

compliance. Plaintiff's reference to the UK financial regulator's watchlist is, once again, deficient because this fact was already in the total mix of information available to investors.

Finally, refer to *infra* pp. 234–43 for a discussion of the Company's failure to mention the SEC's questions about its ICFR, which renders statements made in the Company's November 23, 2022 Preliminary Fourth Quarter 2022 Earnings Media Release actionable.

## LXVII.        November 23, 2022: Rights Offering Media Release

On November 23, 2022, the Company issued a media release announcing that Credit Suisse shareholders had voted to approve two proposed capital increases. Compl. ¶ 259. Plaintiff challenges the following statements made by Defendant Lehmann in the media release: "Today's vote by shareholders marks a further important step in our journey to build the new Credit Suisse. On behalf of the Board of Directors, ***I want to thank our shareholders for their approvals today, which reinforce our collective will to deliver and to execute our strategic plan. This vote confirms confidence in the strategy, as we presented it in October, and we are fully focused on delivering our strategic priorities to lay the foundation for future profitable growth.***" *Id.* Plaintiff says that this statement was materially false and/or misleading because it misrepresents and fails to disclose the following adverse facts known to or recklessly disregarded by Defendants: (1) "as opposed to supporting the Company's 'strategic plan,' the Rights Offering was merely a last-ditch effort to shore-up liquidity necessitated by significant and unusual customer and/or asset outflows that were not disclosed by Defendants, and would not 'lay the foundation for future profitable growth;'" and (2) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times." *Id.* ¶ 260.

Plaintiff fails to identify which part of Lehmann's statement is either untrue or materially misleading. The shareholders approved the Rights Offering, which had indeed been presented in October as part of a plan to lay a foundation for future profitable growth. *Id.* ¶ 237. Plaintiff's insistence that Lehmann was misrepresenting the truth by referring to this as a "strategic plan" rather than a "last ditch effort to shore up liquidity" does not make Lehmann's true words either false or misleading. Moreover, statements like these, about "future earnings, sales goals, and [the Company's] desire to achieve continued prosperity," are not actionable under Section 10(b) and Rule 10b-5, as they "[a]re just the sort of predictive statements of opinion and belief that courts have found immaterial." *Lasker*, 85 F.3d at 58 (citation and quotation marks omitted); *see Duane Reade*, 2003 WL 22801416, at *4–5.

As to Plaintiff's allegations about the Company's failure to mention in this particular statement the significant and unusual customer and/or asset outflows and liquidity issues: there was no need to do so in order to give the investing public the information it required to make informed investment decisions. The Company had already made multiple public disclosures about the adverse impact that the substantial outflows and reverses of October 2022 had had on its liquidity position. *See, e.g., supra* pp. 176–77. "Reasonable investors . . . had ready access to the very information that the plaintiff[] assert[s] should have been disclosed," *Bank of Am. AIG*, 980 F.Supp.2d at 577 (citing *Seibert*, 586 F.2d at 952; *KeySpan*, 383 F.Supp.2d at 377), and could have fully assessed what that information meant in terms of the likely impact of the Rights Offering on Credit Suisse's ability to turn the business around. "[T]he defendants are not liable for failing to reiterate that information." *Id.* "Because the substance of the alleged omissions was already in the public domain, the alleged omissions could not have altered 'the total mix of information available'

to the public and were also immaterial as a matter of law." *Id.* (quoting *Basic*, 485 U.S. at 231–32).

This statement is not challenged on ICFR grounds. Therefore, it is not actionable.

## LXVIII.        December 1, 2022: Defendant Lehmann *Financial Times* Interview

A *Financial Times* article about Credit Suisse contained the following statements:

Axel Lehmann said ***withdrawals had flattened across the group and had started to reverse in the Swiss domestic business***, but the scale of the outflows had caught the Swiss lender off-guard.

"It ***was*** a real storm," said Lehmann at the Financial Times' Global Banking Summit on Thursday. "It ***was*** a storm in the retail and partially in the wealth management segment, in particular in Asia, ***where we had really massive outflows for two to three weeks***."

"The good part of the sad story is we had very few clients leaving. They are still with us, they still continue to do business with us."

He said clients had been taking up to a third of the assets they held with the bank and transferring them to rivals. "I have anecdotes from clients and I know that the money will certainly come back over time."

Compl. ¶ 261. Plaintiff asserts that Lehmann's statements in the *Financial Times* article are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company was experiencing significant and unusual customer and/or asset outflows which had not 'flattened;'" (2) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times;" and (3) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 262.

Again, "The test for whether a statement is materially misleading under Section 10(b) . . . is 'whether the defendants' representations, taken together and in context, would have misled a

reasonable investor.'" *Rombach*, 355 F.3d at 172 n.7 (quoting *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (internal brackets omitted)). Read in context, Lehmann's statements communicate the significance of the customer and/or asset outflows, and his representations that withdrawals had flattened across the group and that the situation "was a storm" were not misleading, in light of the disclosure that withdrawals had "started to reverse in the Swiss domestic business." Compl. ¶ 261. Lehmann's statements could not mislead any reasonable investor into believing that Credit Suisse's liquidity issues, discussed at length in the preceding public disclosures, had fully reversed.

This statement is challenged on ICFR grounds, *see infra* pp. 234–43. Otherwise, not actionable.

## LXIX. December 2, 2022: Defendant Lehmann *Bloomberg* Interviews

Plaintiff challenges statements made by Defendant Lehmann in a *Bloomberg TV* interview and in a *Bloomberg* article. Compl. ¶¶ 263–64. In the *Bloomberg TV* interview, Lehmann stated that outflows "basically have stopped" after Credit Suisse had disclosed on November 23, 2023 the loss of 84 billion francs or $90.8 billion of client assets. *Id.* ¶ 263. In the same interview, Lehmann characterized the October increase in customer outflows as simply a "two-to-three-week event. *Id.*

The *Bloomberg* article stated in relevant part:

Credit Suisse Group AG Chairman Axel Lehmann said the **main indicators of the bank's financial stability were strong** and that its level of liquidity is improving after declines in recent weeks.

*           *           *

**In October, outflows of assets and the subsequent use of liquidity buffers had caused the bank to fall below certain regulatory levels at some of its entities. Credit Suisse saw 84**

> ***billion francs ($89.7 billion) of client asset withdrawals in the first few weeks of the fourth quarter amid persistent rumors about the bank's stability.*** Credit spreads and the cost to insure the bank's debt against default have surged to above 400 basis points, far above peers. ***The outflows have "basically stopped," Lehmann said.***
>
> \*        \*        \*
>
> Credit Suisse shares slumped to record lows in recent days and approached the price of the rights offer that's part of the bank's $4 billion capital increase, signaling investor skepticism. ***Yet the stock rebounded after Lehmann's comments on Friday, helping to arrest the losing streak***. It traded up as much as 6.73% to 2.86 Swiss francs in Zurich.

*Id.* ¶ 264. According to Plaintiff, Lehmann's statements are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company was experiencing significant and unusual customer and/or asset outflows which had not 'basically stopped;'" (2) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all time [sic];" and (3) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 266.

The Complaint alleges that Lehmann insisted that the main indicators of the bank's financial stability were strong and outflows had "basically stopped" while he allegedly knew the opposite – that the Company was continuing to experience significant and unusual customer and/or outflows. Plaintiff does not specifically point to facts tending to show that these statements were untrue and known to be untrue at the moment they were made. However, the Amended Complaint alleges that, in subsequent statements, Credit Suisse disclosed continuing outflows from and after the date of these challenged statements. For example, on February 9, 2023, the Bank advised the market that, "***as the [fourth] quarter progressed, these outflows***

***stabilized to much lower levels but had not yet reversed by year end.***" *Id.* ¶ 277. That disclosure arguably contradicts Lehmann's "basically stopped" statement.

I conclude that these particular statements are actionable.  While it may have been true that the Company's "level of liquidity [was] improving after declines in recent weeks," to say that "the main indicators of the bank's financial stability were strong" while Credit Suisse was in the midst of a liquidity crisis could well be considered a "misrepresentation of existing facts." *See Novak*, 216 F.3d at 315. "Assuming, as we must at this stage, the accuracy of the plaintiff['s] allegations about" the Company's liquidity and customer and/or asset outflows issues – and in light of subsequent disclosures that outflows had not, in fact, "basically stopped" – Plaintiff has sufficiently pled that Lehmann's statements were both false or misleading and material. *Id.*

I am reinforced in this decision by the fact that Plaintiff also alleges that the statements are misleading for failure to mention material weaknesses in the Company's ICFR. For the reasons why, *see infra* pp. 234–43.

Actionable.


## LXX.  December 5, 2022: Defendant Lehmann Interview with *SRF*

A *Reuters* article reporting on Defendant Lehmann's interview with Swiss broadcaster *SRF* states, in relevant part, that, Compl. ¶ 267:

> Credit Suisse (CSGN.S) is "***definitely stable***," Chairman Axel Lehmann told Swiss broadcaster *SRF* on Monday, adding ***that the embattled bank had seen a stabilisation in the outflows of client funds.***
>
> \*       \*       \*
>
> "When you have a capital raising, which has a big dilution effect, that creates a lot of uncertainty and that leads to high volatility," Lehmann said in the interview.

"***But I believe the situation has calmed. The business is definitely stable***," he said. Still, he expected 2023 and 2024 to be years of transformation for the bank as it seeks to stabilise after years of mishaps.

"It's true, the whole group will not be profitable next year," Lehmann said. "What is important is the progress we make.

"What is the earnings power of the Swiss business, wealth management, asset management and the part of the investment bank we retain, and then from 2024 produce positive numbers."

*Id.* ¶ 268. Plaintiff finds the above statements materially false and/or misleading because they misrepresent and fail to disclose certain adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company was experiencing significant and unusual customer and/or asset outflows which had not 'stabilized;'" and (2) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 269.

The above statements are actionable. "While statements containing . . . expressions of optimism, and other puffery are insufficient," "defendants may be liable for misrepresentations of existing facts." *Novak*, 215 F.3d at 315 (citations omitted). Lehmann stated that Credit Suisse was "definitely stable" at a time when he was aware or should have been aware of contrary information – the information about the Company's financial condition contained in many of the preceding challenged statements, or that would be disclosed in short order. *See Freudenberg*, 712 F.Supp.2d at 190. While a company is entitled to be optimistic, this is true only up to a point. *Rombach*, 355 F.3d at 174. In light of the rest of the Company's disclosures, I cannot say as a matter of law that Credit Suisse had not reached that point by December 2022. And this Court cannot conclude that no investor would take rely on Lehmann's statement that Credit's Suisse's business is "definitely stable" when assessing a potential investment. Plaintiff has adequately pleaded that this statement

misrepresents existing facts and would have misled a reasonable investor. *See Freudenberg*, 712 F.Supp.2d at 190.

As for the allegation concerning material weaknesses in the Company's ICFR, *see infra* pp. 234–43.

Actionable.

### LXXI. December 8, 2022: Rights Offering Media Release

Plaintiff challenges language in the Company's media release announcing the completion of its rights offering:

> ***Since October 27, 2022, Credit Suisse has continued to progress on its strategic actions***. In addition to the successful completion of its capital raise, which is expected to strengthen Credit Suisse Group AG's CET1 ratio by approximately 140 basis points, the bank continues to make progress in relation to the definitive transaction agreements to sell a significant part of the Securitized Products Group and other related financing businesses to entities and funds managed by affiliates of Apollo Capital Management. ***The deal is expected to close in the first half of 2023 and is expected to further bolster Credit Suisse Group AG's CET1 capital ratio.***
>
> As announced on December 5, 2022, Credit Suisse Group AG has also completed HoldCo and AT1 issuances for 2022 including approximately USD equivalent of 5 billion of HoldCo debt issued since the Strategy Update on October 27, 2022. ***Together with the capital raise, progress on our Securitized Products transaction and other measures have further strengthened Credit Suisse Group AG's spot liquidity coverage ratio (LCR), with the average daily LCR for the fourth quarter-to-date, as of December 7, 2022, above 140%.***

Compl. ¶ 270. Plaintiff states that this language is materially false and/or misleading because it misrepresents and fails to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "as opposed to supporting the Company's 'strategic actions,' the Rights Offering was merely a last-ditch effort to shore-up liquidity necessitated by significant and unusual customer and/or asset outflows that were not disclosed by Defendants, and would not 'further bolster' Credit Suisse's capital ratio;" and (2) "the Company did not maintain an adequate liquidity

pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times." *Id.* ¶ 271.

But the Rights Offering and deals did, in fact, bring in a certain amount of money, which did alter the Company's liquidity position in a favorable manner. This statement is not actionable – it simply discloses true facts, none of which the Plaintiff argues is false or is believed to be false. The Plaintiff is simply reduced to insisting that Credit Suisse was required to characterize these facts in a negative way, which is not the law. *See Singh*, 106 F.Supp.3d at 448.

As this statement is not challenged on ICFR grounds, I conclude that it is not actionable.


## LXXII.    January 17, 2023: Defendant Lehmann Interview with *Bloomberg TV*

In an interview with *Bloomberg TV*, Defendant Lehmann stated that "it will not look great" for bonuses at the bank, explaining: "***When you suffered huge losses, it is clear that the budget gets cut also on bonuses***." Compl. ¶ 272. Plaintiff says that Lehmann's comments are materially false and/or misleading because they misrepresent and fail to disclose the following adverse fact known to or recklessly disregarded by the Defendants: that the Defendants never cut the executives' bonuses. *Id.* ¶ 273.

"[T]he Second Circuit held that to withstand a motion to dismiss plaintiffs must detail specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question." *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115, 2000 WL 1752848, at *7 (S.D.N.Y. Nov. 28, 2000) (citing *San Leandro*, 75 F.3d 801). Plaintiff has pleaded no fact tending to show that at the time this statement was made, Lehmann was aware that executive bonuses would not be cut. "Corporate officials need not be clairvoyant; they are only

responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309.

Not actionable.

### LXXIII.     February 9, 2023: Fourth Quarter and Fiscal Year 2022 Media Release and Investor Presentation

Plaintiff takes issue with language in the Company's media release announcing financial results for the fourth quarter and fiscal year of 2022, Compl. ¶ 274:

- ***Our performance in 2022 underscores the importance of our forward focus on radically transforming the bank, efficiently reducing risk, lowering our cost base, strengthening our capital position and playing to our strengths and core franchises***. The Group continues to execute on the decisive strategic actions detailed on October 27, 2022, to create a simpler, more focused, stable bank built around the needs of our clients – a new Credit Suisse. *Id.* ¶ 275.

- <u>Defendant Körner</u>: "2022 was a crucial year for Credit Suisse. ***We announced our strategic plan to create a simpler, more focused bank, built around client needs and since October we have been executing at pace. We successfully raised CHF ~4 billion in equity capital, accelerated the delivery of our ambitious cost targets, and are making strong progress on the radical restructuring of our Investment Bank.*** Today's announcement of our acquisition of the M. Klein & Company investment banking business marks another milestone in the carveout of CS First Boston as a leading independent capital markets and advisory business. The transaction should further strengthen CS First Boston's advisory and capital markets capabilities. ***We have a clear plan to create a new Credit Suisse and intend to continue to deliver on our three-year strategic transformation by re-shaping our portfolio, reallocating capital, right-sizing our cost base, and building on our leading franchises.***" *Id.* ¶ 274.

Plaintiff claims that these portions of the media release are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company's new 'strategic plan' was a sham, as was its stated goal of 'efficiently reducing risk,' as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period;" (2) "restructuring of the

Investment Bank was not designed to make the Company 'simpler' and 'more focused,' but was instead necessitated by the Company's wholly inadequate capital position as a result of, among other things, significant and undisclosed customer and/or asset outflows throughout the Class Period;" and (3) "in mid-May 2002 [sic], the UK's financial regulator had put Credit Suisse on its watchlist of institutions requiring tougher supervision because of concerns that it had not done enough to improve its governance and risk controls." *Id.* ¶ 276.

Nothing in these statements is alleged to be false as a matter of fact. The Company did raise capital; it was executing a previously announced restructuring plan that was anticipated to take several years to complete; it did arrange to acquire M. Klein and Company in order to strengthen CS First Boston on a standalone basis. All of this is true. Credit Suisse was trying to "right siz[e] [its] cost base." It was trying to cut risk and refocus on its core businesses. And there is no allegation that the remaining Individual Defendants actually thought otherwise. The Court is not persuaded that Plaintiff's conclusory allegations about the Company's strategic plan and the Investment Bank's restructuring "can stand in for particularized factual allegations raising an inference that the specific challenged statements were misleading . . . when made." *Citigroup*, 2023 WL 2632258, at *17.

Further, where a plaintiff complains of statements that were merely generalizations regarding the company's business practices, "Such generalizations are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." *ECA*, 553 F.3d at 206. The above excerpt includes vague statements about the Company's forward focus, strategic plan, and strategic transformation – and are "legally indistinguishable from statements that have been held to be 'puffery.'" *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F.Supp.3d 473, 494 (S.D.N.Y. 2017).

I have already explained why Plaintiff's claim about the Company's strategic plan constitutes fraud by hindsight pleading as well as an utter mischaracterization of the facts pleaded in his own Complaint. Plaintiff argues that because Credit Suisse eventually failed, there must have been something fraudulent about the changes the Defendants said they were making to the Company's risk management and/or control governance procedures and/or policies. *See Hills v. Bioxcel Therapeutics, Inc.*, No. 3:23-cv-00915, 2024 WL 3374145, at *14 (D. Conn. July 11, 2024). "This approach [to pleading] has been rejected in the Second Circuit." *Id.* Plaintiff's conclusory allegations about Credit Suisse's capital position and the extent of the Company's customer and/or outflows are also insufficient, as that information had been extensively and repeatedly disclosed by the Company in the preceding months. Disclosing this information again would not have altered the total mix of information available to Credit Suisse investors. *See Bank of Am. AIG*, 980 F.Supp.2d at 577–78.

Finally, setting aside the conclusions and looking to Plaintiff's limited factual allegations, the fact that Credit Suisse was placed on a watchlist in mid-2022 "does not mean that [Credit Suisse] was not investing in its [governance and risk controls] at the times the challenged statements were made." *Hills*, 2024 WL 3374145,  at *16. And as noted repeatedly above, the UK financial regulator's action was information that was available in the marketplace at the time this statement was made, and had been available for many months. I reiterate that Plaintiff does not allege anything about subsequent steps taken or not taken by the UK financial regulator that might have required Plaintiff to update what the market already knew. As it is, the market had plenty of opportunity to take it into account and factor it into the price of the stock; reiterating it would not have altered the total mix of information available to investors. Significantly, the statement is not

alleged to be false or misleading for reasons relating to the SEC's Correspondence with the Company about the Company's ICFR.

Not actionable.

## LXXIV.    February 9, 2023: Fourth Quarter and Fiscal Year 2022 Earnings Release

The Company's FY22 Earnings Release states, in relevant part:

**Liquidity issues in 4Q22**
As previously disclosed, during early 4Q22, Credit Suisse began experiencing significantly higher withdrawals of cash deposits as well as nonrenewal of maturing time deposits. However, *as the quarter progressed, these outflows stabilized to much lower levels but had not yet reversed by year end, and customer deposits declined by CHF 138 billion in 4Q22.* As is normal practice, we also limited our access to the capital markets in the period immediately preceding the strategy announcements we made on October 27, 2022. *While these outflows led us to partially utilize liquidity buffers at the Group and legal entity level, and we fell below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level were maintained at all times.* The Group's three-month average daily LCR was 144% as of the end of 4Q22, improved from lower levels earlier in the quarter.

Remediation plans were prepared, initiated and implemented to mitigate these outflows, including accessing the public and private markets. We issued over USD 5 billion through three bond sales in November and December 2022, which saw strong investor demand, and an additional CHF 4 billion through our capital increases. Other steps also include certain asset disposals, including the announced sale of a significant portion of SPG and other related financing businesses. *We would note that the execution of these actions and other deleveraging measures, including, but not limited to, in the non-core businesses, is also expected to strengthen liquidity ratios and, over time, reduce the funding requirements of the Group.* As is common for banks, we also continue to have access to central bank funding sources if required.

\*        \*        \*

**Outflows in assets under management in 4Q22**
As previously disclosed, Credit Suisse began experiencing deposit and net asset outflows in early 4Q22 at levels that substantially exceeded the rates incurred in 3Q22. At the Group level, net asset outflows in 4Q22 were approximately 8% of assets under management as of the end of 3Q22, with approximately two-thirds of these net asset outflows in the quarter concentrated in October 2022. In *Wealth Management, these outflows in 4Q22 had reduced substantially in the rest of the quarter from the elevated levels of early 4Q22*,

but had not reversed, and represented approximately 15% of assets under management reported as of the end of 3Q22. ***In the Swiss Bank, these outflows in 4Q22 broadly stabilized after the elevated levels of early 4Q22***, and represented approximately 2% of assets under management reported as of the end of 3Q22. In Asset Management, these outflows in 4Q22 represented 3% of assets under management reported as of the end of 3Q22.

*     *     *

**Russia's invasion of Ukraine**

In response to Russia's invasion of Ukraine, many countries across the world imposed severe sanctions against Russia's financial system and on Russian government officials and business leaders, and these sanctions have been expanded several times. ***The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of December 31, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 249 million, primarily related to corporates, individuals and the sovereign. In addition, Russian subsidiaries had a net asset value of approximately CHF 214 million as of December 31, 2022. The Group has further reduced Russia related exposures in 4Q22 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.*** The Group notes that these developments may continue to affect its financial performance, including credit loss estimates and potential asset impairments.

*     *     *

As of the end of 4Q22, assets under management of CHF 1,293.6 billion decreased CHF 107.0 billion compared to the end of 3Q22. ***The decrease was mainly driven by net asset outflows of CHF 110.5 billion and foreign exchange-related movements, partially offset by favorable market movements of CHF 27.6 billion.***

Net asset outflows of CHF 110.5 billion in 4Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF 92.7 billion in Wealth Management were driven by outflows across all regions. ***Approximately two-thirds of the outflows were concentrated in October 2022. The outflows in 4Q22 had reduced substantially in the rest of the quarter from the elevated levels of early 4Q22 but had not reversed.*** Net asset outflows of CHF 11.7 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in multi-asset solutions, index solutions and fixed income, from investments and partnerships, primarily related to an emerging markets joint venture, and from alternative investments, primarily related to outflows in credit. Net asset outflows of CHF 8.3 billion in Swiss Bank mainly reflected outflows in the private clients business.

Compl. ¶ 277. Plaintiff alleges that this portion of the earnings release is materially false and/or

misleading because it misrepresents and fails to disclose certain adverse facts known to or

recklessly disregarded by the Defendants: (1) "the Company had significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" (2) "the Company was experiencing significant and unusual customer and/or asset outflows that had not 'stabilized' or 'reduced substantially in the rest of the quarter from the elevated levels of early 4Q22;'" (3) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times;" and (4) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 278.

As discussed extensively (and repeatedly) above, the Company's earlier disclosures, which are quoted extensively in the Complaint, are replete with references to the Company's publicly disclosed risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine. "[T]he demanded disclosures could not have altered the total mix of public information and are immaterial as a matter of law." *See Bank of Am. AIG*, 980 F.Supp.2d at 578 (citing *Basic*, 485 U.S. at 231–32).

Similarly, reasonable investors had ready access to the Company's numerous disclosures about the extent of the customer and/or asset outflows, and the Defendants are not liable for failing to reiterate that information. *Id.* at 577. No fact is pleaded tending to show that the statement that the outflows had "stabilized to much lower levels" – *i.e.*, lessened over the course of the quarter, though they did not cease – was not true; and no reasonable investor could have concluded that the Company was not still experiencing outflows as of the time this statement was made.

As for Plaintiff's criticisms of the Company's liquidity disclosures: again, the Company had already put extensive information about its liquidity crisis in the public domain. *See id*. In light

of information communicated to the market about the Company's ongoing liquidity crisis, no reasonable investor could have concluded from the Fourth Quarter and Fiscal Year 2022 Earnings Release that the Company was sufficiently liquid. *Id.* at 579.

However, for reasons articulated below in the discussion of the Company's ICFR in its last few months of independent existence, the above statement is actionable. *See infra* pp. 234–43.

## LXXV.     February 9, 2023: Fourth Quarter and Fiscal Year 2022 Earnings Conference

Excerpts from the Company's Fourth Quarter 2022 Earnings conference call extend for several pages and contain multiple "statements." Compl. ¶¶ 279–84. What follows is the bolded language identified as false or misleading by Plaintiff.

*Defendant Joshi*:

- The group took clear strides forward despite the challenging fourth quarter. We delivered the strategy update alongside our third quarter earnings and started immediately on implementation. . . . We proactively managed our liquidity position following the outflows in the fourth quarter. We executed a successful series of capital and funding measures, including raising around CHF 4 billion in equity and completing around CHF 6 billion of debt issuance in the fourth quarter. We strengthened our CET1 ratio to 14.1%, and we remain resolutely focused on execution and on supporting our clients. As you can see from this morning's announcement regarding the acquisition of the Investment Banking business of M. Klein & Company and the completion of the first closing of our securitized products transaction with Apollo, we are executing rapidly on the strategy and were ahead of plan.

- Approximately two-thirds of the net asset outflows in the fourth quarter occurred in October, and they reduced considerably in November and December….Since the start of the fourth quarter, we strengthened our balance sheet, including through the capital raises to set the group on a stronger trajectory. We're now three months into our transformation journey and we saw the first signs of the benefits of these and other proactive initiatives in January with positive deposit inflows at the group level and specifically in wealth management. Net asset flows in the Swiss Bank were positive and the net asset outflows in wealth management in January were at a reduced level compared to December with net asset in flows in Asia Pacific.

- Although the group's liquidity position was impacted by deposit outflows in the fourth quarter, our average liquidity coverage ratio at the end of December stood at 144%, well above the group's minimum regulatory requirements and comparing favorably with our

peer group. This represents an improvement from the lower levels in the quarter and was a result of a series of proactive measures, including the capital raises, debt issuances, and deleveraging. We have continued to see the improvement in the ratio since the start of the year and were main focused on maintaining our LCR at a prudent level. The disciplined execution of our strategy, including our simplification program should lead to further liquidity improvements and more efficient liquidity management across the group.

- To summarize, our financial performance for the fourth quarter reflects the decisive actions we have taken against a difficult market backdrop. Looking forward, we expect that the strategic actions taken to reduce the group's risk profile and the challenging market conditions will continue to be reflected in our financial results. *Id.* ¶ 280.

*Defendant Körner*:

- Nonetheless, it was also a year which marked the beginning of the important and necessary transformation for our organization. On October 27, we presented a targeted plan to create the new Credit Suisse, a simpler, more focused bank built around client needs. And today, we reaffirm all of the targets we announced in October.

- We have a robust balance sheet, and we are executing on our transformation from a position of strength. . . . Our liquidity position also improved following the impact of the events of October.

- As previously mentioned, we are seeing the first positive signs, comprehensive global initiatives to regain deposits, as well as assets under management. In January, we saw deposit inflows at group level in Wealth Management and the APAC, as well as net new assets in APAC and to Swiss Bank. Importantly, clients remain overwhelmingly supportive, and we remain very thankful for that.

- We are building a unified culture from the top of the organization with a strong focus on risk management, collaboration, and accountability. We remain disciplined on strategic execution, strengthening and reallocating capital delivering our cost ambitions, and most importantly, supporting our clients globally. As I mentioned, we have acted decisively to address the impact of the outflows experienced in the fourth quarter, and we have seen deposit inflows at the group level, in wealth management and APAC, as well as net new assets in APAC and the Swiss Bank. We are also, making progress with the carve-out of CS First Boston and are creating a more focused markets business that will deliver innovative solutions and products for our Wealth Management and our institutional clients. In short, we are determined to make this transformation a success, restore trust with all stakeholders and ultimately create sustainable value for our shareholders. *Id.* ¶ 279.

- When questioned by an analyst about the "commentary around being proactive on flaws and winning back some of the client money" and "how [] you [are] going about winning back that business," Körner responded, in relevant part: "So, this client outreach program, which I was talking about is really unprecedented. That is at least what the colleagues here in the firm tell me being here longer than 30 years. And I think it has shown, has developed

very good momentum and hence, the figures I gave for January…. I would say that the client support which we get from them is really overwhelming. And I mean this I'm saying, which is absolutely for me and my colleagues is absolutely fantastic. So, the clients, in other words, the clients want us to be successful, and that is something which we can feel and therefore, we are so, focused on delivery." *Id.* ¶ 281.

- When questioned by an analyst about how the Company saw "flows, deposits, custody assets, [and] loans" "developing…over the next 12 months," Körner replied, in relevant part: "The group overall, as I said, is positive on deposits, Wealth Management, globally, positive on deposits, Asia Pac, positive on deposits. And I'm reiterating that because as you are fully aware of, the deposits are these kind of assets . . . . you can assume that in the best mention is a fair chunk of rewinning lost volumes lost business with our clients. And important to note here is as well that we hardly lost any client. I think that is also important that shows you something about what I said before in terms of the relationship which we may have with our clients." *Id.* ¶ 282.

- When questioned by an analyst about outflows and the "split between November and December," as well as what management meant by a "reduced level" of outflows in January, Körner responded, in relevant part: "If you look into October and November together, it's more than 85% and of the outflows stemming from these two months . . . . With respect to your second question, net new assets, in particular, we said we are positive, which is very good because that's a very proactive region, growth region, we are positive in APAC with a good number for January also, in comparison to other years. We are positive in Switzerland, also, with a good number overall here. We are positive in a couple of smaller other geographies, but we are also, still having some outflows in other regions, and that's why we gave this guidance…. That's how you should read it. But again, as I said, in my eyes, the situation has completely changed from last year." *Id.* ¶ 283.

- When questioned by an analyst about what amount of the "over 90 billion of outflows in Wealth Management…you see as a realistic number to come back" and "what clients are open to returning based upon what they see in terms of progression around your restructuring plan," Körner stated, in relevant part: "[W]e feel that the declines [sic] are overwhelmingly supportive. . . . I would say there are three groups of clients. . . . A second group, which I tend to believe is a very large group. At the end of the day, which was a bit more careful, So, I look -- let's look at that, look at how you are doing, how you are executing and so, on, which will come back over time, I'm not saying in a run, but over time. . . . So, to your concrete question, how much is coming back, I would like to know that as well, as you can imagine. As I said, the wealth management colleagues are pretty hopeful that we bring a fair part of the outflows back already in 2023. And the rest will come later. And as I said also, earlier, obviously, our target is to bring all and everything back and then go beyond that." *Id.* ¶ 284.

Allegedly, these remarks are materially false and/or misleading because they misrepresent and fail

to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1)

219

"the Company was not 'seeing positive signs' with respect to 'regain[ing] deposits, as well as assets under management,' and 'the situation' had not 'completely changed from last year,' [sic] as Credit Suisse was experiencing significant and unusual customer and/or asset outflows;" (2) "the Company did not experience 'liquidity improvements' but instead did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times;" and (3) "there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022." *Id.* ¶ 285.

Though Plaintiff's allegations of falsity are largely conclusory, and he "does nothing to transform generalized statements into particularized allegations," *Born v. Quad/Graphics, Inc.*, 521 F.Supp.3d 469, 479 (S.D.N.Y. 2021), some of Körner's statements about the Company's current condition – notably, that it had "a robust balance sheet" and that it was "executing on [its] transformation from a position of strength," Compl. ¶ 279 – are contradicted by the then-existing financial distress at Credit Suisse, *see Freudenberg*, 712 F.Supp.2d at 190–91. Plaintiff has alleged – and prior disclosures confirm – that the Defendants already knew that the Company was facing significant liquidity issues when they made these statements about the Company's business health. *See Manavazian v. Atec Grp., Inc.*, 160 F.Supp.2d 468, 481–82 (E.D.N.Y. 2001). And Plaintiff's ICFR allegation, discussed below, *infra* pp. 234–43, further calls into question the Company's representations about the overall health of its financials.

## LXXVI.     February 9, 2023: Fourth Quarter and Fiscal Year 2022 Press Conference

Plaintiff challenges a response made by Defendant Körner during a Q&A session at a Company press conference on its fourth quarter and fiscal year 2022 results. Compl. ¶ 286. Specifically, when asked about the "numbers of clients who have actually closed their accounts,"

Körner responded: "***98% of our clients remain with us. And I think…that's, I would say, a very, very strong message if you think it's you because you have normal – you have a very normal attrition. And what we are seeing here is, I don't know, either very normal attrition or even below normal attrition. So that's a very, very strong signal to the organization and to Credit Suisse. And this is very, very supportive for all of us and for Credit Suisse, I think.***" *Id.* ¶ 287. Plaintiff asserts that this response is materially false and/or misleading because it misrepresents and fails to disclose an adverse fact known to or recklessly disregarded by the Defendants: that 98% of the Company's clients had not "remained with" Credit Suisse and the Company was not experiencing "normal…or even below normal attrition," but was rather experiencing significant and unusual customer and/or asset outflows. *Id.* ¶ 288.

"The corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects." *Nokia Oyj*, 423 F.Supp.2d at 397 (citation omitted). Under this standard, Körner's statements are not actionable. While the view Körner communicated in the challenged statement might perhaps be overly optimistic, "executives 'are not required to take a gloomy, fearful or defeatist view of the future.'" *Id.* (quoting *Rombach*, 355 F.3d at 174).

Further, not a single fact is pleaded tending to show that Credit Suisse had lost more than 2% of its customers. Körner's statements are consistent with his claims two months prior that the Company had "very few clients leaving." Compl. ¶ 261. Of course, Körner also acknowledged that clients who were staying had transferred as much as a third of the assets they held with Credit Suisse to rival banks. *Id.* But this particular statement refers to clients, not assets; and the information about clients diversifying their banking business had already been disclosed to the market. Absent any particularized allegations, Plaintiff has failed to sufficiently plead that Körner's statements were materially false and/or misleading.

Not actionable.

## LXXVII.          February 9, 2023: Defendant Körner Interview with *Bloomberg TV*

During a *Bloomberg TV* interview, Defendant Körner stated the following: Credit Suisse was "making really good progress" toward "creating a new Credit Suisse," *id.* ¶ 289; the Company had a "clear plan," and was in "full execution" of it, *id.*; outflows "***have reduced very significantly and we are seeing new money coming back in different parts of the firm***," and "***we have launched a very well organized client reachout…[that] has generated*** very positive momentum...[which] will travel with us in 2023," *id.* ¶ 290. When asked if it was "still the plan…to be profitable for 2024 onwards," Körner responded: "That's absolutely the plan. The plan is unchanged." *Id.* ¶ 291. Plaintiff claims that these statements were materially false and/or misleading because they misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: that "the Company was experiencing significant and unusual customer and/or asset outflows which had not 'reduced very significantly'" and "the 'new Credit Suisse' was a sham, as its 'plan' was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices." *Id.* ¶ 292.

Plaintiff has failed to plead any contemporaneous particularized facts to support his allegation that the new Credit Suisse was a "sham" or his criticisms of the Company's plans. *See In re FuBoTV Inc. Sec. Litig.*, No. 21-cv-01412, 2024 WL 1330001, at *6 (S.D.N.Y. Mar. 28, 2024). The Complaint contains not a single allegation of fact explaining what "unsustainable investment approaches" or "risk management and/or control governance best practices" doomed the Bank's restructuring.

However,  Körner's claim that the Company's outflows "have reduced very significantly," Compl. ¶ 290, when read in context, could plausibly have misled a reasonable investor about the nature of the investment, as it makes the financial performance of the Company appear better than it actually was. *See In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17-cv-4846, 2020 WL 1950783, at *10 (E.D.N.Y. Apr. 22, 2020). By this time, Credit Suisse had been hemorrhaging assets for months.

Actionable in part.

## LXXVIII.    March 13, 2023: Defendant Lehmann Speech at Financial Sector Conference

And so we finally reach the endgame: the disclosures of March 13, 2023 and the events of the next week, starting with a *Bloomberg* article reporting on Defendant Lehmann's speech at the Financial Sector Conference states, in relevant part, Compl. ¶ 293:

> Credit Suisse Group AG Chairman Axel Lehmann said government assistance "isn't a topic" for the lender as the Swiss bank seeks to shore up confidence among clients, investors and regulators after a series of missteps.
>
> Speaking at the Financial Sector Conference in Saudi Arabia on Wednesday, Lehmann said *it wouldn't be accurate to compare Credit Suisse's current problems with the recent collapse of Silicon Valley Bank, particularly because the banks are regulated differently.*
>
> *"We have strong capital ratios, a strong balance sheet," Lehmann said. "We already took the medicine," he said, referring to the extensive restructuring program announced in October.*

*Id.* ¶ 294. Plaintiff says that this is materially false and/or misleading because it misrepresents and fails to disclose adverse facts known to or recklessly disregarded by the Defendants: "the Company did not 'have strong capital ratios,' as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times;" and "the 'restructuring' of Credit Suisse was

fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices." *Id.* ¶ 295.

Lehmann's statement that the Company "[has] strong capital ratios, a strong balance sheet," is actionable. He has done more than offer general optimistic statements about the Company's performance. He characterized the Company's current and future business health in extremely positive terms at a time when he allegedly knew or should have known that the contrary was true. The Bank was literally about to fail. "[C]ontext makes it such that 'a reasonable investor could rely on [Lehmann's statements] as reflective of the true state of affairs at the Company'" – which means that his statements are not inactionable puffery. *Turquoise*, 625 F.Supp.3d at 222 (quoting *Petrobras*, 116 F.Supp.3d at 381)). Accordingly, the allegation that this statement was false or misleading cannot be dismissed.

Actionable.


## LXXIX.    March 14, 2023: 2022 Annual Report

Plaintiff takes issue with portions of the Company's 2022 Annual Report:

Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. ***Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date.*** Compl. ¶ 296.

For Credit Suisse, ***2022 was an important year that marked a decisive break from the past and the beginning of our journey to become a simpler, more focused bank built around the needs of our clients.*** In October, we announced a clear strategy that builds on our core strengths and addresses current challenges, and we have since been executing it at pace. ***Our strategic, cultural and operational transformation aims to re-establish Credit Suisse as a solid, reliable and trusted partner with a strong value proposition for all our stakeholders.***

\*　　　\*　　　\*

Culturally, we want to build on our core values of entrepreneurship, inclusion, meritocracy, partnership, accountability, client focus and trust – values that have shaped the bank since 1856 when it was founded by entrepreneur Alfred Escher. ***As part of our cultural transformation, we want to ensure that our people act as prudent and professional risk managers at all times, are part of a diverse and inclusive environment and always feel confident to speak up. As one of the milestones in this respect, all our people, including ourselves, completed a dedicated risk culture training during 2022.***

\*　　　\*　　　\*

Regarding legacy issues, we have also taken decisive action, as demonstrated by the settlements we have reached relating to our residential mortgage-backed securities, foreign exchange and French legacy cases. ***Our regulatory remediation program is advancing, and we have rolled out a comprehensive plan to strengthen and improve risk management across the Group, including putting additional measures and safeguards in place.***

\*　　　\*　　　\*

**Russia's invasion of Ukraine**
In response to Russia's invasion of Ukraine, many countries across the world imposed severe sanctions against Russia's financial system and on Russian government officials and business leaders, and these sanctions have been expanded several times. ***The Group continues to assess the impact of the sanctions already imposed, and potential future escalations, on its exposures and client relationships. As of December 31, 2022, the Group had a net credit exposure to Russia, after specific allowances and provisions for credit losses and valuation adjustments, of CHF 249 million, primarily related to corporates, individuals and the sovereign. The net credit exposure decreased from CHF 848 million as of December 31, 2021. In addition, Russian subsidiaries had a net asset value of approximately CHF 214 million as of December 31, 2022. The Group has further reduced Russia related exposures in the fourth quarter of 2022 as the market and counterparty situation evolved, and remaining exposures continue to be subject to ongoing monitoring and management.***

\*　　　\*　　　\*

***Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We continuously adapt our liquidity and funding profile to reflect changes in our business strategy and regulatory developments.***

\*　　　\*　　　\*

225

> *Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.*

*Id.* ¶ 297. Plaintiff states that portions of the 2022 Annual Report reproduced above are materially false and/or misleading because they misrepresent and fail to disclose the following adverse facts known to or recklessly disregarded by the Defendants: (1) "the Company was not 'developing a remediation plan to address the material weaknesses' it belatedly identified after engaging in a lengthy comment letter process with the SEC, but was instead presently engaged in discussions with Swiss authorities regarding the sale or liquidation of Credit Suisse;" (2) "the Company was not undergoing a 'strategic, cultural and operational transformation' and did not have a 'comprehensive plan to strengthen and improve risk management' whereby its employees would act as 'prudent and professional risk managers at all times,' [sic] as Defendants never implemented meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, which were severely lacking, both at this time and prior to the Class Period;" (3) "the Company had significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine;" and (4) "the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times." *Id.* ¶ 298.

This entire statement is actionable because it paints too rosy a picture of Credit Suisse's financial condition just days before it would enter into a merger designed to stave off its collapse. *See id.* ¶ 367. While the Complaint pleads that, late on March 15 (the very next day), "FINMA and the Swiss National Bank (SNB) announced that Credit Suisse met capital and liquidity

requirements, and that SNB would provide liquidity to Credit Suisse if necessary," *id.* ¶ 364, that does not render the Bank's presentation of its financial situation in the Annual Report either true or not misleading. It is simply not plausible to infer that, just six days before the Bank collapsed, Credit Suisse's management was not aware of the scope of the Company's parlous financial condition. The very fact that SNB stated publicly that it would provide Credit Suisse liquidity "if necessary" suggests that the Bank had a serious potential liquidity problem at the time the Annual Report was issued.

Similarly, Plaintiff is correct that the Company's statements about its liquidity pool, taken together and read in context, would have misled a reasonable investor. *Vivendi*, 838 F.3d at 250. The Company's statements about its liquidity gave comfort to investors that it was managing its liquidity issues – and perhaps could cause a reasonable investor to make an overly optimistic assessment of the Company's current state of affairs. Additionally, the disclosure of any merger discussions that were then under way was necessary to render statements that were made about the Company's financial posture not misleading.

Significantly, the Company's 2022 Annual Report finally identified material weaknesses in the Company's internal control over financial reporting, Compl. ¶ 358 – indeed, the challenged portion of the 2022 Annual Report begins by asserting that everything that followed was "notwithstanding these material weaknesses."[13] While Plaintiff does not plead what "these material weaknesses" were, the fact that material weaknesses had been identified (and were disclosed to have existed at least during the previous fiscal year) casts a pall over the hopeful characterization of the Bank's financial picture.

---

[13]    That, of course, is why the March 14 statements cannot be challenged as false and misleading for failing to disclose material weaknesses in the Company's ICFR.

While the rest of Plaintiff's justifications for alleging that the 2022 Annual Report was false and misleading – everything from the Russian exposure to the UK financial regulator's watchlist – do not hold water, the pleading read as a whole plausibly alleges that this excerpt from the 2022 Annual Report was false and misleading to a reasonable investor, both for what it said and for what it did not say about the Company's financial condition and prospects.

Plaintiff also challenges the veracity of the 2022 Annual Report based on the following disclosure:

> The accompanying consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). The financial year for the Group ends on December 31. Certain reclassifications have been made to the prior year's consolidated financial statements to conform to the current presentation which had no impact on net income/(loss) or total shareholders' equity.

*Id.* ¶ 316. He argues that the above disclosure was materially false or misleading, or omitted information necessary to make it not misleading, for the same reasons he articulated in the context of the 2021 Annual Report. *Id.* ¶ 317; *supra* pp. 107, 109.

But unlike a year earlier, the Company disclosed in the 2022 Annual Report that its internal control over financial reporting was deficient and had apparently been deficient for some time. I am not prepared to say that statements about the propriety of the Company's financial statements are true and correct in light of that disclosure.

Actionable.

## LXXX.    March 14, 2023: 2022 Annual Report SOX Certifications

In connection with the filing of the Company's 2022 Annual Report on Form 20-F with the SEC, Defendants Joshi and Körner executed SOX Certifications that attested to the purported accuracy and completeness of the Company's financial and operational reports, as well as

statements concerning Credit Suisse's internal controls and procedures. *Id.* ¶ 318. Plaintiff

challenges the veracity of Joshi and Körner's SOX Certifications to the extent they represent the

following:

1. I have reviewed this annual report on Form 20-F of Credit Suisse Group AG and Credit Suisse AG;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report;

4. The registrants' other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrants and we have:

    b) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrants, including their consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrants' disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrants' internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is likely to materially affect, the registrants' internal control over financial reporting; and

5.    The registrants' other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrants' auditors and the audit committee of each of the registrant's board of directors (or persons performing the equivalent functions):

c)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrants' ability to record, process, summarize and report financial information; and

d)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting.

*Id.* Plaintiff asserts that the SOX Certifications were materially false and misleading because – just as he alleged in connection with the 2021 Annual Report SOX Certifications – the 2022 Annual Report "did not comply with GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. Furthermore, contrary to the statements in Defendants' SOX Certifications, as Defendants themselves would later admit, Credit Suisse's internal controls over financial reporting suffered from material weaknesses, and, as a result, the Company's financial reports were inaccurate, unreliable, and/or subject to manipulation." *Id.* ¶ 319.

Plaintiff's allegations in the Complaint about Joshi and Körner's 2022 Annual Report SOX Certifications parrot his complaints about Gottstein and Mathers' 2021 Annual Report SOX Certifications. Plaintiff does not specify any GAAP provision or SEC rule that the Credit Suisse Defendants violated. Ordinarily that would doom his pleading at the motion to dismiss stage.[14] *See Harris*, 135 F.Supp.3d at 171 n.28.

However, I am not prepared to dismiss the allegations that these SOX Certifications are false and/or misleading. Contrary to the representations in paragraph 4 of the SOX certification,

---

[14]    *Krasner*, 2012 WL 4069300, at *6; *Davidoff*, 2005 WL 2030501, at *12; *see also Stratte-McClure*, 784 F.Supp.2d at 386; *Marsh & Mclennan Cos.*, 501 F.Supp.2d at 477.

as the Company admitted more or less simultaneously with the issuance of that certification, Credit Suisse's ICFR suffered from material weaknesses. That rendered its financial statements potentially (though not necessarily) inaccurate, unreliable, or subject to manipulation. Even allowing for the fact that SOX Certifications are statements of opinion, *see Lottery.com*, 2024 WL 454298, at *27– and a genuinely held statement of opinion that turns out to be wrong is not necessarily actionable, *see DeCarlo*, 80 F.4th at 176 (citing *Omnicare*, 575 U.S. at 186) – Credit Suisse's simultaneous disclosure of material weaknesses in ICFR would seem to make the representations found in paragraph 4 of the 2022 Annual Report SOX Certifications suspect, if not outright false. At the time the 2022 Annual Report SOX Certifications were made (as opposed to a year earlier, when the 2021 Annual Report was SOX-certified), the certifying officers were fully apprised of the fact that the Company's ICFR – its internal control over financial reporting – was flawed, and had been flawed for the entire 2022 fiscal year. That fact is sufficient to cast doubt on the reasonableness of a belief that a financial statement was prepared in accordance with GAAP, or to render plausible the inference that the "opinions" found in paragraph 4 were not "genuinely held."

Actionable.

## LXXXI.  March 14, 2023: Defendant Körner Speech at European Financials Conference

Plaintiff challenges remarks by Defendant Körner during his speech at the European Financials Conference. Compl. ¶ 299. Körner stated that Credit Suisse did not have "material risk" in the wake of SVB's recent collapse because Credit Suisse had "materially different standards" in capital strength, funding, and liquidity. *Id.* Plaintiff alleges that this was materially false and/or

misleading because it misrepresents and fails to disclose the following adverse facts known to or recklessly disregarded by the Defendants: that "the Company did, in fact, have 'material risk' and did not have 'materially different standards' in capital strength, funding, and liquidity, as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times. *Id.* ¶ 300.

Körner's remarks are actionable. Considering the context – *i.e.*, the preceding disclosures that addressed the Company's capital strength, funding, and liquidity – as well as the fact that the Bank would collapse in just a few more days, it was misleading for Körner to state that the Company did not have "material risk." *See Vivendi*, 838 F.3d at 250.

## LXXXII.    March 14, 2023: Defendant Körner Interview with *Bloomberg*

In an interview with *Bloomberg*, Defendant Körner said, when asked about inflows, that things at the bank were "calm" and, in fact, there had been "***material good inflows" the previous day***, which was a "***positive sign***." Compl. ¶¶ 301–02. He also said that ***outflows had "significantly moderated.***" *Id.* ¶ 302. On the recent collapse of SVB, he said that "was a very different situation" than Credit Suisse, because Credit Suisse was "following ***materially different and higher standards when it comes to capital funding, liquidity, and so on.***" *Id.* ¶ 303. Plaintiff argues that Körner's remarks were materially false and/or misleading because they misrepresented and failed to disclose certain adverse facts known to or recklessly disregarded by the Defendants: "the Company did not 'follow[] materially different and higher standards when it comes to capital funding, [and] liquidity,' as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times;" and "the Company was experiencing significant and unusual customer and/or asset outflows which had not 'significantly moderated.'" *Id.* ¶ 304.

These statements "were directed at [Credit Suisse's] then-existing financial condition and made at a time when defendants were aware or should have been aware of contrary information." *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F.Supp.2d 348, 360 (S.D.N.Y. 2006). While it may be true that Credit Suisse was a different situation than SVB, what is most troubling is that Körner made these statements as assets continued to drain out of Credit Suisse – or, in other words, when outflows had not abated but had only "moderated" (and were no longer being described as having "stabilized"). Moreover, the outflows had gone on for a many months, even after the Company injected new sources of capital and announced a massive restructuring of its business. "Viewing [Körner's] statements in context and drawing all reasonable inferences in favor of the [Plaintiff], the Court finds that the identified statements are attempts to address concerns about specific elements of the [Company's] financial situation . . . rather than general boasting of generic characteristics about the business." *SEC v. Farnsworth*, 692 F.Supp.3d 157, 181 (S.D.N.Y. 2023). As the statements are belied by conditions internally known by Defendants, they are not subject to dismissal. *See Freudenberg*, 712 F.Supp.2d at 190.

Actionable.

## LXXXIII.    March 15, 2023: Defendant Körner Interview with *CNA*

A *Reuters* article reporting on Defendant Körner's interview with *CNA*, a Singaporean news channel, Compl. ¶ 305, states, in relevant part:

> Credit Suisse (CSGN.S) Chief Executive Ulrich Koerner [sic] spoke of the strength of the Swiss lender's liquidity basis in an interview with CNA on Wednesday, after its share price dropped more than 30% following comments by the company's lead investor.
>
> "***Our capital, our liquidity basis is very very strong***," Koerner said. "***We fulfill and overshoot basically all regulatory requirements***."

*Id.* ¶ 306. Plaintiff says this was materially false and/or misleading because it misrepresents and fails to disclose certain adverse facts known to or recklessly disregarded by the Defendants: "Credit Suisse's liquidity was not 'very very strong,' and Credit Suisse did not 'fulfill and overshoot basically all regulatory requirements,' as its liquidity and funding profile, policy, and/or risk parameters were materially deficient at all times." *Id.* ¶ 307.

Plaintiff is correct – Defendants' representations, taken together and in context, would have misled a reasonable investor. *Vivendi*, 838 F.3d at 250. Körner made his statements touting the strength of the Company's capital and liquidity basis, as well as its compliance with regulatory requirements, on March 15, 2023, when, "It was widely reported in the press that Credit Suisse's largest shareholder, the Saudi National Bank, would not buy any more of the Company's shares for 'regulatory' reasons." Compl. ¶ 362. Later that very day, "FINMA and the Swiss National Bank (SNB) announced that Credit Suisse met capital and liquidity requirements, and that SNB would provide liquidity to Credit Suisse if necessary. Credit Suisse then announced later that night that it would be borrowing up to CHF 50 billion from the SNB and also buying back various debt instruments for approximately CHF 3 billion." *Id.* ¶ 364. Körner's public statements do not align with this information, of which he had to be aware. Because Plaintiff has pled that Körner made statements that, when viewed in context, misrepresented the adequacy of the Company's liquidity levels, Plaintiff has sufficiently alleged that Körner's statements were materially misleading.

Actionable.


*Internal Control over Financial Reporting*

I turn now to a recurring issue that becomes significant over the last six months of the proposed Class Period – deficiencies in Credit Suisse's internal control over financial reporting.

Plaintiff alleges that Credit Suisse failed to disclose such deficiencies starting as early as April 2021. *Id.* ¶ 56. For reasons discussed extensively above, that allegation gets him nowhere until October 2022. At that point, the well-pleaded allegations of the Complaint strongly suggest that matters changed.

Plaintiff has alleged that certain statements in the last six months of the Class Period – *i.e.*, late October 2022 onwards – were materially false and/or misleading because they misrepresented and failed to disclose the adverse fact, known to or recklessly disregarded by the Defendants, that "there existed material weaknesses in the Company's internal controls over financial reporting." Plaintiff alleges that the Company "had been put on notice [of this fact] by SEC Comment Letters dated July 15, 2022." *See, e.g.*, *id.* ¶ 285.

It first behooves me to explain what we are talking about. As Credit Suisse says in its 2021 Report, "The management of the [Company] is responsible for establishing and maintaining adequate internal control over financial reporting. [Credit Suisse's] *internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with US GAAP.*" 2021 Annual Report, at 283 (emphasis added). In the "Report of Independent Registered Public Accounting Firm" prepared by PwC AG and attached to Credit Suisse's 2021 Annual Report, PwC AG adds onto Credit Suisse's ICFR definition:

> A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

*Id.* at 284-IV–V. "When a company misrepresents the effectiveness of its internal controls, investors may be left with a false impression of the company's risks and holdings." *In re SunEdison, Inc. Sec. Litig.*, 300 F.Supp.3d 444, 469 (S.D.N.Y. 2018). In other words, if a company misrepresents the effectiveness of its internal controls – or, in this case, its internal control over financial reporting – its financial statements may not be reliable. The failure to disclose material weaknesses in internal control over financial reporting does not automatically mean that financial statements are false and/or misleading, but it raises a much stronger possibility that they are.

In the Complaint, Plaintiff only includes a handful of instances in which Credit Suisse made representations about the adequacy of its internal control over financial reporting – Credit Suisse's 2021 and 2022 Annual Report SOX Certifications. In the 2021 Annual Report SOX Certifications, Gottstein and Mathers said, in relevant part, that they had "evaluated the effectiveness of the registrants' disclosure controls and procedures and presented in [the 2021 Annual Report] our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation" and "disclosed in [the 2021 Annual Report] any change in the registrants' internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is likely to materially affect, the registrants' internal control over financial reporting." Compl. ¶ 318. As noted above, *supra* pp. 111–15, Plaintiff pleads no fact tending to show, or even suggest, that at the time the 2021 Annual Report SOX Certifications were made, the certifying officers did not believe their statements of opinion to be true, and also had any reason to think that they were false. The regulatory actions (especially the SEC inquiry) on which Plaintiff would later rely to assert that various statements by the Company were false and misleading had not yet commenced in March 2022, when the 2021 Annual Report SOX Certifications were made. The fact that it would later

turn out that there were deficiencies in ICFR going back into 2021 is fraud by hindsight pleading, which does not nudge Plaintiff's allegations of falsity into the realm of the plausible at the time the 2021 Annual Report SOX Certifications were made. Ergo, I have dismissed the securities fraud claim insofar as it is predicated on the 2021 Annual Report SOX Certifications.

And the 2022 Annual Report SOX Certifications, as noted above, were issued contemporaneously with the Company's acknowledgement in its 2022 Annual Report that there were in fact material weaknesses in its ICFR – which means that this was not an undisclosed fact. While I believe the 2022 Annual Report SOX Certifications to be actionable (*see supra* pp. 228–31), it is not because Credit Suisse was keeping the material weaknesses in its ICFR secret.

But aside from the SOX Certifications, Credit Suisse does not discuss or make any representations about its ICFR in any of the challenged language from the other 81 statements that Plaintiff has identified as false and/or misleading. This places the issue of ICFR within the ambit of the "pure omissions" doctrine. Pure omissions occur "when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Macquarie*, 601 U.S. at 263. Such omissions are not actionable as false or misleading statements under the federal securities laws. *Id.* But, "Half-truths, on the other hand, are representations that state the truth only so far as it goes, while omitting critical qualifying information." *Id.* (citation and internal quotation marks omitted). Rule 10b-5(b) covers half-truths – it "prohibits omitting material facts necessary to make the 'statements made . . . not misleading.' Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete." *Id.* So one way to satisfy Section 10(b)'s materiality requirement is when an issuer omits to say anything on a subject as long as there is " 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of

information made available.' " *Basic*, 485 U.S. at 231–32, (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

I conclude, based on the well-pleaded allegations of the Complaint, that there came a point where Credit Suisse was no longer privileged to say nothing about the strength of the Company's ICFR – meaning that its silence on the subject no longer qualified as a pure omission, but instead resulted in half-truths. Plaintiff has sufficiently alleged that this moment arrived by October of 2022. Prior to that point, Plaintiff has not pleaded any fact tending to show that any speaker at Credit Suisse was aware of, or had reason to be aware of, material weaknesses in its ICFR. But by October 2022, two regulators, the FCA and the SEC, were concerned about, among other things, the adequacy of the Company's internal controls. Indeed, the reason why the FCA placed Credit Suisse on a watchlist was because of concerns that Credit Suisse had not done enough to improve its culture, governance, and risk controls. Compl. ¶ 401. The SEC had commenced an inquiry into the Company's potential ICFR deficiencies (along with other issues) in the summer of 2022. And while the inquiry itself was not a sign of deficiency (*see supra* pp. 150–51, 166–69), on or about October 20, 2022, the SEC advised the Company that it did not buy Credit Suisse's initial explanation for why its ICFR was adequate. Since internal control over financial reporting can impact the validity of statements about financial condition, I cannot say as a matter of law that a reasonable investor would not have wanted to know that Credit Suisse had been unable to convince the SEC of the adequacy of its internal control over financial reporting. The reasons why I reach this conclusion can be found in the following information, which is in the record on the motion to dismiss:

The SEC issued the initial Comment Letter on July 15, 2022. Ex. 10 to Matuschak Decl. Specifically on the issue of the Company's ICFR, the SEC asked the Company: "In light of your

accounting issues and resulting revisions, as well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management, *please provide us with your analysis supporting your conclusion that there were no material changes to ICFR.*" *Id.* (emphasis added). On August 22, 2022, the Company responded that a number of "accounting issues" did not suggest any material impact on or change to its ICFR. Ex. 13 to Matuschak Decl. These issues included: Credit Suisse's netting treatment in the presentation of a limited population of certain securities lending; its changes to the consolidated statements of cash flows in the years ended December 31, 2020 and 2019 and related purportedly not material control deficiencies; the measures introduced or being implemented by the Company in response to external investigation reports on the Archegos and Greensill matters; the Company's internal assessment of its SOX control inventory; and the results of the Company's management's annual design and operating effectiveness testing, incident reviews and other assessments, individual SOX control matter assessments, and quarterly aggregation assessment of all SOX control matters. *Id.*

This response did not satisfy the SEC, so it sent the Company follow-up questions on October 20, 2022. Ex. 14 to Matuschak Decl. In particular, the SEC asked the Company to explain in more detail each of the control deficiencies it had previously identified, and to explain how the Company concluded that those control deficiencies did not rise to the level of a material weakness. *Id.* The Company responded on November 18, 2022, and explained that: it had concluded that several identified control deficiencies – to wit, "the Mapping rules deficiency, which relates to certain cash flow positions that had not been categorized in accordance with Generally Accepted Accounting Principles in the United States of America ('US GAAP') due to inappropriate mapping rules," and the "Nonfunctional currency gains and losses deficiency, which relates to the

computation and reporting of the cash flow effects of gains and losses on remeasurements within the consolidated statement of cash flows" – were not material or significant, individually or in combination with other control deficiencies, based on a series of qualitative and quantitative factors. Ex. 17 to Matuschak Decl.

Far from quelling concerns in Washington, the admission that there were two identified control deficiencies led the SEC to raise even more questions "as to the actual control(s) that were deficient." It sent these questions in a letter to the Company dated January 17, 2023. Ex. 18 to Matuschak Decl. The SEC requested that the Company, among other things: (1) identify the deficient controls, provide a description of how each control was designed to address the related risk of material misstatement, and explain whether the deficiency related to the design or operating effectiveness of the control; (2) provide Company management's root cause analysis; (3) discuss any remediation efforts; (4) describe the factors that affected the magnitude of the misstatement that might result from the deficiency, and quantify the magnitude; and (5) explain in more detail how the Company performed the severity analysis for each of the control deficiencies related to the errors. *Id.*

Credit Suisse responded to the SEC's questions on February 13, 2023. Ex. 20 to Matuschak Decl. The Company stated that its "risk assessment framework was established to foster effective internal control over financial reporting as of December 31, 2021" and that it "continued to believe that [its] control activities were selected and established to foster effective internal control over financial reporting as of December 31, 2021."[15] *Id.* Again dissatisfied, the SEC sent yet another series of questions on March 10, 2023, commenting that it would like to better understand how Credit Suisse had concluded that a broader risk assessment entity-level control material weakness

---

[15] Recall that the SEC's questions related to the Annual Report for 2021; at this point, the 2022 Annual Report had not been finalized or submitted.

and a broader monitoring entity-level control material weakness did not exist as of December 31, 2022 and 2021. Ex. 21 to Matuschak Decl. Just two days later, in a letter dated March 12, 2023, Credit Suisse finally admitted that there had been material weaknesses in its ICFR dating back to the 2021 Annual Report. Ex. 22 to Matuschak Decl. It stands to reason that the Company, with the assistance of its outside accountant, had been in the process of reaching this conclusion for some time; it is not the sort of conclusion one reaches in two days.

Of course, the devil is in the details, and little of the detailed information contained in the preceding paragraphs can be found in the Complaint. Plaintiff simply refers to the fact of an extended, months-long correspondence between the SEC and the Company; aside from short excerpts from the initial letter from the SEC and the final letter from the Company, Plaintiff does not plead its content, although that content became public before the Amended Complaint was filed.[16] *See, e.g.*, Compl. ¶ 386. Ironically, it is Credit Suisse, in its motion to dismiss, that alerted the Court to the contents of this correspondence.[17]

However, I conclude that the Plaintiff's bare bones allegation about the existence of this correspondence gets it past a motion to dismiss. Plaintiff has alleged that particular statements made between October 2022 and March 2023 (those statements are identified above) are false and/or misleading for failing to disclose the ICFR material weakness issue. During this timeframe, the Company and its executives were making repeated pronouncements about its financial condition. For example: during the period while the SEC was asking questions and expressing

---

[16]    Per the SEC's Division of Corporation Finance's webpage on the Filing Review Process: "the Division makes its comment letters and company responses to those comment letters public on the SEC's EDGAR system no sooner than 20 business days after it has completed its review of a periodic or current report or declared a registration statement effective." *Filing Review Process*, U.S. SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/about/divisions-offices/division-corporation-finance/filing-review-process-corp-fin#:~:text=To%20increase%20the%20transparency%20of,declared%20a%20registration%20statement%20effective (last visited Aug. 9, 2024).

[17]    Although again, the contents of the SEC Correspondence is a matter of public record.

doubts regarding the Company's conclusions about its ICFR, the Company and its executives were providing the market with quarterly financial results and strategy updates, Compl. ¶¶ 234–35, 239, 242, 244–47, 253, 257, 277, 279–84 (October 27, November 2, November 23, 2022; February 9, 2023); Defendant Lehmann was saying that "the main indicators of the bank's financial stability were strong," *id.* ¶ 264 (December 2, 2022), and that the Bank was "definitely stable," *id.* ¶ 268 (December 5, 2022); and Defendant Körner was stating that the Bank had a "robust balance sheet" and was "executing on [its] transformation from a position of strength," *id.* ¶ 279 (February 9, 2023). And the Company made no allusion to the ongoing correspondence in its Fourth Quarter Earnings Release, issued on February 9, 2023, which was after it had received a third letter of inquiry from the SEC. *Id.* ¶ 277; *see* Ex. 18 to Matuschak Decl. So while Plaintiff has not challenged in the Complaint any representations made by the Credit Suisse Defendants about the adequacy of the Company's ICFR from October 2022 to March 2023, I cannot say that their silence qualified as "pure omission," because the failure to apprise the market about the serious ongoing inquiries (inquiries that would eventually lead the Company to conclude that there were indeed material weaknesses in ICFR) cast its various statements about its financial condition in a half-true light. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the "total mix" of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable.

Of course, nothing in the SEC Correspondence that has been provided to the Court discloses precisely when the Company finally reached the conclusion that there existed material weaknesses in its ICFR. That fact will no doubt come out during discovery. However, the SEC questioning the Company repeatedly about its representations regarding its ICFR suggests that, at

the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than "routine." This, in turn, raises the question about whether failure to disclose that such questions were being asked left investors "with a false impression of the company's risks and holdings." *SunEdison*, 300 F.Supp.3d at 469.

The Credit Suisse Defendants insist in their Motion to Dismiss that the Company disclosed at least as early as its 2020 Annual Report that there was a risk that the Company's ICFR "may become inadequate" and that "[t]here [were] inherent limitations to the effectiveness of any system of controls and procedure." 2020 Annual Report, at 426. But that argument (which will surface again in the context of discussing loss causation, see *infra* pp. 280) is too clever by half. Disclosing that "[t]here [were] inherent limitations to the effectiveness of any system of controls and procedure" is not the same thing as disclosing that questions have been raised about the adequacy of the Company's ICFR.

So I conclude that the omission of "critical qualifying information," *Macquarie*, 601 U.S. at 263 – the SEC's continued questioning of the Company's ICFR and its dissatisfaction with the Company's responses – renders actionable the statements identified above. Plaintiff's reference to the SEC Correspondence nudges his claim across the line from conceivable to plausible. *Twombly*, 550 U.S. at 570.[18] For avoidance of doubt, this ruling applies to the 2022 Annual Report SOX Certifications and the following statements: LVI, LVII, LIX, LXI, LXIV, LXVI, LXVIII, LXIX, LXX, LXXIV, and LXXV.

---

[18]    Were I to conclude otherwise, I would simply have to grant the Plaintiff leave to amend his pleading – an amendment to allege these facts would most certainly not be futile – which would no doubt lead to yet another round of time-consuming (and probably time wasting) motion practice.

**B.  The Credit Suisse Defendants' Alleged Scienter**

After painstaking analysis, we have identified a total of eighteen actionable statements and two SOX Certifications by some (not all) of the Credit Suisse Defendants that were made during the last six months before the Bank imploded. The Credit Suisse Defendants argue that claims based on these alleged misstatements should nonetheless be dismissed because Plaintiff has failed to plead scienter.[19]

To state a valid claim under Section 10(b) and Rule 10b-5, a plaintiff must plead with particularity facts that give rise to a strong inference "that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 323 (quotation marks omitted). "Under the heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Slayton*, 604 F.3d at 766 (quoting *Tellabs*, 551 U.S. at 324). "To apply this standard, this Court must 'take into account plausible opposing inferences' and must consider 'plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.' The inference of scienter 'must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations.'" *Schiro v. Cemex, S.A.B. de C.V.*, 396 F.Supp.3d 283, 300 (S.D.N.Y. 2019) (quoting *Tellabs*, 551 U.S. at 323–24).

A litigant may satisfy this pleading requirement by alleging facts showing either: (1) the defendant's motive and opportunity to commit fraud; or (2) strong circumstantial evidence of the

---

[19]  Obviously, Credit Suisse and the Individual Defendants made this argument about the all of the SOX Certifications and every one of the 81 alleged misstatements, but the argument only needs to be considered with respect to the statements that the Court has concluded would be actionable if scienter were adequately alleged. Similarly, we need not consider arguments made by the Individual Defendants who are being dismissed with prejudice from this action – Gottstein, Horta-Osório, and Mathers.

defendant's conscious misbehavior or recklessness. *Avon*, 2019 WL 6115349, at *19 (citing *ECA*, 553 F.3d at 198–99).

In this case, Plaintiff relies on both theories.

### a. Motive and Opportunity

A plaintiff has sufficiently alleged a "strong inference" of a "motive and opportunity to commit fraud" if he pleads facts showing that the defendant "benefited in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307–08.

Plaintiff argues that the Individual Defendants' "desire for concrete, personal financial gain," was sufficient motivation to commit securities fraud, as they "reap[ed] millions of dollars in compensation throughout the Class Period." Compl. ¶¶ 385, 433. Based on the Credit Suisse 2020, 2021, and 2022 Compensation Reports, Plaintiff states that members of Credit Suisse's Executive Board and Board of Directors – including specific Individual Defendants – were paid millions of dollars in exchange for their services. *See id.* ¶¶ 434–36. According to Plaintiff, this "generous compensation structure provided a strong motivation for Individual Defendants and for the Company itself (through the actions of the Individual Defendants as well as the Company's many bankers who were consistently rewarded) to ignore red flags and continue the fraud throughout the Class Period." *Id.* ¶ 437.

Though Plaintiff is correct that the remaining Individual Defendants Joshi, Körner, and Lehmann received significant compensation throughout the Class Period, "To allege a motive sufficient to support the inference [of fraudulent intent], a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." *Shields*, 25 F.3d at 1130 (citation omitted). Motives, like the ones alleged for the Individual Defendants in this case,

that are generally possessed by most corporate directors and officers (*e.g.*, the desire to maintain the appearance of corporate profitability or increase compensation) do not suffice to plead securities fraud.[20] *Kalnit*, 264 F.3d at 139. "[I]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (quoting *Acito*, 47 F.3d at 54); *see also Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 81 n.67 (2d Cir. 2021).

In his opposition papers, Plaintiff responds: (1) that the Individual Defendants do not dispute they had the opportunity to commit fraud, given their positions as "high level corporate insiders," *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 36 (S.D.N.Y. 2019); and (2) "that despite overseeing one of the largest failures of a systemically important financial institution in the history of modern banking, Individual Defendants—and other Credit Suisse employees—were rewarded handsomely." CS Opp. Memo, at 34–35 (citing *Nguyen v. NewLink Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018), *vacated in part on other grounds sub nom. Abramson v. NewLink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020)). Plaintiff cites to *Nguyen*, 297 F.Supp.3d at 498 to argue that while scienter allegations cannot "rest[] solely on the fact that individual defendants stood to benefit by way of employment incentives," "allegations regarding [their] specific motives to obtain outsized bonuses may

---

[20]    *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996); *In re Citigroup Sec. Litig.*, No. 20 Civ. 9132, 2023 WL 2632258, at *12 (S.D.N.Y. Mar. 24, 2023); *In re PRXE Grp., Ltd., Sec. Litig.*, 600 F.Supp.2d 510, 530 (S.D.N.Y. 2009); *Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *9, *11 (S.D.N.Y. Jan. 18, 1996); *Friedman v. Ariz. World Nurseries Ltd.*, 730 F.Supp. 521, 532 (S.D.N.Y. 1990), *aff'd mem.*, 927 F.2d 594 (2d Cir. 1991).

certainly be considered as part of the calculus in assessing whether there is a strong inference of scienter."

What Plaintiff fails to mention – and what distinguishes *Nguyen* from the instant action – is that the financial motive identified by the *Nguyen* plaintiff was specific: in that case, the defendants had motive to lie about or manipulate drug trial patient enrollment numbers since doing so would allow them to reap a concrete benefit in the form of significantly higher bonuses (nearly 60% and 49% of their base salaries). *Id.* Here, reading the Complaint most favorably to Plaintiff, I conclude that he does not plead motive with a similar level of specificity or allege any concrete benefit – beyond listing some of the Individual Defendants' total compensation – that any of the remaining Individual Defendants either received or would have been entitled to receive as a result of misleading the market about the health of Credit Suisse. Again, it is not sufficient to allege that the Individual Defendants who were in office during the Company's last months (Joshi, Körner, and Lehmann) were generally motivated to mislead investors so that they could profit in terms of either "handsome" compensation or a standard bonus. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Thus, Plaintiff's attempt to allege the relevant Individual Defendants' scienter through motive and opportunity to commit fraud fails. *See Rotunno v. Wood*, No. 22-502, 2022 WL 14997930, at *2 (2d Cir. Oct. 27, 2022); *Fadem v. Ford Motor Co.*, 352 F.Supp.2d 501, 524–25 (S.D.N.Y. 2005).[21]

---

[21]  Ironically, in two of the other Credit Suisse cases on this court's docket – *Schur v. Dougan*, 23 Civ. 10944, and *Hohimer Wealth Mgmt. v. Dougan*, 23 Civ. 11138 – there are allegations about a type of Tier 1 Bond known as a Contingent Capital Award ("CCA"), or Credit Suisse Employee AT1 Bond. Specifically, it is alleged that Credit Suisse executives, who were entitled to CCAs, tried to get Swiss authorities to treat them differently than they were treating AT1 bonds held by members of the public. It is possible that allegations of this sort might (or might not) give rise to a "motive and opportunity" scienter argument on the part of the Bank's senior executives. But there is no mention of these bonds in the Complaint in this action. And while I cannot pretend not to know about them – I have been working on all three cases simultaneously for some months – I cannot import allegations from one case into another.

### b.  Conscious Misbehavior or Recklessness

"Where a plaintiff fails to adequately plead motive and opportunity, the complaint may nevertheless state a claim where there is 'strong circumstantial evidence of defendants' conscious misbehavior or recklessness.'" *Iowa Pub. Emps.' Ret. Sys. v. Deloitte & Touche LLP*, 919 F.Supp.2d 321, 330 (S.D.N.Y. 2013) (quoting *Kalnit*, 264 F.3d at 142). But without "a motive for a defendant to commit fraud, 'the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater.'" *In re: Petrobras Sec. Litig.*, No. 14-cv-9662, 2016 WL 1533553, at *2 (S.D.N.Y. Feb. 19, 2016) (quoting *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015)). "The Court must examine these allegations both individually and in aggregate, keeping in mind that such allegations may lend support to an inference of scienter even if they are not, on their own, sufficient to establish it." *Athale v. SinoTech Energy Ltd.*, No. 11 Civ. 0531, 2014 WL 687218, at *6 (S.D.N.Y. Feb. 21, 2014) (citations omitted).

Conscious misbehavior, or intentional misconduct, "is easily identified since it encompasses deliberate illegal behavior . . . ." *Novak*, 216 F.3d at 308 (internal citations omitted). Recklessness is defined as "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

Circumstantial evidence can support a strong inference of scienter under the conscious misbehavior or recklessness theory where defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had

248

access to information suggesting that their public statements were not accurate; . . . (4) failed to check information they had a duty to monitor," *Emps.' Ret. Sys. of Gov. of Virgin Is. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation omitted), or (5) ignored obvious signs of fraud, *Tabor v. Bodisen Biotech, Inc.*, 579 F.Supp.2d 438, 449 (S.D.N.Y. 2008). But, where a plaintiff alleges that the defendants knew about or had access to contrary facts, the plaintiff "must specifically identify the reports or statements containing this information." *Novak,* 216 F.3d at 309.

Another "crucial limitation to ... recklessness-based scienter is the insufficiency of allegations of 'fraud by hindsight.' " *Iowa Pub. Emps.'*, 919 F.Supp.2d at 334 (quoting *Novak*, 216 F.3d at 309). "Allegations that defendants should have anticipated future events and made earlier disclosures do[] not suffice to make out a claim of fraud," *Tecku v. Yieldstreet, Inc.*, No. 20 Civ. 7327, 2022 WL 1322231, at *12 (S.D.N.Y. May 3, 2022) (citing *Acito*, 47 F.3d at 53), but "[c]ourts often reject an incantation of fraud-by-hindsight when plaintiffs allege that 'the company failed to take into account information that was available to it' at the time that the company issued the incorrect statements or omissions," *In re Salix Pharm., Ltd.*, No. 14-cv-8925, 2016 WL 1629341, at *17 (S.D.N.Y. Apr. 22, 2016) (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494–95 (S.D.N.Y. 2004) (citing *In re Vivendi Universal, S.A.*, No. 02-CV-5571, 2004 WL 876050, at *6 (S.D.N.Y. Apr. 22, 2004)).

Plaintiff argues that he has sufficiently pled the Individual Defendants' scienter based on the following circumstantial evidence: (1) the Company's correspondence with the SEC, which commenced in the summer/fall of 2022, Compl. ¶¶ 386–89; *see supra* pp. 150–51, 166–69; (2) information provided by Confidential Witnesses, *id.* ¶¶ 390–93; (3) the February 2021 unsealing of FINMA report (the "FINMA Report") on its investigation into Credit Suisse's involvement in a 2018 fraud involving Patrice Lescaudron, "Credit Suisse's go-to banker for Russian clients

prior to his 2018 conviction for fraud and forgery, *id.* ¶¶ 394–95; (4) 2022 reports of the Individual Defendants' alleged attempt to destroy documents and hide client accounts relating to its Russia dealings, *id.* ¶¶ 396–99; (5) certain Class Period admissions and events, specifically an April 29, 2022 statement by Lehmann at a Company AGM, and the UK financial regulator's May 2022 placement of the Company on a "watchlist of institutions requiring tougher supervision," *id.* ¶¶ 400–01; (6) certain post-Class Period admissions and events, including: admissions by Körner and Lehmann in April 2023; disclosures of probes and investigations into Credit Suisse by Swiss and U.S. agencies; statements by UBS regarding its post-merger review of Credit Suisse; disclosures of fines to be paid by UBS to the U.S. Federal Reserve and to the Bank of England relating to Credit Suisse's dealings with Archegos; and statements within Credit Suisse's 1Q23 Earnings Release, *id.* ¶¶ 402–12; (7) "numerous" red flags, namely issues with Credit Suisse's risk staffing, systems, technology, and structure, as well a public report of Swiss Banks' Russia exposure and the Company's recent history of fines, government investigations, and a guilty plea, *id.* ¶¶ 413–22; (8) the departures of key Credit Suisse executives, *id.* ¶¶ 423–27; (9) the Individual Defendants' high-level positions at Credit Suisse and access to contrary information, *id.* ¶¶ 428–30; and (10) the core operations doctrine, *id.* ¶¶ 431–32. Plaintiff asserts that, taken together, this circumstantial evidence gives rise to the requisite strong inference of scienter.

Again, we must focus our attention on the relevant Individual Defendants – Joshi, Körner, and Lehmann – who were the only Individual Defendants in office during the last six months of the Bank's independent existence, which is when all of the arguably actionable misstatements were made. When we do so, most of this laundry list of scienter allegations is demonstrably irrelevant.

Plaintiff places great stock in information provided by three confidential witnesses. But two of the three Confidential Witnesses were lower level employees (a financial analyst; an executive assistant) who left the company months before any actionable misstatement was made (in April 2022 and August 2021, respectively). *Id.* ¶¶ 41, 45. Nothing either of them has to say connects in any way to any actionable statement or any of the remaining Individual Defendants – two of whom, Körner and Joshi, did not even join Credit Suisse until August 2022 and October 2022, respectively. *Id.* ¶¶ 34–35.

Plaintiff's allegations in relation to CW3 simply do not give rise to a strong inference of scienter. CW3 was a Managing Director at Credit Suisse through the Bank's final months. He attended leadership meetings with C-Suite leaders in February and March 2023, when certain actionable statements were made. *Id.* ¶¶ 48–49. He says that "the executives knew" about customer and asset outflows throughout the Class Period, *id.* ¶ 50, but does not go into any specifics. It would be surprising if the executives did not know about the Company's customer and asset outflows, since the Company disclosed the precise amount of the outflows of funds, and from what divisions they came, as well as the loss of clients. Fully disclosed information is not evidence of intent to defraud, and the amounts were fully disclosed. CW3's information adds nothing to what we already know.

Other issues relied on by Plaintiff are completely irrelevant to the scienter of Joshi, Körner, and Lehmann. Plaintiff's allegation that an unspecified unit of the Bank that had previously been plagued with unspecified sanctions-related issues sold "on a slice of risk related to $2 billion (CHF1.85 billion) of its' 'ultra-high-net-worth' client loans at the end of 2021" does nothing to establish that any of the three remaining Individual Defendants had scienter, because this occurred prior to their joining the Bank. *Id.* ¶ 396. Similarly irrelevant is the 2021 FINMA

Report about the misdeeds of a former Credit Suisse banker during the period 2017–18, *id.* ¶ 395 – again, prior to when Joshi, Körner, and Lehmann joined the Company. No plausible inference can be drawn about anyone's scienter during the last six months of the Class Period from anything that happened five or six years earlier.

As discussed above, there are no actionable statements predicated on the non-disclosure of matters relating to Russian exposure – that issue was fully disclosed to the market throughout the Class Period. But I will briefly note the deficiencies in Plaintiff's scienter allegations that can presumably be linked to the Credit Suisse Defendants' statements about the Company's Russian exposure. The fact of Russia's invasion of Ukraine and the subsequent sanctions was hardly a secret; neither was the fact that Swiss bank secrecy laws had been used for over a century to protect ill-gotten gains realized by nefarious individuals. So anyone who was unaware of either of these facts could hardly be defined as a "reasonable" investor. Plaintiff's reference to a March 17, 2022 public report by the Swiss Bankers Association about the amount of Russian client money held in offshore accounts by all Swiss banks – not just Credit Suisse – does not bolster his scienter allegations in any way. *Id.* ¶ 422. The fact that Suisse Secrets data was leaked in February 2022, *id.* ¶ 397, and that Congress asked Credit Suisse to report on its dealings with Russian clients in March 2022, *id.* ¶ 399 – again, before Joshi and Körner joined the Company – is hardly proof that the Bank was evading Russian sanctions during their tenure. Indeed, as noted in the Amended Complaint, the sanctions had been in place for less than a month when the House of Representatives made its request.

Although, "The Second Circuit has explicitly recognized that plaintiffs may 'rel[y] on post-class period data to confirm what a defendant should have known during the class period,'" *In re Vivendi Universal S.A.*, 381 F.Supp.2d 158, 181 (S.D.N.Y. 2003) (quoting *In re Scholastic*

*Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)); *see Lighthouse*, 902 F.Supp.2d at 340–41, "this proposition has significance only when contradictory information is properly alleged to have been available to defendant in the first place—*i.e.*, only when the post-class period statements actually do *confirm* what defendant knew or should have known." *Sinay v. CNOOC Ltd.*, No. 12 Civ. 1513, 2013 WL 1890291, at *8 (S.D.N.Y. May 6, 2013) (citation omitted) (emphasis in original). None of the post-Class Period admissions or events referenced by Plaintiff suggests that the remaining Individual Defendants knew or had access to contradictory information at the time they made the Class Period statements, or that those statements were false or misleading at the time they were made. *See Dynagas*, 504 F.Supp.3d at 323.

The departure of key executives – non-parties Brian Chin (then-CEO of Credit Suisse's Investment Bank) and Lara Warner (then-Chief Risk and Compliance Officer) at the beginning of the Class Period, Compl. ¶ 423, as well as non-party Urs Rohner and Defendant Horta-Osório in early 2022, *id.* ¶¶ 424–25, and Defendants Gottstein and Mathers in mid-2022, *id.* ¶¶ 426–27 – does not give rise to any inference of scienter on the part of the remaining Individual Defendants during the last six months of the Class Period. The remaining Individual Defendants' "high-level positions" and access to (unspecified) contrary information similarly fails to bolster Plaintiff's rather conclusory scienter allegations, *id.* ¶¶ 427–30. "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).

The "red flags" to which Plaintiff points include a list of old, stale news about misdeeds and problems at Credit Suisse dating back to 2014. Compl. ¶¶ 420–21. Not a single one of these things was unknown to the market during the last months of the bank's existence. That means

they do not tend to show any intention on the part of the Individual Defendants to keep information from the market during the relevant period, which is the essential ingredient of securities fraud. *See In re Pfizer, Inc. Sec. Litig.*, 538 F.Supp.2d 621, 637 (S.D.N.Y. 2008); *see also In re GeoPharma, Inc. Sec. Litig.*, 399 F.Supp.2d 432, 452 (S.D.N.Y. 2005). Calling attention to various scandals and government investigations of the past does not bring Plaintiff any closer to meeting his pleading burden for scienter, either.

To credit Plaintiff's "red flag" allegations about deficiencies in the Company's risk staffing, systems, technology, and structure, Compl. ¶¶ 414–19, and his reference to Lehmann's admission, made on April 29, 2022, that, "Within the organization as a whole, we have failed to often to anticipate material risks," *id.* ¶ 400, would be to "stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud." *Lululemon*, 14 F.Supp.3d at 562 (citation omitted). Such allegations do not lend themselves to establishing the cogent and compelling inference of scienter required by *Tellabs*, 551 U.S. at 324. *See Lululemon*, 14 F.Supp.3d at 584. The more plausible inference is that the business decisions the Company's Board and executives made in order to address the Company's risk-related "inadequacies" – *e.g.*, risk function restructuring, changes to reporting lines, hiring decisions, technology usage – ultimately proved to be fruitless. Compl. ¶¶ 414–19. "The fact that [the Company] was not successful does not give rise to securities violations." *Weight Watchers*, 504 F.Supp.3d at 250 (citation omitted).

In addition to all of the above, very little – if any – of this so-called "evidence" of scienter is connected either to statements that the Court has found to be actionable (which is only two of the four challenged SOX Certifications and eighteen of the many statements that are alleged to be false or misleading), or to any of the three remaining Individual Defendants. And

"In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for *each defendant*; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) (emphasis added). For example, in an effort to advance his claim that, "The Individual Defendants' Attempt to Destroy Documents and Hide Client Accounts Relating to its Russia Dealings Supports Scienter," Plaintiff states that "in early March 2022, the Financial Times reported that Credit Suisse had requested hedge funds and other investors to destroy documents regarding its richest clients' yachts and private jets, in an attempt to stop information leaking about the unit of the bank that had securitized the loans." Compl. ¶ 398. Not only did this occur long before any actionable misrepresentation, but it is not connected to any particular Individual Defendant. It thus gets Plaintiff nowhere in terms of alleging scienter.

In his opposition papers – though not in his pleading – Plaintiff argues that the magnitude of the alleged "historic" fraud supports an inference of scienter. CS Opp. Memo, at 28–29. If the magnitude of Credit Suisse's losses had been kept secret, I would have been inclined to agree with him. Credit Suisse's stock price dropped from $3.73 per ADS on October 27, 2022, *id.* ¶ 351, to $0.9450 per ADS on March 20, 2023, the last day of the proposed Class Period, *id.* ¶¶ 2, 18, 369. That is a decrease of approximately 74.66% of the securities' value. Though "magnitude ... alone does not create an inference of scienter," *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860, 2017 WL 4898228, at *17 (S.D.N.Y Oct. 25, 2017), "[t]he size of the alleged fraud can be relevant to the scienter inquiry, provided it is presented in tandem with other circumstantial evidence to suggest scienter." *In re Pareteum Sec. Litig.*, No. 19 Civ. 9767, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (internal quotations marks and citation omitted); *see Bear Stearns*, 763 F.Supp.2d at 517; *see also Katz v. Image Innovations Holdings, Inc.*, 542 F.Supp.2d

269, 273 (S.D.N.Y. 2008); *In re Scot. Re Grp. Sec. Litig.*, 524 F.Supp.2d 370, 394 n. 174 (S.D.N.Y. 2007); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 327 (S.D.N.Y. 2001). However, I note that, in this case, the full amount of Credit Suisse's ongoing losses was consistently disclosed throughout the entire purported Class Period – which means that any inference of scienter relating to the size of the fraud could hardly be characterized as "strong."

There is, however, one scienter allegation that deserves a hard look, because it is contemporaneous with the period when the actionable statements were made: the Company's correspondence with the SEC.

Plaintiff suggests that the Court should draw an inference of scienter based on the SEC Correspondence. This particular allegation can only relate in part to the individuals who were governing Credit Suisse from July 15, 2022 onwards – Lehmann, Körner, Joshi, Mathers, and Gottstein. And it cannot relate to either Gottstein or Mathers because, for reasons discussed above, both must be dismissed as defendants, since they left Credit Suisse before any arguably actionable statement was made (Gottstein resigned on July 27, 2022, and Mathers on August 22, 2022, *see* Compl. ¶¶ 37–38, 211, 227).

The details of the correspondence were outlined above. *Supra* pp. 166–68. That discussion reveals that Plaintiff has adequately alleged that the Company and its executives' omissions of the SEC's continued questioning of the Company's ICFR from certain disclosures dated October 27, 2022, throughout the end of the Class Period arguably renders such disclosures false and/or misleading.

"The mere commencement and pendency of such investigations cannot support a strong inference of scienter, because 'the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter.'" *Gentiva*, 932 F.Supp.2d at 380 (quoting *In re Manulife Fin. Corp. Sec. Litig.*,

276 F.R.D. 87, 102 (S.D.N.Y. 2011)). This is especially true here, as the Plaintiff has not pled

any facts suggesting that the actions of any Individual Defendants were the focus of any of the

government investigations, or that any of the Individual Defendants was sanctioned as a result of

them. *See Cortina v. Anavex Life Scis. Corp.*, No. 15-cv-10162, 2016 WL 7480415, at *8

(S.D.N.Y. Dec. 29, 2016).

But "while the existence of an investigation alone is not sufficient to give rise to a

requisite cogent and compelling inference of scienter, it may be considered by the Court as part

of its analysis." *Gentiva*, 932 F.Supp.2d at 380.  And as "part of the analysis" it is compelling.

Plaintiff particularly calls attention to the temporal proximity between Credit Suisse's February

13, 2023, contention, in a letter to the SEC, that the Company's ICFR were effective, *see* Ex. 20

to Matuschak Decl., and the Company's admission, just 28 days later, that it had identified

material weaknesses in its ICFR, CS Opp. Memo, at 26–27; Compl. ¶¶ 384, 386; Ex. 22 to

Matuschak Decl. Plaintiff notes that in Credit Suisse's March 12, 2023 acknowledgement of

deficiencies to the SEC, the Company admitted that "the control deficiencies [had] remained un-

remediated for several years," Compl. ¶ 386, and argues in his opposition papers that "a failure

to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter," CS

Opp. Memo, at 26; *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y.

2006) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 294 (S.D.N.Y.

1999)).

"Temporal proximity between an allegedly false statement and a later corrective or

inconsistent statement can be relevant to the question of scienter," *Bettis v. Aixtron SE*, No. 16

Civ. 00025, 2016 WL 7468194, at *16 (S.D.N.Y. Dec. 20, 2016) (citing *In re AnnTaylor Stores

Sec. Litig.*, 807 F. Supp. 990, 1006 (S.D.N.Y. 1992); *Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, 466

F.3d 1, 9 (1st Cir. 2006)). Of course, "proximity alone, without corroborative evidence, is insufficient to give rise to a strong inference of scienter," *Bettis*, 2016 WL 7468194, at *16 (citing *AnnTaylor*, 807 F. Supp. at 1006). For example, the court in *AnnTaylor*, 807 F.Supp. at 1006, found a strong inference of scienter "only after finding that the temporal proximity between statements was corroborated by a separate allegation that the defendant's negative sales reports undermined its optimistic statements about sales growth." *Bettis*, 2016 WL 7468194, at *16.

But the *AnnTaylor* caveat is of little help to Joshi, Körner, and Lehmann, because I have already concluded that the Complaint sufficiently alleges that the Bank may have been unduly optimistic in its public pronouncements during the last few months of the Class Period – particularly in its use of the phrase "clearly stabilized" when outflows were a continuing source of concern, as well as claims by Lehmann that the Bank was "definitely stable" despite evidence to the contrary. That is precisely the sort of "corroborative" evidence that rendered temporal proximity between a statement of immateriality and an acknowledgement of materiality a valuable indicator of scienter in *AnnTaylor*, 807 F.Supp. at 1006.

Furthermore, as a logical matter, the three remaining Individual Defendants who continued to be employed by Credit Suisse until the end could well have known, at the time of Company's February 2023 response to the SEC, that there were issues with the Company's ICFR. February is very close in time to the release of the Company's 2022 Annual Report and PwC AG's 2022 Annual Report Audit in March. It is entirely plausible to infer that PwC AG had begun, in the weeks or perhaps months prior to March 2022 (during its audit process), to raise with the Company issues related to the Company's internal control over financial reporting – especially in light of the continuing correspondence with the SEC. These issues would ultimately

lead the Company to identify material weaknesses in its ICFR in its 2022 Annual Report, Compl. ¶ 296, and PwC AG to state in its 2022 Annual Report Audit that though "The Bank's management and [PwC AG] previously concluded that the Bank maintained effective internal control over financial reporting as of December 31, 2021," "the Bank's management and [PwC AG] ha[d] subsequently determined that material weaknesses in internal control over financial reporting existed and accordingly concluded that internal control over financial reporting was not effective as of such date," *id.* ¶ 341. Certainly, the executives were aware that the SEC was not buying its explanation about the adequacy of those controls. That fact alone makes this case sufficiently similar to *Pareteum*, 2021 WL 3540779, at *16–17, where the court found that "[t]he proximity and size of the company's restatements," issued "just seven months after the Individual Defendants firm and rosy representations of revenue, backlog, and realization," "add[ed] further strength to the strong circumstantial evidence of scienter," since the defendants' representations were made at a time when they had been "advised by the Company's auditors, that the Company's internal controls were 'inadequate and ineffective.'"

The Credit Suisse Defendants also argue that "Nothing in the SEC correspondence suggests that any [of the Credit Suisse Defendants] ever intentionally or reckless misrepresented ICFR issues as immaterial." CS MTD, at 31. Again, I find parallels to *Espinoza*, 8 F.Supp.3d at 1157, which I discussed earlier. *Supra* pp. 175–76. In *Espinoza*, the court held that the shareholder allegations did not give rise to a strong inference of scienter, notwithstanding the fact that the issuer's executives had been engaged for eight months in discussions with the SEC over the issuer's accounting treatment of its court-ordered "Remediation Obligations. 8 F.Supp.3d at 1145–46. Although the executives argued strenuously for their position and their reasoning was backed by years of certifications by outside accountants, eventually, the

executives "capitulate[d] to the SEC's position on accounting." *Id.* at 1156. This capitulation was not sufficient to give rise to a strong inference of scienter – "Ultimately, the stronger inference is that the defendants believed they were accounting appropriately for the [Remediation] Obligations." *Id.*

There are admittedly many similarities between this case and *Espinoza*, the most notable of which is that Credit Suisse's outside auditor, PwC AG "blessed the Company's financials." Compl. ¶ 383. Additionally, Plaintiff has not alleged that the Credit Suisse Defendants withheld any information from PwC AG or Company executives. As was the case in *Espinoza*, the inquiries into Credit Suisse's accounting practices came from the SEC's Division of Corporation Finance, not the Division of Enforcement. And, "There was never a formal inquiry or enforcement action by the SEC, nor any finding of misconduct or fraud." *Espinoza*, 8 F.Supp.3d at 1151.

However, I have already noted the key difference between this case and *Espinoza,* and it is a difference that makes a difference when assessing the plausibility of a scienter allegations. In *Espinoza*, the issuer had publicly disclosed that it was in correspondence with the SEC over its accounting. *See Espinoza,* 8 F.Supp.3d at 1146; *supra* pp. 175–76. In other words, the market was aware that the company had received comments from the SEC about its accounting, and that those comments were unresolved. Credit Suisse, by contrast, chose to keep its correspondence with the SEC a secret. Of course, as noted above, Plaintiff does not argue that there is any hard and fast requirement that an issuer disclose the existence of regulatory comments and correspondence prior to the making of findings or the taking of action – especially when the agency's enforcement arm is not involved. *See, e.g.*, *Rosi*, 2021 WL 1177505, at *24; *In re 3M Co. Sec. Litig.*, No. 20-cv-2488, 2021 WL 4482987, at *14 (D. Minn. Sept. 30, 2021); *Perrin v.*

*SouthWest Water Co.*, No. 2:08-cv-7844, 2011 WL 10756419, at *11 (C.D. Cal. June 30, 2011); *Lapiner v. Camtek, Ltd.*, 2011 WL 3861840 (N.D. Cal. 2011). Moreover, "There are many circumstances where the omission to disclose even a strongly worded comment will not give rise to either a misstatement or scienter—when, for example . . . there are no facts pled that would indicate the defendant would fail to address the regulator's comments or would be unable to do so without significant cost." *Rosi*, 2021 WL 1177505, at *24.

But in *Espinoza,* at least the market was aware of the fact that the SEC was asking questions about the company's accounting, so investors could take the pendency of the inquiry into account – just as, in this case, the market could (and undoubtedly did) take the placement of Credit Suisse on the FCA's watchlist into account, because that information was publicly known. But here, there was no public awareness that the SEC was not just asking questions about Credit Suisse's internal control over financial reporting, but was not convinced by the Company's explanations on the subject, and was engaged in an extended back and forth with Credit Suisse on the issue. In this case, it is alleged that, after a nine month debate with the SEC over internal control over financial reporting, the Company not only announced that it had identified material weaknesses in its internal control over financial reporting (which, as a logical matter, relate to the accuracy of its financial reports), but also acknowledged in its 2022 Annual Report that the material weaknesses "resulted in the revisions contained in [the Company's] previously issued consolidated financial statements for the three years ended December 31, 2021 as disclosed in the 2021 Annual Report." Compl. ¶¶ 386–89; 2022 Annual Report, at 51. Consequently, the inference that important information was deliberately withheld from the market in order to shore up the Company's stock price at a sensitive time is at the very least plausible. The Company did not blow the regulators off, but neither did it allow the market to factor the SEC's comments and

261

questions into the pricing of its stock. The Company's executives were engaged in desperate efforts to save the Company, and they undoubtedly wanted to put as positive a face on their efforts as possible.  But good motives do not automatically excuse the failure to disclose the fact that regulators had raised questions about the Bank's ICFR until Credit Suisse was literally on the verge of collapse.

It is also fair to infer that the remaining Individual Defendants – Joshi, Körner, and Lehmann – who were in charge at Credit Suisse during the period when the SEC Correspondence was ongoing, were or should have been aware of this problem. Certainly at the motion to dismiss stage – even in a PSLRA case, where facts giving rise to strong inferences must be pleaded – I cannot say that such an inference is not more plausible than any opposing inference. For one thing, some of the SEC Correspondence is either addressed to or signed by Joshi. *See, e.g.*, Exs. 17–18 to Matuschak Decl. But also, common sense dictates that a company's senior executives would have become aware of questions raised by the SEC about internal control over financial reporting weeks or even months before those matters were ultimately disclosed to the public. Matters of that sort are normally the subject of internal discussion in the C Suite of any public corporation.

Finally, the core operations doctrine provides that, "When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operation of the company supports the inference that the defendant knew or should have known the statements were false when made." *Atlas*, 324 F.Supp.2d at 489. While the Second Circuit "has not expressly determined if the core operation doctrine remains applicable to proving scienter after the enactment of the PSLRA," *In re Plug Power, Inc. Sec. Litig.*, No. 21-cv-2004, 2023 WL 5577276, at *21 (S.D.N.Y. Aug. 29, 2023) (citing *Frederick v.

*Mechel OAO*, 475 F. App'x 353, 356 n.5 (2d Cir. 2012)), it has suggested that courts can consider core operations allegations as a supplementary, albeit not an independent, means to plead scienter. *Id.*; *In re Skechers USA, Inc. Sec. Litig.*, 444 F.Supp.3d 498, 528 (S.D.N.Y. 2020).

In this case, the Complaint alleges that "the alleged misrepresentations and omissions go to the core of Credit Suisse's business and viability bolster the inference of scienter attributable to the Individual Defendants." Compl. ¶ 432. In particular, Plaintiff calls attention – without further elaboration[22] – to the fact that "Credit Suisse's Form 20-F for FY 2020 revealed that of its overall net revenues of CHF 22.4 billion for 2020, CHF 13.6 billion, or nearly 61%, were derived from its Wealth Management-related businesses." *Id.* ¶ 431.

There does not appear to be any disagreement that the core operations of Credit Suisse included its Wealth Management businesses. It was, after all, a bank. The arguably actionable misstatements relate to the Company's financial stability and therefore to its core operations. While that alone does not give rise to a strong inference (or any inference) of scienter, as a "supplementary" fact, I conclude that it is enough to move the needle in Plaintiff's favor, *see Okla. Firefighters*, 367 F.Supp.3d at 38, and bolster the strength of the inference of scienter, *Glaser v. The9, Ltd.*, 772 F.Supp.2d 573, 595 (S.D.N.Y. 2011).

In short, I conclude that, at the pleading stage, Plaintiff has gotten over the scienter threshold for the three Individual Defendants (Joshi, Körner, and Lehmann) who are implicated – either by virtue of their making actionable statements or by virtue of their positions at Credit Suisse during the period when actionable statements were made – in the possible (but hardly inarguable) securities fraud here pleaded.

---

[22]    I am constrained to note that while Plaintiff references the core operations doctrine in his Complaint, Compl. ¶¶ 431–32, Plaintiff's opposition papers do not even address it beyond a brief mention in a case parenthetical.

### c. Credit Suisse

Plaintiff has also adequately pled Credit Suisse's corporate scienter. "In order to allege that a corporation acted with scienter, a plaintiff must plead with particularity facts giving rise to a strong inference that 'someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Schiro*, 396 F.Supp.3d at 300–01 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008). "'Courts in this district have not developed a bright-line rule to determine when an executive is sufficiently senior such that his or her scienter can be attributed to the entity," *Barrett*, 2017 WL 3995606, at *7, "but courts have generally found that 'management level' employees can serve as proxies for the corporation," *id.* "A strong inference of corporate scienter may also be appropriate 'where a corporate statement is so important and dramatic that it would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" *Gentiva*, 932 F.Supp.2d at 384 (citing *Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435, 2010 WL 3825722, at *13 (S.D.N.Y. 2010)).

Plaintiff contends that he has established Credit Suisse's scienter through the doctrine of respondeat superior and common law agency principles, Compl. ¶¶ 438–39, arguing that: "The Company is liable for the acts of the Individual Defendants and its employees . . . because all the wrongful acts complained of herein were carried out within the scope of their employment" and "[t]he scienter of the Individual Defendants and other employees and agents of the Company, including individual Credit Suisse bankers who profited handsomely during the Class Period, is similarly imputed to the Company." *Id.*

Since I have already found, for the reasons discussed above, that Plaintiff's pleadings are sufficient at this stage to plead scienter with respect to Defendants Joshi, Körner, and Lehmann –

who all could be considered senior managers of Credit Suisse, *id.* ¶¶ 33–35 – for the limited period of time in which the actionable statements and omissions were made, I also find that remaining Individual Defendants' scienter can be imputed to the corporation. *See Lozada v. TaskUs, Inc.*, No. 22 Civ. 1479, 2024 WL 68571, at *25 n.31 (S.D.N.Y. Jan. 5, 2024); *Turquoise*, 625 F.Supp.3d at 245–46.


### C.    Loss Causation

The Credit Suisse Defendants have argued that Plaintiff has failed to plead yet another element of his securities fraud claims: loss causation, or "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

"The loss causation pleading standard is 'not meant to impose a great burden upon a plaintiff.' " *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). To allege loss causation under Section 10(b) and Rule 10b–5, a plaintiff "must provide in the complaint 'notice of what the relevant economic loss might be and what the causal connection might be between that loss and the misrepresentation.'" *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 559 (S.D.N.Y. 2021) (quoting *Dura*, 544 U.S. at 347); *see In re Allergan PLC Sec. Litig.*, No. 18 Civ. 12089, 2019 WL 4686445, at *29 (S.D.N.Y. Sept. 20, 2019). "A plaintiff can plead loss causation only by alleging that the defendant's misstatements or omissions 'concealed something from the market that, when disclosed, negatively affected the value of the security,'" *In re Take-Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 282 (S.D.N.Y. 2008) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)), and the plaintiff must allege that the *subject* of the fraudulent

statement or omission was the actual cause of the loss suffered. *Lentell*, 396 F.3d at 173 (citing *Suez Equity Investors, L.P. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

"Because corporate wrongdoers rarely admit that they committed fraud, 'it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated.'" *Freudenberg*, 712 F.Supp.2d at 202 (quoting *Lentell*, 396 F.3d at 173). "Thus, the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'" *Id.*

"Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson*, 965 F.3d at 179. But "corrective disclosure" and "materialization of risk" are not "fundamentally different pathways for proving loss causation," *Vivendi*, 838 F.3d at 261; "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus," *id.* at 262.

### a. Corrective Disclosures

"In their 'simplest form,'" "loss causation allegations connect the diminution in stock prices to a particular corrective disclosure, 'which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted.'" *Take-Two*, 551 F.Supp.2d at 282 (quoting *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F.Supp.2d 666, 677 (S.D.N.Y. 2007)). "An alleged corrective disclosure that does not reveal the falsity of Defendants'

challenged public statements cannot establish loss causation, a pleading failure that 'is fatal under Second Circuit precedent.'" *Janbay*, 2012 WL 1080306, at *14 (quoting *Lentell*, 396 F.3d at 175).

To plead loss causation, "it is enough that the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out,'" *Vivendi*, 838 F.3d at 261 (citing *Dura*, 554 U.S. at 342). "[N]either the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 712 F.Supp.2d at 202. The corrective disclosure can even be a partial disclosure, *id.* (citing *Dura*, 544 U.S. at 342), and it "need not take the form of a single announcement, but rather, can occur through a series of disclosing events," *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 165 (S.D.N.Y. 2008).

Plaintiff claims that "the relevant truth about the sufficiency of Credit Suisse's risk management and control governance, the significance and impact of customer outflows, and the strength of its ICFR was revealed through a series of disclosures" issued between February 10, 2022 and March 19, 2023, and events. CS Opp. Memo, at 37 (internal citation omitted); Compl. ¶¶ 344–72. According to Plaintiff, as the truth about Defendants' misrepresentations and omissions was revealed to investors and the market through these corrective disclosures, "shares of Credit Suisse securities declined immediately and precipitously because the artificial inflation was removed from the market price of Credit Suisse's securities," causing substantial damage and economic loss to Plaintiff and members of the proposed Class. CS Opp. Memo, at 37; Compl. ¶ 345.

Every statement made prior to October 27, 2022 has been dismissed as not actionable for one or more reasons. Moreover, while Plaintiff asserts that certain statements, made beginning

on February 10, 2022, qualify as "corrective," he fails to identify any statement previously made that was false and/or misleading and so in need of correction. So for loss causation purposes, we will focus on statements made on and after October 27, 2022 that are identified by Plaintiff as "corrective." These include the following:

(1)    The October 27, 2022 "blitzkrieg of information," including, *inter alia*: (i) that it intended to approve "two separate share capital increases" consisting of a new share issuances for the Saudi National Bank and existing shareholders, for a combined total of CHF 4.0 billion; (ii) that it would spin-off its Investment Bank business and sell its Securitized Products Group; and (iii) that it "recorded a net loss attributable to shareholders of CHF 4,034 million" in 3Q22. Following these disclosures and related analyst reports, the price of Credit Suisse ADSs fell 20.04% to close at $3.83 per ADS on October 27, 2022, down from $4.79 per ADS on October 26, 2022, *id.* ¶¶ 350–51.

(2)    The November 23, 2022 media releases, which announced that customers had withdrawn approximately 10% of all assets under management as of the end of Q3 2022, the Company's expectation that it would incur an approximately CHF 1.5 billion loss in Q4 2022, and shareholders approved the proposed capital increases announced on October 27, 2022. These disclosures allegedly resulted in a 6.36% decline in Credit Suisse ADSs price to close at $3.83 per ADS on November 23, 2022, down from $4.09 per ADS on November 22, 2022, *id.* ¶ 352.

(3)    A November 25, 2022 media release announcing Credit Suisse's execution of the capital increases, causing the price of Credit Suisse ADS to fall another 6.27% to close at $3.59 per ADS on November 25, 2022, down from $3.83 per ADS on November 23, 2022, *id.* ¶ 353

(4)    A February 9, 2023 earnings release in which Credit Suisse disclosed a $1.5 billion loss, customer outflows of 110.5 billion Swiss francs in the last three months of 2022, and

a "dramatic" decrease in assets under management; consequently, the price of Credit Suisse

ADSs fell 15.6%, from a closing price of $3.58 on February 8, 2023 to close at $3.02 per ADS

on February 9, 2023, *id.* ¶ 354.

(5)    The 2022 Annual Report filed on March 14, 2023, which identified material

weaknesses in the Company's internal controls, after which the price of Credit Suisse ADSs fell

1.18% to close at $2.51 per ADS on March 14, 2023, down from $2.54 per ADS on March 13,

2023, *id.* ¶¶ 358–59, 361.

(6)    Press reports from March 15, 2023 indicating that Credit Suisse's largest

shareholder, the Saudi National Bank, would not buy any more of the Company's shares for

regulatory reasons; after which the price of Credit Suisse ADSs fell 13.94%, from $2.51 per

ADS on March 14 to close at $2.16 per ADS on March 15, reaching an intra-day low of $1.75

per ADS, *id.* ¶¶ 362–63.

(7)    Finally, assigned as corrective is Credit Suisse's March 19, 2023 announcement

that it had entered into a merger agreement with UBS at the behest of the Swiss government,

after which the price of Credit Suisse ADSs falling 52.99% to close at $0.9450 per ADS on

March 20, 2023 (down from $2.01 per ADS on March 17, 2023, the previous business day), and

falling overall from $10.97 per ADS at the close of trading on April 6, 2021, the first day of the

Class Period, to $0.9450 per ADS on March 20, 2023, *id.* ¶¶ 367, 369; CS Opp. Memo, at 37.

Plaintiff argues that the merger announcement  "constructively" and "fully and finally" revealed

the truth about all of the various (and allegedly undisclosed) problems at Credit Suisse: the

Company's deficient risk management/control governance policies and procedures; the

Defendants' failure to implement meaningful changes to Credit Suisse's risk

management/control governance procedures; the Company's failure to maintain an adequate or

sufficient liquidity pool; the Company's non-disclosure of its significant and unusual customer/asset outflows that had never stabilized after October 2022; the Company's significant, unmanaged risk and exposure resulting from sanctions involving Russia and Russian nationals; and material weaknesses in the Company's ICFR. Compl. ¶ 370; CS Opp. Memo, at 37.

The Credit Suisse Defendants assert that the Complaint fails to allege loss causation via corrective disclosure theory for two reasons. First, "a plaintiff cannot establish a securities fraud claim without disaggregating losses 'caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events[.]'" CS MTD, at 36 (quoting *In re Flag Telecomm. Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009)). According to the Credit Suisse Defendants, Plaintiff "fundamentally fails to plead any facts sufficient to exclude obvious non-fraud explanations for the decline in [Credit Suisse's] stock price," such as a bank panic and other macroeconomic factors. CS MTD, at 37–39.

However, "at the motion to dismiss stage, the Securities Complaint need not rule out all competing theories for the drop in [Credit Suisse's] stock price; that is an issue to be determined by the trier of fact on a fully developed record."[23] *Bear Stearns*, 763 F.Supp.2d at 507. "The requirement . . . to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 189 (2d Cir. 2015) . Indeed, "if the loss was caused by an intervening event, like a general fall in the price of . . . stocks, the chain of

---

[23] *See Fin. Gaur. Ins. v. Putnam Advisory Co.*, 783 F.3d 395, 405 (2d Cir. 2015); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 147–50 (S.D.N.Y. 2021); *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016); *In re Winstar Commc'ns.*, No. 01 Civ. 3014, 2006 WL 473885, at *16 (S.D.N.Y. Feb. 24, 2006); *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *In re Pronetlink Sec. Litig.*, 403 F.Supp.2d 330, 336 (S.D.N.Y. 2005); *In re Am. Intern. Grp., Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 534 (S.D.N.Y. Sept. 27, 2010); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F.Supp.2d 241, 274 (S.D.N.Y. 2010); *In re Fannie Mae 2008 Sec. Litig.*, 742 F.Supp.2d 382, 414 (S.D.N.Y. 2010).

causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap. Inv. Mgmt.*, 343 F.3d at 197; *see Carpenters Pension Trust Fund v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014)).

I will not be surprised if, at the end of the day, the trier of fact concludes that issues other than the undisclosed material weakness in Credit Suisse's ICFR were the cause of the Bank's failure and the tanking of its stock price. Indeed, I will not be surprised if Defendant's theory of why it failed proves to be correct. But this is the pleading stage, and at this stage I can't simply adopt Credit Suisse's explanation. So this argument fails.

The Credit Suisse Defendants also argue that none of the "corrective" disclosures identified by the Plaintiff "corrects," or even suggests the falsity of any prior statement made by Credit Suisse. CS MTD, at 37. *See* Compl. ¶¶ 344–72. Instead, the Credit Suisse Defendants characterize the Complaint as merely asking the Court to accept "that a hodgepodge of disconnected statements addressing a variety of subjects were all materially false," and that when these disconnected statements were "corrected" "by statements that did not purport to correct them," such as announcements of Credit Suisse's net losses, *id.* ¶¶ 346, 350, and disclosures or reports concerning Credit Suisse's efforts to raise additional capital and/or restructure certain divisions, *id.* ¶¶ 348–50, 362, Credit Suisse's stock price declined. CS MTD, at 37–38; *see* Compl. ¶¶ 344–72. The Credit Suisse Defendants have offered an alternative theory: "The market was reacting in early 2023 to bad news . . . ." CS MTD, at 38.

With one exception, I am constrained to agree with the Credit Suisse Defendants. Except for the statements made in connection with the release of the 2022 Annual Report, there is absolutely no pleaded nexus between the alleged corrective disclosures and any prior that has

been found to be a potentially fraudulent (false or misleading) statement. *See Take-Two*, 551 F.Supp.2d at 283.

The October 27, 2022 "blitzkrieg of information," *id.* ¶ 350, allegedly contains "numerous materially false and misleading elements," *id.* ¶ 351. "Plaintiff[] cannot have it both ways;" he "cannot allege that Defendants make certain misstatements . . . and simultaneously argue that the misstatement itself constituted a corrective disclosure." *Flag Telecomm. Holdings*, 574 F.3d at 41. Moreover, Plaintiff does not even try to specify which prior statement(s) made by Credit Suisse the disclosures in the "blitzkrieg" supposedly correct. As the Court has concluded that no statement made prior to that date supports a securities fraud claim, that is hardly surprising.

The next so-called corrective disclosures, dated November 23, 2022, address the Company's outflows and proposed capital increases, Compl. ¶ 352. But again, Plaintiff is trying to have it both ways, *Flag Telecomm. Holdings*, 574 F.3d at 41; these "corrective disclosures" are also challenged by Plaintiff as containing false and/or misleading statements/omissions, *id.* ¶¶ 257–58, 260. Moreover, there are no prior statements in the Complaint on the topic of "proposed capital increases" that have been deemed by the Court to be false and/or misleading. As a purely logical matter, one of these "corrective disclosures" – which Plaintiff says revealed that customers had withdrawn approximately 10% of all assets under management as of the end of 3Q22 and that it expected to incur a substantial loss of approximately CHF 1.5 billion in 4Q22, *id.* ¶ 352 – cannot be "corrective," because the information it supposedly corrects was either true or already known to the market. By November 23, 2022, the Company had disclosed several times, going back to October 27, 2022, *id.* ¶ 242; and November 2, 2022, *id.* ¶ 253, that it expected to incur a loss of approximately CHF 1.5 billion in 4Q22 – the "corrective disclosure"

even prefaces this statement by saying that "as previously announced on October 27, 2022," *id.* ¶ 257. The language in the "corrective disclosures" is consistent with the Company's statements at the time – that outflows were ongoing, and that the Company was incurring significant losses. "The relevant inquiry for loss causation purposes is whether the disclosure in question made some part of a previously undisclosed truth known," *Take-Two*, 551 F.Supp.2d at 285. Because the truth was already known, Plaintiff cannot rely on November 23, 2022 statements to allege loss causation.

Similarly, "investors could not have plausibly have understood" the November 25, 2022 disclosure announcing the execution of the capital increases, Compl. ¶ 353, "to reveal any part of the falsity of Defendants' [previous] alleged misrepresentations." *Take-Two*, 551 F.Supp.2d at 285. I have already found that the challenged statements about capital increases were not actionable because they were not plausibly alleged to be false, *supra* pp. 138–39, 185–86, 202–04. As a result, there are no misrepresentations that can be linked to this particular corrective disclosure.

The February 9, 2023 Earnings Release, identified by Plaintiff as a "corrective disclosure," is yet another disclosure that he also alleged contained false and/or misleading language. Compl. ¶¶ 277–78, 354. In the portion of his Complaint where he discusses the corrective disclosures, Plaintiff states that the Company, in this earnings release, "disclosed a $1.5 billion loss, customer outflows of 110.5 billion Swiss francs in the final three months of 2022, and a dramatic decrease in assets under management." *Id.* ¶ 354. However, when attempting to explain why the statements in the earnings release were false and/or misleading, Plaintiff alleges that the Company misrepresented and failed to disclose that "the Company was experiencing significant and unusual customer and/or asset outflows that had not 'stabilized.'"

*Id.* ¶ 278. Again, Plaintiff cannot have it both ways – the same disclosure cannot at one and the same time be both false/misleading and corrective. *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 01580, 2019 WL 5287980, at *33 (S.D.N.Y. Oct. 18, 2019). Moreover, I have already concluded that none of the Company's statements dealing with the amount of its losses, the amount of customer outflows, or the fact that assets under management were decreasing was false when made. The facts were out there; the Company's failure to characterize those facts using the loaded adjectives that Plaintiff prefers does not add anything to what the market already knew. There was simply nothing that any disclosure could correct.

The one set of statements that I agree qualifies as "corrective" is the statements made in connection with the release of the 2022 Annual Report. Again, Plaintiff alleges that these statements are both corrective and false and/or misleading. Compl. ¶¶ 296–98. Certainly the portions of this announcement that revealed the problems with the Company's ICFR, and the corresponding issues in the 2021 Annual Report and prior quarter financial certifications, are "corrective" in nature. Compl. ¶ 358. Plaintiff calls attention to contemporaneous press reports that attribute Credit Suisse's downfall, at least in part, to the announcement of said material weaknesses. *Id.* ¶ 359. And Plaintiff alleges that there was a decline in the stock price after the Company filed its 2022 Annual Report on March 14, 2023. Compl. ¶¶ 358–59. That gets him across the loss causation threshold –though not until very late in the proposed Class Period.[24]

Plaintiff's allegation that the March 15 press reports about the Saudi National Bank's decision to cease investing in Credit Suisse qualifies as "corrective" borders on the absurd. *Id.*

---

[24] Plaintiff also asserts that the 2022 Annual Report revelations correct the 2022 Annual Report SOX Certification, which were released simultaneously with the 2022 Annual Report, and which attested to the "purported accuracy and completeness of the Company's financial and operational reports as well as statements concerning Credit Suisse's internal controls and procedures." Compl. ¶ 318; CS Opp. Memo, at 38. It is hard to credit as "corrective" a disclosure made at the same time with one it was allegedly correcting. However, it is theoretically possible to release two inconsistent statements simultaneously.

¶¶ 362–63. The Company's stock price did indeed decline again in response to this bad news, but Plaintiff does not connect these disclosures to any earlier misrepresentation or any wrongfully concealed information – nor can he, as these corrective disclosures reveal a contemporaneous decision by the Saudi National Bank to pull the plug on investing in the Company. *See In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 2319118, at *23 (S.D.N.Y. Sept. 21, 2005). Bad news tends to result in stock price decline, but not all bad news is "corrective." The Complaint does not allege that Credit Suisse ever promised its investors that the Saudi National Bank, or any other entity, would continue to prop it up.

Finally, Plaintiff asserts that Company's merger announcement was yet another corrective disclosure.  Compl. ¶¶ 367–70. But the merger announcement corrects nothing. Here is what it said:

> Credit Suisse and UBS have entered into a merger agreement on Sunday following the intervention of the Swiss Federal Department of Finance, the Swiss National Bank and the Swiss Financial Market Supervisory Authority FINMA ("FINMA"). UBS will be the surviving entity upon closing of the merger transaction. Under the terms of the merger agreement all shareholders of Credit Suisse will receive 1 share in UBS for 22.48 shares in Credit Suisse. Until consummation of the merger, Credit Suisse will continue to conduct its business in the ordinary course and implement its restructuring measures in collaboration with UBS.

> *        *        *

> Axel P. Lehmann said: "Given recent extraordinary and unprecedented circumstances, the announced merger represents the best available outcome. This has been an extremely challenging time for Credit Suisse and while the team has worked tirelessly to address many significant legacy issues and execute on its new strategy, we are forced to reach a solution today that provides a durable outcome."

*Id.* ¶ 367. The things that Plaintiff insists were "fully and finally" revealed by this announcement – *e.g.*, that the Company's risk management and/or control governance policies and/or procedures were severely lacking and Defendants failed to implement meaning changes to them

throughout the Class Period, *id.* ¶ 370 – are nowhere mentioned in this "correction." A disclosure cannot correct something that it does not even talk about.

Plaintiff tries to argue that Lehmann's statements which accompanied the merger announcement ("recent extraordinary and unprecedented circumstances" and "many significant legacy issues" "forced [Credit Suisse] to reach a solution today that provides a durable outcome") "explicitly link[] the merger announcement and attendant 52.99% drop in Credit Suisse's ADS price to the same 'circumstances' and 'issues' about which Defendants had issued materially false and misleading statements for nearly two years." CS Opp. Memo, at 37. But there is nothing "explicit" about this. To show loss causation, a plaintiff must allege "more than just a decline in price as a result of a disclosure by the company that the company is doing poorly." *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 240 (E.D.N.Y. 2011). To be a corrective disclosure, the disclosure must "reveal[ ] the truth with respect to *the specific misrepresentations alleged*." *Flag Telecomm. Holdings*, 574 F.3d at 41 (citation omitted) (emphasis added). The merger announcement does not meet this requirement because it does not correct any prior misrepresentation – it simply announces that the Bank is going to merge. Moreover, nearly all of what Plaintiff insists was "corrected" by the merger announcement has been found not to qualify as securities fraud in the first place. *Jiang v. Chirico*, No. 23 Civ. 1258, 2024 WL 967084, at *8 (S.D.N.Y. Mar. 5, 2024).

So aside from the statements made in connection with the release of the 2022 Annual Report, the purportedly "corrective disclosures" were no such thing. However, the disclosures that accompanied the release of the 2022 Annual Report do qualify as "corrective."

### b. Materialization of Risk

Loss causation may also be "pleaded by allegations that a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss." *AOL*, 503 F.Supp.2d at 677 (citing *Lentell*, 396 F.3d at 173, 176). The loss must have been foreseeable, *i.e.*, "within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor," *Flag Telecomm. Holdings*, 574 F.3d at 40 (quoting *Lentell*, 396 F.3d at 173); *Turquoise*, 625 F.Supp.3d at 256; *Lentell*, 396 F.3d at 173, and caused by the materialization of the concealed risk, *Prime Mover Cap. Partners*, 898 F.Supp.2d at 685. When the Second Circuit "has employed a materialization of the risk analysis, it has considered a particular risk that was allegedly concealed by the defendant's actions and which then materialized to cause a market loss." *AOL*, 503 F.Supp.2d at 678.

The Credit Suisse Defendants contend that the Plaintiff has not met his burden, as (1) the Complaint does not identify what risk(s) the allegedly materially false and/or misleading statements and omissions supposedly concealed; and (2) the alleged materialization of disclosed – rather than concealed – risks is not sufficient to plead loss causation. CS MTD, at 38–39; CS Reply, at 19.

The Credit Suisse Defendants are partly correct. To the extent that Plaintiff is arguing that the materialized risks are that Credit Suisse's risk management and control governance was insufficient; that customer outflows were significant and impactful, CS Opp. Memo, at 37; or that the Bank had significant, unmanaged, self-inflicted risk and exposure as a result of sanctions imposed on Russia and its nationals relating to Russia's invasion of Ukraine – all three of those risks were expressly disclosed by Credit Suisse, either prior to the beginning of the Class Period or during the Class Period. They were assuredly disclosed prior to the making of any of the statements the Court has found to be actionable. Credit Suisse's 2020 Annual Report discloses

the following: that Credit Suisse's "risk management procedures and policies may not always be effective," Ex. 1 to Matuschak Decl., at 53; and that "[a]lthough deposits have been, over time, a stable source of funding, this may not continue." Throughout the Class Period, the Company repeatedly disclosed it was losing had considerable risk resulting from the situation in Ukraine and that it was experiencing outflows (*i.e.*, losing "deposits"). These risks were anything but "concealed." "Loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant." *Lentell*, 396 F.3d at 174. None of the information thus far identified is adequately alleged to have been either concealed or misstated. So these allegations do not help Plaintiff in alleging loss causation adequately.

However, what ultimately saves materialization of risk allegations in Plaintiff's Complaint against the remaining Credit Suisse Defendants are his contentions about the weaknesses in the Company's ICFR and the impact that may have had on its financial statements. S*ee* CS Opp. Memo, at 37.

A plaintiff who seeks to prove loss causation must establish two causal connections: a connection between the alleged false or misleading statements and one or more events disclosing the truth concealed by that fraud, and a connection between these events and actual share price declines. *Vivendi*, 634 F.Supp.2d at 365 (citing *Lentell*, 396 F.3d at 173); *see Salvani v. ADVFN PLC*, 50 F.Supp.3d 459, 475 (S.D.N.Y. 2014). In the Complaint, Plaintiff alleges that: certain statements (that I have deemed actionable, *see, e.g.*, *supra* pp. 217–20) made throughout the last six months of the putative Class Period were false and/or misleading because Defendants knew or recklessly disregarded that there existed material weaknesses in the Company's internal control over financial reporting but failed to disclose either (1) that fact, *see, e.g.*, Compl. ¶¶ 263–66, or (2) the fact that the SEC raised serious and repeated questions about the Company's

ICFR in lengthy exchange of correspondence beginning on July 15, 2022. Eventually, the Company admitted to the SEC on March 12, 2023, that it had material weaknesses in its internal control over financial reporting and stated that those weaknesses had "remained un-remediated for several years." *Id.* ¶¶ 384, 386. In Credit Suisse's 2022 Annual Report, which was filed on March 14, 2023, the Company publicly acknowledged that it had identified material weaknesses in the Company's internal control over financial reporting, ¶ 358; that same day, the media, quoting extensively from the 2022 Annual Report, reported on this "dramatic announcement," *id.* ¶ 359. Plaintiff pleads that, in response, the price of Credit Suisse ADSs fell to close at $2.51 per ADS – a new all-time low – on March 14, 2023. *Id.* ¶¶ 359, 361.

In other words, Plaintiff has "identified a concealed risk that proximately caused a decline in the value of stock when revealed." *Salvani*, 50 F.Supp.3d at 476. Had the Company revealed that it was, at the very least, under persistent questioning by the SEC regarding its ICFR, "investors could have arrived at a valuation of the securities that more accurately reflected the risk of the Company suffering from financial problems not reflected on its balance sheets. Instead, trusting that the Company possessed adequate internal controls, it is plausible that investors believed such financial problems would be discovered without undue delay." *Scot. Re Grp.*, 524 F.Supp.2d at 396. Credit Suisse investors did not learn this until March 14, 2023, though the Company had to have known it earlier (how much earlier is open to question).

Furthermore, I have identified statements made as early as October 27, 2022 that I deem actionable because facts are pleaded tending to show that the omission of any information about the existence of the SEC's inquiry became material at or about that point. This means that loss causation resulting from the failure to acknowledge questions about the adequacy of the

Company's ICFR go back to the October 27, 2022, ADS price, which was $3.83 per ADS. Compl. ¶ 351.

The Credit Suisse Defendants argue that risks relating to the Company's ICFR were, like risks relating to risk management procedures, disclosed well before the proposed Class Period began, *e.g.*, in the Company's 2020 Annual Report. CS MTD, at 38. In that report, the Company disclosed: that "there are inherent limitations to the effectiveness of any system of controls and procedures;" that "even effective controls and procedures can only provide reasonable assurance of achieving their control objective;" that "[b]ecause of its inherent limitations, [ICFR] may not prevent or detect misstatements;" and "projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies or procedures may deteriorate." Ex. 1 to Matuschak Decl., at 426.

But I have already explained why this argument fails (*see supra* p. 243): Saying that there are inherent limitations to the effectiveness of any system of controls and procedures is not the same thing as saying that the system actually in place at Credit Suisse was inadequate to the task – which is what was revealed at the end. Despite the Credit Suisse Defendants' arguments to the contrary, this is not a case like *Lentell*, 396 F.3d at 177, where "substantial indicia of the risk that materialized [was] unambiguously apparent on the face of the disclosures alleged to conceal the very same risk . . . ." Here, there are no disclosures that "unambiguously" provide "substantial indicia" of the risk of issues related to the strength of the Company's ICFR. CS MTD, at 38, CS Opp. Memo, at 37–38.

Accordingly, Plaintiff has pled loss causation under both theories – although for an extremely limited period of time.

### D.    Section 20(a) Claim

Now, I turn to Plaintiff's claim against the remaining Individual Defendants – Joshi, Körner, and Lehmann – which arises under Section 20(a) of the Exchange Act. Section 20(a) holds liable any persons who "control" those found primarily liable under the Exchange Act. 15 U.S.C. § 78t(a); *accord ATSI*, 493 F.3d at 108.

Here, the Complaint plausibly alleges an underlying violation of the securities laws. Plaintiff has also sufficiently pled that due to their positions of control and authority as Credit Suisse senior executives and/or directors, Joshi, Körner, and Lehmann "were able to and did control the content of the Company's SEC filings, press releases, and other public statements issued by or on behalf of Credit Suisse during the Class Period." Compl. ¶¶ 463, 483.

Accordingly, Plaintiff's Section 20(a) claim cannot be dismissed against these three Individual Defendants.

### E.    The Claim Against PwC AG

The Complaint alleges that PwC AG committed securities fraud because "the blessings that PwC gave to Credit Suisse's financials" during the Class Period – *i.e.*, statements by PwC AG in its First, Second, and Third Quarter Interim Audit Reports of Credit Suisse from 2021 and 2022, as well as its 2021 and 2022 Annual Report Audits of Credit Suisse – "were false at the times they were made." Compl. ¶¶ 325–43, 440. Plaintiff has focused on PwC AG's alleged failure to comply with its obligations purportedly established in AS No. 5, namely, its obligation to "obtain appropriate evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment." *Id.* ¶¶ 322–23.

According to Plaintiff, "The fact that the existence of accounting issues in Credit Suisse's 2020 financial statements was not revealed until March 2022, and the existence of a material weakness in internal controls over financial reporting related to these issues was not revealed until March 2023, indicates that PwC neither obtained reasonable assurance about whether material weaknesses existed during its 2020 audit nor in its 2021 interim Quarterly Reports." *Id.* ¶ 324.

Plaintiff challenges PwC various accounting certifications throughout the proposed Class Period as false or misleading – specifically each time the accountants certified the following:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of [the end of the quarter]…***Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***
>
> ***We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB)***, the consolidated balance sheet of the Group as of December 31, 2020…In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2020, ***is fairly stated, in all material respects***, in relation to the consolidated balance sheet from which it has been derived.
>
> *     *     *
>
> ***We conducted our review in accordance with the standards of the PCAOB.***

*Id.* ¶¶ 325, 327, 329. In an effort to establish the falsity of portions of the PwC AG's First, Second, and Third Quarter Interim Audit Reports from 2021, Plaintiff points to the fact that, as Credit Suisse later admitted, when PwC AG issued its audit reports: (1) "accounting issues existed that required a revision of Credit Suisse's consolidated financial statements for the year ending December 31, 2020, and as such, it was not 'fairly stated, in all material respects;'" (2) "Credit Suisse had a material weakness in internal controls over financial reporting, and as such, its interim financial statements were not 'in conformity' with GAAP." *Id.* ¶¶ 326, 328, 330.

Plaintiff also challenges as false and misleading language from PwC AG's 2021 Annual

Report Audit:

> We have audited the accompanying consolidated balance sheets of Credit Suisse Group
> AG and its subsidiaries (the "Group") as of December 31, 2021 and 2020 … We also
> have audited the Group's internal control over financial reporting as of December 31,
> 2021, based on criteria established in Internal Control – Integrated Framework (2013)
> issued by the Committee of Sponsoring Organizations of the Treadway Commission
> (COSO).
>
> In our opinion, the consolidated financial statements referred to **above present fairly, in
> all material respects**, the financial position the Group as of December 31, 2021 and
> 2020, and the results of its operations and its cash flows for the years then ended in
> conformity with accounting principles generally accepted in the United States of
> America. ***Also in our opinion, the Group maintained, in all material respects, effective
> internal control over financial reporting as of December 31, 2021, based on criteria
> established in Internal Control – Integrated Framework (2013) issued by the COSO.***
>
> *     *     *
>
> The Group's management is responsible for these consolidated financial statements, for
> maintaining effective internal control over financial reporting, and for its assessment of
> the effectiveness of internal control over financial reporting, included in the
> accompanying Management's report on internal control over financial reporting. **Our
> responsibility is to express opinions on the Group's consolidated financial
> statements and on the Group's internal control over financial reporting based on
> our audits.**
>
> ***We conducted our audits in accordance with the standards of the PCAOB.*** Those
> standards require that we plan and perform the audits to obtain reasonable assurance
> about whether the consolidated financial statements are free of material misstatement,
> whether due to error or fraud, and whether effective internal control over financial
> reporting was maintained in all material respects.
>
> Our audits of the consolidated financial statements included performing procedures to
> assess the risks of material misstatement of the consolidated financial statements, whether
> due to error or fraud, and performing procedures that respond to those risks. Such
> procedures included examining, on a test basis, evidence regarding the amounts and
> disclosures in the consolidated financial statements. Our audits also included evaluating
> the accounting principles used and significant estimates made by management, as well as
> evaluating the overall presentation of the consolidated financial statements. Our audit of
> internal control over financial reporting included obtaining an understanding of internal
> control over financial reporting, assessing the risk that a material weakness exists, and
> testing and evaluating the design and operating effectiveness of internal control based on
> the assessed risk. Our audits also included performing such other procedures as we

considered necessary in the circumstances. ***We believe that our audits provide a reasonable basis for our opinions.***

*Id.* ¶ 331. In an attempt to establish the falsity or misleading nature of portions of PwC AG's 2021 Annual Report Audit, Plaintiff indicates that Credit Suisse's revelation in its 2022 Annual Report that it had "identified certain material weaknesses in internal control over financial reporting as of December 31, 2021," is evidence of PwC AG's failure to properly adhere to pertinent PCAOB Auditing Standards when conducting its 2021 audit. *Id.* ¶ 332. Plaintiff alleges that had PwC AG done so, it "would not have concluded that Credit Suisse "maintained, in all material respects, effective internal control over financial reporting;'" accordingly, certain statements within PwC AG's 2021 Annual Report Audit and the statement that PwC AG "conducted its audit 'in accordance' with PCAOB standards were materially false or misleading." *Id.* Plaintiff further asserts that PwC AG's failure to "give particular attention to" and formally recognize the identified cash flow issues as a "Critical Audit Matter" in connection with the 2021 Annual Report Audit further indicates that PwC AG's audit was not "in accordance" with PCAOB standards. *Id.* ¶ 333.

Finally, Plaintiff takes issue with representations made by PwC AG in its First, Second, and Third Quarter Interim Audit Reports from 2022:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of [the end of the quarter]. . . ***Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.***

> We have previously audited*, **in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB)***, the consolidated balance sheet of the Group as of December 31, 2020 . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2021, ***is fairly stated, in all material respects***, in relation to the consolidated balance sheet from which it has been derived.

*     *     *

***We conducted our review in accordance with the standards of the PCAOB.***

*Id.* ¶¶ 334, 336, 338. Plaintiff claims that the above statements were materially false or misleading, or omitted necessary to make them not misleading, because: (1) "as Credit Suisse later admitted, at the time each of the statements were made, material weaknesses in internal control over financial reporting existed, and as such, the December 31, 2021 consolidated balance sheet was not 'fairly stated, in all material respects;'" (2) "[d]ue to a failure to disclose this material weakness, Credit Suisse's interim financial statements were not 'in conformity' with GAAP;" (3) "PwC's failure to detect and disclose this material weakness strongly indicated that it had not conducted its audit or reviews 'in accordance' with PCAOB Standards." *Id.* ¶¶ 335, 337, 339.

Predictably Plaintiff challenges as untrue and misleading portions of PwC AG's 2022 Annual Report Audit attached to Credit Suisse's 2022 Annual Report on Form 20-F filed with the SEC – even though those documents revealed the existence of material weaknesses in Credit Suisse's ICFR. *Id.* ¶¶ 340–41. The 2022 Annual Report stated, in relevant part, that:

> The Bank identified certain material weaknesses in internal control over financial reporting as of December 31, 2021 and, consequently, December 31, 2022, which are described below. ***As a result of these material weaknesses, the Bank CEO and CFO have concluded that, as of December 31, 2022, the Bank's disclosure controls and procedures were not effective.***
>
> Notwithstanding the existence of these material weaknesses in internal control over financial reporting, the Bank confirms that its consolidated financial statements in this Annual Report **fairly present, in all material respects**, the Bank's consolidated financial condition as of December 31, 2022 and 2021, and its consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP, **as reflected in PricewaterhouseCoopers AG's (PwC) report on those financial statements.**

*Id.* ¶ 340. Plaintiff calls attention to the following portion of PwC AG's 2022 Annual Report

Audit:

> We have audited the accompanying consolidated balance sheets of Credit Suisse AG and its subsidiaries (the "Bank") as of December 31, 2022 and 2021, and the related consolidated statements of operations, comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2022, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Bank's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

> In our opinion, the consolidated financial statements referred to above **present fairly, in all material respects**, the financial position of the Bank as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, ***the Bank did <u>not</u> maintain, in all material respects, effective internal control over financial reporting as of December 31, 2022***, based on criteria established in Internal Control – Integrated Framework (2013) issued by the COSO because material weaknesses in internal control over financial reporting existed as of that date related to (i) the effectiveness of the risk assessment process to identify and analyze the risk of material misstatements in the Bank's financial statements, (ii) the effectiveness of monitoring activities relating to providing sufficient management oversight over the internal control evaluation process to support the Bank's internal control objectives, involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives and assessing and communicating tile severity of deficiencies in a timely manner to those parties responsible for taking corrective action and (iii) the effectiveness of controls over the completeness and the classification and presentation of non-cash items in the consolidated statements of cash flows.

> The Bank's management and we ***previously concluded that the Bank maintained effective internal control over financial reporting as of December 31, 2021***. However, the Bank's management and we have subsequently determined that **material weaknesses in internal control over financial reporting existed** and accordingly concluded that **internal control over financial reporting was not effective as of such date.**

*Id.* ¶ 341. As alleged by Plaintiff, the 2022 Annual Report Audit's issues seem to stem from PwC

AG's representations that "We conducted our audits in accordance with the standards of the

PCAOB" and "We believe that our audits provide a reasonable basis for our opinions." *Id.* ¶ 342.

Since PwC AG did not list either the cash flow issues identified in the 2021 Annual Report or the

material weaknesses in internal control identified in the 2022 Annual Report as "Critical Audit Matters," Plaintiff claims that PwC's failure to give particular attention to the cash flow issues further indicated that PwC's audit was not "in accordance" with PCAOB standards. *Id.* ¶ 343.

PwC AG does not challenge Plaintiff's allegation that these certifications were untrue. Instead, it moves to dismiss the Complaint only on the basis that Plaintiff has failed to allege scienter. For the reasons discussed below, PwC AG is correct.

### a. Motive and Opportunity

Plaintiff contends that the Complaint adequately pleads that PwC AG had both a motive and opportunity to commit fraud. *Dobina v. Weatherford Int'l Ltd.*, 909 F.Supp.2d 228, 241 (S.D.N.Y. 2012). "The contention is unavailing." *Id.*

Plaintiff asserts that "PwC [AG] had significant financial motive to bless Credit Suisse's financial reports and representations about its financial controls: PwC [AG] was compensated in excess of CHF $209.6 million, or approximately USD $[232.13] million, for its work on Credit Suisse's 2020, 2021, and 2022 audits." Compl. ¶¶ 385, 448.  Plaintiff, however, neither alleges that these fees "were not commensurate with work performed" nor asserts that PwC AG was otherwise paid inappropriately. *Dobina*, 909 F.Supp.2d at 253; *see In re Tower Grp. Int'l, Ltd. Sec. Litig.*, No. 13 Civ. 5852, 2015 WL 5813393, at *6 (S.D.N.Y. Sept. 18, 2015). As courts within this District have repeatedly held, the "mere receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient motive for purposes of pleading scienter."[25] *Zucker v. Sasaki*, 963 F.Supp. 301, 308

---

[25]  *See Chen v. China Green Agric. Inc.*, No. 1:20-cv-09232, 2021 WL 4481045, at *6 (S.D.N.Y. Sept. 30, 2021); *In re: Petrobras Sec. Litig.*, No. 14-cv-9662, 2016 WL 1533553, at *2 (S.D.N.Y. Feb. 19, 2016); *Athale v. SinoTech Energy Ltd.*, No. 11 Civ. 0531, 2014 WL 687218, at *5 (S.D.N.Y. Feb. 21, 2014); *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 407 (S.D.N.Y. 2010); *In re Doral Fin. Corp. Sec. Litig.*, 563 F.Supp.2d 461, 465 n.1

(S.D.N.Y. 1997). "To hold otherwise would effectively abolish the requirement of pleading facts which support a strong inference of scienter against professional defendants." *Id.* (citing *Duncan v. Pencer*, No. 94 Civ. 0321, 1996 WL 19043, at *9–10 (S.D.N.Y. Jan. 18, 1996)).

Auditing firms like PwC AG are compensated by public companies like Credit Suisse "for providing opinions that are both expert and objective, and their financial success is at least partly a function of their reputation for honesty and accuracy. While they will ordinarily seek to stay in the good graces of a powerful client with strong connections, they have an at least equally strong motive to maintain their professional reputation," *Petrobras*, 2016 WL 1533553, at *2, as "it is economically irrational to risk [their] professional reputation, license, and the possibility of legal liability simply in return for a professional services fee." *Stephenson v. Citco Grp. Ltd.*, 700 F.Supp.2d 599, 621 (S.D.N.Y. 2010) (citing *Zucker*, 963 F.Supp. at 308; *Shields*, 25 F.3d at 1129–1130). "Although it may be plausible that an auditor would go to great lengths to keep a client's business—even, in some circumstances, by deliberately misstating its finances—such an assumption, by itself, is insufficient to show motive." *In re China Organic Sec. Litig.*, No. 11 Civ. 8623, 2013 WL 5434637, at *9 (S.D.N.Y. Sept. 30, 2013) (citations omitted).

Plaintiff has failed to PwC AG's motive and opportunity to defraud on this basis. Plaintiff's allegations about PwC AG's supposed motive and opportunity to defraud relate to the following topics: (1) PwC AG's purported "fundamental conflict of interest" stemming from its participation in the public auditing system that Plaintiff claims "'incentivizes auditors to please their clients instead of protecting the public,'" Compl. ¶ 445 (quoting David S. Hilzenrath, "Accounting's Big Lie and How to Fix it," Project on Government Oversight, Oct. 6, 2022); (2)

---

(S.D.N.Y. 2008); *Marsh & Mclennan Cos.*, 501 F.Supp.2d at 489; *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 294 (S.D.N.Y. 1999); *Zucker v. Sasaki*, 963 F.Supp. 301, 308 (S.D.N.Y. 1997); *Duncan*, 1996 WL 19043, *10; *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y.1990); *Friedman*, 730 F. Supp. at 532.

a 2022 SEC probe (the "2022 SEC Probe") on conflict-of-interest concerns among accounting

firms, including PwC, *id.* ¶ 447; and (3) a Silicon Valley-based PwC SEC whistleblower's

general comments in 2016 about problems with PwC's auditing culture, *id.* ¶ 446.

These allegations are insufficient for several reasons. First, the "conflict-of-interest"

claim is centered on Plaintiff's assertion that PwC AG cannot be independent since it was chosen

and paid by the company it audited. *Id.* ¶ 445. But Plaintiff does not point to specific facts that

would tend to support this claim, other than the fact of payment for auditing services rendered,

which "does not constitute a sufficient motive for purposes of pleading scienter." *Zucker*, 963

F.Supp. at 308.

The Complaint's reference to an unrelated 2022 SEC probe on conflict-of-interest

concerns among accounting firms does not add to the plausibility of the scienter allegations.

*Rotunno*, 2022 WL 14997930, at *3. The 2022 SEC Probe focused on whether the consulting

and other non-audit services sold by accounting firms undermined their ability to conduct

independent reviews of public companies' financials. Ex. A to Kondstandt Decl., at 1. In its

review of this industry-wide issue, the SEC appears to have targeted *PwC LLP,* and not

Defendant PwC AG. *See id.* Though both firms are part of the international PwC network of

firms, they are entirely different entities, as courts in this district have repeatedly recognized.[26]

Plaintiff pleads not a single fact that would allow a trier of fact to import allegations against the

US-based PwC subsidiary to the Swiss subsidiary.

Plaintiff alleges that scienter can be inferred from information revealed in 2018 by a

senior manager – turned SEC whistleblower – who worked at PwC in Silicon Valley. Compl. ¶

---

[26] *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F.Supp.3d 111, 147 (S.D.N.Y. 2021); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613, 2004 WL 112948, *3 (S.D.N.Y. Jan. 22, 2004); *In re AM Int'l Inc. Sec. Litig.*, 606 F.Supp. 600, 607 (S.D.N.Y. 1985*)*; *Reingold, v. Deloitte, Haskins & Sells*, 599 F.Supp. 1241, 1249, 1254 n.10 (S.D.N.Y. 1984).

446. But this individual does not appear to have been employed by or affiliated with PwC AG, the Swiss entity that audited the Company. Instead, he seems to have worked at a different firm within the international PwC network. The information he provided exclusively related to that PwC's audits of Silicon Valley companies, of which Credit Suisse is manifestly not one.[27] *Id.* Moreover, his "information" is woefully out of date for our purposes, as it relates to events that took place in 2016, several years before PwC AG took over as Credit Suisse's auditor in 2020.

In short, no facts are alleged tending to show that PwC AG doctored its audits in order to curry favor with Credit Suisse so it could retain the Bank's business. Moreover, Swiss companies are required to change auditors on a rotating basis[28] – that is why PwC replaced KPMG AG as Credit Suisse's auditor in 2020, as Plaintiff alleges in the Complaint. *Id.* ¶ 19. So the accounting firm's ostensible desire to retain business is even less plausible than it might be if we were talking about, say, an American accounting firm, which can audit a client company indefinitely.

In Plaintiff's opposition brief, he does little to contest the inadequacy of his pleadings on the subject of PwC AG's motive and opportunity to defraud. Though Plaintiff falls short of completely abandoning his motive-based scienter theory, he only mentions it once, and then to say that, "Plaintiff pleads facts supporting PwC's motive, which include very large fees (over $200m in just a few years) and the motivation to avoid a restatement that impacted global financial markets." PwC Opp. Memo, at 7. As discussed, the former argument is insufficient and the latter argument is raised for the first time in the opposition papers, not in the pleading itself. Plaintiff points to not a single fact alleged in the Complaint that would support a conclusion that

---

[27]    David S. Hilzenrath, *PwC Whistleblower Alleges Fraud in Audits of Silicon Valley Companies*, PROJECT ON GOVERNMENT OVERSIGHT (May 10, 2018), https://www.pogo.org/investigations/pwc-whistleblower-alleges-fraud-in-audits-of-silicon-valley-companies [https://perma.cc/2BTZ-EHJW].

[28]    *See, e.g.*, Dominik Weber, *Prof. Dr Peter Leibfried about current and future challenges in auditing*, KPMG, https://kpmg.com/ch/en/insights/reporting/interview-peter-leibfried.html#:~:text=Audit%20rotation%20is%20an%20important,the%20world's%20largest%20capital%20market [https://perma.cc/3W82-LPWW] (last visited Sept. 11, 2024).

anyone at PwC AG took any action in an effort to avoid restating Credit Suisse's financials or for the purpose of avoiding any impact on global markets.

In sum, Plaintiff offers no specific facts warranting a departure from the entirely plausible inference that PwC AG was acting in its own economic self-interest, *Tower*, 2015 WL 5813393, at *6; *In re Philip Servs. Corp. Sec. Litig.*, 383 F.Supp.2d 463, 470 (S.D.N.Y. 2004), and does not plausibly allege any other motive on the part of PwC AG to commit or to participate in the alleged fraud. Therefore, Plaintiff fails to sufficiently plead scienter through allegations that PwC AG had the motive and opportunity to commit fraud.

### b. Conscious Misbehavior and Recklessness

The recklessness standard "is particularly 'demanding' in the auditor context, in which the alleged misconduct must approximate actual intent to aid in the fraud being perpetrated by the audited company, or indicate willful blind[ness] to the truth." *Iowa Pub. Emps.' Ret. Sys.*, 919 F.Supp.2d at 331 (cleaned up). Establishing this form of scienter at the pleading stage requires far more than a misapplication of accounting principles, *In re DNTW Chartered Accts. Sec. Litig.*, 172 F.Supp.3d 675, 684 (S.D.N.Y. 2016); *see China Organic*, 2013 WL 5434637, at *10; rather, a plaintiff must allege that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Scot. Re Grp.*, 524 F.Supp.2d at 385 (citations and internal quotation marks omitted).

Plaintiff tries in several different ways to plead PwC AG's scienter under a conscious misbehavior or recklessness theory. None is persuasive.

First, Plaintiff argues that PwC AG "blessed the Company's financials, stating they were 'fairly stated, in all material respects'" during every quarter throughout the Class Period, even though PwC AG "knew or recklessly disregarded that those statements were materially false or misleading when made." Compl. ¶¶ 383, 440. That is purely conclusory; no facts are pleaded tending to show that the members of the audit team knew or recklessly disregarded anything.

Additionally, Plaintiff asserts that PwC AG ignored "glaring" red flags that arose during the period prior to PwC's engagement, when KPMG was Credit Suisse's auditor. *Id.* ¶ 442. He asserts that "when PwC [AG] assumed the mantle of Credit Suisse's auditor in 2018, it inherited several known issues, signaling the need to take special care. This need only became more acute in the wake of the Archegos and Greensill Funds failures, and further when the SEC began its inquiry into the company's financial controls in July 2022." *Id.*

But no facts are pleaded tending to show that PwC AG did not take special care in light of inherited issues, or when Archegos and Greensill occurred. On the contrary, Plaintiff suggests that PwC AG was diligent, as he alleges that it "identified significant accounting issues with respect to Credit Suisse's balance sheet and cash flow positions for audit years 2020 and 2019 during the Class Period." *Id.* ¶ 8.

Plaintiff also claims that PwC AG failed to investigate and identify the material weaknesses in Credit Suisse's internal control over financial reporting, which indicates that PwC AG's audits of Credit Suisse deviated from PCAOB standards. *Id.* ¶¶ 322, 441. Plaintiff erroneously directs the Court's attention to AS No. 5 (though he cites to the updated regulation, AS 2201.05,[29] in his opposition papers, PwC Opp. Memo, at 19), which he claims imposes several duties onto PwC AG, including the requirement that a public company's auditor "obtain

---

[29]    The remainder of the Court's opinion will use the corrected reference.

appropriate evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment" and the requirement that a public company's auditor "use the same suitable, recognized control framework to perform his or her audit of internal control over financial reporting as management uses for its annual evaluation of the effectiveness of the company's internal control over financial reporting." Compl. ¶¶ 322–23, 441. Plaintiff argues, "The fact that the existence of accounting issues in Credit Suisse's 2020 financial statements was not revealed until March 2022, and the existence of a material weakness in internal controls over financial reporting related to these issues was not revealed until March 2023, indicates that PwC [AG] neither obtained reasonable assurance about whether material weaknesses existed during its 2020 audit nor in its 2021 interim Quarterly Reports." *Id.* ¶ 324. He contends that if PwC AG had properly adhered to AS 2201.05, it could not have concluded that Credit Suisse "maintained, in all material respects, effective internal control over financial reporting," *id.* ¶¶ 332, 335. For that reason Plaintiff argues that PwC AG's claims that it conducted its audits in accordance with PCAOB standards are materially false or misleading, *id.* ¶¶ 332–33, 335, 337, 339, 343.

However, "The fact that [a defendant] had a duty to review [the Company's] internal controls is not a substitute for specific allegations that [it was] provided with information that demonstrated the inadequacy of [those] internal controls." *Barrett*, 2017 WL 3995606, at *9. Additionally, "In the accounting context, failure 'to identify problems with the . . . company's internal controls and accounting practices does not constitute recklessness,' " *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 Fed.Appx. 717, 720 (quoting *Novak*, 216 F.3d at 309), or misconduct sufficient for Section 10(b) liability. *Dobina*, 909 F.Supp.2d at 254 (citing *Novak*, 216 F.3d at 309; *Gould*, 692 F.3d at 159). "[A] purported failure to investigate does not rise

above the level of negligence, which is legally insufficient." *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F.Supp. 222, 228 (S.D.N.Y. 1989) (citation and internal quotation marks omitted). Thus, Plaintiff has failed to adequately plead PwC AG's scienter on this basis.

As to PwC AG's purported deviations from the relevant PCAOB standard, "allegations of GAAP and GAAS violations are not sufficient, on their own, to establish scienter.*" In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F.Supp.2d 192, 239 (S.D.N.Y. 2004); *Stevelman*, 174 F.3d at 84. "[I]n order to adequately show scienter based upon alleged GAAP and GAAS violations, Plaintiffs must allege not only that GAAP and GAAS violations occurred, but also: (1) the particular deficiencies that were present in the audit; (2) why those deficiencies violate the cited accounting standard; and (3) how the violation of the cited accounting standard establishes auditor scienter." *Athale*, 2014 WL 687218, at *10 (citation omitted). "To rise to the state of mind required, these allegations must be coupled with evidence of corresponding fraudulent intent." *W. Va. Inv. Mgmt. Bd.*, 344 Fed.Appx. at 720 (citation and quotation marks omitted). Plaintiff asserts no facts that give rise to any inference of fraudulent intent on the auditor's part; nor does he plead any facts about the "control framework" contemplated by AS 2201.05 that was supposedly used by Credit Suisse and not used by PwC AG. Critically, in his discussion of PwC AG's alleged AS 2201.05 violation, Plaintiff fails to explain "why the violation indicates that [PwC AG] knew of or was reckless in failing to" identify material weaknesses in Credit Suisse's internal control over financial reporting. *Athale*, 2014 WL 687218, at *11.

Moreover, Plaintiff does not point to any particular fact – aside from the existence of the SEC Correspondence, discussed below – that indicates that PwC AG was or should have been aware of material weaknesses in Credit Suisse's ICFR when it certified the company's financials.

*See Salix Pharm.*, 2016 WL 1629341, at *17; *Lachman*, 487 F.Supp.3d at 138. As PwC AG argues, Plaintiff "identifies no pertinent documents concerning the audits or reviews, meetings or interactions between PwC [AG] and Credit Suisse (or among PwC [AG]), or even a single PwC [AG] professional involved in the audits. Indeed, he alleges no contemporaneous facts at all about the PwC [AG] audits or reviews." PwC AG MTD, at 15. "Without specific allegations pointing to defendants' awareness or recklessness, plaintiff[] [has] not alleged fraud with the particularity required by Rule 9(b) and by the securities laws." *KeySpan*, 383 F.Supp.2d at 387 (citing *Shields*, 25 F.3d at 1129; *Elliott*, 2000 WL 1752848, at *11).

Turning specifically to the SEC Correspondence: Plaintiff alleges that, while PwC AG was "representing in each of Credit Suisse's interim Quarterly Reports that the information included in the Company's balance sheet for the period ending December 31, 2021, was 'fairly stated, in all material respects,'" *id.* ¶¶ 320–21, Credit Suisse was engaged in the SEC Correspondence about why there were no material changes in the Company's ICFR and whether the "accounting issues" identified in the Company's 2021 Annual Report resulted from control deficiencies, *id.* ¶¶ 320–21, 387–88, 440. Eventually, PwC AG concluded, and Credit Suisse publicly reported, on the Form 20-F the Company filed on March 14, 2023, that there existed "certain material weaknesses in internal control over financial reporting as of December 31, 2021 and, consequently, December 31, 2022," *id.* ¶ 320. From this, Plaintiff concludes that "the blessings PwC [AG] gave to Credit Suisse's [2021] financials were false at the times they were made." *Id.* ¶ 440.

However, none of the allegations in the preceding paragraph is probative of PwC AG's alleged conscious misbehavior or recklessness. "[T]he complaint does nothing more than allege that because defendants ultimately disclosed negative information about [Credit Suisse], they

must have been aware of this information earlier." *KeySpan*, 383 F.Supp.2d at 386. Again, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito*, 47 F.3d at 53 (citing *Denny*, 576 F.2d at 470).

To the extent that Plaintiff appears to suggest that the very existence of Credit Suisse's Comment Letter Correspondence with the SEC can be construed as support for PwC AG's purported conscious misbehavior or recklessness for the period after that correspondence began: (1) the SEC Correspondence began on July 15, 2022, so it cannot be used to established PwC AG's scienter for its alleged misstatements in its audits issued prior to that date – the First, Second, and Third Quarter 2021 Interim Audits, the First Quarter 2022 Interim Audit, and the 2021 Annual Report Audit, Compl. ¶¶ 320, 325, 327, 329, 331, 334; and (2) "[s]ecurities regulators are obligated to examine the behavior of public corporations, and the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter." *Manulife Fin. Corp.*, 276 F.R.D. at 102; *see Patel v. L-3 Comms. Holdings Inc.*, No. 14 cv 6038, 2016 WL 1629325 at *10 n.31 (S.D.N.Y. Apr. 21, 2016). Moreover, there is a far more compelling inference about PwC AG that one can draw from its knowledge of the SEC Correspondence. The first letter was sent by the SEC to Credit Suisse in July 2022. Compl. ¶¶ 387–88. During the course of the correspondence, it is fair to infer that PwC AG was aware of it and was on inquiry notice, but nothing more. By the time of the Company's next Annual Report (which did not occur until March 2023), PwC AG had identified problems with Credit Suisse's internal control over financial reporting; it reported them in connection with its audit of the Company's financial statements. The 2022 Annual Report Audit cannot be faulted for failing to identify material weaknesses in the Company's internal control over financial reporting because it did identify those weaknesses, and concluded that they had been present during the prior year as well. The

most compelling inference is that PwC AG, aware of the SEC's interest, did not behave in a fraudulent manner, but instead engaged with Credit Suisse in a good faith effort to satisfy the Commission's concerns – only to end up concluding that the SEC was in fact on to a problem. And while Credit Suisse's failure to disclose the pendency of the inquiry and the SEC's rejection of the Company's explanations renders some of the Company's statements about its financial condition actionable, none of those statements was made by the accountants.

Finally, Plaintiff's attempts to establish scienter through "red flags" ignored by PwC AG fail. These appear to include:

1.   red flags arising out of Credit Suisse's prior engagement of KPMG as its auditor, *id.* ¶ 442;

2.   issues PwC AG inherited once it succeeded KPMG as Credit Suisse's auditor, which were exacerbated by the failures of the Archegos and Greensill funds, as well as the 2022 SEC probe, *id.*; and

3.   Credit Suisse's history of criminal and civil proceedings, fines, and penalties stemming from its risk management and control governance failures. *Id.* ¶ 444.

"A 'red flag' is a sign consciously disregarded by the auditor that 'would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'" *In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11 Civ. 2279, 2012 WL 3758085, at *16 (S.D.N.Y. Aug. 29, 2012) (citing *In re IMAX Sec. Litig.*, 587 F.Supp.2d 471, 483–84 (S.D.N.Y. 2008); *AOL*, 381 F.Supp.2d at 240 n.51). "In order for a red flag to support a strong inference of scienter, the auditor must have actually been aware of its existence," *id.*, "either because they are alleged to have had actual knowledge or because the red flags were so obvious that the auditor must have been aware of them," *Stephenson*, 700

F.Supp.2d at 622. Where "the 'red flags' would be clearly evident to any auditor performing its duties," it is reasonable to infer that the auditor "must have noticed the 'red flags,' but deliberately chose to disregard them." *Philip Servs. Corp.*, 383 F.Supp.2d at 475 (citations omitted).

Some of the red flags identified by the Plaintiff relate to the work of KPMG AG, the Company's former auditor. Plaintiff dedicates two paragraphs of the Complaint to the Steal the List Scandal, which occurred in 2015–2017 and was allegedly an effort to interfere with the Public Company Accounting Oversight Board's ("PCAOB") ability to detect audit deficiencies at "KPMG" (defined by Plaintiff as KPMG AG). *Id.* ¶¶ 19, 23, 442. Plaintiff states that the SEC and the U.S. Attorney's Office for the Southern District of New York charged several individuals with leaking stolen, confidential data about inspections of audits – including "KPMG's" audits of Credit Suisse – to be conducted by the PCAOB to "KPMG." *Id.* ¶¶ 23, 442. Plaintiff alleges that related court filings reveal that "KPMG" was concerned that prior issues, namely, cash flow issues that it had identified in its audits of Credit Suisse, persisted, prompting "KPMG" to conduct "stealth reviews" of its 2016 audit of Credit Suisse and to take measures to ensure that its audit of Credit Suisse would be "clean." Id. ¶ 442. Plaintiff also mentions that **"KPMG has also come under fire in its role as the auditor of three U.S. banks that failed between March and May of 2023."** *Id***.** ¶ 443.

It should go without saying that KPMG's actions cannot be relied on to establish PwC's scienter. Moreover, in the January 22, 2018 SEC press release that Plaintiff quotes from (but does not cite to), the SEC announces that it is charging former staffers at the PCAOB and former

senior officials at *KPMG LLP* – a US-based entity, which was not Credit Suisse's auditor.[30] The article Plaintiff cites to in support of his claim that KPMG was under scrutiny for its role as auditor of certain failed banks exclusively refers to that KPMG's role within the banking and financial services industry in the United States.[31] As courts have held repeatedly, each KPMG member firm operates independently and is a distinct legal entity.[32] *In re Certain Funds, Accts., and/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC*, No. 14 Civ. 1801, 2014 WL 3404955, at *5 (S.D.N.Y. July 9, 2014), *aff'd*, 798 F.3d 113 (2d Cir. 2015). Plaintiff pleads no facts that would allow a trier of fact to conflate the American and Swiss companies.

Plaintiff seems to suggest that another one of the issues PwC AG inherited from KPMG relates to cash flow problems that KPMG supposedly identified in 2016. Compl. ¶ 442. Plaintiff claims that these cash flow problems are a matter of public record due to court filings in the criminal cases related to the Steal the List Scandal – a scandal that involved KPMG U.S. employees. *Id.*; PwC Opp. Memo, at 4, 19. As PwC AG points out in its Reply Brief, Plaintiff also does not "explain why PwC [AG] would be expected to examine the docket of a criminal case against KPMG's U.S. firm to infer what KPMG's Swiss firm may have covertly known about Credit Suisse." PwC Reply, at 4. Even if PwC AG was on notice that there were cash flow problems at Credit Suisse in 2016, the fact that those problems existed in 2016 does not mean that identical or similar issues existed during the Class Period or related to issues later disclosed by Credit Suisse during the Class Period. Compl. ¶¶ 23, 442; *see Schiro*, 396 F.Supp.3d at 307.

---

[30] Press Release, U.S. Securities and Exchange Commission, Six Accountants Charged with Using Leaked Confidential PCAOB Data in Quest to Improve Inspection Results for KPMG (Jan. 22, 2018), https://www.sec.gov/news/press-release/2018-6 [https://perma.cc/FQQ4-ZFNZ].

[31] Preeti Mondal, "KPMG under scrutiny: Why the Auditor is being criticized in relation to Three Failed Banks in the US," The Finance Story, June 12, 2023.

[32] *See Aegean*, 529 F.Supp.3d at 147; *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613, 2004 WL 112948, *3 (S.D.N.Y. Jan. 22, 2004); *AM Int'l*, 606 F.Supp. at 607; *Reingold, v. Deloitte, Haskins & Sells*, 599 F.Supp. 1241, 1249, 1254 n.10 (S.D.N.Y. 1984).

Plaintiff has a similar problem with his claim that PwC AG should have been "on notice that it needed to exercise particular caution and carefully scrutinize Credit Suisse's financial statements and representations" due to "Credit Suisse's history of criminal and civil proceedings and fines and penalties arising out of its risk management and control governance failures." Compl. ¶ 444. The Complaint "is notably silent in alleging particular facts connecting these 'red flags' to PwC and its auditing services." *Petrobras*, 2016 WL 1533553, at *2. Though Credit Suisse's deeply troubling history is certainly something that should cause an auditor to be cautious, Plaintiff once again fails to plead that PwC AG did not have cautionary procedures in place in light of Credit Suisse's unfortunate history. He simply assumes that, because the PwC AG' failed to catch the controls problems in earlier audits, PwC AG failed in its duty. That is the accounting equivalent of fraud by hindsight.

Plaintiff tries to correct the above deficiencies by listing the following "flashing warning signs in the form of scandals, reports of risk management issues, SEC comment letters, and risky accounts, among other things, that undermined its audit opinions," PwC Opp. Memo, at 2: the Archegos and Greensill fund failures, and the Archegos external investigation report, *id.* at 12–15; the Suisse Secrets leak and its revelations about Credit Suisse's "risky clientele," *id.* at 15–16; Credit Suisse's "revolving door of upper management," *id.* at 17–18; and the large increase in Credit Suisse customer outflows in October 2022, *id.* at 18. In the context of his discussion of the failures of Archegos and Greensill in his opposition papers, Plaintiff states that these incidents occurred "while PwC was Credit Suisse's auditor, during quarters where PwC represented that it reviewed Credit Suisse's balance sheet that this review was conducted 'in accordance with the standards of the PCAOB,' and that it was 'not aware of any material modifications that should be made to the accompanying interim financial statements for them to

be in conformity with accounting principles generally accepted in the United States of America.'" *Id.* at 13. Plaintiff also alleges that PwC AG violated additional GAAS provisions in his opposition papers – provisions that he never references in the Complaint. *Id.* at 14, 16, 19.

The Court has already discussed the SEC Correspondence in the context of Plaintiff's allegations about PwC AG's scienter. *See supra* pp. 295–97. And the Court has already disposed of the scienter allegations in connection with the Company's "scandals" – *i.e.*, "Credit Suisse's history of criminal and civil proceedings and fines and penalties arising out of its risk management and control governance failures." *See supra* p. 300. Plaintiff makes little to no effort to connect allegations about PwC AG's role and performance as the Company's auditor to the Suisse Secrets Leak, and it is unclear to the Court how Credit Suisse's "revolving door of upper management" can be used to establish *its auditor's* supposed conscious misbehavior or recklessness. And again, the large increase in outflows in October 2022 was not concealed from the market. Plaintiff pleads no facts tending to show how any of his additional allegations are indicative of PwC AG's scienter.

After examining the Plaintiff's "allegations both individually and in aggregate," *Athale*, 2014 WL 687218, at *6, they do not support a strong inference of scienter in PwC AG. Though pleading "with particularity does not require at this stage that Plaintiff spell out the very moment PwC should have known about the alleged fraud or that PwC had actual knowledge of the scope or particulars of the scheme," *Whalen v. Hibernia Foods PLC*, No. 05 Civ. 3182, 2005 WL 1799370, at *2 (S.D.N.Y. Aug. 1, 2005) (citing *Complete Mgmt. Inc.*, 153 F.Supp.2d at 334–35; *Health Mgmt.*, 970 F.Supp. at 204), "that does not mean that Plaintiffs can 'combine inadequate allegations of motive with inadequate allegations of recklessness ... to demonstrate scienter.'" *Citigroup*, 2023 WL 2632258, at *22 (quoting *Kalnit*, 264 F.3d at 141). Plaintiff has not even

"come close to showing the required level of 'highly unreasonable' conduct that is 'an extreme departure from the standards of ordinary care.'" *Woodley v. Wood*, No. 20 Civ. 2357, 2022 WL 103563, at *10 (S.D.N.Y. Jan. 11, 2022) (citation omitted). At most, Plaintiff's allegations are indicative of mere negligence, which is unactionable under the securities laws. *KeySpan*, 383 F.Supp.2d at 389.

For the foregoing reasons, Plaintiff's § 10(b) and Rule 10b-5 claim against PwC AG is dismissed, with prejudice.

### F.  Further Proceedings

Plaintiff makes a pro forma request that, in the event of dismissal, the Court grant him leave to amend. I have already denied that request insofar as it relates to the period prior to October 2022 (*see supra* p. 163). As much (though not all) of the pleading for the last six months of the proposed Class Period has not been dismissed, there is no need to grant leave to amend.

Class discovery must conclude by November 8, 2024. Obviously, the Class Period for what is left of this case will be considerably shorter than the one originally pleaded; that may impact the propriety of proceeding with Mr. Diabat as the class representative (I don't know). Plaintiff must move for class certification by December 13, 2024. Responsive papers are due January 17, 2025. Reply papers are due January 28, 2025.

### CONCLUSION

For the foregoing reasons, the motions to dismiss by PwC AG and Individual Defendants Gottstein, Horta-Osório, and Mathers are GRANTED; the motions to dismiss by Credit Suisse

and Individual Defendants Joshi, Körner, and Lehmann are GRANTED IN PART AND

DENIED IN PART.

     This constitutes the written decision and order of the court.

     The Clerk of Court is respectfully directed to terminate the motions at Dkt. Nos. 83 and

90.

Dated: September 19, 2024

                                               U.S.D.J.

BY ECF TO ALL COUNSEL