**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ALI DIABAT, Individually and On Behalf of All Others Similarly Situated,<br><br>  Plaintiff,<br><br>v.<br><br>CREDIT SUISSE GROUP AG, et al.,<br><br>  Defendants. | No. 1:23-cv-5874-CM-SLC |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF PLAINTIFF**
**AS CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................ii

I.      INTRODUCTION.......................................................................................................... 1

II.     STATEMENT OF FACTS.............................................................................................. 1

III.    ARGUMENT................................................................................................................... 4

    A.    Plaintiff's Claims Are Well-Suited for Class Treatment............................................... 4

    B.    The Proposed Class Satisfies FED. R. CIV. P. 23(a) ..................................................... 5

        1.    The Proposed Class Is So Numerous that Joinder of All Members Is Impracticable 5

        2.    Questions of Law or Fact Are Common to the Class............................................... 5

        3.    Plaintiff's Claims Are Typical of the Class............................................................. 6

        4.    Plaintiff Will Fairly and Adequately Protect the Interests of the Class .................. 8

        5.    The Proposed Class Is Ascertainable ...................................................................... 9

    C.    The Proposed Class Satisfies FED. R. CIV. P. 23(b)(3)................................................ 10

        1.    Common Questions of Law and Fact Predominate............................................... 10

        2.    The Fraud-on-the-Market Presumption of Reliance Applies ................................ 11

        3.    Plaintiff Satisfies the Market Timing and Publicity Elements .............................. 11

        4.    Any Differences in Class Members' Individual Damages Do Not Defeat Class Certification ............................................................................................................ 19

    D.    Defendants Cannot Rebut the Presumption of Reliance in This Case ......................... 21

    E.    A Class Action Is the Superior Method for Adjudication ........................................... 24

    F.    KSF Satisfies FED. R. CIV. P. 23(g)............................................................................ 25

IV.     CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s):**

<u>**Cases**</u>

*Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 613 (1997) ................................................. 4, 8, 10

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ............................... 4, 6, 10, 11

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp.*, 955 F.3d 254 (2d Cir. 2020) ......................... 11, 21

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F. 4th 74 (2d Cir. 2023) ........................ 21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir. 2000) ............................ 8

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ............................................... 4, 11, 13, 21, 23

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ........................................... 12, 13, 14, 15, 16

*Carpenters Pen. Tr. Fund v. Barclays PLC*, 310 F.R.D. 69 (S.D.N.Y. 2015) ............................. 15

*Comcast v. Berland*, 569 U.S. 27 (2013) ........................................................... 19, 20, 21

*Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3d Cir. 1988) ...................................... 19

*Diabat v. Credit Suisse Grp. AG*, No. 23-cv-5874, 2024 U.S. Dist. LEXIS 170531
   (S.D.N.Y. Sept. 19, 2024) ...................................................................... 2, 3, 24

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) .............................. 11

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 .......................................................... 6

*Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*, 594 U.S. 113 (2021) .................... 10, 23, 24

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) .............................. 11

*In re Allergan PLC Secs. Litig.*, No. 18-cv-12089, 2021 U.S. Dist. LEXIS 170310
   (S.D.N.Y. Sept. 8, 2021) ...................................................................... 1, 20, 23

*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) ..................................... 11

*In re Apple Inc. Sec. Litig.*, No. 4:19-cv-2033, 2023 U.S. Dist. LEXIS 58603
   (N.D. Cal. Mar. 28, 2023) ...................................................................... 18

*In re Arotech Corp. Sec. Litig.*, No. 07-cv-1838, 2010 U.S. Dist. LEXIS 55570
(E.D.N.Y. June 4, 2010) ............................................................................................. 7

*In re Ashanti Goldfields Sec. Litig.*, 2004 U.S. Dist. LEXIS 5165 (E.D.N.Y. Mar. 30, 2004) ...... 8

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-1580, 2020 U.S. Dist. LEXIS 49786
(S.D.N.Y. Mar. 23, 2020) ............................................................................................ 22

*In re Dynex Capital Sec. Litig.*, No. 05-cv-1897, 2011 U.S. Dist. LEXIS 22484
(S.D.N.Y. Mar. 7, 2011) .............................................................................................. 14

*In re Fibrogen Sec Litig.*, No. 21-cv-2623, 2023 U.S. Dist. LEXIS 236083 (N.D. Cal. Oct. 3,
2023) ........................................................................................................................... 18

*In re Global Brokerage*, No. 17-cv-916, 2021 U.S. Dist. LEXIS 52550
(S.D.N.Y. Mar. 18, 2021) ......................................................................................... 7, 14

*In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476 (S.D.N.Y. 2002) .......................... 8

*In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-cv-4953, 2024 U.S. Dist. LEXIS 59981
(S.D.N.Y. Mar. 29, 2024) ....................................................................................... 21, 24

*In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016) ....................................................... 9

*In re Petrobras Sec. Litig.*, 862 F.3d 250 (2d Cir. 2017) ............................................................. 24

*In re Priceline.com Inc.*, 236 F.R.D. 89 (D. Conn. 2006) ........................................................... 19

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) ........................... 5

*In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728, 2019 U.S. Dist. LEXIS 114695
(S.D.N.Y. July 10, 2019) .......................................................................................... 5, 24

*In re Vale S.A. Secs. Litig.*, No. 19-cv-526, 2022 U.S. Dist. LEXIS 6433
(E.D.N.Y. Jan. 11, 2022) ..................................................................................... 12, 15, 16

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ............................. 8

*In re: Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586 (C.D. Cal. 2009) ............................ 15

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ....................................... 12, 13, 16, 17, 18

*Menaldi v. Och-Zipp Capital Mgmt. Grp. LLC*, 328 F.R.D. 86 (S.D.N.Y. 2018) .................... 8, 20

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, No. 08-cv-5310,
2016 U.S. Dist. LEXIS 153804 (S.D.N.Y. Nov. 4, 2016). ..................................................... 6, 24

*Pearlstein v. Blackberry Ltd.*, No. 13-cv-7060, 2021 U.S. Dist. LEXIS 14888
(S.D.N.Y. Jan. 26, 2021)................................................................................. 5, 6, 7, 10, 12

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .................................................. 25

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993).......................................................... 6

*Seijas v. Republic of Arg.*, 606 F.3d 53 (2d Cir. 2010)................................................... 7

*Strougo v. Barclays PLC*, 312 F.R.D. 307 (S.D.N.Y. 2016) ..................................... 12, 13, 14, 16

*Sykes v. Mel S. Harris and Assocs. LLC, et al.*, 780 F.3d 70 (2d Cir. 2015) ............................... 20

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196
(2d Cir. 2008)............................................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ................................................ 4

*UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121 (2d Cir. 2010).......................................... 10

*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017)........................................................ 12, 13

*Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112 (S.D.N.Y. 2008) ........................................ 12, 21

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ....................................................... 5

*Wilson v. LSB Indus.*, No. 15-cv-7614, 2018 U.S. Dist. LEXIS 138832
(S.D.N.Y. Aug. 1, 2018) ............................................................................... 11, 20

**Statutes**

FED. R. CIV. P. 23(a)(2)............................................................................................ 5

FED. R. CIV. P. 23(b)(3) ...................................................................................... 4, 24

FED. R. CIV. P. 23(g)(1)(A). ...................................................................................... 25

iv

Lead Plaintiff Professor Ali Diabat ("Plaintiff") respectfully submits this memorandum in support of his Motion for Class Certification, Appointment of Plaintiff as Class Representative, and Appointment of Kahn Swick & Foti, LLC ("KSF") as Class Counsel.

## I.      INTRODUCTION

A securities fraud lawsuit is a "type of action particularly well suited to class treatment." *In re Allergan PLC Secs. Litig.*, No. 18-cv-12089, 2021 U.S. Dist. LEXIS 170310, at *3 (S.D.N.Y. Sept. 8, 2021) (McMahon, J.).  This case is no exception.  Plaintiff was injured by the same course of conduct as all other Class members: Defendants' misrepresentations and omissions regarding Credit Suisse's internal controls over financial reporting and its current and future business health, that artificially inflated the price of CS Securities[1] over the course of the Class Period. As detailed below, Plaintiff satisfies Rule 23(a)'s requirements for certification: numerosity, commonality, typicality, and adequacy of representation, as well as Rule 23(b)(3)'s requirements of predominance and superiority. Thus, class certification should be granted.

## II.      STATEMENT OF FACTS[2]

In July 2022, the SEC began investigating Credit Suisse Group AG's ("Credit Suisse," the "Company," or the "Bank") internal controls over financial reporting ("ICFR"), in response to certain control deficiencies the Company had previously identified. Over the next nine months, the SEC repeatedly asked Credit Suisse for additional information but was not satisfied with its responses, ultimately informing the Bank on October 20, 2022, "that it did not buy [its] initial explanation for why its ICFR was inadequate." *Diabat v. Credit Suisse Grp. AG*, No. 23-cv-5874,

---

[1] The "CS Securities" encompassed by the proposed Class consist of (i) Credit Suisse American Depository Shares ("CS ADSs"), (ii) seven Credit Suisse notes ("CS Notes"), and (iii) Credit Suisse options on the CS ADSs ("CS Options"). The specific CS Notes are listed in the Expert Report of Matthew D. Cain, Ph.D. ("Cain Report"), incorporated herein by reference and attached as Exhibit A to the accompanying declaration of Kim E. Miller ("Miller Decl.").

[2] All "¶__" citations are to the Complaint (Dkt. No. 65) unless otherwise noted.

1

2024 U.S. Dist. LEXIS 170531, at *419 (S.D.N.Y. Sept. 19, 2024) (McMahon, J.).

The Class Period begins one week later, on October 27, 2022, with the release of Credit Suisse's Third Quarter 2022 financial results. That day, in multiple public releases and on an earnings call, Defendants made various statements about the Bank's financial condition without disclosing the existence of the months-long SEC investigation into the adequacy of its ICFR. ¶¶234, 239, 242. Defendants also announced a massive increase in customer outflows –essentially, a "run on the bank." ¶¶239, 242, 244; *Credit Suisse*, 2024 U.S. Dist. LEXIS 170531, at *287-88. In the following days and months, Defendants repeatedly made statements about Credit Suisse's financial performance without disclosing the material ICFR weaknesses, and while falsely representing its financial statements had been prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). ¶¶253, 257, 261, 263, 268, 277, 279-84. Defendants also repeatedly reassured investors about the Bank's financial health, falsely stating, for example, that customer outflows had "clearly stabilized" and "basically stopped," that there were "some inflows coming," and that Credit Suisse was "definitely stable," when, in fact, the very opposite was true. ¶¶251, 263, 264, 268.

On February 9, 2023, Credit Suisse issued its FY22 Earnings Release, disclosing a $1.5 billion loss, customer outflows of 110.5 billion Swiss francs in the final three months of 2022, and a dramatic decrease in assets under management. ¶354. As the media reported, "analysts were alarmed by the scale of losses," noting they were significantly worse than had been expected. ¶355. Investors were alarmed too; following the revelation of these facts, the price of CS ADSs fell precipitously. ¶356. Again, however, while part of the truth was revealed to the market, Defendants still concealed the ICFR deficiencies. Defendant Körner also made other materially false and misleading statements that day, publicly representing that "the main indicators of the

2

[B]ank's financial stability were strong," Credit Suisse had a "robust balance sheet" and was "executing on [its] transformation from a position of strength," and customer outflows had "reduced very significantly." ¶¶279, 284, 290. Defendant Lehmann echoed these misstatements on March 13, 2023, when he said in a speech at a financial conference that Credit Suisse had "strong capital ratios" and a "strong balance sheet" (¶294), even though "[t]he Bank was literally about to fail." *Credit Suisse*, 2024 U.S. Dist. LEXIS 170531, at *394.

The following day, on March 14, 2023, Credit Suisse issued its 2022 Annual Report and stunned the market by revealing that it had "identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021." ¶¶296, 358. The media reported on this revelation and quoted extensively from the Annual Report, ultimately attributing Credit Suisse's downfall, in part, to the announcement of the material weaknesses in ICFR. ¶359. But while part of the truth about the dire situation at Credit Suisse was revealed to the market, Defendants also made a number of materially false and misleading statements therein in order to make it appear as if Credit Suisse's financial condition was in much better shape than it actually was, including that its liquidity profile was maintained at "a sufficient level" and that it was "developing a remediation plan to address the material weaknesses" that had been disclosed. ¶¶296-97, 360; *see also Credit Suisse*, 2024 U.S. Dist. LEXIS 170531, at *399. That same day, as assets continued to drain out of the Bank, Defendant Körner publicly stated that customer outflows had "significantly moderated," and that Credit Suisse did not have "material risk" in the wake of the recent collapse of Silicon Valley Bank because Credit Suisse was "following materially different and higher standards when it comes to capital funding, liquidity, and so on." ¶¶299, 302-03. Thus, while the price of CS Securities fell on the disclosure of the ICFR weaknesses, because of these materially misleading statements, the stock price avoided total collapse and was able to

3

recover some ground to close at $2.51 per ADS on March 14, 2023 (albeit, a new all-time low). ¶¶359, 361. The CS Notes' prices dropped significantly as well, falling some 6.52% on average from the prior trading day(s). *See* Miller Decl. Ex. B.

The next day, on March 15, 2023, Credit Suisse announced it would be borrowing up to CHF 50 billion from the Swiss National Bank, which news reassured the market and helped the CS ADSs rebound to close at $2.16 per ADS on March 16. ¶¶364-66. Then over that weekend, on Sunday, March 19, 2023, Credit Suisse suddenly announced it would no longer operate as an independent entity, and, at the behest of the Swiss government, would be acquired by its former rival, UBS Group AG, for less than half of its last traded market value on March 17, 2023. ¶367. Upon the revelation of this news, Credit Suisse's ADS price dropped 52.99% to close at $0.9450 per ADS on Monday, March 20, 2023, resulting in massive losses to the Class. ¶369.

## III.    ARGUMENT

### A.    Plaintiff's Claims Are Well-Suited for Class Treatment

The Supreme Court has repeatedly stressed the importance of the class action device in redressing the wrongs committed under federal securities laws. *See*, *e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14, 320 n.4 (2007); *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

For class certification to be granted, Plaintiff must satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997). In addition, Plaintiff must satisfy one of the subsections of Rule 23(b). *Id*. at 614. Here, Plaintiff seeks class certification under Rule 23(b)(3), because "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). "A motion for

4

class certification should not become a mini-trial on the merits; the question before the Court is whether Plaintiff meets Rule 23's requirements, not whether the Plaintiff will prevail on the merits." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728, 2019 U.S. Dist. LEXIS 114695, at *21 (S.D.N.Y. July 10, 2019) (McMahon, J.).

### B. The Proposed Class Satisfies FED. R. CIV. P. 23(a)

#### 1. The Proposed Class Is So Numerous that Joinder of All Members Is Impracticable

"Numerosity may be presumed when a class consists of forty or more [members]." *Pearlstein v. Blackberry Ltd.*, No. 13-cv-7060, 2021 U.S. Dist. LEXIS 14888, at *18-19 (S.D.N.Y. Jan. 26, 2021) (McMahon, J.) (citation omitted). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Id.* (citation omitted). Throughout the Class Period, the CS ADSs were actively traded on the New York Stock Exchange ("NYSE"), and an average of 150.30 million outstanding CS ADSs changed hands weekly. Cain Report at ¶¶16, 38. There were also millions of dollars in CS Notes outstanding during the Class Period, and over 3.5 million CS Options contracts traded during the Class Period, with each contract covering 100 shares of ADSs. *Id.* at ¶¶104, 114-20, 165. Thus, it is more likely than not that Class members number in the thousands, satisfying the numerosity requirement.

#### 2. Questions of Law or Fact Are Common to the Class

The commonality requirement is met where, as here, there are "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). "Even a single common question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011), and Rule 23(a)(2) is a "low hurdle" that is "easily surmounted." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995) (citation omitted). "This case — as is typical of most securities fraud putative class actions - raises common questions of law and fact, including whether (i) Defendants' public

5

statements during the Class Period misrepresented or omitted material facts; (ii) the alleged fraud was material; and (iii) Defendants acted with scienter." *Blackberry*, 2021 U.S. Dist. LEXIS 14888, at *19-20 (citing *Amgen*, 568 U.S. at 474-75). Each Class member was injured as a result of the common misrepresentations and omissions and incurred loss when the truth was revealed, causing CS Securities' prices to drop as a result, and they suffered damages. Plaintiff's legal claims are common to all proposed Class members, and the evidence Plaintiff will employ to prove these claims will be common to all proposed Class members. *See* ¶468 (listing common questions).

### 3.    Plaintiff's Claims Are Typical of the Class

The Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," *Gen. Tel. Cov. Falcon*, 457 U.S. 147, 157 n.13 (1982), and satisfying the typicality requirement in securities cases is "not demanding." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, No. 08-cv-5310, 2016 U.S. Dist. LEXIS 153804, at *13 (S.D.N.Y. Nov. 4, 2016). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id*. (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)). As this Court explained in *Blackberry*, "[i]n a securities class action, when 'plaintiffs will necessarily seek to develop facts relating to…the dissemination of allegedly false or misleading statements underlying their claims,' the claims and nature of evidence are generally considered sufficient to satisfy the typicality requirement." 2021 U.S. Dist. LEXIS 14888, at *20 (citation omitted).

Here, Plaintiff satisfies this test because, like all proposed Class members, he was subjected to the same violations of the federal securities laws due to Defendants' alleged misrepresentations and omissions concerning Credit Suisse's ICFR, its current and future business health, and the compliance of its financial statements with GAAP, such that Plaintiff and all proposed Class

members seek the same redress through damages. The fact that Class members' individual circumstances might differ based on such things as the types of CS Securities they purchased, the timing of those purchases, or the amount of their individual damages, does not affect the typicality of Plaintiff's claims. *See, e.g.*, *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010) ("[I]t is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."); *In re Arotech Corp. Sec. Litig.*, No. 07-cv-1838, 2010 U.S. Dist. LEXIS 55570, at *10 (E.D.N.Y. June 4, 2010) (while "each purchaser's losses may be unique due to the quantity of shares owned and the time during the Class Period when they were acquired, these minor differences do not defeat commonality or typicality for Rule 23 purposes").

Plaintiff stands in precisely the same position as other purchasers of CS Securities during the Class Period, and his claims are typical of the other Class members. While Plaintiff purchased his CS ADSs after the partial corrective disclosures (*see* ECF No. 65-2 at 2), this is of no moment, as <u>all</u> his purchases were made before the final revelatory event of March 19, 2023. *See BlackBerry*, 2021 U.S. Dist. LEXIS 14888, at *25 (holding that timing of proposed class representative's purchases, "between the initial partial corrective disclosure . . . and the final, fully corrective disclosure . . . does not render him atypical"); *see also In re Global Brokerage*, No. 17-cv-0916, 2021 U.S. Dist. LEXIS 52550, at *28 (S.D.N.Y. Mar. 18, 2021) ("Since the proposed Class Representatives made their purchases before [the final revelatory event], it is of no moment that they purchased later rather than earlier in the Class Period.") (citations omitted).

Nor is Plaintiff subject to any cognizable defense, let alone a unique defense that would distract him from the prosecution of the core issues of Defendants' liability to the Class. A "unique defense" sufficient to impact class certification must be one that will "draw the focus of the litigation away from common legal or factual issues," to the detriment of the entire class. *In re*

*Ashanti Goldfields Sec. Litig.*, No. 00-cv-0717, 2004 U.S. Dist. LEXIS 5165, at \*41-42 (E.D.N.Y. Mar. 30, 2004); *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000); *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 481 (S.D.N.Y. 2002). "In order to defeat a motion for certification, however, the conflict [as to typicality and adequacy] must be fundamental." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 91 (S.D.N.Y. 2018) (citation omitted). No such fundamental conflict is present here.

> **4.    Plaintiff Will Fairly and Adequately Protect the Interests of the Class**

Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is also met here. The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa*, 222 F.3d at 60 (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625 (citation omitted). "[T]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted).

Here, both elements of the adequacy requirement are easily satisfied. Plaintiff "possess[es] the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 625, and no actual or potential conflicts exist between Plaintiff and any proposed Class member relating to recovering the damage they suffered due to their purchases of CS Securities at artificially inflated prices. Defendants' identical, wrongful conduct has injured Plaintiff, and it is in Plaintiff's interest to vigorously prosecute this action on behalf of himself and the Class. That is, Plaintiff's interests are directly aligned with the interests of the proposed Class members, who were injured by the same misstatements and omissions, and Plaintiff has the same interest in establishing

8

Defendants' liability and obtaining the maximum recovery. *See*, *e.g.*, Miller Decl. Ex. C (Diabat Dep. Tr.) at 61:8-11 ("I care about maximizing the recovery because I want to help every single member, every person, who was harmed in this class."); *see also* ECF No. 16-9 (Diabat Declaration); ECF No. 60-1 (Diabat PSLRA certification).

That Professor Diabat only purchased CS ADSs and not CS Notes or Options does not affect the adequacy of his representation of the Class. As this Court already recognized, "it is well settled that the holder of one class of an issuer's securities can represent the holders of multiple classes of securities if all suffered the same type of loss due to the same misconduct such that their interests are aligned." ECF No. 58 at 10:9-14; *see also In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 361 (S.D.N.Y. 2016), *aff'd in part and vacated in part on other grounds by In re Petrobras Sec. Litig.*, 862 F.3d 250 (2d Cir. July 7, 2017) ("Because the same alleged misconduct drives plaintiffs' claims, regardless of whether they arise from purchases of Notes, common ADS, or preferred ADS, the interests of all members of the Exchange Act Class are aligned.") (citation omitted).

Furthermore, proposed Class Counsel KSF is highly qualified, experienced, and capable of prosecuting this action. KSF has served as lead and/or class counsel in numerous complex class actions in federal courts across the country and has won substantial recoveries for classes it has represented. *See* Miller Decl. Ex. D (KSF firm resumé).

### 5.    The Proposed Class Is Ascertainable

The proposed class is defined as follows:

> All those who purchased or otherwise acquired Credit Suisse Securities in domestic transactions during the period from October 27, 2022 through and including March 17, 2023 (the "Class Period"), excluding Defendants, officers, and directors of Credit Suisse, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

Because this definition "clearly delineates the Class's boundaries by the dates of investors'

9

transactions" in CS Securities, and "[a]scertaining the members of the Class will be easily administrable by reference to investor records," *Blackberry*, 2021 U.S. Dist. LEXIS 14888, at *36, the proposed Class is ascertainable.

### C.      The Proposed Class Satisfies FED. R. CIV. P. 23(b)(3)

This case also satisfies Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### 1.      Common Questions of Law and Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (internal quotation marks omitted). "Predominance is a test readily met in certain cases alleging…securities fraud…." *Amchem*, 521 U.S. at 625.

To prevail under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must prove: (1) a material misrepresentation;[3] (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Common questions include "whether Defendants engaged in a fraudulent scheme and made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants'

---

[3] Plaintiff does not need to prove materiality now; that "should be left to the merits stage because it does not bear on Rule 23's predominance requirement." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 119 (2021) ("*Goldman II*") (citing *Amgen*, 568 U.S. at 466-68).

conduct injured" investors. *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y. 2008); *see also Amgen*, 568 U.S. at 475 ("[L]oss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions….."). Plaintiff's Section 20(a) "control person" claim requires proof that Defendants controlled Credit Suisse, another common issue. *See, e.g.*, *Wilson v. LSB Indus.*, No. 15-cv-7614, 2018 U.S. Dist. LEXIS 138832, at *12-13 (S.D.N.Y. Aug. 1, 2018). Thus, whether common questions predominate for Plaintiff's claims "turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"). As set forth below, no potential individual questions of reliance predominate because Plaintiff can rely on the presumption of Class-wide reliance under the fraud-on-the-market doctrine established by the Supreme Court in *Basic*. *See id.* at 810-11.

### 2.     The Fraud-on-the-Market Presumption of Reliance Applies

The fraud-on-the-market doctrine rests on the premise that "an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Goldman II*, 594 U.S. at 118 (citing *Halliburton I*, 563 U.S. at 813). To invoke the *Basic* presumption at this stage, Plaintiff must only prove that: (1) the alleged misrepresentations were publicly known; (2) the markets for the securities were efficient; and (3) he or she traded the securities between when the misrepresentations were made and when the truth was revealed. *See id.* (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 286 (2014) ("*Halliburton II*")). "Once the plaintiff makes this showing, § 10(b)'s reliance requirement is presumptively satisfied." *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp.*, 955 F.3d 254, 270 (2d Cir. 2020) ("*Goldman I*"), *vacated on other grounds by Goldman II*. Plaintiff satisfies each requirement.

### 3.     Plaintiff Satisfies the Market Timing and Publicity Elements

Plaintiff purchased CS Securities after Defendants' misrepresentations and omissions and before the full truth was revealed. ¶30; ECF No. 65-2. Moreover, the alleged misrepresentations

11

were public; the majority of them were published in foreign private issuer reports (Form 6-K) or annual reports (Form 20-F) filed with the SEC or in a company press release or made public during earnings calls with analysts and investors, and the others were made to the public either through an official statement or a live televised interview, and were subsequently reported by the press. *See generally* Complaint. Plaintiff has thus satisfied the market timing and publicity prerequisites.

### a. CS ADSs, Options, and Notes Traded In Efficient Markets

The final prerequisite for invoking the presumption of reliance is also met. Because CS ADSs traded on the NYSE throughout the Class Period, "the market for that security is presumed to be efficient.'" *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016), *aff'd sub nom.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 98-99 (2d Cir. 2017); *see also* Cain Report at ¶¶26, 52-53.

In addition to assessing whether securities traded on a national market, courts look to the factors set out in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). *See*, *e.g.*, *Blackberry*, 2021 U.S. Dist. LEXIS 14888, at *40. The *Cammer* factors are whether: (1) the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) the stock has market makers and arbitrageurs; (4) the company is eligible to file an SEC registration Form S-3; and (5) there are empirical facts showing a cause-and-effect relationship between unexpected events or financial releases and an immediate response in the stock price. *Id*. (citing *Waggoner*, 875 F.3d at 94).[4] The *Krogman* factors are: (1) the company's market capitalization; (2) the bid/ask spread for the security; and

---

[4] "Given the distinctions between equity securities and debt securities—including that the latter generally trade at a lower volume—many courts have noted that with respect to bonds, the *Cammer* factors are '"merely an analytical guide and are not exhaustive.'" *In re Vale S.A. Secs. Litig.*, No. 19-cv-0526, 2022 U.S. Dist. LEXIS 6433, at *50-51 (E.D.N.Y. Jan. 11, 2022) (citations omitted).

12

(3) the percentage of stock not held by insiders (the "float"). *See id.* (citing *Krogman*, 202 F.R.D. at 474).[5] Notably, "indirect evidence of market efficiency—including that a stock trades in high volumes on a large national market and is followed by a large number of analysts—will typically be sufficient to satisfy the *Basic* presumption on class certification. In such cases there is no need to demonstrate efficiency through a direct test, such as an event study." *Strougo,* 312 F.R.D. at 322-23; *see also Waggoner*, 875 F.3d at 97-99 (affirming *Strougo* and concluding "that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies"). As in *Strougo*, Plaintiff can demonstrate market efficiency through indirect evidence alone, but nonetheless submits the expert report of Dr. Cain, who analyzed the indirect evidence, performed empirical tests, and concluded that CS ADSs, CS Options, and CS Notes traded in efficient markets during the Class Period. *See* Cain Report at ¶3.

### (i)    High Weekly Trading Volume

High trading volume suggests efficiency "because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Strougo*, 312 F.R.D. at 316 (quoting *Cammer*, 711 F. Supp. at 1286). "*Cammer* supposes that turnover of two percent or more of outstanding shares would justify a strong presumption of efficiency, while turnover of one percent would justify a substantial presumption." *Id*. (citing *Cammer*, 711 F. Supp. at 1286).

CS ADSs traded regularly and actively. On average, 57.90% of outstanding ADSs changed hands weekly. *See* Cain Report at ¶37 & Ex. 2. This is substantially higher than the 2% of the float threshold found sufficient in *Cammer* for a strong presumption of market efficiency, supporting a conclusion that CS ADSs traded in an efficient market throughout the class period. *See id.* at ¶37;

---

[5] As set forth *infra*, neither the *Cammer* nor *Krogman* factors are applicable to the CS Options.

*see also id.* at ¶¶38-39 (discussing how average weekly trading volume and average daily turnover rate for CS ADSs further support market efficiency).

Average weekly trading volume for each CS Note ranged from 0.6% to 4.8%. *See id.*at ¶134 & Ex. 13. Five of the CS Notes traded above the 1% threshold to justify a "substantial presumption" of efficiency; the other two were only slightly below 1%. *See id.* at ¶135. Based on this trading volume, Dr. Cain concludes the CS Notes traded in an efficient market. *See id.* at ¶138. In this regard, it is important to note that because trading volume and frequency tend to be lower for bonds than for common stock, "even where 'trading volume would not likely support a finding of an efficient market for equities, it may be 'sufficient to support such a finding for corporate bonds.'" *In re Global Brokerage*, 2021 U.S. Dist. LEXIS 52550, at *38 (citation omitted); *see also In re Dynex Capital Sec. Litig.*, No. 05-cv-1897, 2011 U.S. Dist. LEXIS 22484, at *13 (S.D.N.Y. Mar. 7, 2011) ("A turnover rate below the 1% threshold established in *Cammer* . . . does not, without more, defeat a finding of an efficient bond market.").

### (ii)    Analyst Coverage

Second, "*Cammer* recognizes that a stock covered by a 'significant number of analysts' is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors." *Strougo*, 312 F.R.D. at 316 (citing *Cammer*, 711 F. Supp. at 1286). During the Class Period, Credit Suisse was covered by analysts from at least 14 investment firms, including Morningstar Inc., Citigroup Inc. Research, and JP Morgan, who collectively issued at least 128 analyst reports regarding Credit Suisse. *See* Cain Report at ¶42 & Ex. 3. That analysts issued so many reports demonstrates broad analyst coverage and is highly indicative of market efficiency. *See id.* at ¶42-44, 47. While these reports tend to focus on ADSs (and ordinary shares) they still contained relevant information for investors in the CS Notes, and several contain information explicitly pertaining to the CS Notes. *See id.* at

14

¶¶139-44; *see also Winstar*, 290 F.R.D. at 446 (finding bond market efficient where three analysts reported directly on bonds and numerous analysts followed company's stock and "reported on [its] health . . . as a whole"). In addition, the three major ratings agencies provided continuous coverage of the CS Notes, which also supports a finding of market efficiency. *See* Cain Report at ¶¶121-22 & Ex. 12, 145; *In re: Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 615 (C.D. Cal. 2009).

### (iii)    Market-Makers

The existence of numerous market makers is further evidence of market efficiency, because they "ensure[s] completion of the market mechanism." *Cammer*, 711 F. Supp. at 1286-87. During the Class Period, there were at least 86 market makers for CS ADSs, and 12-61 independent reporting market makers actively trading each of the CS Notes, which is strong evidence that the CS ADSs and CS Notes traded in efficient markets. *See* Cain Report at ¶¶51, 54, 147, 151 & Ex. 15; *see also Carpenters Pen. Tr. Fund v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) ("[A]nywhere between six and twenty market makers is sufficient to support a finding of market efficiency."). In addition, CS ADSs were held by numerous institutional investors throughout the Class Period, further supporting a finding of market efficiency. *See* Cain Report at ¶53. Another important factor for the CS Notes is the involvement of underwriters, as they "typically serve as market makers for securities." *Id.* at ¶149; *see also Vale*, 2022 U.S. Dist. LEXIS 6433, at *54-55 ("[C]ourts regularly hold that that level of underwriter involvement in a notes offering can help weigh in favor of market efficiency."). Here, for each of the CS Notes' initial offerings, there was underwriter involvement, which further supports a conclusion that the CS Notes traded in an efficient market. *See* Cain Report at ¶¶150-51 & Ex. 16.

### (iv)    Form S-3 Eligibility

Fourth, "the existence of Form S-3 status [or Form F-3 for foreign private issuers] is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp.

15

at 1285. This element is important because "[t]he SEC permits a company to file Form S-3 when, in the SEC's judgment, the market for shares in the company is reasonably efficient at processing information." *Strougo*, 312 F.R.D. at 316. Credit Suisse was eligible to file a Form F-3 during the Class Period because its average ADS float and the market capitalization for each CS Note vastly exceeded the threshold requirements for F-3 registration ($75 million). *See* Cain Report at ¶¶57-60 & Exs. 8, 10. This factor supports a finding of market efficiency.

### (v)    Cause and Effect Relationship

Fifth, because Plaintiff can establish market efficiency indirectly via the first four *Cammer* factors and each *Krogman* factor (see below), the Court need not even "consider whether [Plaintiff] ha[s] also satisfied *Cammer* 5 by proof of an event study." *Strougo*, 312 F.R.D. at 323 (finding consideration of event study unnecessary where market efficiency was established indirectly). Nevertheless, Plaintiff provides direct evidence of price impact in the form of two separate event studies conducted by Dr. Cain to examine the "cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*." Cain Report at ¶¶62, 153.[6] "[A]n event study that correlates . . . disclosures of . . . material information . . . with corresponding fluctuations in price has been considered *prima facie* evidence" of a causal relationship under *Cammer* factor 5. *Vale*, 2022 U.S. Dist. LEXIS 6433, at *30 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)).

The ADS Event Study: Dr. Cain identified three "News Days" during the Class Period –

---

[6] "A generally accepted and peer-reviewed approach to evaluating whether a security price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the security's behavior on news days, or days when a certain type or types of disclosures are made (such as earnings disclosures), with its behavior on no-news days, or days with relatively little or no news. A showing that a security's price is statistically significantly more volatile on news days than on no-news days is considered powerful evidence that the security responds promptly to news and, therefore, supports a finding of efficiency." Cain Report at ¶73.

16

days on which Credit Suisse released earnings announcements or guidance updates (the "ADS News Days"). *See* Cain Report at ¶77 & Ex. 6. Dr. Cain then compared the daily price returns and trading volume of CS ADSs on ADS News Days to those same metrics on days that contained less news during the Class Period (the "ADS No-News Trading Days"). *Id.* at ¶78 & Exs. 6-7. Dr. Cain found that 100% of ADS News Days had statistically significant abnormal returns at the 95% level or higher, compared to 5.26% for the remaining ADS No-News Trading Days in the Class Period. *Id.* at ¶¶79-80 & Exs. 6-7. As a result, Dr. Cain finds a clear cause-and-effect relationship between new, Company-specific information, and movements in the price of CS ADSs, further supporting the conclusion that CS ADSs traded in an efficient market. *See id.* at ¶¶81-82.

The Note Event Study: Dr. Cain utilized a similar methodology as for the ADS Event Study, with some differences explained in his report. *See id.* at ¶153. Dr. Cain identified 12 "News Days" during the Class Period – days on which CS Notes experienced changes in credit ratings or when there was a change in control of Credit Suisse ("Note News Days"). *See id.* at ¶¶159-61 & Ex. 17. Dr. Cain found that 50% of Note News Days had statistically significant abnormal returns at the 95% level, compared to 5.56% for the remaining Note No-News Trading Days. *See id.* at ¶¶161-62 & Exs. 17-18. As a result, Dr. Cain concludes there was a cause-and-effect relationship between new, Company-specific information, and movements in the price of CS Notes, further supporting the conclusion that CS Notes traded in an efficient market. *See id.* at ¶164.

**(vi)    The Three *Krogman* Factors Demonstrate Efficiency for the CS ADS and CS Note Markets**

*Market capitalization*. During the Class Period, the market capitalization for CS ADSs averaged $803.8 million, putting Credit Suisse above the 50th percentile of all companies listed on the NYSE. *See* Cain Report at ¶85 & Ex. 8. The relatively large market capitalization supports a finding that the market for CS ADSs was efficient. *See id.* at ¶86; *Krogman*, 202 F.R.D. at 478

17

(finding this factor weighed slightly in favor of market efficiency when the company's market capitalization was in the top sixty percent of the sample group). The CS Notes had market capitalizations ranging from $617.6 million to $2.662 billion during the Class Period, also supporting a finding of market efficiency. *See* Cain Report at ¶¶165-67 & Ex. 19.

*Bid/ask spread*. Bid/ask spreads are a measure of transaction costs; lower transactions costs indicate a "more informationally efficient market." *Id.* at ¶88. The average bid/ask spread for CS ADSs during the Class Period was 0.26%, which is evidence of market efficiency. *See id.* at ¶¶89-91 & Ex. 9. The average bid-ask spreads for each of the CS Notes during the Class Period ranges from 0.09% to 1.06%, also supporting a conclusion of market efficiency. *See id.* at ¶170 & Ex. 20.

*Percentage of stock not held by insiders (the "public float")*. During the Class Period, no CS ADSs were held by insiders. *See id.* at ¶94 & Ex. 10. This large public float supports a conclusion that the CS ADSs traded in an efficient market. *See id.* at ¶95. For the CS Notes, Dr. Cain calculated that the public float ranged from 99.71% to 99.99% during the Class Period; in other words, virtually all the CS Notes were publicly available to trade – which supports a finding that the CS Notes traded in an efficient market. *See id.* at ¶¶173-74 & Ex. 21.

### b.    The CS Options Traded in an Efficient Market

As explained in detail by Dr. Cain, the *Cammer* and *Krogman* factors are not applicable to options. *See id.* at ¶103; *see also In re Apple Inc. Sec. Litig.*, No. 19-cv-2033, 2023 U.S. Dist. LEXIS 58603, at *5 (N.D. Cal. Mar. 28, 2023) (noting that "direct application of these criteria to options is not a useful measure of efficiency"). However, "when a market for common stock is found to be informationally efficient, reliance on misstatements or omissions can be presumed for the options, since their prices are derivative of the market prices for common stock (or ADSs), which in turn reflect any value-relevant information." Cain Report at ¶107; *see also In re Fibrogen Sec Litig.*, No. 21-cv-2623, 2023 U.S. Dist. LEXIS 236083, at *54-55 (N.D. Cal. Oct. 3, 2023)

18

("The market price for options is directly responsive…to changes in the market price of the underlying stock, and to information affecting that price.") (citing *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988)). Therefore, because the CS ADS market is efficient, the Court can presume the CS Options market is also efficient. *See* Cain Report at ¶¶107-09; *see also In re Priceline.com Inc.*, 236 F.R.D. 89, 99 (D. Conn. 2006) ("Option traders…may use the fraud-on the-market presumption of reliance absent special circumstances compelling a different result.").

Moreover, Dr. Cain analyzed the price movements of CS Options during the Class Period and concluded they were directionally consistent with the underlying CS ADS price movements, further supporting a finding of market efficiency. *See id.* at ¶¶105-06 & Exs. 11A, 11B. Specifically, for each of the 12 dates associated with a statistically significant price movement in the CS ADSs at the 95% confidence level or greater, 11 of 12 CS Call Options Series and 11 of 12 CS Put Options Series experienced price movements that were directionally consistent with the underlying CS ADS price movements. *See id.* Dr. Cain also identified several other factors supporting a finding of efficiency in the market for CS Options, including that: (i) CS Options traded on a national, liquid options exchange – the Chicago Board Options Exchange ("CBOE") – during the Class Period; and (ii) each CS Option contract covered 100 CS ADSs, "indicating significant investor interest in trading options on millions of shares of CS ADSs." *Id.* at ¶104.

### 4.   Any Differences in Class Members' Individual Damages Do Not Defeat Class Certification

The Supreme Court in *Comcast Corp. v. Behrend*, explained that to satisfy the predominance test, plaintiff must provide a model capable of measuring damages on a class-wide basis, and that the model measures only those damages attributable to plaintiff's theory of defendant's wrongdoing. 569 U.S. 27, 34-35 (2013). However, "*Comcast* did not rewrite the standards governing individualized damage considerations…[a]ll that is required at class

certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (citations omitted). Further, "Plaintiffs are not required at [the class certification] stage to demonstrate that any price impact was due to the prior misrepresentation alone," but "simply to propose a methodology for calculating damages that corresponds to its theory of liability." *Allergan*, 2021 U.S. Dist. LEXIS 170310, at *43 (citations omitted).

Courts routinely find plaintiffs have met their burden under *Comcast* where, as here, they "ha[ve] provided a class-wide model for calculating damages arising from its theory of liability…." *Signet Jewelers*, 2019 U.S. Dist. LEXIS 114695, at *57-59; *see also Menaldi*, 328 F.R.D. at 99 (reading *Comcast* narrowly and finding that though the damages model does not "eliminate any alternative causes or contributing factors," it meets the predominance requirement because "it calculates the damages caused by the alleged cover-up"); *Wilson*, 2018 U.S. Dist. LEXIS 138832, at *46-50 (finding plaintiffs met *Comcast* test because their "proposal shows on its face that their class-wide model for calculating damages arises from their theory of liability").

Here, Dr. Cain has provided a detailed "out of pocket" methodology for calculating each Class members' damages based on the timing of each Class member's transactions in CS ADSs, CS Notes, and/or CS Options that can be mechanically applied based on the submission by Class members of their trading information. *See* Cain Report at ¶¶3, 176-188. Specifically, the artificial information in the securities price at the time of sale will be subtracted from the artificial information in price at the time of purchase. *See id.* This method for calculating per share damages ties squarely to Plaintiff's theory of Defendants' fraudulently inflating and maintaining the price of CS Securities during the Class Period. Thus, after resolving the common liability issues, all that will remain will be a mechanical task of computing individual Class members' damages based on

a common methodology. Courts routinely find that this methodology is consistent with §10(b) liability and capable of calculating damages on a class-wide basis. *See Barrick Gold*, 314 F.R.D. at 105-06 (finding out-of-pocket methodology "entirely consistent with [plaintiffs'] theory of Section 10(b) liability and would be measurable on a class-wide basis" and noting "securities class actions routinely seek out-of-pocket damages for fraudulent misrepresentations").

Accordingly, based on the law of this Circuit, Plaintiff's class-wide damages methodologies comply with *Comcast* and damages do not predominate under Rule 23(b)(3).

### D.    Defendants Cannot Rebut the Presumption of Reliance in This Case

Once the publicity, marketing timing, and market efficiency elements of *Basic* are satisfied, "§10(b)'s reliance requirement is presumptively met," and "[a]t that point, the burden shifts to the defendant to rebut the presumption." *Goldman I*, 955 F.3d at 270. "[D]efendants can rebut the presumption and defeat class certification by demonstrating, by a preponderance of the evidence, that the misrepresentations did not actually affect, or impact, the market price of the stock." *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No. 20-cv-4953, 2024 U.S. Dist. LEXIS 59981, at *16 (S.D.N.Y. Mar. 29, 2024) (citing *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F. 4th 74, 80 (2d Cir. 2023) ("*Goldman III*")).

> The absence of price impact can be shown in two ways. First, a defendant can present evidence that the alleged misrepresentations had no "front-end" impact on stock — i.e., no impact on price when the statements were made. Second, a defendant may try to show that there was no "back-end" impact following a corrective disclosure — i.e., that the alleged misrepresentations were not associated with any negative stock returns.

*Allergan*, 2021 U.S. Dist. LEXIS 170310, at *30-31 (citations omitted). "However, for class certification purposes, when Plaintiffs are able to show an alleged misrepresentation had a statistically significant front-end price impact, Defendants are not entitled to rely on these additional back-end arguments to rebut the *Basic* presumption." *In re Chi. Bridge & Iron Co. N.V.*

*Sec. Litig.*, No. 17-cv-1580, 2020 U.S. Dist. LEXIS 49786, at *8 (S.D.N.Y. Mar. 23, 2020). In other words, because Defendants bear the burden of demonstrating the complete absence of price impact, they will have to establish that the alleged misrepresentations and omission had *neither* front-end *nor* back-end price impact. Here, Defendants will not be able to meet their burden on either score, but the price impact on the revelatory events is clear.

Following the February 9, 2023, disclosure by Credit Suisse of massive losses and customer outflows – after repeatedly representing those outflows had stabilized and the Bank was financially healthy – analysts and the media expressed serious concerns. For example, Reuters reported that "analysts were alarmed by the scale of losses and outflows," in a February 9 article titled "Credit Suisse warns of more losses, drawing regulatory attention." ¶355. And Barclay's released a research report that day titled "Credit Suisse AG: Q422 First Look: Much weaker than we anticipated," stating that the announced results were "worse than our expectations, with far larger outflows in wealth management." *Id.* (citing additional negative analyst reports). That day, the price of Credit Suisse ADSs fell 15.6%, from a closing price of $3.58 on February 8, 2023, to $3.02 on February 9, 2023. ¶356.

The March 14, 2023, disclosure of Credit Suisse's previously concealed material weaknesses in its ICFR was reported heavily in the press, with numerous articles quoting from the Annual Report. ¶359 (citing various media articles). That day, CS ADSs fell to $2.51 per ADS, a new all-time low (¶¶359, 361), and the prices of the CS Notes fell an average of 6.52%. *See* Miller Decl. Ex. B. Ultimately, the media attributed Credit Suisse's downfall, in part, to the announcement of the material weaknesses. ¶359.

And on March 19, 2023, Credit Suisse announced its merger with UBS, revealing that – contrary to Defendants' previous statements about the Bank's stability, liquidity and financial

health – the Bank had nearly collapsed.  As the Wall Street Journal presciently observed earlier that day before U.S. markets had opened, "[i]nvestors [we]re assessing the risk of contagion….The deal has been welcomed by regulators, but it may not be enough to assuage investors with stock markets in Asia and Europe down today." ¶368. CSs ADSs fell a staggering 52.9% to close at $0.9450 per ADS on March 20, 2023, which the media attributed to the merger announcement. *See* ¶369 (citing Keith Collins, "Credit Suisse Agrees to be Bought by Swiss Rival UBS," *The Wall Street Journal*, Mar. 20, 2023 ("Shares of Credit Suisse fell sharply following an emergency deal for rival Swiss bank UBS to buy the troubled lender for more than 3 billion dollars.")). As this Court observed, "it seems highly likely – that the ultimate materialization of the risk occurred when Credit Suisse was forcibly merged into UBS and so ceased to exist, which event rendered its securities essentially worthless." ECF No. 120 at 5.

The Supreme Court directs courts reviewing motions for class certification to be "aided by a good dose of common sense." *Goldman II*, 594 U.S. at 122 (citation omitted). With that instruction in mind, and based on the facts as set forth herein, there is simply no credible argument (much less one sufficient for Defendants to meet their heavy burden) that the alleged misrepresentations and omissions had zero impact on CS Securities, such that the price drops associated with the three revelatory events identified by Plaintiffs were due entirely to other factors. And it is not enough for Defendants to "suggest[ ] that another factor also contributed to an impact on" the price of CS Securities;  "it is Defendants' burden to show the *absence* of price impact — not merely to challenge Plaintiff on the persuasiveness of its own price impact claim — once *Basic*'s presumption of reliance attaches." *Allergan*, 2021 U.S. Dist. LEXIS 170310, at *30 (citing *Signet Jewelers*, 2019 U.S. Dist. LEXIS 114695, at *48).

Given the large declines in the value of CS Securities on the disclosure dates, Defendants

23

will be left to argue there is a "mismatch between the contents of the misrepresentation[s] and the corrective disclosure[s]." *Kirkland*, 2024 U.S. Dist. LEXIS 59981, at *18 (citing *Goldman II*, 594 U.S. at 123). But Defendants already made that argument, and the Court ruled that each revelatory event fits neatly with the alleged misrepresentations and omissions. *See Credit Suisse*, 2024 U.S. Dist. LEXIS 170531, at *471 ("Certainly the portions of this [March 14, 2023] announcement that revealed the problems with the Company's ICFR, and the corresponding issues in the 2021 Annual Report and prior quarter financial certifications, are 'corrective' in nature."); *id.* at *362 Feb. 9, 2023, disclosure of continuing outflows "arguably contradicts Lehman's 'basically stopped' statement" of Dec. 2, 2022); ECF No. 120 at 4 ("[T]he [March 19, 2023] announcement that Credit Suisse was going out of business certainly appears to have 'cured' the market's belief that its shares had any value."). Thus, Defendants will be unable to rebut the presumption of reliance.

### E. A Class Action Is the Superior Method for Adjudication

Securities fraud actions "easily satisfy the superiority requirement of Rule 23." *N.J. Carpenters Health Fund*, 2016 U.S. Dist. LEXIS 153804, at *34-35. Rule 23(b)(3) sets forth the following factors to be considered by the Court when making its "superiority" determination: (A) the class members' interest in individually controlling the prosecution…of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by…class members; (C) the desirability…of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. FED. R. CIV. P. 23(b)(3). "[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Signet Jewelers*, 2019 U.S. Dist. LEXIS 114695, at *60 (quoting *Petrobras*, 862 F.3d at 258).

Here, class certification will promote judicial efficiency by permitting common claims and issues to be resolved once with a binding effect on all parties. By contrast, if Plaintiff and each

Class member were forced to bring separate individual actions, each would be required to prove the same wrongdoing by Defendants to establish liability, resulting in judicial inefficiencies and potentially inconsistent judgments. More importantly, class certification is the only way to afford relief to those whose claims are too small to justify individual lawsuits. *See*, *e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class actions allow plaintiffs to pool claims otherwise uneconomical to litigate individually). A class action is not only the superior method of adjudication, but also perhaps the only feasible way to litigate the claims.

  **F. KSF Satisfies FED. R. CIV. P. 23(g)**

  Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class. *See* FED. R. CIV. P. 23(g)(1)(A). Here, Plaintiff's counsel, KSF, has amply demonstrated they are highly qualified to serve as Class Counsel. They have vigorously prosecuted this litigation, investigating and filing the Amended Complaint, extensively briefing Defendants' motions to dismiss, successfully fending off an attempt by a former competing lead plaintiff movant to replace Professor Diabat as lead plaintiff, propounding and responding to discovery requests, and coordinating with an expert on damages and market efficiency. KSF's wealth of knowledge and experience is clear and its extensive resources to prosecute this litigation cannot be doubted. *See* Miller Decl. Ex. D.

**IV. CONCLUSION**

  Plaintiff respectfully requests that the Court certify this action pursuant to Rule 23 as a class action and certify the Class defined herein; appoint Professor Ali Diabat as Class Representative; and appoint KSF as Class Counsel.

DATED: December 13, 2024        Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
J. Ryan Lopatka (admitted *pro hac vice*)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
E-Mail: kim.miller@ksfcounsel.com
E-Mail: j.lopatka@ksfcounsel.com

-and-

Lewis S. Kahn
Craig Geraci (admitted *pro hac vice*)
Matthew P. Woodard (admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
E-Mail: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com

*Counsel for Lead Plaintiff Professor Ali Diabat
and Lead Counsel for the Class*

26