**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALI DIABAT, Individually and On Behalf of All Others
Similarly Situated,

Plaintiff,

- <em>against</em> -

CREDIT SUISSE GROUP AG, AXEL P. LEHMANN,
ULRICH KÖRNER, DIXIT JOSHI, THOMAS
GOTTSTEIN, DAVID R. MATHERS, ANTÓNIO
HORTA-OSÓRIO, and
PRICEWATERHOUSECOOPERS AG,

Defendants.

Case No. 1:23-cv-5874-CM

[rel. 1:23-cv-04458-CM]

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION,**
**APPOINTMENT OF PLAINTIFF AS CLASS REPRESENTATIVE,**
**AND APPOINTMENT OF CLASS COUNSEL**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 3

I.     PLAINTIFF FAILS TO ESTABLISH THAT PURPORTED DAMAGES ARE CAPABLE OF MEASUREMENT ON A CLASSWIDE BASIS CONSISTENT WITH PLAINTIFF'S THEORY OF LIABILITY ........................................................................ 3

     A.     Plaintiff Fails to Demonstrate That His Damages Methodology Could Reliably Measure Purported Inflation in the Context of the Alleged "Historic" Merger of CS and UBS ................................................................................................................... 5

     B.     Plaintiff Fails to Demonstrate That His Damages Methodology Could Measure Purported Damages Associated With the Alleged Materialization of Risk ............ 9

     C.     Plaintiff Fails to Demonstrate That His Damages Methodology Is Capable of Measuring Damages Associated With the Alleged Misrepresentations Concerning CS's ICFR ................................................................................................................ 10

II.     DEFENDANTS' ALLEGED FAILURE TO DISCLOSE POTENTIAL ICFR ISSUES DID NOT IMPACT THE PRICE OF CS SECURITIES ................................................... 11

     A.     The ICFR Statements Had No "Front-End" Price Impact ................................... 13

     B.     The ICFR Statements Had No "Back-End" Price Impact .................................... 13

III.     PLAINTIFF HAS NOT MET HIS BURDEN TO SHOW THAT A CLASS CAN BE CERTIFIED THAT INCLUDES PURCHASERS OF CS OPTIONS OR CS NOTES... 18

     A.     Plaintiff Fails to Demonstrate that the CS Options and Notes Traded In Efficient Markets During the Class Period ........................................................................ 18

     B.     Plaintiff Offers No Methodology to Calculate Damages as to CS Options and Notes ............................................................................................................... 20

IV.     PLAINTIFF FAILS TO MEET THE REQUIREMENTS OF RULE 23(A) ................... 22

     A.     Plaintiff is Atypical ............................................................................................ 22

     B.     Plaintiff's Interests are Antagonistic to CS Noteholders .................................... 24

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021).......................................................................12, 13

*Allied Orthopedic Appliances, Inc.* v. *Tyco Healthcare Grp. L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007)...........................................................................................25

*Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ..............................................................................................13, 15

*Baffa* v. *Donaldson, Lufkin & Jenrette Secs. Corp.*,
222 F.3d 52 (2d Cir. 2000)......................................................................................................22

*Cammer* v. *Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .....................................................................................19, 20

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)..............................................................................................1, 3, 8, 10

*Denney* v. *Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006).....................................................................................................24

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ...................................................................................... 19-20

*Fort Worth Employees' Ret. Fund* v. *J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ...........................................................................................8

*GAMCO Invs., Inc.* v. *Vivendi, S.A.*,
917 F. Supp. 2d 246 (S.D.N.Y. 2013)....................................................................................23

*George* v. *China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013) .................................................................... 22-23

*In re Glob. Brokerage, Inc.*,
2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) .................................................................20, 23

*Goldman Sachs Grp., Inc.* v. *Arkansas Teacher Ret. Sys.*,
594 U.S. 113 (2021)....................................................................................12, 13, 16, 17

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)..................................................................................................12

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ............................................. 15, 16-17

*Krogman* v. *Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) .......................................................................19, 20

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ...............................................................................4n

*In re Northfield Laboratories, Inc. Sec. Litig.*,
267 F.R.D. 536 (N.D. Ill. 2010)................................................................................14

*Pearlstein* v. *Blackberry*,
2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) (McMahon, C.J.).................................23

*In re Petrobras Sec. Litig.*,
104 F. Supp. 3d 618 (S.D.N.Y. 2015)........................................................................23

*Pickett* v. *Iowa Beef Processors*,
209 F.3d 1276 (11th Cir. 2000) ....................................................................... 24-25

*Ramirez* v. *Exxon Mobil Corp.*,
2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)................................................. 11-12

*Shupe* v. *Rocket Cos., Inc.*,
2024 WL 4349172 (E.D. Mich. Sept. 30, 2024)........................................ 15-16, 17

*Sicav* v. *James Jun Wang*,
2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ...........................................................10

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084 (S.D.N.Y. Jul. 10, 2019) (McMahon, C.J.).........................6, 15

*Sjunde AP-Fonden* v. *Goldman Sachs Grp., Inc.*,
2024 WL 1497110 (S.D.N.Y. Apr. 5, 2024).........................................................11

*Valley Drug Co.* v. *Geneva Pharms., Inc.*,
350 F.3d 1181 (11th Cir. 2003) .............................................................................24

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001)....................................................................................24

iii

*Waggoner* v. *Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)..................................................................................................8n

**Rules**

Fed. R. Civ. P. 23 .................................................................................................... *passim*

**PRELIMINARY STATEMENT**[1]

In September 2024, this Court "granted in significant part motions to dismiss brought by Defendants." ECF No. 121 at 2. Among other things, the Court's decision (*see* ECF No. 109, the "MTD Order") "shortened significantly" the Class Period (ECF No. 121 at 2), and ruled that the vast majority of the alleged misstatements and corrective disclosures in the Complaint are not actionable as a matter of law. This case now involves two categories of alleged misstatements: (i) those that allegedly omitted purported deficiencies in Credit Suisse's ("CS") internal controls over financial reporting ("ICFR"), and (ii) those that allegedly mischaracterized CS's financial stability.

Plaintiff bears the burden to satisfy both (1) the "four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation" and (2) Rule 23(b)(3), which requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members." Pl. Br. at 4. Here, Plaintiff has satisfied neither portion of Rule 23. Where individual questions of reliance and/or damages predominate, as they do in this case, Plaintiff cannot satisfy Rule 23(b)(3), and class certification should be denied. Plaintiff also fails to satisfy the adequacy and typicality requirements of Rule 23(a).

With respect to damages, as set forth in Section I, Plaintiff fails to demonstrate that damages are capable of measurement on a classwide basis and in a manner consistent with Plaintiff's theory of liability as required under *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 38 (2013). Specifically, as the accompanying report of Prof. Mark Garmaise sets out in detail, Plaintiff has not offered a methodology that could be used to reliably measure purported inflation and damages

---

[1] Unless otherwise specified, all (i) emphasis is added, (ii) internal citations, quotations, and emendations are omitted, and (iii) capitalized terms have the meanings assigned in Plaintiff's December 13, 2024 Memorandum of Law (ECF No. 127, "Plaintiff's Brief" or "Pl. Br.").

throughout the Class Period in the context of the unprecedented events alleged here. Plaintiff's vague assurances of a future effort to offer such a methodology are insufficient.

With respect to reliance, as set forth in Section II, Plaintiff seeks to invoke the "fraud-on-the-market" presumption as to all of the alleged false statements at issue, but ignores that many of these alleged false statements had no impact on the price of CS Securities. As the accompanying report of Prof. Laura Starks explains, the required price impact as to the ICFR statements is absent such that the presumption of reliance is rebutted. No class can be certified as to these statements.

In addition, Plaintiff seeks to certify a class comprised of individuals and entities that purchased three types of CS Securities—CS American Depositary Shares (ADSs), CS Options, and CS Notes—in U.S. transactions between October 27, 2022 and March 17, 2023. *See* Pl. Br. at 1 n.1, 9. Plaintiff's proposed approach to calculating damages for CS Options and CS Notes suffers from additional flaws, and Plaintiff fails even to establish that CS Options or CS Notes traded in an efficient market. For these additional reasons, as set forth in Section III, no class can be certified as to CS Options or CS Notes.

Finally, Plaintiff fails to satisfy the "typicality" requirement of Rule 23(a)(2). Plaintiff made ***no*** Class Period purchases before the first corrective disclosure: CS's publication of its 2022 Annual Report on March 14, 2023. As a consequence, Plaintiff is subject to the unique defense that he did not (and logically could not have) relied on the ICFR statements (which the Court has ruled were corrected by March 14, 2023 at the latest). Plaintiff also fails to satisfy the "adequacy" requirement of Rule 23(a)(4) because, as an investor in CS ADSs, Plaintiff's interests are directly antagonistic to those of CS Noteholders. On March 20, 2023, CS ADSs experienced a price decline while CS Notes experienced a price increase. Thus, holders of ADSs will want to point to the price

2

drop on March 20, 2023 as purported evidence of inflation; holders of CS Notes will want to ignore

the price movements on March 20, 2023 in any damages analysis. Plaintiff cannot adequately

represent a single class of investors in the face of this direct conflict. *See* <u>Section IV</u>.

<u>**ARGUMENT**</u>

**I.    PLAINTIFF FAILS TO ESTABLISH THAT PURPORTED DAMAGES ARE CAPABLE OF MEASUREMENT ON A CLASSWIDE BASIS CONSISTENT WITH PLAINTIFF'S THEORY OF LIABILITY**

Where a plaintiff relies on a damages model in seeking to certify a class, as Plaintiff does

here, the model must "establish[] that [alleged] damages are capable of measurement on a

classwide basis" and "measure only those damages attributable" to plaintiff's theory of liability.

*Comcast*, 569 U.S. at 34-35. "[F]or purposes of Rule 23, courts must conduct a rigorous analysis

to determine whether that is so." *Id*. at 35. "If [a plaintiff's] model does not even attempt to

[measure only those damages attributable to plaintiff's liability theory], it cannot possibly establish

that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."

*Id.* In such a case, a plaintiff "cannot show Rule 23(b)(3) predominance: Questions of individual

damages calculations will inevitably overwhelm questions common to the class." *Id.* at 34.

Plaintiff does not dispute these principles. Pl. Br. at 19-20. But he purports to satisfy these

requirements by offering the expert report of Dr. Matthew Cain,[2] which Plaintiff describes as

having "provided a detailed 'out of pocket' methodology for calculating each Class members'

damages." *Id.* at 20. Dr. Cain provides no such "detailed" methodology. Instead, Dr. Cain simply

lists various "damages methodologies" often used in typical securities fraud cases and suggests

that some combination of them could be used in this case someday and "modified based on specific

---

[2] *See* Dec. 13, 2024 Expert Report of Matthew D. Cain, Ph.D (ECF No. 128-1 (the "Cain Report")).

3

findings the finder of fact may make." Cain Report ¶ 189. The end result, he suggests, would be a "formulaic out-of-pocket damages model" that "can mechanically calculate damages on a class-wide basis." *Id*. ¶¶ 190-91. While such vague assurances might be sufficient to certify a class in a typical securities fraud case, where a stock drop can be attributed to the revelation of a previously concealed truth, this case is far from typical.

Plaintiff fails to meet his burden for three primary reasons. ***First***, Plaintiff fails to demonstrate that the "precipitous" price drop on March 20, 2023, following the "historic" announcement of the merger of CS and UBS—orchestrated by Swiss regulator FINMA—could be used to reliably measure purported inflation at any point during the Class Period. *See* Section I.A. ***Second***, while Plaintiff relies in whole or in part on a "materialization of the risk" theory of loss causation in connection with the two purported "revelatory events" in this case,[3] Plaintiff offers no damages methodology that could account for a disclosure that allegedly reflects the materialization of a risk. *See* Section I.B. ***Third***, Plaintiff fails to demonstrate that his damages methodology could use any price changes on March 14, 2023, or March 20, 2023, to measure purported inflation associated with alleged misrepresentations concerning CS's ICFR. *See* Section I.C.

---

[3] Per Dr. Cain, "Lead Plaintiff intends to prove the [alleged] artificial inflation in the Credit Suisse Securities dissipated" in "three revelatory events" on February 9, 2023, March 14, 2023, and March 20, 2023. Cain Report ¶ 18 n.20. But the only two potentially "revelatory events" found by this Court are March 14, 2023 and March 20, 2023. MTD Order at 274, 276; ECF No. 121 at 5. Since the February 9, 2023 Earnings Release was not "revelatory" of any previously unknown information, it cannot serve as a basis for any damages calculation. *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (where the court "previously determined that there was no corrective disclosure" on a given date, a decrease in share price on that date "cannot serve as a basis for certifying the class").

A.    **Plaintiff Fails to Demonstrate That His Damages Methodology Could Reliably Measure Purported Inflation in the Context of the Alleged "Historic" Merger of CS and UBS**

As Plaintiff alleges, a distinctive attribute of this case is the regulator-facilitated merger of CS and UBS, announced on March 19, 2023,[4] and the significant price movement the following day.[5] Plaintiff goes to great lengths in his 484-paragraph Amended Complaint to set out what he describes as the "historic" events of March 2023 amid a broader global banking crisis,[6] and the "precipitous[]" drop in the price of CS Securities "after the news of the merger was revealed to the market." AC ¶ 369. This Court has also observed that "the greatest loss of value in [CS's] stock price between October 27, 2022 and March 202[3]—and so the largest aspect of the class's claim for damages—occurred on March 20, the day after the merger was announced." ECF No. 121 at 5.

Notwithstanding his own allegations about the "historic" nature of these events, Plaintiff and Dr. Cain suggest—without support—that generic, boilerplate approaches used in typical

---

[4] *See* ECF No. 65, Consolidated Amended Class Action Complaint ("AC") ¶ 1; *see also* Hall Decl., Ex. 1 (Jan. 17, 2025 Expert Report of Prof. Mark Garmaise, the "Garmaise Report") ¶ 13 ("[A] distinctive attribute of the matter at hand is that Credit Suisse's announcement on March 19, 2023 took place in the context of an extraordinary event, a regulator-facilitated merger, that occurred amidst the 2023 banking crisis that affected banks both in the U.S. and internationally.").

[5] *See* Garmaise Report ¶ 74 ("An important and distinctive attribute of the matter at hand is that the price movement following the March 19, 2023 disclosure of Credit Suisse's merger with UBS represents the market's reaction to the announcement of an extraordinary event, a regulator-facilitated merger, amidst the 2023 banking crisis.").

[6] *See also* AC ¶ 1 ("UBS' takeover of Credit Suisse marks the first time two global, systemically important financial institutions have been brought together since the financial collapse of 2008 and 2009."); ¶ 18 (describing combination of UBS and CS as a "forced" merger "at the behest of the Swiss government" who "feared" that an "imminent collapse" of CS "would trigger a global financial meltdown"); ¶¶ 294, 374, 405 (citing public statements and reports acknowledging a broader banking crisis, including the collapses of Silicon Valley Bank and Signature Bank).

securities fraud cases to calculate classwide damages can be used here to measure inflation and damages in the context of these unprecedented events.[7] But Plaintiff fails to demonstrate that the use of generic approaches in this unique case is consistent with Plaintiff's theory of liability. Indeed, the cases Plaintiff cites only reinforce that typical techniques may be appropriate to calculate damages in "typical" securities fraud cases; they do not stand for the proposition that these techniques can be used in **all** securities fraud cases, let alone cases involving extraordinary events. *Cf. In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *1, *20 (S.D.N.Y. Jul. 10, 2019) (McMahon, C.J.) (cited in Pl. Br. at 5, 24) (holding that an event study could apply in a case described as "typical in all respects save one" which made it only "somewhat unique" and "far from extraordinary").

As Prof. Garmaise sets out in detail in his report, most critically, Dr. Cain "has not explained how he could use the March 20, 2023 Credit Suisse ADS price decline, which followed the March 19, 2023 merger announcement"—*i.e.*, "the greatest loss of value in [CS's] stock price between October 27, 2022 and March 202[3]" (ECF No. 121 at 5)—as a measure of alleged artificial price inflation earlier in the Proposed Class Period. Garmaise Report ¶ 79. The alleged "artificial inflation represents the difference between the price of a security in the 'actual' world as compared to a 'but-for' scenario, that is, the price of a security absent the alleged misrepresentations." *Id.* ¶ 72. Accordingly, a critical aspect of measuring inflation will be modeling what would have happened if the allegedly concealed information about CS's financial condition had been disclosed at some earlier date *(i.e.*, the "but-for" disclosure).

---

[7] *See* Garmaise Report ¶ 12 (opining that Dr. Cain's "list of generic descriptions of approaches that might be used to calculate damages for a securities fraud claim . . . fails to account for various distinctive factors in this matter and is therefore flawed").

For the reasons discussed in the Garmaise Report, however, standard approaches are ***not*** sufficient with respect to the March 20 price drop because, unlike in the usual case, CS's circumstances—and the nature and extent of regulatory involvement—might have been very different if the exact same information Plaintiff alleges was revealed on March 20 was instead revealed days, weeks, or months earlier.[8] In other words, factors relevant to measuring purported inflation here at any given point in time—*i.e.*, the nature of regulatory involvement, the then-current state of a broader global banking crisis, and market expectations concerning such events—are not the types of factors that lend themselves to formulaic modeling. Dr. Cain neither addresses these uncertainties nor even suggests that he has offered a model that is capable of estimating purported inflation in these circumstances. As Prof. Garmaise explains:

> [T]o the extent the hypothetical but-for disclosure could have led to expectations of a different regulatory action (e.g., no regulatory assistance, a bailout by the Swiss government, or a merger by UBS but under different terms and structures, including a different degree of government involvement) and a different financial outcome for Credit Suisse and its securities holders, Dr. Cain has not articulated any reliable methodology he could use to model any such events occurring, let alone to calculate the value impact of these events and therefore inflation.

*Id*. ¶ 85. Not only has Dr. Cain not provided such a model, but Prof. Garmaise is unaware of "any existing methodology from academic literature . . . that is capable of reliably modeling the changes

---

[8] *See* Garmaise Report ¶¶ 80-81. As Prof. Garmaise explains, Dr. Cain does not appear to have anticipated, and certainly has not addressed, these uncertainties in at least two important respects: (1) "Dr. Cain has not shown why it would be reasonable to assume that the support offered by Swiss regulators would have been similar, let alone the same, at earlier points in the Proposed Class Period, given that the regulatory assistance transpired in the specific context of the then ongoing 2023 banking crisis"; (2) "Dr. Cain has also not addressed that regulators may have viewed Credit Suisse differently earlier in the Proposed Class Period for political, policy, or other reasons, and thus may have responded differently to a potential alternative disclosure by the Company." *Id*. ¶¶ 82-83.

7

in market expectations regarding a potential future regulator-facilitated merger in such 'but-for' scenarios and hence the price impact of a 'but-for' disclosure over time." *Id*. ¶¶ 14, 85.[9]

Thus, Plaintiff's claims that purported damages may be calculated through the "mechanical[]" or "formulaic[]" application of standard damages methods is wrong. Pl. Br. at 20; Cain ¶ 177. And without a model, individualized questions of damages—including questions as to market expectations and potential regulatory outcomes at the time of each Class member's purchases and sales—would predominate.

Plaintiff's and Dr. Cain's mere assurances that someday they will be able to put together a classwide damages model that takes all of the above factors in account does not satisfy Plaintiff's burden. *See Comcast*, 569 U.S. at 37; *see also Fort Worth Employees' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) (declining to certify a damages class in a securities case where plaintiffs' expert failed to provide "assurance beyond [the expert's] say-so" of "a damages model that [would] permit the calculation of damages on a classwide basis.").

By failing to provide or even propose a model that could address the unique circumstances alleged here, Plaintiff has failed to carry his burden to satisfy Rule 23(b)(3).

---

[9] Although Plaintiff was not required at this stage to provide a precise measure of how inflation varied across the Class Period, he *was* required to demonstrate that his damages model could someday do so. In this regard, this case is distinguishable from *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (certifying class where expert demonstrated that damages "could be calculated by applying a method across the entire class that focused on the [relevant price decline] . . . and then isolating company-specific events from market and industry events"). Plaintiff does not explain how the type of method accepted in *Waggoner* could be reliably used here where questions of alleged inflation and damages depend on measuring changes in market expectations regarding potential regulatory outcomes.

**B.      Plaintiff Fails to Demonstrate That His Damages Methodology Could Measure Purported Damages Associated With the Alleged Materialization of Risk**

Even if Dr. Cain had explained how he could craft a model that would properly take into account the unique circumstances surrounding the March 20, 2023 price drop—and he has not—Plaintiff has still failed to articulate a workable classwide damages model for that date. This is because this Court held that the March 19, 2023 merger announcement was not a corrective disclosure. *See, e.g.*, MTD Order at 275-76. Instead, this Court left open only the possibility that the announcement, and the price drop that followed on March 20, 2023, "represented a further materialization of a concealed risk." ECF No. 121 at 5.

Thus, if Plaintiff wishes to pursue damages connected to the March 20 price decline, he can do so only on a materialization of risk theory. Under that theory, any calculation of inflation "must be based on the extent to which the market was misled about the risk by the alleged misrepresentations before the risk materialized." Garmaise Report ¶ 87. But one cannot simply take the entire price drop on March 20, 2023 as a reliable measure of the associated alleged inflation. As Prof. Garmaise explains, "the full price decline resulting from the realization of a risk is not a reliable measure of inflation resulting from an alleged misrepresentation about the degree of risk and would overstate any inflation and damages." *Id.* ¶ 91. This is because, "even had the true risk been known by the market, the price typically still would have declined by some amount when that risk ultimately materialized. Instead, any calculation of inflation must be based on the extent to which the market was misled about the risk by the alleged misrepresentations before the risk materialized." *Id.* ¶ 87.

As an initial matter, it is unclear what "risk" Plaintiff believes was concealed until March 19, 2023. *See generally* AC ¶ 370 (listing various facts that supposedly were "fully and finally

9

revealed" on March 19 but not tying any of those facts to any undisclosed risk). But assuming Plaintiff's position is that the "risk" at issue was the risk that CS might face financial distress, that is a risk that all banks—and all companies—face to varying degrees at all times. In light of this fact, as Prof. Garmaise explains, a classwide damages model would need to take into account how investors—or the market at large—assessed this risk vis-à-vis CS at any given time during the Class Period. *See* Garmaise Report ¶¶ 86-96. But Dr. Cain comes nowhere close to explaining how his model would do this—particularly given the broader banking crisis in early 2023, which further complicates how the market was assessing the risk of a bank run or similar events at CS during this time period. *See id.*

Without such a model, individualized questions of damages will inevitably predominate. *See* Section I.A; *see also Sicav* v. *James Jun Wang*, 2015 WL 268855, at *1, *3, *6 (S.D.N.Y. Jan. 21, 2015) (denying motion for certification where "plaintiffs' submission [was] insufficiently rigorous" because it failed to show, *inter alia*, "concretely, how plaintiffs propose[d] to reliably establish damages" and where its "claims of injury [were] due not to corrective disclosures" but required a "trade-by-trade inquiry into whether or not there was persistent price inflation"). This, in turn, renders class certification inappropriate. *Comcast*, 569 U.S. at 34.

**C.      Plaintiff Fails to Demonstrate That His Damages Methodology Is Capable of Measuring Damages Associated With the Alleged Misrepresentations Concerning CS's ICFR**

Dr. Cain claims that he will be able to use standard techniques to measure damages as to the alleged misrepresentations concerning CS's ICFR. But the analysis and opinions Dr. Cain has offered suggests that neither the price drop on March 14, 2023, nor the drop on March 20, 2023, can be used to measure purported inflation during the Class Period.

10

As to March 14, the only event study offered by Dr. Cain does not reliably show a statistically significant price impact. Dr. Cain found the residual return on this day to be -5.2%, but this finding is a product of Dr. Cain's arbitrary exclusion of two "outlier dates" dates from the estimation window of his event study. Garmaise Report ¶¶ 106-10. As Prof. Garmaise explains, upon correcting Dr. Cain's analysis, the purported "residual return" associated with the drop on March 14 (*i.e.*, the purported "abnormal" or company-specific price impact) is not statistically significant under commonly accepted standards. *See id*. ¶¶ 71, 102, 110. And, if the ADSs market was efficient as Plaintiff claims, the price of CS's ADSs fully reflected the March 14, 2023 ICFR disclosure before March 20, so the price change on March 20 cannot be linked to CS's ICFR statements. *Id*. ¶¶ 121-25.

Thus, Dr. Cain cannot measure inflation relating to CS's ICFR using alleged price movements on March 14 or March 20—the only two "revelatory events" at issue—using any of the generic damages methodologies he lists in his report. Without a viable damages methodology, individualized calculations of damages would again inevitably overwhelm common issues.

## II.    DEFENDANTS' ALLEGED FAILURE TO DISCLOSE POTENTIAL ICFR ISSUES DID NOT IMPACT THE PRICE OF CS SECURITIES

Even if this Court does not deny class certification in its entirety—which it should for the reasons discussed herein—it should, at a minimum, deny class certification as to the ICFR statements because those statements had no impact on the price of the CS Securities. *See Sjunde AP-Fonden* v. *Goldman Sachs Grp., Inc.*, 2024 WL 1497110, at *17 (S.D.N.Y. Apr. 5, 2024) (denying in significant part a motion for class certification where plaintiffs could not "rely on the inference that the front-end statements had any impact on price, and the *Basic* presumption [did] not apply as to [those] statements" as to certain of the false statements at issue); *see also Ramirez*

11

v. *Exxon Mobil Corp.*, 2023 WL 5415315, at \*22 (N.D. Tex. Aug. 21, 2023) (holding that "Defendants have sufficiently rebutted the alleged price impact of Defendants' alleged misstatements about the carbon proxy costs" and denying plaintiff's motion "to the extent it seeks to certify claims regarding Defendants' alleged misstatements about carbon proxy costs").

Plaintiff relies on the "fraud-on-the-market" presumption of reliance, but the presumption can be rebutted where alleged false statements have no impact on the price of the securities at issue. Pl. Br. at 11. Specifically, "defendants may rebut the *Basic* presumption at class certification by showing that an alleged misrepresentation did not actually affect the market price of the stock." *Goldman Sachs Grp., Inc.* v. *Arkansas Teacher Ret. Sys.*, 594 U.S. 113, 119 (2021) (hereinafter "*Goldman*") (citing *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014)). This is so because, "[i]f a misrepresentation had no price impact, then *Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Goldman*, 594 U.S. at 119.

As this Court has explained, "[t]he absence of price impact can be shown in two ways. First, a defendant can present evidence that the alleged misrepresentations had no 'front-end' impact on stock—*i.e.*, no impact on price when the statements were made. Second, a defendant may try to show that there was no 'back-end' impact following a corrective disclosure—*i.e.*, that the alleged misrepresentations were not associated with any negative stock returns." *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at \*11 (S.D.N.Y. Sept. 8, 2021).

Here, the accompanying reports of Professors Starks and Garmaise show how the evidence—"qualitative as well as quantitative" and "aided by a good dose of common sense" (*Goldman*, 594 U.S. at 122)—establishes that none of the ICFR statements affected the price of CS Securities on either the "front-end" or "back-end."

## A.      The ICFR Statements Had No "Front-End" Price Impact

Plaintiff's Brief does not even attempt to demonstrate that the ICFR statements had any "front-end" price impact. Nor does the Complaint allege price increases attributable to alleged misstatements or omissions relating to ICFR. This is unsurprising because, as the Court has previously explained, with the exception of CS's 2022 Sarbanes-Oxley ("SOX") certifications, "Credit Suisse [did] not discuss or make any representations about its ICFR in any of the challenged language" of the alleged misstatements that remain in the case. MTD Order at 237.[10] As a matter of "common sense" (*Goldman*, 594 U.S. at 122), then, Plaintiff does not and could not claim that any omission to disclose "material weaknesses" in financial reporting controls "directly caused any unreasonable *increase*" in the price of CS Securities. *In re Allergan*, 2021 WL 4077942, at *11 (emphasis in original).

## B.      The ICFR Statements Had No "Back-End" Price Impact

Where, as here, there was no front-end price impact, Defendants can establish a lack of price impact by showing that the revelation of the "truth" was "not associated with any negative stock returns" (*i.e.*, that back-end price impact is also absent). *Id.* If the price does not drop when the truth is revealed, this is strong evidence that the alleged fraud did not impact the price. *See Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023). Plaintiff focuses on price declines on three days, but none of these can be tied to the disclosure of CS's ICFR issues. As discussed above, the Court has already rejected one of these dates as a corrective disclosure (February 9, 2023), and nothing on that day related to ICFR in any event. We take the

---

[10] Nor can the 2022 SOX certifications have caused any "front-end" price impact given that, even if they were allegedly inaccurate, they were made on March 14, 2023, at the same time CS disclosed the ICFR issues. *See* MTD Order at 274 n.24.

remaining two relevant dates in turn.

### 1.    March 14, 2023

March 14 is the only purported "revelatory event" date that involves ICFR-related news. Plaintiff claims that CS "stunned the market" on March 14, 2023 by revealing in its 2022 Annual Report that it had identified weaknesses in its ICFR. Pl. Br. at 3. How did the market react to this "stunning" revelation? CS ADSs closed at $2.51 per share on March 14, down a mere **three cents** from the $2.54 per share close on March 13. AC ¶ 361. Dr. Cain cannot reliably show the March 14, 2023 "news" resulted in a statistically significant market reaction, even where he unsuccessfully attempts to boost purported statistical significance by impermissibly excluding two "outlier" event dates from his analysis. *See* Garmaise Report ¶ 108 n.110 (explaining that Dr. Cain's exclusion of two "outlier" event dates reduces the volatility from 3.0% to 2.4%); *see also In re Northfield Laboratories, Inc. Sec. Litig.*, 267 F.R.D. 536, 548 (N.D. Ill. 2010) (finding unreliable expert's exclusion of event dates to reduce the expected level of volatility from 4.09% to 3.66%, which has the corresponding effect of making it appear as though the release of news had a greater impact on share price than it actually had). Further, the multiple securities analysts covering CS at the time said virtually nothing about the ICFR issue. *See* Hall Decl., Ex. 2 (Jan. 17, 2025 Expert Report of Prof. Laura Starks, the "Starks Report") ¶¶ 68-76, 82-83. The market was far more focused on other issues, not the highly technical ICFR issue that did not result in any material misstatement of CS's financial statements. Accordingly, there was no back-end price impact on March 14.

*Quantitatively*, there was no statistically-significant decline in the price of CS ADSs on March 14. *See supra* at <u>Section I.C</u> (after correcting for Dr. Cain's arbitrary methodological

14

choices, there was no statistically significant ADS residual return at the 95% confidence level on this date). As both Professors Garmaise and Starks point out, this is hardly surprising because CS had previously disclosed on March 9, 2023 that it was delaying the publication of its Annual Report "in relation to certain open SEC comments" that implicated CS's "controls" related to the compilation of CS's consolidated cash flow statements. Garmaise Report ¶ 117 (quoting from CS's March 9, 2023 press release); *see also* Starks Report ¶¶ 22, 65-67. And the actual cash flow numbers at issue were even older news: CS had corrected those ***a year prior*** in March 2022. Garmaise Report ¶ 116. Thus, by the end of March 9, 2023, the market already had a significant window into the issues discussed in the Annual Report and had already incorporated any potential reaction.

The absence of a significant stock price reaction to the 2022 Annual Report is strong evidence that any new information revealed in it was not value-relevant. *See*, *e.g.*, *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *10 (S.D.N.Y. Mar. 29, 2024) (a company announcement that was not followed by a statistically significant decline in share price was "probative of the absence of price impact"); *cf. In re Signet*, 2019 WL 3001084, at *15 (looking to statistical significance of back-end price declines when assessing price impact arguments).

***Qualitatively***, as Prof. Starks explains, the dozens of securities analysts covering CS in March 2023 paid essentially no attention to the ICFR discussion in the 2022 Annual Report. *See* Starks Report ¶¶ 68-75. This, too, is strong evidence of the absence of price impact. *See Arkansas Teacher Ret. Sys.*, 77 F.4th at 104-05 (where analyst reports did not reference an alleged corrective disclosure, defendants had "sever[ed] the link between back-end price drop and front-end misrepresentation" and thus "rebutted *Basic*'s presumption of reliance"); *Shupe* v. *Rocket Cos.,*

15

*Inc.*, 2024 WL 4349172, at *25 (E.D. Mich. Sept. 30, 2024) (crediting a similar analysis by Prof. Starks in finding the fact that analyst reports did not mention the alleged misrepresentations at issue "largely dispositive" in determining a lack of price impact").[11]

Other qualitative context supports this conclusion. When a plaintiff proceeds on an "inflation-maintenance theory"—*i.e.*, an argument that "the price drop [after an alleged corrective disclosure] is equal to the amount of inflation maintained by [an] earlier misrepresentation"—the inference that a "back-end price drop equals front-end inflation . . . starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 594 U.S. at 123. That is precisely the case here—as noted above, **none** of the pre-March 14, 2023 ICFR statements even mention ICFR issues. This is further evidence that the market did not view CS's March 14, 2023 disclosure that it had discovered ICFR issues as correcting any of the ICFR statements.

If, during the Class Period, CS had told the market that it had no weaknesses in its ICFR, and then changed its position in March 2023, there might be some logic to Plaintiff's contention that the later statement was a "corrective disclosure." But where, as here, the earlier statements addressed other topics and involved ICFR only by alleged omission, and where analysts said virtually nothing about the ICFR issues at the time of the alleged "corrective disclosure," common sense does not permit the inference that the original omission was value-relevant in any sense. *See*

---

[11] Plaintiff points to three press articles discussing the "material weakness" CS described in the Annual Report. *See* AC ¶ 359; Pl. Br. at 3, 22. Unlike analyst reports, where the author has an incentive to identify and discuss value-relevant news about a company and its securities, press reports are far less informative when evaluating price impact. *See* Starks Report ¶ 38. In any event, none of these reports purported to express a view on whether anything CS announced on March 14 corrected an earlier misstatement or omission, nor did they question the reliability of CS's financial reporting.

16

*generally In re Kirkland*, 2024 WL 1342800, at *12 (denying motion for class certification where alleged misstatement referred to future long-term metrics while corrective disclosure referred to specific performance targets and finding that the "substantive mismatch . . . sever[ed] the link between back-end price drop and front-end misrepresentation"); *Shupe*, 2024 WL 4349172, at *26 (denying class certification where "a considerable mismatch exist[ed] between the *generic* nature of the alleged misrepresentations and the *specific* revelation") (emphasis in original).

Finally, academic literature suggests the disclosure of ICFR weaknesses by large, audited firms like CS does not, standing alone, result in a negative market reaction. Garmaise Report ¶¶ 118-19. This comports with "common sense" (*Goldman*, 594 U.S. at 122); where, as here, a company discloses that it identified an ICFR weakness but ***not*** any material errors in its financial statements (*see* AC ¶ 358), the market would assume (correctly, in this case) that the identified issue did not mean that the company's statements about its broader financial condition were false.

### 2.    March 20, 2023

The decline in the price of CS ADSs on March 20 cannot be linked to the ICFR issues; even Dr. Cain does not say otherwise. Still, Plaintiff argues in his brief that "Credit Suisse's downfall" was a result, "in part, [of] the announcement of the material weaknesses." Pl. Br. at 3; AC ¶ 359. This makes no sense, particularly where Dr. Cain argues that CS ADSs "reacted rapidly to Company-specific news." Cain Report ¶ 62; *see also* Garmaise Report ¶¶ 122-25 (an efficient market would have priced in the information about CS's ICFR well prior to March 20). In other words, the March 20 price decline cannot be causally linked to a disclosure about ICFR issues a week or more earlier. Tellingly, Plaintiff does not argue in his brief that the March 20 price decline revealed anything the market did not already know about CS's ICFR. *See* Pl. Br. at 24.

17

In sum, the ICFR statements did not cause any "front-end" *or* "back-end" price impact. The *Basic* presumption is therefore rebutted as to the ICFR statements, and a class action cannot proceed as to those statements.

## III.    PLAINTIFF HAS NOT MET HIS BURDEN TO SHOW THAT A CLASS CAN BE CERTIFIED THAT INCLUDES PURCHASERS OF CS OPTIONS OR CS NOTES

### A.    Plaintiff Fails to Demonstrate that the CS Options and Notes Traded In Efficient Markets During the Class Period

As discussed above, to attempt to establish that common questions of law or fact predominate, Plaintiff relies on the *fraud-on-the market* presumption of reliance. *See supra* at Section II. That presumption relies on a premise of market efficiency that Plaintiff fails to establish as to both CS Options and CS Notes.

***As to CS Options***, Dr. Cain posits that they traded in an efficient market because they traded on the CBOE and their prices were "directionally consistent" with those of CS ADSs. Cain Report ¶¶ 104-06. But Dr. Cain ignores academic literature showing mispricing in options and finding that the CBOE has not been perfectly efficient. *See* Garmaise Report ¶¶ 145-47.

Dr. Cain also fails to analyze the distinct economic characteristics of each CS Option to determine market efficiency. *See id*. ¶ 149. Instead, he analyzes only 22 CS Option series out of a total of 884 that traded during the Class Period, and, as to those he evaluates, he looks at only 12 days of the Class Period. *See* Cain Report ¶ 106; *see also* Garmaise Report ¶ 151. Dr. Cain points to the fact that, on 11 of 12 of these days, the movements in CS Options prices were directionally consistent with movements in CS ADSs prices to suggest market efficiency. *See* Cain Report ¶ 106. But this curated analysis by Dr. Cain ignores that each of the 884 CS Option series that traded during the Class Period "is a unique security, with differences in type of option (i.e. call vs. put), strike price, expiration date, and liquidity," and therefore fails to analyze market efficiency

18

for the overwhelming majority of the CS Option series at issue. Garmaise Report ¶¶ 152-53.

Dr. Cain dismisses the commonly-used factors set forth in *Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (the "*Cammer* factors") and in *Krogman* v. *Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) (the "*Krogman* factors") "as not directly applicable to options." Cain Report ¶ 103. Specifically, Dr. Cain declines to consider trading volume and bid-ask spread, two of the key indicia of market efficiency. Prof. Garmaise considered these factors and found that they do not support a conclusion of efficiency in the trading market for CS Options. *See* Garmaise Report ¶¶ 167-70. In short, Plaintiff's superficial arguments for market efficiency, based on a partial and selective review of a handful of the hundreds of options at issue, cannot carry his burden.

***As to CS Notes***, Dr. Cain purports to apply the *Cammer* and *Krogman* factors (*see* Cain Report ¶¶ 134-74) to conclude that the CS Notes traded in an efficient market as well. But he ignores important data. For example, *Cammer* factor five asks "whether a company's security price quickly responds to and incorporates new, value-relevant information." *Id*. ¶ 61. To conclude that the price movements in the CS Notes meet this factor, Dr. Cain pools all CS Notes together and compares the price reactions and trading volume on two event dates: November 2, 2022 and March 20, 2023. *See* Garmaise Report ¶¶ 174-75. This analysis is deeply flawed for a number of reasons.

First, Dr. Cain looks to just two event dates, one of which is not even in the Class Period. *See* Cain Report ¶ 160. As to the other date, none of the CS Notes had a statistically significant price change. *See* Garmaise Report ¶ 176. In addition, by pooling all CS Notes, Dr. Cain fails to account for the possibility that some CS Notes traded in efficient markets while others did not. *See id*. ¶ 178. Dr. Cain's approach is facially insufficient to support a finding that ***each*** CS Note traded in an efficient market. *See In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281

19

F.R.D. 174, 181-82 (S.D.N.Y. 2012) (plaintiffs did not establish existence of efficient market even though some *Cammer* and *Krogman* factors supported an inference of efficiency, because plaintiff lacked "evidence of a cause-and-effect relationship between unexpected news and market price"); *see also In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at *16 (S.D.N.Y. Mar. 18, 2021) ("Courts have considered [the fifth *Cammer* factor] 'the most important *Cammer* factor' because without finding this causal relationship, it is 'difficult to presume that the market will integrate the release of material information about a security into its price.'"), *report and recommendation adopted*, 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021).

Dr. Cain's approach with respect to other *Cammer* and *Krogman* factors is similarly inadequate. For instance, Dr. Cain evaluates the weekly trading volume for CS Notes as part of his *Cammer* Factor 1 analysis, but ignores that two of the seven CS Notes he evaluates do not satisfy the trading volume benchmark that he cites as relevant for assessing market efficiency. *See* Garmaise Report ¶ 182; *see also id.* ¶¶ 183-85. Once again, Dr. Cain overlooks that each CS Note is an individual security with specific market characteristics, rendering his analysis unreliable.

Plaintiff has failed to establish that the CS Options and Notes traded in an efficient market. Therefore, Plaintiff cannot rely on the fraud-on-the-market presumption of reliance as to CS Options and Notes, and class certification as to these securities should be denied.

### B.    Plaintiff Offers No Methodology to Calculate Damages as to CS Options and Notes

Dr. Cain acknowledges that artificial inflation in CS ADSs is a necessary input to calculate artificial inflation in CS Options. *See* Cain Report ¶¶ 187-88. Because Dr. Cain has not and cannot prove fraud-related inflation of CS ADSs on a classwide basis, as discussed in Section I, any CS Options model will also be incapable of doing so. Additionally, though Dr. Cain concedes that

20

factors beyond artificial inflation, such as the volatility of the underlying ADSs, influence the value of an option, he does nothing to address the particular economic circumstances facing CS in March 2023. Specifically, he ignores that the implied volatilities of CS Options increased substantially at that time. Garmaise Report ¶¶ 131-32. Without proposing any methodology that could identify the "but-for" volatilities to use for each option series in his analysis, Dr. Cain has not offered a methodology that could reliably calculate damages for CS Options consistent with Plaintiff's theory of liability. *See id*. ¶ 132.

As to CS Notes, Dr. Cain does not discuss a specific methodology for calculating purported inflation in CS Notes at all. If he seeks to offer the same one he endorsed for CS ADSs—the "out-of-pocket" method (*see id*. ¶ 134)—it is particularly inadequate because the factors that impacted the values of CS Notes differed significantly from the factors that impacted the values of CS ADSs. *See id*. ¶ 135. For example, Dr. Cain does not explain how the "out-of-pocket" method could reliably measure purported artificial inflation of the CS Notes that was allegedly corrected on March 20 where Dr. Cain's own event study shows that all seven CS Notes had ***positive*** returns on March 20 (which were statistically significant for six of the Notes). *See* Cain Report Ex. 17; Garmaise Report ¶¶ 136-37 (explaining that due to the assumption of CS debt by UBS, an institution with a higher credit rating than CS, CS Noteholders actually benefitted from the deal orchestrated by the Swiss government). In short, Dr. Cain fails to address how the "out-of-pocket" methodology could account for CS ADSs experiencing a price ***decrease*** on March 20 while CS Notes experienced a price ***increase*** on the same day. Dr. Cain overlooks that one methodology applying one theory of liability results in two very different results for two out of the three classes of CS Securities Plaintiff purports to represent.

21

## IV.    PLAINTIFF FAILS TO MEET THE REQUIREMENTS OF RULE 23(a)

### A.    Plaintiff Is Atypical

Both of Plaintiff's Class Period purchases of CS ADSs occurred in the last five days of the Class Period, after the only corrective disclosure. *See* ECF No. 121 at 3. Plaintiff then made another purchase on March 30, 2023, after the Class Period—and well after the market was aware that CS was merging with UBS and would cease operating as an independent entity.[12] These facts give rise to multiple reliance and causation arguments distinct to Plaintiff. A plaintiff cannot satisfy Rule 23(a)(2) where, as here, he is subject to unique defenses not applicable to the proposed class as a whole. *See, e.g.*, *Baffa* v. *Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000) (affirming district court's holding that plaintiff was atypical class representative where she was subject to unique defenses).

The fact that Plaintiff made his first Class Period purchase after the publication of the 2022 Annual Report—and the fact that Plaintiff made a sizable purchase of CS ADSs *after* the UBS merger was announced and *after* what Plaintiff himself refers to as "Credit Suisse's spectacular collapse" (AC ¶ 376)—subjects Plaintiff to the unique defense that none of the alleged misrepresentations, including those he alleges were not corrected or revealed until March 20, 2023, had any bearing on his purchase decisions. Courts have repeatedly found that such purchasing activity renders a plaintiff atypical under Rule 23(a)(2). *See, e.g.*, *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) ("A named plaintiff who has engaged in a post-

---

[12] *See* Hall Decl., Ex. 4 (statement showing that Plaintiff purchased 36,000 shares on March 30, 2023); Hall Decl., Ex. 3 (Nov. 6, 2024 Ali Diabat Dep. Tr. 237:21–238:11("Q. After you learned on March 14th, 2023, of a material weakness, did you make further investments in Credit Suisse ADS? A. After I hear that, yes, I did make two transactions. In fact, three transactions. . . . Two before the merger [announcement], and one after the merger [announcement].")).

disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision."); *GAMCO Invs., Inc.* v. *Vivendi, S.A.*, 917 F. Supp. 2d 246, 261 (S.D.N.Y. 2013) ("[P]ost-disclosure purchases can defeat the typicality requirement for class certification when plaintiffs made a disproportionately large percentage of their purchases post-disclosure.").

Plaintiff contends that he is typical because "all his purchases were made before the final revelatory event of March 19, 2023." Pl. Br. at 7 (emphasis in original). But this is simply untrue. Plaintiff essentially doubled his position in CS ADSs on March 30, 2023, over a week after the merger announcement and the end of the Class Period. *See* Hall Decl., Ex. 4. Accordingly, the cases Plaintiff invokes in support of his purported typicality are inapposite and distinguishable. *See Pearlstein* v. *Blackberry*, 2021 WL 253453, *10 (S.D.N.Y. Jan. 26, 2021) (McMahon, C.J.) (cited in Pl. Br. at 7) (holding that post-class period purchases did not defeat typicality where, unlike here, plaintiff purchased "far more" stock during the class period than after); *In re Glob. Brokerage*, 2021 WL 1160056, at *10 (cited in Pl. Br. at 7) ("Since the proposed Class Representatives made their purchases before [the final corrective disclosure], it is of no moment that they purchased later rather than earlier in the Class Period."). Here, unlike in those cases, Plaintiff's purchases subject him to defenses inapplicable to putative class members who purchased earlier and thus render him unable to satisfy the typicality requirement of Rule 23(a). *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015) (concluding that a proposed lead plaintiff group would be subject to unique defenses because, *inter alia*, significant purchases were made following the class period).

### B.    Plaintiff's Interests Are Antagonistic to CS Noteholders

Separately, Plaintiff is inadequate to represent CS Noteholders, who are proposed members of the Class. Under Rule 23(a)(4), the Court's adequacy assessment looks to two issues: the proposed class representative (i) must have an interest in vigorously pursuing the claims of the class, *and* (ii) "must have no interests antagonistic to the interests of other class members." *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." Pl. Br. at 8; *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (holding that under Rule 23(a)(4), class certification must be denied when there is a "fundamental" conflict between the class representative and members of the class), *abrogated on other grounds by In re Initial Public Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006). Here, Plaintiff's interests are in direct conflict with those of the CS Noteholders he purports to represent.

As discussed above, on March 20, 2023, while Plaintiff's CS ADSs experienced a price decline, CS Notes (which Plaintiff did not own) experienced a price *increase*. Plaintiff points to the March 20 ADS price drop as the primary source of his claimed damages. *See* Pl. Br. at 4. As a consequence, his interests are directly antagonistic to those members of the purported class who invested in CS Notes, who would be incentivized to point to earlier declines as key revelatory events and ignore or seek to discount any events or disclosures on March 19 or 20.

This discrepancy presents the very sort of fundamental and irreconcilable conflict that undercuts adequacy. *See Valley Drug Co.* v. *Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class."); *Pickett* v. *Iowa Beef Processors*,

24

209 F.3d 1276, 1280-81 (11th Cir. 2000) (finding plaintiffs could not adequately protect the interests of the putative class where "the class includes those who claim harm from the very same acts from which other members of the class have benefitted"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177-78 (C.D. Cal. 2007) (denying class certification where "some plaintiffs claim to have been harmed by the same conduct that benefited other members of the class"). Plaintiff cannot fairly represent all members of the proposed class, many of whose interests directly conflict with his own. Plaintiff therefore cannot satisfy the adequacy requirement, providing an independent reason to deny class certification.

## CONCLUSION

Plaintiff's Motion should be denied.


Dated:   January 17, 2025                          Respectfully submitted,


                                                  **CAHILL GORDON & REINDEL LLP**

                                                  /s/ Herbert S. Washer
                                                  Herbert S. Washer
                                                  Jason M. Hall
                                                  Tammy L. Roy
                                                  Edward N. Moss
                                                  Nicholas N. Matuschak
                                                  Ivan Torres
                                                  Kevin Kelly
                                                  32 Old Slip
                                                  New York, New York 10005
                                                  Telephone: (212) 701-3000
                                                  Email: hwasher@cahill.com
                                                  Email: jhall@cahill.com
                                                  Email: troy@cahill.com
                                                  Email: emoss@cahill.com

                                                  *Attorneys for Defendant Credit Suisse Group AG*

25

**GOODWIN PROCTER LLP**

/s/ Richard M. Strassberg
Richard M. Strassberg
Daniel Roeser
Jessica Vogele
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
Email: rstrassberg@goodwinlaw.com
Email: droeser@goodwinlaw.com
Email: jvogele@goodwinlaw.com

*Attorneys for Defendant Axel P. Lehmann*

**HECKER FINK LLP**

/s/ Sean Hecker
Sean Hecker
Kate L. Doniger
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Email: shecker@heckerfink.com
Email: kdoniger@heckerfink.com

*Attorneys for Defendant Dixit Joshi*

**MILBANK LLP**

/s/ George S. Canellos
George S. Canellos
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Email: gcanellos@milbank.com

*Attorneys for Defendant Ulrich Körner*

**WORD COUNT CERTIFICATION**

I, Herbert S. Washer, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 8,166 words in the document.

/s/ Herbert S. Washer
Herbert S. Washer

<u>Attestation Pursuant to Electronic Case Filing Rule 8.5</u>

I, Herbert S. Washer, attest that concurrence in the filing of this document has been obtained from all other signatories.


/s/ Herbert S. Washer
Herbert S. Washer

28