**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALI DIABAT, Individually and On Behalf
of All Others Similarly Situated,

      Plaintiff,

v.

CREDIT SUISSE GROUP AG, et al.,

      Defendants.

No. 1:23-cv-5874-CM-SLC

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF PLAINTIFF
AS CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**

I.   **DAMAGES ARE CAPABLE OF MEASUREMENT ON A CLASS-WIDE BASIS**[1]

Dr. Cain's methodology is tied to Plaintiff's theory of liability and can be applied on a class-wide basis. Pl. Br. at 19-21. Numerous courts have accepted Dr. Cain's model. Cain Reply ¶30 n.36. Nevertheless, Defendants raise a host of premature challenges that primarily concern questions about the model's eventual inputs. Opp. at 3-11.[2] These arguments fail time and time again at this stage. *See Firemen v. Innovage Holding Corp.*, 2025 U.S. Dist. LEXIS 6028, at *9-13 (D. Colo. Jan. 8, 2025).

**Distinctive Circumstances:** Acknowledging similar *Comcast* attacks rarely, if ever, succeed, Defendants and Dr. Garmaise attempt to set this case apart by framing it as so "distinctive" that the standard model "may not" suffice. Garmaise ¶52; Opp. at 5-8. This position distorts Plaintiff's theory of the case, which is that Defendants concealed the truth regarding CS's financial condition. Cain Reply ¶35. In fact, Swiss Parliament recently released a report finding CS, via a "regulatory filter," was able to "obscure[] the true situation of CS AG" throughout and prior to the Class Period. *See* Decl. Ex. B, p. 7. "If the capital ratio of CS AG had been public without the filter, this could have given capital markets, financial analysts and the media more transparent information on which to base their decisions." *Id*. Viewed through the proper lens, the contours of this case are not that unique.

Defendants' arguments (Opp. at 7) about the model's inputs, or "how" inflation will be precisely quantified, require merits discovery. Nevertheless, the out-of-pocket model is more than flexible enough to account for any confounding information. Cain Reply ¶55. Indeed, Dr.

---

[1] "Pl. Br." means ECF No. 127; "Cain Report ¶_" means ECF No. 128-1; "Opp." means ECF No. 130; "Garmaise ¶_" means ECF No. 131-1; "Starks ¶_" means ECF No. 131-2; and "Cain Reply ¶_" means the Expert Reply Report of Matthew D. Cain, Ph.D., which is attached as Exhibit A to the Miller Reply Declaration ("Decl."), filed contemporaneously herewith.

[2] Defendants do not cite any cases rejecting the out-of-pocket method. *See* Opp. at 8, 10.

Garmaise's prior attempts to characterize other securities cases as too "unique" or "distinctive" have been brushed aside by courts. *See Sheet Metal Workers Nat'l Pension Fund v. Aktiengesellschaft*, 2023 U.S. Dist. LEXIS 88178, at *23-24 (N.D. Cal. May 19, 2023); *Shupe v. Rocket Cos.*, 2024 U.S. Dist. LEXIS 178076, at *81-86 (E.D. Mich. Sep. 30, 2024).

**Materialization of the Risk:** This Court has found the out-of-pocket model is perfectly capable of measuring materialization of the risk damages on a class-wide basis. *See In re Allergan PLC Sec. Litig.*, 2021 U.S. Dist. LEXIS 170310, at *47 (S.D.N.Y. Sep. 8, 2021). Yet Defendants essentially argue that Dr. Cain's model cannot disaggregate the impact of confounding information or account for time-varying artificial inflation. Opp. at 9-10; Garmaise ¶¶86-96.

First, event studies can disaggregate the effects of confounding information. *See* Cain Reply ¶47; *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2019 U.S. Dist. LEXIS 114695, at *57-58 (S.D.N.Y. July 10, 2019). "Were it otherwise, nearly every securities fraud class action would fail." *Id*. Once the fact-finder has determined the degree of risk that was fraudulently concealed, the portion of the inflation not attributable to the fraud can be isolated and removed. Cain Reply ¶54. Defendants' supposition that the full price decline cannot be attributed to misrepresentations about risk is a premature assumption. Opp. at 9. Plaintiff need only propose a methodology of calculating damages that corresponds to his theory of liability. He has done so here. *Signet*, 2019 U.S. Dist. LEXIS 114695, at *58.[3]

With respect to time-varying artificial inflation, "*Waggoner* explicitly rejected the notion that *Comcas*t requires 'that damage calculations [] be so precise' as to account for 'variations in

---

[3] For this reason, Dr. Garmaise's argument, which Defendants do not raise in their brief, that Dr. Cain's methodology "does not explain[] how he would remove the impact of the alleged misrepresentations that were deemed not actionable from a measure of damages," Garmaise ¶¶97-100, is without merit. Cain Reply ¶63.

inflation over time.'" *Id.* at \*59 (citation omitted). If the merits show that artificial inflation was not constant over the Class Period, Dr. Cain's model can account for that. Cain Reply ¶¶39-40. Dr. Cain's model can also account for any changing investor expectations on a class-wide basis. Cain Reply ¶¶45-55.[4]

**CS Options and Notes:** Defendants argue that Plaintiff has not offered a method to calculate damages as to the CS Options and Notes. Opp. at 20-21. Not so. Initially, this argument fails for the same reasons discussed above. On a fully developed record, Dr. Cain's model can easily account for inflation relating to the CS Options, and can address how the alleged fraud impacted volatility, if at all, in the CS Options. Cain Reply ¶¶81-83. The same is true for the CS Notes. Cain Reply ¶¶84-89.

## II. DEFENDANTS FAILED TO REBUT THE *BASIC* PRESUMPTION

Defendants concede that the ADSs traded in an efficient market and do not challenge that Plaintiff has established predominance for misrepresentations regarding CS's financial condition.[5] They challenge only that the misrepresentations related to ICFR impacted the price of CS securities. Defendants' arguments have no merit.

From a quantitative standpoint, Defendants cannot meet their heavy burden to prove that there was no price reaction associated with the sustained misrepresentations related to ICFR. To start, Defendants put forth no evidence to demonstrate a lack of front-end price impact for any of

---

[4] Dr. Garmaise (but not Defendants) also prematurely argues that Dr. Cain's methodology does not account for CS "changing leverage." Garmaise ¶99. But this can easily be incorporated into the measure of artificial inflation per share. Cain Reply ¶¶56-60.

[5] Because Defendants do not challenge price impact for Plaintiff's financial condition allegations, their protestations regarding Plaintiff's use of February 9, 2023, as a revelatory event are inconsequential. Even so, the Court made clear that the February 9 disclosure [that outflows had not yet reversed] "arguably contradicts Lehmann's [December 2] 'basically stopped' statement." MTD Order at 217. Notably, at least one CS shareholder REDACTED *See* Decl. Ex. D.

the ICFR misstatements outlined in the Court's MTD Order, including the December 2, 2022 misstatement where "Credit Suisse's ADS price climbed $0.29 per ADS, or 9.36%." ¶265; *see also* Opp. at 13.[6] Nor can they meet their burden to prove a lack of back-end price impact to the Company-specific price decline for CS ADSs on March 14, 2023. *Goldman*, 594 U.S. at 126. Using an event study to isolate CS's ADS March 14 price movement, Dr. Cain establishes that CS ADSs declined 5.17%, which is statistically significant above the 95% level. Cain Reply ¶158 n.210.

Defendants' position that no company-specific price movement took place on March 14, 2023, is belied by their own expert. As an initial matter, Defendants' passing reference to CS's raw price decline on March 14, 2023, is irrelevant, as even Dr. Garmaise endorses the use of an event study "to remove market and industry effects from a security's price," to determine price impact. Garmaise ¶65. Defendants criticize Dr. Cain's event study, however, for a purported "arbitrary" exclusion of two dates on which CS's price would expect to move: when CS announced a public tender offer, and when Defendant Lehman reassured the market in a public interview that outflows had essentially ceased. Opp. at 14. Yet, the one case cited by Defendants on this score, *In re Northfield Laboratories, Inc. Sec. Litig.*, holds this is precisely what Dr. Cain was supposed to do. 267 F.R.D. 536, 548 (N.D. Ill. 2010). And in *Northfield*, plaintiff's expert improperly excluded *117 dates*, "all dates on which he could find any news about Northfield, even if the news was not new[.]" *Id*.

Even under Dr. Garmaise's proposed event study employing a variety of different

---

[6] While Defendants argue that Plaintiff's brief "does not even attempt to demonstrate that the ICFR statements had any 'front-end' price impact," Opp. at 13, the Supreme Court has made clear that Plaintiff has no burden to do so at this stage. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 124 (2021).

exclusion date scenarios, the price reaction on March 14 was statistically significant above the 91.5% level. *See* Garmaise at Ex. 14. While Dr. Garmaise opines the 95% threshold is "commonly used," Garmaise ¶71, Defendants' insinuation that this is a hard baseline for statistical significance has been routinely rejected. Opp. at 15; *see, e.g.*, *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 U.S. Dist. LEXIS 49786, at *11 (S.D.N.Y. Mar. 23, 2020); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018).

Defendants' "qualitative" arguments are equally unavailing. First, relying on Dr. Starks, Defendants argue that the revelation of ICFR material weaknesses had no price impact on CS ADSs because nobody cared. Opp. at 14-16. The most Defendants can muster in support of this argument is that "*multiple* securities analysts covering CS at the time said *virtually* nothing about the ICFR issue" and were "*more focused* on other issues." *Id*. A showing that only a *subset* of analysts, which represent a subset of the of the investment community, said *almost* nothing about the ICFR issues, however, hardly demonstrates the absence of price impact. *See Brokop v. Farmland Partners, Inc.*, 2021 U.S. Dist. LEXIS 204961, at *19 (D. Colo. Sep. 30, 2021) (rejecting expert opinion of "analyst commentary indicating 'nobody cared'" as "not sufficiently persuasive"). To the contrary, analyst reports, news articles, and REDACTED show that investors were concerned about the ICFR issues and that CS itself connected the price reaction of CS securities to the ICFR disclosure. Cain Reply ¶¶159-66. Defendants encourage the Court to ignore press articles by *The Wall Street Journal*, *The Guardian*, and *The New York Times*, all of which reported the disclosure of material weaknesses, in favor of their cherry-picked analyst reports, Opp. at 16 n.11. But "the securities laws care only about the 'significance of an omitted or misrepresented fact to a reasonable investor,'" not just a handful of sophisticated sell-side analysts. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175,

187 (2015).

To that end, Defendants' second argument that the ICFR disclosure was not new information to the market because they had announced a delay to their Annual Report filing "in relation to certain open SEC comments," falls flat. Opp. at 15. Nothing in the March 9, 2023 disclosure reported CS's ICFR material weaknesses. Moreover, the announcement of ICFR issues on March 14, 2023, caused investors concern over CS' candor regarding its financial position. Cain Reply ¶165.

Defendants' final argument, that there is a "mismatch between the contents of the misrepresentation and the corrective disclosure," Opp. at 16, has already been undercut by the Court's motion to dismiss Order. As the Court found, CS "ma[de] repeated pronouncements about its financial condition" while "fail[ing] to apprise the market about the serious inquiries (inquiries that would eventually lead the Company to conclude there were indeed material weaknesses in ICFR) [that] cast its various statements about its financial condition in a half-true light." MTD Order (ECF 109) at 242. "Had the Company revealed that it was, at the very least, under persistent questioning by the SEC regarding its ICFR, 'investors could have arrived at a valuation of the securities that more accurately reflected the risk of the Company suffering from financial problems not reflected on its balance sheets.'" *Id*. at 279 (citation omitted). As such, "Credit Suisse investors did not learn this until March 14, 2023." *Id*.; *see also* Cain Reply ¶¶74-78.[7]

## III.    THE MARKETS FOR CS OPTIONS AND NOTES WERE EFFICIENT

---

[7] Defendants' citations in support of their mismatch argument are inapposite. Unlike here, in *In re Kirkland Lake Gold Ltd. Sec. Litig.*, the court found that the weight of evidence supported defendants' interpretation of the alleged false statement regarding performance targets as over the life of the mine as opposed to the performance at the time of acquisition. 2024 U.S. Dist. LEXIS 59981, at *36 (S.D.N.Y. Mar. 29, 2024). In *Shupe*, the court held that the misrepresentations were far too generic, and Defendants put forth evidence that the market ignored various misrepresentations, which is not the case here. 2024 U.S. LEXIS 178076, at *75-77; *see also* Cain Reply ¶¶159-66.

***CS Options.*** Although Defendants do not challenge market efficiency for CS ADSs, they challenge it for CS options, which are derivative of CS ADSs. Even without the analysis performed by Dr. Cain, *see* Cain Report ¶¶104-06, courts have regularly held that evidence demonstrating efficiency of common stock is "sufficient to trigger the fraud-on-the-market presumption…on the options." *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 754 (S.D. Tex. 2006); *see also Industriens Pensionforsikring A/S v. Becton, Dickinson & Co.*, 2023 U.S. Dist. LEXIS 136947, at *14 (D.N.J. Aug. 3, 2023); *McIntire v. China MediaExpress Holdings, Inc.,* 38 F. Supp. 3d 415, 433-34 (S.D.N.Y. 2014).[8] Citing no cases, Defendants criticize Dr. Cain for  not applying the *Cammer* and *Krogman* factors to CS options, which, as Dr. Cain explains (and courts have agreed), are not particularly useful indicators of efficiency for options markets. Cain Report ¶103; *In re Apple*, 2023 U.S. Dist. LEXIS 58603, at *5.[9] Finally, Defendants contend – again, with no legal support – that Plaintiff has not demonstrated every CS option traded in its own individual efficient market. Opp. at 18. Courts have also rejected this argument. *See, e.g.*, *Marcus v. J.C. Penney Co.*, 2017 U.S. Dist. LEXIS 33257, at *10 (E.D. Tex. Mar. 8, 2017); *In re Enron*, 529 F. Supp. 2d at 754.

***CS Bonds.*** With respect to the market efficiency of CS Bonds, Defendants' critiques are without merit. As Judge Rakoff noted, "[t]he Second Circuit has not adopted a test for the market efficiency of stocks or bonds," but "it has recognized that courts generally apply a set of eight [*Cammer* and *Krogman*] factors[.]'" *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 364-65 (S.D.N.Y. 2016). Of the eight factors, Defendants raise issues with just two: *Cammer* 1 and 5. As for *Cammer*

---

[8] At least one court has agreed that "where the underlying stock trades in an efficient market," academics consider market efficiency options to be an "'essentially settled'" matter. *In re Apple Inc. Sec. Litig.*, 2023 U.S. Dist. LEXIS 58603, at *5 (N.D. Cal. Mar. 28, 2023).

[9] Although not necessary, Dr. Cain addresses how Dr. Garmaise skewed his results by including out of the money options in his analysis. Cain Reply ¶¶108-14.

1, the *Cammer* court held that "average weekly trading of…one percent would justify a substantial presumption" of market efficiency. *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989). Defendants complain that two of the seven bonds traded just under that 1% threshold (at 0.8% and 0.6%) even though Dr. Cain used a conservative analysis that excluded the last week of trading (including that week would bring those bonds to 0.8% and 1.2%, respectively). Cain Report ¶138, n.184-85. Even though these two bonds just barely fall below this 1% threshold, Defendants fail to acknowledge that "the *Cammer* thresholds are designed for common stock, which trades more frequently than bonds," and thus, a lower percentage than 1% should justify that substantial presumption. *Petrobras*, 312 F.R.D. at 365. Pointedly, 4 of the 5 other bonds (5 of 5, including the last week of trading) had average weekly trading volumes of over 2%, which, even for common stock, "would justify a strong presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1286. Even viewing these numbers in Defendants' favor would not result in a finding that the market was inefficient. Cain Reply ¶¶134-38.

As to *Cammer* 5, Defendants take issue with Dr. Cain's identification of November 2, 2022 (credit rating change) and March 20, 2023 (change in control) as news dates for the bonds. Opp. at 19. But Defendants' expert does not dispute that those dates should be used as news dates for bonds, nor does he find fault in Dr. Cain's exclusion of earnings announcements as news dates. Garmaise ¶¶176-77. Tellingly, Dr. Garmaise fails to offer any alternative news days, or to explain how Dr. Cain should have performed his analysis differently. *Id*. Dr. Garmaise's objections to Dr. Cain's so-called "pooling technique" are similarly unfounded. *Id*. at ¶177. Dr. Cain performed an event study for every one of the CS Bonds. Combining non-identical data to perform a hypothesis test is standard practice. Cain Report ¶¶153-57; Cain Reply ¶127. Finally, Defendants' argument that the price movements on November 2, 2022, were not statistically significant ignores that both

8

positive and negative CS information was released that day. *See* Cain Reply ¶124. Meanwhile, Defendants disregard that on March 20, 2023, CS bond prices increased in a statistically significant manner, as would be expected due to the takeover of CS by UBS. Cain Reply ¶131. This provides firm evidence of market efficiency.[10]

Here, like in *Petrobras*, where "the indirect factors overwhelmingly describe a large and well-functioning market for [the Company's] securities, common sense suggests that the market would materially react to material disclosures." *Petrobras*, 312 F.R.D. at 365. As held by Judge Rakoff, "Petrobras was one of the largest and most-analyzed firms in the world throughout the Class Period, and such size and sophistication raise the likelihood of an efficient [bond] market." *Id*. Such a finding is at least as true, if not more so, for CS.

## IV.    DIABAT SATISIFIES THE TYPICALITY AND ADEQUACY REQUIREMENTS

Defendants raise two challenges to Prof. Diabat's typicality and adequacy. Opp. at 22-25. First, as to the timing of Diabat's purchases, this Court rejected the same argument that purchases made only between a partial and final disclosure render a plaintiff atypical. *See Pearlstein v. Blackberry Ltd.*, 2021 U.S. Dist. LEXIS 14888, *24-26 (S.D.N.Y. Jan. 26, 2021). Nor does Diabat's single purchase after the Class Period render him atypical. *Id*. at *27-28. Post-disclosure purchases can render a plaintiff atypical "when those plaintiffs possessed information that had not been disclosed to the investing public or when plaintiffs made a 'disproportionately large percentage' of their purchases post-disclosure." *Id*. (citation omitted). Like in *Blackberry*, there is no evidence here that Diabat purchased based on nonpublic information or that he did not rely on

---

[10] Dr. Garmaise also raises issues with *Krogman* factor 2 (bid-ask spread), but Defendants do not raise this, likely because Dr. Garmaise's sole complaint concerns the comparison study Dr. Cain uses for CS Bonds' bid-ask spreads, but he offers no reason the spreads discussed in that study cannot be used, nor offers any other basis for comparison. *See* Garmaise ¶¶184-85. Nevertheless, courts often disregard this factor when analyzing market efficiency of bonds. *See In re Global Brokerage*, 2021 U.S. Dist. LEXIS 525501, at *53 (S.D.N.Y. Mar. 18, 2021).

the integrity of the market. *See* Decl. Ex. C. And though Defendants mistakenly claim otherwise (Opp. at 23), Diabat purchased "far more" ADSs during the Class Period than after (164,000 ADSs vs. 36,000 ADSs). *See* ECF Nos. 16-4 and 16-5. "The fact that [Diabat] bought shares in [CS] after the market became aware of the corrective information does not render him an atypical class member." *Blackberry*, 2021 U.S. Dist. LEXIS 14888, *28.[11]

Second, there is no "fundamental conflict" among Class members. Opp. at 24. When the merger was announced, CS ADSs experienced a price decline, while CS Notes experienced a price increase. *Id*.; *see also* Cain Reply ¶131. As a result, Defendants argue Diabat's interests are antagonistic to Noteholders, who will be "incentivized to point to earlier declines as key revelatory events and ignore or seek to discount any events or disclosures on March 19 or 20." Opp. at 24. These types of arguments are routinely found to "relate to damages and do not warrant denial of class certification." *In re Symbol Techs., Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 82756, at *18-19 (E.D.N.Y. June 25, 2015) (citation omitted). Thus, it is not surprising Defendants cite no securities cases supporting their position.

Moreover, "the ultimate materialization of the risk [that] occurred when CS was forcibly merged into UBS" cannot simply be "ignored" in a case about the demise of CS. Order (ECF No. 120) at 5. But even if Noteholders could ignore March 19 (and instead use March 14 as the last disclosure date), the PSLRA's 90-day lookback would still require a damages calculation to account for the Notes' price rebound on March 20 — rendering this manufactured conflict illusory. *See* 15 U.S.C. § 78u-4(e)(1). The interests of ADS holders and Noteholders are not antagonistic.

---

[11] Defendants' cases do not change the outcome. Opp at 22-23. *Petrobras* "was not a decision on a class certification motion," *Blackberry*, 2021 U.S. Dist. LEXIS 14888, *25, neither was *GAMCO*. *GAMCO Invs., Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 261 (S.D.N.Y. 2013). While *China Auto* involved a Rule 23 motion, this Court found "the reasoning of *Monster* far more persuasive" here. *Blackberry*, 2021 U.S. Dist. LEXIS 14888, at *26-28.

DATED: January 28, 2025                Respectfully submitted,

                                       **KAHN SWICK & FOTI, LLC**

                                       */s/ Kim E. Miller*
                                       Kim E. Miller (KM-6996)
                                       250 Park Avenue, 7th Floor
                                       New York, New York 10177
                                       Telephone: (212) 696-3730
                                       E-Mail: kim.miller@ksfcounsel.com

                                       -and-

                                       Lewis S. Kahn
                                       Craig J. Geraci, Jr. (admitted *pro hac vice*)
                                       Matthew P. Woodard (admitted *pro hac vice*)
                                       1100 Poydras Street, Suite 960
                                       New Orleans, Louisiana 70163
                                       Telephone: (504) 455-1400
                                       E-Mail: lewis.kahn@ksfcounsel.com
                                       Email: craig.geraci@ksfcounsel.com
                                       Email: matthew.woodard@ksfcounsel.com

                                       -and-

                                       J. Ryan Lopatka (admitted *pro hac vice*)
                                       161 N. Clark Street, Suite 1700
                                       Chicago, Illinois 60601
                                       Telephone: (312) 759-9700
                                       E-Mail: j.lopatka@ksfcounsel.com

                                       *Counsel for Lead Plaintiff Professor Ali Diabat*
                                       *and Lead Counsel for the Class*

## WORD COUNT CERTIFICATION

I, Kim E. Miller, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum (Microsoft Word), and exclusive of the portions of it that are excluded by the rule, there are 3,500 words in this document.

                                       */s/ Kim E. Miller*
                                       Kim E. Miller

11