**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: CREDIT SUISSE SECURITIES FRAUD CLASS ACTIONS | No. 23-cv-5874 (CM) |
| | No. 23-cv-9287 (CM) |
| This matter relates to: | No. 25-cv-934 (CM) |
| *Diabat* | |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF ALI DIABAT'S**
**MOTION TO COMPEL DEFENDANT CREDIT SUISSE GROUP AG**
**TO PRODUCE DOCUMENTS**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................................. 1

II.     RELEVANT BACKGROUND ............................................................................................ 2

     A.    The Swiss Government Reports ................................................................................ 2

     B.    Plaintiff's Requests for Production and Defendants' Objections................................. 3

     C.    FINMA Confirms Its Vast and Vague Assertion of "Supervisory Privilege" ............... 4

III.    LAW AND ARGUMENT ..................................................................................................... 5

     A.    Foreign Law Does Not Prevent the Production of FINMA's CSI ................................ 5

           1.   Legal Standard................................................................................................... 5

           2.   The Comity Analysis Strongly Favors Compelling Discovery............................... 6

     B.    The Bank Examination Privilege Does Not Impede Production................................. 12

           1.   Legal Standard................................................................................................... 12

           2.   The "Good Cause" Factors Strongly Favor Production ........................................ 14

IV.    CONCLUSION.................................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alfadda v. Fenn,*
149 F.R.D. 28 (S.D.N.Y. 1993) .......................................................................................... 8

*Averbach v. Cairo Amman Bank*, No. 19-cv-0004,
2025 U.S. Dist. LEXIS 26727 (S.D.N.Y. Feb. 14, 2025) ...................................... 11, 12

*Chevron Corp. v. Donziger,*
296 F.R.D. 168 (S.D.N.Y. 2013) ............................................................... 10, 11, 12

*Christine Asia Co. v. Alibaba Grp. Holding Ltd.,*
327 F.R.D. 52 (S.D.N.Y. 2018) .......................................................................................... 8

*Delozier v. First Nat'l Bank,*
113 F.R.D. 522 (E.D. Tenn. 1986) ................................................................................. 15

*Fundacion Museo de Arte Contemporaneo de Caracas-Sofia Imber v. CBI-TDB
Union Bancaire Privee*, No. 93-cv-6870,
1996 U.S. Dist. LEXIS 1482 (S.D.N.Y. Feb. 9, 1996) ............................................. 8

*In re Didi Glob. Inc. Sec. Litig.*, No. 21-cv-5807,
2025 U.S. Dist. LEXIS 11325 (S.D.N.Y. Jan. 22, 2025) ............................... 5, 6, 8, 9, 11, 12

*In re Subpoena,*
151 F.R.D. 1 (1992) ............................................................................................................ 14

*In re Wilmington Tr. Sec. Litig.*, No. 10-cv-990,
2016 U.S. Dist. LEXIS 189794 (D. Del. Aug. 16, 2016) ....................................... 14, 15

*King v. Habib Bank Ltd.*, No. 20-cv-4322,
2023 U.S. Dist. LEXIS 228698 (S.D.N.Y. Dec. 22, 2023) .................................... 13, 16

*King v. Habib Bank Ltd.*, No. 20-cv-4322,
2025 U.S. Dist. LEXIS 61144 (S.D.N.Y. Mar. 31, 2025) ............................... 8, 9, 11, 12

*Laydon v. Mizuho Bank, Ltd.,*
183 F. Supp. 3d 409 (S.D.N.Y. 2016) .......................................................................... 5

*Linde v. Arab Bank, PLC,*
706 F.3d 92 (2d Cir. 2013) .......................................................................... 7, 13, 15

*Minpeco, S.A. v. ContiCommodity Servs., Inc.,*
116 F.R.D. 517 (S.D.N.Y. 1987) .................................................................................. 7, 8

*Nike, Inc. v. Wu,*
349 F. Supp. 3d 346 (S.D.N.Y. 2018) .................................................................. 6, 8, 12

*SEC v. Banca Della Svizzera Italiana,*
92 F.R.D. 111 (S.D.N.Y. 1981) ..................................................................................... 6, 7

*SEC v. Euro Sec. Fund*, No. 98-cv-7347,
1999 U.S. Dist. LEXIS 4046 (S.D.N.Y. Apr. 1, 1999) ............................................ 8

*SEC v. Gib. Glob. Sec., Inc.*, No. 13-cv-2575,
2015 U.S. Dist. LEXIS 43773 (S.D.N.Y. Apr. 1, 2015) ............................................................ 6

*SEPTA v. Orrstown Fin. Servs.*, No. 12-cv-00993,
2022 U.S. Dist. LEXIS 148623 (M.D. Pa. Aug. 18, 2022) ................................................. 13, 14

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist.*,
482 U.S. 522 (1987) ................................................................................................................. 5, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................................................................... 7

*Wultz v. Bank of China Ltd.*,
61 F. Supp. 3d 272 (S.D.N.Y. 2013) ................................................................................. 13, 14, 15

**Other Authorities**

*Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, No. 15-md-2631 (S.D.N.Y.),
1/12/18 Status Conf. Tr. (ECF No. 179) ....................................................................................... 8

## I.    INTRODUCTION

The Supreme Court has made clear that foreign laws do not deprive American courts of the power to order parties to produce evidence even though the act of production may violate those laws. And this Court can override any common-law bank examination privilege, if it applies, for "good cause." At the Swiss Financial Market Supervisory Authority's ("FINMA") behest, Credit Suisse Group AG ("Credit Suisse" or "CS") is redacting and withholding, as confidential supervisory information ("CSI"), _everything_ "implicating" exchanges between FINMA and Credit Suisse (including high level exchanges at critical times during the Class Period) — even though the general substance of that information has already been made public in investigative reports released by FINMA and the Swiss Parliamentary Investigative Committee ("PInC"). That a PInC was empowered for only the fifth time in the 175-year history of the Swiss constitution, and publicly published its findings, which heavily relied upon communications between FINMA and Credit Suisse, whittles away the policy underpinnings of any "supervisory privilege."

To that end, unlike in most cases where regulators invoke these privileges to protect candor in the bank examination process, recent press reports suggest FINMA's true motivation may lie in providing cover for Credit Suisse from investor lawsuits. *See* § III.2, *infra*. But whatever FINMA's motives, any interest FINMA may have in shielding Credit Suisse or its CSI under a Swiss law cannot outweigh the U.S.'s strong national interests in enforcing its securities laws and in adjudicating matters with full discovery. Nor can any such interest asserted under a bank examination privilege survive a "good cause" analysis. Unless this Court orders production, FINMA's vast and vague invocation of "supervisory privilege," whether made under some Swiss law or the bank examination privilege, will swallow large swaths of critical evidence, threatening Plaintiffs' ability in each consolidated case to prove their claims (and, arguably, Defendants' ability to defend against them). Respectfully, this Court can and should reject that outcome.

## II.    RELEVANT BACKGROUND

In the wake of Credit Suisse's collapse, Plaintiff brought this securities fraud class action alleging claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5. *See* ECF No. 65 (the "CAC"). After this Court partially denied Defendants' motion to dismiss (*see* ECF No. 109), the parties commenced discovery, with Plaintiff serving his first and second sets of merits-based requests for production of documents ("RFPs") on December 4, 2024, and January 10, 2025, respectively. *See* Declaration of Kim E. Miller (Miller Decl.) at Exhibit A and B.

### A.    The Swiss Government Reports

While the pleading stage of this case was underway, the Swiss Government was conducting its own investigations into the Credit Suisse crisis. FINMA published a report on December 19, 2023, titled, "Lessons Learned from the CS Crisis" (the "FINMA Report"),[1] and on December 20, 2024, the PInC released an almost 600-page report examining in great detail the role of the Swiss Government in Credit Suisse's collapse (the "PInC Report").[2] Both the FINMA Report and the PInC Report highlight numerous, highly relevant interactions between FINMA and Credit Suisse at key times, and establish a clear nexus between the topics of these communications and Credit Suisse's demise. *See*, *e.g.*, Miller Decl., Ex. C (PInC Report Excerpts) at 216-218 (financial condition, outflows), 268 (financial condition); FINMA Report at 35 (financial condition); 52 ("weak control environment"). Neither report, however, disclosed the actual communications or documents exchanged with FINMA or Credit Suisse's internal documents.

---

[1] Available at https://www.finma.ch/en/~/media/finma/dokumente/dokumentencenter/myfinma/finma-publikationen/cs-bericht/20231219-finma-bericht-cs.pdf?sc_lang=en&hash=3F13A6D9398F2F55B90347A64E269F44.

[2] The Swiss Government published the full PInC Report in German, French, and Italian. Plaintiff commissioned a certified translation of the full PInC Report to English. All citations herein are to that translation. Due to its length, Plaintiff attaches only excerpts of the PInC Report as Exhibit C to the Miller Declaration, but would be happy to furnish a full copy if the Court requests one.

**B.    Plaintiff's Requests for Production and Defendants' Objections**

While Plaintiff's first set of RFPs included several requests concerning Credit Suisse's communications with FINMA in the months leading up to the Merger (*see* Miller Decl., Ex. A, Requests No. 17, 20, 53), with the benefit of the PInC Report, Plaintiff's second set of RFPs included highly specific requests concerning events involving FINMA (and other entities) identified in that report. *See* Miller Decl., Ex. B. When Credit Suisse served its responses and objections to the second set of RFPs, it stated that it would not produce any documents responsive to these requests, repeatedly representing, "Swiss laws, regulations, and/or guidance may impose civil or criminal penalties in connection with the disclosure of any documents that could reveal information concerning the PInC investigation." *See* Miller Decl., Ex. B.

The parties then began the meet-and-confer process to seek agreement on the scope of discovery, custodians, and search terms. As part of this process, Credit Suisse represented that it possessed responsive documents in both the U.S. and Switzerland, and that due to the complexities of producing documents located in Switzerland, it would be quicker and more efficient for the parties to conduct merits discovery in two stages. First, Credit Suisse would search for and produce responsive documents from its "U.S. vault," a U.S.-based repository of Credit Suisse documents sent to or from any U.S. based custodian (and not subject to Swiss blocking statutes). After completion of the first step, Credit Suisse would then search for and voluntarily produce responsive documents located in Switzerland that were not captured by U.S. vault searches (and therefore subject to Swiss blocking statutes). Without waiving the ability to challenge the Swiss blocking statutes in the future, Plaintiff agreed to this approach, and the parties are in the process of negotiating a set of search terms applicable to U.S. vault discovery.

As of the date of this filing, Credit Suisse has produced approximately 13,600 merits-based documents. Of these documents, approximately 850 contain redactions for CSI, and a number have

3

been withheld in full due to the asserted CSI of various foreign and domestic regulators. The vast majority of all documents listed on Credit Suisse's privilege logs are being withheld or redacted for CSI asserted by FINMA, specifically. While Plaintiff does not know the total number of documents fully withheld for FINMA-asserted CSI, as Credit Suisse has only provided privilege logs for about 20% of their production, it is at least 100 documents so far.[3]

### C.     FINMA Confirms Its Vast and Vague Assertion of "Supervisory Privilege"

On July 29, 2025, Credit Suisse represented to Plaintiff: "With respect to 'regulatory privilege,' we have made clear to you that while we acknowledge CS cannot itself assert such privileges, it also cannot waive those privileges…. If one or more regulators take the position that they will not assert a privilege over some or all of CS's communications with them, we will, of course, produce or reproduce such communications or references thereto." Miller Decl., Ex. E at 2. As a result, Plaintiff indicated that he intended to bring this issue before the Court, and Credit Suisse sought to obtain FINMA's official position concerning documents sought by Plaintiff.

On August 15, 2025, Credit Suisse informed Plaintiff that "FINMA has confirmed that it is asserting supervisory privilege over documents requested in this action that implicate communications with FINMA." Miller Decl., Ex. F. Specifically, FINMA instructed Credit Suisse:

> After thorough review, we inform you that the requested materials constitute confidential supervisory information that falls within the scope of the supervisory privilege. As such, and in accordance with applicable legal provisions and established regulatory practice, FINMA invokes a supervisory privilege in this matter. The supervisory privilege is effective for one year. FINMA reserves the right to extend this period should the circumstances requiring the protection of the information continue to apply.

---

[3] Credit Suisse has represented that "we view the outcome of your upcoming motion to be applicable to documents regardless of where they are produced from. For example, if the court were to rule that a given category of FINMA communications may not be withheld or redacted, CS would not later invoke the Swiss blocking statute as a separate grounds for withholding FINMA communications—subject, of course, to any broader agreements the parties may enter concerning the production of documents from Switzerland." *See* Miller Decl., Ex. D. Therefore, the only issue to be resolved in this motion is the application of FINMA's "supervisory privilege."

4

*Id.*

After receiving FINMA's response, Plaintiff sought Credit Suisse's position on this motion. Three days before this motion was due, Credit Suisse represented its "current expectation" is to oppose the motion despite previously conceding "CS cannot itself assert such privileges[.]" Miller Decl., Ex. E at 2. Then, with the Court's permission, Plaintiff filed this motion.

## III.    LAW AND ARGUMENT

To start, FINMA has never explained in detail what Swiss law or "supervisory privilege" (whether Swiss or American) is an obstacle to production in this case, or why it impedes production, or even which categories of documents that privilege supposedly covers. But whether they ultimately claim it is a Swiss law or a common-law bank examination privilege, neither prevents this Court from ordering production in the event FINMA establishes one of those privileges actually applies. Although Plaintiff does not concede FINMA (or Credit Suisse) can meet that burden, Plaintiff presumes for the sake of argument that production would violate Swiss law and that the bank examination privilege is applicable to the requested documents at issue.

### A.    Foreign Law Does Not Prevent the Production of FINMA's CSI

#### 1.    Legal Standard

"[W]here the alleged obstacle to production is foreign law, the burden of proving what that law is and demonstrating why it impedes production falls on the party resisting discovery." *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016) (citation omitted). "The Supreme Court has made clear that foreign statutes do not deprive American courts of the power to order parties subject to their jurisdiction to produce evidence even though the act of production may violate such statutes." *In re Didi Glob. Inc. Sec. Litig.*, No. 21-cv-5807, 2025 U.S. Dist. LEXIS 11325, at *6 (S.D.N.Y. Jan. 22, 2025) (citing *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist.*, 482 U.S. 522, 544 n.28 (1987)). "Operation of foreign law 'do[es] not deprive

5

an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that [law].'" *Nike, Inc. v. Wu*, 349 F. Supp. 3d 346, 364 (S.D.N.Y. 2018) (McMahon, J.) (citation omitted). "Ultimately, 'the District Court possesses wide discretion to proceed in whatever manner it deems most effective.'" *Id*. (citation omitted).

When exercising its discretion to enter a discovery order that may violate a foreign law, a district court considers the following factors: (1) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located; (2) the importance to the investigation or litigation of the documents or other information requested; (3) the degree of specificity of the request; (4) whether the information originated in the United States; (5) the availability of alternative means of securing the information; (6) the hardship of compliance on the party or witness from whom discovery is sought; and (7) the good faith of the party resisting discovery. *Nike*, 349 F. Supp. 3d at 364 (citation omitted).[4]

**2.      The Comity Analysis Strongly Favors Compelling Discovery**

**Balancing National Interests.** The "most important factor" in the comity analysis is the "balancing of national interests." *SEC v. Gib. Glob. Sec., Inc.*, 2015 U.S. Dist. LEXIS 43773, at *11 (S.D.N.Y. Apr. 1, 2015). Here, "[t]he trading at issue in this action occurred on a United States exchange in stock registered under the Exchange Act," and "the United States possesses a keen interest in its securities markets." *Didi Glob.*, 2025 U.S. Dist. LEXIS 11325, at *7-8 (citation omitted); *see also SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 117 (S.D.N.Y. 1981) ("The strength of the United States interest in enforcing its securities laws to ensure the integrity

---

[4] In *Didi*, Judge Kaplan noted the last two factors were "not among the relevant factors listed by the Supreme Court [in *Aérospatiale*]" and thus should be afforded "limited weight." *Didi Glob.*, 2025 U.S. Dist. LEXIS 11325, at *7.

of its financial markets cannot seriously be doubted."). The United States also "has a substantial interest in fully and fairly adjudicating matters before its courts, and achieving that goal is only possible with complete discovery." *Id*. at *8 (citation omitted).

The Second Circuit has held these interests weigh just as heavily in actions brought by private parties. In *Linde v. Arab Bank, PLC*, the Second Circuit weighed private plaintiffs' interest in seeking redress for acts of terrorism under the Anti-Terrorism Act against a foreign jurisdiction's interest in enforcing its bank privacy laws. 706 F.3d 92, 112 (2d Cir. 2013). The Second Circuit recognized that the interests of other sovereign nations in enforcing bank secrecy laws can be outweighed in private lawsuits alleging antitrust, commodities fraud, and racketeering claims, because such "private lawsuits can, by virtue of the statutory rights upon which they rely, be so 'infused with the public interest' that the distinction between private civil suits and public enforcement actions is of reduced significance." *Id*. (citing *Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 116 F.R.D. 517, 523-24 (S.D.N.Y. 1987)). "The District Court here appropriately recognized the important U.S. interests at stake in arming private litigants with the 'weapons available in civil litigation' to deter and punish the support of terrorism." *Id*. This logic applies with similar force to private lawsuits brought under the federal securities laws. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission.").

This Court has likewise recognized the U.S.'s vital interests at stake in securities fraud class actions: "My position is very clear. If you want to raise money in the United States of America, the only laws that matter to me are the laws of the United States of America." *Christine*

7

*Asia Co. v. Alibaba Grp. Holding Ltd.*, No. 15-md-2631 (S.D.N.Y.), 1/12/18 Status Conf. Tr. at 10:18-11:17 (ECF No. 179); *see also Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 327 F.R.D. 52, 55 (S.D.N.Y. 2018) ("Chief Judge McMahon already has made clear that Alibaba is required to comply with the discovery laws of the United States.").

While that is not to say FINMA has *no* interest in maintaining its "supervisory privilege," its interest is simply not greater than the U.S.'s interests in this case where Plaintiff has plausibly alleged a securities fraud that buckled the global financial system and devastated investors. Federal courts have regularly held as much when similar interests were at stake. *See Didi Glob.*, 2025 U.S. Dist. LEXIS 11325, at *9 ("The sought-after information is important to plaintiffs' ability to prove their claims, which heavily rely on interactions between DiDi and Chinese regulators."); *King v. Habib Bank Ltd.*, No. 20-cv-4322, 2025 U.S. Dist. LEXIS 61144, at *52 (S.D.N.Y. Mar. 31, 2025) (Wang, Mag. J.) ("[T]he Foreign Regulators' Reports are directly relevant to establish the scienter requirement as to HBL's culpability[.]"); *Nike*, 349 F. Supp. 3d at 364 (finding U.S. interest in trademark laws outweighed Chinese interests in its bank secrecy laws, noting "China's bank secrecy laws are not a 'get out of jail free' card.").[5]

At any rate, it is not even "evident that disclosure of information about [Credit Suisse's] interactions with [Swiss] regulators would undermine [Swiss] interests in any material way," *Didi Glob.*, 2025 U.S. Dist. LEXIS 11325, at *8, particularly in this case where FINMA and the PInC

---

[5] *See also SEC v. Euro Sec. Fund*, No. 98-cv-7347, 1999 U.S. Dist. LEXIS 4046, at *10 (S.D.N.Y. Apr. 1, 1999) (finding U.S. interests in its securities markets outweighed Swiss secrecy interests); *Fundacion Museo de Arte Contemporaneo de Caracas-Sofia Imber v. CBI-TDB Union Bancaire Privee*, No. 93-cv-6870, 1996 U.S. Dist. LEXIS 1482, at *6 (S.D.N.Y. Feb. 9, 1996) (finding U.S. interests in the integrity of New York banking industry and full and fair adjudication of matters outweighed Swiss secrecy interests); *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (finding U.S. interests in enforcing its securities fraud laws and full and fair adjudication of matters outweighed Swiss secrecy interests); *ContiCommodity Servs.*, 116 F.R.D. at 525 (granting motion to compel despite Swiss secrecy interests).

have already issued lengthy public reports discussing FINMA's supposed CSI. For all these reasons, the balancing of national interests in this case weighs heavily in favor of Plaintiff.

**Importance of the Documents.** There can be no serious dispute concerning the importance of the documents sought. The PInC and FINMA Reports detail FINMA's numerous interactions at critical times with high-level representatives of Credit Suisse concerning the bank's control environment, financial condition, and its forced merger with UBS. For example, the FINMA Report revealed that FINMA had been urging Credit Suisse to consider emergency measures, including a potential sale of the bank, from as early as April 2022, and that by November 2022, FINMA had called on Credit Suisse to "make concrete headway" in preparing for a sale of the entire Company. *See* FINMA Report at 19, 35. The PInC Report is even more granular, revealing that FINMA "repeatedly insisted that Credit Suisse prepare for a possible sale" in December 2022, and instructed Credit Suisse via letter on December 19, 2022, "to develop solutions for the short- and medium-term scenarios by the end of January 2023." *See* Miller Decl., Ex. C at 262. Likewise, citing letters and minutes of meetings between FINMA and Credit Suisse, the PInC Report revealed that FINMA expressed continuing concerns about Credit Suisse's liquidity throughout the Class Period. *See Id*. at 216-218, 221-22, 261, 268.

Because these types of interactions reveal undisclosed, adverse information known to Defendants, and call into question the accuracy of Defendants' statements during the Class Period, they will be pivotal to proving falsity and scienter. *See*, *e.g.*, MTD Opinion (ECF No. 109) at 196 ("[T]he failure to advise the market about adverse developments as they transpire qualifies as securities fraud."). Accordingly, this factor weighs heavily in favor of production. *See Didi Glob.*, 2025 U.S. Dist. LEXIS 11325, at *9; *see also Habib Bank*, 2025 U.S. Dist. LEXIS 61144, at *52.

Neither Credit Suisse nor FINMA have credibly disputed the importance of the withheld

and redacted documents. In fact, Credit Suisse conceded relevance by redacting and withholding FINMA's CSI as privileged instead of irrelevant, and it agreed to produce the CSI "[i]f one or more regulators take the position that they will not assert a privilege over some or all of CS's communications with them." Miller Decl., Ex. E at 2. Similarly, FINMA raised no objections to relevance after its "thorough review," and recent press reports suggest FINMA fully recognizes the vital importance of its CSI to investor lawsuits: "these documents would be used against the Swiss Confederation or the bank [Credit Suisse] in arbitration and civil proceedings." *See* Miller Decl., Ex. G at 3 (Owen Walker, "Swiss regulator seeks to block investors from accessing Credit Suisse AT1 files," *Financial Times*, 3 Apr. 2024).

**Degree of Specificity.** The second factor also weighs in favor of compelling production. First, most of Plaintiff's second set of merit's based RFPs seek documents concerning specific actions by, or interactions with, FINMA, as identified in the PInC Report. *See, e.g.*, Miller Decl., Ex. B, Requests 2-5, 15-16, 20. Second, the parties have engaged in extensive meet-and-confers to address Credit Suisse's objections to the RFPs and have been working cooperatively to narrow the scope of Plaintiff's RFPs and to formulate a narrow set of search terms. This fact alone demonstrates there is "no significant issue as to the level of specificity." *See Chevron Corp. v. Donziger*, 296 F.R.D. 168, 205 (S.D.N.Y. 2013). And although the meet-and-confer process is still ongoing, Credit Suisse has raised no issues with identifying FINMA's CSI (and, in fact, has identified numerous documents which it claims contain FINMA's CSI). As such, this factor supports production.

**Where the Information Originated.** Some of the information requested undoubtedly originated in Switzerland, but Credit Suisse is also withholding information that sits in the U.S. vault, some of which certainly originated in the United States. On balance, this factor is neutral.

10

But even if all the information originated in Switzerland, when "the information cannot be easily obtained through alternative means, the origin of the information can be counterbalanced with the inability to obtain the information through an alternative means, thus favoring disclosure." *Donziger*, 296 F.R.D. at 206 (citation omitted). As explained below, Plaintiff cannot readily obtain the information it seeks from other sources, so this factor counsels in favor of production as well.

**Alternative Means of Securing the Information.** Because Credit Suisse is withholding both information exchanged directly with FINMA and internal information "implicating" FINMA's CSI, such information can be obtained only from FINMA or Credit Suisse. As both have refused to produce this important information, there are no other readily available means of obtaining the sought after information.

If FINMA or Credit Suisse claims that Plaintiff can instead obtain the requested information through the Hague Convention on the Taking of Evidence Abroad, "the Supreme Court has declined to 'require first resort to Convention procedures whenever discovery is sought from a foreign litigant.'" *Didi Glob.*, 2025 U.S. Dist. LEXIS 11325, at *9 (quoting *Aérospatiale*, 482 U.S. at 542). Additionally, "the outcome of a request pursuant to the Convention is by no means certain, and making the request will undeniably result in delays of unknown, and perhaps considerable, duration. Thus, the mere fact that the Hague Convention provides an alternative method for obtaining the documents is not proof that it is necessarily an effective, or efficient, method for doing so in this case." *Id.*; *see also Habib Bank*, 2025 U.S. Dist. LEXIS 61144, at *54 ("The Court is 'skeptical that alternative means will result in production, particularly in the absence of a court order.'") (quoting *Averbach v. Cairo Amman Bank*, No. 19-cv-0004, 2025 U.S. Dist. LEXIS 26727 (S.D.N.Y. Feb. 14, 2025)). In fact, FINMA is currently resisting production of documents in Switzerland. *See* Miller Decl., Ex. G. Moreover, at least some of the requested

documents are stored in the United States, making the Hague Convention wholly unnecessary. Accordingly, this factor also weighs in favor of production.

**Hardship to Credit Suisse.** Currently, there is no evidence in the record to support a finding that Credit Suisse would face a substantial hardship if it produced FINMA's CSI. For example, Credit Suisse has not pointed to any evidence demonstrating it will face criminal prosecution, *see Donziger*, 296 F.R.D. at 207, or that a Swiss bank has ever been "punished for complying with a discovery order from a U.S. court." *Cairo Amman Bank*, 2025 U.S. Dist. LEXIS 26727, at *22; *see also Didi Glob.*, 2025 U.S. Dist. LEXIS 11325, at *10-11; *Nike*, 349 F. Supp. 3d at 368. Speculative arguments will not suffice. *See Cairo Amman Bank*, 2025 U.S. Dist. LEXIS 26727, at *22 ("[C]ourts undertaking this inquiry have reached similar conclusions regarding the speculative nature of potential penalties for production of bank records."). And, instead of facing hardship, Credit Suisse should face less hardship if allowed to produce FINMA's CSI, as it will not be required to spend countless hours redacting FINMA's CSI and creating privilege logs. Thus, this factor weighs in favor of production.

**Good Faith of Party Resisting Discovery.** Lastly, Plaintiff has no reason to doubt Credit Suisse's good faith, as it previously represented it was only asserting the purported supervisory privilege on behalf of FINMA. Conversely, FINMA's motivations — whether they are to legitimately protect candor in the examination process or whether they are an illegitimate attempt to shield Credit Suisse from liability — are less clear. *See* Miller Decl., Ex. G. So, "[a]t this juncture, there is yet insufficient evidence to find that either party has engaged in bad faith. Accordingly, this factor does not weigh for or against production." *Habib Bank*, 2025 U.S. Dist. LEXIS 61144, at *59.

**B.      The Bank Examination Privilege Does Not Impede Production**

**1.      Legal Standard**

12

If FINMA or Credit Suisse argues a common-law bank examination privilege also applies or applies instead of Swiss law, good cause nonetheless exists to override that privilege. "Stated broadly, the bank examination privilege is a qualified privilege that protects communications between banks and their examiners in order to preserve absolute candor essential to the effective supervision of banks." *Arab Bank, PLC*, 2009 U.S. Dist. LEXIS 86021, at *7. "This privilege may be asserted only by the regulatory agencies themselves, 'and may not be asserted by [Credit Suisse] on behalf of [FINMA].'" *King v. Habib Bank Ltd.*, 2023 U.S. Dist. LEXIS 228698, at *15 (S.D.N.Y. Dec. 22, 2023) (citing *Wultz v. Bank of China Ltd.*, 61 F. Supp. 3d 272, 282 (S.D.N.Y. 2013)). "The agency asserting the privilege has the burden of establishing its applicability to the documents at issue." *Id*. at *15. "The privilege is only applicable to deliberative documents, and '[p]urely factual material falls outside the privilege[.]'" *Id*. at *15-16.[6]

"Even when documents fall within the bank examination privilege, a court can override the privilege if the requesting party demonstrates 'good cause.'" *Habib Bank*, 2023 U.S. Dist. LEXIS 228698, at *16 (citations omitted). "In determining whether good cause exists, courts should take into account the following factors: '1) the relevance of the evidence sought to be protected; 2) the availability of other evidence; 3) the 'seriousness' of the litigation and the issues involved; 4) the role of the government in the litigation; and 5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable [*i.e.*, the chilling effect].'" *Id*.

---

[6] Notably, courts have found that many of the categories of documents redacted and withheld here are primarily factual or at least partially factual, such as: (1) bank examination reports, (2) formal and informal communications between banks and regulators, (3) documents created by or on behalf of a company in response to an examiners' requests or examination findings or supervisory directives, and (4) internal company documents or emails discussing, describing, or relating to bank examinations, examination findings, or other supervisory matters. *See SEPTA v. Orrstown Fin. Servs.*, No. 12-cv-00993, 2022 U.S. Dist. LEXIS 148623, at *64-70 (M.D. Pa. Aug. 18, 2022).

13

### 2.    The "Good Cause" Factors Strongly Favor Production

Despite its "thorough review," FINMA has made no attempt to carve out purely factual material from deliberative documents. Rather, FINMA has made only a blanket assertion that *all* "the requested materials constitute confidential supervisory information that falls within the scope of the supervisory privilege." Miller Decl., Ex. F. Even if it had properly excised factual material, however, good cause still exists to override the privilege.

**Factors 1-3:** As Factors 1-3 here overlap with the comity factors, Plaintiff only briefly addresses them here. First, the information sought is highly relevant to Plaintiff's claims; second, there are no other readily available means of obtaining the sought after information; and third, this litigation is undoubtedly serious. *See* § III.A.2, *supra*. Indeed, courts examining the bank examination privilege "have concluded that securities fraud allegations raise significant questions regarding the fairness of financial markets and are therefore 'serious' for purposes of the good cause analysis." *SEPTA*, 2022 U.S. Dist. LEXIS 148623, at *80-81; *see also In re Wilmington Tr. Sec. Litig.*, No. 10-cv-990, 2016 U.S. Dist. LEXIS 189794, at *9 (D. Del. Aug. 16, 2016) (stating that allegations "indicating that senior bank management engaged in massive fraud to artificially inflate the price of the institution's publicly traded securities, raise fundamental issues regarding public confidence in the fairness of financial markets"); *In re Subpoena*, 151 F.R.D. 1, 2 (1992) (finding "such [securities fraud] allegations are undoubtedly serious, and raise fundamental issues regarding public confidence in the fairness of the financial markets"). Thus, factors 1-3 strongly weigh in favor of overriding FINMA's purported privilege.

**Factor 4:** Where private litigation is based on claims related to the public interest and supplement government enforcement of the securities laws, courts have concluded that the governmental interest factor is met and weighs in favor of finding good cause. *See SEPTA*, 2022 U.S. Dist. LEXIS 148623, at *83-84; *see also Wultz*, 61 F. Supp. 3d at 290 (concluding that the

14

governmental interest factor of the good cause analysis was satisfied in a suit between private litigants where the underlying statutes upon which the claims were based are "infused with the public interest") (citation omitted); *Arab Bank, PLC*, 706 F.3d at 112.[7]

**Factor 5:** "While the public interest in candor is a serious concern, it is present in every case involving the bank examination privilege—and yet the privilege remains qualified, not absolute." *Wultz*, 61 F. Supp. 3d at 290. And where two purposes of the bank examination privilege are (1) to encourage candor regarding "the banks' financial condition…to detect potential problems," and (2) to prevent "public misunderstanding" that might "unduly undermine confidence in the bank," production of CSI in the instant case — where the bank collapsed years ago and the regulator published a detailed report about the collapse — furthers neither goal of the privilege. *Delozier v. First Nat'l Bank*, 113 F.R.D. 522, 526 (E.D. Tenn. 1986); *see also Wilmington Tr.*, 2016 U.S. Dist. LEXIS 189794, at *34-35 ("There is no risk that disclosure will unduly undermine confidence in the Bank because the Bank has been closed for several years.").

"Moreover, bank personnel are required by law to cooperate with bank examiners, making it 'unlikely as a general matter that government employees will be significantly inhibited in their duties by the possibility of limited disclosure at a later date in circumstances analogous to those present here.'" *Id*. at *35. Finally, the protective order in this case will also prevent the release of documents to the public, and thus "minimizes any harm that might otherwise result from compelling disclosure of bank examination information." *Id.* at *35-36. Regardless, any

---

[7] Although the court in *Wilmington Trust* found this factor weighed against plaintiff because "there are no allegations of wrongdoing on the part of the regulator with respect to its regulation of the Bank," 2016 U.S. Dist. LEXIS 189794, at *32, in this case, the PInC did find that FINMA had a role in Credit Suisse's collapse. *See* ECF No. 133-2 (PInC Report Summary) at 7 ("The regulatory filter obscured the true situation of CS AG….the PInC reached the conclusion that FINMA had designed the regulatory filter incorrectly in several respects and had not properly assessed its impact.").

"[chilling] effects are far outweighed by the other factors that weigh in favor of good cause."

*Habib Bank*, 2023 U.S. Dist. LEXIS 228698, at \*18.

## IV.    CONCLUSION

Even assuming FINMA or Credit Suisse can meet its burden to show that production of documents and communications implicating FINMA's CSI would violate Swiss law or that a bank examination privilege applies here, the factors considered under both analyses still weigh overwhelmingly in favor of production in this case of public importance where thousands of Class members were harmed. Accordingly, Plaintiff respectfully submits that the Court should order Credit Suisse to produce all documents being redacted or withheld due to FINMA's CSI.

DATED: September 22, 2025          Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

 */s/ Kim E. Miller*
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, New York 10177
Telephone: (212) 696-3730
E-Mail: kim.miller@ksfcounsel.com

-and-

Craig J. Geraci, Jr. (admitted *pro hac vice*)
Matthew P. Woodard (admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Email: craig.geraci@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com

-and-

J. Ryan Lopatka (admitted *pro hac vice*)
161 N. Clark Street, Suite 1700
Chicago, Illinois 60601
Telephone: (312) 759-9700
E-Mail: j.lopatka@ksfcounsel.com

*Counsel for Lead Plaintiff Professor Ali Diabat
and Lead Counsel for the Class*

16

## <u>WORD COUNT CERTIFICATION</u>

I, Kim E. Miller, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum (Microsoft Word), and exclusive of the portions of it that are excluded by the rule, there are 5,207 words in this document.

<div align="center" style="margin-left:40%">

*/s/ Kim E. Miller*
Kim E. Miller

</div>