# EXHIBIT C

### 6.3.1 Strengthened operational and strategic supervision of Credit Suisse by FINMA as a result of capital outflows from October onwards

In response to the massive capital outflows, FINMA intensified its contacts with Credit Suisse at both technical and strategic levels from the beginning of October. Weekly meetings are being held at FINMA's operational management level and at Credit Suisse's strategic level, while at operational level, meetings are taking place on a daily basis (e.g., supervisory talks with Credit Suisse's Treasury division[980]).

The following chapter describes the main effects of FINMA's influence on Credit Suisse in terms of the bank's liquidity and capital position, and provides an overview of other important topics of discussion at high-level meetings between the two parties (chap. 6.3.1.1). Finally, it shows to what extent FINMA's Board of Directors had been informed of the bank's situation (chapter 6.3.1.2) and how FINMA was in contact with the US and UK authorities (chapter 6.3.1.3).

#### 6.3.1.1 Operational and strategic monitoring of Credit Suisse's liquidity and capital position and its contingency measures from October 2022 onwards

Until the beginning of September, FINMA will be meeting Credit Suisse's management to discuss the bank's strategic and operational developments, initially on a monthly and then weekly basis. Initially, only selected members of FINMA's management take part in these high-level meetings with the Chairman of the Board of Directors, the CEO and other senior executives[981] of Credit Suisse. As Credit Suisse does not respond satisfactorily to FINMA's repeated invitations to prepare further emergency measures, FINMA decides, starting in November 2022, to hold additional meetings with other representatives of the Board of Directors, including the Vice Chairman, the Chairman of the Risk Committee and the Chairman of the Audit Committee. At the same time, the Credit Suisse situation and emergency measures are discussed directly with other members of the Credit Suisse Board of Directors. In addition, FINMA meets with all members of Credit Suisse's Audit and Risk Committees to discuss the bank's critical situation[982].

The bank's liquidity situation and capitalization as part of the implementation of its strategy, as well as the planned sale of securitization activities, are recurring themes. At regular intervals, FINMA also formulates criticisms and exigencies on emergency measures and liquidity injections, which it will then formally present by letter to the Chairman of the Board of Directors and the CEO of Credit Suisse.

In early October, as part of its high-level meetings, FINMA urged Credit Suisse to prepare to apply for an ELA. The supervisory authority was of the opinion that the bank would soon reach the point of non-viability due to a lack of liquidity. The bank's representatives show discernment and agree to initiate the necessary preparations[983]. However, they intend to use these measures as a last resort, as Credit Suisse does not want to send any negative signals to the market before the announcement of its new strategy on October 27. Credit Suisse's management fears triggering a banking run by requesting an ELA before the announcement of its new strategy

---

[979]  Written responses to PlnC from 9.4.2024, pp. 4 s.

[980]  Among others, the Finance Director (*Chief Financial Officer*, CFO) and the head of the *Strategic Regulatory Communication*

[981]  Written answers to PlnC from 9.4.2024, pp. 7 s.

[982]  Minutes of FINMA's high-level meeting with Crédit Suisse on 6.10.2022, pp. 1 s.

on October 27, to which FINMA replied that the aid would stabilize the situation until the bank had better access to capital markets[984].

Although Credit Suisse's Board of Directors had the ELA application prepared in mid-October[985] and the authorities had to consider a possible request from the bank in the context of the SC (see section 6.3.3.1), Credit Suisse decided not to make such a request, believing it to be unnecessary at the time.

*FINMA's reaction to the inadequacy of certain liquidity buffers*

On October 12, 2022, FINMA noted that on October 7, certain liquidity buffers of Credit Suisse AG under Pillar 2 had fallen below the CHF 30 billion mark. According to FINMA regulations, the supervisory authority should have been informed. As of October 10, these assets had even fallen below CHF 25 billion, and FINMA should have been notified immediately, with an action plan to increase them within five days. FINMA is sharply criticizing Credit Suisse for this failure, and is demanding that, in addition to compliance with the duty to inform, Credit Suisse's senior executives participate from now on in daily conference calls on the liquidity and refinancing situation[986].

In a letter to FINMA dated October 14, 2022, Credit Suisse presented various measures designed to restore liquidity buffers. Overall, the bank was optimistic about the refinancing opportunities it hoped to find on the market following the presentation of the new strategy on October 27, 2022. Nevertheless, it is requesting authorization to use Pillar 2 liquidity buffers until the proposed measures take effect[987]. As a result, in October, before the bank announced its new strategy, FINMA repeatedly authorized Credit Suisse to temporarily use liquidity buffers to meet liquidity requirements, so that the bank could guarantee sufficient liquidity to the various Group companies. At the same time, FINMA is asking Credit Suisse to take further measures to increase its liquidity[988].

According to the information available to the PInC, FINMA will begin to draw up the decision and reorganization plan for Credit Suisse in mid-October 2022[989]. The first drafts of these two documents were ready at the beginning of November. At that time, the head of FINMA's Recovery and Resolution division estimated that FINMA would need around ten days to prepare for resolution (*runway period*; see box 12 in chap. 6.3.4.2)[990].

On October 31, 2022, FINMA enters into a contract with a Swiss law firm to provide services in the event of reorganization or bankruptcy. During the crisis and until March 19, 2023, the reorganization plan and decision will be updated and reworked as and when necessary[991].

*Tolerance for non-compliance with regulatory liquidity requirements*

As the liquidity situation continues to deteriorate in the week prior to the strategy announcement on October 27, 2022, Credit Suisse is informing FINMA of this development

---

[984]  Minutes of FINMA's high-level meeting with Crédit Suisse on 12.10.2022, pp. 1 ss.
[985]  Minutes of FINMA's high-level meeting with Crédit Suisse on 14.10.2022, p. 1, et du 18.10.2022, p.1
[986]  Email from FINMA to Crédit Suisse dated 12.10.2022, 14 h 37
[987]  Letter from Crédit Suisse to FINMA dated 14.10.2022
[988]  Email from FINMA to Crédit Suisse dated 14.10.2022, 13 h 00 ; FINMA's e-mail to Crédit Suisse dated 19.10.2022, 18 h 27
[989]  Transcription de la séance du CFC du 15.10.2022, p. 16
[990]  Transcription de la séance du CFC du 4.11.2022, p. 9
[991]  Minutes of the meeting of the FINMA Board of Directors of 1.11.2022, p. 3; FINMA position paper of 7.8.2024 in connection with the consultation of the administration.

negative on October 20, 2022. It is asking for further temporary easing of Pillar 2 and *net stable funding ratio* requirements, and for temporary permission to use even partial Pillar 1 buffers. While capital outflows continue unabated, dramatically worsening the situation, Credit Suisse management is confident that it will be able to restore Pillar 2 liquidity buffers to regulatory requirements by the end of 2022, thanks to the positive market reaction to the announcement of the new strategy[992].

In FINMA's view, this tolerance was necessary in order to ensure that Credit Suisse had sufficient room to maneuver at all times to make liquidity available to the various legal entities so that they could meet their payment obligations at all times. This approach complies with the requirements of the OLiq. Liquidity buffers are set up in normal times to be used in the event of shortages. The idea was to distribute the available liquidity between the Group's units in such a way as to ensure that the requirements of Pillar 2 are met as fully as possible. On October 24, 2022, FINMA again lowered the tolerance threshold. However, FINMA deplores the fact that the measures taken to date by the bank to prevent capital outflows are insufficient and fall far short of FINMA's expectations. In theory, all the measures included in Credit Suisse's *Contingency Funding Plan* could have improved the situation by some CHF 100 billion. However, it soon became apparent that the measures planned by the bank would not be feasible in times of crisis, either for reasons of timing, or because of the expected stigma. FINMA is astonished that Credit Suisse has so far only decided to implement measures to the tune of some CHF 18.1 billion francs[993].

As Credit Suisse will also have to address capital outflows at its quarterly presentation on October 27, 2022, FINMA warns against a further loss of confidence and subsequent capital outflows. FINMA therefore reiterates its request to the Board of Directors and Executive Board of Credit Suisse to discuss with FINMA, before October 27, 2022, a clear and feasible plan that will enable the bank to secure its solvency and stabilize its liquidity situation itself. FINMA also specifies that it expects Credit Suisse to inform FINMA immediately if it fails to meet the new tolerance levels, or if it becomes apparent that it will not be able to meet them[994].

Just two days later, on October 26, 2022, Credit Suisse informs FINMA that the bank risks no longer meeting the liquidity buffer requirements, whose thresholds FINMA has already lowered, by the end of the week, and that if capital outflows continue, it could no longer meet Pillar 1 requirements and, by the end of October, no longer comply with the *net stable funding ratio*. Credit Suisse is informing FINMA of the liquidity injection measures it has already taken, the medium-term measures it plans to take until the end of the year, and the measures that are not feasible due to the idiosyncratic crisis in which it finds itself. The bank is still counting heavily on the positive effect of the presentation of the new business strategy on October 27, which it believes will enable it to stock up on liquidity. Thereafter, Credit Suisse will never violate the Pillar 1 requirements for the *liquidity coverage ratio* or the *net stable funding ratio*[995].

*Discussion of Credit Suisse's downgrade following the announcement of the company's strategy*

Following the announcement of Credit Suisse's new strategy on October 27, 2022, the rating agency Moody's informed the bank that it would be downgrading its rating in

---

[992] Letter from Credit Suisse to FINMA to 20.10.2022

[993] FINMA letter to Crédit Suisse dated 24.10.2022

[994] FINMA letter to Crédit Suisse dated 24.10.2022

[995] Letter from Crédit Suisse to FINMA dated 26.10.2022

all categories due to uncertainties about the success of strategy implementation and the bank's future profitability, as well as persistent capital outflows[996].

On October 30, 2022, Credit Suisse pointed out to FINMA that, in reaching its decision, Moody's had not taken into account all the information provided by the bank, and that the agency had misinterpreted the bank's use of liquidity buffers. Credit Suisse is therefore asking FINMA whether it will also seek dialogue with Moody's to clear up any misunderstandings. The bank is expecting further capital outflows following the downgrade, which it considers unjustified. FINMA states that, if necessary, it can explain to Moody's, in general terms, the regulatory conditions it imposes and their effects. Credit Suisse, however, did not come back with a specific request. At the same meeting on October 30, 2022, Credit Suisse informs the supervisory authority that it will probably have to resort to an ELA the following week, should capital outflows similar to those of early October occur.

On October 31, 2022, the discussion about Credit Suisse's impending downgrade continued, and FINMA asked the bank to provide additional information on the expected capital outflows in the event of a downgrade[997]. The reaction to the rating changes turned out to be much less negative than initially feared, which Credit Suisse attributes to its efforts with the rating agencies - for example, it sent Moody's more information on its new strategy[998].

At the same meeting on October 31, 2022, the Chairman of the Board of Directors of Credit Suisse also presented FINMA for the first time with an analysis of the compatibility of potential counterparties should the sale of the bank prove necessary. Credit Suisse favors a Swiss solution; however, willing to consider all options, the bank states that BNP, Morgan Stanley and HSBC would be suitable counterparties[999].

*Operational monitoring of Credit Suisse's capital position*

As part of the bank's strategic reorientation, Credit Suisse applies to FINMA for regulatory relief from its capital requirements. At the end of October, FINMA announces that it will grant Credit Suisse various reliefs during the restructuring process, and will temporarily allow Credit Suisse AG to fall slightly below the required threshold for CET1 buffers[1000]. In FINMA, however, the guarantee is subject to a series of conditions and restrictions, in particular requiring the bank to substantially reduce risk by selling the Securitized Products business, to implement the announced cost-cutting program, including the elimination of variable compensation, to increase share capital by at least CHF 3 billion, and to meet the Group's existing capital targets[1001].

In this context, FINMA authorizes the parent company (Credit Suisse AG) to weight a certain portion of the regulatory filter in future with the risk weighting applicable to holdings in companies headquartered in Switzerland,

---

[996] Minutes of FINMA's high-level meeting with Crédit Suisse on 30.10.2022, pp. 1 s.; FINMA (2023): Lessons learned from the Credit Suisse crisis, p. 35

[997] Minutes of FINMA's high-level meeting with Crédit Suisse on 31.10.2022

[998] Minutes of FINMA's high-level meeting with Crédit Suisse on 2.11.2022, p. 1

[999] Minutes of FINMA's high-level meeting with Crédit Suisse on 30.10.2022, p. 3

[1000] In accordance with art. 130, al. 3, CAO

[1001] FINMA letter to Crédit Suisse dated 18.10.2022 ; FINMA letter to Crédit Suisse dated 26.10.2022

rather than that applicable to foreign holdings[1002]. In accordance with FINMA's TBTF decision and the CAO, the risk weights for Swiss holdings are lower than those for foreign holdings[1003]. In the third quarter of 2022, Credit Suisse used part of the filter, amounting to CHF 7.9 bn, in Switzerland rather than abroad. This measure does not increase the bank's equity capital, but reduces the bank's risk-weighted assets, thereby increasing its capital adequacy ratio by 0.19 percentage points[1004]. This measure is granted by FINMA only on condition that Credit Suisse carries out the planned capital increase of CHF 4 billion[1005]. In addition, FINMA requires that the plausibility of the valuations of concerned holdings be verified by a third-party firm[1006]. Credit Suisse's adjustments to the market values of participations are tested by PwC. They are not subject to FINMA supervision or approval[1007].

*FINMA's criticism of Credit Suisse's provision of information*

According to the head of FINMA's Credit Suisse Group Supervision division, Credit Suisse is struggling to assess the efficiency of its own measures and produce reliable scenario analyses and forecasts for capital outflows, when it is due to monitor the state of its liquidity at the beginning of autumn 2022[1008]. On November 5, in view of Credit Suisse's persistently critical liquidity situation, FINMA called the Board of Directors and management to order. The supervisory authority points to glaring shortcomings in access to information, criticizing Credit Suisse for its lack of due diligence (incomplete documentation, often submitted late, after several reminders, or not at all)[1009].

In FINMA's view, this complicates the task of the Swiss and foreign supervisory authorities, since the bank is unable to forecast the liquidity ratios of its various units. FINMA also considers that the expectations it expressed on October 24 regarding measures to restore liquidity buffers have not been met, and doubts that the bank's crisis management and risk management are adequate. For these reasons, FINMA is urging Credit Suisse to take prompt action in future, and to ensure that these measures are reported and presented to the supervisory authorities[1010].

In their reply dated November 16, 2022, Credit Suisse's Chairman of the Board and Chief Executive Officer show understanding, promising to react quickly to FINMA's requests for information and to provide better quality data. The bank does, however, mention the numerous channels of communication with FINMA at various levels, and the regular meetings between management and the Chairman of the Board of Directors with the supervisory authority[1011].

In the meantime, the bank's problems continue unabated, and on November 10, 2022, Credit Suisse again notifies FINMA that it does not meet the liquidity requirements[1012]. On November 16, 2022, FINMA questions the bank's ability to meet its Pillar 2 liquidity requirements by the end of 2022. FINMA once again points out to the bank that all measures taken to date to avoid any breach of Pillar 1 requirements are insufficient.

---

[1002] FINMA letter to Crédit Suisse dated 26.10.2022. About the regulatory filter, see chap. 5.3.3.3.
[1003] FINMA's revised TBTF decision dated 20.10.2017 concerning Crédit Suisse, the device 12
[1004] Birchler expert report (2024), pp. 12 and 13
[1005] Letter from FINMA to PlnC of 9.9.2024; FINMA letter to Crédit Suisse dated 26.10.2022
[1006] FINMA letter to Crédit Suisse dated 26.10.2022
[1007] Letter from FINMA to PlnC from 9.9.2024
[1008] Written answers to the PlnC from 9.4.2024, pp. 6 s.
[1009] FINMA letter to Crédit Suisse dated 5.11.2022
[1010] FINMA letter to Crédit Suisse dated 5.11.2022
[1011] Letter from Crédit Suisse to FINMA dated
[1012] Letter from Crédit Suisse to FINMA dated

It therefore orders the bank to take immediate steps to stabilize its liquidity and cash position on a long-term basis[1013].

*Prioritizing preparations in the event of a bank sale*

During the month of November, FINMA insisted at high-level meetings that Credit Suisse should speed up preparations for a sale scenario and obtain information on potential buyers from FINMA[1014]. Credit Suisse is therefore unable to identify any banks interested in a takeover. However, referring to the positive reaction of the industry, which is confident in the success of the new strategy, it believes that it is not necessary to consider a sale as a "Plan B". Credit Suisse considers that a merger with UBS would be a possible emergency scenario (should the liquidity situation reach an unsustainable point), as it would probably be preferable to a resolution. For a medium-term scenario, which could also involve partial sales, Credit Suisse proposes foreign counterparties, as a full acquisition by a foreign institution seems simpler. In Credit Suisse's view, a merger with UBS would cause capital problems and could entail risks in terms of competition law and social policy.

FINMA is skeptical about an acquisition by a foreign institution, given the legal hurdles and capital issues involved; however, with regard to the legal risks involved in a merger with UBS, it refers to its special competence in the area of competition law in the event of a stress scenario/emergency merger. It calls on Credit Suisse to make significant progress in defining the emergency scenario, and to reduce the preparation time, given that in such a case an ELA would not suffice for a long period of time[1015].

*Tougher criticism of Credit Suisse in early December 2022*

As no improvement in Credit Suisse's crisis management had been noted by the beginning of December 2022, FINMA wrote to the bank's management and Chairman of the Board of Directors again on December 6, 2022. In view of the continuing capital outflows, FINMA is of the opinion that, even with the full implementation of all measures planned by Credit Suisse up to the end of 2022, it is no longer possible to increase the Pillar 1 reserves, and certainly not the Pillar 2 liquidity buffer. FINMA considers Credit Suisse's liquidity situation to be still very fragile, and doubts that the other planned measures will be implemented, since in its view the bank is not making sufficient efforts to sell business areas or financial holdings[1016].

In a letter dated December 6, 2022, FINMA then threatened the bank with consequences if the Board of Directors and Management did not assume their obligation to take decisions to improve liquidity and cash flow effectively and sustainably, and to have them implemented. The supervisory authority gives the bank until December 13, 2022 to review its catalog of measures and define a timetable for their implementation[1017]. The following day, FINMA receives the bank's updated contingency plans. In the event of a rapid deterioration in the situation, these provide for a merger with another global financial institution. FINMA asks Credit Suisse to continue preparations for a merger in the short to medium term and, as part of the medium-term stabilization measures, to consider the partial sale of other business areas, a partial IPO of Credit Suisse (Suisse) AG, strategic partnerships and other capitalization measures[1018].

---

[1013] FINMA letter to Crédit Suisse dated 16.11.2022

[1014] Minutes of FINMA's high-level meetings with Credit Suisse of the 11.11.2022 and 21.11.2022

[1015] Minutes of FINMA's high-level meeting with Crédit Suisse on 11.11.2022, pp. 1 s.

[1016] FINMA letter to Crédit Suisse dated 6.12.2022

[1017] FINMA letter to Crédit Suisse dated 6.12.2022

[1018] FINMA letter to Crédit Suisse dated 7.12.2022

The critical letter issued by FINMA on December 6, 2022, irritated the management of Credit Suisse. On December 12, it criticizes the tone of the letter and FINMA's accusations as harsh and unjustified, and rejects all the accusations made in the letter[1019]. At the same time, the bank's CEO and Chairman of the Board of Directors assured the supervisory authority that the fight against the liquidity crisis was a top priority. They emphasize the measures taken since October and the bank's sound liquidity position prior to the October outflows, without which the bank would not have survived the massive outflows. In the same letter, the management presents the considerations that led it to implement or reject certain measures, the reasons for the repeated discrepancies between prognoses on Credit Suisse's liquidity situation and the data actually provided, and an overview of future measures and plans on the liquidity front. Credit Suisse calls for a discussion at the highest level on the consequences of the FINMA threat[1020].

Such a high-level meeting will take place on December 13, 2022, in the presence of the Chairwoman of FINMA's Board of Directors. The supervisory authority has set Credit Suisse three specific requirements, with deadlines for implementing the measures demanded. By the end of 2022, Credit Suisse must have a plan for replenishing its Pillar 2 liquidity reserves; with regard to emergency measures, FINMA also expects the bank to prepare a short-term "Plan B" by December 23, 2022, and a stabilization plan with a timeframe of three to six months by January 6, 2023. The FINMA delegation reminds the Credit Suisse representatives that the Chairman of the Board of Directors and the Chief Executive Officer are obliged to examine alternatives to reorganization. FINMA assures Credit Suisse that it will take all necessary steps to reorganize or bankrupt the bank if the point of non-viability (PoNV) is reached[1021].

In mid-December, Credit Suisse informed FINMA that it would be able to carry out a sale within two to three weeks, provided the bank gained the necessary time through the ordinary liquidity facility or the ELA. However, the bank has to admit that it has not yet prepared the virtual data room requested by FINMA, which then asks it to complete its preparation[1022].

At a meeting on December 21, 2022, the members of Credit Suisse's Audit Committee assured the supervisory authority that they would give priority to preparing the sale. Although, according to the members of the Audit Committee, the Chairman of the Board of Directors had not formally discussed this option - to which he attached little importance (one member of the Audit Committee stated that the Chairman of the Board of Directors regarded a sale as a "Plan Z") - with the Board of Directors, the latter is pressing him on the matter. FINMA informs the Audit Committee that if the situation continues to deteriorate without the bank having drawn up a plan, it will have to establish that the point of non-viability within the meaning of Article 25 BL has been reached. In this respect, the Board of Directors has obligations towards shareholders and holders of bail-in bonds. FINMA informs those present that, for a long time, it did not feel that the Board of Directors shared its concerns[1023]. In view of the increasingly critical liquidity situation, on December 28, 2022, FINMA imposed new requirements on Credit Suisse's emergency measures (chap. 6.3.5.4).

---

[1019] "harsh and unjustified"; letter from Crédit Suisse to FINMA dated 12.12.2022, p. 1
[1020] Letter from Crédit Suisse to FINMA dated 12.12.2022, pp. 2 ss.
[1021] E-mail from the Head of FINMA's Banking Division to the Chairwoman of FINMA's Board of Directors and the former Director of FINMA from 16.12.2022, 16h01
[1022] Minutes of FINMA's high-level meeting with Crédit Suisse on 12.12.2022, pp. 1 s.
[1023] Minutes of FINMA's high-level meeting with Credit Suisse's Audit Committee held on 21.12.2022, pp. 2 ss

calls on the other authorities to encourage Credit Suisse to prepare measures as well [1297].

*Information given to the Federal Council as a whole in December 2022*

At the meetings of the Federal Council on December 9 and 16, 2022, the head of the FDF verbally informs the other members of the government that the situation of Credit Suisse is stable at a low level[1298]. According to the minutes available to the PlnC, the PLB issue is not addressed. Several members of the Federal council regret that the head of the FDF continues to provide them with little information, and only orally. In their view, the information provided and the lack of written documentation did not allow the government college to assess the extent of the difficulties encountered by Credit Suisse[1299]. The former head of the FDF told the Parliamentary Committee on the Federal council that he considered the risk of indiscretions to be very high, particularly among the entourage of the members of the Federal Council, and that his fears were due in particular to the negative experiences during the COVID-19 pandemic. He also justified his restraint because of the serious stock market consequences that the indiscretions could have had[1300].

*Increased sensitivity of the authorities before the holidays: review of the situation at the CFC meeting of December 22*

On December 22, 2022, the CFC met again to assess the situation just before the Christmas holidays and to determine the next steps. The figures provided by FINMA show that, at that time, 130 billion francs had already been withdrawn from Credit Suisse since the beginning of October and that the bank's situation remains so critical that a further massive outflow of capital would lead to liquidity problems. FINMA states that, for this reason, assurance has been given that Credit Suisse meets the conditions for recourse to the FRL and ELA.

In general, there is a certain skepticism within the CFC regarding the information and forecasts provided by Credit Suisse on certain figures. In particular, the SNB is concerned about the liquidity situation the bank will find itself in at the beginning of 2023, believing that Credit Suisse has made incorrect assumptions in drawing up its year-end forecasts on this point. The SNB also considers that Credit Suisse's forecasts for the first quarter of 2023 are too optimistic and that the authorities cannot therefore rely on these figures[1301]. This opinion is shared by FINMA, which contacted Credit Suisse several times in November and December due to the delicate liquidity situation[1302]. Credit Suisse certainly replies that the situation will remain worrying until the end of the first quarter of 2023[1303], but FINMA believes that this prognosis is essentially based on Credit Suisse's hope of being able to successfully sell its securitized products segment[1304].

On December 19, 2022, FINMA wrote to the Chairman of the Board of Directors and the CEO of Credit Suisse stating that the measures taken to date to rebuild liquidity buffers are not sufficient and that the bank must now take binding internal measures to meet its liquidity targets[1305]. Despite these concerns, on December 22, 2022, FINMA believes

---

[1297] Minutes of the meeting of the SC of 9.12.2022, pp. 1 s.

[1298] Minutes of the meetings of the Federal Council of 9.12.2022 and 16.12.2022

[1299] Minutes of the working group meeting "Confederation Risk Management" CdG of the 20.4.2023, pp. 2 s. ; Minutes of the PlnC meeting of 11.10.2023, pp. 53 et 57 ; minutes of the PlnC meeting of 24.2.2024, pp. 80 et 82

[1300] Minutes of the PlnC meeting of 8.11.2023, pp. 30 ss; Minutes of the PlnC meeting of 22.5.2024, p. 24

[1301] Transcript of the CFC meeting of 22.12.2022, pp. 3 s.

[1302] Letters from FINMA to Credit Suisse dated 16.11.2022, 6.12.2022 and 19.12.2022

[1303] Crédit Suisse letter to FINMA dated 12.12.2022

[1304] Transcript of the CFC meeting of 22.12.2022, p. 4

[1305] FINMA letter to Credit Suisse dated 19.12.2022

that the point of non-viability, which would justify the launch of a reorganization, has not been reached with regard to either solvency (in terms of capital) or liquidity[1306].

*Increased sensitivity of the authorities before the holidays: reflections concerning the sales scenario*

On December 22, 2022, the CFC is aware that the chances of Credit Suisse saving itself have diminished and believes that other scenarios must be carefully prepared for, as the most likely solution seems to be a sale or an emergency sale in a crisis scenario and tight deadlines. He takes a rather positive view of the sale, as it reduces the risks for taxpayers and is in the interest of financial stability[1307]. According to the information provided by FINMA at the CFC meeting, Credit Suisse has drawn up a long list[1308] of potential buyers, most of them foreign, which is based, however, on the assumption that a sale would take place in the medium term and, therefore, that there are still several months left to make the necessary contacts. FINMA, which in December 2022 repeatedly insisted that Credit Suisse prepare for a possible sale and reduce the time needed for implementation[1309], comes to the conclusion that only a Swiss buyer is a viable option in the event of an emergency sale, namely UBS[1310]. On December 19, 2022, Credit Suisse was therefore instructed by FINMA to develop solutions for the short- and medium-term scenarios by the end of January 2023 and to prepare for them as much as possible, in particular by creating a virtual data room[1311]. At this meeting, the CFC has the first SNB documents on the economic consequences of a disorderly default by Credit Suisse[1312]; however, due to lack of time, he does not examine them.

The members of the CFC finally agreed on various subsequent tasks concerning the possible scenarios that will need to be carried out before the next meeting, scheduled for the first week of January 2023. In addition to developing the scenario for a sale with Credit Suisse, the aim is to continue preparing the ELA and, for FINMA and the FDF, to engage in technical discussions regarding a TPO for the Swiss entity in the event of a *break-up*. Available since November 2022, the analysis by the consultancy firm Oliver Wyman on the risks of a PLB for the Confederation is deemed insufficient by the CFC to serve as a basis for decision-making by the Federal Council and the FinDel, which is why subsequent work is also planned on this point. The authorities are refraining for the time being from contacting UBS, as such an intervention is considered too dangerous in the current circumstances[1313].

*Increased sensitivity of the authorities before the holidays: measures taken by the SC to prepare for an unexpected crisis situation*

During the meeting held on the evening of the same day (December 22, 2022), the SC also became clearly more aware of the Credit Suisse problems. After a briefing on the main points of discussion at the GC meeting, the SC considered that it was now unlikely that the bank would extricate itself from this situation on its own. For this reason, it has been decided to examine the option of selling Credit Suisse in more detail and, insofar as it is possible and sensible, to prepare for it. FINMA is responsible for contacting Credit Suisse to determine the degree

---

1306 Minutes of the CFC meeting of 22.12.2022, pp. 10 s.

1307 Transcript of the CFC meeting of 22.12.2022, pp. 6 s., 10 et 20.

1308 On 23.12.2022, Credit Suisse sent FINMA a brief analysis of potential buyers, including JP Morgan, Bank of America, Morgan Stanley, Goldman Sachs, BNP Paribas, Barclays, Deutsche Bank, Standard Chartered, Saudi National Bank and UBS; e-mail from Credit Suisse to FINMA dated 23.12.2022, 10.09 pm

1309 FINMA letter to Credit Suisse dated 19.12.2022

1310 Transcript of the CFC meeting of 22.12.2022, pp. 7 s.

1311 FINMA letter to Credit Suisse dated 19.12.2022; minutes of the SC meeting of 22.12.2022, p. 2

1312 Economic consequences of a disorderly failure of Credit Suisse, SNB working paper of 20.12.2022

1313 Transcript of the CFC meeting of 22.12.2022, pp. 21 and 25

**Figure 9: Liquidity Coverage Ratio (LCR, in %) of Credit Suisse's three main entities from January to February 2023**



*Source*: This figure was created based on the figures provided by Credit Suisse to FINMA every Friday, for the period from Thursday to Wednesday. The 100% liquidity requirement that Credit Suisse had to meet (in red) stems from the official communication from FINMA and applies to all banking institutions in Switzerland[1350].

### 6.4.1    Continuation of FINMA's supervision of Credit Suisse in the context of crisis preparedness

*Failure to comply with cash requirements (January 3)*

As FINMA had already feared in December (see chap. 6.3.1.1), it noted on January 3 that Credit Suisse would temporarily no longer be able to meet liquidity requirements until the end of January 2023. It then requested written justification for the underperformance as well as a funding plan by January 12, 2023[1351], map that Credit Suisse then gives[1352].

*Other preparatory work concerning the various solutions (January 4 to 10)*

At the same time, work on presenting solutions continues in January. In a letter dated January 4 on the status of preparatory work on solutions, Credit Suisse presents a possible transaction structure as part of the scenario involving a sale (see box 9 in chap. 6.3.1.1 above). At that point, Credit Suisse is considering a public takeover bid in accordance with takeover bid law, a merger under the terms of the Merger Act, or an *asset deal*, in which Credit Suisse Group

---

[1350] For further information, see FINMA: What capital and liquidity requirements must institutions meet?, 17.6.2022,
https://www.finma.ch/fr/~/media/finma/dokumente/dokumentencenter/my-finma/4dokumentation/key-metrics-chartpack-2021.pdf?sc_lang=fr&hash=B165AAA8F2364D7633AF34F0A2AC79A9 (status: 8.7.2024)

[1351] FINMA letter to Credit Suisse dated 3.1.2023, p. 1

[1352] FINMA letter to Credit Suisse dated 3.1.2023; position statement of 5.8.2024 as part of the administration consultation, p. 13

AG would sell its subsidiaries and then be liquidated[1353]. At the same time, Credit Suisse submits a list of four candidates to FINMA, including UBS, a US bank, an EU bank and a CSG shareholder.

In the same letter, Credit Suisse lists the key risks and challenges of such a transaction, as requested by FINMA in its email of December 28, 2022. There is a risk of leaks. Furthermore, according to Credit Suisse, it is difficult both to find a partner willing and able to carry out such a transaction and to guarantee the agreement of foreign regulators, investors and customers. In addition, the regulatory requirements for such a transaction need to be specified. Furthermore, Credit Suisse and the other party to the contract would expose themselves to significant risks between the announcement and the conclusion of the transaction[1354]. Added to this would be the risks specific to UBS: among the clientele of Credit Suisse and UBS, many people wish to be clients of two large banks and, in the case of a transaction, would leave for a third-party bank. Job losses are also to be expected. The transaction would therefore present a risk to the Swiss economy and financial center. At that time, Credit Suisse had not yet contacted UBS, but it cites the 2020 talks (see Figure 2 in Chap. 5.1.2). The challenges mentioned would make it considerably more difficult to contact potential parties and to finalize the transaction[1355].

In a telephone conversation on January 5, 2023, Credit Suisse also informed the Banks division of FINMA that it wished to avoid the use of ELA. Following this call, representatives of FINMA and the SNB organized a workshop with representatives of Credit Suisse. On this occasion, the authorities discussed Credit Suisse's letter of January 4 and the bank's current situation; they also discussed the various possible solutions and, in particular, the potential risks in the event of a merger with UBS. Among other things, Credit Suisse considers the differences in culture between the two banks, the retention of Credit Suisse's clientele and the lack of synergies in the area of wealth management as potential risks. UBS is nevertheless said to present the greatest number of synergies with Credit Suisse. Credit Suisse confirms that the virtual data room can be used. FINMA does not share this view; according to its estimates, around four additional weeks are needed to prepare the virtual data room. FINMA and the SNB are asking Credit Suisse to advance the preparatory work on the various solutions[1356].

On January 10, 2023, FINMA met with the head of the *(Audit Committee)* and the head of the *(Risk Committee)* of Credit Suisse. They discussed Credit Suisse's liquidity situation, which was improving slightly, and the preparatory work on the various solutions. FINMA and Credit Suisse agree that at that point, only three scenarios are possible: either Credit Suisse manages on its own, or it merges with another financial institution, or it is restructured. FINMA expresses its disappointment with Credit Suisse's preparatory work, to which Credit Suisse replies that FINMA's requirements are somewhat naive, particularly with regard to contacting potential merger partners.[1357] On January 10, 2023, FINMA meets the on the same day, according to the chair of FINMA's board of directors, she and the head of the FDF are said to have discussed the Credit Suisse situation for the first time together (see chap. 6.4.2)[1358].

---

[1353] Letter from Credit Suisse to FINMA dated 4.1.2023, pp. 3
[1354] Letter from Credit Suisse to FINMA dated 4.1.2023, p. 2
[1355] Letter from Credit Suisse to FINMA dated 4.1.2023, p. 7
[1356] FINMA internal memo dated 5.1.2023, p. 2
[1357] FINMA internal memo dated 10.1.2023, p. 1
[1358] Minutes of the PInC meeting of 1.11.2023, p. 43

The following day, FINMA and Credit Suisse meet again to discuss the weekly update on the Credit Suisse situation and the future FINMA press release concerning the conclusion of the enforcement proceedings. "Greensill"[1359].

*Confirmation from Credit Suisse regarding the virtual data room (from mid-January 2023)*

According to the information available to the PlnC, work on the preparation of the virtual data room intensified in January and February[1360]. At the beginning of the year, FINMA criticized Credit Suisse's preparatory work and demanded that the latter make the virtual data room available more quickly and upload updated data to it[1361].

In the letter dated January 12, Credit Suisse confirmed to FINMA that the majority of the data required for the virtual data room is now ready and that the latter can be operational within 48 hours. Credit Suisse also provided an overview of the documents already filed in the virtual data room[1362]. FINMA took note of this information in its letter dated January 23, 2023, and asked the bank to upload essential additional documents to the data room; for example, the financial planning and capital planning documents were missing[1363].

FINMA also points out that it is the responsibility of the bank's board of directors to monitor the situation and the options still available and to take measures in good time to safeguard the interests of investors and customers[1364].

*Extraordinary meetings of the FINMA Board of Directors concerning the Credit Suisse crisis (January 12 and 18)*

After being informed, from October 2022, of various far-reaching decisions (see chap. 6.3.1.2), the FINMA Board of Directors met again on January 12 and 18, 2023, to further explore the possible decisions. It focused on the criteria that could be used to decide whether to reorganize or liquidate the bank[1365]. On January 12, the chair of the board of directors, the director and the division heads of FINMA informed the board of directors of the situation of Credit Suisse in terms of equity and liquidity. They explain that, during the holiday period, Credit Suisse's liquidity situation became very difficult, but that it has since improved. They also discuss the ViR exercise (see box 12 in chap. 6.3.4.2)[1366].

On January 18, the FINMA board of directors discussed the critical values resulting from the ViR that could threaten a possible reorganization of Credit Suisse. In doing so, it noted that, in the available figures, capital was hardly a problem. The critical values mainly concern liquidity. FINMA does not have any instruments for creating additional liquidity, only instruments for improving solvency (AT1 bonds, bail-in bonds [*bail-in-bonds*]). This is why access to liquidity through the facilities of the SNB or a PLB of the Confederation is

---

[1359] Chronology of the FINMA, p. 27; email exchange between FINMA employees from 11.1.2023

[1360] Minutes of the PlnC meeting of 14.2.2024, pp. 61 s.

[1361] Minutes of the PlnC meeting of 31.1.2024, p. 60

[1362] Letter from Credit Suisse to FINMA dated 12.1.2023, p. 1

[1363] FINMA letter to Credit Suisse dated 23.1.2023, p. 1

[1364] FINMA letter to Credit Suisse dated 23.1.2023, p. 1

[1365] Minutes of the extraordinary meeting of the FINMA Board of Directors of 12.1.2023, p. 1; according to the information available to the PlnC, at that time, the reorganization decision was about 90% complete (minutes of the PlnC meeting of 1.11.2023, p. 61).

[1366] Minutes of the extraordinary meeting of the FINMA Board of Directors of 12.1.2023, p. 1

extremely important for the basis of decision-making in the event of reorganization or bankruptcy. In this regard, the FINMA Board of Directors is considering whether to request a liquidity certificate from the SNB to FINMA, similar to the solvency certificate that FINMA provides to the SNB[1367].

*Other work on the stabilization, emergency and liquidation plans of Credit Suisse*

After FINMA had asked it, on December 13, to develop other concrete measures to stabilize the bank (see chap. 6.3.1.1), on January 6, 2023, Credit Suisse provided a list of all measures implemented or planned[1368]. In its letter dated January 23, 2023, FINMA wrote to Credit Suisse that only a few stabilization measures are still in the pipeline and are already part of the financial planning and ordinary capital requirements. In this context, FINMA asks Credit Suisse to present further contingency measures that the bank could resort to if the situation were to worsen[1369].

*Further discussions between FINMA and Credit Suisse to prepare the sales scenario (late January to late February 2023)*

On January 24, 2023, a weekly meeting on the Credit Suisse situation brought together, on the FINMA side, the director of FINMA, the head of supervision of Credit Suisse, and, exceptionally, the chair of the board of directors of FINMA, and, on the Credit Suisse side, the chair of the board of directors, the CEO and the *head of regulatory affairs*. The discussion focused, among other things, on Credit Suisse's equity and liquidity situation and on the planned press release concerning Greensill. During this meeting, FINMA criticized Credit Suisse's assessment of supervisory obligations. It stated that it had exhausted the possibilities of supervisory law and, since the change in Credit Suisse's strategy, had granted numerous relaxations, the limits of which had been reached. It believes that it has been very accommodating, particularly with the regulatory filter. It emphasizes that foreign supervisory authorities have also made concessions. Credit Suisse replies that the valuation of the parent company's holdings using market value models has triggered a procyclical effect and is therefore problematic[1370].

During the weekly meeting on January 30 between the director of FINMA, the head of supervision of Credit Suisse, the chairman of the board of directors of Credit Suisse and other members of the bank's management, FINMA and Credit Suisse discussed Credit Suisse's AT1 bonds. The discussion is not about a possible impairment of these bonds, but about the repurchase of the oldest series of AT1 bonds by July 2023, without issuing replacement bonds, as desired by Credit Suisse[1371].

The topic of the AT1 bond buyback was again addressed during the weekly meeting on February 6, 2023. The CEO, CFO and Chairman of the Board of Directors of Credit Suisse were informed by the CEO of FINMA and the Head of the Banks division that FINMA could not yet approve the announcement desired by Credit Suisse of the buyback of a series of AT1 bonds for July 2023 without issuing a new series of bonds, as the bank has not yet delivered the analyses necessary to conduct FINMA's Loss Potential Analysis (LPA) and its profitability is still too low. Credit Suisse representatives responded that this sends the wrong signal to the market and that they had hoped FINMA would make an exception[1372].

---

[1367] Minutes of the extraordinary meeting of the FINM board of directors 18.1.2023, p. 2

[1368] Email from Crédit Suisse to FINMA dated 6.1.2023 "Contingency Measures"

[1369] FINMA letter to Credit Suisse dated 23.1.2023
[1370] FINMA internal memo dated 24.1.2023
[1371] FINMA internal memo dated 30.1.2023
[1372] FINMA internal memo dated 6.2.2023

**JK** Translate

# CERTIFICATE OF TRANSLATION

Translation from French to English

The undersigned, J.W.P. van Buren, representative of JK Translate, certifies herewith that the attached document contains a true and faithful translation of the original document.

**JK TRANSLATE**

ATA Corporate Member 270646

www.jktranslate.com
info@jktranslate.com

March 24, 2025



**ata MEMBER**
American Translators Association
ATA Corporate Member
270646

JK Translate | Stadionweg 41-B | 3077 AS Rotterdam | P.O. Box 50548 - 3007 JA Rotterdam - The Netherlands
+31(0)10-2680551 | info@jktranslate.com | www.jktranslate.com
CCI number: 34356993 | VAT: NL821208858B02 | IBAN: NL15RABO0302372938 (€,$,£ ) | BIC/SWIFT: RABONL2U