**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: CREDIT SUISSE SECURITIES FRAUD CLASS
ACTIONS

This matter relates to:

  *Diabat*

Case No. 1:23-cv-05874-CM

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION TO COMPEL

**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
Jason M. Hall
Edward N. Moss
Tammy L. Roy
Nicholas N. Matuschak
32 Old Slip
New York, New York 10005
(212) 701-3000

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ........................................................................................................................ 3

   I.  GRANTING PLAINTIFF'S MOTION WOULD VIOLATE SWISS LAW ...................... 3

   II.  THIS COURT SHOULD NOT ORDER CS TO VIOLATE FINMA'S DIRECTIVE....... 5

      A. Plaintiff Seeks Virtually Every Communication CS Had With FINMA During the
      Relevant Time Period, and Plaintiff Vastly Overstates the Importance of Those
      Communications to This Litigation ............................................................................. 6

      B. The Interests of Both Switzerland and the United States Weigh Against Granting
      Plaintiff's Motion ..................................................................................................... 11

      C. The Remaining Factors Also Support Denying Plaintiff's Motion ............................ 15

   III. PLAINTIFF'S ARGUMENT THAT THE BANK EXAMINATION PRIVILEGE
      SHOULD BE OVERRIDDEN IS OVERBROAD AND PREMATURE........................ 17

CONCLUSION................................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Averbach* v. *Cairo Amman Bank*,
  2025 WL 504612 (S.D.N.Y. Feb. 14, 2025)................................................................7

*Christine Asia Co.* v. *Alibaba Grp. Holding Ltd.*,
  No. 1:15-md-2631 (S.D.N.Y. July 28, 2025), ECF No. 179 ....................................14

*In re Citigroup Bond Litigation*,
  2011 WL 8210671 (S.D.N.Y. Dec. 5, 2011) ..........................................................18

*In re Commodity Exchange, Inc., Gold Futures & Options Trading Litigation*,
  2019 WL 1988525 (S.D.N.Y. May 6, 2019) ......................................................9, 16

*Diabat* v. *Credit Suisse Group AG*,
  2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)..........................................................8

*In re Didi Global Inc. Securities Litigation*,
  2025 WL 267893 (S.D.N.Y. Jan. 22, 2025) ..........................................................14

*Employees Retirement System for City of Providence* v. *Board of Governors of
  Federal Reserve System*,
  2025 WL 1736602 (S.D.N.Y. June 23, 2025) ........................................................20

*Federal Housing Finance Agency* v. *HSBC North America Holdings Inc.*,
  2014 WL 1909446 (S.D.N.Y. May 13, 2014) ........................................................20

*Federal Housing Finance Agency* v. *JPMorgan Chase & Co.*,
  978 F. Supp. 2d 267 (S.D.N.Y. 2013).................................................13, 17, 18, 21

*Kashef* v. *BNP Paribas S.A.*,
  2022 WL 1617489 (S.D.N.Y. May 23, 2022) .............................................7, 15, 17

*King* v. *Habib Bank Ltd.*,
  2023 WL 8879170 (S.D.N.Y. Dec. 22, 2023) ................................................. 18-19

*King* v. *Habib Bank Ltd.*,
  2025 WL 965809 (S.D.N.Y. Mar. 31, 2025)...........................................................7, 14

*Lemanik, S.A.* v. *McKinley Allsopp, Inc.*,
  125 F.R.D. 602 (S.D.N.Y. 1989) .............................................................................9

*Minpeco, S.A.* v. *Conticommodity Services, Inc.*,
  116 F.R.D. 517 (S.D.N.Y. 1987) ..........................................................7, 8, 12, 14n

*Motorola Credit Corp.* v. *Uzan*,
    73 F. Supp. 3d 397 (S.D.N.Y. 2014)...............................................................................11, 16

*NIKE, Inc.* v. *Wu*,
    349 F. Supp. 3d 346 (S.D.N.Y. 2018).....................................................................5, 7, 11, 14

*Peninsula Asset Management (Cayman) Ltd.* v. *Hankook Tire Co., Ltd.*,
    2005 WL 3046284 (S.D.N.Y. Nov. 14, 2005)..........................................................................14

*Securities & Exchange Commission* v. *Gibraltar Global Securities, Inc.*,
    2015 WL 1514746 (S.D.N.Y. Apr. 1, 2015)......................................................................... 8-9

*Southeastern Pennsylvania Transportation Authority* v. *Orrstown Financial*
    *Services, Inc.*,
    2022 WL 3567340 (M.D. Pa. Aug. 18, 2022) ...................................................................19, 21

*In re Subpoena Duces Tecum Served Upon Office of the Comptroller of Currency*,
    151 F.R.D. 1 (D.D.C. 1992)......................................................................................................19

*In re Wilmington Trust Securities Litigation*,
    2016 WL 9753979 (D. Del. Aug. 16, 2016) .........................................................................19, 20

*Wultz* v. *Bank of China Ltd.*,
    61 F. Supp. 3d 272 (S.D.N.Y. 2013)....................................................................................18, 19

**Statutes**

12 U.S.C. § 1828...........................................................................................................................13

**Other Authorities**

12 C.F.R. § 4.36............................................................................................................................13

12 C.F.R. § 261.23 ........................................................................................................................13

Restatement (Third) of Foreign Relations Law of the United States § 442.....................................5

Defendant Credit Suisse Group AG ("CS" or "Credit Suisse") hereby files this brief in opposition to the motion to compel (the "Motion"; ECF No. 146) filed by Lead Plaintiff Ali Diabat ("Plaintiff") and the memorandum of law filed therewith ("Plaintiff's Brief" or "Pl. Br."; ECF No. 147).[1]

## **PRELIMINARY STATEMENT**

In this action, Plaintiff has served extremely broad document requests seeking, among other things, all communications CS had with its primary prudential regulator—FINMA—concerning CS's financial condition and liquidity for what amounts to the last 13 months of CS's existence. Swiss law, however, recognizes that FINMA's ability to candidly discuss supervisory matters with regulated banks such as CS is vital to the orderly functioning of Swiss and global banking markets. As such, Swiss law gives FINMA the right to assert a supervisory privilege over such communications.

FINMA has exercised that right here over documents in CS's possession that implicate communications between CS and FINMA. FINMA's assertion of its privilege is not rote or formulaic—on the contrary, FINMA recently issued a detailed order setting forth precisely why it is asserting its privilege in this particular case. Given that clear instruction, a conflicting order from this Court compelling production of the same documents would, therefore, expose UBS Group AG ("UBS")—CS's successor-in-interest and Switzerland's largest bank—to severe consequences. *See* Section I, below.

Plaintiff's Brief does not argue that *specific* documents CS has withheld or redacted on the basis of FINMA's privilege should be produced. Instead, Plaintiff asks this Court to hold that

---

[1] Unless otherwise specified, all (i) emphasis is added, (ii) internal citations, quotations, and emendations are omitted, and (iii) capitalized terms have the meanings assigned in Plaintiff's Brief.

FINMA's privilege can ***never*** be a valid basis on which CS may withhold or redact ***any*** documents. Given the risk of conflicting instructions from separate sovereigns—Switzerland and the United States—that Plaintiff's Motion implicates, significant comity issues are present.   In such circumstances, courts apply a balancing test to determine the extent to which comity concerns weigh in favor of honoring the applicable foreign law.   Here, all of the factors of that test weigh in favor of honoring FINMA's privilege assertion and, therefore, denying Plaintiff's Motion.

*First*, Plaintiff's requests are extraordinarily broad, seeking essentially all communications between FINMA and CS during the relevant time period.   Despite the breadth of his request, Plaintiff takes the position that, somehow, all of these communications are highly important to this litigation.   This ignores that Plaintiff is already obtaining extensive discovery concerning CS's financial and liquidity condition and Defendants' state of mind through CS's own internal documents.  Plaintiff fails to articulate a need for the FINMA-privileged documents in this context. This factor weighs strongly in favor of denying Plaintiff's Motion.  *See* Section II(A), below.

*Second*, FINMA—and Switzerland itself—has a keen interest in protecting its supervisory communications with regulated banks, both in general and in the specific context of this action. Indeed, the Swiss legislature recently codified FINMA's ability to assert its supervisory privilege precisely to clarify any prior questions as to whether FINMA could exercise that privilege in the context of foreign proceedings.   United States law recognizes the same principle:   that a bank regulator's confidential supervisory communications with its regulated banks should be protected. Thus, the interests of both Switzerland ***and*** the United States weigh in favor of denying Plaintiff's Motion.  *See* Section II(B), below.

*Third*, the remaining factors of the applicable comity test all weigh in favor of honoring the privilege assertion as well.  *See* Section II(C), below.

Principles of comity strongly suggest that Plaintiff's Motion should be denied as a matter of Swiss law.  But even if this Court were to find that only U.S. law applies, FINMA would be entitled to assert the U.S. common-law bank examination privilege over some or all of the documents at issue.  If this Court declines to honor FINMA's assertion of its broader Swiss-law privilege, FINMA should be provided the opportunity to assert the bank examination privilege over specific documents or categories of documents.  As discovery is ongoing, the full universe of implicated documents is not yet clear, making any challenge to particular privilege assertions premature and unripe.  *See* Section III, below.[2]

**ARGUMENT**

**I.      GRANTING PLAINTIFF'S MOTION WOULD VIOLATE SWISS LAW**

There is no dispute on this Motion that, at all relevant times until its merger with UBS, CS's principal supervisory regulator in Switzerland was FINMA.  *See* Ex. 2 to the October 10, 2025 Declaration of Nicholas N. Matuschak filed herewith (the "Matuschak Declaration") at 2 (until its merger with UBS, CS was "subject to the consolidated supervision of [FINMA]").[3] "FINMA is governed by the Swiss Financial Market Supervision Act," or "FINMASA."[4]  October 10, 2025 Declaration of Andrea Huber filed herewith (the "Huber Declaration" or "Huber Decl.") ¶ 15; *see also id.* Ex. A (English translation of FINMASA).

---

[2] Plaintiff's document requests also implicate communications with numerous other regulators or governmental entities in the United States, Switzerland, and elsewhere, but any privileges or other protections that have been or may be asserted by regulators or governmental bodies other than FINMA are not at issue here.  *See, e.g.*, Pl. Br. at 4 n.3 ("[T]he only issue to be resolved in this motion is the application of ***FINMA's*** supervisory privilege.").

[3] Exhibit 2 to the Matuschak Declaration is a certified English-language translation of an October 8, 2025 FINMA order (the "FINMA Order").  The original, German-language version of the FINMA Order is attached to the Matuschak Declaration as Exhibit 1.

[4] The FINMA Order refers to FINMASA as "FINMAG."

3

FINMASA contains provisions restricting the ability of supervised entities, such as CS, to transmit or produce non-public information related to FINMA's supervision.  In particular, Article 42c, Paragraph 5 of FINMASA states that FINMA "may make the transmission, publication, or forwarding of files in the context of supervision subject to its approval if this is in the interest of its task fulfilment and is not in conflict with overriding private or public interests."  Huber Decl. ¶ 17; *see also id.* ¶ 37.  This provision applies to "both domestic and international [requests for] disclosure[.]"  *Id.* ¶ 34.  Similar provisions allow FINMA to restrict or limit confidential supervisory information shared between FINMA and domestic or foreign law enforcement authorities. *See id.* ¶¶ 30-33.  While it is technically possible for a regulated entity to challenge a non-disclosure directive issued by FINMA before the Swiss Federal Administrative Court, Swiss courts are highly deferential to FINMA when considering such challenges.  *See id.* ¶¶ 40-41.

FINMASA does not set forth a specific form that such a directive must take. *See id.* ¶ 39. Here, FINMA has made its directive ("FINMA's Directive") clear to UBS—CS's successor-in-interest—in two forms.  First, on or about August 15, 2025, FINMA informed UBS via email that it was taking the position that the documents Plaintiff has requested in this case that implicate communications with FINMA "constitute confidential supervisory information that falls within the scope of [FINMA's] supervisory privilege" and that the assertion of FINMA's privilege would be "effective for one year."  Miller Decl., Ex. F (ECF No. 148-6); *see also* FINMA Order at 3. Then, after Plaintiff filed his Motion, FINMA issued its Order, which explains in more detail the background and circumstances of, and the reasons for, the assertion of its supervisory privilege in this case.  FINMA's Order addresses, *inter alia*, the legal basis for its privilege assertion (*see* FINMA Order at 4-5) and the considerations that went into that assertion (*see id.* at 5-7).

If UBS were to violate FINMA's Directive—whether in compliance with an order of this Court or for any other reason—it would become subject to a range of penalties. Among other things, FINMA could (i) order UBS to immediately comply with its Directive; (ii) prohibit specific individuals FINMA deems responsible for any breach of its Directive from practicing a profession for up to five years; (iii) publicize UBS's breach of its Directive, which could carry significant reputational consequences for UBS; and (iv) potentially even threaten the licenses of UBS and/or its personnel. *See* Huber Decl. ¶ 48. With respect to any documents containing confidential FINMA communications that are produced from Switzerland, UBS could be exposed to additional criminal sanctions under other provisions of Swiss law. *See id.* ¶ 49.

## II.    THIS COURT SHOULD NOT ORDER CS TO VIOLATE FINMA'S DIRECTIVE

As Plaintiff acknowledges, he is asking this Court "to enter a discovery order that may violate foreign [Swiss] law." Pl. Br. at 6. When considering such a request, courts in this Circuit focus on five factors set forth in Section 442 of the Restatement (Third) of Foreign Relations Law of the United States:

> [1] the importance to the investigation or litigation of the documents or other information requested; [2] the degree of specificity of the request; [3] whether the information originated in the United States; [4] the availability of alternative means of securing the information; and [5] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*NIKE, Inc.* v. *Wu*, 349 F. Supp. 3d 346, 364 (S.D.N.Y. 2018) (McMahon, J.). Many courts also focus on two additional factors: the "hardship of the party facing conflicting legal obligations" and "whether that party has demonstrated good faith in addressing its discovery obligations." *Id.* Here, these factors weigh strongly in favor of denying Plaintiff's Motion.

5

A.      **Plaintiff Seeks Virtually Every Communication CS Had With FINMA During the Relevant Time Period, and Plaintiff Vastly Overstates the Importance of Those Communications to This Litigation**

The first two factors set forth in Section 442 of the Restatement weigh heavily in CS's favor:  Plaintiff's requests are extremely broad, and the importance of the documents he seeks is minimal.

*First*, Plaintiff's document requests are broad enough to capture essentially every single communication between FINMA and CS during the relevant time period.  For example, Request No. 20 in Plaintiff's first set of requests seeks "Documents and Communications, from any time period, concerning investigations, inquiries, or actions relating to the subject matters of this Action, Credit Suisse's financial condition during the months leading up to the [UBS] Merger, or the [UBS] Merger by a government, regulatory agency, or governmental agency, including, but not limited to . . . FINMA[.]"  Miller Decl., Ex. A (ECF No. 148-1) at 8.  Other requests are even broader and could be read to encompass all or virtually all communications with FINMA concerning CS's financial condition.  *See, e.g.*, *id.* at 7. (Request No. 16 in Plaintiff's first set of document requests broadly seeks "Documents and Communications . . . concerning . . . Credit Suisse's liquidity position" and "Credit Suisse's financial stability").  Tellingly, Plaintiff ignores these requests in his Brief.  *See* Pl. Br. at 10 (discussing other requests that would be subsumed by Plaintiff's broader requests discussed above).

While it is true that the parties have worked and continue to work "to narrow the scope of Plaintiff's RFPs" (Pl. Br. at 10), Plaintiff has never suggested that he would be willing to agree to the production of only *some* of CS's communications with FINMA concerning CS's financial condition.  As such, CS understands Plaintiff's current position to be that *every* document in CS's possession or control that constitutes or references communications with FINMA concerning CS's financial condition or the numerous other topics set forth in Plaintiff's document requests must be

6

produced if they fall within the broad universe of documents Plaintiff has requested in this case.

This level of breadth weighs in favor of denying Plaintiff's Motion. *See, e.g.*, *Kashef* v. *BNP Paribas S.A.*, 2022 WL 1617489, at \*3 (S.D.N.Y. May 23, 2022) (finding the fact that "[p]laintiffs ha[d] not clearly articulated for what they are asking" and had "rel[ied] upon generalizations" that did not make it clear why each piece of requested information was "important to their action" weighed against compelling production); *Minpeco, S.A.* v. *Conticommodity Services, Inc.*, 116 F.R.D. 517, 528 (S.D.N.Y. 1987) (finding that "the wide scope of plaintiffs' requests and interrogatories" was a factor weighing against compelling production).  The requests at issue in many of the cases Plaintiff relies upon were significantly narrower. *See, e.g.*, *King* v. *Habib Bank Ltd.*, 2025 WL 965809, at \*3 (S.D.N.Y. Mar. 31, 2025) (cited in Pl. Br. at 8, 9, 11, 12) (plaintiffs "offered to further narrow their requests to only those [documents] expressly referenced in the complaint"); *Averbach* v. *Cairo Amman Bank*, 2025 WL 504612, at \*4-5 (S.D.N.Y. Feb. 14, 2025) (cited in Pl. Br. at 11, 12) (plaintiffs sought "highly specific" records related to specific bank accounts that would result in "minimal responsive documents"); *NIKE*, 349 F. Supp. 3d at 351 (cited in Pl. Br. at 6, 8, 12) (plaintiffs sought only account information related to specific entities in connection with efforts to enforce a default judgment).

***Second***, Plaintiff argues that the FINMA communications he seeks are "pivotal" to his case because they would "reveal undisclosed, adverse information known to Defendants, and call into question the accuracy of Defendants' statements during the Class Period."  Pl. Br. at 9.  This argument appears to be based solely on the fact that, according to Plaintiff, the PInC Report and the FINMA Report (collectively, the "Public Reports") indicate that FINMA had "numerous interactions at critical times with high-level representatives of Credit Suisse concerning the bank's control environment, financial condition, and its forced merger with UBS."  *Id.*  But Plaintiff does

7

not explain why any responsive communications with FINMA would reveal anything that CS's internal documents or communications with other parties (which are already being searched for responsive materials) would not.

For example, a major portion of this case concerns whether and when CS should have disclosed the existence of comment letters from the SEC concerning CS's internal controls over financial reporting, or "ICFR." *See, e.g.*, *Diabat* v. *Credit Suisse Group AG*, 2024 WL 4252502, at \*98-99 (S.D.N.Y. Sept. 19, 2024) (McMahon, J.).  Plaintiff does not suggest that any of CS's communications with FINMA touch on this subject; while Plaintiff does vaguely assert that the Public Reports suggest that FINMA communicated with CS concerning its "control environment" (Pl. Br. at 9), he cites nothing in either Public Report to support that assertion, or point to any suggestion that any such communications included discussions about CS's communications with the SEC or assessment of CS's ICFR.  And even if CS and FINMA did discuss that topic, Plaintiff does not explain what those communications would show that CS's non-privileged internal communications would not.

With respect to alleged misstatements about CS's financial condition, the key questions will be what the Individual Defendants and/or other CS personnel knew about CS's "current and future business health" and overall "financial situation," particularly in early 2023.  *Diabat*, 2024 WL 4252502, at \*123, \*125, \*127.  Again, there is no reason Plaintiff cannot obtain that information via internal CS documents or other documents that do not implicate communications with FINMA.  *See generally Minpeco*, 116 F.R.D. at 529-30 (finding that "the reduced degree of importance of the requested discovery" in light of other discovery available to the plaintiff weighed strongly against compelling production); *cf. Securities & Exchange Commission* v. *Gibraltar Global Securities, Inc.*, 2015 WL 1514746, at \*4 (S.D.N.Y. Apr. 1, 2015) (cited in Pl. Br. at 6)

8

(granting motion to compel over foreign-law objections where, unlike here, the information was "central" and "necessary" to the claims at issue).

Even if such communications were important to this case—they are not—Plaintiff's Brief makes clear that the Public Reports provide "detail[ed]" and "granular" information concerning those discussions. Pl. Br. at 9. Indeed, Plaintiff never suggests that any of CS's communications with FINMA would reveal any facts that could be relevant to this case that Plaintiff—and the public—does not already know via the Public Reports or other public sources. *See id.* at 1 (acknowledging that "the general substance" of the communications on which Plaintiff is focused "has already been made public"); FINMA Order at 6-7 ("[The Public Reports] . . . reveal the numerous interactions between FINMA and Credit Suisse and thus also information about the supervisory relationship. The parties to [this case] are free to use [the Public Reports]. However, they are not entitled to use further information relating to the supervisory relationship.").

In short, Plaintiff has not established that he has a "legitimate need" to view CS communications with FINMA across a period of more than one year[5]—which would jeopardize FINMA's supervisory relationship with the banks it supervises going forward (*see* Section II(B), below)—for purposes of this case. *Lemanik, S.A.* v. *McKinley Allsopp, Inc.*, 125 F.R.D. 602, 608 (S.D.N.Y. 1989); *see also In re Commodity Exchange, Inc., Gold Futures & Options Trading Litigation*, 2019 WL 1988525, at *6 (S.D.N.Y. May 6, 2019) (holding that, particularly in light of the "voluminous, unredacted production that Plaintiffs [were] otherwise receiving," the fact that plaintiffs had failed to "show specifically that . . . [the] information that Defendants intend[ed] to withhold [was] relevant and important to the case" weighed against compelling production). And

---

[5] Plaintiff's document requests initially sought documents from between March 1, 2022 and June 30, 2023. *See, e.g.*, Miller Decl., Ex. A (ECF No. 148-1) at 5. Since then, Plaintiff has agreed to narrow that time period to between March 1, 2022 and April 30, 2023.

even if Plaintiff had established that *some* of CS's communications with FINMA concerning CS's financial condition are important to his case (he has not), he certainly has not established that *all* documents reflecting such communications are.

Plaintiff argues that "Credit Suisse conceded relevance" and that "FINMA [has] raised no objections to relevance." Pl. Br. at 10. As a threshold matter, however, the comity test looks to whether the documents are *important*—not whether they might have some marginal relevance. But the fact that CS had identified them as *responsive* to Plaintiff's document requests says nothing about whether they are actually *relevant* to this case, let alone important. CS believes that many of Plaintiff's document requests encompass, in whole or in part, irrelevant documents, but, in many instances, has chosen not to object in full to each and every such request in the spirit of compromise and to avoid unnecessary disputes. Nor is it the case that FINMA was required to raise relevance objections as part of its supervisory privilege assessment—either as a matter of Swiss law (*see generally* Section I, above) or as a practical matter, since FINMA is not a party to this case and therefore is not in a position to opine on what documents are or are not relevant.

Plaintiff also argues that FINMA's opposition in certain Swiss proceedings to the disclosure of documents concerning its decision to instruct CS to write down its AT1 bonds means that FINMA "recognizes the vital importance of its CSI to investor lawsuits." Pl. Br. at 10. But Plaintiff's document requests encompass a much wider range of communications than those concerning FINMA's write-down directive, and, in any event, FINMA's actions in Switzerland say nothing about whether it believes any of its communications are relevant—much less important—to this case specifically.

In sum, Plaintiff seeks an extremely broad swath of documents without explaining what relevant information Plaintiff believes those documents would contain that CS's internal, non-

privileged documents would not or why any such non-duplicative information is important to this case. This weighs strongly in favor of denying Plaintiff's Motion.

### B. The Interests of Both Switzerland and the United States Weigh Against Granting Plaintiff's Motion

Another of the factors courts consider when deciding the application of foreign law to a discovery dispute is "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." *NIKE*, 349 F. Supp. 3d at 364. Here, both Switzerland *and* the United States have strong interests in ensuring that confidential supervisory communications with banking regulators are not disclosed to third parties. As such, denying Plaintiff's Motion would support *both* countries' interests.

Switzerland's "bank secrecy regime constitutes, not just a seriously enforced national interest, but almost an element of that nation's national identity." *Motorola Credit Corp.* v. *Uzan*, 73 F. Supp. 3d 397, 404 (S.D.N.Y. 2014). But Plaintiff's Motion does not just implicate general concepts of Swiss bank secrecy—it implicates the specific ability of FINMA to protect the disclosure of its confidential supervisory communications. This is an important principle under Swiss law—indeed, the Swiss legislature specifically codified FINMA's privilege in 2016 in response to Swiss case law suggesting that FINMA lacked an adequate legal basis for an assertion of a supervisory privilege in the context of foreign legal proceedings against a Swiss bank. *See* Huber Decl. ¶ 18. By so codifying FINMA's privilege, the Swiss legislature intended to "preserve the confidential and trust-based communication between regulator and supervised entities. In the absence of such protection, supervised entities could be deterred from cooperating fully with FINMA, fearing sensitive information would be seized upon by prosecutors or private plaintiffs," which, in turn, "would undermine FINMA's statutory mandate and, ultimately, jeopardize

11

financial stability and Swiss sovereign interests." *Id.* ¶ 20; *see also id.* ¶¶ 23-28 (discussing how other provisions of Swiss law express the intent of the Swiss legislature to protect FINMA communications in other contexts as well, such as with respect to administrative proceedings before FINMA and Swiss freedom-of-information requests); FINMA Order at 4-8 (discussing the same principles). As FINMA observes in its Order, these concerns "appl[y] all the more in a crisis situation . . . in which the prompt provision of the requested information by the supervised institution is essential for the successful management of the crisis." FINMA Order at 7.

In addition, the fact that FINMA has specifically provided its position as to this case in particular—and then supplemented that position via its detailed Order—is further evidence that FINMA and, by extension, the Swiss government takes the concept of the confidentiality of supervisory communications very seriously. *See generally Minpeco*, 116 F.R.D. at 525 (finding that "statements of the Swiss government" submitted in connection with the motion weighed against disclosure because they "evince[d] a strong Swiss interest in bank secrecy and a familiarity with this litigation"). Finally, the fact that FINMA has sought to protect its supervisory communications from disclosure in ongoing litigation in Switzerland (*see, e.g.*, Pl. Br. at 10-12) is further evidence that FINMA has a strong interest in exercising its rights under FINMASA no matter where litigation arises. *See also* Huber Decl. ¶ 34 ("In practice, FINMA applies a restrictive approach when it comes to both domestic and international disclosures.").

The principle that a banking regulator's confidential communications with a regulated bank should not be disclosed has been recognized not only in Switzerland, but also by every branch of the U.S. government. The judicial branch, for example, has recognized a common-law bank examination privilege because the "distinctively continuous and informal process of bank regulation . . . especially requires candor from regulated entities," and "[t]he success of the

12

supervision therefore depends vitally upon the quality of communication between the regulated banking firm and the bank regulatory agency," which "could not be met as well if communications between the bank and its regulators were not privileged." *Federal Housing Finance Agency* v. *JPMorgan Chase & Co.*, 978 F. Supp. 2d 267, 273 (S.D.N.Y. 2013) (hereinafter "*FHFA I*"). Congress, for its part, has passed laws encouraging full disclosure by regulated banks to "any Federal banking agency, State bank supervisor, or foreign banking authority" by providing that the provision of documents to such regulators does not waive privilege claims as to third parties. *See* 12 U.S.C. § 1828(x)(1).  And numerous U.S. banking regulators have issued their own regulations restricting the disclosure of those regulators' confidential supervisory communications.  *See, e.g.*, 12 C.F.R. § 261.23(a) ("[T]he [Federal Reserve] does not normally disclose confidential supervisory information to the public or authorize third parties in possession of confidential supervisory information to further use or disclose the information."); 12 C.F.R. § 4.36(b) (similar language applicable to the Office of the Comptroller of the Currency).

In short, both Switzerland *and* the United States have a strong interest in protecting confidential supervisory communications between a bank and its regulator from disclosure to third parties.  Plaintiff's Motion is antithetical to such interests.

Plaintiff points to a U.S. interest in encouraging full discovery (*see* Pl. Br. at 7) and in allowing private parties to enforce the U.S. securities laws (*see id.* at 6-7), but these interests should not override the U.S. interest in protecting confidential supervisory communications.  There is no exception, for example, in the Federal Reserve's or OCC's confidentiality regulations for securities cases.  And while, as discussed below, the U.S. bank examination privilege is not absolute, it does reflect the idea that the general U.S. practice of full disclosure in civil litigation must sometimes take a back seat to other, more important considerations, such as the desire to encourage the full

13

and frank exchange of information between banks and their regulators.  *See generally Peninsula Asset Management (Cayman) Ltd.* v. *Hankook Tire Co., Ltd.*, 2005 WL 3046284, at *2 (S.D.N.Y. Nov. 14, 2005) (recognizing that "there are necessary limits on plaintiffs' ability to discover relevant information" in both the United States and other jurisdictions, and holding that "[t]he Korean national interest in the unimpeded function of regulatory bodies trumps the United States' interest in ensuring compliance with discovery obligations").

Although Plaintiff suggests that, in other cases, courts have overridden foreign laws "when similar interests were at stake," none of those cases held that the U.S. interest in civil litigation concerning its securities laws trumps a foreign country's demonstrated interest in maintaining confidentiality between a foreign bank and its foreign banking supervisor.  *See Christine Asia Co.* v. *Alibaba Grp. Holding Ltd.,* No. 1:15-md-2631 (S.D.N.Y. July 28, 2025), ECF No. 179 at 10 (cited in Pl. Br. at 7-8) (implicating Chinese "state secrecy laws," not the assertion of a supervisory privilege); *In re Didi Global Inc. Securities Litigation*, 2025 WL 267893, at *3 (S.D.N.Y. Jan. 22, 2025) (cited in Pl. Br. at 8) (implicating Chinese "data privacy, state secrets, and criminal laws," not a supervisory privilege, in a case where there was "no reliable evidence that the Chinese government ha[d] objected to the disclosure" in the first place); *King*, 2025 WL 965809, at *4 (cited in Pl. Br. at 8) (considering whether U.S. interest in combatting terrorism, not civil securities litigation, outweighed foreign bank secrecy laws); *NIKE*, 349 F. Supp. 3d at 364 (cited in Pl. Br. at 8) (implicating "China's bank secrecy laws," not a supervisory privilege).[6]

---

[6] For the same reasons, the cases Plaintiff cites in footnote 5 of his Brief are inapposite.  Although those cases involved assertions of Swiss bank secrecy laws, none involved an assertion of FINMA's supervisory privilege or implicated FINMASA.  This is a critical difference because the former are focused on protecting the confidentiality of bank clients (*see, e.g.*, *Minpeco*, 116 F.R.D. at 525), while the latter is focused on protecting the confidentiality of an arm of the Swiss government itself—*i.e.*, FINMA.

In any event, denying Plaintiff's Motion would not undermine a U.S. interest in enforcing its securities laws because, as discussed in Section II(A), above, Plaintiff will be able to pursue his case without any FINMA communications. *See Kashef*, 2022 WL 1617489, at *4 (observing that a consideration of U.S. interests may take into account "whether the . . . information [being sought] is actually material to Plaintiffs' efforts to pursue their remedy, and whether that information can be obtained through alternative means").[7]

Because, for the reasons discussed above, enforcing FINMA's privilege assertion would not only support the interests of the foreign jurisdiction but would also support the interests of the United States itself, this factor weighs very heavily in favor of denying Plaintiff's Motion.

### C.    The Remaining Factors Also Support Denying Plaintiff's Motion

The three factors discussed above—the importance of the documents, the specificity of the requests, and the interests of Switzerland and the United States—weigh so heavily in favor of denying Plaintiff's Motion that application of the remaining comity factors would not change the analysis even if they all weighed in Plaintiff's favor. But they do not—on the contrary, these factors also weigh in favor of denying Plaintiff's Motion.

**Location Where the Information Originated**. Plaintiff acknowledges that "[s]ome of the information requested undoubtedly originated in Switzerland." Pl. Br. at 10. Indeed, given that Plaintiff seeks communications between CS and FINMA, a Swiss regulator, *all* of the information Plaintiff seeks originated in Switzerland, even if that information is reflected in some

---

[7] Plaintiff also argues that Swiss interests would not be undermined because the Public Reports already discuss some communications between FINMA and CS. *See* Pl. Br. at 8-9. But Swiss law does not recognize a concept of waiver in this context (*see* Huber Decl. ¶¶ 42-47; FINMA Order at 8), meaning that FINMA's publication of its Report or provision of documents to the PInC is not indicative of a lack of concern on FINMA's part with respect to the confidentiality of its communications.

documents that made their way to the United States.  But even if some of the information requested somehow originated in the United States, this factor weighs against compulsion.  *See Commodity Exchange*, 2019 WL 1988525, at *5 (finding this factor weighed against production even where only "much" of the information sought was located outside the United States).

**Alternative Means of Obtaining the Information**.  Plaintiff argues that "there are no other readily available means of obtaining the sought after information."  Pl. Br. at 11.  But as discussed in Section II(A), above, Plaintiff can obtain the information central to this case—that is, information about CS's ICFR and financial condition—through alternative means, namely, via CS documents other than those reflecting communications with FINMA.  This factor also weighs in favor of denying Plaintiff's Motion.

**Hardship**.  Plaintiff suggests that this factor weighs in his favor because there is no evidence that a Swiss bank has been punished for complying with a discovery order from a U.S. court. *See* Pl. Br. at 12.  As a threshold matter, this is incorrect—as Judge Rakoff has recognized, Switzerland's interest in bank secrecy "is definitely enforced" in an "ongoing, vigorous, and serious" manner. *Motorola*, 73 F. Supp. 3d at 404.  With respect to FINMA's supervisory privilege specifically, it is unsurprising that evidence concerning FINMA's response to a U.S. court order compelling a Swiss bank to produce communications with FINMA over FINMA's privilege objections is limited because it does not appear that any U.S. court has ever issued such an order.[8]

In any event, the Swiss-law declaration submitted herewith establishes that "[FINMA's] privilege is not a symbolic or 'soft' instrument, but a robust legal mechanism backed by enforceable consequences."  Huber Decl. ¶ 51.  And even a small risk of penalization would still

---

[8] The cases Plaintiff cites in this portion of his Brief are inapposite because they do not address Swiss law at all, much less FINMA's privilege specifically.

16

"represent[] a hardship to [CS]" because "Plaintiff[] [is], in effect, asking [CS] to break the laws of [Switzerland]." *See Kashef*, 2022 WL 1617489, at *4. This factor thus weighs in favor of denying Plaintiff's Motion as well.

**Good Faith**. Plaintiff acknowledges that there is no evidence that either CS or FINMA has acted in bad faith. This factor therefore weighs in favor of denying Plaintiff's Motion or, at minimum, is neutral.

All seven of the applicable comity factors—in particular, the importance of the documents at issue, the specificity of the requests, and the interests of the United States and Switzerland— weigh in favor of recognizing FINMA's assertion of its supervisory privilege under FINMASA. For this reason, Plaintiff's Motion should be denied.

### III.    PLAINTIFF'S ARGUMENT THAT THE BANK EXAMINATION PRIVILEGE SHOULD BE OVERRIDDEN IS OVERBROAD AND PREMATURE

Even if this Court were to hold that the comity analysis discussed in Section II, above, does not warrant recognizing FINMA's assertion of its supervisory privilege, many of the documents Plaintiff seeks are very likely protected by the federal common-law bank examination privilege.

Plaintiff does not dispute that FINMA can invoke the bank examination privilege, and there is no logical reason why it could not. As the name suggests, the bank examination privilege applies to "bank examiners" or "bank regulatory agenc[ies]." *FHFA I*, 978 F. Supp. 2d at 273. That is precisely what FINMA is. *See* Huber Decl. ¶ 16; FINMA Order at 2, 4.

FINMA has not asserted the U.S. bank examination privilege over any specific documents to date because, as discussed above, its position is that its Swiss-law privilege applies. But if this Court were to find that FINMA's assertion of its supervisory privilege under FINMASA does not apply to this case, CS submits that the appropriate next steps would be for Plaintiff to identify to CS *specific* documents (or categories thereof) redacted or withheld from production because they

17

implicate FINMA communications and for FINMA to then determine whether and to what extent it wishes to assert the bank examination privilege over such documents. *See Wultz* v. *Bank of China Ltd.*, 61 F. Supp. 3d 272, 282 (S.D.N.Y. 2013) ("Where a claim of the privilege is appropriate, the banking agency must be allowed the opportunity to assert the privilege and the opportunity to defend its assertion.").[9]

As such, the arguments Plaintiff asserts in his Brief with respect to the bank examination privilege are premature. Indeed, Plaintiff appears to be seeking what amounts to an advisory opinion holding that the bank examination privilege should be overridden as to *every* document over which FINMA may assert the bank examination privilege in this case. *See* Pl. Br. at 14-16.

This is putting the cart before the horse. Challenges to an assertion of the bank examination privilege must be made on a document-by-document—or at least category-by-category—basis. Generally, this "requires examination of the [applicable] documents *in camera*." *FHFA I*, 978 F. Supp. 2d at 279; *see also In re Citigroup Bond Litigation*, 2011 WL 8210671, at *2 (S.D.N.Y. Dec. 5, 2011) (conducting an *in camera* review of a number of documents to determine if the bank examination privilege applied to them and/or whether good cause existed to override the privilege). Plaintiff's own cases reflect this approach. *See, e.g.*, *King* v. *Habib Bank Ltd.*, 2023 WL 8879170, at *3 (S.D.N.Y. Dec. 22, 2023) (cited in Pl. Br. at 13, 16) (ruling on the application of the bank examination privilege only after "[h]aving reviewed the documents selected by both parties for *in*

---

[9] Even under Swiss law, FINMA's Order contemplates that if Plaintiff were to identify specific documents that it believes are "essential for [Plaintiff] to be able to present [his] claims," FINMA would consider that position in the context of the specific documents at issue. FINMA Order at 6; *see also id.* at 4 ("If . . . individual documents are submitted at a later date, FINMA will either grant or refuse its consent to the disclosure of files relating to the supervisory relationship with the institution."). But as discussed herein, Plaintiff has, to date, made no effort to challenge or seek more information concerning specific documents that CS has logged on its privilege logs that Plaintiff believes are particularly important to its claims.

18

*camera* review"); *Southeastern Pennsylvania Transportation Authority* v. *Orrstown Financial Services, Inc.*, 2022 WL 3567340, at \*18 (M.D. Pa. Aug. 18, 2022) (hereinafter "*SEPTA*") (cited in Pl. Br. at 13 n.6, 14) ("The Court has conducted an <u>in</u> <u>camera</u> review of the fifty exemplar documents reviewed by the Regulators in connection with the assertion of the bank examination privilege[.]"); *In re Wilmington Trust Securities Litigation*, 2016 WL 9753979, at \*5 (D. Del. Aug. 16, 2016) (cited in Pl. Br. at 14, 15, 15 n.7) ("The court has conducted an *in camera* review of the disputed documents."); *In re Subpoena Duces Tecum Served Upon Office of the Comptroller of Currency*, 151 F.R.D. 1, 2 (D.D.C. 1992) (cited in Pl. Br. at 14) (determination of bank examination privilege was "subject to *in camera* review by the court in disputed cases").

If this Court finds that FINMA's Swiss-law privilege assertion does not apply here—which it should not for all the reasons discussed in Section II, above—this more granular approach will be necessary. Indeed, Plaintiff's document requests, on their face, implicate numerous categories of documents that could reflect FINMA's deliberative processes and opinions. *See, e.g.*, Miller Decl., Ex. B (ECF No. 148-2) at 9 (seeking copies of FINMA assessment letters sent to CS); *id.* at 10 (seeking copies of "formal rulings issued by FINMA"); *id.* at 15 (seeking, among other things, notes or minutes of a call including FINMA concerning the opinions of FINMA and various other parties concerning "the liquidation of Credit Suisse or takeover of Credit Suisse by UBS"); *id.* at 22 (seeking copies concerning the "opinions" of FINMA and other Swiss governmental bodies concerning the likelihood of a "Credit Suisse turnaround").

If FINMA does assert the bank examination privilege over certain documents, CS anticipates that Plaintiff will not be able to carry his burden (*see Wultz*, 61 F. Supp. 3d at 288-89) to establish that "good cause" overrides that privilege. Two of the factors for assessing good cause are "the relevance of the evidence sought to be protected" and "the availability of other evidence."

Pl. Br. at 13.  But, as discussed in Section II(A), above, FINMA's communications are not "highly relevant" to this case (*see id.* at 14), and Plaintiff will be able to obtain the information he purportedly needs from other sources.  *See Federal Housing Finance Agency* v. *HSBC North America Holdings Inc.*, 2014 WL 1909446, at *4 (S.D.N.Y. May 13, 2014) (hereinafter "*FHFA II*") (good cause did not exist to override bank examination privilege where "[t]he documents subject to the privilege[] have marginal relevance to the litigation"); *Employees Retirement System for City of Providence* v. *Board of Governors of Federal Reserve System*, 2025 WL 1736602, at *9 (S.D.N.Y. June 23, 2025) (giving weight to agency's determination that "there wasn't good cause" to disclose confidential supervisory information because, among other reasons, the plaintiff "[had] access to equivalent information elsewhere").  Another factor is "the role of the government in the litigation" (Pl. Br. at 13), but FINMA is not a party to this case and there are "no allegations of wrongdoing" on its part.  *Wilmington Trust*, 2016 WL 9753979, at *10.[10]

Yet another factor is whether compelling the production of the documents would result in a "chilling effect" within the applicable regulator.  Pl. Br. at 13.  The fact that CS itself no longer exists (*see* Pl. Br. at 15) is not grounds in itself for this factor to weigh in favor of disclosure, because such disclosure could have a chilling effect on FINMA itself, as well as on other banks FINMA regulates.  *See FHFA II*, 2014 WL 1909446, at *4 (considering the need for "officials and employees whose decision-making is reflected in [the documents at issue] to continue to express their opinions and judgments on financial governance and policy issues freely" when determining good cause); Huber Decl. ¶ 20 (observing that, in the absence of FINMA's ability to assert its supervisory privilege, "supervised entities could be deterred from cooperating fully with

---

[10] Plaintiff argues now that "FINMA had a role in Credit Suisse's collapse" (Pl. Br. at 15 n.7), but this vague assertion appears nowhere in the operative Complaint.

20

FINMA"); FINMA Order at 4-5, 7 (making similar points).[11]  When applied to U.S. regulators, courts have sometimes held that this factor is limited because "government employees must always be cognizant that their communications may at some point be made public because the privilege is qualified."  *SEPTA*, 2022 WL 3567340, at *25.  But because, as discussed above, FINMA communications are subject to a more absolute privilege under Swiss law, FINMA employees may very well not be "cognizant that their communications may at some point be made public."  *Id.* The compelled disclosure of FINMA communications in the context of a U.S. litigation might therefore have a significant impact on the extent to which FINMA employees feel free to express their candid opinions and conclusions to personnel within UBS or other Swiss banks in the future.

In any event, the good cause determination, too, is properly conducted on a more granular level after *in camera* review.  *See FHFA I*, 978 F. Supp. 2d at 279 (discussing "the need for *in camera* review to determine whether good cause exists").

## CONCLUSION

Plaintiff's Motion should be denied because, under the governing comity test, this Court should recognize FINMA's assertion of its Swiss-law supervisory privilege over its communications with CS.  If this Court declines to recognize that assertion, CS submits that the parties should determine an appropriate procedure for FINMA to assert the federal common-law bank examination privilege over some or all of any responsive CS documents implicating FINMA. If there are any disputes as to whether any such assertions are appropriate and/or should be overridden, the parties can raise those disputes to the Court at an appropriate time.

---

[11] Moreover, UBS still exists, and at least some of Plaintiff's document requests potentially implicate UBS's confidential discussions as well as CS's.

Dated:   October 10, 2025                          Respectfully submitted,


                                                    /s/ Herbert S. Washer
                                                   Herbert S. Washer
                                                   Jason M. Hall
                                                   Edward N. Moss
                                                   Tammy L. Roy
                                                   Nicholas N. Matuschak
                                                   **CAHILL GORDON & REINDEL LLP**
                                                   32 Old Slip
                                                   New York, New York 10005
                                                   (212) 701-3000
                                                   hwasher@cahill.com
                                                   jhall@cahill.com
                                                   emoss@cahill.com
                                                   troy@cahill.com
                                                   nmatuschak@cahill.com

                                                   *Attorneys for Defendant Credit Suisse Group AG*

22

## <u>WORD COUNT CERTIFICATION</u>

I, Herbert S. Washer, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum (Microsoft Word), and exclusive of the portions of it that are excluded by the rule, there are 6,863 words in the document.

/s/ Herbert S. Washer

Herbert S. Washer

23