**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: CREDIT SUISSE SECURITIES FRAUD CLASS
ACTIONS

This matter relates to:

    *Diabat*

Case No. 1:23-cv-05874-CM

## DECLARATION OF ANDREA HUBER IN SUPPORT OF CREDIT SUISSE'S OPPOSITION TO PLAINTIFF'S SEPTEMBER 22, 2025 MOTION TO COMPEL

I, Andrea Huber, LL.M., Pestalozzi Attorneys at Law Ltd, Feldeggstrasse 4, 8008 Zurich, Switzerland, declare as follows:

## I.    Background and Qualifications

1.    I studied law at the University of Zurich and obtained a licentiate degree in law (lic. iur.) in 2000.

2.    I passed the bar examination in Zurich, Switzerland, in 2003.

3.    Between 2003 and 2006, I held various positions at SIX Swiss Exchange Ltd and, in 2004, successfully completed the Exchange Trader Examination.

4.    In 2006, I joined Niederer Kraft Frey Ltd as an Associate and, in 2013, was promoted to Counsel in the Banking, Finance & Regulatory practice.

5.    In 2008, I obtained a Master of Laws (LL.M.) degree from Columbia University School of Law in New York.

6.    In 2017, I joined Loyens & Loeff Schweiz LLC as a Partner in the Banking practice.

7.    In 2019, I was appointed chairperson of Apex Asset Management Ltd, an asset manager subject to prudential supervision by the Swiss Financial Market Supervisory Authority ("FINMA").

8.    In 2020, I joined Pestalozzi Attorneys at Law Ltd as a Partner in the Financial Services Group.

9.    I specialize in banking and financial regulation, including asset management and investment funds, fintech, insurance, internal and regulatory investigations, enforcement proceedings, and white-collar crime. I frequently represent clients before FINMA, the SIX Swiss Exchange, and the CDB Supervisory Board, and I am an Authorized Representative of Issuers at

the SIX Swiss Exchange. I have 20 years of experience advising banks and other financial institutions on the full spectrum of regulatory and legal matters.

10. In 2024, I was appointed Vice Chair of the International Bar Association's (IBA) Banking Regulation Subcommittee.

11. My banking regulatory expertise has been widely recognized in leading legal directories, including Chambers and Partners, The Legal 500, and IFLR1000. I have been ranked as a "Leading Partner" in Banking & Finance as well as in FinTech by The Legal 500 EMEA and acknowledged as a "Highly Regarded" financial services regulatory expert by IFLR1000.

12. I am an active speaker and author on regulatory developments, financial services, compliance and enforcement trends.

## II. Scope of Engagement and Questions Presented

13. I have been engaged by Cahill Gordon & Reindel LLP, counsel for Credit Suisse Group AG, to address certain questions of Swiss law related to the action captioned *In re Credit Suisse Securities Fraud Actions*, Case No. 1:23-cv-05874-CM, pending in the United States District Court for the Southern District of New York. Particularly, my engagement concerns a motion to compel production of certain documents over which the Swiss Financial Market Supervisory Authority ("FINMA") has asserted a supervisory privilege, thereby forbidding disclosure.

14. My opinion has been requested on the question of the legal basis and scope of FINMA's supervisory privilege, the formal prerequisites for FINMA to exercise such supervisory privilege, the protections afforded to FINMA's supervisory activities under Swiss law, and potential consequences of a breach of the supervisory privilege.

### III.    Organization and Mandate of FINMA

15.    FINMA is governed by the Swiss Financial Market Supervision Act ("FINMASA", attached hereto as Exhibit A) and organized as an institution of Swiss public law with its own legal personality (art. 5 FINMASA).

16.    Pursuant to art. 1 FINMASA, FINMA is tasked with supervising the Swiss financial market in accordance with applicable Swiss financial market law. Art. 4 FINMASA further sets forth FINMA's mandate and objective of protecting creditors, investors, and insured persons as well as ensuring the proper functioning of the financial market to sustaining the reputation and competitiveness of the Swiss financial sector.

### IV.    Legal Basis and Rationale of the Supervisory Privilege

17.    The legal basis for FINMA's supervisory privilege is stipulated in art. 42c para. 5 FINMASA, whereas FINMA may "*make the transmission, publication or forwarding of files in the context of supervision subject to its approval if this is in the interest of its task fulfilment and is not in conflict with overriding private or public interests*". This clause thus establishes a formal legal instrument empowering FINMA to restrict the disclosure of supervisory files.

18.    The addition of art. 42c para. 5 into FINMASA was the direct legislative response to case law which had held that FINMA lacked a sufficient statutory basis for such a power. In 2013, FINMA had ordered a supervised bank not to disclose supervisory material in parallel foreign enforcement proceedings, relying on the general clause of art. 31 FINMASA. Whilst FINMA had previously attempted to exert supervisory privilege, its order was challenged in court and in 2014, the Swiss Federal Administrative Court ("SFAC")[1], and subsequently in 2015, the

---

[1]    SFAC Decision B-5579/2013 of 14 October 2014.

4

Swiss Federal Supreme Court ("SFSC")[2], overturned FINMA's order on the basis that FINMA lacked an adequate legal basis for such supervisory privilege. However, the entry into force of art. 42c para. 5 FINMASA on 1 January 2016 ended the debate on the legal basis for FINMA to exert supervisory privilege. Since then, the debate over the mere existence of a legal basis has been settled.

19.    The guiding rationale for the introduction of a dedicated legal basis for FINMA's supervisory privilege lies in the nature of FINMA's communication with supervised entities and in the data and information gathered in such process. To fulfill its statutory mandate (*cf. supra* section III.), FINMA relies on its ability to exchange information with supervised entities in a confidential manner. Furthermore, supervised entities are required by statutory law to cooperate with FINMA (*cf.* arts. 25, 29, and 45 FINMASA). Moreover, the manner in which FINMA interacts with supervised entities, the specific regulatory issues it highlights, and the type of measures it requests or imposes as part of its supervisory role, are of a confidential nature. This results in a wide range of information being captured in supervisory communications and thus in a wealth of information for any potential third party that would gain access thereto.[3] Without adequate safeguards, the very openness that Swiss financial market law requires could expose supervised entities to disproportionate risks in other legal contexts. FINMA itself is expected to prevent its supervisory strategies and communications from becoming the subject of uncontrolled public or third-party scrutiny.

---

[2]    SFSC Decision 2C_1058/2014 of 28 August 2015.

[3]    Cf. David Wyss, *Das Supervisory Privilege für Akten aus dem Aufsichtsverhältnis*, SZW 2023, p 145, 147.

20.    Supervisory privilege is designed to protect not only the interests of FINMA as regulator, but also the integrity of the supervisory process as a whole. By granting FINMA control over the disclosure of supervisory material, the legislature sought to preserve the confidential and trust-based communication between regulator and supervised entities. In the absence of such protection, supervised entities could be deterred from cooperating fully with FINMA, fearing that sensitive information would be seized upon by prosecutors or private plaintiffs. This would undermine FINMA's statutory mandate and, ultimately, jeopardize financial stability and Swiss sovereign interests.

21.    The legislature deliberately refrained from prescribing an exhaustive catalogue of situations where supervisory privilege may be invoked. This open formulation ensures flexibility: the supervisory privilege may be applied, for example, to protect the willingness of supervised entities to cooperate, to shield prudential crisis-management measures from premature disclosure, or to avoid circumvention of Swiss rules on administrative assistance and cooperation with other authorities. In this sense, supervisory privilege is a versatile instrument to balance competing interests between transparency, regulatory effectiveness, and due process in other proceedings.

22.    Since the entry into force of the FINMASA, the Swiss legislature has taken this into consideration by applying a principle of confidentiality with respect to FINMA's supervisory activities and proceedings before FINMA (*cf. infra* section V.), which was strengthened by the introduction of art. 42c para. 5 FINMASA as a further measure to protect FINMA's mandate as financial regulator and, ultimately, Swiss sovereign interests.

**V.    Principle of Confidentiality of Supervisory Activities and Proceedings before FINMA**

23.    A central element of the supervisory framework in Switzerland is the duty of confidentiality with respect to all official matters imposed on FINMA staff and members of its

management bodies under the official secrecy set forth in art. 14 FINMASA. This obligation not only prohibits the unauthorized disclosure of information in evidentiary hearings and court proceedings when acting as parties, witnesses, or expert witnesses, but also serves as a fundamental safeguard of trust in the supervisory process. It ensures that sensitive supervisory information from supervised entities, often provided voluntarily or under broad statutory duties of cooperation, cannot be used outside of its intended regulatory context without FINMA's consent.

24.    Proceedings before FINMA are governed by the Swiss Federal Act on Administrative Procedure ("APA", attached hereto as Exhibit B), which sets out the rules of due process for administrative proceedings. According to art. 6 APA, access to case files is restricted to the parties to the proceedings. Third parties are excluded from accessing FINMA's administrative files, thereby reinforcing the principle that supervisory processes are bilateral (between FINMA and the supervised entity) and not open to general public scrutiny.

25.    This confidentiality is further strengthened by Switzerland's freedom of information regime. While the Federal Act on Freedom of Information in the Administration ("FOIA", attached hereto as Exhibit C) generally grants any person a right of access to official documents without the need to prove a specific interest (art. 6 FOIA), art. 2 para. 2 FOIA explicitly excludes FINMA from its scope. This carve-out underscores the legislature's recognition that financial market supervision requires a heightened level of confidentiality, given the potential market sensitivity of supervisory information. Consequently, third parties have no right of access to documents relating to FINMA proceedings under the FOIA.

26.    While confidentiality is the rule, transparency is not entirely absent. Under art. 22 para. 1 FINMASA, FINMA must inform the public at least once per year about its overall supervisory activities and practices. This reporting obligation is met through annual reports,

enforcement reports, and thematic publications. Importantly, such reporting is provided on a general basis, without reference to individual supervisory proceedings. However, art. 22 para. 2 FINMASA allows FINMA, by way of exception, to disclose information on individual cases if there is a specific supervisory necessity to do so. This necessity may arise, for instance, when disclosure is required (i) to protect market participants or supervised entities, (ii) to correct false or misleading information circulating in the market, or (iii) to safeguard the reputation of the Swiss financial sector. These grounds reflect the balancing exercise between confidentiality and the need for targeted transparency in exceptional cases.

27.     In practice, FINMA adheres to a restrictive disclosure policy. Information on ongoing supervisory activities concerning individual entities or on pending enforcement proceedings is not made public unless overriding public interests justify disclosure. This approach reflects an institutional compromise: while public accountability requires a minimum of transparency, the effectiveness of prudential supervision relies on maintaining a confidential environment that encourages full cooperation by supervised entities. The relative absence of transparency is not a "deficiency" but rather a deliberate design choice to prevent supervisory processes from being instrumentalized in foreign proceedings or private litigation.

28.     Taken together, the duty of official secrecy, the procedural rules of the APA, the explicit FOIA exemption, and the limited reporting obligations under art. 22 FINMASA form a coherent framework of confidentiality. This framework aims to preserve the integrity of the supervisory process and to protect both FINMA's mandate and the stability of the Swiss financial system. It also positions Switzerland within the broader international practice, where comparable regimes likewise shield supervisory communications from unrestricted public access.

**VI.    Cooperation with Swiss and Foreign Law Enforcement Authorities**

29.    In relation between FINMA and other Swiss law enforcement authorities (including Swiss prosecutors), FINMA is subject to the general duty to cooperate with other Swiss authorities (arts. 38 and 39 FINMASA). This obligation reflects the principle that supervisory and prosecutorial functions should not be exercised in silos, but in a coordinated manner in order to ensure an effective protection of the financial system and the rule of law.

30.    However, this general duty to cooperate is not absolute. It is subject to important qualifications under art. 40 FINMASA, which empowers FINMA to refuse disclosure of non-public supervisory information where such disclosure would compromise its mandate. Specifically, FINMA may decline to share information (i) if disclosure would prejudice ongoing supervisory proceedings or the fulfilment of its supervisory activity (art. 40 lit. b FINMASA), or (ii) if disclosure would be incompatible with the objectives and purposes of financial market supervision (art. 40 lit. c FINMASA). This statutory safeguard recognizes that the effectiveness of prudential supervision depends on confidentiality, which could be undermined if sensitive supervisory information were too readily accessible to law enforcement or third parties.

31.    In the international context, cooperation with foreign authorities is subject to further specific safeguards. Given the sensitive nature of supervisory information, disclosure to foreign regulators takes place exclusively as set forth in the framework on cooperation with foreign bodies pursuant to arts. 42–43 FINMASA, consisting of administrative assistance (art. 42 et seq. FINMASA), cooperation with international organizations and bodies (art. 42b FINMASA), the transmission of information by supervised entities (art. 42c FINMASA), and cross-border audits (art. 43 FINMASA). These provisions are designed to reconcile two objectives: enabling Switzerland to engage in effective cross-border supervision, while at the same time preventing the misuse of Swiss supervisory materials in foreign criminal or civil proceedings.

32.     Any disclosure to foreign authorities by means of administrative assistance is permitted only if (i) the requesting foreign authority is bound by official or professional secrecy and (ii) the information to be disclosed must be used exclusively for the enforcement of financial market regulations, either by the requesting authority itself or by other authorities, courts, or bodies to whom the information shall be relayed (art. 42 para. 2 FINMASA).

33.     If the information to be disclosed to a foreign authority shall be used for purposes other than the aforesaid enforcement of financial market regulations (notably with respect to prosecution of criminal matters beyond the scope of financial market law), the disclosure by FINMA is further restricted as FINMA requires the accord of the Swiss Federal Office of Justice and disclosure may only occur if mutual assistance in criminal matters is not precluded (art. 42 para. 5 FINMASA).

34.     In practice, FINMA applies a restrictive approach when it comes to both domestic and international disclosures. The supervisory privilege under art. 42c para. 5 FINMASA may operate as an additional protective layer: if FINMA considers that disclosure of certain supervisory communications could seriously prejudice its mandate or the interests of the supervised entity, it may condition or withhold disclosure altogether. This interplay between the duty to cooperate and the supervisory privilege highlights FINMA's role as "gatekeeper" of supervisory information: it must carefully balance the demands of law enforcement with the need to preserve the confidentiality essential to its supervisory mission.

35.     Overall, the Swiss framework on cooperation with law enforcement authorities, domestic and foreign, reflects a calibrated approach. It enables effective information exchange while embedding safeguards to protect supervisory confidentiality, ensure proportionality, and maintain Switzerland's sovereignty in sensitive cross-border matters. In this respect, Switzerland's

system is comparable to international benchmarks, which likewise restrict the downstream use of supervisory files and requires the regulator's consent for their disclosure in litigation.

## VII.    Disclosure Prohibitions pursuant to art. 42c para. 5 FINMASA

36.    As previously outlined (*cf. supra* section IV.), the supervisory privilege under art. 42c para. 5 FINMASA serves as a statutory safeguard to protect the confidentiality of supervisory exchanges and thereby safeguard FINMA's mandate as well as overarching Swiss sovereign interests. In line with this rationale, FINMA's reporting obligations remain general in scope (*cf. supra* section V.): while it discloses aggregated insights into its supervisory activities through annual enforcement reports, it refrains from disclosing the content of interactions with individual supervised entities. The same logic extends to preventing unauthorized disclosure by the supervised entities themselves.

37.    The protective function of art. 42c para. 5 FINMASA becomes particularly relevant in situations where third parties attempt to access FINMA's communications indirectly, for instance, via disclosure requests addressed to supervised institutions in the context of civil or criminal proceedings. Such access would grant outsiders a deep and potentially prejudicial insight into FINMA's supervisory dialogue, strategies, and risk assessments. It could also create incentives for supervised entities to limit transparency towards FINMA out of fear that disclosures might later be weaponized against them. To prevent such outcomes, FINMA may order supervised entities not to share non-public information or documents arising from the supervisory relationship, provided that (i) the restriction is necessary and appropriate to safeguard FINMA's supervisory mandate, and (ii) the measure is not contrary to overriding public or private interests (art. 42c para. 5 FINMASA). FINMASA does not provide for a definition for such overriding public or private interests, instead the interpretation of such term needs to be based on the general principles applicable to Swiss administrative law generally. With respect to overriding public

11

interest, commonly the examples are public order and security and national interests (notably with respect to the Swiss economy or sovereignty). With respect to overriding private interest, the private interest in due process and in the absence of a "secret justice" may qualify as such overriding private interest. However, this does not encompass procedural difficulties in specific court proceedings with respect to certain aspects of the proceedings but must amount to a *de facto* deprivation of the party's right to due process, therefore setting a very high threshold and limiting the practical relevance of overriding private interest with respect to the supervisory privilege. FINMA therefore retains discretion in this regard and may impose such disclosure prohibitions proactively or reactively, depending on circumstances.

38.    FINMA makes use of its discretion and therefore exercises its right to prohibit supervised entities from disclosing information from the supervisory dialogue regularly, not only in the context of administrative assistance proceedings, but also in civil proceedings.

39.    From a procedural perspective, neither art. 42c para. 5 FINMASA nor any other provision of the FINMASA prescribes the form that such prohibitions must take. Swiss administrative law generally adopts a material rather than a formal definition of an "administrative act" (*Verfügung*).[4] Accordingly, FINMA may issue disclosure prohibitions not only by way of a formal decision (*formelle Verfügung*) but also via informal channels, such as letters or even electronic communications directed to the supervised entity.

## VIII.   Appeal against a Disclosure Prohibition

40.    A supervised entity that has been made subject to a disclosure prohibition under art. 42c para. 5 FINMASA may contest such a measure by way of appeal to the SFAC and,

---

[4]    Häfelin Ulrich/Müller Georg/Uhlmann Felix, *Allgemeines Verwaltungsrecht*, 8th ed., Zurich/St. Gallen 2020, N 872.

ultimately, before the SFSC. In practice, the SFAC exercises a pronounced degree of judicial restraint in this field. Recognizing that FINMA is institutionally closer to the facts, has specialized supervisory expertise, and bears responsibility for safeguarding systemic interests, the SFAC typically accords FINMA a "margin of appreciation" in interpreting the law and assessing the need for supervisory confidentiality. Accordingly, it will not substitute its own judgment for that of FINMA where the latter's reasoning appears reasonable and defensible. [5]

41.     In sum, while the appeal mechanism ensures that disclosure prohibitions remain subject to judicial scrutiny, the combination of FINMA's discretion and the SFAC's deferential approach means that the supervisory privilege is a robust protective instrument. It is difficult to overturn in court and therefore operates as an effective safeguard against the uncontrolled dissemination of supervisory communications, in line with the legislature's intent to protect the integrity of Swiss financial market supervision.

## IX.    Waiver of the Supervisory Privilege

42.     The supervisory privilege under art. 42c para. 5 FINMASA is a regulatory instrument designed to safeguard the confidentiality of FINMA's supervisory activities and proceedings, thereby ensuring the integrity and effectiveness of its statutory mandate. As such, the privilege is vested in and controlled by FINMA itself, not by the supervised entity that is the addressee of a disclosure prohibition. Consequently, a supervised entity subject to a prohibition cannot decide on its own initiative to release the protected information. Any disclosure contrary to FINMA's order would constitute a breach of Swiss law and could trigger sanctions or enforcement action (*cf. infra* section XI.).

---

[5]     SFAC Decision B-5756/2014 of 18 Mai 2017, consid. 2; SFAC Decision B-3092/2016 of 25 April 2018, consid. 3.2.1.

43.    Importantly, the fact that certain supervisory information has been disclosed or authorized for disclosure by FINMA in one context does not preclude FINMA from asserting supervisory privilege in another context. The privilege is not automatically waived by a single instance of disclosure; rather, it continues to apply unless and until the relevant information becomes genuinely and irreversibly public. Only where information has entered the public domain, through formal publication or otherwise, does FINMA lose its ability to shield that information under art. 42c para. 5 FINMASA. Even then, FINMA may still invoke the privilege in relation to other, non-public supervisory information, underscoring the selective and contextual nature of the instrument.

44.    Conversely, if prior disclosure occurred in a framework where secrecy obligations remain in force, the information retains its confidential character. For instance, disclosures to other Swiss authorities or to foreign regulators under administrative assistance are typically subject to statutory duties of professional or official secrecy on the part of the recipient authority. In such cases, the disclosed material continues to qualify as non-public information. FINMA therefore remains entitled to invoke supervisory privilege in relation to such information in other proceedings, since it has not entered the public domain but merely been shared under conditions of confidentiality.

45.    A particularly relevant example concerns disclosures in the context of Swiss parliamentary inquiries conducted by Parliamentary Investigation Committee ("PIC"). According to art. 47 of the Federal Act on the Federal Assembly ("ParlA", attached hereto as Exhibit D), proceedings and records of a PIC are covered by strict secrecy obligations. Members of the PIC are bound by an obligation of secrecy under art. 8 ParlA, while other participants in PIC hearings or interviews are subject to secrecy obligations until the inquiry has been concluded and the final

14

report submitted to the Federal Assembly (art. 169 para. 1 ParlA). Information shared with a PIC therefore remains confidential during the proceedings and only becomes public to the extent it is explicitly included in the published final report. Should the published final report make reference to any specific document, but should the document not actually be published in such final report (or as annex thereto), the document would be deemed to remain confidential. If FINMA is requested to cooperate with and provide information to a PIC, FINMA (and its employees) qualify as "other participants in PIC hearings" pursuant to art. 169 para. 1 ParlA and, as such, are subject to the secrecy obligations set forth in such provision. In cases where the published final report of the PIC refers to documents or information contained in FINMA's supervisory communication and records, without actually publishing or disclosing such documents as part of the final report (or in annexes thereto), such documents cannot be considered public-domain and therefore remain confidential, despite the PIC final report making reference thereto.

46.     Following the conclusion of the enquiry, the records relating to the activities of the PIC are archived in the Swiss Federal Archive, pursuant to the provisions of the Swiss Federal Act on Archiving ("ArchA", attached hereto as Exhibit E) and the Swiss Federal Ordinance to the Federal Act on Archiving ("ArchO", attached hereto as Exhibit F) and remain classified for a retention period of 50 years (art. 12 para. 1 ArchA in conjunction with art. 14 para. 5 ArchO) and thereby continues to qualify as non-public information. Accordingly, information disclosed to the PIC in this parliamentary context retains its status as non-public information and may continue to fall within the protective scope of the supervisory privilege.

47.     The rationale of this approach is twofold: first, to preserve FINMA's control over the supervisory record and ensure that sensitive communications cannot be repurposed without oversight; and second, to protect the broader interests of market stability and sovereign control

over supervisory information. Allowing supervised entities themselves to waive the privilege would undermine its very purpose, as it would enable third parties such as civil litigants or foreign prosecutors to bypass FINMA's protective gatekeeping function. The supervisory privilege thus represents not only a regulatory tool but also an assertion of institutional authority and sovereignty over supervisory information.

**X.       Consequences of a Breach of Supervisory Privilege**

48.       A violation of a disclosure prohibition issued by FINMA under art. 42c para. 5 FINMASA may trigger administrative measures pursuant to arts. 31 et seqq. FINMASA. These measures, which can be tailored to the severity of the violation, include:

- restoration of compliance with the law (art. 31 FINMASA), obliging the supervised entity to immediately remedy the breach and re-establish lawful conditions;

- declaratory ruling that the supervisory privilege was breached (art. 32 para. 1 FINMASA);

- prohibition from practicing a profession of up to five years (art. 33 FINMASA), which may be imposed on individuals responsible for the breach, particularly in cases of deliberate or repeated misconduct;

- publication of the supervisory ruling (art. 34 FINMASA), which can have significant reputational consequences for the entity or individual concerned;

- confiscation (art. 35 FINMASA), where the breach has resulted in financial advantage; and

- in extreme cases, revocation of license (art. 37 FINMASA).

49.       Beyond administrative measures, breaches of the supervisory privilege may also expose the offender to criminal liability, depending on the nature and circumstances of the disclosure. Relevant provisions include:

- Art. 271 Swiss Criminal Code, prohibiting unlawful acts on behalf of a foreign state; this may be engaged where a supervised entity discloses supervisory information to foreign authorities without FINMA's consent, thereby bypassing established mutual assistance channels.

16

- Art. 273 Swiss Criminal Code, penalizing economic intelligence gathering, which could apply if supervisory materials containing sensitive business or financial information are passed to third parties.

- Art. 47 Swiss Banking Act, which criminalizes breaches of banking secrecy, relevant if supervisory communications contain client-related information.

- Art. 48 FINMASA, which sanctions violations of statutory duties towards FINMA, including the obligation to respect supervisory orders.

50.     Finally, breaches may give rise to civil liability under art. 28 Swiss Civil Code for damages caused to third parties. If, for example, an unauthorized disclosure leads to reputational harm, financial loss, or competitive disadvantage for a counterparty or client, the disclosing entity or individual may face claims for compensation.

51.     Taken together, these sanctions, administrative, criminal, and civil, highlight the multi-layered protection afforded to supervisory confidentiality. They demonstrate that supervisory privilege is not a symbolic or "soft" instrument, but a robust legal mechanism backed by enforceable consequences. Its breach may therefore expose supervised entities and individuals not only to FINMA enforcement but also to reputational, criminal, and financial risks. Art. 42c para. 5 FINMASA constitutes an effective protective mechanism, underscoring the weight Swiss law attaches to safeguarding supervisory confidentiality.

## XI.     Assessment of the FINMA Decision

52.     For the purpose of rendering the present expert opinion, I was provided with a copy of FINMA's decision relating to the invocation of supervisory privilege with respect to the proceedings at hand, dated 8 October 2025 (the "FINMA Decision"). Following my review of the FINMA Decision, I conclude that FINMA exercised its supervisory privilege pursuant to art. 42c para. 5 FINMASA based on the grounds discussed herein. Further, the FINMA Decision was rendered not in an informal manner but in the form of a formal decision (*formelle Verfügung*),

17

despite FINMA not being statutorily required to invoke supervisory privilege in a formal decision

(*cf. supra* section VII. in fine).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and I understand that this document may be filed in an action or proceeding in a court of law.

Executed at Feldeggstrasse 4, 8008 Zurich, Switzerland on October 10, 2025.

_____
Andrea Huber, LL.M.