# Exhibit 1

to October 10, 2025 Declaration
of Nicholas N. Matuschak



Eidgenössische Finanzmarktaufsicht FINMA
Autorité fédérale de surveillance des marchés financiers FINMA
Autorità federale di vigilanza sui mercati finanziari FINMA
Swiss Financial Market Supervisory Authority FINMA

# VERFÜGUNG

**der Eidgenössischen Finanzmarktaufsicht FINMA**

**vom 8. Oktober 2025**

in Sachen

**UBS Group AG (als Rechtsnachfolgerin der Credit Suisse Group AG),** Bahnhofstrasse 45, 8001 Zürich

betreffend

**Zustimmungserfordernis (Supervisory Privilege) betreffend Aktenherausgabe aus dem Aufsichtsverhältnis gemäss Art. 42c Abs. 5 FINMAG im US-Verfahren Case 1:23-cv-5874 (S.D.N.Y.)**

Laupenstrasse 27
3003 Bern
Tel. +41 (0)31 327 91 00
**www.finma.ch**





Referenz:
G01540787;
G01540787-000084

## Sachverhalt

(1)       Die Credit Suisse Group AG (nachfolgend: **"CSG"**) war vor der Absorptionsfusion mit der UBS die Konzernobergesellschaft der Credit Suisse Gruppe. Die CSG unterlag bis zum Vollzug der Absorptionsfusion durch die UBS Group AG (nachfolgend: **"UBS"**) am 12. Juni 2023 gemäss Art. 3c ff. BankG[1] der konsolidierten Aufsicht durch die Eidgenössische Finanzmarktaufsicht FINMA (nachfolgend: **"FINMA"**) und war eine der beiden global tätigen Grossbanken mit Sitz in der Schweiz.[2]

(2)       Mit Verfügung vom 16. November 2012 hat die Schweizerische Nationalbank (nachfolgend: **"SNB"**) die CSG als für die Schweizer Volkswirtschaft und das Schweizer Finanzsystem systemrelevante Finanzgruppe eingestuft (sog. Systemically Important Bank; SIB).[3] Finanzgruppen gelten als systemrelevant, wenn ihr Ausfall die Schweizer Volkswirtschaft und das schweizerische Finanzsystem erheblich schädigen würde. Die Systemrelevanz beurteilt sich dabei anhand der Grösse der Finanzgruppe, ihrer Vernetzung mit dem Finanzsystem und der Volkswirtschaft sowie anhand der kurzfristigen Substituierbarkeit der von ihr erbrachten Dienstleistungen. Das Financial Stability Board (FSB) führte die Credit Suisse ab 2011 auf der Liste von Bankengruppen die auch global systemische Relevanz haben (sog. Global Systemically Important Bank; G-SIB).[4]

(3)       Nachdem eine erste grosse Abflusswelle von Kundeneinlagen ab Oktober 2022 durch bestehende Liquiditätspuffer noch aufgefangen werden konnte, verschärfte sich im März 2023 die Vertrauenskrise, mit der sich die Credit Suisse Gruppe seit Längerem konfrontiert sah, akut. Um den unkontrollierten Kollaps der global systemrelevanten Bank und damit eine internationale Finanzkrise sowie einen ausserordentlich hohen Schaden für die Finanz- und die gesamte Volkswirtschaft abzuwenden, leiteten der Bund, die SNB und die FINMA Massnahmen in die Wege, um die Zahlungsfähigkeit der Credit Suisse Gruppe sicherzustellen und die am 19. März 2023 angekündigte Übernahme der Bank durch die UBS zu unterstützen. Am 12. Juni 2023 wurde die Absorptionsfusion der CSG durch die UBS rechtlich vollzogen. Damit waren der Schutz der Gläubigerinnen und Gläubiger sowie die Funktionsfähigkeit der Finanzmärkte gewahrt und somit die gesetzlichen Ziele der FINMA erfüllt.[5]

(4)       Am 25. September 2023 mandatierte die FINMA gestützt auf Art. 24a FINMAG[6] die Prüfbeauftragte Wenger Plattner, um zuhanden der FINMA einen Bericht zum Thema "Krisenbewältigung durch die Credit Suisse" im Zeitraum von Januar 2022 bis zum 12. Juni 2023 zu verfassen. Vor dem Hintergrund eines Leaks in den Medien[7] gelangte die UBS am 6. März 2025 an die FINMA und verwies darauf, dass die Kläger in einem Verfahren gegen die CSG (deren Rechtsnachfolgerin die UBS ist) vor dem US District Court for the Southern District of New York (Case 1:23-cv-5874) Dokumente im Zusammenhang mit der Prüfbeauftragten Wenger Plattner herausverlangten. Die FINMA ordnete gegenüber

---

[1]   Bundesgesetz über die Banken und Sparkassen (Bankengesetz, BankG; SR 952.0).

[2]   Per Ende 2022 umfasste die CS-Gruppe mehr als 1'100 Gesellschaften (Bericht der FINMA zu den Lessons Learned aus der CS-Krise vom 19. Dezember 2023 (nachfolgend: **"FINMA-Bericht"**), S. 23).

[3]   Medienmitteilung der SNB vom 20. Dezember 2012 betreffend Verfügungen der Schweizerischen Nationalbank betreffend Systemrelevanz.

[4]   Seit November 2023 wird die Credit Suisse nicht mehr auf der Liste der G-SIBs des FSB aufgeführt.

[5]   FINMA-Bericht, S. 6.

[6]   Bundesgesetz über die Eidgenössische Finanzmarktaufsicht (Finanzmarktaufsichtsgesetz, FINMAG; SR 956.1).

[7]   Vgl. Artikel "FINMA führt geheime Untersuchung gegen die letzten Chefs der Credit Suisse" in der SonntagsZeitung vom 21. September 2024.

**Referenz:**
G01540787;
G01540787-000084

der UBS an[8], dass jede Übermittlung, Veröffentlichung oder Weitergabe des Berichts, der UBS-Kommentare zum Bericht sowie sämtlicher Dokumente aus dem Aufsichtsverhältnis, die im Zusammenhang mit der Untersuchung der Prüfbeauftragten Wenger Plattner stehen, der Genehmigung der FINMA unterliegen, sofern die entsprechenden Handlungen gegenüber ausländischen Dritten erfolgen sollen.[9] Diese Massnahme hat die FINMA bis am 31. Dezember 2025 befristet mit Vorbehalt einer Verlängerung, wenn die Umstände dies rechtfertigen.

(5)     Am 13. August 2025 gelangte die UBS erneut an die FINMA. Sie ersuchte ihr mitzuteilen, ob die FINMA das sogenannte Supervisory Privilege in Bezug auf einen von Klägern eingereichten Document Production Request geltend machen wird. Gleichzeitig teilte die UBS der FINMA mit, ohne einzelne Dokumente vorzulegen, dass es sich bei den einverlangten Unterlagen insbesondere um "requests 17, 20, 38, and 53 in the plaintiff's first set of merits requests for production of documents to defendants" vom 4. Dezember 2024 und "requests 2, 3, 7, 11, 13, 15, 16, 20, and 23 in the second set of requests" vom 10. Januar 2025 und um die dort erwähnten Dokumente und Informationen im Zusammenhang mit der Aufsicht der FINMA handelt. Die angeforderte Aktenherausgabe betrifft thematisch v.a. die Krisenphase sowie die Akten im Zusammenhang mit der von der FINMA beauftragten Untersuchung durch Wenger Plattner (oben, Rz. (4) sowie request 53 vom 4. Dezember 2024).

(6)     Am 15. August 2025 teilte die FINMA der UBS mit: *"(…) in accordance with applicable legal provisions and established regulatory practice, FINMA invokes a supervisory privilege in this matter. The supervisory privilege is effective for one year. FINMA reserves the right to extend this period should the circumstances requiring the protection of the information continue to apply."*

(7)     Am 5. September 2025 informierte die UBS die FINMA über das vor dem US District Court for the Southern District of New York von Klägern eingereichte Schreiben vom 2. September 2025, in dem die Kläger das gesetzliche Instrument der FINMA in Art. 42c Abs. 5 FINMAG (bzw. das gegenüber der UBS von der FINMA angeordnete Supervisory Privilege) kritisieren.

(8)     Am 24. September 2025 informierte die UBS die FINMA über die vor dem US District Court for the Southern District of New York von Klägern eingereichte Eingabe vom 22. September 2025 mit dem Betreff "Notice of Lead Plaintiff Ali Diabat's Motion to Compel Defendant Credit Suisse Group AG to Produce Documents" sowie über das diese Eingabe begleitende "Memorandum of Law In Support Of Lead Plaintiff Ali Diabat's Motion To Compel Defendant Credit Suisse Group AG To Produce Documents".

---

[8]    FINMA-Schreiben an die UBS vom 21. März 2025.

[9]    Sog. Supervisory Privilege, Art. 42c Abs. 5 FINMAG.

**finma**

Referenz:
G01540787;
G01540787-000084

## Erwägungen

### 1.    Zuständigkeit

(9)    Gemäss Art. 1 Abs. 1 i.V.m. Art. 6 Abs. 1 FINMAG ist die FINMA für die Einhaltung und Anwendung der Finanzmarktgesetze und des FINMAG zuständig. Zu ersteren zählt insbesondere das Bankengesetz.[10]

(10)    Die UBS Group AG (UBS) fungiert als Holdinggesellschaft des UBS-Konzerns und ist im Rahmen der konsolidierten Aufsicht von der FINMA überwacht. Die UBS untersteht dem Bankengesetz bzw. der Aufsicht der FINMA als Finanzgruppe, wobei die Gruppenaufsicht in Ergänzung zur Einzelinstitutsaufsicht erfolgt.[11] Zwecks Durchführung der konsolidierten Aufsicht sind Finanzgruppen im Sinne von Art. 3d Abs. 1 BankG als Beaufsichtigte im Sinne des FINMAG zu betrachten.[12] Dabei gilt die oberste Konzerngesellschaft, die UBS, in aufsichtsrechtlicher Hinsicht als Adressatin der Pflichten der Finanzgruppe und somit des aufsichtsrechtlichen Zustimmungserfordernisses (Supervisory Privilege) gemäss Art. 42c Abs. 5 FINMAG.

(11)    Beim Supervisory Privilege handelt es sich um einen Zustimmungsvorbehalt der FINMA. Die Konzeption des Gesetzes ist dergestalt, dass die FINMA gegenüber dem beaufsichtigten Institut den Genehmigungsvorbehalt anbringt. Bei einem späteren Unterbreiten der einzelnen Dokumente erteilt oder verweigert die FINMA ihre Zustimmung zur Weitergabe von Akten aus dem Aufsichtsverhältnis gegenüber dem Institut. Damit unterscheidet sich das Supervisory Privilege nach schweizerischer Konzeption von einigen ausländischen Pendants. Die Geltendmachung durch die FINMA, in dem sie selbst in Gerichtsverfahren oder vor ausländischen Zivilgerichten auftreten würde, ist gesetzlich nicht vorgesehen und entspricht auch nicht der langjährigen Praxis der FINMA. Es steht der UBS aber frei, die vorliegende Verfügung mit ausländischen Stellen zu teilen. Nach dem Gesagten ist die FINMA als Aufsichtsbehörde der UBS auf Gruppen- und Einzelinstitutsebene damit für den Erlass der vorliegenden Verfügung gegenüber der UBS zuständig.

### 2.    Supervisory Privilege

### 2.1    Rechtliche Grundlagen

(12)    Gemäss Art. 42c Abs. 5 FINMAG[13] kann die FINMA die Übermittlung, die Veröffentlichung oder die Weitergabe von nicht öffentlich zugänglichen Akten aus dem Aufsichtsverhältnis von ihrer Zustimmung abhängig machen, wenn dies im Interesse der Erfüllung ihrer Aufgaben liegt und keine überwiegenden privaten oder öffentlichen Interessen entgegenstehen (sog. Supervisory Privilege). Das Supervisory Privilege bezweckt einerseits zu vermeiden, dass die eigenen Aufsichtshandlungen und -strategien von einer ausländischen Untersuchung be- oder verhindert werden und andererseits zu vermeiden,

---

[10]    Vgl. Fn. 1.

[11]    Art. 3d und 3e Abs. 1 BankG.

[12]    Du Pasquier/Rayrox, in: Watter/Bahar (Hrsg.), Basler Kommentar zum FINMAG/FinfraG, 3. Aufl., Basel 2019, N. 16 zu Art. 3 FINMAG.

[13]    Vgl. Fn. 6.

finma

Referenz:
G01540787;
G01540787-000084

dass die Beaufsichtigten befürchten müssen, dass ihre Kooperationsbereitschaft und Transparenz gegenüber der FINMA in einem ausländischen Verfahren ausgenutzt wird.[14]

(13)     Die FINMA als Aufsichtsbehörde der UBS hat eine effiziente und effektive Überwachung der UBS sicherzustellen. Die FINMA bezweckt dabei insbesondere den Schutz der Gläubigerinnen und Gläubiger sowie der Funktionsfähigkeit des Finanzmarktes (Art. 4 FINMAG). Gegenüber der FINMA haben Beaufsichtigte und somit die CSG sowie die UBS eine umfassende Kooperations- und Editionspflicht, welche beispielsweise gegenüber Strafbehörden nicht besteht.[15] Damit die FINMA ihre Aufsichtstätigkeit wahrnehmen kann, ist sie darauf angewiesen, dass die Beaufsichtigten ihrer Auskunfts- und Meldepflicht gemäss Art. 29 FINMAG nachkommen. Die Durchführung einer effizienten und zeitnahen Aufsichtstätigkeit der FINMA erfordert daher einen offenen Austausch mit den von ihr beaufsichtigten Instituten. Namentlich müssen die Beaufsichtigten darauf vertrauen können, dass an die FINMA übermittelte Informationen betreffend ihre Geschäftätigkeit vertraulich behandelt und ausschliesslich zum Zweck der Durchführung der Aufsichtstätigkeit der FINMA verwendet werden und nicht an Dritte oder gar an die Öffentlichkeit gelangen. Ein offener Informationsfluss zwischen einem Beaufsichtigten und der Aufsicht ist somit für die Erreichung der Ziele der Finanzmarktaufsicht zentral.

(14)     Adressaten des Supervisory Privilege der FINMA sind die von ihr Beaufsichtigten (oben, Rz. (11)). Als Akten aus dem Aufsichtsverhältnis gelten sämtliche physischen und elektronischen Informationen, die Gegenstand des Austausches zwischen der Bank und der FINMA sind (z.B. Informationen aus Briefen, E-Mails, Prüf- und Untersuchungsberichten, Protokollen von gemeinsamen Sitzungen und Verfügungen der FINMA), unabhängig davon, in welchem Dokument sie enthalten sind.[16] Nicht erfasst werden jedoch bereits vorbestehende bankinterne Dokumente, die der FINMA eingereicht werden.[17]

(15)     Art. 42c FINMAG ist eine aufsichtsrechtliche Bestimmung und verpflichtet die Beaufsichtigten, organisatorische Massnahmen zu ergreifen, die ihrer Geschäftätigkeit und Struktur entsprechen, um diese Bestimmung umzusetzen. Verletzungen des Supervisory Privilege können Aufsichtsmassnahmen (Art. 29 ff. FINMAG) gegen das Institut oder die für das Institut handelnden Personen zur Folge haben.[18]

(16)     Die Anordnung eines Supervisory Privilege greift in die informationelle Selbstbestimmungsfreiheit eines Beaufsichtigten ein. Diese Einschränkung ist gerechtfertigt, wenn das öffentliche Interesse oder der Schutz von Grundrechten Dritter die Interessen des Beaufsichtigten und das öffentliche Interesse an einer freien Kommunikation der betroffenen Informationen und Dokumente überwiegen.[19] Aus Gründen der Verhältnismässigkeit kann das Supervisory Privilege auf bestimmte Gegenstände oder Situationen begrenzt werden, so gemäss Lehre ausdrücklich auf Krisenfälle, um funktionsrelevante Funktionen zu schützen oder einen Bank Run zu verhindern.[20] Die Frage, wie die FINMA ihre

---

[14]  Du Pasquier/Menoud, in: Watter/Bahar (Hrsg.), Basler Kommentar zum FINMAG/FinfraG, 3. Aufl., Basel 2019, N. 63 zu Art. 42c FINMAG.

[15]  Art. 29 FINMAG, Art. 45 FINMAG, Art. 13 Verwaltungsverfahrensgesetz (VwVG; SR 172.021).

[16]  Reto Ferrari-Visca, Möglichkeiten und Grenzen von Datenübermittlungen ins Ausland durch Schweizer Banken, Diss. Univ. Bern, Basel 2025, Rz 1734.

[17]  Du Pasquier/Menoud, a.a.O., N. 64 zu Art. 42c FINMAG.

[18]  Du Pasquier/Menoud, a.a.O., N. 69 zu Art. 42c FINMAG.

[19]  Du Pasquier/Menoud, a.a.O., N. 66 zu Art. 42c FINMAG.

[20]  Du Pasquier/Menoud, a.a.O., N. 67 zu Art. 42c FINMAG.

Referenz:
G01540787;
G01540787-000084

Aufsichtstätigkeit und die damit verbundene Interessenabwägung im Einzelnen wahrnimmt, ist weitgehend ihrem technischen Ermessen überlassen.[21]

## 2.2    Interesse am Informationszugang

(17)    Vorliegend sind die Interessen am freien Zugang zu den Dokumenten aus dem Aufsichtsverhältnis, namentlich das Interesse, dass Kläger ihre Ansprüche vorbringen können, aber auch das berechtigte Interesse der UBS, diese Dokumente zu ihrer Verteidigung in ausländische Verfahren einbringen zu können, gegen die Interessen der Finanzmarktaufsicht am Zustimmungserfordernis abzuwägen.

(18)    Die Verfahren der FINMA sind in der Schweiz nicht öffentlich und die FINMA ist explizit vom Geltungsbereich des Öffentlichkeitsgesetzes[22] ausgenommen.[23] Der schweizerische Gesetzgeber räumt der Vertraulichkeit der Aufsichtsprozesse ein grosses Gewicht ein. Auf nationaler Ebene kann die FINMA nach Massgabe von Art. 40 FINMAG die Leistung von Amts- und Rechtshilfe gegenüber nationalen Strafverfolgungsbehörden oder anderen inländischen Behörden verweigern, selbst wenn diese ihrerseits dem Amtsgeheimnis unterstehen. Der Zweck einer Verweigerung liegt insbesondere darin zu verhindern, dass die Bekannt- oder Herausgabe von Informationen die Erfüllung der Aufsichtstätigkeit der FINMA beeinträchtigt. Gemäss höchstrichterlicher Rechtsprechung haben Privatpersonen, selbst wenn sie von der Bank mutmasslich geschädigt worden sind, im aufsichtsrechtlichen Verfahren der FINMA gegen eine Bank keine Parteistellung und damit auch kein Akteneinsichtsrecht.[24] Die FINMA verfügt des Weiteren auch über keine gesetzliche Grundlage zur Herausgabe von Untersuchungsergebnissen an nationale Zivilgerichte und ist weder verpflichtet noch kann sie gezwungen werden, Amtshilfe zu leisten.[25] Die Rechtsprechung betont in diesem Zusammenhang, dass Unterlagen, die im Rahmen eines Verwaltungsverfahrens erstellt wurden, dem Schutz öffentlicher Interessen und nicht den Interessen von Parteien im Zivilprozess dienen.[26]

(19)    Diese vorgenannten Schranken, die im Inland bei der Herausgabe von Dokumenten aus dem Aufsichtsverhältnis bestehen (oben, Rz. (18)), sind zum Schutz der souveränen Wertungen des Schweizer Gesetzgebers auch im internationalen Verhältnis zu berücksichtigen, wenn bei der Anordnung eines Supervisory Privilege eine Interessenabwägung vorzunehmen ist. In Zivilverfahren wären ausländische Zivilkläger gegenüber inländischen Klägern ansonsten bessergestellt, was den vom schweizerischen Gesetzgeber vorgenommenen Wertungen widerspricht. Vor diesem Hintergrund bedarf es einer besonderen Rechtfertigung, um einer Herausgabe von Dokumenten aus dem Aufsichtsverhältnis ins Ausland zuzustimmen, die dafür bestimmt sind, in einem Zivilprozess verwendet zu werden.

(20)    Eine besondere Rechtfertigung könnte dann bestehen, wenn die Herausgabe der ersuchten Dokumente unerlässlich wäre, damit die Parteien überhaupt in der Lage wären, ihre möglichen Ansprüche vorzubringen bzw. sich gegen solche wehren zu können. Im Wesentlichen verlangen die Kläger im US-Verfahren No. 1:23-cv-5874 Schadenersatz, weil die Credit Suisse ihre finanzielle Situation möglicherweise falsch dargestellt habe. Inwiefern die Dokumente aus dem Aufsichtsverhältnis unerlässlich

---

[21]    Vgl. BGE 135 II 356 E. 3.1; Urteil des Bundesgerichts 2C_565/2010 vom 14. April 2011 E. 4.1; Urteil des Bundesverwaltungsgerichts A-4640/2022 vom 13. März 2025 E. 5.6.

[22]    Bundesgesetz über das Öffentlichkeitsprinzip der Verwaltung (Öffentlichkeitsgesetz, BGÖ; SR 152.3).

[23]    Art. 2 Abs. 2 BGÖ.

[24]    BGE 139 II 279 E. 2 und 4.

[25]    BVGE 2014/19 E. 7 ff.

[26]    Vgl. BVGE 2014/19 E. 9.3.



Referenz:
G01540787;
G01540787-000084

wären, um die möglichen Zivilansprüche vorzubringen oder zu entkräften, ist nicht ersichtlich und auch nicht anzunehmen: Da sich das Supervisory Privilege nicht auf bereits vorbestehende bankinterne Dokumente bezieht (oben, Rz. (14)), ist das Interesse an der Herausgabe weiterer Informationen nicht als hoch zu gewichten.

(21)    Dies gilt umso mehr als die Krise der Credit Suisse (oben, Rz. (4)) bereits Gegenstand umfassender, öffentlich zugänglicher Berichte war, namentlich jenen der FINMA[27] sowie der Parlamentarischen Untersuchungskommission (nachfolgend: "PUK").[28] Aus diesen Berichten gehen – um dem grossen Interesse der Öffentlichkeit an der Krisenbewältigung Rechnung zu tragen – auch die zahlreichen Interaktionen zwischen der FINMA und der Credit Suisse und damit auch Informationen aus dem Aufsichtsverhältnis hervor. Es steht den Parteien des US-Verfahrens No. 1:23-cv-5874 frei, sich auf diese Berichte zu stützen. Ein darüber hinausgehendes Recht, weitere Informationen aus dem Aufsichtsverältnis zu verwenden, besteht jedoch nicht.

(22)    Als Zwischenfazit ist festzuhalten, dass das Interesse am freien Zugang zu Informationen und Dokumenten bzw. das Interesse der UBS, sich mit diesen Dokumenten verteidigen zu können, als gering einzustufen ist.

## 2.3    Interesse der Finanzmarktaufsicht am Supervisory Privilege

(23)    Um den unkontrollierten Kollaps der global systemrelevanten Bank Credit Suisse im Jahr 2023 und damit eine drohende internationale Finanz- und Wirtschaftskrise sowie einen ausserordentlich hohen Schaden für die Finanzmärkte abzuwenden, stand die FINMA mit Behörden aus zahlreichen Ländern in engem Kontakt, darunter auch mit US-Behörden (Federal Reserve Bank of New York, US Federal Reserve Board und Federal Deposit Insurance Corporation, New York State Department of Financial Services und die US Securities and Exchange Commission). Es bestand ein Vertrauensverhältnis zwischen den beteiligten Behörden und der offene Austausch mit der CSG und der FINMA war eine wichtige Voraussetzung, damit eine Lösung gefunden[29] sowie negative Auswirkungen für die relevanten Volkswirtschaften (darunter auch die USA) verhindert werden konnten. Dieser Austausch hat dazu beigetragen, dass am 19. März 2023 mit der Fusion zwischen CSG und UBS eine drohende internationale Finanz- und Wirtschaftskrise verhindert wurde.[30]

(24)    Ein offener Austausch zwischen der Aufsicht und einem Finanzinstitut darf nicht dadurch gefährdet werden, dass Finanzinstitute in künftigen Krisen damit rechnen müssen, dass ihre vertraulichen Austausche mit Finanzmarktaufsichtsbehörden in einem Zivil- oder Strafprozess gegen sie verwendet werden. Ansonsten sind Finanzinstitute nicht mehr bereit, mit den Aufsichtsbehörden offen und transparent zu kommunizieren. Für die FINMA, wie auch für andere ausländische Aufsichtsbehörden, besteht damit die Gefahr, dass wegen der potenziellen nachträglichen Verwendung von Akten aus dem Aufsichtsverfahren für nachgelagerte Haftungsfragen die Offenheit und Austauschbereitschaft des Beaufsichtigten mit der Aufsicht vermindert wird. Allenfalls können diese Verfahren sogar zu einer Art Schattenaufsicht führen.[31] Dies gilt umso mehr in einer – wie es bei der Credit Suisse der Fall war –

---

[27]    Vgl. Fn. 2.

[28]    Bericht der PUK zur Geschäftsführung der Bundesbehörden im Kontext der CS-Krise vom 17. Dezember 2024 (gemäss der am 24. Februar 2025 im Bundesblatt publizierten Fassung, BBl 2025 515; nachfolgend: "PUK-Bericht").

[29]    FINMA-Bericht, S. 11, 76, 78.

[30]    PUK-Bericht, S. 29.

[31]    Vgl. DAVID WYSS, Das Supervisory Privilege für Akten aus dem Aufsichtsverhältnis, Schweizer Zeitschrift für Wirtschaft und Finanzmarktrecht (SZW), 2023, S. 148.

Referenz:
G01540787;
G01540787-000084

Krisensituation, in der die unverzügliche Bereitstellung der verlangten Informationen durch den Beaufsichtigten essentiell für das Gelingen einer Krisenbewältigung ist. Andernfalls könnte die FINMA (oder andere ausländische Aufsichtsbehörden) auch keine effektive und zeitnahe Aufsicht mehr gewährleisten und die Erfüllung ihrer gesetzlichen Aufgaben[32] nicht mehr sicherstellen. Die Herausgabe von Informationen aus dem Aufsichtsverhältnis in den hier zur Diskussion stehenden US-Zivilprozess (oben, Rz. (4)) gefährdet damit offensichtlich eine künftige Krisenbewältigung bei einer global tätigen Bank und die internationale Kooperation zwischen Aufsichtsbehörden in einem solchen Fall ernsthaft.

(25)    Dieser Interessenslage hat der Schweizer Gesetzgeber in Art. 42c Abs. 5 FINMAG Rechnung getragen: Das aufsichtsrechtliche Supervisory Privilege in der Schweiz ist somit inhaltlich – obschon es bei dessen Geltendmachung Unterschiede gibt (oben, Rz. (11)) – vergleichbar mit dem US-Bank Examination Privilege.[33]

(26)    Ferner macht die Erwähnung der Akten aus dem Aufsichtsverhältnis der FINMA im Bericht der PUK zur CS-Notfusion den Inhalt dieser Akten nicht öffentlich, stellt nach Schweizer Recht keinen Verzicht auf das Supervisory Privilege durch die FINMA dar und hebelt die der FINMA in Art. 42c Abs. 5 FINMAG zustehende gesetzliche Kompetenz nicht aus (vgl. oben, Rz. (21)).

(27)    Nach dem Gesagten ist im vorliegenden Kontext aufgrund der Sensitivität der involvierten Akten und Informationen aus dem Aufsichtsverhältnis und der kaum absehbaren Konsequenzen einer Herausgabe ein Zustimmungsvorbehalt der FINMA geeignet und erforderlich, um die in der Erfüllung der Aufsichtstätigkeit der FINMA liegenden Interessen zu schützen. Diese Interessen (oben, Rz. (23) ff.) überwiegen die Interessen an der Herausgabe der verlangten Informationen deutlich (oben, Rz. (18) ff.).

### 2.4    Bestätigung und Präzisierung des Supervisory Privilege

(28)    Vor diesem Hintergrund bestätigt und präzisiert die FINMA das von ihr gegenüber der UBS als Rechtsnachfolgerin der CSG bereits angeordnete Supervisory Privilege (oben, Rz. (4) und (6)), wonach jede Übermittlung, Veröffentlichung oder Weitergabe sämtlicher Dokumente aus dem Aufsichtsverhältnis, die die Kläger beantragen (oben, Rz. (5)), der Zustimmung der FINMA bedarf, sofern die entsprechenden Handlungen gegenüber ausländischen Dritten erfolgen sollen. Nicht vom Supervisory Privilege erfasst ist die vorliegende Verfügung (oben, Rz. (11)).

(29)    Das Supervisory Privilege gemäss Art. 42c Abs. 5 FINMAG (oben, Rz. (28)) gilt für sämtliche Dokumente aus dem Aufsichtsverhältnis der FINMA sowie den Bericht der Prüfbeauftragten Wenger Plattner, die UBS-Kommentare zu diesem Bericht sowie sämtliche Dokumente aus dem Aufsichtsverhältnis, die im Zusammenhang mit der Untersuchung der Prüfbeauftragten stehen.

(30)    Das angeordnete Supervisory Privilege gilt mindestens bis zum 31. Dezember 2027 und kann verlängert werden, wenn die Umstände dies rechtfertigen.

---

[32]    Vgl. Fn. 10 und 15.

[33]    Vgl. URS ZULAUF, Kooperation oder Obstruktion? – 20 Jahre Amtshilfe im Finanzmarktrecht vom Börsengesetz zum FINFRAG, GesKR 3/2015, S. 336 ff.



**Referenz:**
G01540787;
G01540787-000084

## 3.    Kosten

(31)    Gemäss Art. 15 FINMAG und Art. 5 Abs. 1 Bst. a FINMA-GebV[34] ist gebührenpflichtig, wer eine Verfügung veranlasst. Die Kosten für den Erlass einer Verfügung bemessen sich nach dem Zeitaufwand und der Bedeutung der Sache für die gebührenpflichtige Person (Art. 8 Abs. 3 und 4 FINMA-GebV).

(32)    Die UBS hat die vorliegende Verfügung veranlasst (oben, Rz. (4) ff.). Die Verfahrenskosten für die vorliegende Verfügung betragen CHF 10'000 und sind der UBS aufzuerlegen.

---

[34]    FINMA-Gebühren und Abgabenverordnung (FINMA-GebV; SR 956.122).



Referenz:
G01540787;
G01540787-000084

## Die Eidgenössische Finanzmarktaufsicht FINMA verfügt:

1.    Jede Übermittlung, Veröffentlichung oder Weitergabe sämtlicher Dokumente aus dem Aufsichts-verhältnis mit der FINMA sowie des Berichts der Prüfbeauftragten Wenger Plattner, der UBS-Kommentare zu diesem Bericht sowie sämtlicher Dokumente aus dem Aufsichtsverhältnis, die im Zusammenhang mit der Untersuchung der Prüfbeauftragten Wenger Plattner stehen, bedarf der Zustimmung durch die FINMA, sofern die entsprechenden Handlungen gegenüber ausländischen Dritten erfolgen sollen.

2.    Das gemäss Ziff. 1 des Dispositivs angeordnete Supervisory Privilege gilt bis mindestens zum 31. Dezember 2027 und kann verlängert werden, wenn die Umstände dies rechtfertigen.

3.    Der UBS Group AG werden Verfahrenskosten von CHF 10'000 auferlegt. Sie werden mit sepa-rater Post in Rechnung gestellt und sind innert 30 Tagen nach Eintritt der Rechtskraft zu bezah-len.

Eidgenössische Finanzmarktaufsicht FINMA

Stefan Walter
Direktor

Annemarie Nussbaumer
Geschäftsbereich Supervisory Policy
und Legal Expertise

## Rechtsmittelbelehrung:

Gegen diese Verfügung kann innert 30 Tagen beim Bundesverwaltungsgericht (Postfach, CH-9023 St. Gallen) Beschwerde geführt werden. Die Beschwerde ist zu begründen und in zwei unterschriebe-nen Exemplaren einzureichen. Die Verfügung und die als Beweismittel angerufenen Urkunden sind bei-zulegen.



**Referenz:**
G01540787;
G01540787-000084

**Zu eröffnen an:**

- **UBS Group AG**, Frau Barbara Levi, Bahnhofstrasse 45, 8001 Zürich (Einschreiben mit Rück-schein)

**Zur Kenntnis an:**

- **UBS Group AG**, Herr Christoph Speth, Bahnhofstrasse 45, 8001 Zürich (Einschreiben/Vertrau-lich)
- **UBS Group AG**, Herr Alan Wehrenberg, Talacker 24, 8001 Zürich (Einschreiben/Vertraulich)
- **Ernst & Young AG**, Herr Hannes Smit, Maagplatz 1, 8010 Zürich (Einschreiben/Vertraulich)

**Versanddatum:**

0 8. Okt. 2025