# Exhibit 2

to October 10, 2025 Declaration
of Nicholas N. Matuschak



Eidgenössische Finanzmarktaufsicht FINMA
Autorité fédérale de surveillance des marchés financiers FINMA
Autorità federale di vigilanza sui mercati finanziari FINMA
Swiss Financial Market Supervisory Authority FINMA

# ORDER

**of the Swiss Financial Market Supervisory Authority FINMA**

**of October 8, 2025**

in the matter of

**UBS Group AG (as the legal successor of Credit Suisse Group AG),**
Bahnhofstrasse 45, 8001 Zurich

regarding the

**Supervisory privilege in connection with the release of files relating to the supervisory relationship pursuant to Art. 42 *c* para. 5 FINMAG in the US case 1:23-cv-5874 (S.D.N.Y.)**

Laupenstrasse 27
3003 Bern
Phone +41 (0)31 327 91 00
**www.finma.ch**



finma

Reference:
G01540787;
G01540787-000084

## Facts of the Case

(1)    Credit Suisse Group AG (hereinafter: **"CSG"**) was the parent company of the Credit Suisse Group prior to the absorption merger with UBS. Until the completion of the absorption merger by UBS Group AG (hereinafter: **"UBS"**) on June 12, 2023, the CSG was, pursuant to Art. 3 *c* et seqq. BankG [Bankengesetz, Swiss Federal Law governing Banks and Savings Banks][1] , subject to the consolidated supervision of the Swiss Financial Market Supervisory Authority FINMA (hereinafter: **"FINMA"**) and was one of the two major global banks based in Switzerland.[2]

(2)    By order of November 16, 2012, the Swiss National Bank (hereinafter: **"SNB"**) classified CSG as a systemically important financial group for the Swiss economy and the Swiss financial system (so-called Systemically Important Bank; SIB).[3] Financial groups are considered systemically important if their failure would cause significant damage to the Swiss economy and the Swiss financial system. The assessment of systemic importance is based on the size of the financial group, its interconnectedness with the financial system and the economy, and the short-term substitutability of the services it provides. The Financial Stability Board (FSB) has included Credit Suisse on the list of banking groups that also have global systemic relevance (so-called Global Systemically Important Banks; G-SIBs) since 2011.[4]

(3)    After an initial major wave during which clients withdrew their funds that started in October 2022, and which was absorbed by existing liquidity buffers, the lack of confidence that the Credit Suisse Group had been facing for some time intensified acutely in March 2023. In order to avert the uncontrolled collapse of the globally systemically important bank and thus an international financial crisis as well as extraordinarily high damage to the financial system and the entire economy, the Swiss Confederation, the SNB and FINMA initiated measures to ensure the solvency of the Credit Suisse Group and to support the takeover of the bank by UBS, which was announced on March 19, 2023. On June 12, 2023, the absorption merger between the CSG and UBS was legally completed. This ensured the protection of creditors and the functioning of the financial markets, thus fulfilling FINMA's statutory objectives.[5]

(4)    On the basis of Article 24*a* FINMAG, FINMA commissioned[6] the auditor Wenger Plattner on September 25, 2023 with the preparation of a report for FINMA on the topic of "Crisis Management by Credit Suisse" for the period from January 2022 to June 12, 2023. In consideration of a leak in the media[7], UBS contacted FINMA on March 5, 2025 and pointed out that the plaintiffs in proceedings against the CSG (whose legal successor is UBS) before the US District Court for the Southern District of New York (Case 1:23-cv-5874) were requesting documents relating to the auditor Wenger Plattner. FINMA instructed UBS[8] that any transmission, publication or dissemination of the report, UBS's comments on the report and all documents arising from the supervisory relationship in connection with the investigation by the auditor Wenger Plattner are subject to FINMA approval if the corresponding actions

---

[1]    Swiss Federal Law governing Banks and Savings Banks (Bankengestz, BankG; SR 952.0).

[2]    As of the end of 2022, the CS Group comprised more than 1,100 companies (FINMA report on lessons learned from the CS crisis of December 19, 2023 (hereinafter: **"FINMA Report"**), p. 23).

[3]    SNB press release of December 20, 2012 concerning Swiss National Bank rulings on systemic importance.

[4]    Since November 2023, Credit Suisse is no longer listed on the FSB's list of G-SIBs.

[5]    FINMA report, p. 6.

[6]    Federal Act on the Swiss Financial Market Supervisory Authority (Financial Market Supervision Act, FINMAG; SR 956.1).

[7]    See the article "FINMA conducts secret investigation against Credit Suisse's last CEOs" in the newspaper SonntagsZeitung of September 21, 2024.

[8]    FINMA letter to UBS dated March 21, 2025.

**Reference:**
G01540787;
G01540787-000084

are to be carried out towards foreign third parties.[9] FINMA limited the applicability of this order to December 31, 2025, subject to an extension if circumstances warranted such an extension.

(5)    On August 13, 2025, UBS again referred the matter to FINMA. USB asked FINMA whether it would invoke the so-called supervisory privilege in relation to a document production request submitted by the plaintiffs. At the same time, UBS informed FINMA, without submitting individual documents, that the requested documents were in particular "requests 17, 20, 38, and 53 in the plaintiff's first set of merits requests for production of documents to defendants" dated December 4, 2024, and "requests 2, 3, 7, 11, 13, 15, 16, 20, and 23 in the second set of requests" dated January 10, 2025, and the documents and information mentioned therein in connection with FINMA supervision. The requested files primarily concern the crisis phase and the files in connection with FINMA's commissioning of Wenger Plattner (see above, margin no. (4) and request 53 of December 4, 2024).

(6)    On August 15, 2025, FINMA informed UBS: "*(…) in accordance with applicable legal provisions and established regulatory practice, FINMA invokes a supervisory privilege in this matter. The supervisory privilege is effective for one year. FINMA reserves the right to extend this period should the circumstances requiring the protection of the information continue to apply.*"

(7)    On September 5, 2025, UBS informed FINMA of a document filed by plaintiffs with the US District Court for the Southern District of New York on September 2, 2025, in which the plaintiffs criticize FINMA's statutory instrument in Article *42c* para. 5 FINMAG (or the supervisory privilege granted by FINMA to UBS).

(8)    On September 24, 2025, UBS informed FINMA of the filing of September 22, 2025, by plaintiffs before the US District Court for the Southern District of New York with the subject "Notice of Lead Plaintiff Ali Diabat's Motion to Compel Defendant Credit Suisse Group AG to Produce Documents" and the accompanying "Memorandum of Law In Support Of Lead Plaintiff Ali Diabat's Motion To Compel Defendant Credit Suisse Group AG To Produce Documents."

---

[9]    So-called Supervisory Privilege, Art. 42*c* para. 5 FINMAG.

**Reference:**
G01540787;
G01540787-000084

## Considerations

### 1.        Jurisdiction

(9)        Pursuant to Art. 1 para. 1 in conjunction with Art. 6 para. 1 FINMAG, FINMA is responsible for the compliance with and the application of the financial market laws and FINMAG. The former includes, in particular, the Banking Act.[10]

(10)        The UBS Group AG (UBS) acts as the holding company of the UBS Group and is supervised by FINMA within the framework of a consolidated supervision. As a financial group, UBS is subject to the Banking Act or FINMA supervision, with the group supervision being carried out in addition to the individual institution supervision.[11] For the purpose of carrying out a consolidated supervision, financial groups within the meaning of Article *3d* para. 1 BankG are to be regarded as supervised entities within the meaning of FINMAG.[12] From a supervisory perspective, the highest group company, UBS, is considered to be the addressee of the financial group's obligations and thus of any supervisory approval requirement (supervisory privilege) pursuant to Article 42 *c* para. 5 FINMAG.

(11)        Supervisory privilege is a reservation of FINMA's approval. The concept of the law is such that FINMA imposes a reservation of approval on the supervised institution. If the individual documents are submitted at a later date, FINMA will either grant or refuse its consent to the disclosure of files relating to the supervisory relationship with the institution. This distinguishes the Swiss concept of supervisory privilege from some of its foreign counterparts. The enforcement of this right by FINMA itself in court proceedings or before foreign civil courts is not provided for by law and does not correspond to FINMA's long-standing practice. However, UBS remains free to share this order with foreign authorities. In view of the above, FINMA, as the supervisory authority of UBS at the group and individual institution level, is therefore responsible for issuing this order to UBS.

### 2.        Supervisory Privilege

### 2.1        Legal Basis

(12)        Pursuant to Art. 42 *c* para. 5 FINMAG, [13] FINMA may make the transmission, publication or disclosure of non-publicly available files regarding the supervisory relationship dependent on its consent if this is in the interest of fulfilling its duties and no overriding private or public interests conflict with said interest (so-called supervisory privilege). The purpose of the supervisory privilege is, on the one hand, to prevent a foreign investigation from impairing or blocking the institution's own supervisory activities and strategies, and, on the other hand, to prevent supervised institutions from having to fear that their willingness to cooperate and be transparent with FINMA will be exploited in foreign proceedings.[14]

---

[10]    See Fn. 1.

[11]    Art. 3*d* and 3*e* para. 1 BankG.

[12]    DU PASQUIER/RAYROX, in: Watter/Bahar (eds.), Basel Commentary on FINMAG/FinfraG, 3rd ed., Basel 2019, No. 16 reg. Art. 3 FINMAG.

[13]    See Fn. 6.

[14]    DU PASQUIER/MENOUD, in: Watter/Bahar (eds.), Basel Commentary on FINMAG/FinfraG, 3rd ed., Basel 2019, No. 63 to Art. 42 *c* FINMAG.

**Reference:**
G01540787;
G01540787-000084

(13)    FINMA, as UBS's supervisory authority, must ensure an efficient and effective supervision of UBS. FINMA's main objective is to protect creditors and ensure the functioning of the financial market (Art. 4 FINMAG). Supervised entities, including CSG and UBS, have a comprehensive duty of cooperation and disclosure towards FINMA, which does not apply, for example, to criminal authorities.[15] In order for FINMA to be able to carry out its supervisory activities, it depends on the supervised institutions complying with their obligation to provide information and reports in accordance with Art. 29 FINMAG. FINMA's performance of efficient and timely supervisory activities therefore requires an open exchange with the institutions it supervises. In particular, supervised institutions must be able to trust that information about their business activities provided to FINMA will be treated confidentially and used exclusively for the purpose of carrying out FINMA's supervisory activities and will not be disclosed to third parties or even to the public. An open flow of information between a supervised entity and the supervisory authority is therefore central to achieving the objectives of a financial market supervision.

(14)    The addressees of FINMA's supervisory privilege are the institutions it supervises (see above, margin no. (11)). All physical and electronic information exchanged between the bank and FINMA (e.g., information from letters, emails, audit and investigation reports, minutes of joint meetings and FINMA orders) are considered files associated with the supervisory relationship, regardless of the document that contains said information.[16] However, pre-existing internal bank documents submitted to FINMA are not included.[17]

(15)    Article 42 *c* FINMAG is a supervisory provision and requires supervised institutions to take organizational measures appropriate to their business activities and structure in order to implement this provision. Violations of the supervisory privilege may result in supervisory measures (Art. 29 et seqq. FINMAG) against the institution or the persons acting on behalf of the institution.[18]

(16)    A supervisory privilege order interferes with the informational self-determination of a supervised entity. This restriction is justified if the public interest or the protection of the fundamental rights of third parties outweighs the interests of the supervised person and the public interest in the free communication of the information and documents in question.[19] For reasons of proportionality, the supervisory privilege can be limited to certain objects or situations, for example, according to the doctrine, expressly to crisis situations, in order to protect functionally relevant functions or to prevent a bank run.[20] The question of how FINMA carries out its supervisory activities and the associated balancing of interests in detail is largely left to its technical discretion.[21]

## 2.2    Interest in Access to Information

(17)    In this case, the interests in free access to the documents relating to the supervisory relationship, namely the interest that plaintiffs are able to present their claims, but also the legitimate interest of

---

[15]    Art. 29 FINMAG, Art. 45 FINMAG, Art. 13 VwVG (Verwaltungsverfahrensgesetz, Administrative Procedure Act; SR 172.021).

[16]    RETO FERRARI-VISCA, Possibilities and limits of data transfers abroad by Swiss banks, Diss. Univ. Bern, Basel 2025, margin no. 1734.

[17]    DU PASQUIER/MENOUD, ibid., No. 64 regarding Art. 42 *c* FINMAG.

[18]    DU PASQUIER/MENOUD, ibid., No. 69 regarding Art. 42 *c* FINMAG.

[19]    DU PASQUIER/MENOUD, ibid., No. 66 regarding Art. 42 *c* FINMAG.

[20]    DU PASQUIER/MENOUD, ibid., No. 67 regarding Art. 42 *c* FINMAG.

[21]    See BGE 135 II 356 E. 3.1; Swiss Federal Court judgment 2C_565/2010 of April 14, 2011 E. 4.1; Judgment of the Swiss Federal Administrative Court A-4640/2022 of March 13, 2025 E. 5.6.

**Reference:**
G01540787;
G01540787-000084

UBS in being able to submit these documents for its defense in foreign proceedings, must be weighed against the interests of the financial market supervisory authority in the consent requirement.

(18)    FINMA's procedures are not public in Switzerland and FINMA is explicitly exempt from the scope of the Freedom of Information Act.[22][23] Swiss lawmakers attaches great importance to the confidentiality of supervisory processes. At the national level, FINMA may, pursuant with Article 40 FINMAG, refuse to provide administrative and legal assistance to national law enforcement authorities or other domestic authorities, even if they are themselves subject to official secrecy. The purpose of a refusal is, in particular, to prevent the disclosure or release of information from impairing the performance of FINMA's supervisory activities. According to the highest court rulings, private individuals, even if they were alleged harmed by the bank, have no party status in FINMA's supervisory proceedings against a bank and therefore no right to inspect the files.[24] Furthermore, FINMA has no legal basis for disclosing investigation results to national civil courts and is neither required nor can it be compelled to provide administrative assistance.[25] In this context, the case law emphasizes that documents created in the context of an administrative procedure serve to protect public interests and not the interests of parties in civil proceedings.[26]

(19)    These aforementioned restrictions, which exist domestically when releasing documents relating to the supervisory relationship (se  above, margin no. (18)), must be taken into account in order to protect the sovereign assessments of the Swiss lawmakers, even in international relations, if a balancing of interests is to be carried out when a supervisory privilege is ordered. In civil proceedings, foreign civil plaintiffs would otherwise be better off than domestic plaintiffs, which contradicts the assessments made by the Swiss lawmakers. Thus, a specific justification is required to approve the release of documents relating to the supervisory relationship abroad that are intended to be used in civil proceedings.

(20)    A special justification could exist if the release of the requested documents were essential for the parties to be able to present their claims or to defend themselves against claims. Essentially, the plaintiffs in US Case No. 1:23-cv-5874 are claiming damages because Credit Suisse may have misrepresented its financial situation. To what extent the documents relating to the supervisory relationship would be essential to assert or refute the civil claims is not clear and cannot be assumed: Since the supervisory privilege does not pertain to pre-existing internal bank documents (see above, margin no. (14)), the interest in the release of further information is not very high.

(21)    This is all the more true since the Credit Suisse crisis (see above, margin no. (4) ) has already been the subject of comprehensive, publicly accessible reports, namely those of FINMA[27] and the Parliamentary Commission of Inquiry (hereinafter:  **"PCI"**).[28] In order to take into account the great public interest in how the crisis is managed, these reports also reveal the numerous interactions between FINMA and Credit Suisse and thus also information about the supervisory relationship. The parties to

---

[22]    Federal Act on the Principle of Public Information in Administration (Public Information Act, Öffentlichkeitsgesetz, BGÖ; SR 152.3).

[23]    Art. 2 para. 2 BGÖ.

[24]    BGE 139 II 279 E. 2 and 4.

[25]    BVGE 2014/19 E. 7 et seqq.

[26]    See BVGE 2014/19 E. 9.3.

[27]    See Fn. 2.

[28]    The PCI report on how the federal authorities are managing the CS crisis dated December 17, 2024 (according to the version published in the Federal Gazette on February 24, 2025, BBl 2025 515; hereinafter: **"PCI Report"**).



**Reference:**
G01540787;
G01540787-000084

US Case No. 1:23-cv-5874 are free to use these reports. However, they are not entitled to use further information relating to the supervisory relationship.

(22)    As an interim conclusion, it can be stated that the interest in free access to information and documents or UBS's interest in being able to defend itself with these documents is considered low.

### 2.3    Interest of the Financial Market Supervisory Authority in the Supervisory Privilege

(23)    In order to avert the uncontrolled collapse of the globally systemically important bank Credit Suisse in 2023 and thus an impending international financial and economic crisis as well as extraordinarily high damage to the financial markets, FINMA was in close contact with authorities from numerous countries, including US authorities (Federal Reserve Bank of New York, US Federal Reserve Board and Federal Deposit Insurance Corporation, New York State Department of Financial Services and the US Securities and Exchange Commission). There was a relationship of trust between the authorities involved and the open exchange with CSG and FINMA was an important prerequisite for finding a solution[29] and preventing negative effects on the relevant economies (including the United States). This exchange contributed to the prevention of an impending international financial and economic crisis due to the merger between CSG and UBS on March 19, 2023.[30]

(24)    An open exchanges between supervisory authorities and financial institutions must not be jeopardized by the fact that financial institutions have to expect that their confidential exchanges with financial market supervisory authorities will be used against them in civil or criminal proceedings in future crises. Otherwise, financial institutions will no longer be willing to communicate openly and transparently with the supervisory authorities. For FINMA, as well as for other foreign supervisory authorities, there is a risk that the potential subsequent use of files from supervisory proceedings for subsequent liability proceedings will reduce the openness and willingness of the supervised institution to dialogue with the supervisory authority. These proceedings could even lead to a kind of shadow supervision.[31] This applies all the more in a crisis situation – as was the case with Credit Suisse – in which the prompt provision of the requested information by the supervised institution is essential for the successful management of the crisis. Otherwise, FINMA (or other foreign supervisory authorities) would no longer be able to ensure an effective and timely supervision and the fulfillment of their statutory duties.[32] The release of information relating to the supervisory relationship in the American civil proceedings at issue here (see above, margin no. (4) ) thus obviously seriously jeopardizes any future crisis management at a globally active bank and international cooperation between supervisory authorities in such a case.

(25)    The Swiss lawmakers took this interest into account in Article 42 *c* para. 5 FINMAG: The supervisory privilege in Switzerland is therefore, in terms of content – although there are differences in how it is asserted (see above, margin no. (11) ) – comparable to the US Bank Examination Privilege.[33]

---

[29]    FINMA report, pp. 11, 76, 78.

[30]    PCI report, p. 29.

[31]    See DAVID WYSS, The Supervisory Privilege regarding to Files from the Supervisory Relationship, Schweizer Zeitschrift für Wirtschaft und Finanzmarktrecht (Swiss Journal of Economics and Financial Market Law (SZW)), 2023, p. 148.

[32]    See Fn. 10 and 15.

[33]    See URS ZULAUF Kooperation oder Obstruktion? – 20 Jahre Amtshilfe im Finanzmarktrecht vom Börsengesetz zum FINFRAG (Cooperation or obstruction? – 20 years of administrative assistance in financial market law from the Stock Exchange Act to the Financial Markets Act (FINFRAG), GesKR 3/2015, p. 336 et seqq.

finma

**Reference**:
G01540787;
G01540787-000084

(26)      Furthermore, the mention of the files relating to FINMA's supervisory relationship in the PCI's report on the CS emergency merger does not make the content of these files public, does not constitute a waiver of the supervisory privilege by FINMA under Swiss law, and does not override the statutory authority granted to FINMA under Article 42 *c* paragraph 5 FINMAG (see above, margin no. (21)).

(27)      In view of the above, in the present context, due to the sensitivity of the files and information relating to the supervisory relationship and the hardly foreseeable consequences of a disclosure, a reservation of FINMA's consent is appropriate and necessary in order to protect the interests inherent in the performance of FINMA's supervisory activities. These interests (see above, margin no. (23) et seqq.) clearly outweigh the interests in the release of the requested information (see above, margin no. (20) et seqq.).(18)

### 2.4      Confirmation and Clarification of the Supervisory Privilege

(28)      Therefore, FINMA confirms and clarifies the supervisory privilege it has already granted to UBS as the legal successor to CSG (see above, margin no. (4) and (6)), according to which any transmission, publication or disclosure of all documents relating to the supervisory relationship requested by the plaintiffs (see above, margin no. (5)), requires the approval of FINMA if the corresponding actions are to be carried out towards foreign third parties. The present order is not covered by the supervisory privilege (see above, margin no. (11)).

(29)      The supervisory privilege pursuant to Art. 42 *c* para. 5 FINMAG (see above, margin no. (28)) applies to all documents relating to the supervisory relationship with FINMA, as well as to the report drafted by the auditor Wenger Plattner, the UBS comments on that report and all documents relating to the supervisory relationship that pertain to the auditors' investigation.

(30)      The supervisory privilege granted is valid until at least December 31, 2027, and can be extended if circumstances warrant.

### 3.      Cost

(31)      Pursuant to Art. 15 FINMAG and Art. 5 para. 1 lit. a FINMA-GebV (FINMA Fees and Tax Ordinance)[34] anyone who initiates an order is liable to pay a fee. The costs for the issuance of an order are calculated based on the time required and the importance of the matter for the person liable for the fee (Art. 8 para. 3 and 4 FINMA-GebV).

(32)      UBS initiated this order (see above, margin no. (4) et seqq.).(4) The procedural costs for this order amount to CHF 10,000 and are to be borne by UBS.

---

[34]    FINMA Fees and Tax Ordinance (FINMA-GebV; SR 956.122).



Reference:
G01540787;
G01540787-000084

**The Swiss Financial Market Supervisory Authority FINMA has ruled as follows:**

1.  Any transmission, publication or dissemination of any documents relating to the supervisory relationship with FINMA, as well as the report drafted by the auditor Wenger Plattner, the UBS comments on this report and any documents relating to the supervisory relationship in connection to the investigation by the auditor Wenger Plattner, require FINMA approval if the corresponding actions are to be carried out towards foreign third parties.

2.  The supervisory privilege ordered pursuant to no. 1 of the operative part of the decision is valid until at least December 31, 2027 and can be extended if circumstances warrant such an extension.

3.  UBS Group AG is ordered to pay procedural costs in the amount of CHF 10,000. Said costs will be invoiced separately and must be paid within 30 days from the date the decision becomes legally binding.

**Swiss Financial Market Supervisory Authority FINMA**

Stefan Walter                    Annemarie Nussbaumer
Direktor                         Supervisory Policy
                                 and Legal Expertise Division

**Instructions on legal remedies:**

An appeal against this decision may be lodged with the Federal Administrative Court (PO Box, CH-9023 St. Gallen) within 30 days. The appeal must be substantiated and submitted in two signed copies. The order and the documents relied upon as evidence must be enclosed.

**To be served to:**

*   **UBS Group AG** , Ms. Barbara Levi, Bahnhofstrasse 45, 8001 Zurich (Registered mail with return receipt)



**Reference**:
G01540787;
G01540787-000084

**For informational purposes:**

- **UBS Group AG** , Mr. Christoph Speth, Bahnhofstrasse 45, 8001 Zurich (Registered Mail/Confidential)

- **UBS Group AG** , Mr. Alan Wehrenberg, Talacker 24, 8001 Zurich (Registered Mail/Confidential)

- **Ernst & Young AG** , Mr. Hannes Smit, Maagplatz 1, 8010 Zurich (Registered Mail/Confidential)

**Date mailed:**

**MORNINGSIDE**
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 2025/10/08

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- German (Germany)

To:

- English (USA)

The documents are designated as:

- 'Verfügung_Supervisory Privilege UBS_final.docx'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_Samuel Wu_

Signature of **Samuel Wu**, Managing Director

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300

Salt Lake City, UT 84111