**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: CREDIT SUISSE SECURITIES FRAUD CLASS ACTIONS | No. 23-cv-5874 (CM) |
| | No. 23-cv-9287 (CM) |
| This matter relates to: | No. 25-cv-934 (CM) |
| *Diabat* | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**LEAD PLAINTIFF ALI DIABAT'S MOTION TO COMPEL**
**DEFENDANT CREDIT SUISSE GROUP AG**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT.............................................................................................................. 1

    A.    The Comity Analysis Strongly Favors Plaintiff.............................................. 1

        1.   The Balancing of National Interests Weighs Heavily in Favor of Production......... 1

        2.   The Requested Information is Highly Important to this Action............................. 3

        3.   Plaintiff's Requests Are Specific .............................................................. 6

        4.   No Alternative Means of Securing the Requested Information Exists ................... 7

        5.   CS Has Not Shown Any Hardship Will Result from Production........................... 8

    B.    FINMA Waived the Bank Examination Privilege by Not Asserting It Here................ 8

III.  CONCLUSION.......................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Chevron Corp. v. Donziger,*
   296 F.R.D. 168 (S.D.N.Y. 2013) ................................................................................ 6, 7

*Emps. Ret. Sys. for the City of Providence v. Bd. of Governors of the Fed. Rsrv.,*
   No. 24-mc-349, 2025 U.S. Dist. LEXIS 118826 (S.D.N.Y. June 23, 2025) ........................... 10

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.,*
   978 F. Supp. 2d 267 (S.D.N.Y. 2013)...................................................................... 10

*In re CitiGroup Bond Litig.,*
   No. 08-cv-9522, 2011 U.S. Dist. LEXIS 155715 (S.D.N.Y. Dec. 5, 2011) ........................... 10

*In re DiDi Glob. Inc. Sec. Litig.,*
   No. 21-cv-5807, 2025 LX 110912 (S.D.N.Y. June 23, 2025).............................................. 9

*In re Franklin Nat'l Bank Sec. Litig.,*
   478 F. Supp. 577 (E.D.N.Y. 1979) ............................................................................ 4

*In re Wilmington Tr. Sec. Litig.,*
   No. 10-cv-990, 2016 U.S. Dist. LEXIS 189794 (D. Del. Aug. 16, 2016)........................ 5, 7, 10

*Kashef v. BNP Paribas SA,*
   No. 16-cv-3228, 2025 U.S. Dist. LEXIS 171590 (S.D.N.Y. Sep. 3,.......................................... 1

*King v. Habib Bank Ltd.,*
   No. 20-cv-4322, 2023 U.S. Dist. LEXIS 228698 (S.D.N.Y. Dec. 22, 2023) ........................... 10

*King v. Habib Bank Ltd.,*
   No. 20-cv-4322, 2025 U.S. Dist. LEXIS 61144 (S.D.N.Y. Mar. 31, 2025).......................... 3, 8

*Linde v. Arab Bank, PLC,*
   463 F. Supp. 2d 310 (E.D.N.Y. 2006) ........................................................................ 6

*Linde v. Arab Bank, PLC,*
   706 F.3d 92 (2d Cir. 2013)................................................................................... 3, 8

*Motorola Credit Corp. v. Uzan,*
   73 F. Supp. 3d 397 (S.D.N.Y. 2014).......................................................................... 8

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.,*
   No. 04-cv-1153, 2005 U.S. Dist. LEXIS 27815 (S.D.N.Y. Nov. 10, 2005)............................. 2

*Schansman v. Sberbank of Russ. PJSC,*
   768 F. Supp. 3d 619 (S.D.N.Y. 2025)........................................................................ 4

*SEPTA v. Orrstown Fin. Servs.,*
   No. 12-cv-993, 2022 U.S. Dist. LEXIS 148623 (M.D. Pa. Aug. 18, 2022) ........................ 5, 7

*Strauss v. Credit Lyonnais, S.A.,*
   242 F.R.D. 199 (E.D.N.Y. 2007) .............................................................................. 6

*United States v. Eaton Corp.,*
   No. 24-3732, 2025 U.S. App. LEXIS 20128 (6th Cir. Aug. 8, 2025) ..................................... 7

*Wultz v. Bank of China Ltd.,*
   61 F. Supp. 3d 272 (S.D.N.Y. 2013)................................................................... 8, 9, 10

**Other Authorities**

*Christine Asia Co. v. Alibaba Grp. Holding Ltd.,*
   No. 15-md-2631 (S.D.N.Y.), 1/12/18 Status Conf. Tr. (ECF No. 179)..................................... 8

## I.    **INTRODUCTION**

In the wake of the collapse of Credit Suisse ("CS") and its merger with competitor UBS (the "Merger"), UBS Chairman Colm Kelleher reported being "very surprised" when he reviewed correspondence between FINMA and CS:

> If I had received such letters from the banking supervisory authority at Morgan Stanley or UBS, I would have said: "Guys, we have a huge problem." The fact that Credit Suisse received these letters and did nothing, or not enough, is inconceivable.

Supplemental Miller Decl., Ex. A. That CS opposes Plaintiff's motion to compel production of these communications, even though CS admittedly has no standing to assert the Swiss supervisory privilege or the bank examination privilege ("BEP"), speaks volumes about the importance of these communications to the claims in this case. And that neither FINMA nor the Swiss Government made any effort to appear in this Court to defend these privileges likewise demonstrates that Switzerland's interests are modest here, and that CS's arguments to support non-disclosure are not persuasive. In a last-ditch effort to veil these documents, CS improperly attempts to invoke the common law BEP on behalf of FINMA, who CS now concedes waived the privilege by choosing never to assert it in the first place.

## II.    **ARGUMENT**

### A.    **The Comity Analysis Strongly Favors Plaintiff**

#### 1.    **The Balancing of National Interests Weighs Heavily in Favor of Production**

UBS paid FINMA CHF 10,000 for an eleventh-hour "Order"—dated two days before CS's opposition was due—which it now uses as a basis to claim that ordering it to produce any document implicating FINMA's supervisory information would impact "very serious" Swiss national interests and a host of other oft-rejected BEP concerns. *See* Def. Br. at 11-13; *see also* Motion at 14-16. But neither FINMA nor the Swiss Government found those interests serious enough to move to intervene. And the Swiss Government itself did not bother to express its view one way or another, unlike in *Kashef v. BNP Paribas SA*, No. 16-cv-3228, 2025 U.S. Dist. LEXIS 171590

(S.D.N.Y. Sep. 3, 2025), where the Swiss Ambassador submitted a letter asking the court to consider certain opinions about Swiss law.[1] To the contrary, the FINMA order itself seems to authorize production in certain circumstances: "A special justification could exist if the release of the requested documents were essential for the parties to be able to present their claims or to defend themselves against claims." *See* FINMA Order at 6. Because these documents are undoubtedly essential to this litigation, no strong interest of FINMA, much less a strong *national* interest of *Switzerland*, would truly be threatened if this Court orders production.

Even if strong Swiss national interests were implicated, the overwhelming weight of authority holds that such interests do not outweigh the U.S.'s strong national interests in enforcing its securities law and in adjudicating matters with full discovery. *See* Motion at 6-9. And in this case, where CS's alleged fraud nearly brought down the global financial system, severely impacting U.S. markets, there is an even stronger interest than usual in favor of disclosure to determine what occurred so the public's trust in U.S. financial markets is not undermined.

Next, CS attempts to distinguish Plaintiff's cases, claiming they involved different claims (*e.g.*, claims under the Anti-Terrorism Act ("ATA")) than the case at hand. *See* Def. Br. at 14. But CS does not cite a single case where a U.S. court declined to order production in a matter involving the protection of the public's interests through private enforcement. In fact, the Second Circuit in *Linde v. Arab Bank, PLC* compared the U.S. interests at stake in private enforcement under the ATA to those in private enforcement of antitrust, commodities fraud, and racketeering laws (which are similar in many respects to securities laws), affirming that those "interests outweighed the

---

[1] Likewise, in the case cited by CS, *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, No. 04-cv-1153, 2005 U.S. Dist. LEXIS 27815, at *5 (S.D.N.Y. Nov. 10, 2005), the Korean Government submitted a letter to the U.S. State Department expressing concerns over a subpoena to Korea's Financial Supervisory Service.

interests of other sovereigns in enforcing bank secrecy laws." 706 F.3d 92, 112 (2d Cir. 2013).

CS also argues that Plaintiff's cases are inapposite because they implicate foreign "bank secrecy laws," which "focus[] on protecting the confidentiality of bank clients," instead of "foreign supervisory privileges," which focus on protecting the confidentiality of governments themselves. *See* Def. Br. at 14 n.6. But CS cites no support for this proposition (from FINMA or otherwise). And while the courts in *King* and *Didi* did refer to "foreign bank secrecy laws," the regulatory information at issue in those cases was practically identical to the information sought in this case. *See King v. Habib Bank Ltd.*, No. 20-cv-4322, 2025 U.S. Dist. LEXIS 61144, at *45 (S.D.N.Y. Mar. 31, 2025) (ordering bank to produce "information relating to regulatory audits, investigations, and inspections by the State Bank of Pakistan ... and Central Bank UAE into deficiencies in HBL's anti-money laundering ..., know your customer ..., counter-terrorism financing ..., and transaction monitoring practices"); *In re Didi Glob. Inc. Sec. Litig.*, No. 21-cv-5807, 2025 U.S. Dist. LEXIS 11325, at *8 (S.D.N.Y. Jan. 22, 2025) (ordering DiDi to produce a witness to testify about "DiDi's interactions with Chinese regulators").

Finally, CS pivots to a peculiar argument that because branches of the U.S. government recognize certain BEPs, this fact somehow weighs in favor of protecting FINMA's supervisory interest under Swiss law in this case. *See* Def. Br. at 12-13. But as CS concedes, FINMA failed to assert a U.S. BEP in this case, *see* Def. Br. at 17, and no U.S. regulator's communications are implicated by this motion. *See* Motion at 4 n.3. So, it is unclear how the mere existence of U.S. BEPs weighs in favor of protecting FINMA's supervisory interest under Swiss law in this case. As a result, it is unsurprising CS does not cite a single case in support of this position.

### 2. The Requested Information is Highly Important to this Action

CS claims documents implicating FINMA's supervisory information are, at best, marginally relevant (*see* Def. Br. at 6), yet CS still vigorously resists producing this supposedly

marginally relevant information. The reason is clear. The requested information will "provide a unique and objective contemporaneous chronicle of the financial decline of [CS]; no satisfactory substitute exists." *In re Franklin Nat'l Bank Sec. Litig.*, 478 F. Supp. 577, 586 (E.D.N.Y. 1979). In fact, last year, Colm Kelleher, Chairman of UBS, described some of this requested information in a far different manner than CS does now:

> On June 12, 2023, when UBS had full control of Credit Suisse for the first time, I looked at the letters from [FINMA] to the Credit Suisse Board of Directors. I was very surprised, to put it diplomatically.…If I had received such letters from the banking supervisory authority at Morgan Stanley or UBS, I would have said: "Guys, we have a huge problem." The fact that Credit Suisse received these letters and did nothing, or not enough, is inconceivable.

Supp. Miller Decl., Ex. A. For this reason alone, there can be no serious dispute concerning the importance of the documents sought.[2]

On March 14, 2023, after a months-long correspondence with the SEC, CS revealed that it had material weaknesses in its ICFR dating back several years. ECF No. 65 (Complaint) at ¶17. Subsequently, FINMA revealed that "numerous" FINMA investigations in the years leading up to the Class Period found that CS had a weak control environment, for example: "CS demonstrated an excessive risk appetite.…The internal control system was not sufficiently sophisticated or effective to adequately identify and address the inherent risks arising from the risk appetite." FINMA Report at 52. Any communications with FINMA about CS's weak control environment would be highly relevant to Defendants' scienter concerning material weaknesses in CS's ICFR during the Class Period. Similarly, the PInC Report revealed, for example, that FINMA began discussing CS's "delicate" financial situation, and the loss of confidence facing the bank, as early

---

[2] CS also argues the comity test looks to whether the documents are important, not relevant (Def. Br. at 10), but "Courts in the Second Circuit have assessed the importance of the requested production by examining whether the requested production is relevant to plaintiffs' claims." *Schansman v. Sberbank of Russ. PJSC*, 768 F. Supp. 3d 619, 638 (S.D.N.Y. 2025).

as May 2022. *See* Supp. Miller Decl. at Ex. B (PInC Report at 184). If, as these reports indicate, communications with FINMA demonstrate CS was in dire financial straits in the months leading up to the Class Period, these facts will be highly relevant to demonstrating both falsity and that Defendants knew, or recklessly disregarded, that CS's financial condition was certainly not as stable as they publicly represented. Thus, one of the best ways to prove falsity and scienter will be to contrast Defendants' statements with highly-probative, contradictory information involving CS's "primary prudential regulator." Def. Br. at 1. As such, Plaintiff tailored most RFPs to these specific events. *See* ECF No. 148 (Miller Decl.) Ex. A, Ex. B; *see also* FINMA Order at 3 ("The requested files primarily concern the crisis phase[.]").

Likely recognizing its "importance" arguments are shaky at best, CS next argues Plaintiff did not explain why it cannot secure equivalent information from another source. *See* Def. Br. at 7-8. But the *same* information cannot be obtained from another source, as "the alternative source[] of information cited by [CS] [is] not viable, as [FINMA has] claimed privilege over many of the Bank's own internal records and other documents in the present matter," *In re Wilmington Tr. Sec. Litig.*, No. 10-cv-990, 2016 U.S. Dist. LEXIS 189794, at *30 (D. Del. 2016), and courts have found "bank examination-related materials have no effective substitutes in cases where a plaintiff's claims require a finding of scienter, because those materials reflect the knowledge and state of mind of the defendants at the time of the examination reports." *SEPTA v. Orrstown Fin. Servs.*, No. 12-cv-993, 2022 U.S. Dist. LEXIS 148623, at *78 (M.D. Pa. Aug. 18, 2022) (collecting cases).

Lastly, CS's suggestion that the PInC and FINMA Reports provide sufficiently detailed information about its discussions with FINMA, such that the underlying documents themselves are unnecessary, also fails. *See* Def. Br, at 9. While FINMA stated it has no objection to the parties using these Reports (FINMA Order at 6-7), FINMA has not waived its supervisory privilege

concerning the underlying communications identified therein, so that critical information will remain inaccessible unless this Court overrides the supervisory privilege and orders production. *See* ECF No. 151 (Huber Decl.) at ¶45. Nor will Plaintiff be able to question witnesses about CS's interactions with FINMA because they still "implicate" FINMA's broad privilege. Thus, the probative value of these Reports is far inferior to obtaining the actual underlying communications. As such, the Reports are not an equivalent substitute to the requested documents themselves.[3]

### 3. Plaintiff's Requests Are Specific

Until the filing of its opposition, CS had not recently raised any "significant issue as to the level of specificity [of Plaintiff's RFPs]," *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 205 (S.D.N.Y. 2013), and has had no problem producing (with significant redactions) and withholding documents purportedly implicating FINMA's supervisory information. Any supposed overbreadth in Plaintiff's initial RFPs is now irrelevant as the parties have already worked extensively for months to narrow the scope of many RFPs, as CS admits (Def. Br. 6), and to formulate a narrow set of search terms applicable to discovery. These search terms are being run against only the custodial files of agreed custodians and only for an *agreed* time period (Def. Br. at 9 n.5), further limiting the reach of the RFPs. Thus, CS's new, manufactured confusion or concern about the "breadth" of a couple RFPs rings hollow.

CS's new argument is also substantively wrong. The few complained of RFPs are similar in breadth to requests sustained in other similar cases. *See, e.g.*, *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 205-06 (E.D.N.Y. 2007); *Linde v. Arab Bank, PLC*, 463 F. Supp. 2d 310, 312 (E.D.N.Y. 2006). Moreover, with the benefit of the PInC Report, Plaintiff's second RFPs were even more specific and narrow—a point that CS does not dispute. *See* ECF No. 148 (Miller Decl.)

---

[3] Notably, CS does not concede that the facts and conclusions in the PInC and FINMA Reports are trustworthy and admissible under Fed. R. Evid. 803(8).

6

at Ex. B. To the extent the breadth of any RFP becomes an issue, Plaintiff will continue to work cooperatively with CS to resolve any such issues. Therefore, this factor weighs in favor of production. *See Donziger*, 296 F.R.D. at 205 (finding this factor supported production where "the parties have engaged in meet-and-confers to address defendants' objections to the requests").

### 4. No Alternative Means of Securing the Requested Information Exists

Plaintiff primarily seeks communications between CS and FINMA (and internal CS documents discussing those exchanges) concerning CS's financial condition and internal controls at critical times during the relevant time period. *See* Motion at 2, 9. And "because Credit Suisse is withholding ***both*** information exchanged directly with FINMA and internal information 'implicating' FINMA's CSI," this information requested by Plaintiff concerning those exchanges cannot be obtained from any another alternative source. Motion at 11 (emphasis added). Again, "the alternative source[] of information cited by [CS] [is] not viable, as [FINMA has] claimed privilege over many of the Bank's own internal records and other documents in the present matter." *Wilmington Tr.*, 2016 U.S. Dist. LEXIS 189794, at *30.

CS does not question this point. Rather, CS claims some equivalent *information* might theoretically be available "through alternative means, namely, via CS documents other than those reflecting communications with FINMA." Def. Br. at 16. But the question is not "whether alternative means could provide substantially equivalent *information*." *United States v. Eaton Corp.*, No. 24-3732, 2025 U.S. App. LEXIS 20128, at *6 (6th Cir. Aug. 8, 2025). It is whether the *same* information can be obtained through some equivalent *means*. *Id*. It cannot. Even if the question was whether equivalent information existed, CS never explains what this theoretical information is, in what form it exists, or how its probative value stacks up. This is unsurprising given that, as discussed above, "bank examination-related materials have no effective substitutes." *SEPTA*, 2022 U.S. Dist. LEXIS 148623 at *78 (collecting cases).

7

**5.  CS Has Not Shown Any Hardship Will Result from Production**

CS does not "point to any specific instances where [Swiss] regulators have sanctioned a bank for disclosing documents *in compliance with a U.S. court order* that violated these countries' bank secrecy laws." *Habib*, 2025 U.S. Dist. LEXIS 61144, at *54-55 (emphasis added). Nor did it provide any "evidence that indicates how likely such an enforcement action might be." *Id*. Instead, the most CS could muster in support of this factor—including from FINMA itself—was speculation that violations "may" result in punishment. *See* FINMA Order at 5; *see also* Huber Decl. at ¶¶ 48-51.[4] A "purely speculative" prospect of punishment, however, does not suffice. *See King*, 2025 U.S. Dist. LEXIS 61144, at *54-55. Even if FINMA had directly threatened punishment for complying with a U.S. court order, "the mere threat of [] prosecution abroad does not strip our courts of the authority to order production of relevant materials in private civil litigation." *Linde*, 706 F.3d at 114; *see also Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, No. 15-md-2631 (S.D.N.Y.), 1/12/18 Status Conf. Tr. at 10:18-11:17 (ECF No. 179). Accordingly, CS is wrong that this factor weighs in favor of denying Plaintiff's Motion.

**B.  FINMA Waived the Bank Examination Privilege by Not Asserting It Here**

Like the Swiss supervisory privilege, a bank regulator, *and only a bank regulator*, can assert the BEP, which is a "qualified privilege." *Wultz v. Bank of China Ltd.*, 61 F. Supp. 3d 272, 281-82 (S.D.N.Y. 2013). As CS now makes abundantly clear, "**FINMA has not asserted the U.S. bank examination privilege** over any specific documents to date because, as discussed above, its position is that Swiss-law privilege applies." Def. Br. at 17 (emphasis added). This single sentence renders the entire BEP section of CS's brief meaningless, because the most fundamental

---

[4] CS cites Judge Rakoff's opinion from 11 years ago as "evidence" that Swiss banks are punished for complying with U.S. discovery orders, Def. Br. at 16, but that opinion cites an example of "a former employee of Bank Julius Baer who aided German tax collectors." *Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 404 (S.D.N.Y. 2014). It says nothing about Swiss banks being punished for violating Swiss "supervisory privileges" due to U.S. court orders.

8

requirement of the privilege is missing: FINMA's assertion of it.[5]

But even if FINMA had not waived the BEP (which it has), and CS could argue for the privilege on FINMA's behalf (which it can't), CS's position is still wrong. First, contrary to CS's hope that FINMA will assert the BEP at some undefined point in the future, Def. Br. at 17-19, FINMA cannot waive a privilege and then assert it later when its other asserted privilege fails. "Courts in this District frequently have found waiver of untimely asserted privilege claims over withheld documents where a party originally asserted a different privilege or protection." *In re DiDi Glob. Inc. Sec. Litig.*, 2025 LX 110912, at *19-20 (S.D.N.Y. June 23, 2025) (collecting cases). CS simply cannot keep FINMA's hypothetical privilege in its pocket for a rainy day.

Second, CS's suggestion that FINMA cannot assert the BEP until Plaintiff chooses specific withheld documents to challenge flips privilege procedure on its head. The requested documents are in possession of CS, which has been withholding and redacting documents—to date, approximately 850 redacted and well over 100 fully withheld (*see* Motion at 3-4)—and has been prospectively designating them as privileged based on both the BEP and FINMA supervisory privilege. If FINMA wished to inspect some or all of the withheld documents before deciding whether to assert the BEP, it could have done so at any time over the last eight months.[6] It did not.

CS also calls for the Court to provide (at some unknown future time) *in camera* review of documents for a BEP. But here, when FINMA has waived its privilege, this approach would truly be "putting the cart before the horse." In every case cited by CS where an *in camera* review occurred, the regulator itself took some action to assert or preserve its privilege, by: (1)

---

[5] CS's explanations of the *reasons* FINMA has not asserted the BEP seem to be mere conjecture, as FINMA's Order explaining its position never mentions anything about asserting a U.S. common law BEP. *See generally* ECF No. 152-2.

[6] Even if a BEP applies, it rarely covers the full withholding of documents, as the privilege only covers "opinions and recommendations," not factual matters. *See Wultz*, 61 F. Supp. 3d at 287.

9

withholding its own documents from production, *see Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 978 F. Supp. 2d 267, 271 (S.D.N.Y. 2013), *In re Subpoena Duces Tecum Served Upon the Office of the Comptroller of the Currency*, 151 F.R.D. 1 (D.D.C. 1992); (2) intervening or otherwise appearing in the action to assert the BEP over all withheld documents, *see In re CitiGroup Bond Litig.*, No. 08-cv-9522, 2011 U.S. Dist. LEXIS 155715, at *7 (S.D.N.Y. Dec. 5, 2011), *King v. Habib Bank Ltd.*, No. 20-cv-4322, 2023 U.S. Dist. LEXIS 228698, at *12 (S.D.N.Y. Dec. 22, 2023); (3) demanding that all documents be withheld on the basis of the privilege, *see Wilmington Tr.*, 2016 U.S. Dist. LEXIS 189794, at *9; or (4) *itself* requesting additional information and exemplars from the bank's privilege log, *see Emps. Ret. Sys. for the City of Providence v. Bd. of Governors of the Fed. Rsrv.*, No. 24-mc-349, 2025 U.S. Dist. LEXIS 118826, at *3 (S.D.N.Y. June 23, 2025). In no circumstance did the requesting party need to first unilaterally identify challenges prior to the assertion of privilege.

Further, that FINMA broadly asserted its supervisory privilege over every single document withheld by CS without even looking at those documents is a strong indication that FINMA has no interest in CS's hypothetically proposed "more granular approach." Def. Br. at 19. While CS is correct that FINMA should be given "the opportunity to assert the [bank examination] privilege and the opportunity to defend its assertion," *Wultz*, 61 F. Supp. 3d at 287, that opportunity has now come and gone. And without a privilege asserted, there is nothing for Plaintiff to challenge.

## III.    **CONCLUSION**

Therefore, two of the seven comity factors are neutral (good faith and origination of documents), or, at best, only one favors CS (origination), Motion at 10, 12, but the rest undoubtedly weigh in favor of Plaintiff, including the most important one. CS should not be allowed to hide behind FINMA's broadly asserted privilege while aggrieved investors are left in the dark—again.

10

DATED: October 16, 2025                    Respectfully submitted,

                                           **KAHN SWICK & FOTI, LLC**

                                            */s/ Kim E. Miller*
                                           Kim E. Miller (KM-6996)
                                           250 Park Avenue, 7th Floor
                                           New York, New York 10177
                                           Telephone: (212) 696-3730
                                           E-Mail: kim.miller@ksfcounsel.com

                                           -and-

                                           Craig J. Geraci, Jr. (admitted *pro hac vice*)
                                           Matthew P. Woodard (admitted *pro hac vice*)
                                           Jyoti Kehl (admitted *pro hac vice*)
                                           1100 Poydras Street, Suite 960
                                           New Orleans, Louisiana 70163
                                           Telephone: (504) 455-1400
                                           Email: craig.geraci@ksfcounsel.com
                                           Email: matthew.woodard@ksfcounsel.com
                                           Email: jyoti.kehl@ksfcounsel.com

                                           -and-

                                           J. Ryan Lopatka (admitted *pro hac vice*)
                                           161 N. Clark Street, Suite 1700
                                           Chicago, Illinois 60601
                                           Telephone: (312) 759-9700
                                           E-Mail: j.lopatka@ksfcounsel.com

                                           *Counsel for Lead Plaintiff Professor Ali Diabat
                                           and Class Counsel*

## WORD COUNT CERTIFICATION

I, Kim E. Miller, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum (Microsoft Word), and exclusive of the portions of it that are excluded by the rule, there are 3,473 words in this document.

                                            */s/ Kim E. Miller*
                                           Kim E. Miller

11