PAU5creC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
IN RE:  CREDIT SUISSE GROUP AG,
*et al.*,                                    23 Civ. 4458 (CM)(SLC)
                                             23 Civ. 5874 (CM)(SLC)
                                             23 Civ. 4813 (CM)(SLC)
                                             23 Civ. 6023 (CM)(SLC)
                                             23 Civ. 7297 (CM)(SLC)
                                             23 Civ. 6039 (CM)(SLC)

------------------------------x
                                             New York, N.Y.
                                             October 30, 2025
                                             2:30 p.m.

Before:

                    HON. SARAH L. CAVE,

                                    U.S. Magistrate Judge

                        APPEARANCES

KAHN SWICK & FOTI, LLC
     Attorneys for Plaintiff Diabat
BY:  CRAIG J. GERACI
     KIM ELAINE MILLER
     J. RYAN LOPATKA


CAHILL GORDON & REINDEL LLP
     Attorneys for Defendant Credit Suisse Group AG
BY:  JASON M. HALL
     TAMMY L. ROY
     NICHOLAS N. MATUSCHAK

PAU5creC

(Case called)

THE DEPUTY CLERK:  Counsel, please state your appearances for the record.

MR. GERACI:  Your Honor, Craig Geraci for the plaintiff, Ali Diabat.

MR. LOPATKA:  J. Ryan Lopatka, also with Kahn Swick & Foti, for plaintiff Diabat.

MS. MILLER:  And Kim Miller for plaintiff.

THE COURT:  Nice to meet all of you.

MR. HALL:  Good afternoon, your Honor.  Jason Hall for Credit Suisse.

MS. ROY:  Tammy Roy for Credit Suisse.

MR. MATUSCHAK:  And Nick Matuschak also for Credit Suisse.

THE COURT:  Nice to meet all of you.

So, Judge McMahon has referred the parties' discovery dispute regarding certain documents that the plaintiffs are seeking to compel the defendants to produce relating to FINMA -- for efficiency, the Swiss regulatory documents, in other words.  I have obviously read the papers in detail and wanted to talk through possibilities of other ways to thread this needle that don't require the Court taking the time or the parties waiting for a decision on this particular motion, but seeing if there might be other ways to get whatever the information is that the plaintiffs are seeking in a different

PAU5creC

way, or at a different time, or through different mechanism.

So, let me start, since it is the plaintiff's motion, however, if you could just describe for me in a little bit more detail what you think these documents tell you and what information it is you think that these documents contain and why we need to get them this way and whether it might be open to seeing if there are other ways to get the same information, or at least to maybe delay this issue until you see if you get some other information from the defendants first that might contain similar information.

MR. GERACI:  Sure.  Is it all right if I sit?

THE COURT:  Sit or stand.  However you are more comfortable is fine.

MR. GERACI:  So, the documents we are looking for, this case is obviously about the collapse of Credit Suisse.

THE COURT:  Right.

MR. GERACI:  It revolves around misrepresentations about Credit Suisse's I will refer to it a ICFR -- Internal Control Over Financial Reporting -- and statements about its financial condition.

THE COURT:  Right.

MR. GERACI:  Leading up to this collapse FINMA, which is like the SEC here in the U.S., in Switzerland, was heavily involved in the crisis, was communicating with regulators all over the world including with the highest levels of Credit

Suisse executives.

So, the reason we have sort of a peek behind the curtain as to what was going on during this crisis is the Swiss parliament did an investigation of the crisis, put out a 600-page report that references some of the communications and the events that were taking place leading up to the collapse.

THE COURT:  Right.

MR. GERACI:  So we have a pretty good idea of what those documents say.

With respect to ICFR, FINMA was saying things like: *Credit Suisse had a very weak control environment.*  And so, the reason we are seeking to get those documents is obviously in, I think it was March '14, Credit Suisse admitted that they had material weakness in their internal controls.  And what we would do is we would use the documents from FINMA saying leading up to this period, you had all these issues with your internal controls, and we would use that, I guess evidence, to say you should have known or knew that you had these problems with your ICFR when you were putting out your financial statements.

THE COURT:  Could you just back up several steps since you are new to me?

MR. GERACI:  Sure.

THE COURT:  How far the parties have gotten in discovery?  Have you gotten any documents from the defendants,

PAU5creC

for example?

MR. GERACI:  So, we have.  We are currently in the process of negotiating a full set of search terms.  I would say we are probably about halfway through that process.  We have been working pretty well to craft a narrow set of terms.  Just recently the defendants have proposed possibly switching from search terms to TARP to kind of speed up the process, make it a little more efficient.

THE COURT:  Sure.

MR. GERACI:  Everybody knows search terms are kind of a pain so we haven't quite gotten to that step but it is something we will consider and work towards.

So, I think as far as documents, we are in the 10,000 to 15,000 range have been produced so far.

THE COURT:  But basically no ESI; no e-mails or internal?

MR. GERACI:  We have e-mails.  We do.

THE COURT:  You have e-mails already.

MR. GERACI:  Yes, we do.

THE COURT:  OK.  And those are sort of non-search term derived e-mails?

MR. GERACI:  So those were grabbed via -- so I guess to back up all the way, the way Judge McMahon set up the schedule is she put class cert at the forefront.

THE COURT:  Right.

PAU5creC

MR. GERACI:  So what we did, because the documents we were getting were coming out of Switzerland, there were issues with getting cross-border documents, we had negotiated a protocol where they would review around the corrected disclosures, they would review five days before and five days after for relevant documents and then produce them.

So that was the first set of documents we got from Credit Suisse.  Once we finished with class cert, we turned our attention to merits discovery and that's where we started negotiating the search terms.  And what defendants have done is for the terms that we have agreed on, they are now running those terms and producing documents on a rolling basis while we continue to negotiate the rest of the search terms.

THE COURT:  Is FINMA, or FINMA communications with FINMA, or whatever FINMA's e-mail address is, like FINMA.org or FINMA.su, is that one of the search terms?

MR. GERACI:  Sure.  One of the search terms is "FINMA" and then our second set of requests for production -- so when we put out the first set of request for production it was a little broader.  We didn't yet have what I will refer to as the PInC report, the Parliamentary Investigative Committee Report. Once we got that report and could look through it and see specific conversations that FINMA had with Credit Suisse, we put out our second request for production, and if you look through those, those are very narrow, they pull language

directly from the PInC report and we ask for relevant communications that are referenced in that report.

THE COURT:  OK.

MR. GERACI:  So, what we have gotten in response to that is:  *We can't produce.  FINMA has asserted its supervisory privilege.*  And the problem is it is not just direct communications with FINMA, it is anything that, in their words, implicates the communication with FINMA so it sweeps very broadly.  And in a case where, just to give you an idea of the scope, I pulled up a PInC report before I walked in here and typed in "FINMA" and it has over 2,500 hits.  So, they were very, very involved in Credit Suisse's collapse, they were talking to chairman of the board, the CEO, all the high-level executives.

So, if you look to some of the courts that have dealt with this type of information, for example I think we cited the SEPTA case, that Court there said these types of communications, they're unique, there are no adequate substitutes for them.  And that is sort of why, despite us being able to work together and negotiate different search terms, we kind of hit a point where I'm not really sure there is a compromise to be had here because the documents are, of course, going to be relevant for things like falsity, scienter, but they could also be relevant, they could be material omissions themselves.  For example, in the motion to dismiss

PAU5creC

order with respect to the ICFR, Credit Suisse was having a long back and forth with the SEC concerning the material weakness that they ultimately disclosed and at some point in that discussion where the SEC kept pushing back and saying we think you have a weakness in your controls and Credit Suisse kept pushing back, Judge McMahon said:  *I cannot say as a matter of law that the company did not have a duty to alert the market to the pendency of this SEC regulatory inquiry and that it could no longer hide behind the pure omission doctrine.*

And then, at another point in the motion to dismiss order, she says:  *The failure to advise the market without adverse developments as they transpire, qualifies as securities fraud.*  And that's in the motion to dismiss opinion at 176 and 196.  And the reason that is relevant is that same logic applies with respect to FINMA's communications to Credit Suisse.

For example, if they're saying you have this weak control environment, your financial condition isn't what you are representing it to be, the fact that they're not disclosing those types of information to the market as they're telling the market everything is fine, our balance sheet is strong, our turnaround plan is working, things like that, we would use these types of documents to show that they were false and misleading.

THE COURT:  And there isn't some other public -- you

PAU5creC

have the reports, obviously, but there is no other public source of these communications or, like an appendices to the report or anything like that?

MR. GERACI:  There are no -- so, in the PInC report it references the communications, they're not quoted or anything like that.  It doesn't say it was an e-mail sent on X date, sometimes it says a letter, but that the actual underlying communications are not attached to the PInC report.

THE COURT:  OK.

MR. GERACI:  And so we -- I can't think of another place to get communications between Credit Suisse and FINMA except for from Credit Suisse or through FINMA and both have, you know, denied our request.

THE COURT:  Understood.

And then what about other, any non-parties like the SEC or other people?  Is third-party discovery underway as to places other than FINMA?

MR. GERACI:  It is.

So, for instance, not the SEC but we have reached out to the Federal Reserve and we are going through I believe it is the *Touhy* process so we are in that process now.  They've initially asserted their supervisory privilege over the documents that we have requested, but I am not sure it is going to be the same level of detail because they're not -- they are going to be involved, probably, in some of the communication,

but I think the vast majority of communications are going to be directly between FINMA and Credit Suisse.

So, there is no other place that I can think of that we can get the documents from a third-party.

THE COURT:  Let me hear from the defendant's side for a little bit and I will let you respond.

Mr. Hall.

MR. HALL:  Thanks, your Honor.

I think I agree, by the way, with counsel's representation about kind of the procedural history, how we got here.

THE COURT:  It is nice when you agree on things.

MR. HALL:  We have, I think for now several months, been in the process of producing ESI, we are continuing to negotiate with my adversaries and I think in a very productive way, on the scope of production.  We are proposing, as he said, a TARP or further search term refinements but that is sort of he proceeding apace.

I think the one thing that maybe wasn't completely clear is what we have produced so far, with the exception of what had been done on the class certification stage, has been produced from the United States.  So these are documents that are on the Bank's servers in the U.S. and some of these documents obviously involve people who are in Switzerland because the documents came into the U.S., someone was copied or

PAU5creC

whatever in the U.S., such that the document is here.  But there is another set of documents which we have agreed to essentially view in a second stage, in Switzerland.  So that we haven't broached yet and we expect to work cooperatively with them to try to figure out what can be done with the Swiss set of materials.

I think that is important because we have been talking about these documents, meaning the documents that are sought on this motion, as though they're sort of a monolith, but maybe they're not.  I hear counsel describing a set of documents as to which they think they can articulate real need to the issues in this case but that's not -- we have withheld something like a thousand documents on the basis of the FINMA privilege assertion so far, 1,085 I think so far last check.  Those documents, candidly, are not all that.  Right?  So some of these documents have a one-line description of something FINMA said about something.  The document might be a 25-page presentation that might be responsive to the request on some other basis, but what is under that redaction might have nothing to do with their issues.  Right?

So my point is just I think that the articulation of need is a little sweeping here, a little general, and not as specific as we see in the cases that the plaintiff even relies on to get through the privilege.

THE COURT:  Right.  So let me ask you this, though.

PAU5creC

In terms of the searches or the search terms or the TARP that Credit Suisse is thinking about doing, let's focus on the U.S. since that sounds like where you are at the moment.  If a document references FINMA, are you withholding it on the basis of this, what is called the FINMA privilege at the moment or are you otherwise producing it?

MR. HALL:  So, I have some numbers.  The basic answer to your question is we are producing that document.  We may apply a redaction to the bit of it that relates to FINMA, so obviously there are documents that cover a lot of ground, maybe for example a presentation to the board where there is discussion of business issues but there is a reference to a conversation or communication that someone had with FINMA.  In that instance the document would be produced, the redaction would be applied, essentially to protect the substance of the communication with FINMA.

THE COURT:  Have you had any discussions with FINMA, is there any chance of you negotiating with them to say at least in the first instance the documents or the communications that are referenced in the public reports, that FINMA might be amenable to -- the U.S. concept of waiver.  Like, if they discussion a communication and put it in a public report, that is a pretty clear waiver under U.S. law even as to any regulatory privilege.  Would they be amenable to that common argument?

PAU5creC

MR. HALL:  So I guess a couple things, probably just a level set here.

They have a statutory privilege under Swiss law that doesn't recognize, as I understand it, the concept of waiver the way we understand it here and so their, I think going-in view, is that they have a statutory authority under Swiss law to set the parameters of the privilege and they have asserted what they have asserted.  That's docket 1512, I think is the FINMA order itself.

I do think that some of the disconnect and some of the reason we are here maybe so early in our process is that the plaintiff, I think, came to the view that they want everything, right, so everything that we don't, aren't in position to produce pursuant to this FINMA order, they want.  There is no subset that they've identified that will satisfy them that is less than everything.  If we got to a world where they could articulate -- and maybe this would require some, I think, some joint effort, frankly -- so even this ability to the categories of documents that they don't have, if they could articulate as to some subset we could be satisfied without getting everything, we could certainly take that back to FINMA.  Obviously I can't speak for them, but my sense is not that they are dead set against considering a more nuanced position.

THE COURT:  Is there any reason that they're not here themselves?  In some of the other cases, I forget who cites

PAU5creC

them, but some of the other cases where the foreign privilege comes up, the ambassador comes in or someone from the foreign agency comes in.  Is there a reason why they're making you come out on the front lines?

MR. HALL:  I think partly this is maybe just a function of the way their law works.  The way their law works is they deliver instruction to the regulated institution, and the regulated institution then is obliged to comply, is their view of it.  So they, I think, probably don't have the view that they are sovereign authority as being directly challenged by this plaintiff, but rather our -- the requirement that we produce is being challenged.

Well, we looked at some of the cases, the *BNP* case and others, where a letter from the ambassador came through.  Here what we do have a formal written order that was delivered to us, because we did obviously make clear to them that this was an issue and that was, the challenge existed and was being heard by this Court, and they were advised at that point to give us that written order, which is in the record.

THE COURT:  So, is it fair to say, though, I realize that you are only just negotiating search terms, but are the plaintiffs otherwise going to get from you, in the interim, some things related to FINMA?  In other words, let's just say hypothetically there is a PowerPoint presentation in preparation for a meeting with FINMA.  Is that something that

PAU5creC

you would withhold based on the instruction that FINMA has given you?

MR. HALL:  In the abstract, I think my initial answer is probably we would withhold it.

THE COURT:  OK.

MR. HALL:  If it was we were going to have a meeting with FINMA and tell them X, or we had a meeting with FINMA and they told us why, if it is in preparation for a meeting with FINMA, here is a set of the bank's business materials or metrics or policies, those things wouldn't be withheld.  So, I think the answer is sort of it depends, unfortunately.

THE COURT:  And what about sort of routine communications?  I don't know what the requirements of FINMA are, but to the extent that there was monthly or quarterly reporting by Credit Suisse, is that reporting something that you are withholding as well?

MR. HALL:  In candor, I think the answer is we are withholding that if it is reporting to FINMA.  Obviously what is not being withheld are the bank's ordinary course business communications, internal or otherwise.  Those are being produced.  So, the facts as they happened in the e-coms, in the ESI, those are being produced.

THE COURT:  Right.

MR. HALL:  I would just add one thing, which counsel sort of alluded to but maybe suggests a back-forward.  Counsel

PAU5creC

alluded to the fact that they have raised this *Touhy* challenge with the Fed.  So, the Fed essentially issued what I guess is viewed as its initial impression that these are supervisory communications subject to the Fed's privilege but invited counsel to make a submission and we have, I think are working with them to identify categories of documents that we are withholding, such that they can then make a presentation to the Fed about need on a more nuanced basis.  Obviously, and this may be what your Honor sort of suggested before, but that I think is a process eventually we could take forward with FINMA, if that is something counsel wanted to do.

THE COURT:  Obviously I am more familiar with the *Touhy* process and have written on that several times, so hopefully the plaintiffs can negotiate with the Fed and come to consensual resolution on that, but we will cross that bridge if and when we come to it.

MR. HALL:  If I could, your Honor, one other point there?

I think counsel maybe misspoke when he said FINMA is equivalent to the SEC.  I think it is much more apt to say FINMA is the equivalent of the Fed.  It is the bank supervisor, Credit Suisse obviously was a Swiss bank, and I think FINMA stood in those shoes.  So, what they're saying in their order is very similar to what the Fed says when they assert supervisory privilege or their regulatory authority to shield

PAU5creC

bank supervisory communications.  What they're saying is we have to be able to have, as the bank supervisor, a free flow of information with the bank.  Right?  And so, I think the analysis that the Court would do at the end of the day as to FINMA would be very similar to what we would do with the Fed.

THE COURT:  Right, but it is sort of over now.  Right?  And Credit Suisse is now a part of something else and doesn't have an independent existence anymore so it is kind of like the Lehman Brothers' communications with the SEC pre September 2008.  It is kind of like it doesn't really matter anymore because -- I realize that you merged into another entity and so they're theoretically ghost pieces of Credit Suisse that still exist, but it is not like -- to me it would be a slightly different situation if Credit Suisse were still a stand-alone institution that was being regulated by FINMA.  We are talking about sort of a corpse at this point.

MR. HALL:  Well, whether or not I would agree with the characterization of corpse, it has been merged into another Swiss bank and I think that is maybe part of the awkwardness here because UBS is the surviving entity.  UBS is Swiss, and UBS is regulated by FINMA.  And so, if UBS is in possession now of an order from FINMA saying don't do a thing, the plaintiff is here asking this Court to issue UBS an order that says do the thing.  In that scenario we are between a rock and a hard place and in a very difficult position.  I think our impulse

would be where you started today, which is can we find a way out of that trap because we do want to get them what they need. I think that, I hope that counsel found us to be reasonable and reasonably cooperative in engaging with them and if there is a solution that involves narrowing this and taking it forward with FINMA and if we have issues coming back to the Court, we are happy to work with them.

THE COURT:  My initial reaction, and I obviously want to give Mr. Geraci a chance to respond, but my initial reaction would be, at a minimum, the communication, if we could start with the communications that are referenced in the actual reports?  And I realize -- I take your word that they don't recognize waiver, but if they disclosed the sum and substance of those communications in the report, it is very hard to see what the remaining objection would be.  I understand that they don't want to be seen as perhaps taking a position where they're, with respect to takes a softer position with respect to privilege in this case, that may be a bad precedent for them, I can understand that, but if there are two public reports that reference communications, there is nothing secret about those anymore.  I guess my first ask is could we at least get those, and if FINMA would be willing to allow those to be produced to the plaintiffs, that might then inform how we can better narrow and figure out how, *OK, FINMA was willing to do this, what else might they be willing to do in this category or*

PAU5creC

*that category.*

So, do you think it is possible to have that conversation?

MR. HALL:  We can certainly take that to them, your Honor, and I will raise that directly with them and report back.  We can certainly do that, yes.

THE COURT:  While you are up, just in terms of the bank examination privilege, what is your view about when that issue is best resolved?

MR. HALL:  So I think, your Honor, the way this stands right now is we served privilege logs -- as I say, we are sort of early days.  We are working with the U.S. piece of this.  At some point there will be a Swiss piece of that where I think that the FINMA privilege will be much more central than maybe it is now.  We have asserted, on the privilege logs, the bank examination privilege applies.  FINMA's position right now is that they have asserted what, to them, and under Swiss law as we understand it, is an absolute privilege.  So, essentially this FINMAsa privilege that we have been talking about in briefing on this motion, I think and focused on, is an absolute privilege in their view and so there was no need, essentially, to do a document by document, are we going to assert the U.S. common law bank examination privilege.  But, the privilege log indicates that it is there.  I think that probably, if I am reading between the lines at how we are taking this forward and

PAU5creC

we are going to get to a narrow set, it will be then incumbent on them to make a decision; will they assert that as to a particular document and take it forward or are they going to let it go.

THE COURT:  So it is possible the bank examination privilege could become a non-issue.

MR. HALL:  I think it could become a non-issue at least as to some documents.  I think initially that requires, I think the courts typically in that scenario would do a document-by-document evaluation of where it is being asserted and weighing and whether it is not possible to do for a thousand documents, maybe.

THE COURT:  Sure.

MR. HALL:  So I think if we get to a place where we are narrowing this and focus in and end up coming back to your Honor with a dispute, we have clarity as to what they're asserting with particular documents.

THE COURT:  I assume on your privilege logs you have asserted other types of privileges as well?

MR. HALL:  We have, your Honor.

THE COURT:  And the privilege logs are evolving, I guess, as your document productions continue.

MR. HALL:  Right.  Exactly right.

So, like I said, I think we produced somewhere in the order of 15,000 or 20,000 documents so far, withheld something

PAU5creC

like 1,085, in whole or in part, so 827 have been redacted and 250 have been withheld in full.  That is just FINMA.  So, obviously our attorney-client privilege or work product assertions are at issue.

THE COURT:  Beyond that.

MR. HALL:  Correct.  Correct.

THE COURT:  While I have you, in terms of timing and volume, is the U.S. side of this bigger than the Swiss side?  Or vice versa?

MR. HALL:  It is a very good question, your Honor, and counsel have asked us that question, and the bottom line is we don't have full visibility to what is in Switzerland.  Part of the reason is what we intend to do and this is, we hope, the efficient way to do it, is produce what we can from the U.S. which avoids all the Swiss law restrictions that might exist, and then essentially de-duplicate what is in Switzerland in the U.S. production against what is in Switzerland and see what is left.

THE COURT:  OK.

MR. HALL:  But that part, because we are still in process in the U.S., hasn't happened yet.

THE COURT:  Anything else you wanted to let me know about?

MR. HALL:  No, your Honor.  Thank you for your time.

THE COURT:  Mr. Geraci, any points you want to respond

PAU5creC

to?

MR. GERACI:  I appreciate that the Court is trying to find a way to thread the needle here.

THE COURT:  That is what magistrate judges do.

MR. GERACI:  I had a feeling that was your point of view and I was thinking of ways to try to make that happen.

THE COURT:  Yes.

MR. GERACI:  My only concern with the approach is I think first contact with FINMA was in March.  It is now October.

THE COURT:  Yes.

MR. GERACI:  We get their response to our brief and it says -- you know, in our opening motion we raised the bank examination privilege as an alternative argument.  FINMA got that brief, looked at it, knew the argument was there, still didn't assert the bank examination privilege, sort of wanted to try their hand with the Court with this first issue, and then kind of wants a second bite at the apple.  So my only concern with it is it is going to drag on, we are not going to get the documents we need.

THE COURT:  Not with me.  It will drag a little bit because that's litigation generally, but I intend to -- Judge has referred this to me to resolve so I intend to do that because she has set a deadline for everybody to finish things and so it is incumbent on me to make sure this moves along.

PAU5creC

So, I am not inclined to -- while I am inclined to give Mr. Hall the opportunity to have this conversation with FINMA, if the answer is "no" that then we just decide the motion.  But if the answer is "yes," or "yes, but" or "yes, partially," that's helpful because that means there is less that is at issue in the motion, so.

MR. GERACI:  Totally understand.

Just to correct one thing, we are not asking for everything, every single communication between FINMA and Credit Suisse.  As I said initially --

THE COURT:  Just the good ones.

MR. GERACI:  Correct.  All the best.

But our second RFPs are very, very narrowly tailored to the documents that your pointed out in the investigative report.  So we are certainly not -- we have been working with them to narrow anything they think is overbroad.  We are willing to continue to do that as well.

THE COURT:  You didn't, when you wrote last time you didn't speak about bank examination privilege.  Do you kind of agree that we can sort of punt that issue for the moment with the caveat that, obviously, we have to stay on top of FINMA and make sure it doesn't drag out to long.

MR. GERACI:  Personally, I think they waived the privilege by not asserting it.  FINMA had to step up -- and I know they're in the weird position of standing up here and

PAU5creC

defending an empty chair -- but they knew about the argument, they still didn't raise it even as like a fall-back argument or anything like that.  So, personally I would say they waived it, but if your Honor is going to put it off to see what they come back and say just because it might not become an issue, I'm OK with that.

THE COURT:  I mean if I don't have to decide the issue because they're not asserting it that would be a much nicer place to be in.  If they are and they do it late, then you obviously have all the waiver arguments.  But I think we would need everything more in writing from you all on the waiver point.  So, I kind of think at least on the bank examination privilege we are not there yet.

I have to say my other inclination is the bank examination privilege is a little bit different than attorney-client privilege and work product, but usually if we are fighting about privilege logs I like to do that all at once so that, if I have to do in camera reviews and stuff, I am doing it once, not seriatim.

Any other points?

MR. GERACI:  That's all I have.

MS. MILLER:  Your Honor, could I clarify one administrative point, just to make sure it is clear?  Because I want to make sure there is no confusion.

THE COURT:  Yes.

PAU5creC

MS. MILLER:  So we have been working together and moving things forward but there is not a schedule in place from Judge McMahon with a discovery cutoff quite yet.

THE COURT:  Thank you for pointing that out.

I'm not sure -- I will tell you typically when -- she's only referred discovery disputes to me and so that generally -- she does that on purpose because she wants to manage the schedule.  So we will deal with -- this group will deal with discovery disputes, this one and whatever other ones may come along, but in terms of setting a schedule, I think that remains with her, but thank you for pointing that out.

So, Mr. Hall, just to circle back to you, if I were to delegate to you the responsibility of speaking to FINMA and seeing can we at least, let's just start with the population of communications that are referred to or referenced in the two public reports, can you have that dialogue?  How long do you think it would take?  When could we have another discussion about it?

MR. HALL:  Your Honor, my experience is that there are layers within FINMA and so I think that probably, to be safe, two or three weeks would be enough.  If I promise you less than that I might have to come back and ask for more.

THE COURT:  So that would take us out to the week of the 17th, then.  Were you all able to bring calendars with you, at least in part?  I apologize for drawing you out on a

PAU5creC

horrible day, but since this was our first time and I have a feeling that we are going to be talking a lot, I thought it would be more helpful for us to be together in the same room. So, you are welcome to shelter in place until the rain stops.

But, in any event, I was looking at the week of the 17th of November to meet with you again and we could do 11:00 on the 19th of November, that is the Wednesday.

MR. HALL:  The Wednesday is fine for us, your Honor.

THE COURT:  How does that work for plaintiffs?

MR. GERACI:  That's fine, your Honor.

THE COURT:  We will set that up as a telephone call.

If by the day before, Mr. Hall, it is looking like you are not going to have an answer, please let me know so we can put it off, but maybe it also helps you to say that you have to report to me on the 19th.

MR. HALL:  It does, your Honor.

THE COURT:  A bit of leverage, so let me help you.

MR. HALL:  No.  Understood.  Thank you.

THE COURT:  So we will set that up as a telephone call.  I will hold the motion in abeyance for now and see how far we might be able to get.  Again, as much as we can do through working through this together and through regular conference and meeting about this, I am hoping that we can do -- not that I am afraid of working on this issue but it is a big enough issue and will require -- there is obviously foreign

law issues and when I dig down into it there may be more that I want to hear from you about it.  So, if we can try to find a way to make the plaintiffs a little bit happy or at least temporarily happy through a consensual process, that would be the goal.

Mr. Geraci, anything on the plaintiff's side, anything further?

MR. GERACI:  Just one point of clarification?

THE COURT:  Yes.

MR. GERACI:  If this process goes through and FINMA comes back and says, fine, you can have the stuff in the public reports, I assume that will also capture documents that are implicated by that privilege and those will be produced as well, so if it is like an internal communication, Credit Suisse talking about something FINMA told them but FINMA is not actually --

THE COURT:  Let's start small.  Let's start small because let's see what -- you may get all the good stuff.  I would assume that if they were writing this public report they had a reason for doing it and they put all the best stuff they found in their communications in the report because that's what people do.  They don't hide things under bushels, usually.

So, that being said, let's start with what's referenced or quoted or referred to in the report, and then if the next thing is if the answer to that is "yes, you can get

PAU5creC

those" and you are reading through those and it leads you to believe there are satellite communications that happened and that are important, we will cross that bridge when we come to it. So, for now I am starting small because I am hoping that FINMA is going to be reasonable. I think a little bit of reasonableness goes a long way.

Thank you very much, everybody. And, like I said, you are welcome to stay until it stops pouring. Have a good afternoon. Thank you.

o0o