UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

PALOMINO MASTER LTD., AZTECA
PARTNERS LLC, AND APPALOOSA LP,

               Plaintiffs,                                  25-cv-8264 (CM)

    -against-

CREDIT SUISSE GROUP AG, AXEL P.
LEHMANN, and ULRICH KÖRNER,

               Defendants.

———————————————————————— x

## OPINION AND ORDER

McMahon, J.:

    Plaintiffs Palomino Master Ltd. ("Palomino"), Azteca Partners LLC ("Azteca"), and Appaloosa LP ("Appaloosa") bring this action against Credit Suisse Group AG ("Credit Suisse"), its former Chairman Axel P. Lehmann ("Lehmann"), and its former Chief Executive Officer Ulrich Körner ("Körner") (collectively, "Defendants"), arising out of the events immediately preceding Credit Suisse's collapse and emergency rescue in March 2023. Plaintiffs allege that, during the week following the collapse of Silicon Valley Bank ("SVB"), defendants falsely assured the market that Credit Suisse's liquidity position was strong and improving and that government assistance was not under consideration, even though Credit Suisse allegedly was experiencing significant asset outflows and acute liquidity stress.

    Plaintiffs further allege that, relying on those statements, Palomino and Azteca, through their investment adviser Appaloosa, purchased substantial positions in Credit Suisse Additional Tier 1 Bonds ("AT1 Bonds"), which were later written down to zero when Swiss regulators orchestrated Credit Suisse's takeover by UBS Group AG ("UBS") in March 2023 (the "Merger").

Palomino and Azteca assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  All Plaintiffs assert claims under the New Jersey Racketeer Influenced and Corrupt Organizations Act ("New Jersey RICO").  Defendants move to dismiss pursuant to Rule 12(b)(6), arguing that the Exchange Act claims fail because the complaint does not adequately allege a domestic securities transaction, and that the New Jersey RICO claims are barred and, in any event, inadequately pleaded.

For the reasons that follow, Defendants' motion is granted in part and denied in part. Plaintiffs' New Jersey RICO claims are dismissed, but the Exchange Act claims survive, and the case will proceed thereon.

I.    **BACKGROUND**

A.  **Factual Background**

Appaloosa is a Delaware limited partnership with its principal place of business in Short Hills, New Jersey.  Dkt. No. 1, Compl., ¶ 32.  It acted as investment adviser to Palomino, a British Virgin Islands company, and Azteca, a Delaware limited liability company, in connection with the purchases of the Credit Suisse AT1 Bonds at issue in this case.  *Id.*, ¶¶ 30–32.

Credit Suisse was a Swiss bank headquartered in Zurich, Switzerland and, until its 2023 acquisition by UBS, was one of Switzerland's two largest institutional banks.  Lehmann served as Chairman of Credit Suisse's Board of Directors beginning in January 2022, and Körner became Credit Suisse's CEO in July 2022.

The complaint alleges that Credit Suisse entered March 2023 in a weakened condition. Credit Suisse had experienced a liquidity crisis in October 2022, after rumors about the bank's financial condition prompted substantial customer withdrawals.  *Id.*, ¶¶ 64–69.  Although Credit

Suisse thereafter announced a restructuring, raised significant capital from Saudi National Bank, and reported that outflows had stabilized by the end of 2022, plaintiffs allege that the bank had not in fact done enough to improve its liquidity position before the events of March 2023. *Id.*, ¶¶ 70–74, 147–149.

According to the complaint, the collapse of SVB on March 10, 2023 renewed market concern about Credit Suisse and triggered a wave of depositor withdrawals. *Id.*, ¶¶ 75–85. In response, Credit Suisse's leadership allegedly sought to reassure the market that the bank's position remained sound. *Id.*, ¶ 85.

On March 14, 2023, Körner appeared on Bloomberg Television and stated that SVB's failure had not affected Credit Suisse and that the bank had received "material inflows" on March 13. *Id.*, ¶ 86. He further stated that Credit Suisse was subject to "materially different and higher standards when it comes to capital funding and liquidity [than SVB]," described Credit Suisse's liquidity coverage ratio as "strong, very strong" and "getting stronger as we speak," and referred to the bank's Common Equity Tier 1 ("CET1") ratio, a measure of a bank's ability to absorb losses and remain solvent, as "very strong at 14.1%." *Id.*, ¶¶ 87–90.

That same day, Credit Suisse released a fixed-income investor presentation. Plaintiffs allege that the presentation represented that Credit Suisse's capital exceeded regulatory requirements, that its liquidity coverage ratio had been "rebuilt" from lower levels in the quarter, that under the Swiss resolution regime there would be "No creditor worse off than in liquidation" and that there was in place a "strict and complete hierarchy of losses," under which AT1 capital was "senior" to CET1 capital *Id.*, ¶¶ 91–98.

Based on these representations, on March 14, 2023, Palomino and Azteca, through Appaloosa, began purchasing Credit Suisse AT1 Bonds. *Id.*, ¶ 99. The complaint alleges that

3

plaintiffs continued purchasing the notes through March 19, 2023, ultimately amassing a substantial position. *Id.*, ¶ 100. Plaintiffs further allege that the AT1 Bonds were trading in the United States; that Appaloosa received quotes in U.S. dollars; that many of the purchased notes had ISIN numbers beginning with "US"; that plaintiffs paid for the notes in U.S. dollars through Goldman Sachs, a U.S.-based prime broker; that the executing counterparty brokers appeared to be based in the United States; and that Appaloosa's traders were located in New Jersey when they placed the orders. *Id.*, ¶¶ 101–105.

On March 15, 2023, then-Chairman Lehmann appeared at the Financial Sector Conference in Riyadh, Saudi Arabia. *Id.*, ¶¶ 106–107. According to the complaint, he stated that Credit Suisse had already "taken its medicine" and had been "significantly de-risking its balance sheet" for more than five months. *Id.*, ¶ 109. When asked whether Credit Suisse would "allow some kind of government assistance," Lehmann responded: "That's not a topic. Look, we are regulated, we have a strong capital ratio, a very strong balance sheet, we are all hands on deck, so that's not a topic whatsoever." *Id.*, ¶ 110.

Later the same day, after public remarks by the Chairman of the Saudi National Bank Ammar Al Khudairy cast further doubt on Credit Suisse's stability, Credit Suisse's CEO Körner gave an interview to CNA's Asia Tonight. *Id.*, ¶¶ 111–120. Plaintiffs allege that Körner again described Credit Suisse's position as "not comparable" to SVB's and stated: "we fulfill, and overshoot basically, all regulatory requirements. Our capital, our liquidity basis, is very, very strong." *Id.*, ¶¶ 118–120.

By the afternoon of March 15, however, the financial press was reporting that Credit Suisse was in discussions with Swiss authorities about ways to stabilize the bank, including a possible public backstop. *Id.*, ¶¶ 121–124. On the morning of March 16, 2023, Credit Suisse announced

that it intended to borrow up to CHF 50 billion (Swiss francs) from the Swiss National Bank. *Id.*, ¶ 125. Plaintiffs allege that this announcement came only hours after Körner's statement that Credit Suisse's liquidity was "very, very strong," and less than a day after Lehmann stated that assistance from the Swiss government was "not a topic whatsoever." *Id.*, ¶¶ 125–127.

The CHF 50 billion loan from the Swiss National Bank proved insufficient to restore market confidence. *Id.*, ¶¶ 130–136. On March 19, 2023, the Swiss Federal Department of Finance, the Swiss National Bank, and the Swiss Financial Market Supervisory Authority ("FINMA") announced an emergency transaction under which UBS Group AG agreed to acquire Credit Suisse for approximately CHF 3 billion in UBS shares, together with extensive governmental support measures designed to stabilize the Swiss financial system. *Id.*, ¶¶ 137–139. These measures included, among other things, a liquidity assistance of CHF 200 billion provided by the Swiss National Bank and a federal loss guarantee covering up to CHF 9 billion of certain UBS losses arising from assets assumed in the transaction. *Id.*, ¶ 223.

As part of this rescue, FINMA ordered the permanent write-down of approximately CHF 16 billion of Credit Suisse's AT1 Bonds, rendering those securities worthless. *Id.*, ¶ 140; *see also* Press Release, Swiss Fin. Mkt. Supervisory Auth., *FINMA approves takeover of Credit Suisse by UBS* (Mar. 19, 2023). AT1 Bonds are a class of subordinated bank capital securities designed to absorb losses when a bank's capital position deteriorates or when extraordinary governmental support becomes necessary. *See id.*, ¶¶ 43–57. They form part of a bank's equity capital and are typically subordinated to traditional debt instruments but senior to common equity. *See id.*, ¶¶ 45–48, 94–95. The complaint alleges that AT1 investors generally expect to rank ahead of equity holders in the event of losses. *Id.*, ¶¶ 40, 94–95.

On March 23, 2023, FINMA publicly explained that the write-down was triggered by the occurrence of a "Viability Event" under the terms governing Credit Suisse's AT1 instruments and by emergency measures adopted by the Swiss Federal Council on March 19, 2023, entitled the *Emergency Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans by the Swiss National Bank to Systematically Important Banks*. *Id.*, ¶¶ 141–143.  FINMA stated:

> The Credit Suisse Group is experiencing a crisis of confidence, which has manifested in considerable outflows of client funds.  This was intensified by the upheavals in the US banking market in March 2023.  There was a risk of the bank becoming illiquid, even if it remained solvent, and it was necessary for the authorities to take action in order to prevent serious damage to the Swiss and international financial markets. . . . In close coordination with FINMA, the Swiss Confederation and the SNB, UBS will take over Credit Suisse in full. The extraordinary government support will trigger a complete write-down of the nominal value of all AT1 debt of Credit Suisse in the amount of around CHF 16 billion, and thus an increase in core capital.

Press Release, Swiss Fin. Mkt. Supervisory Auth., *FINMA approves takeover of Credit Suisse by UBS* (Mar. 19, 2023).  FINMA further explained that the Swiss emergency law adopted on March 19, 2023 authorized the regulator to write down the entire value of AT1 Bonds notwithstanding the applicable creditor hierarchy in ordinary bank insolvency proceedings.  *Id.*, ¶¶ 141–143.

Finally, plaintiffs allege that, at Credit Suisse's April 4, 2023 shareholder meeting, Lehmann and Körner made statements that contradicted their public assurances from mid-March. *Id.*, ¶¶ 144–151.  According to the complaint, defendants there acknowledged that Credit Suisse had entered March 2023 in a weak liquidity position, that the bank had been "significantly weakened" by asset outflows in October 2022, and that the collapse of SVB had caused shockwaves to which Credit Suisse was "particularly vulnerable." *Id.*, ¶¶ 147–151.

Plaintiffs contend that defendants' mid-March statements falsely maintained the market price of Credit Suisse's AT1 Bonds at artificially inflated levels by concealing the bank's

deteriorating liquidity condition and vulnerability to government intervention.  Plaintiffs allege that, in reliance on those misrepresentations and the resulting integrity of the market price, Palomino and Azteca, through Appaloosa, purchased the AT1 Bonds at prices they otherwise would not have paid, or would not have purchased them at all.  When the truth emerged and FINMA ordered the complete write-down of AT1 Bonds, the inflation dissipated and the value of the bonds collapsed, causing their losses.

### B.    Procedural History

Plaintiffs commenced this action on April 23, 2024, in the United States District Court for the District of New Jersey.  The complaint asserted claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5, together with claims under New Jersey RICO.

Defendants moved to transfer the action to this Court pursuant to 28 U.S.C. § 1404(a).  On January 31, 2025, Magistrate Judge José Almonte granted the motion and ordered the case transferred to the Southern District of New York.  *Palomino Master Ltd. v. Credit Suisse Grp. AG*, 2025 WL 353810, at *1, *4–8 (D.N.J. Jan. 31, 2025).  Judge Almonte concluded, among other things, that the action could have been brought in this District and that practical considerations strongly favored transfer because related Credit Suisse securities cases arising out of the events of March 2023 were already pending before this Court.  *Id.* at *4–8.  Although plaintiffs argued that transfer might jeopardize their New Jersey RICO claims, Judge Almonte held that any potential downstream issue related to the Securities Litigation Uniform Standards Act ("SLUSA") did not bar transfer.  *Id.* at 5 n.5.

Plaintiffs appealed that ruling under Federal Rule of Civil Procedure 72(a).  On September 10, 2025, District Judge Julien Neals affirmed the transfer order.  *Palomino Master Ltd. v. Credit Suisse Grp. AG*, 2025 WL 2621865, at *1–9 (D.N.J. Sept. 10, 2025).  Judge Neals likewise held

that transfer to this Court was proper and that Judge Almonte had not clearly erred in concluding that this action was sufficiently similar to the related Credit Suisse securities litigation already pending before this Court to warrant transfer in the interest of efficiency and consistency. *Id.* at *3–9.

After transfer, Defendants moved to dismiss. This motion presents three questions: (1) whether Plaintiffs have plausibly alleged domestic transactions under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010); (2) whether their New Jersey RICO claims are barred by SLUSA; and (3) whether those claims are otherwise adequately pleaded.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(6) Standard

To survive dismissal, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). At this stage, the Court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555–56. If the allegations do not nudge the claims "across the line from conceivable to plausible," dismissal is required. *Id.* at 570.

### III.    DISCUSSION

#### A. Plaintiffs Have Plausibly Alleged Domestic Transactions in Credit Suisse's AT1 Bonds

This case presents a relatively uncommon application of *Morrison* in the context of over-the-counter transactions in contingent convertible bank instruments (AT1 Bonds), rather than exchange-listed securities.  Defendants argue that plaintiffs' claims under Section 10(b) and Rule 10b-5 fail because the complaint does not plausibly allege that plaintiffs purchased Credit Suisse's AT1 Bonds in domestic transactions.

Defendants are correct that Section 10(b) does not apply extraterritorially.  But accepting the complaint's factual allegations as true, and drawing all reasonable inferences in plaintiffs' favor, Plaintiffs have adequately alleged that their purchases were domestic transactions within the meaning of *Morrison* and its progeny.

#### 1.    Applicable Law

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010), the Supreme Court held that Section 10(b) reaches only "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  The Court explained that, "With regard to securities not registered on domestic exchanges, the exclusive focus [is] on domestic purchases and sales."  *Id.* at 266–67.  Because plaintiffs do not allege that Credit Suisse's AT1 Bonds were listed on a domestic exchange, their claims depend on whether the complaint plausibly alleges "domestic transactions in other securities."  *Id.* at 267.

The Second Circuit addressed that question in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012), holding that "to sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States."  A transaction in an

unlisted security is domestic when either (1) "the purchaser incurred irrevocable liability within the United States to take and pay for a security," or (2) "the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68. Alternatively, a plaintiff can establish domesticity by alleging facts supporting the inference that title passed in the United States. *Id.* at 67.

In defining when irrevocable liability attaches, *Absolute Activist* drew on *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972), which held that the time of a securities "purchase or sale" is the point when "the parties to the transaction are committed to one another" – that is, when "in the classic contractual sense, there was a meeting of the minds of the parties," such that they "obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 68 (citation omitted). To determine whether that point was reached in the United States, courts consider "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70.

Subsequent Second Circuit decisions have reaffirmed that this inquiry is practical and fact-specific, and must be conducted with due regard for the case's procedural posture. District courts in this Circuit, applying *Absolute Activist*, have likewise held that allegations concerning U.S.-placed orders, transmission through U.S.-based intermediaries, and domestic payments may suffice at the pleading stage to support the inference that irrevocable liability was incurred in the United States. *See, e.g.*, *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 559–61 (S.D.N.Y. 2014), *aff'd in part, appeal dismissed in part*, 813 F.3d 98 (2d Cir. 2016).

In *Giunta v. Dingman*, 893 F.3d 73, 79–82 (2d Cir. 2018), the Second Circuit held that a domestic transaction was plausibly alleged where the complaint supported the inference that the parties entered into a binding agreement in New York and funds were wired from New York, even though additional steps remained to complete the transaction abroad.  The Circuit emphasized that, *at the pleading stage,* the question is whether the complaint alleges facts giving rise to the "plausible inference" that irrevocable liability was incurred in the United States.  *Id.* at 79 (quoting *Absolute Activist*, 677 F.3d at 68).  The court did not suggest that the absence of conclusive proof at the pleading stage would warrant dismissal.

The Circuit has cautioned that no single factor is dispositive.  In *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014), it explained that "the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange" is not, "standing alone," sufficient to establish domesticity.  But that admonition does not mean that the placement of orders in the United States is irrelevant; only that it is insufficient in isolation.  *Absolute Activist* itself recognized as much in listing "the placement of purchase orders" among the pertinent facts courts may consider in determining where irrevocable liability attached.  677 F.3d at 70.

Most recently, in *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024), the Second Circuit again underscored that the domesticity inquiry is not to be conducted by isolating one fact from the overall transactional picture.  There, the Circuit held that plaintiffs had plausibly alleged domestic transactions where they had placed orders from the United States and where those orders were matched on servers located in the United States.  *Id.* at 136–41.  The Court reiterated that irrevocable liability attaches when parties "becom[e] bound to effectuate the transaction or enter[ ] into a binding contract to purchase or sell securities," *id.* at 136 (quoting *In re Vivendi, S.A.*

11

*Securities Litigation*, 838 F.3d 223, 265 (2d Cir. 2016)), and further stressed that irrevocable liability may attach "in more than one location" and "at more than one time." *Id.* at 136–37. It therefore rejected the proposition that a plaintiff must identify a single exclusive situs of the transaction at the pleading stage. Instead, where the pleaded facts make it plausible that one or more steps giving rise to irrevocable liability occurred in the United States, dismissal is not warranted. *See id.* at 137–41.

A plaintiff need not prove domesticity at the pleading stage; it is enough to allege facts supporting a plausible inference that irrevocable liability attached, or title passed, in the United States. The inquiry is holistic. Courts consider the totality of the pleaded facts bearing on contract formation, order placement, counterparties, payment, and transfer – not whether any single allegation conclusively fixes the locus of the transaction.

### 2.    Application

Consistent with these standards, the complaint adequately alleges that Palomino and Azteca, acting through their investment adviser Appaloosa, purchased Credit Suisse's AT1 Bonds in domestic transactions.

The complaint alleges that, beginning on March 14, 2023, Palomino and Azteca, through Appaloosa, purchased Credit Suisse AT1 Bonds and continued doing so through March 19, 2023. It further alleges that the AT1 Bonds "were trading in the United States"; that Appaloosa "received quotes in U.S. dollars"; that plaintiffs paid for the bonds "in U.S. dollars" and through Goldman Sachs, a U.S.-based prime broker; that the counterparties executing Appaloosa's trades are alleged to have been based in the United States; and that Appaloosa's traders "were all located in New Jersey when the orders were placed." Dkt. No. 1, Compl., ¶¶ 101–105. These allegations bear directly on at least three of the factors identified in *Absolute Activist*: "the placement of purchase

orders," "the passing of title," and "the exchange of money."  677 F.3d at 70.  They also resemble the allegations found sufficient in *Atlantica Holdings*, where the court sustained Exchange Act claims based on allegations that orders were placed in the United States, routed through New York intermediaries, and funded through domestic transfers.  2 F. Supp. 3d at 559–60.  Thus, Plaintiffs' allegations plausibly support the inference that plaintiffs incurred irrevocable liability in the United States to take and pay for the AT1 Bonds.

That conclusion follows naturally from the Second Circuit's reasoning in *Giunta* and *Williams*.  In *Giunta*, the Circuit held that a domestic transaction had been adequately alleged where the parties entered into the agreement in New York and the purchaser wired funds from New York, notwithstanding that later steps remained to be completed outside the United States. 893 F.3d at 79–82.  The Circuit rejected the district court's view that the existence of a later foreign condition meant that the parties had not yet incurred irrevocable liability in New York.  *Id.* at 80– 81. So too here.  Even if later settlement procedures occurred outside the United States, that would not foreclose the possibility that plaintiffs incurred irrevocable liability domestically when the orders were placed and accepted through the alleged U.S.-centered trading process.

*Williams* reinforces that conclusion.  There, the Circuit held that domesticity had been plausibly alleged based on two "transactional steps": the matching of the trades in the United States, and the plaintiffs' submission of orders and payments from the United States.  96 F.4th at 137–41.  The Court explained that irrevocable liability may attach at multiple points in the life of a transaction and that domesticity may therefore be pleaded through more than one U.S.-based transactional contact.  *Id.* at 136–40.  Here, too, the complaint alleges multiple such contacts: plaintiffs' orders were placed from New Jersey; payment was routed through a U.S.-based prime

broker and made in U.S. dollars; the bonds were allegedly trading in the United States; and the executing counterparties appeared to be U.S.-based.

Defendants are right that the complaint does not identify, with documentary precision, the exact instant at which each of Plaintiffs' trades became irrevocable. But neither *Absolute Activist* nor its progeny imposes such a requirement *at the motion-to-dismiss stage*. Indeed, *Williams* cautions against too exacting a demand for transactional precision "at this early stage of the litigation," especially where the pleaded facts make it plausible that one or more of the steps giving rise to irrevocable liability occurred domestically. 96 F.4th at 137–41. Plaintiffs' pleaded facts do just that and suffice at the pleading stage.

Defendants' various arguments to the contrary improperly isolate individual facts and treat them as dispositive. For example, Defendants contend that (i) the use of U.S. dollars and U.S.-denominated instruments is irrelevant to domesticity; (ii) the involvement of a U.S.-based prime broker and allegedly U.S.-based counterparties does not establish where a transaction was executed; and (iii) the placement of purchase orders from the United States, standing alone, is insufficient to incur irrevocable liability. Considered in isolation, these allegations are unremarkable. But Defendants' error lies in treating each alleged domestic contact as if it must independently satisfy *Morrison*.

As the Second Circuit explained in *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198, 218 (2d Cir. 2014), courts do "not identify, or rely on, any single factor or bright-line rule" in determining the territorial reach of Section 10(b). Judge Leval, concurring, stated that "no single factor is dispositive," and courts must avoid a "mechanical" application of *Morrison* that either elevates or negates isolated contacts over the substance of the transaction. *Parkcentral*, 763 F.3d at 218. He further explained that the question whether a transaction is

impermissibly extraterritorial "does not lend itself to reliable analysis by a bright-line test," but instead requires a "more subtle and flexible inquiry," akin to the multifactor analysis courts employ in resolving transnational choice-of-law problems. *Id.* (collecting cases). A contrary approach would reintroduce precisely the kind of "vague" and "unpredictable" inquiry that *Morrison* rejected, 561 U.S. at 259, by permitting liability to turn on isolated domestic contacts, or the absence thereof, rather than the place where irrevocable liability attached. *See Absolute Activist*, 677 F.3d at 70. It would also create perverse incentives, allowing sophisticated actors to structure transactions precisely to evade the federal securities laws while preserving the economic reality of domestic dealing. *See Parkcentral*, 763 F.3d at 218. Thus, Defendants' attempt to disaggregate Plaintiffs' allegations and dismiss each as insufficient "standing alone" misapprehends the governing standard.

Whether Plaintiffs can ultimately prove domesticity is a question for a later stage; at the pleading stage, their allegations suffice. Defendants do not challenge the sufficiency of plaintiffs' allegations as to falsity, scienter, or materiality. *See* Dkt. No. 39, at 12 n.4 (stating that they "do not seek to re-litigate their arguments as to" alleged misstatements in *Diabat v. Credit Suisse AG*, 2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)). The Court therefore proceeds with the assumption that those elements are adequately pleaded for purposes of this motion.

### B. SLUSA Does Not Require Dismissal of Plaintiffs' New Jersey RICO Claims

Defendants argue that Plaintiffs' New Jersey RICO claims are barred by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 78bb(f). They are not.

SLUSA bars certain state-law class actions alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A). A "covered security" is a security "listed, or authorized for listing, on a national

15

securities exchange."  15 U.S.C. § 77r(b)(1)(A); *see also* 15 U.S.C. § 78bb(f)(5)(E).  The Supreme

Court has instructed that this language is to be read broadly but not without limit.  In *Merrill Lynch,*

*Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85–89 (2006), the Court held that SLUSA is

not confined to claims brought by purchasers or sellers themselves; it is enough that the alleged

fraud "coincide" with a covered-securities transaction.  But in *Chadbourne & Parke LLP v. Troice*,

571 U.S. 377, 387–88 (2014), the Court made clear that the statute still "focuses upon transactions

in covered securities, not upon transactions in uncovered securities."  Accordingly, if a security is

not a "covered security," SLUSA does not apply, even if the same misstatements might also relate

to covered securities in other contexts.

The complaint alleges fraud in connection with purchases of uncovered securities; SLUSA

therefore does not apply.  Plaintiff alleges that Defendants' March 2023 statements about Credit

Suisse's liquidity, outflows, and need for government assistance induced Plaintiffs to purchase

Credit Suisse AT1 Bonds, and that Plaintiffs were injured when those bonds were written down to

zero days later.  The New Jersey RICO claim is pleaded the same way.  The alleged predicate acts

are the March 13–15 misstatements, and the pleaded injury is that those statements caused Credit

Suisse's AT1 Bonds to trade at artificially inflated prices during the period in which Plaintiffs

purchased them.  Dkt. No. 1, Compl., ¶¶ 242–50.  That is a theory of fraud connected to purchases

of AT1 Bonds – uncovered securities – not to purchases or sales of Credit Suisse American

Depositary Shares ("ADS") or any other covered security.

Defendants do not contend otherwise.  They concede, as they must, that Credit Suisse's

AT1 bonds were not listed on a U.S. exchange.  Instead, they argue that SLUSA nonetheless

applies because the same alleged misstatements also overlapped with the claims asserted in *Diabat*

*v. Credit Suisse Group AG*, No. 23-cv-5874 (S.D.N.Y.) involving Credit Suisse ADS, which are

16

covered securities.  In Defendants' view, that overlap is enough to trigger SLUSA preclusion even where Plaintiffs' own claims arise solely from transactions in uncovered securities.  *See* Defs.' Mem. L. Supp. Mot. to Dismiss, at 10 (quoting *In re Harbinger Capital Partners Funds Investor Litigation*, 2015 WL 1439520, at *6 (S.D.N.Y. Mar. 30, 2015)).  That reads both SLUSA and *Harbinger* too broadly.

Start with the complaint.  Nothing in it alleges that Plaintiffs purchased Credit Suisse ADS, held Credit Suisse ADS, sold Credit Suisse ADS, or acquired any direct or indirect ownership interest in ADS through some intermediary vehicle.  This is not a feeder-fund case.  *See In re Herald*, 730 F.3d 112, 118–20 (2d Cir. 2013) (claims arising from indirect investment through feeder funds tied to covered securities).  It is not a disguised covered-security case.  *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 109 (2d Cir. 2001) (variable annuities treated as covered securities).  And it is not a case in which plaintiffs bought an interest in one instrument that, in turn, represented an ownership stake in covered securities.  *See Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1351 n.2 (11th Cir. 2008) (mutual funds as covered securities because they hold portfolios of exchange-traded securities).  It is a case about AT1 Bonds, which are subordinated, contingent-convertible debt instruments that are not listed on a U.S. national exchange and do not themselves confer any ownership interest in covered securities. The complaint says so repeatedly.  *See, e.g.*, Dkt. No. 1, Compl. ¶¶ 24–25, 30–32, 99–105, 246, 249–50.

This distinction is dispositive under *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014).  There, the plaintiffs bought uncovered certificates of deposit and alleged they had been misled by statements that those certificate of deposits ("CDs") were backed by covered securities. *Troice*, 571 U.S. at 380–83.  The Supreme Court held that SLUSA was inapplicable because the

17

alleged misrepresentations were material to the plaintiffs' decisions to buy the uncovered CDs, not to anyone's decision to buy or sell covered securities. 571 U.S. at 387–90. The Court emphasized that SLUSA does not extend to "garden-variety" frauds merely because covered securities are referenced as part of the scheme. *Id.* at 387–88, 392–97. That reasoning governs here. Even assuming that Credit Suisse's broader capital structure included exchange-traded ADS, the fraud alleged in this complaint is one that purportedly induced purchases of AT1 Bonds and caused losses when those bonds were wiped out – not one material to any transaction in covered securities.

Defendants rely heavily on *Harbinger*, but that case is materially different. There, the complaint alleged what Judge Nathan described as a single, continuous fraudulent scheme that began with misrepresentations made in connection with the acquisition of covered SkyTerra securities and continued after the company went private as LightSquared. *Harbinger*, 2015 WL 1439520, at *5–9. The court concluded that plaintiffs could not avoid SLUSA by artfully dividing the pleaded scheme into a later "uncovered" phase while omitting the covered-security portion that was already embedded in their theory of liability. *Id.* at *7–9. That reasoning has no application here.

Plaintiffs have not pleaded a single scheme spanning both covered and uncovered phases of the same investment. Nor have they pleaded that their own purchases of AT1 notes constituted a direct or indirect acquisition of covered securities. Defendants are not asking the Court to look past artful pleading and identify the covered-security core of the same complaint. They are asking the Court to import covered-security transactions from the ADS-based action in *Diabat v. Credit Suisse Group AG*, No. 23-cv-5874 (S.D.N.Y.) and then use that separate litigation to extinguish the state-law claim pleaded here. SLUSA does not go that far.

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) does not compel a different result. *Dabit* teaches that the "in connection with" requirement is not limited to claims brought by purchasers or sellers themselves, and that holder claims can fall within SLUSA where the alleged fraud "coincide[s]" with transactions in covered securities. 547 U.S. at 85–89. But *Dabit* did not eliminate the statute's covered-security limitation. *Troice* made that explicit, explaining that *Dabit* remains good law but does not extend SLUSA to frauds that are not material to decisions to buy, sell, or hold covered securities. 571 U.S. at 387–88. Defendants' theory would do precisely what *Troice* forbids. It would convert a complaint about purchases of uncovered AT1 Bonds into a SLUSA-barred action solely because the same issuer made the same statements during the same period and those statements may also have affected a separate market for covered securities. That connection is too attenuated to trigger SLUSA preclusion.

The Court is also unpersuaded by Defendants' reliance on Plaintiffs' transfer briefing in New Jersey, where Plaintiffs predicted that transfer to this District would likely provoke a SLUSA argument. A litigant's prediction about the argument its adversary may later make is not a concession that the argument is correct. And in any event, whether plaintiffs anticipated this motion says nothing about whether SLUSA actually applies to the complaint they filed.

Read in light of *Troice*, the statute is straightforward. SLUSA does not bar a state-law claim unless the alleged misrepresentation is material to a decision by someone other than the fraudster to buy, sell, or hold a *covered security*. Here, the complaint alleges that Defendants' statements induced purchases of Credit Suisse AT1 Bonds and inflated the market for those bonds. It does not allege that Plaintiffs – or any other identified victims whose transactions form part of this complaint – were induced to buy, sell, or hold Credit Suisse ADS or any other covered security. That the same statements also allegedly defrauded the purchasers of a covered security does not

19

convert this action into one "in connection with" the purchase or sale of a covered security within the meaning of SLUSA.  *See Troice*, 571 U.S. at 387–88.

Accordingly, SLUSA does not apply.  Nevertheless, the Court must still decide whether Plaintiffs adequately plead the elements of a New Jersey RICO claim.

### C.  Plaintiffs Fail to State a Claim Under New Jersey RICO

All three Plaintiffs – Palomino Master Ltd., Azteca Partners LLC, and Appaloosa LP – assert claims under the New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J. Stat. Ann. §§ 2C:41-1 to -6.2, against Credit Suisse Group AG, Axel P. Lehmann, and Ulrich Körner.  Plaintiffs invoke both N.J. Stat. Ann. § 2C:41-2(c), which prohibits a person associated with an enterprise from conducting the enterprise's affairs through a pattern of racketeering activity, and N.J. Stat. Ann. § 2C:41-2(d), which makes it unlawful to conspire to violate subsections (a), (b), or (c). They also assert aiding-and-abetting liability against Lehmann and Körner.  The Court begins with § 2C:41-2(c), because Plaintiffs fail at the threshold to plead a distinct enterprise.

### 1.     Plaintiffs Fail to Plead a Distinct Enterprise Under § 2C:41-2(c)

New Jersey's RICO statute makes it unlawful for "any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity."  N.J. Stat. Ann. § 2C:41-2(c).  Because New Jersey RICO is modeled on its federal counterpart, New Jersey courts routinely look to federal RICO decisions for guidance, except where New Jersey has affirmatively adopted a different rule.  *See State v. Cagno*, 49 A.3d 388, 399–400 (2012).

Defendants rely on *In re Refco Inc. Securities Litigation*, 826 F. Supp. 2d 478 (S.D.N.Y. 2011), to argue that New Jersey law does not require distinctness between the RICO "person" and the enterprise.  That reliance is misplaced.  *Refco* adopted, without elaboration, a Special Master's Report and Recommendation that read *State v. Ball* to relax federal RICO constraints more broadly.  It is true that New Jersey has, in certain respects, adopted a more expansive understanding of the "enterprise" element than federal law.  *Ball*, 661 A.2d at 257–65.  But *Ball* did not abandon the requirement that the enterprise be distinct from the alleged racketeering activity itself.  To the contrary, the court emphasized that an enterprise must be an "ongoing organization" whose associates "function as a continuing unit," and that it must exist "separate and apart from the pattern of racketeering activity."  *Id.* at 259 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Thus, the "enterprise" and the "pattern of racketeering activity" are distinct elements. The enterprise is the organizational vehicle, while the pattern consists of the predicate acts carried out through it.

Nothing in *Ball* suggests that New Jersey eliminated the distinctness requirement between the RICO "person" and the enterprise.  *Accord Prudential Ins. Co. of Am. v. Bank of Am., Nat. Ass'n*, 14 F. Supp. 3d 591, 615 (D.N.J. 2014) ("There is not the slightest mention or discussion in *Ball* about whether or not the "person" participating in a NJRICO enterprise must be distinct from the enterprise itself.").  Courts applying New Jersey RICO have consistently rejected Plaintiffs' reading of *Ball*.  *See, e.g.*, *id.* at 608–09 (explaining that *Ball* did not dispense with distinctness and continuing to apply federal distinctness principles); *see also Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 510 (3d Cir. 2006) ("A close reading of *Ball* suggests, contrary to plaintiffs' contention, that the New Jersey Supreme Court believed the New Jersey RICO statute was and should be consistent with the federal RICO statute.").  *Ball* relaxes certain structural formalities

21

associated with the enterprise element, but it does not collapse the enterprise into either the pattern of racketeering activity or the defendant who conducts it.

Two distinct requirements follow, and they are analytically separate.  First, under *Ball* and *Turkette*, the enterprise must be distinct from the pattern of racketeering activity.  Second, under settled federal law incorporated through *Cagno*, the RICO "person" must be distinct from the enterprise.

The distinctiveness requirement – drawn from federal law – concerns the relationship between the RICO "person" and the enterprise.  Under § 1962(c), "the person and the enterprise referred to must be distinct."  *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).  New Jersey courts look to that body of law in the absence of any contrary state rule.  *See Cagno*, 49 A.3d at 400.  Thus, even if an enterprise is distinct from the pattern of racketeering activity, a claim still fails if the enterprise is not distinct from the defendant "person."

The Second Circuit has repeatedly enforced that distinctness requirement, holding that "by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented."  *Riverwoods*, 30 F.3d at 344.  Where alleged RICO actors "operate within a unified corporate structure" and are "guided by a single corporate consciousness," the enterprise is not distinct from the persons.  *U1IT4Less, Inc. v. FedEx Corp.*, 871 F.3d 199, 206–09 (2d Cir. 2017) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120–21 (2d Cir. 2013)).

These requirements operate together.  *Ball* requires an enterprise distinct from the pattern of racketeering activity, while *Riverwoods* requires an enterprise distinct from the RICO person. These are distinct inquiries.  The first asks whether the alleged enterprise is anything more than

22

the conduct itself.  The second asks whether it is anything more than the defendants who allegedly carried out that conduct.

Plaintiffs allege that the enterprise was "operated, managed, and controlled by, among others, Credit Suisse, Lehmann, and Körner," and that its purpose was to prevent a bank run by disseminating misleading statements about Credit Suisse's financial condition.  But those allegations describe nothing more than Credit Suisse acting through its Chairman and Chief Executive Officer in the course of managing the corporation's affairs.

Indeed, Plaintiffs allege no association with any entity outside Credit Suisse, no structure separate from the corporation itself, and no purpose distinct from the corporation's own business. They do not allege that the corporate form was used in some independent way to facilitate the scheme, nor that Defendants formed any organization apart from the corporation to carry it out. What they allege, instead, is that senior officers Lehmann and Körner disseminated false and misleading statements concerning Credit Suisse's liquidity position to "prevent a run on the bank" and "to prevent [its] collapse."  Dkt. No. 40, Pls.' Mem. L. Opp'n to Defs.' Mot. to Dismiss, at 8, 27.  Averting a bank run and preserving confidence in Credit Suisse is nothing more than the objective of the corporation itself.  This is not an enterprise; it is the company itself acting through its officers.

Applying these distinct requirements, Plaintiffs' allegations fail.

*First,* the alleged enterprise is not distinct from the racketeering conduct.  The purported enterprise has no structure, purpose, or identity apart from the alleged dissemination of misleading statements undertaken to stabilize Credit Suisse's financial condition.  The problem is not that Credit Suisse is identical to the conduct, but that the alleged enterprise is defined entirely by that conduct and has no independent existence apart from it.  Describing that conduct as unlawful does

not create a separate enterprise; the enterprise itself must exist independently of the conduct. *See Turkette*, 452 U.S. at 583.

*Second,* Plaintiffs' alleged enterprise is not distinct from the RICO persons. Even apart from the conduct, the alleged enterprise collapses into the defendants themselves. A corporation acting together with its own officers and agents, within the scope of their corporate roles, does not constitute an enterprise separate from the corporation itself. Here, the alleged enterprise is nothing more than Credit Suisse together with the very individuals through whom it necessarily acts. That is the paradigmatic *Riverwoods* problem. *See also Cruz*, 720 F.3d at 121 ("The requirement of distinctness cannot be evaded by alleging that a corporation has violated the statute by conducting an enterprise that consists of itself plus all or some of its officers or employees.").

Plaintiffs may argue that the alleged racketeering acts are "separate" from Credit Suisse's ordinary business activities. But the question is not whether the conduct is lawful or unlawful; it is whether there is an entity distinct from both the conduct and the actors. Plaintiffs identify neither. Where, as here, the alleged enterprise consists of a corporation acting through its own officers to pursue the corporation's own objectives, no such distinct entity exists. As the Sixth Circuit observed, "if a corporate defendant can be liable for participating in an enterprise comprised only of its agents . . . then RICO liability will attach to any act of corporate wrongdoing and the statute's distinctness requirement will be rendered meaningless." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013).

The Supreme Court's decision in *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001), does not compel a different result. The Court recognized that the distinctness requirement is satisfied where RICO "person" is an individual employee or owner and the "enterprise" is the corporation itself. *Cedric Kushner*, 533 U.S. at 163. In *Cedric Kushner*, a single individual, who

24

was both the sole owner and employee of a corporation, was alleged to have conducted the corporation's affairs through a pattern of racketeering activity. *Id.* at 160–61. The Court held that distinctness was satisfied because a natural person is legally separate from the corporation he owns, even if he controls it completely. *Id.* at 163. It emphasized that the case involved "a corporate employee unlawfully conduct[ing] the affairs of the corporation of which he is the sole owner – whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." *Id.* at 166. But the Court expressly distinguished the situation in which "a corporate employee is the 'person' and the corporation is the 'enterprise'" from the quite different case in which "a corporation [is] the 'person' and the corporation, together with all its employees and agents, [is] the 'enterprise.'" *Id.* at 164–65. The latter remains impermissible. *See id.*

Accordingly, Plaintiffs fail to state a claim under N.J. Stat. Ann. § 2C:41-2(c). Because Plaintiffs have not stated a substantive RICO violation, their claim under § 2C:41-2(d) for conspiracy to violate that provision must also be dismissed as a matter of law. *See Smulley v. Liberty Mut. Holding Co.*, 939 F.3d 114, 121 (2d Cir. 2019) (holding, in the federal RICO context, that "without a sufficiently pleaded substantive RICO violation under 18 U.S.C. § 1962(c), [a] conspiracy claim under § 1962(d) fails as well.").

### 2.    Plaintiffs Fail to Plead a Conspiracy Under § 2C:41-2(d)

Even putting aside the fact that Plaintiffs have failed to adequately allege a cognizable enterprise, they do not plausibly allege an agreement among Defendants to participate in the conduct of that enterprise's affairs through a pattern of racketeering activity either, as § 2C:41-2(d) requires.

New Jersey law requires an agreement. Under N.J. Stat. Ann. § 2C:5-2(a), a person is guilty of conspiracy only if, "with the purpose of promoting or facilitating [a crime's] commission

he agrees with such other person or persons" to engage in or aid that conduct.  The New Jersey Supreme Court has emphasized that "the agreement to commit a specific crime is at the heart of a conspiracy charge." *State v. Samuels*, 914 A.2d 1250, 1255 (2007).  That requirement applies with full force to claims under New Jersey's RICO statute, which, while broader than its federal counterpart in certain respects, remains guided by federal RICO principles.  *See Cagno*, 49 A.3d at 400.

Federal RICO cases reinforce this point.  The "core of a RICO civil conspiracy is an agreement," and a complaint must allege specifically facts implying "any agreement involving each of the defendants to commit at least two predicate acts." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25–26 (2d Cir. 1990).  Although Rule 9(b) does not apply to allegations of agreement, *id.* at 26 n.4, a plaintiff must still plead facts sufficient to support a plausible inference that such an agreement existed.  Conclusory allegations that defendants "agreed" or "conspired," without supporting factual content, are insufficient as a matter of law.  *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 545 (S.D.N.Y. 2014); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1994 WL 88129, at *30 (S.D.N.Y. Mar. 15, 1994) (collecting cases).

The complaint does not plausibly allege any agreement among Defendants.  Plaintiffs' conspiracy allegations – set forth in paragraphs 289 through 295 – are wholly conclusory, and the remainder of the complaint fares no better in supplying facts that would support a plausible inference of any agreement among Defendants.  They assert, in generalized terms, that Defendants "agreed," "conspired," or "participated" in a scheme, but they do not plead any facts suggesting when the alleged agreement was formed, what its terms were, or how any particular defendant manifested assent to it.  Nor do they plead facts supporting a plausible inference that each defendant knowingly agreed to the commission (whether personally or through others) of at least

26

two incidents of racketeering conduct – *i.e.*, violations of the New Jersey statutory offenses incorporated into N.J. Stat. Ann. § 2C:41-1(a) – as part of a coordinated enterprise.

The absence of factual allegations suggesting coordination or organization among Defendants independently defeats any inference of agreement.  Courts require allegations that the purported conspirators acted as a group with some degree of structure, interaction, or coordinated decision-making.  *See, e.g.*, *D'Ambly v. Exoo*, 2021 WL 5083816, at *3–5 (D.N.J. Nov. 1, 2021) (dismissing RICO claims where the complaint "does not address the other alleged members' roles," "what planning occurred, or even if there were any interactions between the members to further the Enterprise's goal," and where plaintiffs failed to allege that any participants were even aware of the enterprise or its objectives).  Here, as in *D'Ambly*, Plaintiffs allege no facts concerning how Defendants coordinated, what roles they played, or whether they acted pursuant to any shared plan.  The complaint thus provides no basis to infer the existence of a knowing agreement.

At most, the complaint alleges that Credit Suisse, acting through its Chairman and Chief Executive Officer, made public statements concerning the company's financial condition during a period of market stress.  Those allegations describe ordinary corporate conduct – albeit conduct Plaintiffs contend was misleading – not an agreement to engage in racketeering.  *See U1IT4Less, Inc.*, 871 F.3d at 207.  A plaintiff may not simply re-label the underlying conduct as the product of an "agreement" without alleging facts showing that such an agreement actually existed.  *See Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp. 435, 451 (E.D.N.Y. 1997).

Because Plaintiffs have failed to plead either a cognizable enterprise or an agreement, all claims under New Jersey's RICO statute are dismissed.

### D.  Consolidation for Pre-Trial Purposes

Defendants move to consolidate this action with related actions pending before this Court, including *Diabat v. Credit Suisse Group AG*, No. 23-cv-5874 (S.D.N.Y.), and *Core Capital Partners LP v. Credit Suisse Group AG*, No. 23-cv-9287.  These actions arise from the same alleged course of conduct surrounding the March 2023 collapse of Credit Suisse and assert overlapping claims based on materially similar alleged misstatements.

Under Federal Rule of Civil Procedure 42(a), a court may consolidate actions that "involve a common question of law or fact."  Fed. R. Civ. P. 42(a); *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999).  District courts have broad discretion to consolidate actions, but that discretion is not unfettered. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284–85 (2d Cir. 1990).  The Court must balance considerations of judicial economy against any risk of confusion or prejudice. *See Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993).

Consolidation of this action with these related Credit Suisse cases for pre-trial purposes is appropriate.  These actions present substantially overlapping claims arising from the same alleged misstatements, the same March 2023 collapse of Credit Suisse, and the same alleged corrective disclosures and materializations of risk.  Consolidation for pre-trial purposes will promote judicial economy, avoid duplicative discovery and motion practice, and will not otherwise prejudice Plaintiffs' rights. *See Disc. Bank & Tr. Co. v. Salomon Inc.*, 141 F.R.D. 42, 44 (S.D.N.Y. 1992).

The overlap is extensive.  In their briefing, Defendants identify multiple alleged misstatements in this action that are the same statements already at issue in the related Credit Suisse litigation, including statements by Körner and Lehmann during the critical March 14–15, 2023 period.  All Defendants in this action are also defendants in the related Credit Suisse cases, and both this action and the *Core Capital* action concern claims asserted on behalf of Credit Suisse

28

AT1 bondholders.  The transfer of this case to this District and its assignment to this Court likewise reflects the substantial factual overlap with the already-pending Credit Suisse actions.

The complaint confirms that this case arises from the same nucleus of operative facts: the deterioration of Credit Suisse's liquidity position in early March 2023, public reassurances by senior executives, the March 14, 2023 disclosure of material weaknesses in internal controls, the March 15 loss of market confidence, and the March 19–20 rescue transaction in which Credit Suisse was acquired by UBS and the AT1 Bonds were written down.  These are the same events at the core of the *Core Capital* and *Diabat* actions.

This Court has already addressed materially indistinguishable circumstances in the related Credit Suisse litigation.  In *In re Credit Suisse Securities Fraud Class Actions*, No. 23-CV-5874 (CM), 2025 WL 1866293 (S.D.N.Y. July 7, 2025), the Court considered whether to consolidate the *Core Capital* action – brought on behalf of AT1 bondholders – with the *Diabat* class action. The Court concluded that, while full merger into a single action was not appropriate, consolidation for pre-trial purposes was warranted because the cases arose from the same underlying facts and presented overlapping questions of law and fact.  *Id.* at 11–13.  The Court therefore ordered the actions administratively consolidated for discovery and other pre-trial matters.  *Id.*

The same reasoning applies here.  Like *Core Capital*, this action arises from the same alleged misstatements, the same collapse of Credit Suisse, and the same alleged corrective disclosures and loss-causing events.  It presents the same core questions of falsity, scienter, and loss causation that are already being litigated in the consolidated Credit Suisse proceedings.  There is no basis to treat this case differently.

Nor would consolidation for pre-trial purposes prejudice Plaintiffs.  Consolidation under Rule 42(a) "does not merge the suits into a single cause, or change the rights of the parties."

*Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97 (1933).  It merely permits coordinated management of overlapping proceedings.  This Court has already employed that approach in the related Credit Suisse litigation – declining to merge actions into a single case, but consolidating them administratively for discovery and other pre-trial matters because of their substantial overlap. The same approach is warranted here.

Because considerations of judicial economy favor consolidation, and there is little risk of prejudice, the Court orders that this action be consolidated with *In re Credit Suisse Securities Fraud Class Actions*, No. 23-cv-5874 (S.D.N.Y.), for pre-trial purposes.  Any decision as to consolidation for trial shall await the conclusion of pre-trial proceedings.

The Court recognizes that this action was filed later than some, but not all, of the related cases and that discovery in these actions may be well underway.  That circumstance does not counsel against consolidation, but it does require careful case management to avoid duplication of efforts.  Accordingly, the Court will rely on the Magistrate Judge supervising discovery to coordinate proceedings in a manner that permits Plaintiffs in this action to obtain the benefit of discovery already taken in the related cases.  This may include, for example, requiring Plaintiffs to identify any additional interrogatories or deposition questions not previously posed, and facilitating the sharing and use of discovery materials already produced.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  Plaintiffs' claims under New Jersey RICO are DISMISSED.  To the extent Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-

5, those claims survive because Defendants have not challenged the sufficiency of Plaintiffs' allegations as to falsity, scienter, or materiality at this stage.

The Clerk of Court is respectfully directed to consolidate this case with *In re Credit Suisse Securities Fraud Class Actions*, No. 1:23-cv-5874-CM (S.D.N.Y.), for the conduct of all pre-trial matters. Unless a filing pertains to all related actions, it shall be filed only under the docket number of the relevant case. Any filing that pertains to more than one action must be docketed in each applicable case.

The Clerk of Court is also directed to terminate the motion at Docket Number 38 in *Palomino Master Ltd. v. Credit Suisse Group AG*, No. 25-cv-8264, and to remove it from the Court's list of open motions.

This constitutes the decision and order of the Court.

Dated: March 26, 2026

_____
U.S.D.J.