**KAHN SWICK & FOTI, LLC**
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr. (admitted *pro hac vice*)
Matthew P. Woodard (admitted *pro hac vice*)
Jyoti Kehl (admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com
Email: jyoti.kehl@ksfcounsel.com

-and-

J. Ryan Lopatka (admitted *pro hac vice*)
161 N. Clark Street, Suite 1700
Chicago, Illinois 60601
Telephone: (312) 759-9700
Email: j.lopatka@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Diabat*
*and Class Counsel*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: CREDIT SUISSE SECURITIES FRAUD CLASS ACTIONS<br><br>This matter relates to:<br><br>*Diabat* | No. 1:23-cv-5874-CM-SLC<br><br>**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF ALI DIABAT'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** |

## TABLE OF CONTENTS

**Page:**

I.     PRELIMINARY STATEMENT .................................................................................. 1

II.    RELEVANT PROCEDURAL HISTORY AND BACKGROUND ................................. 2

III.   ARGUMENT ......................................................................................................... 6

     A. Liberal Legal Standard for Leave to Amend ....................................................... 6

     B. The Proposed Amendment is not Futile................................................................. 7

         1. Defendants Misrepresented CS's Consideration of a Capital Raise ..................... 7

         2. Plaintiff Adequately Alleges Misrepresentations Regarding CS's
            Financial Condition and the Strength of Its CET1 Ratio ..................................... 11

         3. Plaintiff Adequately Alleges Defendant Lehmann's December 1, 2022
            Statements Regarding the Reversal of Outflows Are Actionable......................... 14

         4. Plaintiff Adequately Alleges Defendants' March 16, 2023, Statements
            Regarding SNB Aid Are Actionable................................................................. 17

     C. Plaintiff Seeks Permission to Amend With No Undue Delay .......................................... 18

     D. In Seeking Leave to Amend, There Is No Bad Faith, Dilatory Motive or
       Undue Prejudice to Defendants ........................................................................ 19

IV.   CONCLUSION................................................................................................... 21

<u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases**

*A.V. by Versace, Inc. v. Gianni Versace S.p.A,*
 87 F.Supp.2d 281 (S.D.N.Y. 2000) .................................................................................... 20

*Agerbrink v. Model Service LLC,*
 155 F.Supp.3d 448 (S.D.N.Y. 2016) ................................................................................... 19

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.,*
 663 F. Supp. 3d 334 (S.D.N.Y. 2023) ................................................................................. 15

*Amley v. Sumitomo Mitsui Banking Corp.,* No. 1:19-cv-3777,
 2020 WL 5658666 (S.D.N.Y. Sep. 23, 2020) ............................................................... 19, 20

*Anderson News, L.L.C. v. Am. Media, Inc.,*
 680 F.3d 162 (2d Cir. 2012) .................................................................................................. 6

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.,*
 77 F.4th 74 (2d Cir. 2023) ................................................................................................... 16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
 493 F.3d 87 (2d Cir. 2007) .................................................................................................. 18

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* No. 17-cv-1580,
 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .................................................................... 12

*In re Scholastic Corp. Sec. Litig.,*
 252 F.3d 63 (2d Cir. 2001) .................................................................................................. 15

*In re Vivendi, S.A. Sec. Litig.,*
 838 F.3d 223 (2d Cir. 2016) ................................................................................................ 12

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
 797 F.3d 160 (2d Cir. 2015) .................................................................................................. 1

*Lucente v. Int'l Bus. Machs. Corp.,*
 310 F.3d 243 (2d Cir. 2002) .................................................................................................. 7

*Parker v. Columbia Pictures Industries,*
 204 F.3d 326 (2d Cir. 2000) ................................................................................................ 19

*Pearlstein v. BlackBerry Ltd.,* No. 13-cv-7060,
 2017 WL 4082306 (S.D.N.Y. Sept. 13, 2017) ..................................................................... 7

*Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.,*
 769 F.3d 313 (5th Cir. 2014) ............................................................................................... 13

*Ruotolo v. City of New York,*
 514 F.3d 184 (2d Cir. 2008) ................................................................................................ 20

*Securitas Elec. Sec. v. Debon,* No. 1:20-cv-5323,
 2022 WL 484943 (S.D.N.Y. Feb. 17, 2022) .................................................................. 6, 19

*Waggoner v. Barclays PLC,*
 875 F.3d 79 (2d Cir. 2017) .................................................................................................. 16

**Rules**

Fed. R. Civ. P. 15(a)(2) .......................................................................................................... 6

Lead Plaintiff Ali Diabat ("Plaintiff") respectfully submits this memorandum in support of his motion for leave to file a second amended complaint. A copy of the Proposed Consolidated Second Amended Class Action Complaint ("PSAC") and a redline showing the changes from the operative complaint (ECF No. 65, "AC") are annexed hereto as Exhibits A and B.

## I.    PRELIMINARY STATEMENT

With the Second Circuit's emphasis on "the liberal standards set forth in Rule 15," Plaintiff's request for leave to amend with the PSAC, which streamlines Plaintiff's pleading by adding additional, highly detailed allegations based on newly discovered evidence and still cutting over 75 pages when compared to the AC, should be "freely give[n]." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Importantly, neither of the two primary factors that would prevent amendment—futility and undue delay—are present here.

First, all additionally alleged misstatements are supported by detailed facts deriving from (1) the 566-page Swiss Parliamentary Investigation Committee Report (the "PInC Report"), which analyzed and assessed the circumstances leading up to the emergency merger between Credit Suisse ("CS or the "Company") and UBS Group AG ("UBS"); (2) a report by the Swiss Financial Market Supervisory Authority ("FINMA") titled "Lessons Learned from the CS Crisis," (the "FINMA Report"); (3) direct communications referenced in the PInC Report between FINMA and the highest levels of CS's management, including Individual Defendants, which Plaintiff procured after filing a motion to compel; and (4) internal CS documents produced to Plaintiff in this action. These detailed facts, unavailable at the time Plaintiff filed the operative complaint in this action, bolster the existing allegations that were previously sustained, allow Plaintiff to plead new misstatements that strengthen the case, and allow Plaintiff to now provide the factual support previously found missing by the Court for certain misstatements alleged in the AC. Thus, Plaintiff's amendment is not futile.

Second, there was no undue delay in seeking to amend. For the past eight months, Plaintiff has been working to obtain private FINMA-CS communications, which were withheld on the basis of FINMA's supervisory privilege. After Plaintiff filed a motion to compel, and after attending conferences with Magistrate Judge, Hon. Sarah L. Cave, the parties agreed to undertake what has been a long, painstaking process by which CS submitted specific documents to FINMA and awaited their response on whether they agree to waive the privilege. Plaintiff finally received the first tranche of seven documents on December 5, 2025, five more on March 30, 2026, and one additional document on April 21, 2026. These documents strongly bolster, and shed new light on, Plaintiff's allegations. Although more FINMA-CS communications are hopefully on the way, Plaintiff prepared the attached PSAC and the instant motion for filing. With this litigation still in its relatively early stages, there is no undue delay—nor is there any bad faith, dilatory motive, or prejudice to Defendants—that would prevent amendment.

The PSAC also conforms its allegations to the Court's Decision and Order Disposing of Pending Motions to Dismiss (ECF No. 109, the "MTD Order"), thus making the PSAC consistent with the surviving claims and more streamlined for the parties and the Court going forward.

For these reasons, and as discussed further below, Plaintiff respectfully submits that the Court should grant Plaintiff's motion.

## II.    RELEVANT PROCEDURAL HISTORY AND BACKGROUND

After being appointed Lead Plaintiff by this Court, "Plaintiff filed his consolidated amended class action complaint containing allegations that CS, the Individual Defendants, and PwC AG violated federal securities laws." MTD Order at 12. The Amended Complaint alleged a Class Period of April 6, 2021, through and including March 20, 2023. AC at ¶2. All Defendants filed motions to dismiss. ECF Nos. 83-85, 90-93. On September 19, 2024, this Court entered an Order sustaining in-part the claims alleged against CS and Individual Defendants Joshi, Körner,

and Lehmann, and dismissing the claims against PwC and Individual Defendants Gottstein, Horta-Osório, and Mathers. MTD Order at 302. Thereafter, the Court granted Plaintiff's motion for class certification with a class period of October 27, 2022, to March 17, 2023, inclusive. ECF No. 138. Discovery has been ongoing.

After the Court issued its MTD Order, on December 17, 2024, the Swiss Parliament issued the PInC Report, evaluating the circumstances leading up to the emergency merger of CS and UBS. The 566-page PInC Report is the culmination of a year-and-a-half long investigation, which included, among other things, 79 hearings involving current and former government officials and representatives of CS and UBS, as well as a review of "a very large number of internal administrative and bank records" and "non-publicly accessible documents." PInC Report Summary (ECF No. 132-2) at 2. The PInC also consulted ten economic and legal experts to "clarify a number of highly technical issues." *Id.*

Based on the in-depth investigation, the lengthy PInC Report made numerous findings. First, in CS's reporting of its parent bank's capital ratio, the PInC Report found that the Company used a "regulatory filter [that] obscured the true situation of CS AG," "reported the amount of the filter in a manner that was hardly comprehensible to outsiders," and determined that "[i]f the capital ratio of CS AG had been public without the filter, this could have given capital markets, financial analysts and the media more transparent information on which to base their decisions." ¶62.[1] Second, the PInC Report found that, despite having "sufficient opportunity to make the necessary preparations for drawing a larger amount of ELA [emergency liquidity assistance]," CS "did not do so," "partly due to the potential stigmatising effect of having to report receiving ELA," because CS "always wanted to present the image of a solid bank." ¶¶19, 242. Further, Defendant

---

[1] Unless otherwise noted, all "¶__" references herein are to the PSAC.

Lehmann specifically halted any discussion of creating a legal basis for a public liquidity backstop, because he feared it would suggest Credit Suisse was "in a desperate situation." ¶20. Third, the PInC Report found that, leading up to and during the Class Period, FINMA "repeatedly raised various issues with CS," including its precarious liquidity position, through a variety of means such as assessment letters, and eventually mandatory "daily conference calls [with CS senior executives] on the liquidity and refinancing situation." ¶¶241, 244.

The PInC Report was published by the Swiss Parliament in German, French, and Italian, but only a 30-page summary of the report was published in English (the "PInC Report Summary"). After the PInC Report's publication, Plaintiff commissioned a certified translation in English, which was completed near the end of March 2025. *See* PSAC at 2. Shortly thereafter, Plaintiff served Defendants with additional document requests tied directly to various portions of the report, many of which involved communications between CS and FINMA. *See* ECF No. 147 (Memo iso Mtn to Compel) at 3. After Plaintiff received Defendants' responses and objections to these document requests and participated in meet-and-confer follow-ups, a hurdle to production emerged when Defendants, on behalf of FINMA, asserted FINMA's supervisory privilege, which covers nonpublic documents and information from the interactions between FINMA and CS. ECF No. 147 at 3-5. On September 2, 2025, Plaintiff submitted a letter to the Court raising the discovery issue arising out of the FINMA supervisory issue (ECF No. 143), and the next day, the Court ordered a briefing schedule for a motion to compel (ECF No. 144). After briefing, during which FINMA did, in fact, assert its supervisory privilege (*see* ECF No. 152-2), the Court referred the motion and all other discovery disputes to Judge Cave. ECF No. 155.

At a conference held on October 30, 2025, Judge Cave stated her view that documents referenced in public reports are "pretty clear waiver under U.S. law even as to any regulatory

privilege" (*see* 10/30/25 Tr. at 12:17-24); various update letters were submitted (and continue to be submitted) to Judge Cave on the issue (*see* ECF Nos. 160-61, 167, 169, 173, 175-76, 178); and an additional conference was held on November 19, 2025, at which the Parties agreed to a process in which Defendants would search for and send specific documents referenced in the PInC Report and the FINMA Report to FINMA for the regulator to review and determine if it would agree to waive its supervisory privilege. *See* 11/19/25 Tr. at 18-22. The Parties assembled an initial list of approximately 80 referenced documents. *See* ECF No. 167. On December 16, 2025, Defendants submitted a letter to Judge Cave explaining that FINMA consented to the production of an initial tranche of seven documents, and that Defendants would provide additional documents to FINMA on a rolling basis as they were located. ECF No. 169. Defendants produced those seven documents to Plaintiff on December 19, 2025. *See* ECF No. 173. On February 12, 2026, Defendants sent an additional 21 documents to FINMA. *See* ECF No. 176. FINMA consented to the production of six of these documents. *Id.* Defendants produced five of these documents on March 30, 2026, and the sixth on April 21, 2026. *See* ECF No. 178. Credit Suisse submitted an additional 16 documents to FINMA on April 21, 2026, which FINMA has not yet provided its position on, and is currently attempting to locate any remaining documents. *Id.*[2]

The additional allegations of the PSAC derive primarily from this recently received correspondence between CS and FINMA, the PInC and FINMA Reports, and additional internal CS documents produced to Plaintiff by Defendants. Aside from conforming Plaintiff's pleading with the Court's MTD Order and adding additional specific details supporting previously-

---

[2] In addition to addressing communications exchanged directly between CS and FINMA through the process outlined above, as a result of guidance from Judge Cave to deal with direct communications first, the parties have just begun working through a separate list of "approximately 380 documents appearing on CS's privilege logs" that Plaintiff believes may reference a FINMA communication referenced in one or both of the public reports, where Plaintiff believes the supervisory privilege may have been waived. *See* ECF No. 176 at 2.

sustained statements, the PSAC includes the following additional allegations:

(1)    Defendants CS, Lehmann, Mathers, and Gottstein made actionable misrepresentations on May 31, 2022, and July 27, 2022, which misleadingly denied that CS was considering raising capital, and concealed the Company's true financial condition along with the fact that FINMA had voiced concerns with the Company's liquidity position and ability to withstand further company specific or market wide negative events (¶¶81-94);

(2)    Defendants CS, Gottstein, Mathers, Körner, and Joshi made numerous misleading statements throughout the Class Period regarding the strength of CS's financial condition by misrepresenting its CET1 ratio (see, e.g., ¶¶92-94; 134; 176; 185);

(3)    Defendants CS and Lehmann made actionable misrepresentations on December 1, 2022, regarding the reversal of outflows, despite knowing or recklessly disregarding that the statements were contrary to internal data (¶¶140-143); and

(4)    Defendants CS and Körner made actionable misrepresentations on March 16, 2023, that CS was buying the time necessary to complete its restructuring plan by borrowing up to CHF 50 billion from the Swiss National Bank even though CS was days away from collapse, and even though "it was already clear at that time that this aid in the form of cash would not be enough[.]" (¶¶203-206).

An index of the changes from the AC to the PSAC is attached hereto as Exhibit C.

As set forth in more detail below, based on the newly discovered facts, the PSAC sufficiently pleads Exchange Act claims with respect to these additional allegations.

## III.    ARGUMENT

### A.    Liberal Legal Standard for Leave to Amend

"Rule 15(a) provides that leave to amend a complaint 'shall be freely given when justice so requires.'" *Securitas Elec. Sec. v. Debon*, No. 1:20-cv-5323, 2022 WL 484943, at *1 (S.D.N.Y. Feb. 17, 2022) (McMahon, J.) (citing Fed. R. Civ. P. 15(a)(2) and *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)). "Under this liberal standard, amendment should be allowed so long as (1) the party seeking the amendment has not unduly delayed, (2) that party is not acting in bad faith or with a dilatory motive, (3) the opposing party will not be unduly prejudiced by the amendment, and (4) the amendment is not futile." *Debon*, 2022 WL 484943 at *1 (citation omitted). None of these factors prevent amendment here.

6

## B.    The Proposed Amendment is not Futile

"In considering whether a complaint is futile, courts conduct an inquiry comparable to the analysis governing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060, 2017 WL 4082306, at *2 (S.D.N.Y. Sept. 13, 2017) (citing *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)). "To state a cause of action under Section 10(b) and Rule 10b-5, a plaintiff must allege '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Id.* (citation omitted).

### 1.    Defendants Misrepresented CS's Consideration of a Capital Raise

Plaintiff adequately pleads that Defendants made actionable misrepresentations on May 31, 2022, and July 27, 2022, which misleadingly denied that CS was considering raising capital and concealed the Company's true financial condition and that FINMA had raised concerns with the sufficiency of CS's liquidity. On May 31, 2022, *Reuters* published an article in which it reported, based on two sources with knowledge, that, among other things, "Credit Suisse [was] in the early stages of weighing options to bolster its capital after a string of losses [had] eroded its financial buffers." ¶81. The same article quoted a CS spokesperson denying the reports, stating that "Credit Suisse is currently not considering raising additional equity capital," and that "[t]he Group is robustly capitalised with a CET1 ratio of 13.8% and a CET1 leverage ratio of 4.3%." *Id.*

Then, on July 27, 2022, Defendant Lehmann appeared in an interview on CNBC, and when asked about market speculation surrounding a CS capital raise, he responded: "Look, on capital we'll report despite the loss today, a CET1 ratio of 13.5%. I'm happy to see that number and we will guide the market also in light of the uncertainty that we certainly are going to defend a CET1 ratio until the end of the year between 13 to 14%. So I think we are good on this one." ¶86. The

7

interviewer then pressed, "I do feel you need to address that because the market won't take that answer as a comprehensive no. Is it a no?" Lehman replied, "That's a clear no." *Id.* During CS's earnings call that same day, a UBS analyst also asked about a capital increase, to which Defendant Mathers responded, "I think the first point I'd make is, I've been CFO for 12 years and 13.5% CET1 is one of the highest CET1 ratios we've actually ever reported. So, you know, we are in a strong capital position. And our leverage ratio is equally strong in terms of that. So, I think the bank is well funded in terms of that." ¶89. In response to another analyst question regarding FINMA's view of CS's capital position, Defendant Gottstein replied, "On the FINMA capital side, you know, clearly, as it was said by David, the [13.5%] is a very solid capital base…. We are obviously always also in contact with FINMA. But this is very consistent with the spirit there." ¶91. Defendant Lehmann added, "The question obviously, you know, with FINMA, we are in very close contact and I think [have] their support on the general strategic direction and our intent." *Id.*

Plaintiff adequately pleads in the PSAC that these statements were false or misleading when made. According to a July 14, 2022, letter from FINMA to CS's Board of Directors and Executive Board, ███████████████████████████████████

███████████████████████████ ¶84. Indeed, just seven days before CS's May 31, 2022, statement that it was "currently not considering raising additional equity capital," FINMA sent Defendants Lehmann and Gottstein an assessment letter explaining that ███

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ ¶83. Moreover, two days before Lehmann's interview with CNBC, during which he emphatically denied market

8

speculation surrounding a capital raise, FINMA sent CS a letter ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ ¶88. In other words, at the time Lehmann publicly denied

that CS was considering a capital raise, and Mathers reported the Company having a "strong capital

position" and being "well funded," ██████████████████████████████████████████

██████████████████████

Plaintiff also adequately alleges numerous facts to support that these statements were made

with scienter. Among other things, FINMA directed its communications to the highest levels of

CS's management, including to CS's Board of Directors and Executive Board, and even to

Defendants Lehmann and Gottstein directly. Moreover, correspondence back to FINMA from CS

openly acknowledged the Company's capital deficiencies that Defendants were publicly denying.

*See, e.g.*, ¶¶83, 88. UBS Chairman Colm Kelleher subsequently reported being "very surprised, to

put it diplomatically" when he reviewed correspondence between FINMA and CS after the merger:

"If I had received such letters from the banking supervisory authority at Morgan Stanley or UBS,

I would have said: 'Guys, we have a huge problem.' The fact that CS received these letters and

did nothing, or not enough, is inconceivable." ¶260. Furthermore, the PInC report found that CS

was continuously concerned with "present[ing] the image of a solid bank," and even refrained

from taking ELA despite the urging of FINMA to do so, because Defendants "did not want to send

any negative signals to the market before the announcement of its new strategy on October 27,"

which further supports Plaintiff's allegations of Defendants' scienter in that they were motivated

to conceal the Company's need for capital. ¶¶11, 286.

The Court previously held Plaintiff adequately alleged falsity and scienter for financial

condition misrepresentations under a similar rationale. *See, e.g.*, MTD Order at 208 ("Lehmann stated that CS was 'definitely stable' at a time when he was aware or should have been aware of contrary information [about the Company's 'financial condition'].")'; 224 ("[Lehmann] characterized the Company's current and future business health in extremely positive terms at a time when he allegedly knew or should have known that the contrary was true."); 233 (holding actionable "statements [that] 'were directed at [CS's] then-existing financial condition and made at a time when defendants were aware or should have been aware of contrary information.'"). Although the Court previously held that, with respect to the May 31, 2022 misstatement, "Plaintiff pleads no fact tending to show that Credit Suisse was, in fact, considering the possibility of raising additional capital as early as May 2022, which is what would be required for the challenged statement to have been false when made," MTD Order at 138-39, Plaintiff now provides those missing facts. *See* ¶¶83-84. And where the Court likewise found the allegations regarding the July 27, 2022 Earnings Conference were unsupported by facts (MTD Order at 153), the PSAC now homes in on specific statements Defendants Mathers and Gottstein made about CS not needing to increase capital, when just days before they had told FINMA ███████████████████ ███████████████████████████████████████████████ ███████████ .

Finally, Plaintiff adequately alleges loss causation for these misrepresentations through a series of revelations. First, on September 22, 2022, *Reuters* published an article reporting that, despite CS's denials, the Company was "sounding out investors for fresh cash…." ¶218. CS securities plunged on the news. *Id.* The next day, September 23, 2022, *Reuters* updated the article with an expert estimate that CS would need to raise approximately CHF 4 billion to finance its restructuring, causing the price of CS securities to plunge even farther. *Id.* However, because CS

10

neither confirmed nor denied the report, the article only partially revealed the truth underlying Defendants' misrepresentations. ¶¶219-20. Second, on October 27, 2022, the Company confirmed (as it had been privately planning for months) that, despite its prior denials, it did, in fact, intend to approve "two separate share capital increases." ¶221. But while the price of CS securities again fell substantially upon the revelation, Defendants continued to conceal the precarious nature of the Company's financial position, framing the capital raise as "further stengthen[ing] the Group's capital base and support[ing] its new strategic direction," rather than truthfully disclosing that, as FINMA had expressed, ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

¶221. The full truth regarding the Company's dire financial position was not revealed to the market until March 19, 2023, with the announcement of the merger of CS and UBS. ¶¶232-34. These allegations, set forth in detail in the PSAC, adequately plead loss causation.

2.     **Plaintiff Adequately Alleges Misrepresentations Regarding CS's Financial Condition and the Strength of Its CET1 Ratio**

In the PSAC, Plaintiff adequately pleads that Defendants made numerous misleading statements regarding the strength of CS' financial condition and, specifically, that Defendants misrepresented the CET1 ratio of Credit Suisse AG ("CS AG," often referred to as the "parent bank"). CET1 is the highest quality capital, and is considered a measure of a financial institution's capital strength and ability to withstand financial distress. As stated in the FINMA Report, CS AG "had the weakest capital adequacy situation within the Group and thus represented the weakest link in the chain." ¶195. In its quarterly financial filings on July 27, 2022, November 2, 2022, and February 9, 2023, Defendants repeatedly misrepresented CS AG's capital position by reporting a CET1 ratio that was misleadingly inflated due the use of a complex filter, but for the use of which

11

CS AG's CET1 capital would have fallen below regulatory requirements. ¶¶57-67. At no point did Defendants report CS AG's CET1 ratio without the filter, which misleadingly created the impression that both CS AG and CS, as a Company, had ready access to sufficient capital to withstand financial distress. ¶62. This was untrue, leading to CS's eventual emergency merger with UBS.

Plaintiff adequately pleads that reasonable investors were misled by Defendants' opaque accounting treatment with regard to CS AG's CET1 ratio. As explained in the PInC Report, Defendants' use of the regulatory filter "obscured the true financial condition of [the bank]," and "maintain[ed] the appearance of sufficient capitalisation until the very end." ¶57. While the CET1 ratio without the filter potentially could have been calculated by cobbling together figures from different sources (including sources outside of CS' SEC filings), the PInC Report made clear that "CS's parent company reported the amount of the filter in a manner that was hardly comprehensible to outsiders," and "[i]f the capital ratio of CS AG had been public without the filter, this could have given capital markets, financial analysts, and the media more transparent information on which to base their decisions." ¶62; *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 248-49 (2d Cir. 2016) (rejecting argument that the market could not be misled because complicated accounting treatment was disclosed, holding "[m]uch less would a reasonable investor, who is not as well-versed at making sense of Vivendi's disclosures as a financial analyst, be able to discern the impact of purchase accounting"); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-1580 (LGS), 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020) ("While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the

marketplace.") (quoting *Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014)). Moreover, based on the Class Period statements of analysts and CS's largest shareholder, the Saudi National Bank, who said just days before the merger announcement, that "I don't think [CS] will need extra money; if you look at their ratios, they're fine," investors were plainly misled by Defendants' presentation of their capital position. ¶63.

Plaintiff likewise adequately pleads scienter for Defendants' misleading CET1 representations. First, non-public correspondence with FINMA and high-level CS executives, including CS's Board of Directors and Executive Board, and Defendants Lehmann, Körner, and Gottstein, explicitly discuss CS AG's dire capital situation. For example, in an assessment letter dated just days before the newly alleged Class Period begins, FINMA stated: ███████████

████████████████████████████████████

███████████ ¶4. Second, Defendants repeatedly leaned on the CET1 ratio as an indicator of strength and stability, and spoke about it with knowledge, understanding, and authority. *See, e.g.*, ¶89 (Mathers: "I think the first point I'd make is, I've been CFO for 12 years and 13.5% CET1 is one of the highest CET1 ratios we've actually ever reported. So, you know, we are in a strong capital position."); ¶167 (Körner: "***We have a robust balance sheet, and we are executing on our transformation from a position of strength.*** We reported a year-end CET1 ratio of 14.1% and a Tier 1 leverage ratio of 7.7%."); ¶176 (Joshi: "Our parent capital ratio was around 250 basis points higher compared to the end of September at 12.2%."). Third, one of the central pillars of the strategy CS announced on October 27, 2022—the sale of CS's securities products group—was not feasible during the Class Period because the divestiture would have further negative effects on CS AG's CET1 ratio. ¶13. Finally, the PInC Report, the product of a year-and-a-half long investigation comprised of interviews with CS insiders and review of internal documents, outlines Defendants'

13

knowledge of the CS's true capital situation, such as participating in "daily conference calls on the liquidity and refinancing situation" with FINMA, and also describes Lehmann as "embellishing the situation, particularly to create an impression of security," and "always want[ing] to present the image of a solid bank." ¶¶26, 132.

Finally, Plaintiff adequately alleges loss causation for these misrepresentations, which led the market to believe that CS was sufficiently capitalized. It was not until March 19, 2023, when CS, UBS, and Swiss Federal authorities held a press conference announcing the emergency merger, that investors finally learned of CS's true financial condition, at which point the artificial inflation dissipated from the price of CS securities and investors suffered damages. ¶¶232-34. This is consistent with how the Court has previously viewed the curative nature of this final disclosure: "the announcement that CS was going out of business certainly appears to have 'cured' the market's belief that its shares had any value." ECF No. 120 at 5. Accordingly, the PSAC adequately pleads actionable misstatements regarding CS' CET1 ratio.

### 3. Plaintiff Adequately Alleges Defendant Lehmann's December 1, 2022 Statements Regarding the Reversal of Outflows Are Actionable

On December 1, 2022, the *Financial Times* published an article entitled "Credit Suisse chair says outflows have reversed since 'social media storm,'" in which Defendant Lehmann is quoted making numerous misrepresentations of material fact. ¶140. Among other things, the article states, "Axel Lehmann said withdrawals had flattened across the group and had *started to reverse* in the Swiss domestic business," and quotes Lehmann as describing the issue as something that concluded by mid-October: "'It *was* a real storm,' said Lehmann at the Financial Times' Global Banking Summit on Thursday. 'It *was* a storm in the retail and partially in the wealth management segment, in particular in Asia, *where we had really massive outflows for two to three weeks*.'" *Id.* Although the Court previously dismissed these statements for not adequately alleging falsity as to

14

CS's financial condition (though other statements in this interview were sustained for ICFR purposes), the PSAC now pleads sufficient facts to support that these statements were false and made with scienter.

Plaintiff alleges, based on internal CS documents, that Defendant Lehmann knew or recklessly disregarded that withdrawals had not "started to reverse," as he represented to the *Financial Times*. The day after the article was published, his own head of Investor Relations, Michele Cubic, corresponded with members of the SOX team, who all questioned and disagreed with his comments:



¶142. With these internal communications showing that high level CS insiders disagreed with the accuracy of Lehmann's statement, noting that ███████████████████████ ██████████████████████████, Plaintiff adequately pleads both falsity and scienter. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 355 (S.D.N.Y. 2023) ("A complaint can plead recklessness by adequately alleging that 'defendants knew facts or had access to non-public information contradicting their public statements' and therefore 'knew or should have known they were misrepresenting material facts.'") (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001), where plaintiffs adequately alleged scienter through "detailed

allegations as to what defendants knew on a daily, weekly and monthly basis… while at the same time making public statements that painted a different picture"). Moreover, the PInC report acknowledged that, based on internal documents and numerous interviews with insiders, Lehmann had a tendency towards "embellishing the situation, particularly to create an impression of security," and "always wanted to present the image of a solid bank," further supporting his scienter. ¶¶26, 132.

Finally, the PSAC alleges a plain causal connection between Defendant Lehmann's misrepresentation that "withdrawals had flattened across the group and had started to reverse in the Swiss domestic business" and the Company's revelatory disclosure on February 9, 2023, that the Company's outflows had not, in fact, "basically stopped," but had only "stabilized to much lower levels but had not yet reversed by year end." ¶224. This is practically a mirror image correction. *See Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 97 (2d Cir. 2023) (discussing *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), where loss causation was established when plaintiffs "presented a tight fit between corrective disclosure and misrepresentation" because "the corrective disclosure directly implicated not just the same topic, but the alleged misstatements themselves"). But even though this disclosure corrected Lehmann's specific misstatement about outflows in the fourth quarter of 2022, Defendants continued to conceal: (1) CS's perilous financial condition and (2) the material weaknesses in the Company's internal controls. The truth about CS's internal controls would not be revealed until the Company filed its 2022 Annual Report (¶¶228-29), and the truth about CS's financial condition would not be fully revealed to investors until the announcement of the merger. ¶¶232-34. These allegations adequately allege loss causation.

16

4.    **Plaintiff Adequately Alleges Defendants' March 16, 2023, Statements Regarding SNB Aid Are Actionable**

On March 16, 2023, prior to NYSE market open, CS published a media release titled, "Credit Suisse Group takes decisive action to pre-emptively strengthen liquidity and announces public tender offers for debt securities." ¶203. Later, after market open, CS filed this media release on Form 6-K with the SEC, which stated, among other things, that "Credit Suisse is taking decisive action to *pre-emptively strengthen its liquidity* by intending to exercise its option to borrow from the Swiss National Bank (SNB) up to CHF 50 billion under a Covered Loan Facility as well as a short-term liquidity facility, which are fully collateralized by high quality assets." *Id.* The media release also quoted Defendant Körner, stating that "[t]hese measures demonstrate decisive action *to strengthen Credit Suisse as we continue our strategic transformation to deliver value to our clients and other stakeholders*," and further noted that "Credit Suisse *has made significant progress toward this transformation* and on an accelerated schedule to *build the foundation for the new Credit Suisse.*" *Id.*

The market predictably interpreted these statements as an indication that CS was buying the time necessary to complete its restructuring plan. ¶¶205-06. In truth, according to several people interviewed by the PInC, "it was already clear at that time that this aid in the form of cash would not be enough, as CS had not prepared well enough and was therefore unable to fully exploit the potential of the ELA." ¶204. Moreover, by the time this statement was published, Swiss authorities had already approached CS and UBS to prepare for a possible merger. *Id.* Thus, the PSAC adequately alleges these statements were misleading when made.

Plaintiff also adequately pleads scienter for Defendants' SNB aid misrepresentations. First, Defendant Lehmann would later admit that as of March 13, he knew a turnaround would not be successful. ¶267. Second, as the Court previously held with respect to Defendants' other

17

characterizations of CS's financial near the end of the Class Period, these SNB aid statements were made at a time when they were "aware or should have been aware of contrary information [about the Company's 'financial condition']." *See* MTD Order at 208, 224, 233. Defendants Körner and Joshi received daily updates from the Credit Suisse treasury (*see* ¶112), so they would have known that in the short period from March 13-15, 2023, Credit Suisse suffered CHF 17.5 billion in customer outflows, which showed no sign of stopping. ¶32. As such, they knew, or recklessly disregarded, that the CHF 50 billion was not an action to "pre-emptively strengthen [CS's] liquidity" but rather an emergency measure to prevent the Company from total liquidation.

Finally, the PSAC adequately alleges loss causation, as the full truth regarding the Company's dire financial position was not revealed to the market until three days later, with the announcement of the merger between CS and UBS on March 19, 2023. ¶¶229-233.

### C.    Plaintiff Seeks Permission to Amend With No Undue Delay

Here, Lead Plaintiff acted promptly in seeking leave to file the PSAC once sufficient facts supporting the additional allegations became available. As the Court has acknowledged, "[s]ecurities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." MTD Order at 14 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). Accordingly, Plaintiff had to collect enough facts to support well-pleaded allegations that "'specify each statement [or omission] alleged to have been misleading [and] the reasons why the statement is misleading' and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.*

As discussed above in the Relevant Procedural History and Background, Plaintiff has been actively and diligently working since he served document requests concerning the PInC Report on January 10, 2025, and since he filed his corresponding motion to compel, to acquire facts that support the new allegations, and only recently received some FINMA correspondences

18

corroborating the PInC Report and further supporting falsity and scienter for the newly alleged misstatements. After receiving the first seven FINMA correspondences on December 19, 2025, and additional correspondences on March 30, 2026, and April 21, 2026, Plaintiff promptly filed this motion for leave to amend, along with a PSAC that also cuts over 75 pages of dismissed allegations and conforms the allegations to the Court's previous Orders. In fact, Plaintiff could very well (and indeed, he expects to) receive additional FINMA-related documents soon that further support these allegations, but in the interest in acting promptly, Plaintiff files this motion now without further delay. Courts have routinely found such measures do not amount to "undue delay." *See Agerbrink v. Model Service LLC*, 155 F.Supp.3d 448, 452-453 (S.D.N.Y. 2016) (collecting cases).

> ### D.     In Seeking Leave to Amend, There Is No Bad Faith, Dilatory Motive or Undue Prejudice to Defendants

Even if the Court found that there was some delay in submitting Plaintiff's PSAC, "'[m]ere delay . . . absent a showing of bad faith or undue prejudice[,] does not provide a basis for a district court to deny a right to amend.'" *Amley v. Sumitomo Mitsui Banking Corp.*, No. 1:19-cv-3777 (CM), 2020 WL 5658666, at *2 (S.D.N.Y. Sep. 23, 2020) (McMahon, J.); *see also Parker v. Columbia Pictures Industries*, 204 F.3d 326, 339 (2d Cir. 2000) ("[W]e have held repeatedly that 'mere delay' is not, of itself, sufficient to justify a denial of a Rule 15(a) motion ...."). Here, Plaintiff is not acting in bad faith, has no dilatory motive, and there is no undue prejudice to Defendants to undermine Plaintiff's proposed amendment.

As an initial matter, because Plaintiff is timely seeking leave to amend to protect the interests of the Class and to maximize Class damages, no party will be able raise bad faith or dilatory motive as grounds to deny his motion for leave to amend. *See Debon*, 2022 WL 484943, at *3. Thus, Defendants need to show undue prejudice to warrant denial of Plaintiff's request.

19

*Sumitomo*, 2020 WL 5658666, at *3 ("The party opposing the amendment has the burden of establishing any prejudice.") (citation omitted); *A.V. by Versace, Inc. v. Gianni Versace S.p.A*, 87 F.Supp.2d 281, 299 (S.D.N.Y. 2000) ("[P]rejudice alone is insufficient to justify a denial of leave to amend; rather, the necessary showing is '*undue* prejudice to the opposing party.'") (emphasis in original). "To determine if an amendment would prejudice an opposing party, courts consider, 'among other factors, whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute.'" *Sumitomo*, 2020 WL 5658666, at *3 (citation omitted).

Defendants will not suffer any undue prejudice with this amendment. First, fact discovery is still ongoing, and no merits depositions have yet occurred. While the PSAC brings the Class Period back an additional five months (beginning May 31, 2022, rather than October 27, 2022), the current agreed-upon timeframe for discovery captures this new time period, and thus, Plaintiff does not anticipate needing to broaden the temporal scope of discovery at this time. "Regardless, even if discovery were prolonged, 'the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.'" *A.V. by Versace*, 87 F.Supp.2d at 299; *see also Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when an 'amendment [comes] on the eve of trial and would result in new problems of proof.'") (citation omitted). The PSAC seeks to generally allege the same sustained claims as in the operative complaint and is fully consistent with the Court's Opinion. Nor will amending significantly delay the resolution of the dispute.

As the PSAC is consistent with the MTD Order, if the PSAC unfortunately leads to "another round of time-consuming (and probably time wasting) motion practice," MTD Order at 243 n.18, Plaintiff respectfully submits that such motion to dismiss likely can be easily disposed

20

because the Court's prior holdings are law of the case, and the instant motion necessarily adjudicates whether the PSAC would survive a motion to dismiss.

## IV.   CONCLUSION

Because Plaintiff has not unduly delayed seeking leave to amend, is not acting in bad faith or with a dilatory motive, Defendants will not be unduly prejudiced, and the amendment is not futile, Plaintiff respectfully submits that the motion for leave should be granted.

DATED: May 1, 2026

Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
Craig Geraci (admitted *pro hac vice*)
Matthew P. Woodard (admitted *pro hac vice*)
Jyoti Kehl (admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
E-mail: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com
Email: jyoti.kehl@ksfcounsel.com

-and-

J. Ryan Lopatka (admitted pro hac vice)
161 N. Clark Street, Suite 1700
Chicago, Illinois 60601
Telephone: (312) 759-9700
Email: j.lopatka@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Diabat and
Class Counsel*

21

## WORD COUNT CERTIFICATION

I, Kim E. Miller, certify that the foregoing memorandum of law complies with the word count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word processing program used to prepare the memorandum (Microsoft Word), and exclusive of the portions of it that are excluded by the rule, there are 6,774 words in this document.

/s/ Kim E. Miller
Kim E. Miller

22