UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: CREDIT SUISSE SECURITIES FRAUD CLASS ACTIONS

This matter relates to:

Diabat

CIVIL ACTION No. 23 Civ. 5874 (CM) (SLC)

**ORDER**

**SARAH L. CAVE,** United States Magistrate Judge.

The Court held a telephone conference on September 24, 2026 (the "Conference") to discuss: (i) the status of discovery; (ii) the status of the issues raised in the parties' joint status letter dated August 14, 2026 (Dkt. No. 226) concerning the documents over which FINMA has asserted supervisory privilege (the "FINMA Documents"); and (iii) the motion filed by Lead Plaintiff Professor Ali Diabat ("Plaintiff") to compel Defendant Credit Suisse Group AG ("Credit Suisse") to produce certain documents (Dkt. No. 146–148 (the "Motion"); 170). Counsel for Plaintiff and counsel for Credit Suisse appeared at the Conference. Although the Court ordered FINMA's U.S. counsel to appear at the Conference, (Dkt. No. 227 ¶ 2), no counsel appeared on behalf of FINMA. Following the Conference, the Court **ORDERS** the following:

1. The parties may order a copy of the Conference transcript by using the annexed form.
2. Although FINMA's U.S. counsel did not appear at the Conference, FINMA's U.S. counsel emailed a letter to Chambers on September 23, 2026 (the "FINMA Letter") explaining FINMA's assertion of supervisory privilege the FINMA Documents. Given that the FINMA Letter discusses issues relevant to the Motion, the Court attaches a copy of the FINMA Letter to this Order as Exhibit 1.

3. Notwithstanding FINMA's position set forth in the FINMA Letter, Plaintiff requested at the Conference that the Court issue a ruling on the Motion to the extent the Motion seeks to compel Credit Suisse to produce the FINMA Documents. The Court sets the following briefing schedule on that issue:

    a. Plaintiff shall file his letter, limited to 1,750 words, by **October 2, 2026**.

    b. Credit Suisse shall file its response, limited to 1,750, by **October 9, 2026**.

    c. As soon as practicable, Credit Suisse shall file a letter indicating the procedure by which it will submit the FINMA Documents for the Court's in camera review.

4. By **November 2, 2026**, the parties shall file a joint letter limited to 1,050 words setting forth the status of fact discovery.

Dated: New York, New York
September 24, 2026

SO ORDERED.

**SARAH L. CAVE**
**United States Magistrate Judge**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# Request for the production of a transcript from an electronic recording

Send one request per completed form to:

# etranscripts@nysd.uscourts.gov

Transcripts from an electronic record are generated by a Court Approved Transcriber, NOT the Southern District Court Reporters. The transcript will be delivered to your office and you will be invoiced directly by the transcriber. Submission of this form constitutes an agreement to pay for the transcription services described herein. This form should not be submitted for the purpose of obtaining a price estimate.
**NOTE:** CJA requests require prior approval by submitting an Auth-24 document in the CJA eVoucher System. If granted, the attorney then submits the etranscripts order form (indicate CJA Request). Upon notification from the transcriber, the attorney will create a CJA 24 Voucher in the eVoucher system.

Today's Date: ___________________

| Case Caption | |
|---|---|

| DOCKET NUMBER | DATE OF THE HEARING | JUDGE'S NAME |
|---|---|---|
| | | |

## INDICATE SERVICE:

(prices listed are per page)

| Daily $7.30 | 3 Day $6.55 | 7 Day $5.85 | 14 Day $5.10 | 30 Day $4.40 |
|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ |

| | | |
|---|---|---|
| Your Name | | |
| Firm Name | | |
| Address | | |
| City, State | | Zip Code |
| Telephone Number | | |
| E-mail Address | | |

RESET PRINT SAVE EMAIL

# EXHIBIT 1

MAYER | BROWN

Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020-1001
United States of America

T: +1 212 506 2500

mayerbrown.com

September 23, 2026

**Mark G. Hanchet**
Partner
T: +1 212 506 2695
MHanchet@mayerbrown.com

VIA EMAIL AND HAND DELIVERY

The Honorable Sarah L. Cave
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Courtroom 18A
New York, NY 10007-1312

Re: *In re Credit Suisse Securities Fraud Class Action*, 23 Civ. 5874 (CM) (SLC) (S.D.N.Y.)

Dear Judge Cave:

We write on behalf of the Swiss Financial Market Supervisory Authority ("FINMA"), an independent regulatory authority created by Swiss statute, and the principal supervisor of Switzerland's financial markets.

FINMA, as Switzerland's autonomous and independent authority for the supervision of the financial markets, is responsible for the prudential supervision of banks, insurance companies, and other financial institutions in Switzerland, including Credit Suisse Group AG (whose legal successor is UBS Group AG ("UBS")). FINMA regulates a highly sensitive sector, and the confidentiality of FINMA's supervisory mandate is a fundamental principle of the Swiss financial market—a principle shared by other well-regulated financial markets, including the United States. The exceptional confidentiality attaching to FINMA's mandate is further confirmed by Article 2(2) of the Swiss Freedom of Information Act, which explicitly excludes FINMA, as the only supervisory authority forming part of the decentralized federal administration, from that law's scope of application.

FINMA submits this letter voluntarily, in advance of the telephonic conference scheduled in the referenced action for September 24, 2026, and in lieu of participating in that conference, in connection with the pending motion to compel the production of certain documents over which FINMA has asserted its supervisory privilege.

At the outset, FINMA wishes to convey its respect for this Court and the long history of cooperation that has existed between the United States and Switzerland in judicial matters. FINMA also recognizes the important role that U.S. courts play in providing a forum for private litigants to fully and fairly pursue and defend their rights in civil litigation.

That said, as an independent Swiss financial supervisory authority that is not a party to this litigation nor subject to this Court's jurisdiction, FINMA does not intend to participate in these proceedings or engage in meet-and-confer negotiations with counsel for plaintiff. As a matter of longstanding institutional practice and in the absence of a legal basis, FINMA does not directly participate in civil litigation with private parties, including actions involving the financial institutions it supervises. This practice reflects fundamental principles of Swiss law (which does not require FINMA to participate as a party in private litigation to assert and defend its supervisory privilege, whether before Swiss or foreign courts) and international comity (which does not require a non-U.S. financial supervisor to appear and negotiate with private litigants over any such assertion).

Indeed, as a public-law institution, FINMA may act only where there is a legal basis for doing so, and Swiss law does not contain any legal provision that would provide FINMA with a basis to participate in civil litigation between private parties. In keeping with these principles, Swiss courts do not demand the participation of U.S. financial supervisors like the Federal Reserve Board or the Office of the Comptroller of the Currency in civil litigation between private parties before deciding whether to credit examination privilege assertions by those U.S. supervisors.

FINMA's Swiss law-based policy of not directly participating in civil suits between private parties, including this action, should not be construed as indifference as to the Swiss supervisory privilege or its application here. To the contrary, the supervisory privilege is critical to FINMA's role and responsibility in regulating Swiss financial markets and, as described below, FINMA has already considered and provided its position regarding the very documents at issue.

## I. The Supervisory Privilege Is A Critical Component of FINMA's Statutory Mandate

The Swiss supervisory privilege, and the ability to candidly and confidentially exchange information with regulated entities, is crucial to FINMA's regulatory mandate. The privilege is grounded in Swiss statutory law. As set forth in the case-specific order that FINMA issued on October 8, 2025 (the "FINMA Order," attached hereto as previously filed in translated form at ECF 152-2, as Exhibit A), Article 42c paragraph 5 of the Swiss Financial Market Supervision Act ("FINMASA") provides that FINMA may "make the transmission, publication or forwarding of files in the context of supervision subject to its approval if this is in the interest of its task fulfillment and is not in conflict with overriding private or public interests." This provision was enacted by the Swiss Legislature on January 1, 2016, as a direct legislative response to Swiss court decisions indicating that FINMA lacked an explicit statutory basis for restricting the disclosure of supervisory files. The Swiss Legislature thus made a deliberate policy judgment to vest FINMA with this authority. The Swiss supervisory privilege applies to relevant communications and

related materials when that information is sought in non-Swiss courts (like here), and the parties to this litigation do not appear to dispute the content of Swiss law.[1]

At the Swiss national level, FINMA may, under certain circumstances, refuse to disclose supervisory information even to domestic authorities, even where those authorities are themselves subject to official secrecy. FINMA Order ¶ 18. These legislative policy choices must likewise be respected in the international context. Otherwise, parties to non-Swiss civil proceedings would be afforded broader access to information arising from the supervisory relationship than is available to Swiss domestic parties, thereby undermining the confidentiality protections deliberately established by the Swiss Legislature. *Id.* ¶ 19.

The privilege serves critical purposes: it protects the confidential, trust-based communication between FINMA and the financial institutions it supervises, and it prevents supervised entities from being deterred from cooperating candidly with their regulator out of fear that their communications will be disclosed in civil litigation or otherwise. *Id.* ¶¶ 12, 23-24. This strict confidentiality regime ensures that FINMA can effectively exercise its critical systemic function of supervising financial institutions. For this reason, it is entirely within FINMA's authority to determine the scope of implicated information covered by the privilege. *Id.* ¶ 12.

In this sense, FINMA's supervisory privilege is analogous to the bank examination privilege long recognized in the United States, as FINMA itself noted in its October 8, 2025, Order. *Id.* ¶ 25. Disregard of the supervisory privilege could also undermine cooperative efforts among various national financial supervisors, especially in the context of crisis management. *See id.* ¶ 24. Both supervisory privileges serve to protect the integrity and candor of communications between financial regulators and supervised institutions, and both reflect a policy judgment that unfettered discovery of supervisory communications would undermine effective financial supervision, harm the open and candid communication on which FINMA's supervision (and that of other supervisors) depends, and pose risks to the safety and soundness of the global financial system.

Importantly, the Swiss supervisory privilege is vested in and controlled exclusively by FINMA, not by the supervised entity. *See id.* ¶ 16. UBS cannot waive the privilege on its own, and disclosure of materials or information contrary to FINMA's Order would constitute a breach of Swiss law, potentially triggering supervisory measures (Art. 29 et seq. FINMASA) against the institution or the persons acting on behalf of the institution.

## II. FINMA Has A Direct and Substantial Interest In Having Its Invocation Of The Swiss Supervisory Privilege Respected In This Litigation

Clearly demonstrating FINMA's interest in having its assertion of privilege respected in this case, FINMA has already issued a case-specific Order addressing the documents at issue in the pending discovery dispute and has allowed UBS to share this Order with this Court. As set forth in that

[1] See also the expert opinion of Andrea Huber submitted in support of UBS's opposition to plaintiff's motion to compel. ECF No. 131.

Order, the supervisory privilege applies to all documents relating to the supervisory relationship between FINMA and UBS/Credit Suisse. The FINMA Order expressly states that the supervisory privilege applies to the Wenger Plattner auditor report, UBS's comments thereon, and all documents relating to the supervisory relationship between FINMA and the supervised entities. FINMA Order ¶ 29. The Order remains valid until at least December 31, 2027, and can be extended if circumstances warrant. *Id.* ¶ 30.

FINMA has also engaged repeatedly with its regulated entity, UBS, on addressing document-specific requests related to discovery in this case. FINMA has more than demonstrated the Swiss interest in having FINMA's privilege determinations respected in this Court.

**III. U.S. Courts Have Consistently Deferred to Foreign and Domestic Regulators' Privilege Assertions**

It is a well-established principle that U.S. courts should respect the sovereign acts and legal positions of foreign governments and regulators as a matter of international comity. The Supreme Court has explained that comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). In the discovery context, principles of comity require courts to balance the interests of the requesting party against the sovereign interests of foreign nations in the confidentiality of their regulatory processes. *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court*, 482 U.S. 522, 546 (1987) ("American courts should . . . take care to demonstrate due respect for any special problem confronted by . . . any sovereign interest expressed by a foreign state.").

Courts in this Circuit and across the country have consistently given significant weight to the positions of foreign sovereigns and financial supervisors when those entities have affirmatively communicated their interest in protecting confidential information, even where the non-U.S. supervisor has not formally intervened in the litigation. The authorities discussed below confirm this principle and demonstrate that FINMA's position is entitled to substantial deference.

U.S. courts have consistently upheld the claims of financial supervisors over confidential supervisory information, recognizing that the confidentiality of the supervisory process is essential to effective supervision and that private litigants' interest in discovery does not override a supervisor's determination that supervisory materials should remain privileged. In *Employees Retirement System for the City of Providence v. Board of Governors of the Federal Reserve System*, 2025 WL 1736602 (S.D.N.Y. June 23, 2025), the court upheld the Federal Reserve Board's assertion of supervisory privilege over 961 withheld documents that the Federal Reserve argued contained confidential supervisory information protected by the bank-examination privilege. *Id.* at *10. Likewise, in *In re Citigroup Bond Litigation*, 2011 WL 8210671 (S.D.N.Y. Dec. 5, 2011), three federal bank regulators—the Federal Reserve Board, the Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation—asserted the bank examination privilege over documents sought in discovery, and the court concluded that the privilege applied and could not be overcome for hundreds of documents. *Id.* at *2.

As a governmental supervisory body performing a critical public function, FINMA's interest in the supervisory privilege implicates the sovereign interests of Switzerland. *See* FINMA Order ¶¶ 18-19. Courts accord similar weight to the positions of non-U.S. sovereigns and regulators—even where the non-U.S. regulator has not formally intervened in the litigation. Where a foreign regulator has communicated its objection to disclosure through an amicus brief, diplomatic note, letter, or other submission, courts have treated that communication as a significant expression of sovereign interest warranting substantial deference under principles of international comity. In *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, 2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010), the European Commission filed a letter and amicus brief without formally intervening, opposing the production of documents from Commission's enforcement proceedings; the court denied the motion to compel, holding that the Commission's confidentiality and enforcement interests outweighed the plaintiffs' discovery interests. *Id.* at *10. Similarly, in *In re Qualcomm*, *Inc.*, 162 F. Supp. 3d 1029 (N.D. Cal. 2016), the Korean Fair Trade Commission's amicus brief opposing discovery was a "[s]ignificant[]" factor in the court's denial of the discovery applications. *Id.* at 1034.

As noted, FINMA's principled position that it does not inject itself in civil litigation between private litigants should by no means be construed as a waiver of, or lack of interest in, the upholding of the Swiss supervisory privilege, which is critical to its mandate. As the foregoing authorities demonstrate, a foreign sovereign regulator's privilege assertion is entitled to significant weight even where the regulator does not formally intervene or participate in the litigation. *See, e.g.*, *In re Payment Card Interchange Fee*, 2010 WL 3420517, at *10 (European Commission's letter and amicus brief was sufficient to defeat a motion to compel); *In re Qualcomm*, 162 F. Supp. 3d at 1034 (KFTC's amicus brief alone constituted a "significant" factor in the court's denial of discovery).

## IV. Conclusion

FINMA's position is supported by Swiss statutory law, the attached FINMA Order, and well-established principles of international comity as recognized by courts in this Circuit and elsewhere. Compelling the disclosure of these documents over FINMA's objection would undermine the confidential supervisory relationship between FINMA and the entities it regulates, would be contrary to the sovereign interests of Switzerland and an affront to Swiss sovereignty, and would set a troubling precedent for foreign and U.S. financial supervisors alike that would potentially impair the supervisors' ability to perform their critical systemic functions.

FINMA appreciates the Court's consideration of its position in this matter.

Respectfully submitted,

Mark G. Hanchet
Partner

Cc: Counsel of Record (by email)

# Exhibit A

finma
Eidgenössische Finanzmarktaufsicht FINMA
Autorité fédérale de surveillance des marchés financiers FINMA
Autorità federale di vigilanza sui mercati finanziari FINMA
Swiss Financial Market Supervisory Authority FINMA

# ORDER

## of the Swiss Financial Market Supervisory Authority FINMA

## of October 8, 2025

in the matter of

**UBS Group AG (as the legal successor of Credit Suisse Group AG),**
Bahnhofstrasse 45, 8001 Zurich

regarding the

## Supervisory privilege in connection with the release of files relating to the supervisory relationship pursuant to Art. 42 *c* para. 5 FINMAG in the US case 1:23-cv-5874 (S.D.N.Y.)

Laupenstrasse 27
3003 Bern
Phone +41 (0)31 327 91 00
**www.finma.ch**

Reference:
G01540787;
G01540787-000084

## Facts of the Case

(1) Credit Suisse Group AG (hereinafter: **"CSG"**) was the parent company of the Credit Suisse Group prior to the absorption merger with UBS. Until the completion of the absorption merger by UBS Group AG (hereinafter: **"UBS"**) on June 12, 2023, the CSG was, pursuant to Art. 3 *c* et seqq. BankG [Bankengesetz, Swiss Federal Law governing Banks and Savings Banks][1] , subject to the consolidated supervision of the Swiss Financial Market Supervisory Authority FINMA (hereinafter: **"FINMA"**) and was one of the two major global banks based in Switzerland.[2]

(2) By order of November 16, 2012, the Swiss National Bank (hereinafter: **"SNB"**) classified CSG as a systemically important financial group for the Swiss economy and the Swiss financial system (so-called Systemically Important Bank; SIB).[3] Financial groups are considered systemically important if their failure would cause significant damage to the Swiss economy and the Swiss financial system. The assessment of systemic importance is based on the size of the financial group, its interconnectedness with the financial system and the economy, and the short-term substitutability of the services it provides. The Financial Stability Board (FSB) has included Credit Suisse on the list of banking groups that also have global systemic relevance (so-called Global Systemically Important Banks; G-SIBs) since 2011.[4]

(3) After an initial major wave during which clients withdrew their funds that started in October 2022, and which was absorbed by existing liquidity buffers, the lack of confidence that the Credit Suisse Group had been facing for some time intensified acutely in March 2023. In order to avert the uncontrolled collapse of the globally systemically important bank and thus an international financial crisis as well as extraordinarily high damage to the financial system and the entire economy, the Swiss Confederation, the SNB and FINMA initiated measures to ensure the solvency of the Credit Suisse Group and to support the takeover of the bank by UBS, which was announced on March 19, 2023. On June 12, 2023, the absorption merger between the CSG and UBS was legally completed. This ensured the protection of creditors and the functioning of the financial markets, thus fulfilling FINMA's statutory objectives.[5]

(4) On the basis of Article 24*a* FINMAG, FINMA commissioned[6] the auditor Wenger Plattner on September 25, 2023 with the preparation of a report for FINMA on the topic of "Crisis Management by Credit Suisse" for the period from January 2022 to June 12, 2023. In consideration of a leak in the media[7], UBS contacted FINMA on March 5, 2025 and pointed out that the plaintiffs in proceedings against the CSG (whose legal successor is UBS) before the US District Court for the Southern District of New York (Case 1:23-cv-5874) were requesting documents relating to the auditor Wenger Plattner. FINMA instructed UBS[8] that any transmission, publication or dissemination of the report, UBS's comments on the report and all documents arising from the supervisory relationship in connection with the investigation by the auditor Wenger Plattner are subject to FINMA approval if the corresponding actions

---

1 Swiss Federal Law governing Banks and Savings Banks (Bankengestz, BankG; SR 952.0).

2 As of the end of 2022, the CS Group comprised more than 1,100 companies (FINMA report on lessons learned from the CS crisis of December 19, 2023 (hereinafter: **"FINMA Report"**), p. 23).

3 SNB press release of December 20, 2012 concerning Swiss National Bank rulings on systemic importance.

4 Since November 2023, Credit Suisse is no longer listed on the FSB's list of G-SIBs.

5 FINMA report, p. 6.

6 Federal Act on the Swiss Financial Market Supervisory Authority (Financial Market Supervision Act, FINMAG; SR 956.1).

7 See the article "FINMA conducts secret investigation against Credit Suisse's last CEOs" in the newspaper SonntagsZeitung of September 21, 2024.

8 FINMA letter to UBS dated March 21, 2025.

are to be carried out towards foreign third parties.[9] FINMA limited the applicability of this order to December 31, 2025, subject to an extension if circumstances warranted such an extension.

(5) On August 13, 2025, UBS again referred the matter to FINMA. USB asked FINMA whether it would invoke the so-called supervisory privilege in relation to a document production request submitted by the plaintiffs. At the same time, UBS informed FINMA, without submitting individual documents, that the requested documents were in particular “requests 17, 20, 38, and 53 in the plaintiff's first set of merits requests for production of documents to defendants” dated December 4, 2024, and “requests 2, 3, 7, 11, 13, 15, 16, 20, and 23 in the second set of requests” dated January 10, 2025, and the documents and information mentioned therein in connection with FINMA supervision. The requested files primarily concern the crisis phase and the files in connection with FINMA’s commissioning of Wenger Plattner (see above, margin no. (4) and request 53 of December 4, 2024).

(6) On August 15, 2025, FINMA informed UBS: “*(…) in accordance with applicable legal provisions and established regulatory practice, FINMA invokes a supervisory privilege in this matter. The supervisory privilege is effective for one year. FINMA reserves the right to extend this period should the circumstances requiring the protection of the information continue to apply.”*

(7) On September 5, 2025, UBS informed FINMA of a document filed by plaintiffs with the US District Court for the Southern District of New York on September 2, 2025, in which the plaintiffs criticize FINMA's statutory instrument in Article *42c* para. 5 FINMAG (or the supervisory privilege granted by FINMA to UBS).

(8) On September 24, 2025, UBS informed FINMA of the filing of September 22, 2025, by plaintiffs before the US District Court for the Southern District of New York with the subject “Notice of Lead Plaintiff Ali Diabat's Motion to Compel Defendant Credit Suisse Group AG to Produce Documents” and the accompanying “Memorandum of Law In Support Of Lead Plaintiff Ali Diabat's Motion To Compel Defendant Credit Suisse Group AG To Produce Documents.”

9 So-called Supervisory Privilege, Art. 42*c* para. 5 FINMAG.

finma

Reference:
G01540787;
G01540787-000084

## Considerations

### 1. Jurisdiction

(9) Pursuant to Art. 1 para. 1 in conjunction with Art. 6 para. 1 FINMAG, FINMA is responsible for the compliance with and the application of the financial market laws and FINMAG. The former includes, in particular, the Banking Act.[10]

(10) The UBS Group AG (UBS) acts as the holding company of the UBS Group and is supervised by FINMA within the framework of a consolidated supervision. As a financial group, UBS is subject to the Banking Act or FINMA supervision, with the group supervision being carried out in addition to the individual institution supervision.[11] For the purpose of carrying out a consolidated supervision, financial groups within the meaning of Article *3d* para. 1 BankG are to be regarded as supervised entities within the meaning of FINMAG.[12] From a supervisory perspective, the highest group company, UBS, is considered to be the addressee of the financial group's obligations and thus of any supervisory approval requirement (supervisory privilege) pursuant to Article 42 *c* para. 5 FINMAG.

(11) Supervisory privilege is a reservation of FINMA's approval. The concept of the law is such that FINMA imposes a reservation of approval on the supervised institution. If the individual documents are submitted at a later date, FINMA will either grant or refuse its consent to the disclosure of files relating to the supervisory relationship with the institution. This distinguishes the Swiss concept of supervisory privilege from some of its foreign counterparts. The enforcement of this right by FINMA itself in court proceedings or before foreign civil courts is not provided for by law and does not correspond to FINMA's long-standing practice. However, UBS remains free to share this order with foreign authorities. In view of the above, FINMA, as the supervisory authority of UBS at the group and individual institution level, is therefore responsible for issuing this order to UBS.

### 2. Supervisory Privilege

#### 2.1 Legal Basis

(12) Pursuant to Art. 42 *c* para. 5 FINMAG,[13] FINMA may make the transmission, publication or disclosure of non-publicly available files regarding the supervisory relationship dependent on its consent if this is in the interest of fulfilling its duties and no overriding private or public interests conflict with said interest (so-called supervisory privilege). The purpose of the supervisory privilege is, on the one hand, to prevent a foreign investigation from impairing or blocking the institution's own supervisory activities and strategies, and, on the other hand, to prevent supervised institutions from having to fear that their willingness to cooperate and be transparent with FINMA will be exploited in foreign proceedings.[14]

---

[10] See Fn. 1.

[11] Art. 3*d* and 3*e* para. 1 BankG.

[12] Du Pasquier/Rayrox, in: Watter/Bahar (eds.), Basel Commentary on FINMAG/FinfraG, 3rd ed., Basel 2019, No. 16 reg. Art. 3 FINMAG.

[13] See Fn. 6.

[14] Du Pasquier/Menoud, in: Watter/Bahar (eds.), Basel Commentary on FINMAG/FinfraG, 3rd ed., Basel 2019, No. 63 to Art. 42 *c* FINMAG.

finma

Reference:
G01540787;
G01540787-000084

(13) FINMA, as UBS's supervisory authority, must ensure an efficient and effective supervision of UBS. FINMA's main objective is to protect creditors and ensure the functioning of the financial market (Art. 4 FINMAG). Supervised entities, including CSG and UBS, have a comprehensive duty of cooperation and disclosure towards FINMA, which does not apply, for example, to criminal authorities.[15] In order for FINMA to be able to carry out its supervisory activities, it depends on the supervised institutions complying with their obligation to provide information and reports in accordance with Art. 29 FINMAG. FINMA's performance of efficient and timely supervisory activities therefore requires an open exchange with the institutions it supervises. In particular, supervised institutions must be able to trust that information about their business activities provided to FINMA will be treated confidentially and used exclusively for the purpose of carrying out FINMA's supervisory activities and will not be disclosed to third parties or even to the public. An open flow of information between a supervised entity and the supervisory authority is therefore central to achieving the objectives of a financial market supervision.

(14) The addressees of FINMA's supervisory privilege are the institutions it supervises (see above, margin no. (11)). All physical and electronic information exchanged between the bank and FINMA (e.g., information from letters, emails, audit and investigation reports, minutes of joint meetings and FINMA orders) are considered files associated with the supervisory relationship, regardless of the document that contains said information.[16] However, pre-existing internal bank documents submitted to FINMA are not included.[17]

(15) Article 42 *c* FINMAG is a supervisory provision and requires supervised institutions to take organizational measures appropriate to their business activities and structure in order to implement this provision. Violations of the supervisory privilege may result in supervisory measures (Art. 29 et seqq. FINMAG) against the institution or the persons acting on behalf of the institution.[18]

(16) A supervisory privilege order interferes with the informational self-determination of a supervised entity. This restriction is justified if the public interest or the protection of the fundamental rights of third parties outweighs the interests of the supervised person and the public interest in the free communication of the information and documents in question.[19] For reasons of proportionality, the supervisory privilege can be limited to certain objects or situations, for example, according to the doctrine, expressly to crisis situations, in order to protect functionally relevant functions or to prevent a bank run.[20] The question of how FINMA carries out its supervisory activities and the associated balancing of interests in detail is largely left to its technical discretion.[21]

## 2.2 Interest in Access to Information

(17) In this case, the interests in free access to the documents relating to the supervisory relationship, namely the interest that plaintiffs are able to present their claims, but also the legitimate interest of

---

15 Art. 29 FINMAG, Art. 45 FINMAG, Art. 13 VwVG (Verwaltungsverfahrensgesetz, Administrative Procedure Act; SR 172.021).

16 RETO FERRARI-VISCA, Possibilities and limits of data transfers abroad by Swiss banks, Diss. Univ. Bern, Basel 2025, margin no. 1734.

17 DU PASQUIER/MENOUD, ibid., No. 64 regarding Art. 42 *c* FINMAG.

18 DU PASQUIER/MENOUD, ibid., No. 69 regarding Art. 42 *c* FINMAG.

19 DU PASQUIER/MENOUD, ibid., No. 66 regarding Art. 42 *c* FINMAG.

20 DU PASQUIER/MENOUD, ibid., No. 67 regarding Art. 42 *c* FINMAG.

21 See BGE 135 II 356 E. 3.1; Swiss Federal Court judgment 2C_565/2010 of April 14, 2011 E. 4.1; Judgment of the Swiss Federal Administrative Court A-4640/2022 of March 13, 2025 E. 5.6.

UBS in being able to submit these documents for its defense in foreign proceedings, must be weighed against the interests of the financial market supervisory authority in the consent requirement.

(18) FINMA's procedures are not public in Switzerland and FINMA is explicitly exempt from the scope of the Freedom of Information Act.[22][23] Swiss lawmakers attaches great importance to the confidentiality of supervisory processes. At the national level, FINMA may, pursuant with Article 40 FINMAG, refuse to provide administrative and legal assistance to national law enforcement authorities or other domestic authorities, even if they are themselves subject to official secrecy. The purpose of a refusal is, in particular, to prevent the disclosure or release of information from impairing the performance of FINMA's supervisory activities. According to the highest court rulings, private individuals, even if they were alleged harmed by the bank, have no party status in FINMA's supervisory proceedings against a bank and therefore no right to inspect the files.[24] Furthermore, FINMA has no legal basis for disclosing investigation results to national civil courts and is neither required nor can it be compelled to provide administrative assistance.[25] In this context, the case law emphasizes that documents created in the context of an administrative procedure serve to protect public interests and not the interests of parties in civil proceedings.[26]

(19) These aforementioned restrictions, which exist domestically when releasing documents relating to the supervisory relationship (se above, margin no. (18)), must be taken into account in order to protect the sovereign assessments of the Swiss lawmakers, even in international relations, if a balancing of interests is to be carried out when a supervisory privilege is ordered. In civil proceedings, foreign civil plaintiffs would otherwise be better off than domestic plaintiffs, which contradicts the assessments made by the Swiss lawmakers. Thus, a specific justification is required to approve the release of documents relating to the supervisory relationship abroad that are intended to be used in civil proceedings.

(20) A special justification could exist if the release of the requested documents were essential for the parties to be able to present their claims or to defend themselves against claims. Essentially, the plaintiffs in US Case No. 1:23-cv-5874 are claiming damages because Credit Suisse may have misrepresented its financial situation. To what extent the documents relating to the supervisory relationship would be essential to assert or refute the civil claims is not clear and cannot be assumed: Since the supervisory privilege does not pertain to pre-existing internal bank documents (see above, margin no. (14)), the interest in the release of further information is not very high.

(21) This is all the more true since the Credit Suisse crisis (see above, margin no. (4) ) has already been the subject of comprehensive, publicly accessible reports, namely those of FINMA[27] and the Parliamentary Commission of Inquiry (hereinafter: **"PCI"**).[28] In order to take into account the great public interest in how the crisis is managed, these reports also reveal the numerous interactions between FINMA and Credit Suisse and thus also information about the supervisory relationship. The parties to

---

[22] Federal Act on the Principle of Public Information in Administration (Public Information Act, Öffentlichkeitsgesetz, BGÖ; SR 152.3).

[23] Art. 2 para. 2 BGÖ.

[24] BGE 139 II 279 E. 2 and 4.

[25] BVGE 2014/19 E. 7 et seqq.

[26] See BVGE 2014/19 E. 9.3.

[27] See Fn. 2.

[28] The PCI report on how the federal authorities are managing the CS crisis dated December 17, 2024 (according to the version published in the Federal Gazette on February 24, 2025, BBl 2025 515; hereinafter: **"PCI Report"**).

US Case No. 1:23-cv-5874 are free to use these reports. However, they are not entitled to use further information relating to the supervisory relationship.

(22) As an interim conclusion, it can be stated that the interest in free access to information and documents or UBS's interest in being able to defend itself with these documents is considered low.

### 2.3 Interest of the Financial Market Supervisory Authority in the Supervisory Privilege

(23) In order to avert the uncontrolled collapse of the globally systemically important bank Credit Suisse in 2023 and thus an impending international financial and economic crisis as well as extraordinarily high damage to the financial markets, FINMA was in close contact with authorities from numerous countries, including US authorities (Federal Reserve Bank of New York, US Federal Reserve Board and Federal Deposit Insurance Corporation, New York State Department of Financial Services and the US Securities and Exchange Commission). There was a relationship of trust between the authorities involved and the open exchange with CSG and FINMA was an important prerequisite for finding a solution[29] and preventing negative effects on the relevant economies (including the United States). This exchange contributed to the prevention of an impending international financial and economic crisis due to the merger between CSG and UBS on March 19, 2023.[30]

(24) An open exchanges between supervisory authorities and financial institutions must not be jeopardized by the fact that financial institutions have to expect that their confidential exchanges with financial market supervisory authorities will be used against them in civil or criminal proceedings in future crises. Otherwise, financial institutions will no longer be willing to communicate openly and transparently with the supervisory authorities. For FINMA, as well as for other foreign supervisory authorities, there is a risk that the potential subsequent use of files from supervisory proceedings for subsequent liability proceedings will reduce the openness and willingness of the supervised institution to dialogue with the supervisory authority. These proceedings could even lead to a kind of shadow supervision.[31] This applies all the more in a crisis situation – as was the case with Credit Suisse – in which the prompt provision of the requested information by the supervised institution is essential for the successful management of the crisis. Otherwise, FINMA (or other foreign supervisory authorities) would no longer be able to ensure an effective and timely supervision and the fulfillment of their statutory duties.[32] The release of information relating to the supervisory relationship in the American civil proceedings at issue here (see above, margin no. (4) ) thus obviously seriously jeopardizes any future crisis management at a globally active bank and international cooperation between supervisory authorities in such a case.

(25) The Swiss lawmakers took this interest into account in Article 42 *c* para. 5 FINMAG: The supervisory privilege in Switzerland is therefore, in terms of content – although there are differences in how it is asserted (see above, margin no. (11) ) – comparable to the US Bank Examination Privilege.[33]

---

[29] FINMA report, pp. 11, 76, 78.

[30] PCI report, p. 29.

[31] See DAVID WYSS, The Supervisory Privilege regarding to Files from the Supervisory Relationship, Schweizer Zeitschrift für Wirtschaft und Finanzmarktrecht (Swiss Journal of Economics and Financial Market Law (SZW)), 2023, p. 148.

[32] See Fn. 10 and 15.

[33] See URS ZULAUF Kooperation oder Obstruktion? – 20 Jahre Amtshilfe im Finanzmarktrecht vom Börsengesetz zum FINFRAG (Cooperation or obstruction? – 20 years of administrative assistance in financial market law from the Stock Exchange Act to the Financial Markets Act (FINFRAG), GesKR 3/2015, p. 336 et seqq.

finma

Reference:
G01540787;
G01540787-000084

(26) Furthermore, the mention of the files relating to FINMA's supervisory relationship in the PCI's report on the CS emergency merger does not make the content of these files public, does not constitute a waiver of the supervisory privilege by FINMA under Swiss law, and does not override the statutory authority granted to FINMA under Article 42 *c* paragraph 5 FINMAG (see above, margin no. (21)).

(27) In view of the above, in the present context, due to the sensitivity of the files and information relating to the supervisory relationship and the hardly foreseeable consequences of a disclosure, a reservation of FINMA's consent is appropriate and necessary in order to protect the interests inherent in the performance of FINMA's supervisory activities. These interests (see above, margin no. (23) et seqq.) clearly outweigh the interests in the release of the requested information (see above, margin no. (20) et seqq.).(18)

## 2.4 Confirmation and Clarification of the Supervisory Privilege

(28) Therefore, FINMA confirms and clarifies the supervisory privilege it has already granted to UBS as the legal successor to CSG (see above, margin no. (4) and (6)), according to which any transmission, publication or disclosure of all documents relating to the supervisory relationship requested by the plaintiffs (see above, margin no. (5)), requires the approval of FINMA if the corresponding actions are to be carried out towards foreign third parties. The present order is not covered by the supervisory privilege (see above, margin no. (11)).

(29) The supervisory privilege pursuant to Art. 42 *c* para. 5 FINMAG (see above, margin no. (28)) applies to all documents relating to the supervisory relationship with FINMA, as well as to the report drafted by the auditor Wenger Plattner, the UBS comments on that report and all documents relating to the supervisory relationship that pertain to the auditors' investigation.

(30) The supervisory privilege granted is valid until at least December 31, 2027, and can be extended if circumstances warrant.

## 3. Cost

(31) Pursuant to Art. 15 FINMAG and Art. 5 para. 1 lit. a FINMA-GebV (FINMA Fees and Tax Ordinance)[34] anyone who initiates an order is liable to pay a fee. The costs for the issuance of an order are calculated based on the time required and the importance of the matter for the person liable for the fee (Art. 8 para. 3 and 4 FINMA-GebV).

(32) UBS initiated this order (see above, margin no. (4) et seqq.).(4) The procedural costs for this order amount to CHF 10,000 and are to be borne by UBS.

[34] FINMA Fees and Tax Ordinance (FINMA-GebV; SR 956.122).

finma

**Reference:**
G01540787;
G01540787-000084

## The Swiss Financial Market Supervisory Authority FINMA has ruled as follows:

1. Any transmission, publication or dissemination of any documents relating to the supervisory relationship with FINMA, as well as the report drafted by the auditor Wenger Plattner, the UBS comments on this report and any documents relating to the supervisory relationship in connection to the investigation by the auditor Wenger Plattner, require FINMA approval if the corresponding actions are to be carried out towards foreign third parties.

2. The supervisory privilege ordered pursuant to no. 1 of the operative part of the decision is valid until at least December 31, 2027 and can be extended if circumstances warrant such an extension.

3. UBS Group AG is ordered to pay procedural costs in the amount of CHF 10,000. Said costs will be invoiced separately and must be paid within 30 days from the date the decision becomes legally binding.

**Swiss Financial Market Supervisory Authority FINMA**

| | |
|---|---|
| Stefan Walter<br>Direktor | Annemarie Nussbaumer<br>Supervisory Policy<br>and Legal Expertise Division |

## Instructions on legal remedies:

An appeal against this decision may be lodged with the Federal Administrative Court (PO Box, CH-9023 St. Gallen) within 30 days. The appeal must be substantiated and submitted in two signed copies. The order and the documents relied upon as evidence must be enclosed.

**To be served to:**

- **UBS Group AG** , Ms. Barbara Levi, Bahnhofstrasse 45, 8001 Zurich (Registered mail with return receipt)

finma

Reference:
G01540787;
G01540787-000084

**For informational purposes:**

- **UBS Group AG** , Mr. Christoph Speth, Bahnhofstrasse 45, 8001 Zurich (Registered Mail/Confidential)
- **UBS Group AG** , Mr. Alan Wehrenberg, Talacker 24, 8001 Zurich (Registered Mail/Confidential)
- **Ernst & Young AG** , Mr. Hannes Smit, Maagplatz 1, 8010 Zurich (Registered Mail/Confidential)

**Date mailed:**

MORNINGSIDE
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

**Date: 2025/10/08**

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- German (Germany)

To:

- English (USA)

The documents are designated as:

- 'Verfügung_Supervisory Privilege UBS_final.docx'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director



299 South Main Street, Suite 1300
Salt Lake City, UT 84111