# Exhibit B

**List of Written Communications Referenced in Reports**

Green: FINMA allowed to be produced; Red: FINMA refused to allow production; White: Credit Suisse could not locate.[1]

| No. | Date | Description from PInC and/or FINMA Reports | Relevance, if withheld |
|---|---|---|---|
| 1 | April 2022 | **<u>From PInC Report</u>**: "Credit Suisse's revised stabilization plan will be re-examined in 2021 to determine whether it can be implemented. FINMA approves it in 2022. According to Credit Suisse's structural deficit situation, FINMA invited the bank at the beginning of the second quarter of 2022 to draw up concrete emergency measures based on the stabilization plan, to be able to react to unforeseeable events. Further interactions, both written and verbal, followed during the summer of 2022; in particular, the bank was asked to prepare for an unfavorable scenario should the market deem the strategic reorientation not credible, should the capital increase fail, or should another major incident occur. It was only after several requests from FINMA that Credit Suisse finally began to prepare and implement the various measures in its stabilization plan." at 142.<br><br>**<u>From FINMA Report</u>**: "FINMA reviewed and approved CS's recovery plans as they met the statutory requirements…FINMA also criticised the fact that the recovery plan only described the effects of the individual measures at consolidated level and did not contain an overview of how these would affect material group companies – in particular the parent bank. Already at the beginning of Q2 2022, due to the structural loss situation at CS, FINMA demanded that the bank draw up specific emergency measures based on the recovery plan so that it would be able to react to unforeseeable events. Further interactions followed over the summer of 2022, as well as a request to the bank to prepare for an adverse scenario should the strategic | The referenced document(s) speaks to CS/CS AG's financial condition shortly before the proposed new class period began (*see* ECF No. 199-1 at 1), in contrast to Defendants' statements regarding CS's capital strength. It also speaks to scienter, as it shows the recipient was aware of FINMA's opinion/criticism of CS/CS AG's financial condition and failure to prepare credible contingency plans in the event that another adverse event occurs. Lastly, it speaks to issues of loss causation and damages, because the communication supports the foreseeability of the final revelatory event: the FINMA-brokered emergency merger with UBS.<br><br>It is possible that this communication is the same as the April 11, 2022 Letter (Entry 2), in |

[1] While CS represents it has not located the "white" entries, Plaintiff notes that many seem to be on substantially similar topics to the withheld "red" entries (*Compare, e.g.*, unlocated Entry 26 (CS provides FINMA a list of potential counterparties for a sale) with withheld Entry 44 (same); unlocated Entry 40 (citing FINMA's proposed restructuring plan) to withheld Entries 63, 70, 73 (also regarding the restructuring plan)). As such, for the sake of efficiency, the Court could extend its ruling on the withheld entries herein to the unlocated entries as well.

| | | | |
|---|---|---|---|
| | | reorientation not be viewed as credible by the market, the capital increase fail or another significant event occur. Only after several requests from FINMA did CS finally initiate the preparation and implementation of individual measures from its recovery plan." at 69. | which case the reasoning below would also apply. |
| 2 | April 11, 2022 | **<u>From PInC Report</u>**: "In both the April 2022 letter and the 2021 assessment letter, FINMA addressed the parent company's low capitalization and profitability, and asked the Board of Directors and management to take measures to strengthen the bank's financial resilience." at 141.<br><br>**<u>From FINMA Report</u>**: "FINMA had been increasingly drawing CS's attention to the need for emergency measures since April 2022." at 19.<br><br>"On a number of occasions, FINMA drew the attention of CS's Board of Directors to the low capital base of CS AG (parent bank) and the risks in connection with its capital plan. In April 2022, FINMA called on the bank to develop a plan and set out various potential courses of action that could be put into place and implemented to strengthen the capital base in an emergency should the situation deteriorate. FINMA reiterated these concerns in May and informed the responsible parties at CS that, in the meantime, the Group too was now falling short of its medium-term capital targets of 14%, with a CET1 ratio of 13.8%." at 31.<br><br>"The losses and strategy adjustments towards the end of 2021 also led to a reduction in the valuation of the subsidiaries, and the capital situation of CS AG deteriorated. FINMA pointed out this fact in April 2022 and asked the bank's managers to take the appropriate steps." at 61.<br><br>"Due to the ongoing loss situation, FINMA instructed the bank's Board of Directors already in April 2022 to develop concrete emergency measures." at 70. | The referenced document(s) speaks to CS/CS AG's financial condition shortly before the proposed new class period began, in contrast to Defendants' statements regarding CS's capital strength, as well as to scienter and loss causation.<br><br>This letter is cited numerous times in the FINMA Report, underlying the importance of the communication in FINMA's own opinion.<br><br>This letter is also the first in a long chain where FINMA repeatedly expresses concern about the capitalization of CS AG and asks CS for mitigation plans should the bank suffer another "critical" incident. FINMA has allowed several other communications in that same chain that expressly reference the content of the April 11 Letter (*see, e.g,* Entries 6, 9, 39) to be produced.<br><br>Finally, FINMA has allowed the 2021 Assessment Letter (Entry 3), which addresses some of the same subjects as this letter, to be produced. |

| | | | |
|---|---|---|---|
| 3 | May 23, 2022 | **<u>From PInC Report</u>**: FINMA's 2021 assessment letter discussed the risk analysis carried out by CS, appointment of the new Chairman of the Board, and gaps in CS's control functions. FINMA highlighted the underlying causes of CS's reduced earning power and weakness in its core businesses. at 134. | |
| 4 | June 30, 2022 | **<u>From FINMA Report</u>**: "In June 2022, [CS] voluntarily called a USD 1.5 billion AT1 instrument for redemption on the first call date. For the purposes of compliance with capital requirements, FINMA required a substitute issuance, which CS carried out for an amount of USD 1.65 billion. This instrument was issued with a coupon of 9.75%, a much higher coupon than for CS's other AT1 instruments or for issues by comparable institutions…. As a result of these developments, FINMA once again intensified the discussions around emergency measures it had compelled CS to take in spring 2022. At the end of June 2022, CS informed FINMA of further strategy adjustments at the investment bank, which would also comprise the sale of parts of its business." at 32. | The document speaks to CS/CS AG's financial condition in the summer of 2022, contradicts Defendants' statements regarding CS's capital strength, and is relevant to scienter and loss causation.<br><br>Communications regarding the sale of parts of CS's business are relevant because CS publicly touted the pending sale of its SPG, while internally acknowledging that the sale was not possible at the time due to issues with CS AG's capital ratio. *See* PInC Rept at 229 ("The authorities are also discussing the ongoing plan of Credit Suisse to (partially) sell its securitized products segment…. a full sale is difficult due to insufficient funding capacity at Credit Suisse...").<br><br>This letter is part of a chain that began with FINMA's letter of April 11, 2022 (not produced) and included several other letters that were produced and that expressly reference the content of the June 30 Letter (*see* Entries 6, 9). |

| | | | |
|---|---|---|---|
| 5 | July 2022 | **<u>From FINMA Report</u>**: "In July 2022, FINMA – together with foreign authorities in the Core College – stepped up its supervisory activities in the area of liquidity with a view to the imminent publication of a further quarter of significant losses. From this point on, it demanded that CS hold more liquidity in order to cushion any negative developments." at 65. | |
| 6 | July 14, 2022 | **<u>From PInC Report</u>**: "On July 14, 2022, FINMA sent a letter to the bank's management and board of directors concerning the bank's 'structural deficit situation'. The letter contained two demands. In it, FINMA criticizes the urgency measures submitted to date by the bank to meet regulatory capital ratio requirements in the event of unforeseen events. Once again, it demands that the bank submit, by the end of the month, a concrete plan with options that are immediately feasible and effective in the short term. FINMA is also informing the bank that it will closely monitor the implementation of the planned capital and financing instruments. In this regard, too, FINMA invites the bank to provide a timetable for replenishing or replacing the AT1 instruments in order to meet the Pillar 2 requirements for the Tier 1 capital ratio. In addition, FINMA is informing Credit Suisse of its expectations regarding the issuance of bail-in bonds to guarantee the bank's overall re-solvency. In addition to the increased liquidity requirements already imposed, FINMA is demanding that Credit Suisse increase its liquidity ratio, in particular by building up a sufficient liquidity cushion. The increased requirements are justified by the difficult market environment and the structured deficit situation." at 210. | |
| 7 | July 16, 2022 | **<u>From PInC Report</u>**: ". . . FINMA sent Credit Suisse its initial thoughts on the bank's planned restructuring. While FINMA welcomes the planned restructuring through a reduction in the size of the investment bank, it feels that clarification is needed on a number of points concerning the operational feasibility and financing of these plans. Furthermore, FINMA is very skeptical about the bank's request to change the valuation method used to define the regulatory filter. | |

| | | | |
|---|---|---|---|
| | | The net asset value method (net asset value) proposed by Credit Suisse for the valuation of participations requires considerable clarification on the part of FINMA, not least because it increases the value of the portfolio of participations on which the valuation is based." at 211. | |
| 8 | July 25, 2022 | **<u>From PInC Report</u>**: "In its response of July 25, 2022 [to FINMA's July 14, 2022 letter], Credit Suisse sets out various capital scenarios for Credit Suisse Group AG and Credit Suisse AG. The bank also presents four options for strengthening the capital of both units. It also addresses the overview requested by FINMA of the planned AT1 bond issue, and informs the supervisory authority that, in view of the tense macroeconomic situation and specific concerns regarding its current profitability, it has taken various measures to preserve its liquidity." at 210. | Whether CS was already planning on this date to announce a capital raise is highly relevant to the allegations of the Proposed Second Amended Complaint (*see* ECF No. 199-1 at ¶¶77-89). Even if the amendment is not granted, the letter is highly relevant to CS's financial condition in the summer of 2022 and to scienter and loss causation.<br><br>This letter is referenced extensively in FINMA's Aug. 5, 2022 letter (Entry 9), which it allowed to be produced. |
| 9 | Aug. 5, 2022 | **<u>From PInC Report</u>**: FINMA "requested weekly status updates from the bank's CEO and Chairman of the Board of Directors on the progress of the various packages of measures. The reasons for this closer monitoring include the short timeframe until the strategy announcement, FINMA's expectation that Credit Suisse should carry out a capital increase to finance its strategy, and the clearly formulated expectation that Credit Suisse should prepare for an adverse scenario by planning ad hoc measures and shortening the timeframe for their implementation." at 210. | |
| 10 | Aug. 9, 2022 | **<u>From PInC Report</u>**: "FINMA therefore requires a timetable for the preparation of a sound financial plan by August 9, 2022." at 210. | |
| 11 | Aug. 29, 2022 | **<u>From PInC Report</u>**: "FINMA sent a letter to the Chairman of the Board of Directors and the Chief Executive Officer of Credit Suisse, | |

| | | | |
|---|---|---|---|
| | | setting out its position on the need for regulatory relaxation with regard to the capital situation. She points out that Credit Suisse's new strategy must be able to be implemented without regulatory measures. As Credit Suisse AG has already benefitted from significant regulatory relaxations in the treatment of its shareholdings, FINMA considers that its room for maneuver is very limited . . . . The supervisory authority further explains that additional regulatory relief for the level of the parent company could only be considered if Credit Suisse succeeded in carrying out a sufficient capital increase in October 2022. It also indicates that such relaxations would be linked to new conditions. FINMA is once again critical of the change in valuation method to net asset value, and calls the general timetable envisaged by Credit Suisse ambitious, particularly as it allows too little time for interaction with FINMA." at 211. | |
| 12 | Sept. 9, 2022 | **From PInC Report**: "The capital increase is also deemed necessary by FINMA, because it believes that, based on the initial business figures for the third quarter of 2022, the bank's structural deficit situation will persist, and that the financial plans cannot be met. In the same letter, FINMA therefore requires a timetable for the preparation of a sound financial plan by August 9, 2022, and revised capital planning for Credit Suisse Group AG and Credit Suisse AG by September 9, 2022." at 210. | |
| 13 | Sept. 15, 2022 | **From PInC Report**: "FINMA notified Credit Suisse of its final decision to reject the bank's request to change the valuation method. It concluded that the net asset value method would not have been appropriate for valuing the investment. Among other things, it feared that net asset value did not accurately reflect the economic value of the investment." at 212. | |
| 14 | Sept. 30, 2022 | **From PInC Report**: "FINMA is also instructing Credit Suisse to prepare for a scenario in which the strategic reorientation at the end of October is not deemed credible by the market, the increase or some other major incident occurs. As possible preparatory work, it | |

| | | | |
|---|---|---|---|
| | | proposes measures that would have enabled the bank to carry out a reorganization or stabilization (re-coverage) under its own responsibility, such as the partial IPO of Credit Suisse AG. It sets a deadline of September 30, 2022 for Credit Suisse to submit a report to the Board of Directors." at 210-11. | |
| 15 | Oct. 4, 2022 | **From PInC Report**: "Letter from FINMA to CS inviting CS to develop contingency options." at Appendix 4 | Other similar letters about FINMA encouraging CS to develop contingency options (*e.g.*, Entries 6, 9) have proven very relevant to CS's financial condition, as well as to scienter and loss causation. |
| 16 | Oct. 12, 2022 | **From PInC Report**: In an email, "FINMA is sharply criticizing Credit Suisse for this failure, and is demanding that, in addition to compliance with the duty to inform, Credit Suisse's senior executives participate from now on in daily conference calls on the liquidity and refinancing situation." at 217. | |
| 17 | Oct. 12, 2022 | **From PInC Report**: "On October 12, 2022, the [FINMA] Board of Directors practices processing [an ELA application] on the basis of actual data supplied by Credit Suisse." at 227. | |
| 18 | Oct. 14, 2022 | **From PInC Report**: "In a letter to FINMA dated October 14, 2022, Credit Suisse presented various measures designed to restore liquidity buffers. Overall, the bank was optimistic about the refinancing opportunities it hoped to find on the market following the presentation of the new strategy on October 27, 2022. Nevertheless, it is requesting authorization to use Pillar 2 liquidity buffers until the proposed measures take effect." at 217. | This is just two weeks before the alleged statements on Oct. 27, 2022, in which Defendants disclosed that CS had "partially utilized liquidity buffers," but did not disclose that the Company had no visibility on when the buffers would be restored. This letter is highly relevant to the falsity of that statement, as well as to scienter and loss causation. |
| 19 | Oct. 14, 2022<br>1pm CET | **From PInC Report**: "As a result, in October, before the bank announced its new strategy, FINMA repeatedly authorized Credit Suisse to temporarily use liquidity buffers to meet liquidity | This is just two weeks before the alleged statements on Oct. 27, 2022, and is highly relevant to CS's |

| | | | |
|---|---|---|---|
| | | requirements, so that the bank could guarantee sufficient liquidity to the various Group companies. At the same time, FINMA is asking Credit Suisse to take further measures to increase its liquidity." at 217 (citing both an Oct. 14, 2022 email and an Oct. 19, 2022 email (Entry 22)). | financial condition, whether the Oct. 27 statements were materially false or misleading and made with scienter, and to loss causation.<br><br>Both the Oct. 14, 2022 and the Oct. 19, 2022 emails are referenced in FINMA's letters of Oct. 24, 2022 (Entry 24) and Nov. 5, 2022 (Entry 32), both of which FINMA allowed to be produced. |
| 20 | Oct. 17, 2022 | **<u>From PInC Report</u>**: "On October 17, 2022, FINMA made it clear to Credit Suisse that it had already granted it considerable leeway. As a result of the above-mentioned measures taken by FINMA, expectations for the parent company's CET1 ratio were lowered from 10.3% to 9%, corresponding to CHF 2. 7 bn at the end of the third quarter of 2022. She stressed that it was now up to Credit Suisse to act, rather than asking for further relief. . . .At the exchange on October 17, 2022, Credit Suisse presented the work in progress on the sale of the securitized products segment: in addition to a total sale and a partial sale, a third option was to reduce securitized assets within the 9% threshold." at 224. | |
| 21 | Oct. 18, 2022 | **<u>From PInC Report</u>**: "At the exchange on October 17, 2022, Credit Suisse presented the work in progress on the sale of the securitized products segment: in addition to a total sale and a partial sale, a third option was to reduce securitized assets within the 9% threshold. In its letter dated October 18, 2022, FINMA informed Credit Suisse in writing of the conditions it had to meet in order for the relevant relief to apply." at 224. | This letter concerns the sale of the SPG, which, contrary to Defendants' assertions on Oct. 27, 2022 (just one week later), was not possible at the time due to effects on CS AG's CET1 ratio. *See* Entry 4, above. This letter speaks directly to whether those statements were materially false or misleading and made with scienter, and to loss causation. |

| | | | |
|---|---|---|---|
| 22 | Oct. 19, 2022 6:27pm CET | **<u>From PInC Report</u>**: "As a result, in October, before the bank announced its new strategy, FINMA repeatedly authorized Credit Suisse to temporarily use liquidity buffers to meet liquidity requirements, so that the bank could guarantee sufficient liquidity to the various Group companies. At the same time, FINMA is asking Credit Suisse to take further measures to increase its liquidity." at 217 (cites 10/14 email and 10/19 email, unclear what parts come from which email). | This is just one week before the alleged Oct. 27, 2022 statements, and is highly relevant to CS's financial condition, whether the Oct. 27 statements were materially false or misleading and made with scienter, and to loss causation.<br><br>Both the Oct. 14, 2022 and this Oct. 19, 2022 emails are referenced in FINMA's letters of Oct. 24, 2022 (Entry 24) and Nov. 5, 2022 (Entry 32), both of which FINMA allowed to be produced. |
| 23 | Oct. 20, 2022 | **<u>From PInC Report</u>**: "As the liquidity situation continues to deteriorate in the week prior to the strategy announcement on October 27, 2022, Credit Suisse is informing FINMA of this development negative on October 20, 2022. It is asking for further temporary easing of Pillar 2 and net stable funding ratio requirements, and for temporary permission to use even partial Pillar 1 buffers. While capital outflows continue unabated, dramatically worsening the situation, Credit Suisse management is confident that it will be able to restore Pillar 2 liquidity buffers to regulatory requirements by the end of 2022, thanks to the positive market reaction to the announcement of the new strategy." at 217-18. | This is just one week before the alleged Oct 27, 2022 statements, and is highly relevant to CS's financial condition, whether the Oct 27 statements were materially false or misleading and made with scienter, and to loss causation.<br><br>This letter is also referenced in the Oct. 24, 2022 letter (Entry 24), which FINMA allowed to be produced. |
| 24 | Oct. 24, 2022 | **<u>From PInC Report</u>**: "On October 24, 2022, FINMA again lowered the tolerance threshold. However, FINMA deplores the fact that the measures taken to date by the bank to prevent capital outflows are insufficient and fall far short of FINMA's expectations. . . . FINMA is astonished that Credit Suisse has so far only decided to implement measures to the tune of some CHF 18.1 billion francs. As Credit Suisse will also have to address capital outflows at its quarterly | |

| | | | |
|---|---|---|---|
| | | presentation on October 27, 2022, FINMA warns against a further loss of confidence and subsequent capital outflows. FINMA therefore reiterates its request to the Board of Directors and Executive Board of Credit Suisse to discuss with FINMA, before 27 October 2022, a clear and feasible plan that will enable the bank to secure its solvency and stabilize its liquidity situation itself. FINMA also specifies that it expects Credit Suisse to inform FINMA immediately if it fails to meet the new tolerance levels, or if it becomes apparent that it will not be able to meet them." at 218. | |
| 25 | Oct. 26, 2022 | **<u>From PInC Report</u>**: "[O]n October 26, 2022, Credit Suisse informs FINMA that the bank risks no longer meeting the liquidity buffer requirements, whose thresholds FINMA has already lowered, by the end of the week, and that if capital outflows continue, it could no longer meet Pillar 1 requirements and, by the end of October, no longer comply with the net stable funding ratio. Credit Suisse is informing FINMA of the liquidity injection measures it has already taken, the medium-term measures it plans to take until the end of the year, and the measures that are not feasible due to the idiosyncratic crisis in which it finds itself." at 218. | This is from day before the alleged Oct. 27, 2022 statements and is highly relevant to CS's financial condition, whether the Oct. 27 statements were materially false or misleading and made with scienter, and to loss causation.<br><br>Particularly, Defendants represented on Oct. 27, and again in the Nov. 2, 2022 3Q22 Quarterly Report, "the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times." ECF No. 65 (CAC) at ¶¶242, 253. |
| 26 | Oct. 31, 2022 | **<u>From PInC Report</u>**: "On October 31, 2022, the discussion about Credit Suisse's impending downgrade continued, and FINMA asked the bank to provide additional information on the expected capital outflows in the event of a downgrade. The reaction to the rating changes turned out to be much less negative than initially feared, which Credit Suisse attributes to its efforts with the rating agencies - for example, it sent Moody's more information on its new strategy. At | |

| | | | |
|---|---|---|---|
| | | the same meeting on October 31, 2022, the Chairman of the Board of Directors of Credit Suisse also presented FINMA for the first time with an analysis of the compatibility of potential counterparties should the sale of the bank prove necessary. Credit Suisse favors a Swiss solution; however, willing to consider all options, the bank states that BNP, Morgan Stanley and HSBC would be suitable counterparties." at 219. | |
| 27 | October 2022 | **<u>From FINMA Report</u>**: "Shortly after the first large outflows of client assets in October 2022, FINMA requested that CS include additional information in the form of the liquidity crisis template (LCT) in its daily liquidity reports." at 66.<br><br>"FINMA requested the weekly submission of the "funding in resolution" reports from the bank – which show the liquidity requirement in the event of a PONV." at 72. | |
| 28 | Beginning of November 2022 | **<u>From PInC Report</u>**: "In mid-October 2022, [FINMA] thus set to work on the decision and the reorganization plan for Credit Suisse. The first drafts of these two documents were ready at the beginning of November." at 415. | |
| 29 | Nov. 2, 2022 | **<u>From PInC Report</u>**: "Following the Federal Council meeting on November 2, the SC also met in the afternoon, in the form of a conference call. The head of the FDF reported on the Federal Council meeting. FINMA announced that, due to the low level of liquidity, an ELA request had been announced the previous day by Credit Suisse, but was subsequently withdrawn. The reason for this withdrawal is that the bank should have communicated publicly about this ELA request, which would have represented a risk: it always wanted to present the image of a solid bank." at 245. | |
| 30 | Nov. 3, 2022 | **<u>From PInC Report</u>**: "On November 3 … FINMA is not satisfied with the data provided by the Bank. In his view, the weekly report on Credit Suisse's key figures was incomplete, partly outdated and not detailed enough to enable FINMA to make any decisions on the basis of reliable data." at 227. | This was one day after the Nov. 2, 2022 3Q22 Quarterly Report was published and is highly relevant to CS's financial condition, scienter, and loss causation. Essentially, if |

| | | | |
|---|---|---|---|
| | | | CS's liquidity data was outdated and unreliable, it calls into question the figures reported the previous day and in the Oct. 27, 2022 statements. |
| 31 | Nov. 4, 2022 | **<u>From PInC Report</u>**: "On November 4, 2022, the CFC again considered the bank's situation. Those present at the meeting regret that it did not provide the necessary figures; FINMA therefore plans to send a letter of reprimand to Credit Suisse. However, the CFC mainly discusses the preparation of the SC meeting on November 7. In this context, it mainly clarifies the outstanding issues concerning roles and responsibilities in preparation for a PLB." at 247.<br><br>"Letter from FINMA to Credit Suisse: Invitation to calculate the effects of a concrete reorganization plan on the balance sheet and the income statement." at Appendix 4. | |
| 32 | Nov. 5, 2022 | **<u>From PInC Report</u>**: "According to the head of FINMA's Credit Suisse Group Supervision division, Credit Suisse is struggling to assess the efficiency of its own measures and produce reliable scenario analyses and forecasts for capital outflows, when it is due to monitor the state of its liquidity at the beginning of autumn 2022. On November 5, in view of Credit Suisse's persistently critical liquidity situation, FINMA called the Board of Directors and management to order. The supervisory authority points to glaring shortcomings in access to information, criticizing Credit Suisse for its lack of due diligence (incomplete documentation, often submitted late, after several reminders, or not at all). In FINMA's view, this complicates the task of the Swiss and foreign supervisory authorities, since the bank is unable to forecast the liquidity ratios of its various units. FINMA also considers that the expectations it expressed on October 24 regarding measures to restore liquidity buffers have not been met, and doubts that the bank's crisis management and risk management are adequate. For these reasons, FINMA is urging Credit Suisse to take prompt action in future, and to ensure that these measures are reported and presented to the supervisory authorities." at 220. | |

| | | | |
|---|---|---|---|
| 33 | Nov. 10, 2022 | **From PInC Report**: "Credit Suisse's Chairman of the Board and Chief Executive Officer show understanding, promising to react quickly to FINMA's requests for information and to provide better quality data… In the meantime, the bank's problems continue unabated, and on November 10, 2022, Credit Suisse again notifies FINMA that it does not meet the liquidity requirements." at 220. | Highly relevant to CS's financial condition, as well as the scienter of Defendants' Lehmann and Korner, and to loss causation. |
| 34 | Nov. 14, 2022 | **From PInC Report**: On November 14, 2022, the FINMA Board of Directors practiced "processing [an ELA application] on the basis of actual data supplied by Credit Suisse." at 227. | |
| 35 | Nov. 16, 2022 | **From PInC Report**: In their response to FINMA's criticism regarding the provision of information by CS, on "November 16, 2022, Credit Suisse's Chairman of the Board and Chief Executive Officer show understanding, promising to react quickly to FINMA's requests for information and to provide better quality data. The bank does, however, mention the numerous channels of communication with FINMA at various levels, and the regular meetings between management and the Chairman of the Board of Directors with the supervisory authority." at 220. | |
| 36 | Nov. 16, 2022 | **From PInC Report**: "On November 16, 2022, FINMA questions the bank's ability to meet its Pillar 2 liquidity requirements by the end of 2022. FINMA once again points out to the bank that all measures taken to date to avoid any breach of the Pillar 1 requirements are insufficient. It therefore orders the bank to take immediate steps to stabilize its liquidity and cash position on a long-term basis." at 221. | Highly relevant to CS's financial condition and to scienter and loss causation. This letter was referenced in the Dec. 19, 2022 letter (Entry 43), which FINMA allowed to be produced. |
| 37 | Dec. 5, 2022 | **From PInC Report**: "On December 5, 2022, FINMA informed the CFC that Credit Suisse's capital outflows were not drying up and that a substantial improvement in the situation in this respect could not be expected by the end of the year, even with the implementation of containment measures. Several scenarios aimed at stabilizing or even saving Credit Suisse are being discussed in the meantime: among others, the use of ELA, the sale of the bank, the introduction of a PLB as liquidity assistance without reorganization and the introduction of a PLB as part of a reorganization. The possibility of | This is very shortly after Lehmann's Dec. 1 and 2, 2022 statements that outflows had "basically stopped," "flattened," and "started to reverse" (ECF No. 65 at ¶¶261, 264). This document appears to directly contradict those statements. |

| | | | |
|---|---|---|---|
| | | bankruptcy is also raised. FINMA believes that a reorganization can be implemented, but prefers another solution that also achieves the objectives of creditor protection. In its view, a credible sales scenario meets this requirement." at 259. | |
| 38 | Dec. 6, 2022 | **<u>From PInC Report</u>**: "As no improvement in Credit Suisse's crisis management had been noted by the beginning of December 2022, FINMA wrote to the bank's management and Chairman of the Board of Directors again on December 6, 2022. In view of the continuing capital outflows, FINMA is of the opinion that, even with the full implementation of all measures planned by Credit Suisse up to the end of 2022, it is no longer possible to increase the Pillar 1 reserves, and certainly not the Pillar 2 liquidity buffer. FINMA considers Credit Suisse's liquidity situation to be still very fragile, and doubts that the other planned measures will be implemented, since in its view the bank is not making sufficient efforts to sell business areas or financial holdings. In a letter dated December 6, 2022, FINMA then threatened the bank with consequences if the Board of Directors and Management did not assume their obligation to take decisions to improve liquidity and cash flow effectively and sustainably, and to have them implemented. The supervisory authority gives the bank until December 13, 2022 to review its catalog of measures and define a timetable for their implementation." at 221. | |
| 39 | Dec. 7, 2022 | **<u>From PInC Report</u>**: "FINMA receives the bank's updated contingency plans. In the event of a rapid deterioration in the situation, these provide for a merger with another global financial institution. FINMA asks Credit Suisse to continue preparations for a merger in the short to medium term and, as part of the medium term stabilization measures, to consider the partial sale of other business areas, a partial IPO of Credit Suisse (Suisse) AG, strategic partnerships and other capitalization measures." at 221. | |
| 40 | Dec. 9, 2022 | **<u>From PInC Report</u>**: "In order to decide on any risk of insolvency and the procedure to follow in the event of (partial) liquidation, and to ascertain the costs involved, the bank must, within a very short | |

| | | | |
|---|---|---|---|
| | | period of time, draw up an interim balance sheet and carry out an assessment" at 251, citing "FINMA reorganization proposal of Dec 9, 2022." | |
| 41 | Dec. 12, 2022 | **<u>From PInC Report</u>**: "The critical letter issued by FINMA on December 6, 2022, irritated the management of Credit Suisse. On December 12, it criticizes the tone of the letter and FINMA's accusations as harsh and unjustified, and rejects all the accusations made in the letter. At the same time, the bank's CEO and Chairman of the Board of Directors assured the supervisory authority that the fight against the liquidity crisis was a top priority. They emphasize the measures taken since October and the bank's sound liquidity position prior to the October outflows, without which the bank would not have survived the massive outflows. In the same letter, the management presents the considerations that led it to implement or reject certain measures, the reasons for the repeated discrepancies between prognoses on Credit Suisse's liquidity situation and the data actually provided, and an overview of future measures and plans on the liquidity front. Credit Suisse calls for a discussion at the highest level on the consequences of the FINMA threat." at 222.<br><br>"Credit Suisse certainly replies that the situation will remain worrying until the end of the first quarter of 2023." at 261 (citing this letter). | FINMA has allowed production of the referenced Dec. 6, 2022 letter (Entry 38), which appears to be on the same subject matter, so it is unclear why they refused to allow this response to be produced, particularly as this letter is described in so much detail in the PInC Report.<br><br>This is shortly after Defendant Lehmann's statements in early Dec. 2022 that outflows had flattened and the situation had "stabilized," so an admission that CS is expecting the situation to remain "worrying" until the end of 1Q23 would be highly relevant to the falsity of those statements, as well as to scienter and loss causation.<br><br>This letter is also referenced in the Dec. 19, 2022 letter (Entry 43), which FINMA allowed to be produced. |
| 42 | Dec. 16, 2022 | **<u>From PInC Report</u>**: "The FINMA delegation reminds the Credit Suisse representatives that the Chairman of the Board of Directors and the Chief Executive Officer are obliged to examine alternatives to reorganization. FINMA assures Credit Suisse that it will take all necessary steps to reorganize or bankrupt the bank if the point of non-viability (PoNV) is reached." at 222. | |

| | | | |
|---|---|---|---|
| 43 | Dec. 19, 2022 | **<u>From PInC Report</u>**: "On December 19, 2022, FINMA wrote to the Chairman of the Board of Directors and the CEO of Credit Suisse stating that the measures taken to date to rebuild liquidity buffers are not sufficient and that the bank must now take binding internal measures to meet its liquidity targets." at 261.<br><br>"Credit Suisse was therefore instructed by FINMA to develop solutions for the short- and medium term scenarios by the end of January 2023 and to prepare for them as much as possible, in particular by creating a virtual data room." at 262. | |
| 44 | Dec. 23, 2022 | **<u>From PInC Report</u>**: "According to the information provided by FINMA at the CFC meeting, Credit Suisse has drawn up a long list[1308] of potential buyers, most of them foreign, which is based, however, on the assumption that a sale would take place in the medium term and, therefore, that there are still several months left to make the necessary contacts. FINMA, which in December 2022 repeatedly insisted that Credit Suisse prepare for a possible sale and reduce the time needed for implementation, comes to the conclusion that only a Swiss buyer is a viable option in the event of an emergency sale, namely UBS." at 262. FN 1308: "On 23.12.2022, Credit Suisse sent FINMA a brief analysis of potential buyers, including JP Morgan, Bank of America, Morgan Stanley, Goldman Sachs, BNP Paribas, Barclays, Deutsche Bank, Standard Chartered, Saudi National Bank and UBS." | Highly relevant to falsity because it indicates that CS's financial condition in Dec. 2022 was already so poor that FINMA believed it may require an emergency sale versus a traditional merger with a due-diligence period of several months. The "analysis" of the potential buyers likely includes any impediments to a potential sale, which may further speak to CS's financial condition. Further relevant to scienter and loss causation. |
| 45 | Dec. 28, 2022 | **<u>From PInC Report</u>**: "In view of the increasingly critical liquidity situation, on December 28, 2022, FINMA imposed new requirements on Credit Suisse's emergency measures." at 222. | Highly relevant to CS's financial condition, as well as to scienter and loss causation. Shortly before this statement, Lehmann represented that outflows had flattened and the situation had "stabilized," so the fact that FINMA saw CS's liquidity situation as "increasingly critical" is highly relevant to the falsity of those statements. |

| | | | |
|---|---|---|---|
| 46 | Dec. 28, 2022, 6:36 pm | **From PInC Report**: Despite the work carried out to date with a view to the creation of the virtual data room, it would still have been necessary to allow for a due diligence period of four weeks for potential buyers, FINMA couples the second requirement to a threat of reorganization within the meaning of Article 25 LB, believing that destabilization would inevitably result in reorganization. at 266. | |
| 47 | End of December 2022 | **From PInC Report**: "The assessments that FINMA sends to Credit Suisse at the end of 2022 take into account the data provided by the bank at the reference date at the end of 2021. On this date, the situation is unchanged compared with a year earlier, at the end of 2020: Credit Suisse is re-solvent, and the bank's planning meets the legal requirements. FINMA evaluates the plans submitted as one year earlier, since no changes in law or practice have occurred between the two evaluation periods." at 225-26. | |
| 48 | End of 2022 | **From PInC Report**: "Despite numerous interventions by FINMA, including various enforcement proceedings, Credit Suisse has not made lasting progress in complying with the applicable provisions. Even in late fall 2022, when the problems encountered by the bank could no longer be ignored, it opposed - sometimes vehemently - FINMA's instructions. It did so, for example, when the supervisory authority asked it to set up the data room essential for a subsequent merger or when looking for potential buyers or merger partners." at 485.<br><br>**From FINMA Report**: "At the end of the year, FINMA made it clear to CS that it had to make concrete progress on the first scenario – the emergency sale – and already set up a data room. CS only complied with this request following repeated intervention by FINMA." at 35. | |
| 49 | Jan. 3, 2023 | **From PInC Report**: "As FINMA had already feared in December (see chap. 6.3.1.1), it noted on January 3 that Credit Suisse would temporarily no longer be able to meet liquidity requirements until the end of January 2023. It then requested written justification for the | Highly relevant to CS's financial condition, particularly in advance of the alleged Feb. 9, 2022 statements, where Defendants stated that outflows had "stabilized" and touted |

| | | | |
|---|---|---|---|
| | | underperformance as well as a funding plan by January 12, 2023, that Credit Suisse then gives." at 268. | the "strength" of CS's "robust balance sheet." ECF No. 65 at ¶¶277, 279. Further relevant to scienter and loss causation. |
| 50 | Jan. 4, 2023 | **<u>From PInC Report</u>**: "In a letter dated January 4 on the status of preparatory work on solutions, Credit Suisse presents a possible transaction structure as part of the scenario involving a sale (see box 9 in chap. 6.3.1.1 above). At that point, Credit Suisse is considering a public takeover bid in accordance with takeover bid law, a merger within under the terms of the Merger Act, or an asset deal, in which the Credit Suisse Group AG would sell its subsidiaries and then be liquidated. At the same time, Credit Suisse submits a list of four candidates to FINMA, including UBS, a US bank, an EU bank and a CSG shareholder. In the same letter, Credit Suisse lists the key risks and challenges of such a transaction, as requested by FINMA in its email of December 28, 2022." at 269. | |
| 51 | Jan. 6, 2022 | **<u>From PInC Report</u>**: "After FINMA had asked it, on December 13, to develop other concrete measures to stabilize the bank (see chap. 6.3.1.1), on January 6, 2023, Credit Suisse provided a list of all measures implemented or planned." at 271. | Highly relevant to CS's financial condition, whether the alleged Feb. 9, 2022 statements were materially false or misleading and made with scienter, and to loss causation.<br><br>FINMA allowed their Jan. 23, 2023 response to this letter (Entry 53) to be produced. As the PInC noted (*see* Entry 53, below), the Jan. 23, 2023 was critical of the measures Credit Suisse put forth, further supporting the inevitability of a merger. |
| 52 | Jan. 12, 2023 | **<u>From PInC Report</u>**: "According to the information available to the PInC, work on the preparation of the virtual data room intensified in January and February. At the beginning of the year, FINMA criticized Credit Suisse's preparatory work and demanded that the latter make | Highly relevant because it shows that CS was preparing in earnest for a sale—while Defendants told shareholders on Feb. 9, 2023 that |

| | | | |
|---|---|---|---|
| | | the virtual data room available more quickly and upload updated data to it. In the letter dated January 12, Credit Suisse confirmed to FINMA that the majority of the data required for the virtual data room is now ready and that the latter can be operational within 48 hours. Credit Suisse also provided an overview of the documents already filed in the virtual data room. FINMA took note of this information in its letter dated January 23, 2023, and asked the bank to upload essential additional documents to the data room; for example, the financial planning and capital planning documents were missing." at 270.<br><br>**<u>Additional From FINMA Report</u>**: "Following the October 2022 bank run, FINMA required the bank to establish a virtual data room and sequence a sale under stress in preparation for a sale of the Group." at 19. | their strategic plan was on-track, outflows had stabilized, and the Company was strengthening its liquidity ratios. *See, e.g.*, ECF No. 65 at ¶¶279-80. Further relevant to scienter and loss causation.<br><br>Additionally, the documents CS uploaded to the virtual data room are likely highly relevant to CS's financial condition, as they were intended to be used for due diligence purposes in the event of a sale. As such, even if this document is only a list of other documents, it is relevant because it could lead to the discovery of other, responsive documents.<br><br>Like the previous entry, this letter is referenced in FINMA's Jan. 23, 2023 letter (Entry 53), which FINMA allowed to be produced. The Jan. 23, 2023 letter is similarly critical of CS's preparation of the virtual data room, the subject of this letter (*see* Entry 53, below). |
| 53 | Jan. 23, 2023 | **<u>From PInC Report</u>**: "In its letter dated January 23, 2023, FINMA wrote to Credit Suisse that only a few stabilization measures are still in the pipeline and are already part of the financial planning and ordinary capital requirements. In this context, FINMA asks Credit Suisse to present further contingency measures that the bank could resort to if the situation were to worsen." at 271. | |

| | | | |
|---|---|---|---|
| | | FINMA "asked the bank to upload essential additional documents to the data room; for example, the financial planning and capital planning documents were missing. FINMA also pointed out that it is the responsibility of the bank's board of directors to monitor the situation and the options still available and to take measures in good time to safeguard the interests of investors and customers." at 270. | |
| 54 | Btw Feb. 17 and 22, 2023 | **From PInC Report**: FINMA and the SNB "sent Credit Suisse a detailed questionnaire concerning the available guarantees that would qualify as legal liens under the ELA+." at 282. | Relevant to CS's financial condition, particularly in light of the PInC's finding that "Credit Suisse had not prepared well enough and was therefore unable to fully exploit the potential of the ELA." at 300. Further relevant to scienter and loss causation. |
| 55 | Feb. 28, 2023 | **From PInC Report**: "FINMA closes enforcement proceedings 'Greensill' against Credit Suisse; Credit Suisse seriously failed in its prudential obligations in terms of risk management." at Appendix 4. | |
| 56 | March 13, 2023 | **From PInC Report**: "FINMA letter to Credit Suisse: New requests for contingent options by the FINMA." at Appendix 4. | Other similar letters about FINMA encouraging CS to develop contingency options (*e.g.*, Entries 6, 9) have proven very relevant to CS's financial condition, as well as to scienter and loss causation. |
| 57 | March 15, 2023, post-12:00 pm meeting | **From PInC Report**: "The SC subsequently decided to contact UBS and Credit Suisse in order to prepare for a possible merger." at 295. | |
| 58 | March 15, 2023, afternoon | **From PInC Report**: "The scenario for a reorganization of Credit Suisse had been prepared by FINMA as early as the fall of 2022. … On March 15, the bank was ordered by FINMA to draw up an acceptable reorganization plan by the following evening, Thursday, March 16 (see chap. 7.2.2.6), a deadline that was subsequently | |

| | | | |
|---|---|---|---|
| | | extended until the morning of Friday, March 17 (see chap. 7.2.2.8). Thus, on March 17, a draft resolution plan by FINMA was ready and translated into English (see chap. 7.2.3.6).” at 459.<br><br>**<u>From FINMA Report</u>**: “On the afternoon of Wednesday, 15 March 2023, CS was instructed to check and further develop the restructuring plan prepared by FINMA by Thursday [March 16] evening in order to improve the likelihood of success of such an undertaking. Only under increased pressure from FINMA did CS submit its comments and suggestions for improvements to the prepared restructuring plan on Friday [March 17] morning.” at 73. | |
| 59 | March 15, 2023 | **<u>From PInC Report</u>**: “In the ELA request of March 15, 2023, and in the ELA+ requests of March 17 and 19, 2023, Credit Suisse explained to the SNB and FINMA that it was unable to generate enough liquidity on the money market, the capital market or elsewhere to cover its needs in this area.”<br><br>**<u>From FINMA Report</u>**: “In the meantime, the further deterioration of the bank’s liquidity situation had become unstoppable. As early as Friday, 17 March 2023, CS had to once again apply for liquidity assistance, for an amount of CHF 20 billion (ELA+). In its application for further liquidity support from the SNB, CS confirmed that the bank was unable to procure sufficient liquidity either via the money or capital markets or in any other way to cover the liquidity requirements in place. It argued it required further assistance so as to increase its liquidity holdings with immediate effect to allow it to continue to make payments without creating any further alarm among its various agent banks, settlement and clearing bodies, and – first and foremost – its clients. Following this, the SNB granted further liquidity (ELA+) for a total of CHF 20 billion.35 Without this further support, CS would have become immediately insolvent by midday on Friday, 17 March 2023.” at 37. | Highly relevant to CS’s financial condition, as well as scienter and loss causation. Additionally, Defendants repeatedly represented in quarterly/annual reports CS had access to funding from the SNB if necessary (*see, e.g.*, ECF No. 65 at ¶242, “We also continue to have access to central bank funding sources if required.”). This supports that CS had not adequately prepared to take ELA, even though Defendants knew or recklessly disregarded that CS would likely need it. |

| | | | |
|---|---|---|---|
| 60 | March 16, 2023, 11:00 am | **<u>From PInC Report</u>**: "Following up on the criticism made by the chairman of the board of UBS, the director of FINMA complains to the CEO of Credit Suisse, at around 11 a.m., that UBS still does not have access to the virtual data room (data room). FINMA emphasizes the urgency of this request. The CEO of Credit Suisse promises to deal with it immediately." at 318. | |
| 61 | March 16, 2023, evening | **<u>From FINMA Report</u>**: "With regard to the numbers in the restructuring plan, FINMA was dependent on the bank providing accurate data from the valuation in resolution. As time was running out, FINMA submitted the restructuring plan to the bank on the evening of Thursday, 16 March 2023, asking it to complete it with the data from the valuation in resolution and to ensure that the plan and the bail-in could be implemented in a legally compliant manner." at 73-74. | Highly relevant to CS's financial condition, as well as scienter and loss causation. If CS was having trouble providing accurate financial data to FINMA, it calls into question the figures it reported on Feb. 9 and March 14, 2023. |
| 62 | March 16, 2023, 10:00 pm | **<u>From PInC Report</u>**: "Around 10 p.m., Credit Suisse's Treasury division informs the head of FINMA's Credit Suisse supervision that the Fed and the Bank of New York are still demanding liquidity of USD 18 billion and that Credit Suisse is now also experiencing increased outflows of capital in Swiss francs. Credit Suisse tells FINMA that it believes it can meet this condition of the US authorities." at 318. | |
| 63 | March 17, 2023, morning | **<u>From PInC Report</u>**: "The deadline for Credit Suisse to finalize its restructuring plan is extended until 5 a.m. on Friday [March 17, 2023]." at 318.<br><br>At 4:56am "Responding to the request of the FINMA, Credit Suisse presents a reorganization plan likely to be approved." at 322. | Highly relevant to CS's financial condition, as well as to scienter and loss causation.<br><br>The restructuring plan likely highlighted existing issues with CS that led to the collapse. In addition to the existence of these issues, the very emergent need for a restructuring plan itself contradicts statements made by Defendants *the same week*, for example, that state |

| | | | |
|---|---|---|---|
| | | | assistance was "not a topic" for CS (ECF No. 65 at ¶294), that CS was continuing to successfully execute on the strategy it announced Oct. 27, 2022 (¶297), and that the bank's liquidity basis was "very very strong" (¶306). |
| 64 | March 17, 2023 | **From PInC Report**: "[I]n the ELA+ requests of March 17 and 19, 2023, Credit Suisse explained to the SNB and FINMA that it was unable to generate enough liquidity on the money market, the capital market or elsewhere to cover its needs." at 342. | |
| 65 | March 17, 2023 | **From PInC Report**: "FINMA is finalizing during these days in March the draft resolution it has been preparing since October 2022 (see chap. 7.2.2.6). On Friday, March 17, a translated draft in English is available. Among other things, it describes the episodes preceding the Credit Suisse crisis, the structure of the Credit Suisse group and the applicable capital and liquidity requirements, and analyzes the preconditions for the reorganization of Credit Suisse, approves the reorganization plan drawn up by Credit Suisse and details the reorganization measures required by FINMA. It also emerges that FINMA considers reorganization to be feasible." at 329. | |
| 66 | March 17, 2023 | **From PInC Report**: "According to the resolution proposal, the following elements attest to the fact that Credit Suisse fulfills the conditions for resolution: Credit Suisse can no longer finance itself on the market despite the use of ELA, is suffering massive capital withdrawals and has lost the confidence of the markets. (n°55 ss.). The parent company could therefore become insolvent in the near future and ultimately go bankrupt. (n° 57). The holding company could also be affected (n°58 s.). In addition, sanitation is proportionate (n°60 ss.)." at 329 fn. 1709. | |
| 67 | March 17, 2023, 12:45 pm | **From PInC Report**: "At 12:45 p.m.: Credit Suisse requests Emergency Liquidity Assistance (ELA+) in the amount of 20 billion and confirmation of solvency from FINMA." at Appendix 4. | |

| | | | |
|---|---|---|---|
| 68 | March 17, 2023, 5:30 pm | **From PInC Report**: "At 5:30 p.m., Credit Suisse informs FINMA, in a telephone conversation about the restructuring, that it believes a bail-in is neither necessary nor legally possible. The head of the Recovery and Resolution division of FINMA reminds Credit Suisse of its legal obligation to participate in the preparation of the resolution even if other solutions are developed." at 329. | |
| 69 | March 17, 2023 | **From PInC Report**: SIF organized a meeting between representatives of CS and UBS to "restart negotiations." at 458. | |
| 70 | March 18, 2023, 12:15 pm | **From PInC Report**: "FINMA sent CS a letter regarding the submission of an acceptable restructuring plan." at 334. | Highly relevant to CS's financial condition, as well as to scienter and loss causation. The issues likely highlighted by the referenced plan, as well as the very need to complete the restructuring plan on such a tight timeline, contradict rosy statements made by Defendants earlier the same week (*see* Entry 63, above). |
| 71 | March 18, 2023, 12:30 pm | **From PInC Report** at 340:<br>• During its meeting, which began at 12:30 p.m., the board of directors of Credit Suisse and the management, also present, examined the draft UBS contract<br>• With regard to the other options, the chairman of the board of directors has announced that BlackRock has distanced itself from acquiring a stake in the last hour after intense and constructive discussions. The board of directors regrets this development and assumes that an information leak contributed to this decision<br>• Subsequently, the external legal advisors who participate in the meeting explain to the board of directors of Credit Suisse its obligations towards the bank, creditors and shareholders, as well as any liability issues.<br>• The head of the FDF, the president of the SNB and the chair of the FINMA board of directors took part in the meeting of the board of directors of Credit Suisse on March 18, 2023. The Chair of the | |

| | | | |
|---|---|---|---|
| | | FINMA Board of Directors informed the Board of Directors of Credit Suisse that FINMA assumed that the point of non-viability was fast approaching and that the supervisory authority would have no choice but to initiate resolution by reorganization or liquidation. | |
| 72 | March 18, 2023 (afternoon) | **<u>From PInC Report</u>**: "On the afternoon of March 18, the authorities' communications managers began to consult with their counterparts at UBS and Credit Suisse. From the outset, UBS wanted an official communication from the authorities that was concerted, including a joint press conference with the banks, as formulated in its list of conditions . . . The banks' communications managers take part in the coordination meeting for the first time at 8 p.m. that evening. All those present agree on the communications strategy. They agree that the press releases and discussion notes concerning the outcome scenario of the negotiations (agreement) should be ready the following day, regardless of the progress of the negotiations between the banks. At the end of this meeting, the spokesperson for the Federal Council informs the members of the government that all work relating to the communication is coordinated with the information services of the two banks, that they will continue to be coordinated the following day and that the process is being discussed jointly." at 369. | |
| 73 | March 18, 2023, 6:15 pm | **<u>From PInC Report</u>**: "FINMA asks Credit Suisse to submit an acceptable restructuring plan by Saturday [March 18] lunchtime. At 6.15 pm on the same day, FINMA receives the restructuring plan adapted by Credit Suisse." at 345. | Highly relevant to CS's financial condition, as well as to scienter and loss causation. The issues likely highlighted by the referenced plan, as well as the very need to complete the restructuring plan on such a tight timeline, contradict rosy statements made by Defendants earlier the same week (*see* Entry 63, above). |
| 74 | March 19, 2023 | **<u>From PInC Report</u>**: "On Sunday, March 19, 2023, the communication managers meet a total of three times for coordination sessions" with communications representatives from CS and UBS. at 369. | |

| | | | |
|---|---|---|---|
| 75 | March 19, 2023, 6:45 am | **<u>From PInC Report</u>**: "At 6:45 a.m., a telephone conversation takes place between the Chairman of the Board of Directors of Credit Suisse and the heads of SFI and FINMA. According to the report, the director of FINMA clearly informs the chairman of the board of directors of Credit Suisse that the point of non-viability (PoNV) has been reached with regard to liquidity and that, consequently, the value of the shares has fallen to zero . . . Then [The Secretary of State for International Financial Matters] made an offer to the chairman of the board of directors of Credit Suisse which she described as her final proposal for shareholder compensation: 2 billion instead of 1 billion." at 357. | |
| 76 | March 19, 2023 (morning) | **<u>From FINMA Report</u>**: "CS informed FINMA of its estimate of the cash that it would require in order to be able to start the week ahead without problems, estimating a figure of around CHF 100 billion." at 39. | |
| 77 | March 19, 2023 (afternoon) | **<u>From PInC Report</u>**: "After asking Credit Suisse, on the afternoon of March 19, 2023, to depreciate the AT1 instruments, FINMA formally ordered it by decision and based on the Banking Act and the Federal Council's emergency ordinance, at 10:01 p.m., to proceed with the depreciation." at 331. | |
| 78 | March 19, 2023, 5:00 pm | **<u>From PInC Report</u>**: "Credit Suisse request for additional emergency liquidity assistance (ELA+) and solvency certificate from FINMA." at Appendix 4. | |
| 79 | March 19, 2023, 6:10 pm | **<u>From PInC Report</u>**: At 6:10pm on March 19, 2023: "Second request from ELA+ from Credit Suisse to the SNB for 30 billion francs." at 356.<br><br>"While the Federal Council was still examining these issues, it learned at around 4.45 p.m. [on March 19] that Credit Suisse and UBS had reached an agreement on the new conditions. Once an agreement was reached, Credit Suisse once again applied for an ELA+, for up to 30 billion francs, at the SNB, which also fulfills this request." at 365. | Highly relevant to CS's financial condition as well as to scienter and loss causation. |

| | | | |
|---|---|---|---|
| 80 | March 19, 2023, 7:00 pm | **From PInC Report**: "Decision to approve the merger by the FINMA." at 356. | |
| 81 | March 19, 2023, 10:01 pm | **From PInC Report**: "FINMA formally instructed that CS write off the AT1 instruments." at 356. | |
| 82 | March 19-22, 2023 | **From PInC Report**: "CS requested that FINMA reconsider the employee participation programs replicated in the AT1 instruments." at 331. | |
| 83 | March 22, 2023 | **From PInC Report**: "In response to CS's request for reconsideration of the AT1 bond issue, FINMA confirmed its initial ruling of 19 March 2023." at 331. | |
| 84 | March 2022 – April 2023 | **From PInC Report Summary**: "FINMA made its approval of the filter contingent on CS disclosing its equity capital on a quarterly basis and having a third party regularly audit the relevant valuations of holdings in its subsidiaries." at 7. | |
| 85 | March 2022 – April 2023 | **From PInC Report**: "[S]everal of [FINMA's] assessment letters mention the execution or non-execution of certain measures, and the supervisory authority has issued letters of reprimand." at 153. | |
| 86 | Sept 2022 – March 2023 | **From PInC Report**: "At regular intervals, FINMA also formulates criticisms and exigencies on emergency measures and liquidity injections, which it will then formally present by letter to the Chairman of the Board of Directors and the CEO of Credit Suisse." at 216. | |
| 87 | Feb 2023 – March 2023 | **From FINMA Report**: "The Chair of the Board of Directors, Axel Lehmann, made public statements in connection with the outflows of client funds in early December 2022. FINMA investigated whether these statements constituted infringements of financial market law. While it reached the conclusion that these grounds were insufficient for proceedings to be instituted, FINMA left the bank in no doubt as to its expectations with regard to any future communication." at 35. | |

| | | | |
|---|---|---|---|
| 88 | March 2023 | **From PInC Report**: "FINMA, in coordination with SFI, asked Credit Suisse to provide it with a bi-weekly update containing key performance indicators (Key Performance Indicators) on the bank's status, which was implemented at the beginning of March 2023. This document should enable the authorities to have a continuous assessment of the bank's viability and thus serve as a basis for important decisions to answer a crucial question, namely when any action by the authorities is necessary." at 283. | |
| 89 | Nov. 8, 2022 | **From FINMA Report**: "Owing to the massive outflows within a very short time in October 2022, it was decided during that month that FINMA's operational crisis readiness for an intervention should be set at seven to ten days. Hence the runway period, comprising the final preparations for a resolution, was shortened in order to take account of the circumstances of the (still) ongoing bank run. FINMA requested the weekly submission of the "funding in resolution" reports from the bank – which show the liquidity requirement in the event of a PONV." at 72.<br>• Privilege logs produced in this case show an email, withheld on the basis of FINMA's CSI, dated Nov. 8, 2022, with the subject "RE: PLACEHOLDER: FiR Governance for Liquidity Assumptions - RECAP Session 2," which Plaintiff believes to be one of the above-referenced "funding in resolution" reports.<br>• Counsel for Credit Suisse replied on July 28, 2026, that CS had submitted the email to FINMA, but it had not permitted its production. | The Weekly FiR reports are highly relevant to CS's financial condition, as well as to scienter and loss causation. Moreover, the reports are likely to be primarily factual (*e.g.*, comprising of financial data), and as such, they are likely exempt from the asserted privilege. |