**KAHN SWICK & FOTI, LLC**
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr. (admitted *pro hac vice)*
Matthew P. Woodard (admitted *pro hac vice*)
Jyoti Kehl (admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com
Email: jyoti.kehl@ksfcounsel.com

-and-

J. Ryan Lopatka (admitted *pro hac vice*)
161 N. Clark Street, Suite 1700
Chicago, IL 60601
Telephone: (312) 759-9700
Email: j.lopatka@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Diabat*
*and Lead Counsel for the Class and Class Counsel*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: CREDIT SUISSE SECURITIES FRAUD CLASS ACTIONS<br><br>This matter relates to:<br><br>*Diabat* | No. 1:23-cv-5874-CM-SLC<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


**Page:**

OVERVIEW ..... 3

I. Defendants concealed Credit Suisse's true financial condition, leading to a historic merger and severe decline in the price of its ADSs. ..... 3

A. In the Spring and Summer of 2022, regulators urged Credit Suisse to act but Credit Suisse responded with optimistic platitudes. ..... 4

B. Credit Suisse management remained misleadingly optimistic after massive outflows and announced a new, doomed strategy ..... 7

C. Defendants concealed Credit Suisse's true financial condition as Swiss authorities urged the Group to prepare for a sale. ..... 10

D. Defendants continued to paint a misleadingly rosy picture while regulators scrambled to force a historic merger. ..... 14

II. Credit Suisse also concealed a months-long correspondence with the SEC regarding the effectiveness of internal control over financial reporting. ..... 17

III. The PInC Report Finds Defendants "Obscured" the True Financial Condition of Credit Suisse via a "Regulatory Filter." ..... 23

JURISDICTION AND VENUE ..... 27

PARTIES ..... 27

I. Plaintiff ..... 27

II. Defendants ..... 28

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 29

I. May 31, 2022: Denial of *Reuters* Report on Capital Raise ..... 29

II. July 27, 2022: Defendant Lehmann CNBC Interview ..... 31

III. July 27, 2022: Second Quarter 2022 Earnings Conference ..... 34

IV. July 27, 2022: Second Quarter 2022 Earnings Release and Media Release ..... 36

V. October 27, 2022: 2022 Strategy Update Presentation ..... 37

VI. October 27, 2022: Third Quarter 2022 Media Release and Investor Presentation ..... 38

VII. October 27, 2022: Third Quarter 2022 Earnings Release ..... 39

VIII. October 27, 2022: Third Quarter 2022 Earnings Conference ..... 41

IX. October 31, 2022: Defendant Lehmann Interview with *Bloomberg TV* ..... 43

X. November 2, 2022: Third Quarter 2022 Report ..... 43

XI. November 23, 2022: Preliminary Fourth Quarter 2022 Earnings Media Release ... 46

XII. December 1, 2022: Defendant Lehmann *Financial Times* Interview ... 47

XIII. December 2, 2022: Defendant Lehmann *Bloomberg* Interviews ... 48

XIV. December 5, 2022: Defendant Lehmann Interview with *SRF* ... 49

XV. February 9, 2023: Fourth Quarter 2022 Earnings Release ... 50

XVI. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Earnings Conference ... 52

XVII. February 9, 2023: Defendant Körner Interview with *Bloomberg TV* ... 57

XVIII. March 14, 2023: 2022 Annual Report ... 58

XIX. March 14, 2023: Defendant Körner Speech at European Financials Conference ... 60

XX. March 14, 2023: Defendant Körner Interview with *Bloomberg* ... 60

XXI. March 15, 2023: Defendant Lehmann Speech at Financial Sector Conference in Saudi Arabia ... 61

XXII. March 15, 2023: Defendant Körner Interview with *CNA* ... 62

XXIII. March 16, 2023: Media Release re SNB Aid ... 62

CREDIT SUISSE'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP ... 64

I. Interim Financial Statements ... 65

II. Audited Financial Statements ... 66

III. SOX Certifications ... 66

THE TRUTH IS REVEALED CAUSING LOSSES AND ECONOMIC DAMAGES ... 68

DEFENDANTS ACTED WITH SCIENTER ... 79

I. The Individual Defendants Knew or Recklessly Disregarded That Their Statements Were Materially False and Misleading ... 79

B. The SEC Inquiry Into Credit Suisse's Financial Reporting Supports a Strong Inference of Scienter ... 84

C. The Timing of Defendants' Statements Supports an Inference of Scienter ... 88

D. The Individual Defendants' Admissions Support a Strong Inference of Scienter ... 89

E. The Individual Defendants' High-Level Positions and Access to Non-Public Information Contrary to Their Public Statements Support a Strong Inference of Scienter ... 91

II. The Core Operations Doctrine Further Supports a Strong Inference of Scienter ... 92

III. The Individual Defendants and Other High-Level Credit Suisse Personnel Had Both Motive and Opportunity to Commit Fraud ..... 93

IV. Corporate Scienter is Established ..... 95

PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY ..... 96

THE 2022 ANNUAL REPORT OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN UNDER ITEM 5 OF FORM 20-F ..... 96

THE PRESUMPTION OF RELIANCE ..... 98

CONTROL PERSON ALLEGATIONS ..... 99

CLASS ACTION ALLEGATIONS ..... 100

COUNT I ..... 102

COUNT II ..... 104

PRAYER FOR RELIEF ..... 105

JURY TRIAL DEMANDED ..... 105

Lead Plaintiff Ali Diabat ("Plaintiff"), individually and on behalf of all other persons similarly situated, brings this securities class action on behalf of persons or entities who purchased or otherwise acquired: (i) Credit Suisse American Depository Shares ("ADSs"), (ii) seven Credit Suisse notes (specifically the LAE3 Notes, the AC5 Notes, the AF8 Notes, the L2E0 Notes, the L2G5 Notes, the L2K6 Notes, and the L2M2 Notes), and/or (iii) options on the Credit Suisse ADSs in domestic transactions from May 31, 2022, through and including March 20, 2023, (the "Class Period"), against defendants Credit Suisse Group AG ("Credit Suisse," the "Company," or the "Group"); former Chairman of the Board of Directors Axel P. Lehmann ("Lehmann"); former Chief Executive Officer ("CEO") Ulrich Körner ("Körner"); former Chief Financial Officer ("CFO") Dixit Joshi ("Joshi"); former CEO Thomas Gottstein ("Gottstein"); and former CFO David R. Mathers ("Mathers") (collectively, "Defendants"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters based upon the investigation conducted by Lead Counsel. This investigation included review and analysis of: (i) court records; (ii) public filings of Credit Suisse Group AG and Credit Suisse AG ("CS AG" [1]) with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) Credit Suisse's press releases and other investor materials; (v) analyst reports and independent media reports regarding Credit Suisse, its securities price movement, pricing, and volume data; (vi) news articles; and (vii) documents produced by Credit Suisse in the initial stages of the discovery process.

[1] CS AG is the parent company of the majority of Credit Suisse's divisions, including Wealth Management and the Swiss Bank. *See* ¶73, *infra*. CS AG is often referred to as the "parent bank" even though it is a subsidiary of Credit Suisse Group AG.

The following is further based on two public reports published by the Swiss government. On December 19, 2023, the Swiss Financial Market Supervisory Authority ("FINMA"), the Swiss regulator responsible for supervising banks and other financial institutions, published a report titled, "Lessons Learned from the CS Crisis" (the "FINMA Report"). The FINMA Report details years of FINMA's "increasingly intensified" supervisory actions, but concludes that, due to recurrent scandals, serious deficiencies in risk management, and the weak capitalization of CS AG, these actions were not sufficient to prevent the collapse of Credit Suisse.

Additionally, for only the fifth time in the 175-year history of the Swiss constitution, Switzerland's Parliament empowered a special parliamentary investigation committee (the "PInC") to investigate the downfall of Credit Suisse. After a year-and-a-half long investigation based on witness interviews, expert reports, and thousands of documents produced by Credit Suisse and other parties, on December 17, 2024, the Swiss Parliament published a report titled, "Conduct of federal authorities in the context of the Credit Suisse crisis" (the "PInC Report"). The approximately 560-page PInC Report was published in German, French, and Italian, but only a 30-page summary of the report was published in English (the "PInC Report Summary"). Plaintiff's Counsel commissioned a certified translation of the remainder of the report, which was completed near the end of March 2025. The PInC Report includes numerous facts supporting both falsity and scienter in this matter, for example: 1) multiple Swiss regulators stepped up their supervision of Credit Suisse in the summer of 2022 due to concerns about its capital and liquidity, meeting frequently with Defendants Lehmann, Körner, and other high level Credit Suisse management; 2) by the fall of 2022, regulators began considering a sale of Credit Suisse to be the likely solution to the Company's financial issues; and 3) Credit Suisse used a "regulatory filter" to mislead the public as to the Company's actual financial condition until the very end.

## OVERVIEW

### I. Defendants concealed Credit Suisse's true financial condition, leading to a historic merger and severe decline in the price of its ADSs.

1. On March 19, 2023, banking giant Credit Suisse announced it would no longer operate as an independent entity and would merge into its former rival, UBS Group AG ("UBS"). With approximately CHF 1.25 trillion[2] in assets under management at the time of the merger, Credit Suisse is widely considered the largest and most significant bank to fail or require a forced takeover since the 2008 financial crisis. The public was shocked by the news of this historic merger, which *appeared* to be hastily brokered by the Swiss government over a weekend. But in reality, Defendants had been concealing regulators' concerns about Credit Suisse's severe capital and liquidity issues and the effectiveness of Credit Suisse's internal controls for months, because they "wanted to present the image of a solid bank." PInC Report at 245. By November 2022, after Credit Suisse failed to staunch the liquidity drain from months of customer outflows, Swiss regulators saw the writing on the wall and encouraged Credit Suisse to begin preparing for a sale of the company. Meanwhile, Defendants falsely continued to assure the public that outflows had "stabilized" (or even "reversed") and tout Credit Suisse's "robust balance sheet" and a strategy that they claimed would usher in a "new Credit Suisse." And as the global banking giant teetered for months on the verge of complete collapse, the Credit Suisse Board and management—including the Individual Defendants—continued collecting exceptionally high compensation and bonuses, which FINMA found, "encouraged an inappropriate risk culture" that contributed to the Company's downfall. FINMA Report at 49.

2. Eventually, Defendants could no longer keep up the charade, and the Swiss Government had no choice but to step in. By Wednesday, March 15, 2023, multiple Swiss

---

[2] "CHF" is the abbreviation for the Swiss franc.

governmental bodies began facilitating earnest negotiations for the emergency sale of Credit Suisse to UBS, fearing a global financial catastrophe if a sale was not completed before the markets opened the following Monday. UBS purchased Credit Suisse for just CHF 3 billion, valuing Credit Suisse ADSs at just USD $0.82/share—a ***59% discount*** from the previous trading day. When the merger was announced, revealing the truth about Credit Suisse's abysmal financial situation, the price of Credit Suisse's ADSs plummeted ***52.99% in one day***.

**A. In the Spring and Summer of 2022, regulators urged Credit Suisse to act but Credit Suisse responded with optimistic platitudes.**

3. In the years leading up to the collapse, Credit Suisse was marred by high-profile scandals, executive turnover, and regulatory enforcement actions in Switzerland, the United Kingdom, and the United States. In March 2021, significantly, the failure of Credit Suisse's funds structured in collaboration with UK-based financier Lex Greensill ("Greensill Funds") and the collapse of Archegos Capital Management ("Archegos"), a hedge fund for which Credit Suisse had significant, undisclosed exposure, forced Credit Suisse to incur substantial losses and revealed critical risk management and control governance failures. As investors and customers began to lose confidence in Credit Suisse, the financial and reputational recovery from each scandal became increasingly more difficult.

4. The week before the Class Period began, on May 23, 2022, FINMA sent Credit Suisse an assessment letter addressed to Defendants Lehmann and Gottstein (the "May 2022 Assessment Letter"). Assessment letters are the result of formal assessments performed by FINMA at regular intervals wherein FINMA details a bank's risk rating, any weaknesses that have been identified, and the actions that need to be taken. These assessment letters—as well as all other correspondence between FINMA and Credit Suisse—are non-public and considered highly confidential. *See, e.g.*, FINMA Report at 49 ("FINMA was also bound by legal restrictions

regarding the provision of information to the public."). In the May 2022 Assessment Letter, FINMA called [redacted] CS-Diabat_00203075-76. FINMA explained: [redacted] CS-Diabat_00203076.

5. On May 31, 2022, the first day of the Class Period, *Reuters* reported, based on two sources with knowledge, that Credit Suisse was in the early stages of weighing options to bolster its capital after a string of losses had eroded financial buffers. The market swiftly reacted to this negative news. For example, a Jefferies analysts wrote in a research note: "The news, if confirmed, points to potentially more pain than we currently expect." Credit Suisse issued a prompt response that same day, in the same article, which outright denied the statements of the two *Reuters* sources: "Credit Suisse is currently not considering raising additional equity capital." Yet non-public correspondence between FINMA and Credit Suisse reveals [redacted] Further, in stark contrast to the Swiss regulators' recently relayed concerns regarding the deteriorating capital position at Credit Suisse," the Company stated: "The Group is robustly capitalised with a CET1 ratio of 13.8% and a CET1 leverage ratio of 4.3%." CET1 is high quality capital, and a financial institution's CET1 ratio is a measure of its capital strength. As described in further detail below, the PInC Report found that Credit Suisse used a regulatory filter to mislead the public about the parent bank's true CET1 ratio, further obscuring the Company's financial condition and ability to withstand financial distress.

6. Around the same time, May 2022, Swiss regulators, including FINMA, the Swiss National Bank ("SNB"), and the Federal Department of Finance ("FDF") began discussing "Credit Suisse's delicate situation" in various non-public meetings. PInC Report at 184. Topics at a May 31, 2022, meeting of the Steering Committee ("SC"), a consortium body formed by FINMA, the SNB, and the FDF, included "the capital situation of Credit Suisse's parent company," and the SNB stated that "action [was] needed to strengthen [CS AG's] capital base" because "***capital reserves are low, so that the next incident could be critical.***" *Id.* (emphasis added).

7. Knowing that one more incident could ruin Credit Suisse and have disastrous effects on the Swiss economy, FINMA began calling on the Group in non-public meetings and correspondence to implement concrete plans to rapidly stabilize its financial condition in the event of another scandal. In a letter dated April 11, 2022, FINMA asked Credit Suisse for [redacted] *See* CS-Diabat_00203087. In a follow up letter dated July 14, 2022, directed to Credit Suisse's Board of Directors and Executive Board, FINMA stated [redacted] *Id*. Credit Suisse [redacted], but again, in a letter dated August 5, 2022, addressed to Defendants Lehmann and Körner, FINMA found [redacted] CS-Diabat_00203095.

8. In this same August 5, 2022, letter to Defendants Lehmann and Körner, FINMA stated: [redacted]

[redacted] CS-Diabat_00203093 (emphasis added). Likewise, in a July 16, 2022, email, addressed to Defendants Lehmann and Gottstein, FINMA stated: [redacted] CS-Diabat_00203115 (emphasis added).

9. Despite privately acknowledging to FINMA on July 25, 2022, [redacted]— Defendants publicly contradicted those private acknowledgements just two days later. On July 27, 2022, when a CNBC interviewer asked Defendant Lehmann if Credit Suisse was planning to do a capital raise, Lehmann denied the claim and stated, "I think we are good on this one." In an earnings call that same day, Defendant Mathers, in response to a specific question about whether Credit Suisse needed to raise capital, made positive statements about Credit Suisse being in a "strong capital position" and being "well funded," and he denied that Credit Suisse needed to raise capital as a result. On the basis of these materially false or misleading statements, the price of Credit Suisse's ADSs rose approximately 5.56% on July 27, 2022, and a further 3.81% the following day, July 28, 2022.

**B. Credit Suisse management remained misleadingly optimistic after massive outflows and announced a new, doomed strategy.**

10. FINMA's worries about [redacted] were realized

just a few months later. On the evening of Friday, September 30, 2022, a memo from Defendant Körner to Credit Suisse employees was leaked to the public. The memo stated that the bank was at a "critical moment," noting recent declines in stock price and issues with the Group's credit spreads.[3] Then, on Saturday, October 1, 2022, a journalist from ABC tweeted, "Credible source tells me a major international investment bank is on the brink."[4] In light of the negative tone of Körner's memo leaked the day before, the public assumed the tweet was referencing Credit Suisse. This sentiment significantly exacerbated already ongoing customer outflows, particularly in Credit Suisse's Wealth Management division.

11. In response to these outflows, Credit Suisse activated the first two levels of its contingency funding plan ("CFP"), a multi-tiered plan for responding to a potential liquidity shortfall, on October 3 and 6, 2022, respectively. Around this time, the Swiss Committee on Financial Crises (the "CFC," another joint initiative of FINMA, the SNB, and the FDF) escalated the Credit Suisse situation to "Red Phase," meaning it "detect[ed] an immediate threat to the Swiss economy or to the functioning of the Swiss or international financial system." FINMA Report at 16. In mid-October, fearing that "the bank would soon reach the point of non-viability due to a lack of liquidity," FINMA encouraged Credit Suisse to take Emergency Liquidity Assistance ("ELA") from the SNB, yet Credit Suisse refrained from taking ELA, because it did "not want to send any negative signals to the market before the announcement of its new strategy on October 27." PInC Report at 216. These facts were all unknown to the public at the time and were not revealed until months after the Class Period, when the FINMA and PInC Reports were published.

---

[3] Marion Halftermeyer, "Credit Suisse Market Turmoil Deepens After CEO Memo Backfires," *Bloomberg*, Oct. 3, 2022.

[4] Emma Rapaport, "ABC reporter deletes tweet claiming investment bank 'on the brink,'" *Financial Review*, Oct. 3, 2022.

12. Then, on October 24, 2022, FINMA sent a harshly worded, non-public letter to Credit Suisse's Board of Directors and Executive Board, stating: [redacted] CS-Diabat_00203098.

13. On October 27, 2022, Credit Suisse publicly announced a new strategic plan. There were two main parts of the plan: (1) replenishing capital through two new share issuances, one for the Saudi National Bank and one for existing shareholders, for a combined total of CHF 4 billion; and (2) slimming down the core businesses of the Group through the spin-off of Credit Suisse's Investment Bank business and sale of its Securitized Products Group ("SPG").

14. The announcement of the strategic plan also partially corrected Defendants' previous misleading statements that Credit Suisse was not considering and would not require a capital raise. Upon learning of this new revelation, the market reacted strongly, and the price of Credit Suisse securities fell precipitously. For example, an analyst from J.P.Morgan stated, "We believe the main driver of negative share price reaction was the announcement of a CHF 4bn capital raise to 'clear the deck' and such a material dilution should have been avoided in our view. On our forecasts CSG CET1 ratio does not fall below 13.5% through the restructuring period post capital raise completion." But while Credit Suisse disclosed its capital raises, Defendants characterized them as measures to "further strengthen the Group's capital base and support its new strategic direction," rather than truthfully disclosing that the capital raises were required to support its precarious financial condition, which Defendants continued to conceal. Defendants further

concealed that FINMA, [redacted]

15. On the same day, October 27, 2022, Credit Suisse published its earnings report for the third quarter of 2022 (“3Q22”), and held an earnings call to discuss the results. While the results were undeniably poor, and Defendants had no choice but to address the massive outflows that had occurred earlier in the month, management’s statements were misleadingly positive given the true state of affairs at Credit Suisse and the Company’s behind-the-scenes discussions with FINMA. Thus, the market was unable to factor this material information into the pricing of Credit Suisse’s stock.

### C. Defendants concealed Credit Suisse’s true financial condition as Swiss authorities urged the Group to prepare for a sale.

16. On October 30, 2022, just days after the October 27 announcement of Credit Suisse’s strategic plan, which Defendants touted as the beginning of a “new Credit Suisse,” Credit Suisse privately informed FINMA that the Company would likely need to take ELA the following week should outflows continue. PInC Report at 219. After FINMA pressed Credit Suisse for a plan to address the potential continuing outflows, on October 31, 2022, Defendant Lehmann presented FINMA with an analysis of potential counterparties if a sale of Credit Suisse became necessary. *Id.* In the event outflows continued, “CS regarded the sale of the entire Group as the best option, and FINMA called on the bank to make concrete headway in moving ahead with preparations for this scenario.” FINMA Report at 35.

17. This same day, Defendant Lehmann appeared for an interview on *Bloomberg TV*, in which he falsely stated that outflows had “clearly stabilized,” and in fact, Credit Suisse was seeing “some inflows coming [in].” In reaction to these statements, the price of Credit Suisse’s

ADSs increased approximately 4.83% on October 31, 2022.

18. One day later, on November 1, 2022, Defendant Körner activated the third and final level of Credit Suisse's CFP, which required authorization by the Group CEO to activate. FINMA Report at 63.

19. On November 2, 2022, FINMA informed the other Swiss financial regulators that Credit Suisse had prepared again to take ELA, but again withdrew the request because it "wanted to present the image of a solid bank." PInC Report at 245. The same day, November 2, 2022, Credit Suisse released its 3Q22 Quarterly Report, in which Defendants misleadingly emphasized once again that the measures outlined in its strategic plan would remediate the outflows. However, the 3Q22 Quarterly Report neither mentioned Credit Suisse's withdrawn application for ELA nor FINMA's concerns that continuing outflows may require a sale of the Company. But it did reveal, contrary to Defendant Lehmann's prior statement, that outflows had "stabilized to lower levels but have ***not yet reversed***." (Emphasis added).

20. Fearing there would be no legal basis to bail out Credit Suisse in an emergency, the FDF began preparing a proposal to the Swiss legislature to create a public liquidity backstop ("PLB"), which legislation would be general and not specifically name Credit Suisse. PInC Report at 245. However, on November 4, 2022, Defendant Lehmann personally requested that these preparations be stopped, because he "fear[ed] that a direct link [would] be made between such a decision and the situation of Credit Suisse" and would "suggest that the bank is in a desperate situation." PInC Report at 244-46. Just days later, on November 10, 2022, Credit Suisse informed FINMA that it could not meet the regulator's liquidity requirements. PInC Report at 221. By the end of November 2022, considering a turnaround of Credit Suisse's dire financial condition to be unlikely, Swiss regulators agreed that all authorities should discuss possible alternative solutions

with Credit Suisse, including a sale of the Company. PInC Report Summary at 14. Yet none of these material facts were disclosed in Credit Suisse's November 23, 2022, announcement of its preliminary 4Q22 results, which optimistically concluded, "The Group continues to execute on the decisive strategic actions detailed on October 27, 2022, to create a simpler, more focused and more stable bank – a new Credit Suisse."

21. Then, in early December 2022, Defendant Lehmann told multiple media outlets that outflows had "started to reverse" and "basically stopped," knowing, or recklessly disregarding, that this statement was false. Internal emails among members of Credit Suisse's SOX Steering Committee (a group that managed Credit Suisse's ICFR and quarterly reviewed and attested to the accuracy of the Company's financial reporting), one of whom was also a member of Credit Suisse's Executive Board, revealed that Credit Suisse did not "have yet a clear fact pattern that would support the use of the term 'reversal.'" CS-Diabat_00089853. The Executive Board member stated that the deposit trend figures were "made available daily in multiple senior management meetings." *Id.*

22. On December 5, 2022, FINMA informed the CFC, based on monitoring it conducted with the assistance of Credit Suisse management, that "***Credit Suisse's capital outflows were not drying up*** and that a substantial improvement in the situation in this respect could not be expected by the end of the year." PInC Report at 259 (emphasis added). ***The same day***, December 5, 2022, contrary to the non-public statements of FINMA, Defendant Lehmann told Swiss broadcaster *SRF* that client outflows had "definitely stabilized," and "the situation has calmed."

23. On December 6, 2022, FINMA wrote another letter to Credit Suisse's Board of Directors and Executive Board, stating: [redacted]

[redacted] CS-Diabat_00203105 (emphasis added). Pillar 1 refers to minimum capital requirements for a financial institution, whereas Pillar 2 is additional capital meant to act as a buffer, in the case of additional bank-specific risks. FINMA concluded: [redacted] CS-Diabat_00203106. FINMA emphasized, [redacted] *Id.*

24. Around this same time, "FINMA insisted even more emphatically that preparations be made for a merger." PInC Report Summary at 14. In a non-public letter dated December 7, 2022, addressed to Defendants Körner and Joshi, FINMA stated: [redacted] CS-Diabat_00203128 (certified translation). In order to prepare for such a scenario, FINMA "instructed CS to develop a short- and medium-term sale scenario by early January." PInC Report Summary at 15.

25. By December 22, 2022, Swiss regulators concluded "that the chances of Credit Suisse saving itself have diminished," and "the most likely solution seems to be a sale." PInC Report at 262. While Credit Suisse had presented FINMA with a "long list of potential buyers," FINMA concluded that UBS was the only viable buyer if an emergency sale was required. *Id.* On

December 28, 2022, FINMA's Chairman alerted SNB's Chairman that Credit Suisse "was in an extremely dire condition and its liquidity situation had once again deteriorated significantly." PInC Report Summary at 16. FINMA noted, "the bank only had a few billion in liquid assets left, which is why a default on payment could have a domino effect." PInC Report at 266.

26. On December 29, 2022, "FINMA made clear demands that CS complete preparations for a sale by early January," including demands that the Company "devise a short-term scenario in which CS would be taken over by UBS." PInC Report Summary at 16. CS complied by mid-January. *Id*. The PInC found: "In general, all those present at [the December 29 meeting] agree that the Chairman of the Board of Directors of Credit Suisse appears optimistic, and sometimes even overly optimistic. In his answers to the questions asked by the authorities, he mainly highlights the positive aspects. For them, it has become clear that ***the chairman of the board of directors of Credit Suisse is underestimating and embellishing the situation, particularly to create an impression of security***." PInC Report at 241 (emphasis added).

27. Amidst the continuing turmoil, on February 9, 2023, Credit Suisse released its earnings report for 4Q22 and held an earnings call to discuss the Company's fourth quarter and fiscal year 2022 results. Defendants continued to paint a picture of a Company that had faced some struggles but was secure and on track to regaining stability, particularly due to its adequate capitalization and liquidity. There was no mention of either FINMA's significant concerns regarding Credit Suisse's capital and liquidity or its calls to finalize preparations for an emergency sale of the Company.

### D. Defendants continued to paint a misleadingly rosy picture while regulators scrambled to force a historic merger.

28. On March 15, 2023, at a conference in Saudi Arabia, Ammar Al Khudairy—the chairman of the Saudi National Bank—bluntly stated in a response to *Bloomberg* reporter about

whether the Saudi National Bank would be willing to provide additional financial "assistance" to Credit Suisse: "The answer is absolutely not, for many reasons outside the simplest reason, which is regulatory and statutory."[5] The market reacted strongly to this statement, assuming Al Khudairy knew insider information about the Group's financial condition.

29. For almost a year, unknown to the public, FINMA had been urging Credit Suisse to prepare a recovery plan in the case of another incident. Yet when crisis hit, there was only one available solution—the last-resort, emergency sale with UBS. Indeed, Colm Kelleher, the Chairman of UBS, would later admit to being "very surprised, to put it diplomatically" when he reviewed correspondence between FINMA and CS after the merger: "The fact that CS received these letters and did nothing, or not enough, is inconceivable."[6]

30. Starting on March 15, 2023, "events unfolded rapidly…. authorities immediately realised that urgent measures were now required to prevent the systemically important CS from being liquidated. They therefore set up a crisis unit at the main office of the FDF." PInC Report Summary at 18 (emphasis added). "Given the urgency of the situation, [the Swiss Government was] determined to come up with a viable solution by Sunday evening at the latest to calm the markets before global stock markets opened for trading on Monday [March 20, 2023]." *Id.*

31. The same day, March 15, 2023, Defendant Körner publicly stated in an interview that Credit Suisse's capital and liquidity basis were "very very strong." In another interview on the same day, Defendant Lehmann stated Credit Suisse had "strong capital ratios, a strong balance sheet," and that state aid was "not a topic" for the Group. Not only were these statements materially

[5] Yousef Gamal El-Din, "Credit Suisse Reels After Top Shareholder Rules Out Raising Stake," *Bloomberg*, Mar. 15, 2023.

[6] Christian Kolbe, "'At Credit Suisse, there were cowboys who only thought about their own interests,'" *Blick*, Oct 1, 2024.

false or misleading because they were made while the Swiss Government was actively negotiating a sale of Credit Suisse in order to prevent its imminent collapse, Defendant Lehmann's statement was materially misleading because that same day, only about 12 hours after his statements were made, Credit Suisse finally requested CHF 50 billion in ELA from the SNB—which request was granted just hours later and announced on the morning of March 16, 2023. PInC Report at 300. The market reacted positively to this announcement, assuming the additional liquidity would be sufficient to counteract the deposit outflows in 4Q22 (which they wrongly believed, based on Defendants' statements, had concluded). But Credit Suisse's announcement of the aid was misleading in itself, both because it omitted mention that the Group was on the brink of collapse, and because, according to several people interviewed by the PInC, "it was already clear at that time that this aid in the form of cash would not be enough." *Id.*

32. Moreover, the statements of Defendants Körner and Lehmann were materially false or misleading because, the week of March 13, 2023, Credit Suisse was experiencing massive outflows. The FINMA Report revealed critical details about the massive outflows at Credit Suisse on each day of the final week before the bank collapsed:

| **Date** | **Outflows** |
|---|---|
| March 13, 2023 | CHF 1.6 billion |
| March 14, 2023 | CHF 2.7 billion |
| March 15, 2023 | CHF 13.2 billion |
| March 16, 2023 | CHF 17.1 billion |
| March 17, 2023 | CHF 10.1 billion |

FINMA Report at 36-37.

33. After several days of negotiations, and after the Swiss Government agreed to certain legal concessions and guarantees against losses, UBS agreed to a deal in the evening of Saturday, March 18, 2023. PInC Report at 351. The head of the FDF called Defendant Lehmann and urged him to accept the offer from UBS, stating: "***there was no viable plan B and that it was now***

***necessary to think about Switzerland's interests***." *Id*. at 353 (emphasis added). In the afternoon of March 19, 2023, "an agreement was finally reached between CS and UBS." PInC Report Summary at 20.

34. The merger was announced in a press conference on the evening of Sunday, March 19, 2023, and in a press release filed by Credit Suisse with the SEC on March 20, 2023. The purchase price was just CHF3 billion, valuing Credit Suisse ADSs at just $0.82/share—a ***59% discount*** from the previous trading day.

35. For months leading up to Credit Suisse's collapse, Defendants had publicly painted a portrait of a beleaguered company whose strong fundamentals rendered it capable of turning around to create a "new Credit Suisse." The announcement of the merger, forced by the Swiss Government, finally shattered this illusion and revealed the full truth about Credit Suisse's financial condition. When the truth was revealed, it decimated the price of Credit Suisse's ADSs, which fell from $2.01/share at market close on Friday, March 17, 2023, to $0.94/share at close of market on March 20, 2023—***a 52.99% decline***.

## II. Credit Suisse also concealed a months-long correspondence with the SEC regarding the effectiveness of internal control over financial reporting.

36. During the Class Period, Defendants knowingly or recklessly failed to disclose to investors that their ongoing risk management and control governance issues led the SEC to believe Credit Suisse had deficiencies in its ICFR, leading to a months-long correspondence and the eventual delay of the filing of Credit Suisse's 2022 Annual Report.

37. On July 15, 2022, the SEC initiated private comment letter correspondence with Credit Suisse through its then-CFO Defendant Mathers (subsequent letters were addressed to Defendant Joshi), requesting more information about the Company's "revision" of its financial statements for the years ending December 31, 2020, and December 31, 2019, as reflected in the

2021 Annual Report. Specifically, in its July 15, 2022, letter, the SEC asked:

> In light of your accounting issues and resulting revisions, as well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management, please provide us with your analysis supporting your conclusion that there were no material changes to ICFR.

38. The maintenance of effective ICFR is an essential duty of senior management of a corporation, particularly the CFO and CEO, in order to ensure that the information reported in the company's financial statements is accurate and does not contain any material misstatement. Continuing to revise and maintain effective ICFR is a crucial foundation for all public companies, particularly large and globally significant companies like Credit Suisse. The fact that the SEC was questioning Credit Suisse's ICFR put Defendants on notice that further assessment and revisions to the ICFR were necessary. This is particularly true for Defendants Lehmann, Körner, and Joshi, who were specifically brought in to adequately assess risk after the failures of their predecessors. Likewise, Defendants' touting of new risk-reduction plans and strategies to investors while omitting mention of the SEC's concerns was highly material and misleading.

39. Nor was the SEC the first regulator to question Credit Suisse's ICFR. In the non-public May 2022 Assessment Letter, FINMA [redacted] CS-Diabat_00203075-76. FINMA stated: [redacted] *Id.* FINMA directed the Credit Suisse Board of Directors and Executive Board to [redacted]

[redacted] CS-Diabat_00203080. And around the same time, mid-May 2022 (just before the beginning of the Class Period), the UK's financial regulator, the Financial Conduct Authority ("FCA"), placed Credit Suisse on a "watchlist of institutions requiring tougher supervision," based on concerns that it had "not done enough to improve its culture, governance and risk controls."[7]

40. Nevertheless, on August 22, 2022, Credit Suisse responded to the SEC that, while it acknowledged the existence of several "accounting issues," "operational incidents" (including the Archegos incident), and changes in business structure and senior management, these factors "did not materially affect, and were not reasonably likely to materially affect, the ICFR at the Group or the Bank." Credit Suisse's August 22, 2022, response did not satisfy the SEC. It sent the Company follow-up questions on October 20, 2022. In particular, the SEC asked the Company to explain in more detail each of the control deficiencies previously identified, and to explain how the Company concluded that those deficiencies did not rise to the level of a material weakness.

41. Credit Suisse responded on November 18, 2022, explaining that it had identified several control deficiencies, which mainly affected the way Credit Suisse reported its cash flow, but had determined they were not material or significant, individually or in combination with other control deficiencies, based on a series of qualitative and quantitative factors.

42. Far from quelling concerns in Washington, Credit Suisse's explicit admission of control deficiencies led the SEC to raise even more questions "as to the actual control(s) that were deficient." It sent these questions in a letter to the Company dated January 17, 2023. The SEC requested that the Credit Suisse, among other things: (1) identify the deficient controls, provide a

---

[7] "UK regulator puts Credit Suisse on watchlist after scandals," *Financial Times*, Jun. 12, 2022.

description of how each control was designed to address the related risk of material misstatement, and explain whether the deficiency related to the design or operating effectiveness of the control; (2) provide Company management's root cause analysis; (3) discuss any remediation efforts; (4) describe the factors that affected the magnitude of the misstatement that might result from the deficiency, and quantify the magnitude; and (5) explain in more detail how the Company performed the severity analysis for each of the control deficiencies related to the errors.

43. Credit Suisse responded to the SEC's questions on February 13, 2023. The Company stated that it "continued to believe that [its] control activities were selected and established to foster effective internal control over financial reporting as of December 31, 2021."

44. Discussions between Credit Suisse and the SEC continued late into the evening on March 8, 2023, the day before Credit Suisse had planned to file its Form 20-F for the period ending December 31, 2022 ("2022 Annual Report"). As a consensus could not be reached, the SEC asked Credit Suisse to delay the filing of the 2022 Annual Report.

45. Credit Suisse issued a press release on March 9, 2023, announcing that it was delaying the publication of the 2022 Annual Report "in relation to certain open SEC comments" about its "controls." Nothing in that press release reported the serious questions raised by the SEC over the past several months or the existence of material weaknesses in Credit Suisse's ICFR. Instead, Credit Suisse characterized the delay as "prudent" "following a late call" by the SEC. While the price of Credit Suisse's ADSs declined approximately 4.48% on March 9, 2023, in reaction to the news about the late filing, Defendants' misleading characterization significantly cushioned the blow. Notably, Credit Suisse's correspondence with the SEC was not made public until April 11, 2023—after the merger with UBS had already been announced.

46. Still dissatisfied with Credit Suisse's responses, the SEC sent yet another series of

questions on March 10, 2023, commenting that it would like to better understand how Credit Suisse had concluded that a broader risk assessment entity-level control material weakness and a broader monitoring entity-level control material weakness did not exist as of December 31, 2022 and 2021. Just two days later, in a letter to the SEC dated March 12, 2023, Credit Suisse finally admitted that there had been material weaknesses in its ICFR dating back to the 2021 Annual Report.

47. Specifically, Credit Suisse stated: "[W]e have, and have had, a material weakness in internal control over financial reporting as it relates to COSO Principle 7," and "management has concluded that there was a material weakness in the Group's internal control over financial reporting as of December 31, 2021 and which continued as of December 31, 2022, related to COSO Principle 17." The Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") is a framework of principles for developing and maintaining effective internal controls. Principle 7 "[i]dentifies and analyzes risks." Principle 17 "[e]valuates and communicates deficiencies." FINMA [redacted]—specifically Defendants Lehmann and Gottstein—[redacted]. *See, e.g.*, CS-Diabat_00203081 [redacted]; CS-Diabat_00203080 [redacted].

48. Credit Suisse did not disclose the existence of these material weaknesses to investors for another two days.

49. When the Form 20-F was eventually filed on March 14, 2023, it revealed to the

public for the first time that Credit Suisse had "identified certain material weaknesses in internal control over financial reporting as of December 31, 2021 and, consequently, December 31, 2022."

50. During the period from July 15, 2022, through March 14, 2023, Defendants made repeated pronouncements about Credit Suisse's financial condition while failing to apprise the market about the serious inquiries from the SEC that would eventually lead the Company to admit there were material weaknesses in its ICFR, thus casting these statements about its financial condition in a half-true light. Had the Company revealed that it was under persistent questioning by the SEC regarding its ICFR, investors could have arrived at a valuation of Credit Suisse's securities that more accurately reflected its true condition.

51. After the March 9, 2023, announcement of the delay in the publication of Credit Suisse's annual report, Swiss authorities "discuss[ed] the measures taken by Credit Suisse to prevent this from happening again and are of the opinion that these are described in a very summary manner by the bank." PInC Report at 292. "From the authorities' point of view, the postponement of the publication of the Credit Suisse annual report has further destabilized the markets." *Id.* And just five days after admitting there had been material weaknesses in its ICFR dating back to the 2021 Annual Report, Credit Suisse collapsed.

52. But the adverse effects of the weaknesses in Credit Suisse's ICFR did not cease with the merger. On March 17, 2025, UBS revealed that its auditor, Ernst & Young, "expressed an 'adverse opinion' on internal controls over financial reporting related to legacy Credit Suisse matters."[8] "The issue relates to 'material weaknesses' originally discovered at Credit Suisse when it was still a standalone bank…. 'Although Credit Suisse AG is no longer a separate legal entity, numerous of its booking, accounting and risk management systems remain in use for activities that

---

[8] Noele Illien, "UBS Auditor Issues Adverse Opinion Over Credit Suisse Controls," *Bloomberg*, Mar. 17, 2025.

have not yet been exited or migrated to UBS systems,' UBS said." *Id*.

## III. The PInC Report Finds Defendants "Obscured" the True Financial Condition of Credit Suisse via a "Regulatory Filter."

53. The PInC Report further revealed another way in which Credit Suisse was able to "obscure[] the true financial condition of [the Group]." PInC Report Summary at 7. The PInC found, that to the detriment of investors, Defendants utilized a "regulatory filter" "to maintain the appearance of sufficient capitalisation until the very end." *Id*. This revelation answered a question that had been plaguing experts and analysts: how could Credit Suisse have been on the brink of failing when its CET1 ratio appeared to meet or exceed regulatory requirements?[9]

54. CET1 ratio is a measure of a financial institution's capital strength and ability to withstand financial distress. CET1 capital is a financial institution's highest quality capital: capital that can absorb losses immediately when they occur. If a financial institution's CET1 ratio is high, it is more likely that the institution would have sufficient liquid capital to cover outflows in the event of a run on the bank. FINMA supervises financial institutions to ensure compliance with applicable regulations. Starting in 2019, FINMA required Credit Suisse to have a CET1 ratio of at least 10%. At Credit Suisse's request, purportedly to assist in its touted strategic transformation process, FINMA lowered this requirement to 9.28% as of September 30, 2022.

55. However, as explained in the PInC Report, FINMA allowed Credit Suisse to use a "regulatory filter" which let CS AG report an artificially higher CET1 ratio. The regulatory filter allowed CS AG to account for certain overvalued assets using their higher book value rather than their lower fair market value. For example, if CS AG paid $10 for an asset, but current value on the open market was only $6, the regulatory filter would allow CS AG to value the asset at $10

[9] *See* Yvan Lengwiler, "Global Lessons from the demise of Credit Suisse," VoxEU Centre for Economic Policy Research, Sept. 4, 2023 ("One of the puzzles of Credit Suisse's failure is that it comfortably [met] all regulatory capital and liquidity requirements.").

when calculating its CET1 ratio. This was supposed to be counterbalanced by a "value reserve" in the book value of other undervalued assets. If applied properly, these provisions would have ensured CS AG always held sufficient capital. However, as outflows continued throughout the Class Period, the Company did not have sufficient undervalued assets to counterbalance the overvalued assets—yet, CS AG continued to use the filter. Urs Birchler, a former SNB official and the author of an expert report commissioned by the PInC during its investigation into the collapse of Credit Suisse (the "Birchler Report"), used the following visual to explain:




56. According to the Birchler Report, the filter remained relatively stable from 2019 through 3Q21. However, when the overhang from the Archegos and Greensill Funds scandals caused the Group to begin performing poorly in 4Q21, the filter started becoming a larger and larger portion of CS AG's CET1 capital, eventually accounting for over 50% of its reported CET1 capital in 3Q22. *See* Birchler Report at 12. Throughout the Class Period, CS AG's CET1 ratio was only able to remain above regulatory minimum requirements because of the filter. *Id.* at 13. Without the filter, CS AG's CET1 ratio would have dipped as low as 5% in 3Q22. *Id.*

57. CS AG's misleading use of the filter created an impression that it had ready access to far more capital than it actually had. At a meeting with FINMA on December 6, 2022, the SNB

noted, "the precarious capitalization of the parent company prevents the elimination of risks." PInC Report at 260. "For the PInC, this statement is all the more remarkable given that at the end of 2022, the parent company Credit Suisse AG benefited from the regulatory filter to the tune of 14.5 billion francs. This sum represented almost half of its regulatory capital." *Id*. The FINMA Report lists CS AG's weak capitalization as a "main reason" for Credit Suisse's failure, because it had "the weakest capital adequacy situation within the Group and thus represented the weakest link in the chain." FINMA Report at 7.

58. Throughout the Class Period, in quarterly and annual financial reports filed with the SEC, Credit Suisse reported CS AG's CET1 ratio with the filter, but never reported CS AG's CET1 ratio without the filter. The filter was also not discussed in Credit Suisse's "Pillar 3 and Regulatory Disclosures" document, which it filed quarterly on Form 6-K. Instead, these documents pointed investors, in a much smaller font, to a document only available on Credit Suisse's website, also titled "Regulatory Disclosures," which contained figures from which the ratio without the filter potentially could have been calculated. "These figures [were] not published with the other important figures, i.e., in the table dedicated to capital requirements and capital indicators in Switzerland, but in text form," and there was no comparison to previous periods. PInC Report at 166-67. The PInC Report explained, "CS's parent company reported the amount of the filter in a manner that was hardly comprehensible to outsiders." PInC Report Summary at 7. The PInC Report continued, "The regulatory filter obscured the true situation of CS AG. As a result, CS was not forced to strengthen its equity situation at a time when it might have been easier to do so. ***If the capital ratio of CS AG had been public without the filter, this could have given capital markets, financial analysts and the media more transparent information on which to base their decisions.***" *Id.* (emphasis added).

59. Many sophisticated investors and analysts and investors were misled by the use of this filter. For example, on March 15, 2023, just days before Credit Suisse collapsed, the chairman of Credit Suisse's largest shareholder, the Saudi National Bank, stated: "I don't think [Credit Suisse] will need extra money; if you look at their ratios, they're fine."[10]

60. Notably, UBS would later confirm that Credit Suisse had "in fact been undercapitalized for a long time," and that "the collapse of Credit Suisse was driven by years of… reliance on substantial regulatory concessions."[11] According to UBS, "without the merger agreement, Credit Suisse would have collapsed and shareholders would have faced a total loss."[12]

61. The effect of the regulatory filter was one of the biggest bombshells revealed in the PInC Report, with many news outlets reporting on the finding. For example, a *Bloomberg* article stated: "The concession would later enable Credit Suisse to report a capital level, expressed as CET1 ratio, that continued to exceed the required minimum while the lender was already careening toward its demise."[13]

62. Had the Company disclosed the details about the regulatory filter in a non-misleading manner that was comprehensible to reasonable investors, investors could have arrived at a valuation of Credit Suisse's securities that more accurately reflected the then-existing financial condition of Credit Suisse and reflected the risk the Company was suffering from financial

[10] Dominic Lau, "Everything Fine at Credit Suisse, Saudi National Bank Head Says," *Bloomberg*, Mar. 16, 2023; *see also* Kian Abouhossein et al., "Where do we go from here?: Scenario analysis," J.P. Morgan, Mar. 16, 2023 ("[I]n our view, CSG's capital position is not the issue."); Alastair Ryan, "Choices and Implications," BofA Global Research, Mar. 16, 2023 ("Switzerland has unique capital requirements . . . the group already has a significant [capital] surplus to requirements.").

[11] "Credit Suisse collapse probe slams banking regulator," *France24*, Dec. 20, 2024.

[12] "Complaints from CS Shareholders: Dispute Advances to Next Round," *Finews*, Aug. 30, 2024.

[13] Levin Stamm, "Swiss Bank Watchdog Blundered on Credit Suisse, Report Finds," *BNN Bloomberg*, Dec. 20, 2024

problems, such as insufficient capitalization, not reflected on its balance sheets.

63. Instead, the public discovered the truth about the Company's financial condition when Credit Suisse collapsed and was forced to merge with its biggest competitor, sending the price of its securities plummeting.

## JURISDICTION AND VENUE

64. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

65. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

66. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Credit Suisse's ADSs traded on the New York Stock Exchange ("NYSE") throughout the Class Period. Accordingly, there are investors in Credit Suisse's securities located within the U.S., some of whom reside in this Judicial District.

67. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

### I. Plaintiff

68. Plaintiff Ali Diabat, as set forth in previously filed certifications (*see* ECF Nos. 16-4; 65-2), purchased Credit Suisse securities in domestic transactions during the Class Period and was damaged when the truth was revealed and the artificial inflation was removed from the price

of the securities.

## II. Defendants

69. From its founding in 1856 until its merger with UBS in June of 2023, Credit Suisse was a global financial services company based in Zurich, Switzerland. It had branch offices in the United States and around the globe. During the Class Period, substantially all of Credit Suisse's operations were conducted through the following four divisions: Wealth Management, Investment Bank, Swiss Bank, and Asset Management. The parent company of these divisions was Credit Suisse subsidiary Credit Suisse AG. The names of both Credit Suisse Group AG and Credit Suisse AG appeared on the covers of each of the Forms 6-K and 20-F filed during the Class Period. The following organizational chart, available on Credit Suisse's former website, illustrates this structure:




70. Credit Suisse was organized under the laws of Switzerland with its principal

executive office located at Paradeplatz 8, 8001, Zurich, Switzerland. Prior to its merger into UBS and subsequent delisting, Credit Suisse's ADSs and options on Credit Suisse ADSs were listed and traded on the NYSE under the ticker symbol "CS," and its bonds traded worldwide, including domestically. After the merger, UBS succeeded to all rights and obligations of Credit Suisse. UBS is organized under the laws of Switzerland with its principal executive office located at Bahnhofstrasse 45, 8001 Zurich, Switzerland.

71. Defendant Axel P. Lehmann ("Lehmann") served as Chairman of the Board of Directors ("Chairman") from January 2022 until June 2023.

72. Defendant Ulrich Körner ("Körner") joined the Credit Suisse Executive Board in March 2021 and served as the Company's CEO from August 2022 until June 2023.

73. Defendant Dixit Joshi ("Joshi") served as the Company's CFO, and a member of Credit Suisse's Executive Board, from October 2022 until June 2023.

74. Defendant Thomas Gottstein ("Gottstein") joined the Credit Suisse Executive Board in October 2015 and served as the Company's CEO from February 2020 until July 31, 2022.

75. Defendant David R. Mathers ("Mathers") served as the Company's CFO, and a member of Credit Suisse's Executive Board, from October 2010 until September 30, 2022.

76. Defendants Lehmann, Körner, Joshi, Gottstein, and Mathers are collectively referred to herein as the "Individual Defendants." The Individual Defendants and Credit Suisse are collectively referred to herein as "Defendants."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### I. May 31, 2022: Denial of *Reuters* Report on Capital Raise

77. On May 31, 2022, *Reuters* published an article, titled "EXCLUSIVE Credit Suisse weighs options to strengthen capital – sources," in which it reported, based on two sources with knowledge, that "Credit Suisse [was] in the early stages of weighing options to bolster its capital

after a string of losses [had] eroded its financial buffers that "[s]elling shares to some of its existing investors is the preferred option, but Credit Suisse has not ruled out tapping all shareholders," and that "[a] sale of a business, such as Credit Suisse's asset management division, [was] also a possibility." The same article quoted a Credit Suisse spokesperson, who outright denied these sources, claiming the Company was "robustly capitalized": "'Credit Suisse is currently not considering raising additional equity capital,' the bank said in a statement. 'The Group is robustly capitalised with a CET1 ratio of 13.8% and a CET1 leverage ratio of 4.3%.'"

78. Whether Credit Suisse planned to raise capital in the near future was material to investors because any capital raise would necessarily dilute the ownership percentage and voting rights of existing shareholders. Additionally, a Jefferies analysts wrote in a research note: "The news, if confirmed, points to potentially more pain than we currently expect."

79. The statements contained in ¶77 were materially false or misleading or omitted information necessary to make them not misleading, because eight days earlier, FINMA had sent an assessment letter to Defendants Lehmann and Gottstein [redacted]. Specifically, FINMA called [redacted] CS-Diabat_00203075-76; *see also* PInC Report at 134, 140 (summarizing the May 2022 Assessment Letter). The regulator also explained: [redacted] CS-Diabat_00203076. None of this adverse information was disclosed to the market.

80. The statements contained in ¶77 were also materially false or misleading, or omitted

information necessary to make them not misleading, because, as stated by the two sources in the *Reuters* article, Credit Suisse had recently participated in various meetings with FINMA about raising additional capital. Specifically, a July 14, 2022, letter from FINMA to Credit Suisse's Board of Directors and Executive Board refers to [redacted] (thus corroborating the contemporaneous claims made by the two sources in the *Reuters* article): [redacted] CS-Diabat_00203088 (emphasis added). Thus, Credit Suisse was, in fact, considering the possibility of raising additional capital as early as May 2022.

81. Further, the PInC found, without the effects of the regulatory filter, "Credit Suisse would already have had difficulty meeting the legal capital requirements in 2021 and would have been completely unable to do so from 2022." PInC Report at 485-86; *see also* Birchler Report at 12. The PInC explained that the use of the filter "obscured the real situation" of CS AG's undercapitalization from the public. *Id.* at 411. As such, the characterization that Credit Suisse was "robustly capitalized" was materially false or misleading. Further, the PInC Report found that, without the filter, Credit Suisse would have been "forced to strengthen its capital position in a timely manner by carrying out a capital increase" at an earlier time. *Id.* While use of the filter allowed CS to delay raising capital, Defendants knew or recklessly disregarded the truth that, by May 2022, the parent bank was already severely undercapitalized and a capital raise would likely be the only way to remedy the situation.

## II. <u>July 27, 2022</u>: Defendant Lehmann CNBC Interview

82. On July 27, 2022, Defendant Lehmann gave an interview with CNBC Squawk Box Europe, which was published online with the title, "Credit Suisse's departing CEO Thomas Gottstein wasn't forced out of the bank, chairman says."

83. This interview also addressed the topic of whether Credit Suisse needed to raise additional capital:

> **CNBC:** And can we just nail a couple of boxes here? One is the market's been speculating about a capital raise. Two, the market's been speculating about a partnership or probably a loss of independence for the bank. I know that was that quite amusing State Street rumor that was doing the rounds thanks to one of the financial blogs here. Just tell us ultimately whether any of these rumors will turn out to be true.
>
> **Lehmann:** Look, on capital we'll report despite the loss today, a CET1 ratio of 13.5%. I'm happy to see that number and we will guide the market also in light of the uncertainty that we certainly are going to defend a CET1 ratio until the end of the year between 13 to 14%. So I think we are good on this one and we will manage that very, very tightly. I cannot comment to know all the speculations and some of them, as you said, seem to be quite ridiculous.
>
> **CNBC:** But I do feel you need to address that because the market won't take that answer as a comprehensive no. Is it a no? There is no plan at this stage to partner with another business or indeed perhaps sell the company.
>
> **Axel P. Lehmann:** That's a clear no.
>
> **CNBC:** That's a clear no. Okay. Thank you very much indeed for that.

84. Other publications swiftly picked up on this interview and reported that Defendant Lehmann denied a capital raise would be necessary. For example, the same day, in an article in *Financial Magnates* titled "Credit Suisse Says 'Clear No' to Bank's Possible Sale or Capital Raise" stated: "Credit Suisse, a Swiss investment banking company, has denied claims that the firm wants to sell its business ***or raise capital to support its financial losses***. The Chairman of Credit Suisse, Axel Lehmann told broadcaster CNBC on Wednesday: 'a clear no' when asked about the rumors making the rounds in recent months." (Emphasis added).

85. Defendant Lehmann's denials when asked if Credit Suisse needed to raise capital were materially false or misleading because, at this time, he knew or recklessly disregarded the truth that Credit Suisse was already planning a "substantial" capital raise to be announced on October 27, 2022. FINMA stated, in an email addressed to Defendants Lehmann and Gottstein

dated July 16, 2022: [redacted] CS-Diabat_00203115. And in a letter addressed to Defendants Lehmann and Körner dated August 5, 2022, which referred to a letter sent by Credit Suisse to FINMA on July 25, 2022 (two days before this interview), FINMA stated:

[redacted]

CS-Diabat_00203093-94 (emphasis added). Additionally, a July 14, 2022, letter from FINMA to Credit Suisse's Board of Directors and Executive Board refers to [redacted] CS-Diabat_00203088. Thus, not only had Credit Suisse been planning a [redacted].

86. Further, the PInC found, without the effects of the regulatory filter, "Credit Suisse would already have had difficulty meeting the legal capital requirements in 2021 and would have been completely unable to do so from 2022." PInC Report at 485-86; *see also* Birchler Report at 12. The PInC explained that the use of the filter "obscured the real situation" of CS AG's undercapitalization from the public. *Id.* at 411. The PInC Report also found that, without the filter, Credit Suisse would have been "forced to strengthen its capital position in a timely manner by carrying out a capital increase" at an earlier time. *Id.* While use of the filter allowed CS to delay

raising capital, Defendants knew or recklessly disregarded the truth that, by the time this statement was made, the parent bank was already severely undercapitalized and a capital raise would likely be the only way to remedy the situation.

### III. July 27, 2022: Second Quarter 2022 Earnings Conference

87. On July 27, 2022, Credit Suisse held a conference call with analysts and investors to discuss the Company's second quarter 2022 earnings (the "2Q22 Earnings Conference") for the period ended June 30, 2022. During this conference call, Daniele Brupbacher, an analyst at UBS, asked, "[A]t this point in time, are you ready and able to exclude capital increase to -- if you go into this strategic review?" Defendant Mathers responded, "I think the first point I'd make is, I've been CFO for 12 years and 13.5% CET1 is one of the highest CET1 ratios we've actually ever reported. So, you know, we are in a strong capital position. And our leverage ratio is equally strong in terms of that. So, I think the bank is well funded in terms of that."

88. Defendant Mathers' statements about Credit Suisse having the highest CET1 ratios ever reported, being in a "strong capital position," and being "well funded," in response to a specific question about whether Credit Suisse needed to raise additional capital were materially false or misleading, or omitted information necessary to make them not misleading. Specifically, Defendant Mathers knew or recklessly disregarded the truth that FINMA had previously [redacted] On July 12, 2022, in a meeting with FINMA, Defendants Lehmann and Gottstein [redacted]. And on July 25, 2022, two days before the 2Q22 Earnings Conference took place, Credit Suisse again [redacted]

CS-Diabat_00203093-94. Moreover, in contradiction to Mathers' statements about Credit Suisse's "strong capital position," the PInC Report found that without the effects of the regulatory filter, which "obscured" Credit Suisse's true financial condition from the public, Credit Suisse would have been unable to meet legal capital requirements by early 2022. PInC Report at 485-86; *see also* Birchler Report at 12. The PInC Report also found that, without the filter, Credit Suisse would have been "forced to strengthen its capital position in a timely manner by carrying out a capital increase" at an earlier time. *Id.* While use of the filter allowed CS to delay raising capital, Defendants knew or recklessly disregarded the truth that, by the time this statement was made, the parent bank was already severely undercapitalized and a capital raise would likely be the only way to remedy the situation.

89. Kian Abouhossein, Analyst at J.P.Morgan, asked, regarding the Group's CET1 ratio, "have you had discussions with FINMA and how would FINMA see potentially capital going below 13%?" Gottstein replied, "On the FINMA capital side, you know, clearly, as it was said by David, the [13.5%] is a very solid capital base…. We are obviously always also in contact with FINMA. But this is very consistent with the spirit there." Lehmann added, "The question obviously, you know, with FINMA, we are in very close contact and I think [have] their support on the general strategic direction and our intent." These statements were materially false or misleading, or omitted facts necessary to make them not misleading. In an assessment letter dated May 23, 2022, FINMA [redacted] CS-Diabat_00203075-76 (emphasis added). Shortly before this call, in a letter dated July 14, 2022,

FINMA stated that [redacted] CS-Diabat_00203087-88. These communications demonstrate FINMA did not believe Credit Suisse had a "very solid capital base."

## IV. <u>July 27, 2022:</u> Second Quarter 2022 Earnings Release and Media Release

90. On the same day, July 27, 2022, the Company issued an earnings release (the "2Q22 Earnings Release") and a media release, along with slides accompanying its presentation to investors (the "2Q22 Media Release") announcing financial results for the second quarter of 2022, both of which it filed with the SEC on a Form 6-K the same day. The Form 6-Ks were signed by Gottstein and Mathers on behalf of both Credit Suisse AG and Credit Suisse Group AG. The 2Q22 Earnings Release stated: "Credit Suisse AG (Bank parent company)'s Swiss CET1 ratio decreased from 11.8% as of 1Q22 to 11.4% as of the end of 2Q22, primarily driven by net losses and an adverse foreign exchange impact, despite capital distributions from its UK participations." And the 2Q22 Media Release stated: "Parent CET1 ratio of 11.4% vs. 11.8% at 1Q22, driven by net losses and adverse FX impact, partially offset by USD 1.2bn capital distribution from CSSEL."

91. These statements were materially false or misleading, or omitted information necessary to make them not misleading, because, as noted in the PInC Report, the effects of the regulatory filter on CS AG's CET1 ratio were disclosed in a misleading way that allowed Credit Suisse to maintain the appearance of sufficient capitalization. Without the effects of the regulatory filter, CS AG's CET1 ratio decreased to 7.6% in 2Q22 (see Birchler Report at 12), far below the 10% minimum required by regulators.

92. These statements were highly material to investors. On August 30, 2022, Deutsche Bank Research published a report titled, "Darkest Before Dawn." The report noted: "The parent CET1 ratio of 11.4% (vs a 12% target by end-2022) has attracted a lot of attention over the last

few quarters. However, we do not believe that it is the binding constraint for the group." If analysts had known that CS AG's CET1 ratio without the effects of the regulatory filter was just 7.6% at the end of the second quarter, their outlook on Credit Suisse's capital would likely have been far less positive.

## V. October 27, 2022: 2022 Strategy Update Presentation

93. On October 27, 2022, the Company held its 2022 Strategy Update Presentation with investors (the "2022 Strategy Update Presentation"). During the 2022 Strategy Update Presentation, Defendant Lehmann stated, in relevant part:

> [We] intend to significantly derisk and reduce our Investment Bank, focusing on core parts of sustainable value. This means we plan to transfer certain investment banking and capital market capabilities into a separate entity, revitalization, the CS First Boston brand. Credit Suisse intends to remain a long-term investor, creating equity ownership and a partner-like culture to tap the right talent and attract external capital. Going forward, this business will be advisory-led and have a reduced risk profile. We expect to access external credit facilities for the leveraged finance business. I will be delighted when Michael Klein is appointed CEO-designate of Credit Suisse First Boston. He will lead this transformation towards Credit Suisse First Boston's more independent future.
>
> * * *
>
> And finally, we have entered into a framework agreement and exclusivity agreement to transfer a significant portion of our Securitized Products business to an investor group led by Apollo Global Management. This proposed transaction will support our transformation. It will derisk and reposition Securitized Products to release capital.

94. Defendant Körner then stated, in relevant part, as follows:

> We are creating a new Credit Suisse with a simpler, more stable, more focused business model built around our leading franchises in Wealth Management and in our Swiss home market, complemented by our strong capabilities in Asset Management and Markets. We will radically restructure our Investment Bank and reduce risk by around 40%. We will create a resized connected Markets business as an integral part of new Credit Suisse.
>
> * * *
>
> We currently have USD 90 billion of risk-weighted assets in the Investment Bank, down from historic levels but still accounting for about 1/3 of the group. And they

> are not generating sufficient value in the current setup. With the actions announced today, we will reduce our risk exposure by around 40%, both in terms of risk-weighted assets and leverage exposure.

95. The statements contained in ¶¶93-94 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were materially deficient at all times; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

### VI. <u>October 27, 2022</u>: Third Quarter 2022 Media Release and Investor Presentation

96. On October 27, 2022, the Company also issued a media release announcing financial results for the third quarter and of 2022 (the "3Q22 Media Release"), which it filed with the SEC, along with slides accompanying its presentation to investors, on a Form 6-K the same day. The 3Q22 Media Release quoted Defendant Körner, in relevant part, as follows:

> "The third quarter, and more broadly 2022 so far, have been significantly impacted by the continued challenging market and macroeconomic conditions, leading to a weaker performance for our Investment Bank in particular. Our recent Group level performance has been disappointing for our stakeholders. From today, we are taking a series of decisive actions to re-focus Credit Suisse around the needs of our clients and stakeholders. Our new, integrated model will be focused on Wealth Management, the Swiss Bank, as well as Asset Management, and we will radically restructure the Investment Bank, strengthen capital, and accelerate our cost transformation. We believe these actions will lead Credit Suisse to a more stable performance and generate lasting value for our shareholders."

97. The 3Q22 Media Release further stated, in relevant part:

> Credit Suisse's performance in the third quarter of 2022 continued to be challenged by the current economic and market environment. The combination of the geopolitical situation as well as the significant monetary tightening by major central

> banks worldwide in response to the continued and significant increase in inflation have resulted in continued heightened market volatility, weak customer flows and ongoing client deleveraging.
>
> * * *
>
> We reported a net loss attributable to shareholders of CHF 4.0 bn, compared to net income attributable to shareholders of CHF 434 mn in 3Q21. Our reported net loss attributable to shareholders included an impairment of deferred tax assets related to our strategic review of CHF 3.7 bn. The challenging market conditions in 3Q22 were the main driver of the decline in Group AuM which stood at CHF 1.4 trn, down CHF 53 bn from CHF 1.45 trn at the end of 2Q22. This included Group net asset outflows of CHF 12.9 bn in 3Q22, compared to NNA of CHF 5.6 bn in 3Q21.
>
> * * *
>
> [D]uring the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced a significant level of deposit and assets under management outflows. While these outflows have stabilized since this period, they have not yet reversed. We have plans to address these matters through, among other things, accessing capital markets after October 27 and executing the strategic initiatives we announce today. We would note that the execution of these measures is also expected to generate liquidity and reduce the funding requirements of the Group.

The statements contained in ¶¶96-97 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized"; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

## VII. <u>October 27, 2022</u>: Third Quarter 2022 Earnings Release

98. On October 27, 2022, the Company also issued its earnings release announcing financial results for the third quarter of 2022 (the "3Q22 Earnings Release") for the period ended, September 30, 2022, which it filed with the SEC as an exhibit to a Form 6-K the same day. The

Form 6-K was signed by Defendants Körner and Joshi on behalf of both Credit Suisse AG and Credit Suisse Group AG. The 3Q22 Earnings Release stated, in relevant part, as follows:

> **Liquidity issues in October 2022**
> During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced significantly higher withdrawals of cash deposits as well as non-renewal of maturing time deposits. These outflows have since stabilized to much lower levels but have not yet reversed. As is normal practice, we also limited our access to the capital markets in the period immediately preceding our upcoming strategy announcements. While these outflows have partially utilized liquidity buffers at the Group and legal entity level, and we have fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times. The Group's average daily LCR for the month of October through October 25 was 154%, with lower spot rates over this period that remained below this average through that date. Remediation plans have been prepared to reverse these outflows, including accessing the public and private markets following our announcements on October 27 together with certain asset disposals and other measures. We would note that the execution of the strategic measures that we have announced is also expected to generate liquidity and reduce the funding requirements of the Group. We also continue to have access to central bank funding sources if required.
>
> These circumstances have exacerbated the risks we described under "Liquidity Risk" in our Risk Factors contained in our 2021 Annual Report.
>
> **Outflows in assets under management in October 2022**
> During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced client asset outflows at levels that substantially exceeded the rates incurred in 3Q22. These asset outflows primarily impacted our Wealth Management and Swiss Bank divisions. These outflows have reduced significantly since mid-October but have not yet reversed. It is premature to estimate the impact on net new asset flows for 4Q22 but, coupled with reductions in asset values due to adverse market movements in client portfolios in 3Q22, this reduction in assets under management may lead to decreased fee revenues for the Group, thereby leading to reduced profitability.
>
> * * *
>
> As of the end of 3Q22, assets under management of CHF 1,400.6 billion decreased CHF 53.3 billion compared to the end of 2Q22. The decrease was mainly driven by unfavorable market movements and net asset outflows of CHF 12.9 billion. Net asset outflows of CHF 12.9 billion in 3Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF 6.4 billion in Wealth Management

> reflected mainly outflows across the Middle East, Asia Pacific and Swiss ultra-high-net-worth businesses, partially offset by inflows in the European businesses. Net asset outflows of CHF 4.2 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in index solutions, equities and fixed income, and alternative investments, primarily related to outflows in credit, partially offset by inflows from investments and partnerships, primarily related to an emerging markets joint venture. Net asset outflows of CHF 1.5 billion in Swiss Bank reflected outflows in the private clients business, partially offset by inflows in institutional clients business.

99. The statements contained in ¶98 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i)he Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized" or "reduced significantly since mid-October"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

## VIII. <u>October 27, 2022</u>: Third Quarter 2022 Earnings Conference

100. On October 27, 2022, Credit Suisse also held a conference call with analysts and investors to discuss the Company's third quarter 2022 earnings (the "3Q22 Earnings Conference") for the period ended September 30, 2022. During the 3Q22 Earnings Conference, Defendant Joshi began by stating, in relevant part:

> As you all know, challenging conditions continue during the third quarter with heightened market volatility, weak customer flows, and ongoing client deleveraging. And our financial performance reflects these challenges….I would like to provide some additional context and commentary on asset flows at the start of the fourth quarter. We did see a significant level of deposit in AUM outflows during the first two weeks of October. Whilst these outflows have stabilized since this period, they have not yet reversed. We have plans to address these matters after 27th of October through, among other things, accessing capital markets and executing the strategic initiatives we have announced today. We would note that

> the execution of these measures is also expected to generate liquidity and reduce the funding requirements of the group.

101. When questioned by an analyst about "what drove" the customer outflows, Defendant Joshi responded:

> You know, as you know, the negative social media news around our name at the beginning of October, you know, did lead to outflows, you know, across our franchise. You know, it's something that we're looking to address today through the strategic announcements that we're making, including the 4 billion capital raise and ensuring that, you know, we're well capitalized through this transformation period, while we make the transformational announcements and restructuring across our investment bank and other business areas.

102. When questioned by another analyst about "what actually happened during the quarter" regarding the outflows in order "for us to be able to assess…how to look at them going forward," Defendant Körner responded:

> So, if we look at the wealth management situation, you've seen the outflows of 6.4 billion for the quarter. And you rightly put it, which you then see reflected in the transaction-based income line as well, our wealth management business is very strong, as you know, in APAC and emerging markets. That has impacted that clearly, as we said. If you look at the 6.4 billion, it's a combination in the third quarter of, you know, deleveraging and derisking, if you want to. So, about 3 billion comes from deleveraging and other like 2 billion is proactive, call it derisking, and then some additional deposit outflows. I think that's the right way to think about that one.

103. When questioned by another analyst if Defendants "could give us a sense of scale of a similar run rate to" the outflows seen in 3Q22, Defendant Körner responded:

> What we have seen -- and thanks for the question, what we have seen, particularly at the beginning of October, certainly, a heightened level of outflows, which was very much based on what you have seen in the media and the press rumors. And let me say here very clearly, to the largest extent possible, factually incorrect rumors. But, obviously, that, you know, the overall situation that has come in and down very significantly in the last couple of weeks, actually.

104. The statements contained in ¶¶100-03 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's

business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized" and were not chiefly the result of "deleveraging" and "derisking"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

## IX. October 31, 2022: Defendant Lehmann Interview with *Bloomberg TV*

105. On October 31, 2022, Defendant Lehmann was interviewed on *Bloomberg TV*. During the interview, when asked if he was expecting outflows to "reverse," Lehmann responded that ***outflows had "clearly stabilized***."

106. The statements contained in ¶105 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company was experiencing significant and unusual customer and/or asset outflows that had not "clearly stabilized."

## X. November 2, 2022: Third Quarter 2022 Report

107. On November 2, 2022, the Company filed with the SEC its financial report for the third quarter of 2022 (the "3Q22 Quarterly Report"), on Form 6-K for the period ended September 30, 2022. The Form 6-K was signed by Defendants Körner and Joshi on behalf of both Credit Suisse AG and Credit Suisse Group AG. The 3Q22 Quarterly Report stated, in relevant part, as follows:

> In 3Q22, we reported net revenues of CHF 3,804 million, which decreased 30% compared to 3Q21, primarily reflecting lower net revenues in the Investment Bank

and Wealth Management. The decrease in the Investment Bank was driven by significantly reduced capital markets revenues and lower equity and fixed income sales and trading revenues, reflecting challenging operating conditions and the Group's relative underperformance The decrease in Wealth Management mainly reflected lower transaction- and performance-based revenues, lower recurring commissions and fees and lower other revenues, partially offset by higher net interest income.

* * *

During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced significantly higher withdrawals of cash deposits as well as non-renewal of maturing time deposits. These outflows have since stabilized to much lower levels but have not yet reversed. As is normal practice, we also limited our access to the capital markets in the period immediately preceding our strategy announcements. While these outflows have partially utilized liquidity buffers at the Group and legal entity level, and we have fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times….Remediation plans have been prepared to reverse these outflows, including accessing the public and private markets following our announcements on October 27 together with certain asset disposals, including the transfer of a significant portion of SPG [Securitized Products Group] to an investor group led by Apollo, and other measures. We would note that the execution of the strategic measures that we have announced is also expected to generate liquidity and reduce the funding requirements of the Group. We also continue to have access to central bank funding sources if required.

* * *

**Outflows in assets under management in October 2022**
During the month of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced client asset outflows at levels that substantially exceeded the rates incurred in 3Q22. These asset outflows primarily impacted our Wealth Management and Swiss Bank divisions. These outflows have reduced since mid-October but have not yet reversed. It is premature to estimate the impact on net new asset flows for 4Q22 but, coupled with reductions in asset values due to adverse market movements in client portfolios in 3Q22, this reduction in assets under management may lead to decreased fee revenues for the Group, thereby leading to reduced profitability.

108. The statements contained in ¶107 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.

Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized"; (ii) the Company did not maintain a "sufficient" liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were not "conservative" and were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

109. The 3Q22 Quarterly Report also stated: "Credit Suisse AG (Bank parent company)'s Swiss CET1 ratio decreased from 11.4% as of 2Q22 to 9.7% as of the end of 3Q22, primarily driven by estimated participation impairments as a result of the comprehensive strategic review announced on October 27, 2022, net losses and an adverse foreign exchange impact, partially offset by a capital repatriation from a UK participation." Additionally, Credit Suisse had announced on October 27, 2022, its intention to raise approximately CHF 4 billion in capital. The 3Q22 Quarterly Report stated, after this capital raise: "the Bank parent company's CET1 ratio is estimated to increase by approximately 130-140 basis points on a pro-forma basis to 11.0-11.1%." These statements were materially false or misleading, or omitted information necessary to make them not misleading, because, as noted in the PInC Report, CS AG's CET1 ratio was disclosed in a misleading way that allowed Credit Suisse to maintain the appearance of sufficient capitalization. Without the effects of the regulatory filter, CS AG's CET1 ratio would have fallen to 4.9% (*see* Birchler Report at 12)—almost half of the 9.28% requirement. This figure severely calls into question Credit Suisse's ability to access sufficient CET1 capital to withstand further capital outflows, which, by its own admission, it was continuing to experience. The misleading nature of these statements is confirmed by UBS's later statements that Credit Suisse had "in fact been undercapitalized for a long time" and that "the collapse of Credit Suisse was driven by years of …

reliance on substantial regulatory concessions."

## XI. November 23, 2022: Preliminary Fourth Quarter 2022 Earnings Media Release

110. On November 23, 2022, the Company issued a media release announcing preliminary financial results for the fourth quarter of 2022 (the "Preliminary 4Q22 Media Release"), which it filed with the SEC on a Form 6-K the same day. The Preliminary 4Q22 Media Release stated, in relevant part, as follows:

> In its Outlook statement on October 27, 2022, the bank highlighted that the challenging economic and market environment has had an adverse impact on client activity across its divisions. In particular, the Investment Bank has been impacted by the substantial industry-wide slowdown in capital markets and reduced activity in the Sales & Trading businesses, exacerbating normal seasonal declines, and the Group's relative underperformance. In addition, client activity remains subdued in the Wealth Management and Swiss Bank divisions, and the bank expects these market conditions to continue in the coming months.
>
> As previously disclosed, Credit Suisse began experiencing deposit and net asset outflows in the first two weeks of October 2022 at levels that substantially exceeded the rates incurred in the third quarter of 2022. At the Group level, as of November 11, 2022, net asset outflows were approximately 6% of assets under management at the end of the third quarter of 2022. In Wealth Management, these outflows have reduced substantially from the elevated levels of the first two weeks of October 2022 although have not yet reversed and were approximately 10% of assets under management at the end of the third quarter of 2022. In the Swiss Bank, these client balances have stabilized and were approximately 1% of assets under management at the end of the third quarter of 2022.
>
> As announced on October 27, 2022, these outflows have led the bank to partially utilize liquidity buffers at the Group and legal entity level, and while the bank has fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times.
>
> Credit Suisse is executing on its strategic commitments to strengthen its balance sheet and reduce risk, engaging clients proactively and accessing the public and private markets, including the recent issuance of approximately USD 5 billion through two bond sales, which saw strong investor demand. Key steps taken include the recently announced sale of a significant part of Credit Suisse's Securitized Products Group (SPG) and other related financing businesses to Apollo Global Management….These actions and other deleveraging measures including, but not limited to, in the non-core businesses, are expected to strengthen liquidity ratios and reduce the funding requirements of the Group.

* * *

> Strategic actions taken to significantly reduce the Group's risk profile are expected to be reflected in near-term financial results…. Lower deposits and assets under management are expected to lead to reduced net interest income and recurring commissions and fees; this is likely to lead to a loss for Wealth Management in the fourth quarter of 2022. Together with the adverse revenue impact from the previously disclosed exit from the non-core businesses and exposures, and as previously announced on October 27, 2022, Credit Suisse would expect the Investment Bank and the Group to report a substantial loss before taxes in the fourth quarter 2022, of up to CHF ~1.5 billion for the Group….
>
> The Group continues to execute on the decisive strategic actions detailed on October 27, 2022, to create a simpler, more focused and more stable bank – a new Credit Suisse.

111. The statements contained in ¶110 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

## XII. December 1, 2022: Defendant Lehmann *Financial Times* Interview

112. On December 1, 2022, the *Financial Times* published an article entitled "Credit Suisse chair says outflows have reversed since 'social media storm,'" citing Defendant Lehmann and stating that Credit Suisse clients had returned to the bank after pulling out tens of billions of dollars of assets at the start of October. The article stated in relevant part:

> Axel Lehmann said ***withdrawals had flattened across the group and had started to reverse in the Swiss domestic business***, but the scale of the outflows had caught the Swiss lender off-guard.
>
> "It ***was*** a real storm," said Lehmann at the Financial Times' Global Banking Summit on Thursday. "It ***was*** a storm in the retail and partially in the wealth

> management segment, in particular in Asia, ***where we had really massive outflows for two to three weeks***."
>
> "The good part of the sad story is we had very few clients leaving. They are still with us, they still continue to do business with us."
>
> (Emphasis added.)

113. The statements contained in ¶112 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "flattened"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

## XIII. December 2, 2022: Defendant Lehmann *Bloomberg* Interviews

114. On December 2, 2022, before market hours, in a *Bloomberg TV* interview, Lehmann stated that outflows "basically have stopped" after it had disclosed on November 23, 2023, the loss of 84 billion francs or $90.8 billion of client assets. In the same interview, Lehmann characterized the October increase in customer outflows as simply a "two-to-three-week event."

115. Also, on December 2, 2022, *Bloomberg* published an article entitled "Credit Suisse Gains Most Since 2020 After Asset Outflows Halted" quoting Lehmann's assurances regarding the Company's financial stability. The article stated in relevant part:

> Credit Suisse Group AG Chairman Axel Lehmann said the ***main indicators of the bank's financial stability were strong*** and that its level of liquidity is improving after declines in recent weeks.

* * *

> ***In October, outflows of assets and the subsequent use of liquidity buffers had caused the bank to fall below certain regulatory levels at some of its entities.***
>
> ***Credit Suisse saw 84 billion francs ($89.7 billion) of client asset withdrawals in the first few weeks of the fourth quarter amid persistent rumors about the bank's stability.*** Credit spreads and the cost to insure the bank's debt against default have surged to above 400 basis points, far above peers. ***The outflows have "basically stopped," Lehmann said.***
>
> (Emphasis added)

116. Following Defendant Lehmann's statements, Credit Suisse's ADS price climbed $0.29 per ADS, or 9.36%, to close at $3.38 per ADS on December 2, 2022.

117. The statements contained in ¶¶114-15 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "basically stopped"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all time; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

## XIV. December 5, 2022: Defendant Lehmann Interview with *SRF*

118. On December 5, 2022, Defendant Lehmann was interviewed on Swiss broadcaster *SRF*. *Reuters* reported on the interview in an article published that day titled, "Credit Suisse business is stable, chairman tells broadcaster SRF."

119. The article stated, in relevant part:

> Credit Suisse (CSGN.S) is "***definitely stable,***" Chairman Axel Lehmann told Swiss broadcaster SRF on Monday, adding that ***the embattled bank had seen a stabilisation in the outflows of client funds***.

* * *

> "When you have a capital raising, which has a big dilution effect, that creates a lot of uncertainty and that leads to high volatility," Lehmann said in the interview.
>
> "***But I believe the situation has calmed***. ***The business is definitely stable***," he said. Still, he expected 2023 and 2024 to be years of transformation for the bank as it seeks to stabilise after years of mishaps.
>
> "It's true, the whole group will not be profitable next year," Lehmann said. "What is important is the progress we make.
>
> "What is the earnings power of the Swiss business, wealth management, asset management and the part of the investment bank we retain, and then from 2024 produce positive numbers."
>
> (Emphasis added).

120. The statements contained in ¶119 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "stabilized"; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

## XV. <u>February 9, 2023</u>: Fourth Quarter 2022 Earnings Release

121. On February 9, 2023, the Company issued its earnings release announcing financial results for the fourth quarter and fiscal year of 2022 (the "4Q22 Earnings Release") for the period and year ended December 31, 2022, which it filed with the SEC on a Form 6-K the same day. The Form 6-K was signed by Defendants Körner and Joshi on behalf of both Credit Suisse AG and Credit Suisse Group AG. The 4Q22 Earnings Release stated, in relevant part, as follows:

> **Liquidity issues in 4Q22**
> As previously disclosed, during early 4Q22, Credit Suisse began experiencing

significantly higher withdrawals of cash deposits as well as nonrenewal of maturing time deposits. However, as the quarter progressed, these outflows stabilized to much lower levels but had not yet reversed by year end, and customer deposits declined by CHF 138 billion in 4Q22. As is normal practice, we also limited our access to the capital markets in the period immediately preceding the strategy announcements we made on October 27, 2022. While these outflows led us to partially utilize liquidity buffers at the Group and legal entity level, and we fell below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level were maintained at all times. The Group's three-month average daily LCR was 144% as of the end of 4Q22, improved from lower levels earlier in the quarter.

Remediation plans were prepared, initiated and implemented to mitigate these outflows, including accessing the public and private markets. We issued over USD 5 billion through three bond sales in November and December 2022, which saw strong investor demand, and an additional CHF 4 billion through our capital increases. Other steps also include certain asset disposals, including the announced sale of a significant portion of SPG and other related financing businesses. We would note that the execution of these actions and other deleveraging measures, including, but not limited to, in the non-core businesses, is also expected to strengthen liquidity ratios and, over time, reduce the funding requirements of the Group. As is common for banks, we also continue to have access to central bank funding sources if required.

* * *

**Outflows in assets under management in 4Q22**

As previously disclosed, Credit Suisse began experiencing deposit and net asset outflows in early 4Q22 at levels that substantially exceeded the rates incurred in 3Q22. At the Group level, net asset outflows in 4Q22 were approximately 8% of assets under management as of the end of 3Q22, with approximately two-thirds of these net asset outflows in the quarter concentrated in October 2022. In Wealth Management, these outflows in 4Q22 had ***reduced substantially in the rest of the quarter from the elevated levels of early 4Q22***, but had not reversed, and represented approximately 15% of assets under management reported as of the end of 3Q22. In the Swiss Bank, these outflows in 4Q22 broadly stabilized after the elevated levels of early 4Q22, and represented approximately 2% of assets under management reported as of the end of 3Q22. In Asset Management, these outflows in 4Q22 represented 3% of assets under management reported as of the end of 3Q22.

* * *

As of the end of 4Q22, assets under management of CHF 1,293.6 billion decreased CHF 107.0 billion compared to the end of 3Q22. ***The decrease was mainly driven***

> ***by net asset outflows of CHF 110.5 billion and foreign exchange-related movements, partially offset by favorable market movements of CHF 27.6 billion***.
>
> Net asset outflows of CHF 110.5 billion in 4Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF 92.7 billion in Wealth Management were driven by outflows across all regions. ***Approximately two-thirds of the outflows were concentrated in October 2022. The outflows in 4Q22 had reduced substantially in the rest of the quarter from the elevated levels of early 4Q22 but had not reversed.*** Net asset outflows of CHF 11.7 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in multi-asset solutions, index solutions and fixed income, from investments and partnerships, primarily related to an emerging markets joint venture, and from alternative investments, primarily related to outflows in credit. Net asset outflows of CHF 8.3 billion in Swiss Bank mainly reflected outflows in the private clients business.
>
> (Emphasis added).

122. The statements contained in ¶121 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i)the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized" or "reduced substantially in the rest of the quarter from the elevated levels of early 4Q22"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022, October 20, 2022, and January 17, 2023.

## XVI. February 9, 2023: Fourth Quarter and Fiscal Year 2022 Earnings Conference

123. On February 9, 2023, Credit Suisse held a conference call with analysts and investors to discuss the Company's fourth quarter and fiscal year 2022 earnings (the "FY22 Earnings Conference") for the period ended December 31, 2023. During the FY22 Earnings Conference, Defendant Körner stated, in relevant part:

2022 was an extremely challenging year for Credit Suisse with the group posting a net loss of CHF 7.3 billion. ***Nonetheless, it was also a year which marked the beginning of the important and necessary transformation for our organization. On October 27, we presented a targeted plan to create the new Credit Suisse, a simpler, more focused bank built around client needs. And today, we reaffirm all of the targets we announced in October.***

* * *

***We have a robust balance sheet, and we are executing on our transformation from a position of strength.*** We reported a year-end CET1 ratio of 14.1% and a Tier 1 leverage ratio of 7.7%. ***Our liquidity position also improved following the impact of the events of October.*** The average liquidity coverage ratio was at 144% at the end of the fourth quarter with further improvements this year.

* * *

Now let me be clear, our teams continue to work relentlessly on serving our clients. Since October, we have proactively engaged with more than 10,000 wealth management clients and over 50,000 clients in the Swiss bank. As previously mentioned, we are seeing the first positive signs, comprehensive global initiatives to regain deposits, as well as assets under management. In January, we saw deposit inflows at group level in Wealth Management and the APAC, as well as net new assets in APAC and to Swiss Bank. Importantly, clients remain overwhelmingly supportive, and we remain very thankful for that. To remind you of the strength of our Wealth Management business, we are the No. 2 wealth manager outside the U.S. with a deep client franchise balance between ultra and high net risk clients.

* * *

We are building a unified culture from the top of the organization with a strong focus on risk management, collaboration, and accountability. We remain disciplined on strategic execution, strengthening and reallocating capital delivering our cost ambitions, and most importantly, supporting our clients globally. As I mentioned, we have acted decisively to address the impact of the outflows experienced in the fourth quarter, and we have seen deposit inflows at the group level, in wealth management and APAC, as well as net new assets in APAC and the Swiss Bank. We are also, making progress with the carve-out of CS First Boston and are creating a more focused markets business that will deliver innovative solutions and products for our Wealth Management and our institutional clients. In short, we are determined to make this transformation a success, restore trust with all stakeholders and ultimately create sustainable value for our shareholders.

(Emphasis added).

124. Defendant Joshi then stated, in relevant part:

***The group took clear strides forward despite the challenging fourth quarter. We delivered the strategy update alongside our third quarter earnings and started immediately on implementation.*** We made good progress reducing noncore-related exposures on cost reduction measures and on balance sheet reductions relating to the Capital Release Unit. ***We proactively managed our liquidity position following the outflows in the fourth quarter. We executed a successful series of capital and funding measures, including raising around CHF 4 billion in equity and completing around CHF 6 billion of debt issuance in the fourth quarter. We strengthened our CET1 ratio to 14.1%, and we remain resolutely focused on execution and on supporting our clients. As you can see from this morning's announcement regarding the acquisition of the Investment Banking business of M. Klein & Company and the completion of the first closing of our securitized products transaction with Apollo, we are executing rapidly on the strategy and were ahead of plan.***

* * *

I'll touch on the impact of the client asset outflows during the fourth quarter on Slide 15. Our assets under management were impacted by significant net asset outflows early in the quarter which affected both our revenues and our liquidity position for the fourth quarter. ***Approximately two-thirds of the net asset outflows in the fourth quarter occurred in October, and they reduced considerably in November and December….Since the start of the fourth quarter, we strengthened our balance sheet, including through the capital raises to set the group on a stronger trajectory.***

***We're now three months into our transformation journey and we saw the first signs of the benefits of these and other proactive initiatives in January with positive deposit inflows at the group level and specifically in wealth management. Net asset flows in the Swiss Bank were positive and the net asset outflows in wealth management in January were at a reduced level compared to December with net asset in flows in Asia Pacific.***

* * *

Moving on to our liquidity coverage ratio. ***Although the group's liquidity position was impacted by deposit outflows in the fourth quarter, our average liquidity coverage ratio at the end of December stood at 144%, well above the group's minimum regulatory requirements and comparing favorably with our peer group. This represents an improvement from the lower levels in the quarter and was a result of a series of proactive measures, including the capital raises, debt issuances, and deleveraging. We have continued to see the improvement in the ratio since the start of the year and were main focused on maintaining our LCR at a prudent level. The disciplined execution of our strategy, including our simplification program should lead to further liquidity improvements and more efficient liquidity management across the group.***

* * *

> ***To summarize, our financial performance for the fourth quarter reflects the decisive actions we have taken against a difficult market backdrop. Looking forward, we expect that the strategic actions taken to reduce the group's risk profile and the challenging market conditions will continue to be reflected in our financial results.***

(Emphasis added).

125. When questioned by an analyst about how the Company saw "flows, deposits, custody assets, [and] loans" "developing…over the next 12 months," Defendant Körner responded:

> So, I would say with respect to your Wealth Management question, what is important, that's why we gave these indications from January. ***The group overall, as I said, is positive on deposits, Wealth Management, globally, positive on deposits, Asia Pac, positive on deposits. And I'm reiterating that because as you are fully aware of, the deposits are these kind of assets.*** So, to say, which leave first and have the fungibility to reenter first. And I think that is important to bear in mind. As you immediately understand [], we do not give your business plan figures, but ***you can assume that in the best mention is a fair chunk of rewinning lost volumes lost business with our clients. And important to note here is as well that we hardly lost any client. I think that is also important that shows you something about what I said before in terms of the relationship which we may have with our clients.***

(Emphasis added).

126. When questioned by an analyst about outflows and the "split between November and December," as well as what management meant by a "reduced level" of outflows in January, Defendant Körner responded:

> [W]e said like two-thirds in October. ***If you look into October and November together, it's more than 85% and of the outflows stemming from these two months***, and that was exactly the reason…. ***With respect to your second question, net new assets, in particular, we said we are positive, which is very good because that's a very proactive region, growth region, we are positive in APAC with a good number for January also, in comparison to other years. We are positive in Switzerland, also, with a good number overall here. We are positive in a couple of smaller other geographies, but we are also, still having some outflows in other***

> ***regions, and that's why we gave this guidance…. That's how you should read it. But again, as I said, in my eyes, the situation has completely changed from last year.***

(Emphasis added).

127. When questioned by an analyst about what amount of the "over 90 billion of outflows in Wealth Management…you see as a realistic number to come back" and "what clients are open to returning based upon what they see in terms of progression around your restructuring plan," Defendant Körner responded:

> ***So, to your concrete question, how much is coming back, I would like to know that as well, as you can imagine. As I said, the wealth management colleagues are pretty hopeful that we bring a fair part of the outflows back already in 2023. And the rest will come later. And as I said also, earlier, obviously, our target is to bring all and everything back and then go beyond that.***

(Emphasis added).

128. The statements contained in ¶¶123-27 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was not "seeing positive signs" with respect to "regain[ing] deposits, as well as assets under management," and "the situation" had *not* "completely changed from last year, as Credit Suisse was experiencing significant and unusual customer and/or asset outflows; (ii) the Company did not experience "liquidity improvements" but instead did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022, October 20, 2022, and January 17, 2023.

129. In this same FY22 Earnings Conference, Defendant Joshi also stated, "Our parent

capital ratio was around 250 basis points higher compared to the end of September at 12.2%." This statement was materially false or misleading or omitted facts necessary to make it not misleading because, as noted in the PInC Report, they were disclosed in a misleading way that allowed Credit Suisse to maintain the appearance of sufficient capitalization. Without the effects of the regulatory filter, CS AG's CET1 ratio was just 7.8%, 4.4% lower than reported and far below both Credit Suisse's stated target of 12% and the 10% required by regulators. The misleading nature of these statements is confirmed by UBS's later statements that Credit Suisse had "in fact been undercapitalized for a long time" and that "the collapse of Credit Suisse was driven by years of . . . reliance on substantial regulatory concessions."

### XVII. February 9, 2023: Defendant Körner Interview with *Bloomberg TV*

130. On February 9, 2023, Defendant Körner was interviewed on *Bloomberg TV*. During the interview, Defendant Körner stated that Credit Suisse was "making really good progress" toward "creating a new Credit Suisse," it had a "clear plan," and was in "full execution" of it. With respect to outflows, Körner said they "***have reduced very significantly and we are seeing new money coming back in different parts of the firm.***" (Emphasis added). He said that "we have launched a very well organized client reachout…[that] has generated very positive momentum...[which] will travel with us in 2023." When asked if it was "still the plan…to be profitable for 2024 onwards," Körner responded: "That's absolutely the plan. The plan is unchanged."

131. The statements contained in ¶130 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "reduced very significantly."

## XVIII. March 14, 2023: 2022 Annual Report

132. On March 14, 2023, the Company filed with the SEC its 2022 annual report (the "2022 Annual Report") on Form 20-F for the year ended December 31, 2022. The 2022 Annual Report was signed by Defendants Körner and Joshi, attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting. Notably, the 2022 Annual Report identified material weaknesses in the Company's internal controls over financial reporting, but also stated the following, in relevant part:

> Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. ***Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date.***
>
> (Emphasis added).

133. The 2022 Annual Report further stated:

> In October, we announced a clear strategy that builds on our core strengths and addresses current challenges, and we have since been executing it at pace. ***Our strategic, cultural and operational transformation aims to re-establish Credit Suisse as a solid, reliable and trusted partner with a strong value proposition for all our stakeholders***.
>
> * * *
>
> ***Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We continuously adapt our liquidity and funding profile to reflect changes in our business strategy and regulatory developments.***
>
> * * *
>
> Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. To address short-term liquidity stress, ***we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of***

> ***severe market and idiosyncratic stress***. Our liquidity risk parameters reflect various liquidity stress assumptions. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.

(Emphasis added).

134. The statements contained in ¶¶132-33 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was *not* "developing a remediation plan to address the material weaknesses" it belatedly identified after engaging in a lengthy comment letter process with the SEC, but was instead presently engaged in discussions with Swiss authorities regarding the sale or liquidation of Credit Suisse; and (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

135. The 2022 Annual Report also stated, "The Bank parent company's Swiss CET1 ratio increased to 12.2% as of December 31, 2022 from 11.7% as of December 31, 2021, primarily reflecting significantly reduced RWA levels… partially offset by capital contributions from Credit Suisse Group AG relating to the capital increases executed in the fourth quarter of 2022." This statement was materially false or misleading or omitted facts necessary to make them not misleading because, as of the end of 2022, CS AG had a CET1 ratio of just 7.8% when adjusted for the impact of the regulatory filter, far below both Credit Suisse's target of 12% and the 9.28% required by regulators. The misleading nature of these statements is confirmed by UBS's later statements that Credit Suisse had "in fact been undercapitalized for a long time" and that "the collapse of Credit Suisse was driven by years of . . . reliance on substantial regulatory concessions."

### XIX. March 14, 2023: Defendant Körner Speech at European Financials Conference

136. On March 14, 2023, Defendant Körner spoke at the Morgan Stanley European Financials Conference in London. During the conference, Defendant Körner stated that ***Credit Suisse did not have "material risk"*** in the wake of Silicon Valley Bank ("SVB")'s recent collapse because Switzerland had "***materially different standards" in capital strength, funding and liquidity***. (Emphasis added).

137. The statements contained in ¶136 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company *did*, in fact, have "material risk" and did *not* have "materially different standards" in capital strength, funding, and liquidity, as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

### XX. March 14, 2023: Defendant Körner Interview with *Bloomberg*

138. On March 14, 2023, Defendant Körner was interviewed by *Bloomberg*. When asked about inflows, Körner said that things at the bank were "calm" and, in fact, there had been "***material good inflows***" ***the previous day***, which was a "***positive sign***." Koerner also said that ***outflows had "significantly moderated."*** (Emphasis added).

139. With respect to the recent collapse of SVB, Koerner said that "was a very different situation" than Credit Suisse, because Credit Suisse was "following ***materially different and higher standards when it comes to capital funding, liquidity, and so on***." (Emphasis added).

140. The statements contained in ¶¶138-39 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company did *not* "follow[] materially different and higher standards

when it comes to capital funding, [and] liquidity," as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (ii) the Company was experiencing significant and unusual customer and/or asset outflows which had not "significantly moderated."

### XXI. March 15, 2023: Defendant Lehmann Speech at Financial Sector Conference in Saudi Arabia

141. On March 15, 2023, Defendant Lehmann spoke at the Financial Sector Conference in Saudi Arabia. The speech was reported in an article published that day by Bloomberg titled "Credit Suisse Chairman Says State Aid 'Not a Topic.'" The article states:

> Credit Suisse Group AG Chairman Axel Lehmann said government assistance "isn't a topic" for the lender as the Swiss bank seeks to shore up confidence among clients, investors and regulators after a series of missteps.
>
> Speaking at the Financial Sector Conference in Saudi Arabia on Wednesday, Lehmann said it wouldn't be accurate to compare Credit Suisse's current problems with the recent collapse of Silicon Valley Bank, particularly because the banks are regulated differently.
>
> "We have strong capital ratios, a strong balance sheet," Lehmann said. "We already took the medicine," he said, referring to the extensive restructuring program announced in October.

142. The statements contained in ¶141 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company did not "have strong capital ratios," as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (ii) the "restructuring" of Credit Suisse was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices.

### XXII. March 15, 2023: Defendant Körner Interview with *CNA*

143. On March 15, 2023, Defendant Körner was interviewed by *CNA*, a Singapore news channel. The interview was reported by *Reuters* in an article published that day titled "Credit Suisse CEO said bank's liquidity basis is 'very very strong.'"

144. The article stated, in relevant part:

> Credit Suisse (CSGN.S) Chief Executive Ulrich Koerner spoke of the strength of the Swiss lender's liquidity basis in an interview with CNA on Wednesday, after its share price dropped more than 30% following comments by the company's lead investor.
>
> ***"Our capital, our liquidity basis is very very strong***," Koerner said. "***We fulfill and overshoot basically all regulatory requirements***."
>
> (Emphasis added).

145. The statements contained in ¶¶143-44 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Credit Suisse's liquidity was not "very very strong," and Credit Suisse did not "fulfill and overshoot basically all regulatory requirements," as its liquidity and funding profile, policy, and/or risk parameters were materially deficient at all times.

### XXIII. March 16, 2023: Media Release re SNB Aid

146. On March 16, 2023, prior to NYSE market open, Credit Suisse published a media release titled, "Credit Suisse Group takes decisive action to pre-emptively strengthen liquidity and announces public tender offers for debt securities." Later, after market open, Credit Suisse filed this media release on Form 6-K with the SEC. The media release stated:

> **Credit Suisse is taking decisive action to pre-emptively strengthen its liquidity by intending to exercise its option to borrow from the Swiss National Bank (SNB) up to CHF 50 billion under a Covered Loan Facility as well as a short-term liquidity facility, which are fully collateralized by high quality assets. Credit Suisse also announces offers by Credit Suisse International to**

> **repurchase certain OpCo senior debt securities for cash of up to approximately CHF 3 billion.**
>
> * * *
>
> CEO Ulrich Koerner said: "These measures demonstrate decisive action to strengthen Credit Suisse as we continue our strategic transformation to deliver value to our clients and other stakeholders. We thank the SNB and FINMA as we execute our strategic transformation. My team and I are resolved to move forward rapidly to deliver a simpler and more focused bank built around client needs."

(Emphasis in Original).

147. The statements in ¶146 were materially false or misleading or omitted information necessary to make them not misleading. According to several people interviewed by the PInC, "it was already clear at that time that this aid in the form of cash would not be enough, as Credit Suisse had not prepared well enough and was therefore unable to fully exploit the potential of the ELA." PInC Report at 300. By the time this statement was published, Swiss authorities had already approached CS and UBS to prepare for a merger, as they feared the "drastic deterioration" of Credit Suisse's situation "would trigger an international financial crisis." PInC Report at 294-95. Moreover, Lehmann himself would later admit in his remarks on April 4, 2023, that as of "the beginning of the fateful week"—*i.e.*, March 13, three days before this statement was made—a turnaround would not be successful.

148. Analysts reacted positively to this announcement. Analysts from J.P. Morgan stated: "Credit Suisse announced that it intended to access a liquidity facility with the Swiss National Bank of up to CHF50bn, a critical factor, in our opinion, that will allay some of the market concerns on liquidity given the focus on deposit outflows not only in Q4'22, but also as a result of the failure of smaller US banks."[14] An analyst from HSBC stated: "CS's actions serve both to demonstrate access to funding, also through it loan assets, as well as an attempt to normalise senior

---

[14] Roberto Henriques, "A Central Bank Bazooka," *J.P. Morgan*, Mar. 16, 2023.

debt spreads through the tender offer. Comments made by the CEO on Tuesday indicating an improving trend on deposit flows are reaffirmed with LCR said to have risen from 144% in 4Q to 150% QTD and higher on a spot basis."[15] And an analyst from BofA Global Research stated: "Bank closures are permanent and historically significant events. Forbearance measures are inherently temporary. We think that buying time for CS to deliver is likely appealing compared with the alternatives. We re-iterate our Buy rating based on the earnings potential of the franchise over time."[16]

149. As is clear from these statements, analysts interpreted Credit Suisse's statements as an indication that Credit Suisse was buying the time necessary to complete its restructuring plan, not that Credit Suisse was mere days away from collapse.

## CREDIT SUISSE'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP

150. During the Class Period, in the Company's SEC filings and elsewhere, Defendants represented that Credit Suisse's financial statements were prepared in conformity with generally accepted accounting principles ("GAAP"), a common set of accounting rules, standards, and procedures issued by the Financial Accounting Standards Board ("FASB").

151. As set forth in FASB Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about

[15] Piers Brown, "Hold: Swiss authorities provide support," *HSBC*, Mar. 16, 2023.

[16] Alastair Ryan, "Choices and Implications," *BofA Global Research*, Mar. 16, 2023.

> future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

152. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

153. SEC Rule 4-01(a) of SEC Regulation S-X provides that: "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform to GAAP. As stated in the professional standards adopted by the AICPA:

> [F]inancial statements are management's responsibility…. [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management…. Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

## I. Interim Financial Statements

154. Credit Suisse disclosed in each of its 2022 interim financial statements (including the 3Q22 Quarterly Report), that:

> The accompanying unaudited condensed consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). These condensed consolidated financial statements should be read in conjunction with the consolidated financial statements and notes thereto for the year ended December 31, 2021 included in the Credit Suisse Annual Report 2021.

155. The statements contained in ¶154 were materially false or misleading, or omitted information necessary to make them not misleading, because Credit Suisse's interim financial statements did not comply with GAAP, but rather resulted from a series of decisions by Defendants

designed to conceal the truth regarding Credit Suisse's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. As a result, Defendants materially misstated the Company's financial results throughout the Class Period.

## II. Audited Financial Statements

156. Credit Suisse disclosed in its 2022 Annual Report filed on Form 20-F with the SEC on March 14, 2023, that:

> The accompanying consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). The financial year for the Group ends on December 31. Certain reclassifications have been made to the prior year's consolidated financial statements to conform to the current presentation which had no impact on net income/(loss) or total shareholders' equity.

157. The statements contained in ¶156 were materially false or misleading, or omitted information necessary to make them not misleading, because Credit Suisse's 2022 Annual Report did not comply with GAAP but rather resulted from a series of decisions by Defendants designed to conceal the truth regarding Credit Suisse's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. As a result, Defendants materially misstated the Company's financial results throughout the Class Period.

## III. SOX Certifications

158. In connection with the filing of the Company's 2022 Annual Report on Form 20-F with the SEC, Defendants Körner and Joshi executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that attested to the purported accuracy and completeness of the Company's financial and operational reports as well as statements concerning Credit Suisse's

internal controls and procedures, as follows:

> 1. I have reviewed this annual report on Form 20-F of Credit Suisse Group AG and Credit Suisse AG;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report;
>
> 4. The registrants' other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrants and we have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrants, including their consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > c) evaluated the effectiveness of the registrants' disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > d) disclosed in this report any change in the registrants' internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is likely to materially affect, the registrants' internal control over financial reporting; and
>
> 5. The registrants' other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrants' auditors and the audit committee of each of the registrant's board of directors (or persons performing the equivalent functions):
>
> > a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrants' ability to record, process, summarize and report financial information; and

> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting.

159. Defendants Körner and Joshi's SOX Certifications were materially false and misleading because the 2022 Annual Report did not comply with GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. Furthermore, contrary to the statements in Defendants' SOX Certifications, as Defendants themselves would later admit, Credit Suisse's internal controls over financial reporting suffered from material weaknesses, and, as a result, the Company's financial reports were inaccurate, unreliable, and/or subject to manipulation.

## THE TRUTH IS REVEALED CAUSING LOSSES AND ECONOMIC DAMAGES

160. As alleged herein, during the Class Period, Defendants made numerous material misstatements and omissions regarding the sufficiency of Credit Suisse's risk management and control governance, the strength of its internal controls over financial reporting, the significance and impact of customer and asset outflows, the lack of "material risk" confronting the Company, and its current financial condition and its outlook, that were widely disseminated to the securities market, investment analysts, and the investing public. Defendants' misrepresentations concealed the true financial condition of Credit Suisse, along with FINMA's increased involvement in Credit Suisse's business and FINMA's growing concern that Credit Suisse's capital and liquidity positions could not withstand any further negative market news or events. Plaintiff and other members of the Class purchased or acquired Credit Suisse securities at artificially inflated prices, relying upon the integrity of the market price for Credit Suisse securities and market information relating to Credit Suisse, and they were damaged when the price of Credit Suisse securities fell as

a result of the truth being revealed. The relevant truth about Credit Suisse was revealed through a series of events and disclosures on: (1) September 22-23, 2022, (2) October 27, 2022, (3) February 9, 2023, (4) March 14, 2023, and (5) March 19, 2023.

161. On September 22, 2022, *Reuters* published an exclusive report, based on two people familiar with the matter, that Credit Suisse, despite its prior denials on May 31, 2022, and July 27, 2022, was seeking to raise capital: "Credit Suisse is sounding out investors for fresh cash…as it attempts a radical overhaul of its investment bank." In response to this new *Reuters* report, a Credit Suisse spokesperson neither confirmed nor denied the news: "We have said we will update on progress on our comprehensive strategy review when we announce our third-quarter earnings. It would be premature to comment on any potential outcomes before then." The market reacted swiftly and negatively to the revelation in the *Reuters* article, which partially revealed the truth about Credit Suisse's financial condition and Defendants' false and misleading denials that the Company was, in fact, considering a capital raise. As a result, the price of Credit Suisse securities fell precipitously, with its ADSs falling approximately 5.8%, from $5.00 per ADS at closing on September 21, 2022, to $4.71 per ADS at closing on September 22, 2022. On the morning of September 23, 2022, *Reuters* published an updated version of the article, which included a quote from a Swiss analyst estimating Credit Suisse would need to raise CHF 4 billion to fund its anticipated new strategy. As the market continued to digest the news, including the update regarding the anticipated amount of capital needed, the price of Credit Suisse ADSs fell another 12.10% to close at $4.14 per ADS on September 23, 2022.

162. Analysts and journalists tied the share price drop directly to the recent reports of Credit Suisse needing to raise more capital. For example, on September 22, 2022, *Bloomberg* reported Credit Suisse shares "slumped to a record low as investors signaled that doubts remain

over the troubled lender's…capital position," and the next day, September 23, 2022, *Reuters* reported, "Credit Suisse shares dropped to a record low on Friday [September 23] after a Reuters report said the company is looking to raise fresh cash." The same day, in a report titled Credit Suisse: Woes Are Priced In, But Its Shares Are Not A Buy," Labutes IR explained:

> Another issue that has been important for Credit Suisse's weak share price, has been the market perception that the bank has a capital gap and will need to raise equity through a capital increase. According to some analysts, the potential capital raise could amount to about CHF 4 billion ($4.08 billion), or 37% of its current market value. This would be a significant dilution of current shareholders, and therefore quite negative for its share price, explaining why its shares have reached a new all-time low very recently.

163. Because Credit Suisse did not confirm the report of a capital raise at this time, the price reaction following the September 22, 2022, *Reuters* article and September 23, 2022, update did not fully reveal the truth that the Company was, in fact, planning to raise new capital. Likewise, because Credit Suisse did not issue a denial at this time (unlike their response to the May 31, 2022, *Reuters* article), the market gave more credibility to this article and began speculating as to what a "potential capital raise" would mean for existing shareholders. Analysts disagreed whether a capital raise would be necessary. On October 3, 2022, a BofA Global Research report stated: "The debate over whether additional equity capital is needed at a group level has been largely settled, we think, by the rise in debt costs: an equity raise now looks a core part of the restructuring." However, on October 5, 2022, an analyst from J.P.Morgan wrote: "[W]e do not see a capital increase as a given outcome. While recent negative newsflow and market reaction may impact franchise value near-term, we expect this to be resolved post clarity on restructuring."

164. Then, on October 27, 2022, among other news, the Company confirmed, in its Rights Offering Media Release, that, despite its prior denials, it did, in fact, intend to approve "two separate share capital increases" consisting of new share issuances for the Saudi National Bank and existing shareholders, for a combined total of CHF $4 billion (approximately USD $4.4

billion). But even though this disclosure revealed the falsity of Credit Suisse's May 31, 2022, and July 27, 2022, misstatements regarding whether Credit Suisse was considering or needed to raise capital, Credit Suisse's announcement continued to conceal material information concerning the true scope of its financial condition. It framed the capital raise as "further stengthen[ing] the Group's capital base and support[ing] its new strategic direction," rather than truthfully disclosing that FINMA [redacted] CS-Diabat_00203093.

165. On balance, analysts interpreted the newly revealed capital raises as having a negative impact on Credit Suisse's share price. Analysts at J.P.Morgan stated, "We believe the main driver of negative share price reaction was the announcement of a CHF 4bn capital raise to 'clear the deck' and such a material dilution should have been avoided in our view." Analysts at Kepler Cheuvreux, in a report titled "Credit Suisse / Change at a hefty price," stated that "[t]he decisions taken are, in our view radical enough. However, the cost is immense and the new 3-year restructuring period will have high execution risk.… We expect the shares to underperform today." Similarly, *The New York Times* reported, "Credit Suisse's stock fell more than 18 percent on Thursday [October 27, 2022], as investors absorbed the scale of the firm's reorganization plans and the amount of capital it was seeking to raise by selling new shares."[17] In response to the revelations, the price of Credit Suisse securities fell substantially, including ADSs falling 20.04% to close at $3.83 per ADS on October 27, 2022, down from $4.79 per ADS on October 26, 2022.

166. However, the price of Credit Suisse securities remained artificially inflated because

[17] Michael J. de la Merced, "Credit Suisse Unveils Sweeping Revamp to Revive Its Fortunes," *The New York Times*, Oct. 27, 2022.

Defendants continued to conceal materially false or misleading information from the public. The same day, October 27, 2022, Credit Suisse revealed a new strategic plan, which it claimed would remediate the liquidity issues caused by recent outflows that Defendants claimed were due to "incorrect rumors." These statements were materially false or misleading because outflows had actually been ongoing for months due to clients' lack of confidence in the Group, FINMA had been pressing Credit Suisse's Board and management to implement concrete plans to improve capital and liquidity and had expressed frustration that the proffered plans were inadequate, FINMA had granted regulatory concessions which allowed CS AG to report a much higher than accurate CET1 ratio, and a key element of the strategic plan was not even possible without CS AG breaching regulatory capital requirements. Defendant Lehmann also touted Credit Suisse's "significant progress" in improving Credit Suisse's risk management control processes while concealing the fact that Credit Suisse had already received multiple letters from the SEC questioning the adequacy of the Group's ICFR.

167. On February 9, 2023, before market hours, the Company issued its FY22 Earnings Release in which it disclosed a $1.5 billion loss, customer outflows of CHF 110.5 billion in the final three months of 2022, and a dramatic decrease in assets under management. This Earnings Release also stated, "as the [fourth] quarter progressed, these outflows stabilized to much lower levels but ***had not yet reversed by year end***." Thus, due to Defendants' prior misleading statements about the state of outflows, the FY22 Earnings Release, which partially revealed the true state of affairs at Credit Suisse, fell far short of what the market expected, resulting in the dissipation of artificial inflation and causing investor damages. For example, this disclosure revealed that that the bank's outflows had not, in fact, "reversed" or "basically stopped," as Defendant Lehmann stated on December 1 and 2, 2022, but had only "stabilized to much lower levels but had not yet

reversed by year end."

168. "[A]nalysts were alarmed by the scale of losses and outflows," reported *Reuters* in a February 9 article titled "Credit Suisse warns of more losses, drawing regulatory attention." For example, analysts at Barclay's released a research report that day titled "Credit Suisse AG: Q422 First Look: Much weaker than we anticipated," stating that the announced results were "worse than our expectations, with far larger outflows in wealth management." Deutsche Bank analysts, in a research report titled "Credit Suisse: 4Q22 – Capital & liquidity issues checked; material impact on businesses," observed that "operational momentum in Wealth Management and Investment Bank came in significantly worse than expected," and that "the impact on the businesses has been worse than expected." Kepler Cheuvreux analysts, in a research report titled "Credit Suisse: Q4 2022 first reaction: Very significant outflows in Wealth Management," stated: "There is little positive to be found in CS Q4 results and the outlook for 2023 is grim."

169. Following the revelations of these previously undisclosed facts by Credit Suisse on February 9, 2023, the price of Credit Suisse securities declined. For example, the price of Credit Suisse ADSs fell 15.6%, from a closing price of $3.58 on February 8, 2023, to close at $3.02 per ADS on February 9, 2023. The ADS price continued to fall in the coming days as investors digested the news.

170. But even though this February 9, 2023, disclosure corrected Defendant Lehmann's specific misstatements on December 1 and 2, 2022, that outflows had "reversed" and "basically stopped," Defendants' statements continued to conceal the bank's perilous financial position, including FINMA's growing concerns about Credit Suisse, continued to conceal that the SEC was raising serious questions about the adequacy of Credit Suisse's ICFR, and continued to conceal material weaknesses in the Company's ICFR. The truth about the bank's internal controls would

not be revealed until March 14, 2022, when the Company filed its 2022 Annual Report, and the truth about the bank's financial condition would not be fully revealed until the announcement of the merger on March 19, 2023, which was designed to stave off the bank's collapse.

171. On March 14, 2023, the Company filed its 2022 Annual Report, which was signed by Defendants Körner and Joshi. The 2022 Annual Report identified material weaknesses in the Company's internal controls, which stated the following, in relevant part:

> **We have identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021**
>
> Management has identified certain material weaknesses in our internal control over financial reporting as a result of which management has concluded that, as of December 31, 2022, ***the Group's internal control over financial reporting was not effective, and for the same reasons, management has reassessed and has reached the same conclusion regarding December 31, 2021, as more fully described in this Annual Report. Management has also accordingly concluded that our disclosure controls and procedures were not effective.***
>
> ***The material weaknesses that have been identified relate to the failure to design and maintain an effective risk assessment process to identify and analyze the risk of material misstatements in its financial statements and the failure to design and maintain effective monitoring activities relating to (i) providing sufficient management oversight over the internal control evaluation process to support the Group's internal control objectives; (ii) involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives; and (iii) assessing and communicating the severity of deficiencies in a timely manner to those parties responsible for taking corrective action. These material weaknesses contributed to an additional material weakness, as management did not design and maintain effective controls over the classification and presentation of the consolidated statement of cash flows. This material weakness resulted in the revisions contained in our previously issued consolidated financial statements for the three years ended December 31, 2021 as disclosed in the 2021 Annual Report.***
>
> Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to

> controls to date. ***While we are taking steps to address these material weaknesses, which could require us to expend significant resources to correct the material weaknesses or deficiencies, any gaps or deficiencies in our internal control over financing reporting may result in us being unable to provide required financial information in a timely and reliable manner and/or incorrectly reporting financial information, which could reduce confidence in our published information, impact access to capital markets, impact the trading price of our securities or subject us to potential regulatory investigations and sanctions. In addition, there can be no assurance that these measures will remediate the material weaknesses in our internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Any of the foregoing could materially and adversely affect our business, results of operations and financial condition.***

(Emphasis added).

172. In addition to revealing the truth concerning the problems with Credit Suisse's internal controls, and the corresponding issues in the prior quarter financial certifications, the disclosure of additional systemic problems at Credit Suisse further eroded the market's confidence in the Company and Defendants' representations of the bank's stability. The media reported on this dramatic announcement and quoted extensively from the Annual Report.[18] Ultimately, the media attributed Credit Suisse's downfall, in part, to the announcement of the material weaknesses.[19] On this news, the price of Credit Suisse securities fell, including ADSs falling 1.18% to close at $2.51 per ADS on March 14, 2023.

173. Thereafter, Defendants continued to make materially false and misleading statements, particularly with respect to the bank's liquidity and financial health, concealing the Company's true state of affairs at a time when FINMA was actively brokering a merger between

---

[18] *See, e.g.*, Margot Patrick, "Credit Suisse Finds Material Weaknesses in Financial Reporting," *The Wall Street Journal*, Mar. 14, 2023; Julia Kollewe & Graeme Wearden, "Credit Suisse warns of 'material weaknesses' in financial reporting," *The Guardian*, Mar. 14, 2023.

[19] *See, e.g.*, Michael J. de la Merced et al., "UBS Agrees to Buy Rival Credit Suisse," *The New York Times*, Mar. 19, 2023.

Credit Suisse and its historic rival, UBS. On the day the 2022 Annual Report was released, Defendant Körner spoke at Morgan Stanley's European Financials Conference, reassuring the public with respect to Credit Suisse's liquidity and outflows, and representing that the restructuring was progressing rapidly. Analysts at BofA Global Research, in a report titled "Credit Suisse Group: CEO comments supportive," noted Körner's comments favorably and maintained its "buy" rating. Similarly, Kepler Cheuvreux released an analyst report that day titled "Credit Suisse: CEO gives relatively reassuring message," noting that Körner's "message was reassuring on liquidity, outflows, and costs" that the improvements in liquidity and outflows "can help stem the very negative newsflow around CS and stop the negative spiraling," and that Credit Suisse was "forcefully tackling the issue related to the material weakness in the financial reporting process."

174. Thus, while the price of Credit Suisse ADSs fell as much as 5% in intra-day trading, it was able to recover some ground to close at $2.51 per ADS on March 14, 2023, down from $2.54 per ADS on March 13, 2023—a new all-time low.

175. Then, on the evening of Sunday, March 19, 2023, Credit Suisse, UBS, and Swiss Federal authorities held a press conference announcing that UBS would be taking over Credit Suisse. Credit Suisse also issued a media release announcing the merger, which it filed with the SEC on Form 6-K on the morning of Monday, March 20, 2023. Under the terms of the agreement, Credit Suisse would be bought by UBS in a fire-sale for approximately $3.2 billion—less than half of its last traded market value on March 17, 2023. The media release stated: "This move comes after the Swiss Federal Department of Finance, the Swiss National Bank and FINMA asked both companies to conclude the transaction to restore necessary confidence in the stability of the Swiss economy and banking system."

176. In the press release, Defendant Lehmann was quoted as saying, in stark contrast to

the statements he made just a few days prior, that "Given recent extraordinary and unprecedented circumstances, the announced merger represents the best available outcome. This has been an extremely challenging time for Credit Suisse and while the team has worked tirelessly to address many significant legacy issues and execute on its new strategy, we are forced to reach a solution today that provides a durable outcome."

177. After the news of the merger was revealed to the market, the price of Credit Suisse securities fell precipitously, as the artificial inflation caused by Defendants' material omissions and false and misleading statements made during the Class Period was finally removed from the price of Credit Suisse securities, thereby causing substantial damage to Plaintiff and other members of the Class. The announcement of the merger, which was designed to stave off Credit Suisse's collapse, revealed to investors that Defendants' statements regarding, *inter alia*, Credit Suisse's CET1 ratio, stability, then-existing financial condition and liquidity, its current and future business health, and the lack of "material risk" confronting the Company, painted too rosy a picture of the Company's financial condition at the time the statements were made. In other words, the merger announcement revealed to the market that Defendants' prior statements were misleading and not reflective of the true state of affairs at Credit Suisse at those times. Indeed, on the news of the merger, the price of Credit Suisse ADSs fell ***52.99%*** to close at $0.9450 per ADS on March 20, 2023 (down from $2.01 per ADS on March 17, 2023, the previous business day), and fell overall from $7.05 per ADS at the close of trading on May 31, 2022, the first day of the Class Period, to $0.94 per ADS on March 20, 2023, an astonishing ***86.66%*** overall decline in value. The media noted the stunning price decline.[20]

[20] *See, e.g.,* Keith Collins, "Credit Suisse Agrees to be Bought by Swiss Rival UBS," *The Wall Street Journal*, Mar. 20, 2023 ("Shares of Credit Suisse fell sharply following an emergency deal for rival Swiss bank UBS to buy the troubled lender for more than 3 billion dollars.").

178. Defendants' prior misrepresentations and omissions also concealed Credit Suisse's true risk of collapse. Contrary to Defendants' Class Period statements touting the strength of Credit Suisse's capital position, CS AG's CET1 ratio was only staying above the regulatory minimum thanks to the application of a regulatory filter, which was reported in a way that was "hardly comprehensible to outsiders." Further, unbeknownst to the market, Credit Suisse's dire capital and liquidity position forced FINMA to increase its supervision of the group, including requiring weekly meetings with Credit Suisse top management and urging Credit Suisse to make "concrete plans" to prepare for a merger in the event outflows continued. In a series of letters treated with the utmost confidentiality by the Swiss government, FINMA pressed Defendants again and again to implement realistic plans to stabilize the Group in the event of another incident, which was all but inevitable due to the public's lack of confidence in Credit Suisse. Yet, when another incident occurred, there was only one solution capable of preventing a total meltdown of Credit Suisse, and with it, the global economy—a merger with rival UBS.

179. Throughout the Class Period, if Defendants had fully and truthfully disclosed Credit Suisse's true financial condition of the company, and that their capital/liquidity position could not withstand further negative market events or news, investors would have arrived at a valuation of its securities that more accurately reflected the risk the Company was not as financially healthy as represented and was facing the risk of ultimate failure. But, throughout the Class Period, Credit Suisse "always wanted to present the image of a solid bank." PInC Report at 245. As a result, Credit Suisse investors did not learn of the Company's true financial condition until Defendants announced its forced merger with UBS.

180. The timing and magnitude of Credit Suisse's securities price rise and decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused

by changes in market conditions, macroeconomic or industry factors, or other facts unrelated to Defendants' fraudulent conduct.

181. The economic loss (*i.e.*, damages) suffered by Plaintiff and other members of the Class, was a direct result of the truth about Defendants' misrepresentations and omissions being revealed to investors, and the subsequent, significant decline in the value of Credit Suisse securities was also the direct result of the truth about Defendants' misrepresentations and omissions being revealed to the market.

## DEFENDANTS ACTED WITH SCIENTER

182. Throughout the Class Period, the Individual Defendants touted the sufficiency of Credit Suisse's risk management and control governance and the strength of its internal controls over financial reporting, touted Credit Suisse's financial condition, and downplayed the significance and extent of customer and/or asset outflows, all while in possession of contradictory information. Accordingly, Defendants knew or recklessly disregarded that their Class Period statements were materially false or misleading when made. The Individual Defendants also had significant financial motives to commit fraud, reaping millions of dollars in compensation throughout the Class Period.

### I. The Individual Defendants Knew or Recklessly Disregarded That Their Statements Were Materially False and Misleading

#### A. The PInC Report Supports a Strong Inference of Scienter

183. The PInC Report contains numerous facts demonstrating Defendants knew or recklessly disregarded ongoing critical issues with Credit Suisse's financial condition, including its capital and liquidity, throughout the Class Period. The PInC Report laid blame for Credit Suisse's collapse directly at management's feet.

184. FINMA sent yearly assessment letters to Credit Suisse, in which it "repeatedly raised various issues with CS." PInC Report Summary at 6. From at least 2015 onwards, FINMA

requested "that CS should proactively and transparently report to it on major regulatory developments," but Credit Suisse "failed to comply." *Id.* FINMA also: (i) "expressed doubts regarding the sustainability of the bank's strategy and, in particular, its remuneration policy," (ii) "drew CS's attention to the risks associated with the numerous changes in the Executive Board" including "gaps in the anti-money laundering system and in decentralised risk control," (iii) "repeatedly voiced its concerns that CS was not growing its equity organically but rather through injections of capital and financing from other subsidiaries," and (iv) "regularly imposed additional requirements on CS and almost annually demanded improvements in the reporting of its equity and liquidity situation." *Id.* The PInC Report notes, despite these facts, "CS made little progress." *Id.* Additionally, FINMA conducted eleven enforcement proceedings against Credit Suisse from 2012-2022 and eight enforcement proceedings against members of Credit Suisse's Executive Board, five of which were still pending at the time the PInC Report was published in 2024. *Id.* at 8. Based on these facts, "the PInC finds it incomprehensible that, despite the bank's many transgressions, no causal responsibility could be established for the relevant misconduct." *Id.*

185. With regards to ELA, the PInC Report found: "CS would have had sufficient opportunity to make the necessary preparations for drawing a larger amount of ELA but, according to the information available to the PInC, it did not do so." PInC Report Summary at 8. Particularly, "CS refrained from drawing on ELA funds on three occasions between October and December 2022, partly due to the potential stigmatising effect of having to report receiving ELA." *Id.* Defendant Lehmann also stopped the Swiss Government from conducting any discussion of creating a legal basis for a public liquidity backstop in November 2022 due to concerns about market perception. PInC Report at 245. And when it finally became inevitable that the Group would need to take ELA or collapse, "it was already clear at that time that this aid in the form of

cash would not be enough, as Credit Suisse had not prepared well enough and was therefore unable to fully exploit the potential of the ELA." PInC Report at 300.

186. Swiss authorities began discussing "Credit Suisse's delicate situation" as early as May 2022 (PInC Report at 184), and beginning in July 2022, several months into the Class Period, FINMA stepped up its supervision of Credit Suisse and "exerted greater pressure on CS to improve its contingency plan in response to the structural loss situation." PInC Report Summary at 12. "From August, it met with the bank's CEO and Chairman of the Board of Directors for weekly status updates on the range of measures being implemented in parallel." *Id.* "From September, weekly high-level meetings were held with CS senior management to examine strategic and operational developments." *Id.* Additionally, the SNB "began carrying out daily liquidity monitoring with CS from June 2022," and, in autumn 2022, "stepped up its preparations for granting of ELA by asking CS to identify further assets that could serve as collateral for the SNB for possible use of ELA." PInC Report Summary at 12-13.

187. In early October 2022, CS AG's liquidity buffers fell below regulatory requirements; however, Credit Suisse neglected to inform FINMA, despite a duty to do so. FINMA "sharply criticiz[ed]" Credit Suisse for this concealment and required Credit Suisse executives begin participating in "daily conference calls on the liquidity and refinancing situation." PInC Report at 217. According to FINMA, Credit Suisse was "struggling to assess the efficiency of its own measures and produce reliable scenario analyses and forecasts for capital outflows." *Id.* at 220. FINMA brought the "glaring shortcomings in access to information" to the Credit Suisse Board of Directors and management, "criticizing Credit Suisse for its lack of due diligence (incomplete documentation, often submitted late, after several reminders, or not at all)." *Id.*

188. In late October 2022, "FDF and the Chairman of the SNB's Governing Board

initiated so-called non-meetings with the Chairman of the Board of Directors of CS" in order to "expedite efforts to find a solution with CS in a non-formal setting." PInC Report Summary at 14-15. Also in October 2022, "the willingness of UBS to take over CS was already clarified at a non-meeting with the Chairman of the Board of Directors of UBS." *Id*. at 15. And on November 1, 2022, "both the head of the FDF and Chairman of the SNB's Governing Board had asked the Chairman of the Board of Directors of CS to take the necessary steps in preparation for [selling of the bank]." PInC Report Summary at 14. Despite Defendants' knowledge, or reckless disregard, of these facts, on October 27, 2022, Credit Suisse announced a new strategy, proclaimed to have "achieved significant progress and clear results" with regards to risk management, and stated that outflows had "stabilized" to much lower levels. The possibility of a takeover was not discussed at all by Defendants in Credit Suisse's October or November SEC filings, much less the imminent possibility of a takeover by UBS.

189. On December 21, 2022, the members of Credit Suisse's Audit Committee assured FINMA that they would "give priority to preparing the sale"; however, they noted Lehmann "attached little importance" to the idea of a sale, which he referred to as "Plan Z." *Id*. at 222. On December 22, 2022, "FINMA notified the CFC that it had instructed CS to develop a short- and medium-term sale scenario by early January so that it would be prepared for an emergency sale of the bank." PInC Report Summary at 16. In a non-meeting with the Chairman of the Board of Directors of Credit Suisse on December 29, 2022, "FINMA made clear demands that CS complete preparations for a sale by early January," including producing a shortlist of potential buyers and establishing a virtual data room to facilitate due diligence. *Id*. At this meeting, "all those present" agreed that Defendant Lehmann "appears optimistic, and sometimes even overly optimistic…. it has become clear that the chairman of the board of directors of Credit Suisse is underestimating

and ***embellishing the situation, particularly to create an impression of security***." PInC Report at 241 "In early January, CS provided FINMA with a shortlist of four potential buyers and in mid-January confirmed that the required data room had been prepared." *Id*. Even with these measures in place, Credit Suisse still made positive statements about its capital, liquidity, and the execution of its strategic plan on February 9, 2023.

190. On March 15, 2023, the same day that both Defendants Lehmann and Körner made positive statements regarding the state of Credit Suisse, authorities realized urgent measures were needed to prevent Credit Suisse from being liquidated and set up a crisis unit at FDF headquarters. PInC Report Summary at 18. This same day, just hours after assuring investors that State assistance was "not a topic," Credit Suisse applied for ELA. PInC Report Summary at 19. On March 15, 2023, "The authorities found Credit Suisse still very optimistic, and the bank's representatives were said to have shown a great lack of judgment that day. The authorities, for their part, reportedly made it clear to the bank that the sale to UBS is the intended solution and that Credit Suisse must prepare accordingly." PInC Report at 298. However, Credit Suisse continued to refuse UBS access to its virtual data room, leading the Chairman of UBS to "assume[] that Credit Suisse was intentionally delaying the work." *Id*. at 307. When Credit Suisse told FINMA it intended to use the ELA it requested on March 15 to repurchase certain AT1 bonds, FINMA replied "that Credit Suisse had not understood the gravity of the situation," and "the bank's behavior was very problematic." PInC Report at 310. However, the PInC found "Credit Suisse would have gone bankrupt on Friday [March 17] if the Swiss authorities had not found a solution by Friday evening." PInC Report at 328.

191. Numerous facts also point to the fact that Defendants knowingly or recklessly concealed CS AG's capital issues from the public. For example, FINMA collaborated with Credit

Suisse and Credit Suisse's auditors to set "audit strategies" each year, and over the years, "the parent company's capital requirements" was repeatedly classified as "high" or "very high" risk, and yet, changes were not made to lower the risk. PInC Report at 178. In October 2022, Credit Suisse also attempted to conceal its true CET1 ratio by rebooking certain foreign assets to domestic assets, thereby lowering their risk weights, and by requesting that FINMA allow it to use an inappropriate valuation method for its portfolio that would not "accurately reflect the economic value" of the holdings. Birchler Report at 13, PInC Report at 213.

### B. The SEC Inquiry Into Credit Suisse's Financial Reporting Supports a Strong Inference of Scienter

192. On March 12, 2023, Credit Suisse responded to a nine-month long inquiry from the SEC into the sufficiency of its financial reporting, stating that it "note[d] the Staff's concerns, and have now reassessed our position" and would report a material weakness in its internal control over financial reporting. Significantly, the Company stated: "***We acknowledge that the control deficiencies remained un-remediated for several years.***"

193. The SEC's inquiry began in July 2022, although the Company did not disclose it until March 9, 2023, and, even then, falsely characterized it as a "last minute request" that it had received the evening before, in order to justify the delay in publication of its 2022 Annual Report. The letters themselves, as well as the fact that Credit Suisse had been communicating with the SEC for ***eight months*** leading up to the "last minute request" was not revealed until April 11, 2023—after Credit Suisse had already collapsed and announced its merger with UBS. The inquiry stemmed from Credit Suisse's disclosure in its 20-F for FY 2021 that "[i]n connection with ongoing internal control processes, the Group identified accounting issues," but that because they were not considered "material," it would not need to restate its financial statements.

194. The SEC's July 15, 2022, comment letter asked whether the "accounting issues"

resulted from "control deficiencies," and "[i]n light of your accounting issues and resulting revisions, as well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management, ***please provide us with your analysis supporting your conclusion that there were no material changes to ICFR***." The SEC's comments could not have come as a surprise to Defendants, as FINMA, the FCA, and Credit Suisse's own management had been criticizing the Group's control environment for years. *See* CS-Diabat_00203076 (May 23, 2022, FINMA Assessment Letter, [redacted]); CS-Diabat_00033142 (SOX Program Director states, "I am asking the same questions since last year and nobody seems able to provide a credible answer…. there have been significant control failures across the organization, and if another set of large incidents happen it's questionable whether the Bank would even survive").

195. What followed was a lengthy exchange of correspondence back and forth between the Company and the SEC, during which the Company tried to justify its position that the identified errors were not material, and the SEC pushed back. This process culminated in the Company's March 12, 2023, admission and disclosure of a material weakness in its internal controls. Specifically, Credit Suisse stated: "We will report that we have, and have had, a material weakness in internal control over financial reporting as it relates to COSO Principle 7" and "management has concluded that there was a material weakness in the Group's internal control over financial reporting as of December 31, 2021 and which continued as of December 31, 2022, related to COSO Principle 17. Specifically, management's severity assessment of certain control deficiencies did not sufficiently consider the magnitude of the potential misstatement that could result, but rather considered the actual error amongst other qualitative considerations for determining the potential impact and severity of a deficiency." COSO Principle 7 is: "Identifies and analyzes risks." COSO

Principle 17 is: "Evaluates and communicates deficiencies." FINMA raised and warned Credit Suisse—specifically Defendants Lehmann and Gottstein—[redacted] CS-Diabat_00203081 [redacted]; CS-Diabat_00203080 [redacted].

196. As the correspondence with the SEC was ongoing, and despite knowledge of the correspondence, the Company and its executives were providing the market with quarterly financial results and strategy updates, (*supra* ¶90 (July 27, 2022); ¶98 (October 27, 2022); ¶107 (November 2, 2022); ¶110 (November 23, 2022); ¶121 (February 9, 2023)); Defendant Lehmann was saying that "the main indicators of the bank's financial stability were strong," *supra*, ¶115 (December 2, 2022), and that the Bank was "definitely stable," *supra* ¶119 (December 5, 2022); and Defendant Körner was stating that the Bank had a "robust balance sheet" and was "executing on [its] transformation from a position of strength," *supra* ¶123 (February 9, 2023). And Defendants Körner and Joshi executed SOX certifications attached to the 2022 20-F which stated: "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report."

197. The maintenance of effective ICFR is an essential duty of senior management of a corporation, particularly the Chief Financial Officer and Chief Executive Officer, in order to ensure that the information reported in the company's financial statements is accurate and does

not contain any material misstatement. As Credit Suisse said in its 2022 Annual Report, "The management of the Group is responsible for establishing and maintaining adequate internal control over financial reporting. The Group's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with US GAAP." 2022 Annual Report, at 257. In the "Report of Independent Registered Public Accounting Firm" prepared by PwC AG and attached to Credit Suisse's 2022 Annual Report, PwC AG adds onto Credit Suisse's ICFR definition:

> A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

2022 Annual Report at 258-I.

198. PwC explains in a publicly available pamphlet, "Internal Control are often an area of focus for investors, creditors, shareholders and Board members, among other stakeholders, when ensuring that the organisation provides accurate financial reporting which shows its state of operations." *See* "Internal Control over Financial Reporting (ICFR): Driving governance through effective financial reporting," *PricewaterhouseCoopers*. The pamphlet explains that this is especially true in light of situations such as the 2002 collapse of Enron, the 2008 global financial crisis, and the 2016 global oil price slump. A key function of ICFR is to "introduce new practices to assess the risks facing the businesses and having sound Internal Control to mitigate those risks." Continuing to revise and maintain effective ICFR is a crucial foundation for a company like Credit

Suisse in light of the pre-Class Period scandals. The fact that the SEC was questioning the ICFR put the Company on notice that further assessment and revisions to Credit Suisse's ICFR were necessary. This is particularly true for Defendants Lehmann, Körner, and Joshi, who were specifically brought in to adequately assess risk after the failures of their predecessors. Likewise, Defendants' touting of new risk-reduction plans and strategies to investors while omitting mention of the SEC's concerns was highly material and misleading.

### C. The Timing of Defendants' Statements Supports an Inference of Scienter

199. The temporal proximity of certain of Defendants' misstatements and omissions to the revelation of the truth about said statements supports an inference of scienter.

200. First, just months separated the announcement of Credit Suisse's results and strategy update in October 2022 and the forced merger between Credit Suisse and UBS in March 2023. And only one month passed between the February 9, 2023, pre-announcement of Credit Suisse's 2022 annual results and the announcement on March 9, 2023, that Credit Suisse would be delaying the release of its annual report due to a late-night request by the SEC, followed by the revelation just days later that Credit Suisse had a material weakness in its ICFR. Likewise, just 28 days passed between Credit Suisse's February 13, 2023, letter to the SEC, in which it claimed the Company's ICFR were effective, and its March 12, 2023, letter to the SEC in which it admitted acknowledged ICFR deficiencies to the SEC, admitting that "the control deficiencies [had] remained unremediated for several years."

201. On October 27, 2022, and even later, on October 31, 2022, Defendant Körner represented that outflows had "stabilized," and even "reverse[d]." One day later, on November 1, 2022, Defendant Körner approved triggering the third and final level of Credit Suisse's Contingency Funding Plan. And just one day after that, on November 2, 2022, Defendants revealed

that outflows had slowed "to much lower levels" but had not yet reversed.

202. Defendant Lehmann said state aid was "not a topic" on March 15, 2023, the same day the Company applied to access up to CHF 50 billion in state aid.

203. But perhaps the strongest example of temporal proximity is the fact that Defendants continued to make positive statements about Credit Suisse's capital, liquidity, and plans for the future during the week of March 13, 2023, as Credit Suisse was on the brink of collapse, after Defendant Lehmann admitted to knowing that turnaround would not be possible, and at a time when Credit Suisse was knee-deep (if not deeper) in negotiations with UBS about the merger.

### D. The Individual Defendants' Admissions Support a Strong Inference of Scienter

204. On April 4, 2023, at the Company's final annual general meeting of shareholders, Defendant Lehmann admitted that the Company's risk management and controls were deficient, and it had failed to rectify the problems. Specifically, Defendant Lehmann conceded:

> We needed a comprehensive strategic and cultural transformation. The business model had to be fundamentally overhauled and changed. It was also clear that there were unhealthy developments, errant behaviors, and wrong incentive systems. That there were transactions that should not have been allowed to play out. That we needed to work in many areas not only on structures, but also on mentalities and culture. That is what we wanted to rectify.
>
> * * *
>
> The period from October to March was not long enough. One legacy issue after another had already seen trust eroded – and with it, patience dwindled. At that, we failed. It was too late.
>
> * * *
>
> We failed to stem the impact of legacy scandals, and counter negative headlines with positive facts in order to rebuild the lost confidence.

205. In these same remarks, Lehmann admitted that he knew a turnaround would not be possible as of "the beginning of the fateful week," *i.e.*, March 13, 2023. However, he and other

Defendants continued to make positive statements about Credit Suisse, including at a conference on March 15, 2023, and in a media release on March 16, 2023.

206. Thereafter, Defendant Körner gave his remarks, conceding that "the bank had been ***significantly weakened by the strong outflows in October 2022***," and that it had been "***particularly vulnerable at the time***" when Silicon Valley Bank and Signature Banks collapsed [March 10 and March 12, 2023, respectively]. (Emphasis added).

207. On April 24, 2023, Credit Suisse revealed in its final, 1Q23 Earnings Release: "In the second half of March 2023, Credit Suisse experienced significant withdrawals of cash deposits as well as non-renewal of maturing time deposits. Customer deposits declined by CHF 67 billion in 1Q23."

208. Recent statements by UBS regarding its post-merger review of Credit Suisse further support a strong inference of scienter. On August 31, 2023, in a UBS earnings call, Sergio Ermotti, the CEO of UBS, made remarks regarding "our assessment of Credit Suisse as of March 19." He explained that UBS had done an "in-depth analysis" and an "extremely thorough review, and had concluded, in relevant part:

> It was not just a matter of liquidity drying up. ***Credit Suisse's business model and business mix was deeply flawed and its reputation severely damaged. With its structural lack of underlying profitability, unsustainable capital allocation, and negative revenue and costs prospects, the bank was no longer in a position to continue on its own.*** This is clearly visible from the year-to-date losses Credit Suisse reported today, a culmination of the bank's two loss-making years.

209. That same day, in an interview on *CNBC International TV*, Ermotti stated that "our analysis has proven that the business model was not viable any longer . . . the business model was not sustainable any longer and needs to be restructured." Ermotti also stated, with respect to elements of Credit Suisse's "culture" that needed to be addressed in connection with the integration, "[t]he most important one is risk discipline, risk/reward discipline . . . some people [at

Credit Suisse] were not really probably behaving in the best interest of clients and the bank."

### E. The Individual Defendants' High-Level Positions and Access to Non-Public Information Contrary to Their Public Statements Support a Strong Inference of Scienter

210. As the Individual Defendants conceded both before, during, and after the Class Period, Credit Suisse's risk management and internal controls were severely lacking, and massive customer and asset outflows eventually prompted the Swiss government to intervene and pressure the Company's merger with UBS. That the alleged misrepresentations and omissions go to the core of Credit Suisse's ability to operate as a going concern bolster the inference of scienter.

211. The Individual Defendants were all high-level corporate insiders, each of whom—by virtue of his high-level position—directly participated in the management of the Company, was directly involved in the day-to-day operations of Credit Suisse at the highest levels, was directly or indirectly involved in the oversight or implementation of the Company's risk management procedures/policies and internal controls over financial reporting, and was privy to confidential information concerning the Company and its business, operations, practices, financial statements, and financial condition, including the misstatements alleged herein. Defendants received daily updates regarding liquidity and customer outflows. *See, e.g.*, CS-Diabat_00080083 ("I continue to provide daily updates [regarding breaches of LCR and NSFR] to CRO/CFO/CEO plus [Board members] Richard, Mirko and Blythe."); CS-Diabat_00089853 ("Our deposits trend is made available daily in multiple senior management meetings and to our various regulators"). Because of the Individual Defendants' positions, they possessed the power and authority to, and did, control and monitor the contents of Credit Suisse's SEC filings, press releases, presentations, and other public statements during the Class Period made and disseminated to investors, securities analysts, money and portfolio managers and institutional investors (*i.e.*, the market), and/or approved or ratified these statements. Defendants Körner and Joshi signed and/or certified the Company's 2022

Annual Report filed on Form 20-F with the SEC, and the Individual Defendants regularly issued releases and spoke about the Company's business and operations. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the SEC filings, press releases, and other public statements detailed herein, and is primarily liable for the false and misleading statements and omissions and wrongful conduct pleaded herein.

## II. The Core Operations Doctrine Further Supports a Strong Inference of Scienter

212. A financial institution's CET1 ratio is one of its most significant financial metrics, especially after the 2008 financial crisis, as it is used determine the financial institution's ability to withstand financial distress. Numerous international and regional regulations are in place to ensure globally significant financial institutions are sufficiently capitalized. CS AG was Credit Suisse's primary subsidiary, and the parent of Credit Suisse's four operating divisions. The "capital situation" of CS AG was a frequent topic of correspondence between CS and FINMA. CS AG's CET1 ratio was mentioned in quarterly and annual financial reports during the Class Period, was the subject of questions from analysts during earnings calls, and was frequently discussed by analysts in their reports. Given their high-level positions in Credit Suisse, it would be highly reckless (at best) if any of the Individual Defendants did not know the truth about CS AG's capitalization and the effects of the regulatory filter on CS AG's CET1 ratio. Put simply, a bank cannot fulfill its primary purposes without sufficient capital to fund its operations.

213. Further, Credit Suisse's Form 20-F for FY 2020 revealed that, of its overall net revenues of CHF 22.4 billion for 2020, CHF 13.6 billion, or nearly ***61%***, were derived from its Wealth Management-related businesses. As such, it would be highly reckless (at best) if the Individual Defendants did not know the truth about the financial condition—and persistent customer outflows—of that business unit.

214. That the alleged misrepresentations and omissions go to the core of Credit Suisse's

business and viability bolster the inference of scienter attributable to the Individual Defendants.

## III. The Individual Defendants and Other High-Level Credit Suisse Personnel Had Both Motive and Opportunity to Commit Fraud

215. Throughout the Class Period the Individual Defendants were engaged in desperate efforts to save Credit Suisse from self-inflicted wounds, so they were motivated to misleadingly put as positive a face on their efforts as possible at the expense of investors—even right up to the verge of the Company's collapse. On at least three occasions during the Class Period, Credit Suisse refused to accept emergency liquidity assistance, not because it wasn't needed, but because Credit Suisse did "not want to send any negative signals to the market," or "wanted to present the image of a solid bank."

216. After shepherding Credit Suisse through a year of unprecedented failure, the 2022 Compensation Report filed with the 2022 Annual report on March 14, 2023, revealed that total aggregate Executive Board compensation in 2022 totaled approximately ***CHF 32.22 million*** (approximately USD $35.33 million), while Defendant Körner's compensation was approximately ***CHF 2.3 million*** (approximately USD $2.52 million), Defendant Mathers' compensation was approximately ***CHF 4.3 million*** (approximately USD $4.72 million), Defendant Lehmann's compensation was approximately ***CHF 3.2 million*** (approximately USD $3.5 million), Defendant Joshi's compensation was approximately ***CHF 1.2 million*** (approximately USD $1.32 million) (in addition to a CHF 6.97 million one-time signing bonus awarded in 1Q23) and total compensation awarded to the Board of Directors was approximately ***CHF 10.4 million*** (approximately USD $11.4 million). Total compensation awarded to Material Risk Takers and Controllers, who in 2022 totaled 1,577 Credit Suisse employees, amounted to approximately ***CHF 1.514 billion*** (approximately USD $1.653 billion).

217. Credit Suisse's generous compensation structure provided a strong motivation for

the Individual Defendants and for the Company itself (through the actions of the Individual Defendants as well as the Company's many bankers who were consistently rewarded) to ignore red flags and continue the fraud throughout the Class Period.

218. Additionally, the 2022 Annual Report—filed just *days* before the Credit Suisse collapsed—stated that, in February 2023, "the Compensation Committee granted a one-time Transformation Award to approximately 500 employees globally who hold senior leadership positions and other talent identified as being critical to the 'New Credit Suisse' strategy." Subject to a shareholder vote at the 2023 Annual General Meeting, this "Transformation Award" would also be extended to the Executive Board—including Defendants Körner and Joshi. Unlike the awards to management, which would only vest if the share price exceeded CHF 3.82 as of December 31, 2025, the Executive Board Transformation Award (which was worth up to ***CHF 70 million***) was set for 100% vesting in 2025, regardless of the performance of the Company. As such, the Credit Suisse Executive Board and Management had a direct motivation to make Credit Suisse's new strategy, as announced on October 27, 2022, seem as successful as possible.

219. The FINMA Report found that "high variable remuneration in loss-making years" and "inadequate influence of misconduct and risk behaviour on individual remuneration" "encouraged an inappropriate risk culture over the past decade." FINMA Report at 49. Moreover, the FINMA Report revealed that "[n]umerous bank-internal and supervisory audits and bank-internal and FINMA investigations" found "the moral hazards arising from the remuneration system" contributed to the many scandals the Company was involved in leading up to the near-collapse. FINMA Report at 52. Further, in contrast to the "pay-for-performance culture" management publicly touted, "development of variable remuneration at CS primarily followed the developments in the market, with business performance only playing a secondary role." FINMA

Report at 49.

220. An expert report by Professors Harald Hau and Jean-Charles Rochet regarding Credit Suisse's financial situation, commissioned by the PInC, explained, that while performance bonuses can "play a very useful role if they contribute to the distribution of earnings risk between shareholders and employees," at Credit Suisse, "performance bonuses were decoupled from economic profits and therefore effectively a cost factor that jeopardized the survival of the bank." Hau Report at 15. The Hau Report found:

> During the period from 2011 to 2022, the bank substantially and continually ***destroyed a total of <u>CHF 34 billion</u> of shareholder equity while rewarding bank managers with cumulative performance bonuses of <u>CHF 40 billion</u>***. This large-scale redistribution of shareholder assets to the bank managers indicates a failure of the Board of Directors to properly take shareholders' interests into account. A long-term failure of Credit Suisse at the capital market seemed inevitable given such conditions.

Hau Report at 4 (Emphasis added).

221. UBS Chairman Colm Kelleher explained that, after the takeover, UBS had found similarly:

> Many executives were compensated largely in cash. With a relatively small amount of deferred stock. These were completely bogus incentive compensation packages. But frankly, in parts of Credit Suisse's investment bank, there were cowboys who were only thinking about their own interests. We saw that some of the deals they were making made no sense for the bank.[21]

## IV. Corporate Scienter is Established

222. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

223. The scienter of the Individual Defendants and other employees and agents of the

---

[21] Christian Kolbe, "At Credit Suisse, there were cowboys who only thought about their own interests," *Blick*, Oct. 1, 2024.

Company, including individual Credit Suisse bankers who profited handsomely during the Class Period, is similarly imputed to the Company under *respondeat superior* and agency principles.

## **PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY**

224. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the scheme or any of the allegedly materially false and misleading statements pleaded herein. Many of the statements were regarding present or past events or were mixed statements of past/present and future conditions—and thus were not forward-looking. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

225. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

## **THE 2022 ANNUAL REPORT OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN UNDER ITEM 5 OF FORM 20-F**

226. Part I, Item 5(d) of Form 20-F requires registrants to:

> [I]dentify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

227. "The disclosure requirements for Item 5 of Form 20-F (Operating and Financial

Review and Prospects) are substantively comparable to the MD&A requirements under Item 303 of Regulation S-K."[22]

228. In a 1989 Interpretive Release,[23] the SEC describes the purposes of the MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

229. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

230. Accordingly, Credit Suisse had an affirmative obligation to disclose facts in the 2022 Annual Report filed on Forms 20-F required by Item 5 of Form 20-F and Item 303 of Regulation S-K, including information regarding known trends, uncertainties, or events, including, but not limited to, the fact that the Company was experiencing significant and unusual customer

---

[22] SEC Final Rule Release No. 33-10890, *Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information*, Nov. 19, 2020, at 91; *see also Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021).

[23] *Management's Discussion & Analysis of Fin. Condition & Results of Operations*; Certain Inv. Co. Disclosures, Release No. 6835 (May 18, 1989).

and/or asset outflows throughout the Class Period.

## THE PRESUMPTION OF RELIANCE

231. Plaintiff and other members of the Class are entitled to a presumption of reliance on Defendants' material misrepresentations, deceptive devices, and fraudulent scheme pursuant to the fraud-on-the-market doctrine because, among other things, during the Class Period:

232. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(a) The misrepresentations and omissions were material;

(b) Credit Suisse's securities were actively traded in efficient markets and its ADSs were traded on the NYSE;

(c) Credit Suisse's securities were liquid and traded with moderate to high weekly volumes;

(d) As a regulated issuer, Credit Suisse filed periodic public reports with the SEC;

(e) Credit Suisse regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(f) The market reacted promptly to public information disseminated by Credit Suisse;

(g) Credit Suisse was covered by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. These reports were publicly available and entered the public marketplace;

(h) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Credit Suisse securities; and

(i) Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiff and other members of the Class purchased or acquired Credit Suisse securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

233. Alternatively, Plaintiff and the members of the Class are entitled to the presumption

of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

234. Alternatively, Defendants corrupted the market for Credit Suisse securities through a course of conduct that misled the market as to the value of Credit Suisse securities. To the extent that these Defendants disrupted the integrity of the market for Credit Suisse securities, Plaintiff and members of the Class are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153 (1972).

## **CONTROL PERSON ALLEGATIONS**

235. The Individual Defendants, by virtue of their high-level and controlling positions at Credit Suisse, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the actions, individually and in concert, of these individuals.

236. Defendant Lehmann, in his role as Chairman of the Board of Directors, Defendants Gottstein and Körner, in the role as CEO, and Defendants Mathers and Joshi, in the role as CFO, were participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased or otherwise acquired Credit Suisse securities during the Class Period. The scheme/course of conduct deceived the investing public regarding Credit Suisse's business, operations, financial condition, and the intrinsic value of Credit Suisse's securities, and caused Plaintiff and other members of the Class to purchase or otherwise acquire Credit Suisse securities

at artificially inflated prices.

237. The Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, and financial condition, so that the market prices of Credit Suisse's securities would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period. Defendants were also under a continuing duty to update and/or correct any false or misleading statements alleged herein.

238. The Individual Defendants, because of their positions of control and authority, were able to and did control the content of the Company's SEC filings, press releases, and other public statements issued by or on behalf of Credit Suisse during the Class Period. Each would have been provided with copies of at least some of the statements made in the SEC filings other public statements at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements alleged herein.

## **CLASS ACTION ALLEGATIONS**

239. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Credit Suisse securities in domestic transactions during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

240. As this Court has previously found, the members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities

were actively traded and the Company's ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

241. As this Court has previously found, Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

242. As this Court has previously found, Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

243. As this Court has previously found, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in making false statements;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

244. As this Court has previously found, a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

245. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

246. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

247. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

248. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class

Period.

249. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of, such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

250. The Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

251. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements. The market price of the Company's securities declined upon the disclosure of the revelatory facts alleged herein.

252. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class suffered damages when they acquired the Company's securities at artificially inflated prices during the Class Period and were damaged upon the disclosure of the revelatory facts alleged herein, which the artificial inflation in an amount to be established at trial.

253. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities in domestic transactions during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

254. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

255. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of outflows.

256. As officers and/or directors of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

257. Because of the position of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class

Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

258. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Class Counsel;

(b) awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: November 13, 2026

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*

Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Email: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr. (admitted *pro hac vice)*
Matthew P. Woodard (admitted *pro hac vice*)
Jyoti Kehl (admitted *pro hac vice*)
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com
Email: matthew.woodard@ksfcounsel.com
Email: jyoti.kehl@ksfcounsel.com

-and-

J. Ryan Lopatka (admitted *pro hac vice*)
161 N. Clark Street, Suite 1700
Chicago, IL 60601
Telephone: (312) 759-9700
Email: j.lopatka@ksfcounsel.com

*Counsel for Lead Plaintiff Ali Diabat, Lead Counsel for the Class and Class Counsel*